**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| ———————————————— x | : | Chapter 11 |
| In re | : | |
| | : | Case No. 08-12229 (MFW) |
| WASHINGTON MUTUAL, INC., et al., | : | |
| | : | |
| Debtors | : | Jointly Administered |
| ———————————————— x | : | |

Black Horse Capital LP, Black Horse Capital Master Fund Ltd., Black Horse Capital (QP) LP, Greywolf Capital Partners II, Greywolf Overseas Fund, Guggenheim Portfolio Company VII, LLC, HFR RVA Combined Master Trust, IAM Mini-Fund 14 Limited, LMA SPC for and on behalf of the MAP 89 Segregated Portfolio, Lonestar Partners LP, Mariner LDC, Nisswa Convertibles Master Fund Ltd., Nisswa Fixed Income Master Fund Ltd., Nisswa Master Fund Ltd., Paige Opportunity Partners LP, Paige Opportunity Partners Master Fund, Pandora Select Partners, LP, Pines Edge Value Investors Ltd, Riva Ridge Capital Management LP, Riva Ridge Master Fund, Ltd., Scoggin Capital Management II LLC, Scoggin International Fund Ltd., Scoggin Worldwide Fund Ltd., Visium Global Fund, Ltd., VR Global Partners, L.P. Whitebox Asymmetric Partners LP, Whitebox Combined Partners, LP, Whitebox Convertible Arbitrage Partners, LP, Whitebox Hedged High Yield Partners, LP and Whitebox Special Opportunities LP, Series B,

     Plaintiffs

v.

JPMorgan Chase Bank, N.A., JPMorgan Chase & Co., Washington Mutual, Inc., Washington Mutual Preferred Funding, LLC, Washington Mutual Preferred Funding (Cayman) I Ltd., Washington Mutual Preferred Funding Trust I, Washington Mutual Preferred Funding Trust II, Washington Mutual Preferred Funding Trust III, Washington Mutual Preferred Funding Trust IV

     Defendants.

Adversary Proceeding
No._____

## COMPLAINT FOR DECLARATORY AND OTHER RELIEF

Plaintiffs, by and through their counsel, hereby file this Complaint seeking relief based on the following allegations,[1] which as to themselves are made on personal knowledge and otherwise on information and belief:

## I.    INTRODUCTION

1.    This Complaint seeks, inter alia, a declaratory judgment that certain trust preferred securities (the "Trust Preferred Securities") (as well as all rights, claims and entitlements thereto) are, and at all times have been, the property of third-party investors and not property of the chapter 11 estate of Washington Mutual, Inc. ("WMI"). This fact is true notwithstanding certain of the Defendants' protestations that the purported Conditional Exchange (as defined herein) of the Trust Preferred Securities for preferred equity interests in WMI occurred in the hours before WMI tumbled into bankruptcy.

2.    As an initial matter, the purported Conditional Exchange did not occur and/or cannot be given legal effect, and the Trust Preferred Securities never became property of WMI's estate because, inter alia: (a) the terms of the documents governing the Trust Preferred Securities (which were drafted by, or under the direction of, WMI) imposed certain conditions precedent to such an exchange, which conditions were never satisfied; (b) applicable law governing the transfer of securities such as the Trust Preferred Securities mandated certain critical events prior to the effectuation of such an exchange, which events never occurred; and (c) the terms of the Trust Preferred Securities and the underlying, governing documents (all of which were drafted by, or under the direction of, WMI) impose strict limitations on parties to whom the Trust

---

[1]    Plaintiffs reserve all rights to amend this complaint to add, and/or to seek other relief against, officers and directors of Washington Mutual, Inc. and others involved in the fraud and other actions alleged herein.

Preferred Securities may be transferred, which limitations precluded and continue to preclude WMI from taking any interest in the Trust Preferred Securities.

3. Moreover, recently-concluded Senate investigations have revealed that during the period in which the Trust Preferred Securities were used to raise $4 billion, WMI and certain of its affiliates (together, the "Washington Mutual Entities") were engaged and/or involved in rampant fraud, misrepresentation and/or reckless business practices. First, certain of the Washington Mutual Entities fraudulently misrepresented the safety and soundness of the banking operations of Washington Mutual Bank, N.A. ("WMB" and, together with WMI, "Washington Mutual"), greatly understating the mounting risks in WMB's loan portfolio and greatly overstating the risk control protocols in place. Next, WMI colluded with its primary regulator, the OTS (as defined herein), to conceal a secret agreement to transfer the Trust Preferred Securities out of WMI upon the occurrence of a purported Conditional Exchange. Through the intentional non-disclosure of this material fact, certain of the Washington Mutual Entities falsely represented that, upon a Conditional Exchange, those investors would retain an indirect entitlement to the value of the Trust Preferred Securities through their preferred equity interests in WMI. Moreover, the OTS was well aware of undisclosed problems with Washington Mutual's safety and soundness, which could give rise to conditions potentially triggering a purported Conditional Exchange. In light of the OTS's complicity in concealing these material facts from investors in the Trust Preferred Securities, the OTS exceeded the scope of its regulatory authority and any resulting directive from the OTS to initiate a purported Conditional Exchange should be deemed void and of no force or effect.

4. By its words and actions, WMI concedes the purported Conditional Exchange never occurred, and that, therefore, the Trust Preferred Securities never became part of WMI's

estate. But, as part of its proposed chapter 11 plan, WMI asks this Court, a court of equity, to exercise its powers to deliver the Trust Preferred Securities to JPMorgan Chase ("JPMC") (a party well aware of the fraud and misrepresentations permeating the issuance of the Trust Preferred Securities and WMI's operations). In that regard, WMI seeks an Order from this Court compelling specific performance by various parties, causing them, inter alia, to engage in numerous transactions that could not be accomplished absent this Court's Order, to ignore numerous conditions precedent to such transactions, and to ignore applicable transfer restrictions. WMI also asks this Court to ignore the significant wrongdoing effected by WMI and certain of the other Washington Mutual Entities in the structuring and sale of the Trust Preferred Securities. But, those who seek equity must do equity, and WMI's prior fraudulent behavior now precludes it from invoking this Court's equitable jurisdiction for its own ends.

5.     Moreover, JPMC, through its significant access to the books and records of the Washington Mutual Entities, was well aware of the fraud permeating the issuance of the Trust Preferred Securities and WMI's secret agreement with the OTS to divert the value of the Trust Preferred Securities upon the occurrence of a purported Conditional Exchange. Given its knowledge of those frauds, JPMC should not, in any case, be viewed as a bona fide good faith purchaser of the Trust Preferred Securities or the value thereof and JPMC's claimed right to an interest in the Trust Preferred Securities, if any, should be subject to the fraud and other claims of investors in the Trust Preferred Securities.

6.     Even if arguendo, the purported Conditional Exchange had occurred, and WMI did obtain bare legal title to the Trust Preferred Securities (which it did not), the issuance of the securities, and their subsequent sale or transfer, is so tainted with fraud and misrepresentation (of which JPMC was well aware at the time of the purported Conditional Exchange), that this Court

– a Court of equity – should fashion an appropriate equitable remedy to prevent WMI and/or JPMC from obtaining the benefit of ill-gotten gains at the expense of the Plaintiffs.

7.     Finally, by this action, Plaintiffs seek recovery from certain of the Washington Mutual Entities based on their involvement in the above-described fraud and misrepresentations.

## II.     PARTIES

### A.     Plaintiffs

8.     Black Horse Capital, LP is an investment management firm with its principal place of business at 338 S. Sharon Amity Rd., #202, Charlotte, NC 28211.

9.     Black Horse Capital Master Fund Ltd. is an investment fund with its principal place of business at c/o M&C Corporate Services Limited, P.O. Box 309GT, Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands.

10.     Black Horse Capital (QP) LP is an investment fund with its principal place of business at 338 S. Sharon Amity Rd., #202, Charlotte, NC 28211.

11.     Greywolf Capital Partners II is an investment management firm with its principal place of business at 4 Manhattanville Road, Suite 201, Purchase, NY 10577.

12.     Greywolf Overseas Fund is a Cayman Islands exempted company, with registered offices 89 Nexus Way, c/o Ogier Fiduciary Services (Cayman) Limited, Camana Bay, Grand Cayman, Cayman Islands KY1-9007. Its investment manager, Greywolf Capital Management LP, is located at 4 Manhattanville Road, Suite 201, Purchase, NY 10577.

13.     Guggenheim Portfolio Company VII, LLC is an investment fund with its principal place of business at 660 Madison Avenue, 20th floor, New York, NY 10021.

14.     HFR RVA Combined Master Trust is an investment trust with its principal place of business at 3033 Excelsior Boulevard, Suite 300, Minneapolis, MN 55416.

15. IAM Mini-Fund 14 Limited is an investment fund with its principal place of business at 3033 Excelsior Boulevard, Suite 300, Minneapolis, MN 55416.

16. LMA SPC for and on behalf of the MAP 89 Segregated Portfolio is an investment fund with its principal place of business at the offices of Pine River Capital Management L.P., 601 Carlson Parkway, Suite 330, Minnetonka, MN 55305.

17. Lonestar Partners LP is an investment management firm with its principal place of business at One Maritime Plaza, Suite 1125, San Francisco, CA 94111.

18. Mariner LDC is an investment fund with its principal place of business at the offices of Riva Ridge Capital Management LP, 55 5th Avenue, 18th floor, New York, NY 10003.

19. Nisswa Convertibles Master Fund Ltd. is an investment fund with its principal place of business at the offices of Pine River Capital Management L.P., 601 Carlson Parkway, Suite 330, Minnetonka, MN 55305.

20. Nisswa Fixed Income Master Fund Ltd. is an investment fund with its principal place of business at the offices of Pine River Capital Management L.P., 601 Carlson Parkway, Suite 330, Minnetonka, MN 55305.

21. Nisswa Master Fund Ltd., is an investment fund with its principal place of business at the offices of Pine River Capital Management L.P., 601 Carlson Parkway, Suite 330, Minnetonka, MN 55305.

22. Paige Opportunity Partners LP is an investment management firm with its principal place of business at 630 3rd Avenue, 6th floor, New York, NY 10017.

23. Paige Opportunity Partners Master Fund is an investment fund with its principal place of business at 630 3rd Avenue, 6th floor, New York, NY 10017.

24. Pandora Select Partners, LP is an investment management firm with its principal place of business at 3033 Excelsior Boulevard, Suite 300, Minneapolis, MN 55416.

25. Pines Edge Value Investors Ltd. is an investment management firm with its principal place of business at the offices of Pine River Capital Management L.P., 601 Carlson Parkway, Suite 330, Minnetonka, MN 55305.

26. Riva Ridge Capital Management LP is an investment management firm with its principal place of business at 55 5th Avenue, 18th floor, New York, NY 10003.

27. Riva Ridge Master Fund, Ltd. is an investment fund with its principal place of business at the offices of Riva Ridge Capital Management LP, 55 5th Avenue, 18th floor, New York, NY 10003.

28. Scoggin Capital Management II LLC is an investment management firm with its principal place of business at 660 Madison Avenue, 20th floor, New York, NY 10021.

29. Scoggin International Fund Ltd. is an investment fund with its principal place of business at 660 Madison Avenue, 20th floor, New York, NY 10021.

30. Scoggin Worldwide Fund Ltd. is an investment fund with its principal place of business at 660 Madison Avenue, 20th floor, New York, NY 10021.

31. Visium Global Master Fund, Ltd. is an investment fund with its principal place of business at 950 Third Avenue, 29th floor, New York, NY 10022.

32. VR Global Partners, L.P., is an investment management firm with its principal place of business at the offices of Admiral Administration Ltd., Admiral Financial Center, 5th floor, 90 Fort Street, P.O. Box 32021 SMB, George Town, Grand Cayman, KY1-1208, Cayman Islands.

33.     Whitebox Asymmetric Partners LP, is an investment fund with its principal place of business at 3033 Excelsior Boulevard, Suite 300, Minneapolis, MN 55416.

34.     Whitebox Combined Partners, LP is an investment fund with its principal place of business at 3033 Excelsior Boulevard, Suite 300, Minneapolis, MN 55416.

35.     Whitebox Convertible Arbitrage Partners, LP is an investment fund with its principal place of business at 3033 Excelsior Boulevard, Suite 300, Minneapolis, MN 55416.

36.     Whitebox Hedged High Yield Partners, LP is an investment fund with its principal place of business at 3033 Excelsior Boulevard, Suite 300, Minneapolis, MN 55416.

37.     Whitebox Special Opportunities Fund LP, Series B is an investment fund with its principal place of business at 3033 Excelsior Boulevard, Suite 300, Minneapolis, MN 55416.

38.     In the aggregate, Plaintiffs hold approximately $1 billion (in terms of liquidation preference) of the Trust Preferred Securities.

39.     Together, the above-listed parties will be referred to as the "Plaintiffs" or the "Trust Preferred Holders."

**B.      Defendants**

40.     JPMorgan Chase Bank, N.A. ("JPMorgan" or "JPMC") is a national banking association organized under the laws of the United States, with its principal place of business in Columbus, Ohio.  JPMC is a wholly-owned subsidiary of JPMorgan Chase & Co., a Delaware corporation.   JPMC purportedly acquired substantially all of the assets of WMB out of receivership on September 25, 2008.

41.     JPMorgan Chase & Co. is a Delaware Corporation with a principal place of business at 270 Park Ave., New York, NY 10017.  JPMorgan Chase & Co.'s registered agent is the Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

42.     Washington Mutual, Inc. is a holding company incorporated in the state of Washington with its principal place of business at 1301 Second Ave., Seattle, WA 98101. Prior to the seizure of Washington Mutual Bank, WMI was the savings and loan holding company that owned WMB and indirectly owned WMB's subsidiaries.

43.     Washington Mutual Preferred Funding, LLC ("WMPF") is a Delaware limited liability company with a principal place of business at 1301 Second Ave., Seattle, WA 98101. WMPF's registered agent is the Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801. WMPF was formed for the purpose of issuing securities to raise capital for WMB. In 2006 and 2007, WMPF issued approximately $4 billion worth of preferred securities to various issuer trusts, which were established as special purpose entities for the sole purpose of issuing the $4 billion worth of Trust Preferred Securities to investors. WMPF, a limited liability company, is managed by a three-person board of managers. Until the seizure of WMB and sale of WMB's assets, two of the three managers and all of the officers of WMPF were officers of WMI or its affiliates.[2] At all times prior to the seizure of WMB and sale of WMB's assets, WMPF was pervasively controlled by WMI.[3]

44.     Washington Mutual Preferred Funding (Cayman) I Ltd. is a special purpose entity ("SPE") formed under Cayman Island law for the purpose of issuing certain Trust Preferred Securities to investors as a way to raise capital for WMB, as described in an offering circular dated February 24, 2006 ("WaMu Cayman").

45.     Washington Mutual Preferred Funding Trust I is an SPE formed under Delaware law for the purpose of issuing certain Trust Preferred Securities to investors as a way to raise

---

[2]     See WaMu Delaware IV Offering Memorandum, pp. 25 & 49.

[3]     See WaMu Delaware IV Offering Memorandum, p. 25.

capital for WMB, as described in an offering circular dated February 24, 2006 ("WaMu Delaware I").

46.     Washington Mutual Preferred Funding Trust II is an SPE formed under Delaware law for the purpose of issuing certain Trust Preferred Securities to investors as a way to raise capital for WMB, as described in an offering circular dated December 6, 2006 ("WaMu Delaware II").

47.     Washington Mutual Preferred Funding Trust III is an SPE formed under Delaware law for the purpose of issuing certain Trust Preferred Securities to investors as a way to raise capital for WMB, as described in an offering circular dated May 21, 2007 ("WaMu Delaware III").

48.     Washington Mutual Preferred Funding Trust IV is an SPE formed under Delaware law for the purpose of issuing certain Trust Preferred Securities to investors as a way to raise capital for WMB, as described in an offering circular dated October 18, 2007 ("WaMu Delaware IV").

### III.     JURISDICTION AND VENUE

49.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and FRBP 7001, and 28 U.S.C. §§ 2201 and 2202.

50.     Venue in this Court is proper pursuant to 28 U.S.C. § 1409.

### IV.     STATEMENT OF FACTS

**A.     The Trust Preferred Securities.**

51.     The gravamen of this action is to establish, _inter alia_, Plaintiffs' current ownership of certain of the Trust Preferred Securities.

1.     **Overview Of Trust Preferred Securities.**

52.     On February 3, 2006, WMI and WMB established WMPF to raise capital for WMB through the issuance of the Trust Preferred Securities. Until the seizure of WMB and sale of WMB's assets, two of the three managers and all of the officers of WMPF were officers of WMI or its affiliates.[4] At all times prior to the seizure of WMB and sale of WMB's assets, WMPF was pervasively controlled by WMI.[5] WMI controlled and dictated the terms on which the Trust Preferred Securities were formulated and offered to investors.

53.     The Trust Preferred Securities were issued between March 2006 and October 2007 in a series of five similarly-structured, but separate, issuances under SEC Rule 144A and/or Regulation S. Specifically, the Trust Preferred Securities include those certain:

   a.     Washington Mutual Preferred Funding (Cayman) I Ltd. 7.25% Perpetual Non-Cumulative Preferred Securities, Series A-1 and Series A-2, as described in an offering circular dated February 24, 2006 (the "WaMu Cayman TPS");

   b.     Washington Mutual Preferred Funding Trust I Fixed-to-Floating Rate Perpetual Non-Cumulative Trust Securities, as described in an offering circular dated February 24, 2006 (the "WaMu Delaware I TPS");

   c.     Washington Mutual Preferred Funding Trust II Fixed-to-Floating Rate Perpetual Non-Cumulative Trust Securities, as described in an offering circular dated December 6, 2006 (the "WaMu Delaware II TPS");

   d.     Washington Mutual Preferred Funding Trust III Fixed-to-Floating Rate Perpetual Non-Cumulative Trust Securities, as described in an offering circular dated May 21, 2007 (the "WaMu Delaware III TPS"); and

   e.     Washington Mutual Preferred Funding Trust IV Fixed-to-Floating Rate Perpetual Non-Cumulative Trust Securities, as described in an offering circular dated October 18, 2007 (the "WaMu Delaware IV TPS").

---

[4]     See, e.g., WaMu Delaware III Offering Memorandum, pp. 23 & 45.

[5]     See WaMu Delaware III Offering Memorandum, p. 23.

54. Plaintiffs are purchasers of the Trust Preferred Securities, certain of which securities were purchased prior to the seizure of WMB and sale of WMB's assets in September 2008 and certain of which were purchased thereafter. In the aggregate, Plaintiffs' holdings in the various issuances of Trust Preferred Securities are as follows:

| Trust Preferred Security | Aggregate Holdings |
|---|---|
| WaMu Cayman TPS | $71,255,000.00 |
| WaMu Delaware I TPS | $403,090,000.00 |
| WaMu Delaware II TPS | $90,974,000.00 |
| WaMu Delaware III TPS | $171,400,000.00 |
| WaMu Delaware IV TPS | $273,757,000.00 |

55. In simplified terms, the issuances of the Trust Preferred Securities were structured as follows:

a. In a series of transactions occurring between March 2006 and October 2007, WMB (directly and/or through its wholly-owned subsidiary, University Street) contributed certain collateralized home equity and/or mortgage loans to WMPF (the "Loan Assets"). The total initial aggregate face amount of the Loan Assets contributed to WMPF in connection with the five Trust Preferred Securities offerings was approximately $13.5 billion.

b. Thereafter, WMPF contributed the Loan Assets to a series of newly-formed asset trusts (each, an "Asset Trust"[6]), in exchange for preferred and residual beneficial interests in such Asset Trusts (respectively, the "Preferred Trust Interests" and the "Residual Trust Interests"). WMPF was dependent on the officers and employees of WMB to service the Loan Assets.

c. In connection with the foregoing transactions, University Street, Inc. (an indirect subsidiary of WMB) received 100% of the common equity of WMPF. WMB received preferred equity interests in WMPF tied to each of the separate Preferred Trust Interests, with a total liquidation preference of $4 billion (the "WMPF Preferred Interests").

