## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | x | |
| In re | : | Chapter 11 |
| | : | |
| WASHINGTON MUTUAL, INC., et al.,[1] | : | Case No. 08-12229 (MFW) |
| | : | |
| Debtors | : | Jointly Administered |
| | x | |
| | : | |
| Black Horse Capital LP, et al., | : | |
| | : | |
| Plaintiffs | : | |
| v. | : | |
| | : | Adversary Proceeding |
| JPMorgan Chase Bank, N.A., et al, | : | No. 10-51387 (MFW) |
| | : | |
| Defendants. | : | |
| | x | |

### ANSWER AND COUNTERCLAIM OF DEBTOR AND DEFENDANT WASHINGTON MUTUAL, INC.

Washington Mutual, Inc. ("WMI"), Debtor and Debtor in Possession in these

jointly administered chapter 11 cases, and a Defendant in this Adversary Proceeding,

hereby submits, by and through its counsel, this Answer to Plaintiffs' Complaint:

### INTRODUCTION

This Adversary Proceeding is nothing more than an attempt by a group of

sophisticated investors and, in connection with WMI's chapter 11 case, equity holders, to

overturn the priority regime of title 11 of the United States Code (the "Bankruptcy

Code") and receive a windfall ahead of WMI's true creditors and ordinary investors.

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395). The Debtors' principal offices are located at 925 Fourth Avenue, Seattle, Washington 98104.

Those Plaintiffs who actually bought Trust Preferred Securities *prior* to the Conditional Exchange of September 25, 2008, were fully informed that they were taking the risk that the Office of Thrift Supervision ("OTS") could, *at its sole discretion*, direct a Conditional Exchange of the Trust Preferred Securities for preferred shares in WMI at any time. Those Plaintiffs were also fully informed that the Conditional Exchange would operate automatically, and that the Trust Preferred Securities which they held would be legally *deemed* to represent preferred shares in WMI upon the declaration of the Conditional Exchange, rather than waiting for the physical exchange of securities. Because they had full knowledge and prior disclosure that the purpose of the Trust Preferred Securities offerings was to raise capital for Washington Mutual Bank ("WMB") and the fact that Trust Preferred Securities would constitute "core" (or "tier 1") capital of WMB, Plaintiffs' contention is absurd that investors were somehow misled because they were not informed that OTS would further direct that the Trust Preferred Securities would be downstreamed from WMI to Washington Mutual Bank ("WMB"). Any reasonable investor in the Trust Preferred Securities would have understood from the disclosures concerning the purpose of offering the Trust Preferred Securities that the reason why the OTS would order a Conditional Exchange would be to provide financial support to WMB. The fact that the Trust Preferred Securities were used in this fashion could not have been a surprise. Moreover, there was no undertaking in the governing documents that WMI would not downstream the Trust Preferred Securities to WMB. To the extent that Plaintiffs are claiming that they were uninformed about purported mismanagement and suspect loan practices at WMB, they are indistinguishable from many other WMI

shareholders making the same claims and are attempting to use this Adversary Proceeding to subvert the priority regime in the Bankruptcy Code.

Further, based on Plaintiffs' admissions in Paragraph 54 of the Adversary Complaint and the July 26, 2010 filing of their counsel under Bankruptcy Rule 2019, WMI understands that many of the Plaintiffs purchased the purported rights to the Trust Preferred Securities *after* the September 26, 2008 issuance of the press release regarding the Conditional Exchange. In other words, they purchased supposed rights to the Trust Preferred Securities *after* the Conditional Exchange was announced, the Bank itself was sold, and allegations about fraud and mismanagement in WMB were publicly disseminated. Given both the disclosures in the initial offerings of Trust Preferred Securities and the information that was publicly available after September 26, 2008, WMI believes that these Plaintiffs bought their purported rights to the Trust Preferred Securities at a substantial discount, hoping to realize a windfall if the Trust Preferred Securities were declared not to be property of WMI's estate. Alternatively, they hoped to use these arguments to receive some benefit under a settlement or a plan of reorganization, at the expense of true creditors and other shareholders.

The timing of this Complaint makes its lack of substance most obvious. If the Plaintiffs truly believed that they continued to own the Trust Preferred Securities after the Conditional Exchange was announced, they would have filed an adversary proceeding seeking a declaration of ownership soon after September 25, 2008. Instead, they waited almost two years after that date until a proposed Global Settlement had been reached and a Plan of Reorganization proposed. Clearly, those Plaintiffs who purchased rights to the

Trust Preferred Securities have been disappointed that their hoped for windfall has not

occurred, and are trying to use this belated proceeding as leverage to sweeten the pot.

## GENERAL DENIAL

Except as otherwise expressly admitted herein, WMI denies each and

every allegation in the Complaint, including, without limitation, any allegations

contained in the preamble, introduction, prayer, headings, footnotes and subheadings of

the Complaint, and in any answer filed by another party. To the extent the allegations in

Complaint seek to impose liability on WMI, they are specifically denied. Pursuant to

Federal Rule of Civil Procedure 8(b)(6), as made applicable to this action by Federal

Rule of Bankruptcy Procedure 7008, averments in the Complaint to which no responsive

pleading is required shall be deemed as denied. WMI expressly reserves the right to seek

to amend and/or supplement this Answer, as may be necessary.

## SPECIFIC RESPONSES

### I. Introduction

1. This Complaint seeks, inter alia, a declaratory judgment that certain
trust preferred securities (the "Trust Preferred Securities") (as well as all
rights, claims and entitlements thereto) are, and at all times have been, the
property of third-party investors and not property of the chapter 11 estate
of Washington Mutual, Inc. ("WMI"). This fact is true notwithstanding
certain of the Defendants' protestations that the purported Conditional
Exchange (as defined herein) of the Trust Preferred Securities for
preferred equity interests in WMI occurred in the hours before WMI
tumbled into bankruptcy.

Answer 1. WMI denies each and every allegation in Paragraph 1 of the Complaint and

further avers as follows. On September 25, 2008, the Office of Trust Supervision

("OTS"), pursuant to its regulatory authority, issued its directive ordering the Conditional

Exchange of the Trust Preferred Securities for preferred equity interests in WMI, as

contemplated by the transactional documents governing the Trust Preferred Securities. Pursuant to the terms of the applicable agreements, the Conditional Exchange occurred automatically, and the holders of the Trust Preferred Securities (including any of the Plaintiffs holding those securities at that time) became unconditionally obligated to surrender any Trust Preferred certificate. The Plaintiffs in this Action are holders of preferred equity interests seeking to avoid the express terms of the securities they purchased and recover ahead of true creditors in violation of the priority scheme set forth in the Bankruptcy Code.

> 2. As an initial matter, the purported Conditional Exchange did not occur and/or cannot be given legal effect, and the Trust Preferred Securities never became property of WMI's estate because, inter alia: (a) the terms of the documents governing the Trust Preferred Securities (which were drafted by, or under the direction of, WMI) imposed certain conditions precedent to such an exchange, which conditions were never satisfied; (b) applicable law governing the transfer of securities such as the Trust Preferred Securities mandated certain critical events prior to the effectuation of such an exchange, which events never occurred; and (c) the terms of the Trust Preferred Securities and the underlying, governing documents (all of which were drafted by, or under the direction of, WMI) impose strict limitations on parties to whom the Trust Preferred Securities may be transferred, which limitations precluded and continue to preclude WMI from taking any interest in the Trust Preferred Securities.

Answer 2. WMI denies each and every allegation in Paragraph 2 of the Complaint and further avers as follows. The Conditional Exchange of Trust Preferred Securities for preferred equity in WMI occurred automatically upon the Office of Thrift Supervision's directive and became effective in accordance with applicable law and the applicable contractual agreements. All conditions precedent necessary for the effectiveness of the Conditional Exchange were satisfied, and there were no legal impediments to the completion of the Conditional Exchange.

3. Moreover, recently-concluded Senate investigations have revealed that during the period in which the Trust Preferred Securities were used to raise $4 billion, WMI and certain of its affiliates (together, the "Washington Mutual Entities") were engaged and/or involved in rampant fraud, misrepresentation and/or reckless business practices. First, certain of the Washington Mutual Entities fraudulently misrepresented the safety and soundness of the banking operations of Washington Mutual Bank, N.A. ("WMB" and, together with WMI, "Washington Mutual"), greatly understating the mounting risks in WMB's loan portfolio and greatly overstating the risk control protocols in place. Next, WMI colluded with its primary regulator, the OTS (as defined herein), to conceal a secret agreement to transfer the Trust Preferred Securities out of WMI upon the occurrence of a purported Conditional Exchange. Through the intentional non-disclosure of this material fact, certain of the Washington Mutual Entities falsely represented that, upon a Conditional Exchange, those investors would retain an indirect entitlement to the value of the Trust Preferred Securities through their preferred equity interests in WMI. Moreover, the OTS was well aware of undisclosed problems with Washington Mutual's safety and soundness, which could give rise to conditions potentially triggering a purported Conditional Exchange. In light of the OTS's complicity in concealing these material facts from investors in the Trust Preferred Securities, the OTS exceeded the scope of its regulatory authority and any resulting directive from the OTS to initiate a purported Conditional Exchange should be deemed void and of no force or effect

Answer 3. WMI admits that the Senate Permanent Subcommittee on Investigations conducted an investigation into the lending practices of Washington Mutual Bank ("WMB"). Otherwise, WMI denies each and every allegation in Paragraph 3 of the Complaint and further avers as follows. Investors in Trust Preferred Securities were fully informed of the potential that the OTS could decide to issue a directive ordering the Conditional Exchange upon the occurrence of any of three Exchange Events, including when (a) WMB becomes undercapitalized under the OTS' "prompt corrective action regulations at 12 C.F.R. Part 565; (b) WMB is placed into conservatorship or receivership; and (c) OTS, *in its sole discretion*, anticipates that WMB would become undercapitalized in the near future or takes a supervisory action that limits the payment of

dividends by WMB and therewith directs a Conditional Exchange. Therefore, investors

in Trust Preferred Securities (including those Plaintiffs who <u>actually</u> owned Trust

Preferred Securities prior to September 25, 2008), knowingly took the risk that OTS

might decide in its sole discretion to exercise its regulatory authority and direct the

Conditional Exchange of Trust Preferred Securities for WMI preferred equity. Moreover,

on information (including the filing made by Plaintiffs' counsel under Fed. R. Bankr. P.

2019) and belief, many of the Plaintiffs acquired rights in Trust Preferred Securities <u>after</u>

the Conditional Exchange occurred.

> 4. By its words and actions, WMI concedes the purported Conditional
> Exchange never occurred, and that, therefore, the Trust Preferred
> Securities never became part of WMI' s estate. But, as part of its proposed
> chapter 11 plan, WMI asks this Court, a court of equity, to exercise its
> powers to deliver the Trust Preferred Securities to JPMorgan Chase
> ("JPMC") (a party well aware of the fraud and misrepresentations
> permeating the issuance of the Trust Preferred Securities and WMI's
> operations). In that regard, WMI seeks an Order from this Court
> compelling specific performance by various parties, causing them, inter
> alia, to engage in numerous transactions that could not be accomplished
> absent this Court's Order, to ignore numerous conditions precedent to
> such transactions, and to ignore applicable transfer restrictions. WMI also
> asks this Court to ignore the significant wrongdoing effected by WMI and
> certain of the other Washington Mutual Entities in the structuring and sale
> of the Trust Preferred Securities. But, those who seek equity must do
> equity, and WMI's prior fraudulent behavior now precludes it from
> invoking this Court's equitable jurisdiction for its own ends.

Answer 4. WMI denies each and every allegation in Paragraph 4 of the Complaint and

further avers as follows. As part of the Global Settlement Agreement incorporated in the

Debtors' proposed chapter 11 plan, WMI has requested the Court, pursuant to 11 U.S.C.

§ 1142(b), to direct certain actions to document the occurrence of the Conditional

Exchange consistent with the terms of the applicable agreements, such as the

amendments of records to reflect the transfer of securities. But, as a matter of law and

under the terms of the applicable agreements, the Conditional Exchange became effective

automatically upon OTS' direction, regardless of whether these actions are performed.

> 5. Moreover, JPMC, through its significant access to the books and
> records of the Washington Mutual Entities, was well aware of the fraud
> permeating the issuance of the Trust Preferred Securities and WMI' s
> secret agreement with the OTS to divert the value of the Trust Preferred
> Securities upon the occurrence of a purported Conditional Exchange.
> Given its knowledge of those frauds, JPMC should not, in any case, be
> viewed as a <u>bona</u> <u>fide</u> good faith purchaser of the Trust Preferred
> Securities or the value thereof and JPMC's claimed right to an interest in
> the Trust Preferred Securities, if any, should be subject to the fraud and
> other claims of investors in the Trust Preferred Securities.

Answer 5. WMI does not have sufficient knowledge about what JPMC knew and

therefore denies each of the allegations concerning its knowledge. WMI denies each

remaining allegation in Paragraph 5 of the Complaint.

> 6. Even if <u>arguendo</u>, the purported Conditional Exchange had occurred,
> and WMI did obtain bare legal title to the Trust Preferred Securities
> (which it did not), the issuance of the securities, and their subsequent sale
> or transfer, is so tainted with fraud and misrepresentation (of which JPMC
> was well aware at the time of the purported Conditional Exchange), that
> this Court — a Court of equity — should fashion an appropriate equitable
> remedy to prevent WMI and/or JPMC from obtaining the benefit of ill-
> gotten gains at the expense of the Plaintiffs.

Answer 6. Paragraph 6 of the Complaint contains a request for relief, rather than an

allegation of fact. To the extent that a response is required, WMI denies each and every

allegation in Paragraph 6 of the Complaint and denies that Plaintiffs are entitled to any

relief. Granting Plaintiffs the relief they seek would not serve the cause of equity because

it would allow investors who bought Trust Preferred Securities with the knowledge that

the OTS in its sole discretion could order a Conditional Exchange – including investors

who actually bought Trust Preferred Securities <u>after</u> the Conditional Exchange occurred –

to participate in the assets of WMI's estate ahead of true creditors.

7. Finally, by this action, Plaintiffs seek recovery from certain of the Washington Mutual Entities based on their involvement in the above-described fraud and misrepresentations.

Answer 7. Paragraph 7 of the Complaint contains a request for relief against other Defendants, rather than an allegation of fact. To the extent that a response is required, WMI denies each and every allegation in Paragraph 7 of the Complaint and denies Plaintiffs are entitled to any relief.

## II.    Parties

### A. Plaintiffs

8. Black Horse Capital, LP is an investment management firm with its principal place of business at 338 5. Sharon Amity Rd., #202, Charlotte, NC 28211.

9. Black Horse Capital Master Fund Ltd. is an investment fund with its principal place of business at do M&C Corporate Services Limited, P.O. Box 309GT, Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands.

10. Black Horse Capital (QP) LP is an investment fund with its principal place of business at 338 S. Sharon Amity Rd., #202, Charlotte, NC 28211.

11. Greywolf Capital Partners II is an investment management firm with its principal place of business at 4 Manhattanville Road, Suite 201, Purchase, NY 10577.

12. Greywolf Overseas Fund is a Cayman Islands exempted company, with registered offices 89 Nexus Way, c/o Ogier Fiduciary Services (Cayman) Limited, Camana Bay, Grand Cayman, Cayman Islands KY1-9007. Its investment manager, Greywolf Capital Management LP, is located at 4 Manhattanville Road, Suite 201, Purchase, NY 10577.

13. Guggenheim Portfolio Company VII, LLC is an investment fund with its principal place of business at 660 Madison Avenue, 20th floor, New York, NY 10021.

14. HFR RVA Combined Master Trust is an investment trust with its principal place of business at 3033 Excelsior Boulevard, Suite 300, Minneapolis, MN 55416.

