under direction of the Washington Mutual legal department. We are utilizing a more generic term acceptable w/in regulatory guidelines and industry standards."[34]

Answer 132.   WMI admits that Paragraph 132 of the Complaint quotes and paraphrases language included in the NYAG Complaint, which Plaintiffs cite in Paragraph 132.  WMI respectfully refers the Court to the NYAG Complaint for the content thereof and denies any characterization inconsistent therewith and the substance thereof.  WMI avers that the first sentence of Paragraph 132 of the Complaint is too vague and ambiguous to require a response.  To the extent a response is required, WMI denies the remaining allegations in Paragraph 132 of the Complaint.

> 133.   By dictating false higher values, Washington Mutual was able to mask the true state of its loan portfolio. All of this allowed certain of the Washington Mutual Entities to hide from investors in the Trust Preferred Securities the real risk profile of WMB and Trust Preferred Securities, implying that a Conditional Exchange was highly unlikely.

Answer 133.   WMI denies the allegations contained in Paragraph 133 of the Complaint.

> c.    **At The Same Time The Strengths Of Its Underwriting Guidelines Were Being Touted To The Public, WMI Was Watering Those Guidelines Down To Facilitate High Risk Lending.**

> 134.   Contrary to representations that Washington Mutual was abiding by strict underwriting guidelines, the dictated policies were the exact opposite.

Answer 134.   WMI denies the allegations contained in Paragraph 134 of the Complaint.

---

[34] NYAG Complaint, ¶ 69.

135. Because Washington Mutual was interested primarily in quickly processing, bundling and selling loans, the quantity, rather than the quality, of loans processed became the key driver. To foster volume, Washington Mutual loosened standards to allow loans to be funded after little to no documentation, and without considering the borrower's real ability to repay the loans. Washington Mutual also adopted a compensation structure that rewarded volume over all else. At its worst, outright fraud was committed, and nothing was done to correct it.

Answer 135. WMI denies the allegations of Paragraph 135 of the Complaint.

136. Although the subprime lending operations of Long Beach had significant issues, as described herein, Washington Mutual also created significant problems with its supposed "prime borrower" lending. First, "prime" borrowers were not necessarily those with better credit scores than Long Beach's subprime borrowers. Second, Washington Mutual increasingly made very risky loans to people with below average credit scores and increased the use of riskier products, including Option ARMs, "Stated-income," "no-doc" and "low-doc" loans (often called "liar loans,"), or 100% LTV loans, as part of its "prime" portfolio.[35]

Answer 136. WMI admits that Senator Levin's April 13, 2010 Opening Statement cited in Paragraph 136 of the Complaint includes language that Plaintiffs quote and paraphrase in Paragraph 136, respectfully refers the Court to the statement for the content thereof and denies any characterization inconsistent therewith and the substance thereof. The allegations in Paragraph 136 concerning "significant issues," "significant problems," "supposed 'prime borrower' lending," and allegations that "prime borrowers were not necessarily those with better scores than Long Beach's subprime borrowers" are vague and ambiguous and therefore require no response. To the extent a response is required, WMI denies same and any remaining allegations in Paragraph 136.

---

[35] See Senator Levin Opening Statement, April 13, 2010 Senate Subcommittee Hearing, p. 6.

137.    In 2006 and 2007, management allowed, and even mandated, a further loosening of the underwriting standards. Washington Mutual made "prime" loans to borrowers with FICO scores well below the standard of 660 for prime loans set by the FDIC and the OTS. Training documents were circulated that identified anything above 619 as "prime." It went further -- borrowers with a score of 621, even with a bankruptcy in the previous four years, would be considered "prime" borrowers and in some instances, borrowers with FICO scores as low as 540 were approved for "prime" loans.

Answer 137.    WMI avers that the first sentence of Paragraph 137 of the Complaint and

allegations concerning "training documents" are vague and ambiguous and therefore

require no response. To the extent a response is required, WMI denies sufficient

information to form a belief as to the truth of the allegations in Paragraph 137 and

therefore denies those allegations.

138.    Additionally, exceptions to the underwriting guidelines were granted almost as a matter of course, making them meaningless. For those borrowers who could not fit into the already generous guidelines, exceptions were almost always approved.

Answer 138.    WMI denies the allegations contained in Paragraph 138 of the Complaint.

139.    To make matters worse, contrary to statements made in the offering circulars and public statements of the officers, Washington Mutual policy was to underwrite Option ARM loans based solely on a borrower's ability to make the initial minimum payments, or "teaser" payments, rather than based on the ability of the borrower to make the substantially higher payments that inevitably would come due.

Answer 139.    WMI denies the allegations in Paragraph 139 of the Complaint and

respectfully refers the Court to the WMI 2005 Form 10-K, filed March 15, 2006, and

incorporated by reference in the WaMu Delaware II Offering Circular for the content

thereof. WMI denies the remaining allegations in Paragraph 139 of the Complaint.

140.    Even after the OCC raised concerns in 2005 about Option ARMs, urging other regulators to jointly issue guidance on "nontraditional mortgages" to strengthen lending standards, Washington Mutual continued to fund billions of dollars worth of Option ARMs every year based on more lax underwriting guidelines than WMI represented.  By the end of 2007, when the walls started to crumble, WMB held $48 billion in Option ARMs that were negatively amortizing because borrowers' monthly payments were not enough to cover even the interest charges.

Answer 140.    WMI admits that WMB funded Option ARMs between 2005 and 2007 and that WMI's 2007 Form 10-K reflects approximately $48 billion in Option ARM loans that experienced a net increase in negative amortization during that year.  WMI respectfully refers the Court to its 2007 Form 10-K for the content thereof, and further respectfully refers the Court to its 2005 Form 10-K and its 2006 Form 10-K for the content of these documents, which also disclose loans that experienced a net increase in negative amortization during the applicable year.  WMI denies any allegations in Paragraph 140 inconsistent therewith.  WMI denies knowledge or information sufficient to form a belief as to the truth of the characterization in Paragraph 140 of OCCs action and therefore denies those allegations.  WMI denies the remaining allegations contained in Paragraph 140 of the Complaint.

141.    The OTS, at Washington Mutual's strong urging, resisted the OCC's proposal.  Internally, the OTS even discussed the need to go "on the offensive" to stop other regulators from strengthening lending standards.[36]  In doing so, the OTS, acting to protect Washington Mutual and not the public interest, relied on data from Washington Mutual and argued that stricter standards, such as requiring banks to evaluate a borrower's ability to repay the mortgage using a fully-indexed interest rate

---

[36] See April 16 Senate Subcommittee Hearing Ex. 71, July 2006 email.

and amortized payment amount rather than just the ability to make "teaser" payments, would reduce Washington Mutual's business.[37]

Answer 141. WMI admits that the April 16, 2010 Senate Subcommittee Hearing Exhibit 71 cited by Plaintiffs in Paragraph 141 of the Complaint and the April 16, 2010 Memorandum cited by Plaintiffs in Paragraph 141 of the Complaint include language quoted and paraphrased by Plaintiffs in Paragraph 141. WMI respectfully refers the Court to these documents for the content thereof and denies any characterization inconsistent therewith and the substance thereof. WMI denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 141 of the Complaint that characterize the motivations and action of the OTS, and WMI therefore denies same. WMI denies any remaining allegations contained in Paragraph 141.

> 142. After Washington Mutual caused it to delay, the OTS finally signed on to the Joint Guidance on Nontraditional Mortgages, which was released in October 2006. The change in standards was so dramatic that, as an example, Countrywide later admitted that under the new standards, 89% of its 2006 borrowers and 83% of its 2005 borrowers would not have qualified.[38]

Answer 142. WMI denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 142 of the Complaint that characterize the motivations or actions of the OTS or that characterize the practices of Countrywide, and WMI therefore denies same. WMI denies any remaining allegations in Paragraph 142.

---

[37] See 4/16/10 Memorandum to Members of the Permanent Subcommittee on Investigations, p. 6.

[38] See Appelbaum & Nakashima, "Banking regulator played advocate over enforcer; Agency let lenders get out of control, then fail" Washington Post, Nov. 23, 2008.

143.    However, unlike the other regulators, the OTS, which acted to protect Washington Mutual and not the public interest, did not require Washington Mutual to comply with the new Guidance immediately. Instead, the OTS continued to allow Washington Mutual to originate as many loans as possible, thereby facilitating Washington Mutual's fraudulent lending practices. The OTS also viewed the guidance as only suggestive. As Washington Mutual explained: "[OTS's] initial response was that they view the guidance as flexible. They specifically pointed out that the language in the guidance says 'should' vs. 'must' in most cases and they are looking to Washington Mutual to establish our own position of how the guidance impacts our business processes."[39] The OTS also advised Washington Mutual that the OTS expected Washington Mutual to determine "how the guidance impacts ... business processes" and the OTS would take into consideration Washington Mutual's "history and experience" in determining whether Washington Mutual is in compliance with the guidance.[40]

Answer 143.  WMI admits that Plaintiffs cite to Exhibit 73 to the April 16, 2010 Senate

Hearing in Paragraph 143 of the Complaint and that Exhibit 73 includes language quoted

by Plaintiffs in Paragraph 143.  WMI respectfully refers the Court to Exhibit 73 for the

content thereof and denies any characterization inconsistent therewith.  WMI denies

knowledge or information sufficient to form a belief as to the truth of the allegations in

Paragraph 143 of the Complaint that purport to characterize motivations of the OTS, and

WMI therefore denies those allegations.  WMI avers that the second sentence of

Paragraph 143 includes legal conclusions as to "fraudulent lending practices" to which no

response is required.  To the extent a response is required, WMI denies the remaining

allegations in Paragraph 143.

---

[39] See April 16, 2010 Hearing Ex. 73, Alternative Mortgage Guidance Implementation Plan, October 2006.

[40] See April 16, 2010 Hearing Ex. 73, Alternative Mortgage Guidance Implementation Plan, October 2006.

144. Washington Mutual came to the conclusion that there would only be limited changes with regard to the Option ARM product, and there is no "fundamental reason to change our approach on how the Option ARM product is offered to our customers . . . ."[41] In effect, Washington Mutual conducted business as usual, failing to follow any legitimate underwriting guidelines while churning out its highest-risk products. Investors in the Trust Preferred Securities were not made aware of the fact that the OTS was not requiring compliance with the new guidelines, and the OTS was effectively complicit in Washington Mutual's fraudulent lending practices.

Answer 144. WMI admits that Plaintiffs cite to Exhibit 73 to the April 16, 2010 Senate Hearing in Paragraph 144 of the Complaint and that Exhibit 73 includes language quoted by Plaintiffs in Paragraph 144. WMI respectfully refers the Court to Exhibit 73 for the content thereof and denies any characterization inconsistent therewith. WMI denies knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 144 that characterize the knowledge of "Investors in the Trust Preferred Securities" or the actions of the OTS, and WMI therefore denies those allegations. WMI avers that the allegations in the last sentence of Paragraph 144 contain legal conclusions to which no response is required. To the extent a response is required, WMI denies the remaining allegations in Paragraph 144.

145. By the time the OTS decided to begin to require compliance, it was the end of 2007 (the Trust Preferred Securities offerings had all been issued by that time), the secondary subprime mortgage market had already frozen, and Washington Mutual's loan originations had declined.[42] Nonetheless, the OTS's continued delay, protecting Washington Mutual and not the public interest, certainly allowed Washington Mutual to originate billions worth of loans that it should not have originated, further

---

[41] See April 16, 2010 Hearing Ex. 73, Alternative Mortgage Guidance Implementation Plan, October 2006.

[42] See April 16, 2010 Opening Statement of Senator Carl Levin, D-Mich., before the U.S. Senate Subcommittee on Investigation, p. 6.

increasing the prospects of an occurrence of events or circumstances
triggering the purported Conditional Exchange.

Answer 145.   WMI admits that Paragraph 145 of the Complaint cites to the April 16,

2010 Opening Statement of Senator Levin to the Senate Subcommittee on Investigation,

respectfully refers the Court to the statement for the content thereof, and denies any

characterization inconsistent therewith, and denies the substance thereof.  WMI denies

knowledge or information sufficient to form a belief as to the truth of allegations in

Paragraph 145 that characterize the motivations or actions of the OTS, and WMI

therefore denies those allegations.  WMI denies the remaining allegations in Paragraph

145.

### d.   Washington Mutual's Internal Pay Incentives Fostered Fraud.

146.   Compensation practices at Washington Mutual and Long Beach
encouraged the processing of risky, and even fraudulent loans. Loan
officers received more money per loan for originating higher risk loans
because those loans were seen as being more profitable.  However, there
were no incentives for higher quality loans.[43]  Underwriters also received
greater commissions based on volume of loans closed, rather than quality.
Additionally, they received quotas for daily loan production.

Answer 146.  WMI admits that Paragraph 146 of the Complaint cites to the April 13,

2010 Memorandum from Senators Levin and Coburn to Members of the Permanent

Subcommittee on Investigations and that Plaintiffs quote and paraphrase from that

document regarding alleged loan and compensation practices.  WMI respectfully refers

the Court to the Memorandum for the content thereof and denies any characterization

---

[43] April 13, 2010 Memo from Senators Levin and Coburn to Permanent Subcommittee on
Investigations, p. 5.

inconsistent therewith and the substance thereof. The allegations concerning "fraudulent loans" in the first sentence of Paragraph 146 contain a legal conclusion to which no response is required. To the extent that a response is required, WMI denies the remaining allegations in Paragraph 146.

> 147. Because of the added pay incentives, loan officers would push Option ARM loans on borrowers, even when the borrowers sought traditional loans. Frequently, loan officers would not educate borrowers on the product so that Option ARM borrowers thought they were paying the fully-indexed rate when, in fact, they were paying only a portion of the interest.

Answer 147. WMI denies knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 147 of the Complaint that characterize motivations or actions of loan officers, and WMI therefore denies same. WMI denies any remaining allegations in Paragraph 147.