---

[6] The Asset Trusts are: (a) Washington Mutual Home Equity Trust I (a Delaware statutory trust); (b) WaMu 2006-OA1 (a Delaware statutory trust); and (c) WaMu 2007 Flex1 (a Delaware statutory trust).

d. WMPF thereafter established a series of grantor trusts (these grantor trusts; WaMu Cayman, WaMu Delaware I, WaMu Delaware II, WaMu Delaware III and WaMu Delaware IV, collectively are referred to herein as the "SPEs").

e. These SPEs then purchased from WMB the WMPF Preferred Interests, with $4 billion raised and/or arranged by certain investment banks.[7] The SPEs then issued the Trust Preferred Securities to those investment banks, which then resold the Trust Preferred Securities to third-party investors. Eventually, Plaintiffs purchased certain of the Trust Preferred Securities.

f. Thereafter, as the Loan Assets in the Asset Trusts produced to WMPF income from amortization, interest, refinancing transactions, and/or foreclosures, WMPF was to have issued quarterly dividends at specified rates to the holders of the WMPF Preferred Interests (i.e., the SPEs). The SPE's were then to have passed those dividends along to the holders of the Trust Preferred Securities. Unless holders of the Trust Preferred Securities received their stated dividends in a particular quarter, WMPF was prohibited from paying dividends to University Street, Inc., holder of the common interests in WMPF, for that quarter.

g. At all times prior to the seizure of WMB and sale of WMB's assets in September 2008, WMB, WMPF and the SPEs were under the pervasive control of WMI, and WMI was aware of actions taken by WMPF and the SPEs with respect to the Trust Preferred Securities.

56. The corporate structure resulting from the foregoing was depicted in the offering memoranda substantially as follows:

---

[7]     Third party underwriters involved in the structuring and issuance of the various Trust Preferred Securities offerings included:

a. WaMu Cayman: Goldman Sachs & Co.; Citigroup; Credit Suisse; HSBC; Morgan Stanley; and UBS Investment Bank.

b. WaMu Delaware I: Goldman Sachs & Co.; Credit Suisse; Morgan Stanley.

c. WaMu Delaware II: Credit Suisse; Goldman Sachs & Co.; Lehman Brothers, Inc.; Morgan Stanley, Keefe, Bruyette & Woods; UBS Investment Bank.

d. WaMu Delaware III: Goldman Sachs & Co.; Lehman Brothers, Inc.; UBS Investment Bank; Credit Suisse; Morgan Stanley; Keefe, Bruyette & Woods; JP Morgan Securities, Inc.; Wachovia Securities.

e. WaMu Delaware IV: Goldman Sachs & Co.; Credit Suisse; Lehman Brothers, Inc.; Morgan Stanley.



See, e.g., WaMu Delaware I Offering Memorandum, p. 3.

57. Each of the Trust Preferred Securities is pari passu with the other Trust Preferred Securities. And, each was perpetual in nature, and provided for non-cumulative dividends accruing at specified annual rates; payable quarterly to the extent declared by WMPF's board of

managers.[8]   If the stated dividends were paid in full in a particular quarter, WMPF was also

authorized to pay dividends to University Street (due to the latter's common equity interest in

WMPF) so long as certain financial ratios were met.[9]  Each Trust Preferred Security carries with

it a stated liquidation preference ($4 billion in total across all five Trust Preferred Securities

issuances), which is required to be paid to redeem or cancel the securities.

58.   The Trust Preferred Securities were evidenced by a Rule 144A global certificate

or a Regulation S global certificate (as appropriate).[10]   Upon issuance, the global certificates

were deposited with a registrar as custodian for The Depository Trust Company (the "DTC").[11]

DTC is a limited purpose trust company created to hold securities for its participating

organizations.[12]  The Trust Preferred Securities were registered in the name of Cede & Company,

DTC's nominee.[13]

59.   The offering memorandum for each of the Trust Preferred Securities issuances

incorporated by reference the then-current SEC filings of WMI and WMB, as well as certain

information filed by WMB with its primary regulator, the Office of Thrift Supervision ("OTS")[14]

---

[8]   See, e.g., WaMu Delaware III Offering Memorandum, p. 7, 10.

[9]   See id. at pp. 7 & 13.

[10]   See, e.g., WaMu Cayman Offering Memorandum, p. 96-97.

[11]   See id. at 97.

[12]   See, e.g., WaMu Delaware III Offering Memorandum, p. 102.

[13]   See Debtors' Answer and Counterclaims, JPMorgan Chase Bank, N.A. v. Washington Mutual, Inc., et al., Adv. Proceeding No. 09-50551 ("Debtors' Counterclaims"), p. 100.

[14]   The OTS is an office of the Department of the Treasury, established by the Home Owners' Loan Act ("HOLA"), 12 U.S.C. § 1461, et seq., for the purpose of supervising and regulating federal savings associations.  HOLA directs the OTS to "provide for the organization, incorporation, examination, operation and regulation of . . . Federal savings associations . . . ." 12 U.S.C. § 1464(a).  OTS's stated mission is "[t]o supervise savings associations and their holding companies in order to maintain their safety and soundness

(as is discussed infra).[15]  Investors were advised that the incorporated information provided, among other things, "important information concerning WMB's financial condition and operating results."[16]

### 2. The "Conditional Exchange" Feature And Undisclosed Side Agreement With The OTS.

60.     Each series of the Trust Preferred Securities included a purported "Conditional Exchange" feature, whereby, upon the occurrence of certain events, the Trust Preferred Securities might be exchanged for preferred equity of WMI.  Specifically, the following were set forth as events potentially precipitating a purported Conditional Exchange (each, an "Exchange Event"):

   a.  WMB becoming "undercapitalized" under the OTS's "prompt corrective action" regulations;

   b.  WMB being placed into conservatorship or receivership; and

   c.  The OTS, in its sole discretion, anticipating WMB becoming "undercapitalized" in the near term or the OTS taking a supervisory action that limited the payment of dividends by WMB.[17]

Following the occurrence of one or more of the foregoing Exchange Events, the OTS could issue a notice initiating the series of transactions, which, subject to the satisfaction of other conditions (which, as discussed below, were never satisfied), would constitute the purported Conditional

---

and compliance with consumer laws, and to encourage a competitive industry that meets America's financial services needs."  As Washington Mutual's primary federal regulator, the OTS was responsible for full scope examinations to assess the safety and soundness of the bank's operations and compliance with consumer protection laws.

[15]     See, e.g., WaMu Delaware III Offering Memorandum, p. xi.

[16]     See id. at p. xii.

[17]     See, e.g., WaMu Delaware III Offering Memorandum, p. 73.

Exchange.[18] But, "[a]bsent an OTS directive after the occurrence of an Exchange Event, no exchange of the Trust [Preferred] Securities" would occur.[19] If the OTS issued such directive, the purported Conditional Exchange, would be effective as of 8:00 a.m. (Eastern) on the day set forth in the OTS directive or, if no date was set forth, as of 8:00 a.m. (Eastern) on the earliest possible date following WMI's issuance of a press release disclosing the OTS's directive.[20] Following completion of the purported Conditional Exchange, holders of Trust Preferred Securities were to have received a like amount of preferred equity in WMI, having substantially equivalent terms as the applicable exchanged Trust Preferred Security as to dividends, redemption and liquidation preferences.[21]

61. In connection with each issuance of the Trust Preferred Securities, WMPF represented that: "After the occurrence of the Conditional Exchange, the Trust [Preferred] Securities would be owned by WMI."[22] Each of the offering circulars also depicted WMI's retention of the Trust Preferred Securities visually, as each of the presented organizational charts showed the Trust Preferred Securities being transferred to WMI – but failed to disclose any prospective further transfer of the Trust Preferred Securities to WMB or any other entity.[23]

---

[18] See id.

[19] See id. at 74.

[20] See id. at 74.

[21] See, e.g., WaMu Delaware III Offering Memorandum, p. 12.

[22] See, e.g., WaMu Delaware I Offering Circular dated February 24, 2006, p. 64; WaMu Delaware III Offering Memorandum, p. 74; WaMu Delaware IV Offering Memorandum, p. 92.

[23] See, e.g., WaMu Delaware I Offering Circular dated February 24, 2006, p. 3; WaMu Delaware III Offering Memorandum, p. 3; WaMu Delaware IV Offering Memorandum, p. 5.

62.     Moreover, each offering circular included risk factors related to the potential occurrence of a Conditional Exchange. But none disclosed that the Trust Preferred Securities would or even might be transferred by WMI to WMB. In fact, certain of the relevant risk factors implicitly represented that following a purported Conditional Exchange, the Trust Preferred Securities would remain the property of WMI.

63.     For example, one of the relevant risk factors states:

> An Exchange Event triggering a Conditional Exchange will occur if WMB is placed into conservatorship or receivership. WMB's conservatorship or receivership could lead to WMI becoming subject to a voluntary or involuntary proceeding under the U.S. Bankruptcy Code. In the event of WMI's bankruptcy, the claims of WMI's secured, senior, general and subordinated creditors would be entitled to a priority of payment over the claims of holders of equity interests such as the Series M WMI Preferred Stock [one of the series of WMI preferred equity potentially exchangeable for the corresponding Trust Preferred Securities]. As a result of such subordination, if WMI became subject to a bankruptcy proceeding after a Conditional Exchange the holders of the Depositary Shares would likely receive, if anything, substantially less than they would have received had the Conditional Exchange not occurred.[24]

Such risk factor contains no reference to any contemplated, or even potential, downstreaming of the Trust Preferred Securities to WMB. Rather, it implies only that, with respect to the value of the Trust Preferred Securities, the holders of the new WMI preferred equity would be subordinate to "WMI's secured, senior, general and subordinated creditors," and not that there was any risk investors would also be subordinate to WMB's creditors with respect to the value of the Trust Preferred Securities (as a result of the transfer of the Trust Preferred Securities to WMB).

64.     Contrary to the express and implied representations to investors that the Trust Preferred Securities (and the value thereof) would be owned by WMI following the occurrence

---

[24]     WaMu Delaware III Offering Memorandum, p. 28.

of a purported Conditional Exchange, WMI secretly intended to "downstream" the Trust Preferred Securities to WMB following an exchange. This secret intention was reflected in a series of side-letters between WMI and the OTS (each, a "Side Letter"), sent in advance of each issuance through John Robinson, the Executive Vice President of WMI's Corporate Risk Management division.

65.     With regard to the potential transfer of the Trust Preferred Securities from WMI to WMB, each of the Side Letters provided substantially as follows:

> As you are aware, in the notice WMB requested the OTS confirm the sale of the [Trust Preferred Securities] . . . to outside investors constitutes the sale of [WMPF Preferred] . . . to outside investors and that the [WMPF Preferred] qualify for inclusion in core capital of WMB. In connection with that request, WMI hereby undertakes that if, as a result of [an Exchange Event] . . . , WMI exchanges its Holding Company Shares . . . for [Trust Preferred Securities], or if WMI subsequent to such exchange acquires the [WMPF Preferred], WMI will contribute to WMB the [Trust Preferred Securities] or, as appropriate, the [WMPF Preferred].[25]

Each of the Side Letters contained the legend "CONFIDENTIAL TREATMENT REQUESTED." Based on WMI's request in each Side Letter that the undisclosed intent to transfer the Trust Preferred Securities to WMB be afforded "confidential treatment" and the disclosure that the Trust Preferred Securities would be sold to "outside investors," the OTS knew or should have known of WMI's intent to conceal this material undertaking from investors in the Trust Preferred Securities.

66.     These secret Side Letters, which contradicted the offering memoranda, were not, in fact, disclosed to the initial investors, secondary purchasers, or the marketplace until after WMI's attempt to effect the purported Conditional Exchange and transfer the Trust Preferred Securities to WMB. Rather, certain of the Washington Mutual Entities intended for investors to

---

[25]     See February 23, 2006 letter from John F. Robinson (WMI) to Darrel Dochow (OTS).

believe that upon a purported Conditional Exchange, through holdings in WMI preferred equity, the exchanged investors would retain an interest in the value of the Trust Preferred Securities (subject only to the claims of structurally senior creditors of WMI and, potentially, the pari passu claims of other WMI preferred equity holders).

67.     If the Trust Preferred Securities were to remain at the WMI level, their value would make a material difference to investors who had been exchanged into WMI preferred equity holdings. Specifically, so long as the Trust Preferred Securities remained at WMI and there were only $8.3 billion in creditor claims at the WMI level,[26] the exchanged investors would be entitled to a share of the value of the Trust Preferred Securities as long as WMI's assets (including the value of the Trust Preferred Securities) exceeded creditor claims at the WMI level. If, for example, the Trust Preferred Securities were transferred, instead, to WMB, the exchanged investors (then having a claim to the value of the Trust Preferred Securities only through WMI's equity interest in WMB) would be behind not only creditor claims at the WMI level, but might also be subject to satisfaction of significant creditor claims at the WMB level before they could realize upon the value of the Trust Preferred Securities.[27]

68.     An illustration of the impact of the hidden intent to downstream the Trust Preferred Securities in this case is readily available. In WMI's chapter 11 case, there are at least three significant pools of value at stake: (a) $4 billion in deposit accounts; (b) $5.8 billion in tax refunds; and (c) the $4 billion in liquidation preference associated with the Trust Preferred Securities. Were WMI to retain the $4 billion in deposit accounts (and, Plaintiffs believe

---

[26]     See Fourth Amended Disclosure Statement, § IV.D.10; Monthly Operating Report for Washington Mutual, Inc., et al. for the Period October 1, 2008 through October 31, 2008. [Docket No. 369].

[27]     Plaintiffs reserve all rights to challenge, in the chapter 11 case, amounts claimed by creditors of WMI and WMB to be owed them by WMI.

JPMC's asserted claims to this value are without merit) and even just half of its tax refunds (i.e., $2.9 billion), the $4 billion in value associated with the Trust Preferred Securities remain at the WMI level (rather than contributed to the empty WMB shell) would result in a solvent WMI estate and a significant recovery to exchanged WMI preferred holders (assuming $8.3 billion in creditor claims at the WMI level).

69.     As such, the practical result of the purported Conditional Exchange on the ownership rights of the Trust Preferred Securities holders, if given effect as contemplated in the secret Side Letters, would directly contravene the impact represented in the various offering memoranda for the Trust Preferred Securities. Indeed, if the purported Conditional Exchange and attempted transfer of the Trust Preferred Securities from WMI to WMB were to be given effect as proposed by WMI, WMB (and/or any successor thereto) would have reaped not only the benefit of the $4 billion from the sale of the Trust Preferred Securities but also the very securities issued to third parties in exchange for that price.

70.     The existence of these secret Side Letters was not disclosed to investors or the marketplace until after the seizure of WMB and sale of WMB's assets and WMI's Chapter 11 filing in September 2008. Indeed, WMI actively sought to hide its secret intention to transfer the Trust Preferred Securities to WMB by seeking "confidential treatment" for the Side Letters such that investors could not learn of WMI's false representations even through a Freedom of Information Act request directed to the OTS, the recipient of the secret Side Letters. Certain of the Washington Mutual Entities also participated in the concealment of the Side Letters and WMI's intentions with respect to the Trust Preferred Securities.

### 3. The Purported Conditional Exchange Failed And Cannot Now Be Consummated.

71. On September 25, 2008, WMB was seized and the Federal Deposit Insurance Corporation (the "FDIC") was appointed as receiver.[28] The FDIC immediately executed upon what now appears to have been a preexisting plan to sell WMB's assets to JPMC for $1.88 billion pursuant to a purchase and assumption agreement. In that transaction, JPMC purported to purchase certain assets of WMB and expressly excluded all assets and liabilities of WMI. JPMC also expressly excluded from its purchase of WMB's assets "any interest, right, action, claim, or judgment against" WMI.

72. Following the FDIC's actions, the OTS directed that the purported Conditional Exchange be effected.[29] WMI subsequently confirmed that it would follow the OTS's directive, and that the purported Conditional Exchange would occur the following morning (September 26, 2008) at 8:00 a.m. (Eastern).

73. Later, on the evening of September 25, after the assets of WMB had been sold to JPMC, and after the purported Conditional Exchange had been announced, but before it could have been effected, an employee of WMI purportedly agreed to assign the Trust Preferred

---

[28] The FDIC is an independent agency charged with administering the Federal Deposit Insurance Act, 12 U.S.C. § 1811, et seq., and the federal bank deposit insurance system. The stated purpose of the FDIC is to maintain stability and public confidence in the nation's financial system by: (a) insuring deposits; (b) examining and supervising financial institutions for safety and soundness and consumer protection; and (c) managing receiverships. The FDIC has backup supervisory authority over federally insured depository institutions that are primarily regulated by the OTS, Office of the Comptroller of the Currency or Federal Reserve. The FDIC insured WMB's deposits, and therefore, acted as the backup regulator for Washington Mutual. Additionally, the FDIC was appointed as receiver for WMB on September 25, 2008. Immediately after its appointment as receiver, the FDIC sold substantially all of the assets of WMB to JPMorgan.

[29] See September 25, 2008 Letter from Darrel Dochow (OTS) to Steve Frank (WMI).

Securities to WMB for no consideration. But, it was not until after approximately 7:45 a.m. (Eastern) on September 26, 2008 that WMI issued a press release regarding the purported Conditional Exchange claimed to occur only minutes later at 8:00 a.m. (which press release made no mention of any downstream contribution of the Trust Preferred Securities to WMB).

### a. WMI Admits The Conditional Exchange Was Not Consummated.

74. By its own words and actions, WMI admits the purported Conditional Exchange was not consummated. Specifically, in each of WMI's Monthly Operating Reports, filed in its chapter 11 case, WMI describes the purported Conditional Exchange's status substantially as follows:

> WMI and its advisors currently are assessing a number of legal, accounting and tax issues related to the [Trust Preferred Securities] and the transactions related to the Conditional Exchange. Because of these unresolved issues, WMI has not reflected the Conditional Exchange and/or its attendant transactions on its financial statements, including any possible interest (direct or indirect, contingent or otherwise) in the [Trust Preferred Securities] and the assets, as the case may be, of Washington Mutual Preferred Funding, LLC.[30]

75. In or about March 2010, WMI announced its intention to pursue confirmation of a plan of reorganization in its chapter 11 case and the approval of an accompanying settlement agreement whereby the Trust Preferred Securities, and other assets, would be delivered to JPMC. In each Monthly Operating Report following the announcement of that proposed settlement, WMI further described the current status of the purported Conditional Exchange transaction substantially as follows:

---

[30]     See, e.g., Monthly Operating Report for Washington Mutual, Inc., et al. for the Period January 1, 2010 through January 31, 2010, Note 1 (emphasis added). [Docket No. 2425].