15. IAM Mini-Fund 14 Limited is an investment fund with its principal place of business at 3033 Excelsior Boulevard, Suite 300, Minneapolis, MN 55416.

16. LMA SPC for and on behalf of the MAP 89 Segregated Portfolio is an investment fund with its principal place of business at the offices of Pine River Capital Management L.P., 601 Carlson Parkway, Suite 330, Minnetonka, MN 55305.

17. Lonestar Partners LP is an investment management firm with its principal place of business at One Maritime Plaza, Suite 1125, San Francisco, CA 94111.

18. Mariner LDC is an investment fund with its principal place of business at the offices of Riva Ridge Capital Management LP, 55 5th Avenue, 18th floor, New York, NY 10003.

19. Nisswa Convertibles Master Fund Ltd. is an investment fund with its principal place of business at the offices of Pine River Capital Management L.P., 601 Carlson Parkway, Suite 330, Minnetonka, MN 55305.

20. Nisswa Fixed Income Master Fund Ltd. is an investment fund with its principal place of business at the offices of Pine River Capital Management L.P., 601 Carlson Parkway, Suite 330, Minnetonka, MN 55305.

21. Nisswa Master Fund Ltd., is an investment fund with its principal place of business at the offices of Pine River Capital Management L.P., 601 Carlson Parkway, Suite 330, Minnetonka, MN 55305.

22. Paige Opportunity Partners LP is an investment management firm with its principal place of business at 630 3rd Avenue, 6th floor, New York, NY 10017.

23. Paige Opportunity Partners Master Fund is an investment fund with its principal place of business at 630 3rd Avenue, 6th floor, New York, NY 10017.

24. Pandora Select Partners, LP is an investment management firm with its principal place of business at 3033 Excelsior Boulevard, Suite 300, Minneapolis, MN 55416.

25. Pines Edge Value Investors Ltd. is an investment management firm with its principal place of business at the offices of Pine River Capital

Management L.P., 601 Carlson Parkway, Suite 330, Minnetonka, MN 55305.

26. Riva Ridge Capital Management LP is an investment management firm with its principal place of business at 55 5th Avenue, 18th floor, New York, NY 10003.

27. Riva Ridge Master Fund, Ltd. is an investment fund with its principal place of business at the offices of Riva Ridge Capital Management LP, 55 5th Avenue, 18th floor, New York, NY 10003.

28. Scoggin Capital Management II LLC is an investment management firm with its principal place of business at 660 Madison Avenue, 20th floor, New York, NY 10021.

29. Scoggin International Fund Ltd. is an investment fund with its principal place of business at 660 Madison Avenue, 20th floor, New York, NY 10021.

30. Scoggin Worldwide Fund Ltd. is an investment fund with its principal place of business at 660 Madison Avenue, 20th floor, New York, NY 10021.

31. Visium Global Master Fund, Ltd. is an investment fund with its principal place of business at 950 Third Avenue, 29th floor, New York, NY 10022.

32. VR Global Partners, L.P., is an investment management firm with its principal place of business at the offices of Admiral Administration Ltd., Admiral Financial Center, 5th floor, 90 Fort Street, P.O. Box 32021 SMB, George Town, Grand Cayman, KY1-1208, Cayman Islands.

33. Whitebox Asymmetric Partners LP, is an investment fund with its principal place of business at 3033 Excelsior Boulevard, Suite 300, Minneapolis, MN 55416.

34. Whitebox Combined Partners, LP is an investment fund with its principal place of business at 3033 Excelsior Boulevard, Suite 300, Minneapolis, MN 55416.

35. Whitebox Convertible Arbitrage Partners, LP is an investment fund with its principal place of business at 3033 Excelsior Boulevard, Suite 300, Minneapolis, MN 55416.

36. Whitebox Hedged High Yield Partners, LP is an investment fund with its principal place of business at 3033 Excelsior Boulevard, Suite 300, Minneapolis, MN 55416.

37. Whitebox Special Opportunities Fund LP, Series B is an investment fund with its principal place of business at 3033 Excelsior Boulevard, Suite 300, Minneapolis, MN 55416.

38. In the aggregate, Plaintiffs hold approximately $1 billion (in terms of liquidation preference) of the Trust Preferred Securities.

Answer 8-38. WMI is without sufficient information to admit or deny Paragraphs 8-38

of the Complaint, and therefore denies those Paragraphs.

39. Together, the above-listed parties will be referred to as the "Plaintiffs" or the "Trust Preferred Holders."

Answer 39. WMI admits that the entities identified in Paragraphs 8-37 of the Complaint

are Plaintiffs in this action, but WMI does not have sufficient information to admit or

deny that each of the them are "Trust Preferred Holders," and therefore denies that

allegation.

**B. Defendants**

40. JPMorgan Chase Bank, N.A. ("JPMorgan" or "JPMC") is a national banking association organized under the laws of the United States, with its principal place of business in Columbus, Ohio. JPMC is a wholly-owned subsidiary of JPMorgan Chase & Co., a Delaware corporation. JPMC purportedly acquired substantially all of the assets of WMB out of receivership on September 25, 2008.

41. JPMorgan Chase & Co. is a Delaware Corporation with a principal place of business at 270 Park Ave., New York, NY 10017. JPMorgan Chase & Co.'s registered agent is the Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

Answer 40-41. WMI admits the allegations in Paragraphs 40-41 of the Complaint.

42. Washington Mutual, Inc. is a holding company incorporated in the state of Washington with its principal place of business at 1301 Second Ave., Seattle, WA 98101. Prior to the seizure of Washington Mutual Bank, WMI was the savings and loan holding company that owned WMB and indirectly owned WMB's subsidiaries.

Answer 42. WMI denies that its principal place of business is at 1301 Second Ave.,

Seattle, WA 98101. Otherwise, WMI admits the allegations in Paragraph 42 of the

Complaint.

> 43. Washington Mutual Preferred Funding, LLC ("WMPF") is a
> Delaware limited liability company with a principal place of business at
> 1301 Second Ave., Seattle, WA 98101. WMPF's registered agent is the
> Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.
> WMPF was formed for the purpose of issuing securities to raise capital for
> WMB. In 2006 and 2007, WMPF issued approximately $4 billion worth
> of preferred securities to various issuer trusts, which were established as
> special purpose entities for the sole purpose of issuing the $4 billion worth
> of Trust Preferred Securities to investors. WMPF, a limited liability
> company, is managed by a three-person board of managers. Until the
> seizure of WMB and sale of WMB's assets, two of the three managers and
> all of the officers of WMPF were officers of WMI or its affiliates.[2] At all
> times prior to the seizure of WMB and sale of WMB's assets, WMPF was
> pervasively controlled by WMI.[3]

Answer 43. WMI admits that, as of September 25, 2008, Washington Mutual Preferred

Funding, LLC ("WMPF") was a Delaware limited liability company with a principal

place of business at 1301 Second Ave., Seattle, WA 98101, but is without sufficient

information to admit or deny whether that is still true, and therefore denies the truth of

the allegations after that date. WMI further admits that, as of September 25, 2008,

WMPF's registered agent was the Corporation Trust Company, 1209 Orange Street,

Wilmington, DE 19801, but is without sufficient information to admit or deny whether

that is still true, and therefore denies the truth of the allegations after that date. WMI

admits that one of the purposes of WMPF was the issuance of securities to raise capital

for WMB. WMI admits that, in 2006 and 2007, WMPF issued approximately $4 billion

---

[2]    See WaMu Delaware IV Offering Memorandum, pp. 25 & 49.

[3]    See WaMu Delaware IV Offering Memorandum, p. 25.

worth of preferred securities to various issuer trusts, which were established as special

purpose entities for the sole purpose of issuing the $4 billion worth of Trust Preferred

Securities to investors. WMI admits that prior to the sale of assets to JMPC, WMI held

an indirect ownership interest in WMPF, which as a limited liability company, was

managed by a three-person board of managers (one of whom was an "independent

manager" under the applicable documents), and that from time to time some of the

managers (other than the independent manager) held other positions with WMI or its

affiliates. WMI denies the remaining allegations in Paragraph 43 of the Complaint.

> 44.     Washington Mutual Preferred Funding (Cayman) I
> Ltd. is a special purpose entity ("SPE") formed under
> Cayman Island law for the purpose of issuing certain Trust
> Preferred Securities to investors as a way to raise capital for
> WMB, as described in an offering circular dated February
> 24, 2006 ("WaMu Cayman").

> 45.     Washington Mutual Preferred Funding Trust I is an
> SPE formed under Delaware law for the purpose of issuing
> certain Trust Preferred Securities to investors as a way to
> raise capital for WMB, as described in an offering circular
> dated February 24, 2006 ("WaMu Delaware I").

> 46.     Washington Mutual Preferred Funding Trust II is an
> SPE formed under Delaware law for the purpose of issuing
> certain Trust Preferred Securities to investors as a way to
> raise capital for WMB, as described in an offering circular
> dated December 6, 2006 ("WaMu Delaware II").

> 47.     Washington Mutual Preferred Funding Trust III is
> an SPE formed under Delaware law for the purpose of
> issuing certain Trust Preferred Securities to investors as a
> way to raise capital for WMB, as described in an offering
> circular dated May 21, 2007 ("WaMu Delaware III").

> 48,     Washington Mutual Preferred Funding Trust IV is
> an SPE formed under Delaware law for the purpose of
> issuing certain Trust Preferred Securities to investors as a
> way to raise capital for WMB, as described in an offering
> circular dated October 18, 2007 ("WaMu Delaware IV").

Answer 44.-48. WMI admits the allegations in Paragraphs 44-48 of the Complaint.

## III. JURISDICTION AND VENUE

49. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§157 and 1334 and FRBP 7001, and 28 U.S.C. §§ 2201 and 2202.

Answer 49. Paragraph 49 of the Complaint contains conclusions of law as to which no responsive pleading is required.

50. Venue in this Court is proper pursuant to 28 U.S.C. § 1409.

Answer 50. Paragraph 50 of the Complaint contains conclusions of law as to which no responsive pleading is required.

## IV. STATEMENT OF FACTS

### A. The Trust Preferred Securities

51. The gravamen of this action is to establish, inter alia, Plaintiffs' current ownership of certain of the Trust Preferred Securities.

Answer 51. Paragraph 51 purports to characterize the nature of the Complaint and therefore requires no responsive pleading. To the extent Paragraph 51 contains allegations of fact to which a response is required, WMI denies such allegations.

### 1. Overview of the Trust Preferred Securities.

52. On February 3, 2006, WMI and WMB established WMPF to raise capital for WMB through the issuance of the Trust Preferred Securities. Until the seizure of WMB and sale of WMB's assets, two of the three managers and all of the officers of WMPF were officers of WMI or its affiliates.[4] At all times prior to the seizure of WMB and sale of WMB's assets, WMPF was pervasively controlled by WMI.[5] WMI controlled and dictated the terms on which

---

[4]    See, e.g., WaMu Delaware III Offering Memorandum, pp. 23 & 45.

[5]    See WaMu Delaware III Offering Memorandum, p. 23.

the Trust Preferred Securities were formulated and offered
to investors.

Answer 52. WMI admits that, on February 3, 2006, Washington Mutual Preferred

Funding, LLC was formed in the State of Delaware. WMI admits that Washington

Mutual Preferred Funding Trusts I-IV issued the Trust Preferred Securities in order to

raise capital for WMB. WMI admits that, prior to September 25, 2008, two of the three

managers and all of the officers of WMPF were officers of WMI or its affiliates, but

avers that the third was an independent manager. WMI avers that the remaining

allegations set forth in paragraph 52 of the Complaint contain legal conclusions

concerning the control of the Trust Preferred Securities to which no response is required.

To the extent a response is required, except as specifically admitted herein, WMI denies

each and every allegation set forth in paragraph 52 of the Complaint.

> 53.     The Trust Preferred Securities were issued between
> March 2006 and October 2007 in a series of five similarly-
> structured, but separate, issuances under SEC Rule 144A
> and/or Regulation S. Specifically, the Trust Preferred
> Securities include those certain:
>
> (i)      Washington Mutual Preferred Funding (Cayman) I Ltd. 7.25%
>          Perpetual Non-Cumulative Preferred Securities, Series A-1 and Series
>          A-2, as described in an offering circular dated February 24, 2006 (the
>          "WaMu Cayman TPS");
>
> (ii)     Washington Mutual Preferred Funding Trust I Fixed-to-Floating Rate
>          Perpetual Non-Cumulative Trust Securities, as described in an
>          offering circular dated February 24, 2006 (the "WaMu Delaware I
>          TPS");
>
> (iii)    Washington Mutual Preferred Funding Trust II Fixed-to-Floating Rate
>          Perpetual Non-Cumulative Trust Securities, as described in an
>          offering circular dated December 6, 2006 (the "WaMu Delaware II
>          TPS");
>
> (iv)     Washington Mutual Preferred Funding Trust III Fixed-to-Floating
>          Rate Perpetual Non-Cumulative Trust Securities, as described in an

offering circular dated May 21, 2007 (the "WaMu Delaware III TPS"); and

(v)    Washington Mutual Preferred Funding Trust IV Fixed-to-Floating Rate Perpetual Non-Cumulative Trust Securities, as described in an offering circular dated October 18, 2007 (the "WaMu Delaware IV TPS").

Answer 53. WMI admits that the WaMu Cayman TPS, WaMu Delaware I TPS, WaMu Delaware II TPS, WaMu Delaware III TPS, and WaMu Delaware IV TPS Offering Circulars describe the issuance of the Trust Preferred Securities. WMI respectfully refers the Court to those Offering Circulars for the content thereof and denies any characterization inconsistent therewith. WMI denies the remaining allegations set forth in paragraph 53 of the Complaint.

54.    Plaintiffs are purchasers of the Trust Preferred Securities, certain of which securities were purchased prior to the seizure of WMB and sale of WMB's assets in September 2008 and certain of which were purchased thereafter. In the aggregate, Plaintiffs' holdings in the various issuances of Trust Preferred Securities are as follows:

| Trust Preferred Security | Aggregate Holdings |
|---|---|
| WaMu Cayman TPS | $71,255,000.00 |
| WaMu Delaware I TPS | $403,090,000.00 |
| WaMu Delaware II TPS | $90,974,000.00 |
| WaMu Delaware III TPS | $171,400,000.00 |
| WaMu Delaware IV TPS | $273,757,000.00 |

Answer 54. WMI is without sufficient information to admit or deny the truth of the allegations set forth in paragraph 54 of the Complaint. To the extent that a response is required, WMI denies each and every allegation set forth in paragraph 54 of the Complaint.

55.     In simplified terms, the issuances of the Trust Preferred Securities were structured as follows:

a.  In a series of transactions occurring between March 2006 and October 2007, WMB (directly and/or through its wholly-owned subsidiary, University Street) contributed certain collateralized home equity and/or mortgage loans to WMPF (the "Loan Assets"). The total initial aggregate face amount of the Loan Assets contributed to WMPF in connection with the five Trust Preferred Securities offerings was approximately $13.5 billion.

b.  Thereafter, WMPF contributed the Loan Assets to a series of newly-formed asset trusts (each, an "Asset Trust"[6]), in exchange for preferred and residual beneficial interests in such Asset Trusts (respectively, the "Preferred Trust Interests" and the "Residual Trust Interests"). WMPF was dependent on the officers and employees of WMB to service the Loan Assets.

c.  In connection with the foregoing transactions, University Street, Inc. (an indirect subsidiary of WMB) received 100% of the common equity of WMPF. WMB received preferred equity interests in WMPF tied to each of the separate Preferred Trust Interests, with a total liquidation preference of $4 billion (the "WMPF Preferred Interests").

d.  WMPF thereafter established a series of grantor trusts (these grantor trusts; WaMu Cayman, WaMu Delaware I, WaMu Delaware II, WaMu Delaware III and WaMu Delaware IV, collectively are referred to herein as the "SPEs").

e.  These SPEs then purchased from WMB the WMPF Preferred Interests, with $4 billion raised and/or arranged by certain investment banks.[7] The SPEs then issued the Trust Preferred Securities to those

---

[6]     The Asset Trusts are: (a) Washington Mutual Home Equity Trust I (a Delaware statutory trust); (b) WaMu 2006-OA1 (a Delaware statutory trust); and (c) WaMu 2007 Flex-l (a Delaware statutory trust).