> 148. The pay incentives created a breeding ground for fraud. "One Sales Associate admitted that during . . . crunch time some of the Associates would 'manufacture' asset statements from previous loan docs" because they were told "to get the loans funded with whatever it took."[44] Certain loans could be approved by a loan processor without the involvement of an actual underwriter if the borrower and loan met certain criteria that could be approved by a computer program automatically. Regularly, loans that were rejected by the computer program would be re-entered by the loan processor, who would "tweak the system" a little at a time until the loan got approved.

Answer 148. WMI admits that Paragraph 148 of the Complaint cites "April 13, 2010 Senate Subcommittee Hearing Ex. 30" and that the cited exhibit includes language that Plaintiffs quote in Paragraph 148. WMI respectfully refers the Court to the exhibit for the content thereof and denies any characterization inconsistent therewith. WMI denies

---

[44] April 13, 2010 Senate Subcommittee Hearing Ex. 30.

knowledge or information sufficient to form a belief as to the truth of allegations in

Paragraph 148 that characterize actions of loan processors, and WMI therefore denies

those allegations. WMI avers that allegations concerning "[c]ertain loans" and "certain

criteria" are vague and ambiguous and therefore require no response. WMI further avers

that allegations of fraud in the first sentence of Paragraph 148 contain a legal conclusion

to which no response is required. To the extent a response is required, WMI denies all

remaining allegations in Paragraph 148.

e.      **Washington Mutual Repeatedly Identified,
And Hid, Significant Deficiencies And Even
<u>Fraud In Its Subprime Lending Operations.</u>**

149.    Contrary to representations of upstanding lending practices,
Washington Mutual was well aware for several years that its subprime
lending practices were unacceptable. "Long Beach loans repeatedly
suffered from early payment defaults, poor underwriting, fraud, and high
delinquency rates."[45]

Answer 149. WMI admits that Paragraph 149 of the Complaint cites to the April 13,

2010 Memorandum from Senators Levin and Coburn to Members of the Permanent

Subcommittee on Investigations and that the Memorandum includes language quoted by

Plaintiffs in Paragraph 149. WMI respectfully refers the Court to the Memorandum for

the content thereof and denies any characterization inconsistent therewith. WMI denies

the remaining allegations in Paragraph 149.

150.    In 2003, concerns about securitizations and loan sales not meeting
the representations and warranties contained in the sales agreements
reached a level that Washington Mutual could not ignore, and it was

---

[45] April 13, 2010 Memo from Senators Levin and Coburn to Permanent Subcommittee on
Investigations, p. 4.

forced to halt Long Beach securitizations. An internal residential quality assurance report for Long Beach's first quarter of 2003 concluded that 40% of loans were unacceptable for securitization and sale. Based on a subsequent review of 4,000 loans, only "950 were deemed saleable, 800 were deemed unsalable, and the remainder contained deficiencies requiring remediation prior to sale."[46] Additionally, of 4,500 securitized loans that were eligible for foreclosure, 10% contained documentation issues preventing such foreclosure.[47] Without fixing the problems, Washington Mutual let Long Beach resume securitizing loans. Unsurprisingly, problems resurfaced in 2005, just before the start of the campaign to raise $4 billion through sale of the Trust Preferred Securities.

Answer 150. WMI admits that Paragraph 150 of the Complaint cites to "April 13, 2010 Senate Subcommittee Hearing Ex. 8(b)" and that Exhibit 8(b) includes language that Plaintiffs paraphrase and quote in Paragraph 150. WMI respectfully refers the Court to Exhibit 8(b) for the content thereof and denies any characterization inconsistent therewith and the substance thereof. WMI denies any remaining allegations in Paragraph 150.

151.    Long Beach had shifted some of its sales to a "whole loan program," under which, it was required to repurchase loans if the borrower failed to make the first payment due to the investor. The poor quality of loans originated and sold by Long Beach suffered such high rates of early payment defaults that Long Beach was required to repurchase $875 million worth of nonperforming loans in 2005, suffering a net loss of $107 million. The subsequent Washington Mutual internal review identified the problems that had been brewing for a long time:

> The shift to whole loan sales, including the EPD [early payment default] provision, brought to the surface the impact of relaxed credit guidelines, breakdowns in manual underwriting processes, and inexperienced subprime personnel. These factors, coupled with a push to increase loan volume and the lack of an automated fraud monitoring tool, exacerbated the deterioration in loan quality.[48]

---

[46] April 13, 2010 Senate Subcommittee Hearing Ex. 8(b), p. 3.

[47] April 13, 2010 Senate Subcommittee Hearing Ex. 8(b), p. 4.

[48] April 13, 2010 Senate Subcommittee Hearing Ex. 10, p. 2.

Answer 151. WMI admits that Paragraph 151 of the Complaint cites to "April 13, 2010 Senate Subcommittee Hearing Ex. 10" and that Exhibit 10 includes language that Plaintiffs quote and paraphrase in Paragraph 151 of the Complaint. WMI respectfully refers the Court to Exhibit 10 for the content thereof and denies any characterization inconsistent therewith. WMI denies the remaining allegations in Paragraph 151.

> 152.    Supposedly to improve operations, Washington Mutual terminated Long Beach senior management and shifted the subprime lending operations to report to David Schneider, President of Washington Mutual's Home Loans Division. However, improvement did not come. In April 2006 (just one month into the series of five Trust Preferred Securities issuances), Washington Mutual president Steve Rotella told Killinger that Long Beach "delinquencies are up 140% and foreclosures close to 70% . . . . First payment defaults are way up and the 2005 vintage is way up relative to previous years. It is ugly."[49] By the end of the year, it was clear that 2006 securities had even higher early delinquency rates than the previous problem years of 2003-2005.[50] But, the marketing of Trust Preferred Securities to investors, incorporating by reference statements regarding the safety and stability of WMB, continued.

Answer 152. WMI admits that various Washington Mutual Entities offered Trust Preferred Securities to investors and that, in 2006, Long Beach Mortgage was organizationally realigned under WMI's Home Loans executive management team headed by David Schneider. WMI further admits that Paragraph 152 of the Complaint cites to "April 13, 2010 Senate Subcommittee Hearing Ex. 11" and "April 13, 2010 Senate Subcommittee Hearing Ex. 16, December 11, 2006 email" and that Exhibit 11 and Exhibit 16 include language that Plaintiffs quote and paraphrase in Paragraph 152. WMI

---

[49] April 13, 2010 Senate Subcommittee Hearing Ex. 11, April 27, 2006 email.

[50] April 13, 2010 Senate Subcommittee Hearing Ex. 15, December 6, 2006 email.

respectfully refers the Court to these Exhibits for the content thereof and denies any

characterization inconsistent therewith. WMI denies the remaining allegations in

Paragraph 152.

> 153. Internal audits continued to identify repeated and growing
> problems. In late 2006, Washington Mutual's Chief Risk Officer,
> received an email about Long Beach that identified ongoing key risk
> issues:
> - Appraisal deficiencies that could impact value...
> - Material misrepresentations relating to credit evaluation...
> - Legal documents were missing or contained errors or discrepancies
> - Credit evaluation or loan decision errors
> - Required credit documentation was insufficient or missing from
> the file. ...
> - On a vintage basis, the deterioration was accelerating in recent
> vintages with each vintage since 2002 having performed worse than the
> prior vintage.[51]
>
> The underlying and ongoing issues were discussed by the Market Risk
> Committee during a December 12, 2006 meeting, but again, no fix was to
> come.

Answer 153. WMI admits that Paragraph 153 of the Complaint cites to "April 13, 2010

Senate Subcommittee Hearing Ex. 16, December 11, 2006 email" and that Exhibit 16

includes language that Plaintiffs quote in Paragraph 153. WMI respectfully refers the

Court to Exhibit 16 for the content thereof and denies any characterization inconsistent

therewith and denies the substance thereof. WMI further admits that the Market Risk

Committee of WMI, WMB, WMBfsb, and the Asset Liability Committee of WMBfsb

met on December 12, 2006, but avers that the phrase "underlying and ongoing issues" is

too vague and ambiguous to require further response to the last sentence of Paragraph

153 of the Complaint. WMI further avers that the first sentence of Paragraph 153 is too

---

[51] April 13, 2010 Senate Subcommittee Hearing Ex. 16, December 11, 2006 email.

vague and ambiguous to require a response. WMI denies the remaining allegations in

Paragraph 153.


154. After several 2007 reviews identified the same lending, credit and even appraisal problems that had been pointed out for years, Washington Mutual finally closed Long Beach and took over subprime lending operations in mid-2007.

Answer 154. WMI admits that independent Long Beach operations ceased in 2007 and

respectfully refers the Court to WMI's 2007 Form 10-K for the content thereof, which

discloses that all lending through the subprime mortgage channel was discontinued by the

end of that year. WMI avers that the phrase "several 2007 reviews" in Paragraph 154 of

the Complaint is too vague and ambiguous to require a further response. To the extent a

response is required, WMI denies the remaining allegations in Paragraph 154.

### f.    Washington Mutual Misrepresented The State Of Its Practices, While Ignoring Outright Fraud.

155. Even when fraud was uncovered by Washington Mutual, management did little to nothing to correct the problems, and certainly did not disclose it to investors. A 2005 internal investigation uncovered extremely high rates of fraud of 58% and 83% in loans originated by two of the top loan producing offices in southern California, which accounted for hundreds of millions of dollars in home loans every year. This issue was brought to the attention of senior management, but nothing was done to correct the problems nor were investors in the Trust Preferred Securities advised. Instead:

> The fraud problem was left to fester until two years later, when in June 2007, one of the bank's mortgage insurance companies refused to insure any more loans issued by the loan producer...and complained to Washington Mutual's state and federal regulators about fraudulent borrower information.[52]

---

[52] Senator Levin, Opening Statement, April 13, 2010 Senate Subcommittee Hearings, p. 7.

Answer 155.   WMI admits that Paragraph 155 of the Complaint cites to Senator Levin's

April 13, 2010 Opening Statement before the Senate Permanent Subcommittee and that

the Statement includes language quoted by Plaintiffs in Paragraph 155.   WMI

respectfully refers the Court to the Statement for the content thereof, denies any

characterization inconsistent therewith, and denies the substance of the quoted language.

WMI avers that the phrase "2005 internal investigation" is too vague and ambiguous to

require a response to the allegations in the second sentence of Paragraph 155.   To the

extent a response is required, WMI denies those allegations and all remaining allegations

in Paragraph 155.

> 156.    The resulting 2007 review showed that one of the previously
> identified problem offices had a fraud rate of 62%. In an April 2008
> internal memorandum – which Washington Mutual initially tried to hide
> from its regulator – Washington Mutual's fraud investigation and audit
> team noted the similar rate of fraud that had been found in 2005, and
> questioned whether further review should be conducted, since many
> fraudulent loans that had been marked as containing fraudulent
> information had been securitized and sold to investors.[53]

Answer 156.   WMI avers that the phrases "the resulting 2007 review" and "one of the

previously identified problem offices" in the first sentence of Paragraph 156 of the

Complaint are too vague and ambiguous to require a response.   To the extent a response

is required, WMI denies the allegation.   WMI further avers that the allegations of

"fraud," "fraudulent loans," and "fraudulent information" in Paragraph 156 contain legal

conclusions to which no response is required.   To the extent a response is required, WMI

---

[53] Senator Levin Opening Statement, April 13, 2010 Senate Subcommittee Hearing, p. 7;
April 13, 2010 Senate Subcommittee Hearing Ex. 24, April 2008 Memorandum.

denies the allegations. WMI admits that Paragraph 156 of the Complaint cites to Senator

Levin's April 13, 2010 Opening Statement before the Senate Permanent Subcommittee

on Investigations and to "April 13, 2010 Senate Subcommittee Hearing Ex. 24, April

2008 Memorandum" and that the cited Statement and Exhibit 24 discuss "suspected loan

fraud" in 62% of a small sampling of 2007 loans at one California loan center that also

had been investigated in 2005. WMI respectfully refers the Court to the Statement and to

Exhibit 24 for the content thereof, denies any characterization in Paragraph 156

inconsistent therewith, and further denies any characterization of Exhibit 24 in Senator

Levin's Opening Statement that is inconsistent with Exhibit 24 itself. WMI denies any

remaining allegations in Paragraph 156.

> 157.    Senior management had simply refused to impose any form of
> control to prevent the sale of fraudulent loans, and instead, allowed the
> problems to fester for years.[54] Senator Levin summarized the fraudulent
> lending practices that Washington Mutual hid from the public:
>
>> Sales associates manufacturing documents, large numbers of loans
>> that don't meet credit standards, offices issuing loans in which 58,
>> 62, or 83% contain evidence of fraudulent borrower information,
>> loans marked as containing fraud but then sold to investors
>> anyway. These are massive, deep seated problems. And they are
>> problems that, inside the bank, were communicated to senior
>> management, but were not fixed.[55]

Answer 157. WMI admits that Paragraph 157 of the Complaint cites to Senator Levin's

April 13, 2010 Opening Statement before the Senate Permanent Subcommittee on

Investigations and that the Statement includes language that Plaintiffs quote in Paragraph

---

[54] See April 13, 2010 Senate Subcommittee Hearing Ex. 34, p. 3.

[55] Senator Levin Opening Statement, April 13, 2010 Senate Subcommittee Hearing, p. 8.

157. WMI respectfully refers the Court to the Statement for the content thereof, denies

any characterization inconsistent therewith, and denies the substance of the quotation.

WMI denies that Plaintiffs' citation to "April 13, 2010 Senate Subcommittee Hearing Ex.

34, p. 3" supports the allegations in the first sentence of Paragraph 157. WMI avers that

allegations regarding "fraudulent loans" and "fraudulent lending practices" contain legal

conclusions to which no response is required. To the extent a response is required, WMI

denies the remaining allegations in Paragraph 157.