Pursuant to the terms of the proposed Settlement Agreement, upon consummation of the Plan, WMI and relevant third parties *will complete* the Conditional Exchange.[31]

76. The settlement agreement (the "Proposed Global Settlement"), whereby the Trust Preferred Securities would be delivered to JPMC, itself recognizes that neither the purported Conditional Exchange nor the alleged transfer of the Trust Preferred Securities from WMI to WMB was consummated. Specifically, the proposed settlement agreement provides for:

> . . . (f) any and all persons and entities shall be authorized and directed to take necessary, proper or advisable actions and all other actions reasonably requested or directed by JPMC to record, reflect, transfer, vest, assign, convey, and maintain, as necessary, that a transfer of the Trust Preferred Securities was made to WMI (and subsequently by WMB to JPMC) and that JPMC is the sole legal, equitable, and beneficial owner of the Trust Preferred Securities as transferee of WMI, including, without limitation, by: (i) causing the applicable trustees, registrars, paying agents, depository, and transfer agents to amend their records (including the securities registers of each Issuing Trust) to reflect a transfer of the Trust Preferred Securities to WMI and then to WMB, and to reflect JPMC as the sole legal, equitable, and beneficial owner of the Trust Preferred Securities; (ii) causing the trustees and boards of directors of the Issuing Trusts to take all necessary, proper and advisable action to reflect JPMC as the sole legal, equitable, and beneficial owner of the Trust Preferred Securities; and (iii) amending any agreements, articles, or declarations to reflect JPMC as the sole legal, equitable, and beneficial owner of the Trust Preferred Securities . . . .[32]

**b.      The Failure To Properly Execute The Conditional Exchange Renders The Claimed Transfer Null, Void And Without Effect.**

77. Assuming, <u>arguendo</u>, the validity of the Conditional Exchange provisions, upon the declaration of a purported Conditional Exchange, applicable law and the applicable documents required certain steps to be taken before the Trust Preferred Securities could be

---

[31]      <u>See</u>, <u>e.g.</u>, Monthly Operating Report for Washington Mutual, Inc., <u>et al</u>. for the Period April 1, 2010 through April 30, 2010, Note 2. [Docket No. 4428].

[32]      <u>See</u> Proposed Global Settlement Agreement, § 2.3(f).

transferred from third party investors to WMI. The offering memoranda for the Trust Preferred Securities, at varying points, make reference to the purported Conditional Exchange being "automatic" or "deemed" to have occurred. As discussed herein, such descriptions are unenforceable as a matter of contract and law, and in any event, are not controlling because, inter alia, they are at odds with the operative documents drafted by or under the direction of WMI, to which holders of the Trust Preferred Securities are parties, and are subject to and controlled by those operative documents.[33] Further, as a matter of law, an issuer of securities cannot by unilateral proclamation, render invalid otherwise applicable law governing transfers of securities and/or other related matters.

78.     Neither the requisite legal nor requisite documentary steps were taken, and the purported Conditional Exchange, therefore, remains unconsummated. And, as discussed below, to the extent WMI seeks the Court's assistance in consummating the purported Conditional Exchange or other transfers of the Trust Preferred Securities (including to JPMC) notwithstanding these legal and documentary infirmities, the Court should deny such relief based, inter alia, on WMI's inequitable and illegal conduct in connection with the issuance of the Trust Preferred Securities and/or JPMC's knowledge thereof prior to WMI's attempt to effect the purported Conditional Exchange.

### i.     Documentary Requirements For Consummation Of Conditional Exchange.

79.     ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

_____

[33] ███████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

██████████████████████████████████████.[34]  The holder of those certificates, DTC

(through its nominee, Cede & Co.) has not surrendered the certificates.

80.  ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████[35]  The applicable trustees have not recorded

WMI as the holder of the Trust Preferred Securities in any of the associated trust registers.

Indeed, through positions taken in connection with other litigation before this Court, WMI

apparently concedes that the required recordings in the applicable registers were not made, either

before or after the filing of the WMI bankruptcy proceedings.[36]  Moreover, in opposing

consummation of the "downstream undertaking" in other litigation before this Court, WMI

stated:

> ***More than simply a clerical act, registration is a legally***
> ***significant act*** that facilitates the administration of a large-scale
> security issuance involving multiple holders, like the [Trust
> Preferred Securities].  Therefore, under applicable law and the
> Uniform Commercial Code as adopted by the State of Washington,
> the [Trust Preferred Securities] have not been delivered to WMB.
> Thus the [Trust Preferred Securities] are property of WMI's
> bankruptcy estate.[37]

81.  ████████████████████████████████████████████

████████████████████████████████████████████████████

---

[34]  ████████████████████████████████████████

[35]  ████████████████████

[36]  See Debtors' Counterclaims, ¶ 56.

[37]  See id. at ¶ 57 (emphasis added).

The WMI preferred equity was never issued, nor does it appear the required notice of the purported Conditional Exchange was transmitted to holders of the Trust Preferred Securities.

82.     In light of the foregoing, the transactions and actions required to consummate the purported Conditional Exchange under the terms of the applicable documents never occurred.

### ii.     Statutory Requirements For Consummation Of Conditional Exchange.

83.     Because the Trust Preferred Securities were issued in certificated form, UCC § 8-301(a)[40] governs delivery upon a transfer, in this case requiring: (a) WMI to acquire possession of the security certificate; or (b) another person, other than a securities intermediary, to take possession of the security certificate on behalf of the purchaser, or, having previously acquired possession of the security certificate, to acknowledge it holds the certificate on behalf of the transferee. Neither of these alternative required steps occurred with respect to either the Trust Preferred Securities (to WMI) or the WMI preferred equity (to the holders of the Trust Preferred Securities).

84.     As such, the legal requirements for delivery of the Trust Preferred Securities, constructive conditions precedent to consummation of any exchange or transfer, have not been

---

38      ██████████████████████████████████████████████

39      █████████████████

40      Plaintiffs note that WaMu Delaware I – IV were Delaware statutory trusts, and subject to Delaware's codification of the Uniform Commercial Code. For present purposes, Plaintiffs assume transfers of Trust Preferred Securities issued by WaMu Cayman would be subject to similar restrictions.

fulfilled, and, therefore, the purported Conditional Exchange could not have been, and never was, consummated.

### c. Strict Restrictions On Transfers Of The Trust Preferred Securities Prevent Consummation Of The Conditional Exchange.

85.     Additionally, in connection with the issuances of the Trust Preferred Securities, strict limitations were placed on the subsequent transfer of such securities. For example, each certificate representing the Trust Preferred Securities included a legend providing as follows:

> . . . AND NEITHER THIS SECURITY NOR ANY BENEFICIAL INTEREST HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT TO A PERSON WHO IS BOTH A "QUALIFIED INSTITUTIONAL BUYER" WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT ("QUALIFIED INSTITUTIONAL BUYER") AND A "QUALIFIED PURCHASER" WITHIN THE MEANING OF SECTION 2(a)(51) OF THE INVESTMENT COMPANY ACT AND THE RULES AND REGULATIONS THEREUNDER ("QUALIFIED PURCHASER") ACQUIRING FOR ITS OWN ACCOUNT OR THE ACCOUNT OF A PERSON WHO IS BOTH A QUALIFIED INSTITUTIONAL BUYER AND A QUALIFIED PURCHASER (AN "ELIGIBLE PURCHASER").[41]

86.     Any attempted transfer in violation of such restrictions would be void ab initio, of no force and effect, and would not operate to transfer any rights to the proposed transferee.[42]

---

[41]     See, e.g., WaMu Delaware III Offering Memorandum, p. iv; ███████████████████████ ███████████████████████

[42]     See, e.g., WaMu Delaware III Offering Memorandum, p. vi ("Any transfer of Trust Securities in breach of the transfer restrictions set forth in this 'Notice to Investors' and the Trust Agreement will be of no force and effect, will be void ab initio, and will not operate to transfer any rights to the transferee, notwithstanding any instructions to the contrary to the Trust, its Transfer Agent, or any other intermediary."); ██████████ ███████████████████████████████████████████████████████.

87.     The transfer restrictions applicable to the Trust Preferred Securities, which were drafted and imposed on purchasers by WMPF and the SPEs (which, at all times, were under the control of WMI) incorporate by reference the concept of "Qualified Institutional Buyer" from SEC Rule 144A.  The term "Qualified Institutional Buyer," which is incorporated into the governing documents related to the Trust Preferred Securities, is defined in the disjunctive, and may be applicable to the following:

   a.  Any of [certain entities], acting for its own account or the accounts of other qualified institutional buyers, *that in the aggregate owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with the entity*;[43]

   b.  Securities dealers registered under the Securities Act of 1934 and certain investment companies registered under the Investment Company Act of 1940;[44]

   c.  Any entity, all of the equity owners of which are qualified institutional buyers;[45]

   d.  Any bank, acting for its own account or the accounts of other qualified institutional buyers, that (i) in the aggregate *owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with the bank*; and (ii) has an audited *net worth of at least $25 million* as demonstrated in its latest financial statements, as of a date not more than sixteen months preceding the transaction.[46]

88.     According to the December 1, 2008 Monthly Operating Report filed by WMI in its chapter 11 case, as of September 26, 2008 (the date of the purported Conditional Exchange), WMI held only $59.7 million in "Investment Securities" – apparently more than $40 million less

---

[43]     See 17 CFR § 230.144A(a)(1)(i) (enumerated entities include insurance companies, certain investment companies, certain employee benefit plans, business development companies, certain charitable organizations and registered investment advisors.

[44]     See 17 CFR § 230.144A(a)(1)(ii) - (iv).

[45]     See 17 CFR § 230.144A(a)(1)(v).

[46]     See 17 CFR § 230.144A(a)(1)(vi).

than would be required to be a Qualified Institutional Buyer under 144A(a)(1)(i) or (vi).[47] Moreover, as of September 26, 2008, WMI reported that its liabilities exceeded its assets by approximately $575 million – leaving WMI with a negative net worth of that same amount (approximately $600 million less than would be required to be a Qualified Institutional Buyer under Rule 144A(a)(1)(vi)).[48]

89. As of September 26, 2008 (and at all times through the present day), WMI was incapable of satisfying the transfer restrictions it elected to impose in connection with the Trust Preferred Securities. As such, according to the terms of the Trust Preferred Securities themselves, any attempted transfer of the Trust Preferred Securities to WMI (including the "transfer" purported to be effected by the Conditional Exchange) would have been, and would still be, void ab initio, of no force and effect, and would have failed to transfer to WMI any right to the Trust Preferred Securities.

### 4. The OTS's Involvement In The Secret Side Letters Renders The Conditional Exchange Null And Void.

90. In connection with each offering of the Trust Preferred Securities, WMI sent a Side Letter to the OTS. Specifically, WMI sent letters to the OTS on January 30, 2006, February 23, 2006, November 14, 2006 and August 17, 2007.

91. The letters indicated that WMI was establishing WMPF for the purpose of issuing preferred securities to "outside investors," specifically informing the OTS that WMI intended for the securities to be issued to third parties. WMI requested in the Side Letters that the OTS allow the Trust Preferred Securities to qualify for inclusion as core capital of WMB. In connection

---

[47] See, Monthly Operating Report for Washington Mutual, Inc., et al. for the Period October 1, 2008 through October 31, 2008. [Docket No. 369].

[48] See id.

with that request, WMI informed the OTS that it would transfer the Trust Preferred Securities to WMB if a Conditional Exchange was declared.

92.     Each of the Side Letters from WMI expressly stated that "confidential treatment" was requested, asserting that the information (i.e., the statement by WMI that it would transfer the Trust Preferred Securities to WMB in the event of a purported Conditional Exchange) was proprietary, commercial information and thus privileged within the meaning of 5 U.S.C. § 552(b)(4) and 31 C.F.R. § 1.2(c)(1) and 1.6(a). In order to be entitled to request "confidential treatment" under the regulations cited in the Side Letters, WMI was required to affirm that the information had not been publicly disclosed and would not be publicly disclosed.

93.     The undisclosed contingent transfer of the Trust Preferred Securities by WMI to WMB was material to purchasers of the Trust Preferred Securities and rendered the offering materials pursuant to which the Trust Preferred Securities were sold false and misleading.

94.     In the Side Letters with the OTS, WMI did not expressly inform the OTS that the existence of the Side Letters would not be disclosed in the offering materials used by the SPEs to sell the Trust Preferred Securities. However, as a result of this requested "confidential treatment" the OTS knew or should have known that "outside investors" would be unaware of the material fact that WMI would attempt to transfer the Trust Preferred Securities to WMB following a purported Conditional Exchange and such information would not be disclosed in the offering materials pursuant to which the securities were to be sold.

95.     The Side Letters were not, in fact, disclosed to outside investors until some time after WMI attempted to consummate the purported Conditional Exchange. As a result, the OTS was a witting or reckless aider and abettor of the fraud on investors perpetrated by certain of the Washington Mutual Entities.

96.     As such, the directive by the OTS on September 25, 2008 declaring that a Conditional Exchange had occurred (coupled with WMI's purported steps to transfer the Trust Preferred Securities to WMB) was in furtherance of the fraud perpetrated on the outside investors by certain of the Washington Mutual Entities, was in excess of the OTS' authority, was against public policy, and is void ab initio.

97.     Alternatively, because the OTS knew the Side Letters were delivered to it in connection with an anticipated public offering of securities, the OTS knew or should have known the request for confidential treatment of the contingent transfer of the Trust Preferred Securities by WMI to WMB was inconsistent with the requirements of full disclosure mandated by the Federal Securities laws and a violation of important federal public policy, that, therefore, thwarted the legitimate expectations of investors.

98.     The OTS was, at a minimum, grossly negligent in agreeing to treat the Trust Preferred Securities as core capital of WMB based on the secret Side Letters because, inter alia, the OTS failed to ensure that the Side Letters were disclosed in the offering materials issued to sell the securities to investors.

99.     By the above actions in connection with the issuances of the Trust Preferred Securities, the OTS acted beyond its statutory authority. As a result, inter alia, of the foregoing, the purported Conditional Exchange of the Trust Preferred Securities initiated by OTS directive is void ab initio and unenforceable.

**B.      Pervasive Fraud, Misrepresentations And**
**Material Omissions Permeated And Infected The**
**Issuances And Sales Of The Trust Preferred Securities.**

100.    The concealment of WMI's secret Side Letters with the OTS was just one part of a campaign of many material omissions, misrepresentations and/or frauds visited upon investors

in the Trust Preferred Securities. As a recently-concluded Senate investigation has revealed, from the first issuance of the Trust Preferred Securities in March 2006 through the collapse of Washington Mutual in September 2008, Washington Mutual was engaging in a covert shift into high risk lending segments and business practices, while at the same time falsely representing to investors (including, importantly, investors in the Trust Preferred Securities) the safety and soundness of WMB's assets, operations and business practices. As the financial condition of WMB was critical to investors' understanding of the likelihood of a purported Conditional Exchange occurring, the concealment of the true condition and status of WMB was a material omission, misrepresentation and/or overt fraud against such investors.

> **1.    Certain Of The Washington Mutual Entities
> Perpetrated A Continuing Fraud On Investors In
> The Trust Preferred Securities By Misrepresenting
> <u>Numerous Matters Material To Such Parties' Investment Decisions</u>.**

101.    As was found recently by the Senate Permanent Subcommittee on Investigations, "[b]efore its fall, Washington Mutual held itself out as a well-run prudent bank that was a pillar of its community . . . . [B]ehind closed doors, the bank's management was surrounded by deep-seated problems including shoddy lending practices and poor quality loans."[49]

102.    Throughout 2006 and 2007, hiding behind the facade of a "well-run prudent bank," certain of the Washington Mutual Entities sought to raise capital through the offerings of the Trust Preferred Securities. The allure of investing in these securities was the fact that Washington Mutual outwardly appeared to be a safe, and soundly-run, enterprise, that an investment in the Trust Preferred Securities was likely to yield a safe, stable source of income to investors and/or upon redemption, a $4 billion liquidation preference, and a Conditional

---

[49]    See April 16, 2010 Opening Statement of Senator Carl Levin, D-Mich., before the U.S. Senate Subcommittee on Investigation.

Exchange appeared to be a remote possibility. But, the opposite was the case. First, as discussed above, the offering circulars concealed WMI's intentions as to the end result of the purported Conditional Exchange by representing the Trust Preferred Securities would be held by WMI.

103. Second, the offering circulars impliedly represented a Conditional Exchange was highly unlikely by, among other things, touting the strength and quality of WMB, its assets and its business practices. For example, the offering circulars represented to investors in the Trust Preferred Securities that WMB's capital was well in excess of not only the minimum regulatory requirements, but also in excess of the "minimum to be categorized as well-capitalized" under applicable OTS regulations.[50] Even when noting difficulties in the lending industry in connection with the last offering of Trust Preferred Securities in October 2007, certain of the Washington Mutual Entities still represented that WMB's capital was more than adequate at the time, and in fact, that the capital to risk weighted assets ratio actually improved from 2006 and 2005.[51]

104. Certain of the Washington Mutual Entities further represented to investors in the Trust Preferred Securities that the adequacy of the collateral underlying WMB's loan portfolios "generally [was] determined by an appraisal made in accordance with pre-established appraisal guidelines. At origination, all appraisals [were] required to conform to the Uniform Standards of Professional Appraisal Practice . . . ."[52] At the same time, however, Washington Mutual was engaged in appraisal manipulation to improperly inflate property values to increase production (as described more fully below).

---

[50] See WaMu Delaware I Offering Circular at p. 32-33; WaMu Delaware II Offering Circular at p. 35; WaMu Delaware III Offering Circular at p. 34-35.

[51] See WaMu Delaware IV Offering Circular at p. 38-39.

[52] See, e.g., WaMu Delaware III Offering Circular at p. 49, 60.

105.     Next, with respect to underwriting guidelines, the offering circulars represented to investors in the Trust Preferred Securities that Washington Mutual calculated borrowers' ability to repay option adjustable rate mortgage loans ("Option ARMs") based on the fully indexed rate of the loan.[53] However, that also was false. Instead, and contrary to numerous other public statements, Washington Mutual followed the much riskier practice of approving loans based on the borrowers' ability to pay only the monthly minimum payments that resulted in negative amortization. Indeed, Washington Mutual continuously loosened its underwriting guidelines, virtually to the point of non-existence.

106.     Additionally, each of the offering circulars incorporated WMI's then-current SEC filings, which boasted of claimed safe lending practices. However, as was subsequently revealed and as is discussed further below, the incorporated SEC filings contained numerous misrepresentations including:

- April 2005—"Our first quarter results validate that our business model is working – assets, deposits and checking accounts are growing; credit quality remains strong; mortgage banking income increased and our expenses continue to decline." – quote from Kerry Killinger, former chairman and chief executive officer of Washington Mutual ("Killinger"), from 4/19/2005 press release attached as exhibit to 4/19/2005 8-K (incorporated by reference in the WaMu Delaware I Offering Circular)

- Late 2005—Third Quarter Form 10-Q (incorporated by reference in WaMu Delaware I and WaMu Cayman Offering Circulars) stating that the company maintained "appropriate policies, standards and limits designed to maintain risk exposures within the Company's risk tolerance…Enterprise Risk Management also provides objective oversight of risk elements inherent in the Company's business activities and practices…"

- 2005 Form 10-K, filed March 15, 2006 (incorporated by reference in the WaMu Delaware II Offering Circular): "The Company seeks to mitigate the credit risk in this portfolio by ensuring compliance with underwriting standards on loans originated to subprime borrowers and by re-underwriting all purchased subprime

---

[53]     See WaMu Delaware II Offering Circular at p. 60; WaMu Delaware III Offering Circular at p. 60; WaMu Delaware IV Offering Circular at p. 65.

loans." Further, "[t]he Company actively manages the credit risk inherent in its Option ARM portfolio by ensuring compliance with its underwriting standards, monitoring loan performance and conducting risk modeling procedures."

> With respect to the Option ARM loans, WMI stated: "current loan-to-value ratios have generally improved – in many cases offsetting the credit risk associated with negative amortization that may have resulted from the borrower's use of the minimum payment option."

WMI repeated the same representations in its 2006 10-K.

- 2006 Form 10-K, filed March 1, 2007 (incorporated by reference in the WaMu Delaware III and WaMu Delaware IV Offering Circulars) - Washington Mutual again touted the underwriting standards for the Option ARM portfolio: "The Company actively manages the credit risk inherent in its Option ARM portfolio primarily by ensuring compliance with its underwriting standards, monitoring loan performance and conducting risk modeling procedures." The Company also claimed that beginning in December 2005, the underwriting process for Option ARMs required calculating the borrower's debt-to-income ratio based on the fully-indexed rate only.