[7]     Third party underwriters involved in the structuring and issuance of the various Trust Preferred Securities offerings included:

a.  WaMu Cayman: Goldman Sachs & Co.; Citigroup; Credit Suisse; HSBC; Morgan Stanley; and UBS Investment Bank.

b.  WaMu Delaware I: Goldman Sachs & Co.; Credit Suisse; Morgan Stanley.

investment banks, which then resold the Trust Preferred Securities to third-party investors. Eventually, Plaintiffs purchased certain of the Trust Preferred Securities.

f.   Thereafter, as the Loan Assets in the Asset Trusts produced to WMPF income from amortization, interest, refinancing transactions, and/or foreclosures, WMPF was to have issued quarterly dividends at specified rates to the holders of the WMPF Preferred Interests (i.e., the SPEs). The SPE's were then to have passed those dividends along to the holders of the Trust Preferred Securities. Unless holders of the Trust Preferred Securities received their stated dividends in a particular quarter, WMPF was prohibited from paying dividends to University Street, Inc., holder of the common interests in WMPF, for that quarter.

g.   At all times prior to the seizure of WMB and sale of WMB's assets in September 2008, WMB, WMPF and the SPEs were under the pervasive control of WMI, and WMI was aware of actions taken by WMPF and the SPEs with respect to the Trust Preferred Securities.

Answer 55. The allegations in paragraph 55 of the Complaint constitute legal conclusions and an admittedly over-"simplified" attempt to describe the terms of the issuances of the Trust Preferred Securities as to which no response is required. To the extent that a response is required, WMI respectfully refers the Court to the WaMu Cayman TPS, WaMu Delaware I, II, III, and IV TPS Offering Circulars referenced by Plaintiffs in paragraph 53 for the content thereof describing the structure of the issuance of the Trust Preferred Securities, and WMI denies any characterization inconsistent

---

c.   WaMu Delaware II: Credit Suisse; Goldman Sachs & Co.; Lehman Brothers, Inc.; Morgan Stanley, Keefe, Bruyette & Woods; UBS Investment Bank.

d.   WaMu Delaware III: Goldman Sachs & Co.; Lehman Brothers, Inc.; UBS Investment Bank; Credit Suisse; Morgan Stanley; Keefe, Bruyette & Woods; JP Morgan Securities, Inc.; Wachovia Securities.

e.   WaMu Delaware IV: Goldman Sachs & Co.; Credit Suisse; Lehman Brothers, Inc.; Morgan Stanley.

therewith. WMI denies each and every remaining allegation set forth in Paragraph 55 of

the Complaint.

56.    The corporate structure resulting from the foregoing
was depicted in the offering memoranda substantially as
follows:



See, e.g., WaMu Delaware I Offering Memorandum, p. 3.

Answer 56. WMI admits that the WaMu Delaware I Offering Memorandum cited in

paragraph 56 portrays a diagram outlining the relationship among, *inter alia*, WMI,

WMB, University Street, Inc., Washington Mutual Preferred Funding LLC, and WaMu

Delaware I, and respectfully refers the Court to that document for the content thereof and

denies any characterization inconsistent therewith. WMI denies each and every

remaining allegation set forth in paragraph 56 of the Complaint.

> 57.     Each of the Trust Preferred Securities is pari passu
> with the other Trust Preferred Securities. And, each was
> perpetual in nature, and provided for non-cumulative
> dividends accruing at specified annual rates; payable
> quarterly to the extent declared by WMPF's board of
> managers.[8] If the stated dividends were paid in full in a
> particular quarter, WMPF was also authorized to pay
> dividends to University Street (due to the latter's common
> equity interest in WMPF) so long as certain financial ratios
> were met.[9] Each Trust Preferred Security carries with it a
> stated liquidation preference ($4 billion in total across all
> five Trust Preferred Securities issuances), which is required
> to be paid to redeem or cancel the securities.

Answer 57. The allegations in paragraph 57 of the Complaint constitute legal

conclusions regarding the nature of the Trust Preferred Securities as to which no response

is required. To the extent that a response is required, WMI respectfully refers the Court

to the WaMu Cayman TPS, WaMu Delaware I, II, III, and IV TPS Offering Circulars

referenced by Plaintiffs in paragraphs 53 and 57 for the content thereof describing the

nature of the Trust Preferred Securities, and WMI denies any characterization

inconsistent therewith. WMI denies each and every remaining allegation in Paragraph 57

of the Complaint.

---

[8]     See, e.g., WaMu Delaware III Offering Memorandum, p. 7, 10.

[9]     See, id. at pp. 7& 13.

58. The Trust Preferred Securities were evidenced by a Rule 144A global certificate or a Regulation S global certificate (as appropriate).[10] Upon issuance, the global certificates were deposited with a registrar as custodian for The Depository Trust Company (the "DTC").[11] DTC is a limited purpose trust company created to hold securities for its participating organizations.[12] The Trust Preferred Securities were registered in the name of Cede & Company, DTC's nominee.[13]

Answer 58. WMI admits that the Global Securities were to be deposited upon issuance with the Registrar as custodian for The Depository Trust Company ("DTC") in New York, New York, and registered in the name of DTC or its nominee. WMI admits that DTC is a limited-purpose trust company created to hold securities for its participating organizations. WMI admits that the Trust Preferred Securities were registered in the name of DTC's nominee, Cede & Co. WMI avers that the remaining allegations in paragraph 58 of the Complaint constitute legal conclusions regarding the nature and issuance of the Trust Preferred Securities as to which no response is required. To the extent that a response is required, WMI respectfully refers the Court to the WaMu Cayman TPS, WaMu Delaware I, II, III, and IV TPS Offering Circulars referenced by Plaintiffs in paragraphs 53, 57, and 58 for the content thereof describing the nature and issuance of the Trust Preferred Securities, and WMI denies any characterization

---

[10] See, e.g., WaMu Cayman Offering Memorandum, p. 96-97.

[11] See, id. at 97.

[12] See, e.g., WaMu Delaware III Offering Memorandum, p. 102.

[13] See Debtors' Answer and Counterclaims, JPMorgan Chase Bank, N.A. v. Washington Mutual, Inc., et al., Adv. Proceeding No. 09-50551 ("Debtors' Counterclaims"), p. 100.

inconsistent therewith. WMI denies each and every remaining allegation in Paragraph 58 of the Complaint.

> 59.    The offering memorandum for each of the Trust Preferred Securities issuances incorporated by reference the then-current SEC filings of WMI and WMB, as well as certain information filed by WMB with its primary regulator, the Office of Thrift Supervision ("OTS")[14] (as is discussed infra).[15] Investors were advised that the incorporated information provided, among other things, "important information concerning WMB's financial condition and operating results."[16]

Answer 59. WMI admits that the OTS is an office in the Department of the Treasury, and that the OTS was established by the Home Owners' Loan Act, codified at 12 U.S.C. § 1461, *et seq.* WMI respectfully refers the Court to 12 U.S.C. § 1461, *et seq.*, referenced by Plaintiffs in footnote 14 of the Complaint, for the content thereof describing the purpose and authority of the OTS, and WMI denies any characterization inconsistent therewith. WMI admits that the WaMu Cayman TPS, WaMu Delaware I, II, III, and IV TPS Offering Circulars referenced in paragraph 59 incorporate by reference certain information that WMI filed with the Securities and Exchange Commission ("SEC") and

---

[14]    The OTS is an office of the Department of the Treasury, established by the Home Owners' Loan Act ("HOLA"), 12 U.S.C. § 1461, et seq., for the purpose of supervising and regulating federal savings associations. HOLA directs the OTS to "provide for the organization, incorporation, examination, operation and regulation of. . . Federal savings associations . . . ." 12 U.S.C. § 1464(a). OTS's stated mission is "[to supervise savings associations and their holding companies in order to maintain their safety and soundness and compliance with consumer laws, and to encourage a competitive industry that meets America's financial services needs." As Washington Mutual's primary federal regulator, the OTS was responsible for full scope examinations to assess the safety and soundness of the bank's operations and compliance with consumer protection laws.

[15]    See, e.g., WaMu Delaware III Offering Memorandum, p. xi.

[16]    See id. at p.xii.

OTS. WMI respectfully refers the Court to the WaMu Cayman TPS, WaMu Delaware I,

II, III, and IV TPS Offering Circulars for the content thereof, and WMI denies any

characterization inconsistent therewith. WMI denies each and every remaining allegation

in Paragraph 59 of the Complaint.

2.    **The "Conditional Exchange" Feature And**
      **Undisclosed Side Agreements With the OTS.**

60.  Each Series of the Trust Preferred Securities included a purported
"Conditional Exchange" feature, whereby, upon the occurrence of certain events,
the Trust Preferred Securities might be exchanged for preferred equity of WMI.
Specifically, the following were set forth as events potentially precipitating a
purported Conditional Exchange (each, an "Exchange Event"):

a.    WMB becoming "undercapitalized" under the OTS's "prompt
      corrective action" regulations;
b.    WMB being placed into conservatorship or receivership; and
c.    The OTS, in its sole discretion, anticipating WMB becoming
      "undercapitalized" in the near term or the OTS taking a
      supervisory action that limited the payment of dividends by WMB.

Following the occurrence of one or more of the foregoing Exchange Events, the
OTS could issue a notice initiating the series of transactions, which, subject to the
satisfaction of other conditions (which, as discussed below, were never satisfied),
would constitute the purported Conditional Exchange. But, "[a]bsent an OTS
directive after the occurrence of an Exchange Event, no exchange of the Trust
[Preferred] Securities" would occur. If the OTS issued such directive, the
purported Conditional Exchange, would be effective as of 8:00 a.m. (Eastern) or
the day set forth in the OTS directive, or if no date was set forth, as of 8:00 a.m.
(Eastern) on the earliest possible date following WMI's issuance of a press release
disclosing the OTS's directive. Following completion of the purported
Conditional Exchange, holders of Trust Preferred Securities were to have received
a like amount of preferred equity in WMI, having substantially equivalent terms
as the applicable exchanged Trust Preferred Security as to dividends, redemption
and liquidation preferences.

Answer 60. The allegations in paragraph 60 of the Complaint contain legal conclusions

as to the efficacy of the Conditional Exchange to which no response is required. To the

extent that a response is required, WMI admits that the offering circulars for the Trust

Preferred Securities include the language quoted by Plaintiffs in Paragraph 60 with

respect to the description of an Exchange Event and respectfully refers the Court to that

document for the content thereof and denies any characterization inconsistent therewith.

Otherwise, WMI denies each and every allegation in Paragraph 60.

> 61. In connection with each issuance of the Trust Preferred Securities, WMPF represented that: "After the occurrence of the Conditional Exchange, the Trust [Preferred] Securities would be owned by WMI." Each of the offering circulars also depicted WMI's retention of the Trust Preferred Securities visually, as each of the presented organizational charts showed the Trust Preferred Securities being transferred to WMI – but failed to disclose any prospective further transfer of the Trust Preferred Securities to WMB or any other entity.

Answer 61. WMI admits that the offering circulars for the Trust Preferred Securities

include the language quoted by Plaintiffs in Paragraph 61 and respectfully refers the

Court to that document for the content thereof and denies any characterization

inconsistent therewith. WMI also admits that the offering circulars for the Trust

Preferred Securities includes diagrams graphically outlining relationships among parties

involved with the Trust Preferred Securities and respectfully refers the Court to that

document for the content thereof and denies any characterization inconsistent therewith.

WMI avers that none of the offering statements included any undertaking by WMI as to

what would be done with the Trust Preferred Securities after a Conditional Exchange

occurred. WMI denies the remaining allegations contained in Paragraph 61.

> 62. Moreover, each offering circular included risk factors related to the potential occurrence of a Conditional Exchange. But none disclosed that the Trust Preferred Securities would or even might be transferred by WMI to WMB. In fact, certain of the relevant risk factors implicitly represented that following a purported Conditional Exchange, the Trust Preferred Securities would remain property of WMI.

Answer 62. The allegations set forth in paragraph 62 of the Complain contain legal

conclusions as to the adequacy of transfer of the Trust Preferred Securities to WMB as to

which no response is required. To the extent that a response is required, WMI denies

each and every allegation in Paragraph 62 of the Complaint and further avers as follows.

Investors in Trust Preferred Securities were fully informed that the purpose of the

offerings of Trust Preferred Securities was to provide core capital for WMB and of the

potential that the OTS could decide to issue a directive ordering the Conditional

Exchange upon the occurrence of any of several Exchange Events, including when WMB

becomes undercapitalized, is placed in receivership, or when OTS, *in its sole discretion*,

anticipates that WMB would become undercapitalized. Therefore, investors in Trust

Preferred Securities (including those Plaintiffs who actually owned Trust Preferred

Securities prior to September 25, 2008), knowingly took the risk that OTS might decide

in its sole discretion to exercise its regulatory authority and direct the Conditional

Exchange of Trust Preferred Securities for WMI preferred equity.

63. For example, one of the relevant risk factors states:

> An Exchange Event triggering a Conditional Exchange will occur
> if WMB is placed into conservatorship or receivership. WMB's
> conservatorship or receivership could lead to WMI becoming
> subject to a voluntary or involuntary proceeding under the U.S.
> Bankruptcy Code. In the event of WMI's bankruptcy, the claims
> of WMI's secured, senior, general and subordinated creditors
> would be entitled to a priority of payment over the claims of
> holders of equity interests such as the Series M WMI Preferred
> Stock [one of the series of WMI preferred equity potentially
> exchangeable for the corresponding Trust Preferred Securities].
> As a result of such subordination, if WMI became subject to a
> bankruptcy proceeding after a Conditional Exchange the holders of
> the Depositary Shares would likely receive, if anything,

> substantially less than they would have received had the
> Conditional Exchange not occurred.

> Such risk factor contains no reference to any contemplated, or even potential,
> downstreaming of the Trust Preferred Securities to WMB. Rather, it implies only
> that, with respect to the value of the Trust Preferred Securities, the holders of the
> new WMI preferred equity would be subordinate to "WMI's secured, senior,
> general and subordinated creditors," and not that there was any risk investors
> would also be subordinate to WMB's creditors with respect to the value of the
> Trust Preferred Securities (as a result of the transfer of the Trust Preferred
> Securities to WMB).

Answer 63. The allegations set forth in paragraph 63 of the Complaint contain legal

conclusions to which no response is required. To the extent that a response is required,

WMI admits that the WaMu Delaware III Offering Circular cited in Paragraph 63 of the

Complaint includes the language quoted by Plaintiffs in Paragraph 63 and respectfully

refers the Court to that document for the content thereof and denies any characterization

inconsistent therewith. WMI denies the remaining allegations in Paragraph 63 of the

Complaint.

> 64. Contrary to the express and implied representations to investors that the Trust
> Preferred Securities (and the value thereof) would be owned by WMI following
> the occurrence of a purported Conditional Exchange, WMI secretly intended to
> "downstream" the Trust Preferred Securities to WMB following an exchange.
> This secret intention was reflected in a series of side-letters between WMI and the
> OTS (each, a "Side Letter"), sent in advance of each issuance through John
> Robinson, the Executive Vice President of WMI's Corporate Risk Management
> division.

Answer 64. WMI admits that it sent letters to OTS in which it requested that the Trust

Preferred Securities qualify for inclusion as the core capital of WMB, and, in order to

obtain OTS' consent to this request, WMI agreed to transfer the Trust Preferred

Securities to WMB in the event that OTS directed a Conditional Exchange. WMI denies

the remaining allegations set forth in paragraph 64 of the Complaint and further avers that

the arrangements set forth in correspondence to OTS were neither secret nor contrary to any express or implied representations to investors.