> g.    **Contrary To Representations To Investors In The Trust Preferred Securities Regarding Robust Practices, Risk Management Was Relegated To A Mere "Customer Service" Role.**

> 158.    The purpose of risk management in a lending institution is to provide a buffer against unsafe lending practices by identifying and controlling risks. But, rather than allow its risk management group to perform this important function, Washington Mutual and its senior officers secretly reduced the group's effectiveness while simultaneously increasing the bank's risk.

Answer 158. WMI admits that one purpose of risk management in a lending institution is

to identify and control risks associated with lending practices, but denies any implication

that this is the sole purpose. WMI denies the remaining allegations in Paragraph 158 of

the Complaint.

> 159.    As early as September 2005, senior management knew of serious and systemic risk management deficiencies through an internal report identifying significant issues, including material flaws in Washington Mutual's risk modeling. In that report, it was found that the Loan Performance Risk Model ("LPRM"), by which Washington Mutual was supposed to measure risk in its portfolio, was untested on products with the potential to negatively amortize. This meant Washington Mutual was not properly measuring the risk profile of its flagship product, the Option ARM.

Answer 159.  WMI avers that the phrase "an internal report identifying significant issues"

is so vague and ambiguous as to require no response to the allegations in Paragraph 159

of the Complaint.  To the extent a response is required, WMI denies the allegations in

Paragraph 159.

> 160.   Option ARM loans dominated Washington Mutual's residential
> portfolio from 2005 forward, and negative amortization skyrocketed from
> 2004 through 2007.  During that time period, Washington Mutual Option
> ARM borrowers in negative amortization as a percentage of the total value
> of Option ARM loans increased from 25% to 70%.  Yet, Washington
> Mutual was incapable of measuring the risk associated with these events,
> and senior management ignored and/or covered up the problem.

Answer 160.  WMI admits that WMB offered Option ARM loans as part of its residential

portfolio and that the percentage of Option ARM borrowers whose final loan payment of

the year resulted in negative amortization, as measured against the total value of the

Option ARM loans, increased from 2004 through 2007.  WMI respectfully refers the

Court to WMI's 2005 Form 10-K, 2006 Form 10-K, and 2007 Form 10-K for the content

thereof, including disclosures concerning these percentages, and denies any allegations

inconsistent therewith.  WMI denies all remaining allegations of Paragraph 160 of the

Complaint.

> 161.   Importantly, Washington Mutual was required to maintain and
> periodically adjust a reserve amount for probable losses resulting from
> borrower defaults or when it was probable that borrowers would default
> (the "Allowance for Loan and Lease Losses" or "Allowance").  By not
> properly accounting for and protecting against risk in calculating the
> Allowance for Loss, Washington Mutual improperly inflated its net
> income quarter after quarter.  According to calculations prepared in
> connection with pending securities litigation in Washington state, the
> estimated effect on net income due to understating the Allowance ranged

from $33 million in the first quarter of 2006 to $592 million in the third quarter of 2007.[56]

Answer 161. WMI admits that WMB maintained and periodically adjusted an allowance for loan losses that represented management's estimate of incurred credit losses inherent in WMB's loan portfolio at specified dates. WMI denies that WMB failed to properly account for and protect against risk in calculating allowances for loss from borrower defaults and further denies that WMI or WMB improperly inflated net income quarter after quarter. WMI lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 161 and therefore denies those allegations.

162. Instead of addressing this serious flaw in its risk management practices, Washington Mutual made the express decision to weaken its controls further. To this end, in the fourth quarter of 2005, then-Chief Risk Officer James Vanasek told the Company's credit risk managers that senior management decided the company would be more "aggressive" in lending and that the risk managers were expected to cooperate with the efforts to "push the envelope." An October 31, 2005 internal memorandum prepared by Melissa Martinez, Washington Mutual's then Chief Compliance and Risk Oversight Officer explicitly stated that risk management would be going through a "cultural change" and "behavioral change." It further stated that risk management would have to assume a "customer service" role, rather than impose a "regulatory burden" on other Washington Mutual segments. From then on, Washington Mutual's risk management group was supposed to be only "advisory." But, even when members of the group provided "advice," the recommendations were routinely ignored by senior management.

Answer 162. WMI denies the allegations in the first and last sentences of Paragraph 162 of the Complaint. WMI lacks information sufficient to form a belief as to the remaining allegations in Paragraph 162 and therefore denies those allegations.

---

[56] Amended Consolidated Class Action Complaint, *In Re: Washington Mutual, Inc. Securities Litigation*, U.S. Dist. Ct., W.D. Washington, No. 2:08-md-1919, p. 111.

163.    Notwithstanding contrary representations to investors in the Trust Preferred Securities, Washington Mutual continuously undermined its own risk management practices, allowing risk to build secretly in its portfolio. This hidden lack of oversight contributed materially to the events claimed to justify the purported Conditional Exchange.

Answer 163.   WMI denies the allegations set forth in Paragraph 163 of the Complaint.

## C.    The OTS Repeatedly Identified Serious Problems At Washington Mutual, But Allowed Them To Continue Unabated For Fear Of Losing The Audit Income And Favor Of Its Largest "Customer."

164.    The OTS is charged with regulating the operations of federal savings banks or thrifts, such as Washington Mutual Bank. As Washington Mutual's primary federal regulator, the OTS was responsible for conducting full scope examinations to assess the safety and soundness of the banking operations and compliance with consumer protection laws.

Answer 164.   WMI admits that WMB was regulated by the OTS and that OTS conducted examinations of WMB.  WMI avers that the remaining allegations in Paragraph 164 of the Complaint state conclusions of law regarding the OTS's regulatory function to which no response is required.

165.    For years, the OTS repeatedly identified, but chose not to disclose publicly, significant weaknesses in Washington Mutual's banking practices, including the escalating reliance on high-risk products, "'less than satisfactory' underwriting standards, 'higher than acceptable' underwriting errors, weak risk management controls, and a disturbing numbers [sic] of loans with false borrower information or that failed to comply with the bank's credit requirements."[57]

Answer 165.   WMI admits that Paragraph 165 of the Complaint cites to the April 15, 2010 US Senate Permanent Subcommittee on Investigations Press Release and that the

---

[57] See April 15, 2010 US Senate Permanent Subcommittee on Investigations Press Release, p. 2; April 16, 2010 Senate Subcommittee Hearing Ex. 82, April 2010 Report from the Offices of the Inspector General, Department of the Treasury, Federal Deposit Insurance Corporation ("OIG Report") p. 15.

press release includes language quoted by Plaintiffs in Paragraph 165. WMI respectfully

refers the Court to the press release for the content thereof, denies any characterization

inconsistent therewith, and denies the substance of the quotation. WMI further admits

that Paragraph 165 purports to quote from "April 16, 2010 Senate Subcommittee Hearing

Ex. 82, April 2010 Report from the Offices of the Inspector General, Department of the

Treasury, Federal Deposit Insurance Corporation ("OIG Report") p. 15," which discusses

the OTS's regulatory oversight of WMB but does not contain the language quoted by

Plaintiffs in Paragraph 165. WMI respectfully refers the Court to Exhibit 82 for the

content thereof, denies any characterization in Paragraph 165 inconsistent therewith, and

denies the substance of Exhibit 82's characterization of WMB's practices. WMI lacks

knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in Paragraph 165 and therefore denies those allegations.

> 166.     Those findings were all shared with Washington Mutual's officers
> and directors, with the apparent expectation of correction. Even without
> any correction, from 2003 until February 2008 (importantly, well after the
> last Trust Preferred Securities offering), the OTS consistently rated
> Washington Mutual in a way that indicated to the public, to depositors and
> to investors in the Trust Preferred Securities that the bank was
> fundamentally sound. Worse still, the OTS, in an effort to protect
> Washington Mutual and not the public interest, fought other regulators and
> their efforts to rein in high risk loans, even preventing the FDIC from
> engaging in any oversight.

Answer 166.    WMI admits that the OTS rated WMB as part of the OTS's regulatory

function. WMI lacks knowledge or information sufficient to form a belief as to the truth

of the allegations in Paragraph 166 of the Complaint to the extent they characterize the

motivations, expectations, or actions of the OTS or the perceptions of the public,

depositors, and investors in the Trust Preferred Securities, and WMI therefore denies

those allegations. WMI avers that the allegation that "[t]hose findings were all shared with Washington Mutual's officers and directors" is too vague and ambiguous to require a response. To the extent a response is required, WMI denies same and all remaining allegations in Paragraph 166.

> 167. The OTS received its entire budget from fees assessed on its regulated institutions. As the OTS's largest regulated institution, from 2003 to 2008, Washington Mutual made up between 12-15% of the OTS's total budget. As such, Washington Mutual was frequently referred to by the OTS as one of its best "constituents" or "customers," a customer the OTS did not want to risk losing.[58]

Answer 167. WMI admits that Paragraph 167 of the Complaint cites to the April 16, 2010 Opening Statement of Senator Carl Levin and that the Statement includes the language paraphrased by Plaintiffs in Paragraph 167. WMI respectfully refers the Court to the Opening Statement for the content thereof and denies any characterization inconsistent therewith and the substance thereof. WMI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 167 of the Complaint, including the substance of the quotation from Senator Levin's April 16, 2010 Opening Statement, and WMI therefore denies those allegations.

> 168. Because of its failure to act as a proper regulator, the OTS enabled, and indeed facilitated, the ongoing misrepresentations to investors in the Trust Preferred Securities. In fact, the OTS even signed on to the scheme to conceal WMI's intent to downstream the Trust Preferred Securities by treating the Side Letters as confidential and not even inquiring as to whether WMI would disclose its true intentions to investors. In essence, the OTS allowed, if not outright facilitated, the perpetration of an ongoing fraud on investors in the Trust Preferred Securities.

---

[58] April 16, 2010 Opening Statement of Senator Carl Levin, D-Mich., before the U.S. Senate Subcommittee on Investigations, p. 1.

Answer 168.  WMI avers that the Trust Preferred Securities were intended to raise core

capital for WMB and otherwise denies the allegations of Paragraph 168 of the Complaint.

1.    **The OTS Facilitated The Fraud On**
      **Investors In The Trust Preferred Securities.**

169.    Throughout the relevant time period, the OTS conducted routine
examinations of Washington Mutual, as it did with other thrifts, focused
around the CAMELS[59] rating system used by all of the federal bank
regulators and culminating in an annual Report of Examination ("ROE").

Answer 169.  The allegations set forth in Paragraph 169 of the Complaint contain a

conclusion of law as to which no response is required.  WMI further avers that the phrase

"the relevant time period" is too vague and ambiguous to require a response.  To the

extent a response is required, WMI admits that the OTS conducted examinations of

WMB and that the "CAMELS" rating system is used by federal bank regulators.  WMI

lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 169 of the Complaint that characterize the OTS's regulatory

actions and therefore denies the allegations.

170.    A primary purpose of the rating system is to identify institutions
that pose a risk of failure and require more than normal supervision.  The
CAMELS comprehensive numerical values range from 1 to 5, with 1
being the highest ranking available for banks.  The standard descriptions
of each rating are:

---

[59] The CAMELS composite rating reflects a qualitative assessment based on the review
of component ratings related to: (C) Capital adequacy in relation to risk profile and
operations; (A) Asset quality relative to credit risk related to loan and investment
portfolios; (M) Management imposed policies, procedures and practices regarding risk
exposure; (E) Earnings;  (L) Liquidity; and (S) Sensitivity to market risk.

| 1 | Sound in every respect |
|---|---|
| 2 | Fundamentally sound |
| 3 | Exhibits some degree of supervisory concern in one or more of the component areas (i.e., capital adequacy, asset quality, management, earnings, liquidity, sensitivity to market risk) |
| 4 | Generally exhibits unsafe and unsound practices or conditions |
| 5 | Exhibits extremely unsafe and unsound practices or conditions; exhibits a critically deficient performance; often contains inadequate risk management practices relative to the institution's size, complexity, and risk profile; and is of the greatest supervisory concern |

Answer 170.  The allegations in Paragraph 170 of the Complaint state conclusions of law as to which no response is required.   To the extent a response is required, WMI denies the allegations in Paragraph 170.

171.    Between 2001 and 2007, the OTS consistently gave Washington Mutual a composite rating of 2.  According to the Inspector General:

> [A] composite 2 rating reflects the agency's assessment that an institution is fundamentally sound.  The CAMELS composite criteria for a 2 also states that such institutions have only moderate weaknesses that are within the board's and management's capability and willingness to correct, and have satisfactory risk management practices relative to the institution's size, complexity, and risk profile.  Institutions in this category are stable and capable of withstanding business fluctuations….[T]he composite rating is a critical factor in supporting the need for enforcement actions and in determining the assessment rate an institution should pay for deposit insurance purposes.[60]

---

[60] OIG Report, p. 16.

Answer 171. WMI admits that Paragraph 171 of the Complaint cites to the "OIG

Report, p.16" (which WMI construes as page 16 of the Report of the Office of the

Inspector General, Exhibit 82 to the April 16, 2010 hearings of the Senate Permanent

Subcommittee on Investigations), that the OIG Report includes the language quoted by

Plaintiffs in Paragraph 171, and that the OIG Report reflects that, between 2001 and

2007, the OTS gave WMB a composite rating of 2. WMI respectfully refers the Court to

the OIG Report for the content thereof, and denies any characterization inconsistent with

the OIG Report.