107. Between 2005 and 2008, Washington Mutual's officers also bolstered the misrepresentations made in WMI's public filings by repeatedly misrepresenting the quality of Washington Mutual's loan portfolio (especially as characterized by loan-to-value ratios and loss reserves) and covering up the loosening of Washington Mutual's underwriting standards by making statements such as:

- November 15, 2005, Investor Day Conference—Killinger claimed that, "[o]n credit risk. We have excellent process, policies, underwritings, standards and reserving methodologies and they have served us very well for quite some time."

> At that same conference, Craig Chapman, President of the commercial group that housed Long Beach Mortgage Company ("Long Beach") before 2006, when discussing the "disciplined" subprime underwriting standards, claimed: "we allow no rate exceptions in the process. Our pricing is controlled centrally. It's distributed through the network. There is process in place and triggers so that no loans can – there are no rate exceptions, I mean, on loans." Chapman also misrepresented that with respect to ARMs "we underwrite these loans at a fully indexed rate. Even our [interest only] loans are underwritten on 30-year amortizing and not on any introductory rates or just interest only rates."

- January 18, 2006, earnings call with investors—Stephen Rotella, Washington Mutual's President and Chief Operating officer from January 2005 until October

2008, stated with respect to the Option ARM loans, "an important fact is we underwrite every loan at the fully indexed rate."

- July 19, 2006, earnings call with investors—Thomas Casey, Executive Vice President and CFO and member of the Executive Committee from October 2002 through October 11, 2008, touted the "strong ongoing stability and strength of the [loan] portfolio," "[c]redit quality continues to be strong" and "Option ARMs continue to be a good, strong leader for us."

- September 6 and 7, 2006 Annual Investors Day Conference—Rotella stated that he and the other officers felt "good about the fact that we've been aggressive in controlling what we can control. Frankly, we've been ahead of the market in my perspective."

David Schneider, Executive Vice President and President of Home Loans overseeing all home lending operations from August 2005 until October 2008 stated:

> On subprime, we have seen…some early payment default and repurchase activity. We saw most of that occur for us in late '05, Q4 '05, and first quarter of '06. We reserved for it appropriately and we have also, in second quarter of '06, tightened up a number of our underwriting guidelines…

> In fact, we think we've lost probably a percentage or so of market share over the past year as a result of tightening some of the credit guidelines in our subprime business. And we think that was the prudent thing to do and actually we think we're ahead of many of our competitors here.

Analysts questioned the officers regarding the Company's decision to use third-party appraisers. An unnamed Washington Mutual representative claimed that the decision would give Washington Mutual "better quality" in its appraisals, and Killinger stated, "there's a very strong governance process over those external appraisers."

- October 18, 2006, earnings call with investors—Killinger stated:

> We have more than 20 years experience underwriting and originating option ARM loans through many market cycles. We understand that the best mortgage customer is a well-informed borrower and that's why we focus on providing clear, understandable disclosures for our customers and ongoing training for our sales force.…[T]he quality of our option ARM portfolio remains strong.

Killinger further claimed, "[i]n our underwriting on option ARMs we underwrite to the fully indexed rate, we never underwrite to the teaser rate."

- November 16, 2006, Merrill Lynch Banking & Financial Services Conference—Killinger claimed that the quality of the Option ARM portfolio is attributed to the safe underwriting practices: "Our option ARM portfolio quality is also very good....This quality reflects the option ARM underwriting which evaluates the borrower's ability to make the loan's fully amortizing payments, even though they are allowed to make a much lower initial payment."

- December 13, 2006, Goldman Sachs Financial Services CEO Conference—Killinger "On the credit front, we're in very good shape . . . If anything, I can be accused of being too conservative. And perhaps we could have maximized our profitability even more by taking on more credit risk through this period of very benign credit. But we want to stay ahead of the curve, be a little more conservative."

  In response to specific inquiries, Killinger stated:

  > When we do our reserving, I will tell you that we factor in the existing book of business; what the current delinquencies are; we make assumptions about housing price declines and the economy; and we develop models about what we think is going to happen to delinquencies, ultimate charge-offs.

- January 17, 2007 earnings call with investors—Killinger explained that to protect against the softening housing market "We tightened underwriting."

- January 30, 2007, Citigroup 2007 Financial Services Conference—Killinger falsely touted the credit quality of Washington Mutual's loan portfolio stating that it "continues to be in very good shape" claiming that the Company's prime loans were "high quality" the Option ARM portfolio was "very good" and the home equity portfolio was a "very high quality."

  Killinger attributed the purportedly high credit quality of Washington Mutual's Option ARM loans to the low LTV ratios associated with those loan portfolios:

  > [O]ur option ARM portfolio, that quality is very good as characterized by the ... . loan-to-value at origination of 71%. . . . [W]e continue to be comfortable with the overall risk profile of the balance sheet subprime portfolio, which has...a 78% loan-to-value at origination and estimated current loan-to-value of only 66%. . . .[O]ur home equity portfolio . . . [has] a combined loan-to-value of only 70%.

- July 18, 2007, earnings call with investors—Casey stated: "While we anticipate that we will see higher [nonperforming assets] across all of our home loan portfolios, we expect losses in the prime loans to be much lower due to the lower LTVs and high FICO profile of our prime portfolio." Casey also claimed that the

Option ARM portfolio was strong, because "[i]t's a very high FICO and low LTV portfolio."

- September 10, 2007, Lehman Brothers 5th Annual Financial Services Conference—Killinger continued to tout the strength of Washington Mutual and the steps it had taken to protect its credit quality, stating that the Company had undergone "a series of major underwriting changes in our home loans lending guidelines" and continuing to insist that Option ARMs and other adjustable-rate mortgages were generating "attractive" returns and that "the credit quality in these loans is good."

  Killinger also boasted of the Company's purportedly low LTV ratios in its home loan portfolio noting that, in the Company's Jumbo Option ARM loans and 5/1 Jumbo Hybrid loans, "the credit quality in these loans is good. . . . Loan originations . . . had a loan-to-value rate of only 70%."

108. Finally, certain of the Washington Mutual Entities misrepresented the quality and function of Washington Mutual's risk management practices:

> The Chief Credit Officer is responsible for overseeing the work of a credit policy committee, monitoring the quality of the WMI Group's credit portfolio, determining the reasonableness of the WMI Group's allowance for loan losses, reviewing and approving large credit exposures and setting underwriting criteria for credit-related products and programs. Credit risk management is based on analyzing the creditworthiness of the borrower, the adequacy of the underlying collateral given current events and conditions and the existence and strength of any guarantor support.[54]

However, as discussed below, contrary to such representations, Washington Mutual was in fact undercutting its risk management practices, effectively making its risk management group a "customer service" vassal for its loan processors rather than a check on abuses.

**2. Despite Representations To Investors In Trust Preferred Securities To The Contrary, From The First Issuance Of The Trust Preferred Securities Through September 2008, Washington Mutual Was Growing Increasingly Unstable And Risky.**

109. Behind closed doors, Washington Mutual's true state (which was known to the OTS) was much different than that represented to investors in the Trust Preferred Securities.

---

[54] See, e.g., WaMu Delaware III Offering Circular at p. 51, 61-62.

Washington Mutual's systemic change in strategy to originate and underwrite an increasing number of high-risk loan products was implemented with new policies that emphasized loan volume over loan quality, eviscerated risk management, and changed incentives to encourage riskier activity.

110. Increasingly risky and shoddy lending practices resulted in a business model that was not only unsafe and unsound, but also rife with fraud. After conducting a substantial investigation, the Senate Permanent Subcommittee on Investigations made the following findings of fact related to Washington Mutual:

- **High Risk Lending Strategy.** Washington Mutual executives embarked upon a high risk lending strategy and increased sales of high risk home loans to Wall Street, because they projected that high risk home loans, which generally charged higher rates of interest, would be more profitable for the bank than low risk home loans.

- **Shoddy Lending Practices.** Washington Mutual and its affiliate, Long Beach, used shoddy lending practices riddled with credit, compliance, and operational deficiencies to make tens of thousands of high risk home loans that too often contained excessive risk, fraudulent information, or errors.

- **Steering Borrowers to High Risk Loans.** Washington Mutual and Long Beach too often steered borrowers into home loans they could not afford, allowing and encouraging them to make low initial payments that would be followed by much higher payments, and presumed that rising home prices would enable those borrowers to refinance their loans or sell their homes before the payments shot up.

- **Polluting the Financial System.** Washington Mutual and Long Beach securitized over $77 billion in subprime home loans and billions more in other high risk home loans, used Wall Street firms to sell the securities to investors worldwide, and polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss.

- **Securitizing Delinquency-Prone and Fraudulent Loans**. At times, Washington Mutual selected and securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors who bought the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered.

- **Destructive Compensation**. Washington Mutual's compensation system rewarded loan officers and loan processors for originating large volumes of high risk loans, paid extra to loan officers who overcharged borrowers or added stiff prepayment

penalties, and gave executives millions of dollars even when its high risk lending strategy placed the bank in financial jeopardy.[55]

### a. WMB's Ever-Increasing, And Hidden, High-Risk Lending Practices.

111.   Historically, WMB had focused on low-risk, traditional 30-year fixed and government-backed mortgages.   However, chasing what it thought would be higher profits and wider margins, Washington Mutual began skewing its lending practices towards increasingly risky loan products.   In essence, Washington Mutual began pursuing profits and growth at the expense of reason and safety.   Washington Mutual's foray into nontraditional lending began to take hold in 1999 when it bought Long Beach.   Long Beach was exclusively a subprime lender that operated by having third party mortgage brokers originate loans funded by Long Beach. Those loans were made for the express purpose of securitizing and selling them on the secondary market.   As such, volume was the key.   Washington Mutual quickly embraced the principle of quantity over quality.   Symbolizing this new focus, in 2003, Long Beach securitized $4.5 billion in home loans – by 2006, its operations had grown six times, funding and selling almost $30 billion worth of subprime loans.[56]

112.   In addition to increasing its subprime lending through Long Beach, in 2003 Washington Mutual made a strategic decision to further increase its risk by: approving more home loans for high-risk borrowers; rapidly increasing approval of stated income, or "liar" loans; relying heavily on Option ARMs, in which the borrower could choose the amount to be paid, frequently leading to negative amortization as borrowers paid less than the monthly interest;

---

[55]   See April 13, 2010 Memo from Senators Carl Levin and Tom Coburn to Members of the Permanent Subcommittee on Investigations, p. 6.

[56]   See Senator Levin Opening Statement, April 13, 2010 Senate Subcommittee Hearing, p. 3.

approving loans containing higher loan to value ratios, sometimes as high as 105%; and increasing concentrations of loans in states such as California and Florida, where quick appreciation and quick turnover led to more loans and more fees, but were at significant risk of sudden collapses in property values.

113.    The Option ARM became Washington Mutual's flagship product, even for its supposed "prime" borrowers.    Option ARMs were particularly risky because they gave borrowers a low introductory interest rate with a subsequent increase to a floating rate.    In addition, borrowers had the choice to pay: (a) the fully amortizing amount needed to pay off the loan in 30 years; (b) a greater amount to pay off the loan in 15 years; (c) interest only; or (d) a "minimum" payment that was even less than the accrued interest for the month.[57]

114.    When borrowers made only the "minimum" or "teaser" payment, which occurred very frequently, unpaid interest would be added to the loan principal, increasing the amount of the debt or, in other words, negatively amortizing the loan.    After a set number of years or when the loan principal reached a particular amount (i.e. 110% or even as much as 125%), the loan would "recast."    At that point, the borrower would be forced to make payments in the amount required to pay off the loan within the remaining term, causing "payment shock" and all too often, loan defaults.    As an example:

> [A] borrower taking out a $400,000 loan, with a teaser rate of 1.5% and subsequent interest rate of 6%, could have a minimum payment of $1,333. If the borrower then made only the minimum payments until the loan recast, the new payment using the 6% rate would be $2,786, an increase of more than 100%.  What began as a 30-year loan for $400,000 became a 25-year loan for $432,000.[58]

---

[57]    See April 13, 2010 Memo from Senators Levin and Coburn to Permanent Subcommittee on Investigations, p. 3.

[58]    See April 13, 2010 Memo from Senators Levin and Coburn to Permanent Subcommittee on Investigations, p. 3.

115. To avoid recasting, borrowers would seek to refinance their loans, frequently into Option ARMs again. Thus, the cycle would begin anew, the borrowers' debt would increase further, and the bank's exposure to default would also grow. Refinancing existing loans was a significant part of Washington Mutual's business. In something akin to a Ponzi scheme, Washington Mutual was able to dodge temporarily the results of the looming flood of defaults through refinancing of the risky loans with new, even riskier (based on increasing debt load) mortgages – a practice that the officers knew would not be sustainable.

116. Option ARMs are risky for lenders, as well as borrowers, because the minimum payment feature "erodes the equity cushion available to protect the bank in event of foreclosure. Loans with loan-to-value ratios of 80 percent or more and the ability to negatively amortize to 125 percent of the original loan amount ... are especially at risk."[59] Such loans also result in inflated profitability for the bank because accrued interest is counted as income, but in many cases is never recovered.[60]

117. From 2005 on, Option ARMs made up more than half of Washington Mutual's supposed "prime" loan portfolio.

118. As Washington Mutual continued to increase the risk in its loan portfolio and continued to process scores of bad loans, it became less and less prepared for the market shift that eventually occurred. When the secondary subprime loan market froze, Washington Mutual was no longer able to dump its high risk loans (many of which were destined to fail based on Washington Mutual's shoddy lending practices) into the capital markets, forcing Washington

---

[59] April 16, 2010 Hearing Ex. 74, OTS Option ARM Neg Am Review Work Program, 212A.

[60] See Hudson & Overton, "The Second S&L Scandal" p. 8 (Center for Responsible Lending, January 2009).

Mutual to bear more and more of the impact of the losses from its faulty underwriting and origination processes. For the fourth quarter of 2007 (immediately after the final issuance of Trust Preferred Securities), Washington Mutual reported a $1 billion loss, followed by another $1 billion loss the next quarter and then a $3.2 billion loss for the second quarter of 2008.[61]

### b. Contrary To Public Statements Regarding The Quality Of Its Loan Portfolio, Washington Mutual Was Hiding Its Deeply Flawed Appraisal Practices.

119. Certain of the Washington Mutual Entities repeatedly represented to investors in the Trust Preferred Securities that Washington Mutual's loan portfolio was strong, due in large part to low loan-to-value ("LTV") ratios. Behind the scenes, however, those LTV ratios were being manipulated and falsified.

120. The importance of LTV ratios was explained by WMI in its 2005 Form 10-K and 10-K/A:

> Loan-to-value ratios are a key determinant of future performance. Home loans with loan-to-value ratios of greater than 80 percent at origination without private mortgage insurance or government guarantees expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination.....This greater credit risk arises because, in general, both default risk and the severity of loss is higher when borrowers have less equity to protect in the event of foreclosure.

121. Regarding the Option ARM loans, WMI stated: "current loan-to-value ratios have generally improved – in many cases offsetting the credit risk associated with negative amortization that may have resulted from the borrower's use of the minimum payment option." WMI repeated the same representations in its 2006 10-K.

122. What was not disclosed to investors in the Trust Preferred Securities was that in or around 2005, Washington Mutual management implemented the practice of pressuring its in-

---

[61]  See April 13, 2010 Memo from Senators Levin and Coburn to Permanent Subcommittee on Investigations, p. 5.

house appraisers to inflate home values for loan applications. Inflating the appraisals allowed Washington Mutual to artificially decrease the loan-to-value ratios on approved loans, which in turn created the illusion that the loans were less risky.

123.    Because higher LTV ratios signify greater risk, Washington Mutual also would have been required to reserve at higher rates for its Allowance for Loan and Lease Losses. By artificially inflating collateral values, Washington Mutual avoided the obligation to implement this safety measure.

124.    For these and other reasons, appraiser independence is expected to be sacrosanct. The Uniform Standards of Professional Appraisal Practice, which are incorporated into federal law (12 C.F.R. § 34.44) dictate: "An appraiser must perform assignments with impartiality, objectivity, and independence, and without accommodation of personal interests. In appraisal practice, an appraiser must not perform as an advocate for any party or issue." Federal regulations further require that in-house appraisers "must be independent of the lending, investment, and collection functions and not involved, except as an appraiser, in the federally related transaction, and have no direct or indirect interest, financial or otherwise, in the property." 12 C.F.R. § 34.45. Outside appraisers, must also remain independent and must not have any direct or indirect interest in the transaction. Id.

125.    Washington Mutual subsequently outsourced its appraisals to create the appearance of independence. In 2006, Washington Mutual started outsourcing its appraisals to two third-party appraisal companies, American Corporation through its subsidiary, eAppraiseIT, and Lenders Services Inc. ("LSI"). Rather than create actual independence, Washington Mutual created a mere illusion.

126. On November 1, 2007 (just after the last issuance of the Trust Preferred Securities), after a nine-month investigation, New York Attorney General Cuomo filed a complaint against First American Corporation and eAppraiseIT, outlining in detail how Washington Mutual pressured appraisers to inflate values ("NYAG Complaint").

127. As a condition of the engagement, Washington Mutual required eAppraiseIT to agree to allow Washington Mutual to choose its "preferred appraisers." Additionally, at Washington Mutual's request, eAppraiseIT hired approximately 50 former Washington Mutual employees as Appraisal Business Managers ("ABMs") and staff appraisers. Washington Mutual further required that the ABMs be given the authority to override and revise appraisal values reached by third-party appraisers.

128. Washington Mutual's loan production staff began complaining almost immediately that the appraisals were too low. eAppraiseIT's Executive Vice President advised eAppraiseIT's President in August 2006 that Washington Mutual's loan officers would frequently pressure appraisal field managers for an "extra few thousand," or "tell[] them specifically what they needed," or would "ask for several ROVs [Reconsiderations of Value] on the same property." Eventually, eAppraiseIT capitulated to the frequent demands to raise values by implementing an official "raise the value" policy providing flexibility to raise values 5%, up to $50,000.

129. To ensure that eAppraiseIT would continue to provide inflated appraisals, Washington Mutual constantly threatened to take its business elsewhere. As Washington Mutual applied more pressure and began sending more business to LSI, eAppraiseIT's President decided to "roll over and just do it" and assign all Washington Mutual's work to Washington Mutual's "proven appraisers." In an email to senior management, he explained: "We will pay their

appraisers whatever they demand. Performance ratings to retain position as a Washington Mutual Proven Appraiser will be based on how many come in on value, negating a need for an ROV."[62]

130. On March 1, 2007, eAppraiseIT's President explained to executives:

> Recently, we have been notified that Lending would like us to use more of their "Proven Appraisers" versus appraisers off our pre-selected appraiser panel. It seems the amount of Reconsideration of Value (ROV) requests associated with our appraisers far exceeds those initiated when a Washington Mutual proven appraiser completes a file. Said differently, **WaMu proven appraisers bring the value in a greater majority of the time** with minimal involvement of the vendor, sales and Appraisal Oversight. **I am fine with that, of course, and will happily assign WaMu orders to WaMu proven appraisers instead of eAppraiseIT's approved panel appraiser whenever possible.**[63]

eAppraiseIT further ceded control by allowing Washington Mutual to blacklist appraisers who did not provide high enough values.