> 65. With regard to the potential transfer of the Trust Preferred Securities from WMI to WMB, each of the Side Letters provided substantially as follows:

>> As you are aware, in the notice WMB requested the OTS confirm the sale of the [Trust Preferred Securities] ... to outside investors constitutes the sale of [WMPF Preferred] ... to outside investors and that the [WMPF Preferred] qualify for inclusion in core capital of WMB. In connection with that request, WMI hereby undertakes that if, as a result of [an Exchange Event] ..., WMI exchanges its Holding Company Shares ... for [Trust Preferred Securities], or if WMI subsequent to such exchange acquires the [WMPF Preferred], WMI will contribute to WMB the [Trust Preferred Securities] or, as appropriate, the [WMPF Preferred].

> Each of the Side Letters contained the legend "CONFIDENTIAL TREATMENT REQUESTED." Based on WMI's request in each Side Letter that the undisclosed intent to transfer the Trust Preferred Securities to WMB be afforded "confidential treatment" and the disclosure that the Trust Preferred Securities would be sold to "outside investors," the OTS knew or should have known of WMI's intent to conceal this material undertaking from investors in the Trust Preferred Securities.

Answer 65.    WMI admits that the February 23, 2006 letter from WMI to OTS cited in Paragraph 65 of the Complaint includes the language quoted by Plaintiffs in paragraph 65 and respectfully refers the Court to that document for the content thereof and denies any characterization inconsistent therewith.  WMI further admits that its letters to OTS contained the legend "Confidential Treatment Requested" and that WMI requested OTS treat its letters concerning the Trust Preferred Securities as confidential business information under the Freedom of Information Act. WMI specifically avers that it is routine in the financial services industries for financial institutions to request confidential treatment under the Freedom of Information Act for submissions made to regulatory agencies.  WMI denies knowledge or information sufficient to form a belief as to the

truth of the allegation in Paragraph 65 of the Complaint concerning what was known to OTS and therefore denies same. WMI denies the remaining allegations contained in Paragraph 65.

> 66.    These secret Side Letters, which contradicted the offering memoranda, were not, in fact, disclosed to the initial investors, secondary purchasers, or the marketplace until after WMI's attempt to effect the purported Conditional Exchange and transfer the Trust Preferred Securities to WMB. Rather, certain of the Washington Mutual Entities intended for investors to believe that upon a purported Conditional Exchange, through holdings in WMI preferred equity, the exchanged investors would retain an interest in the value of the Trust Preferred Securities (subject only to the claims of structurally senior creditors of WMI and, potentially, the pari passu claims of other WMI preferred equity holders).

Answer 66. WMI denies each and every allegation in paragraph 66 of the Complaint.

> 67. If the Trust Preferred Securities were to remain at the WMI level, their value would make a material difference to investors who had been exchanged into preferred equity holdings. Specifically, so long as the Trust Preferred Securities remained at WMI and there were only $8.3 billion in creditor claims at the WMI level, the exchanged investors would be entitled to a share of the value of the Trust Preferred Securities as long as WMI's assets (including the value of the Trust Preferred Securities) exceeded creditor claims at the WMI level. If, for example, the Trust Preferred Securities were transferred, instead, to WMB, the exchanged investors (then having a claim to the value of the Trust Preferred Securities only through WMI's equity interest in WMB) would be behind not only creditor claims at the WMI level, but might also be subject to satisfaction of significant creditor claims at the WMB level before they could realize upon the value of the Trust Preferred Securities.

Answer 67. The allegations set forth in paragraph 67 of the Complaint contain legal conclusions as to the legal impact of the Conditional Exchange as to which no response is required. To the extent a response is required, WMI denies each and every allegation in paragraph 67 of the Complaint.

68. An illustration of the impact of the hidden intent to downstream the Trust Preferred Securities in this case is readily available. In WMI's chapter 11 case, there are at least three significant pools of value at stake: (a) $4 billion in deposit accounts; (b) $5.8 billion in tax refunds; and (c) the $4 billion in liquidation preference associated with the Trust Preferred Securities. Were WMI to retain the $4 billion in deposit accounts (and, Plaintiffs believe JPMC's asserted claims to this value are without merit) and even just half of its tax refunds (i.e., $2.9 billion), the $4 billion in value associated with the Trust Preferred Securities remain at the WMI level (rather than contributed to the empty WMB shell) would result in a solvent WMI estate and a significant recovery to exchanged WMI preferred holders (assuming $8.3 billion in creditors claims at the WMI level).

Answer 68. The allegations set forth in paragraph 68 of the Complaint contain legal

conclusions as to the adequacy of disclosure and legal impact of the Conditional

Exchange as to which no response is required. To the extent a response is required, WMI

denies each and every allegation in paragraph 68 of the Complaint.

69. As such, the practical result of the purported Conditional Exchange on the ownership rights of the Trust Preferred Securities holders, if given effect as contemplated in the secret Side Letters, would directly contravene the impact represented in the various offering memorandum for the Trust Preferred Securities. Indeed, if the purported Conditional Exchange and attempted transfer of the Trust Preferred Securities from WMI to WMB were to be given effect as proposed by WMI, WMB (and/or any successor thereto) would have reaped not only the benefit of the $4 billion from the sale of the Trust Preferred Securities but also the very securities issued to third parties in exchange for that price.

Answer 69. The allegations set forth in paragraph 69 of the Complaint contain legal

conclusions as to the effect of the Conditional Exchange as to which no response is

required. To the extent that a response is required, WMI denies each and every allegation

in paragraph 69 of the Complaint, and specifically avers that the disclosed purpose of the

Trust Preferred Securities was to raise core capital for WMB.

70. The existence of these secret Side Letters was not disclosed to investors or the marketplace until after the seizure of WMB and sale of WMB's assets and WMI's Chapter 11 filing in September 2008. Indeed, WMI actively sought to hide its secret intention to transfer the Trust Preferred Securities to WMB by

seeking "confidential treatment" for the Side Letters such that investors could not learn of WMI's false representations even through a Freedom of Information Act request directed to the OTS, the recipient of the secret Side Letters. Certain of the Washington Mutual Entities also participated in the concealment of the Side Letters and WMI's intentions with respect to the Trust Preferred Securities.

Answer 70. WMI admits that it requested OTS treat its letters concerning the Trust Preferred Securities as confidential business information under the Freedom of Information Act. WMI specifically avers that it is routine in the financial services industry for financial institutions to request confidential treatment under the Freedom of Information Act for submissions made to regulatory agencies. WMI denies the remaining allegations set forth in paragraph 70 of the Complaint and further avers as follows. Investors in Trust Preferred Securities were fully informed that the purpose of offering the Trust Preferred Securities was to raise core capital for WMB, and of the potential that the OTS could decide to issue a directive ordering the Conditional Exchange upon the occurrence of any of several Exchange Events, including when WMB becomes undercapitalized, is placed in receivership, or when OTS, *in its sole discretion*, anticipates that WMB would become undercapitalized.

### 3.    The Purported Conditional Exchange Failed And Cannot Now Be Consummated.

71. On September 25, 2008, WMB was seized and the Federal Deposit Insurance Corporation (the "FDIC") was appointed as receiver. The FDIC immediately executed upon what now appears to have been a preexisting plan to sell WMB's assets to JPMC for $1.88 billion pursuant to a purchase and assumption agreement. In that transaction, JPMC purported to purchase certain assets of WMB and expressly excluded all assets and liabilities of WMI. JPMC also expressly excluded from its purchase of WMB's assets "any interest, right, action, claim, or judgment against" WMI.

Answer 71. WMI admits that, on September 25, 2008, OTS placed WMB in receivership and the Federal Deposit Insurance Corporation was appointed as Receiver of WMB.

WMI admits that the FDIC is an independent agency charged with certain administrative responsibilities under the Federal Deposit Insurance Act, 12 U.S.C. § 1811, et seq. WMI admits that the stated purpose of the FDIC is to maintain stability and public confidence in the nation's financial system by insuring deposits, examining and supervising financial institutions for safety and soundness and consumer protection, and managing receiverships. WMI further admits that the FDIC has supervisory authority over federally insured depository institutions, that the FDIC insured certain WMB deposits, and that FDIC had regulatory authority. WMI admits that, following its appointment as Receiver, FDIC sold certain of WMB's assets to JPMC for $1.88 billion pursuant to that certain Purchase and Assumption Agreement ("P&A Agreement") dated as of September 25, 2008. WMI avers that the terms of the purchase are set forth in the P&A Agreement and respectfully refers the Court to that document for its content. WMI denies any remaining allegations contained in Paragraph 71.

> 72. Following the FDIC's actions, the OTS directed that the purported Conditional Exchange be effected. WMI subsequently confirmed that it would follow the OTS's directive, and that the purported Conditional Exchange would occur the following morning (September 26, 2008) at 8:00 a.m. (Eastern).

Answer 72. WMI admits that, on September 25, 2008, OTS sent a letter to WMI which stated in part that, "[p]ursuant to the conditional exchange provision in the prospectus of the REIT preferred offerings of the bank, OTS concludes an "Exchange Event" has occurred and therefore directs an exchange of WaMu REIT Preferred Securities to a like amount of preferred stock in Washington Mutual Incorporated." WMI further admits that, on September 25, 2008, it sent a letter to OTS stating in part that it would "issue a press release on September 26, 2008 announcing that such Conditional Exchange will

occur at 8:00 a.m. New York time on September 26, 2008." WMI denies all other

allegations contained in Paragraph 72.

> 73. Later, on the evening of September 25, after the assets of WMB had been sold to JPMC, and after the purported Conditional Exchange had been announced, but before it could have been effected, an employee of WMI purportedly agreed to assign the Trust Preferred Securities to WMB for no consideration. But, it was not until after approximately 7:45 a.m. (Eastern) on September 26, 2008 that WMI issued a press release regarding the purported Conditional Exchange claimed to occur only minutes later at 8:00 a.m. (which press release made no mention of any downstream contribution of the Trust Preferred Securities to WMB).

Answer 73. WMI admits that it sent a letter on September 25, 2008 to OTS stating in

part that, "[i]n any event, effective September 25, 2008, WMI has assigned to WMB all

of its right, title and interest to the Delaware trust securities, the Cayco Preferred

Securities and the WMPF Preferred Securities, and upon receipt of the [the securities]

WMI will immediately contribute and transfer same to WMB, and such contribution and

transfer will occur regardless of any events which may occur prior to such contribution

and transfer." WMI denies all other allegations in paragraph 73 of the Complaint.

### a. WMI Admits The Conditional Exchange Was Not Consummated.

74. By its own words and actions, WMI admits the purported Conditional Exchange was not consummated. Specifically, in each of WMI's Monthly Operating Reports, filed in its chapter 11 case, WMI describes the purported Conditional Exchange's status substantially as follows:

> WMI and its advisors currently are assessing a number of legal, accounting and tax issues related to the [Trust Preferred Securities] and the transactions related to the Conditional Exchange. Because of these unresolved issues, WMI has not reflected the Conditional Exchange and/or its attendant transactions on its financial statements, including any possible interest (direct or indirect, contingent or otherwise) in the [Trust Preferred Securities] and the assets, as the case may be, of Washington Mutual Preferred Funding, LLC.

Answer 74. WMI avers that the allegations set forth in paragraph 74 of the Complaint

contain legal conclusions as to the efficacy of the Conditional Exchange as to which no

response is required. To the extent a response is required, WMI admits that WMI

monthly operating reports, including Monthly Operating Report for Washington Mutual,

Inc., et al. for the Period January 1, 2010 through January 31, 2010 [Docket No. 2425]

cited in paragraph 74 of the Complaint, included the language quoted by Plaintiffs in

Paragraph 74 and respectfully refers the Court to those documents for the content thereof

and denies any characterization inconsistent therewith. WMI denies all other allegations

contained in Paragraph 75.

> 75. In or about March 2010, WMI announced its intention to pursue confirmation
> of a plan of reorganization in its chapter 11 case and the approval of an
> accompanying settlement agreement whereby the Trust Preferred Securities, and
> other assets, would be delivered to JPMC. In each Monthly Operating Report
> following the announcement of that proposed settlement, WMI further described
> the current status of the purported Conditional Exchange transaction substantially
> as follows:
>
>> Pursuant to the terms of the proposed Settlement Agreement, upon
>> consummation of the Plan, WMI and relevant third parties *will complete*
>> the Conditional Exchange.

Answer 75. WMI admits that, on March 26, 2010, the Debtors filed a proposed plan of

reorganization pursuant to chapter 11 of the Bankruptcy Code and a related disclosure

statement, which were first amended on May 16, 2010, and that they have been amended

subsequently. WMI admits that the May 21, 2010 Global Settlement Agreement

executed by and among the Debtors, JPMC, the FDIC Receiver (as defined in the

proposed plan of reorganization), FDIC Corporate (as defined in the plan of

reorganization), the Settlement Note Holders (as defined in the plan of reorganization)

and the Creditors' Committee (as defined in the plan of reorganization) is the foundation

of WMI's chapter 11 plan. WMI further admits that the Monthly Operating Report for

Washington Mutual, Inc., et al. for the Period April 1, 2010 through April 30, 2010

[Docket No. 4428] cited in paragraph 75 of the Complaint, and all subsequent monthly

operating reports filed by WMI, included the language quoted by Plaintiffs in Paragraph

74 and respectfully refers the Court to those documents for the content thereof and denies

any characterization inconsistent therewith. WMI denies all other allegations contained in

Paragraph 75.

> 76. The settlement agreement (the "Proposed Global Settlement"), whereby the Trust Preferred Securities would be delivered to JPMC, itself recognizes that neither the purported Conditional Exchange nor the alleged transfer of the Trust Preferred Securities from WMI to WMB was consummated. Specifically, the proposed Settlement agreement provides for:

>> .... (f) any and all persons and entities shall be authorized and directed to take necessary, proper or advisable actions and all other actions reasonably requested or directed by JPMC to record, reflect, transfer, vest, assign, convey, and maintain, as necessary, that a transfer of the Trust Preferred Securities was made to WMI (and subsequently by WMB to JPMC) and that JPMC is the sole legal, equitable, and beneficial owner of the Trust Preferred Securities as transferee of WMI, including, without limitation, by: (i) causing the applicable trustees, registrars, paying agents, depository, and transfer agents to amend their records (including the securities registers of each Issuing Trust) to reflect a transfer of the Trust Preferred Securities to WMI and then to WMB, and to reflect JPMC as the sole legal, equitable, and beneficial owner of the Trust Preferred Securities; (ii) causing the trustees and boards of directors of the Issuing Trusts to take all necessary, proper and advisable action to reflect JPMC as the sole legal, equitable, and beneficial owner of the Trust Preferred Securities; and (iii) amending any agreements, articles, or declarations to reflect JPMC as the sole legal, equitable, and beneficial owner of the Trust Preferred Securities ...

Answer 76. The allegations set forth in paragraph 76 of the Complaint contain legal

conclusions as to the efficacy of the Conditional Exchange as to which no response is

required. To the extent a response is required, WMI admits that § 2.3(f) of the Proposed

Global Settlement cited in paragraph 76 of the Complaint includes the language quoted

by Plaintiffs in Paragraph 76 and respectfully refers the Court to those documents for the

content thereof and denies any characterization inconsistent therewith. WMI denies all

other allegations contained in Paragraph 76.