> 172.    While it was giving Washington Mutual positive ratings, the
> OTS was actually identifying and presenting to Washington Mutual's
> officers and directors significant problems with Washington Mutual's
> increasingly risky and unsafe practices.
>
> > The painful fact is that [federal regulators] had a front row seat to
> > Washington Mutual's high risk lending strategy, its poor quality
> > loans, and substandard securitization practices, but did little to stop
> > it.
> > ...
> >
> > OTS knew all about Washington Mutual's high risk lending
> > strategy....OTS knew about Washington Mutual's shoddy lending
> > practices, having repeatedly identified problems with the bank's
> > operations in examination reports year after year. Every time OTS
> > listed a problem, it also told WaMu to take corrective action. But
> > when the problem didn't get fixed, OTS failed to force change.[61]

Answer 172. WMI admits that Paragraph 172 cites to the April 16, 2010 Opening

Statement of Senator Levin before the Senate Permanent Subcommittee on Investigations

and that the statement includes the language quoted by Plaintiffs in Paragraph 172. WMI

---

[61] April 16, 2010 Opening Statement of Senator Carl Levin, D-Mich., before the U.S.
Senate Subcommittee on Investigations, p. 2-3.

respectfully refers the Court to the Opening Statement for the content thereof, denies any

characterization inconsistent therewith, and denies knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 172, including the substance

of the quote from Senator Levin's Opening Statement, to the extent they characterize the

motivations or actions of the OTS, and WMI therefore denies same. WMI further denies

the substance of Senator Levin's Opening Statement regarding WMB's operations.

> 173.      Thus, despite the ever-increasing risk incurred by Washington
> Mutual and the bank's shoddy lending practices, the OTS facilitated the
> misrepresentations to investors that they had no reason to suspect trouble
> at Washington Mutual.

Answer 173.   WMI denies the allegations of Paragraph 173 of the Complaint.

> 174.      For years, the OTS consistently found, and pointed out to
> management, that Washington Mutual's risk management was
> insufficient, underwriting standards were "less than satisfactory," the
> number of underwriting errors were "higher than acceptable," and even
> found loans with erroneous or fraudulent information that did not comply
> with the bank's credit requirements, or contained other problems.[62]

Answer 174.   WMI admits that Paragraph 174 cites the April 16, 2010 Memorandum

from Senators Levin and Coburn to the Senate Permanent Subcommittee on

Investigations and that the Memorandum includes language that Plaintiffs quote and

paraphrase in Paragraph 174. WMI respectfully refers the Court to the Memorandum for

the content thereof, denies any characterization inconsistent therewith, denies the

substance of allegations concerning WMB's practices, denies knowledge or information

sufficient to form a belief as to the truth of the allegations in Paragraph 174 of the

---

[62] April 16, 2010 Memorandum to Members of the Permanent Subcommittee on
Investigations, p. 5.

Complaint that characterize the motivations or actions of the OTS, and WMI therefore

denies same. WMI avers that the phrase "pointed out to management" in the first

sentence of Paragraph 174 renders the allegations too vague and ambiguous to require a

response. To the extent a response is required, WMI denies same and the remaining

allegations in Paragraph 174.

175.    Specific problems that were repeatedly uncovered by the OTS
and reported to Washington Mutual include:

**2004**

"Underwriting of SFR loans remains less than satisfactory." One
of the three causes of underwriting deficiencies was "a sales
culture focused on building market share." 2004 Report of
Examination (ROE), 9/13/04, OTSWMSO4-0000001497. (Full
exhibit sealed.)[63]

...

"The level of SFR underwriting exceptions in our samples has
been an ongoing examination issue for several years and one that
management has found difficult to address." Field Visit ROE,
10/18/04, OTSWMEF-00000047576. (Full exhibit sealed.)

"[Residential Quality Assurance]'s review of 2003 originations
disclosed critical error rates as high as 57.3 percent of certain loan
samples, thereby indicating that SFR [Single Family Residential]
underwriting still requires much improvement. While this group
has appropriately identified underwriting deficiencies, it has not
been as successful in effecting change." 2004 ROE, 9/13/04,
OTSWMSO4-000001498. (Full exhibit sealed.)

**2005**

"SFR Loan Underwriting — This has been an area of concern for
several exams...." MRBA [Matter Requiring Board Attention],

---

[63] References to exhibits in these paragraphs are the same references to exhibits
referenced by and relied upon by the Senate Subcommittee on Investigations.

OTS Letter to Washington Mutual Board of Directors, 2/7/05, OTSWMEF-0000047591. (Full exhibit sealed.)

...

"We continue to have concerns regarding the number of underwriting exceptions and with issues that evidence lack of compliance with Bank policy." OTS Exam Findings Memo, 6/3/05, "Single Family Residential Home Loan Review," OTSWME05-004 0000392. Exhibit 26.

"[W]e remain concerned with the number of underwriting exceptions and with issues that evidence lack of compliance with bank policy .... [T]he level of deficiencies, if left unchecked, could erode the credit quality of the portfolio. Our concerns are increased with [sic] the risk profile of the portfolio is considered, including concentrations in Option ARM loans to higher-risk borrowers, in low and limited documentation loans, and loans with subprime or higher-risk characteristics. We are concerned further that the current market environment is masking potentially higher credit risk." 2005 ROE, 8/29/05, OTSWMS05-004 0001794. (Full exhibit sealed.)

...

## 2006

"During the prior examination, we noted numerous instances of underwriters exceeding underwriting guidelines, errors in income calculations, errors in debt-to-income (DTI) calculations, lack of sufficient mitigating factors for credit-quality related issues, and insufficient title insurance coverage on negative amortization loans. ... [U]nderwriting errors [] continue to require management's attention." OTS Exam Findings Memo, 5/23/06, "Home Loan Underwriting," OTSWMSO6-008 0001299. Exhibit 33.

"Overall, we concluded that the number and severity of underwriting errors noted remain at higher than acceptable levels." OTS Exam Findings Memo, 5/25/06, "Loan Underwriting Review – Long Beach Mortgage," OTSWMSO6-008 0001243. Exhibit 35.

"Subprime underwriting practices remain less than satisfactory. ...[T]he number and severity of underwriting exceptions and errors

remain at higher than acceptable levels. ... The findings of this judgmental sample are of particular concern since loans with risk layering ... should reflect more, rather than less, stringent underwriting. Borrowers in this category generally have debt ratios that are near the maximum rations allowed by LBMC's policy; thus, any DTI ratio calculation errors made by LBMC underwriters for such borrowers are likely to push these loans outside LBMC's underwriting guidelines for DTI ratios." 2006 ROE, 8/29/06, OTSWMS06-008 0001680. (Full exhibit sealed.)

## 2007

"Underwriting policies, procedures, and practices were in need of improvement, particularly with respect to stated income lending. Based on our current findings, and the fact that a number of similar concerns were raised at prior examinations, we concluded that too much emphasis was placed on loan production, often at the expense of loan quality." 2007 ROE, 9/18/07, OTSWMEF-0000046679. (Full exhibit sealed.)

"Based on our review of 75 subprime loans originated by LBMC, we concluded that subprime underwriting practices remain less than satisfactory .... Given that this is a repeat concern and MRBA [Matter Requiring Board Attention], we informed management that underwriting must be promptly corrected, or heightened supervisory action would be taken, including limiting the Bank's ability to continue SFR subprime underwriting." 2007 ROE, 9/18/07, OTSWMEF-0000047146. (Full exhibit sealed.)[64]

Answer 175.    WMI admits that Paragraph 175 cites to Exhibit 1d of the April 16, 2010

Hearing Exhibits of the Permanent Subcommittee on Investigations and that Exhibit 1d

includes language that Plaintiffs quote in Paragraph 175. WMI respectfully refers the

Court to Exhibit 1d for the content thereof and denies any characterization inconsistent

therewith and the substance thereof. WMI denies knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 175 of the Complaint that

---

[64] April 16, 2010 Permanent Subcommittee on Investigations, Ex. 1d.

characterize motivations or actions of the OTS, and WMI therefore denies same. WMI

denies any remaining allegations set forth in Paragraph 175 of the Complaint.

176.    The underwriting deficiencies were not the only problems identified by the OTS and presented to Washington Mutual.   The OTS also repeatedly noted deficiencies in Washington Mutual's risk management efforts.

**2004** "

Board   oversight   and   management   performance   has   been satisfactory ... but ... increased operational risks warrant prompt attention.  These issues limit the institution's flexibility and may threaten its ability to remain competitive and independent." 2004 Report    of    Examination    (ROE),    9/13/04,    OTSWMSO4-0000001504.  (Full exhibit sealed.)

...

"Ensure cost-cutting measures are not impacting critical risk management   areas."      2004   ROE,   9/13/04,   OTSWMSO4-000001488.  (Full exhibit sealed.)

**2005**

...

"Until full exception data collection, reporting, and follow-up processes are in place and stabilized, senior management and the Board cannot fully assess whether quality assurance processes are having a meaningful impact on line activities, including loan underwriting. We are particularly concerned with the establishment of good quality assurance process for SFR underwriting, which has been an issue for the past several examinations."   2005 ROE, 8/29/05, OTSWMS05-004 0001792.  (Full exhibit sealed.)

...

**2007**

"Risk management practices in the HLG (Home Loans Group) during most of the review period were inadequate .... [A]s previously noted, the risk misrepresentation in stated income loans

has been generally reported for some time...."    2007 ROE,
9//18/07, OTSWMEF-0000046681.  (Full exhibit sealed.)

....

**2008** "

Poor financial performance due in part to market conditions;
however, performance exacerbated by conditions within
management's control:  poor underwriting quality, geographic
concentrations in problem markets, liberal underwriting policy,
risk layering." OTS Presentation to Washington Mutual Board of
Directors based on Comprehensive Examinations, 7/15/08,
Polakoff_Scott-00061303027, Exhibit 12.

"An adequate [Enterprise Risk Management] function still does not
exist although this has been an MRBA for some time." OTS
Presentation, 7/15/08, Polakoff_Scott00061303_028. Exhibit 12.[65]

Answer 176.    WMI admits that Paragraph 176 cites to Exhibit 1e of the April 16, 2010

Hearing Exhibits of the Permanent Subcommittee on Investigations and that Exhibit 1e

includes language that Plaintiffs quote in Paragraph 176.  WMI respectfully refers the

Court to Exhibit 1e for the content thereof and denies any characterization inconsistent

therewith and the substance thereof.  WMI denies knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 176 of the Complaint that

characterize motivations or actions of the OTS, and WMI therefore denies same.  WMI

denies any remaining allegations set forth in Paragraph 176 of the Complaint.


177.    As can be seen from the lists above, "WaMu's bad practices
went well beyond individual cases and instead involved systematic efforts
to mislead borrowers and investors."[66]    However, the OTS consistently

---

[65] April 16, 2010 Permanent Subcommittee on Investigations Ex. 1e.

[66] Hudson, Michael & Jim Overton, "The Second S&L Scandal" p. 9 (Center for
Responsible Lending January 2009).

resisted making any public representation that Washington Mutual's practices were less than satisfactory. It was not until late February 2008 that the OTS finally downgraded the bank's CAMELS rating from a 2 to a 3, and even then it did not take any other public action that would have identified the depth and breadth of Washington Mutual's problems. Instead, the OTS waited until the next month to accept a nonpublic board resolution in which WMI's board promised to fix problems but provided no specific plans or deadlines for doing so. "It was a kid gloves approach..." that helped preserve a sense that the bank was more stable than it actually was.[67]

Answer 177.   WMI admits that Paragraph 177 of the Complaint cites "The Second S&L Scandal" and Senator Levin's April 16, 2010 Opening Statement before the Senate Subcommittee on Investigations, and that the article and Opening Statement include language that Plaintiffs quote in Paragraph 177.  WMI respectfully refers the Court to the article and Opening Statement for the content thereof, denies any characterization inconsistent therewith, and denies the substance of the quotations.  WMI denies knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 177 that characterize the motivations or actions of the OTS, and WMI therefore denies same.  WMI denies the remaining allegations in Paragraph 177.

178.   Because the OTS merely identified for Washington Mutual its deficiencies, rather than taking action as the primary federal regulator, Washington Mutual had free reign to ignore its mounting problems, implement all of the policies that contradicted its public representations of safety and soundness, and certain of the Washington Mutual Entities were enabled to bilk $4 billion from investors in the Trust Preferred Securities.

Answer 178.   WMI denies the allegations of Paragraph 178 of the Complaint.

2.     **The OTS's Complicity Was Aimed At Keeping Its Largest Constituent Appeased.**

---

[67] April 16, 2010 Opening Statement of Senator Carl Levin, D-Mich., before the U.S. Senate Subcommittee on Investigation, p. 5.

179. Even Washington Mutual officials were flabbergasted by the OTS's facilitating of Washington Mutual's practices. Testifying before the Senate Subcommittee, Washington Mutual's former chief risk officer Jim Vanasek said:

> What I cannot explain is why the superiors in the agencies didn't take a tougher tone with the banks given the degree of...negative findings....[T]here seemed to be a tolerance there or a political influence on senior management of those agencies that prevented them from taking a more active stance. By a more active stance, I mean putting the banks under letters of agreement and forcing change.[68]

Answer 179. WMI admits that Jim Vanasek formerly was Chief Risk Enterprise Officer for WMI. WMI further admits that Paragraph 179 of the Complaint cites to the April 16, 2010 Opening Statement of Senator Levin to the Senate Permanent Subcommittee on Investigations and that the statement includes purported quotations from Mr. Vanasek that are in turn quoted by Plaintiffs in Paragraph 179. WMI respectfully refers the Court to the Opening Statement for the content thereof, denies any characterization inconsistent therewith, and denies knowledge or information sufficient to form a belief as to the truth of the substance of the quotation. WMI denies the remaining allegations in Paragraph 179.

180. Mr. Vanasek's successor testified: "the approach that the OTS took was much more light-handed than I was used to. It seemed as if the regulator was prepared to allow the bank to work through its problems and had a higher degree of tolerance...than I had seen with the other...regulators."[69]

---

[68] April 16, 2010 Opening Statement of Senator Carl Levin, D-Mich., before the U.S. Senate Subcommittee on Investigation, p. 3.

[69] April 16, 2010 Opening Statement of Senator Carl Levin, D-Mich., before the U.S. Senate Subcommittee on Investigation, p. 3.