131. Washington Mutual and eAppraiseIT knew that loan processors should not have the influence on appraisals that both entities allowed. In May 2007, eAppraiseIT's Executive Vice President sent a letter to a Washington Mutual senior executive, identifying the problems in the business relationship:

> In the first quarter of 2007, the sales group of WAMU began to insist they choose the appraisers mostly due to their concerns about 'low values.' eAppraiseIT encouraged WAMU to resist these pressures if possible. However, WAMU decided to go with what came to be called the "proven" list of appraisers recommended by sales....
>
> The use of the "proven" panel is challenging for eAppraiseIT in two ways: A: Financially – The proven panel is paid a minimum of 20% more than the eAppraiseIT panel. B. Risk Management – the possibility of collusion between the loan officers and appraisers is increased when eAppraiseIT does not control the selection. In addition, eAppraiseIT is concerned with

---

[62]  NYAG Complaint, ¶ 38.

[63]  NYAG Complaint, ¶ 42 (emphasis in original).

any possible lender pressure or perception of lender pressure when the only way to get on the WAMU "proven" panel is through the loan officer.[64]

132. Washington Mutual did not share eAppraiseIT's concerns about undermining the integrity of the appraisal process. In fact, control over appraisals was exactly what Washington Mutual wanted. Indeed, rather than correct the lack of independence, Washington Mutual decided to mask it. On June 7, 2007, a Washington Mutual executive directed eAppraiseIT to change the name of the Proven List, and instead rename it the "WaMu Select" panel. The stated reason was: "Name change from 'proven appraiser' and/or use of the moniker 'PAL' list is discontinued, under direction of the Washington Mutual legal department. We are utilizing a more generic term acceptable w/in regulatory guidelines and industry standards."[65]

133. By dictating false higher values, Washington Mutual was able to mask the true state of its loan portfolio. All of this allowed certain of the Washington Mutual Entities to hide from investors in the Trust Preferred Securities the real risk profile of WMB and Trust Preferred Securities, implying that a Conditional Exchange was highly unlikely.

> **c.    At The Same Time The Strengths Of Its Underwriting Guidelines Were Being Touted To The Public, WMI Was Watering Those Guidelines Down To Facilitate High Risk Lending.**

134. Contrary to representations that Washington Mutual was abiding by strict underwriting guidelines, the dictated policies were the exact opposite.

135. Because Washington Mutual was interested primarily in quickly processing, bundling and selling loans, the quantity, rather than the quality, of loans processed became the key driver. To foster volume, Washington Mutual loosened standards to allow loans to be

---

[64]    NYAG Complaint, ¶ 68.

[65]    NYAG Complaint, ¶ 69.

funded after little to no documentation, and without considering the borrower's real ability to repay the loans. Washington Mutual also adopted a compensation structure that rewarded volume over all else. At its worst, outright fraud was committed, and nothing was done to correct it.

136. Although the subprime lending operations of Long Beach had significant issues, as described herein, Washington Mutual also created significant problems with its supposed "prime borrower" lending. First, "prime" borrowers were not necessarily those with better credit scores than Long Beach's subprime borrowers. Second, Washington Mutual increasingly made very risky loans to people with below average credit scores and increased the use of riskier products, including Option ARMs, "Stated-income," "no-doc" and "low-doc" loans (often called "liar loans,"), or 100% LTV loans, as part of its "prime" portfolio.[66]

137. In 2006 and 2007, management allowed, and even mandated, a further loosening of the underwriting standards. Washington Mutual made "prime" loans to borrowers with FICO scores well below the standard of 660 for prime loans set by the FDIC and the OTS. Training documents were circulated that identified anything above 619 as "prime." It went further -- borrowers with a score of 621, even with a bankruptcy in the previous four years, would be considered "prime" borrowers and in some instances, borrowers with FICO scores as low as 540 were approved for "prime" loans.

138. Additionally, exceptions to the underwriting guidelines were granted almost as a matter of course, making them meaningless. For those borrowers who could not fit into the already generous guidelines, exceptions were almost always approved.

---

[66] See Senator Levin Opening Statement, April 13, 2010 Senate Subcommittee Hearing, p. 6.

139. To make matters worse, contrary to statements made in the offering circulars and public statements of the officers, Washington Mutual policy was to underwrite Option ARM loans based solely on a borrower's ability to make the initial minimum payments, or "teaser" payments, rather than based on the ability of the borrower to make the substantially higher payments that inevitably would come due.

140. Even after the OCC raised concerns in 2005 about Option ARMs, urging other regulators to jointly issue guidance on "nontraditional mortgages" to strengthen lending standards, Washington Mutual continued to fund billions of dollars worth of Option ARMs every year based on more lax underwriting guidelines than WMI represented. By the end of 2007, when the walls started to crumble, WMB held $48 billion in Option ARMs that were negatively amortizing because borrowers' monthly payments were not enough to cover even the interest charges.

141. The OTS, at Washington Mutual's strong urging, resisted the OCC's proposal. Internally, the OTS even discussed the need to go "on the offensive" to stop other regulators from strengthening lending standards.[67] In doing so, the OTS, acting to protect Washington Mutual and not the public interest, relied on data from Washington Mutual and argued that stricter standards, such as requiring banks to evaluate a borrower's ability to repay the mortgage using a fully-indexed interest rate and amortized payment amount rather than just the ability to make "teaser" payments, would reduce Washington Mutual's business.[68]

142. After Washington Mutual caused it to delay, the OTS finally signed on to the Joint Guidance on Nontraditional Mortgages, which was released in October 2006. The change

---

[67] See April 16 Senate Subcommittee Hearing Ex. 71, July 2006 email.

[68] See 4/16/10 Memorandum to Members of the Permanent Subcommittee on Investigations, p. 6.

in standards was so dramatic that, as an example, Countrywide later admitted that under the new standards, 89% of its 2006 borrowers and 83% of its 2005 borrowers would not have qualified.[69]

143.    However, unlike the other regulators, the OTS, which acted to protect Washington Mutual and not the public interest, did not require Washington Mutual to comply with the new Guidance immediately. Instead, the OTS continued to allow Washington Mutual to originate as many loans as possible, thereby facilitating Washington Mutual's fraudulent lending practices. The OTS also viewed the guidance as only suggestive. As Washington Mutual explained: "[OTS's] initial response was that they view the guidance as flexible. They specifically pointed out that the language in the guidance says 'should' vs. 'must' in most cases and they are looking to Washington Mutual to establish our own position of how the guidance impacts our business processes."[70] The OTS also advised Washington Mutual that the OTS expected Washington Mutual to determine "how the guidance impacts ... business processes" and the OTS would take into consideration Washington Mutual's "history and experience" in determining whether Washington Mutual is in compliance with the guidance.[71]

144.    Washington Mutual came to the conclusion that there would only be limited changes with regard to the Option ARM product, and there is no "fundamental reason to change our approach on how the Option ARM product is offered to our customers . . . ."[72] In effect,

---

[69]    See Appelbaum & Nakashima, "Banking regulator played advocate over enforcer; Agency let lenders get out of control, then fail" Washington Post, Nov. 23, 2008.

[70]    See April 16, 2010 Hearing Ex. 73, Alternative Mortgage Guidance Implementation Plan, October 2006.

[71]    See April 16, 2010 Hearing Ex. 73, Alternative Mortgage Guidance Implementation Plan, October 2006.

[72]    See April 16, 2010 Hearing Ex. 73, Alternative Mortgage Guidance Implementation Plan, October 2006.

Washington Mutual conducted business as usual, failing to follow any legitimate underwriting guidelines while churning out its highest-risk products. Investors in the Trust Preferred Securities were not made aware of the fact that the OTS was not requiring compliance with the new guidelines, and the OTS was effectively complicit in Washington Mutual's fraudulent lending practices.

145.    By the time the OTS decided to begin to require compliance, it was the end of 2007 (the Trust Preferred Securities offerings had all been issued by that time), the secondary subprime mortgage market had already frozen, and Washington Mutual's loan originations had declined.[73] Nonetheless, the OTS's continued delay, protecting Washington Mutual and not the public interest, certainly allowed Washington Mutual to originate billions worth of loans that it should not have originated, further increasing the prospects of an occurrence of events or circumstances triggering the purported Conditional Exchange.

### d.    Washington Mutual's Internal Pay Incentives Fostered Fraud.

146.    Compensation practices at Washington Mutual and Long Beach encouraged the processing of risky, and even fraudulent loans. Loan officers received more money per loan for originating higher risk loans because those loans were seen as being more profitable. However, there were no incentives for higher quality loans.[74] Underwriters also received greater commissions based on volume of loans closed, rather than quality. Additionally, they received quotas for daily loan production.

---

[73]    See April 16, 2010 Opening Statement of Senator Carl Levin, D-Mich., before the U.S. Senate Subcommittee on Investigation, p. 6.

[74]    April 13, 2010 Memo from Senators Levin and Coburn to Permanent Subcommittee on Investigations, p. 5.

147. Because of the added pay incentives, loan officers would push Option ARM loans on borrowers, even when the borrowers sought traditional loans. Frequently, loan officers would not educate borrowers on the product so that Option ARM borrowers thought they were paying the fully-indexed rate when, in fact, they were paying only a portion of the interest.

148. The pay incentives created a breeding ground for fraud. "One Sales Associate admitted that during . . . crunch time some of the Associates would 'manufacture' asset statements from previous loan docs" because they were told "to get the loans funded with whatever it took."[75] Certain loans could be approved by a loan processor without the involvement of an actual underwriter if the borrower and loan met certain criteria that could be approved by a computer program automatically. Regularly, loans that were rejected by the computer program would be re-entered by the loan processor, who would "tweak the system" a little at a time until the loan got approved.

### e. Washington Mutual Repeatedly Identified, And Hid, Significant Deficiencies And Even Fraud In Its Subprime Lending Operations.

149. Contrary to representations of upstanding lending practices, Washington Mutual was well aware for several years that its subprime lending practices were unacceptable. "Long Beach loans repeatedly suffered from early payment defaults, poor underwriting, fraud, and high delinquency rates."[76]

150. In 2003, concerns about securitizations and loan sales not meeting the representations and warranties contained in the sales agreements reached a level that Washington Mutual could not ignore, and it was forced to halt Long Beach securitizations. An internal

---

[75]   April 13, 2010 Senate Subcommittee Hearing Ex. 30.

[76]   April 13, 2010 Memo from Senators Levin and Coburn to Permanent Subcommittee on Investigations, p. 4.

residential quality assurance report for Long Beach's first quarter of 2003 concluded that 40% of loans were unacceptable for securitization and sale. Based on a subsequent review of 4,000 loans, only "950 were deemed saleable, 800 were deemed unsalable, and the remainder contained deficiencies requiring remediation prior to sale."[77] Additionally, of 4,500 securitized loans that were eligible for foreclosure, 10% contained documentation issues preventing such foreclosure.[78] Without fixing the problems, Washington Mutual let Long Beach resume securitizing loans. Unsurprisingly, problems resurfaced in 2005, just before the start of the campaign to raise $4 billion through sale of the Trust Preferred Securities.

151.    Long Beach had shifted some of its sales to a "whole loan program," under which, it was required to repurchase loans if the borrower failed to make the first payment due to the investor. The poor quality of loans originated and sold by Long Beach suffered such high rates of early payment defaults that Long Beach was required to repurchase $875 million worth of nonperforming loans in 2005, suffering a net loss of $107 million. The subsequent Washington Mutual internal review identified the problems that had been brewing for a long time:

> The shift to whole loan sales, including the EPD [early payment default] provision, brought to the surface the impact of relaxed credit guidelines, breakdowns in manual underwriting processes, and inexperienced subprime personnel. These factors, coupled with a push to increase loan volume and the lack of an automated fraud monitoring tool, exacerbated the deterioration in loan quality.[79]

152.    Supposedly to improve operations, Washington Mutual terminated Long Beach senior management and shifted the subprime lending operations to report to David Schneider,

---

[77]     April 13, 2010 Senate Subcommittee Hearing Ex. 8(b), p. 3.

[78]     April 13, 2010 Senate Subcommittee Hearing Ex. 8(b), p. 4.

[79]     April 13, 2010 Senate Subcommittee Hearing Ex. 10, p. 2.

President of Washington Mutual's Home Loans Division. However, improvement did not come. In April 2006 (just one month into the series of five Trust Preferred Securities issuances), Washington Mutual president Steve Rotella told Killinger that Long Beach "delinquencies are up 140% and foreclosures close to 70% . . . . First payment defaults are way up and the 2005 vintage is way up relative to previous years. It is ugly."[80] By the end of the year, it was clear that 2006 securities had even higher early delinquency rates than the previous problem years of 2003-2005.[81] But, the marketing of Trust Preferred Securities to investors, incorporating by reference statements regarding the safety and stability of WMB, continued.

153. Internal audits continued to identify repeated and growing problems. In late 2006, Washington Mutual's Chief Risk Officer, received an email about Long Beach that identified ongoing key risk issues:

- Appraisal deficiencies that could impact value...

- Material misrepresentations relating to credit evaluation...

- Legal documents were missing or contained errors or discrepancies

- Credit evaluation or loan decision errors

- Required credit documentation was insufficient or missing from the file.

  ...

- On a vintage basis, the deterioration was accelerating in recent vintages with each vintage since 2002 having performed worse than the prior vintage.[82]

The underlying and ongoing issues were discussed by the Market Risk Committee during a December 12, 2006 meeting, but again, no fix was to come.

---

[80] April 13, 2010 Senate Subcommittee Hearing Ex. 11, April 27, 2006 email.

[81] April 13, 2010 Senate Subcommittee Hearing Ex. 15, December 6, 2006 email.

[82] April 13, 2010 Senate Subcommittee Hearing Ex. 16, December 11, 2006 email.

154.   After several 2007 reviews identified the same lending, credit and even appraisal problems that had been pointed out for years, Washington Mutual finally closed Long Beach and took over subprime lending operations in mid-2007.

### f.   Washington Mutual Misrepresented The State Of Its Practices, While Ignoring Outright Fraud.

155.   Even when fraud was uncovered by Washington Mutual, management did little to nothing to correct the problems, and certainly did not disclose it to investors.  A 2005 internal investigation uncovered extremely high rates of fraud of 58% and 83% in loans originated by two of the top loan producing offices in southern California, which accounted for hundreds of millions of dollars in home loans every year.  This issue was brought to the attention of senior management, but nothing was done to correct the problems nor were investors in the Trust Preferred Securities advised.  Instead:

> The fraud problem was left to fester until two years later, when in June 2007, one of the bank's mortgage insurance companies refused to insure any more loans issued by the loan producer…and complained to Washington Mutual's state and federal regulators about fraudulent borrower information.[83]

156.   The resulting 2007 review showed that one of the previously identified problem offices had a fraud rate of 62%.  In an April 2008 internal memorandum – which Washington Mutual initially tried to hide from its regulator – Washington Mutual's fraud investigation and audit team noted the similar rate of fraud that had been found in 2005, and questioned whether further review should be conducted, since many fraudulent loans that had been marked as containing fraudulent information had been securitized and sold to investors.[84]

---

[83]   Senator Levin, Opening Statement, April 13, 2010 Senate Subcommittee Hearings,  p. 7.

[84]   Senator Levin Opening Statement, April 13, 2010 Senate Subcommittee Hearing, p. 7; April 13, 2010 Senate Subcommittee Hearing Ex. 24, April 2008 Memorandum.

157.    Senior management had simply refused to impose any form of control to prevent the sale of fraudulent loans, and instead, allowed the problems to fester for years.[85]    Senator Levin summarized the fraudulent lending practices that Washington Mutual hid from the public:

> Sales associates manufacturing documents, large numbers of loans that don't meet credit standards, offices issuing loans in which 58, 62, or 83% contain evidence of fraudulent borrower information, loans marked as containing fraud but then sold to investors anyway.  These are massive, deep seated problems.  And they are problems that, inside the bank, were communicated to senior management, but were not fixed.[86]

### g.    Contrary To Representations To Investors In The Trust Preferred Securities Regarding Robust Practices, Risk Management Was Relegated To A Mere "Customer Service" Role.

158.    The purpose of risk management in a lending institution is to provide a buffer against unsafe lending practices by identifying and controlling risks.  But, rather than allow its risk management group to perform this important function, Washington Mutual and its senior officers secretly reduced the group's effectiveness while simultaneously increasing the bank's risk.

159.    As early as September 2005, senior management knew of serious and systemic risk management deficiencies through an internal report identifying significant issues, including material flaws in Washington Mutual's risk modeling.  In that report, it was found that the Loan Performance Risk Model ("LPRM"), by which Washington Mutual was supposed to measure risk in its portfolio, was untested on products with the potential to negatively amortize.  This meant Washington Mutual was not properly measuring the risk profile of its flagship product, the Option ARM.

---

[85]    See April 13, 2010 Senate Subcommittee Hearing Ex. 34, p. 3.

[86]    Senator Levin Opening Statement, April 13, 2010 Senate Subcommittee Hearing, p. 8.

160.     Option ARM loans dominated Washington Mutual's residential portfolio from 2005 forward, and negative amortization skyrocketed from 2004 through 2007. During that time period, Washington Mutual Option ARM borrowers in negative amortization as a percentage of the total value of Option ARM loans increased from 25% to 70%. Yet, Washington Mutual was incapable of measuring the risk associated with these events, and senior management ignored and/or covered up the problem.

161.     Importantly, Washington Mutual was required to maintain and periodically adjust a reserve amount for probable losses resulting from borrower defaults or when it was probable that borrowers would default (the "Allowance for Loan and Lease Losses" or "Allowance"). By not properly accounting for and protecting against risk in calculating the Allowance for Loss, Washington Mutual improperly inflated its net income quarter after quarter. According to calculations prepared in connection with pending securities litigation in Washington state, the estimated effect on net income due to understating the Allowance ranged from $33 million in the first quarter of 2006 to $592 million in the third quarter of 2007.[87]

162.     Instead of addressing this serious flaw in its risk management practices, Washington Mutual made the express decision to weaken its controls further. To this end, in the fourth quarter of 2005, then-Chief Risk Officer James Vanasek told the Company's credit risk managers that senior management decided the company would be more "aggressive" in lending and that the risk managers were expected to cooperate with the efforts to "push the envelope." An October 31, 2005 internal memorandum prepared by Melissa Martinez, Washington Mutual's then Chief Compliance and Risk Oversight Officer explicitly stated that risk management would be going through a "cultural change" and "behavioral change." It further stated that risk

---

[87]     Amended Consolidated Class Action Complaint, *In Re: Washington Mutual, Inc. Securities Litigation*, U.S. Dist. Ct., W.D. Washington, No. 2:08-md-1919, p. 111.

management would have to assume a "customer service" role, rather than impose a "regulatory burden" on other Washington Mutual segments. From then on, Washington Mutual's risk management group was supposed to be only "advisory." But, even when members of the group provided "advice," the recommendations were routinely ignored by senior management.

163. Notwithstanding contrary representations to investors in the Trust Preferred Securities, Washington Mutual continuously undermined its own risk management practices, allowing risk to build secretly in its portfolio. This hidden lack of oversight contributed materially to the events claimed to justify the purported Conditional Exchange.

**C.    The OTS Repeatedly Identified Serious Problems At Washington Mutual, But Allowed Them To Continue Unabated For Fear Of Losing The Audit Income And Favor Of Its Largest "Customer."**

164. The OTS is charged with regulating the operations of federal savings banks or thrifts, such as Washington Mutual Bank. As Washington Mutual's primary federal regulator, the OTS was responsible for conducting full scope examinations to assess the safety and soundness of the banking operations and compliance with consumer protection laws.

165. For years, the OTS repeatedly identified, but chose not to disclose publicly, significant weaknesses in Washington Mutual's banking practices, including the escalating reliance on high-risk products, "'less than satisfactory' underwriting standards, 'higher than acceptable' underwriting errors, weak risk management controls, and a disturbing numbers [sic] of loans with false borrower information or that failed to comply with the bank's credit requirements."[88]

---

[88]    See April 15, 2010 US Senate Permanent Subcommittee on Investigations Press Release, p. 2; April 16, 2010 Senate Subcommittee Hearing Ex. 82, April 2010 Report from the Offices of the Inspector General, Department of the Treasury, Federal Deposit Insurance Corporation ("OIG Report") p. 15.