**b.      The Failure to Properly Execute The Conditional Exchange**
**Renders the Claimed Transfer Null, Void and Without Effect.**

77. Assuming, arguendo, the validity of the Conditional Exchange provisions,
upon the declaration of a purported Conditional Exchange, applicable law and the
applicable documents required certain steps to be taken before the Trust Preferred
Securities could be transferred from third party investors to WMI. The offering
memoranda for the Trust Preferred Securities, at varying points, make reference
to the purported Conditional Exchange being "automatic" or "deemed" to have
occurred. As discussed herein, such descriptions are unenforceable as a matter of
contract and law, and in any event, are not controlling because, inter alia, they are
at odds with the operative documents drafted by or under the direction of WMI, to
which holders of the Trust Preferred Securities are parties, and are subject to and
controlled by those operative documents. Further, as a matter of law, an issuer of
securities cannot be unilateral proclamation, render invalid otherwise applicable
law governing transfers of securities and/or other related matters.

Answer 77. The allegations set forth in paragraph 77 of the Complaint contain legal

conclusions concerning the efficacy of the Conditional Exchange as to which no response

is required. WMI further avers that the discussion of the Trust Preferred Securities trust

agreements in paragraph 77 are merely legal arguments and legal conclusions to which

no response is required and respectfully refers the Court to those documents for the

content thereof and denies any characterization inconsistent therewith. To the extent a

response is required, WMI denies each and every allegation in paragraph 77.

78. Neither the requisite legal nor requisite documentary steps were taken, and
the purported Conditional Exchange, therefore, remains unconsummated. And, as
discussed below, to the extent WMI seeks the Court's assistance in consummating
the purported Conditional Exchange or other transfers of the Trust Preferred
Securities (including to JPMC) notwithstanding these legal and documentary
infirmities, the Court should deny such relief based, inter alia, on WMI's

36

inequitable illegal conduct in connection with the issuance of the Trust Preferred Securities and/or JPMC's knowledge thereof prior to WMI's attempt to effect the purported Conditional Exchange.

Answer 78. The allegations set forth in paragraph 78 of the Complaint contain legal conclusions concerning the efficacy of the Conditional Exchange as to which no response is required. To the extent a response is required, WMI denies each and every allegation in paragraph 78.

i. **Documentary Requirements For Consummation Of Conditional Exchange.**

79. Under the applicable trust agreements, in connection with a purported Conditional Exchange, holders were alleged to have an unconditional obligation to surrender to WMI any certificates representing the Trust Preferred Securities. The holder of those certificates, DTC (through its nominee, Cede & Co.) has not surrendered the certificates.

Answer 79. The allegations set forth in paragraph 79 contain legal conclusions as to the surrender of certificates representing the Trust Preferred Securities as to which no response is required. To the extent that a response is required, WMI admits that § 4.08(a)(i) of the amended Delaware trust agreements states that upon the occurrence of a Conditional Exchange, that "each Holder of Trust Securities shall be unconditionally obligated to surrender to WMI any Certificates representing the Trust Securities owned by such Holder on the date and time provided in the next succeeding paragraph." WMI respectfully refers the Court to those documents for the content thereof and denies any characterization inconsistent therewith. WMI is without sufficient information to admit or deny whether DTC or Cede & Co. have surrendered the certificates, and therefore denies those allegations. WMI denies all other allegations contained in Paragraph 79.

80. Next, in connection with a purported Conditional Exchange, the applicable trustees were to have recorded in the applicable trust registers WMI as the holder

of the Trust Preferred Securities, "as transferee from the Holders of the Trust [Preferred] Securities immediately prior to such date and time..." The applicable trustees have not recorded WMI as the holder of the Trust Preferred Securities in any of the associated trust registers. Indeed, through positions taken in connection with other litigation before this Court, WMI apparently concedes that the required recordings in the applicable registers were not made, either before or after the filing of the WMI bankruptcy proceedings. Moreover, in opposing consummation of the "downstreaming undertaking" in other litigation before this Court, WMI stated:

> ***More than simply a clerical act, registration is a legally significant act*** that facilitates the administration of a large-scale security issuance involving multiple holders, like the [Trust Preferred Secuirities]. Therefore, under the applicable law and the Uniform Commercial Code as adopted by the State of Washington, the [Trust Preferred Securities] have not been delivered to WMB. Thus the [Trust Preferred Securities] are property of WMI's bankruptcy estate.

Answer 80. The allegations set forth in paragraph 80 of the Complaint contain legal conclusions as to the efficacy of the Conditional Exchange to which no response is required. To the extent that a response is required, WMI admits that ¶ 56 of the Debtors' Answer and Amended Counterclaims in Response to the Complaint of JPMorgan Chase Bank, N.A. filed on September 11, 2009 (the "Debtors' Counterclaims") cited in paragraph 80 states that, "[u]pon information and belief, the SPEs, the issuers of the Trust Securities, have made no transfer notations registering the Trust Securities to WMB to reflect any purported Assignment" and admits that the footnote to ¶ 56 states that "[t]he Debtors are not aware of any transfer notations being made post-petition, but reserve their right to amend the complaint to avoid any such unauthorized transfers of property of the Debtors' estate." WMI further admits that ¶ 57 of the Debtors' Counterclaims includes the language quoted by Plaintiffs in Paragraph 80. WMI respectfully refers the Court to the Debtors' Counterclaims for the content thereof and denies any characterization inconsistent therewith. WMI further admits that § 4.08(a)(ii) of the amended Delaware

trust agreements states that, once Conditional Exchange has been ordered, "the Trustees shall (or shall cause the Register and Transfer Agent to) record in the Register WMI as the owner of all of the Trust Securities, as transferee from the Holders of Trust Securities immediately prior to such date and time." WMI respectfully refers the Court to the trust agreement documents for the content thereof and denies any characterization inconsistent therewith. WMI denies all other allegations contained in Paragraph 80.

> 81. Third, in connection with a purported Conditional Exchange, WMI was required to issue to each holder of the Trust Preferred Securities a like amount of the applicable series of WMI preferred equity. And, WMI was obligated to mail to each holder of record of the Trust Preferred Securities a notice regarding the occurrence of a purported Conditional Exchange. The WMI preferred equity was never issued, nor does it appear the required notice of the purported Conditional Exchange was transmitted to holders of the Trust Preferred Securities.

Answer 81. The allegations set forth in paragraph 81 of the Complaint contain legal conclusions as to the efficacy of the Conditional Exchange to which no response is required. To the extent a response is required, WMI admits that § 4.08(a)(ii) of the WaMu Delaware IV Trust Agreement (as well as § 4.08(a)(ii) of the WaMu Delaware I-III Trust Agreements) states that once a Conditional Exchange has been ordered, "the Trustees shall (or shall cause the Register and Transfer Agent to) record in the Register WMI as the owner of all of the Trust Securities, as transferee from the Holders of Trust Securities immediately prior to such date and time." WMI further admits that § 4.08(c) of the WaMu Delaware IV Trust Agreements (as well as § 4.08(c) of the WaMu Delaware I-III Trust Agreements) describes a procedure for the distribution of notice related to a Conditional Exchange and specifically provides that "[u]ntil replacement certificates representative of Fixed-to-Floating Rate Depositary Shares are Delivered or in the event such replacement certificates are not delivered, any certificates previously

representing Trust Preferred Securities shall be deemed for all purposes to represent

Fixed-to-Floating Rate Depositary Shares." WMI respectfully refers the Court to the

trust agreement documents for the content thereof and denies any characterization

inconsistent therewith. WMI denies all other allegations contained in Paragraph 81.

> 82. In light of the foregoing, the transactions and actions required to consummate the purported Conditional Exchange under the terms of the applicable documents never occurred.

Answer 82. The allegations set forth in paragraph 82 of the Complaint contain legal

conclusions concerning the efficacy of the Conditional Exchange as to which no response

is required. To the extent a response is required, WMI denies each and every allegation

in paragraph 82.

### ii. Statutory Requirements For Consummation Of Conditional Exchange.

> 83. Because the Trust Preferred Securities were issued in certificated form, UCC § 8-301(a) governs delivery upon a transfer, in this case requiring: (a) WMI to acquire possession of the security certificate; or (b) another person, other than a securities intermediary, to take possession of the security certificate on behalf of the purchaser, or, having previously acquired possession of the security certificate, to acknowledge it holds the certificate on behalf of the transferee. Neither of these alternative required steps occurred with respect to either the Trust Preferred Securities (to WMI) or the WMI preferred equity (to the holders of the Trust Preferred Securities).

Answer 83. The allegations set forth in Paragraph 83 of the Complaint contain legal

conclusions as to the application and requirements of UCC § 8-301(a) as to which no

response is required. To the extent a response is required, WMI denies each and every

allegation in Paragraph 83.

> 84. As such, the legal requirements for delivery of the Trust Preferred Securities, constructive conditions precedent to consummation of any exchange or transfer,

have not been fulfilled, and, therefore, the purported Conditional Exchange could not have been, and never was, consummated.

Answer 84. The allegations set forth in Paragraph 84 of the Complaint contain legal conclusions as to the efficacy of the Conditional Exchange to which no response is required. To the extent a response is required, WMI denies each and every allegation in Paragraph 84.

### c. Strict Restrictions On Transfers Of the Trust Preferred Securities Prevent Consummation Of the Conditional Exchange.

85. Additionally, in connection with the issuances of the Trust Preferred Securities, strict limitations were placed on the subsequent transfer of such securities. For example, each certificate representing the Trust Preferred Securities included a legend providing as follows:

> ... AND NEITHER THIS SECURITY NOR ANY BENEFICIAL INTEREST HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT TO A PERSON WHO IS BOTH A "QUALIFIED INSTITUTIONAL BUYER" WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT ("QUALIFIED INSTITUTIONAL BUYER") AND A "QUALIFIED PURCHASER" WITHIN THE MEANING OF SECTION 2(a)(51) OF THE INVESTMENT COMPANY ACT AND THE RULES AND REGULATIONS THEREUNDER ("QUALIFIED PURCHASER") ACQUIRING FOR ITS OWN ACCOUNT OR THE ACCOUNT OF A PERSON WHO IS BOTH A QUALIFIED INSTITUTIONAL BUYER AND A QUALIFIED PURCHASER (AN "ELIGIBLE PURCHASER").

Answer 85. The allegations set forth in paragraph 85 of the Complaint contain legal conclusions as to the requirements for the transfer of the Trust Preferred Securities as to which no response is required. To the extent to a response is required, WMI admits that the Notice to Investors sections of the Trust Preferred Securities offering memorandum and the Exhibit A to the trust agreements include the language quoted by Plaintiffs in Paragraph 85 of the Complaint. WMI further admits that § 3.05(a) of the WaMu trust

agreements contain similar language but not precisely the same as the language quoted by the Plaintiffs in paragraph 85 of the Complaint. WMI respectfully refers the Court to those documents for the content thereof and denies any characterization inconsistent therewith. WMI denies any remaining allegations in paragraph 85 of the Complaint.

> 86. Any attempted transfer in violation of such restrictions would be void <u>ab initio</u>, of no force and effect, and would not operate to transfer any rights to the proposed transferee.[17]

Answer 86. The allegations set forth in paragraph 86 of the Complaint contain legal conclusions as to the efficacy of the Conditional Exchange as to which no response is required. To the extent a response is required, WMI admits that WaMu Delaware III Offering Memorandum contains the portion of the sentence quoted by the Plaintiffs in footnote 42 of the Complaint. WMI admits that WaMu Delaware III Trust Agreement, § 3.03(f) contains a sentence which reads in its entirety that "[a]ny purported transfer of a Trust Security in violation of the restrictions set forth in the legend required by *Exhibit A* or otherwise not in accordance with this Trust Agreement or the Trust Agency Agreement, to the fullest extent permitted by applicable law, shall be void and the Registrar and Transfer Agent shall not register any such transfer if it becomes aware of such violation." WMI denies all remaining allegations in paragraph 86 of the Complaint.

---

[17] <u>See</u>, <u>e.g.</u>, WaMu Delaware III Offering Memorandum, p. vi ("Any transfer of Trust Securities in breach of the transfer restrictions set forth in this 'Notice to Investors' and the Trust Agreement will be of no force and effect, will be void <u>ab initio</u>, and will not operate to transfer any rights to the transferee, notwithstanding any instructions to the contrary to the Trust, its Transfer Agent, or any other intermediary."); WaMu Delaware III Trust Agreement, § 3.03(f) ("Any purported transfer of a Trust Security in violation of the restrictions set forth in the legend required by Exhibit A ... shall be void and the Registrar and Transfer Agent shall not register any such transfer if it becomes aware of such violation.").

87. The transfer restrictions applicable to the Trust Preferred Securities, which were drafted and imposed on purchasers by WMPF and the SPEs (which, at all times, were under the control of WMI) incorporate by reference the concept of "Qualified Institutional Buyer" from SEC Rule 144A. The term "Qualified Institutional Buyer," which is incorporated into the governing documents related to the Trust Preferred Securities, is defined in the disjunctive, and may be applicable to the following:

    a.    Any of [certain entities], acting for its own account or the accounts of other qualified institutional buyers, *that in the aggregate owns and invests on a discretionary basis at least 100 million in securities of issuers that are not affiliated with the entity.*

    b.    Securities dealers registered under the Securities Act of 1934 and certain investment companies registered under the Investment Company Act of 1940;

    c.    Any entity, all of the equity owners of which are qualified institutional buyers;

    d.    Any bank, acting for its own account or the accounts of other qualified institutional buyers, that (i) in the aggregate *owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with the bank*, and (ii) has an audited *net worth of at least $25 million* as demonstrated in its latest financial statements, as of a date not more than sixteen months preceding the transaction.

Answer 87. The allegations set forth in paragraph 87 of the Complaint contain legal conclusions as to the efficacy of the Conditional Exchange no response is required. WMI further avers that the paragraph 87 of the Complaint is merely a recital of a legal argument and legal conclusion concerning the Code of Federal Regulations as to which no response is required. To the extent that a response is required, WMI denies every allegation in paragraph 87 of the Complaint.

88. According to the December 1, 2008 Monthly Operating Report filed by WMI in its chapter 11 case, as of September 26, 2008 (the date of the purported Conditional Exchange), WMI held only $59.7 million in "Investment Securities" – apparently more than $40 million less than would be required to be a Qualified

Institutional Buyer under 144A(a)(1)(i) or (vi). Moreover, as of September 26, 2008, WMI reported that its liabilities exceeded its assets by approximately $575 million – leaving WMI with a negative net worth of that same amount (approximately $600 million less than would be required to be a Qualified Institutional Buyer under Rule 144A(a)(1)(vi)).

Answer 88. The allegations set forth in paragraph 88 of the Complaint contain legal conclusions as to the efficacy of the Conditional Exchange as to which no response is required. To the extent a response is required, WMI admits its Monthly Operating Report for Washington Mutual, Inc., et al. [Docket No. 369] cited in paragraph 88 of the Complaint contains an unaudited balance sheet as of October 31, 2008 which includes $59,688,627 of investment securities in the assets column for WMI as of September 26, 2008 and which describes WMI's liabilities. WMI respectfully refers the Court to this document for the content thereof and denies any characterization inconsistent therewith. WMI denies all other allegations contained in Paragraph 88.

89. As of September 26, 2008 (and at all times through the present day), WMI was incapable of satisfying the transfer restrictions it elected to impose in connection with the Trust Preferred Securities. As such, according to the terms of the Trust Preferred Securities themselves, any attempted transfer of the Trust Preferred Securities to WMI (including the "transfer" purported to be effected by the Conditional Exchange) would have been, and would still be, void ab initio, of no force and effect, and would have failed to transfer to WMI any right to the Trust Preferred Securities.

Answer 89. The allegations set forth in paragraph 89 of the Complaint contain legal conclusions as to the efficacy of the Conditional Exchange as to which no response is required. To the extent a response is required, WMI denies each and every allegation contained in Paragraph 89 of the Complaint.

90.     In connection with each offering of the Trust Preferred Securities, WMI sent a Side Letter to the OTS. Specifically, WMI sent letters to the OTS on January 30, 2006, February 23, 2006, November 14, 2006 and August 17, 2007.