Answer 180. WMI admits that Ron Cathcart succeeded Jim Vanasek as WMI's Chief

Risk Enterprise Officer, that Paragraph 180 of the Complaint cites to the April 16, 2010

Opening Statement of Senator Levin to the Senate Permanent Subcommittee on

Investigations, and that the statement includes purported quotations from Mr. Cathcart

that are in turn quoted by Plaintiffs in Paragraph 180. WMI respectfully refers the Court

to the Opening Statement for the content thereof, denies any characterization inconsistent

therewith, and denies knowledge or information sufficient to form a belief as to the truth

of the substance of the quotation.

> 181. "Regulations work best when regulators stay at arms length
> from those that they regulate. Too often in this case, Washington Mutual
> regulators were not at arms length; they were arm in arm."[70] The OTS
> was more than willing to let Washington Mutual do whatever it wanted
> because it needed to protect the OTS's relationship with Killinger and
> Washington Mutual, which OTS Director John Reich described as "my
> largest constituent."[71]

Answer 181. WMI admits that Paragraph 181 of the Complaint cites to Senator Levin's

April 16, 2010 Opening Statement to the Senate Permanent Subcommittee on

Investigations and to "April 16 Permanent Subcommittee on Investigations Ex. 78, May

2007 email" and that the cited documents contain language quoted by Plaintiffs in

Paragraph 181. WMI respectfully refers the Court to the cited material for the content

thereof, denies any characterization inconsistent therewith, denies the substance of the

---

[70] April 16, 2010 Opening Statement of Senator Carl Levin, D-Mich., before the U.S. Senate Subcommittee on Investigation, p. 3.

[71] April 16 Permanent Subcommittee on Investigations Ex. 78, May 2007 email.

quotation from Senator Levin's statement, and lacks knowledge or information sufficient

to form a belief as to the truth of the substance of the quotation from Exhibit 78. WMI

denies knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 181 that characterize the OTS's motivations or

actions, and WMI therefore denies those allegations.

> 182.    To keep its best customer appeased, the OTS eschewed its
> regulatory function, and helped to hide Washington Mutual's dirty secrets
> – and the Side Letters were just one such dirty secret.   The OTS's failure
> to act in any way allowed, if not directly assisted, the perpetration and
> perpetuation of a fraud on investors in the Trust Preferred Securities.

Answer 182.   WMI denies the allegations of Paragraph 182 of the Complaint.

**D.      JPMorgan Chase had Complete Access To WMB's Internal
Information For Months Prior To September 2008, And, Therefore,
Knew Or Should Have Known Investments In The Trust Preferred
Securities Had Been Induced Through Fraud And Misrepresentations.**

> 183.      Long before JPMC purchased WMB's assets out of receivership
> for $1.88 billion, it had its sights set on acquiring the bank to further its
> goals of expanding its presence on the West Coast.  Throughout 2008,
> JPMC was given access to Washington Mutual's confidential information
> and received significant assistance from federal regulators.  As a result,
> JPMC had full knowledge of the inner workings of Washington Mutual, of
> its assets, and of the true nature of the Trust Preferred Securities, including
> WMI's secret pact with the OTS to downstream the Trust Preferred
> Securities to WMB.  Despite having already obtained a significant bargain
> in September 2008 (as explained below), JPMC now also seeks title to the
> Trust Preferred Securities.

Answer 183.   WMI admits that JPMC purchased WMB assets out of receivership.  WMI

denies knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 183 of the Complaint that characterize JPMC's knowledge,

motivations, or actions, and WMI therefore denies same. WMI denies the existence of a

"secret pact with OTS" and all remaining allegations in Paragraph 183.

### 1. JPMC's Access To The Bank

184.     Throughout the spring and summer of 2008, JPMC enjoyed significant access to non-public information regarding Washington Mutual and its condition. And, enjoying that access and the assistance of federal regulators, JPMC simply bided its time until it could pounce following Washington Mutual's expected stumble.

Answer 184.   WMI admits that, pursuant to a confidentiality agreement, it granted

JPMC access to certain public and non-public information during 2008 in connection

with due diligence on potential transactions. WMI lacks information and knowledge

sufficient to form a belief as to the truth of the remaining allegations of Paragraph 184 of

the Complaint and therefore denies those allegations.

185.     In early 2008, several financial institutions, including JPMC, were invited to explore a possible acquisition of Washington Mutual. Throughout March 2008, JPMC conducted significant amounts of due diligence, reviewing the assets and liabilities of Washington Mutual in preparation for submitting an acquisition proposal.

Answer 185.   WMI admits the allegations of Paragraph 185 of the Complaint, except

lacks information and knowledge sufficient to form a belief as to the truth of the

allegation that JPMC's diligence was done "in preparation for submitting an acquisition

proposal" and therefore denies that allegation.

186.     JPMC made a bid on March 31, 2008 to acquire Washington Mutual for up to $8 per share, or approximately $7 billion, plus the assumption of debt – equating to a potential implied transaction value of upwards of $30 billion. The March JPMC bid, however, was rejected in favor of a $7.2 billion infusion of primarily equity from several institutional investors.

Answer 186.   WMI admits that a March 31, 2008 proposal from JPMC was rejected and

that WMI accepted and consummated a $7.2 billion equity investment from other

investors.  WMI denies the characterization in Paragraph 186 of the Complaint of the

March 31, 2008 proposal from JMPC and further denies information or knowledge

sufficient to form a belief as to the remaining allegations in Paragraph 186 and therefore

denies same.

> 187.   Despite the rejection of its offer in March 2008, JPMC was not
> deterred in its quest to own Washington Mutual and/or WMB.
> Throughout the summer, JPMC continued to model acquisition scenarios
> and continued to meet with regulators about acquiring Washington Mutual
> and/or WMB.[72]  During those summertime meetings, the regulators and
> JPMC discussed JPMC's potential purchase of the bank out of
> receivership – giving JPMC inside information about such a potential
> seizure months before regulators actually effected it.[73]

Answer 187.   WMI admits that Paragraph 187 of the Complaint cites Debtors'

December Rule 2004 Motion, Exhibits 10-12, and that Exhibit 10 includes language that

Plaintiffs quote in connection with that citation.  WMI respectfully refers the Court to the

Exhibits for the content thereof and denies any characterization inconsistent therewith.

> 188.   At around the same time, JPMC was receiving other unofficial
> assistance from the federal government.  As reported in a November 2008
> Seattle Times article, then Treasury Secretary Henry Paulson personally
> called Killinger in July 2008 to say: "You should have sold to JPMorgan
> Chase in the spring, and you should do so now. Things could get a lot
> more difficult for you."  Such a warning caught Killinger and top
> executives off guard because of the recent $7.2 billion capital raise.

---

[72] See Debtors' December Rule 2004 Motion, Ex. 10, July 17, 2008 internal email "we
may get more color tomorrow with the regulators"; Debtors' December Rule 2004
Motion, Ex. 11 July 2008 discussion materials.

[73] See Debtors' December Rule 2004 Motion, Ex. 12, July 2008 Discussion Materials,
JPM EX 5817; Debtors' December Rule 2004 Motion, Ex. 11, July 2008 Discussion
Materials, JPM EX 324).

Answer 188.    WMI lacks knowledge or information sufficient to form a belief as to the

truth of the allegations in Paragraph 188 of the Complaint and therefore denies those

allegations.

> 189.    In addition to discussing the acquisition of WMB out of
> receivership with regulators in July 2008, JPMC received advanced notice
> in September of the impending seizure. According to a September 30,
> 2008 Wall Street Journal article, "Three weeks before J.P. Morgan bought
> Washington Mutual's deposits for $1.9 billion, officials at the Federal
> Deposit Insurance Corp. called J.P. Morgan to say the FDIC was carefully
> monitoring Washington Mutual and that a seizure of its assets was likely.
> The FDIC said it would want to immediately auction off Washington
> Mutual's assets if a seizure was necessary."[74]

Answer 189.    WMI admits that Paragraph 189 of the Complaint cites Debtors'

December Rule 2004 Motion, Exhibit 13, and that the Exhibit includes language that

Plaintiffs quote in Paragraph 189.    WMI respectfully refers the Court to the Exhibit for

the content thereof and denies any characterization inconsistent therewith.

> 190.    On or about September 12, 2008, WMI hired Goldman Sachs,
> which had participated in each of the Trust Preferred Securities offerings,
> as an advisor to find a buyer for Washington Mutual. On that same day,
> Bloomberg reported that JPMC was in "advanced talks to buy Washington
> Mutual." However, JPMC already knew WMB was going to be seized
> and it would be able to purchase the bank's assets at a steep discount if it
> only waited for federal regulators to make good on their threats. Although
> JPMC's intention at that point was to work directly with the FDIC to
> acquire the bank out of receivership, the pseudo-auction process in early
> September 2008 gave JPMC the ability to update its due diligence and to
> obtain additional access to non-public information regarding Washington
> Mutual and/or WMB.[75]

---

[74] Debtors' December Rule 2004 Motion, Ex. 13, 9/30/08 WSJ article.

[75] See Debtors' December Rule 2004 Motion, Ex. 6, Sept. 19, 2008 presentation to
ratings agencies, JPM EX 12888, JPMC stated that Washington Mutual had hired
investment banks "to run auction process", but indicated that it would "not participate in

Answer 190.   WMI admits that in 2007 and 2008 it retained Goldman Sachs, among

other investment banks, to raise capital and/or locate a potential merger partner or

acquirer for all or part of WMI's business.   WMI further admits that Goldman Sachs &

Co. was an underwriter for the five offerings of Trust Preferred Securities referenced as

being held by Plaintiffs in Paragraph 54 of the Complaint.   WMI further admits that

Paragraph 190 of the Complaint cites Debtors' December Rule 2004 Motion, Exhibit 6,

and that the cited exhibit includes language that Plaintiffs quote in connection with that

citation.   WMI respectfully refers the Court to the Exhibit for the content thereof and

denies any characterization inconsistent therewith.   WMI lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations in Paragraph 190 of

the Complaint and therefore denies those allegations.

> 191.     Additionally, the FDIC assisted JPMC in obtaining all of the
> information it wanted, even when Washington Mutual employees
> resisted.[76]  With its continued, or at least renewed, access to non-public
> information and the assistance of federal regulators, JPMC spent the first
> weeks of September 2008 reviewing and updating its due diligence.

Answer 191.   WMI admits that Paragraph 191 of the Complaint cites Debtors'

December Rule 2004 Motion, Exhibit 17.   WMI respectfully refers the Court to the

Exhibit for the content thereof and denies any characterization inconsistent therewith.

WMI lacks knowledge or information sufficient to form a belief as to the truth of the

allegations in Paragraph 191 of the Complaint, and therefore denies the allegations.

---

auction [because its] [a]pproach is to work directly with the FDIC"); Bd. of Directors
Presentation, JPM EX 12951.

[76] See Debtors' December Rule 2004 Motion, Ex. 17, 9/22/08 email to FDIC re:
information request, JPM EX 77.

192.     When the government's decision to seize WMB and auction its assets was finally made known to others on September 23, 2008, JPMC's advanced notice and the assistance from regulators put it in prime position to acquire the bank it had long coveted, at a steep discount from the price it was willing to pay only months earlier.

Answer 192.   WMI admits that the FDIC was appointed receiver for WMB and the FDIC opened up the bid process for WMB on September 23, 2008. WMI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 192 of the Complaint, and therefore denies the allegations.

## 2.     JPMorgan Admits That It Acquired WMB For A Price Far Below Its Worth.

193.     On September 25, 2008, just two days after the FDIC announced it was seeking a bidder for Washington Mutual, JPMC entered into a purchase and assumption agreement with the FDIC, whereby JPMC acquired WMB's branches, deposit liabilities, loan portfolio and covered bonds and secured debts for $1.88 billion. At the same time, JPMC was able to exclude significant liabilities (having expressly excluded the liabilities of WMI), and all for a small fraction of the price JPMC had been willing to pay in Spring 2008.

Answer 193.   WMI admits that JPMC and the FDIC entered into a Purchase and Assumption Agreement Whole Bank ("P&A Agreement") on September 25, 2008. WMI respectfully refers the Court to the P&A Agreement for the content thereof and denies any characterization inconsistent therewith. WMI denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 193 of the Complaint that to the extent they characterize the motivations or actions of JPMC, and WMI therefore denies those allegations.

194.    Immediately after the acquisition, JPMC acknowledged the windfall it received. In its September 30, 2008 Form 10-Q, filed less than one week after it acquired WMB, JPMC showed an after-tax gain of $581 million from the acquisition. The gain was based on negative goodwill, or a gain received by paying less than the fair value of the acquired net assets. JPMC subsequently reassessed its windfall gain, stating in its 2008 Form 10-K that the gain totaled $1.9 billion. Thus, JPMC acknowledged that it paid less than half-price for WMB.[77]  JPMC has since recorded billions more in gains associated with acquired assets (in particular, mortgage loans) that have proven to be far more valuable than was reflected in JPMC's purchase price.

Answer 194.   WMI admits that JPMC filed a Form 10-Q with the SEC and that

Plaintiffs cite this document in Paragraph 194 of the Complaint.  WMI respectfully refers

the Court to this filing for the content thereof and denies any characterization inconsistent

therewith.  WMI further admits that Paragraph 194 of the Complaint cites Debtors'

Counterclaim ¶ 72, respectfully refers the Court to that document for the content thereof,

and denies any characterization inconsistent therewith.  WMI denies knowledge or

information sufficient to form a belief as to the truth of the remaining allegations in

Paragraph 194 and therefore denies those allegations.

195.    In the March 23, 2009 letter to shareholders, James L. Dimon, CEO and chairman of the board for JPMC, further described the huge gain from the WMB purchase.  Specifically, he stated that "[m]oments" after the seizure of WMB by the FDIC, JPMC:

> [A]cquired the deposits, assets and certain liabilities of Washington Mutual for approximately $1.9 billion....Importantly, we did not acquire the assets or liabilities of the bank's holding company or assume the $14 billion of senior unsecured debt and subordinated debt of Washington Mutual's banks. The deal was financially compelling—it was immediately accretive to earnings,

---

[77] See Debtors' Counterclaim ¶ 72.

and it will add an estimated $2 billion or 50 cents per share to our 2009 results and increasingly more thereafter.