166.     Those findings were all shared with Washington Mutual's officers and directors, with the apparent expectation of correction. Even without any correction, from 2003 until February 2008 (importantly, well after the last Trust Preferred Securities offering), the OTS consistently rated Washington Mutual in a way that indicated to the public, to depositors and to investors in the Trust Preferred Securities that the bank was fundamentally sound. Worse still, the OTS, in an effort to protect Washington Mutual and not the public interest, fought other regulators and their efforts to rein in high risk loans, even preventing the FDIC from engaging in any oversight.

167.     The OTS received its entire budget from fees assessed on its regulated institutions. As the OTS's largest regulated institution, from 2003 to 2008, Washington Mutual made up between 12-15% of the OTS's total budget. As such, Washington Mutual was frequently referred to by the OTS as one of its best "constituents" or "customers," a customer the OTS did not want to risk losing.[89]

168.     Because of its failure to act as a proper regulator, the OTS enabled, and indeed facilitated, the ongoing misrepresentations to investors in the Trust Preferred Securities. In fact, the OTS even signed on to the scheme to conceal WMI's intent to downstream the Trust Preferred Securities by treating the Side Letters as confidential and not even inquiring as to whether WMI would disclose its true intentions to investors. In essence, the OTS allowed, if not outright facilitated, the perpetration of an ongoing fraud on investors in the Trust Preferred Securities.

---

[89]     April 16, 2010 Opening Statement of Senator Carl Levin, D-Mich., before the U.S. Senate Subcommittee on Investigations, p. 1.

1. **The OTS Facilitated The Fraud On Investors In The Trust Preferred Securities.**

169. Throughout the relevant time period, the OTS conducted routine examinations of Washington Mutual, as it did with other thrifts, focused around the CAMELS[90] rating system used by all of the federal bank regulators and culminating in an annual Report of Examination ("ROE").

170. A primary purpose of the rating system is to identify institutions that pose a risk of failure and require more than normal supervision. The CAMELS comprehensive numerical values range from 1 to 5, with 1 being the highest ranking available for banks. The standard descriptions of each rating are:

| 1 | Sound in every respect |
|---|---|
| 2 | Fundamentally sound |
| 3 | Exhibits some degree of supervisory concern in one or more of the component areas (i.e., capital adequacy, asset quality, management, earnings, liquidity, sensitivity to market risk) |
| 4 | Generally exhibits unsafe and unsound practices or conditions |
| 5 | Exhibits extremely unsafe and unsound practices or conditions; exhibits a critically deficient performance; often contains inadequate risk management practices relative to the institution's size, complexity, and risk profile; and is of the greatest supervisory concern |

171. Between 2001 and 2007, the OTS consistently gave Washington Mutual a composite rating of 2. According to the Inspector General:

---

[90] The CAMELS composite rating reflects a qualitative assessment based on the review of component ratings related to: (C) Capital adequacy in relation to risk profile and operations; (A) Asset quality relative to credit risk related to loan and investment portfolios; (M) Management imposed policies, procedures and practices regarding risk exposure; (E) Earnings; (L) Liquidity; and (S) Sensitivity to market risk.

> [A] composite 2 rating reflects the agency's assessment that an institution is fundamentally sound. The CAMELS composite criteria for a 2 also states that such institutions have only moderate weaknesses that are within the board's and management's capability and willingness to correct, and have satisfactory risk management practices relative to the institution's size, complexity, and risk profile. Institutions in this category are stable and capable of withstanding business fluctuations….[T]he composite rating is a critical factor in supporting the need for enforcement actions and in determining the assessment rate an institution should pay for deposit insurance purposes.[91]

172.    While it was giving Washington Mutual positive ratings, the OTS was actually identifying and presenting to Washington Mutual's officers and directors significant problems with Washington Mutual's increasingly risky and unsafe practices.

> The painful fact is that [federal regulators] had a front row seat to Washington Mutual's high risk lending strategy, its poor quality loans, and substandard securitization practices, but did little to stop it.
>
> …
>
> OTS knew all about Washington Mutual's high risk lending strategy….OTS knew about Washington Mutual's shoddy lending practices, having repeatedly identified problems with the bank's operations in examination reports year after year. Every time OTS listed a problem, it also told WaMu to take corrective action. But when the problem didn't get fixed, OTS failed to force change.[92]

173.    Thus, despite the ever-increasing risk incurred by Washington Mutual and the bank's shoddy lending practices, the OTS facilitated the misrepresentations to investors that they had no reason to suspect trouble at Washington Mutual.

174.    For years, the OTS consistently found, and pointed out to management, that Washington Mutual's risk management was insufficient, underwriting standards were "less than satisfactory," the number of underwriting errors were "higher than acceptable," and even found

---

[91]    OIG Report, p. 16.

[92]    April 16, 2010 Opening Statement of Senator Carl Levin, D-Mich., before the U.S. Senate Subcommittee on Investigations, p. 2-3.

loans with erroneous or fraudulent information that did not comply with the bank's credit requirements, or contained other problems.[93]

175. Specific problems that were repeatedly uncovered by the OTS and reported to Washington Mutual include:

**2004**

"Underwriting of SFR loans remains less than satisfactory." One of the three causes of underwriting deficiencies was "a sales culture focused on building market share." 2004 Report of Examination (ROE), 9/13/04, OTSWMSO4-0000001497. (Full exhibit sealed.)[94]

...

"The level of SFR underwriting exceptions in our samples has been an ongoing examination issue for several years and one that management has found difficult to address." Field Visit ROE, 10/18/04, OTSWMEF-00000047576. (Full exhibit sealed.)

"[Residential Quality Assurance]'s review of 2003 originations disclosed critical error rates as high as 57.3 percent of certain loan samples, thereby indicating that SFR [Single Family Residential] underwriting still requires much improvement. While this group has appropriately identified underwriting deficiencies, it has not been as successful in effecting change." 2004 ROE, 9/13/04, OTSWMSO4-000001498. (Full exhibit sealed.)

**2005**

"SFR Loan Underwriting — This has been an area of concern for several exams...." MRBA [Matter Requiring Board Attention], OTS Letter to Washington Mutual Board of Directors, 2/7/05, OTSWMEF-0000047591. (Full exhibit sealed.)

...

"We continue to have concerns regarding the number of underwriting exceptions and with issues that evidence lack of compliance with Bank policy." OTS Exam Findings Memo, 6/3/05, "Single Family Residential Home Loan Review," OTSWME05-004 0000392. Exhibit 26.

"[W]e remain concerned with the number of underwriting exceptions and with issues that

---

[93] April 16, 2010 Memorandum to Members of the Permanent Subcommittee on Investigations, p. 5.

[94] References to exhibits in these paragraphs are the same references to exhibits referenced by and relied upon by the Senate Subcommittee on Investigations.

evidence lack of compliance with bank policy .... [T]he level of deficiencies, if left unchecked, could erode the credit quality of the portfolio. Our concerns are increased with [sic] the risk profile of the portfolio is considered, including concentrations in Option ARM loans to higher-risk borrowers, in low and limited documentation loans, and loans with subprime or higher-risk characteristics. We are concerned further that the current market environment is masking potentially higher credit risk." 2005 ROE, 8/29/05, OTSWMS05-004 0001794. (Full exhibit sealed.)

...

## 2006

"During the prior examination, we noted numerous instances of underwriters exceeding underwriting guidelines, errors in income calculations, errors in debt-to-income (DTI) calculations, lack of sufficient mitigating factors for credit-quality related issues, and insufficient title insurance coverage on negative amortization loans. ... [U]nderwriting errors [] continue to require management's attention." OTS Exam Findings Memo, 5/23/06, "Home Loan Underwriting," OTSWMSO6-008 0001299. Exhibit 33.

"Overall, we concluded that the number and severity of underwriting errors noted remain at higher than acceptable levels." OTS Exam Findings Memo, 5/25/06, "Loan Underwriting Review – Long Beach Mortgage," OTSWMSO6-008 0001243. Exhibit 35.

"Subprime underwriting practices remain less than satisfactory. ...[T]he number and severity of underwriting exceptions and errors remain at higher than acceptable levels. ... The findings of this judgmental sample are of particular concern since loans with risk layering ... should reflect more, rather than less, stringent underwriting. Borrowers in this category generally have debt ratios that are near the maximum rations allowed by LBMC's policy; thus, any DTI ratio calculation errors made by LBMC underwriters for such borrowers are likely to push these loans outside LBMC's underwriting guidelines for DTI ratios." 2006 ROE, 8/29/06, OTSWMS06-008 0001680. (Full exhibit sealed.)

## 2007

"Underwriting policies, procedures, and practices were in need of improvement, particularly with respect to stated income lending. Based on our current findings, and the fact that a number of similar concerns were raised at prior examinations, we concluded that too much emphasis was placed on loan production, often at the expense of loan quality." 2007 ROE, 9/18/07, OTSWMEF-0000046679. (Full exhibit sealed.)

"Based on our review of 75 subprime loans originated by LBMC, we concluded that subprime underwriting practices remain less than satisfactory .... Given that this is a repeat concern and MRBA [Matter Requiring Board Attention], we informed management that underwriting must be promptly corrected, or heightened supervisory action would be taken, including limiting the Bank's ability to continue SFR subprime

underwriting." 2007 ROE, 9/18/07, OTSWMEF-0000047146. (Full exhibit sealed.)[95]

176.    The underwriting deficiencies were not the only problems identified by the OTS and presented to Washington Mutual.    The OTS also repeatedly noted deficiencies in Washington Mutual's risk management efforts.

**2004**

"Board oversight and management performance has been satisfactory ... but ... increased operational risks warrant prompt attention.  These issues limit the institution's flexibility and may threaten its ability to remain competitive and independent."  2004 Report of Examination (ROE), 9/13/04, OTSWMSO4-0000001504.  (Full exhibit sealed.)

...

"Ensure cost-cutting measures are not impacting critical risk management areas."  2004 ROE, 9/13/04, OTSWMSO4-000001488.  (Full exhibit sealed.)

**2005**

...

"Until full exception data collection, reporting, and follow-up processes are in place and stabilized, senior management and the Board cannot fully assess whether quality assurance processes are having a meaningful impact on line activities, including loan underwriting.  We are particularly concerned with the establishment of good quality assurance process for SFR underwriting, which has been an issue for the past several examinations."  2005 ROE, 8/29/05, OTSWMS05-004 0001792.  (Full exhibit sealed.)

...

**2007**

"Risk management practices in the HLG (Home Loans Group) during most of the review period were inadequate ....  [A]s previously noted, the risk misrepresentation in stated income loans has been generally reported for some time...."  2007 ROE, 9//18/07, OTSWMEF-0000046681.  (Full exhibit sealed.)

....

---

[95]    April 16, 2010 Permanent Subcommittee on Investigations, Ex. 1d.

**2008**

"Poor financial performance due in part to market conditions; however, performance exacerbated by conditions within management's control: poor underwriting quality, geographic concentrations in problem markets, liberal underwriting policy, risk layering." OTS Presentation to Washington Mutual Board of Directors based on Comprehensive Examinations, 7/15/08, Polakoff_Scott-00061303027, Exhibit 12.

"An adequate [Enterprise Risk Management] function still does not exist although this has been an MRBA for some time." OTS Presentation, 7/15/08, Polakoff_Scott-00061303_028. Exhibit 12.[96]

177.   As can be seen from the lists above, "WaMu's bad practices went well beyond individual cases and instead involved systematic efforts to mislead borrowers and investors."[97] However, the OTS consistently resisted making any public representation that Washington Mutual's practices were less than satisfactory. It was not until late February 2008 that the OTS finally downgraded the bank's CAMELS rating from a 2 to a 3, and even then it did not take any other public action that would have identified the depth and breadth of Washington Mutual's problems. Instead, the OTS waited until the next month to accept a nonpublic board resolution in which WMI's board promised to fix problems but provided no specific plans or deadlines for doing so. "It was a kid gloves approach..." that helped preserve a sense that the bank was more stable than it actually was.[98]

178.   Because the OTS merely identified for Washington Mutual its deficiencies, rather than taking action as the primary federal regulator, Washington Mutual had free reign to ignore its mounting problems, implement all of the policies that contradicted its public representations

---

[96]   April 16, 2010 Permanent Subcommittee on Investigations Ex. 1e.

[97]   Hudson, Michael & Jim Overton, "The Second S&L Scandal" p. 9 (Center for Responsible Lending January 2009).

[98]   April 16, 2010 Opening Statement of Senator Carl Levin, D-Mich., before the U.S. Senate Subcommittee on Investigation, p. 5.

of safety and soundness, and certain of the Washington Mutual Entities were enabled to bilk $4 billion from investors in the Trust Preferred Securities.

**2. The OTS's Complicity Was Aimed At Keeping Its Largest Constituent Appeased.**

179. Even Washington Mutual officials were flabbergasted by the OTS's facilitating of Washington Mutual's practices. Testifying before the Senate Subcommittee, Washington Mutual's former chief risk officer Jim Vanasek said:

> What I cannot explain is why the superiors in the agencies didn't take a tougher tone with the banks given the degree of...negative findings....[T]here seemed to be a tolerance there or a political influence on senior management of those agencies that prevented them from taking a more active stance. By a more active stance, I mean putting the banks under letters of agreement and forcing change.[99]

180. Mr. Vanasek's successor testified: "the approach that the OTS took was much more light-handed than I was used to. It seemed as if the regulator was prepared to allow the bank to work through its problems and had a higher degree of tolerance...than I had seen with the other...regulators."[100]

181. "Regulations work best when regulators stay at arms length from those that they regulate. Too often in this case, Washington Mutual regulators were not at arms length; they were arm in arm."[101] The OTS was more than willing to let Washington Mutual do whatever it

---

[99] April 16, 2010 Opening Statement of Senator Carl Levin, D-Mich., before the U.S. Senate Subcommittee on Investigation, p. 3.

[100] April 16, 2010 Opening Statement of Senator Carl Levin, D-Mich., before the U.S. Senate Subcommittee on Investigation, p. 3.

[101] April 16, 2010 Opening Statement of Senator Carl Levin, D-Mich., before the U.S. Senate Subcommittee on Investigation, p. 3.

wanted because it needed to protect the OTS's relationship with Killinger and Washington Mutual, which OTS Director John Reich described as "my largest constituent."[102]

182.    To keep its best customer appeased, the OTS eschewed its regulatory function, and helped to hide Washington Mutual's dirty secrets – and the Side Letters were just one such dirty secret.    The OTS's failure to act in any way allowed, if not directly assisted, the perpetration and perpetuation of a fraud on investors in the Trust Preferred Securities.

**D.    JPMorgan Chase Had Complete Access To WMB's Internal Information For Months Prior To September 2008, And, Therefore, Knew Or Should Have Known Investments In The Trust Preferred Securities Had Been Induced Through Fraud And Misrepresentations.**

183.    Long before JPMC purchased WMB's assets out of receivership for $1.88 billion, it had its sights set on acquiring the bank to further its goals of expanding its presence on the West Coast.    Throughout 2008, JPMC was given access to Washington Mutual's confidential information and received significant assistance from federal regulators.    As a result, JPMC had full knowledge of the inner workings of Washington Mutual, of its assets, and of the true nature of the Trust Preferred Securities, including WMI's secret pact with the OTS to downstream the Trust Preferred Securities to WMB.    Despite having already obtained a significant bargain in September 2008 (as explained below), JPMC now also seeks title to the Trust Preferred Securities.

**1.    JPMC's Access To The Bank**

184.    Throughout the spring and summer of 2008, JPMC enjoyed significant access to non-public information regarding Washington Mutual and its condition.    And, enjoying that access and the assistance of federal regulators, JPMC simply bided its time until it could pounce following Washington Mutual's expected stumble.

---

[102]    April 16 Permanent Subcommittee on Investigations Ex. 78, May 2007 email.

185.     In early 2008, several financial institutions, including JPMC, were invited to explore a possible acquisition of Washington Mutual. Throughout March 2008, JPMC conducted significant amounts of due diligence, reviewing the assets and liabilities of Washington Mutual in preparation for submitting an acquisition proposal.

186.     JPMC made a bid on March 31, 2008 to acquire Washington Mutual for up to $8 per share, or approximately $7 billion, plus the assumption of debt – equating to a potential implied transaction value of upwards of $30 billion. The March JPMC bid, however, was rejected in favor of a $7.2 billion infusion of primarily equity from several institutional investors.

187.     Despite the rejection of its offer in March 2008, JPMC was not deterred in its quest to own Washington Mutual and/or WMB. Throughout the summer, JPMC continued to model acquisition scenarios and continued to meet with regulators about acquiring Washington Mutual and/or WMB.[103] During those summertime meetings, the regulators and JPMC discussed JPMC's potential purchase of the bank out of receivership – giving JPMC inside information about such a potential seizure months before regulators actually effected it.[104]

188.     At around the same time, JPMC was receiving other unofficial assistance from the federal government. As reported in a November 2008 Seattle Times article, then Treasury Secretary Henry Paulson personally called Killinger in July 2008 to say: "You should have sold to JPMorgan Chase in the spring, and you should do so now. Things could get a lot more

---

[103]     See Debtors' December Rule 2004 Motion, Ex. 10, July 17, 2008 internal email "we may get more color tomorrow with the regulators"; Debtors' December Rule 2004 Motion, Ex. 11 July 2008 discussion materials.

[104]     See Debtors' December Rule 2004 Motion, Ex. 12, July 2008 Discussion Materials, JPM EX 5817; Debtors' December Rule 2004 Motion, Ex. 11, July 2008 Discussion Materials, JPM EX 324).

difficult for you." Such a warning caught Killinger and top executives off guard because of the recent $7.2 billion capital raise.

189. In addition to discussing the acquisition of WMB out of receivership with regulators in July 2008, JPMC received advanced notice in September of the impending seizure. According to a September 30, 2008 Wall Street Journal article, "Three weeks before J.P. Morgan bought Washington Mutual's deposits for $1.9 billion, officials at the Federal Deposit Insurance Corp. called J.P. Morgan to say the FDIC was carefully monitoring Washington Mutual and that a seizure of its assets was likely. The FDIC said it would want to immediately auction off Washington Mutual's assets if a seizure was necessary."[105]

190. On or about September 12, 2008, WMI hired Goldman Sachs, which had participated in each of the Trust Preferred Securities offerings, as an advisor to find a buyer for Washington Mutual. On that same day, Bloomberg reported that JPMC was in "advanced talks to buy Washington Mutual." However, JPMC already knew WMB was going to be seized and it would be able to purchase the bank's assets at a steep discount if it only waited for federal regulators to make good on their threats. Although JPMC's intention at that point was to work directly with the FDIC to acquire the bank out of receivership, the pseudo-auction process in early September 2008 gave JPMC the ability to update its due diligence and to obtain additional access to non-public information regarding Washington Mutual and/or WMB.[106]

---

[105] Debtors' December Rule 2004 Motion, Ex. 13, 9/30/08 WSJ article.

[106] See Debtors' December Rule 2004 Motion, Ex. 6, Sept. 19, 2008 presentation to ratings agencies, JPM EX 12888, JPMC stated that Washington Mutual had hired investment banks "to run auction process", but indicated that it would "not participate in auction [because its] [a]pproach is to work directly with the FDIC"); Bd. of Directors Presentation, JPM EX 12951.

191. Additionally, the FDIC assisted JPMC in obtaining all of the information it wanted, even when Washington Mutual employees resisted.[107] With its continued, or at least renewed, access to non-public information and the assistance of federal regulators, JPMC spent the first weeks of September 2008 reviewing and updating its due diligence.