Answer 90.  WMI admits that it sent letters to OTS on February 23 2006, November 14, 2006 and August 17, 2007 and respectfully refers the Court to those documents for the content thereof.  WMI admits that it sent a regulatory notice to the FDIC on January 30, 2006, and that OTS received a copy.  WMI denies the remaining allegations in Paragraph 90.

91.     The letters indicated that WMI was establishing WMPF for the purpose of issuing preferred securities to "outside investors," specifically informing the OTS that WMI intended for the securities to be issued to third parties. WMI requested in the Side Letters that the OTS allow the Trust Preferred Securities to qualify for inclusion as core capital of WMB. In connection with that request, WMI informed the OTS that it would transfer the Trust Preferred Securities to WMB if a Conditional Exchange was declared.

Answer 91.  WMI admits that it sent letters to OTS in which it requested to that the Trust Preferred Securities qualify for inclusion as the core capital of WMB, and in order to obtain OTS' consent to this request, WMI agreed to transfer the Trust Preferred Securities to WMB in the event that OTS directed a Conditional Exchange.  WMI respectfully refers the Court to those letters for the content thereof and denies any characterization inconsistent therewith.  WMI denies the remaining allegations set forth in paragraph 91 of the Complaint.

92.     Each of the Side Letters from WMI expressly stated that "confidential treatment" was requested, asserting that the information (i.e., the statement by WMI that it would transfer the Trust Preferred Securities to WMB in the event of a purported Conditional Exchange) was proprietary, commercial information and thus privileged within the

meaning of 5 U.S.C. § 552(b)(4) and 31 C.F.R. § 1.2(c)(1) and 1.6(a). In order to be entitled to request "confidential treatment" under the regulations cited in the Side Letters, WMI was required to affirm that the information had not been publicly disclosed and would not be publicly disclosed.

Answer 92. WMI admits that it requested OTS treat its letters concerning the Trust Preferred Securities as confidential business information under the Freedom of Information Act, as is the standard practice for financial institutions submitting information to regulatory agencies. WMI denies the remaining allegations set forth in paragraph 92 of the Complaint.

93.     The undisclosed contingent transfer of the Trust Preferred Securities by WMI to WMB was material to purchasers of the Trust Preferred Securities and rendered the offering materials pursuant to which the Trust Preferred Securities were sold false and misleading.

Answer 93. The allegations set forth in paragraph 93 of the Complaint contain legal conclusions as to which no response is required. To the extent that a response is required, WMI denies each and every allegation set forth in paragraph 93 of the Complaint and further avers as follows. Investors in Trust Preferred Securities were fully informed that the purpose of the offering was to raise core capital for WMB and of the potential that the OTS could decide to issue a directive ordering the Conditional Exchange upon the occurrence of any of several Exchange Events, including when WMB becomes undercapitalized, is placed in receivership, or when OTS, *in its sole discretion*, anticipates that WMB would become undercapitalized.

94.     In the Side Letters with the OTS, WMI did not expressly inform the OTS that the existence of the Side Letters would not be disclosed in the offering materials used by the SPEs to sell the Trust Preferred Securities. However, as a result of this requested "confidential treatment"

the OTS knew or should have known that "outside investors" would be unaware of the material fact that WMI would attempt to transfer the Trust Preferred Securities to WMB following a purported Conditional Exchange and such information would not be disclosed in the offering materials pursuant to which the securities were to be sold.

Answer 94. The allegations set forth in paragraph 94 of the Complaint contain legal conclusions as to the adequacy of disclosure as to which no response is required. To the extent that a response is required, WMI denies knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 94 of the Complaint concerning what was known to OTS and therefore denies those allegations. WMI denies the remaining allegations contained in Paragraph 94 of the Complaint.

95. The Side Letters were not, in fact, disclosed to outside investors until some time after WMI attempted to consummate the purported Conditional Exchange. As a result, the OTS was a witting or reckless aider and abettor of the fraud on investors perpetrated by certain of the Washington Mutual Entities.

Answer 95. The allegations set forth in paragraph 95 of the Complaint contain legal conclusions as to the efficacy of the Conditional Exchange and to the existence of legal liability to which no response is required. To the extent a response is required, WMI denies knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 95 of the Complaint concerning what was known to OTS and therefore denies those allegations. WMI denies the remaining allegations set forth in paragraph 95 of the Complaint.

96. As such, the directive by the OTS on September 25, 2008 declaring that a Conditional Exchange had occurred (coupled with WMI's purported steps to transfer the Trust Preferred Securities to WMB) was in furtherance of the fraud perpetrated on the outside investors by certain of the Washington Mutual Entities,

was in excess of the OTS' authority, was against public policy, and is void ab initio.

Answer 96. The allegations set forth in paragraph 96 of the Complaint contain legal conclusions as to the efficacy of the Conditional Exchange and the federal securities laws to which no response is required. To the extent a response is required, WMI denies each and every allegation contained in Paragraph 96 of the Complaint.

> 97.    Alternatively, because the OTS knew the Side Letters were delivered to it in connection with an anticipated public offering of securities, the OTS knew or should have known the request for confidential treatment of the contingent transfer of the Trust Preferred Securities by WMI to WMB was inconsistent with the requirements of full disclosure mandated by the Federal Securities laws and a violation of important federal public policy, that, therefore, thwarted the legitimate expectations of investors.

Answer 97. The allegations set forth in paragraph 97 of the Complaint contain legal conclusions as to the application of federal securities laws as to which no response is required. To the extent a response is required, WMI denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 97 of the Complaint concerning what was known to OTS and therefore denies those allegations. WMI denies the remaining allegations contained in Paragraph 97.

> 98.    The OTS was, at a minimum, grossly negligent in agreeing to treat the Trust Preferred Securities as core capital of WMB based on the secret Side Letters because, inter alia, the OTS failed to ensure that the Side Letters were disclosed in the offering materials issued to sell the securities to investors.

Answer 98. The allegations set forth in paragraph 98 of the Complaint contain legal conclusions as to the disclosure required by federal securities laws as to which no response is required. To the extent a response is required, WMI denies each and every allegation contained in Paragraph 98 of the Complaint.

99.     By the above actions in connection with the issuances of the Trust
Preferred Securities, the OTS acted beyond its statutory authority. As a result,
inter alia, of the foregoing, the purported Conditional Exchange of the Trust
Preferred Securities initiated by OTS directive is void ab initio and unenforceable.

Answer 99. The allegations set forth in paragraph 99 of the Complaint contain legal

conclusions as to the efficacy of the Conditional Exchange as to which no response is

required.  To the extent a response is required, WMI denies each and every allegation

contained in Paragraph 99 of the Complaint.

**B.      Pervasive Fraud, Misrepresentations And
Material Omissions Permeated And Infected The
Issuances And Sales Of The Trust Preferred Securities.**

100.    The concealment of WMI's secret Side Letters with the OTS was just one
part of a campaign of many material omissions, misrepresentations and/or frauds
visited upon investors in the Trust Preferred Securities.  As a recently-concluded
Senate investigation has revealed, from the first issuance of the Trust Preferred
Securities in March 2006 through the collapse of Washington Mutual in
September 2008, Washington Mutual was engaging in a covert shift into high risk
lending segments and business practices, while at the same time falsely
representing to investors (including, importantly, investors in the Trust Preferred
Securities) the safety and soundness of WMB's assets, operations and business
practices.  As the financial condition of WMB was critical to investors'
understanding of the likelihood of a purported Conditional Exchange occurring,
the concealment of the true condition and status of WMB was a material
omission, misrepresentation and/or overt fraud against such investors.

Answer 100.   WMI denies the allegations of Paragraph 100 of the Complaint.

**1.      Certain Of The Washington Mutual Entities
Perpetrated A Continuing Fraud On Investors In
The Trust Preferred Securities By Misrepresenting
Numerous Matters Material To Such Parties'
Investment Decisions.**

101.    As was found recently by the Senate Permanent Subcommittee on
Investigations, "[b]efore its fall, Washington Mutual held itself out as a
well-run prudent bank that was a pillar of its community . . . . [B]ehind

closed doors, the bank's management was surrounded by deep-seated
problems including shoddy lending practices and poor quality loans."[18]

Answer 101.   WMI admits that Senator Levin's April 16, 2010 Opening Statement

includes the language quoted by Plaintiffs in Paragraph 101 of the Complaint,

respectfully refers the Court to that statement for the content thereof and denies any

characterization inconsistent therewith.  WMI denies the remainder of Paragraph 101 of

the Complaint, including the substance of the quotations.

> 102.   Throughout 2006 and 2007, hiding behind the facade of a "well-
> run prudent bank," certain of the Washington Mutual Entities sought to
> raise capital through the offerings of the Trust Preferred Securities.  The
> allure of investing in these securities was the fact that Washington Mutual
> outwardly appeared to be a safe, and soundly-run, enterprise, that an
> investment in the Trust Preferred Securities was likely to yield a safe,
> stable source of income to investors and/or upon redemption, a $4 billion
> liquidation preference, and a Conditional Exchange appeared to be a
> remote possibility.  But, the opposite was the case.  First, as discussed
> above, the offering circulars concealed WMI's intentions as to the end
> result of the purported Conditional Exchange by representing the Trust
> Preferred Securities would be held by WMI.

Answer 102.   WMI admits that certain of the Washington Mutual Entities sought to raise

capital for WMB through the offerings of Trust Preferred Securities but denies the

remaining allegations in Paragraph 102 of the Complaint.  WMI avers, on information

and belief, that some or all of Plaintiffs did not invest in securities they believed were

likely to yield a safe, stable source of income or a $4 billion liquidation preference, but

rather invested in distressed securities, the trading price of which reflected the legal rights

appurtenant to those securities and the financial and regulatory circumstances of WMI

---

[18] See April 16, 2010 Opening Statement of Senator Carl Levin, D-Mich., before the U.S.
Senate Subcommittee on Investigation.

and WMB. The Rule 2019 filing submitted by Plaintiffs' counsel specifically disclosed

that many of the Plaintiffs had purchased purported rights to Trust Preferred Securities

after the Conditional Exchange occurred, but does not disclose the specific holdings of

any Plaintiff. WMI has requested in discovery that each Plaintiff identify when it

purchased its purported rights to Trust Preferred Securities and what it paid for those

rights, as well as the information relied on in the purchase.

> 103. Second, the offering circulars impliedly represented a Conditional
> Exchange was highly unlikely by, among other things, touting the strength
> and quality of WMB, its assets and its business practices. For example,
> the offering circulars represented to investors in the Trust Preferred
> Securities that WMB's capital was well in excess of not only the minimum
> regulatory requirements, but also in excess of the "minimum to be
> categorized as well-capitalized" under applicable OTS regulations.[19] Even
> when noting difficulties in the lending industry in connection with the last
> offering of Trust Preferred Securities in October 2007, certain of the
> Washington Mutual Entities still represented that WMB's capital was
> more than adequate at the time, and in fact, that the capital to risk
> weighted assets ratio actually improved from 2006 and 2005.[20]

Answer 103. Paragraph 103 purports to summarize the offering circulars and WMI

respectfully refers the Court to the WaMu Delaware I, II, III, and IV Offering Circulars

cited by Plaintiffs in Paragraph 103 of the Complaint for the content thereof and denies

any characterization inconsistent therewith. WMI denies the remaining allegations in

Paragraph 103.

> 104. Certain of the Washington Mutual Entities further represented to
> investors in the Trust Preferred Securities that the adequacy of the
> collateral underlying WMB's loan portfolios "generally [was] determined

---

[19] See WaMu Delaware I Offering Circular at p. 32-33; WaMu Delaware II Offering
Circular at p. 35; WaMu Delaware III Offering Circular at p. 34-35.

[20] See WaMu Delaware IV Offering Circular at p. 38-39.

by an appraisal made in accordance with pre-established appraisal guidelines. At origination, all appraisals [were] required to conform to the Uniform Standards of Professional Appraisal Practice . . . ."[21] At the same time, however, Washington Mutual was engaged in appraisal manipulation to improperly inflate property values to increase production (as described more fully below).

Answer 104.   WMI admits that the WaMu Delaware III Offering Circular cited in

Paragraph 104 of the Complaint includes the language quoted by Plaintiffs in Paragraph

104 and respectfully refers the Court to that document for the content thereof and denies

any characterization inconsistent therewith. WMI denies the remaining allegations in

Paragraph 104 of the Complaint.

105.    Next, with respect to underwriting guidelines, the offering circulars represented to investors in the Trust Preferred Securities that Washington Mutual calculated borrowers' ability to repay option adjustable rate mortgage loans ("Option ARMs") based on the fully indexed rate of the loan.[22] However, that also was false. Instead, and contrary to numerous other public statements, Washington Mutual followed the much riskier practice of approving loans based on the borrowers' ability to pay only the monthly minimum payments that resulted in negative amortization. Indeed, Washington Mutual continuously loosened its underwriting guidelines, virtually to the point of non-existence.

Answer 105.   WMI respectfully refers the Court to WaMu Delaware II-IV Offering

Circulars for the content thereof and denies any characterization inconsistent therewith.

WMI also respectfully refers the Court to the WMI 2005 Form 10-K, filed March 15,

2006, which was incorporated by reference in the WaMu Delaware II Offering Circular,

for the content thereof.  WMI denies any allegations in Paragraph 105 of the Complaint

---

[21] See, e.g., WaMu Delaware III Offering Circular at p. 49, 60.

[22] See WaMu Delaware II Offering Circular at p. 60; WaMu Delaware III Offering Circular at p. 60; WaMu Delaware IV Offering Circular at p. 65.

that are inconsistent therewith and the remaining allegations in Paragraph 105 of the

Complaint.

106. Additionally, each of the offering circulars incorporated WMI's then-current SEC filings, which boasted of claimed safe lending practices. However, as was subsequently revealed and as is discussed further below, the incorporated SEC filings contained numerous misrepresentations including:

- April 2005—"Our first quarter results validate that our business model is working – assets, deposits and checking accounts are growing; credit quality remains strong; mortgage banking income increased and our expenses continue to decline." – quote from Kerry Killinger, former chairman and chief executive officer of Washington Mutual ("Killinger"), from 4/19/2005 press release attached as exhibit to 4/19/2005 8-K (incorporated by reference in the WaMu Delaware I Offering Circular)

- Late 2005—Third Quarter Form 10-Q (incorporated by reference in WaMu Delaware I and WaMu Cayman Offering Circulars) stating that the company maintained "appropriate policies, standards and limits designed to maintain risk exposures within the Company's risk tolerance...Enterprise Risk Management also provides objective oversight of risk elements inherent in the Company's business activities and practices..."

- 2005 Form 10-K, filed March 15, 2006 (incorporated by reference in the WaMu Delaware II Offering Circular): "The Company seeks to mitigate the credit risk in this portfolio by ensuring compliance with underwriting standards on loans originated to subprime borrowers and by re-underwriting all purchased subprime loans." Further, "[t]he Company actively manages the credit risk inherent in its Option ARM portfolio by ensuring compliance with its underwriting standards, monitoring loan performance and conducting risk modeling procedures."
  With respect to the Option ARM loans, WMI stated: "current loan-to-value ratios have generally improved – in many cases offsetting the credit risk associated with negative amortization that may have resulted from the borrower's use of the minimum payment option."
  WMI repeated the same representations in its 2006 10-K.

- 2006 Form 10-K, filed March 1, 2007 (incorporated by reference in the WaMu Delaware III and WaMu Delaware IV Offering Circulars) - Washington Mutual again touted the underwriting standards for the Option ARM portfolio: "The Company actively manages the credit risk inherent in its Option ARM portfolio primarily by ensuring compliance with its underwriting standards, monitoring loan performance and conducting risk modeling

procedures." The Company also claimed that beginning in December 2005, the underwriting process for Option ARMs required calculating the borrower's debt-to-income ratio based on the fully-indexed rate only.