...

With the acquisition of WaMu, we purchased approximately $240 billion of mortgage and mortgage-related assets, with $160 billion in deposits and $38 billion in equity. We immediately wrote down most of the bad or impaired assets (approximately $31 billion), properly reserved for the remaining assets, and established reserves for severance and close-down costs. After recognizing all of these costs, we believe that we now have a relatively "clean" company that came with approximately $4 billion in "good" common equity.[78]

Answer 195.   WMI admits that Paragraph 195 of the Complaint cites to a March 23, 2009 Letter to Shareholders from James L. Dimon and that the letter includes the language quoted by Plaintiffs in Paragraph 195.  WMI respectfully refers the Court to the letter for the content thereof, denies any characterization inconsistent therewith, and denies knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 195, including the substance of the quotation, and therefore denies same.

3.      **With Its Unprecedented Access, JMPC Had Prior Knowledge Of The True Nature Of The Trust Preferred Securities, Including That They Were Tainted By Fraud.**

196.      JPMC spent months reviewing Washington Mutual's assets and liabilities, had constant access to WMB and regulators, made two offers to acquire the bank, and ultimately acquired WMB with full knowledge of all of the bank's assets and operations. As such, with respect to the Trust Preferred Securities, JPMC knew that they were not WMB assets and that JPMC could not acquire those interests from WMB without a number of intervening steps.

---

[78] March 23, 2009 Letter to Shareholders, p. 10.

Answer 196. WMI admits that JPMC made a March 31, 2008 proposal to acquire WMI, and that JPMC ultimately acquired certain assets and liabilities of WMB through the September 25, 2008 P&A Agreement. WMI denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 196 of the Complaint and therefore denies those allegations.

> 197. Having reviewed the terms of the Trust Preferred Securities, including the governing documents, JPMC was on notice that a series of events had to occur before the Trust Preferred Securities would, assuming arguendo the validity of the Conditional Exchange provisions, even become assets of WMI.79 First, an Exchange Event would have to occur. Second, the OTS would have to issue a directive that there be such a Conditional Exchange. Third, the holders of the securities would have to surrender the certificates to WMI. Fourth, the applicable trustees would have to record in the appropriate registers that WMI was the owner of the Trust Preferred Securities. Fifth, WMI would have to issue to each holder a like amount of depositary shares representing the WMI preferred stock. And still, at that point, the Trust Preferred Securities would be held by WMI, not WMB. Importantly, JPMC did not acquire any assets or liabilities of WMI.

Answer 197. WMI admits that Paragraph 197 of the Complaint cites to Debtors' December Rule 2004 Motion, Exhibits 12 and 15, respectfully refers the Court to those documents for the content thereof, and denies any characterization inconsistent therewith. WMI avers that Paragraph 197 of the Complaint contains legal conclusions to which no response is required. WMI lacks knowledge or information sufficient to form a belief as to the truth of allegations in Paragraph 197 of the Complaint that purport to characterize JPMC's understanding or action, and therefore denies those allegations.

---

[79] See Debtors' December Rule 2004 Motion, Ex. 15, Sept. 14, 2008 Discussion Materials, JPM EX 278; Debtors' December Rule 2004 Motion, Ex. 12, July 2008 Discussion Materials, JPM EX 5817.

198.     Furthermore, as a result of the due diligence it conducted, JPMC had access to and reviewed the secret Side Letter agreements with the OTS to downstream the Trust Preferred Securities following the occurrence of a Conditional Exchange. JPMC knew or should have known the secret Side Letters and the promise to downstream the Trust Preferred Securities to WMB were not disclosed to investors in the Trust Preferred Securities, nor to the marketplace. JPMC was provided with all of the documents related to the Trust Preferred Securities, including the misleading offering circulars and the secret Side Letters.

Answer 198.   WMI does not have sufficient information to admit or deny that JMPC reviewed certain letters in its due diligence and the denies those allegations. WMI denies the remaining allegations of Paragraph 198 of the Complaint.

199.     Not only did JPMC have access to all of the documents related to the transactions during its due diligence in the spring and late summer of 2008, but JPMorgan Securities, Inc. (which is a direct subsidiary of JPMC) acted as an underwriter for the WaMu Delaware III offering. As an underwriter, JPMC's direct subsidiary is charged with knowledge of the misrepresentations in the offering circular. Each of the offering circulars contained the same material omission as that on which JPMorgan Securities, Inc. acted as underwriter. As such, JPMC should also be charged with knowledge, through JPMorgan Securities, Inc., of the fraud and misrepresentations infecting at least the WaMu Delaware III offering, if not all of the other offerings given the similarity of the transactions.

Answer 199.   WMI admits that JPMorgan Securities, Inc. was an underwriter for the WaMu Delaware III offering.  The allegations in Paragraph 199 of the Complaint are legal conclusions as to which no response is required.  To the extent a response is required, WMI denies all remaining allegations of Paragraph 199.

200.     Given its direct access to WMB and the involvement of its own subsidiary in the transactions, JPMC knew that certain of the Washington Mutual Entities procured investments in the Trust Preferred Securities under false pretenses. Because JPMC knew of the true nature of the securities and of the misrepresented offerings, it would be inequitable for JPMC to be given the tainted fruits of the offerings, while the Trust

Preferred Holders, and other investors in the Trust Preferred Securities, are deprived of the misrepresented value of the securities.

Answer 200.    WMI avers that allegations in Paragraph 200 contain legal conclusions as to which no response is required.  To the extent a response is required, WMI denies those allegations.

## COUNT I
## DECLARATORY JUDGMENT
## (Against WMI, JPMC)

201.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1, 2, 8-59, 71-72, 74-77, 79-83, and 84-89, which are incorporated by reference as if set forth fully herein.

Answer 201:  WMI incorporates by reference its responses to the allegations contained in paragraphs 1, 2, 8-59, 71-72, 74-77, 79-83, and 84-89 of the Complaint

202.    There is an actual controversy between the Trust Preferred Holders, WMI and JPMC regarding ownership of the Trust Preferred Securities, which is of sufficient immediacy to warrant judicial relief under 28 U.S.C. § 2201.

Answer 202.  WMI avers that the allegations set forth in paragraph 202 of the Complaint contain legal conclusions concerning whether there is an actual controversy between the Trust Preferred Holders, WMI and JPMC, as to which no response is required.  To the extent a response is required, WMI denies each and every allegation set forth in paragraph 202 of the Complaint.

203.  Both WMI and JPMC have asserted a claim of ownership to the Trust Preferred Securities.  However, the operative controlling documents related to the Trust Preferred Securities imposed certain conditions to

consummation of the purported Conditional Exchange.
These conditions were not satisfied. As such, WMI never
obtained an interest in the Trust Preferred Securities, and it
had no rights to the Trust Preferred Securities to transfer to
WMB and/or JPMC.

Answer 203. WMI admits the allegations of the first sentence of Paragraph 203 and

denies the remaining allegations.

204. Under the applicable trust agreements, in connection
with a purported Conditional Exchange, holders
purportedly had an unconditional obligation to surrender to
WMI any certificates representing the Trust Preferred
Securities. Those certificates, held by Cede & Co., as
nominee for DTC, were never delivered to WMI. As such,
this condition precedent to consummation of the purported
Conditional Exchange has not been satisfied, the purported
Conditional Exchange therefore failed, and ownership of
the Trust Preferred Securities remains with the Plaintiffs
and similarly-situated investors.

Answer 204. WMI admits the first sentence of Paragraph 204. WMI is without

sufficient information to admit or deny the second sentence of Paragraph 204 and

therefore denies those allegations. WMI avers that under the express terms of the

governing documents, following the Conditional Exchange, any certificates previously

representing Trust Preferred Securities were deemed to represent preferred equity in

WMI until the certificates are surrendered and replaced. WMI denies the remaining

allegations in Paragraph 204.

205. In connection with a purported Conditional Exchange,
the applicable trustees were to have recorded in the
applicable trust registers WMI as the holder of the Trust
Preferred Securities, "as transferee from the Holders of the
Trust [Preferred] Securities immediately prior to such date
and time . . . ." The applicable trustees have not recorded
WMI as the holder of the Trust Preferred Securities in any
of the associated trust registers. As such, this condition

precedent to consummation of the purported Conditional
Exchange has not been satisfied, the purported Conditional
Exchange therefore failed, and ownership of the Trust
Preferred Securities remains with the Plaintiffs and
similarly-situated investors.

Answer 205. WMI admits that under the applicable trust agreements, upon the

occurrence of the Conditional Exchange, WaMu Delaware I, II, III, and IV TPS or the

applicable trustees were to record in the applicable trust registers that WMI was the

owner of all the Trust Preferred Securities, as transferee from the holders of Trust

Preferred Securities immediately prior to the date and time of the Conditional Exchange.

WMI admits that [the applicable trustees] have not yet recorded WMI as the holder of the

Trust Preferred Securities in any of the associated trust registers. WMI avers that the

allegations set forth in paragraph 205 of the Complaint contain legal conclusions

concerning the efficacy of the Conditional Exchange as to which no response is required.

To the extent that a response is required, WMI denies each and every remaining

allegation set forth in paragraph 205 of the Complaint.

206. In connection with a purported Conditional Exchange,
WMI was required to issue to each holder of the Trust
Preferred Securities a like amount of the applicable series
of WMI preferred equity. WMI was further obligated to
mail to each holder of record of the Trust Preferred
Securities a notice regarding the occurrence of a purported
Conditional Exchange. The WMI preferred equity was
never issued, nor was the required notice of the purported
Conditional Exchange transmitted. As such, these
conditions precedent to consummation of the purported
Conditional Exchange have not been satisfied, the
purported Conditional Exchange therefore failed, and
ownership of the Trust Preferred Securities remains with
the Plaintiffs and similarly-situated investors.

Answer 206. WMI admits the allegations contained in the third sentence of Paragraph 206, but avers that the failure to provide notice or issue new certificates for the preferred securities, on account of the bankruptcy filing of WMI, is of no legal significance to the Conditional Exchange. WMI avers that under the express terms of the governing documents, following the Conditional Exchange, any certificates previously representing Trust Preferred Securities were deemed to represent preferred equity in WMI until the certificates are surrendered and replaced. The remaining allegations of Paragraph 26 are legal conclusions as to which no response is required. To the extent that a response is required, WMI denies each and every remaining allegation set forth in paragraph 206 of the Complaint.

> 207. Because the purported Conditional Exchange never occurred, WMI never acquired ownership or title to the Trust Preferred Securities and thus could not have transferred ownership or title to the Trust Preferred Securities to WMB. Because WMI could not lawfully transfer ownership or title to the Trust Preferred Securities to WMB, neither WMB nor the FDIC could transfer ownership or title to the Trust Preferred Securities to JPMC.

Answer 207. WMI avers that the allegations set forth in paragraph 207 of the Complaint contain legal conclusions concerning the efficacy of the Conditional Exchange as to which no response is required. To the extent that a response is required, WMI denies each and every allegation set forth in paragraph 207 of the Complaint.

> 208. Lastly, although the Trust Preferred Securities were purportedly transferred to JPMC, there is no indication that such a transfer was in fact consummated. As previously alleged by WMI, the issuers of the Trust Preferred Securities made no transfer notations registering the Trust

> Preferred Securities to WMB (or any other party) to reflect
> any purported assignment.

Answer 208. WMI avers that the allegations set forth in paragraph 208 of the Complaint

contain legal conclusions concerning the efficacy of the Conditional Exchange as to

which no response is required. To the extent that a response is required, WMI denies

each and every allegations set forth in paragraph 208 of the Complaint.

> 209. Under every circumstance, JPMC has no right to the
> Trust Preferred Securities. In addition, JPMC cannot assert
> any claim for the Trust Preferred Securities because it
> expressly excluded from its purchase of WMB's assets
> "any interest, right, action, claim, or judgment against"
> WMI.

Answer 209. WMI avers that the allegations set forth in paragraph 209 of the Complaint

contains legal conclusions concerning the efficacy of the Conditional Exchange as to

which no response is required. To the extent that a response is required, WMI avers that

it lacks information and knowledge sufficient to form a belief as to the truth of the

allegations of Paragraph 209 of the Complaint because the matters asserted are legal

issues in dispute which have been settled under the Global Settlement Agreement.

> 210. As such, Plaintiffs request a declaratory judgment
> determining that:
>
> - The purported Conditional Exchange was never consummated.
>
> - The purported Conditional Exchange cannot now be consummated.
>
> - WMI has no right, title or interest in the Trust Preferred Securities.
>
> - JPMC has no right, title or interest in the Trust Preferred Securities.
>
> - As a result, the Trust Preferred Securities and any claim thereto, do not constitute property of the estate under 11 U.S.C. § 541.

- As a result, <u>inter alia</u>, of the failure of the purported Conditional Exchange, all right, title and interest in the Trust Preferred Securities remains with investors who held such securities immediately prior to 8:00 a.m. (Eastern) on September 26, 2008, or to any party to whom such parties subsequently transferred such Trust Preferred Securities, other than in connection with the purported Conditional Exchange.

Answer 210. Paragraph 210 of the Complaint sets forth a request for relief, rather than an allegation of fact. To the extent that a response is required, WMI denies each and every allegation set forth in paragraph 210 of the Complaint.

## COUNT II
## DECLARATORY JUDGMENT
## (Against WMI, JPMC)

211. Plaintiffs repeat and reallege the allegations contained in paragraphs 1, 2, 8-59, 71-72, 74-77, 79-83, and 84-89, which are incorporated by reference as if set forth fully herein.

Answer 211. WMI incorporates by reference its responses to the allegations contained in paragraphs 1, 2, 8-59, 71-72, 74-77, 79-83, and 84-89 of the Complaint.