192. When the government's decision to seize WMB and auction its assets was finally made known to others on September 23, 2008, JPMC's advanced notice and the assistance from regulators put it in prime position to acquire the bank it had long coveted, at a steep discount from the price it was willing to pay only months earlier.

### 2. JPMorgan Admits That It Acquired WMB For A Price Far Below Its Worth.

193. On September 25, 2008, just two days after the FDIC announced it was seeking a bidder for Washington Mutual, JPMC entered into a purchase and assumption agreement with the FDIC, whereby JPMC acquired WMB's branches, deposit liabilities, loan portfolio and covered bonds and secured debts for $1.88 billion. At the same time, JPMC was able to exclude significant liabilities (having expressly excluded the liabilities of WMI), and all for a small fraction of the price JPMC had been willing to pay in Spring 2008.

194. Immediately after the acquisition, JPMC acknowledged the windfall it received. In its September 30, 2008 Form 10-Q, filed less than one week after it acquired WMB, JPMC showed an after-tax gain of $581 million from the acquisition. The gain was based on negative goodwill, or a gain received by paying less than the fair value of the acquired net assets. JPMC subsequently reassessed its windfall gain, stating in its 2008 Form 10-K that the gain totaled $1.9

---

[107] See Debtors' December Rule 2004 Motion, Ex. 17, 9/22/08 email to FDIC re: information request, JPM EX 77.

billion. Thus, JPMC acknowledged that it paid less than half-price for WMB.[108] JPMC has since recorded billions more in gains associated with acquired assets (in particular, mortgage loans) that have proven to be far more valuable than was reflected in JPMC's purchase price.

195. In the March 23, 2009 letter to shareholders, James L. Dimon, CEO and chairman of the board for JPMC, further described the huge gain from the WMB purchase. Specifically, he stated that "[m]oments" after the seizure of WMB by the FDIC, JPMC:

> [A]cquired the deposits, assets and certain liabilities of Washington Mutual for approximately $1.9 billion….Importantly, we did not acquire the assets or liabilities of the bank's holding company or assume the $14 billion of senior unsecured debt and subordinated debt of Washington Mutual's banks.

> The deal was financially compelling—it was immediately accretive to earnings, and it will add an estimated $2 billion or 50 cents per share to our 2009 results and increasingly more thereafter.

> …

> With the acquisition of WaMu, we purchased approximately $240 billion of mortgage and mortgage-related assets, with $160 billion in deposits and $38 billion in equity. We immediately wrote down most of the bad or impaired assets (approximately $31 billion), properly reserved for the remaining assets, and established reserves for severance and close-down costs. After recognizing all of these costs, we believe that we now have a relatively "clean" company that came with approximately $4 billion in "good" common equity.[109]

**3.      With Its Unprecedented Access, JPMC Had Prior Knowledge Of The True Nature Of The Trust Preferred Securities, Including That They Were Tainted By Fraud.**

196.    JPMC spent months reviewing Washington Mutual's assets and liabilities, had constant access to WMB and regulators, made two offers to acquire the bank, and ultimately acquired WMB with full knowledge of all of the bank's assets and operations. As such, with

---

[108]    See Debtors' Counterclaim, ¶ 72.

[109]    March 23, 2009 Letter to Shareholders, p. 10.

respect to the Trust Preferred Securities, JPMC knew that they were not WMB assets and that JPMC could not acquire those interests from WMB without a number of intervening steps.

197. Having reviewed the terms of the Trust Preferred Securities, including the governing documents, JPMC was on notice that a series of events had to occur before the Trust Preferred Securities would, assuming arguendo the validity of the Conditional Exchange provisions, even become assets of WMI.[110] First, an Exchange Event would have to occur. Second, the OTS would have to issue a directive that there be such a Conditional Exchange. Third, the holders of the securities would have to surrender the certificates to WMI. Fourth, the applicable trustees would have to record in the appropriate registers that WMI was the owner of the Trust Preferred Securities. Fifth, WMI would have to issue to each holder a like amount of depositary shares representing the WMI preferred stock. And still, at that point, the Trust Preferred Securities would be held by WMI, not WMB. Importantly, JPMC did not acquire any assets or liabilities of WMI.

198. Furthermore, as a result of the due diligence it conducted, JPMC had access to and reviewed the secret Side Letter agreements with the OTS to downstream the Trust Preferred Securities following the occurrence of a Conditional Exchange. JPMC knew or should have known the secret Side Letters and the promise to downstream the Trust Preferred Securities to WMB were not disclosed to investors in the Trust Preferred Securities, nor to the marketplace. JPMC was provided with all of the documents related to the Trust Preferred Securities, including the misleading offering circulars and the secret Side Letters.

---

[110] See Debtors' December Rule 2004 Motion, Ex. 15, Sept. 14, 2008 Discussion Materials, JPM EX 278; Debtors' December Rule 2004 Motion, Ex. 12, July 2008 Discussion Materials, JPM EX 5817.

199. Not only did JPMC have access to all of the documents related to the transactions during its due diligence in the spring and late summer of 2008, but JPMorgan Securities, Inc. (which is a direct subsidiary of JPMC) acted as an underwriter for the WaMu Delaware III offering. As an underwriter, JPMC's direct subsidiary is charged with knowledge of the misrepresentations in the offering circular. Each of the offering circulars contained the same material omission as that on which JPMorgan Securities, Inc. acted as underwriter. As such, JPMC should also be charged with knowledge, through JPMorgan Securities, Inc., of the fraud and misrepresentations infecting at least the WaMu Delaware III offering, if not all of the other offerings given the similarity of the transactions.

200. Given its direct access to WMB and the involvement of its own subsidiary in the transactions, JPMC knew that certain of the Washington Mutual Entities procured investments in the Trust Preferred Securities under false pretenses. Because JPMC knew of the true nature of the securities and of the misrepresented offerings, it would be inequitable for JPMC to be given the tainted fruits of the offerings, while the Trust Preferred Holders, and other investors in the Trust Preferred Securities, are deprived of the misrepresented value of the securities.

## COUNT I
## DECLARATORY JUDGMENT
## (Against WMI, JPMC)

201. Plaintiffs repeat and reallege the allegations contained in paragraphs 1, 2, 8-59, 71-72, 74-77, 79-83, and 84-89, which are incorporated by reference as if set forth fully herein.

202. There is an actual controversy between the Trust Preferred Holders, WMI and JPMC regarding ownership of the Trust Preferred Securities, which is of sufficient immediacy to warrant judicial relief under 28 U.S.C. § 2201.

203. Both WMI and JPMC have asserted a claim of ownership to the Trust Preferred Securities. However, the operative controlling documents related to the Trust Preferred Securities imposed certain conditions to consummation of the purported Conditional Exchange. These conditions were not satisfied. As such, WMI never obtained an interest in the Trust Preferred Securities, and it had no rights to the Trust Preferred Securities to transfer to WMB and/or JPMC.

204. Under the applicable trust agreements, in connection with a purported Conditional Exchange, holders purportedly had an unconditional obligation to surrender to WMI any certificates representing the Trust Preferred Securities. Those certificates, held by Cede & Co., as nominee for DTC, were never delivered to WMI. As such, this condition precedent to consummation of the purported Conditional Exchange has not been satisfied, the purported Conditional Exchange therefore failed, and ownership of the Trust Preferred Securities remains with the Plaintiffs and similarly-situated investors.

205. In connection with a purported Conditional Exchange, the applicable trustees were to have recorded in the applicable trust registers WMI as the holder of the Trust Preferred Securities, "as transferee from the Holders of the Trust [Preferred] Securities immediately prior to such date and time . . . ." The applicable trustees have not recorded WMI as the holder of the Trust Preferred Securities in any of the associated trust registers. As such, this condition precedent to consummation of the purported Conditional Exchange has not been satisfied, the purported Conditional Exchange therefore failed, and ownership of the Trust Preferred Securities remains with the Plaintiffs and similarly-situated investors.

206. In connection with a purported Conditional Exchange, WMI was required to issue to each holder of the Trust Preferred Securities a like amount of the applicable series of WMI

preferred equity. WMI was further obligated to mail to each holder of record of the Trust Preferred Securities a notice regarding the occurrence of a purported Conditional Exchange. The WMI preferred equity was never issued, nor was the required notice of the purported Conditional Exchange transmitted. As such, these conditions precedent to consummation of the purported Conditional Exchange have not been satisfied, the purported Conditional Exchange therefore failed, and ownership of the Trust Preferred Securities remains with the Plaintiffs and similarly-situated investors.

207. Because the purported Conditional Exchange never occurred, WMI never acquired ownership or title to the Trust Preferred Securities and thus could not have transferred ownership or title to the Trust Preferred Securities to WMB. Because WMI could not lawfully transfer ownership or title to the Trust Preferred Securities to WMB, neither WMB nor the FDIC could transfer ownership or title to the Trust Preferred Securities to JPMC.

208. Lastly, although the Trust Preferred Securities were purportedly transferred to JPMC, there is no indication that such a transfer was in fact consummated. As previously alleged by WMI, the issuers of the Trust Preferred Securities made no transfer notations registering the Trust Preferred Securities to WMB (or any other party) to reflect any purported assignment.

209. Under every circumstance, JPMC has no right to the Trust Preferred Securities. In addition, JPMC cannot assert any claim for the Trust Preferred Securities because it expressly excluded from its purchase of WMB's assets "any interest, right, action, claim, or judgment against" WMI.

210. As such, Plaintiffs request a declaratory judgment determining that:

- The purported Conditional Exchange was never consummated.

- The purported Conditional Exchange cannot now be consummated.

- WMI has no right, title or interest in the Trust Preferred Securities.

- JPMC has no right, title or interest in the Trust Preferred Securities.

- As a result, the Trust Preferred Securities and any claim thereto, do not constitute property of the estate under 11 U.S.C. § 541.

- As a result, inter alia, of the failure of the purported Conditional Exchange, all right, title and interest in the Trust Preferred Securities remains with investors who held such securities immediately prior to 8:00 a.m. (Eastern) on September 26, 2008, or to any party to whom such parties subsequently transferred such Trust Preferred Securities, other than in connection with the purported Conditional Exchange.

### COUNT II
### DECLARATORY JUDGMENT
### (Against WMI, JPMC)

211. Plaintiffs repeat and reallege the allegations contained in paragraphs 1, 2, 8-59, 71-72, 74-77, 79-83, and 84-89, which are incorporated by reference as if set forth fully herein.

212. There is an actual controversy between the Trust Preferred Holders, WMI and JPMC regarding ownership of the Trust Preferred Securities, which is of sufficient immediacy to warrant judicial relief under 28 U.S.C. § 2201.

213. Both WMI and JPMC have asserted a claim of ownership to the Trust Preferred Securities. However, applicable law imposes certain requirements to effectuation of any transfer of the Trust Preferred Securities. These requirements were not met. As such, the purported Conditional Exchange through which WMI has claimed ownership of the Trust Preferred Securities was never consummated. As WMI never obtained any rights to the Trust Preferred Securities, it had no rights to the Trust Preferred Securities to transfer to WMB and/or JPMC.

214. Because the Trust Preferred Securities were issued in certificated form, UCC § 8-301(a) governs delivery upon a transfer, in this case requiring: (a) WMI to acquire possession of

the applicable security certificate(s); or (b) for another person, other than a securities intermediary, to take possession of the security certificate(s) on behalf of WMI, or, having previously acquired possession of the certificate, acknowledge that it holds on behalf of WMI. WMI never acquired possession of the applicable certificates for the Trust Preferred Securities, and no other person in possession of such securities has recognized WMI as the transferee of the Trust Preferred Securities. As such, the legal requirements for delivery of the Trust Preferred Securities, a condition precedent to consummation of any exchange or transfer, have not been fulfilled, the purported Conditional Exchange failed, and ownership of the Trust Preferred Securities remains with the Plaintiffs and similarly-situated investors.

215. Because the purported Conditional Exchange never occurred, WMI could not have transferred the Trust Preferred Securities to WMB and JPMC could not have acquired the Trust Preferred Securities.

216. Lastly, although the Trust Preferred Securities were purportedly transferred to JPMC, there is no indication that such a transfer was in fact consummated. As previously alleged by WMI, the issuers of the Trust Preferred Securities made no transfer notations registering the Trust Preferred Securities to WMB to reflect any purported assignment.

217. Under every circumstance, JPMC has no right to the Trust Preferred Securities. Indeed, JPMC cannot assert any claim for the Trust Preferred Securities because it expressly excluded from its purchase of WMB's assets "any interest, right, action, claim, or judgment against" WMI.

218. As such, Plaintiffs request a declaratory judgment determining that:

- The purported Conditional Exchange was never consummated.

- The purported Conditional Exchange cannot now be consummated.

- WMI has no right, title or interest in the Trust Preferred Securities.

- JPMC has no right, title or interest in the Trust Preferred Securities.

- As a result, the Trust Preferred Securities and any claim thereto, do not constitute property of the estate under 11 U.S.C. § 541.

- As a result, inter alia, of the failure of the purported Conditional Exchange, all right, title and interest in the Trust Preferred Securities remains with investors who held such securities immediately prior to 8:00 a.m. (Eastern) on September 26, 2008, or to any party to whom such parties subsequently transferred such Trust Preferred Securities, other than in connection with the purported Conditional Exchange.

## COUNT III
## DECLARATORY JUDGMENT
### (Against WMI, JPMC)

219. Plaintiffs repeat and reallege the allegations contained in paragraphs 1, 2, 8-59, 71-72, 74-77, 79-83, and 84-89, which are incorporated by reference as if set forth fully herein.

220. There is an actual controversy between the Trust Preferred Holders, WMI and JPMC regarding ownership of the Trust Preferred Securities, which is of sufficient immediacy to warrant judicial relief under 28 U.S.C. § 2201.

221. Both WMI and JPMC have asserted a claim of ownership to the Trust Preferred Securities. However, the Trust Preferred Securities and related controlling agreements impose restrictions on transferees of the Trust Preferred Securities. Those restrictions prohibited any transfer of the Trust Preferred Securities to WMI. As such, the purported Conditional Exchange through which WMI has claimed ownership of the Trust Preferred Securities was never consummated. As WMI never obtained any rights to the Trust Preferred Securities, it had no rights to the Trust Preferred Securities to transfer to WMB and/or JPMC.

222. The terms of the Trust Preferred Securities themselves and the applicable governing documents (each of which were drafted by or under the direction of WMI), require all

transferees of the Trust Preferred Securities to satisfy certain requirements, including having, on the date of the proposed transfer, a net worth of at least $25 million and $100 million in securities held for discretionary investment purposes. On the date of the purported Conditional Exchange, WMI had a negative net worth of approximately $575 million – $600 million less than would be required to meet the definition of "Eligible Purchaser" imposed by WMI itself. On the date of the purported Conditional Exchange, WMI held only $59.7 million in "investment securities" – apparently over $40 million less than would be required to meet the definition of "Eligible Purchaser" imposed by WMI itself.

223.    The applicable documents, including the certificates representing the Trust Preferred Securities, provide that any purported transfer to a party not satisfying, among other conditions, the preceding, is void ab initio, is without force and effect, and does not transfer any right to the proposed transferee. On September 26, 2008 (the date of the purported Conditional Exchange) and on every day since, WMI failed to meet the eligibility requirements it chose to impose on transfers of the Trust Preferred Securities.

224.    As such, the purported Conditional Exchange is void ab initio, is of no force or effect, and failed to transfer to WMI any right to the Trust Preferred Securities. Therefore, ownership of the Trust Preferred Securities remains with the Plaintiffs and similarly-situated investors

225.    Because the purported Conditional Exchange never occurred, WMI could not have transferred the Trust Preferred Securities to WMB and JPMC could not have acquired the Trust Preferred Securities.

226.    Lastly, although the Trust Preferred Securities were purportedly transferred to JPMC, there is no indication that such a transfer was in fact consummated. As previously

alleged by WMI, the issuers of the Trust Preferred Securities made no transfer notations registering the Trust Preferred Securities to WMB to reflect any purported assignment.

227. Under every circumstance, JPMC has no right to the Trust Preferred Securities. Indeed, JPMC cannot assert any claim for the Trust Preferred Securities because it expressly excluded from its purchase of WMB's assets "any interest, right, action, claim, or judgment against" WMI.

228. As such, Plaintiffs request a declaratory judgment determining that:

- The purported Conditional Exchange was never consummated.

- The purported Conditional Exchange cannot now be consummated.

- WMI has no right, title or interest in the Trust Preferred Securities.

- JPMC has no right, title or interest in the Trust Preferred Securities.

- As a result, the Trust Preferred Securities and any claim thereto, do not constitute property of the estate under 11 U.S.C. § 541.

- As a result, inter alia, of the failure of the purported Conditional Exchange, all right, title and interest in the Trust Preferred Securities remains with investors who held such securities immediately prior to 8:00 a.m. (Eastern) on September 26, 2008, or to any party to whom such parties subsequently transferred such Trust Preferred Securities, other than in connection with the purported Conditional Exchange.

### COUNT IV
### DECLARATORY JUDGMENT
### (Against WMI, JPMC)

229. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

230. There is an actual controversy between the Trust Preferred Holders, WMI and JPMC regarding ownership of the Trust Preferred Securities, which is of sufficient immediacy to warrant judicial relief under 28 U.S.C. § 2201.

231.   Even if, <u>arguendo</u>, the purported Conditional Exchange satisfied the documentary and statutory requirements, Plaintiffs seek, alternatively, a declaration that the purported Conditional Exchange should be deemed to have not occurred because, <u>inter alia</u>, the OTS acted in excess of its authority by effectively aiding and abetting the commission of a fraud on investors.

232.   In connection with each offering of the Trust Preferred Securities, WMI sent the secret Side Letters to the OTS, specifically informing the OTS that it intended to issue certain securities for sale to the public.

233.   WMI further requested in the secret Side Letters that the OTS allow the Trust Preferred Securities to qualify for inclusion as core capital of WMB. In connection with that request, WMI stated its secret intention to transfer the Trust Preferred Securities to WMB following a purported Conditional Exchange.

234.   In addition, WMI specifically asked that the arrangement be kept secret, requesting that the letters making that request be treated as confidential.

235.   The OTS granted each request to allow the Trust Preferred Securities to be treated as WMB core capital based on WMI's representation that WMI would downstream the Trust Preferred Securities to WMB after a purported Conditional Exchange.

236.   The OTS also allowed WMI's request to treat each of the Side Letters as confidential. Indeed, none of the Side Letters or the commitments contained therein were disclosed to investors until after WMI attempted to consummate the purported Conditional Exchange in September 2008.

237. The OTS authorized the requests in the secret Side Letters without requiring the intended "downstreaming" to be disclosed to potential investors and with knowledge that this secret arrangement would, in fact, not be disclosed.

238. By entering into that arrangement, the OTS aided and abetted the commission of fraud by WMI and the affiliated entities.

239. As such, the OTS's agreement to a secret side deal that materially affects the value of the securities issued and which was not disclosed in connection with the offering of the securities, was beyond the scope of the OTS's authority.

240. Further, the purported Conditional Exchange and transfer to WMB were contingent and dependant on the actions of the OTS. Because the purported Conditional Exchange and downstreaming were the result of a secret arrangement that was beyond the scope of the OTS's authority and/or were done by the OTS acting to facilitate illegal or fraudulent conduct by WMI and certain of the Washington Mutual Entities, the OTS directive initiating the purported Conditional Exchange and the subsequent downstreaming was also beyond the scope of the OTS's authority and otherwise should be held to be without force or effect and a nullity.

241. Further, the OTS, as Washington Mutual's primary regulator, was aware of significant issues with WMB's safety and soundness at the times of the Trust Preferred Securities issuances. The OTS was also aware that events giving rise to a purported Conditional Exchange were based on the safety and soundness of WMB, and that investors in the Trust Preferred Securities would consider material the actual condition of WMB.