Answer 106. WMI admits that it made certain filings with the SEC in 2005 and 2006 and WMI respectfully refers the Court to those filings for the content thereof, including disclosures that Option ARM products possess features that may result in increased credit risk. WMI denies any characterization inconsistent with the SEC filings references in Paragraph 106. WMI further admits that Kerry Killinger was formerly Chairman and Chief Executive Officer of WMI. WMI respectfully refers the Court to each of the offering circulars for the Trust Preferred Securities for the content thereof. WMI denies the remaining allegations in Paragraph 106.

107. Between 2005 and 2008, Washington Mutual's officers also bolstered the misrepresentations made in WMI's public filings by repeatedly misrepresenting the quality of Washington Mutual's loan portfolio (especially as characterized by loan-to-value ratios and loss reserves) and covering up the loosening of Washington Mutual's underwriting standards by making statements such as:

- November 15, 2005, Investor Day Conference—Killinger claimed that, "[o]n credit risk. We have excellent process, policies, underwritings, standards and reserving methodologies and they have served us very well for quite some time." At that same conference, Craig Chapman, President of the commercial group that housed Long Beach Mortgage Company ("Long Beach") before 2006, when discussing the "disciplined" subprime underwriting standards, claimed: "we allow no rate exceptions in the process. Our pricing is controlled centrally. It's distributed through the network. There is process in place and triggers so that no loans can – there are no rate exceptions, I mean, on loans." Chapman also misrepresented that with respect to ARMs "we underwrite these loans at a fully indexed rate. Even our [interest only] loans are underwritten on 30-year amortizing and not on any introductory rates or just interest only rates."
- January 18, 2006, earnings call with investors—Stephen Rotella, Washington Mutual's President and Chief Operating officer from

January 2005 until October 2008, stated with respect to the Option ARM loans, "an important fact is we underwrite every loan at the fully indexed rate."

- July 19, 2006, earnings call with investors—Thomas Casey, Executive Vice President and CFO and member of the Executive Committee from October 2002 through October 11, 2008, touted the "strong ongoing stability and strength of the [loan] portfolio," "[c]redit quality continues to be strong" and "Option ARMs continue to be a good, strong leader for us."

- September 6 and 7, 2006 Annual Investors Day Conference— Rotella stated that he and the other officers felt "good about the fact that we've been aggressive in controlling what we can control. Frankly, we've been ahead of the market in my perspective."

- David Schneider, Executive Vice President and President of Home Loans overseeing all home lending operations from August 2005 until October 2008 stated:

  On subprime, we have seen…some early payment default and repurchase activity. We saw most of that occur for us in late '05, Q4 '05, and first quarter of '06. We reserved for it appropriately and we have also, in second quarter of '06, tightened up a number of our underwriting guidelines…
  In fact, we think we've lost probably a percentage or so of market share over the past year as a result of tightening some of the credit guidelines in our subprime business. And we think that was the prudent thing to do and actually we think we're ahead of many of our competitors here.
  Analysts questioned the officers regarding the Company's decision to use third-party appraisers. An unnamed Washington Mutual representative claimed that the decision would give Washington Mutual "better quality" in its appraisals, and Killinger stated, "there's a very strong governance process over those external appraisers."

- October 18, 2006, earnings call with investors—Killinger stated: We have more than 20 years experience underwriting and originating option ARM loans through many market cycles. We understand that the best mortgage customer is a well-informed borrower and that's why we focus on providing clear, understandable disclosures for our customers and ongoing training for our sales force.…[T]he quality of our option ARM portfolio remains strong.
  Killinger further claimed, "[i]n our underwriting on option ARMs we underwrite to the fully indexed rate, we never underwrite to the teaser rate."

- November 16, 2006, Merrill Lynch Banking & Financial Services Conference— Killinger claimed that the quality of the Option

ARM portfolio is attributed to the safe underwriting practices: "Our option ARM portfolio quality is also very good....This quality reflects the option ARM underwriting which evaluates the borrower's ability to make the loan's fully amortizing payments, even though they are allowed to make a much lower initial payment."

- December 13, 2006, Goldman Sachs Financial Services CEO Conference— Killinger "On the credit front, we're in very good shape . . . If anything, I can be accused of being too conservative. And perhaps we could have maximized our profitability even more by taking on more credit risk through this period of very benign credit. But we want to stay ahead of the curve, be a little more conservative."

  In response to specific inquiries, Killinger stated: When we do our reserving, I will tell you that we factor in the existing book of business; what the current delinquencies are; we make assumptions about housing price declines and the economy; and we develop models about what we think is going to happen to delinquencies, ultimate charge-offs.

- January 17, 2007 earnings call with investors—Killinger explained that to protect against the softening housing market "We tightened underwriting."

- January 30, 2007, Citigroup 2007 Financial Services Conference— Killinger falsely touted the credit quality of Washington Mutual's loan portfolio stating that it "continues to be in very good shape" claiming that the Company's prime loans were "high quality" the Option ARM portfolio was "very good" and the home equity portfolio was a "very high quality."

  Killinger attributed the purportedly high credit quality of Washington Mutual's Option ARM loans to the low LTV ratios associated with those loan portfolios:

  [O]ur option ARM portfolio, that quality is very good as characterized by the … . loan-to-value at origination of 71%. . . . [W]e continue to be comfortable with the overall risk profile of the balance sheet subprime portfolio, which has…a 78% loan-to-value at origination and estimated current loan-to-value of only 66%. . . .[O]ur home equity portfolio . . . [has] a combined loan-to-value of only 70%.

- July 18, 2007, earnings call with investors—Casey stated: "While we anticipate that we will see higher [nonperforming assets] across all of our home loan portfolios, we expect losses in the prime loans to be much lower due to the lower LTVs and high FICO profile of our prime portfolio." Casey also claimed that the Option ARM portfolio was strong, because "[i]t's a very high FICO and low LTV portfolio."

- September 10, 2007, Lehman Brothers 5th Annual Financial Services Conference—Killinger continued to tout the strength of Washington Mutual and the steps it had taken to protect its credit quality, stating that the Company had undergone "a series of major underwriting changes in our home loans lending guidelines" and continuing to insist that Option ARMs and other adjustable-rate mortgages were generating "attractive" returns and that "the credit quality in these loans is good."

  Killinger also boasted of the Company's purportedly low LTV ratios in its home loan portfolio noting that, in the Company's Jumbo Option ARM loans and 5/1 Jumbo Hybrid loans, "the credit quality in these loans is good. . . . Loan originations . . . had a loan-to-value rate of only 70%."

Answer 107.   WMI denies the allegations of Paragraph 107 of the Complaint

108.   Finally, certain of the Washington Mutual Entities misrepresented the quality and function of Washington Mutual's risk management practices:

> The Chief Credit Officer is responsible for overseeing the work of a credit policy committee, monitoring the quality of WMI Group's credit portfolio, determining the reasonableness of WMI Group's allowance for loan losses, reviewing and approving large credit exposures and setting underwriting criteria for credit-related products and programs. Credit risk management is based on analyzing the creditworthiness of the borrower, the adequacy of the underlying collateral given current events and conditions and the existence and strength of any guarantor support.[23]

However, as discussed below, contrary to such representations, Washington Mutual was in fact undercutting its risk management practices, effectively making its risk management group a "customer service" vassal for its loan processors rather than a check on abuses.

Answer 108.   WMI denies the allegations of Paragraph 108 of the Complaint.

---

[23] See, e.g., WaMu Delaware III Offering Circular at p. 51, 61-62.

2.    **Despite Representations To Investors In Trust
      Preferred Securities To The Contrary, From The First Issuance OF
      the Trust Preferred Securities Through September 2008, Washington
      Mutual Was Growing Increasingly Unstable and Risky.**

109.    Behind closed doors, Washington Mutual's true state (which was
known to the OTS) was much different than that represented to investors
in the Trust Preferred Securities. Washington Mutual's systemic change
in strategy to originate and underwrite an increasing number of high-risk
loan products was implemented with new policies that emphasized loan
volume over loan quality, eviscerated risk management, and changed
incentives to encourage riskier activity.

Answer 109.    WMI denies the allegations of Paragraph 109 of the Complaint.

110.    Increasingly risky and shoddy lending practices resulted in a
business model that was not only unsafe and unsound, but also rife with
fraud. After conducting a substantial investigation, the Senate Permanent
Subcommittee on Investigations made the following findings of fact
related to Washington Mutual:

- **High Risk Lending Strategy.** Washington Mutual executives
  embarked upon a high risk lending strategy and increased sales of
  high risk home loans to Wall Street, because they projected that
  high risk home loans, which generally charged higher rates of
  interest, would be more profitable for the bank than low risk home
  loans.
- **Shoddy Lending Practices.** Washington Mutual and its affiliate,
  Long Beach, used shoddy lending practices riddled with credit,
  compliance, and operational deficiencies to make tens of thousands
  of high risk home loans that too often contained excessive risk,
  fraudulent information, or errors.
- **Steering Borrowers to High Risk Loans.** Washington Mutual
  and Long Beach too often steered borrowers into home loans they
  could not afford, allowing and encouraging them to make low
  initial payments that would be followed by much higher payments,
  and presumed that rising home prices would enable those
  borrowers to refinance their loans or sell their homes before the
  payments shot up.
- **Polluting the Financial System.** Washington Mutual and Long
  Beach securitized over $77 billion in subprime home loans and
  billions more in other high risk home loans, used Wall Street firms
  to sell the securities to investors worldwide, and polluted the

financial system with mortgage backed securities which later incurred high rates of delinquency and loss.

- **Securitizing Delinquency-Prone and Fraudulent Loans**. At times, Washington Mutual selected and securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors who bought the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered.

- **Destructive Compensation**. Washington Mutual's compensation system rewarded loan officers and loan processors for originating large volumes of high risk loans, paid extra to loan officers who overcharged borrowers or added stiff prepayment penalties, and gave executives millions of dollars even when its high risk lending strategy placed the bank in financial jeopardy.[24]

Answer 110. WMI admits that the April 13, 2010 memo from Senators Carl Levin and Tom Coburn to Members of the Permanent Subcommittee on Investigations that Plaintiffs cite in Paragraph 110 of the Complaint includes language quoted by Plaintiffs in Paragraph 110, respectfully refers the Court to the memo for the content thereof, denies any characterization inconsistent therewith, and denies the substance of those statements. The allegations set forth in the first sentence of Paragraph 110 of the Complaint contain legal conclusions as to which no response is required, To the extent a response is required, WMI denies the those allegations and respectfully refers the Court to the WMI 2005 10-K, 2006 10-K, and 2007 10-K for the content thereof. WMI denies any allegations in Paragraph 110 inconsistent therewith. WMI also denies the remaining allegations in Paragraph 110 of the Complaint.

---

[24] See April 13, 2010 Memo from Senators Carl Levin and Tom Coburn to Members of the Permanent Subcommittee on Investigations, p. 6.

### a. WMB's Ever-Increasing, And Hidden, High-Risk Lending Practices.

111.   Historically, WMB had focused on low-risk, traditional 30-year fixed and government-backed mortgages. However, chasing what it thought would be higher profits and wider margins, Washington Mutual began skewing its lending practices towards increasingly risky loan products. In essence, Washington Mutual began pursuing profits and growth at the expense of reason and safety. Washington Mutual's foray into nontraditional lending began to take hold in 1999 when it bought Long Beach. Long Beach was exclusively a subprime lender that operated by having third party mortgage brokers originate loans funded by Long Beach. Those loans were made for the express purpose of securitizing and selling them on the secondary market. As such, volume was the key. Washington Mutual quickly embraced the principle of quantity over quality. Symbolizing this new focus, in 2003, Long Beach securitized $4.5 billion in home loans – by 2006, its operations had grown six times, funding and selling almost $30 billion worth of subprime loans.[25]

Answer 111.   WMI admits that WMB offered traditional 30-year fixed and government-backed mortgages, that WMI acquired Long Beach Mortgage in 1999, that Long Beach Mortgage was a broker-sourced subprime mortgage lender, and that Senator Levin made the April 13, 2010 Opening Statement cited in Paragraph 111 of the Complaint, to which WMI respectfully refers the Court for the content thereof and denies any characterization inconsistent therewith and the substance thereof. WMI denies the remaining allegations in Paragraph 111.

112.   In addition to increasing its subprime lending through Long Beach, in 2003 Washington Mutual made a strategic decision to further increase its risk by: approving more home loans for high-risk borrowers; rapidly increasing approval of stated income, or "liar" loans; relying heavily on Option ARMs, in which the borrower could choose the amount to be paid, frequently leading to negative amortization as borrowers paid less than the monthly interest; approving loans containing higher loan to value ratios,

---

[25] See Senator Levin Opening Statement, April 13, 2010 Senate Subcommittee Hearing, p. 3.

> sometimes as high as 105%; and increasing concentrations of loans in
> states such as California and Florida, where quick appreciation and quick
> turnover led to more loans and more fees, but were at significant risk of
> sudden collapses in property values.

Answer 112.   WMI admits that subprime lending increased through Long Beach

Mortgage and that WMB offered a mortgage product known as an Option ARM that

provided borrowers with repayment options.  WMI denies the remaining allegations in

Paragraph 112 of the Complaint.

> 113.   The Option ARM became Washington Mutual's flagship product,
> even for its supposed "prime" borrowers.  Option ARMs were particularly
> risky because they gave borrowers a low introductory interest rate with a
> subsequent increase to a floating rate.  In addition, borrowers had the
> choice to pay: (a) the fully amortizing amount needed to pay off the loan
> in 30 years; (b) a greater amount to pay off the loan in 15 years; (c)
> interest only; or (d) a "minimum" payment that was even less than the
> accrued interest for the month.[26]

Answer 113.   WMI admits that WMB's Option ARM allowed borrowers to choose

between various payment options and that Plaintiffs paraphrase language in the April 13,

2010 memo from Senators Carl Levin and Tom Coburn to Members of the Permanent

Subcommittee on Investigations that Plaintiffs cite in Paragraph 113 of the Complaint.

WMI respectfully refers the Court to the memo for the content thereof, denies any

characterization inconsistent therewith and the substance thereof.  WMI denies the

remaining allegations in Paragraph 113.

> 114.   When borrowers made only the "minimum" or "teaser" payment,
> which occurred very frequently, unpaid interest would be added to the
> loan principal, increasing the amount of the debt or, in other words,

---

[26] See April 13, 2010 Memo from Senators Levin and Coburn to Permanent
Subcommittee on Investigations, p. 3.

negatively amortizing the loan. After a set number of years or when the
loan principal reached a particular amount (i.e. 110% or even as much as
125%), the loan would "recast." At that point, the borrower would be
forced to make payments in the amount required to pay off the loan within
the remaining term, causing "payment shock" and all too often, loan
defaults. As an example: "[A] borrower taking out a $400,000 loan, with a
teaser rate of 1.5% and subsequent interest rate of 6%, could have a
minimum payment of $1,333. If the borrower then made only the
minimum payments until the loan recast, the new payment using the 6%
rate would be $2,786, an increase of more than 100%. What began as a
30-year loan for $400,000 became a 25-year loan for $432,000."[27]

Answer 114.   WMI admits that Plaintiffs quote and paraphrase language included in the

April 13, 2010 memo from Senators Carl Levin and Tom Coburn to Members of the

Permanent Subcommittee on Investigations that Plaintiffs cite in Paragraph 114 of the

Complaint. WMI respectfully refers the Court to the memo for the content thereof,

denies any characterization inconsistent therewith and the substance thereof. WMI

denies the remaining allegations in Paragraph 114.