212. There is an actual controversy between the Trust Preferred Holders, WMI and JPMC regarding ownership of the Trust Preferred Securities, which is of sufficient immediacy to warrant judicial relief under 28 U.S.C. § 2201.

Answer 212. WMI avers that the allegations set forth in paragraph 212 of the Complaint contain legal conclusions concerning whether there is an actual controversy between the Trust Preferred Holders, WMI and JPMC, as to which no response is required. To the extent a response is required, WMI denies each and every allegations set forth in paragraph 212 of the Complaint.

213. Both WMI and JPMC have asserted a claim of ownership to the Trust Preferred Securities. However, applicable law imposes certain requirements to effectuation of any transfer of the Trust Preferred Securities. These requirements were not met. As such, the purported Conditional Exchange through which WMI has claimed ownership of the Trust Preferred Securities was never consummated. As WMI never obtained any rights to the Trust Preferred Securities, it had no rights to the Trust Preferred Securities to transfer to WMB and/or JPMC.

Answer 213. WMI admits the first sentence of Paragraph 213 of the Complaint and denies each and every remaining allegation.

214. Because the Trust Preferred Securities were issued in certificated form, UCC § 8- 301(a) governs delivery upon a transfer, in this case requiring: (a) WMI to acquire possession of the applicable security certificate(s); or (b) for another person, other than a securities intermediary, to take possession of the security certificate(s) on behalf of WMI, or, having previously acquired possession of the certificate, acknowledge that it holds on behalf of WMI. WMI never acquired possession of the applicable certificates for the Trust Preferred Securities, and no other person in possession of such securities has recognized WMI as the transferee of the Trust Preferred Securities. As such, the legal requirements for delivery of the Trust Preferred Securities, a condition precedent to consummation of any exchange or transfer, have not been fulfilled, the purported Conditional Exchange failed, and ownership of the Trust Preferred Securities remains with the Plaintiffs and similarly-situated investors.

Answer 214. WMI avers that the allegations set forth in paragraph 214 of the Complaint contain legal conclusions concerning the operation of UCC § 8- 301(a) as to which no response is required. Otherwise, WMI denies each and every allegation set forth in paragraph 214 of the Complaint.

215. Because the purported Conditional Exchange never occurred, WMI could not have transferred the Trust

Preferred Securities to WMB and JPMC could not have
acquired the Trust Preferred Securities.

Answer 215. WMI denies each and every allegation set forth in paragraph 215 of

the Complaint.

216. Lastly, although the Trust Preferred Securities were
purportedly transferred to JPMC, there is no indication that
such a transfer was in fact consummated. As previously
alleged by WMI, the issuers of the Trust Preferred
Securities made no transfer notations registering the Trust
Preferred Securities to WMB to reflect any purported
assignment.

Answer 216. WMI avers that the allegations set forth in paragraph 216 of the Complaint

contain legal conclusions concerning the efficacy of the Conditional Exchange as to

which no response is required. To the extent a response is required, WMI denies each

and every allegation set forth in paragraph 216 of the Complaint.

217. Under every circumstance, JPMC has no right to the
Trust Preferred Securities. Indeed, JPMC cannot assert any
claim for the Trust Preferred Securities because it expressly
excluded from its purchase of WMB's assets "any interest,
right, action, claim, or judgment against" WMI.

Answer 217. WMI avers that the allegations set forth in paragraph 217 of the Complaint

contain legal conclusions concerning the efficacy of the Conditional Exchange as to

which no response is required. To the extent that a response is required, WMI lacks

information and knowledge sufficient to form a belief as to the truth of the allegations of

Paragraph 217 of the Complaint because the matters asserted are legal issues in dispute

which have been settled under the Global Settlement Agreement.

218. As such, Plaintiffs request a declaratory judgment
determining that:

- The purported Conditional Exchange was never consummated.

- The purported Conditional Exchange cannot now be consummated.

- WMI has no right, title or interest in the Trust Preferred Securities.

- JPMC has no right, title or interest in the Trust Preferred Securities.

- As a result, the Trust Preferred Securities and any claim thereto, do not constitute property of the estate under 11 U.S.C. § 541.

- As a result, inter alia, of the failure of the purported Conditional Exchange, all right, title and interest in the Trust Preferred Securities remains with investors who held such securities immediately prior to 8:00 a.m. (Eastern) on September 26, 2008, or to any party to whom such parties subsequently transferred such Trust Preferred Securities, other than in connection with the purported Conditional Exchange.

Answer 218. Paragraph 218 of the Complaint sets forth a request for relief, rather than an allegation of fact. To the extent that a response is required, WMI denies each and every allegation set forth in paragraph 218 of the Complaint.

## COUNT III
## DECLARATORY JUDGMENT
## (Against WMI, JPMC)

219. Plaintiffs repeat and reallege the allegations contained in paragraphs 1, 2, 8-59, 71-72, 74-77, 79-83, and 84-89, which are incorporated by reference as if set forth fully herein.

Answer 219. WMI incorporates by reference its responses to the allegations contained in paragraphs 1, 2, 8-59, 71-72, 74-77, 79-83, and 84-89 of the Complaint.

220. There is an actual controversy between the Trust Preferred Holders, WMI and JPMC regarding ownership of the Trust Preferred Securities, which is of sufficient immediacy to warrant judicial relief under 28 U.S.C. § 2201.

Answer 220. WMI avers that the allegations set forth in Paragraph 220 of the Complaint

contain legal conclusions as to which no response is required. To the extent that a

response is required, WMI denies the allegations contained in Paragraph 220 of the

Complaint.

> 221. Both WMI and JPMC have asserted a claim of
> ownership to the Trust Preferred Securities. However, the
> Trust Preferred Securities and related controlling
> agreements impose restrictions on transferees of the Trust
> Preferred Securities. Those restrictions prohibited any
> transfer of the Trust Preferred Securities to WMI. As such,
> the purported Conditional Exchange through which WMI
> has claimed ownership of the Trust Preferred Securities
> was never consummated. As WMI never obtained any
> rights to the Trust Preferred Securities, it had no rights to
> the Trust Preferred Securities to transfer to WMB and/or
> JPMC.

Answer 221. WMI admits the first sentence of Paragraph 221 of the Complaint and

denies each and every remaining allegation.

> 222. The terms of the Trust Preferred Securities themselves
> and the applicable governing documents (each of which
> were drafted by or under the direction of WMI), require all
> transferees of the Trust Preferred Securities to satisfy
> certain requirements, including having, on the date of the
> proposed transfer, a net worth of at least $25 million and
> $100 million in securities held for discretionary investment
> purposes. On the date of the purported Conditional
> Exchange, WMI had a negative net worth of approximately
> $575 million – $600 million less than would be required to
> meet the definition of "Eligible Purchaser" imposed by
> WMI itself. On the date of the purported Conditional
> Exchange, WMI held only $59.7 million in "investment
> securities" – apparently over $40 million less than would
> be required to meet the definition of "Eligible Purchaser"
> imposed by WMI itself.

Answer 222. WMI denies each and every allegation contained in Paragraph 222 of the

Complaint. WMI denies that the Trust Preferred Securities prevent a Conditional

Exchange from occurring where the recipient does not have a net worth of at least $25

million and $100 million in securities held for discretionary investment purposes. Even if

such a requirement existed, WMI would meet the requirements of an "Eligible

Purchaser" under the governing documents of the Trust Preferred Securities.

> 223. The applicable documents, including the certificates
> representing the Trust Preferred Securities, provide that any
> purported transfer to a party not satisfying, among other
> conditions, the preceding, is void ab initio, is without force
> and effect, and does not transfer any right to the proposed
> transferee. On September 26, 2008 (the date of the
> purported Conditional Exchange) and on every day since,
> WMI failed to meet the eligibility requirements it chose to
> impose on transfers of the Trust Preferred Securities.

Answer 223. WMI denies each and every allegation contained in Paragraph 223 of the

Complaint. WMI denies that the Trust Preferred Securities prevent a Conditional

Exchange from occurring where the recipient does not have a net worth of at least $25

million and $100 million in securities held for discretionary investment purposes. Even if

such a requirement existed, WMI avers that it would meet the requirements of an

"Eligible Purchaser" under the governing documents of the Trust Preferred Securities.

> 224. As such, the purported Conditional Exchange is void
> ab initio, is of no force or effect, and failed to transfer to
> WMI any right to the Trust Preferred Securities. Therefore,
> ownership of the Trust Preferred Securities remains with
> the Plaintiffs and similarly-situated investors

Answer 224. WMI denies each and every allegation contained in Paragraph 224 of the

Complaint.

225. Because the purported Conditional Exchange never occurred, WMI could not have transferred the Trust Preferred Securities to WMB and JPMC could not have acquired the Trust Preferred Securities.

Answer 225. WMI denies each and every allegation contained in Paragraph 225 of the Complaint.

226. Lastly, although the Trust Preferred Securities were purportedly transferred to JPMC, there is no indication that such a transfer was in fact consummated. As previously alleged by WMI, the issuers of the Trust Preferred Securities made no transfer notations registering the Trust Preferred Securities to WMB to reflect any purported assignment.

Answer 226. WMI admits that it stated that in ¶ 56 of the Debtors' Answer and Amended Counterclaims in Response to the Complaint of JPMorgan Chase Bank, N.A. filed on September 11, 2009 (the "Debtors' Counterclaims") that "[u]pon information and belief, the SPEs, the issuers of the Trust Securities, have made no transfer notations registering the Trust Securities to WMB to reflect any purported Assignment" and admits that the footnote to ¶ 56 states that "[t]he Debtors are not aware of any transfer notations being made post-petition, but reserve their right to amend the complaint to avoid any such unauthorized transfers of property of the Debtors' estate." WMI denies the remaining allegations of Paragraph 226. All conditions precedent necessary for the effectiveness of the Conditional Exchange were performed, and there were no legal impediments to the completion of the Conditional Exchange. WMI avers that under the terms of the applicable agreements, the Conditional Exchange became effective automatically upon the direction of the OTS, regardless of whether such transfer notations were made.

227. Under every circumstance, JPMC has no right to the Trust Preferred Securities. Indeed, JPMC cannot assert any claim for the Trust Preferred Securities because it expressly excluded from its purchase of WMB's assets "any interest, right, action, claim, or judgment against" WMI.

Answer 227. WMI avers that the allegations set forth in paragraph 227 of the Complaint contain legal conclusions concerning the efficacy of the Conditional Exchange to which no response is required. To the extent that a response is required, WMI lacks information and knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 227 of the Complaint because the matters asserted are legal issues in dispute which have been settled under the Global Settlement Agreement.

228. As such, Plaintiffs request a declaratory judgment determining that:

- The purported Conditional Exchange was never consummated.

- The purported Conditional Exchange cannot now be consummated.

- WMI has no right, title or interest in the Trust Preferred Securities.

- JPMC has no right, title or interest in the Trust Preferred Securities.

- As a result, the Trust Preferred Securities and any claim thereto, do not constitute property of the estate under 11 U.S.C. § 541.

- As a result, inter alia, of the failure of the purported Conditional Exchange, all right, title and interest in the Trust Preferred Securities remains with investors who held such securities immediately prior to 8:00 a.m. (Eastern) on September 26, 2008, or to any party to whom such parties subsequently transferred such Trust Preferred Securities, other than in connection with the purported Conditional Exchange.

Answer 228. Paragraph 228 of the Complaint contains a request for relief, rather than an

allegation of fact. To the extent that a response is required, WMI denies each and every

allegation in Paragraph 228 of the Complaint.

## COUNT IV
## DECLARATORY JUDGMENT
## (Against WMI, JPMC)

229. Plaintiffs repeat and reallege the allegations contained
in the preceding paragraphs, which are incorporated by
reference as if set forth fully herein.

Answer 229. In response to paragraph 229 of the Complaint, WMI incorporates its

responses to paragraphs 1-228 above.

230. There is an actual controversy between the Trust
Preferred Holders, WMI and JPMC regarding ownership of
the Trust Preferred Securities, which is of sufficient
immediacy to warrant judicial relief under 28 U.S.C. §
2201.

Answer 230. WMI avers that the allegations set forth in paragraph 230 of the Complaint

contain legal conclusions as to whether there is an "actual controversy" between the

parties as to which no response is required. To the extent a response is required, WMI

denies the allegations in paragraph 230.

231. Even if, arguendo, the purported Conditional
Exchange satisfied the documentary and statutory
requirements, Plaintiffs seek, alternatively, a declaration
that the purported Conditional Exchange should be deemed
to have not occurred because, inter alia, the OTS acted in
excess of its authority by effectively aiding and abetting the
commission of a fraud on investors.

Answer 231. WMI avers that the allegations set forth in paragraph 231 of the Complaint

contain legal conclusions concerning the efficacy of the Conditional Exchange and the

scope of authority of the OTS as to which no response is required. To the extent a

response is required, WMI denies the allegations in paragraph 231.

> 232. In connection with each offering of the Trust Preferred
> Securities, WMI sent the secret Side Letters to the OTS,
> specifically informing the OTS that it intended to issue
> certain securities for sale to the public.

Answer 232. WMI admits that it sent letters to OTS in connection with each offering of

the Trust Preferred Securities, informing OTS of its intent to issue those securities in

order to raise core capital for WMB. WMI denies the remaining allegations set forth in

paragraph 232 of the Complaint.

> 233. WMI further requested in the secret Side Letters that
> the OTS allow the Trust Preferred Securities to qualify for
> inclusion as core capital of WMB. In connection with that
> request, WMI stated its secret intention to transfer the Trust
> Preferred Securities to WMB following a purported
> Conditional Exchange.

Answer 233. WMI admits that in letters sent to the OTS, it requested that the Trust

Preferred Securities qualify for inclusion as core capital of WMB. WMI further admits

that because the purpose of the offering for Trust Preferred Securities was to obtain core

capital for WMB, WMI agreed to transfer the Trust Preferred Securities to WMB in the

event that the OTS directed a Conditional Exchange. WMI denies the remaining

allegations set forth in paragraph 233 of the Complaint.