242. By assisting certain of the Washington Mutual Entities in concealing the condition of WMB, the OTS aided and abetted a fraud upon investors in the Trust Preferred Securities. Such actions were beyond the scope of the OTS's authority or were done by the OTS

acting to facilitate illegal or fraudulent conduct by certain of the Washington Mutual Entities. As such, the OTS's directive initiating the purported Conditional Exchange based on fraudulently-concealed material information regarding WMB was also beyond the scope of the OTS's authority and otherwise should be held to be without force or effect and a nullity.

243.    Therefore, Plaintiffs request that this Court enter a judgment declaring that:

- Through its participation in the issuance of the Trust Preferred Securities and its agreements, as set forth in the undisclosed Side Letter agreements with WMI regarding contribution of the Trust Preferred Securities to WMB following a purported Conditional Exchange, the OTS acted in excess of its authority and its actions related to the Conditional Exchange otherwise should be held to be without force or effect and a nullity.

- The OTS's actions aided and abetted a fraud by certain of the Washington Mutual Entities against holders of the Trust Preferred Securities. By aiding and abetting that fraud, the OTS acted in excess of its authority and its actions related to the Conditional Exchange otherwise should be held to be without force or effect and a nullity

- Any directive by the OTS to execute a purported Conditional Exchange was, is, and will be, null, void, and without effect.

- As a result, the Trust Preferred Securities and any claim thereto, do not constitute property of the estate under 11 U.S.C. § 541.

- As a result, inter alia, of the failure of the purported Conditional Exchange, all right, title and interest in the Trust Preferred Securities remains with investors who held such securities immediately prior to 8:00 a.m. (Eastern) on September 26, 2008, or to any party to whom such parties subsequently transferred such Trust Preferred Securities, other than in connection with the purported Conditional Exchange.

## COUNT V
## DECLARATORY JUDGMENT
### (Against WMI)

244.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

245.    As alleged herein throughout, WMI and certain of the Washington Mutual Entities perpetrated a fraud on investors by intentionally, or at a minimum negligently: (a)

misrepresenting the true nature of the Trust Preferred Securities and the purported Conditional Exchange by failing to disclose the secret agreement to transfer the Trust Preferred Securities from WMI to WMB; and (b) misrepresenting the safety and soundness of Washington Mutual's operations at the same time Washington Mutual was implementing high risk, and even fraudulent, lending practices.

246. WMI participated in the fraud by approving the creation, issuance and offering of the Trust Preferred Securities and entering into the secret side arrangement with the OTS.

247. As part of its proposed chapter 11 plan, WMI asks this Court, a court of equity, to, inter alia, exercise its powers to compel specific performance of certain steps necessary to consummate the purported Conditional Exchange. In that regard, WMI seeks, inter alia, an Order from this Court compelling non-Debtor parties to engage in numerous transactions that could not be accomplished absent this Court's Order, to ignore numerous conditions precedent to such transactions and to ignore applicable transfer restrictions.

248. WMI, as a participant in the fraud perpetrated against investors in the Trust Preferred Securities, has acted inequitably with respect to the Trust Preferred Securities.

249. Therefore, Plaintiffs request that this Court enter a judgment declaring that:

- WMI, as a result of its inequitable conduct in connection with the issuances of the Trust Preferred Securities, has unclean hands with respect to the Trust Preferred Securities.

- WMI is ineligible for equitable relief necessary to consummate the purported Conditional Exchange or any other transfer of the Trust Preferred Securities.

## COUNT VI
## DECLARATORY JUDGMENT
## (Against JPMC)

250. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

251. JPMorgan Securities, Inc., a direct subsidiary of JPMC, acted as an underwriter for the WaMu Delaware III offering. As an underwriter, JPMC's direct subsidiary is charged with knowledge of the misrepresentations and omissions in the WaMu Delaware III offering circular. Each of the other offering circulars contained the same or similar material misrepresentations and omissions related to the Trust Preferred Securities as the offering circular pursuant to which JPMorgan Securities acted as underwriter.

252. Because of its role in the issuance of the WaMu Delaware III Trust Preferred Securities through its direct subsidiary, JPMC was aware of the Side Letters and the non-disclosure of WMI's intent to transfer the Trust Preferred Securities to WMB upon the occurrence of a purported Conditional Exchange.

253. Because of its role in the issuance of the WaMu Delaware III Trust Preferred Securities through its direct subsidiary, JPMC was also aware that certain public representations regarding the safety and soundness of WMB were materially false, and that problems with the safety and soundness of WMB were likely to give rise to circumstances potentially triggering a purported Conditional Exchange.

254. Additionally, through its access to non-public information of Washington Mutual in and before September 2008, JPMC was aware of the Side Letters and the non-disclosure of WMI's intent to transfer the Trust Preferred Securities to WMB upon the occurrence of a purported Conditional Exchange.

255. Through its access to non-public information regarding Washington Mutual in and before September 2008, JPMC was also aware that public representations regarding the safety and soundness of WMB were materially false, and that problems with the safety and

soundness of WMB were likely to give rise to circumstances potentially triggering a purported Conditional Exchange.

256. JPMC was aware of these material omissions and misrepresentations to investors in the Trust Preferred Securities at the time it allegedly purchased the assets of WMB, from which transaction JPMC has claimed an interest in the Trust Preferred Securities.

257. As a result of its knowledge of and/or direct or indirect participation in the fraud involved in the formulation and sale of the Trust Preferred Securities, JPMC knew that any acquisition of the Trust Preferred Securities through the purported Conditional Exchange was tainted by fraud. Because of that knowledge, JPMC cannot be a <u>bona fide</u> good faith purchaser of the Trust Preferred Securities.

258. Therefore, Plaintiffs request that this Court enter a judgment declaring that:

- As a result of its knowledge of the fraud in the issuance and sale of the Trust Preferred Securities, JPMC cannot be a <u>bona fide</u> purchaser of the Trust Preferred Securities.

- As a result of its knowledge of the fraud in the issuance and sale of the Trust Preferred Securities, JPMC's claim to the Trust Preferred Securities, if any, is subject to the fraud claims of investors in the Trust Preferred Securities.

**COUNT VII**
**FRAUD**
**<u>(Against WMPF, SPEs)</u>**

259. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

260. The offerings of the Trust Preferred Securities were conducted by and consummated through the SPEs (Washington Mutual Delaware I-IV and WaMu Cayman) and WMPF (collectively, the "Offering Defendants").

261.     In particular, in connection with each offering, WMPF issued securities to the SPEs, and the SPEs issued the Trust Preferred Securities sold to investors.

262.     Certain officers of the SPEs were also officers of WMPF.  Certain of those persons were also officers of WMI.

263.     In offering to sell the Trust Preferred Securities, and explaining the structure of the securities and the purported Conditional Exchange, the Offering Defendants had a duty to make complete and non-misleading representations about the Trust Preferred Securities.

264.     False information regarding the true nature of the purported Conditional Exchange was provided intentionally within the offering circulars, and by reference to and incorporation of false and/or misleading statements of WMI.

265.     Specifically, upon the occurrence of certain extraordinary events, primarily related to the financial strength of WMB, and a subsequent directive from the OTS, the Trust Preferred Securities might be subject to a purported Conditional Exchange, pursuant to which, inter alia, investors were to have been issued preferred interests in WMI in exchange for their Trust Preferred Securities holdings.

266.     The Offering Defendants failed to disclose the existence of the secret Side Letters with the OTS, pursuant to which WMI stated that upon the occurrence of a purported Conditional Exchange event, WMI would transfer the newly-obtained Trust Preferred Securities to WMB.

267.     Instead, the offering circulars expressly stated and implied, through a series of representations and risk factors, the Trust Preferred Securities would remain the property of WMI following a purported Conditional Exchange.  In addition, the circulars expressly stated: "After the occurrence of the Conditional Exchange, the Trust Securities will be owned by WMI."

268.    These secret Side Letters were not revealed to the initial investors, the marketplace, or to secondary purchasers of the Trust Preferred Securities until after the seizure of WMB on September 25, 2008.    In fact, WMI specifically requested, and the OTS granted, confidential treatment for each of the Side Letters.

269.    In addition to hiding the secret Side Letters and WMI's intent to transfer the Trust Preferred Securities to WMB, the Offering Defendants further misrepresented the stability and soundness of WMB, thereby implying the possibility of a purported Conditional Exchange was remote.

270.    Through direct statements and by incorporating misrepresentations of the status and practices of WMB, the offering circulars implied the purported Conditional Exchange, which was tied, primarily, to WMB's financial stability, was a highly unlikely event.    While touting the strength of its risk management, underwriting and loan portfolio, Washington Mutual was actually: (a) deliberately hampering risk management practices; (b) adopting and enforcing policies favoring loan quantity over quality; (c) loosening underwriting standards by granting "prime" loans to sub-prime borrowers, offering significantly higher numbers of "no-doc" and "low-doc" loans, approving borrowers for loans based only on their ability to make artificially low "minimum" payments for a short period of time, and using underwriting exceptions to the point that the exceptions became the rule; and (d) intentionally corrupting the appraisal process to inflate home values so as to make WMB's portfolio seem artificially strong.

271.    With the knowledge of the Offering Defendants, those misrepresentations were bolstered by public statements of Washington Mutual's officers, who continually assured investors and the public at large that Washington Mutual was acting prudently in managing risk,

was applying stricter underwriting guidelines and was maintaining a strong loan portfolio. Such assurances were materially false and misleading.

272. The Offering Defendants actively and intentionally concealed the true nature of the Conditional Exchange and the likelihood of an occurrence of a Conditional Exchange by making statements about the Conditional Exchange and the status and practices of Washington Mutual that concealed the true nature of the investments. By their concealment of the foregoing, the Offering Defendants intended to prevent investors in the Trust Preferred Securities from obtaining such information. And, investors in the Trust Preferred Securities were, in fact, prevented from obtaining such information as a result of the Offering Defendants' concealment thereof.

273. At a minimum, the Offering Defendants breached their duty to make full and fair disclosure by making statements that omitted material facts such that their statements were rendered misleading.

274. The omissions and statements in the offering circulars, including those incorporated by reference, were made with the intention that potential investors rely on the misrepresentations and omissions and invest in the Trust Preferred Securities. The Offering Defendants knew or should have known that a reasonable person would regard the above omissions and/or misrepresentations as important in investing in the Trust Preferred Securities.

275. Purchasers of Trust Preferred Securities reasonably relied on the material omissions and misrepresentations of the Offering Defendants.

276. Because of the misrepresentations and omissions regarding the safety and soundness of Washington Mutual's operations and the misrepresentations and omissions related

to the issuance of the Trust Preferred Securities, the Offering Defendants caused damages in an amount to be proven at trial.

**COUNT VIII**
**NEGLIGENT MISREPRESENTATION**
**(Against WMPF, SPEs)**

277.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

278.    In the alternative, the Offering Defendants negligently misrepresented the nature of the Conditional Exchange and/or the safety and soundness of WMB's operations.

279.    In offering to sell the Trust Preferred Securities, explaining the structure of the securities and the Conditional Exchange, and describing the safety and soundness of WMB's operations, the Offering Defendants had a duty to make complete and not misleading representations.

280.    The Offering Defendants failed to exercise reasonable care or competence in communicating the true nature of the Conditional Exchange, and instead, provided false information regarding the true nature of the Conditional Exchange.

281.    Concurrent with each issuance of the Trust Preferred Securities, WMI made a secret commitment to the OTS that upon the occurrence of a Conditional Exchange event, WMI would transfer the newly-obtained Trust Preferred Securities to WMB.

282.    The offering circulars failed to disclose the intent or the secret agreement to immediately transfer the Trust Preferred Securities from WMI to WMB. Instead, the circulars suggest the opposite: "After the occurrence of the Conditional Exchange, the Trust Securities will be owned by WMI."

283. The Offering Defendants failed to exercise reasonable care or competence in communicating the safety and soundness of WMB's operations, and instead, provided false information regarding the safety and soundness of WMB's operations.

284. The offering circulars also incorporate by reference materially false information regarding the safety and soundness of WMB's operations, thereby leading investors to believe the occurrence of a purported Conditional Exchange was a remote possibility.

285. Investors in the Trust Preferred Securities reasonably relied upon the false and/or incomplete information provided by the Offering Defendants.

286. Because of the failure to accurately communicate the result of the Conditional Exchange and/or the safety and soundness of WMB, the Offering Defendants caused damages in an amount to be proven at trial.

## COUNT IX
## AIDING AND ABETTING FRAUD
## (Against WMPF)

287. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

288. As alleged herein throughout, investors in the Trust Preferred Securities were defrauded based on: (a) intentional misrepresentations about the true nature of the Trust Preferred Securities and the Conditional Exchange and the secret Side Letters regarding the transfer of the Trust Preferred Securities to WMB; and (b) intentional misrepresentations regarding the safety and soundness of Washington Mutual's operations.

289. Investors in the Trust Preferred Securities relied on such misrepresentations and omissions to their detriment.

290. In connection with each of the offerings, the designated SPE was the direct issuer of the Trust Preferred Securities offered under the applicable offering circular.

291. WMPF provided substantial assistance to the SPEs in commission of the fraud, including, inter alia, by issuing preferred securities to the SPEs, which securities formed the interest underlying the Trust Preferred Securities issued by the SPEs.

292. WMPF provided such substantial assistance to the SPEs with full knowledge that the effect thereof would be to obtain commitments from investors under false pretenses.

293. Accordingly, WMPF aided and abetted the fraud committed by the SPEs and is liable for damages in an amount to be determined at trial.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Enter judgment in favor of Plaintiffs under Count I, and further enter a declaration that:

    i. Holders of certificates representing the Trust Preferred Securities never delivered such certificates to WMI;

    ii. The applicable trustees have not recorded WMI as the holder of the Trust Preferred Securities in any of the associated Trust Registers;

    iii. The WMI preferred equity to be exchanged for the Trust Preferred Securities was never issued to holders of the Trust Preferred Securities;

    iv. The required notice of the purported Conditional Exchange was never issued to holders of the Trust Preferred Securities;

    v. The purported Conditional Exchange is null, void and of no effect;

    vi. WMI never obtained an interest in the Trust Preferred Securities, and, as such, WMI never had any rights to the Trust Preferred Securities to transfer to WMB and/or JPMC; and

    vii. All right, title and interest in the Trust Preferred Securities remains with investors who held such securities immediately prior to 8:00 a.m. (Eastern) on September 26, 2008, or to any party to whom such parties subsequently transferred such Trust Preferred Securities, other than in connection with the purported Conditional Exchange.

B. Enter judgment in favor of Plaintiffs under Count II, and further enter a declaration that:

      i. WMI never acquired possession of the applicable security certificates for the Trust Preferred Securities;

     ii. No other person in possession of the applicable security certificates for the Trust Preferred Securities has taken possession of the security certificates for the Trust Preferred Securities on behalf of WMI, or has acknowledged WMI as the transferee of the Trust Preferred Securities or that it holds such security certificates on behalf of WMI;

   iii. The purported Conditional Exchange is null, void and of no effect;

   iv. WMI never obtained an interest in the Trust Preferred Securities, and, as such, WMI never had any rights to the Trust Preferred Securities to transfer to WMB and/or JPMC; and

    v. All right, title and interest in the Trust Preferred Securities remains with investors who held such securities immediately prior to 8:00 a.m. (Eastern) on September 26, 2008, or to any party to whom such parties subsequently transferred such Trust Preferred Securities, other than in connection with the purported Conditional Exchange.

C.    Enter judgment in favor of Plaintiffs under Count III, and further enter a declaration that:

      i. The Trust Preferred Securities and applicable governing documents impose restrictions on transfer of the Trust Preferred Securities, including by establishing requirements for an eligible assignee or transferee;

     ii. WMI is not, and has not been since at least September 25, 2008, an eligible assignee or transferee of the Trust Preferred Securities;

   iii. The purported Conditional Exchange was void ab initio, without force or effect, and did not transfer any right in or to the Trust Preferred Securities to WMI;

   iv. The purported Conditional Exchange remains null, void and of no effect; and

    v. All right, title and interest in the Trust Preferred Securities remains with investors who held such securities immediately prior to 8:00 a.m. (Eastern) on September 26, 2008, or to any party to whom such parties subsequently transferred such Trust Preferred Securities, other than in connection with the purported Conditional Exchange.

D.    In the alternative, enter Judgment in favor of Plaintiffs under Count IV, and further enter a declaration that:

i. Through its participation in the issuance of the Trust Preferred Securities and its agreements, as set forth in the undisclosed Side Letter agreements with WMI regarding contribution of the Trust Preferred Securities to WMB following a purported Conditional Exchange, the OTS acted in excess of its authority and its actions related to the Conditional Exchange otherwise should be held to be without force or effect and a nullity;

ii. The OTS's actions aided and abetted a fraud by WMI and WMPF against holders of the Trust Preferred Securities, and therefore exceeded the OTS's authority;

iii. The purported Conditional Exchange was dependent and contingent on actions of the OTS that exceeded the OTS's authority;

iv. Any directive by the OTS to execute a purported Conditional Exchange and/or transfer of the Trust Preferred Securities to any other party was, is, and will be, null, void, and without effect; and

v. All right, title and interest in the Trust Preferred Securities remains with investors who held such securities immediately prior to 8:00 a.m. (Eastern) on September 26, 2008, or to any party to whom such parties subsequently transferred such Trust Preferred Securities, other than in connection with the purported Conditional Exchange.

E. In the alternative, enter judgment in favor of Plaintiffs under Count V and further enter a declaration that:

i. WMI participated in a fraud against investors in the Trust Preferred Securities;

ii. WMI has acted inequitably with respect to the Trust Preferred Securities;

iii. WMI has unclean hands with respect to the Trust Preferred Securities; and

iv. WMI is ineligible for equitable relief necessary to consummate the purported Conditional Exchange or any other transfer of the Trust Preferred Securities.

v. All right, title and interest in the Trust Preferred Securities remains with investors who held such securities immediately prior to 8:00 a.m. (Eastern) on September 26, 2008, or to any party to whom such parties subsequently transferred such Trust Preferred Securities, other than in connection with the purported Conditional Exchange.

F. In the alternative, enter Judgment in favor of Plaintiffs under Count VI, and further enter a declaration that:

i. JPMC had knowledge of the non-disclosure of the Side Letters and the misrepresentations regarding the safety and soundness of WMB prior to its purchase of the assets of WMB.

ii. JPMC cannot be a bona fide purchaser of the Trust Preferred Securities.

iii. JPMC's claim to the Trust Preferred Securities, if any, is subject to the fraud claims of investors in the Trust Preferred Securities.

G.   Enter judgment in favor of Plaintiffs under Count VII and award damages in an amount to be determined at trial.

H.   Enter judgment in favor of Plaintiffs under Count VIII and award damages in an amount to be determined at trial.

I.   Enter judgment in favor of Plaintiffs under Count IX and award damages in an amount to be determined at trial.

J.   Enter any further relief the Court deems equitable and just.

Dated: July 6, 2010

**CAMPBELL & LEVINE LLC**

/s/ Kathleen Campbell Davis
Marla Rosoff Eskin, Esq. (DE 2989)
Bernard G. Conaway, Esq. (DE 2856)
Kathleen Campbell Davis, Esq. (DE 4229)
800 North King Street, Suite 300
Wilmington, DE 19809
(302) 426-1900
(302) 426-9947 (fax)

- and -

**BROWN RUDNICK LLP**
Sigmund S. Wissner-Gross
Robert J. Stark
Seven Times Square
New York, New York 10036
(212) 209-4800

- and -

James W. Stoll
Jeremy B. Coffey
Daniel J. Brown
One Financial Center
Boston, MA 02111
(617) 856-8200

*Counsel to Plaintiffs*

# 1754303 v18 - 028943/0001