115.    To avoid recasting, borrowers would seek to refinance their loans,
frequently into Option ARMs again. Thus, the cycle would begin anew,
the borrowers' debt would increase further, and the bank's exposure to
default would also grow. Refinancing existing loans was a significant part
of Washington Mutual's business. In something akin to a Ponzi scheme,
Washington Mutual was able to dodge temporarily the results of the
looming flood of defaults through refinancing of the risky loans with new,
even riskier (based on increasing debt load) mortgages – a practice that the
officers knew would not be sustainable.

Answer 115.   WMI admits that refinancing existing loans was a part of WMB's business

but avers that only a minority of the refinancing volume was from existing WMB

borrowers and that many of the loans refinanced were not Option ARM loans. WMI

---

[27] See April 13, 2010 Memo from Senators Levin and Coburn to Permanent
Subcommittee on Investigations, p. 3.

denies knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 115 regarding knowledge or motivation of WMB borrowers and WMI therefore denies those allegations. WMI denies the remaining allegations in Paragraph 115.

> 116.    Option ARMs are risky for lenders, as well as borrowers, because the minimum payment feature "erodes the equity cushion available to protect the bank in event of foreclosure. Loans with loan-to-value ratios of 80 percent or more and the ability to negatively amortize to 125 percent of the original loan amount ... are especially at risk."[28] Such loans also result in inflated profitability for the bank because accrued interest is counted as income, but in many cases is never recovered.[29]

Answer 116.    WMI admits that Plaintiffs quote and paraphrase language included in Exhibit 74 from the April 16, 2010 Hearing before the Permanent Subcommittee on Investigations and from the "Hudson & Overton" article cited in Paragraph 116 of the Complaint. WMI respectfully refers the Court to these documents for the content thereof and denies any characterization inconsistent therewith and the substance thereof. WMI denies the remaining allegations in Paragraph 116, except respectfully refers the Court to the WMI 2005 Form 10-K, 2006 Form 10-K, and 2007 Form 10-K for the content thereof, including disclosures that the Option ARM products possess features that may result in increased credit risk. WMI denies any allegations in Paragraph 116 inconsistent therewith. WMI denies the remaining allegations in Paragraph 116.

---

[28] April 16, 2010 Hearing Ex. 74, OTS Option ARM Neg Am Review Work Program, 212A.

[29] See Hudson & Overton, "The Second S&L Scandal" p. 8 (Center for Responsible Lending, January 2009).

117.    From 2005 on, Option ARMs made up more than half of
Washington Mutual's supposed "prime" loan portfolio.

Answer 117.    WMI avers that the phrase "supposed 'prime' loan portfolio" renders the

allegations in Paragraph 117 of the Complaint vague and ambiguous so as to not require a

response.  To the extent a response is required, WMI denies knowledge or information

sufficient to admit or deny the allegations in Paragraph 117 and therefore denies same.

118.    As Washington Mutual continued to increase the risk in its loan
portfolio and continued to process scores of bad loans, it became less and
less prepared for the market shift that eventually occurred. When the
secondary subprime loan market froze, Washington Mutual was no longer
able to dump its high risk loans (many of which were destined to fail
based on Washington Mutual's shoddy lending practices) into the capital
markets, forcing Washington Mutual to bear more and more of the impact
of the losses from its faulty underwriting and origination processes. For
the fourth quarter of 2007 (immediately after the final issuance of Trust
Preferred Securities), Washington Mutual reported a $1 billion loss,
followed by another $1 billion loss the next quarter and then a $3.2 billion
loss for the second quarter of 2008.[30]

Answer 118.    WMI admits that Plaintiffs quote or paraphrase language included in the

April 13, 2010 memo from Senators Carl Levin and Tom Coburn to Members of the

Permanent Subcommittee on Investigations that Plaintiffs cite in Paragraph 118 of the

Complaint.  WMI respectfully refers the Court to the memo for the content thereof,

denies any characterization inconsistent therewith and the substance thereof.  WMI

denies the remaining allegations of Paragraph 118 of the Complaint, except admits that it

reported losses for the last quarter of 2007 and the first two quarters of 2008.

---

[30] See April 13, 2010 Memo from Senators Levin and Coburn to Permanent
Subcommittee on Investigations, p. 5.

### b.  Contrary To Public Statements Regarding The Quality Of Its Loan Portfolio, Washington Mutual Was Hiding Its Deeply Flawed Appraisal Practices.

119.    Certain of the Washington Mutual Entities repeatedly represented to investors in the Trust Preferred Securities that Washington Mutual's loan portfolio was strong, due in large part to low loan-to-value ("LTV") ratios. Behind the scenes, however, those LTV ratios were being manipulated and falsified.

Answer 119.    WMI denies the allegations of Paragraph 119 of the Complaint.

120.    The importance of LTV ratios was explained by WMI in its 2005 Form 10-K and 10-K/A:

> Loan-to-value ratios are a key determinant of future performance. Home loans with loan-to-value ratios of greater than 80 percent at origination without private mortgage insurance or government guarantees expose the Company to greater credit risk than home loans with loan-to-value ratios of 80 percent or less at origination.....This greater credit risk arises because, in general, both default risk and the severity of loss is higher when borrowers have less equity to protect in the event of foreclosure.

Answer 120.    WMI admits that it filed a 2005 Form 10-K that includes language quoted by Plaintiffs in Paragraph 120 of the Complaint, respectfully refers the Court to the filing for the content thereof, and denies any characterization inconsistent therewith.

121.    Regarding the Option ARM loans, WMI stated: "current loan-to-value ratios have generally improved – in many cases offsetting the credit risk associated with negative amortization that may have resulted from the borrower's use of the minimum payment option." WMI repeated the same representations in its 2006 10-K.

Answer 121.    WMI admits that it filed Form 10-Ks for 2005 and 2006 that included language quoted by Plaintiffs in Paragraph 121 of the Complaint, respectfully refers the Court to the filings for the content thereof, and denies any characterization inconsistent therewith.

122.     What was not disclosed to investors in the Trust Preferred
Securities was that in or around 2005, Washington Mutual management
implemented the practice of pressuring its in-house appraisers to inflate
home values for loan applications.  Inflating the appraisals allowed
Washington Mutual to artificially decrease the loan-to-value ratios on
approved loans, which in turn created the illusion that the loans were less
risky.

Answer 122.   WMI denies the allegations of Paragraph 122 of the Complaint.

123.     Because higher LTV ratios signify greater risk, Washington
Mutual also would have been required to reserve at higher rates for its
Allowance for Loan and Lease Losses.  By artificially inflating collateral
values, Washington Mutual avoided the obligation to implement this
safety measure.

Answer 123.   WMI avers that the allegations set forth in Paragraph 123 of the Complaint

contain legal conclusions to which no response is required.  To the extent a response is

required, WMI admits that the LTV ratio is a factor considered in establishing reserves

for loan losses but denies the remaining allegations in Paragraph 123.

124.     For these and other reasons, appraiser independence is expected to
be sacrosanct.  The Uniform Standards of Professional Appraisal Practice,
which are incorporated into federal law (12 C.F.R. § 34.44) dictate: "An
appraiser must perform assignments with impartiality, objectivity, and
independence, and without accommodation of personal interests.  In
appraisal practice, an appraiser must not perform as an advocate for any
party or issue."  Federal regulations further require that in-house
appraisers "must be independent of the lending, investment, and collection
functions and not involved, except as an appraiser, in the federally related
transaction, and have no direct or indirect interest, financial or otherwise,
in the property." 12 C.F.R. § 34.45. Outside appraisers, must also remain
independent and must not have any direct or indirect interest in the
transaction.  Id.

Answer 124.   WMI avers that the allegations in Paragraph 124 of the Complaint state

legal conclusions that do not require a response.  To the extent a response is required,

WMI admits that the standards and regulations cited by Plaintiffs in Paragraph 124 of the

Complaint include language quoted by Plaintiffs in Paragraph 124, respectfully refers the

Court to the cited standards and regulations for the content thereof, and denies any

characterization inconsistent therewith. WMI further avers that the first sentence of

Paragraph 124 of the Complaint is too vague and ambiguous to require a response. To

the extent a response is required, WMI denies knowledge or information to form a belief

as to the truth of the allegation and therefore denies same. WMI denies any remaining

allegations in Paragraph 124.

> 125.    Washington Mutual subsequently outsourced its appraisals to
> create the appearance of independence. In 2006, Washington Mutual
> started outsourcing its appraisals to two third-party appraisal companies,
> American Corporation through its subsidiary, eAppraiseIT, and Lenders
> Services Inc. ("LSI"). Rather than create actual independence,
> Washington Mutual created a mere illusion.

Answer 125.    WMI admits that WMB started outsourcing appraisals in 2006 to First

American eAppraiseIT and to Lenders Services Inc. WMI denies the remaining

allegations set forth in Paragraph 125 of the Complaint.

> 126.    On November 1, 2007 (just after the last issuance of the Trust
> Preferred Securities), after a nine-month investigation, New York
> Attorney General Cuomo filed a complaint against First American
> Corporation and eAppraiseIT, outlining in detail how Washington Mutual
> pressured appraisers to inflate values ("NYAG Complaint").

Answer 126.    WMI admits that the New York Attorney General filed a complaint on

November 1, 2007, against First American Corporation and First American eAppraiseIT

(the "NYAG Complaint"), respectfully refers the Court to the NYAG Complaint for the

content thereof, and denies any characterization inconsistent therewith and the substance

thereof. WMI avers that the NYAG Complaint was a matter of public record for almost a

year before the Conditional Exchange occurred on September 25, 2008, and prior to the

date on which some, if not all of the Plaintiffs acquired their purported rights to Trust

Preferred Securities. WMI denies knowledge or information sufficient to form a belief as

to the truth of the characterization in Paragraph 126 of the Complaint of the New York

Attorney General's investigation and therefore denies those allegations.

> 127.    As a condition of the engagement, Washington Mutual required
> eAppraiseIT to agree to allow Washington Mutual to choose its "preferred
> appraisers." Additionally, at Washington Mutual's request, eAppraiseIT
> hired approximately 50 former Washington Mutual employees as
> Appraisal Business Managers ("ABMs") and staff appraisers. Washington
> Mutual further required that the ABMs be given the authority to override
> and revise appraisal values reached by third-party appraisers.

Answer 127.    WMI denies knowledge or information sufficient to form a belief as to the

truth of the characterization of eAppraiseIT's hiring actions alleged in Paragraph 127 of

the Complaint and therefore denies same. To the extent allegations in Paragraph 127 of

the Complaint mirror those in the NYAG Complaint, WMI respectfully refers the Court

to the NYAG Complaint for the content thereof and denies any characterization

inconsistent therewith and the substance thereof. WMI denies any remaining allegations

in Paragraph 127.

> 128.    Washington Mutual's loan production staff began complaining
> almost immediately that the appraisals were too low. eAppraiseIT's
> Executive Vice President advised eAppraiseIT's President in August 2006
> that Washington Mutual's loan officers would frequently pressure
> appraisal field managers for an "extra few thousand," or "tell[] them
> specifically what they needed," or would "ask for several ROVs
> [Reconsiderations of Value] on the same property." Eventually,
> eAppraiseIT capitulated to the frequent demands to raise values by

implementing an official "raise the value" policy providing flexibility to raise values 5%, up to $50,000.

Answer 128. WMI denies knowledge or information sufficient to form a belief as to the truth of the characterization in Paragraph 128 of the Complaint of actions taken by eAppraiseIT and therefore denies same. To the extent allegations in Paragraph 128 of the Complaint mirror those in the NYAG Complaint, WMI respectfully refers the Court to the NYAG Complaint for the content thereof and denies any characterization inconsistent therewith and the substance thereof. WMI denies the remaining allegation in Paragraph 128.

> 129. To ensure that eAppraiseIT would continue to provide inflated appraisals, Washington Mutual constantly threatened to take its business elsewhere. As Washington Mutual applied more pressure and began sending more business to LSI, eAppraiseIT's President decided to "roll over and just do it" and assign all Washington Mutual's work to Washington Mutual's "proven appraisers." In an email to senior management, he explained: "We will pay their appraisers whatever they demand. Performance ratings to retain position as a Washington Mutual Proven Appraiser will be based on how many come in on value, negating a need for an ROV."[31]

Answer 129. WMI admits that Paragraph 129 of the Complaint quotes language included in the NYAG Complaint, which Plaintiffs cite in Paragraph 129. WMI respectfully refers the Court to the NYAG Complaint for the content thereof and denies any characterization inconsistent therewith and the substance thereof. WMI denies knowledge or information sufficient to form a belief as to the truth of the characterization

---

[31] NYAG Complaint, ¶ 38.

in Paragraph 129 of the Complaint of actions taken by eAppraiseIT and therefore denies

same. WMI denies any remaining allegations in Paragraph 129.

130. On March 1, 2007, eAppraiseIT's President explained to executives:

> Recently, we have been notified that Lending would like us to use more of their "Proven Appraisers" versus appraisers off our pre-selected appraiser panel. It seems the amount of Reconsideration of Value (ROV) requests associated with our appraisers far exceeds those initiated when a Washington Mutual proven appraiser completes a file. Said differently, WaMu proven appraisers bring the value in a greater majority of the time with minimal involvement of the vendor, sales and Appraisal Oversight. I am fine with that, of course, and will happily assign WaMu orders to WaMu proven appraisers instead of eAppraiseIT's approved panel appraiser whenever possible.[32]

eAppraiseIT further ceded control by allowing Washington Mutual to blacklist appraisers who did not provide high enough values.

Answer 130. WMI admits that Paragraph 130 of the Complaint quotes language

included in the NYAG Complaint, which Plaintiffs cite in Paragraph 130 of the

Complaint. WMI respectfully refers the Court to the NYAG Complaint for the content

thereof and denies any characterization inconsistent therewith and the substance thereof.

WMI denies knowledge or information sufficient to form a belief as to the truth of the

characterization in Paragraph 130 of the Complaint of actions taken by eAppraiseIT and

therefore denies same.

131. Washington Mutual and eAppraiseIT knew that loan processors should not have the influence on appraisals that both entities allowed. In May 2007, eAppraiseIT's Executive Vice President sent a letter to a

---

[32] NYAG Complaint, ¶ 42 (emphasis in original).

Washington Mutual senior executive, identifying the problems in the business relationship:

> In the first quarter of 2007, the sales group of WAMU began to insist they choose the appraisers mostly due to their concerns about 'low values.' eAppraiseIT encouraged WAMU to resist these pressures if possible. However, WAMU decided to go with what came to be called the "proven" list of appraisers recommended by sales.... The use of the "proven" panel is challenging for eAppraiseIT in two ways: A: Financially – The proven panel is paid a minimum of 20% more than the eAppraiseIT panel. B. Risk Management – the possibility of collusion between the loan officers and appraisers is increased when eAppraiseIT does not control the selection. In addition, eAppraiseIT is concerned with any possible lender pressure or perception of lender pressure when the only way to get on the WAMU "proven" panel is through the loan officer.[33]

Answer 131. WMI admits that Paragraph 131 of the Complaint quotes language included in the NYAG Complaint, which Plaintiffs cite in Paragraph 131. WMI respectfully refers the Court to the NYAG Complaint for the content thereof and denies any characterization inconsistent therewith and the substance thereof. WMI denies knowledge or information sufficient to form a belief as to the truth of the characterization in Paragraph 131 of the Complaint of eAppraiseIT's knowledge and therefore denies same. WMI denies the remaining allegations in Paragraph 131.

> 132. Washington Mutual did not share eAppraiseIT's concerns about undermining the integrity of the appraisal process. In fact, control over appraisals was exactly what Washington Mutual wanted. Indeed, rather than correct the lack of independence, Washington Mutual decided to mask it. On June 7, 2007, a Washington Mutual executive directed eAppraiseIT to change the name of the Proven List, and instead rename it the "WaMu Select" panel. The stated reason was: "Name change from 'proven appraiser' and/or use of the moniker 'PAL' list is discontinued,

---

[33] NYAG Complaint, ¶ 68.