> 234. In addition, WMI specifically asked that the
> arrangement be kept secret, requesting that the letters
> making that request be treated as confidential.

Answer 234. WMI admits that it requested the OTS treat its letters concerning the Trust

Preferred Securities as confidential business information under the Freedom of

Information Act. WMI denies the remaining allegations set forth in paragraph 234 of the

Complaint.

> 235. The OTS granted each request to allow the Trust
> Preferred Securities to be treated as WMB core capital
> based on WMI's representation that WMI would
> downstream the Trust Preferred Securities to WMB after a
> purported Conditional Exchange.

Answer 235. WMI admits that the OTS agreed to include the Trust Preferred Securities

as WMB core capital, and that WMI agreed to transfer the Trust Preferred Securities to

WMB in the event of a Conditional Exchange, because the disclosed purpose of offering

the Trust Preferred Securities was to raise core capital for WMB. WMI denies the

remaining allegations set forth in paragraph 235 of the Complaint.

> 236. The OTS also allowed WMI's request to treat each of
> the Side Letters as confidential. Indeed, none of the Side
> Letters or the commitments contained therein were
> disclosed to investors until after WMI attempted to
> consummate the purported Conditional Exchange in
> September 2008.

Answer 236. WMI denies the allegations set forth in paragraph 236 of the Complaint.

> 237. The OTS authorized the requests in the secret Side
> Letters without requiring the intended "downstreaming" to
> be disclosed to potential investors and with knowledge that
> this secret arrangement would, in fact, not be disclosed.

Answer 237. WMI denies the allegations set forth in paragraph 237 of the Complaint.

> 238. By entering into that arrangement, the OTS aided and
> abetted the commission of fraud by WMI and the affiliated
> entities.

Answer 238.  Paragraph 238 of the Complaint states a legal conclusion as to which no

response is required.  To the extent a response is required, WMI denies the allegations set

forth in paragraph 238 of the Complaint.

> 239. As such, the OTS's agreement to a secret side deal
> that materially affects the value of the securities issued and
> which was not disclosed in connection with the offering of
> the securities, was beyond the scope of the OTS's
> authority.

Answer 239.  Paragraph 239 of the Complaint states a legal conclusion as to which no

response is required.  To the extent a response is required, WMI denies the allegations set

forth in paragraph 239 of the Complaint.

> 240. Further, the purported Conditional Exchange and
> transfer to WMB were contingent and dependant on the
> actions of the OTS.  Because the purported Conditional
> Exchange and downstreaming were the result of a secret
> arrangement that was beyond the scope of the OTS's
> authority and/or were done by the OTS acting to facilitate
> illegal or fraudulent conduct by WMI and certain of the
> Washington Mutual Entities, the OTS directive initiating
> the purported Conditional Exchange and the subsequent
> downstreaming was also beyond the scope of the OTS's
> authority and otherwise should be held to be without force
> or effect and a nullity.

Answer 240.  Paragraph 240 of the Complaint states a legal conclusion as to which no

response is required.  To the extent a response is required, WMI denies the allegations set

forth in paragraph 240 of the Complaint.

> 241. Further, the OTS, as Washington Mutual's primary
> regulator, was aware of significant issues with WMB's
> safety and soundness at the times of the Trust Preferred
> Securities issuances. The OTS was also aware that events
> giving rise to a purported Conditional Exchange were based
> on the safety and soundness of WMB, and that investors in

the Trust Preferred Securities would consider material the
actual condition of WMB.

Answer 241. Paragraph 241 of the Complaint states a legal conclusion as to which no

response is required. To the extent a response is required, WMI denies the allegations set

forth in paragraph 241 of the Complaint.

> 242. By assisting certain of the Washington Mutual Entities
> in concealing the condition of WMB, the OTS aided and
> abetted a fraud upon investors in the Trust Preferred
> Securities. Such actions were beyond the scope of the
> OTS's authority or were done by the OTS acting to
> facilitate illegal or fraudulent conduct by certain of the
> Washington Mutual Entities. As such, the OTS's directive
> initiating the purported Conditional Exchange based on
> fraudulently concealed material information regarding
> WMB was also beyond the scope of the OTS's authority
> and otherwise should be held to be without force or effect
> and a nullity.

Answer 242. Paragraph 242 of the Complaint states a legal conclusion as to which no

response is required. To the extent a response is required, WMI denies the allegations set

forth in paragraph 242 of the Complaint.

> 243. Therefore, Plaintiffs request that this Court enter a judgment

declaring that:

> Through its participation in the issuance of the Trust
> Preferred Securities and its agreements, as set forth in the
> undisclosed Side Letter agreements with WMI regarding
> contribution of the Trust Preferred Securities to WMB
> following a purported Conditional Exchange, the OTS
> acted in excess of its authority and its actions related to the
> Conditional Exchange otherwise should be held to be
> without force or effect and a nullity.

- The OTS's actions aided and abetted a fraud by certain of the Washington Mutual Entities against holders of the Trust Preferred Securities. By aiding and abetting that fraud, the OTS acted in excess of its authority and its actions related to the Conditional Exchange otherwise should be held to be without force or effect and a nullity.

- Any directive by the OTS to execute a purported Conditional Exchange was, is, and will be, null, void, and without effect.

- As a result, the Trust Preferred Securities and any claim thereto, do not constitute property of the estate under 11 U.S.C. § 541.

- As a result, inter alia, of the failure of the purported Conditional Exchange, all right, title and interest in the Trust Preferred Securities remains with investors who held such securities immediately prior to 8:00 a.m. (Eastern) on September 26, 2008, or to any party to whom such parties subsequently transferred such Trust Preferred Securities, other than in connection with the purported Conditional Exchange.

Answer 243. WMI avers that the allegations set forth in paragraph 243 of the Complaint contain legal conclusions concerning the efficacy of the Conditional Exchange and the scope of authority of the OTS as to which no response is required. To the extent a response is required, WMI denies the allegations in paragraph 243.

## COUNT V
## DECLARATORY JUDGMENT
### (Against WMI)

244. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs, which are incorporated by reference as if set forth fully herein.

Answer 244. WMI incorporates by reference its responses to the allegations in the preceding paragraphs.

245. As alleged herein throughout, WMI and certain of the Washington Mutual Entities perpetrated a fraud on investors by intentionally, or at a minimum negligently: (a) misrepresenting the true nature of the Trust Preferred

> Securities and the purported Conditional Exchange by
> failing to disclose the secret agreement to transfer the Trust
> Preferred Securities from WMI to WMB; and (b)
> misrepresenting the safety and soundness of Washington
> Mutual's operations at the same time Washington Mutual
> was implementing high risk, and even fraudulent, lending
> practices.

Answer 245.   Paragraph 245 of the Complaint states a legal conclusion as to which no

response is required.  To the extent a response is required, WMI denies each and every

allegation in Paragraph 245 of the Complaint.

> 246.   WMI participated in the fraud by approving the
> creation, issuance and offering of the Trust Preferred
> Securities and entering into the secret side arrangement
> with the OTS.

Answer 246.   Paragraph 246 of the Complaint states a legal conclusion as to which no

response is required.  To the extent a response is required, WMI denies each and every

allegation in Paragraph 246 of the Complaint.

> 247.   As part of its proposed chapter 11 plan, WMI asks
> this Court, a court of equity, to, <u>inter alia</u>, exercise its
> powers to compel specific performance of certain steps
> necessary to consummate the purported Conditional
> Exchange.  In that regard, WMI seeks, inter alia, an Order
> from this Court compelling non-Debtor parties to engage in
> numerous transactions that could not be accomplished
> absent this Court's Order, to ignore numerous conditions
> precedent to such transactions and to ignore applicable
> transfer restrictions.

Answer 247.   WMI admits that WMI is asking the Court, in the order confirming the its

plan of reorganization to direct the Debtors and certain third parties, pursuant to 11

U.S.C. § 1142(b), to deliver certain instruments and enter certain entries in books and

records with respect to the Conditional Exchange.  Otherwise, WMI denies each and

every allegation in Paragraph 247 of the Complaint.

248.     WMI, as a participant in the fraud perpetrated against investors in the Trust Preferred Securities, has acted inequitably with respect to the Trust Preferred Securities.

Answer 248.     WMI denies each and every allegation in Paragraph 248 of the Complaint.

249.     Therefore, Plaintiffs request that this Court enter a judgment declaring that:

WMI, as a result of its inequitable conduct in connection with the issuances of the Trust Preferred Securities, has unclean hands with respect to the Trust Preferred Securities.

WMI is ineligible for equitable relief necessary to consummate the purported Conditional Exchange or any other transfer of the Trust Preferred Securities.

Answer 249.     Paragraph 249 of the Complaint sets forth a prayer for relief.     WMI denies that Plaintiffs are entitled to such relief and denies each and every allegation in Paragraph 249 of the Complaint.

## COUNTS VI-IX

Answer 250-293.     WMI is not named as a Defendant in any of Counts VI-IX; therefore, WMI does not have an obligation to respond to any of the allegations in Paragraphs 250-293 of the Complaint.     To the extent, a response is required, WMI denies the each and every allegation in Paragraphs 250-293.

## ANSWER TO PRAYER FOR RELIEF

WMI denies that the Plaintiffs are entitled to the relief requested or to any relief, and WMI denies all allegations of the Complaint except as specifically admitted herein.

## DEFENSES, AFFIRMATIVE DEFENSES, AND RESERVATION OF RIGHTS

The statement of any defense hereinafter does not assume the burden of proof for any issue as to which applicable law places the burden upon the Plaintiffs.

WMI expressly reserves the right to assert, and hereby gives notice that it intends to rely upon, any other defense and/or affirmative defense that may become available or appear during discovery proceedings or otherwise in this case and hereby reserves the right to amend this Answer to assert any such defense and/or affirmative defense. WMI hereby incorporates into this Answer and asserts any and all defenses asserted or pled in this proceeding by any other party to the extent the defenses are applicable to WMI under the facts and law.

WMI has not knowingly or intentionally waived any applicable affirmative defenses. WMI presently lacks sufficient knowledge or information on which to form a belief as to whether it may have, as yet unstated, defenses or affirmative defenses, and expressly reserves all rights with respect to all defenses or affirmative defenses that may be revealed during the course of discovery.

WMI assert the following affirmative defenses, without assuming the burden of proof when the burden of proof would otherwise be on the Plaintiffs:

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.


## SECOND AFFIRMATIVE DEFENSE

The damages allegedly suffered by Plaintiffs were not the proximate or foreseeable result of acts or omissions of WMI.

## THIRD AFFIRMATIVE DEFENSE

The causes of action asserted in the Complaint are barred for lack of causation.

## FOURTH AFFIRMATIVE DEFENSE

The causes of action asserted in the Complaint are barred for lack of reliance.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiffs lack standing, in whole or in part, to bring the claims asserted in the Complaint.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs have not pled misrepresentation with the particularity required by the Federal Rules of Civil Procedure and the Federal Rules of Bankruptcy Procedure.

## SEVENTH AFFIRMATIVE DEFENSE

The causes of action asserted in the Complaint are barred by Plaintiffs' failure to exhaust all administrative remedies prior to filing the Complaint.

## EIGHTH AFFIRMATIVE DEFENSE

This Court does not have subject matter jurisdiction over Count IV of the Complaint.

US_ACTIVE:\43481829\13\79831.0003
RLF1 3608650v. 1

## NINTH AFFIRMATIVE DEFENSE

The claims against WMI in this Complaint are barred by the doctrine of laches.

## TENTH AFFIRMATIVE DEFENSE

The claims against WMI in this Complaint are barred by the doctrine of estoppel.

## ELEVENTH AFFIRMATIVE DEFENSE

The claims against WMI in this Complaint are barred by the doctrine of waiver.

## TWELFTH AFFIRMATIVE DEFENSE

WMI reserves its right to raise affirmative defenses as they become known through discovery or otherwise, and hereby reserves the right to amend its answer and affirmative defenses to assert any such defense.

## COUNTERCLAIM

For its counterclaim against Plaintiffs, defendant WMI alleges as follows:

1.    This Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C. §§ 157 and 1334.  This Counterclaim is a core proceeding.

2.    Venue is proper in this Court under 28 U.S.C. § 1409.

3.    Plaintiffs allegedly hold securities of WMI or of an affiliate of WMI.

4.     Counts I-VI of the Complaint seek declaratory and equitable relief to the effect that Plaintiffs retain "all right, title and interest" in some or all of the Trust Preferred Securities.

5.     By their Complaint, Plaintiffs seek payment on account of their alleged ownership of the Trust Preferred Securities.

6.     Section 101(5) of the Bankruptcy Code provides that a "claim" is a "right to an equitable remedy for breach of performance, if such breach gives rise to a right to payment. . ."

7.     Plaintiffs assert "claims" against WMI in Counts I-VI of the Complaint.

8.     Plaintiffs' claims seek to rescind the automatic conversion of the securities they own into preferred interests in WMI.

9.     Plaintiffs' in Counts I-VI of the Complaint assert claims arising from rescission of a purchase or sale of a security of WMI or of an affiliate of WMI, or for damages arising from the purchase or sale of such a security.

10.     WMI denies any and all liability on Counts I-VI of the Complaint, but should the Court find that Plaintiffs are entitled to any relief, Plaintiffs' claims are subject to mandatory subordination to all claims or interests that are senior to or equal preferred equity interests in accordance with section 510(b) of the Bankruptcy Code.

WHEREFORE, on its Counterclaim, WMI prays for judgment ordering that any claims asserted by Plaintiffs against WMI are subordinated to all claims or interests that are senior to or equal to preferred equity interests.

Respectfully submitted,

Dated: Wilmington, Delaware
September 14, 2010

_Ch. I/_

Mark D. Collins (No. 2981)
Chun I. Jang (No. 4790)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

– and –

Brian S. Rosen, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

ATTORNEYS TO THE DEBTORS
AND DEBTORS IN POSSESSION