# EXHIBIT A

CONFIDENTIAL



# Washington Mutual

$750,000,000

# Washington Mutual Preferred Funding (Cayman) I Ltd.

## 7.25% Perpetual Non-cumulative Preferred Securities
### Automatically Exchangeable in Specified Circumstances into
### Depositary Shares representing Preferred Stock of Washington Mutual, Inc.

Washington Mutual Preferred Funding (Cayman) I Ltd., a Cayman Islands exempted company limited by shares ("WaMu Cayman"), will invest the proceeds of its 7.25% Perpetual Non-cumulative Preferred Securities, Series A-1, liquidation preference $100,000 per security (the "Series A-1 WaMu Cayman Preferred Securities"), and its 7.25% Perpetual Non-cumulative Preferred Securities, Series A-2, liquidation preference $10,000 per security (the "Series A-2 WaMu Cayman Preferred Securities" and, together with the Series A-1 WaMu Cayman Preferred Securities, the "WaMu Cayman Preferred Securities") offered hereby in a like amount of 7.25% Perpetual Non-cumulative Preferred Securities, liquidation preference $1,000 per security (the "Fixed Rate Company Preferred Securities"), of Washington Mutual Preferred Funding LLC, a Delaware limited liability company (the "Company"). The terms of the Series A-1 WaMu Cayman Preferred Securities and the Series A-2 WaMu Cayman Preferred Securities are identical except for their per security liquidation preference. WaMu Cayman will have no material assets other than the Fixed Rate Company Preferred Securities. The financial entitlements of each WaMu Cayman Preferred Security will be substantially the same as the financial entitlements of a like amount of Fixed Rate Company Preferred Securities, with the consequence that dividends and the redemption price on the WaMu Cayman Preferred Securities will be payable on the same dates and in the same amounts as the corresponding dividends and redemption price, as applicable, on a like amount of Fixed Rate Company Preferred Securities. The Company's initial material assets will consist of indirect interests in mortgages and mortgage-related assets originated by Washington Mutual Bank as described herein.

Dividends on the Fixed Rate Company Preferred Securities will be payable if, when and as declared by the Company's Board of Managers out of legally available funds, on a non-cumulative basis at an annual rate of 7.25% on the liquidation preference per security, quarterly in arrears on March 15, June 15, September 15 and December 15 of each year, commencing on June 15, 2006 (each, a "Dividend Payment Date"), or the next Business Day if any such day is not a Business Day.

If the Office of Thrift Supervision (together with any successor regulator, the "OTS") so directs following the occurrence of an Exchange Event as described herein, each WaMu Cayman Preferred Security will be automatically exchanged for depositary shares representing a like amount of Washington Mutual, Inc.'s ("WMI") Series J Perpetual Non-cumulative Fixed Rate Preferred Stock.

See "Risk Factors" beginning on page 18 for a description of the risk factors you should consider before you invest in the securities offered hereby.

(Continued on next page)

---

**Offering price: $100,000.00 per Series A-1 WaMu Cayman Preferred Security**
**$ 10,000.00 per Series A-2 WaMu Cayman Preferred Security**

---

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). THE SERIES A-1 WAMU CAYMAN PREFERRED SECURITIES ARE BEING OFFERED AND SOLD ONLY IN THE UNITED STATES AND ONLY TO U.S. PERSONS THAT ARE BOTH "QUALIFIED INSTITUTIONAL BUYERS" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) AND "QUALIFIED PURCHASERS" (WITHIN THE MEANING OF SECTION 2(a)(51) OF THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT")) IN RELIANCE ON AN EXEMPTION FROM REGISTRATION PURSUANT TO RULE 144A. THE SERIES A-2 WAMU CAYMAN PREFERRED SECURITIES ARE BEING OFFERED AND SOLD ONLY TO NON-U.S. PERSONS IN TRANSACTIONS OUTSIDE THE UNITED STATES IN RELIANCE ON AN EXEMPTION FROM REGISTRATION PURSUANT TO REGULATION S UNDER THE SECURITIES ACT. PROSPECTIVE PURCHASERS OF SERIES A-1 WAMU CAYMAN PREFERRED SECURITIES ARE HEREBY NOTIFIED THAT THE SELLER OF THE SECURITIES MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A. THE SECURITIES ARE NOT TRANSFERABLE EXCEPT IN ACCORDANCE WITH THE RESTRICTIONS DESCRIBED UNDER "NOTICE TO INVESTORS."

---

The Initial Purchasers expect to deliver the Series A-1 WaMu Cayman Preferred Securities through the facilities of The Depository Trust Company and the Series A-2 WaMu Cayman Preferred Securities through the facilities of Clearstream Banking, société anonyme, and Euroclear Bank S.A./N.V., as operator of the Euroclear System, as participants in The Depository Trust Company, in each case, against payment in New York, New York on or about March 7, 2006.

## Goldman, Sachs & Co.
*Sole Global Coordinator and Sole Structuring Coordinator*

| Citigroup | Credit Suisse | HSBC | Morgan Stanley | UBS Investment Bank |
|---|---|---|---|---|
| | | | *Senior Co-Manager* | |

---

Offering Circular dated February 24, 2006.

*(Continued from previous page)*

The Fixed Rate Company Preferred Securities will not be redeemable at the option of the Company prior to the Dividend Payment Date in March 2011, except upon the occurrence of a Tax Event, an Investment Company Act Event or a Regulatory Capital Event (each as described herein). Upon the occurrence of a Tax Event, an Investment Company Act Event or a Regulatory Capital Event, the Company may redeem the Fixed Rate Company Preferred Securities in whole but not in part. On or after the Dividend Payment Date in March 2011, the Company may redeem the Fixed Rate Company Preferred Securities in whole or in part. Any redemption will be subject to the prior approval of the OTS and will be at a redemption price equal to the liquidation preference per Fixed Rate Company Preferred Security, *plus* declared but unpaid dividends, if any, *plus* a U.S. Treasury-based "make whole" amount if the redemption occurs prior to the Dividend Payment Date in March 2011.

The WaMu Cayman Preferred Securities will be issued only in book-entry form. Each individual purchaser or group of affiliated purchasers that acquires Series A-1 WaMu Cayman Preferred Securities in the initial offering must acquire at least three Series A-1 WaMu Cayman Preferred Securities having an aggregate liquidation preference of $300,000.

The Initial Purchasers are offering the Series A-2 WaMu Preferred Securities, which are being offered outside the United States to non-U.S. persons in reliance upon Regulation S under the Securities Act, through their respective selling agents.

Application will be made to list the Series A-2 WaMu Cayman Preferred Securities on the Euro MTF market of the Luxembourg Stock Exchange. The Series A-1 WaMu Cayman Preferred Securities will not be listed on any securities exchange or automated dealer quotation system.

**The securities offered hereby are not insured or guaranteed by the U.S. Federal Deposit Insurance Corporation.**

*This offering circular is confidential. You are authorized to use this offering circular solely for the purpose of considering the purchase of the securities described in the offering circular. WMI, Washington Mutual Bank ("WMB"), University Street, Inc. ("University Street"), the Company, WaMu Cayman, Washington Mutual Home Equity Trust I (the "Asset Trust"), Washington Mutual Preferred Funding Trust I ("WaMu Delaware") and other sources identified herein have provided the information contained in this offering circular. The Initial Purchasers named herein make no representation or warranty, express or implied, as to the accuracy or completeness of such information, and nothing contained in this offering circular is, or shall be relied upon as, a promise or representation by the Initial Purchasers. You may not reproduce or distribute this offering circular, in whole or in part, and you may not disclose any of the contents of this offering circular or use any information herein for any purpose other than considering the purchase of the notes. You agree to the foregoing by accepting delivery of this offering circular.*

---

**THE SECURITIES OFFERED HEREBY HAVE NOT BEEN RECOMMENDED BY ANY UNITED STATES FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

The distribution of this offering circular and the offering and sale of the securities offered hereby in certain jurisdictions may be restricted by law. WMI, WMB, University Street, the Company, WaMu Cayman, the Asset Trust, WaMu Delaware and the Initial Purchasers require persons in whose possession this offering circular comes to inform themselves about and to observe any such restrictions. This offering circular does not constitute an offer of, or an invitation to purchase, any of the securities offered hereby in any jurisdiction in which such offer or invitation would be unlawful.

---

Notwithstanding anything herein to the contrary, each investor (and each employee, representative, or agent of any investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated herein and all materials of any kind (including opinions or other tax analyses) that are provided to the investors relating to such tax treatment and tax structure. However, any information relating to the United States Federal income tax treatment or tax structure will remain confidential (and the foregoing sentence will not apply) to the extent reasonably necessary to enable any person to comply with applicable securities laws. For this purpose, "tax treatment" means United States Federal or state income tax treatment, and "tax structure" means any facts relevant to the United States Federal or state income tax treatment of the transactions contemplated herein but does not include information relating to the identity of the issuer of the securities, the issuer of any assets underlying the securities, or any of their respective affiliates that are offering the securities.

No person has been authorized to give any information or to make any representations other than those contained in this offering circular, and, if given or made, such information or representations must not be relied upon as having been authorized by any of WMI, WMB, University Street, the Company, WaMu Cayman or the Asset Trust. Neither the delivery of this offering circular nor any sale hereunder will create, under any circumstances, any implication that there has been no change in the affairs of WMI, WMB, the Company, WaMu Cayman, University Street or the Asset Trust since the date hereof or that the information contained herein is correct as of any time subsequent to its date.

---

NOTICE TO NEW HAMPSHIRE RESIDENTS ONLY

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE OF NEW HAMPSHIRE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

———————————

NO INVITATION TO SUBSCRIBE FOR WAMU CAYMAN PREFERRED SECURITIES IS BEING MADE TO THE PUBLIC IN THE CAYMAN ISLANDS.

———————————

IN CONNECTION WITH THIS OFFERING, GOLDMAN, SACHS & CO. AND ITS AFFILIATES, ON BEHALF OF THE INITIAL PURCHASERS, MAY OVER-ALLOT OR EFFECT TRANSACTIONS WITH A VIEW TO SUPPORTING THE MARKET PRICE OF THE SECURITIES OFFERED HEREBY AT A LEVEL HIGHER THAN THAT WHICH MIGHT OTHERWISE PREVAIL FOR A LIMITED PERIOD OF TIME AFTER THE ISSUE DATE. HOWEVER, THERE MAY BE NO OBLIGATION ON GOLDMAN, SACHS & CO. TO DO THIS. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME, AND MUST BE BROUGHT TO AN END AFTER A LIMITED PERIOD.

## NOTICE TO INVESTORS

*Because of the following restrictions, purchasers are advised to consult legal counsel prior to making any offer, purchase, resale, pledge or other transfer of the securities offered hereby.*

### Series A-1 WaMu Cayman Preferred Securities

Each purchaser of Series A-1 WaMu Cayman Preferred Securities (including the registered holders and beneficial owners of the Series A-1 WaMu Cayman Preferred Securities as they exist from time to time, including as a result of transfers, in each case as of the time of purchase) will be deemed to have represented and agreed as follows:

(A) the purchaser (i) is a *"qualified institutional buyer"* within the meaning of Rule 144A of the Securities Act, (ii) is aware that the sale of the Series A-1 WaMu Cayman Preferred Securities to it is being made in reliance on Rule 144A or another exemption from the registration requirements of the Securities Act, and (iii) is acquiring such Series A-1 WaMu Cayman Preferred Securities for its own account or the account of one or more qualified institutional buyers;

(B) the purchaser (i) is a *"qualified purchaser"* within the meaning of Section 2(a)(51) of the Investment Company Act and the rules and regulations thereunder, (ii) is aware that WaMu Cayman will not be registered under the Investment Company Act in reliance on the exemption set forth in Section 3(c)(7) thereof and that the Series A-1 WaMu Cayman Preferred Securities have not been and will not be registered under the Securities Act, and (iii) is acquiring such Series A-1 WaMu Cayman Preferred Securities for its own account or the account of one or more qualified purchasers as to which the purchaser exercises sole investment discretion, as the case may be;

(C) either (i) the purchaser is not (a) an *"employee benefit plan"* as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended (*"ERISA"*), whether or not subject to ERISA and including, without limitation, foreign or governmental plans, (b) a *"plan"* within the meaning of Section 4975 of the Internal Revenue Code of 1986, as amended (the *"Code"*), or (c) any entity whose underlying assets include *"plan assets"* of any of the foregoing by reason of investment by an employee benefit plan or other plan in such entity (each of the foregoing, a *"Benefit Plan Investor"*), or (ii) the purchaser is an insurance company general account that represents, warrants and covenants that, at the time of acquisition and throughout the period it holds the securities, (x) it is eligible for and meets the requirements of the Department of Labor Prohibited Transaction Class Exemption 95-60, (y) less than 25% of the assets of such general account are (or represent) assets of a Benefit Plan Investor and (z) it is not a person who has discretionary authority or control with respect to the assets of WaMu Cayman or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person and would not otherwise be excluded under 29 C.F.R. 2510.3-101(f)(1);

(D) the purchaser is not purchasing the Series A-1 WaMu Cayman Preferred Securities with a view to the resale, distribution or other disposition thereof in violation of the Securities Act;

(E) neither the purchaser nor any account for which the purchaser is acquiring the Series A-1 WaMu Cayman Preferred Securities will hold such Series A-1 WaMu Cayman Preferred Securities for the benefit of any other person and the purchaser and each such account will be the sole beneficial owners thereof for all purposes and will not sell participation interests in the Series A-1 WaMu Cayman Preferred Securities or enter into any other arrangement pursuant to which any other person will be entitled to an interest in the distributions on the Series A-1 WaMu Cayman Preferred Securities;

(F) the certificates evidencing the Series A-1 WaMu Cayman Preferred Securities will bear a legend to the following effect:

THIS SECURITY IS ONE OF THE 7.25% PERPETUAL NON-CUMULATIVE PREFERRED SECURITIES, SERIES A-1 ("SERIES A-1 WAMU CAYMAN PREFERRED SECURITIES") ISSUED BY WASHINGTON MUTUAL PREFERRED FUNDING (CAYMAN) I LTD. ("WAMU CAYMAN"). THE ISSUER OF THIS SECURITY HAS NOT BEEN REGISTERED AS AN INVESTMENT COMPANY UNDER THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"), AND THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND NEITHER THIS SECURITY NOR ANY BENEFICIAL INTERESTS HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT TO A PERSON WHO IS BOTH A "QUALIFIED INSTITUTIONAL BUYER" WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT ("QUALIFIED INSTITUTIONAL BUYER") AND A "QUALIFIED PURCHASER" WITHIN THE MEANING OF SECTION 2(a)(51) OF THE INVESTMENT COMPANY ACT AND THE RULES AND REGULATIONS THEREUN-DER ("QUALIFIED PURCHASER") ACQUIRING FOR ITS OWN ACCOUNT OR THE ACCOUNT OF A PERSON WHO IS BOTH A QUALIFIED INSTITUTIONAL BUYER AND A QUALIFIED PURCHASER (AN "ELIGIBLE PURCHASER") AND EACH SUCH PERSON AND ACCOUNT FOR WHICH SUCH PERSON IS PURCHASING (A) IS NOT A BROKER-DEALER THAT OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN US$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT ITS AFFILIATED PERSONS, (B) IS NOT A PLAN REFERRED TO IN PARAGRAPH (a)(1)(i)(D) OR (a)(1)(i)(E) OF RULE 144A, OR A TRUST FUND REFERRED TO IN PARAGRAPH (a)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF SUCH PLAN, (C) WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN WAMU CAYMAN, (D) WILL HOLD AND TRANSFER AT LEAST $100,000 LIQUIDATION PREFERENCE OF SERIES A-1 WAMU CAYMAN PRE-FERRED SECURITIES (i.e., AT LEAST ONE SERIES A-1 WAMU CAYMAN PREFERRED SECURITY), AND (E) UNDERSTANDS THAT WAMU CAYMAN MAY RECEIVE A LIST OF PARTICIPANTS HOLDING POSITIONS IN THIS SECURITY FROM ONE OR MORE BOOK-ENTRY DEPOSITARIES. EACH PURCHASER OF THIS SECURITY OR ANY BENEFICIAL INTERESTS HEREIN WILL BE DEEMED TO REPRESENT THAT IT AGREES TO COMPLY WITH THE TRANSFER RESTRICTIONS SET FORTH HEREIN AND IN THE MEMORANDUM AND ARTICLES OF ASSOCIATION OF WAMU CAYMAN (AS AMENDED, THE "ARTICLES OF ASSOCIATION"), AND WILL NOT TRANSFER THIS SECURITY OR ANY BENEFICIAL INTERESTS HEREIN EXCEPT TO AN ELIGIBLE PURCHASER WHO CAN MAKE THE SAME REPRESENTATIONS AND AGREEMENTS ON BEHALF OF ITSELF AND EACH ACCOUNT FOR WHICH IT IS PURCHASING. ANY PURPORTED TRANSFER OF THIS SECURITY OR ANY BENEFICIAL INTERESTS HEREIN THAT IS IN BREACH, AT THE TIME MADE, OF ANY TRANSFER RESTRICTIONS SET FORTH HEREIN OR IN THE ARTICLES OF ASSOCIATION WILL BE VOID AB INITIO. IF AT ANY TIME WAMU CAYMAN DETERMINES IN GOOD FAITH THAT A HOLDER OR BENEFICIAL OWNER OF THIS SECURITY OR BENEFICIAL INTERESTS HEREIN IS IN BREACH, AT THE TIME GIVEN, OF ANY OF THE TRANSFER RESTRICTIONS SET FORTH HEREIN, WAMU CAYMAN SHALL CONSIDER THE ACQUISI-TION OF THIS SECURITY OR SUCH BENEFICIAL INTERESTS VOID, OF NO FORCE AND EFFECT AND WILL NOT, AT THE DISCRETION OF WAMU CAYMAN, OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO WAMU CAYMAN, ITS AGENT FOR REGISTRATION OF TRANS-FER, EXCHANGE OR PAYMENT (THE "TRANSFER AGENT"), OR ANY OTHER INTERME-DIARY. IN ADDITION, WAMU CAYMAN OR ITS TRANSFER AGENT MAY REQUIRE SUCH ACQUIRER OR BENEFICIAL OWNER TO SELL THIS SECURITY OR SUCH BENEFICIAL INTERESTS TO AN ELIGIBLE PURCHASER.

NO SECURITY MAY BE PURCHASED OR TRANSFERRED TO: (I) AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED *("ERISA")*, WHETHER OR NOT SUBJECT TO ERISA AND INCLUDING, WITHOUT LIMITATION, FOREIGN OR GOVERN-MENTAL PLANS, (II) A "PLAN" WITHIN THE MEANING OF SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE *"CODE"*), OR (III) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" OF ANY OF THE FOREGOING BY REASON OF INVESTMENT BY AN EMPLOYEE BENEFIT PLAN OR OTHER PLAN IN SUCH ENTITY (EACH OF THE FOREGOING, A "BENEFIT PLAN INVESTOR"), EXCEPT FOR AN INSURANCE COMPANY GENERAL ACCOUNT THAT REPRESENTS, WARRANTS AND COVENANTS THAT, AT THE TIME OF ACQUISITION AND THROUGHOUT THE PERIOD IT HOLDS THE SECURITIES, (I) IT IS ELIGIBLE FOR AND MEETS THE REQUIREMENTS OF THE DEPARTMENT OF LABOR PROHIBITED TRANSACTION CLASS EXEMPTION 95-60, (II) LESS THAN 25% OF THE ASSETS OF SUCH GENERAL ACCOUNT ARE (OR REPRESENT) ASSETS OF A BENEFIT PLAN INVESTOR AND (III) IT IS NOT A PERSON WHO HAS DISCRETIONARY AUTHORITY OR CONTROL WITH RESPECT TO THE ASSETS OF WAMU CAYMAN OR ANY PERSON WHO PROVIDES INVESTMENT ADVICE FOR A FEE (DIRECT OR INDIRECT) WITH RESPECT TO SUCH ASSETS, OR ANY AFFILIATE OF SUCH A PERSON AND WOULD NOT OTHERWISE BE EXCLUDED UNDER 29 C.F.R. 2510.3-101(F)(1).

UNLESS THIS SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO WAMU CAYMAN OR THE TRANSFER AGENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

(G) the purchaser and each account for which it is purchasing:

(i) is not a broker-dealer that owns and invests on a discretionary basis less than $25 million in securities of unaffiliated issuers;

(ii) is not a participant-directed employee plan, such as a 401(k) plan, as referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan;

(iii) was not formed for the purpose of investing in WaMu Cayman;

(iv) will hold at least $300,000 liquidation preference of Series A-1 WaMu Cayman Preferred Securities (*i.e.*, at least three Series A-1 WaMu Cayman Preferred Securities) in the case of each initial investor, and will hold and transfer $100,000 liquidation preference of Series A-1 WaMu Cayman Preferred Securities (*i.e.*, at least one Series A-1 WaMu Cayman Preferred Security) in the case of each subsequent investor;

(v) will provide notice of the transfer restrictions described in this "Notice to Investors" to any subsequent transferees;

(vi) acknowledges that WaMu Cayman may receive a list of participants holding positions in the Series A-1 WaMu Cayman Preferred Securities from one or more book-entry depositaries; and

v

(vii) may not transfer the Series A-1 WaMu Cayman Preferred Securities or beneficial interests therein except to a transferee who can make the same representations and agreements as set forth in this "Notice to Investors" and WaMu Cayman's Memorandum and Articles of Association as in effect on the issue date of the WaMu Cayman Preferred Securities (together, as amended, *"WaMu Cayman's Articles of Association"*) on behalf of itself and each account for which it is purchasing.

The purchaser acknowledges that the Series A-1 WaMu Cayman Preferred Securities are being offered only in a transaction not involving any public offering within the meaning of the Securities Act. The Series A-1 WaMu Cayman Preferred Securities have not been and will not be registered under the Securities Act and WaMu Cayman has not been and will not be registered under the Investment Company Act, and, if in the future the purchaser decides to offer, resell, pledge or otherwise transfer the Series A-1 WaMu Cayman Preferred Securities, such Series A-1 WaMu Cayman Preferred Securities may be offered, resold, pledged or otherwise transferred only in accordance with the legend on such Series A-t WaMu Cayman Preferred Securities described above. The purchaser acknowledges that no representation is made by WaMu Cayman, the Company or the Initial Purchasers as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Series A-t WaMu Cayman Preferred Securities.

### Reminder Notices

Whenever WaMu Cayman sends an annual report or other periodic report to holders of the Series A-1 WaMu Cayman Preferred Securities, it will also send a reminder notice (each, a *"Reminder Notice"*) to the holders of the Series A-1 WaMu Cayman Preferred Securities. Each Reminder Notice will state that (i) each holder of a Series A-1 WaMu Cayman Preferred Security (or an interest in a Series A-1 WaMu Cayman Preferred Security) that is a U.S. person must be able to make the representations set forth above in paragraphs (B) and (G)(iv) under "Series A-t WaMu Cayman Preferred Securities — Representations of Purchasers" (the *"3(c)(7) Representations"*), (ii) the Series A-1 WaMu Cayman Preferred Securities (or interests in the Series A-1 WaMu Cayman Preferred Securities) are transferable only to purchasers deemed to have made the 3(c)(7) Representations and to have satisfied the other transfer restrictions applicable to the securities, (iii) if any prospective transferee of the Series A-1 WaMu Cayman Preferred Securities (or an interest in the Series A-1 WaMu Cayman Preferred Securities) that is a U.S. person is determined not to be a qualified purchaser, then WaMu Cayman will have the right (exercisable in its sole discretion) to refuse to honor such transaction, and (iv) if any security holder (or any holder of an interest in a security) that is a U.S. person is determined not to be a qualified purchaser, then WaMu Cayman will have the right (exercisable in its sole discretion) to treat the transfer to such purchaser as null and void and require such purchaser to sell all of its securities (and all interests therein) to a transferee designated by WaMu Cayman at the then current market price therefor. WaMu Cayman will send a copy of each annual or other periodic reports (and each Reminder Notice) to DTC with a request that participating organizations in DTC (*"DTC Participants"*) forward them to the security holders or holders of an interest in Series A-1 WaMu Cayman Preferred Securities.

### CUSIP

WaMu Cayman will cause each "CUSIP" obtained for a 144A Global Security to have an attached "fixed field" that contains "3c7", "GRLS" and "144A" indicators.

### Series A-2 WaMu Cayman Preferred Securities

Each purchaser of Series A-2 WaMu Cayman Preferred Securities (including the registered holders and beneficial owners of the Series A-2 WaMu Cayman Preferred Securities, as they

exist from time to time, including as a result of transfers, in each case as of the time of purchase) will be deemed to have represented and agreed as follows:

(A) the purchaser is (i) a non-U.S. person within the meaning of Rule 902 of the Securities Act purchasing the Series A-2 WaMu Cayman Preferred Securities in an offshore transaction in accordance with Regulation S under the Securities Act and (ii) aware that the sale of the Series A-2 WaMu Cayman Preferred Securities to it is being made in reliance on Regulation S or another exemption from the registration requirements of the Securities Act;

(B) either (i) the purchaser is not a Benefit Plan Investor or (ii) the purchaser is an insurance company general account that represents, warrants and covenants that, at the time of acquisition and throughout the period it holds the securities, (x) it is eligible for and meets the requirements of the Department of Labor Prohibited Transaction Class Exemption 95-60, (y) less than 25% of the assets of such general account are (or represent) assets of a Benefit Plan Investor and (z) it is not a person who has discretionary authority or control with respect to the assets of WaMu Cayman or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person and would not otherwise be excluded under 29 C.F.R. 25t0.3-t01(f)(t).

(C) the purchaser is not purchasing the Series A-2 WaMu Cayman Preferred Securities with a view to the resale, distribution or other disposition thereof in violation of the Securities Act;

(D) neither the purchaser nor any account for which the purchaser is acquiring the Series A-2 WaMu Cayman Preferred Securities will hold such Series A-2 WaMu Cayman Preferred Securities for the benefit of any other person and the purchaser and each such account will be the sole beneficial owners thereof for all purposes and will not sell participation interests in the Series A-2 WaMu Cayman Preferred Securities or enter into any other arrangement pursuant to which any other person be entitled to an interest in the distributions on the Series A-2 WaMu Cayman Preferred Securities;

(E) the certificates evidencing the Series A-2 WaMu Cayman Preferred Securities will bear a legend to the following effect:

THIS SECURITY IS ONE OF THE 7.25% PERPETUAL NON-CUMULATIVE PREFERRED SECURITIES, SERIES A-2 ("SERIES A-2 WAMU CAYMAN PREFERRED SECURITIES") ISSUED BY WASHINGTON MUTUAL PREFERRED FUNDING (CAYMAN) I LTD. ("WAMU CAYMAN"). THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND NEITHER THIS SECURITY NOR ANY BENEFICIAL INTERESTS HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (t) IN AN OFFSHORE TRANSAC- TION MEETING THE REQUIREMENTS OF REGULATION S UNDER THE SECURITIES ACT TO A PERSON OTHER THAN A U.S. PERSON, OR (2) IN RELIANCE UPON RULE t44A UNDER THE SECURITIES ACT IN A TRANSACTION INVOLVING AN EXCHANGE OF THIS SECURITY FOR A LIKE AMOUNT OF 7.25% PERPETUAL NON-CUMULATIVE PREFERRED SECURITIES, SERIES A-t, OF WAMU CAYMAN, WHICH IS ALSO THE ISSUER OF THIS SECURITY, BUT ONLY UPON RECEIPT BY WAMU CAYMAN'S TRANSFER AGENT OF A WRITTEN CERTIFICATE ON BEHALF OF THE TRANSFEROR TO THE EFFECT THAT SUCH TRANSFER IS BEING MADE TO A PERSON WHO THE TRANSFEROR REASONA- BLY BELIEVES IS BOTH A "QUALIFIED INSTITUTIONAL BUYER" WITHIN THE MEANING OF RULE t44A UNDER THE SECURITIES ACT ("QUALIFIED INSTITUTIONAL BUYER") AND A "QUALIFIED PURCHASER" WITHIN THE MEANING OF SECTION 2(a)(5t) OF THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED ("QUALIFIED PUR- CHASER"), ACQUIRING FOR ITS OWN ACCOUNT OR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER WHO IS ALSO A QUALIFIED PURCHASER (AN "ELIGIBLE

PURCHASER'') IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A UNDER THE SECURITIES ACT AND IN ACCORDANCE WITH ALL APPLICABLE LAWS OF THE STATES OF THE UNITED STATES AND OTHER JURISDICTIONS. EACH PURCHASER OF THIS SECURITY OR ANY BENEFICIAL INTERESTS HEREIN WILL BE DEEMED TO REPRESENT THAT IT AGREES TO COMPLY WITH THE TRANSFER RESTRICTIONS SET FORTH HEREIN AND IN THE MEMORANDUM AND ARTICLES OF ASSOCIATION OF WAMU CAYMAN (AS AMENDED, THE ''ARTICLES OF ASSOCIATION''), AND WILL NOT TRANSFER THIS SECURITY OR ANY BENEFICIAL INTERESTS HEREIN EXCEPT TO A PURCHASER WHO CAN MAKE THE SAME REPRESENTATIONS AND AGREEMENTS ON BEHALF OF ITSELF AND EACH ACCOUNT FOR WHICH IT IS PURCHASING. ANY PURPORTED TRANSFER OF THIS SECURITY OR ANY BENEFICIAL INTERESTS HEREIN THAT IS IN BREACH, AT THE TIME MADE, OF ANY TRANSFER RESTRICTIONS SET FORTH HEREIN OR IN THE ARTICLES OF ASSOCIATION WILL BE VOID AB INITIO. IF AT ANY TIME WAMU CAYMAN DETERMINES IN GOOD FAITH THAT A HOLDER OR BENEFICIAL OWNER OF THIS SECURITY OR BENEFICIAL INTERESTS HEREIN IS IN BREACH, AT THE TIME GIVEN, OF ANY OF THE TRANSFER RESTRICTIONS SET FORTH HEREIN, WAMU CAYMAN SHALL CONSIDER THE ACQUISITION OF THIS SECURITY OR SUCH BENEFICIAL INTERESTS VOID, OF NO FORCE AND EFFECT AND WILL NOT, AT THE DISCRETION OF WAMU CAYMAN, OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO WAMU CAYMAN, ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT (THE ''TRANSFER AGENT''), OR ANY OTHER INTERMEDIARY. IN ADDITION, WAMU CAYMAN OR ITS TRANSFER AGENT MAY REQUIRE SUCH ACQUIRER OR BENEFICIAL OWNER TO SELL THIS SECURITY OR SUCH BENEFICIAL INTERESTS TO AN ELIGIBLE PURCHASER.

NO SECURITY MAY BE PURCHASED OR TRANSFERRED TO: (I) AN ''EMPLOYEE BENEFIT PLAN'' AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED (''ERISA''), WHETHER OR NOT SUBJECT TO ERISA AND INCLUDING, WITHOUT LIMITATION, FOREIGN OR GOVERN-MENTAL PLANS, (II) A ''PLAN'' WITHIN THE MEANING OF SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE ''CODE''), OR (III) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE ''PLAN ASSETS'' OF ANY OF THE FOREGOING BY REASON OF INVESTMENT BY AN EMPLOYEE BENEFIT PLAN OR OTHER PLAN IN SUCH ENTITY (EACH OF THE FOREGOING, A ''BENEFIT PLAN INVESTOR''), EXCEPT FOR AN INSURANCE COMPANY GENERAL ACCOUNT THAT REPRESENTS, WARRANTS AND COVENANTS THAT, AT THE TIME OF ACQUISITION AND THROUGHOUT THE PERIOD IT HOLDS THE SECURITIES, (I) IT IS ELIGIBLE FOR AND MEETS THE REQUIREMENTS OF THE DEPARTMENT OF LABOR PROHIBITED TRANSACTION CLASS EXEMPTION 95-60, (II) LESS THAN 25% OF THE ASSETS OF SUCH GENERAL ACCOUNT ARE (OR REPRESENT) ASSETS OF A BENEFIT PLAN INVESTOR AND (III) IT IS NOT A PERSON WHO HAS DISCRETIONARY AUTHORITY OR CONTROL WITH RESPECT TO THE ASSETS OF WAMU CAYMAN OR ANY PERSON WHO PROVIDES INVESTMENT ADVICE FOR A FEE (DIRECT OR INDIRECT) WITH RESPECT TO SUCH ASSETS, OR ANY AFFILIATE OF SUCH PERSON AND WOULD NOT OTHERWISE BE EXCLUDED UNDER 29 C.F.R. 2510.3-101(F)(1).

UNLESS THIS SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION (''DTC''), TO WAMU CAYMAN OR THE TRANSFER AGENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE

HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

(F) the purchaser and each account for which it is purchasing:

(i) will provide notice of the transfer restrictions described in this "Notice to Investors" to any subsequent transferees; and

(ii) may not transfer the Series A-2 WaMu Cayman Preferred Securities or beneficial interests therein except to a transferee who can make the same representations and agreements as set forth in this "Notice to Investors" and WaMu Cayman's Articles of Association on behalf of itself and each account for which it is purchasing.

The purchaser acknowledges that the Series A-2 WaMu Cayman Preferred Securities are being offered only in a transaction not involving any public offering within the meaning of the Securities Act. The Series A-2 WaMu Cayman Preferred Securities have not been and will not be registered under the Securities Act and WaMu Cayman has not been and will not be registered under the Investment Company Act, and, if in the future the purchaser decides to offer, resell, pledge or otherwise transfer the Series A-2 WaMu Cayman Preferred Securities, such Series A-2 WaMu Cayman Preferred Securities may be offered, resold, pledged or otherwise transferred only in accordance with the legend on such Series A-2 WaMu Cayman Preferred Securities described above. The purchaser acknowledges that no representation is made by WaMu Cayman, the Company or the Initial Purchasers as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Series A-2 WaMu Cayman Preferred Securities.

## Forced Sale of Securities

Any transfer of WaMu Cayman Preferred Securities in breach of the transfer restrictions set forth in this "Notice to Investors" and WaMu Cayman's Articles of Association will be of no force and effect, will be void *ab initio*, and will not operate to transfer any rights to the transferee, notwithstanding any instructions to the contrary to WaMu Cayman, its Transfer Agent or any other intermediary.

The purchaser agrees that in the event that WaMu Cayman or its Transfer Agent determines in good faith that a holder or beneficial owner of the WaMu Cayman Preferred Securities is in breach, at the time given, of any of the representations or agreements set forth above, WaMu Cayman shall consider the acquisition of the WaMu Cayman Preferred Securities or beneficial interests therein void, of no force and effect and will not, at the discretion of WaMu Cayman, operate to transfer any rights to the transferee notwithstanding any instructions to the contrary to WaMu Cayman, the Transfer Agent or any other intermediary. In addition, WaMu Cayman or the Transfer Agent may require such acquirer or beneficial owner to transfer such WaMu Cayman Preferred Securities or beneficial interests therein to a transferee acceptable to WaMu Cayman who is able to and who does make all of the representations and agreements set forth in this "Notice to Investors." Pending such transfer, such holder will be deemed not to be the holder of such WaMu Cayman Preferred Securities for any purpose, including but not limited to receipt of dividend and redemption payments on such WaMu Cayman Preferred Securities or distributions on the liquidation of WaMu Cayman, and such holder will be deemed to have no interest whatsoever in such WaMu Cayman Preferred Securities except as otherwise required to redeem or sell its interest therein as described in this paragraph.

## Investment Company Act

An issuer that is organized outside of the United States (such as WaMu Cayman) is not permitted to register under the Investment Company Act without first obtaining an order from the

SEC permitting it to register as an investment company under the Investment Company Act. WaMu Cayman does not intend to seek such an order and could not satisfy some of the requirements of the Investment Company Act (e.g., limitations on the ratio of preferred equity to common equity) that would have to be satisfied for WaMu Cayman to obtain such an order. Accordingly, WaMu Cayman has not and does not intend to register under the Investment Company Act and will rely on Section 3(c)(7) under the Investment Company Act ("Section 3(c)(7)") for exemption from registration as an investment company. To rely on Section 3(c)(7), WaMu Cayman must have a "reasonable belief" that all purchasers of the WaMu Cayman Preferred Securities that are U.S. persons (including the Initial Purchasers and subsequent transferees) are "qualified purchasers" at the time of their purchase of such securities. The Series A-1 WaMu Cayman Preferred Securities are being offered and sold only in the United States and only to U.S. persons and the Series A-2 WaMu Cayman Preferred Securities are being offered and sold only to non-U.S. persons in transactions outside the United States. WaMu Cayman will establish a reasonable belief for purposes of Section 3(c)(7) based upon the representations deemed made by the purchasers of the securities as set forth under "Series A-1 WaMu Cayman Preferred Securities" and "Series A-2 WaMu Cayman Preferred Securities," the covenants and undertakings of WaMu Cayman referred to below and the agreements of the Initial Purchasers relating to the private placement of the securities pursuant to Rule 144A and Regulation S referred to under "Plan of Distribution."

## DTC Actions with respect to the WaMu Cayman Preferred Securities

WaMu Cayman will direct DTC to take the following steps in connection with the WaMu Cayman Preferred Securities:

- to include the "3c7" marker and, in lieu of the "GABS" marker or otherwise, the "GRLS" marker in the DTC 20-character security descriptor and the 48-character additional descriptor for the WaMu Cayman Preferred Securities in order to indicate that sales are limited with respect to U.S. persons to Qualified Purchasers;

- to cause (i) each physical DTC delivery order ticket delivered by DTC to purchasers to contain the 20-character security descriptors and (ii) each DTC delivery order ticket delivered by DTC to purchasers in electronic form to contain the "3c7" and "GRLS" indicators and the related user manual for participants, which will contain a description of relevant restrictions;

- to send, on or prior to the closing date of this Offering, an "Important Notice" to all DTC Participants in connection with the Offering of the securities. The "Important Notice" will notify DTC Participants that the securities are Section 3(c)(7) securities issued by a non-U.S. Person. WaMu Cayman may instruct DTC from time to time (but not more frequently than every six months) to reissue the "Important Notice";

- to include WaMu Cayman in DTC's "Reference Directory" of Section 3(c)(7) offerings;

- to include in all "confirms" of trades of the Series A-1 WaMu Cayman Preferred Security in DTC, CUSIP numbers with a "fixed field" attached to the CUSIP number that has the "3c7" and "GRLS" markers; and

- to deliver to WaMu Cayman from time to time a list of all DTC Participants holding an interest in the securities.

## Bloomberg Screens, etc.

WaMu Cayman will from time to time request all third-party vendors to include on screens maintained by such vendors appropriate legends regarding Rule 144A and Section 3(c)(7) restrictions on the WaMu Cayman Preferred Securities. Without limiting the foregoing, the Initial

Purchasers will request that Bloomberg, L.P. include the following on each Bloomberg screen containing information about the securities as applicable:

- the bottom of the "Security Display" page describing the Series A-1 WaMu Cayman Preferred Securities should state: "Iss'd under 144A/3c7" and "GRLS";

- the "Security Display" page should have a flashing red indicator stating "Additional Note Pg";

- such indicator for the WaMu Cayman Preferred Securities should link to an "Additional Security Information" page, which should state that the Series A-1 WaMu Cayman Preferred Securities are being offered in reliance on the exception from registration under Rule 144A of the Securities Act of 1933, as amended (the "*Securities Act*") to persons that are (i) "qualified institutional buyers" as defined in Rule 144A under the Securities Act, and (ii) with respect to U.S. Persons, "qualified purchasers" as defined under Section 2(a)(51) of the Investment Company Act of 1940, as amended; and

- the "Disclaimer" pages for the WaMu Cayman Preferred Securities should state that the securities have not been and will not be registered under the Securities Act of 1933, as amended, and Washington Mutual Preferred Funding (Cayman) I Ltd. has not been registered under the Investment Company Act of 1940, as amended (the "*Investment Company Act*"), and the WaMu Cayman Preferred Securities may not be offered or sold in the United States absent an applicable exemption from registration requirements and any such offer and sale of these securities must be in accordance with Section 3(c)(7) of the Investment Company Act.

## Legends

WaMu Cayman will not remove the legend set forth in "— Series A-1 WaMu Cayman Preferred Securities" or "— Series A-2 WaMu Cayman Preferred Securities" at any time.

## Exchanges Between Rule 144A Global Security Evidencing Series A-1 WaMu Cayman Preferred Securities and Regulation S Global Security Evidencing Series A-2 WaMu Cayman Preferred Securities

The Series A-1 WaMu Cayman Preferred Securities will be evidenced by the Rule 144A Global Security and the Series A-2 WaMu Cayman Preferred Securities will be evidenced by the Regulation S Global Security, in each case, as described under "Book-Entry Issuance." An investor (including a beneficial owner) in Series A-1 WaMu Cayman Preferred Securities may sell such securities to a non-U.S. person who takes delivery in the form of an interest in the Regulation S Global Security only if the certifications described under "Book-Entry Issuance" are made and, in connection with such sale, the transferor's interest in the Series A-1 WaMu Cayman Preferred Securities evidenced by the Rule 144A Global Security is exchanged by the transferee for Series A-2 WaMu Cayman Preferred Securities evidenced by the Regulation S Global Security. Similarly, an investor (including a beneficial owner) in Series A-2 WaMu Cayman Preferred Securities may sell such securities in the United States or to a U.S. person who takes delivery in the form of an interest in the Rule 144A Global Security only if the certifications described under "Book-Entry Issuance" are made and, in connection with such sale, the transferor's interest in the Series A-2 WaMu Cayman Preferred Securities evidenced by the Regulation S Global Security is exchanged by the transferee for Series A-1 WaMu Cayman Preferred Securities evidenced by the Rule 144A Global Security.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This offering circular and the documents incorporated herein by reference contain certain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995 with respect to financial condition, results of operations, and other matters. Statements in this offering circular, including those incorporated herein by reference, that are not historical facts are "forward-looking statements" for the purpose of the safe harbor provided by Section 21E of the Exchange Act and Section 27A of the Securities Act. Forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts. They often include words, such as "expects", "anticipates", "intends", "plans", "believes", "seeks", "estimates" or words of similar meaning, or future or conditional verbs, such as "will", "should", "could" or "may".

Forward-looking statements provide WMI's or WMB's (as applicable) expectations or predictions of future conditions, events or results. They are not guarantees of future performance. By their nature forward-looking statements are subject to risks and uncertainties. These statements speak only as of the date they are made. WMI and WMB do not undertake to update forward-looking statements to reflect the impact of circumstances or events that arise after the date the forward-looking statements were made. There are a number of factors, many of which are beyond WMI's or WMB's (as applicable) control, that could cause actual conditions, events or results to differ significantly from those described in the forward-looking statements. The factors are generally described in WMI's or WMB's (as applicable) most recent Form 10-K and Form 10-Q under the caption "Risk Factors."

## WHERE YOU CAN FIND MORE INFORMATION

WMI files annual, quarterly and current reports, proxy statements and other information with the Securities and Exchange Commission (the "SEC"). You may read and copy any document that WMI files with the SEC at the SEC's public reference room in Washington, D.C. Please call the SEC at t-800-SEC-0330 for further information on the public reference room. In addition, WMI's SEC filings are available to the public at the SEC's web site at http://www.sec.gov. You can also inspect reports, proxy statements and other information about WMI at the offices of the New York Stock Exchange, 20 Broad Street, New York, New York.

This offering circular incorporates by reference certain information that WMI files with the SEC. The information incorporated by reference is considered to be a part of this offering circular and should be read with the same care. When WMI updates the information contained in documents that have been incorporated by reference by making future filings with the SEC, the information incorporated by reference in this offering circular is considered to be automatically updated and superseded. In other words, in the case of a conflict or inconsistency between information with respect to WMI contained in this offering circular and information incorporated by reference into this offering circular, you should rely on the information contained in the document that was filed later. WMI incorporates by reference the documents listed below and any documents it files with the SEC in the future under Sections 13(a), 13(c), 14, or 15(d) of the Exchange Act until the Offering is completed:

- Annual Report on Form 10-K for the year ended December 31, 2004;

- Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2005, June 30, 2005 and September 30, 2005; and

- Current Reports on Form 8-K dated January 6, 2005, January 14, 2005, January 20, 2005, January 24, 2005, February 18, 2005, February 22, 2005, March 2, 2005, March 22, 2005, March 23, 2005, April 19, 2005, June 7, 2005, June 9, 2005, June 24, 2005, July 6, 2005, July 20, 2005, July 25, 2005, September 8, 2005, September 23, 2005, September 26, 2005, October 4, 2005, October 19, 2005, October 27, 2005, November 2, 2005, December 23, 2005, January 18, 2006 January 23, 2006, February 7, 2006 and February 21, 2006. (The press release text of WMI dated January t8, 2006 and the financial supplement of WMI, included as Exhibits 99.1 and 99.2 to WMI's Current Report on Form 8-K, dated January t8, 2006, are incorporated by reference in this offering circular notwithstanding that such Current Report provides that the press release and financial statements were "furnished" but not "filed" under the Exchange Act. Please note that the information included in the January t8, 2006 Current Report on Form 8-K has not been audited by Deloitte & Touche LLP, WMI's independent registered public accountants).

WMB files annual and quarterly reports and other information with the OTS. You may read and copy these reports and other non-confidential information that WMB files with the OTS at the OTS's offices at 1700 G Street, N.W., Washington, D.C. 20552. In addition, WMB's most recent periodic filings with the OTS are available to the investors at WMI's web site at http://www.wamu.com/ir and then clicking the "Fixed Income" button.

This offering circular incorporates by reference certain information that WMB files with the OTS. The information incorporated by reference is considered to be a part of this offering circular and should be read with the same care. When WMB updates the information contained in documents that have been incorporated by reference by making future filings with the OTS, the information incorporated by reference in this offering circular is considered to be automatically updated and superseded. In other words, in the case of a conflict or inconsistency between information with respect to WMB contained in this offering circular and information incorporated by reference into this offering circular, you should rely on the information contained in the

document that was filed later. WMB incorporates herein by reference the documents listed below and any documents it files with the OTS in the future under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act or regulations of the OTS to substantially similar effect until the Offering is completed:

• Annual Report on Form 10-K for the year ended December 31, 2004; and

• Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2005, June 30, 2005 and September 30, 2005.

This offering circular also incorporates herein by reference certain other information that WMB submits to the OTS. WMB submits to the OTS quarterly reports regarding WMB's financial condition and operations on OTS Form 1313 entitled "Thrift Financial Report" (each, a *"Thrift Financial Report"* and collectively, the *"Thrift Financial Reports"*). Each Thrift Financial Report consists of a Consolidated Statement of Condition, Consolidated Statement of Operations, Consolidated Cash Flow Information, Consolidated Capital Requirements and other supporting schedules as of the end of the period to which the report relates. The Thrift Financial Reports are prepared in accordance with regulatory instructions issued by the OTS. These regulatory instructions in most, but not all, cases follow generally accepted accounting principles in the United States (*"GAAP"*) or the opinions and statements of the Accounting Principles Board or the Financial Accounting Standards Board. While the Thrift Financial Reports are supervisory and regulatory documents, not previously accounting documents, and do not provide a complete range of financial disclosure about WMB, the reports nevertheless provide important information concerning WMB's financial condition and operating results. In addition, WMB's Thrift Financial Reports are not audited. The non-confidential portions of Thrift Financial Reports filed by WMB are on file with, and are publicly available upon written request to the Office of Thrift Supervision, FOIA, 1700 G Street, N.W., Washington, D.C. 20552, Attention: Dissemination Branch and are also available at the U.S. Federal Deposit Insurance Corporation's (the *"FDIC"*) web site at http://www.fdic.gov.

You may request a copy of these filings, other than an exhibit to a filing unless that exhibit is specifically incorporated by reference into that filing, at no cost, by writing to or telephoning WMI at:

1201 Third Avenue
Seattle, Washington 98101
(206) 461-3187

## ENFORCEMENT OF CIVIL LIABILITIES

WaMu Cayman has been advised by Maples and Calder, its Cayman Island counsel, that the courts of the Cayman Islands should not be expected to (i) enforce judgments of U.S. courts obtained in actions against WaMu Cayman's directors who are non-residents of the United States predicated upon the civil liability provisions of the U.S. federal securities laws or (ii) entertain original actions brought in the Cayman Islands against such persons or WaMu Cayman predicated solely upon U.S. federal securities laws. There is no treaty in effect between the United States and the Cayman Islands providing for such enforcement, and there are grounds upon which the Cayman Islands courts may not enforce judgments of U.S. courts.

## INDEX OF TERMS

*An index of terms used in this offering circular with specific meanings appears on the inside back cover of this offering circular.*

## OFFERING CIRCULAR SUMMARY

*The following summary is qualified in its entirety by the detailed information appearing elsewhere in this offering circular, in particular, the information under the headings "Description of the WaMu Cayman Preferred Securities" and "Description of the Fixed Rate Company Preferred Securities," which describe the terms and conditions of the securities offered hereby.*

### Introduction

The 7.25% Perpetual Non-cumulative Preferred Securities, Series A-1, liquidation preference $100,000 per security (the *"Series A-1 WaMu Cayman Preferred Securities"*), and the 7.25% Perpetual Non-cumulative Preferred Securities, Series A-2, liquidation preference $10,000 per security (the *"Series A-2 WaMu Cayman Preferred Securities"* and, together with the Series A-1 WaMu Cayman Preferred Securities, the *"WaMu Cayman Preferred Securities"*), are being issued by Washington Mutual Preferred Funding (Cayman) I Ltd. *("WaMu Cayman")* in a financing transaction that raises capital for Washington Mutual Bank *("WMB")*. WMB is a subsidiary of Washington Mutual, Inc. *("WMI")*. WMI and its affiliates are referred to herein as the *"WMI Group"*.

WaMu Cayman will invest the proceeds of the WaMu Cayman Preferred Securities in a like amount of 7.25% Perpetual Non-cumulative Preferred Securities, liquidation preference $1,000 per security (the *"Fixed Rate Company Preferred Securities"*), of Washington Mutual Preferred Funding LLC, a Delaware limited liability company (the *"Company"*). WaMu Cayman will have no material assets other than the Fixed Rate Company Preferred Securities. The financial entitlements of each WaMu Cayman Preferred Security will be substantially the same as the financial entitlements of a like amount of Fixed Rate Company Preferred Securities, with the consequence that dividends and the redemption price on each WaMu Cayman Preferred Security will be payable on the same dates and in the same amounts as the corresponding dividends and redemption price, as applicable, on a like amount of Fixed Rate Company Preferred Securities. The Company's initial material assets will consist of direct or indirect interests in mortgages or mortgage-related assets originated by WMB as described under "The Company — Business of the Company — Assets of the Company" and "The Asset Trust."

The terms of the Series A-1 WaMu Cayman Preferred Securities and the Series A-2 WaMu Cayman Preferred Securities are identical except for their per security liquidation preference. The Series A-1 WaMu Cayman Preferred Securities are being offered in reliance upon Rule 144A under the U.S. Securities Act of 1933, as amended (the *"Securities Act"*) only in the United States and to persons who are *"qualified institutional buyers"* within the meaning of 144A and *"qualified purchasers"* within the meaning of Section 2(a)(51) of the U.S. Investment Company Act of 1940, as amended (the *"Investment Company Act"*). The Series A-2 WaMu Cayman Preferred Securities are being offered and sold in reliance upon Regulation S under the Securities Act only to non-U.S. persons in transactions outside the United States. Resales of Series A-1 WaMu Cayman Preferred Securities to non-U.S. persons and of Series A-2 WaMu Cayman Preferred Securities in the United States or to U.S. persons are subject to restrictions as described under "Notice to Investors — Exchanges Between Rule 144A Global Security Evidencing Series A-1 WaMu Cayman Preferred Securities and Regulation S Global Security Evidencing Series A-2 WaMu Cayman Preferred Securities," in each case subject to the certification requirements described under "Book-Entry Issuance."

By a separate offering circular dated the same date as this offering circular, Washington Mutual Preferred Funding Trust I, a Delaware statutory trust established by the Company as grantor *("WaMu Delaware")*, is offering $1,250,000,000 of its Perpetual Exchangeable Non-cumulative Trust Securities (the *"Trust Securities"*). WaMu Delaware will invest the proceeds of the Trust Securities in a like amount of the Company's Perpetual Non-cumulative Fixed-to-Floating Rate Preferred Securities (the *"Fixed-to-Floating Rate Company Preferred Securities"*

and, together with the Fixed Rate Company Preferred Securities, the "*Company Preferred Securities*"). The terms of the Fixed-to-Floating Rate Company Preferred Securities are substantially identical to the Fixed Rate Company Preferred Securities except for the dividend rate. The Trust Securities are being offered and sold only in the United States and only to U.S. persons that are both qualified institutional buyers and qualified purchasers in reliance on the exemption from registration under the Securities Act pursuant to Rule 144A. They are not being offered by this offering circular. The WaMu Cayman Preferred Securities are not exchangeable for Trust Securities, or *vice versa*.

WMB has asked for confirmation from the Office of Thrift Supervision (together with any successor regulator, the "*OTS*") that the Company Preferred Securities constitute core capital of WMB under the OTS' applicable regulatory capital regulations and, upon receipt of such confirmation, intends to treat the Company Preferred Securities accordingly.

If the OTS so directs following the occurrence of an Exchange Event, each WaMu Cayman Preferred Security will be automatically exchanged for a like amount of Fixed Rate Depositary Shares each representing 1/1000th of a share of WMI's Series J Perpetual Non-cumulative Fixed Rate Preferred Stock, no par value and liquidation preference $1,000,000 per share ("*Fixed Rate WMI Preferred Stock*"), as described below in this Summary under "— The Offering — Conditional Exchange." Upon a Conditional Exchange, the Trust Securities will also be automatically exchanged, but for depositary shares representing a different series of WMI's preferred stock, having substantially equivalent terms (with certain exceptions) as to dividends, liquidation preference and redemption preference as the Fixed-to-Floating Rate Company Preferred Securities.

This offering circular uses the term "*like amount*" in describing the financial entitlements and voting rights, as applicable, of the WaMu Cayman Preferred Securities as compared to the Fixed Rate Company Preferred Securities and in describing the amount of Fixed Rate Depositary Shares, each representing a 1/1000th interest in one share of Fixed Rate WMI Preferred Stock for which the WaMu Cayman Preferred Securities will be exchanged upon the occurrence of a Conditional Exchange. The term "*like amount*" means:

- when describing the financial entitlements or voting rights, as applicable, of WaMu Cayman Preferred Securities as compared to Fixed Rate Company Preferred Securities, a number of Fixed Rate Company Preferred Securities that have the same aggregate liquidation preference as the WaMu Cayman Preferred Securities to which the reference is being made (e.g., 1,000 Fixed Rate Company Preferred Securities with an aggregate liquidation preference of $1,000,000 are a "like amount" for ten Series A-1 WaMu Cayman Preferred Securities or 100 Series A-2 WaMu Cayman Preferred Securities, each having an aggregate liquidation preference of $1,000,000); and

- when describing the number of depositary shares for Fixed Rate WMI Preferred Stock with which WaMu Cayman Preferred Securities will be exchanged upon a Conditional Exchange, a number of Fixed Rate Depositary Shares, each representing a 1/1000th interest in one share of Fixed Rate WMI Preferred Stock, having a liquidation preference equal to the liquidation preference of the WaMu Cayman Preferred Securities that are being exchanged (e.g., 10,000 Fixed Rate Depositary Shares representing Fixed Rate WMI Preferred Stock with an aggregate liquidation preference of $10,000,000 are a "like amount" for 100 Series A-1 WaMu Cayman Preferred Securities or 1,000 Series A-2 WaMu Cayman Preferred Securities, each having an aggregate liquidation preference of $10,000,000).

The offering of the WaMu Cayman Preferred Securities and the related issuance of the Fixed Rate Company Preferred Securities are referred to herein as the "*Offering*".

The following diagram outlines the relationship among WMI, WMB, University Street, the Company, the Asset Trust, WaMu Cayman, WaMu Delaware, purchasers of the WaMu Cayman Preferred Securities and purchasers of the Trust Securities:



---

[1] New American Capital, Inc., not shown here, is WMB's direct parent.

[2] Marion Holdings, Inc., not shown here, is University Street's direct parent.

[3] Transferred by WMB to WaMu Cayman.

[4] Transferred by WMB to WaMu Delaware.

## WaMu Cayman

Washington Mutual Preferred Funding (Cayman) I Ltd. is a Cayman Islands exempted company limited by shares, incorporated on February 23, 2006 for the purposes set forth below in "WaMu Cayman." All of WaMu Cayman's ordinary shares (the *"WaMu Cayman Ordinary Shares"*) will be held in trust for the benefit of a Cayman Islands charity. WaMu Cayman will not issue any securities other than the WaMu Cayman Ordinary Shares, and the WaMu Cayman Preferred Securities offered hereby. WaMu Cayman will be prohibited from issuing other equity securities or any debt securities. The Fixed Rate Company Preferred Securities will be the only material assets of WaMu Cayman. WaMu Cayman will be managed by a Board of Directors consisting of five directors, three of whom will be appointed by such Cayman Islands charitable trust and two of whom will be persons who are also members of the Company's Board of Managers. Of the two WaMu Cayman directors who are also members of the Company's Board of Managers, one will be the same individual who is the Company's Independent Manager.

Subject to the limitations and assumptions described under "Certain Tax Considerations — United States Federal Income Tax Consequences," for United States Federal income tax purposes, WaMu Cayman intends to be treated as a corporation, and for the holders of the WaMu Cayman Preferred Securities to be treated as holders of stock in such corporation.

## The Company

Washington Mutual Preferred Funding LLC is a Delaware limited liability company formed on February 3, 2006 for the purpose of (i) issuing the Fixed Rate Company Preferred Securities to WaMu Cayman, the Fixed-to-Floating Rate Company Preferred Securities to WaMu Delaware, the common securities of the Company (the *"Company Common Securities"*) to University Street, Inc., an indirect subsidiary of WMB *("University Street")*, and additional Parity Equity Securities or Junior Equity Securities subject to certain limitations described in this offering circular (ii) acquiring and holding Eligible Investments and (iii) performing functions necessary or incidental thereto.

The Fixed-to-Floating Rate Company Preferred Securities rank *pari passu* with the Fixed Rate Company Preferred Securities as to dividends and upon liquidation of the Company. The terms of the Fixed-to-Floating Rate Company Preferred Securities are substantially identical to the terms of the Fixed Rate Company Preferred Securities other than with respect to the rate applicable to dividends thereon. The Fixed-to-Floating Rate Company Preferred Securities will, if, when and as declared by the Company's Board of Managers, pay dividends at an annual rate of 6.534% until the Dividend Payment Date on March 15, 2011 and an annual rate equal to three-month LIBOR plus 1.4825% for the Dividend Period starting on such Dividend Payment Date and each Dividend Period thereafter.

University Street will own all of the Company Common Securities. The Eligible Investments owned by the Company from time to time will generate net income for payment by the Company to WaMu Cayman as dividends on the Fixed Rate Company Preferred Securities (and consequently for payment as dividends by WaMu Cayman to holders of the WaMu Cayman Preferred Securities), to WaMu Delaware as dividends on the Fixed-to-Floating Rate Company Preferred Securities (and consequently for pass through by WaMu Delaware to the holders of the Trust Securities) and to University Street as dividends on the Company Common Securities.

Subject to the limitations and assumptions described under "Certain Tax Considerations — United States Federal Income Tax Consequences," the Company intends to be treated as a partnership (other than a publicly traded partnership taxable as a corporation) for United States Federal income tax purposes and will receive the opinion of Mayer, Brown, Rowe & Maw LLP to the effect that, for United States Federal income tax purposes, the Company will not be treated as an association taxable as a corporation or as a publicly traded partnership taxable as a corporation.

The Company will be managed by a Board of Managers. The Company's Board of Managers will have three members, one of whom is not, and has not been during the preceding five years, an officer or employee of WMI or any affiliate of WMI, other than a financing subsidiary (the *"Independent Manager"*).

## Initial Conveyances

In connection with the Offering, WMB will convey a portfolio of first lien, closed-end, fixed rate home equity loans *("HELs")* to the Company in exchange for 100% of the Company Preferred Securities. Concurrently with such transfer by WMB, University Street will convey a portfolio of HELs to the Company in exchange for 100% of the Company Common Securities. The portfolios conveyed by WMB and University Street to the Company will consist of approximately $5,389,459,150 of HELs in the aggregate. The Company will convey 100% of the HELs that it owns to the Asset Trust in exchange for the Class A Trust Certificate of the Asset Trust. WMB will then sell the Fixed Rate Company Preferred Securities and the Fixed-to-Floating Rate Company Preferred Securities for cash to WaMu Cayman and WaMu Delaware, respectively.

## University Street

University Street, Inc. is a Washington corporation. It has elected to be treated as a real estate investment trust for United States Federal income tax purposes. University Street will hold 100% of the Company Common Securities which represent 100% of the voting rights in the Company (subject to the limited rights of holders of the Company Preferred Securities described herein).

## The Asset Trust

Washington Mutual Home Equity Trust I is a Delaware statutory trust formed pursuant to a trust agreement, to be entered into on or before the closing date, between the Company, as depositor, and Deutsche Bank Trust Company Delaware, as Delaware trustee (the *"Delaware Trustee"*). The Pooling and Servicing Agreement among the Company, as depositor, WMB, as Servicer, Deutsche Bank Trust Company Delaware, as Delaware Trustee, and Deutsche Bank National Trust Company, as Trustee (the *"Pooling and Servicing Agreement"*), will restate the trust agreement and will be the governing instrument of the Asset Trust. The Asset Trust will make an election to be treated as a real estate mortgage investment conduit *("REMIC")* for United States Federal income tax purposes.

The initial assets of the Asset Trust will consist of the portfolio of HELs to be conveyed by the Company to the Asset Trust in connection with the Offering. The HELs were originated by WMB primarily through its retail branches between September 2001 and September 2005. As of January 31, 2006, the HELs to be transferred into the Asset Trust had an aggregate unpaid principal balance of approximately $5,389,459,150.

## WMI

With a history dating back to 1889, Washington Mutual, Inc., a Washington corporation, is a retailer of financial services to consumers and small businesses. Based on its consolidated assets at September 30, 2005, WMI was the largest thrift holding company in the United States and the seventh largest among all U.S.-based bank and thrift holding companies. As of September 30, 2005, WMI, together with its subsidiaries, had total assets of approximately $333.6 billion, total liabilities of approximately $311.0 billion and total stockholders' equity of approximately $22.6 billion. As of September 30, 2005, WMI and its subsidiaries also had total deposits of approximately $190.4 billion. WMI's common stock is listed on the New York Stock

Exchange under the symbol "WM". The principal business offices of WMI are located at 1201 Third Avenue, Seattle, Washington 98101 and its telephone number is 206-461-2000.

**WMB**

Washington Mutual Bank (formerly known as Washington Mutual Bank, FA) is a federally chartered savings association, chartered and operating under the United States Home Owners' Loan Act of 1933, as amended. WMB engages in mortgage banking, consumer banking and small business banking. WMB, as a federally chartered association, has the authority to make various types of loans, including loans secured by homes and commercial real estate, secured and unsecured consumer loans, and secured and unsecured commercial loans. As a federal savings association, WMB is subject to regulation and examination by the OTS, its primary regulator. WMB is an indirect wholly-owned subsidiary of WMI.

Prior to 2004, WMB had two sister depository institutions which were both owned directly by WMI. WMB has since acquired both of these sister institutions. One of these institutions, Washington Mutual Bank fsb, a federal savings bank, became a wholly-owned subsidiary of WMB on February 1, 2004. The other institution, Washington Mutual Bank, a savings bank chartered under the laws of the state of Washington, converted into a federally chartered savings bank and then was merged into WMB on January 1, 2005.

## The Offering

**Issuer** . . . . . . . . . . . . . . . . . . . . . . . . . As to the WaMu Cayman Preferred Securities, Washington Mutual Preferred Funding (Cayman) I Ltd., a Cayman Islands exempted company limited by shares.

As to the Fixed Rate Company Preferred Securities, Washington Mutual Preferred Funding LLC, a Delaware limited liability company.

As to the Fixed Rate WMI Preferred Stock (which will be represented by the Fixed Rate Depositary Shares) for which the WaMu Cayman Preferred Securities will be exchanged upon the occurrence of a Conditional Exchange, Washington Mutual, Inc., a Washington corporation.

**Offered Securities** . . . . . . . . . . . . . . . 7.25% Perpetual Non-cumulative Preferred Securities, Series A-1, liquidation preference $100,000 per security and $302,300,000 in the aggregate, and 7.25% Perpetual Non-cumulative Preferred Securities, Series A-2, liquidation preference $10,000 per security and $447,700,000 in the aggregate, both issued by WaMu Cayman. The terms of the Series A-1 WaMu Cayman Preferred Securities and the Series A-2 WaMu Cayman Preferred Securities are identical except for their per security liquidation preference. The financial entitlements of each WaMu Cayman Preferred Security will be substantially the same as the financial entitlements of a like amount of Fixed Rate Company Preferred Securities, with the consequence that dividends and the redemption price on the WaMu Cayman Preferred Securities will be payable on the same dates and in the same amounts as the corresponding dividends and redemption price, as applicable, on a like amount of Fixed Rate Company Preferred Securities.

**Dividends** . . . . . . . . . . . . . . . . . . . . . . . Dividends on the WaMu Cayman Preferred Securities will become payable on a non-cumulative basis (except in the limited circumstances set out under "Description of the WaMu Cayman Preferred Securities — Dividends"), on each date on which the Company pays to WaMu Cayman dividends on the Fixed Rate Company Preferred Securities, in an amount per WaMu Cayman Preferred Security equal to the amount of dividends received by WaMu Cayman on a like amount of Fixed Rate Company Preferred Securities (including with respect to Additional Taxes, if any). WaMu Cayman's Board of Directors is not required to declare the payment of dividends in order for dividends to be paid. However, payment of dividends may be blocked by WaMu Cayman's Board of Directors, but only by their unanimous action (including consent of the Independent Director).

For purposes of this offering circular, we refer to distributions payable by the Company on its securities as "divi-

7

dends.'' Dividends on the Fixed Rate Company Preferred Securities are payable as follows:

*Dividend Rate.* Dividends on the Fixed Rate Company Preferred Securities will accrue at a fixed rate *per annum* equal to 7.25% applied to the liquidation preference of $1,000 per Fixed Rate Company Preferred Security.

*Dividend Payment Dates.* If declared by the Company's Board of Managers, the Dividend Payment Dates for the Fixed Rate Company Preferred Securities are the 15th day of March, June, September and December of each year, commencing on June 15, 2006. If any Dividend Payment Date is not a Business Day, then dividends will be payable on the first Business Day following such Dividend Payment Date with the same force and effect as if payment were made on the date such payment was originally payable.

*Declaration of Dividends, etc.* Dividends on the Fixed Rate Company Preferred Securities when, as and if declared by the Company's Board of Managers out of legally available funds, will be payable at the applicable dividend rate applied to the liquidation preference per Fixed Rate Company Preferred Security accruing on a non-cumulative basis on each such security as follows: (i) from March 7, 2006 in the case of the Fixed Rate Company Preferred Securities offered hereby and (ii) if additional Fixed Rate Company Preferred Securities are issued at a future date, from (A) March 7, 2006 if such date is before June 15, 2006, (B) the date of issue if such date is a Dividend Payment Date and (C) either the immediately preceding Dividend Payment Date or the date of issue as determined by the Company if the date of issue is other than a Dividend Payment Date and is after June 15, 2006. Any such dividends will be distributed to holders of Fixed Rate Company Preferred Securities in the manner described under ''Description of the Fixed Rate Company Preferred Securities — Dividends.''

*Non-cumulative Dividends.* Dividends on the Fixed Rate Company Preferred Securities are not cumulative. Accordingly, in the event dividends are not declared on the Fixed Rate Company Preferred Securities for payment on any Dividend Payment Date, then any accrued dividends will cease to accrue and be payable. If the Company's Board of Managers has not declared a dividend before the Dividend Payment Date for any Dividend Period, the Company will have no obligation to pay dividends accrued for such Dividend Period after the Dividend Payment Date for that Dividend Period, whether or not dividends on the Fixed Rate Company Preferred Securities are declared for any future Dividend Period.

| Redemption / Replacement Capital Covenant . . . . . . . . . . . . . . . . . . . . . . . | **General.**  On each day on which the Company redeems Fixed Rate Company Preferred Securities, WaMu Cayman will redeem a like amount of WaMu Cayman Preferred Securities. If the redemption of the Fixed Rate Company Preferred Securities is in part instead of in whole, then WaMu Cayman will allocate the partial redemption between the Series A-1 WaMu Cayman Preferred Securities and the Series A-2 WaMu Cayman Preferred Securities in proportion to their aggregate liquidation preferences. The redemption provisions of the Fixed Rate Company Preferred Securities are described below. |
|---|---|

Subject to a covenant in favor of certain of WMI's debtholders limiting WMI's and its subsidiaries' right to repurchase or redeem the Fixed Rate Company Preferred Securities or the WaMu Cayman Preferred Securities (among others) as described in the next paragraph, and subject to the Company having received the prior approval of the OTS for any proposed redemption of Fixed Rate Company Preferred Securities, the Company may, at its option, redeem the Fixed Rate Company Preferred Securities:

- in whole but not in part, prior to the Dividend Payment Date in March, 2011, if a Tax Event, an Investment Company Act Event or a Regulatory Capital Event occurs. The cash redemption price will be the greater of (i) $1,000 per Fixed Rate Company Preferred Security or (ii) the sum of present values of $1,000 per Fixed Rate Company Preferred Security and all undeclared dividends for the Dividend Period from the redemption date to and including the Dividend Payment Date in March 2011, discounted to the redemption date on a quarterly basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate, as calculated by an Independent Investment Banker, *plus* 0.40%,

  *plus* any declared and unpaid dividends to the redemption date, or

- in whole or in part, on or after the Dividend Payment Date in March 2011, at a cash redemption price of $1,000 per Fixed Rate Company Preferred Security, *plus* any declared and unpaid dividends to the redemption date, without accumulation of any undeclared dividends.

See "Description of the Fixed Rate Company Preferred Securities — Redemption."

**Restriction on Redemption or Repurchases.**  At or prior to initial issuance of the WaMu Cayman Preferred Securities, WMI will enter into a *"Replacement Capital Covenant"* as described under "Description of the WaMu Cayman Preferred Securities — Restriction on Redemption or Repurchases." In the Replacement Capital Covenant, WMI will

covenant in favor of certain of its debtholders that, if WMI or a subsidiary repurchases or redeems any WaMu Cayman Preferred Securities, Trust Securities or Company Preferred Securities or, after a Conditional Exchange, Fixed Rate Depositary Shares (or related Fixed Rate WMI Preferred Stock), WMI or its subsidiaries will do so only if and to the extent that the total redemption or purchase price is equal to or less than designated percentages of the net cash proceeds that WMI or its subsidiaries have received during the 180 days prior to such redemption or repurchase from the issuance of securities having the characteristics described under "Description of the WaMu Cayman Preferred Securities — Restriction on Redemption or Repurchases."

Ranking . . . . . . . . . . . . . . . . . . . . . . .    **WaMu Cayman Preferred Securities.** The WaMu Cayman Preferred Securities will rank senior to the WaMu Cayman Ordinary Shares in terms of dividends and liquidation payments. The Series A-1 WaMu Cayman Preferred Securities and the Series A-2 WaMu Cayman Preferred Securities will rank *pari passu* with each other in terms of dividends and liquidation payments and otherwise have identical terms other than as to their respective per security liquidation preference.

WaMu Cayman's Memorandum and Articles of Association (together, as amended, the *"WaMu Cayman's Articles of Association"*) will provide that WaMu Cayman will not, without the consent of the holder of each outstanding WaMu Cayman Preferred Security, issue equity securities ranking *pari passu* or senior to the WaMu Cayman Preferred Securities in terms of dividends or redemption or liquidation payments or incur any indebtedness.

**Fixed Rate Company Preferred Securities.** The Fixed Rate Company Preferred Securities will rank *pari passu* with the Fixed-to-Floating Rate Company Preferred Securities and senior to the Company Common Securities in terms of dividends and liquidation payments.

During a Dividend Period, the Company may not declare or pay any dividends on any of its Junior Equity Securities, other than dividends payable in Junior Equity Securities, or repurchase, redeem or otherwise acquire for consideration, directly or indirectly, any Junior Equity Securities (other than as a result of reclassification of Junior Equity Securities for or into other Junior Equity Securities, or the exchange or conversion of Junior Equity Securities for or into other Junior Equity Securities), unless dividends for such Dividend Period on all outstanding Company Preferred Securities have been declared and paid in full, or declared and set aside for payment, as the case may be.

The Company may from time to time issue additional Parity Equity Securities without the consent of the holders of the

Company Preferred Securities, *provided* that (i) after giving effect to such issuance, the *pro forma* net book value of the Company's assets (after giving effect to the acquisition of any New Assets in connection with the issuance of such Parity Equity Securities) will equal or exceed 1.5 times the sum of the aggregate liquidation preference of the preferred securities of the Company then outstanding and any such Parity Equity Securities that the Company proposes to issue, (ii) after giving effect to such issuance, the Company's *pro forma* funds from continuing operations, or "*FFO*", for the four fiscal quarters beginning with the fiscal quarter in which such Parity Equity Securities are proposed to be issued (calculated (A) assuming that such proposed Parity Equity Securities are issued and that, if any Parity Equity Securities (including the Parity Equity Securities that the Company proposes to issue) bear dividends based on a floating rate, the applicable dividend rate will not change during such four fiscal quarters from the rate in effect on the applicable date of determination and (B) as adjusted to reflect any New Assets) equals or exceeds 150% of the amount that would be required to pay full annual dividends on all preferred securities of the Company then outstanding and any such Parity Equity Securities that the Company proposes to issue and (iii) the Company is not otherwise in breach of any of its covenants set forth in the LLC Agreement. See "Description of the Fixed Rate Company Preferred Securities — Ranking."

In the Exchange Agreement, WMI will covenant in favor of the holders of the WaMu Cayman Preferred Securities and the Trust Securities that, if full dividends on (i) the Company Preferred Securities, (ii) the WaMu Cayman Preferred Securities or (iii) the Trust Securities for any Dividend Period are not paid, then WMI will not declare or pay dividends with respect to, or redeem, purchase or acquire, any of its equity capital securities during the next succeeding Dividend Period, except dividends in connection with a shareholders' rights plan, if any, or dividends in connection with benefits plans.

Conditional Exchange . . . . . . . . . . . . . If the OTS so directs following the occurrence of an Exchange Event, each WaMu Cayman Preferred Security will be automatically exchanged for a like amount of Fixed Rate Depositary Shares representing 1/1000th of a share of WMI's Series J Perpetual Non-cumulative Fixed Rate Preferred Stock (the "*Fixed Rate Depositary Shares*").

"*Exchange Event*" means (i) WMB becoming "undercapitalized" under the OTS' "prompt corrective action" regulations, (ii) WMB being placed into conservatorship or receivership or (iii) the OTS, in its sole discretion, directing such exchange in anticipation of WMB becoming "undercapitalized" in the near term or taking supervisory action

that limits the payment of dividends, as applicable, by WMB, and in connection therewith, directs such exchange.

The Fixed Rate WMI Preferred Stock will have substantially equivalent terms as to dividends, redemption and liquidation preference as the Fixed Rate Company Preferred Securities, except that the Fixed Rate WMI Preferred Stock: (i) will not have the benefit of the covenants described under "Description of the Fixed Rate Company Preferred Securities — Voting Rights and Covenants;" (ii) will not be listed on any securities exchange or automated dealer quotation system; (iii) will be redeemable prior to the Dividend Payment Date occurring on March 15, 2011 only upon the occurrence of a Regulatory Capital Event (as described herein); (iv) Additional Amounts will not be payable with respect to the Fixed Rate WMI Preferred Stock; and (v) if WMI fails to pay, or declare and set aside for payment, full dividends on the Fixed Rate WMI Preferred Stock for six Dividend Periods, the authorized number of WMI's directors will increase by two, and the holders of Fixed Rate WMI Preferred Stock, voting together with the holders of any other equity capital securities of WMI having similar voting rights, including the Fixed-to-Floating Rate WMI Preferred Stock, will have the right to elect two directors in addition to the directors then in office at the next annual meeting of shareholders. The Fixed Rate WMI Preferred Stock will be subject to the Replacement Capital Covenant described under "— Redemption / Replacement Capital Covenant" above.

WMI will covenant in the Exchange Agreement in favor of the holders of the WaMu Cayman Preferred Securities that it will not issue any preferred stock that would rank senior to the Fixed Rate WMI Preferred Stock upon its issuance. Each share of Fixed Rate WMI Preferred Stock will, upon issuance, rank at least *pari passu* with the most senior preferred stock of WMI, if any, then outstanding.

Voting Rights and Certain
Covenants ........................ Except as otherwise set forth below, the holders of the Fixed Rate Company Preferred Securities will not have voting rights.

However, the LLC Agreement will provide that, except with the consent or affirmative vote of the holders of at least two-thirds of the Fixed Rate Company Preferred Securities and the Fixed-to-Floating Rate Company Preferred Securities, voting together as a single class, the Company will not:

• effect a consolidation, merger or share exchange with or into another entity other than an entity controlled by, or under common control with, WMI;

• issue any securities of the Company ranking senior to the Company Preferred Securities in respect of pay-

ments of dividends or on liquidation to the Company Preferred Securities (*"Senior Equity Securities"*);

- incur any indebtedness for borrowed money;

- pay dividends on the Company's Junior Equity Securities unless the Company's FFO, for the four prior fiscal quarters equals or exceeds 150% of the amount that would be required to pay full annual dividends on all outstanding Company Preferred Securities, as well as any other Parity Equity Securities;

- amend or otherwise change the requirement that the Company make investments and distributions with the proceeds of the Company's assets such that the Company's FFO over any period of four fiscal quarters will equal or exceed 150% of the amount that would be required to pay full annual dividends on all outstanding Company Preferred Securities, as well as any other Parity Equity Securities;

- issue any additional Company Common Securities to any person, other than University Street or another affiliate of WMI;

- amend or otherwise change the terms of any Asset Documentation in a manner which is materially adverse to WaMu Cayman or the holders of the WaMu Cayman Preferred Securities;

- remove or cause to be removed, as applicable, "Washington Mutual" from the Company's, WaMu Cayman's or WaMu Delaware's name unless the name of WMI changes and the Company makes a change to the Company's, WaMu Cayman's and WaMu Delaware's name to be consistent with the new group name;

- take any action or fail to take any action that would cause the Company to fail to be treated as a partnership (other than a publicly traded partnership taxable as a corporation) for United States Federal income tax purposes;

- amend or otherwise change the requirement that the Company not engage in a U.S. trade or business for United States Federal income tax purposes;

- amend or otherwise change the requirement that the Company hold only assets that qualify for the portfolio interest exemption under the Code and are exempt from gross basis United States withholding taxes;

- amend or otherwise change the requirement that the Company manage its affairs such that income with respect to the WaMu Cayman Preferred Securities does not constitute "unrelated business taxable income" for United States Federal income tax purposes; or

- amend its Certificate of Formation or LLC Agreement in a manner that materially and adversely affects the terms of the Company Preferred Securities; *provided, however,* that, if such amendment affects only one class of Company Preferred Securities, such amendment will require only the class vote of the holders of at least two-thirds of the applicable Company Preferred Securities of such class (voting separately and not as a single class with the other class) and, if such amendment affects both classes but affects them differently, then such amendment will require a class vote of each class of Company Preferred Securities, each voting separately.

In addition, the LLC Agreement will provide that, without the consent of all of the Managers, including the Independent Manager, the Company will not:

- terminate, amend, or otherwise change any Asset Documentation; or

- effect a consolidation, merger or share exchange (excluding the Conditional Exchange) that is not tax-free to the holders of the Fixed Rate Company Preferred Securities, and the related WaMu Cayman Preferred Securities, unless such transaction was approved by the consent or affirmative vote of the holders of at least two-thirds of the Fixed Rate Company Preferred Securities and the Fixed-to-Floating Rate Preferred Securities, voting together as a single class.

In addition, the LLC Agreement will provide that if (i) the Company fails to pay full dividends on the Company Preferred Securities on any Dividend Payment Date, (ii) WaMu Cayman fails to pay full dividends on the WaMu Cayman Preferred Securities on any Dividend Payment Date or (iii) a Bankruptcy Event occurs, the holders of the Fixed Rate Company Preferred Securities and the Fixed-to-Floating Rate Company Preferred Securities, voting together as a single class, by majority vote, are entitled to remove the initial or any succeeding Independent Manager and to fill the vacancy created by such removal or any other vacancy existing in the office of the Independent Manager.

The voting rights described above with respect to the Fixed Rate Company Preferred Securities will be passed on to the holders of the related WaMu Cayman Preferred Securities and with respect to the Fixed-to-Floating Rate Company Preferred Securities will be passed through to the holders of the related Trust Securities of WaMu Delaware. See "Description of the WaMu Cayman Preferred Securities — Voting Rights."

Additional Amounts . . . . . . . . . . . . . . .    If the Company or WaMu Cayman is required to pay any additional taxes, duties or other governmental charges as a result of an Additional Tax Event, the Company will pay as

14

additional amounts on the Fixed Rate Company Preferred Securities such amounts as will be required so that dividends on the Fixed Rate Company Preferred Securities, and accordingly on the WaMu Cayman Preferred Securities, will not be reduced as a result of any such Additional Taxes. See "Description of the Fixed Rate Company Preferred Securities — Additional Amounts." If investors exchange their Fixed Rate Company Preferred Securities for Fixed Rate WMI Preferred Stock upon a Conditional Exchange, WMI will not be obligated to pay Additional Amounts on the Fixed Rate WMI Preferred Stock.

Assets and the Asset Trust ........ The initial assets of the Company will consist of the Class A Asset Trust Certificate representing its interest in the Asset Trust. The Asset Trust is a Delaware statutory trust formed pursuant to a trust agreement between the Company, as depositor, and Deutsche Bank Trust Company Delaware, as Delaware Trustee. The Pooling and Servicing Agreement among the Company, as depositor, WMB, as Servicer, Deutsche Bank Trust Company Delaware, as Delaware Trustee, and Deutsche Bank National Trust Company, as Trustee, will restate the trust agreement and will thereafter be the governing instrument of the Asset Trust. The Asset Trust will make a REMIC election for federal tax purposes.

The initial assets of the Asset Trust will consist of a portfolio (including payments thereon received from and after February 1, 2006) of HELs and certain related assets originated by WMB primarily through its retail branches between September 1, 2001 and September 30, 2005. As of January 31, 2006, the 56,090 HELs had an aggregate unpaid principal balance of approximately $5,389,459,150. These loans typically are made for reasons such as home purchases, home improvements, furniture and fixtures purchases, purchases of automobiles and debt consolidation. These HELs are first lien, closed-end fixed rate home equity loans and are generally repaid on a self-amortizing basis.

From time to time, the Company may acquire Additional Assets. All Additional Assets acquired by the Company will be Eligible Assets.

Listing ........................... Application will be made to list the Series A-2 WaMu Cayman Preferred Securities on the Euro MTF market of the Luxembourg Stock Exchange. The Series A-1 WaMu Cayman Preferred Securities will not be listed on any securities exchange or automated dealer quotation system.

Use of Proceeds.................. WaMu Cayman will use the proceeds of the sale of the WaMu Cayman Preferred Securities to purchase a like amount of Fixed Rate Company Preferred Securities from WMB, which the Company will issue to WMB in exchange for the conveyance of a portfolio of HELs to the Company.

The WMI Group will use the proceeds from the sale of the Fixed Rate Company Preferred Securities to WaMu Cayman and the Fixed-to-Floating Rate Preferred Securities to WaMu Delaware for general corporate purposes, which may include the repurchase of WMI's common stock.

Ratings .......................... The WaMu Cayman Preferred Securities are expected to be assigned upon issuance ratings of "BBB" by Standard & Poor's Rating Services, a division of The McGraw Hill Companies, Inc., "Baa2" by Moody's Investors Services, Inc. and "A−" by Fitch, Inc. A rating is not a recommendation to buy, sell or hold securities and may be subject to revision, suspension or withdrawal at any time by the assigning rating organization.

Tax Consequences .............. It is anticipated that WaMu Cayman will be a passive foreign investment company ("*PFIC*") for United States Federal income tax purposes and that the WaMu Cayman Preferred Securities will be treated as equity interests therein.

The Company intends to qualify as a partnership (other than a publicly traded partnership taxable as a corporation) for United States Federal income tax purposes, and thus, the Company Preferred Securities held by WaMu Cayman are intended to constitute equity interests in such partnership.

WaMu Cayman and the Company intend to operate so as not to be engaged in a U.S. trade or business. Accordingly, WaMu Cayman intends that it will not be subject to United States Federal income taxes on its net income.

See "Certain Tax Considerations — United States Federal Income Tax Consequences."

ERISA Considerations............. No WaMu Cayman Preferred Security may be purchased by or transferred to any Benefit Plan Investor, except for an insurance company general account that represents, warrants and covenants that, at the time of acquisition and throughout the period it holds the securities, (A) it is eligible for and meets the requirements of the Department of Labor Prohibited Transaction Class Exemption 95-60, (B) less than 25% of the assets of such general account are (or represent) assets of a Benefit Plan Investor and (C) it is not a person who has discretionary authority or control with respect to the assets of WaMu Cayman or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person and would not otherwise be excluded under 29 C.F.R. 25†0.3-†0†(f)(†).

Governing Law ................... WaMu Cayman's Articles of Association and the WaMu Cayman Preferred Securities will be governed by, and construed in accordance with, the laws of the Cayman Islands. The LLC Agreement and the Fixed Rate Company

Preferred Securities will be governed by, and construed in accordance with, the laws of the State of Delaware. The Fixed Rate WMI Preferred Stock will be governed by and construed in accordance with the laws of the State of Washington. The Fixed Rate Depositary Shares will be governed by, and construed in accordance with, the laws of the State of New York.

CUSIP / ISIN . . . . . . . . . . . . . . . . . . . . . .    The CUSIP number for the Series A-1 WaMu Cayman Preferred Securities is 93934V AA 5.

The ISIN number for the Series A-1 WaMu Cayman Preferred Securities is US93934VAA52.

The CUSIP number for the Series A-2 WaMu Cayman Preferred Securities is G9463G AA 6.

The ISIN number for the Series A-2 WaMu Cayman Preferred Securities is USG9463GAA60.

## RISK FACTORS

*Purchasers should carefully consider the following risk factors in conjunction with the other information contained in this offering circular, as well as information that is incorporated by reference in this offering circular, before purchasing any WaMu Cayman Preferred Securities, the financial entitlements of which will be substantially similar to those of a like amount of Fixed Rate Company Preferred Securities and which are conditionally exchangeable into Fixed Rate Depositary Shares representing interests in Fixed Rate WMI Preferred Stock.*

### Risks Relating to the Terms of the WaMu Cayman Preferred Securities and the Fixed Rate Company Preferred Securities

**WaMu Cayman's ability to pay dividends on the WaMu Cayman Preferred Securities depends on whether the Company will pay dividends on the Fixed Rate Company Preferred Securities.**

The only material assets of WaMu Cayman will be the Fixed Rate Company Preferred Securities. Consequently, WaMu Cayman's ability to pay dividends on the WaMu Cayman Preferred Securities depends entirely on whether the Company pays dividends on the Fixed Rate Company Preferred Securities held by WaMu Cayman. If the Company does not declare and pay dividends on the Fixed Rate Company Preferred Securities, WaMu Cayman will not pay dividends on the WaMu Cayman Preferred Securities.

**Even if the Company pays dividends on the Fixed Rate Company Preferred Securities held by WaMu Cayman, it is possible that WaMu Cayman's Board of Directors may act to prevent payment of dividends on the WaMu Cayman Preferred Securities.**

Even though WaMu Cayman's Articles of Association provide that dividends on the WaMu Cayman Preferred Securities will be automatically payable on each date on which the Company pays to WaMu Cayman dividends on the Fixed Rate Company Preferred Securities owned by WaMu Cayman, WaMu Cayman's Articles of Association also provide that WaMu Cayman's Board of Directors, acting unanimously (including the two directors who are also members of the Company's Board of Managers (one of whom is the Independent Manager)), may prevent the payment of such dividends on the WaMu Cayman Preferred Securities. However, if full dividends on the WaMu Cayman Preferred Securities for any Dividend Period have not been declared and paid, then, as described under "Description of the Fixed Rate Company Preferred Securities — Restrictions on Dividends by WMI," WMI will not declare or pay dividends with respect to any of its equity capital securities during the next succeeding Dividend Period, except dividends in connection with a shareholder's rights plan, if any, or dividends in connection with benefits plans.

**The level of the Company's assets relative to the aggregate liquidation preference of the Company Preferred Securities could shrink over time because of, among other things, dividends paid by the Company on the Company Common Securities or other Junior Equity Securities if any are issued at a future date.**

The LLC Agreement includes provisions that limit the Company's ability to pay dividends on the Company's Junior Equity Securities but, subject to satisfaction of those limitations, does not prohibit dividends that could cause the level of the Company's assets relative to the aggregate liquidation preference of the Company Preferred Securities to shrink. These limitations are described under "Description of the Fixed Rate Company Preferred Securities — Ranking," "— Restrictions on Dividends" and "Voting Rights and Covenants." They include the following:

- during a Dividend Period, the Company may not pay dividends on Junior Equity Securities, or repurchase, redeem or otherwise acquire for consideration directly or indirectly (with limited exceptions) Junior Equity Securities, unless dividends for such Dividend Period on all outstanding Company Preferred Securities have been declared and paid in full, or set aside for payment, as the case may be; and

18

- without the consent or affirmative vote the holders of at least two-thirds of the Fixed Rate Company Preferred Securities and the Fixed-to-Floating Rate Company Securities, voting together as a single class, the Company may not:
  - pay dividends on Junior Equity Securities unless the Company's FFO for the four prior fiscal quarters equals or exceeds 150% of the amount that would be required to pay full dividends on the outstanding Company Preferred Securities, as well as any other Parity Equity Securities; or
  - amend or otherwise change the requirement that the Company make investments and distributions with the proceeds of the Company's assets such that the Company's FFO for any period of four fiscal quarters will equal or exceed 150% of the amount that would be required to pay full annual dividends on all outstanding Company Preferred Securities, as well as any other Parity Equity Securities.

As HELs in the Asset Trust prepay or repay principal and distributions with respect to such principal payments are made by the Asset Trust to the Company on the Class A Asset Trust Certificate, subject to the limitations referenced above, the Company may choose to apply such amounts to pay dividends on the Company Common Securities or reinvest such amounts in additional Eligible Assets. Additionally, subject to the limitations referenced above, the Company could distribute a portion of the Class A Asset Trust Certificate as a dividend on the Company Common Securities. The Company has no current intention to pay an extraordinary dividend, and WMI has no current intention to cause or permit the Company to pay such an extraordinary dividend. Nevertheless, dividends paid by the Company on the Company Common Securities could result in a reduction in the Company's assets that could have the consequence, notwithstanding its compliance with the limitations referred to above, of the Company not having funds available to pay full dividends on the Company Preferred Securities in future periods or loss by investors of some or all of the amount of their investment were the Company to be liquidated.

***The WaMu Cayman Preferred Securities are perpetual and not redeemable at the option of the holder, and holders of the WaMu Cayman Preferred Securities can have no assurance of receiving their initial investment back.***

The WaMu Cayman Preferred Securities may not be redeemed at the option of the holder thereof under any circumstances, are perpetual and have no maturity date. While the WaMu Cayman Preferred Securities may be redeemed at the option of the Company under certain circumstances described herein, any such redemption is subject to the approval of the OTS and may be constrained by operation of the Replacement Capital Covenant. Investors in the WaMu Cayman Preferred Securities will have no right to reclaim their initial investment from WaMu Cayman and there can be no guarantee that the WaMu Cayman Preferred Securities will ever be redeemed. If investors in the WaMu Cayman Preferred Securities choose to sell their WaMu Cayman Preferred Securities in order to reclaim all or part of their initial investment in the absence of any redemption, there can be no guarantee that such investors would be able to sell their securities in the secondary market, or that if such sale occurred the sale price would at or above the initial price.

***Dividends on the WaMu Cayman Preferred Securities and the Fixed Rate Company Preferred Securities are not cumulative and purchasers will not receive dividends on the WaMu Cayman Preferred Securities for any quarter unless dividends are authorized and declared by the Company's Board of Managers for that quarter on the like amount of Fixed Rate Company Preferred Securities held by WaMu Cayman.***

Dividends on the Fixed Rate Company Preferred Securities are not cumulative. Consequently, if the Company's Board of Managers does not declare a dividend on the Fixed Rate

Company Preferred Securities for any quarter, WaMu Cayman will not be entitled to receive dividends for such quarter, and consequently holders of the WaMu Cayman Preferred Securities will not receive dividends with respect to their securities for that quarter. In addition, the Company's Board of Managers may determine that it would be in the Company's best interests to pay less than the full amount of the stated dividends on the Fixed Rate Company Preferred Securities or no dividends for any quarter even though funds are available. Factors that would generally be considered by the Company's Board of Managers in making this determination are the amount of available funds, the Company's financial condition and capital needs, the impact of current and pending legislation and regulations, economic conditions, and tax considerations.

***Even if the Company pays dividends on Fixed Rate Company Preferred Securities held by WaMu Cayman, it is possible that WaMu Cayman may not be able to pay dividends on the WaMu Cayman Preferred Securities because it has incurred involuntary liabilities.***

Even if the Company pays dividends on Fixed Rate Company Preferred Securities held by WaMu Cayman, it is possible that WaMu Cayman may not be able to pay dividends because WaMu Cayman may only pay dividends on the WaMu Cayman Preferred Securities out of funds legally available therefor. Although WaMu Cayman's Articles of Association restrict its activities as described under "WaMu Cayman" and WaMu Cayman is otherwise precluded from incurring any indebtedness for borrowed money and does not anticipate having any material liabilities, it is possible that WaMu Cayman may incur involuntary liabilities that may, in turn, preclude it from paying dividends on the WaMu Cayman Preferred Securities even if the Company has paid dividends on the Fixed Rate Company Preferred Securities owned by WaMu Cayman.

***A decline in WMB's capital levels may result in a Conditional Exchange. If a Conditional Exchange occurs, it is likely to occur at a time when WMB's and WMI's financial condition has deteriorated and may have other adverse consequences.***

The returns from an investment in the WaMu Cayman Preferred Securities will be dependent to a significant extent on the performance and capital of WMB due to the potential for a Conditional Exchange. A decline in the performance and capital levels of WMB or the placement by the OTS of WMB into conservatorship or receivership could result in a Conditional Exchange of the WaMu Cayman Preferred Securities for Fixed Rate Depositary Shares representing Fixed Rate WMI Preferred Stock. The Fixed Rate WMI Preferred Stock would represent an investment in WMI and not in the Company or WaMu Cayman. Under these circumstances:

- the WaMu Cayman Preferred Securities would be exchanged for a preferred equity interest in WMI at a time when WMB's and, ultimately, WMI's financial condition has deteriorated or when WMB may have been placed into conservatorship or receivership and, accordingly, it is unlikely that WMI would be in a financial position to make any dividend payment on the amount of Fixed Rate WMI Preferred Stock;

- in the event of a liquidation of WMI, the claims of creditors of WMI would be entitled to priority in payment over the claims of holders of equity interests such as the Fixed Rate Depositary Shares, and, therefore, the former holders of the WaMu Cayman Preferred Securities who would then hold the Fixed Rate Depositary Shares representing Fixed Rate WMI Preferred Stock because of the occurrence of the Conditional Exchange may receive substantially less than such holders would receive had the WaMu Cayman Preferred Securities not been exchanged for the Fixed Rate Depositary Shares. See "— Risk Factors Applicable to Fixed Rate Depositary Shares Issued in a Conditional Exchange — The Fixed Rate WMI Preferred Stock will rank subordinate to the direct indebtedness of WMI;"

- for United States Federal income tax purposes, a Conditional Exchange would most likely be a taxable event to holders of the WaMu Cayman Preferred Securities, and in that

event such holders generally would incur a gain or loss, as the case may be, measured by the difference between their adjusted tax basis in the WaMu Cayman Preferred Securities and the fair market value of the Fixed Rate Depositary Shares. In addition, dividends, if any, paid to Foreign Holders of Fixed Rate Depositary Shares received upon a Conditional Exchange generally will be subject to a 30% United States withholding tax unless the holder qualifies for a reduction from withholding tax under an applicable United States income tax treaty; and

- although the terms of Fixed Rate Depositary Shares are substantially similar to the terms of the Fixed Rate Company Preferred Securities, there are differences that holders of WaMu Cayman Preferred Securities might deem to be important, such as the fact that holders of Fixed Rate Depositary Shares will not generally have voting rights, except as required by law or in connection with the right to elect directors if dividends are missed (see "Description of the Fixed Rate WMI Preferred Stock — Voting Rights"), or benefit from any protective covenants. In addition, neither the Fixed Rate WMI Preferred Stock nor the Fixed Rate Depositary Shares will be listed on any securities exchange or automated dealer quotation system, and the Initial Purchasers are under no obligation to and do not intend to make a market in the Fixed Rate Depositary Shares.

**The terms of the WaMu Cayman Preferred Securities and the Fixed Rate Company Preferred Securities provide for limited voting rights.**

Except as specified in WaMu Cayman's Articles of Association or in relation to the right to direct the manner in which WaMu Cayman exercises its voting rights with respect to the Fixed Rate Company Preferred Securities, holders of WaMu Cayman Preferred Securities are not entitled to voting rights. Except as specified in the LLC Agreement, WaMu Cayman, as holder of Fixed Rate Company Preferred Securities, is not entitled to voting rights. However, the Company is prohibited by the LLC Agreement from taking certain actions without the consent or vote of at least two-thirds of either the Fixed Rate Company Preferred Securities voting separately or the Fixed Rate Company Preferred Securities and the Fixed-to-Floating Rate Company Preferred Securities, voting together as a single class, as applicable. For a description of the matters on which the holders of Fixed Rate Company Preferred Securities have a right to vote, see "Description of the Fixed Rate Company Preferred Securities — Voting Rights and Covenants."

**Holders of WaMu Cayman Preferred Securities and Fixed Rate Company Preferred Securities have no redemption rights; however, the Company may (but is not required to) redeem the Fixed Rate Company Preferred Securities upon the occurrence of a Tax Event, an Investment Company Act Event or a Regulatory Capital Event prior to March 15, 2011, and at any time thereafter and such redemption will cause an automatic redemption of the WaMu Cayman Preferred Securities.**

Subject to the Replacement Capital Covenant and the prior approval of the OTS, the Company may redeem the Fixed Rate Company Preferred Securities (i) in whole but not in part upon the occurrence of a Tax Event, an Investment Company Act Event or a Regulatory Capital Event prior to March 15, 2011 and (ii) in whole or in part, at any time on or after March 15, 2011. The redemption by the Company of the Fixed Rate Company Preferred Securities will automatically cause a redemption of the WaMu Cayman Preferred Securities for which the redemption price will be paid from the proceeds WaMu Cayman receives from the Company as a consequence of the redemption of the Fixed Rate Company Preferred Securities. The occurrence of a Tax Event, an Investment Company Act Event or a Regulatory Capital Event will not, however, give a holder of the WaMu Cayman Preferred Securities any right to request that the Fixed Rate Company Preferred Securities or the WaMu Cayman Preferred Securities be redeemed.

If the Company redeems the Fixed Rate Company Preferred Securities, the WaMu Cayman Preferred Securities will be automatically redeemed, and the former holders of the WaMu

Cayman Preferred Securities may not be able to invest their redemption proceeds in securities with a dividend yield and other terms comparable to that of the WaMu Cayman Preferred Securities. A Treasury based "make whole" amount will be payable only in connection with a redemption prior to March 15, 2011.

**The WaMu Cayman Preferred Securities will rank subordinate to claims of WaMu Cayman's creditors.**

Although WaMu Cayman is a special purpose vehicle and its activities will be limited by WaMu Cayman's Articles of Association, the WaMu Cayman Preferred Securities will rank subordinate to claims of WaMu Cayman's creditors, if any. Accordingly, if

- WaMu Cayman does not have funds legally available to pay full dividends on the WaMu Cayman Preferred Securities; or

- in the event of WaMu Cayman's liquidation, dissolution or winding up, WaMu Cayman does not have funds legally available to pay the full liquidation value of the WaMu Cayman Preferred Securities,

in each case, because of claims of any such creditors, any funds that are legally available to pay such amounts will be paid *pro rata* to the WaMu Cayman Preferred Securities.

**The Fixed Rate Company Preferred Securities will rank subordinate to claims of the Company's creditors and on a parity with other series of preferred securities issued by the Company.**

The Fixed Rate Company Preferred Securities will rank subordinate to all claims of the Company's creditors. The Fixed Rate Company Preferred Securities will rank *pari passu* as to dividends and upon liquidation with the Fixed-to-Floating Rate Company Preferred Securities and other Parity Equity Securities that the Company may issue. The Company will issue the Fixed-to-Floating Rate Company Preferred Securities to WaMu Delaware at a time substantially contemporaneous with this Offering and may issue additional Parity Equity Securities at any time in the future, subject to certain conditions at the time of issuance, without the consent or approval of the holders of the WaMu Cayman Preferred Securities. Accordingly, if

- the Company does not have funds legally available to pay full dividends on the Fixed Rate Company Preferred Securities and any Parity Equity Securities; or

- in the event of the Company's liquidation, dissolution or winding up, the Company does not have funds legally available to pay the full liquidation value of the Fixed Rate Company Preferred Securities and any Parity Equity Securities,

any funds that are legally available to pay such amounts will be paid *pro rata* to the Fixed Rate Company Preferred Securities and any other Parity Equity Securities then outstanding. See "Description of Other Company Securities — Fixed-to-Floating Rate Company Preferred Securities."

**There has never been a market for the WaMu Cayman Preferred Securities.**

Prior to this Offering, there was no market for the WaMu Cayman Preferred Securities. Although the Initial Purchasers intend to make a market in the WaMu Cayman Preferred Securities, they are under no obligation to do so and, to the extent that such market making is commenced, it may be discontinued at any time. The Series A-1 WaMu Cayman Preferred Securities will not be listed on any securities exchange or automated dealer quotation system, and although WaMu Cayman will apply to list the Series A-2 WaMu Cayman Preferred Securities on the Euro MTF market of the Luxembourg Stock Exchange, there can be no assurance that an active and liquid trading market for the WaMu Cayman Preferred Securities will develop or be sustained. If such a market were to develop, the prices at which the WaMu Cayman Preferred

Securities trade would depend on many factors, including prevailing interest rates, the operating results of the Company, WMB and WMI, and the market for similar securities. Holders of WaMu Cayman Preferred Securities may not be able to resell their WaMu Cayman Preferred Securities at or above the initial price. Furthermore, the WaMu Cayman Preferred Securities are not and will not be registered under the Securities Act, will be deemed to be restricted securities within the meaning of Rule 144 under the Securities Act and are subject to significant transfer restrictions as described in "Notice to Investors." These restrictions on transfer may inhibit the development of an active and liquid trading market for the WaMu Cayman Preferred Securities and may adversely impact the market price of the WaMu Cayman Preferred Securities.

**The WaMu Cayman Preferred Securities are not obligations of, or guaranteed by, any other entity.**

The WaMu Cayman Preferred Securities do not constitute obligations or equity securities of WMI, WMB, the Company, Marion Holdings Inc., an intermediate holding company between WMB and University Street ("*Marion*"), University Street, the Asset Trust, WaMu Delaware or any other entity, nor are WaMu Cayman's obligations with respect to the WaMu Cayman Preferred Securities guaranteed by any other entity. In particular, neither WMI, WMB, the Company, University Street, Marion, the Asset Trust, WaMu Delaware nor any other entity guarantees that WaMu Cayman will declare or pay any dividends, nor are they obligated to provide additional capital or other support to WaMu Cayman to enable WaMu Cayman to pay dividends in the event the Company fails to pay dividends on the Fixed Rate Company Preferred Securities and WaMu Cayman is thus unable to pay dividends on the WaMu Cayman Preferred Securities. The WaMu Cayman Preferred Securities are not exchangeable for Fixed Rate Depositary Shares or Fixed Rate WMI Preferred Stock except upon a Conditional Exchange. No holder of WaMu Cayman Preferred Securities will have the right to require WaMu Cayman to exchange the WaMu Cayman Preferred Securities for Fixed Rate Depositary Shares.

**The Fixed Rate Company Preferred Securities solely represent an interest in the Company and are not obligations of, or guaranteed by, any other entity.**

The Fixed Rate Company Preferred Securities do not constitute obligations or equity securities of any entity other than the Company, including WMI, WMB, Marion, University Street, WaMu Cayman, the Asset Trust and WaMu Delaware, nor are the Company's obligations with respect to the Fixed Rate Company Preferred Securities guaranteed by any other entity. In particular, neither WMI, WMB, Marion, University Street, WaMu Cayman, the Asset Trust, WaMu Delaware nor any other entity, guarantees that the Company will declare or pay any dividends to WaMu Cayman, nor are they obligated to provide additional capital or other support to the Company to enable the Company to pay dividends on the Fixed Rate Company Preferred Securities to WaMu Cayman in the event the Company's assets and results from operations are insufficient for such purpose.

**Risks Associated with the Company's Business**

**The Company is effectively controlled by WMI and the Company's relationship with WMI, and/or WMB may create potential conflicts of interest.**

All of the Company's officers and certain of the Company's managers are also officers of WMI or WMB or their affiliates. After this Offering, WMI, WMB and University Street will continue to control all of the Company's outstanding voting securities. WMI, WMB, and University Street will have the right to elect all of the Company's managers, including the Independent Manager.

WMB and University Street may have interests that are not identical to the Company's interests. WMI, through its subsidiary, New American Capital, Inc., is the ultimate owner of WMB's and University Street's common stock, and may have investment goals and strategies

that differ from those of the holders of the WaMu Cayman Preferred Securities. Consequently, conflicts of interest between the Company, on one hand, and WMB, University Street and/or WMI, on the other hand, may arise.

**The Company is dependent on the officers and employees of WMI and WMB for the selection, structuring and monitoring of the loans in the Asset Trust and the Company's relationship with WMI and/or WMB may create potential conflicts of interest.**

WMI and WMB are involved in virtually every aspect of the Company's existence. WMB administers the Company's day-to-day activities under the terms of certain agreements between WMB and the Company. The Company is dependent on the diligence and skill of the officers and employees of WMB for the selection, structuring and monitoring of the HELs in the Asset Trust and the Company's other Eligible Investments.

This dependency and the Company's close relationship with WMI and WMB may create potential conflicts of interest. Specifically, such conflicts of interest may arise because the employees of WMI and WMB (i) were directly involved in the decisions regarding the amount, type and price of HELs and other assets acquired indirectly from University Street and WMB prior to the Offering and (ii) will make decisions on the amount, type and (if applicable) price of any future acquisitions by the Company of Additional Assets from University Street, WMB or other parties.

**The Company is dependent on the officers and employees of WMB for the servicing of the loans in the Asset Trust and the Company's relationship with WMB may create potential conflicts of interest.**

The Company is dependent on WMB and others for the servicing of the HELs in the Asset Trust and is expected to be dependent on WMB and others for the servicing of any underlying collateral with respect to Additional Assets. WMB administers the Company's day-to-day activities under the terms of the Asset Documentation relating to the Company's assets. These agreements contain and will contain terms which the Company believes are consistent with those resulting from arm's-length negotiations. With respect to the Pooling and Servicing Agreement and the Asset Trust, WMB's servicing fee will be a *per annum* fee, paid monthly, for each HEL based on the unpaid principal balance of such HEL and will equal 0.125% *per annum*. WMB, as Servicer, will be entitled to retain certain fees and ancillary charges, including any prepayment fees, insufficient funds fees, modification fees, payoff statement fees and late charges with respect to the HELs as additional servicing compensation and will also be entitled to certain income generated by permitted investments made with collections on the HELs.

Despite the Company's belief that the terms of the Asset Documentation between WMB and the Company reflect and will reflect terms consistent with those negotiated on an arm's-length basis, the Company's dependency on WMB's officers and employees and the Company's close relationship with WMB may create potential conflicts of interest. Specifically, such conflicts of interest may arise because the employees of WMB have the power to modify the terms of HELs and other underlying assets in the Asset Trust and other Eligible Assets and make business decisions with respect to the servicing of such underlying assets, particularly to the extent such underlying collateral is defaulted or otherwise non-performing.

**Regulators may limit the Company's ability to implement the Company's business plan and may restrict the Company's ability to pay dividends.**

Because the Company is an indirect subsidiary of WMB, regulatory authorities will have the right to examine the Company and its activities and, under certain circumstances, to impose restrictions on WMB or the Company that could impact its ability to conduct business pursuant to

the Company's business plan and that could adversely affect the Company's financial condition and results of operations.

If the OTS, which is WMB's primary regulator, determines that WMB's relationship with the Company results in an unsafe or unsound practice, or if, in certain instances, WMB is no longer well-capitalized, WMB's regulators have the authority to:

- restrict the Company's ability to transfer assets;
- restrict the Company's ability to pay dividends to its security holders;
- restrict the Company's ability to redeem its preferred securities; or
- require WMB to sever its relationship with the Company or divest its ownership of the Company.

If the OTS determines that WMB is operating with an insufficient level of capital, or that the payment of dividends by either WMB or its subsidiaries, under the then-present circumstances, is an unsafe and unsound practice, the OTS could restrict the Company's ability to pay dividends, which would result in a corresponding restriction in WaMu Cayman's payment of dividends on the WaMu Cayman Preferred Securities.

*If any of the Company, the Asset Trust or WaMu Cayman loses its exemption under the Investment Company Act it could have a material adverse effect on the Company and would likely result in a redemption of the Fixed Rate Company Preferred Securities and the WaMu Cayman Preferred Securities.*

Each of the Company, the Asset Trust and WaMu Cayman believes that it is not, and intends to conduct its operations so as not to be, required to register as an investment company under the Investment Company Act. Under the Investment Company Act, a non-exempt entity that is an investment company is required to register with the SEC or obtain an order from the SEC permitting it to register as an investment company under the Investment Company Act (in the case of a non-U.S. entity) and is subject to extensive, restrictive and potentially adverse regulation relating to, among other things, operating methods, management, capital structure, dividends and transactions with affiliates. The Investment Company Act exempts entities that, directly or through majority-owned subsidiaries, are "primarily engaged in the business of purchasing or otherwise acquiring mortgages and other liens on and interests in real estate" (which the Company refers to as "*Qualifying Interests*"). Under current interpretations of the staff of the SEC, in order to qualify for this exemption, each of the Company and the Asset Trust, among other things, must maintain at least 55% of the Company's assets in Qualifying Interests and also may be required to maintain an additional 25% in Qualifying Interests or other real estate related assets. The assets that the Company or the Asset Trust may acquire therefore may be limited by the provisions of the Investment Company Act. The Company and the Asset Trust have each established a policy of limiting authorized investments which are not Qualifying Interests to no more than 20% of the value of their respective total assets. The Investment Company Act does not treat cash and cash equivalents as either Qualifying Interests or other real estate related assets.

Based on the criteria outlined above, the Company and the Asset Trust each believe that, as of the time of the Offering, the Company's and the Asset Trust's Qualifying Interests will comprise at least 90% of the estimated fair market value of their respective total assets. As a result, the Company and the Asset Trust each believe that they are not required to register as an investment company under the Investment Company Act. Neither the Company nor the Asset Trust intends, however, to seek an exemptive order, no-action letter or other form of interpretive guidance from the SEC or its staff on this position. If the SEC or its staff were to take a different position with respect to whether the Company's or the Asset Trust's assets constitute Qualifying Interests, the Company or the Asset Trust could be required either (i) to change the manner in

which it conducts its operations to avoid being required to register as an investment company, or (ii) to register as an investment company, either of which could have a material adverse effect on the Company or the Asset Trust, as the case may be, the Company's ability to make payments in respect of the Fixed Rate Company Preferred Securities and, accordingly, the trading price of the WaMu Cayman Preferred Securities. Further, in order to ensure that the Company and the Asset Trust at all times continues to qualify for the above exemption from the Investment Company Act, the Company and the Asset Trust may be required at times to adopt less efficient methods of financing certain of the Company's and the Asset Trust's assets than would otherwise be the case and may be precluded from acquiring certain types of assets whose yield is higher than the yield on assets that could be purchased in a manner consistent with the exemption. The net effect of these factors may be to lower at times the Company's net interest income. Finally, if the Company or the Asset Trust were an unregistered investment company, there would be a risk that the Company or the Asset Trust, as the case may be, would be subject to monetary penalties and injunctive relief in an action brought by the SEC, that the Company or the Asset Trust, as the case may be, would be unable to enforce contracts with third parties and that third parties could seek to obtain rescission of transactions undertaken during the period the Company or the Asset Trust was determined to be an unregistered investment company.

In addition, an issuer that is organized outside the United States, such as WaMu Cayman, is not permitted to register under the Investment Company Act without first obtaining an order from the SEC permitting it to register as an investment company under the Investment Company Act. WaMu Cayman does not intend to seek such an order and could not satisfy some of the requirements of the Investment Company Act (e.g., limitations on the ratio of preferred equity to common equity) that would have to be satisfied for WaMu Cayman to obtain such an order. Accordingly, WaMu Cayman has not and does not intend to register under the Investment Company Act in reliance on the exemption from registration set forth in Section 3(c)(7) thereof. Were such an exemption no longer available, potential ramifications of a failure by WaMu Cayman to obtain an order permitting it to register, if such registration were in fact required, include, but are not limited to, an injunctive or administrative proceeding by the SEC for disgorgement and/or monetary penalties and an order prohibiting WaMu Cayman from committing or causing future violations of the federal securities laws. In the event the Company, the Asset Trust or WaMu Cayman is ever considered an investment company under the Investment Company Act as a result of an Investment Company Act Event, the Company would likely redeem the Fixed Rate Company Preferred Securities. See above under "— Risks Relating to the Terms of the WaMu Cayman Preferred Securities and the Fixed Rate Company Preferred Securities — Holders of WaMu Cayman Preferred Securities and Fixed Rate Company Preferred Securities have no redemption rights; however, the Company may (but is not required to) redeem the Fixed Rate Company Preferred Securities upon the occurrence of a Tax Event, an Investment Company Act Event or a Regulatory Capital Event prior to March 15, 2011, and at any time thereafter and such redemption will cause an automatic redemption of the WaMu Cayman Preferred Securities."

Additionally, the Company may from time to time have Asset Subsidiaries other than the Asset Trust. The Company may not establish an Asset Subsidiary unless the establishment and operation of such Asset Subsidiary will not cause the Company to be an investment company which is required to register under the Investment Company Act and such Asset Subsidiary is not itself an investment company which is required to register under the Investment Company Act. If any such Asset Subsidiary were to be required to register as an investment company, the results would be similar to those described above in respect to the Asset Trust being required to register as an investment company.

### Adverse Effect of Determination of Company's Partnership Status

Prior to the issuance of the Company Preferred Securities, the Company will receive an opinion from Mayer, Brown, Rowe & Maw LLP to the effect that, for United States Federal

income tax purposes, (i) the Company will not be treated as an association taxable as a corporation and (ii) although no activities closely comparable to that contemplated by the Company have been the subject of any U.S. Treasury regulation, revenue ruling or judicial decision, the Company will not be treated as a publicly traded partnership taxable as a corporation. The opinions are based on certain assumptions and on certain representations and agreements regarding restrictions on the future conduct of the activities of the Company. Although the Company intends to conduct its activities in accordance with such assumptions, representations and agreements, if it were nonetheless determined that the Company was taxable as a corporation for United States Federal income tax purposes, then the Company would be subject under the Code to the regular corporate income tax. Such taxes would reduce the amounts available to make payments on the Company Preferred Securities.

### Adverse Effect of Determination of U.S. Trade or Business Status

Prior to the issuance of the WaMu Cayman Preferred Securities, WaMu Cayman will receive an opinion from Mayer, Brown, Rowe & Maw LLP to the effect that, for United States Federal income tax purposes, although no activities closely comparable to that contemplated by WaMu Cayman have been the subject of any U.S. Treasury regulation, revenue ruling or judicial decision, WaMu Cayman will not be treated as engaged in the conduct of a trade or business within the United States and, consequently, WaMu Cayman's profits will not be subject to United States Federal income tax on a net income basis (including the branch profits tax). The opinion is based on certain assumptions and on certain representations and agreements regarding restrictions on the future conduct of the activities of WaMu Cayman and the Company. Although WaMu Cayman intends to conduct its activities in accordance with such assumptions, representations and agreements, if it were nonetheless determined that WaMu Cayman was engaged in a United States trade or business and had taxable income that is effectively connected with such United States trade or business, then WaMu Cayman would be subject under the Code to the regular corporate income tax on such effectively connected taxable income and possibly to the 30% branch profits tax as well. Such taxes would reduce the amounts available to make payments on the WaMu Cayman Preferred Securities.

### The Company has no control over changes in interest rates and such changes could negatively impact the Company's financial condition, results of operations, and ability to pay dividends.

Initially, the Company's income consists primarily of payments received on the HELs which are the underlying assets supporting the Class A Asset Trust Certificate (such underlying assets, together with any collateral with respect to any Additional Assets, the "Company's Portfolio"). At January 31, 2006, 100% of the HELs to be included in the Company's Portfolio bear interest at fixed rates; however, in the future, the Company could acquire Additional Assets which include or are secured by adjustable-rate loans. Adjustable-rate loans decrease the risks to a lender associated with changes in interest rates but involve other risks. As interest rates rise, the payment by the borrower rises to the extent permitted by the terms of the loan, and the increased payment increases the potential for default. At the same time, the marketability of the underlying property may be adversely affected by higher interest rates. In a declining interest rate environment, there may be an increase in prepayments on the HELs or other assets in the Company's Portfolio as the borrowers refinance their mortgages at lower interest rates. Under these circumstances, the Company may find it more difficult to acquire Additional Assets with rates sufficient to support the payment of the dividends on the Fixed Rate Company Preferred Securities. A declining interest rate environment would adversely affect the Company's ability to pay full, or even partial, dividends on the Fixed Rate Company Preferred Securities.

**The loans in the Company's Portfolio are subject to economic conditions that could negatively affect the value of the collateral securing such loans and/or the results of the Company's operations.**

The value of the collateral underlying the Company's Portfolio and/or the results of the Company's operations could be affected by various conditions in the economy, such as:

- local and other economic conditions affecting real estate and other collateral values;
- sudden or unexpected changes in economic conditions, including changes that might result from terrorist attacks and the United States' response to such attacks;
- the continued financial stability of a borrower and the borrower's ability to make loan principal and interest payments, which may be adversely affected by job loss, recession, divorce, illness or personal bankruptcy; and
- interest rate levels and the availability of credit to refinance loans at or prior to maturity.

**The loans in the Company's Portfolio that are held through the Asset Trust are concentrated in two states, and adverse conditions in those states, in particular, could negatively impact the Company's operations.**

At January 31, 2006, more than 79% (as a percentage of loan principal balances) of the assets in the Company's Portfolio were located in Texas and California. Because of the concentration of the Company's interest in those states, in the event of adverse economic conditions in those states, the Company would likely experience higher rates of loss and delinquency on the Company's Portfolio than if the underlying HELs were more geographically diversified. Additionally, the HELs in the Company's Portfolio may be subject to a greater risk of default than other comparable loans in the event of adverse economic, political, or business developments or natural hazards that may affect Texas and California, and the ability of property owners or commercial borrowers in those states to make payments of principal and interest on the underlying loans. In the event of any adverse development or natural disaster in those states, the Company's ability to pay dividends on the Fixed Rate Company Preferred Securities could be adversely affected.

**The Company cannot assure purchasers that it paid WMB and University Street fair market value for all of the Company's assets because the Company has not obtained any third party valuations of all such assets. Nor can the Company assure purchasers that the Company will acquire or dispose of its assets in the future at their fair market value.**

The Company has adopted policies with a view to ensuring that all financial dealings between WMB, University Street and the Company will be fair to each party and consistent with market terms. However, there has been no third party valuation of all of the Company's assets. In addition, it is not anticipated that third party valuations will be obtained in connection with future acquisitions or dispositions of assets even in circumstances where an affiliate of the Company is selling the assets to the Company, or purchasing the assets from the Company. Accordingly, the Company cannot assure purchasers that the purchase price the Company paid for all of the Company's assets was equal to the fair market value of those assets. Nor can the Company assure purchasers that the consideration to be paid by the Company to, or received by the Company from, WMB, University Street or any of the Company's affiliates in connection with future acquisitions or dispositions of assets will be equal to the fair market value of such assets.

**The Asset Trust or any other Asset Subsidiary, and therefore, the Company, could incur losses as a result of environmental liabilities of properties underlying the Company's assets in the Company's Portfolio through foreclosure action.**

The Asset Trust or any other Asset Subsidiary may be forced to foreclose on an underlying HEL or other assets where the borrower has defaulted on its obligation to repay the applicable

loan. It is possible that the Asset Trust or any other Asset Subsidiary, and therefore, the Company, may be subject to environmental liabilities with respect to foreclosed property. The discovery of these liabilities and any associated costs for removal of hazardous substances, wastes, contaminants or pollutants, could have a material adverse effect on the fair value of such assets.

**Delays in liquidating defaulted loans could occur and could cause the Company's business to suffer.**

Substantial delays could be encountered in connection with the liquidation of the collateral securing defaulted loans in the Company's Portfolio, with corresponding delays in the Company's receipt of related proceeds. An action to foreclose on a mortgaged property or repossess and sell other collateral securing a loan is regulated by state statutes and rules. Any such action is subject to many of the delays and expenses of lawsuits, which may impede the Company's ability to foreclose on or sell the collateral or to obtain proceeds sufficient to repay all amounts due on the related loan in the Company's Portfolio.

**The Company may invest in assets that involve new risks and need not maintain the current asset coverage.**

Although the Company's Portfolio currently consists primarily of HELs held through the Asset Trust, to the extent it acquires Additional Assets in the future, the Company is not required to limit its investments to assets of the types currently in the Company's Portfolio. See "The Company — Business of the Company — Assets of the Company." Assets such as second lien closed end home equity loans, first or second lien home equity lines of credit, mortgage loans on single family or multi-family residences, commercial mortgage loans or other real estate assets may involve different risks not described in this offering circular. Moreover, while the LLC Agreement will call for maintaining specified levels of FFO coverage as to expected dividends, the Company is not required to maintain the levels of asset coverage that currently exist.

**The Company is dependent on WMI, WMB and University Street with respect to its acquisition of Additional Assets and may be subject to conflicts of interest with respect to its acquisition of new assets.**

The dependency of the Company on WMI, University Street and WMB and the Company's close relationship with WMI, University Street and WMB may create potential conflicts of interest in connection with the Company's acquisition of Additional Assets. The Company will be dependent on WMI, University Street and WMB to identify Additional Assets which it may acquire, but WMI, University Street and WMB are not required to contribute or sell Additional Assets to the Company. If WMI, University Street and WMB are unable to identify, or are unwilling to contribute or sell, suitable Additional Assets, then over time the Company's level of FFO coverage as to expected dividends will decline. Moreover, conflicts of interest may arise because the employees of WMI, University Street and WMB will, subject to certain restrictions, make decisions on the amount, type and (to the extent the Company purchases Additional Assets) price of future acquisitions by the Company of Additional Assets from University Street, WMB or other members of the WMI Group as well as future dispositions of assets to WMB, University Street or third parties.

**Risk Factors Applicable to Fixed Rate Depositary Shares Issued in a Conditional Exchange.**

**Holders of WaMu Cayman Preferred Securities may have adverse tax consequences as a result of a Conditional Exchange.**

For United States Federal income tax purposes, a Conditional Exchange would most likely be a taxable event to holders of WaMu Cayman Preferred Securities under the Code, and they generally would incur a gain or loss, as the case may be, measured by the difference between their adjusted tax basis in the WaMu Cayman Preferred Securities and the fair market value of the Fixed Rate Depositary Shares. In addition, dividends, if any, paid to Foreign Holders of Fixed

Rate Depositary Shares received upon a Conditional Exchange generally will be subject to a 30% U.S. withholding tax unless the holder qualifies for a reduction from withholding tax under an applicable United States income tax treaty.

***A decline in WMI's financial condition may restrict its ability to pay dividends and could result in a loss on the investment of the former holders of WaMu Cayman Preferred Securities.***

If WMI's financial condition were to deteriorate, the holders of the Fixed Rate Depositary Shares could suffer direct and materially adverse consequences, including suspension of the payment of non-cumulative dividends on the Fixed Rate WMI Preferred Stock and, if a liquidation, dissolution or winding up of WMI were to occur, loss by holders of Fixed Rate Depositary Shares of all or part of their investment. See "Description of the Fixed Rate WMI Preferred Stock."

***A Conditional Exchange may be based on WMB's receivership, which could lead to WMI's bankruptcy and would mean that others are likely to have liquidation claims senior to that of the holders of the Fixed Rate Depositary Shares.***

An Exchange Event triggering a Conditional Exchange will occur if WMB is placed into conservatorship or receivership. WMB's conservatorship or receivership could lead to WMI becoming subject to a voluntary or involuntary proceeding under the U.S. Bankruptcy Code. In the event of WMI's bankruptcy, the claims of WMI's secured, senior, general and subordinated creditors would be entitled to a priority of payment over the claims of holders of equity interests such as the Fixed Rate WMI Preferred Stock. As a result of such subordination, if WMI became subject to a bankruptcy proceeding after a Conditional Exchange, the holders of the Fixed Rate Depositary Shares would likely receive, if anything, substantially less than they would have received had the Conditional Exchange not occurred.

***The Fixed Rate WMI Preferred Stock will rank subordinate to the direct indebtedness of WMI.***

The Fixed Rate WMI Preferred Stock will be subordinate and rank junior in right of payment to all of WMI's indebtedness for borrowed money and indebtedness evidenced by notes or other securities. Because the sole source of funds for payment in respect of the Fixed Rate Depositary Shares is the Fixed Rate WMI Preferred Stock, the Fixed Rate Depositary Shares are effectively subordinated on the same basis as the Fixed Rate WMI Preferred Stock. The terms of the Fixed Rate Depositary Shares and the Fixed Rate WMI Preferred Stock will not limit in any way WMI's ability to incur additional indebtedness.

***The Fixed Rate WMI Preferred Stock will be structurally subordinated to all obligations of WMI's subsidiaries, and as a holding company, WMI may require cash from its subsidiaries to make payments with respect to the Fixed Rate Depositary Shares.***

WMI is a holding company that conducts its operations through its operating subsidiaries and relies primarily on interest payments, dividends, proceeds from inter-company transactions and loans from those subsidiaries to meet its obligations for payment with respect to its outstanding equity securities, any and all of which may be subject to contractual restrictions and regulatory restrictions. Accordingly, the Fixed Rate WMI Preferred Stock (and thus the Fixed Rate Depositary Shares) is structurally subordinated to all existing and future liabilities of WMI's subsidiaries. Holders of Fixed Rate Depositary Shares should look only to the assets of WMI, and not any of its subsidiaries, for payments with respect to the Fixed Rate Depositary Shares. If WMI is unable to obtain cash from its subsidiaries it may be unable to fund dividend payments in respect of the Fixed Rate Depositary Shares.

*Upon the occurrence of a Conditional Exchange, the holders of the Fixed Rate Depositary Shares will not have the benefit of the same favorable covenants as the Fixed Rate Company Preferred Securities.*

Upon the occurrence of a Conditional Exchange, the holders of the Fixed Rate Depositary Shares will not benefit from the same favorable covenants as the Fixed Rate Company Preferred Securities.

*WMI is not obligated to pay dividends on the Fixed Rate WMI Preferred Stock and dividends on these securities are not cumulative.*

Dividends on the Fixed Rate WMI Preferred Stock are not cumulative. Consequently, if the board of directors of WMI ("WMI's Board of Directors") does not declare dividends on the Fixed Rate WMI Preferred Stock for any quarterly period, the holders of the Fixed Rate Depositary Shares would not be entitled to any such dividend whether or not funds are or subsequently become available.

WMI's Board of Directors may determine that it would be in WMI's best interest to pay less than the full amount of the stated dividends on the Fixed Rate WMI Preferred Stock or no dividends for any quarter even if funds are available. Factors that would be considered by WMI's Board of Directors in making this determination are WMI's financial condition and capital needs, the impact of current and pending legislation and regulations, economic conditions, tax considerations, and such other factors as WMI's Board of Directors may deem relevant.

*There is no active trading market for Fixed Rate WMI Preferred Stock or the Fixed Rate Depositary Shares and such trading market may never develop.*

The Fixed Rate WMI Preferred Stock and the Fixed Rate Depositary Shares will be new issues of securities. WMI does not intend to cause the listing or quotation of the Fixed Rate WMI Preferred Stock or the Fixed Rate Depositary Shares on any securities exchange or automated dealer quotation system, including any such securities exchange or automated dealer quotation system on which the Series A-2 WaMu Cayman Preferred Securities are listed or quoted. The Initial Purchasers are under no obligation to and do not intend to make a market in the Fixed Rate Depositary Shares. Consequently, it is unlikely that an active and liquid trading public market for the Fixed Rate Depositary Shares or the underlying Fixed Rate WMI Preferred Stock will develop or be maintained. The lack of liquidity and an active trading market could adversely affect ability of the holders of Fixed Rate Depositary Shares to dispose of such shares.

In addition, neither the Fixed Rate Depositary Shares nor the Fixed Rate WMI Preferred Stock represented by such shares have or will be registered under the Securities Act and will be deemed to be restricted securities within the meaning of Rule 144 of the Securities Act. Holders of Fixed Rate Depositary Shares will not be able to offer, sell, pledge or otherwise transfer the Fixed Rate Depositary Shares other than:

- to a qualified institutional buyer within the meaning of Rule 144A of the Securities Act in a transaction complying with Rule 144A;

- to a non-U.S. person within the meaning of Rule 902 of Regulation S in a transaction complying with Regulation S;

- otherwise in accordance with an applicable exemption from the registration requirements of the Securities Act; or

- to WMI or one of WMI's affiliates, and in any case, in accordance with exemptions from any applicable state securities or blue sky laws.

These restrictions on transfer may inhibit the development of an active and liquid trading market for the Fixed Rate Depositary Shares and may adversely impact the market price of such shares.

## CERTAIN INFORMATION CONCERNING WMB

### General

Washington Mutual Bank (formerly known as Washington Mutual Bank, FA and referred to herein as *"WMB"*) is a federally chartered savings association, chartered and operating under the United States Home Owners' Loan Act of 1933, as amended. WMB engages in mortgage banking, consumer banking and small business banking. WMB, as a federally chartered association, has the authority to make various types of loans, including loans secured by homes and commercial real estate, secured and unsecured consumer loans, and secured and unsecured commercial loans. As a federal savings association, WMB is subject to regulation and examination by the U.S. Office of Thrift Supervision (together with any successor regulator, the *"OTS"*), its primary regulator. WMB is an indirect wholly-owned subsidiary of WMI.

Prior to 2004, WMB had two sister depository institutions which were both owned directly by WMI. WMB has since acquired both of these sister institutions. One of these institutions, Washington Mutual Bank fsb, a federal savings bank, became a wholly-owned subsidiary of WMB on February 1, 2004. The other institution, Washington Mutual Bank, a savings bank chartered under the laws of the state of Washington, converted into a federally chartered savings bank and then was merged into WMB on January 1, 2005.

WMB has applied to the OTS for approval to acquire Long Beach Mortgage Company. Long Beach Mortgage Company's primary business is to originate, purchase, securitize and sell subprime loans. Long Beach Mortgage Company is a wholly-owned subsidiary of WMI and is a non-bank affiliate of WMB. Assets originated by Long Beach Mortgage Company will not be owned by the Asset Trust.

The WaMu Cayman Preferred Securities will be exchangeable, without the approval or any action on the part of the holders of such securities, for Fixed Rate Depositary Shares under any of the following circumstances, each of which is referred to as an Exchange Event:

- WMB becomes "undercapitalized" under the OTS' "prompt corrective action" regulations;

- WMB is placed into conservatorship or receivership; or

- the OTS, in its sole discretion, anticipates that WMB may become "undercapitalized" in the near term or takes supervisory action that limits the payment of dividends by WMB, and in connection therewith, directs such exchange.

### Capital Adequacy

WMB is subject to OTS capital requirements. The capital adequacy requirements are quantitative measures established by OTS regulations that require WMB to maintain minimum amounts and ratios of capital. The OTS requires WMB to maintain minimum ratios of core and total capital to risk-weighted assets, as well as core capital to adjusted total assets and tangible capital to adjusted total assets. Under applicable OTS regulations "Tier 1 capital" and "core capital" have the same meaning.

Federal law and regulations establish minimum capital standards, and under the OTS regulations, WMB is required to have a (i) leverage ratio of core capital to adjusted total assets of at least 4.00%, (ii) a ratio of core capital to total risk-weighted assets ratio of at least 4.00%, (iii) a ratio of total capital to risk-weighted assets of at least 8.00% and (iv) a ratio of tangible capital to total adjusted assets of at least 1.50%. A savings association's adjusted total assets represent the savings association's total assets on its Thrift Financial Report Consolidated Statement of Condition filed with the OTS less assets of non-includable subsidiaries, goodwill and other intangibles assets (exclusive of mortgage servicing rights and purchased credit card relationships), disallowed servicing assets and purchased credit card relationships and accumu-

lated gains (losses) on certain available-for-sale securities and cash flow hedges. For purposes of determining risk-weighted assets for the risk-based capital ratios, the book value of each of the savings association's on-balance sheet assets, and a portion of certain off-balance sheet items and exposures, are weighted from 0% to 100% based on broad categories. For instance, U.S. government debt obligations are generally risk-weighted at 0%; certain qualifying residential mortgage loans on one-to-four family dwellings are generally risk weighted at 50%; and commercial loans and most other assets are generally risk-weighted at 100%. Off-balance sheet items (including letters of credit, loan commitments, swaps and other derivatives) are converted into on-balance sheet "equivalent" amounts for risk-based capital purposes, then assigned a risk weight like other assets. The capital risk weighting assigned to certain asset-backed securities may vary from 20% to 200% depending on credit rating. Subordinated residual interests retained in asset securitizations, credit enhancement and forms of "recourse" can result in higher capital charges or deductions from capital.

For purposes of the OTS regulations, "*total capital*" is defined as the sum of core capital and supplementary capital. "*Core capital*" generally includes: common shareholders' equity (which includes related surplus); non-cumulative perpetual preferred stock (which includes related surplus); and qualifying minority interests in the equity accounts of consolidated subsidiaries (which may include such instruments as qualifying REIT preferred stock and the Company Preferred Securities). "*Supplementary capital*" generally includes (subject to certain limits and sub-limits): cumulative perpetual preferred stock; maturing capital instruments; Dutch auction and money market preferred stock; hybrid capital instruments (including certain mandatory convertible notes); term subordinated debt; the savings association's allowance for loan and lease losses (up to a maximum of 1.25% of total risk-weighted assets); and up to 45% of the pretax net unrealized gains of available-for-sale equity securities investments. Supplementary capital is permitted to count towards only one-half of total capital. Both core capital and tangible capital are subject to various deductions. Some of these deductions are more stringent for tangible capital than core capital, including goodwill, certain other intangible assets, and certain servicing assets in excess of certain limits.

Federal law and regulations also establish five capital categories for savings associations: well-capitalized, adequately capitalized, undercapitalized, significantly undercapitalized and critically undercapitalized. A savings association is treated as well-capitalized if its ratio of total capital to risk-weighted assets is 10.00% or more, its ratio of core capital to risk-weighted assets is 6.00% or more, its leverage ratio is 5.00% or more, and it is not subject to any federal supervisory agreement order or directive to meet a specific capital level. In order to be adequately capitalized, any savings association must have a ratio of total capital to risk-weighted assets of not less than 8.00%, a ratio of core capital to risk-weighted assets of not less than 4.00%, and (unless it is in the most highly-rated category) a leverage ratio of not less than 4.00%. Any savings association that is neither well-capitalized nor adequately capitalized will be considered undercapitalized. Any savings association with a tangible equity ratio of 2.00% or less will be considered critically undercapitalized.

Undercapitalized savings associations are subject to certain prompt corrective action requirements, regulatory controls and restrictions, which become more extensive as an association becomes more severely undercapitalized. Failure by WMB to comply with applicable capital requirements, if unremedied, would result in restrictions on its activities and lead to regulatory enforcement actions against WMB including, but not limited to, the issuance of a capital directive to ensure the maintenance of required capital levels. The Federal Deposit Insurance Corporation Improvement Act of 1991 requires the federal banking regulators to take prompt corrective action with respect to depository institutions that do not meet minimum capital requirements. Additionally, FDIC or OTS approval of any regulatory application filed for its review may be dependent on compliance with capital requirements.

In addition, the OTS from time to time may impose higher specific capital requirements on any savings association that is perceived to have risks, exposures, credit concentration, rapid growth or other circumstances warranting special attention. Failure to satisfy such a capital directive could subject an association to civil money penalties, judicial enforcement and administrative remedies available to the OTS, as well as a finding that a savings association is "undercapitalized".

Whether WMB would ever be determined by the OTS to be "undercapitalized", or at risk of becoming "undercapitalized" in the near term — thereby triggering the exchange of the WaMu Cayman Preferred Securities for Fixed Rate Depositary Shares — could be influenced not only by the OTS' capital adequacy regulations, but also by the regulator's interpretations and judgment on other matters. For example, the OTS' views on asset credit quality potentially could affect a thrift or savings association's capital status. Among other things, the OTS typically evaluates asset quality, loan loss reserves and procedures during periodic regulatory examinations of each federal savings association. If, following such an examination or otherwise, the OTS in its discretion were to require WMB to significantly increase its reserves against credit losses (i.e., the allowance for loan and lease losses), this could potentially reduce WMB's retained earnings and regulatory capital. As noted above, a savings association's allowance for loan and lease losses is includable within supplementary capital only up to a limit, and is not includable at all in core capital.

A savings association's regulatory capital status, and the risk of being deemed "undercapitalized" could also be affected by other developments or by future changes in regulatory capital and other standards. WMB and WMI continue to actively follow the progress of the U.S. banking agencies and the Basel Committee on Banking Supervision in developing a new set of regulatory risk-based capital requirements. The Basel Committee on Banking Supervision is a committee established by the central bank governors of certain industrialized nations, including the United States. The new requirements are commonly referred to as Basel II or The New Basel Capital Accord; however, final requirements have not been adopted. WMB and WMI are assessing the potential impacts of Basel II.

The regulatory capital ratios calculated for WMB, along with the capital amounts and ratios for the minimum regulatory requirement and the minimum amounts and ratios required to be categorized as well-capitalized under the regulatory framework for prompt corrective action were as follows:

| WMB | December 31, 2005 | | | | | |
|---|---|---|---|---|---|---|
| | Actual | | Minimum Regulatory Requirement | | Minimum to be Categorized as Well-Capitalized Under the OTS' Prompt Corrective Action Regulations | |
| | Amount | Ratio | Amount | Ratio | Amount | Ratio |
| | (Dollars in millions) | | | | | |
| Total capital to total risk-weighted assets ........................... | $26,530 | 11.62% | $18,260 | 8.00% | $22,825 | 10.00% |
| Core capital to total risk-weighted assets ........................... | 19,661 | 8.61 | 9,130 | 4.00 | 13,695 | 6.00 |
| Core capital to adjusted total assets (leverage) ...................... | 21,098 | 6.56 | 12,860 | 4.00[1] | 16,075 | 5.00 |
| Tangible capital to tangible assets (tangible equity) ................. | 20,642 | 6.43 | 4,816 | 1.50 | n/a | n/a |

| WMB | December 31, 2004 | | | | | |
|---|---|---|---|---|---|---|
| | Actual | | Minimum Regulatory Requirement | | Minimum to be Categorized as Well-Capitalized Under the OTS' Prompt Corrective Action Regulations | |
| | Amount | Ratio | Amount | Ratio | Amount | Ratio |
| | | | (Dollars in millions) | | | |
| Total capital to total risk-weighted assets........................... | $20,698 | 11.68% | $14,174 | 8.00% | $17,718 | 10.00% |
| Core capital to total risk-weighted assets........................... | 14,392 | 8.12 | 7,087 | 4.00 | 10,631 | 6.00 |
| Core capital to adjusted total assets (leverage)...................... | 14,530 | 5.46 | 10,635 | 4.00[1] | 13,294 | 5.00 |
| Tangible capital to tangible assets (tangible equity)................ | t4,530 | 5.46 | 3,988 | 1.50 | n/a | n/a |

| WMB | December 31, 2003 | | | | | |
|---|---|---|---|---|---|---|
| | Actual | | Minimum Regulatory Requirement | | Minimum to be Categorized as Well-Capitalized Under the OTS' Prompt Corrective Action Regulations | |
| | Amount | Ratio | Amount | Ratio | Amount | Ratio |
| | | | (Dollars in millions) | | | |
| Total capital to total risk-weighted assets........................... | $15,444 | 10.80% | $11,441 | 8.00% | $14,302 | 10.00% |
| Core capital to total risk-weighted assets........................... | 12,472 | 8.72 | 5,721 | 4.00 | 8,581 | 6.00 |
| Core capital to adjusted total assets (leverage)...................... | 12,531 | 5.50 | 9,116 | 4.00[1] | 11,395 | 5.00 |
| Tangible capital to tangible assets (tangible equity)................ | 12,531 | 5.50 | 3,419 | 1.50 | n/a | n/a |

[1] The minimum leverage ratio guideline is 3% for financial institutions that do not anticipate significant growth and that have well-diversified risk, excellent asset quality, high liquidity, good earnings, effective management and monitoring of market risk and, in general, are considered top-rate, strong banking organizations.

**Benefits to WMB**

WMB has requested confirmation from the OTS that the Company Preferred Securities constitute core capital of WMB under the OTS's applicable regulatory capital regulations and, upon receipt of such confirmation, intends to treat the Company Preferred Securities accordingly.

## USE OF PROCEEDS

WaMu Cayman will use the proceeds of the sale of the WaMu Cayman Preferred Securities in this Offering, expected to be approximately $735,000,000, net of underwriting commissions, to purchase from WMB a like amount of Fixed Rate Company Preferred Securities, which the Company will issue to WMB in exchange for the conveyance from WMB of a portfolio of HELs. The WMI Group will use the proceeds from the sale of the Fixed Rate Company Preferred Securities to WaMu Cayman and the Fixed-to-Floating Rate Preferred Securities to WaMu Delaware for general corporate purposes, which may include the repurchase of WMI's common stock.

# WAMU CAYMAN

Washington Mutual Preferred Funding (Cayman) I Ltd. *("WaMu Cayman")* is a Cayman Islands exempted company limited by shares incorporated on February 23, 2006 under the Companies Law (2004 Revision) of the Cayman Islands (the *"Companies Law"*) and its Memorandum and Articles of Association (together, as amended, *"WaMu Cayman's Articles of Association"*).

WaMu Cayman's Articles of Association limit its activities to (i) holding the 7.25% Perpetual Non-Cumulative Preferred Securities, liquidation preference $1,000 per security (the *"Fixed Rate Company Preferred Securities"*), (ii) issuing the 7.25% Perpetual Non-cumulative Preferred Securities, Series A-1, liquidation preference $100,000 per security and $302,300,000 in the aggregate (the *"Series A-1 WaMu Cayman Preferred Securities"*) and 7.25% Perpetual Non-cumulative Preferred Securities, Series A-2, liquidation preference $10,000 per security and $447,700,000 in the aggregate (the *"Series A-2 WaMu Cayman Preferred Securities"* and, together with the Series A-1 WaMu Cayman Preferred Securities, the *"WaMu Cayman Preferred Securities"*), (iii) issuing the WaMu Cayman Ordinary Shares to the Cayman Trust and (iv) performing functions necessary or incidental thereto. WaMu Cayman is prohibited from issuing other equity or any debt securities or engaging in any other activities. Subject to the limitations and assumptions described under "Certain Tax Considerations," WaMu Cayman will be treated as a corporation for United States Federal income tax purposes. The Fixed Rate Company Preferred Securities will be the only assets of WaMu Cayman, other than the sum of $1,000 representing the issued and paid-up share capital. The registered office of WaMu Cayman is at PO Box 309GT, Ugland House, South Church Street, George Town, Grand Cayman, Cayman Islands. Copies of WaMu Cayman's Articles of Association will be available upon request to WMI or free of charge at the specified office of the co-paying agent in Luxembourg maintained by WaMu Cayman (the *"Paying Agent in Luxembourg"*).

## Capitalization

The authorized share capital of WaMu Cayman consists of (i) 3,023 Series A-1 WaMu Cayman Preferred Securities par value $1.00 and liquidation preference $100,000 each, all of which will be issued in connection with this Offering, (ii) 44,770 Series A-2 WaMu Cayman Preferred Securities par value $1.00 and liquidation preference $10,000 each, all of which will be issued in connection with this Offering and (iii) 1,000 ordinary shares, par value $1.00 each (the *"WaMu Cayman Ordinary Shares"*), all of which have been issued.

The WaMu Cayman Preferred Securities are described under "Description of WaMu Cayman Preferred Securities." All of the issued WaMu Cayman Ordinary Shares are paid-up and are held by Maples Finance Limited, as share trustee (in such capacity, the *"Share Trustee"*) of a trust (the *"Cayman Trust"*) established under the terms of a declaration of trust (the *"Declaration of Trust"*) dated February 23, 2006 under which the Share Trustee holds the WaMu Cayman Ordinary Shares in trust until the termination of the Cayman Trust. The Cayman Trust will not terminate for so long as any WaMu Cayman Preferred Securities are outstanding. The Cayman Trust may not dispose of or otherwise deal with the WaMu Cayman Ordinary Shares for so long as the WaMu Cayman Preferred Securities are outstanding. Prior to the termination of the Cayman Trust, the Cayman Trust is an accumulation trust, and no distributions will be made while any WaMu Cayman Preferred Security is outstanding. Following the termination of the Cayman Trust, the Share Trustee will wind up the Cayman Trust and make a final distribution to charity. The Share Trustee has no beneficial interest in, and derives no benefit (other than its fee for acting as Share Trustee) from, its holding of the WaMu Cayman Ordinary Shares.

The following table illustrates the expected capitalization of WaMu Cayman as of the closing of this Offering, after giving effect to the issuance of the WaMu Cayman Preferred Securities on the closing date:

|  | As of the Closing Date |
|---|---|
|  | (Unaudited) |
| Series A-1 WaMu Cayman Preferred Securities............. | $302,300,000 |
| Series A-2 WaMu Cayman Preferred Securities............. | $447,700,000 |
| WaMu Cayman Ordinary Shares ......................... | $        1,000 |
| Total Capitalization...................................... | $750,001,000 |

## Business of WaMu Cayman

### Assets of WaMu Cayman

WaMu Cayman's sole assets will be the Fixed Rate Company Preferred Securities and $1,000 from the issuance of the WaMu Cayman Ordinary Shares to the Cayman Trust.

### Administration

Maples Finance Limited, a licensed trust company incorporated under the laws of the Cayman Islands, acts as the administrator of WaMu Cayman (the *"Administrator"*) under the Administration Agreement to be entered into on or before the closing date (the *"Administration Agreement"*), between WaMu Cayman and Maples Finance Limited. The office of the Administrator serves as the general business office of WaMu Cayman. Through this office and pursuant to the terms of the Administration Agreement, the Administrator performs various management functions on behalf of WaMu Cayman, including the provision of clerical, administrative and other services.

The Administrator will serve until it resigns, is dissolved or is removed by WaMu Cayman. The Administrator may delegate its duties under the Administration Agreement to other parties, but doing so will not release the Administrator from any of its obligations under the Administration Agreement.

Under the Administration Agreement, WaMu Cayman may remove the Administrator at any time, without paying any penalty, by giving at least 30 days' written notice to the Administrator. However, if the Administrator is dissolved or commits an act of bankruptcy, or if it breaches the Administration Agreement (and the breach, if capable of being cured, remains uncured for 30 days after receiving notice of such breach from WaMu Cayman or WMI), WaMu Cayman may remove the Administrator on 14 days' notice to the Administrator.

The Administrator may resign at any time by giving at least 30 days' written notice to WaMu Cayman. No resignation or removal of the Administrator will become effective while any WaMu Cayman Preferred Securities are outstanding until a successor administrator has been appointed and has accepted and assumed its duties. The Administration Agreement may be amended by the Administrator and WaMu Cayman; *provided, however,* that such amendment may not have a material adverse affect on the rights and interests of the holders of the WaMu Cayman Preferred Securities.

Under the Expenses Agreement, to be entered into on or before the closing date (the *"Expenses Agreement"*), among WaMu Cayman and WMB, all charges or expenses of WaMu Cayman other than payments required under the terms of the WaMu Cayman Preferred Securities, including the fees, charges and expenses of the Administrator, the Registrar, the Transfer Agent or any Paying Agent, will be paid or caused to be paid by WMB, *provided* that if the Administrator incurs fees, charges or expenses, for which they are not otherwise liable under

the Administration Agreement, at the request of a holder of WaMu Cayman Preferred Securities or other person, such holder or other person will be liable for such fees, charges and expenses.

## Management of WaMu Cayman

### Directors

WaMu Cayman will be managed by a Board of Directors. WaMu Cayman's Articles of Association will provide that WaMu Cayman's Board of Directors will be composed of five members. Pursuant to WaMu Cayman's Articles of Association, two of the five directors will automatically and at all times consist of two of the persons who are then currently serving as members of the Company's Board of Managers (the ''Company Designated Directors''), as designated by the Company in a notice to WaMu Cayman. One of the Company Designated Directors will at all times be the person who is the Company's Independent Manager, as designated by the Company in a notice to WaMu Cayman. The person who is the Company's Independent Manager will also be designated as WaMu Cayman's Independent Director (the ''Independent Director'').

The other three directors of WaMu Cayman will be appointed by the Share Trustee as holder of 100% of the WaMu Cayman Ordinary Shares. These persons will not be or have been directors or employees of WMI or any affiliate of WMI. The directors of WaMu Cayman will serve until their successors are duly appointed by the Share Trustee as holder of 100% of the WaMu Cayman Ordinary Shares, or the Company in the case of the Company Designated Directors (including the Independent Director), as applicable. Except in certain circumstances described under ''— Independent Director'' below or in connection with the prevention of the dividend on the WaMu Company Preferred Securities in circumstances where the Company has paid dividends on the Fixed Rate Company Preferred Securities held by WaMu Cayman, action by the WaMu Cayman's Board of Directors will be by majority vote.

The persons who will be the directors of the Company upon completion of this Offering are as follows:

| Name | Position and Offices Held |
|---|---|
| Wendy Ebanks | Director |
| Carlos Fallajah | Director |
| Guy Major | Director |
| Robert Williams | Director |
| Kenneth J. Uva | Independent Director |

### Independent Director

As a consequence of the WaMu Cayman's Independent Director being the same person as the Company's Independent Manager, WaMu Cayman's Independent Director will be a person who must not during the preceding five years have been a director or employee of WMI or any affiliate of WMI, other than a direct or indirect financing subsidiary of WMI. In addition, the holders of the WaMu Cayman Preferred Securities and the holders of the Trust Securities, by exercise of their right to direct the manner in which WaMu Cayman and WaMu Delaware exercise their voting rights with respect to the Fixed Rate Company Preferred Securities and Fixed-to-Floating Rate Company Preferred Securities, respectively, voting together as a single class, will be entitled to remove the initial or any succeeding Independent Manager of the Company, and consequently WaMu Cayman's Independent Director, and to fill the vacancies so created by such removals or any other vacancy existing in the office of WaMu Cayman's Independent Director and Independent Manager of the Company if (i) the Company fails to pay full dividends on the Fixed Rate Company Preferred Securities on any Dividend Payment Date, (ii) WaMu Cayman fails to pay full dividends on the WaMu Cayman Preferred Securities on any Dividend Payment

Date or (iii) a Bankruptcy Event occurs. The person so elected will be deemed to be the Company's Independent Manager, and consequently WaMu Cayman's Independent Director, irrespective of whether he or she meets the independence test described above. Such right will continue for as long as any Company Preferred Securities are outstanding.

WaMu Cayman's Articles of Association will provide that, for so long as any WaMu Cayman Preferred Securities are outstanding, certain actions by WaMu Cayman are subject to prior approval by the Independent Director as well as by a majority of the entire Board of Directors. WaMu Cayman will not be able, without the approval of the Independent Director, to (i) redeem or repurchase any of the WaMu Cayman Ordinary Shares or (ii) to the extent within the power of the WaMu Cayman, directors, convert or approve the conversion of the Company into another type of entity, or approve the consolidation or merger of the Company with or into any other entity or the consolidation or merger of any other entity with or into the Company, or the sale by the Company of any of its assets. In addition, the Independent Director shall have the power, acting alone, to cause WaMu Cayman to enforce the terms of the Fixed Rate Company Preferred Securities and the LLC Agreement.

### Compensation of Directors

WaMu Cayman's directors will not receive any compensation for their service on WaMu Cayman's Board of Directors from WaMu Cayman.

WaMu Cayman's Articles of Association will provide that WaMu Cayman will indemnify any director of WaMu Cayman against any liability incurred by such director as a result of any act or failure to act in carrying out his or her functions other than such liability, if any, that such director may incur by his or her own willful neglect or default, provided that so long as any WaMu Cayman Preferred Securities are outstanding any such indemnity will be limited to that contemplated by the terms of the Administration Agreement and the Expense Agreement. No such director will be liable to WaMu Cayman for any loss or damage in carrying out his or her functions unless that liability arises through the willful neglect or default of such director.

### Additional Information

The information with respect to WaMu Cayman that is required by paragraph (d)(4)(i) of Rule 144A under the Securities Act, including quarterly unaudited and annual audited financial statements, in each case prepared in accordance with generally accepted accounting principles in the United States ("GAAP"), will be available upon request to WMI or free of charge at the specified office of the Paying Agent in Luxembourg until the earlier of (i) the redemption in full of Fixed Rate Company Preferred Securities and the WaMu Cayman Preferred Securities or (ii) the Conditional Exchange. A copy of WaMu Cayman's Articles of Association will be available upon request to WMI or free of charge at the specified office of the Paying Agent in Luxembourg.

## THE COMPANY

Washington Mutual Preferred Funding LLC (the *"Company"*) is a Delaware limited liability company formed on February 3, 2006 under the Delaware Limited Liability Company Act, as amended (the *"LLC Act"*), pursuant to an initial limited liability company agreement and a certificate of formation filed with the Secretary of State of the State of Delaware. The limited liability company agreement will be amended and restated in its entirety on or about March 7, 2006 (as so amended and restated, the *"LLC Agreement"*).

The LLC Agreement generally limits the Company's activities to (i) issuing the Fixed Rate Company Preferred Securities, the Perpetual Non-cumulative Fixed-to-Floating Rate Preferred Securities (the *"Fixed-to-Floating Rate Company Preferred Securities"*, and together with the Fixed Rate Company Preferred Securities, the *"Company Preferred Securities"*), the common securities of the Company (the *"Company Common Securities"*), and additional Parity Equity Securities of the Company (ii) acquiring and holding Eligible Investments, including the Class A Asset Trust Certificate (which will be the sole initial Eligible Investments of the Company) in accordance with the investment policy as described in ''— Business of the Company — Assets of the Company'' and (iii) performing functions necessary or incidental thereto. Subject to the limitations and assumptions described under "Certain Tax Considerations — United States Federal Income Tax Consequences", the Company intends to be treated as a partnership for United States Federal income tax purposes (other than a publicly traded partnership taxable as a corporation) and may not take any action, or permit any action to be taken, that would cause the Company to fail to be treated as a partnership for United States Federal income tax purposes for so long as any Company Preferred Securities are outstanding, except with the consent or affirmative vote of the holders of at least two-thirds of the Fixed Rate Company Preferred Securities and the Fixed-to-Floating Rate Company Preferred Securities, voting together as a single class. The principal executive office of the Company is 1201 Third Avenue, Seattle, Washington 98101. Copies of the LLC Agreement will be available upon request to WMI or free of charge at the specified office of the Paying Agent in Luxembourg.

The Company will receive the opinion of Mayer, Brown, Rowe & Maw LLP to the effect that, for United States Federal income tax purposes, the Company will not be treated as an association taxable as a corporation or as a publicly traded partnership taxable as a corporation.

### Capitalization

Upon completion of this Offering, University Street, Inc., an indirect subsidiary of WMB (*"University Street"*), will hold all of the Company Common Securities, representing 100% of the voting rights in the Company (subject to the limited voting rights of holders of the Company Preferred Securities described under "Description of Fixed Rate Company Preferred Securities"). Upon completion of this Offering, WaMu Cayman will hold all of the Fixed Rate Company Preferred Securities and WaMu Delaware will hold all of the Fixed-to-Floating Rate Company Preferred Securities.

The following table illustrates the expected capitalization of the Company as of the closing of this Offering, after giving effect to the issuance of the Company Common Securities, the Fixed Rate Company Preferred Securities and the Fixed-to-Floating Rate Company Preferred Securities on the closing date:

|  | As of the Closing Date |
|---|---|
|  | (Unaudited) |
| Fixed Rate Company Preferred Securities | $ 750,000,000 |
| Fixed-to-Floating Rate Company Preferred Securities | $1,250,000,000 |
| Company Common Securities | $3,389,459,150 |
| Total Capitalization | $5,389,459,150 |

## Business of the Company

### Assets of the Company

In connection with the Offering, WMB will convey a portfolio of HELs to the Company in exchange for 100% of the Company Preferred Securities. Concurrently, University Street will convey a portfolio of HELs to the Company in exchange for the Company Common Securities. The portfolios conveyed by WMB and University Street to the Company will consist of HELs having an aggregate principal balance of approximately $5,389,459,150 as of January 31, 2006 and includes payments received on such portfolio from and after February 1, 2006. The Company will then convey the assets received by it from WMB and University Street to the Asset Trust in exchange for interests in the Asset Trust represented by the Class A Asset Trust Certificate and the Class R Asset Trust Certificate.

The Eligible Investments (which will initially consist of the Class A Asset Trust Certificate owned by the Company) from time to time will generate net income for distribution by the Company to WaMu Cayman as holder of the Fixed Rate Company Preferred Securities (and consequently for payment as dividends by WaMu Cayman to holders of the WaMu Cayman Preferred Securities), to WaMu Delaware as holder of the Fixed-to-Floating Rate Company Preferred Securities (and, consequently for payment as dividends by WaMu Delaware to the holders of the Trust Securities), and to University Street as holder of the Company Common Securities.

The Company intends to manage its assets so as (i) to ensure that the Company will at all times maintain its exemption under the Investment Company Act, (ii) to result in the Company at all times maintaining sufficient FFO to allow payments to be made with respect to its Junior Equity Securities (including payments to University Street as holder of the Company Common Securities) and (iii) to maintain the desired treatment under the Code for the Company's assets and obligations.

Current requirements under the Investment Company Act mandate that in order to maintain its exemption from registration as an investment company the Company must limit its assets which are not Qualifying Interests to no more than 20% of its total assets at any time. The Company expects that initially the distributions it receives from the Asset Trust as holder of the Class A Asset Trust Certificate will significantly exceed the amount required to make required distributions on the Company Preferred Securities and any Parity Equity Securities. Cash received from the Asset Trust and any Permitted Investments purchased with such funds are not Qualifying Interests, and therefore funds received from the Asset Trust and retained by the Company will be limited (together with any other assets which are not Qualifying Interests) to 20% of the Company's total assets at any time. For this and other reasons, in the ordinary course, the Company expects that it will distribute all or substantially all of the funds it receives from the Asset Trust to University Street, as holder of the Company Common Securities, to the

extent it is permitted to do so in accordance with the restrictions on distributions with respect to the Company Common Securities and such funds are not otherwise required to pay required distributions on the Company Preferred Securities and any other Parity Equity Securities. The Company intends to invest funds it receives from the Asset Trust in Permitted Investments prior to such funds being distributed to the holders of the Company Common Securities, the Company Preferred Securities and any other Parity Equity Securities.

The Company also expects that over time the principal balance of the HELs held by the Asset Trust will decrease as a result of principal payments and payoffs. Since (i) in accordance with the terms of the Pooling and Servicing Agreement, additional assets may only be added to the Asset Trust in very limited circumstances and (ii) funds distributed to the Company by the Asset Trust may be distributed to University Street as discussed above and to the extent held by the Company will generally (when invested in Permitted Investments) generate a lower rate of return than the HELs held in the Asset Trust, over time the Company expects that its FFO will decline. Accordingly, prior to the point that the Company's FFO level is reduced to a level that would prevent payments with respect to its Junior Equity Securities (including payments to University Street as holder of the Company Common Securities) the Company intends to acquire additional income producing investments which constitute Eligible Assets. Any additional assets which are acquired by the Company will not be transferred to the Asset Trust or serviced in accordance with the Pooling and Servicing Agreement. Additional assets which are acquired by the Company and are not Permitted Investments (such assets, "*Additional Assets*") may (but are not in all cases required to) consist of obligations of Asset Subsidiaries. The terms of the Asset Documentation with respect to any Additional Assets will provide for the servicing of such Additional Assets.

"*Eligible Assets*" means assets:

(a) which (i) are securities, interests or other obligations of an Asset Subsidiary which are backed or collateralized by first or second lien closed end home equity loans, first or second lien home equity lines of credit, mortgage loans on single family or multi-family residences, commercial mortgage loans or other real estate assets, in each case, with respect to real estate located in the United States, *provided, however*, that the Company may acquire and hold first or second lien closed end home equity loans, first or second lien home equity lines of credit, mortgage loans on single family or multi-family residences, commercial mortgage loans or other real estate assets directly if the Company receives an Asset Tax Opinion in connection with such assets or (ii) otherwise satisfy the Rating Agency Condition and are approved by all of the managers, including the Independent Manager;

(b) which will be serviced and maintained in accordance with Asset Documentation;

(c) the collateral for which is not permitted to include under the related Asset Documentation any first or second lien closed end home equity loans, first or second lien home equity lines of credit, mortgage loans on single family or multi-family residences, commercial mortgage loans or other real estate assets as to which the applicable obligor was more than 30 days delinquent as of the applicable cut-off date or transfer date;

(d) the collateral for which does not create or carry any obligation of the Company or any Asset Subsidiary to make future advances or loans to any obligor with respect to such collateral under lines of credit, revolving loan facilities or other similar features; and

(e) the acquisition, maintenance and servicing of which will not (in itself or in connection with any of the Company's other assets):

(i) cause the Company to be an "investment company" which is required to register under the Investment Company Act;

(ii) cause the imposition of United States Federal income withholding tax in respect of payments made by the Company on the Company Preferred Securities or any Parity Equity Securities;

(iii) cause the Company to be treated under the Code as a publicly traded partnership taxable as a corporation; or

(iv) cause the Company to be treated as engaged in a US trade or business, as determined for United States Federal income tax purposes.

*"Asset Documentation"* means (a) with respect to the Asset Trust and the Class A Asset Trust Certificate, the Pooling and Servicing Agreement and any related custody agreement and (b) with respect to any Additional Assets, the documentation (i) governing the maintenance and servicing of such Additional Assets and custodial arrangements related thereto and (to the extent applicable) any underlying collateral related to such Additional Assets and (ii) establishing (if applicable) any Asset Subsidiary created in connection with such Additional Assets; *provided* that the execution of any such documentation, to the extent such documentation is not substantially similar in all material respects to the Pooling and Servicing Agreement (with such changes as may be necessary or desirable to reflect the collateral for such Additional Assets), must satisfy the Rating Agency Condition and be approved by all of the managers, including the Independent Manager.

*"Asset Subsidiary"* means the Asset Trust and, with respect to any Additional Assets, an entity formed for the purpose holding the collateral related to such Additional Assets and making payments with respect thereto to the Company and:

(a) in which the Company holds all or substantially all of the economic interests;

(b) which is established and governed pursuant to Asset Documentation;

(c) which is not an "investment company" which is required to register under the Investment Company Act;

(d) the establishment and operation of which will not cause the Company to be an "investment company" which is required to register under the Investment Company Act;

(e) the establishment and operation of which will not cause the imposition of United States Federal withholding tax in respect of payments by the Company on the Company Preferred Securities or any Parity Equity Securities;

(f) the establishment and operation of which will not cause the Company to be treated under the Code as a publicly traded partnership taxable as a corporation; and

(g) the establishment and operation of which will not cause the Company to be treated as engaged in a US trade or business, as determined for United States Federal income tax purposes.

"*Asset Tax Opinion*" means, with respect to any assets, an opinion of counsel from a nationally recognized tax counsel to the effect that the acquisition and ownership of such assets by the Company will not (in itself or in connection with any of the Company's other assets):

(a) cause the imposition of United States Federal withholding tax in respect of payments made by the Company on the Company Preferred Securities or any Parity Equity Securities;

(b) cause the Company to be treated under the Code as a publicly traded partnership taxable as a corporation; or

(c) cause the Company to be treated as engaged in a U.S. trade or business, as determined for United States Federal income tax purposes.

"*Asset Portfolio*" means the Class A Asset Trust Certificate and any Permitted Investments and Additional Assets held by the Company from time to time.

"*Eligible Investments*" means Permitted Investments, the Class A Trust Certificate, the Class R Asset Trust Certificate and Eligible Assets.

"*Permitted Investments*" means one or more of the obligations or securities listed below:

(a) obligations of, or guaranteed as to principal and interest by, the United States of America or any agency or instrumentality thereof when such obligations are backed by the full faith and credit of the United States of America;

(b) repurchase agreements on obligations described in clause (a) of this definition of "Permitted Investments"; *provided*, that the unsecured obligations of the party agreeing to repurchase such obligations have at the time one of the two highest short term debt ratings of the Rating Agencies; and *provided further*, that such repurchaser's unsecured long term debt has one of the two highest unsecured long term debt ratings of each of the Rating Agencies;

(c) federal funds, certificates of deposit, time deposits and bankers' acceptances of any bank or trust company incorporated under the laws of the United States of America or any state; *provided*, that the debt obligations of such bank or trust company (or, in the case of the principal bank in a bank holding company system, debt obligations of the bank holding company) at the date of acquisition thereof have one of the two highest short term debt ratings of each of the Rating Agencies and unsecured long term debt has one of the two highest unsecured long term debt ratings of each of the Rating Agencies;

(d) federal funds, certificates of deposit, time deposits, demand deposits and bankers' acceptances of WMB;

(e) obligations of, or obligations guaranteed by, any state of the United States of America or the District of Columbia, *provided*, that such obligations at the date of acquisition thereof shall have one of the two highest long-term debt ratings available for such securities from each of the Rating Agencies;

(f) commercial paper of any corporation incorporated under the laws of the United States of America or any state thereof, which on the date of acquisition has the highest commercial paper rating of each of the Rating Agencies, *provided*, that the corporation has unsecured long term debt that has one of the two highest unsecured long term debt ratings of each of the Rating Agencies;

(g) securities (other than stripped bonds or stripped coupons) bearing interest or sold at a discount that are issued by any corporation incorporated under the laws of the United States of America or any state thereof and have one of the two

highest long-term unsecured ratings available for such securities from each of the Rating Agencies; and

(h) any other category of investments that satisfy the Rating Agency Condition and is approved by all of the managers, including the Independent Manager; subject to a receipt by the Company of an Asset Tax Opinion with respect to such category of investments.

*provided, however*, that any of the investments listed above will not be Permitted Investments to the extent that investment therein would cause the outstanding principal amount of Permitted Investments that are then held by the Company to exceed 20% of the aggregate principal amount of all Eligible Investments. In no event shall an instrument be a Permitted Investment if such instrument (x) evidences a right to receive only interest payments with respect to the obligations underlying such instrument or (y) has been purchased at a price greater than the outstanding principal balance of such instrument.

*"Rating Agencies"* means, at any time, S&P, Moody's, and Fitch, but only in the case of each such agency if it is rating the relevant security, including the WaMu Cayman Preferred Securities or the Trust Securities, at the time or, if none of them is providing a rating for the relevant security, including the WaMu Cayman Preferred Securities or the Trust Securities at such time, then any "nationally recognized statistical rating organization" as that phrase is defined for purposes of Rule 436(g)(2) under the Securities Act, which is rating such relevant security.

*"Rating Agency Condition"* means written notice from each Rating Agency confirming that the proposed change or modification will not result in a reduction of the rating then currently assigned by such Rating Agency to the WaMu Cayman Preferred Securities or the Trust Securities.

### Employees and Administrative Services Agreement

Prior to issuing the Fixed Rate Company Preferred Securities, the Company and WMB will enter into an Administrative Services Agreement (the *"Administrative Services Agreement"*) pursuant to which WMB will provide (or cause to be provided) certain accounting, legal, tax and other support services to the Company, assist the Company in maintaining compliance with all pertinent U.S. local, state and federal laws and provide necessary administrative, record keeping and secretarial services to the Company. Under such agreement, the Company will agree to reimburse the provider of such services from time to time for the value of services provided by such provider to the Company. The Company expects that any such reimbursement will be in a *de minimis* amount.

The Company will maintain limited liability company records and audited financial statements that are separate from those of WMI and any of its other affiliates. None of the officers, employees or managers of the Company will have any direct or indirect pecuniary interest in any security to be acquired or disposed of by the Company or in any transaction in which the Company has an interest.

### Management of the Company

#### Managers and Officers

The Company will be managed by a Board of Managers. The LLC Agreement will provide that the Company's Board of Managers will at all times be composed of three members, one of whom is not and has not been during the preceding five years an officer or employee of WMI or any affiliates of WMI, other than a financing subsidiary (the *"Independent Manager"*). The Company's managers will serve until their successors are duly elected and qualified. Except in certain circumstances described under "— Independent Manager" below, action by the

Company's Board of Managers will be by majority vote. The Company will have five officers upon issuance of the Fixed Rate Preferred Securities.

The persons who will be the managers and executive officers of the Company upon completion of the Offering will include:

| Name | Position and Offices Held |
| --- | --- |
| Robert Williams | Manager and Senior Vice President |
| Peter Freilinger | Manager and Senior Vice President |
| Kenneth J. Uva | Independent Manager |
| Doreen Logan | First Vice President and Assistant Secretary |
| Paul Phillips | Vice President |
| Chad Smith | First Vice President and Secretary |

Each of the initial managers (other than the Independent Manager) and officers of the Company are individuals who are officers or employees of WMI or one of its affiliates. The initial Independent Manager is Kenneth J. Uva, who is an employee of CT Corporation.

The Company will designate two of the persons then currently serving as members of the Company's Board of Managers to serve as members of WaMu Cayman's Board of Directors in a notice to WaMu Cayman. One of the Company Designated Directors will at all times be the person who is the Company's Independent Manager, as designated by the Company in a notice to WaMu Cayman. The person who is the Company's Independent Manager will also be designated as WaMu Cayman's Independent Director. The Company Designated Directors will serve as directors of WaMu Cayman until their successors are duly elected and qualified.

**Independent Manager**

Under the LLC Agreement, in order to be considered "independent", a manager must not, during the preceding five years, have been a director or employee of WMI or any affiliate of WMI, other than a direct or indirect financing subsidiary of WMI.

The LLC Agreement will require that, in assessing the benefits to the Company of any proposed action requiring his or her consent, the Company's Independent Manager take into account the interests of holders of both Company Common Securities and the Company Preferred Securities. The LLC Agreement provides that in considering the interests of the holders of the Company Preferred Securities, the Company's Independent Manager owes such holders the same duties which the Independent Manager owes to the holders of Company Common Securities.

The LLC Agreement will provide that, for so long as any Company Preferred Securities are outstanding, certain actions by the Company are subject to prior approval of all Managers including the Independent Manager. The Company will not be able, without the approval of the Independent Manager, to (i) terminate, amend or otherwise change any Asset Documentation or (ii) effect a consolidation, merger or share exchange that is not tax-free to the holders of the Company Preferred Securities unless such consolidation, merger or share exchange was approved by the consent or affirmative vote of the holders of at least two-thirds of the Fixed Rate Company Preferred Securities and the Fixed-to-Floating Rate Company Preferred Securities, voting together as a single class. In addition, in the event that the Asset Trust fails to make a payment to the Company or any payments are not received with regard to any Additional Asset in violation of the terms of the related Asset Documentation on any scheduled payment date, the Independent Manager will have the authority to cause the Company, as the holder of the Series A Asset Trust Certificate or any Additional Asset, as applicable, to enforce its rights in such capacity until payments have been resumed and a year has passed since the date of the latest scheduled payment date with respect to which the Asset Trust or the Additional Asset failed to make a payment.

The holders of the Company Preferred Securities, voting together as a single class, by majority vote of the votes cast on such matter at a meeting properly called and held or by written instructions signed by the holders of Company Preferred Securities representing a majority of the voting rights of all outstanding Company Preferred Securities, voting together as a single class, are entitled to remove the initial or any succeeding Independent Manager and to fill the vacancy created by such removal or any other vacancy existing in the office of the Independent Manager if (i) the Company fails to pay full dividends on the Company Preferred Securities on any Dividend Payment Date, (ii) WaMu Cayman fails to pay full dividends on the WaMu Cayman Preferred Securities on any Dividend Payment Date, or (iii) a Bankruptcy Event occurs. The person so elected will be deemed to be an Independent Manager irrespective of whether he or she meets the independence test described above. Such right will continue for as long as any Fixed Rate Company Preferred Securities are outstanding.

"*Bankruptcy Event*" means the Company, WaMu Cayman or WaMu Delaware (i) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due, (ii) makes a general assignment, arrangement or composition with or for the benefit of its creditors or (iii) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding up or liquidation.

## Compensation of Managers and Officers

The Company intends to pay the initial Independent Manager a reasonable fee for his or her services as a manager of the Company, plus reimbursement of expenses for attendance at each meeting of the Company's Board of Managers. As to managers and officers of the Company who are also officers or employees of WMI or one of its affiliates, the Company will pay, or reimburse the related affiliate for, a portion of the salary and benefits of any such persons in proportion to the estimated amount of time spent by such person on the Company's business as compared to time spent on the business of WMI or one of its other affiliates. However, the Company expects such amount to be *de minimis*.

## Indemnification of Managers and Officers

The LLC Agreement will provide that the Company will, to the fullest extent permitted by law, indemnify any manager or officer of the Company for any liability and related expenses (including reasonable counsel's fees) arising out of such manager's or officer's status as a manager or officer of the Company; *provided, however*, that a court of competent jurisdiction has not determined that such manager or officer did not act in good faith and in a manner that he or she reasonably believed to be in, or not opposed to, the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe that his or her conduct was unlawful. The LLC Agreement will provide that the right to indemnification is a contract right and set forth certain procedural and evidentiary standards applicable to enforcement of a claim. The LLC Agreement will provide that the Company may purchase and maintain insurance to protect any manager or officer against any liability asserted against him or her, or incurred by him or her, arising out of his or her status as such.

## Additional Covenants of the Company in the LLC Agreement

The LLC Agreement provides that, so long as any Company Preferred Securities are outstanding, the Company will not authorize, create or increase the authorized amount of or issue any class or series of any equity shares of the Company, or any warrants, options or other rights convertible or exchangeable into any class or series of any equity shares of the Company, ranking senior to the Company Preferred Securities, either as to dividend rights, redemption rights or rights on dissolution, liquidation or winding up of the Company without the consent or

an affirmative vote of the holders of at least two-thirds of the Fixed Rate Company Preferred Securities and the Fixed-to-Floating Rate Company Preferred Securities, voting together as a single class. The LLC Agreement also provides that, except with the consent or affirmative vote of the holders of at least two-thirds of the Fixed Rate Company Preferred Securities and the Fixed-to-Floating Rate Company Preferred Securities, voting together as a single class, the Company will not take certain other actions. These actions are described under "Description of the Fixed Rate Company Preferred Securities — Voting Rights and Covenants."

**Additional Information**

The information with respect to the Company that is required by paragraph (d)(4)(i) of Rule 144A under the Securities Act, including quarterly unaudited and annual audited financial statements, in each case prepared in accordance with U.S. GAAP, will be available upon request to WMI or free of charge at the specified office of the Paying Agent in Luxembourg until the earlier of (i) the redemption in full of the Fixed Rate Company Preferred Securities, or (ii) the Conditional Exchange.

# THE ASSET TRUST

## General

Washington Mutual Home Equity Trust I (the "Asset Trust") is a statutory trust formed under the laws of the State of Delaware pursuant to a trust agreement between the Company, as depositor, and Deutsche Bank Trust Company Delaware, as Delaware trustee. The Pooling and Servicing Agreement among the Company, as depositor, WMB, as servicer (the "Servicer"), Deutsche Bank Trust Company Delaware, as Delaware trustee (the "Delaware Trustee") and Deutsche Bank National Trust Company, as trustee (the "Trustee"), will restate the trust agreement and will be the governing instrument of the Asset Trust.

The Asset Trust will not own any assets other than the HELs and the other assets described below. The Asset Trust will not have any liabilities other than those incurred in connection with the Pooling and Servicing Agreement and any related agreement. The Asset Trust will not have any directors, officers or other employees. No equity contribution will be made to the Asset Trust by WMB, the depositor or any other party, except for a *de minimis* contribution made by the depositor pursuant to the initial trust agreement, and the Asset Trust will not have any other capital. The fiscal year end of the Asset Trust will be December 31. The Asset Trust will act through the Trustee and the Delaware Trustee, whose fees and reasonable expenses will be paid or reimbursed by the Servicer.

For purposes of this offering circular with respect to the underwriting, origination and servicing of the HELs in the Asset Trust, references to WMB include WMB, originators acquired by WMB and WMB's subsidiaries.

## General Description of Assets

The assets of the Asset Trust will consist of HELs having, as of the Cut-Off Date, a value of approximately $5,389,459,150, payments received thereon and certain other investments. The HELs were originated by WMB primarily through its retail branches between September 1, 2001 and September 30, 2005. As of January 31, 2006, the HELs transferred into the Asset Trust had an aggregate unpaid principal balance of approximately $5,389,459,150.

The assets of the Asset Trust will consist of 56,090 HELs that had an aggregate unpaid principal balance as of the Cut-Off Date, of approximately $5,389,459,150. The HELs have a weighted average gross interest rate of 6.076% and range from a gross interest rate of 4.00% to 11.315%. The weighted average current, unpaid principal balance of the HELs is $96,086 with a minimum current, unpaid principal balance of $25,002 and a maximum current, unpaid principal balance of $965,000. Assets in the Asset Trust have various original maturities ranging from 5 years to 40 years and were, on average, originated within the last 25.46 months. The current average loan-to-value ratio is 53.48% and the average loan-to-value ratio at origination was 57.51%. The HELs have a weighted average Credit Score (as defined below) of 757. Most of the properties underlying the HELs are owner occupied with 3.86% of the properties non-owner occupied. The HELs are geographically concentrated in Texas (49.01%), California (30.59%), Florida (7.17%), and New York (5.08%). HELs are typically made for reasons such as home purchases, home improvements, furniture and fixtures purchases, purchases of automobiles and debt consolidation. The HELs are generally repaid on a fully-amortizing basis.

## Acquisition of the Portfolio and Related Transactions

In anticipation of the transactions described in this offering circular, WMB contributed a pool of HELs to the Company in exchange for a corresponding amount of the Company's Fixed Rate Company Preferred Securities and Fixed-to-Floating Rate Company Preferred Securities. In addition, University Street contributed a pool of HELs to the Company in exchange for all of the

50

Company's Company Common Securities. The aggregate value of these contributions totaled approximately $5,389,459,150.

Concurrently with the issuance of the WaMu Cayman Preferred Securities, the Company will contribute to the Asset Trust all of the HELs it received from WMB and University Street. Such contribution will be made in exchange for the Class A-1 Washington Mutual Home Equity Trust I Certificate (the "Class A Asset Trust Certificate") and the Class R Washington Mutual Home Equity Trust I Certificate (the "Class R Asset Trust Certificate"). For United States Federal tax purposes, the Class A Asset Trust Certificate will represent the sole class of regular interests in the Asset Trust, and the Class R Asset Trust Certificate will represent the sole class of residual interests in the Asset Trust. The Company will retain the Class A Asset Trust Certificate and expects to sell the Class R Asset Trust Certificate to WMB.

The Asset Trust will own the right to receive all payments of principal and interest on the HELs due after January 31, 2006 (the "Cut-Off Date"). A schedule to the Pooling and Servicing Agreement will include information about each HEL, including:

- the outstanding principal balance as of the close of business on the Cut-Off Date;

- the term of the HEL; and

- the applicable interest rate as of the close of business on the Cut-Off Date.

The notes relating to the HELs will not be endorsed to the Asset Trust and no assignments to the Asset Trust of the mortgages securing the HELs will be prepared. WMB, in its capacity as initial Custodian, will have possession of and will review such notes and the HELs as Custodian for the Asset Trust and financing statements will be filed evidencing the Asset Trust's interest in the HELs.

In exchange for the HELs and the other assets described above, the Trustee will authenticate and deliver the Class A Asset Trust Certificate and the Class R Asset Trust Certificate pursuant to the order of the depositor.

## Description of the Portfolio

### General

All of the HELs in the portfolio of the Asset Trust will consist of closed-end, first lien home equity loans secured by a first lien that primarily is on the borrower's residence. Such residences are largely single family properties. These loans typically are made for reasons such as home purchases, home improvements, acquisition of furniture and fixtures, purchases of automobiles, and debt consolidation. The HELs are generally paid on a fully-amortizing basis. As of January 31, 2006, none of the HELs were delinquent in payments for a period of more than 30 days; however, the process of selection for the HELs conveyed to the Asset Trust excluded any such loans. Nevertheless, there can be no assurance that HELs held in the portfolio of the Asset Trust will not become delinquent in the future. WMB's delinquency experience with respect to first lien, closed-end home equity loans owned by WMB and its subsidiaries has consistently been less than one percent of the total outstanding unpaid principal balance of such loans. As of December 31, 2005, total delinquencies of the first lien, closed-end home equity loans owned by WMB and its subsidiaries, including charge-offs during 2005, were 0.60% of the total unpaid principal balances of such loans.

The following tables represent information as of January 31, 2006 with respect to the HELs included in the portfolio of the Asset Trust:

*Distribution by Current Principal Balance*

| Current Principal Balance | Number of Loans | Current Principal Balance | Percent of Overall Portfolio Balance |
|---|---|---|---|
| $0–$49,999 | 11,198 | $ 432,387,414 | 8.02% |
| $50,000–$74,999 | 13,561 | 853,233,512 | 15.83 |
| $75,000–$99,999 | 11,231 | 976,769,683 | 18.12 |
| $100,000–$199,999 | 17,073 | 2,313,001,283 | 42.92 |
| $200,000–$299,999 | 2,322 | 539,701,841 | 10.01 |
| $300,000–$499,999 | 644 | 236,692,050 | 4.39 |
| Greater than $500,000 | 61 | 37,673,368 | 0.70 |
| Total | 56,090 | $5,389,459,150 | 100.00% |

*Distribution by Current Gross Interest Rate*

| Current Gross Interest Rate | Number of Loans | Current Principal Balance | Percent of Overall Portfolio Balance |
|---|---|---|---|
| 4.00–4.99% | 15 | $ 1,977,067 | 0.04% |
| 5.00–5.99 | 26,026 | 2,624,484,236 | 48.70 |
| 6.00–6.99 | 27,509 | 2,571,843,320 | 47.72 |
| 7.00–7.99 | 2,277 | 173,421,367 | 3.22 |
| 8.00–8.99 | 209 | 14,243,687 | 0.26 |
| 9.00–9.99 | 26 | 1,654,510 | 0.03 |
| 10.00–10.99 | 25 | 1,658,731 | 0.03 |
| 11.00–11.99 | 3 | 176,232 | 0.00 |
| Total | 56,090 | $5,389,459,150 | 100.00% |

*Distribution by Property Type*

| Property Type | Number of Loans | Current Principal Balance | Percent of Overall Portfolio Balance |
|---|---|---|---|
| Single Family | 51,667 | $4,958,055,897 | 92.00% |
| Townhouse | 2,071 | 253,335,974 | 4.70 |
| Condominium | 2,269 | 171,618,855 | 3.18 |
| Manufactured Housing | 83 | 6,448,424 | 0.12 |
| Total | 56,090 | $5,389,459,150 | 100.00% |

## Distribution by State

| State | Number of Loans | Current Principal Balance | Percent of Overall Portfolio Balance |
|---|---|---|---|
| Texas | 28,652 | $2,641,385,492 | 49.01% |
| California | 15,288 | 1,648,481,206 | 30.59 |
| Florida | 4,943 | 386,598,404 | 7.17 |
| New York | 2,486 | 273,920,738 | 5.08 |
| Washington | 1,181 | 110,746,674 | 2.05 |
| New Jersey | 694 | 76,275,944 | 1.42 |
| Oregon | 788 | 74,128,630 | 1.38 |
| Georgia | 446 | 38,773,740 | 0.72 |
| Idaho | 334 | 27,517,454 | 0.51 |
| Arizona | 305 | 26,256,800 | 0.49 |
| Other | 973 | 85,374,067 | 1.58 |
| Total | 56,090 | $5,389,459,150 | 100.00% |

## Distribution by Credit Score

| Credit Score[1] | Number of Loans | Current Principal Balance | Percent of Overall Portfolio Balance |
|---|---|---|---|
| Less than 600 | 900 | $ 80,943,626 | 1.50% |
| 600–649 | 1,786 | 169,408,159 | 3.14 |
| 650–699 | 5,866 | 566,608,998 | 10.51 |
| 700–749 | 11,759 | 1,160,863,350 | 21.54 |
| 750–799 | 21,633 | 2,144,571,619 | 39.79 |
| 800–849 | 14,146 | 1,267,063,398 | 23.51 |
| Total | 56,090 | $5,389,459,150 | 100.00% |

[1] *"Credit Score"* means a statistical credit score obtained by WMB and many other mortgage lenders in connection with a loan application to help assess a borrower's creditworthiness. A Credit Score is generated by models developed by a third party, Fair, Isaac & Co., and made available to WMB through three national consumer reporting agencies. The Credit Score is based on a borrower's historical credit data, including, among other things, payment history, delinquencies on accounts, levels of outstanding indebtedness, length of credit history, types of credit and bankruptcy experience. A higher Credit Score indicates a more favorable credit rating.

### Distribution by Current Loan-to-Value Ratio

| Current Loan-to-Value Ratio[1] | Number of Loans | Current Principal Balance | Percent of Overall Portfolio Balance |
|---|---|---|---|
| Less than 10.001% | 887 | $ 35,940,629 | 0.67% |
| 10.001–20.000 | 4,030 | 218,673,171 | 4.06 |
| 20.001–30.000 | 5,876 | 416,715,161 | 7.73 |
| 30.001–40.000 | 7,745 | 645,895,191 | 11.98 |
| 40.001–50.000 | 8,680 | 815,139,892 | 15.12 |
| 50.001–60.000 | 9,517 | 997,096,237 | 18.50 |
| 60.001–70.000 | 9,082 | 1,018,570,234 | 18.90 |
| 70.001–80.000 | 9,703 | 1,173,314,741 | 21.77 |
| 80.001–90.000 | 567 | 67,808,505 | 1.26 |
| 90.001–100.000 | 3 | 305,389 | 0.01 |
| **Total** | 56,090 | $5,389,459,150 | 100.00% |

[1] The current loan-to-value ratio of a mortgage loan is a fraction, the numerator of which is the outstanding principal balance of the mortgage loan and the denominator of which is the collateral value, generally at time of origination of the related mortgage property, expressed as a percentage.

### Distribution by Remaining Months to Maturity

| Remaining Months to Maturity | Number of Loans | Current Principal Balance | Percent of Overall Portfolio Balance |
|---|---|---|---|
| Less than 61 | 939 | $ 39,046,979 | 0.72% |
| 61–120 | 5,522 | 318,110,997 | 5.90 |
| 121–180 | 12,882 | 1,011,975,772 | 18.78 |
| 181–240 | 28,716 | 3,034,564,574 | 56.31 |
| 241–300 | 342 | 37,686,873 | 0.70 |
| 301–360 | 7,688 | 948,039,671 | 17.59 |
| Greater than 360 | 1 | 34,284 | 0.00 |
| **Total** | 56,090 | $5,389,459,150 | 100.00% |

### Distribution by Year of Origination

| Year of Origination | Number of Loans | Current Principal Balance | Percent of Overall Portfolio Balance |
|---|---|---|---|
| 2001 | 266 | $ 21,414,942 | 0.40% |
| 2002 | 5,685 | 548,951,912 | 10.19 |
| 2003 | 27,005 | 2,649,489,615 | 49.16 |
| 2004 | 16,285 | 1,593,766,430 | 29.57 |
| 2005 | 6,849 | 575,836,251 | 10.68 |
| **Total** | 56,090 | $5,389,459,150 | 100.00% |

Underwriting

*General*

The HELs owned by the Asset Trust were, in all material respects, originated in accordance with the underwriting guidelines of WMB as described herein. The HELs have been underwritten by WMB using automated underwriting systems.

WMB's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Some HELs are manually underwritten, in which case an underwriter reviews information submitted by the borrower and supporting documentation, if required, and a credit report of the borrower, and based on that review determines whether to originate a loan in the amount and with the terms requested by the borrower. Some HELs are underwritten through WMB's automated underwriting system, described below.

Prospective borrowers are required to provide details about their financial factors such as their assets, liabilities and related monthly expenses, as well as income and employment information. Borrowers may provide this information by electronic transmission to a bank representative who inputs the information directly into the lending system. Each borrower also provides an authorization to access a credit report that summarizes the borrower's credit history.

*Evaluation of the Borrower's Credit Standing*

To evaluate a prospective borrower's credit history, the loan underwriter obtains a credit report relating to the borrower from one or more credit reporting agencies. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments. In most cases the credit report provides a Credit Score for the borrower. Credit Scores are designed to assess a borrower's creditworthiness and likelihood to default on an obligation over a defined period (usually two to three years) based on a borrower's credit history. Credit Scores do not necessarily correspond to the probability of default over the life of a HEL because they reflect past credit history, rather than an assessment of future payment performance. Credit Scores range from approximately 430 to approximately 850, with higher scores indicating more favorable credit history. In the case of co-borrowers, the Credit Score for the primary borrower is typically used, unless the co-borrower has a Credit Score that is 40 points lower than that of the primary borrower, in which case the lower score is then used. The primary borrower is determined by the applicant at the time the borrowing request is made. Minimum Credit Scores are required for some loan products and loan programs. Credit Scores may not be available for some borrowers.

*Evaluation of the Borrower's Repayment Ability*

In evaluating a prospective borrower's ability to repay a HEL, the loan underwriter considers the ratio of the borrower's total monthly debt (including non-housing expenses) to the borrower's gross income (referred to as the *"debt-to-income ratio"* or *"back-end ratio"*). The maximum acceptable ratios may vary depending on other loan factors, such as loan amount and loan purpose, loan-to-value ratio, credit score and the availability of other liquid assets. Exceptions to the ratio guidelines may be made when compensating factors are present.

*Evaluation of the Adequacy of the Collateral*

The adequacy of the property being pledged as collateral generally is determined by an appraisal made in accordance with pre-established appraisal guidelines. At origination, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation, and are made on forms

55

acceptable to the Federal National Mortgage Association and/or the Federal Home Loan Mortgage Corporation. Appraisers may be staff appraisers employed by WMB or independent appraisers selected in accordance with the pre-established appraisal guidelines. Such guidelines generally require that the appraiser, or an agent on its behalf, personally inspect the property and verify whether the property is in adequate condition and, if the property is new construction, whether it is substantially completed. However, in the case of HELs underwritten through WMB's automated underwriting system, an automated valuation method ("AVM") may be used in lieu of a traditional appraisal. The AVM relies on public records regarding the encumbered property and/or neighboring properties and statistically derives a value using that information. If AVMs are used, they comply with the requirements of the Financial Institutions Reform and Recovery Act of 1989, as amended, and are independently verified periodically. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property.

Title insurance or alternative services (e.g., lien insurance) are required for all HELs. Certain of the HELs owned by the Asset Trust involve the use of "alternative services". These services consist of three services (including property reports and recording services) and are used in lieu of title insurance, endorsements and title company services. Alternative services may be used in certain circumstances including in connection with first liens that are being granted to a lender other than in connection with the purchase of a home; or in connection with loans made to borrowers who already own, on a free and clear basis, the property being used as collateral to secure the loan in question. Alternative services provide a low cost alternative to standard title insurance and provide acceptable risk coverage in the event of default.

### Documentation Programs

Each HEL owned by the Asset Trust has been underwritten using either WMB's full income documentation program or its stated income program. Under WMB's full documentation program, the prospective borrower's stated income is verified through receipt of the borrower's most recent pay stub and most recent W-2 form or, in the case of self-employed borrowers or borrowers with more than 25% of their income from commissions, two years of personal (and, if applicable, business) tax returns. For self-employed borrowers, profit and loss statements may also be required.

Under WMB's stated income program, the prospective borrower's income and assets either are not required to be obtained or are obtained but not verified. Eligibility criteria and the amount of the loan are determined by an automated underwriting system. Purchase loans as well as refinance loans may be eligible for participation in WMB's stated income program.

A credit report for the borrower generally is required for all HELs underwritten under either program.

### Exceptions to Program Parameters

Exceptions to WMB's loan program parameters may be made on a case-by-case basis if compensating factors are present. In those cases, the basis for the exception is documented, and in some cases the approval of a senior underwriter is required. Compensating factors may include, but are not limited to, low loan-to-value ratio, good credit standing, the availability of other liquid assets and stable employment.

### Automated Underwriting System

Currently, all HELs originated by WMB utilize a proprietary automated underwriting system known as "SUCCESS". Based on the borrower's credit report and the information provided by the borrower, the system either (i) approves the loan subject to the satisfaction of specified

conditions, which may include the receipt of additional documentation, (ii) refers the loan application to an underwriter for manual underwriting, or (iii) declines the file based on predetermined eligibility criteria. In making the underwriting decision, SUCCESS distinguishes among different levels of credit standing, based on a proprietary custom score model, the borrower's Credit Score, and specific policies, application and loan characteristics. WMB has developed these credit standing levels based on a statistical analysis of the past performance of its portfolio of home equity loans. WMB has used analysis of the past performance of its portfolio of home equity loans. WMB has used SUCCESS to underwrite HELs since May 2001. WMB regularly evaluates and validates SUCCESS and to date has completed all required compliance and fair lending evaluations in a satisfactory manner. WMB periodically upgrades its proprietary automated underwriting system. SUCCESS was last upgraded in November 2004.

### Quality Control Review

WMB's credit risk oversight department conducts quality control reviews of statistical samplings of previously originated HELs on a regular basis.

### Credit Risk Management Policies

Credit risk within the WMI Group is managed by means of a broad set of policies and principles contained in its credit policy. The Chief Credit Officer is responsible for overseeing the work of a credit policy committee, monitoring the quality of the WMI Group's credit portfolio, determining the reasonableness of the WMI Group's allowance for loan losses, reviewing and approving large credit exposures and setting underwriting criteria for credit-related products and programs. Credit risk management is based on analyzing the creditworthiness of the borrower, the adequacy of the underlying collateral given current events and conditions and the existence and strength of any guarantor support.

Credit risk assessment is a process that requires the evaluation of numerous factors, many of which are qualitative. Process integrity relies on the ability of the WMI Group's lending personnel to analyze all risk elements. It also depends on maintaining risk rating accuracy by recognizing changing elements of credit risk and promptly initiating risk rating changes.

### Conflicts of Interest Policies

Pursuant to WMB's code of ethics (the "Code of Ethics"), WMB extends credit to borrowers only when such extension of credit is financially reasonable for both WMB and the borrower in question. Pursuant to the Code of Ethics, lending personnel cannot permit personal relationships or other considerations to influence lending decisions, and cannot approve extensions of credit to, or be involved in the funding or auditing of any loans made to family or friends.

### Servicing and the Servicers

#### General

All of the HELs owned by the Asset Trust will be serviced by WMB, as the Servicer, pursuant to the Pooling and Servicing Agreement. WMB will have possession of the mortgage files (i.e., the credit reports, servicing documents, etc.) in its capacity as Servicer and the Loan Documents (as defined below) in its capacity as Custodian for the Asset Trust.

The Pooling and Servicing Agreement will provide that WMB may not resign from its obligations and duties thereunder as Servicer except upon a determination that its duties thereunder are no longer permissible under applicable law. No such resignation will become effective until a successor Servicer has assumed WMB's servicing obligations and duties under

the Pooling and Servicing Agreement. In the event of a Servicer resignation, the Company, subject to the terms of the Pooling and Servicing Agreement, shall appoint a successor Servicer.

The Servicer will receive a fee for its services as Servicer under the Pooling and Servicing Agreement. The servicing fee will be calculated as a per annum percentage for each HEL based on the principal balance for such HEL. The servicing fee with respect to each such HEL will equal 0.125% per annum and will be paid monthly. This Servicer will be entitled to retain certain ancillary fees and charges, including, but not limited to, any prepayment fees, insufficient funds fees, modification fees, payoff statement fees and late charges with respect to the HELs as additional servicing compensation and will also be entitled to certain income generated by permitted investments made with collections on the HELs. The Servicer generally will pay all expenses incurred in connection with its responsibilities as Servicer under the Pooling and Servicing Agreement (subject to reimbursement for certain expenses and advances, including those incurred by it in connection with the liquidation of defaulted HELs, the restoration of damaged mortgaged properties, and payments by the Servicer for taxes and insurance premiums with respect to mortgaged properties).

Any person into which the Servicer may be merged, converted or consolidated, or any person resulting from any merger, conversion or consolidation to which the Servicer is a party will be the successor Servicer under the Pooling and Servicing Agreement.

The Servicer will outsource to third party vendors some servicing functions, as described under ''— The Servicer — Servicing Procedures — The Servicer's Third Party Vendors and Service Providers'' below.

### The Servicer

#### The Servicer's Servicing Experience

WMB, including its predecessors in interest, has been servicing loans secured by real estate or other property for over 115 years. The home equity loans serviced by WMB include closed-end fixed and adjustable rate home equity loans and open-end home equity lines of credit. The HELs in WMB's portfolio have been originated by WMB.

The following table shows the number and aggregate unpaid principal balance of HELs serviced by the Servicer as of December 31 for each of the most recent three years:

#### Closed-end Home Equity Loans Serviced by the Servicer

|  | December 31, | | |
| --- | --- | --- | --- |
|  | 2004 | 2003 | 2002 |
|  | (Dollars in Thousands) | | |
| Number of Closed-End Home Equity Loans Serviced by WMB | 150,450 | 131,105 | 126,547 |
| Aggregate Unpaid Principal Balance | $9,851,722 | $7,918,281 | $6,364,840 |

#### Servicing Procedures

*Servicing Functions.* The functions to be performed by the Servicer under the Pooling and Servicing Agreement will include, among other servicing functions, payment collection, payment application, and default management. The Servicer will perform its servicing functions at loan servicing centers located in Melbourne, Florida; Houston, Texas; San Antonio, Texas; Stockton, California; Chatsworth, California; Seattle, Washington; and Canyon Park, Washington.

*Servicing Standard; Waivers and Modifications.* Pursuant to the Pooling and Servicing Agreement, the Servicer will be required to service the HELs owned by the Asset Trust,

consistent with prudent first lien, closed-end home equity loan servicing practices and (unless inconsistent with those servicing practices) in the same manner in which, and with the same care, skill, prudence and diligence with which, it services and administers similar HELs for its own portfolio. The Servicer will be required to make reasonable efforts to collect or cause to be collected all payments under the HELs and, to the extent consistent with the Pooling and Servicing Agreement and applicable insurance policies, follow such collection procedures as are followed with respect to comparable HELs that are held in portfolios of responsible mortgage lenders in the local areas where each mortgaged property is located. Under the terms of the Pooling and Servicing Agreement, the servicing standard applicable to the Servicer may only be modified with the consent of the Company.

Under the terms of the Pooling and Servicing Agreement, the Servicer (subject to certain conditions) may waive, modify or vary any term of any HEL or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to the applicable obligor if it has determined, exercising its good faith business judgment in the same manner as it would if it were the owner of the related HEL, that the security for, and the timely and full collectability of, such HEL would not be adversely affected by such waiver, modification, postponement or indulgence, and may make certain other modifications with respect to the HELs and the related property in accordance with the terms of the Pooling and Servicing Agreement.

***Loan Servicing System.*** In performing its servicing functions, the Servicer generally will use computerized loan servicing systems. The Servicer leases its primary servicing system from AMS-CGI (known as *"Advanced Consumer Lending System"* or *"ACLS"*). ACLS produces detailed information about the financial status of each HEL, including outstanding principal balance, current interest rate, outstanding fees and information about transactions that affect the HEL, including the amount and due date of each payment, the date of receipt of each payment, and how the payment was applied. ACLS works in conjunction with AMS-CGI's Computer Automated Collection System (*"CACS"*) to monitor payment collections and to provide default collection activity information regarding delinquent consumer loans. The Servicer began using ACLS in 2003. Prior to November 2003, the Servicer serviced equity HELs using an ALLTEL loan servicing system; in November 2003, the Servicer transferred servicing onto the ACLS servicing platform by converting approximately 948,000 loan records from the ALLTEL loan servicing system to ACLS.

***Collections and Distributions.*** Under the terms of the Pooling and Servicing Agreement, collections with respect to the HELs will be collected by the Servicer and initially deposited into accounts controlled by the Servicer and may be commingled with funds with respect to other HELs or mortgage loans serviced or owned by the Servicer. The Servicer is required to deposit collections received with respect to the HELs owned by the Asset Trust into a certificate account controlled by the Trustee under the Pooling and Servicing Agreement on a monthly basis. The amount of collections required to be remitted to the Trustee in any given monthly deposit is determined by the timing of the Servicer's receipt of collections and the type of collections they represent. In accordance with the terms of the Pooling and Servicing Agreement, the Servicer may retain certain amounts with respect to expenses and advances from collections or apply them towards the costs of certain costs and permitted expenses connected with the servicing of the HELs. The Servicer will neither be permitted nor required to make servicer advances to cover any gap between scheduled payments on the HELs and the actual collections thereon in any given period.

Subject to the terms and conditions set forth in the Pooling and Servicing Agreement, on a monthly basis the Trustee will distribute collections deposited in the certificate account to the Company, as holder of the Class A Asset Trust Certificate, less (a) fees, expenses and indemnities payable to the Trustee and the Delaware Trustee and (b) fees and certain other amounts payable to the Servicer. No amounts will be payable from collections with respect to the Class R Asset Trust Certificate.

Under the terms of the Pooling and Servicing Agreement, collections with respect to the HELs may be invested in certain permitted investments prior to their distribution to the Company, as holder of the Class A Asset Trust Certificate. The Servicer shall be entitled to retain any investment income produced by such investment as additional servicing compensation.

**Servicing of Delinquent HELs; Foreclosure.** The Servicer will make reasonable efforts to collect or cause to be collected all payments on the HELs owned by the Asset Trust that are 16 or more days delinquent. Strategic decisions regarding early stage collection efforts are guided by Experian's Strategic Account Management System, Probe©. Early stage collections, in other words, collections beginning on the 16th day of delinquency and continuing through the 89th day of delinquency, are conducted primarily through the use of automated outbound collection telephone calls and debt collection letters. Late stage collections, or collection efforts taking place from the 90th day and through the 180th day of delinquency, are segregated in CACS by risk and a combination of manual and automated collection efforts are used. CACS also segregates delinquent accounts by status, including bankruptcy, probate, foreclosure, real-estate-owned and "special activities" (e.g., consumer credit counseling and recovery). These collection efforts are carried out by personnel who specialize in debt collection and recovery. Such efforts may include payment reminder telephone calls to the borrower, letter campaigns, drive-by property inspections and other collection activities permissible under the Loan Documents and applicable law.

The Servicer will be required under the Pooling and Servicing Agreement to foreclose upon the mortgaged property related to each defaulted HEL as to which no satisfactory arrangements can be made for collection of delinquent payments. Under the Pooling and Servicing Agreement, the Servicer will be permitted, in lieu of foreclosure, if prudent to do so and taking into account the desirability of maximizing net liquidation proceeds, to accept a payment of less than the outstanding principal balance of the defaulted HELs. The Servicer will not be permitted to foreclose upon a mortgaged property if it is aware of evidence of toxic waste or other environmental contamination on the mortgaged property and it determines that it would be imprudent to foreclose.

**Insurance.** The Servicer maintains a blanket hazard policy for all HELs. In addition, the Servicer tracks all HELs for compliance with applicable law regarding flood insurance coverage. When necessary, the Servicer "force places" flood insurance policies.

### Limitations on the Servicer's Liability

The Pooling and Servicing Agreement will provide that neither the Servicer nor any director, officer, employee or agent of the Servicer (the "Servicer Indemnified Parties") will be under any liability to the Asset Trust, the Company or the holder of the Class A Asset Trust Certificate and the Class R Asset Trust Certificate or others for any action taken (or not taken) by any Servicer Indemnified Party in good faith pursuant to the Pooling and Servicing Agreement, or for errors in judgment; *provided, however,* that the Servicer shall not be protected against any liability that would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties thereunder. The Pooling and Servicing Agreement will further provide that any Servicer Indemnified Party is entitled to indemnification by the Asset Trust and will be held harmless against any loss, liability or expense incurred in connection with any legal action relating to the Pooling and Servicing Agreement or the certificates issued thereunder (except any such loss, liability, or expense otherwise reimbursable pursuant to the Pooling and Servicing Agreement) and any loss, liability or expense incurred by reason of willful misfeasance, bad faith or gross negligence in the performance of duties thereunder or by reason of reckless disregard of obligations and duties thereunder. In addition, the Pooling and Servicing Agreement will provide that the Servicer is not under any obligation to appear in, prosecute or defend any legal action that is not incidental to its responsibilities under the Pooling and Servicing Agreement and that in

60

its opinion may involve it in any expense or liability. The Servicer may however, in its discretion, undertake any such action that it may deem necessary or desirable with respect to the Pooling and Servicing Agreement and the rights and duties of the parties thereto and the interests of the holders of the Class A Asset Trust Certificate and the Class R Asset Trust Certificate. In such event, the legal expenses and costs of such action and any liability resulting therefrom will be expenses, costs and liabilities of the Asset Trust, and the Servicer will be entitled to be reimbursed therefor and to charge the certificate account.

   *Servicer Termination, Servicer Replacement.*   Under the terms of the Pooling and Servicing Agreement, after the occurrence of any one of several typical Servicer termination events, including but not limited to a receivership with respect to the Servicer or (subject to the expiration of typical grace periods and materiality requirements) the failure by the Servicer to make required deposits to the certificate account, the Company may remove the Servicer. If the Servicer is removed by the Company, the Company shall have the sole power to appoint a replacement Servicer.

   *The Servicer's Third Party Vendors and Service Providers.*   Under the Pooling and Servicing Agreement, the Servicer may perform its servicing responsibilities through agents or independent contractors, but shall not thereby be released from any of its responsibilities thereunder. The Servicer expects that it will outsource some of its responsibilities pursuant to these provisions, which services may include some or all of the following: (i) management of foreclosure actions, (ii) monitoring of borrower bankruptcy proceedings, (iii) preservation of properties related to delinquent loans, (iv) processing of primary mortgage insurance claims, (v) maintenance, marketing and sale of real-estate-owned properties, (vi) assuring that hazard insurance coverage is maintained, (vii) determining whether flood insurance coverage is required and assuring that any required coverage is maintained, (viii) tax bill procurement and tracking of delinquent tax payments, (ix) printing and mailing billing statements, (x) depositing borrower payments into lockbox accounts, (xi) performing certain calculations with respect to scheduled and actual collections, (xii) performing certain tax related calculations, (xiii) performing calculations with respect to monthly distributions from the Asset Trust and (xiv) performing reporting functions required under the Pooling and Servicing Agreement. From time to time, the Servicer may cease to outsource one or more of the foregoing servicing functions or may choose to outsource additional servicing functions. Some vendors may perform more than one function, and some functions may be performed by more than one vendor.

### The Servicer's Quality Control Procedures

   The Servicer uses a combination of management controls and technology controls to ensure the accuracy and integrity of servicing records. Management controls include the use of approval levels, the segregation of duties, and reconciliations of servicing data and accounts, among others. Technology controls include the use of data security controls and interface controls to ensure that only authorized persons have the ability to access and change system data or to submit data to or receive data from vendors and investors. Specific security profiles for each job function include a predetermined set of data security controls that are appropriate for that job function. The regional data center for the ACLS Server, which is located in Seattle, Washington, is kept in a fire resistant environment, and commercial electrical power is backed up by generators.

   In addition, the Servicer conducts periodic internal audits of critical servicing and technology functions. External audits by entities such as the OTS and United Guaranty and the annual examination by WMI's independent accountants in connection with their audit of WMI and its subsidiaries may provide independent verification of the adequacy of such functions.

   The Servicer maintains detailed business continuity plans so that it can resume critical business functions in the event of a disaster or other serious system outage, which plans are

reviewed and updated periodically. The Servicer is obligated to return to full system functionality within 48 hours of a reported system outage. The Servicer performs annual disaster recovery tests in which it reroutes data and servicing system operations to the designated back-up site, and then processes sample transactions from all servicing locations to ensure the functionality of such back-up site.

It is the Servicer's policy to require its other third party vendors to implement measures similar to those described above to ensure the accuracy and integrity of servicing records.

## The Custodian

Washington Mutual Bank will act as custodian (the *"Custodian"*) for the Asset Trust pursuant to a Custody Agreement to be entered into on or before the closing date (the *"Custody Agreement"*), among the Trustee, the Servicer and the Custodian. The Custodian will hold the notes, mortgages and other legal documents related to the HELs (collectively, the *"Loan Documents"*) for the benefit of the Trustee. The Custodian will maintain the Loan Documents in secure and fire resistant facilities. The mortgage files held by the Servicer will not be physically segregated from Loan Documents in the Custodian's custody but will be kept in shared facilities. The Custodian will review the Loan Documents related to each HEL and deliver to the Trustee a certification to the effect that, except as noted in the certification, all required documents have been executed and received.

In the event of the termination of the Custody Agreement, the Custodian will be required to deliver the Loan Documents in the Custodian's custody to the Trustee or any successor Custodian appointed by the Company.

The Servicer may pay the Custodian a fee for its services under the Custody Agreement from time to time. Payment of this fee will not affect dividends to the Company.

# WMI

## General

WMI is a Washington corporation. It owns two federal savings associations as well as numerous nonbank subsidiaries. WMI is a multiple savings and loan holding company. As a savings and loan holding company, WMI is subject to regulation by the OTS.

WMI's federal savings associations are subject to extensive regulation and examination by the OTS, their primary federal regulator, as well as the U.S. Federal Deposit Insurance Corporation ("FDIC"). Prior to 2004, WMB had two sister depository institutions which were both owned directly by WMI. WMB has since acquired both of these sister institutions. One of these institutions, Washington Mutual Bank fsb, a federal savings bank, became a wholly-owned subsidiary of WMB on February 1, 2004. The other institution, Washington Mutual Bank, a savings bank chartered under the laws of the state of Washington, converted into a federally chartered savings bank and then was merged into WMB on January 1, 2005. Consequently, WMI no longer owns a state savings bank that is subject to regulation and supervision by the Director of Financial Institutions of the State of Washington or by the FDIC. WMI's nonbank financial subsidiaries are also subject to various federal and state laws and regulations.

All of WMI's banking subsidiaries are under the common control of WMI and are insured by the FDIC. If an insured institution fails, claims for administrative expenses of the receiver and for deposits in U.S. branches (including claims of the FDIC as subrogee of the failed institution) have priority over the claims of general unsecured creditors. In addition, the FDIC has authority to require any of WMI's banking subsidiaries to reimburse it for losses it incurs in connection either with the failure of another of WMI's banking subsidiaries or with the FDIC's provision of assistance to one of WMI's banking subsidiaries that is in danger of failure.

## Holding Company Status and Acquisitions

WMI is a multiple savings and loan holding company, as defined by federal law, because it owns more than one savings association. WMI is regulated as a unitary savings and loan holding company, however, because the OTS deems WMI's federal savings associations to have been acquired in supervisory transactions. Therefore, WMI is exempt from certain restrictions that would otherwise apply under federal law to the activities and investments of a multiple savings and loan holding company. These restrictions will apply to WMI if any of WMI's banking institutions fails to meet a qualified thrift lender test established by federal law. As of December 31, 2004, WMI's banking subsidiaries were in compliance with qualified thrift lender standards.

WMI may not acquire control of another savings association without the prior approval of the OTS. WMI may not be acquired by a company, other than a bank holding company, unless the OTS approves such an acquisition, or by an individual unless the OTS does not object after receiving notice. WMI may not be acquired by a bank holding company unless the Board of Governors of the Federal Reserve System (the "Federal Reserve") approves. In any case, the public must have an opportunity to comment on the proposed acquisition, and the OTS or Federal Reserve must complete an application review. Without prior approval from the OTS, WMI may not acquire more than 5% of the voting stock of any savings institution that is not one of WMI's subsidiaries.

The Gramm-Leach-Bliley Act generally restricts any non-financial entity from acquiring WMI unless such non-financial entity was, or had submitted an application to become, a savings and loan holding company as of May 4, 1999. Because WMI was treated as a unitary savings and loan holding company prior to that date, WMI may engage in non-financial activities and acquire non-financial subsidiaries.

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

WMB is the Servicer and the originator of the HELs. WMB is expected to be the Servicer and may be the originator with respect to any Additional Assets. University Street is an indirect subsidiary of WMB. The Company is a subsidiary of University Street.

There is not currently, and there was not during the past two years, any material business relationship, agreement, arrangement, transaction or understanding that is or was entered into outside the ordinary course of business or is or was on terms other than would be obtained in an arm's-length transaction with an unrelated third party, between (i) any of WMB or University Street on the one hand and (ii) any of the Company, the Asset Trust, WaMu Cayman or WaMu Delaware on the other hand.

Employees of WMB administer the day-to-day activities of the Company under the terms of the Administrative Services Agreement, which obligates the Company to pay an annual service fee as provided under such agreement. Additionally, the Company periodically reimburses WMB for general overhead expenses. The Company expects that the amount of such service fees and reimbursements will be *de minimis*.

## DESCRIPTION OF THE WAMU CAYMAN PREFERRED SECURITIES

*The following summary describes the material terms and provisions of the WaMu Cayman Preferred Securities. This description is qualified in its entirety by reference to the terms and provisions of WaMu Cayman's Articles of Association. A copy of WaMu Cayman's Articles of Association may be obtained upon request to WMI or free of charge at the specified office of the Paying Agent in Luxembourg.*

### General

The WaMu Cayman Preferred Securities are preferred shares issued by WaMu Cayman, the terms of which are set forth in WaMu Cayman's Articles of Association. When issued, the WaMu Cayman Preferred Securities will be paid-up and non-assessable. The WaMu Cayman Preferred Securities are perpetual and will not be convertible into the WaMu Cayman Ordinary Shares and will not be subject to any sinking fund or other obligation of WaMu Cayman for their repurchase or retirement.

The WaMu Cayman Preferred Securities consist of 3,023 of the 7.25% Perpetual Non-cumulative Preferred Securities, Series A-1, liquidation preference $100,000 per security and $302,300,000 in the aggregate (the *"Series A-1 WaMu Cayman Preferred Securities"*), and 44,770 of the 7.25% Perpetual Non-cumulative Preferred Securities, Series A-2, liquidation preference $10,000 per security and $447,700,000 in the aggregate (the *"Series A-2 WaMu Cayman Preferred Securities"*). The terms of the Series A-1 WaMu Cayman Preferred Securities and the Series A-2 WaMu Cayman Preferred Securities are identical except for their per security liquidation preference. The aggregate liquidation preference of the WaMu Cayman Preferred Securities is $750,000,000.

WaMu Cayman will invest the proceeds of the WaMu Cayman Preferred Securities offered hereby in a like amount of Fixed Rate Company Preferred Securities, liquidation preference $1,000 per security and $750,000,000 in the aggregate.

The financial entitlements of each WaMu Cayman Preferred Security will be substantially the same as the financial entitlements of a like amount of Fixed Rate Company Preferred Securities, with the consequence that dividends and the redemption price on each WaMu Cayman Preferred Security will be payable on the same dates and in the same amounts as the corresponding dividends and redemption price, as applicable, that are paid by the Company to WaMu Cayman on a like amount of Fixed Rate Company Preferred Securities; *provided* that if any such payment of dividends or redemption price is received by WaMu Cayman after 2:00 P.M. New York time, the related payment will instead by made by WaMu Cayman to the holders of the WaMu Cayman Preferred Securities on the next day that is a Business Day. The Dividend Payment Dates and related Dividend Periods are the same for the WaMu Cayman Preferred Securities and the Fixed Rate Company Preferred Securities, and, accordingly, the terms *"Dividend Payment Date"*, *"Dividend Period"* and *"Business Day"* have the same meanings as applied to each of those securities.

The WaMu Cayman Preferred Securities are automatically exchangeable under certain circumstances into a like amount of Fixed Rate Depositary Shares. See "— Conditional Exchange."

Under WaMu Cayman's Articles of Association, WaMu Cayman is prohibited from issuing any securities other than the WaMu Cayman Preferred Securities and the WaMu Cayman Ordinary Shares without the consent of the holders of 100% of the WaMu Cayman Preferred Securities. Accordingly, WaMu Cayman may not issue any additional securities ranking senior or *pari passu* with the WaMu Cayman Preferred Securities as to dividends or upon liquidation without the consent of the holders of 100% of the WaMu Cayman Preferred Securities. The holders of the WaMu Cayman Preferred Securities will have no pre-emptive rights.

The WaMu Cayman Preferred Securities are not obligations of, or guaranteed by, WMI, WMB, Marion, the Company, University Street, WaMu Delaware or any of their respective affiliates or any other entity. The WaMu Cayman Preferred Securities represent equity interests solely in WaMu Cayman and do not represent an interest in any of the foregoing entities.

## Ranking

The WaMu Cayman Preferred Securities will rank senior to the WaMu Cayman Ordinary Shares as to dividends and upon liquidation.

## Dividends

Dividends on the WaMu Cayman Preferred Securities will become payable on a non-cumulative basis (except in the limited circumstances described below), on each date on which the Company pays dividends to WaMu Cayman on the Fixed Rate Company Preferred Securities owned by WaMu Cayman, in an amount per WaMu Cayman Preferred Security equal to the amount of dividends received by WaMu Cayman on such date on a like amount of Fixed Rate Company Preferred Securities (including with respect to Additional Taxes, if any), in each case subject to WaMu Cayman having legally available funds for such purpose; *provided* that if any such payment of dividends is received by WaMu Cayman after 2:00 P.M. New York time, the related payment will instead be made by WaMu Cayman to holders of the WaMu Cayman Preferred Securities on the next day that is a Business Day. Accordingly:

- if the Company pays full dividends on a Dividend Payment Date for the Fixed Rate Company Preferred Securities, WaMu Cayman will pay corresponding full dividends on the WaMu Cayman Preferred Securities on such Dividend Payment Date;

- if the Company pays partial dividends on a Dividend Payment Date for the Fixed Rate Company Preferred Securities, WaMu Cayman will pay partial dividends in the same proportionate amount on the WaMu Cayman Preferred Securities on such Dividend Payment Date; and

- if the Company pays no dividends on a Dividend Payment Date for the Fixed Rate Company Preferred Securities, WaMu Cayman will pay no dividends on the WaMu Cayman Preferred Securities on such Dividend Payment Date.

See "Description of the Fixed Rate Company Preferred Securities — Dividends."

Under WaMu Cayman's Articles of Association, WaMu Cayman's Board of Directors is not required to declare the payment of dividends in order for dividends to be paid. However, payment of dividends may be blocked by WaMu Cayman's Board of Directors, but only by their unanimous action (including consent of the Independent Director).

The record date for the payment of dividends on the WaMu Cayman Preferred Securities will be the first day of the month in which the relevant Dividend Payment Date occurs or, if any such day is not a Business Day, the next day that is a Business Day.

Dividends on the Fixed Rate Company Preferred Securities are non-cumulative. Dividends on the WaMu Cayman Preferred Securities are non-cumulative, except to the extent that on a Dividend Payment Date WaMu Cayman has received from the Company a payment of dividends on the Fixed Rate Company Preferred Securities but fails to pay the corresponding dividend on the WaMu Cayman Preferred Securities. If:

- WaMu Cayman pays no dividends or less than full dividends on the WaMu Cayman Preferred Securities on a Dividend Payment Date because it received no dividend or less than full dividends on the Fixed Rate Company Preferred Securities, then holders of WaMu Cayman Preferred Securities will have no right to receive, and WaMu Cayman will have no obligation to pay, such unpaid dividends at a future date, whether or not

dividends are paid on a future Dividend Payment Date on the WaMu Cayman Preferred Securities or the Ordinary Shares; and

- WaMu Cayman pays no dividends or less than full dividends on the WaMu Cayman Preferred Securities on a Dividend Payment Date where the preceding clause does not apply, but rather the directors have unanimously determined not to pay dividends or to pay less than full dividends on the WaMu Cayman Preferred Securities pursuant to their authority to block dividends as described above, then holders of the WaMu Cayman Preferred Securities will have a cumulative right to receive such unpaid dividends and no further dividends may be paid on WaMu Cayman Ordinary Shares until such unpaid dividends have been paid on the WaMu Cayman Preferred Securities.

## Restrictions on Dividends

During a Dividend Period, no dividends will be paid on any WaMu Cayman Ordinary Shares, other than dividends payable in WaMu Cayman Ordinary Shares, and no WaMu Cayman Ordinary Shares will be repurchased, redeemed or otherwise acquired for consideration, directly or indirectly, unless dividends for such Dividend Period on all outstanding WaMu Cayman Preferred Securities have been declared and paid in full, or set aside for payment, as the case may be.

Under certain circumstances, if the OTS determines that WMB is operating with an insufficient level of capital or is engaged in, or its relationship with the Company results in, an unsafe and unsound banking practice, the OTS could restrict payment of dividends by the Company on the Fixed Rate Company Preferred Securities, resulting in a corresponding restriction in WaMu Cayman's payment of dividends on the WaMu Cayman Preferred Securities.

## Restrictions on Dividends by WMI

In the Exchange Agreement, WMI will covenant in favor of the holders of the WaMu Cayman Preferred Securities and the Trust Securities, that if full dividends on (i) the Company Preferred Securities, (ii) the WaMu Cayman Preferred Securities or (iii) the Trust Securities for any Dividend Period have not been declared and paid, then, as described under "Description of the Fixed Rate Company Preferred Securities — Restrictions on Dividends by WMI", WMI will not declare or pay dividends with respect to, or redeem, purchase or acquire any of its equity capital securities during the next succeeding Dividend Period, except dividends in connection with a shareholders' rights plan, if any, or dividends in connection with benefits plans.

## Redemption

The WaMu Cayman Preferred Securities will not be redeemable at the option of the holders thereof. On each day on which the Company redeems Fixed Rate Company Preferred Securities, WaMu Cayman will redeem a like amount of WaMu Cayman Preferred Securities for a redemption price in the same amount as the corresponding redemption price on a like amount of Fixed Rate Company Preferred Securities; *provided* that if any such payment of redemption price is received by WaMu Cayman after 2:00 p.m. New York time, the related payment will instead be made by WaMu Cayman to holders of the WaMu Cayman Preferred Securities on the next day that is a Business Day. See "Description of the Fixed Rate Company Preferred Securities — Redemption."

If the redemption of the Fixed Rate Company Preferred Securities is in part instead of in whole on any redemption date, then WaMu Cayman will allocate the partial redemption between the Series A-1 WaMu Cayman Preferred Securities and the Series A-2 WaMu Cayman Preferred Securities in proportion to their aggregate liquidation preferences, rounded by WaMu Cayman's directors, if necessary, so that no WaMu Cayman Preferred Securities are redeemed in part and not in whole (*i.e.*, no fractional shares). The particular WaMu Cayman Preferred Securities to be redeemed will be selected not more than 60 days prior to the redemption date by WaMu

Cayman's Board of Directors, from the outstanding WaMu Cayman Preferred Securities not previously called for redemption, by such method as WaMu Cayman's Board of Directors deems fair and appropriate.

A notice of redemption of the WaMu Cayman Preferred Securities will be mailed by first class mail, postage prepaid, addressed to the holders of record of the securities to be redeemed at their respective last addresses appearing on the books and records of WaMu Cayman. Such mailing will be at least 30 days but not more than 60 days before the date fixed for redemption.

## Restriction on Redemption or Repurchases

At or prior to the initial issuance of the WaMu Cayman Preferred Securities, WMI will enter into a *"Replacement Capital Covenant"* relating to the WaMu Cayman Preferred Securities, the Trust Securities, the Fixed Rate Company Preferred Securities, the Fixed Rate Depositary Shares (and related Fixed Rate WMI Preferred Stock), the Fixed-to-Floating Rate Company Preferred Securities and the Fixed-to-Floating Depositary Shares (and related Fixed-to-Floating Rate WMI Preferred Stock) that may be issued upon a Conditional Exchange (collectively, the *"Replacement Covenant Covered Securities"*). *WMI's covenants in the Replacement Capital Covenant run only to the benefit of holders of Covered Debt (as defined below), and are not enforceable by holders of WaMu Cayman Preferred Securities or of any other Replacement Covenant Covered Securities.* However, those covenants could preclude WMI from redeeming or repurchasing Replacement Covenant Covered Securities at a time WMI might otherwise wish to do so.

In the Replacement Capital Covenant, WMI covenants to redeem or repurchase Replacement Covenant Covered Securities only if and to the extent that the total redemption or repurchase price is equal to or less than the sum, as of the date of redemption or repurchase, of (i) 133.33% of the aggregate net cash proceeds WMI or its subsidiaries have received during the 180 days prior to such date from the issuance and sale of common stock of WMI plus (ii) 100% of the aggregate net cash proceeds WMI or its subsidiaries have received during the 180 days prior to such date from the issuance of securities that, among other things:

- are, with limited exceptions (including for certain hybrid securities that are in the form of debt), *pari passu* with or junior to the Fixed Rate WMI Preferred Stock upon WMI's liquidation, dissolution or winding up;

- are perpetual, or have a mandatory redemption or maturity date that is not less than forty years after the date of initial issuance of such securities; and

- provide for dividends or other distributions that are either non-cumulative or, if cumulative, are subject to certain optional or mandatory deferral provisions and certain explicit replacement provisions.

WMI's ability to raise proceeds from qualifying securities during the 180 days prior to a proposed redemption or repurchase sufficient to allow such redemption or repurchase to proceed without violating the Replacement Capital Covenant will depend on, among other things, market conditions at such times as well as the acceptability to prospective purchasers of the terms of such qualifying securities.

WMI's covenants in the Replacement Capital Covenant will run in favor of persons that buy, hold or sell WMI's indebtedness during the period that such indebtedness is *"Covered Debt"*, which is currently comprised of WMI's 4.625% Subordinated Notes due 2014, which have CUSIP No. 939322AN3. Other debt will replace WMI Covered Debt under the Replacement Capital Covenant on the earlier to occur of (i) the date two years prior to the maturity of such existing Covered Debt, or (ii) the date WMI gives notice of a redemption of such existing Covered Debt such that the date such existing Covered Debt is repurchased in such an amount that, the outstanding principal amount of such existing Covered Debt is or will become less than $100 million.

The Replacement Capital Covenant is subject to various additional terms and conditions and this description is qualified in its entirety by reference to the Replacement Capital Covenant, a copy of the form of which is available upon request from WMI. The Replacement Capital Covenant may be terminated if the holders of at least 51% by principal amount of each of the Covered Debt so agree, or if WMI no longer has outstanding any long-term indebtedness that qualifies as Covered Debt, without regard to whether such indebtedness is rated by a nationally recognized statistical rating organization.

Subject to the Replacement Capital Covenant and the terms of any outstanding debt instruments, WMI or its affiliates may from time to time purchase any outstanding WaMu Cayman Preferred Securities by tender, in the open market or by private agreement.

**Rights Upon Liquidation**

In the event WaMu Cayman voluntarily or involuntarily liquidates, dissolves or winds up, the holders of WaMu Cayman Preferred Securities at the time outstanding will be entitled to receive liquidating dividends in the amount of $100,000 per security and $302,300,000 in the aggregate, in the case of the Series A-1 WaMu Cayman Preferred Securities, and $10,000 per security and $447,700,000 in the aggregate, in the case of the Series A-2 WaMu Cayman Preferred Securities, in each case, *plus* the amount of any dividends theretofore received by WaMu Cayman on a like amount of Fixed Rate Company Preferred Securities but not yet distributed as a dividend on the WaMu Cayman Preferred Securities *plus* the amount of dividends on a like amount of Fixed Rate Company Preferred Securities that WaMu Cayman is entitled to receive from the Company but has not yet received (because for example, the Company's Board of Managers has declared but not yet paid such dividends) before any distribution of assets is made to holders of WaMu Cayman Ordinary Shares and subject to the rights of general creditors.

After payment of the full amount of the liquidating distributions to which they are entitled, the holders of WaMu Cayman Preferred Securities will have no right or claim to any of WaMu Cayman's remaining assets. In the event that, upon any such voluntary or involuntary liquidation, dissolution, or winding up, the available assets are insufficient to pay the amount of the liquidation distributions on all outstanding WaMu Cayman Preferred Securities, then the holders of WaMu Cayman Preferred Securities will share ratably in any such distribution of assets in proportion to the full liquidating distributions to which they would otherwise be respectively entitled.

**Voting Rights**

Except as expressly required by applicable law and as set forth below, the holders of WaMu Cayman Preferred Securities will have no voting rights. In the event holders of WaMu Cayman Preferred Securities are entitled to vote on a matter together as a single class or together with the holders of the WaMu Cayman Ordinary Shares, the holders of the Series A-1 WaMu Cayman Preferred Securities will be entitled to ten votes per security and the holders of the Series A-2 WaMu Cayman Preferred Securities will be entitled to one vote per security.

In the event that WaMu Cayman is entitled to exercise its voting rights with respect to the Fixed Rate Company Preferred Securities, each holder of WaMu Cayman Preferred Securities will have the right to direct the manner in which WaMu Cayman exercises such voting rights with respect to a like amount of Fixed Rate Company Preferred Securities on a proportionate basis. If WaMu Cayman receives notice from the Company that WaMu Cayman as holder of Fixed Rate Company Preferred Securities is entitled to vote on any matter, promptly after learning of such entitlement WaMu Cayman shall cause to be mailed to each holder of WaMu Cayman Preferred Securities, by first class mail, postage prepaid, notice of such vote (including a description of the subject matter of the vote and related circumstances to the extent known to WaMu Cayman), along with a copy of any notice or other written communication received by WaMu Cayman from

the Company with respect to such vote and related matters. In each such notice WaMu Cayman shall request direction from each holder of WaMu Cayman Preferred Securities as to how WaMu Cayman as a holder of Fixed Rate Company Preferred Securities shall vote on the matter at issue a like amount of Fixed Rate Company Preferred Securities that correspond to such holder's WaMu Cayman Preferred Securities. Each holder of WaMu Cayman Preferred Securities shall have the right to direct the manner in which WaMu Cayman exercises such voting rights with respect to a like amount of Fixed Rate Company Preferred Securities.

So long as any WaMu Cayman Preferred Securities are outstanding, WaMu Cayman will not, without the consent or vote of the holders of WaMu Cayman Preferred Securities entitled to at least two-thirds of the total voting rights of all outstanding WaMu Cayman Preferred Securities, voting together as a single class, (i) amend, alter or repeal or otherwise change any provision of WaMu Cayman's Articles of Association (including the terms of the WaMu Cayman Preferred Securities) if such amendment, alteration, repeal or change would materially and adversely affect the rights, preferences, powers or privileges of the WaMu Cayman Preferred Securities, or (ii) merge, convert, consolidate, reorganize or effect any other business combination involving WaMu Cayman. WaMu Cayman's Articles of Association will also provide that so long as any WaMu Cayman Preferred Securities are outstanding, WaMu Cayman will not, without the consent of the holder of each outstanding WaMu Cayman Preferred Security, authorize, create or increase the authorized amount of or issue any class or series of any equity shares of WaMu Cayman, or any warrants, options or other rights convertible or exchangeable into any class or series of any equity shares of WaMu Cayman, ranking *pari passu* or senior to the WaMu Cayman Preferred Securities, either as to dividend rights, redemption rights or rights on dissolution, liquidation or winding up of WaMu Cayman.

### Independent Director Approval

WaMu Cayman's Articles of Association will require that, for as long as any WaMu Cayman Preferred Securities are outstanding, certain actions by WaMu Cayman are subject to prior approval by the Independent Director as well as by a majority of the entire Board of Directors of WaMu Cayman. See "WaMu Cayman — Management of WaMu Cayman — Independent Director." In order to be considered "independent", a director must not during the preceding five years have been a director or employee of WMI or any affiliate of WMI, other than a direct or indirect financing subsidiary of WMI.

The actions that require approval of the Independent Director include (i) redemption or repurchase of any WaMu Cayman Ordinary Shares and (ii) to the extent within the power of the directors, any action to convert or approve the conversion of WaMu Cayman into any other type of entity or the consolidation or merger of WaMu Cayman with or into any other entity, the consolidation or merger of any other entity with or into WaMu Cayman, or the sale by WaMu Cayman of any of its assets. Additionally, the Independent Director, acting alone and without the vote or consent of the other members of the Board of Directors, has the right on behalf of WaMu Cayman to enforce WaMu Cayman's rights as a holder of Fixed Rate Company Preferred Securities, including related rights under the LLC Agreement.

### Conditional Exchange

Each WaMu Cayman Preferred Security will be exchanged automatically for a like amount of newly issued Fixed Rate Depositary Shares, each representing a 1/1000th interest in one share of Fixed Rate WMI Preferred Stock, if the OTS so directs in writing upon or after the occurrence of an Exchange Event. An *"Exchange Event"* will occur when:

- WMB becomes "undercapitalized" under the OTS' "prompt corrective action" regulations;

- WMB is placed into conservatorship or receivership; or

- the OTS, in its sole discretion, anticipates WMB becoming "undercapitalized" in the near term or takes a supervisory action that limits the payment of dividends by WMB and in connection therewith, directs an exchange.

For purposes of this offering circular, this exchange is referred to as the "Conditional Exchange".

If the OTS so directs following the occurrence of an Exchange Event, each holder of WaMu Cayman Preferred Securities will be unconditionally obligated to surrender to WMI or its agent any certificates representing the WaMu Cayman Preferred Securities owned by such holder, and WMI will be unconditionally obligated to issue to such holder in exchange for each such WaMu Cayman Preferred Security a depositary receipt representing a like amount of Fixed Rate Depositary Shares for Fixed Rate WMI Preferred Stock. Any WaMu Cayman Preferred Securities purchased or redeemed by WMI or any of its affiliates prior to the time of exchange will not be deemed outstanding and will not be subject to Conditional Exchange.

The Conditional Exchange will occur as of 8:00 A.M., New York time, on the date for such exchange set forth in the applicable OTS directive, or, if such date is not set forth in the directive, as of 8:00 A.M., New York time, on the earliest possible date such exchange could occur consistent with the directive, as evidenced by the issuance by WMI of a press release prior to such time. As of the time of exchange, all of the WaMu Cayman Preferred Securities will be transferred to WMI without any further action by WaMu Cayman, all rights of the holders of WaMu Cayman Preferred Securities as WaMu Cayman's shareholders will cease, and such persons will be, for all purposes, the holders of Fixed Rate Depositary Shares.

WMI will mail notice of the issuance of an OTS directive after the occurrence of an Exchange Event to each holder of WaMu Cayman Preferred Securities within 30 days, and WMI will deliver (or cause to be delivered) to each such holder, depositary receipts for Fixed Rate Depositary Shares upon surrender of the WaMu Cayman Preferred Securities. Until such depositary receipts are delivered or in the event such depositary receipts are not delivered, any certificates previously representing WaMu Cayman Preferred Securities will be deemed for all purposes to represent Fixed Rate Depositary Shares. All corporate authorization necessary for WMI to issue the Fixed Rate Depositary Shares and the Fixed Rate WMI Preferred Stock as of the time of exchange will be completed prior to or upon completion of this Offering. Accordingly, once the OTS directs a Conditional Exchange after the occurrence of an Exchange Event, no action will be required to be taken by holders of WaMu Cayman Preferred Securities, by WMI, by WMB (other than to inform the OTS), by the Company, or by WaMu Cayman in order to effect the automatic exchange as of the time of exchange. After the occurrence of the Conditional Exchange, the WaMu Cayman Preferred Securities will be owned by WMI.

Holders of WaMu Cayman Preferred Securities, by purchasing such securities, whether in this Offering or in the secondary market after this Offering, will be deemed to have agreed to be bound by the unconditional obligation to exchange such WaMu Cayman Preferred Securities for Fixed Rate Depositary Shares if the OTS so directs following the occurrence of an Exchange Event. WaMu Cayman's Articles of Association provide that the holders of WaMu Cayman Preferred Securities will be unconditionally obligated to surrender such preferred securities. Prior to issuance of the WaMu Cayman Preferred Securities, WMI will enter into an Exchange Agreement on or before the closing date (the "Exchange Agreement"), among WMI, WaMu Cayman, WaMu Delaware and Mellon Investor Services LLC, as depositary (the "Depositary"), to implement the Conditional Exchange.

Holders of WaMu Cayman Preferred Securities cannot exchange their WaMu Cayman Preferred Securities for Fixed Rate Depositary Shares voluntarily. Absent an OTS directive after the occurrence of an Exchange Event, no exchange of the WaMu Cayman Preferred Securities for Fixed Rate Depositary Shares will occur. Upon the issuance of an OTS directive on or following the occurrence of an Exchange Event, the Fixed Rate WMI Preferred Stock and related

Fixed Rate Depositary Shares to be issued as part of the Conditional Exchange will constitute a newly issued series of preferred stock of WMI and will have substantially similar terms and provisions with respect to dividends, liquidation, and redemption as the Fixed Rate Company Preferred Securities, except that the Fixed Rate Depositary Shares:

- will not have the benefit of the covenants, including with respect to any additional taxes, described under "Description of the Fixed Rate Company Preferred Securities — Voting Rights and Covenants;"
- will not be listed on any securities exchange or automated dealer quotation system;
- will be redeemable prior to the Dividend Payment Date occurring on March 15, 2011 only upon the occurrence of a Regulatory Capital Event;
- Additional Amounts will not be payable with respect to the Fixed Rate WMI Preferred Stock; and
- if WMI fails to pay, or declare and set aside for payment, full dividends on the Fixed Rate WMI Preferred Stock for six Dividend Periods, the authorized number of WMI's directors will increase by two, and the holders of Fixed Rate WMI Preferred Stock, voting together with the holders of any other Voting Parity Stock, including the Fixed-to-Floating Rate WMI Preferred Stock, will have the right to elect two directors in addition to the directors then in office at the next annual meeting of shareholders.

WMI will covenant in the Exchange Agreement in favor of the holders of the WaMu Cayman Preferred Securities and the Trust Securities that, prior to the issuance of the Fixed Rate WMI Preferred Stock upon a Conditional Exchange, WMI will not issue any preferred stock that would rank senior to the Fixed Rate WMI Preferred Stock upon its issuance. Each share of Fixed Rate WMI Preferred Stock will upon issuance rank at least *pari passu* with the most senior preferred stock of WMI, if any, then outstanding. The Initial Purchasers are under no obligation to and do not intend to make a market in the Fixed Rate Depositary Shares. Absent the occurrence of a Conditional Exchange, holders of WaMu Cayman Preferred Securities will have no dividend, liquidation preference, redemption or other rights with respect to any security of WMI, WMB or University Street.

## Form, Transfer and Book-Entry Procedures

The WaMu Cayman Preferred Securities will be issued only in book-entry form. See "Book-Entry Issuance."

## Payments and Paying Agents

Payments in respect of the WaMu Cayman Preferred Securities in the form of Global Securities will be made to the address of the holder entitled thereto as such address will appear on the register. The DTC nominee (the *"Nominee"*) will be the registered holder of the WaMu Cayman Preferred Securities in the form of Global Securities. Payments made to the order of the Common Nominee will be made by wire transfer to DTC and DTC will credit the relevant accounts of the DTC Participants, which in the case of the Series A-2 WaMu Cayman Preferred Securities will be the accounts of Euroclear and Clearstream, as applicable. In the unlikely event that the circumstances described under "Book-Entry Issuance — Form, Denomination, Transfer and Book-Entry Procedures — Special Situations When Global Security Will Be Terminated" apply and the WaMu Cayman Preferred Securities are not in the form of Global Securities, payments in respect of the WaMu Cayman Preferred Securities will be made by wire transfer, direct deposit or check mailed to the address of the holder entitled thereto as such address will appear on the securities register. The principal paying agent (the *"Principal Paying Agent"*) for the WaMu Cayman Preferred Securities initially will be Wilmington Trust (Cayman), Ltd., a

licensed trust company incorporated in the Cayman Islands (in its individual capacity, "WTC Cayman") and any co-paying agent will be appointed by WaMu Cayman. The Principal Paying Agent and any co-paying agent (collectively, the "Paying Agents") will be permitted to resign as Paying Agents upon 30 days' written notice to WaMu Cayman. In the event that WTC Cayman will no longer be the Principal Paying Agent, WaMu Cayman will appoint a successor to act as Principal Paying Agent.

### Series A-2 WaMu Cayman Preferred Securities, Paying Agent in Luxembourg

For so long as any of the Series A-2 WaMu Cayman Preferred Securities are listed on the Euro MTF Market of the Luxembourg Stock Exchange and the rules of such exchange so require, WaMu Cayman will also maintain a co-paying agent in Luxembourg (the "Paying Agent in Luxembourg"), which initially will be J.P. Morgan Bank Luxembourg, S.A.

### Registrar and Transfer Agent

WTC Cayman will act as Registrar (the "Registrar") and Transfer Agent (the "Transfer Agent") for the WaMu Cayman Preferred Securities.

Registration of transfers of WaMu Cayman Preferred Securities will be effected without charge by or on behalf of WaMu Cayman, but WaMu Cayman or the Transfer Agent will require, prior to registration, payment (or the giving of such indemnity as the Registrar and Transfer Agent may require) of a sum sufficient to cover any tax or other governmental charges that may be imposed in connection with any transfer of definitive WaMu Cayman Preferred Securities. WaMu Cayman will not be required to register or cause to be registered the transfer of definitive WaMu Cayman Preferred Securities during the period of 15 days before the day of selection for redemption of such WaMu Cayman Preferred Securities and ending at the close of business on the day of mailing of the notice of redemption for the WaMu Cayman Preferred Securities that have been called for redemption.

### Expenses of the Paying Agent, Transfer Agent and Registrar

If the Paying Agent, Transfer Agent or Registrar incurs fees, charges or expenses, for which it is not otherwise liable under the Agency Agreement to be entered into on or before the closing date among WTC Cayman, WaMu Cayman and the Company, at the request of a holder of WaMu Cayman Preferred Securities or other person, such holder or other person will be liable for such fees, charges or expenses.

### Notices

Notices to the holders of the WaMu Cayman Preferred Securities will be given by delivery of the relevant notice to DTC, Euroclear and/or Clearstream, as applicable, and any other relevant securities clearing system identified in writing by WaMu Cayman for communication by each of them to entitled participants. In addition, so long as any Series A-2 WaMu Cayman Preferred Securities are listed on the Euro MTF Market of the Luxembourg Stock Exchange and the rules of such exchange so require, notices will be published in a daily newspaper of general circulation in Luxembourg (which is expected to be the Luxemburger Wort).

### Listing

Application will be made to list the Series A-2 WaMu Cayman Preferred Securities on the Euro MTF market of the Luxembourg Stock Exchange. The Series A-1 WaMu Cayman Preferred Securities will not be listed on any securities exchange or automated dealer quotation system.

## Governing Law

WaMu Cayman's Articles of Association and the WaMu Cayman Preferred Securities will be governed by and construed in accordance with the laws of the Cayman Islands.

## Restrictions on Transfer

For information regarding restrictions on ownership of the WaMu Cayman Preferred Securities, see "Notice to Investors."

## DESCRIPTION OF THE FIXED RATE COMPANY PREFERRED SECURITIES

*The following summary describes the material terms and provisions of the Fixed Rate Company Preferred Securities. This description is qualified in its entirety by reference to the terms and provisions of the LLC Agreement. A copy of the LLC Agreement may be obtained upon request to WMI or free of charge at the specified office of the Paying Agent in Luxembourg.*

### General

The 7.25% Perpetual Non-cumulative Preferred Securities, liquidation preference $1,000 per security and $750,000,000 in the aggregate (the *"Fixed Rate Company Preferred Securities"*), are limited liability company interests in the Company, the terms of which are set forth in the LLC Agreement. When issued, the Fixed Rate Company Preferred Securities will be validly issued, and no additional payments will be required pursuant to the LLC Act for such securities to represent limited liability company interests in the Company. The holders of the Fixed Rate Company Preferred Securities will have no pre-emptive rights with respect to any limited liability company interests in the Company or any other securities of the Company convertible into or carrying rights or options to purchase any such securities. The Fixed Rate Company Preferred Securities are perpetual and will not be convertible into Company Common Securities or any other class or series of limited liability company interests in the Company and will not be subject to any sinking fund or other obligation of the Company for their repurchase or retirement.

The Fixed Rate Company Preferred Securities will be issued in certificated form only.

The Fixed Rate Company Preferred Securities are not obligations of, or guaranteed by, WMI, WMB, Marion, University Street, or any of their respective affiliates or any other entity. The Fixed Rate Company Preferred Securities solely represent an interest in the Company and do not represent an interest in any of the foregoing entities.

The Fixed Rate Company Preferred Securities are not insured or guaranteed by the FDIC.

### Ranking

The Fixed Rate Company Preferred Securities will rank senior to the Company Common Securities and will rank *pari passu* with the Company's other preferred securities, including the Fixed-to-Floating Rate Preferred Company Securities, in terms of payment of dividends and on liquidation.

The Company's Board of Managers has the power to create and issue Junior Equity Securities and additional equity securities ranking *pari passu* with the Fixed Rate Company Preferred Securities in terms of payment of dividends or on liquidation or redemption (any such securities, together with the Fixed-to-Floating Rate Company Preferred Securities, the *"Parity Equity Securities"*) without the consent of the holders of the Company Preferred Securities, *provided*, that (i) after giving effect to the issuance of any Parity Equity Securities, the pro forma net book value of the Company's assets (after giving effect to any assets acquired by the Company in connection with the issuance of such Parity Equity Securities (*"New Assets"*)) will equal or exceed 1.5 times the sum of the aggregate liquidation preference of the preferred securities of the Company then outstanding and any such Parity Equity Securities that the Company proposes to issue, (ii) after giving effect to such issuance, the Company's pro forma FFO for the four fiscal quarters beginning with the fiscal quarter in which such Parity Equity Securities are proposed to be issued (calculated (A) assuming that such proposed Parity Equity Securities are issued and that, if outstanding or proposed new Parity Equity Securities bear dividends based on a floating rate, the applicable dividend rate will not change during such four fiscal quarters from the rate in effect on the applicable date of determination and (B) as adjusted to reflect any New Assets) equals or exceeds 150% of the amount that would be required to pay full annual dividends on all preferred securities of the Company then outstanding

75

and any such Parity Equity Securities that the Company proposes to issue, and (iii) the Company is not otherwise in breach of any of its covenants set forth in the LLC Agreement. Funds from operations, or "FFO", means net income (computed in accordance with GAAP), excluding gains (or losses) from sales of property, *plus* depreciation and amortization, and after adjustments for unconsolidated partnerships and joint ventures. Adjustments for unconsolidated partnerships and joint ventures will be calculated to reflect funds from operations on the same basis.

The LLC Agreement provides that, so long as any Fixed Rate Company Preferred Securities remain outstanding, the Company may not except with the consent of at least two-thirds of the Fixed Rate Company Preferred Securities and the Fixed-to-Floating Rate Company Preferred Securities, voting together as a single class, issue Senior Equity Securities.

**Dividends**

For purposes of this offering circular, we refer to distributions payable by the Company on its securities as "dividends". Dividends on the Fixed Rate Company Preferred Securities will be payable if, when and as declared by the Company's Board of Managers out of its legally available funds, on a non-cumulative basis at an annual rate of • % on the liquidation preference thereof, which is $1,000 per security. Dividends on the Fixed Rate Company Preferred Securities, if, when and as declared by the Company's Board of Managers, will be payable quarterly in arrears on March 15, June 15, September 15 and December 15 of each year (the *"Dividend Payment Date"*), commencing on June 15, 2006. If any Dividend Payment Date is not a Business Day, then dividends will be payable on the first Business Day following such Dividend Payment Date with the same force and effect as if payment were made on the date such payment was originally payable. Each period from and including a Dividend Payment Date (or the date of issuance of the Fixed Rate Company Preferred Securities) to but excluding the following Dividend Payment Date is referred to herein as a *"Dividend Period"*. Dividends on the Fixed Rate Company Preferred Securities will accrue as follows: (i) from March 7, 2006 in the case of the Fixed Rate Company Preferred Securities offered hereby, and (ii) if additional Fixed Rate Company Preferred Securities are issued at a future date, from (A) March 7, 2006 if such date is before June 15, 2006, (B) the date of issue if such date is a Dividend Payment Date and (C) the immediately preceding Dividend Payment Date or the date of issue (as determined by the Company) if the date of issue is other than a Dividend Payment Date and is after June 15, 2006. The record date for the payment of dividends, if declared, will be the first day of the month in which the relevant dividend payment occurs or, if any such day is not a Business Day, the next day that is a Business Day. Dividends payable on the Fixed Rate Company Preferred Securities for any period greater or less than a full Dividend Period will be computed on the basis of twelve 30-day months, a 360-day year, and the actual number of days elapsed in the period. No interest will be paid on any dividend payment of Fixed Rate Company Preferred Securities, WaMu Cayman Preferred Securities or Fixed Rate Depositary Shares.

*"Business Day"* means any day other than a Saturday, Sunday or any other day on which banks in New York, New York, Seattle, Washington or Georgetown, Grand Cayman are generally required or authorized by law to be closed.

Dividends on the Fixed Rate Company Preferred Securities are non-cumulative. If the Company's Board of Managers does not declare a dividend on the Fixed Rate Company Preferred Securities or declares less than a full dividend in respect of any Dividend Period, holders of the Fixed Rate Company Preferred Securities will have no right to receive any dividend or a full dividend, as the case may be, for that Dividend Period, and the Company will have no obligation to pay any dividends or full dividends on the Fixed Rate Company Preferred Securities for that Dividend Period, whether or not dividends are declared and paid for any future Dividend Period with respect to any of the Fixed Rate Company Preferred Securities, the Fixed-to-Floating

Rate Company Preferred Securities, any other series of Parity Equity Securities, any Junior Equity Securities or the Company Common Securities.

## Restrictions on Dividends

During a Dividend Period, no dividends will be declared or paid on any securities of the Company ranking junior to the Company Preferred Securities in respect of payments of dividends or on liquidation ("*Junior Equity Securities*"), other than dividends payable in Junior Equity Securities, and no Junior Equity Securities will be repurchased, redeemed or otherwise acquired for consideration, directly or indirectly (other than as a result of reclassification of Junior Equity Securities for or into other Junior Equity Securities, or the exchange or conversion of Junior Equity Securities for or into other Junior Equity Securities), unless dividends for such Dividend Period on all outstanding Company Preferred Securities have been declared and paid in full, or declared and set aside for payment, as the case may be.

When dividends are not paid in full on, or a sum sufficient for such full payment is not set apart for, the Fixed Rate Company Preferred Securities, the Fixed-to-Floating Rate Company Preferred Securities and any other Parity Equity Securities, if any, all dividends declared upon the Fixed Rate Company Preferred Securities, the Fixed-to-Floating Rate Company Preferred Securities and any other Parity Equity Securities, if any, will be declared *pro rata*. Thus, the amount of dividends declared per Fixed Rate Company Preferred Security, the Fixed-to-Floating Rate Company Preferred Securities and such other Parity Equity Securities, if any, will in all cases bear to each other the same ratio that (i) full dividends per Fixed Rate Company Preferred Security for the then-current Dividend Period, which will not include any accumulation in respect of unpaid dividends for prior Dividend Periods, and (ii) full dividends, which will not include any accumulation in respect of unpaid dividends for prior Dividend Periods, on such other capital securities, bear to each other.

Under certain circumstances, if the OTS determines that WMB is operating with an insufficient level of capital or is engaged in, or its relationship with the Company results in, an unsafe and unsound banking practice, the OTS could restrict the Company's ability to pay dividends, including dividends to the holders of the Fixed Rate Company Preferred Securities. See "The Company — Business of the Company."

## Restrictions on Dividends by WMI

WMI will covenant in the Exchange Agreement for the benefit of the holders of the WaMu Cayman Preferred Securities and the Trust Securities that if full dividends on (i) the Company Preferred Securities, (ii) the WaMu Cayman Preferred Securities or (iii) the Trust Securities for any Dividend Period have not been declared and paid, WMI will not declare or pay dividends with respect to, or redeem, purchase or acquire, any of its equity capital securities during the next succeeding Dividend Period, except dividends in connection with a shareholders' rights plan, if any, or dividends in connection with benefits plans.

## Redemption

The Fixed Rate Company Preferred Securities will not be redeemable at the option of the holders thereof. Subject to a covenant in favor of certain of WMI's debtholders limiting WMI's and its subsidiaries' right to repurchase or redeem the Fixed Rate Company Preferred Securities or the WaMu Cayman Preferred Securities (among others) as described under "Description of the WaMu Cayman Preferred Securities — Restriction on Redemption or Repurchases," and subject to the Company having received the prior approval of the OTS for any proposed

redemption of Fixed Rate Company Preferred Securities, the Company may, at its option redeem the Fixed Rate Company Preferred Securities:

- in whole but not in part, prior to the Dividend Payment Date in March 2011, upon the occurrence of a Tax Event, an Investment Company Act Event or a Regulatory Capital Event, at a cash redemption price equal to the greater of:

  (i) $1,000 per Fixed Rate Company Preferred Security, or

  (ii) the sum of present values of $1,000 per Fixed Rate Company Preferred Security and all undeclared dividends for the Dividend Period from the redemption date to and including the Dividend Payment Date in March 2011, discounted to the redemption date on a quarterly basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate, as calculated by an Independent Investment Banker, *plus* 0.40%,

  *plus* any declared but unpaid dividends to the redemption date; or

- in whole or in part, on or after the Dividend Payment Date in March 2011, at a cash redemption price of $1,000 per Fixed Rate Company Preferred Security, *plus* any declared and unpaid dividends to the redemption date, without accumulation of any undeclared dividends.

The Fixed-to-Floating Rate Company Preferred Securities will be separately redeemable on similar terms and conditions.

"*Comparable Treasury Issue*" means the United States Treasury security selected by the Independent Investment Banker as having a maturity comparable to the term remaining to the Dividend Payment Date on March 15, 2011 that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of perpetual preferred securities having similar terms as the Fixed Rate Company Preferred Securities with respect to the payment of dividends and distributions of assets upon liquidation, dissolution or winding-up of the issuer of such preferred stock.

"*Comparable Treasury Price*" means with respect to any redemption date for the Fixed Rate Company Preferred Securities the average of the Reference Treasury Dealer Quotations for such redemption date, after excluding the highest and lowest of such Reference Treasury Dealer Quotations, or if the Independent Investment Banker obtains fewer than five such Reference Treasury Dealer Quotations, the average of all such quotations.

"*Independent Investment Banker*" means an independent investment banking institution of national standing appointed by the Company.

An "*Investment Company Act Event*" occurs when the Company determines, based upon receipt of an opinion of counsel, that there is a significant risk that the Company, the Asset Trust or any other Asset Subsidiary, WaMu Cayman or WaMu Delaware is or will be considered an "investment company" that is required to be registered under the Investment Company Act, as a result of a change in applicable laws, regulations or related interpretations.

"*Reference Treasury Dealer*" means each of three primary U.S. government securities dealers (each a "*Primary Treasury Dealer*"), as specified by the Company; provided that if any Primary Treasury Dealer as specified by the Company ceases to be a Primary Treasury Dealer, the Company will substitute for such Primary Treasury Dealer another Primary Treasury Dealer and if the Company fails to select a substitute within a reasonable period of time, then the substitute will be a Primary Treasury Dealer selected by the Independent Investment Banker after consultation with the Company.

"*Reference Treasury Dealer Quotations*" means, with respect to the Reference Treasury Dealer and any redemption date, the average, as determined by the Independent Investment

Banker, of the bid and asked prices for the Comparable Treasury Issue (expressed, in each case, as a percentage of its principal amount) quoted in writing to the Independent Investment Banker by such Reference Treasury Dealer at 5:00 p.m., New York City time, on the third Business Day preceding such redemption date.

A *"Regulatory Capital Event"* occurs when the Company determines, based upon receipt of an opinion of counsel, that there is a significant risk that the Company Preferred Securities will no longer constitute core capital of WMB for purposes of the capital adequacy regulations issued by the OTS as a result of a change in applicable laws, regulations or related interpretations after issuance of the Fixed Rate Company Preferred Securities.

A *"Tax Event"* occurs when the Company determines, based upon receipt of an opinion of counsel, that there is a significant risk that (i) the Company will be required by a relevant jurisdiction to withhold amounts from payments to the holders of any Company Preferred Securities for taxes or any other governmental charges, (ii) WaMu Cayman will be required by a relevant jurisdiction to withhold amounts from payments to the holders of the WaMu Cayman Preferred Securities for taxes or any other governmental charges, or WaMu Delaware will be required by a relevant jurisdiction to withhold amounts from payments to the holders of the Trust Securities for taxes or any other governmental charges, (iii) WaMu Cayman is or will be treated as engaged in a trade or business within the United States for United States Federal income tax purposes or (iv) the Company is or will be treated as a publicly traded partnership taxable as a corporation or as an association taxable as a corporation for United States Federal income tax purposes.

*"Treasury Rate"* means the rate per year equal to the quarterly equivalent yield to maturity of the Comparable Treasury Issue, calculated using a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such redemption date. The Treasury Rate will be calculated on the third Business Day preceding the redemption date.

A notice of redemption of the Fixed Rate Company Preferred Securities will be mailed by first class mail, postage prepaid, addressed to the holders of record of the securities to be redeemed at their respective last addresses appearing on the books and records of the Company. Such mailing will be at least 35 days but not more than 65 days before the date fixed for redemption.

The Company's ability to redeem any Fixed Rate Company Preferred Security is subject to compliance with applicable regulatory requirements, including the prior approval of the OTS, relating to the redemption of capital instruments. Under current policies of the OTS, such approval would be granted only if the redemption were to be made out of the proceeds of the issuance of another capital instrument or if the OTS were to determine that the conditions and circumstances of WMB warrant the reduction of a source of permanent capital.

The Fixed-to-Floating Rate Company Preferred Securities are subject to their own redemption provisions and may be redeemed separately.

### Restrictions on Redemption or Repurchases

At or prior to issuance of the Fixed Rate Company Preferred Securities and the WaMu Cayman Preferred Securities, WMI will enter into the Replacement Capital Covenant described under "Description of the WaMu Cayman Preferred Securities — Restriction on Redemption or Repurchases," limiting WMI's and its subsidiaries, including the Company's, ability to redeem or repurchase certain securities, including the Fixed Rate Company Preferred Securities.

## Rights upon Liquidation

In the event the Company voluntarily or involuntarily dissolves and winds up, the holders of Fixed Rate Company Preferred Securities at the time outstanding will be entitled to receive liquidating dividends in the amount of $1,000 per security, *plus* any authorized, declared, but unpaid dividends to the date of liquidation, out of the Company's assets legally available for distribution, before any distribution of assets is made to holders of Junior Equity Securities and subject to the rights of general creditors.

After payment of the full amount of the liquidating distributions to which they are entitled, the holders of Fixed Rate Company Preferred Securities will have no right or claim to any of the Company's remaining assets. In the event that, upon any such voluntary or involuntary dissolution and winding up, the available assets are insufficient to pay the amount of the liquidation distributions on all outstanding Fixed Rate Company Preferred Securities and the corresponding amounts payable on the Fixed-to-Floating Rate Company Preferred Securities and any other Parity Equity Securities, if any, then the holders of Fixed Rate Company Preferred Securities, the Fixed-to-Floating Rate Company Preferred Securities and any other Parity Equity Securities, if any, will share ratably in any such distribution of assets in proportion to the full liquidating distributions to which they would otherwise be respectively entitled.

For such purposes, the Company's consolidation or merger with or into any other entity, the consolidation or merger of any other entity with or into the Company, or the sale of all or substantially all of the Company's property or business, will not be deemed to constitute the Company's dissolution and winding up.

## Voting Rights and Covenants

Except as set forth below, holders of Fixed Rate Company Preferred Securities will not have voting rights. The LLC Agreement provides that, so long as any Fixed Rate Company Preferred Securities are outstanding, the Company will not, except with the consent or affirmative vote of the holders of at least two-thirds of the Fixed Rate Company Preferred Securities and the Fixed-to-Floating Rate Company Preferred Securities, voting together as a single class (provided that for the purpose of any such approval, a like amount of Fixed Rate Company Preferred Securities as any WaMu Cayman Preferred Securities that are directly or indirectly held or beneficially owned by any member of WMI Group will be treated as if they were not outstanding):

- effect a consolidation, merger or share exchange with or into another entity other than an entity controlled by, or under common control with, WMI;

- issue any Senior Equity Securities;

- incur any indebtedness for borrowed money;

- pay dividends on the Company's Junior Equity Securities unless the Company's FFO for the four prior fiscal quarters equals or exceeds 150% of the amount that would be required to pay full annual dividends on all outstanding Company Preferred Securities, as well as any other Parity Equity Securities;

- amend or otherwise change the requirement that the Company make investments and distributions with the proceeds of the Company's assets such that the Company's FFO over any period of four fiscal quarters will equal or exceed 150% of the amount that would be required to pay full annual dividends on all outstanding Company Preferred Securities, as well as any other Parity Equity Securities;

- issue any additional Company Common Securities to any person, other than University Street or another affiliate of WMI;

- amend or otherwise change the terms of any Asset Documentation in a manner which is materially adverse to WaMu Cayman, WaMu Delaware or the holders of the WaMu Cayman Preferred Securities or Trust Securities;

- remove or cause to be removed, as applicable, "Washington Mutual" from the Company's, WaMu Cayman's or WaMu Delaware's name unless the name of WMI changes and the Company makes a change to the Company's, WaMu Cayman's and WaMu Delaware's name to be consistent with the new group name;

- take or fail to take any action that would cause the Company to fail to be treated as a partnership (other than a publicly traded partnership taxable as a corporation) for United States Federal income tax purposes;

- amend or otherwise change the requirement that the Company not engage in a U.S. trade or business for United States Federal income tax purposes;

- amend or otherwise change the requirement that the Company hold only assets that qualify for the portfolio interest exemption under the Code and are exempt from United States Federal withholding taxes;

- amend or otherwise change the requirement that the Company manage its affairs such that its income does not constitute "unrelated business taxable income" within the meaning of Section 512 of the Code; or

- amend its Certificate of Formation or LLC Agreement in a manner that materially and adversely affects the terms of the Company Preferred Securities *provided, however*, that, if such amendment affects only one class of Company Preferred Securities, such amendment will require only the class vote of such class (voting separately and not as a single class with the other class) and, if such amendment affects both classes but affects them differently, then such amendment will require a class vote of each class of Company Preferred Securities, each voting separately.

In addition, the LLC Agreement provides that, except with the consent of all of the Company's managers, including its Independent Manager, the Company will not:

- terminate, amend or otherwise change any Asset Documentation; or

- effect a consolidation, merger or share exchange (excluding the Conditional Exchange) that is not tax-free to the holders of the Fixed Rate Company Preferred Securities, and the related WaMu Cayman Preferred Securities, unless such transaction was approved by the consent or affirmative vote of the holders of at least two-thirds of the Fixed Rate Company Preferred Securities and Fixed-to-Floating Rate Company Preferred Securities, voting together as a single class.

In addition, the LLC Agreement will provide that if (i) the Company fails to pay full dividends on the Company Preferred Securities on any Dividend Payment Date, (ii) WaMu Cayman fails to pay full dividends on the WaMu Cayman Preferred Securities on any Dividend Payment Date, or (iii) a Bankruptcy Event occurs, the holders of the Fixed Rate Company Preferred Securities and the Fixed-to-Floating Rate Company Preferred Securities, voting together as a single class, by majority vote, are entitled to remove the initial or any succeeding Independent Manager and to fill the vacancy created by such removal or any other vacancy existing in the office of the Independent Manager.

The LLC Agreement requires that, in assessing the benefits to the Company of any proposed action requiring his or her consent, the Company's Independent Manager take into account the interests of holders of both Company Common Securities and the Company Preferred Securities. The LLC Agreement provides that in considering the interests of the holders of the Company Preferred Securities, the Company's Independent Manager owes the same

duties to such holders which the Independent Manager owes to the holders of Company Common Securities.

As a condition to effecting any consolidation, merger or share exchange described above, the Company will mail to the holders of record of the Fixed Rate Company Preferred Securities a notice of such consolidation, merger or share exchange. The notice will be mailed at least 15 days prior to such transaction becoming effective and will contain a description of such transaction together with a certificate of one of the Company's officers stating that such transaction complies with the requirements set forth in the LLC Agreement and that all conditions precedent provided therein relating to such transaction have been fulfilled.

As described under "Description of the WaMu Cayman Preferred Securities — Voting Rights," each holder of WaMu Cayman Preferred Securities will have the right to direct the manner in which WaMu Cayman exercises its voting rights as to a like amount of Fixed Rate Company Preferred Securities held by WaMu Cayman with respect to any of the matters on which a holder of Fixed Rate Company Preferred Securities is entitled to vote.

WMI's articles of incorporation do not contain similar covenants regarding the Fixed Rate WMI Preferred Stock following an exchange of the WaMu Cayman Preferred Securities. Therefore, following a Conditional Exchange, holders of the Fixed Rate Depositary Shares would no longer have any voting rights, except as provided by Washington law or in connection with the right to elect directors if dividends are skipped or not paid in full. See below under "Description of the Fixed Rate WMI Preferred Stock — Voting Rights."

## Additional Amounts

If the Company or WaMu Cayman is required to pay any Additional Taxes as a result of an Additional Tax Event, the Company will pay as additional amounts on the Fixed Rate Company Preferred Securities such amounts as will be required so that dividends on the Fixed Rate Company Preferred Securities or the WaMu Cayman Preferred Securities, as applicable, will not be reduced as a result of any such Additional Taxes ("Additional Amounts").

"Additional Taxes" means the sum of any additional taxes, duties and other governmental charges to which a WaMu Cayman has become subject from time to time as a result of an Additional Tax Event.

An "Additional Tax Event" means the determination by the Company, based upon receipt of an opinion of counsel, rendered by a law firm experienced in such matters, in form and substance reasonably satisfactory to the Company and WMI, to the effect that, as a result of any amendment to, or change (including any announced proposed change) in, the laws (or any regulations thereunder) of the United States or the Cayman Islands or of any political subdivision or taxing authority thereof or therein, or as a result of any official administrative pronouncement or judicial decision interpreting or applying such laws or regulations, which amendment or change is effective or which proposed change, pronouncement or decision is announced on or after the date of issuance of the WaMu Cayman Preferred Securities, there is a significant risk that (i) the Company or WaMu Cayman is, or will be within 90 days of the date of such opinion of counsel, required by a relevant jurisdiction to withhold amounts from payments to the holders of the Fixed Rate Company Preferred Securities or WaMu Cayman Preferred Securities, respectively, for any taxes, duties and other governmental charges, (ii) WaMu Cayman is, or will be within 90 days of the date of such opinion of counsel, subject to United States Federal income tax with respect to income received or accrued on the like amount of Fixed Rate Company Preferred Securities held by it, or (iii) WaMu Cayman is, or will be within 90 days of the date of such opinion of counsel, subject to more than a de minimis amount of other taxes, duties or other governmental charges.

## Amendments and Termination of the LLC Agreement

University Street may, at any time and from time to time, without the consent of the holders of the Fixed Rate Company Preferred Securities, amend the LLC Agreement: (i) (A) to correct or supplement any provision in the LLC Agreement that may be defective or inconsistent with any other provision therein, or (B) to make any other provisions with respect to matters or questions arising under the LLC Agreement, *provided*, that any such action taken under this clause (i) will not materially adversely affect the interests of the holders of Fixed Rate Company Preferred Securities, as set forth in an officer's certificate; or (ii) to cure any ambiguity or inconsistency or correct any manifest error. Any other amendment of the LLC Agreement must be approved by vote of holders of two-thirds (by aggregate liquidation preference) of the Fixed Rate Company Preferred Securities and Fixed-to-Floating Rate Company Preferred Securities, voting together as a single class (see "— Voting Rights and Covenants"); *provided* that, for the purpose of such approval, a like amount of Company Preferred Securities as any WaMu Cayman Preferred Securities or Trust Securities that are directly or indirectly held or beneficially owned by any member of WMI Group will be treated as if they were not outstanding. The Company will notify the Paying Agents and the holders of the WaMu Cayman Preferred Securities of any such amendment of the LLC Agreement within a reasonable period of time.

The LLC Agreement will terminate upon the termination of the Company under the LLC Act.

## Governing Law

The LLC Agreement and the Fixed Rate Company Preferred Securities will be governed by, and construed in accordance with, the laws of the State of Delaware.

## DESCRIPTION OF OTHER COMPANY SECURITIES

### Common Securities

*The following summary of the terms of the other Company securities does not purport to be complete and is subject in all respects to the applicable provisions of the LLC Act and the LLC Agreement. A copy of the LLC Agreement may be obtained upon request to WMI and free of charge at the specified office of the Paying Agent in Luxembourg.*

### General

Upon consummation of this Offering, the Company will have outstanding 1,000 Company Common Securities, all of which will be held by University Street.

The Company Common Securities may be sold, assigned or otherwise transferred by University Street to another entity, subject to WMI maintaining direct or indirect ownership of 100% of the outstanding Company Common Securities and receipt by University Street of an opinion of counsel to the effect that as a result of any such sale, transfer or assignment the Company will not be taxable as a corporation for United States Federal income tax purposes.

Pursuant to the LLC Agreement, except with the consent or the affirmative vote of the holders of at least two-thirds of the Fixed Rate Company Preferred Securities and the Fixed-to-Floating Rate Company Preferred Securities, voting together as a single class, the Company will not issue any additional Company Common Securities to any person, other than University Street or another affiliate of WMI.

No additional payments will be required pursuant to the LLC Act for Company Common Securities to represent limited liability company interests in the Company upon issuance against full payment of the purchase price therefor.

### Voting

Subject to the limited rights of the holders of the Fixed Rate Company Preferred Securities as described under "Description of the Fixed Rate Company Securities — Voting Rights and Covenants," and corresponding rights of the holders of the Fixed-to-Floating Rate Company Preferred Securities and any voting rights granted to holders of Parity Equity Securities all voting rights of the Company's security holders are vested in the Company Common Securities. The holders of Company Common Securities are entitled to vote in proportion to the liquidation amounts represented by their Company Common Securities.

### Dividends

The Company Common Securities will rank junior to the Company Preferred Securities as to payment of dividends. No dividends will be declared or paid in any Dividend Period on the Company Common Securities, other than dividends payable in Company Common Securities, and no Company Common Securities will be repurchased, redeemed or otherwise acquired for consideration, directly or indirectly (other than as a result of reclassification of Company Common Securities for or into Company Common Securities, or the exchange or conversion of Company Common Securities for or into Company Common Securities), unless dividends in such Dividend Period on all outstanding Company Preferred Securities have been declared and paid in full, or set aside for payment, as the case may be. Pursuant to the LLC Agreement, except with the consent or the affirmative vote of the holders of at least two-thirds of the Fixed Rate Company Preferred Securities and the Fixed-to-Floating Rate Company Preferred Securities, voting together as a single class, the Company will not pay any dividends on the Company Common Securities unless the Company's FFO for the four prior fiscal quarters equals or exceeds 150% of the amount that would be required to pay full annual dividends on all

outstanding Company Preferred Securities, as well as on all Parity Equity Securities, if any; *provided*, that, for the purpose of such approval, a like amount of Fixed Rate Company Preferred Securities as any WaMu Cayman Preferred Securities that are directly or indirectly held or beneficially owned by any member of WMI Group will be treated as if they were not outstanding.

### Liquidation Rights

The Company Common Securities will rank junior to the Company Preferred Securities upon liquidation. In the event of any voluntary or involuntary dissolution of the Company, after all of the Company's debts and liabilities have been satisfied and there have been paid or set aside for the holders of the Company Preferred Securities the full preferential amounts to which such holders are entitled, the holders of Company Common Securities will be entitled to share equally and ratably in any assets remaining.

### Fixed-to-Floating Rate Company Preferred Securities

The Fixed-to-Floating Rate Company Preferred Securities rank *pari passu* with the Fixed Rate Company Preferred Securities offered hereby as to dividends and upon liquidation of the Company. The terms of the Fixed-to-Floating Rate Company Preferred Securities are substantially identical to the Fixed Rate Company Preferred Securities other than with respect to the rate applicable to dividends thereon. The Fixed-to-Floating Rate Company Preferred Securities will, if, when and as declared by the Company's Board of Managers, pay dividends at an annual rate of 6.534% until the Dividend Payment Date in March 2011 and an annual rate equal to three-month LIBOR plus 1.4825% for the Dividend Period starting on such Dividend Payment Date and each Dividend Period thereafter. The Fixed-to-Floating Rate Company Preferred Securities will be held by WaMu Delaware, which will issue a like amount of Trust Securities to investors in a separate offering contemporaneous to the Offering. The Fixed-to-Floating Rate Company Preferred Securities will not be listed on any securities exchange or automated dealer quotation system.

### Ability to Issue Additional Preferred Securities

Pursuant to the LLC Agreement, the Company may not issue any Senior Equity Securities or incur indebtedness except with the consent or affirmative vote of holders of at least two-thirds of the Fixed Rate Company Preferred Securities and the Fixed-to-Floating Rate Company Preferred Securities, voting together as a single class, as described under "Description of the Fixed Rate Company Preferred Securities — Voting Rights and Covenants." The Company may issue additional Parity Equity Securities without the consent of the holders of Company Preferred Securities only if the tests described under "Description of the Fixed Rate Company Preferred Securities — Ranking" are satisfied.

# DESCRIPTION OF THE FIXED RATE WMI PREFERRED STOCK

*The following summary describes the material terms and provisions of the Fixed Rate WMI Preferred Stock. The description is qualified in its entirety by reference to the terms and provisions of WMI's Articles of Incorporation and Articles of Amendment establishing the Fixed Rate WMI Preferred Stock. A copy of WMI's Articles of Incorporation and such articles of amendment may be obtained free of charge at the specified office of the Paying Agent in Luxembourg.*

## General

WMI has authorized and reserved for issuance, upon a Conditional Exchange as described under "Description of the WaMu Cayman Preferred Securities — Conditional Exchange," 750 shares of its Series J Perpetual Non-cumulative Fixed Rate Preferred Stock, no par value and liquidation preference $1,000,000 per share (the *"Fixed Rate WMI Preferred Stock"*). The shares of Fixed Rate WMI Preferred Stock, if and when issued upon a Conditional Exchange, will be represented by fixed rate depositary shares of WMI (the *"Fixed Rate Depositary Shares"*), each representing 1/1000th of a share of Fixed Rate WMI Preferred Stock. The holders of the Fixed Rate WMI Preferred Stock will have no pre-emptive rights with respect to any shares of WMI's capital stock or any of its other securities convertible into or carrying rights or options to purchase any such capital stock. The Fixed Rate WMI Preferred Stock is perpetual and will not be convertible into shares of WMI common stock or any other class or series of its capital stock, and will not be subject to any sinking fund or other obligation for its repurchase or retirement.

The Fixed Rate WMI Preferred Stock, upon issuance, will have substantially equivalent terms as to dividends, redemption, liquidation preference and redemption preference as the Fixed Rate Company Preferred Securities and WaMu Cayman Preferred Securities for which they may be exchanged, except that the Fixed Rate WMI Preferred Stock: (i) will not have the benefit of the covenants described under "Description of Fixed Rate Company Preferred Securities — Voting Rights and Covenants"; (ii) will not be listed on any securities exchange or automated dealer quotation system; and (iii) will be redeemable prior to the Dividend Payment Date occurring on March 15, 2011 only upon the occurrence of a Regulatory Capital Event. In addition, if WMI fails to pay, or declare and set aside for payment, full dividends on the Fixed Rate WMI Preferred Stock after its issuance for six Dividend Periods, the authorized number of WMI's directors will increase by two, and the holders of Fixed Rate WMI Preferred Stock, voting together with the holders of any other shares of WMI ranking on a parity with the Fixed Rate WMI Preferred Stock as to dividends or upon liquidation, including the Fixed-to-Floating Rate WMI Preferred Stock (*"WMI Parity Stock"*), will have the right to elect two directors in addition to the directors then in office at the next annual meeting of shareholders. Accordingly, the Dividend Payment Dates and related Dividend Periods for the Fixed Rate WMI Preferred Stock, once issued, will be the same as the Dividend Payment Dates and related Dividend Periods for the WaMu Cayman Preferred Securities and the Fixed Rate Company Preferred Securities, and the terms *"Dividend Payment Date"* and *"Dividend Period"* have the same meanings as applied to the Fixed Rate WMI Preferred Stock as applied to each of those securities; it being understood that in the event that the Fixed Rate WMI Preferred Stock is not issued prior to March 15, 2011, a Dividend Payment Date shall be deemed to occur on such date with respect to the Fixed Rate WMI Preferred Stock for the purposes of determining the terms of redemption thereof. The term *"Business Day"*, when used with reference to the Fixed Rate WMI Preferred Stock, means any day other than a Saturday, Sunday or any other day on which banks in New York, New York, or Seattle, Washington are generally required or authorized by law to be closed.

The Fixed Rate WMI Preferred Stock will be subject to the Replacement Capital Covenant described under "Description of the WaMu Cayman Preferred Securities — Restriction on Redemption or Repurchases" above.

## Ranking

WMI will covenant in the Exchange Agreement in favor of the holders of the WaMu Cayman Preferred Securities and the Trust Securities, as applicable, that prior to the issuance of the Fixed Rate WMI Preferred Stock upon a Conditional Exchange, WMI will not issue any preferred stock that would rank senior to the Fixed Rate WMI Preferred Stock or the Fixed-to-Floating Rate WMI Preferred Stock upon its issuance.

The Fixed Rate WMI Preferred Stock will, upon issuance, rank senior to WMI's common stock and at least *pari passu* with the most senior preferred stock of WMI, if any, then outstanding, and to any other preferred stock that WMI may issue in the future. WMI may authorize and issue additional shares of preferred stock that may rank junior to or *pari passu* with the Fixed Rate WMI Preferred Stock as to dividends and upon liquidation, winding up, or dissolution without the consent of the holders of the Fixed Rate WMI Preferred Stock.

## Dividends

Dividends on the Fixed Rate WMI Preferred Stock will be payable if, when and as declared by WMI's Board of Directors out of its legally available funds, on a non-cumulative basis at an annual rate of 7.25% on the liquidation preference thereof, which is $1,000,000 per share. Dividends on the Fixed Rate WMI Preferred Stock, if, when and as declared by WMI's Board of Directors, will be payable quarterly in arrears on March 15, June 15, September 15, and December 15 of each year, commencing on the first such day after issuance of the Fixed Rate WMI Preferred Stock. If any Dividend Payment Date is not a Business Day, then dividends will be payable on the first Business Day following such Dividend Payment Date with the same force and effect as if payment were made on the date such payment was originally payable. The record date for the payment of dividends, if declared, will be the first day of the month in which the relevant Dividend Payment Date occurs or, if any such day is not a Business Day, the next day that is a Business Day. Dividends payable on the Fixed Rate WMI Preferred Stock for any period greater or less than a full Dividend Period will be computed on the basis of twelve 30-day months, a 360-day year, and the actual number of days elapsed in the period. No interest will be paid on any dividend payment of Fixed Rate WMI Preferred Stock or Fixed Rate Depositary Shares. Holders of Fixed Rate Depositary Shares will receive 1 / 1000th of any such dividend payment on the Fixed Rate WMI Preferred Stock.

Dividends on the Fixed Rate WMI Preferred Stock are non-cumulative. If WMI's Board of Directors does not declare a dividend on the Fixed Rate WMI Preferred Stock or declares less than a full dividend in respect of any Dividend Period, the holders of the Fixed Rate WMI Preferred Stock will have no right to receive any dividend or a full dividend, as the case may be, for the Dividend Period, and WMI will have no obligation to pay a dividend or to pay full dividends for that Dividend Period, whether or not dividends are declared and paid for any future Dividend Period with respect to the Fixed Rate WMI Preferred Stock, WMI's common stock or any other class or series of WMI's preferred stock.

## Redemption

The Fixed Rate WMI Preferred Stock will not be redeemable at the option of the holders thereof. Subject to a covenant in favor of certain of WMI's debtholders limiting WMI's and its subsidiaries' right to repurchase or redeem the Fixed Rate WMI Preferred Stock (among others) as described under "Description of the WaMu Cayman Preferred Securities — Restriction on

Redemption or Repurchases," WMI may, at its option redeem the Fixed Rate WMI Preferred Stock:

- in whole but not in part, prior to the Dividend Payment Date in March 2011, upon the occurrence of a Regulatory Capital Event at a cash redemption price equal to the greater of:

  (i) $1,000,000 per share of Fixed Rate WMI Preferred Stock; or

  (ii) the sum of present values of $1,000,000 per share of Fixed Rate WMI Preferred Stock and all undeclared dividends for the Dividend Period from the redemption date to and including the Dividend Payment Date in March 2011, discounted to the redemption date on a quarterly basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate, as calculated by an Independent Investment Banker, *plus* 0.40%,

  *plus* any declared but unpaid dividends to the redemption date, or

- in whole or in part, on or after the Dividend Payment Date in March 2011, at a cash redemption price of $1,000,000 per share of Fixed Rate WMI Preferred Stock, *plus* any declared and unpaid dividends to the redemption date, without accumulation of any undeclared dividends.

Dividends will cease to accrue on the Fixed Rate WMI Preferred Stock called for redemption on and as of the date fixed for redemption and such Fixed Rate WMI Preferred Stock will be deemed to cease to be outstanding; *provided*, that the redemption price, including any authorized and declared but unpaid dividends for the current Dividend Period, if any, to the date fixed for redemption, has been duly paid or provision has been made for such payment.

Notice of any redemption will be mailed at least 30 days, but not more than 60 days, prior to any redemption date to each holder of the Fixed Rate WMI Preferred Stock to be redeemed at such holder's registered address.

## Replacement

At or prior to issuance of the Fixed Rate Company Preferred Securities and the WaMu Cayman Preferred Securities, WMI will enter into the Replacement Capital Covenant described under "Description of the WaMu Cayman Preferred Securities — Restriction on Redemption or Repurchases," limiting WMI's ability to redeem or repurchase certain securities, including the Fixed Rate WMI Preferred Stock.

## Rights upon Liquidation

In the event WMI voluntarily or involuntarily liquidates, dissolves or winds up, the holders of Fixed Rate WMI Preferred Stock at the time outstanding will be entitled to receive liquidating distributions in the amount of $1,000,000 per share, or $1,000 per Fixed Rate Depositary Share representing a 1/1000th interest in the Fixed Rate WMI Preferred Stock, plus an amount equal to declared but unpaid dividends for the current Dividend Period to the date of liquidation, out of WMI's assets legally available for distribution to its shareholders, before any distribution of assets is made to holders of WMI's common stock or any securities ranking junior to the Fixed Rate WMI Preferred Stock upon liquidation and subject to the rights of the holders of any class or series of securities ranking senior to or on a parity with the Fixed Rate WMI Preferred Stock upon liquidation and the rights of its depositors and creditors.

After payment of the full amount of the liquidating distributions to which they are entitled, the holders of the Fixed Rate WMI Preferred Stock will have no right or claim to any of WMI's remaining assets. In the event that, upon any such voluntary or involuntary liquidation, dissolution, or winding up, WMI's available assets are insufficient to pay the amount of the

liquidation distributions on all outstanding Fixed Rate WMI Preferred Stock and the corresponding amounts payable on any other securities of equal ranking, then the holders of the Fixed Rate WMI Preferred Stock and any other securities of equal ranking will share ratably in any such distribution of assets in proportion to the full liquidating distributions to which they would otherwise be respectively entitled.

For such purposes, WMI's consolidation or merger with or into any other entity, the consolidation or merger of any other entity with or into it, or the sale of all or substantially all of WMI's property or business, will not be deemed to constitute its liquidation, dissolution, or winding up.

## Voting Rights

Holders of Fixed Rate WMI Preferred Stock will not have any voting rights, including the right to elect any directors, except upon issuance as required by law, or as set forth below if WMI fails to pay, or declare and set aside for payment, full dividends on Fixed Rate WMI Preferred Stock for six Dividend Periods.

If WMI fails to pay, or declare and set aside for payment, full dividends on the Fixed Rate WMI Preferred Stock after issuance or any other class or series of WMI Parity Stock (including the Fixed-to-Floating Rate WMI Preferred Stock) having similar voting rights ("*Voting Parity Stock*") for six Dividend Periods or their equivalent, the authorized number of WMI's directors will be increased by two. Subject to compliance with any requirement for regulatory approval of, or non-objection to, persons serving as directors, the holders of Fixed Rate WMI Preferred Stock, voting together as a single class with the holders of any Voting Parity Stock, will have the right to elect two directors in addition to the directors then in office at WMI's next annual meeting of shareholders. This right will continue at each subsequent annual meeting until WMI pays dividends on the Fixed Rate WMI Preferred Stock and any Voting Parity Stock for three consecutive Dividend Periods or its equivalent and pays or declares and sets aside for payment dividends for the fourth consecutive Dividend Period or its equivalent.

The term of such additional directors will terminate, and the total number of directors will be decreased by two, at the first annual meeting of shareholders after WMI pays dividends on the Fixed Rate WMI Preferred Stock and any Voting Parity Stock for three consecutive Dividend Periods or its equivalent and declares and pays or sets aside for payment dividends on the Fixed Rate WMI Preferred Stock and any Voting Parity Stock for the fourth consecutive Dividend Period or its equivalent or, if earlier, upon the redemption of all Fixed Rate WMI Preferred Stock. After the term of such additional directors terminates, the holders of the Fixed Rate WMI Preferred Stock will not be able to elect additional directors unless dividends on the Fixed Rate WMI Preferred Stock have again not been paid or declared and set aside for payment for six future Dividend Periods.

Any additional director elected by the holders of Fixed Rate WMI Preferred Stock and Voting Parity Stock may only be removed by the vote of the holders of record of the outstanding Fixed Rate WMI Preferred Stock and Voting Parity Stock voting together as a single class, at a meeting of WMI shareholders called for that purpose. As long as dividends on the Fixed Rate WMI Preferred Stock or any Voting Parity Stock have not been paid for six Dividend Periods or their equivalent, any vacancy created by the removal of any such director may be filled only by the vote of the holders of the outstanding Fixed Rate WMI Preferred Stock and any Voting Parity Stock, voting together as a single class, at the same meeting at which such removal is considered.

Washington law attaches mandatory voting rights to classes or series of shares that are affected by certain amendments to the articles of incorporation. The holders of the outstanding

shares of a class or series are entitled to vote as a separate voting group if shareholder voting is otherwise required by Washington law and if the amendment would:

- increase the aggregate number of authorized shares of the class or series;
- effect an exchange or reclassification of all or part of the issued and outstanding shares of the class or series into shares of another class or series, thereby adversely affecting the holders of the shares so exchanged or reclassified;
- change the rights, preferences, or limitations of all or part of the issued and outstanding shares of the class or series, thereby adversely affecting the holders of shares of the class or series;
- change all or part of the issued and outstanding shares of the class or series into a different number of shares of the same class or series, thereby adversely affecting the holders of shares of the class or series;
- create a new class or series of shares having rights or preferences with respect to dividends or other distributions or to dissolution that are, or upon designation by the board of directors may be, prior, superior, or substantially equal to the shares of the class or series;
- increase the rights or preferences with respect to distributions, or on liquidations or dissolution, or the number of authorized shares of any class or series that, after giving effect to the amendment, has rights or preferences with respect to distributions, or on liquidations or dissolution that are, or upon designation by the board of directors may be, prior, superior, or substantially equal to the shares of the class or series;
- limit or deny an existing pre-emptive right of all or part of the shares of the class or series;
- cancel or otherwise adversely affect rights to distributions that have accumulated but not yet been declared on all or part of the shares of the class or series; or
- effect a redemption or cancellation of all or part of the shares of the class or series in exchange for cash or any other form of consideration other than shares of the corporation.

WMI will covenant in the Exchange Agreement that in the event WMI, prior to the Conditional Exchange, effects, or is, the subject of a merger, consolidation, statutory share exchange, sale of all or substantially all of its assets or other form of business combination, (i) in which WMI is not the surviving, resulting or receiving corporation thereof or (ii) if WMI is the surviving or resulting corporation, shares representing a majority of WMI's total voting power are either converted or exchanged into securities of another person or into cash or other property (any such transaction in either (i) or (ii) being a *"Business Combination"*), then WMI (i) shall not enter into such Business Combination unless the Successor Entity agrees, effective upon the consummation of such Business Combination, to abide by all of WMI's obligations under the provisions of the Exchange Agreement restricting the payment of dividends by WMI in the event dividends are not paid with respect to the Company Preferred Securities and (ii) may, at the election of the Board of Directors of WMI prior to the effectiveness of such Business Combination, assign, effective upon the consummation of such Business Combination, all of its other obligations under the Exchange Agreement to a Successor Entity that has both Fixed Rate Substitute Preferred Stock and Fixed-to-Floating Rate Substitute Preferred Stock and, as a result of such assignment, all references to WMI, Fixed Rate WMI Preferred Stock, Fixed-to-Floating Rate WMI Preferred Stock, Fixed Rate Depositary Share and Fixed-to-Floating Rate Depositary Share shall become and be deemed to be references to such Successor Entity, to such Fixed Rate Substitute Preferred Stock, to such Fixed-to-Floating Rate Substitute Preferred Stock, to a Fixed Rate Successor Depositary Share and to a Fixed-to-Floating Rate Successor Depositary Share, respectively.

"*Successor Entity*" means a corporation designated by the Board of Directors of WMI (i) that is the surviving, resulting or receiving corporation, as applicable, in any Business Combination, (ii) the securities of which are received in a Business Combination by some or all holders of WMI voting shares or (iii) that the Board of Directors of WMI determines to be an acquiror of WMI in a Business Combination.

"*Fixed Rate Substitute Preferred Stock*" means a class or series of equity securities of a Successor Entity having the preferences, limitations and relative rights in its articles or certificate of incorporation or other constituent documents that are substantially similar to those set forth in the articles of amendment establishing the Fixed Rate WMI Preferred Stock.

"*Fixed-to-Floating Rate Substitute Preferred Stock*" means a class or series of equity securities of a Successor Entity having the preferences, limitations and relative rights in its articles or certificate of incorporation or other constituent documents that are substantially similar to those set forth in the articles of amendment establishing the Fixed-to-Floating Rate WMI Preferred Stock.

"*Fixed Rate Successor Depositary Share*" means a depositary share substantially similar to a Fixed Rate Depositary Share representing an interest in the Fixed Rate Substitute Preferred Stock.

"*Fixed-to-Floating Rate Successor Depositary Share*" means a depositary share substantially similar to a Fixed-to-Floating Rate Depositary Share representing an interest in the Fixed-to-Floating Rate Substitute Preferred Stock.

## Conditional Exchange

For a description of how an exchange of the WaMu Cayman Preferred Securities into Fixed Rate Depositary Shares may occur upon an Exchange Event, purchasers should read "Description of the WaMu Cayman Preferred Securities — Conditional Exchange."

# DESCRIPTION OF THE FIXED RATE DEPOSITARY SHARES

*The following summary describes the material terms and provisions of the Fixed Rate Depositary Shares. This description is qualified in its entirety by reference to the terms and provisions of the Deposit Agreement, the form of depositary receipts, which contain the terms and provisions of the Fixed Rate Depositary Shares, and WMI's articles of incorporation and articles of amendment. Copies of each of the foregoing documents may be obtained upon request to WMI or free of charge at the specified office of the Paying Agent in Luxemburg.*

## General

Each depositary share will represent a 1/1000th interest in one share of Fixed Rate WMI Preferred Stock (the "Fixed Rate Depositary Shares"). The Fixed Rate Depositary Shares will be evidenced by depositary receipts. The shares of Fixed Rate WMI Preferred Stock underlying the Fixed Rate Depositary Shares will, upon an exchange as a result of an Exchange Event, be deposited with the Depositary, under a Deposit Agreement to be entered into on or before the closing date (the "Deposit Agreement"), among WMI, the Depositary and the registrar appointed thereunder and all holders from time to time of depositary receipts issued by the Depositary thereunder. WMI does not intend to list or quote the Fixed Rate Depositary Shares or the Fixed Rate WMI Preferred Stock on any securities exchange or automated dealer quotation system. Accordingly, there will be no public trading market for the Fixed Rate Depositary Shares or the Fixed Rate WMI Preferred Stock. The Initial Purchasers are under no obligation to and do not intend to make a market in the Fixed Rate Depositary Shares.

Subject to the terms of the Deposit Agreement, each owner of a Fixed Rate Depositary Share will be entitled, through the Depositary, to all the rights, preferences and privileges of a share of Fixed Rate WMI Preferred Stock. Owners of a single Fixed Rate Depositary Share, representing a 1/1000th interest in one share of Fixed Rate WMI Preferred Stock, will be subject to all of the limitations of the fractional share represented thereby, which are summarized above under "Description of the Fixed Rate WMI Preferred Stock."

The Depositary will act as transfer agent and registrar and paying agent with respect to the Fixed Rate Depositary Shares.

The Depositary's office at which the depositary receipts will be administered is located at 480 Washington Blvd., Jersey City, NJ 07310.

Purchasers may hold Fixed Rate Depositary Shares either directly or indirectly through their broker or other financial institution. If purchasers hold Fixed Rate Depositary Shares directly, by having Fixed Rate Depositary Shares registered in their name on the books of the Depositary, the purchaser is a depositary receipt holder. If purchasers hold the Fixed Rate Depositary Shares through their broker or financial institution nominee, the purchasers must rely on the procedures of such broker or financial institution to assert the rights of a depositary receipt holder described in this section. Purchasers should consult with their broker or financial institution to find out what those procedures are.

## Issuance of Depositary Receipts

Automatically upon a Conditional Exchange, WMI will issue the shares of Fixed Rate WMI Preferred Stock, and WMI will deposit such shares of the Fixed Rate WMI Preferred Stock with the Depositary, which will then issue and deliver the depositary receipts to WMI. WMI will, in turn, deliver the depositary receipts to the holders of WaMu Cayman Preferred Securities as of the date of a Conditional Exchange. Depositary receipts will be issued evidencing only whole Fixed Rate Depositary Shares. Following the occurrence of a Conditional Exchange, each WaMu Cayman Preferred Security will be exchanged for a like amount of depositary receipts. See "Description of the WaMu Cayman Preferred Securities — Conditional Exchange."

## Dividends and Other Distributions

The Depositary will distribute all cash dividends, dividends paid in Fixed Rate Depositary Shares representing paid-up and non-assessable shares of Fixed Rate WMI Preferred Stock or other cash distributions received in respect of the Fixed Rate WMI Preferred Stock to the record holders of Fixed Rate Depositary Shares in proportion to the numbers of such Fixed Rate Depositary Shares owned by such holders on the relevant record date. In the event of a distribution other than in cash, the Depositary will distribute property received by it to the record holders of Fixed Rate Depositary Shares entitled thereto, unless the Depositary determines that it is not feasible to make such distribution, in which case the Depositary may, after consultation with WMI, sell such property and distribute the net proceeds from such sale to such holders.

## Redemption of Fixed Rate Depositary Shares

If the Fixed Rate WMI Preferred Stock underlying the Fixed Rate Depositary Shares are redeemed, the Fixed Rate Depositary Shares will be redeemed with the proceeds received by the Depositary resulting from the redemption, in whole or in part, of such Fixed Rate WMI Preferred Stock held by the Depositary. The redemption price per Fixed Rate Depositary Share will be equal to the applicable redemption price per share payable with respect to such Fixed Rate WMI Preferred Stock. If less than all the Fixed Rate Depositary Shares are to be redeemed, the Fixed Rate Depositary Shares to be redeemed will be selected by lot or *pro rata*, in WMI's sole discretion.

After the date fixed for redemption (which will be the same date as the redemption date, if any, for the Fixed Rate WMI Preferred Stock), the Fixed Rate Depositary Shares so called for redemption will no longer be deemed to be outstanding and all rights of the holders of the Fixed Rate Depositary Shares will cease, except the right to receive the moneys payable upon such redemption and any money or other property to which the holders of such Fixed Rate Depositary Shares were entitled upon such redemption upon surrender to the Depositary of the depositary receipts evidencing such Fixed Rate Depositary Shares.

## Amendment of Deposit Agreement

The form of depositary receipt evidencing the Fixed Rate Depositary Shares and any provision of the Deposit Agreement may at any time be amended by agreement between WMI and the Depositary. However, any amendment which materially and adversely alters the rights of the holders of depositary receipts will not be effective unless such amendment has been approved by the holders of at least a majority of the Fixed Rate Depositary Shares then outstanding. Every holder of an outstanding depositary receipt at the time any amendment becomes effective will be deemed, by continuing to hold such depositary receipt, to consent and agree to such amendment and to be bound by the Deposit Agreement as amended thereby.

## Charges of Depositary

WMI will pay the charges of the Depositary in connection with the initial deposit of the Fixed Rate WMI Preferred Stock and the initial issuance of the Fixed Rate Depositary Shares upon the occurrence of a Conditional Exchange, and any redemption of the Fixed Rate WMI Preferred Stock. Holders of Fixed Rate Depositary Shares will pay all other transfer and other taxes and governmental charges and, in addition, such other charges as are expressly provided in the Deposit Agreement to be for their accounts. All other charges and expenses of the Depositary and of any registrar incident to the performance of their respective obligations arising from the depositary arrangements will be paid by WMI only after prior consultation and agreement between the Depositary and WMI and consent by WMI to the incurrence of such expenses, which consent will not be unreasonably withheld.

## Miscellaneous

The Depositary will forward to the holders of the Fixed Rate Depositary Shares all reports and communications from WMI which WMI would be required to furnish to the holders of the Fixed Rate WMI Preferred Stock.

Neither the Depositary nor WMI will be liable if it is prevented or delayed by law or any circumstances beyond its control in performing its obligations under the Deposit Agreement. The obligations of WMI and the Depositary under the Deposit Agreement will be limited to performance in good faith of their duties thereunder, and they will not be obligated to prosecute or defend any legal proceedings in respect of any Fixed Rate Depositary Shares or the Fixed Rate WMI Preferred Stock unless satisfactory indemnity is furnished. They may rely upon written advice of counsel or independent accountants, or information provided by persons presenting Fixed Rate WMI Preferred Stock for deposit, holders of Fixed Rate Depositary Shares or other persons believed to be competent and on documents believed to be genuine.

## Resignation and Removal of Depositary; Termination of Deposit Agreement

The Depositary may resign at any time by delivering to WMI notice of its election to do so, and WMI may at any time remove the Depositary, with any such resignation or removal taking effect upon the appointment of a successor depositary and its acceptance of such appointment. Such successor depositary will be appointed by WMI within 60 days after delivery of the notice of resignation or removal. Upon termination of the Deposit Agreement, the Depositary will discontinue the transfer of depositary receipts, will suspend the distribution of dividends to the holders thereof and will not give any further notices (other than notice of such termination) or perform any further acts under the Deposit Agreement, except that the Depositary will continue to collect dividends and other distributions pertaining to Fixed Rate WMI Preferred Stock and will continue to deliver Fixed Rate WMI Preferred Stock certificates together with such dividends and distributions and the net proceeds of any sales of rights, preferences, privileges or other property in exchange for depositary receipts surrendered. At any time after the expiration of three years from the date of termination, the Depositary may sell the Fixed Rate WMI Preferred Stock and hold the proceeds of such sale, without interest, for the benefit of the holders of depositary receipts who have not then surrendered their depositary receipts. After making such sale, the Depositary will be discharged from all obligations under the Deposit Agreement except to account for such proceeds.

## DESCRIPTION OF THE OTHER WMI CAPITAL STOCK

As of the date hereof, the authorized capital stock of WMI consists of t,600,000,000 shares of WMI common stock and 10,000,000 shares of preferred stock, no par value. As of the close of business on February t5, 2006, there were 994,380,908 shares of WMI common stock outstanding and no shares of preferred stock of WMI outstanding. As of the close of business on February t5, 2006, 700,000 shares of preferred stock of WMI were authorized, but unissued, as contemplated by WMI's Rights Agreement, dated as of December 20, 2000, entered into by and between WMI and Mellon Investor Services LLC The shares of WMI preferred stock to be issued upon the occurrence of a Conditional Exchange have been duly authorized and when and if issued will be validly issued, fully paid, nonassessable and free of preemptive rights, with no personal liability attaching to the ownership thereof.

WMI has authorized for issuance in connection with the offering of the Trust Securities and the related issuance by the Company of its Fixed-to-Floating Rate Company Preferred Securities up to t,250 shares of its Series I Perpetual Non-cumulative Fixed-to-Floating Rate Preferred Stock, no par value, and liquidation preference of $1,000,000 per share (the *"Fixed-to-Floating Rate WMI Preferred Stock"*). The shares of Fixed-to-Floating WMI Preferred Stock will be issued by WMI solely upon the occurrence of a Conditional Exchange. The shares of Fixed-to-Floating Rate WMI Preferred Stock, if and when issued upon the occurrence of a Conditional Exchange, will be represented by Fixed-to-Floating Rate Depositary Shares of WMI (the *"Fixed-to-Floating Rate Depositary Shares"*), each of which will represent a t /1000th of a share of Fixed-to-Floating Rate WMI Preferred Stock.

The Fixed-to-Floating Rate WMI Preferred Stock will rank *pari passu* with the Fixed Rate WMI Preferred Stock as to dividends and upon liquidation of WMI. The terms of the Fixed-to-Floating Rate WMI Preferred Stock are substantially identical to the Fixed Rate WMI Preferred Stock other than with respect to the rate applicable to dividends thereon. The Fixed-to-Floating Rate WMI Preferred Stock will, if, when and as declared by WMI's Board of Directors, pay dividends at an annual rate of 6.534% until March t5, 201 t and at an annual rate equal to three-month LIBOR plus 1.4825% for the Dividend Period starting on such Dividend Payment Date and each Dividend Period thereafter. The Fixed-to-Floating Rate WMI Preferred Stock will not be listed on any securities exchange or automated dealer quotation system.

# BOOK-ENTRY ISSUANCE

## Form, Denomination, Transfer and Book-Entry Procedures

### General

The Series A-1 WaMu Cayman Preferred Securities are being offered and sold only in the United States and only to U.S. persons who are both qualified institutional buyers within the meaning of Rule 144A under the Securities Act and qualified purchasers within the meaning of Section 2(a)(51) of the Investment Company Act in reliance on an exemption from registration pursuant to Rule 144A under the Securities Act (the "*Rule 144A Offering*").

The Series A-1 WaMu Cayman Preferred Securities will be issued only in fully registered form. Each initial purchaser in the Offering and each account for which it is purchasing will hold at least $300,000 liquidation preference of Series A-1 WaMu Cayman Preferred Securities (*i.e.*, at least three Series A-1 WaMu Cayman Preferred Securities) and each subsequent purchaser and each account for which it is purchasing will hold and transfer at least $100,000 liquidation preference of Series A-1 WaMu Cayman Preferred Securities (*i.e.*, at least one Series A-1 WaMu Cayman Preferred Security). Any transfer, sale or other disposition of Series A-1 WaMu Cayman Preferred Securities having a liquidation preference of less than $100,000 or which result in a beneficial owner holding Series A-1 WaMu Cayman Preferred Securities having an aggregate liquidation preference of less than $100,000, will be deemed to be null and void *ab initio* and of no legal effect whatsoever. Any such transferee will be deemed not to be the beneficial owner of such Series A-1 WaMu Cayman Preferred Securities for any purpose, including, but not limited to, the receipt of dividends on such Series A-1 WaMu Cayman Preferred Securities, and such transferee will be deemed to have no interest whatsoever in such Series A-1 WaMu Cayman Preferred Securities.

Each purchaser of Series A-1 WaMu Cayman Preferred Securities pursuant to the Rule 144A Offering, and each purchaser who holds a beneficial interest in the Rule 144A Global Security at any time, will be deemed to have represented to WaMu Cayman that it is both a qualified institutional buyer within the meaning of Rule 144A under the Securities Act and a qualified purchaser within the meaning of Section 2(a)(51) under the Investment Company Act. If a beneficial owner of Series A-1 WaMu Cayman Preferred Securities who is required to be a "qualified purchaser" within the meaning of Section 2(a)(51) under the Investment Company Act is at any time not a qualified purchaser, WaMu Cayman may (i) require such beneficial owner to sell its Series A-1 WaMu Cayman Preferred Securities to a person who is a non-U.S. person within the meaning of Rule 902 of Regulation S under the Securities Act or who is a U.S. person that is also a qualified purchaser within the meaning of Section 2(a)(51) under the Investment Company Act and who is otherwise qualified to purchase such Series A-1 WaMu Cayman Preferred Securities in a transaction exempt from registration under the Securities Act or (ii) require the beneficial owner to sell such Series A-1 WaMu Cayman Preferred Securities to WaMu Cayman or an affiliate thereof at a price equal to the least of (A) the purchase price paid by the holder for such Series A-1 WaMu Cayman Preferred Securities, (B) 100% of the liquidation preference thereof or (C) the fair market value thereof.

The Series A-2 WaMu Cayman Preferred Securities are being offered and sold only to non-U.S. persons within the meaning of Rule 902 of Regulation S under the Securities Act in transactions outside the United States in reliance on an exemption from registration pursuant to Regulation S under the Securities Act (the "*Regulation S Offering*").

Each purchaser of Series A-2 WaMu Cayman Preferred Securities pursuant to the Regulation S Offering will be deemed to have represented to WaMu Cayman that it is a non-U.S. person within the meaning of Rule 902 of Regulation S under the Securities Act and is not acquiring WaMu Cayman Preferred Securities for the account or benefit of such a U.S. person.

## Global Securities

The Series A-1 WaMu Cayman Preferred Securities initially will be represented by one or more securities in registered, global form (the *"Rule 144A Global Security"*). The Series A-2 WaMu Cayman Preferred Securities initially will be represented by one or more securities in registered, global form (the *"Regulation S Global Security"*, and together with the Rule 144A Global Security, the *"Global Securities"*). The Global Securities will be deposited upon issuance with the Registrar as custodian for The Depository Trust Company (*"DTC"*) in New York, New York, and registered in the name of DTC or its nominee (the *"Nominee"*), in each case for credit to an account of a DTC Participant, as described below. Through and including the 40th day after the latter of the commencement of the offering and the original issue date of the Series A-2 WaMu Cayman Preferred Securities (such period through and including the 40th day, the *"Restricted Period"*), beneficial interests in the Regulation S Global Security may be held only through the Euroclear System or Clearstream (as indirect participants in DTC), unless transferred to a person that takes delivery through the Rule 144A Global Security in accordance with the certification requirements described below. Beneficial interests in the Rule 144A Global Security may not be exchanged for beneficial interest in the Regulation S Global Security or vice versa at any time except in accordance with the transfer and certification requirements described below. See *"— Exchanges between Regulation S Global Securities and Rule 144A Global Securities."*

## Special Considerations for Global Securities

As an indirect holder, a purchaser's rights relating to a Global Security will be governed by the account rules of the purchaser's financial institution and of DTC, as well as the general laws relating to securities transfers. WaMu Cayman will not recognize the purchaser as a holder of WaMu Cayman Preferred Securities and instead will deal only with DTC or its nominee. See *"— The DTC System."*

Purchasers should be aware that because WaMu Cayman Preferred Securities are issued only in the form of Global Securities:

- they cannot get WaMu Cayman Preferred Securities registered in their name;

- they cannot receive physical certificates for their interest in the WaMu Cayman Preferred Securities;

- they will be "Street Name" holders and must look to their own bank or broker for payments on the WaMu Cayman Preferred Securities and the protection of their legal rights relating to the WaMu Cayman Preferred Securities;

- they may not be able to sell interests in the WaMu Cayman Preferred Securities to some insurance companies and other institutions that are required by law to own securities in the form of physical certificates; and

- DTC's policies will govern payments, transfers, exchanges and other matters relating to the purchaser's interest in the Global Security. See *"— The DTC System."* WaMu Cayman, the Company and the Registrar have no responsibility for any aspect of DTC's actions or for its records of ownership interests in the Global Security. WaMu Cayman, the Company and the Registrar also do not supervise DTC in any way.

## Special Situations when the Global Securities Will Be Terminated

In a few special situations, the Global Securities will terminate and interests in them will be exchanged for physical certificates representing WaMu Cayman Preferred Securities. After that exchange, the choice of whether to hold WaMu Cayman Preferred Securities directly or in "Street Name" will be up to the beneficial owner. Purchasers must consult their own bank or broker to

find out how to have their interests in WaMu Cayman Preferred Securities transferred to their own name, so that they will be direct holders.

The special situations for termination of a Global Security are:

- DTC notifies WaMu Cayman that it is unwilling, unable or no longer qualified to continue as the depositary for the WaMu Cayman Preferred Securities; or

- WaMu Cayman in its sole discretion determines that the Global Security will be exchangeable for certificated WaMu Cayman Preferred Securities.

When a Global Security terminates, DTC (and not WaMu Cayman, the Company or the Securities Registrar) is responsible for deciding the names of the institutions that will be the initial direct holders.

If WaMu Cayman Preferred Securities are issued in certificated form, dividends, if any, will be payable, and WaMu Cayman Preferred Securities may be transferred or exchanged, at the corporate trust office of the Registrar in New York, New York, *provided* that payment of interest on certificated WaMu Cayman Preferred Securities may be made at the option of WaMu Cayman by check mailed to the address of the persons entitled thereto.

### The DTC System

DTC is a limited-purpose trust company created to hold securities for its participating organizations (the *"DTC Participants"*). DTC also facilitates the clearance and settlement between Participants of transactions of securities deposited with DTC through changes in the account records of DTC Participants. DTC Participants include securities brokers and dealers (including the Initial Purchasers), banks, trust companies, clearing corporations and certain other organizations. Access to DTC's system is also available to other entities such as securities brokers and dealers, banks and trust companies that work through a DTC Participant (the *"Indirect Participants"*).

When the WaMu Cayman Preferred Securities are purchased through the DTC system, the purchase must be made by or through a DTC Participant, who will receive credit for the WaMu Cayman Preferred Securities on DTC's records. The purchaser's ownership interest will only be recorded on the DTC Participants' (or Indirect Participants') records. DTC has no knowledge of a purchaser's individual ownership of the WaMu Cayman Preferred Securities. DTC's records only show the identity of the DTC Participants and the amount of the WaMu Cayman Preferred Securities held by or through them. A purchaser will not receive a written confirmation of its purchase or sale or any periodic statement directly from DTC; it will receive these from the DTC Participant or Indirect Participant. Thus, the DTC Participants (or Indirect Participants) are responsible for keeping an accurate account of the holdings of their customers.

Any redemption notices with respect to the WaMu Cayman Preferred Securities will be sent by the Company and WaMu Cayman directly to DTC, who will in turn inform the DTC Participants, who will then contact the beneficial owners. If less than all of the WaMu Cayman Preferred Securities are being redeemed, DTC's current practice is to choose by lot the amount of the interest of each DTC Participant to be redeemed. Each DTC Participant will then use an appropriate method to allocate the redemption among its beneficial holders.

It is DTC's current practice, upon receipt of any payment to credit DTC Participants' accounts on the payment date based on their holdings of beneficial interests in the Global Securities as shown on DTC's records. In addition, it is DTC's current practice to assign any consenting or voting rights to DTC Participants whose accounts are credited with WaMu Cayman Preferred Securities on a record date, by using an omnibus proxy. Payments by DTC Participants to owners of beneficial interests in the Global Securities, and voting by DTC Participants, will be based on the customary practices between the DTC Participants and owners of beneficial

interests, as is the case with the WaMu Cayman Preferred Securities held for the account of customers registered in "Street Name". However, payments will be the responsibility of the DTC Participants and not of DTC, the Securities Registrar, WaMu Cayman or the Company.

Except for trades involving only Euroclear and Clearstream Participants, interests in the WaMu Cayman Preferred Securities will trade in DTC's settlement system, and secondary market trading activity in such interests will therefore settle in immediately available funds, subject in all cases to the rules and procedures of DTC and its participants. Transfers between participants in DTC will be effected in accordance with DTC's procedures, and will be settled in same-day funds. Transfers between participants in Euroclear and Clearstream will be effected in the ordinary way in accordance with their respective rules and operating procedures.

Subject to compliance with the transfer and exchange provisions applicable to the WaMu Cayman Preferred Securities described elsewhere in this offering circular, cross-market transfers between DTC Participants, on the one hand, and Euroclear or Clearstream Participants, on the other hand, will be effected by DTC in accordance with DTC's rules on behalf of Euroclear or Clearstream, as the case may be, by its respective depositary; *however*, such cross-market transfers will require delivery of instructions to Euroclear or Clearstream, as the case may be, by the counter-party in such system in accordance with the rules and procedures and within the established deadlines (Brussels time) of such system. Euroclear or Clearstream, as the case may be, will, if the transaction meets its settlement requirements, deliver instructions to its respective depositary to take action to elect final settlement on its behalf by delivering or receiving interests in the relevant Global Security in DTC, and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to DTC. Euroclear Participants and Clearstream Participants may not deliver instructions directly to the depositaries for Euroclear or Clearstream.

Because of time zone differences, the securities account of a Euroclear or Clearstream participant purchasing an interest in a Global Security from a DTC Participant will be credited, and any such crediting will be reported to the relevant Euroclear or Clearstream Participant, during the securities settlement processing day (which must be a business day for Euroclear and Clearstream) immediately following the DTC settlement date. Cash received in Euroclear or Clearstream as a result of sales of interests in a Global Security by or through a Euroclear or Clearstream Participant to a DTC Participant will be received with value on the DTC settlement date but will be available in the relevant Euroclear or Clearstream cash account only as of the business day for Euroclear or Clearstream following the DTC settlement date.

DTC has advised WaMu Cayman that it will take any action permitted to be taken by a holder of the WaMu Cayman Preferred Securities (including the presentation of the WaMu Cayman Preferred Securities for exchange as described below) only at the direction of one or more DTC Participants to whose account in the Global Securities are credited and only in respect of such portion of the aggregate principal amount of the WaMu Cayman Preferred Securities as to which such participant or participants has or have given such direction.

Although DTC, Euroclear and Clearstream have agreed to the foregoing procedures in order to facilitate transfers of beneficial ownership interests in the Global Security among DTC Participants, Euroclear Participants and Clearstream Participants, they are under no obligation to perform or continue to perform such procedures, and such procedures may be discontinued at any time. Neither the Company, WaMu Cayman, the Securities Registrar, or any of their representative agents will have any responsibility for the performance by DTC, Euroclear, Clearstream or their participants or indirect participants, of their respective obligations under the rules and procedures governing their operations, including maintaining, supervising or reviewing the records relating to, or payments made on account of, beneficial ownership interests in the Global Security.

## Euroclear and Clearstream

Clearstream Banking société anonyme, 42 Avenue JF Kennedy, L-1855, Luxembourg ("Clearstream"), is a subsidiary of Clearstream International ("Clearstream International"), a Luxembourg limited liability company formed in January 2000 through the merger of Cedel International and Deutsche Boerse Clearing, a subsidiary of Deutsche Boerse AG. In July 2002, Deutsche Boerse AG acquired Cedel International and its 50% ownership of Clearstream International.

Clearstream is registered as a bank in Luxembourg, and as such is subject to supervision by the Luxembourg Financial Sector Supervisory Commission, which supervises Luxembourg banks.

Clearstream holds securities for its customers ("Clearstream Participants") and facilitates the clearance and settlement of securities transactions by electronic book-entry transfers between their accounts. Clearstream provides various services, including safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Clearstream also deals with domestic securities markets in several countries through established depository and custodial relationships. Clearstream has established an electronic bridge with Euroclear Bank S.A./N.V. as the Euroclear Operator in Brussels to facilitate settlement of trades between systems. Clearstream currently accepts over 200,000 securities for clearance.

Clearstream International's customers are world-wide financial institutions including underwriters, securities brokers and dealers, banks, trust companies and clearing corporations. Clearstream International's United States customers are limited to securities brokers and dealers and banks. Currently, Clearstream International has over 2,500 customers located in over 94 countries, including all major European countries, Canada and the United States. Indirect access to Clearstream is available to other institutions which clear through or maintain custodial relationship with an account holder of Clearstream.

The Euroclear System ("Euroclear") was created in 1968 to hold securities for its participants ("Euroclear Participants") and to clear and settle transactions between Euroclear Participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for physical movement of certificates and any risk from lack of simultaneous transfers of securities and cash. Transactions may be settled in a variety of currencies, including United States dollars. Euroclear includes various other securities, including securities lending and borrowing and interfaces with domestic markets in several countries generally similar to the arrangements for cross-market transfers with DTC described above. Euroclear is operated by Euroclear Bank S.A./N.V. (the "Euroclear Operator"). All operations are conducted by the Euroclear Operator, and all Euroclear securities clearance accounts and Euroclear cash accounts are accounts with the Euroclear Operator. Euroclear plc establishes policy for Euroclear on behalf of Euroclear Participants. Euroclear Participants include banks (including central banks), securities brokers and dealers and other professional financial intermediaries. Indirect access to Euroclear is also available to other firms that clear through or maintain a custodial relationship with a Euroclear Participant, either directly or indirectly.

Securities clearance accounts and cash accounts with the Euroclear Operator are governed by the Terms and Conditions Governing Use of Euroclear and the related Operating Procedures of the Euroclear System and applicable Belgian law (collectively, the "Euroclear Terms and Conditions"). The Euroclear Terms and Conditions govern transfers of securities and cash within Euroclear, withdrawals of securities and cash from Euroclear, and receipts of payments with respect to securities in Euroclear. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear Operator acts under the Euroclear Terms and Conditions only on behalf of Euroclear Participants, and has no record of, or relationship with, persons holding through Euroclear Participants.

## Exchanges between Regulation S Global Securities and Rule 144A Global Securities

### Transfers of WaMu Cayman Preferred Securities

A purchaser (including a beneficial owner) of Series A-1 WaMu Cayman Preferred Securities may sell such securities to a non-U.S. person only if the certifications described below are made and, in connection with such sale, the transferor's interest in the Series A-1 WaMu Cayman Preferred Securities evidenced by the Rule 144A Global Security is exchanged by the transferee for Series A-2 WaMu Cayman Preferred Securities evidenced by the Regulation S Global Security.

Similarly, a purchaser (including a beneficial owner) of Series A-2 WaMu Cayman Preferred Securities may sell such securities in the United States or to a U.S. person only if the certifications described below are made and, in connection with such sale, the transferor's interest in the Series A-2 WaMu Cayman Preferred Securities evidenced by the Regulation S Global Security is exchanged by the transferee for Series A-1 WaMu Cayman Preferred Securities evidenced by the Rule 144A Global Security.

### Exchanges between Global Securities

Beneficial interests in the Rule 144A Global Security may be exchanged for beneficial interests in the Regulation S Global Security only in connection with a transfer of such interests or an exchange by the beneficial owner who makes the certifications described below. Beneficial interests in the Regulation S Global Security may be exchanged for beneficial interests in the Rule 144A Global Security only in connection with a transfer of such interests or an exchange by the beneficial owner who makes the certifications described below. Such transfers and exchanges are subject to compliance with the certification requirements described below.

A beneficial interest in the Rule 144A Global Security may be transferred to a person who takes delivery in the form of an interest in the Regulation S Global Security, whether before or after the expiration of the Restricted Period, only upon receipt by the Securities Registrar of a written certificate on behalf of the transferor to the effect that the transferee is a non-U.S. person within the meaning of Rule 902 of Regulation S under the Securities Act, such transfer is being made in accordance with Rule 904 of Regulation S under the Securities Act and that, if such transfer occurs prior to the expiration of the Restricted Period, the interest transferred will be held immediately thereafter through Euroclear or Clearstream.

A beneficial interest in the Regulation S Global Security may be transferred in the United States or to a U.S. person who takes delivery in the form of an interest in the Rule 144A Global Security, whether before or after the expiration of the Restricted Period, only upon receipt by the Securities Registrar of a written certificate on behalf of the transferor to the effect that such transfer is being made to a person who the transferor reasonably believes is both a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act and a "qualified purchaser" within the meaning of Section 2(a)(51) of the Investment Company Act, purchasing for its own account or the account of a "qualified institutional buyer" who is also a "qualified purchaser" in a transaction meeting the requirements of Rule 144A under the Securities Act and in accordance with all applicable securities laws of the states of the United States and other jurisdictions.

Any beneficial interest in one of the Global Securities that is exchanged for an interest in the other Global Security will cease to be an interest in such Global Security and will become an interest in the other Global Security. Accordingly, such interest will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in such other Global Security for as long as it remains such an interest.

Any exchange of a beneficial interest in the Regulation S Global Security for a beneficial interest in the Rule 144A Global Security or vice versa will be effected in DTC by means of an

instruction originated by the Securities Registrar through the DTC Deposit/Withdraw at Custodian ("DWAC") system. Accordingly, in connection with any such exchange, appropriate adjustments will be made in the records of the Securities Registrar to reflect a decrease in the liquidation preference of such Regulation S Global Security and a corresponding increase in the liquidation preference of such Rule 144A Global Security or vice versa, as applicable.

## CERTAIN TAX CONSIDERATIONS

*United States Internal Revenue Service Circular 230 Notice: To ensure compliance with Internal Revenue Service Circular 230, prospective investors are hereby notified that: (i) any discussion of U.S. Federal tax issues contained or referred to in this offering circular or any document referred to herein is not intended or written to be used, and cannot be used, by prospective investors for the purpose of avoiding penalties that may be imposed on them under the U.S. Internal Revenue Code; (ii) such discussion is written for use in connection with the promotion or marketing of the transactions or matters addressed herein; and (iii) prospective investors should seek advice based on their particular circumstances from an independent tax advisor.*

### General

The following discussion summarizes the United States Federal income taxation of WaMu Cayman and the principal United States Federal income tax and Cayman Islands tax consequences to holders of WaMu Cayman Preferred Securities. This discussion is of a general nature and is not intended to be, nor should it be construed as, tax advice to any holder. Purchasers should consult their own tax advisor regarding the tax consequences of acquiring, owning and disposing of WaMu Cayman Preferred Securities.

The discussion addresses only purchasers that hold WaMu Cayman Preferred Securities as capital assets and does not purport to be a comprehensive description of all the tax considerations that may be relevant to particular holders in light of a purchaser's personal circumstances. In addition, the discussion is not addressed to any U.S. Holder that beneficially owns (actually or constructively, within the meaning of Code Section 958) 10% or more the WaMu Cayman Preferred Securities. The discussion also does not describe all aspects of taxation that may be relevant to certain types of purchasers to which special provisions of United States Federal income tax law may apply, including:

- dealers in securities and currencies;
- regulated investment companies
- traders in securities;
- tax-exempt organizations;
- banks and insurance companies;
- persons that hold WaMu Cayman Preferred Securities as part of a hedge, straddle or conversion transaction;
- persons whose functional currency is not the United States dollar; and
- U.S. expatriates.

The summary is based on United States Federal and Cayman Islands tax law, including the Code, existing and proposed U.S. Treasury regulations, administrative rulings and judicial decisions all as currently in effect. These legal sources are subject to change or differing interpretations at any time, which change or interpretation could apply retroactively and could affect the validity of the discussion below. There can be no assurance that the Internal Revenue Service ("IRS") will take the same view of the United States Federal income tax consequences of an investment in the Preferred Securities as described herein.

**Each purchaser is urged to consult its own tax advisor as to the tax consequences of acquiring, owning and disposing of WaMu Cayman Preferred Securities, including the United States Federal, state, local, Cayman Islands and any other tax consequences of acquiring, owning and disposing of the WaMu Cayman Preferred Securities and the Fixed Rate WMI Preferred Stock.**

As used in this discussion, the term *"U.S. Holder"* means a beneficial owner of a WaMu Cayman Preferred Security that is, for United States Federal income tax purposes, a citizen or resident of the United States, a corporation or partnership created or organized in or under the laws of the United States or any State, an estate the income of which is includible in gross income for United States Federal income tax purposes regardless of its source, or a trust if a court within the United States is able to exercise primary supervision over its administration and one or more United States persons have authority to control all substantial decisions of the trust. The term *"Foreign Holder"* means a beneficial owner of a WaMu Cayman Preferred Security that is not a U.S. Holder.

## United States Federal Income Tax Consequences

### Tax Treatment of WaMu Cayman and its Investment in Company Preferred Securities

**Classification of WaMu Cayman and the Company.** WaMu Cayman will be treated as a foreign corporation for Federal income tax purposes. All of its material assets are expected to consist of Fixed Rate Company Preferred Securities. The Company intends to be classified as a U.S. domestic partnership for United States Federal income tax purposes, and the Fixed Rate Company Preferred Securities acquired by WaMu Cayman are expected to constitute equity interests in such partnership.

An entity that is classified as a partnership for United States Federal income tax purposes generally is not a taxable entity and incurs no United States Federal income tax liability. Instead, each partner is required to take into account its allocable share of income, gains, losses, deductions and credits of the partnership in computing its United States Federal income tax liability, if any, even if no cash distributions are made by the partnership to the partner. An entity that is classified as a partnership for United States Federal income tax purposes nevertheless will be taxable as a corporation if it is a "publicly traded partnership" and fails to satisfy a "90% qualifying income" test, within the meaning of Code Section 7704.

On the date of the initial issuance of the WaMu Cayman Preferred Securities, the Company will receive an opinion from Mayer, Brown, Rowe & Maw LLP to the effect that, for United States Federal income tax purposes, although no activities closely comparable to that contemplated by the Company have been the subject of any U.S. Treasury regulation, revenue ruling or judicial decision, the Company will not be treated as an association or publicly traded partnership taxable as a corporation. The opinions are based on certain assumptions and on certain representations and agreements regarding restrictions on the future conduct of the activities of the Company. Although the Company intends to conduct its activities in accordance with such assumptions, representations and agreements, if it were nonetheless determined that the Company was taxable as a corporation for United States Federal income tax purposes, then cash available for distribution to WaMu Cayman in respect of the Company Preferred Securities would be reduced on account of taxes payable by the Company. A determination by the Company, based on receipt of an opinion of counsel, that there is a significant risk that the Company is or will be subject to federal income tax would constitute a Tax Event — see "Description of Fixed Rate Company Preferred Securities." The remainder of this discussion assumes that the Company is treated as a partnership, and not as an association or publicly traded partnership taxable as a corporation, for United States Federal income tax purposes, and that the Fixed Rate Company Preferred Securities owned by WaMu Cayman will constitute equity interests in such partnership.

**U.S. Trade or Business Status.** WaMu Cayman intends to conduct its affairs so as to not be engaged in a trade or business in the United States or be subject to taxation on a net income basis in the United States. On the date of the initial issuance of the WaMu Cayman Preferred Securities, WaMu Cayman will receive an opinion from Mayer, Brown, Rowe & Maw LLP to the effect that, for United States Federal income tax purposes, although no activities closely comparable to that contemplated by WaMu Cayman have been the subject of any U.S. Treasury

regulation, revenue ruling or judicial decision, it will not be treated as engaged in the conduct of a trade or business within the United States and, consequently, WaMu Cayman's income will not be subject to United States Federal income tax on a net income basis (including the U.S. branch profits tax). Mayer, Brown, Rowe & Maw LLP's opinion is not binding on the IRS or the courts, and no ruling will be sought from the IRS regarding this, or any other, aspect of WaMu Cayman's United States Federal income tax treatment. Accordingly, no assurance can be given that the IRS will not assert positions contrary to those stated in Mayer, Brown, Rowe & Maw LLP's opinion or that a court would not entertain any such assertions.

Mayer, Brown, Rowe & Maw LLP's opinion is based on certain assumptions and on certain representations and agreements regarding restrictions on the future conduct of WaMu Cayman's activities. Although WaMu Cayman intends to conduct its activities in accordance with such assumptions, representations and agreements, it it were nonetheless determined to be engaged in a trade or business in the United States and had taxable income that was effectively connected with such United States trade or business (including as a result of a determination that its distributive share of income derived from the Company in respect of the Fixed Rate Company Preferred Securities constituted taxable income effectively connected with a trade or business carried on in the United States by the Company), then WaMu Cayman would be subject to United States Federal income tax on such income at regular United States corporate income tax rates and possibly to a 30% United States branch profits tax as well. Moreover, in the event WaMu Cayman were to derive effectively connected income in respect of its ownership of the Fixed Rate Company Preferred Securities the United States corporate income tax imposed thereon would be required to be collected in the first instance through a withholding by the Company of such tax at a rate of 35% on WaMu Cayman's distributive share of the income. A determination by WaMu Cayman, based on receipt of an opinion of counsel, that there is a significant risk that it is or will be treated as engaged in a trade or business within the United States, would constitute a Tax Event — see "Description of Fixed Rate Company Preferred Securities." The remainder of this discussion assumes that WaMu Cayman will not be considered to be engaged in a trade or business within the United States.

**United States Withholding Tax.** Interest that constitutes "portfolio interest" within the meaning of the Code is generally exempt from United States withholding tax. As a partner in the Company, WaMu Cayman will be treated as earning directly its share of the income earned by the Company. Company's material assets will initially consist of the "regular interest" (*i.e.*, the Class A Asset Trust Certificate) issued in registered form by the Asset Trust, which will be treated as a "real estate mortgage investment conduit" under the Code (a *"REMIC"*). REMIC regular interests are generally treated as indebtedness for United States Federal income tax purposes that qualifies for the portfolio interest exemption. Accordingly, WaMu Cayman expects that its distributive share of interest paid on the Asset Trust regular interest will constitute "portfolio interest" under the Code, and thus, will not be subject to United States withholding tax. In addition, during the term of the transaction, Company expects, pursuant to its investment guidelines, to invest cash on hand from time to time in short term debt instruments and other debt securities that qualify for the portfolio interest exemption.

## Tax Consequences to *U.S.* Holders of *WaMu* Cayman Preferred Securities

WaMu Cayman will treat the WaMu Cayman Preferred Securities as equity for United States Federal income tax purposes. In general, the characterization as of the time of issuance of an instrument by an issuer as debt or equity is binding for United States Federal income tax purposes on all holders (but not the IRS), unless a holder discloses on its tax return that it is treating the instrument in a manner inconsistent with the issuer's characterization. In addition, because WaMu Cayman is a foreign corporation, special rules described below apply to certain U.S. Holders of the Preferred Securities.

*Investment in a Passive Foreign Investment Company.* WaMu Cayman will constitute a "passive foreign investment company" under the Code *("PFIC")*. Except as provided below, U.S. Holders of the WaMu Cayman Preferred Securities will be considered U.S. Holders in a PFIC. In general, U.S. Holders in a PFIC may desire to make an election to treat WaMu Cayman as a "qualified electing fund" *("QEF")*. Generally, a QEF election should be made on or before the due date for filing a U.S. Holder's Federal income tax return for the first taxable year for which it held Preferred Securities. If a timely QEF election is made for WaMu Cayman, a U.S. Holder will be required to include in gross income its pro rata share of WaMu Cayman's ordinary earnings and to include as long-term capital gain its pro rata share of our net capital gain (as defined in applicable Treasury regulations), if any, whether or not any cash is distributed. In certain cases in which a QEF does not distribute all of its earnings in a taxable year, U.S. Holders may also be permitted to elect to defer payment of some or all of the taxes on the QEF's income subject to an interest charge on the deferred amount. WaMu Cayman will provide, upon request, all information that a U.S. Holder making a QEF election is required to obtain for Federal income tax purposes (e.g., the U.S. Holder's pro rata share of ordinary income and net capital gain, if any), and will provide, upon request, a "PFIC Annual Information Statement" as described in Treasury regulation Section 1.1295-1 (or in any successor Treasury regulation), including all representations and statements required by such statement, and will take any other reasonable steps to facilitate such election.

If a U.S. Holder does not make a timely QEF election, it will be subject to a special United States Federal tax on so-called "excess distributions", which includes both certain distributions on the Preferred Securities and gain on any disposition of the Preferred Securities. The amount of United States Federal tax on excess distributions will be increased by an interest charge reflecting the deemed amount of tax deferral that the taxpayer has experienced. In many cases, the application of the tax on excess distributions will be substantially more onerous than the treatment applicable if a timely QEF election is made. U.S. Holders should consult with their tax counsel regarding the United States Federal income tax consequences of investing in a PFIC and the desirability of making a QEF election.

U.S. **HOLDERS OF WAMU CAYMAN PREFERRED SECURITIES SHOULD CONSIDER CAREFULLY WHETHER TO MAKE A QEF ELECTION AND THE CONSEQUENCES OF NOT MAKING SUCH AN ELECTION.**

*Distributions on Preferred Securities to U.S. Holders.* The treatment of actual distributions of cash on the Preferred Securities, in very general terms, will vary depending on whether a U.S. Holder has made a timely QEF election as described above. See "— Tax Consequences to U.S. Holders of WaMu Cayman Preferred Securities — Investment in a Passive Foreign Investment Company." If a timely QEF election has been made, distributions should be allocated first to amounts previously taxed pursuant to the QEF election and to this extent would not be taxable to U.S. Holders. Distributions in excess of such previously taxed amounts will be taxable to such U.S. Holders as ordinary income upon receipt, to the extent of any remaining amounts of WaMu Cayman's current and accumulated earnings and profits. Distributions in excess of previously taxed amounts and any remaining current and accumulated earnings and profits will be treated by such U.S. Holders first as a nontaxable return of capital and then as capital gain.

In the event that a U.S. Holder does not make a timely QEF election some or all of any dividends distributed with respect to its Preferred Securities may constitute excess distributions, taxable as previously described. See "— Tax Consequences to U.S. Holders of WaMu Cayman Preferred Securities — Investment in a Passive Foreign Investment Company."

*Sale, Redemption or Other Disposition of Preferred Securities.* In general, a U.S. Holder of a WaMu Cayman Preferred Security will recognize gain or loss upon the sale or exchange of the Preference Share equal to the difference between the amount realized and such holder's adjusted tax basis in the Preference Share. Initially, the tax basis of a U.S. Holder should equal the amount paid for a WaMu Cayman Preferred Security. Such basis will be increased by

amounts taxable to such holder by virtue of a QEF election and decreased by actual distributions made on the U.S. Holder's WaMu Cayman Preferred Securities that are deemed to consist of such previously taxed amounts or treated as a nontaxable return of capital.

If a U.S. Holder does not make a timely QEF election as described above, any gain realized on the sale or exchange of a WaMu Cayman Preferred Security (or any gain deemed to accrue prior to the time a non-timely QEF election is made) will be treated as an excess distribution and taxed as ordinary income under the special tax rules described above. See "— Tax Conse-quences to U.S. Holders of WaMu Cayman Preferred Securities — Investment in a Passive Foreign Investment Company."

### Tax Treatment of Tax-Exempt U.S. Holders of Preferred Securities

For purposes of this discussion, a "*Tax-Exempt U.S. Holder*" means any U.S. domestic organization qualified under Code Section 501(c)(3), any trust or governmental plan qualified under Code Section 401(a), any individual retirement account and any other non-governmental U.S. Holder generally exempt from United States Federal income taxation. A Tax-Exempt U.S. Holder will not be subject to the tax on unrelated business taxable income (*"UBTI"*) with respect to either actual or constructive distributions received on its Preferred Securities or any capital gains derived from an investment in the Preferred Securities. However, notwithstanding the foregoing, a Tax-Exempt U.S. Holder which incurs "acquisition indebtedness" (as defined in Code Section 514(c)) with respect to its Preferred Securities may be subject to the tax on UBTI in respect of any income or gains derived in respect of the Preferred Securities to the extent that such Preferred Securities constitute "debt-financed property" of the Tax-Exempt U.S. Holder within the meaning of Code Section 514(b).

Tax-Exempt U.S. Holders should consult their own tax advisors regarding the tax consequences to them of an investment in the Preferred Securities.

### Tax Treatment of Foreign Holders of Preferred Securities

Payments on the WaMu Cayman Preferred Securities to a Foreign Holder, and gain realized on the sale, exchange or redemption of the Preferred Securities by such Foreign Holder, generally will not be subject to United States Federal income or withholding tax, as the case may be, unless such income is effectively connected with a trade or business conducted by such Foreign Holder in the United States, or, in the case of gain, such Foreign Holder is a nonresident alien individual who holds the WaMu Cayman Preferred Securities as a capital asset and who is present in the United States more than 182 days in the taxable year of the sale and certain other conditions are met.

### Certain Reporting Requirements to U.S. Holders

A U.S. Holder (including a tax exempt entity) that purchases WaMu Cayman Preferred Securities for cash in the original offering will be required to file an IRS Form 926 or similar form with the IRS if (i) such person owned, directly or by attribution, immediately after the transfer at least 10% of our equity, as measured by vote or value or (ii) if the transfer, when aggregated with all transfers made by such person (or any related person) within the preceding 12 month period, exceeds $100,000. In the event a U.S. Holder fails to file any such required form, the U.S. Holder could be required to pay a penalty equal to 10% of the gross amount paid for such Preferred Securities (subject to a maximum penalty of $100,000, except in cases involving intentional disregard). U.S. persons should consult their tax advisors with respect to this or any other reporting requirement which may apply with respect to their acquisition of WaMu Cayman Preferred Securities.

### Information Reporting and Backup Withholding

Under certain circumstances, the Code requires "information reporting", and may require "backup withholding", with respect to certain payments made on the Preferred Securities and the payment of the proceeds from the disposition of such instruments. Backup withholding generally will not apply to corporations, tax-exempt organizations, qualified pension and profit sharing trusts, and individual retirement accounts. Backup withholding will apply to a U.S. Holder if the U.S. Holder fails to provide certain identifying information (such as the U.S. Holder's taxpayer identification number) or otherwise comply with the applicable requirements of the backup withholding rules. The application for exemption from backup withholding for a U.S. Holder is available by providing a properly completed IRS Form W-9.

A Foreign Holder generally will not be subject to the United States information reporting or backup withholding requirements with respect to payments received on the WaMu Cayman Preferred Securities. If, however, the Foreign Holder holds its WaMu Cayman Preferred Securities through a broker or middleman with certain specified connections to the United States, the broker or middleman may request the Foreign Holder to submit documentary evidence as to its status as a Foreign Holder and the broker or middleman has no actual knowledge to the contrary. In addition, in the event that the Global Securities are terminated and interests therein are exchanged for physical certificates representing WaMu Cayman Preferred Securities, a Foreign Holder generally will be required to provide WaMu Cayman with documentary evidence certifying its status as a Foreign Holder on an applicable IRS Form W-8 if such person directly holds its certificated WaMu Cayman Preferred Securities.

Except as described below, the payment of the proceeds from the disposition of a WaMu Cayman Preferred Security by a Foreign Holder to or through a non-U.S. office of a non-U.S. broker generally will not be subject to the United States backup withholding or information reporting requirements. The payments of the proceeds from the disposition of a WaMu Cayman Preferred Security by a Foreign Holder to or through the U.S. office of a broker or a middleman generally will not be subject to information reporting and backup withholding if the Foreign Holder certifies its status as a Foreign Holder (and, if applicable, its beneficial owners also certify their status as non-U.S. persons) under penalties of perjury on the appropriate IRS Form W-8, satisfies certain documentary evidence requirements for establishing that it is a Foreign Holder or otherwise establishes an exemption. The payment of proceeds from the disposition of a WaMu Cayman Preferred Security by a Foreign Holder to or through a non-U.S. office of a U.S. broker or middleman or to or through a non-U.S. broker or middleman with certain specific types of relationships with the United States generally will not be subject to backup withholding but will be subject to information reporting unless the Foreign Holder certifies its status as a Foreign Holder (and, if applicable, its beneficial owners also certify their status as non-U.S. persons) under penalties of perjury or the broker has certain documentary evidence in its files as to the Foreign Holder's foreign status and the broker or middleman has no actual knowledge to the contrary.

Backup withholding is not an additional tax and may be refunded (or credited against the U.S. Holder's or Foreign Holder's United States Federal income tax liability, if any), provided that certain required information is furnished. The information reporting requirements may apply regardless of whether withholding is required.

### Tax Return Disclosure Requirements

Under recently issued Treasury Regulations and other administrative guidance promulgated by the IRS, a holder of WaMu Cayman Preferred Securities that recognizes a loss on a sale or exchange of such holder's WaMu Cayman Preferred Securities in excess of certain thresholds may be required, subject to certain exceptions, to file IRS Form 8886 with such holder's United States Federal income tax return for each taxable year (and for each of the 5 succeeding years) in which such holder reflects such loss.

Prospective holders of WaMu Cayman Preferred Securities are urged to consult their own tax advisors regarding the application to them of any tax return disclosure requirements associated with an investment in the Preferred Securities.

### Foreign, State, and Local Taxes

Holders may be liable for foreign, state, and local taxes in the country, state, or locality in which they are resident or doing business or in a states or locality in which we or Company conducts or is deemed to conduct business. Because the tax laws of each country, state, and locality may differ, each prospective investor should consult its own tax advisors with respect to any taxes that may be payable as a result of an investment in the Preferred Securities.

WaMu Cayman has received an undertaking from the Governor-in-Cabinet of the Cayman Islands that, in accordance with section 6 of the Tax Concessions Law (1999 Revision) of the Cayman Islands, for a period of 20 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to WaMu Cayman or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on the shares, debentures or other obligations of WaMu Cayman or (ii) by way of the withholding in whole or in part of a payment of dividend or other distribution of income or capital by WaMu Cayman to its members or a payment of principal or interest or other sums due under a debenture or other obligation of WaMu Cayman.

# ERISA CONSIDERATIONS

Section 406 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code") prohibit pension, profit-sharing or other retirement plans and accounts subject to ERISA or Section 4975 of the Code and entities that are deemed to hold "plan assets" of any of the foregoing (each, a "Plan") from engaging in certain transactions with persons that are "parties in interest" under ERISA or "disqualified persons" under the Code with respect to such Plan. A violation of these "prohibited transaction" rules may result in an excise tax or other penalties and liabilities under ERISA and the Code for such persons or the fiduciaries of the Plan. In addition, Title I of ERISA also requires fiduciaries of a Plan subject to ERISA to make investments that are prudent, diversified and in accordance with the governing plan documents.

Certain transactions involving WaMu Cayman might be deemed to constitute prohibited transactions under ERISA and the Code with respect to a Plan that purchased WaMu Cayman Preferred Securities or Fixed Rate Company Preferred Securities if assets of WaMu Cayman were deemed to be assets of the Plan. Under a regulation issued by the United States Department of Labor (the "Regulation"), the assets of WaMu Cayman would be treated as plan assets of a Plan for the purposes of ERISA and the Code only if the Plan acquired an "equity interest" in WaMu Cayman and none of the exceptions to plan assets contained in the Regulation was applicable. An equity interest is defined under the Regulation as an interest other than an instrument that is treated as indebtedness under applicable local law and that has no substantial equity features. The WaMu Cayman Preferred Securities and the Fixed Rate Company Preferred Securities are not likely to be treated as indebtedness for purposes of the Regulation. As such, WaMu Cayman intends to prohibit the acquisition and holding of any WaMu Cayman Preferred Security or Fixed Rate Company Preferred Security or any interest in a WaMu Cayman Preferred Security or Fixed Rate Company Preferred Security by or on behalf of a Benefit Plan Investor (as defined below).

For the purposes of the Regulation, the term "Benefit Plan Investor" includes all employee benefit plans, regardless of whether or not they are subject to ERISA (such as, for example, governmental plans), individual retirement accounts, Keogh Plans and other plans subject to Section 4975 of the Code, and entities whose underlying assets are deemed to include plan assets by reason of the investment in that entity by Benefit Plan Investors, such as group trusts, bank collective investment trusts, insurance company separate accounts, and certain insurance company general accounts.

By acquiring a WaMu Cayman Preferred Security or Fixed Rate Company Preferred Security (or any interest therein), each purchaser and transferee will be deemed to represent, warrant and covenant that, from the date of acquisition throughout the period of holding such WaMu Cayman Preferred Security or Fixed Rate Company Preferred Security (or interest therein), it is not, and it is not acquiring such WaMu Cayman Preferred Security or Fixed Rate Company Preferred Security (or interest therein) with the assets of a Benefit Plan Investor, except for an insurance company general account that represents, warrants and covenants that, at the time of acquisition and throughout the period it holds the securities, (i) it is eligible for and meets the requirements of the Department of Labor Prohibited Transaction Class Exemption 95-60, (ii) less than 25% of the assets of such general account are (or represent) assets of a Benefit Plan Investor and (iii) it is not a person who has discretionary authority or control with respect to the assets of WaMu Cayman or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person and would not otherwise be excluded under 29 C.F.R. 2510.3-101(f)(1).

## RATINGS

It is expected that the WaMu Cayman Preferred Securities will be rated "Baa2" by Moody's Investor Services, Inc. *("Moody's")*, "BBB" by Standard & Poors Rating Services, a division of the McGraw Hill Companies, Inc. *("S&P")*, and "A−" by Fitch, Inc. *("Fitch")*. The ratings of the WaMu Cayman Preferred Securities are not recommendations to purchase, hold or sell shares of Preferred Stock, inasmuch as the ratings do not comment as to the market price or suitability for a particular purchaser. Nor do the ratings described above address the likelihood that a holder of WaMu Cayman Preferred Securities will be able to sell such securities. The ratings are based on current information furnished to S&P, Moody's and Fitch by WMI, WMB, the Company and WaMu Cayman and information obtained from other sources. The ratings may be changed, suspended or withdrawn at any time as a result of changes in, or the unavailability of, such information.

## PLAN OF DISTRIBUTION

The Company, WaMu Cayman, WMI and the Initial Purchasers have entered into a purchase agreement with respect to the WaMu Cayman Preferred Securities. Subject to certain conditions, each Initial Purchaser has severally agreed to purchase the amount (by liquidation preference) of WaMu Cayman Preferred Securities indicated in the following tables.

| Initial Purchasers | Liquidation Preference of Series A-1 WaMu Cayman Preferred Securities |
|---|---|
| Goldman, Sachs & Co. ...................................... | $302,300,000 |
| Total ................................................ | $302,300,000 |

| Initial Purchasers | Liquidation Preference of Series A-2 WaMu Cayman Preferred Securities |
|---|---|
| Goldman, Sachs & Co. ...................................... | $267,700,000 |
| Morgan Stanley & Co. Incorporated ......................... | $ 90,000,000 |
| Citigroup Global Markets Limited ............................ | $ 22,500,000 |
| Credit Suisse Securities (USA) LLC ......................... | $ 22,500,000 |
| HSBC Bank plc ............................................. | $ 22,500,000 |
| UBS Securities LLC ........................................ | $ 22,500,000 |
| Total ................................................ | $447,700,000 |

The Initial Purchasers are committed to take and pay for all of the securities being offered hereby, if any are taken. The initial offering price is set forth on the cover page of this offering circular. After the securities are released for sale, the Initial Purchasers may change the offering price and other selling terms. The Initial Purchasers have agreed to reimburse WMI and its affiliates for certain expenses incurred in connection with this Offering.

The securities offered hereby have not been and will not be registered under the Securities Act. The Initial Purchasers have agreed that they will only offer or sell (i) the Series A-1 WaMu Cayman Preferred Securities in the United States and only to U.S. persons who are both "qualified institutional buyers" within the meaning of Rule 144A under the Securities Act and "qualified purchasers" within the meaning of Section 2(a)(51) under the Investment Company Act in transactions meeting the requirements of Rule 144A and (ii) the Series A-2 WaMu Cayman Preferred Securities outside the United States to "non-U.S. persons" (within the meaning of Regulation S under the Securities Act) in offshore transactions in reliance on Regulation S.

In connection with sales of the Series A-2 WaMu Cayman Preferred Securities outside the United States, the Initial Purchasers have agreed that they will not offer, sell or deliver the securities to, or for the account or benefit of, "U.S. persons" within the meaning of Rule 902 of Regulation S under the Securities Act (i) as part of the Initial Purchasers' distribution at any time or (ii) otherwise until 40 days after the later of the commencement of the Offering or the date the securities were originally issued. The Initial Purchasers will send to each dealer to whom they

sell such Series A-2 WaMu Cayman Preferred Securities during such 40-day period a confirmation or other notice setting forth the restrictions on offers and sales of the securities within the United States or to, or for the account or benefit of, U.S. persons.

In addition, with respect to Series A-2 WaMu Cayman Preferred Securities initially sold pursuant to Regulation S, until 40 days after the period referred to above, an offer or sale of such securities within the United States by a dealer that is not participating in the Offering may violate the registration requirements of the Securities Act.

In connection with the Offering, the Initial Purchasers may purchase and sell securities in the open market. These transactions may include short sales, stabilizing transactions and purchases to cover positions created by short sales. Short sales involve the sale by the Initial Purchasers of a greater number of securities than they are required to purchase in the Offering. Stabilizing transactions consist of certain bids or purchases made for the purpose of preventing or retarding a decline in the market price of the securities while the Offering is in progress.

These activities by the Initial Purchasers may stabilize, maintain or otherwise affect the market price of the securities. As a result, the price of the securities may be higher than the price that otherwise might exist in the open market. If these activities are commenced, they may be discontinued by the Initial Purchasers at any time. These transactions may be effected in the over-the-counter market or otherwise.

Each of the underwriters has represented and agreed that:

- It has not made or will not make an offer of the securities being offered hereby to the public in the United Kingdom within the meaning of section 102B of the Financial Services and Markets Act 2000 (as amended) ("FSMA") except to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities or otherwise in circumstances which do not require the publication by the company of a prospectus pursuant to the Prospectus Rules of the Financial Services Authority ("FSA");

- It has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of section 21 of FSMA) to persons who have professional experience in matters relating to investments falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 or in circumstances in which section 21 of FSMA does not apply to the company; and

- It has complied with, and will comply with all applicable provisions of FSMA with respect to anything done by it in relation to the shares in, from or otherwise involving the United Kingdom.

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), each Initial Purchaser has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of the securities being offered hereby to the public in that Relevant Member State prior to the publication of a prospectus in relation to the securities which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of securities to the public in that Relevant Member State at any time:

- to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

- to any legal entity which has two or more of (i) an average of at least 250 employees during the last financial year; (ii) a total balance sheet of more than €43,000,000; and (iii) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

- in any other circumstances which do not require the publication by the Company of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of securities to the public" in relation to any securities in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the securities to be offered so as to enable an investor to decide to purchase or subscribe the securities, as the same may be varied in that Relevant Member State by any measure implementing the Prospectus Directive in that Relevant Member State and the expression Prospectus Directive means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

The securities offered hereby may not be offered or sold by means of any document other than to persons whose ordinary business is to buy or sell shares or debentures, whether as principal or agent, or in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32) of Hong Kong, and no advertisement, invitation or document relating to the shares may be issued, whether in Hong Kong or elsewhere, which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to securities which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571) of Hong Kong and any rules made thereunder.

This offering circular has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this offering circular and any other document or material in connection with the offer or sale, or invitation for subscription or purchase of the securities may not be circulated or distributed, nor may the securities be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA or, (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the securities offered hereby are subscribed or purchased under Section 275 by a relevant person which is: (i) a corporation (which is not an accredited investor) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or (ii) a trust (where the Trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor, shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest in that trust will not be transferable for 6 months after that corporation or that trust has acquired the shares under Section 275 except: (A) to an institutional investor under Section 274 of the SFA or to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA; (B) where no consideration is given for the transfer; or (C) by operation of law.

The securities offered hereby have not been and will not be registered under the Securities and Exchange Law of Japan (the "Japan Securities and Exchange Law") and each underwriter has agreed that it will not offer or sell any securities, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organized under the laws of Japan), or to others for re-offering or resale, directly or indirectly, in Japan or to a resident of Japan, except pursuant

114

to an exemption from the registration requirements of, and otherwise in compliance with, the Securities and Exchange Law and any other applicable laws, regulations and ministerial guidelines of Japan.

WMI and the Company have agreed in the purchase agreement, subject to certain exceptions, that for a period of 180 days after the date of this offering circular, neither they, nor any of their subsidiaries or other affiliates over which they exercise management or voting control, nor any person acting on their behalf will, without the prior written consent of Goldman, Sachs & Co., offer, sell, contract to sell or otherwise dispose of any securities that are substantially similar to the securities.

WMI, the Company and WaMu Cayman have agreed to indemnify the Initial Purchasers against certain liabilities, including liabilities under the Securities Act.

Certain of the Initial Purchasers and their respective affiliates have, from time to time, performed, and may in the future perform, various financial advisory and investment banking services for the company, for which they received or will receive customary fees and expenses.

## VALIDITY OF SECURITIES

The validity of the WaMu Cayman Preferred Securities will be passed upon for WMI and the Initial Purchasers by Maples and Calder, George Town, Grand Cayman. The validity of the Fixed Rate Company Preferred Securities will be passed upon for the Company by Richards, Layton & Finger, P.A., special Delaware counsel for the Company, for WMI by Mayer, Brown, Rowe & Maw LLP, New York, New York, and for the Initial Purchasers by Sullivan & Cromwell LLP, New York, New York. The validity of the Fixed Rate Depositary Shares and of the Fixed Rate WMI Preferred Stock will be passed upon for WMI by Heller Ehrman LLP, Seattle, Washington, and by Mayer, Brown, Rowe & Maw LLP, and for the Initial Purchasers by Sullivan & Cromwell LLP. Mayer, Brown, Rowe & Maw LLP and Sullivan & Cromwell LLP will rely upon the opinion of Richards, Layton & Finger, P.A., as to matters of Delaware law, and upon the opinion of Heller Ehrman LLP as to matters of Washington law.

# GENERAL INFORMATION

## Listing

Application will be made to list the Series A-2 WaMu Cayman Preferred Securities offered hereby to non-U.S. persons in reliance on an exemption from registration pursuant to Regulation S, on the Euro MTF market of the Luxembourg Stock Exchange, in accordance with the rules thereof. The Series A- t WaMu Cayman Preferred Securities will not be listed on any securities exchange or automated dealer quotation system. Prior to such listing, a legal notice relating to the issue of the Series A-2 WaMu Cayman Preferred Securities will be filed with the Chief Registrar of the District Court of Luxembourg *(Greffier en Chef du Tribunal d'Arrondissement de et à Luxembourg)* where such legal notice will be available for inspection free of charge and where copies of such documents will be obtainable upon request.

Upon such listing, the Series A-2 WaMu Cayman Preferred Securities will be freely transferable on the Euro MTF Market of the Luxembourg Stock Exchange. Once executed, transactions carried out on the Euro MTF Market may not be cancelled.

## Authorization

The issuance of the Series A-2 WaMu Cayman Preferred Securities was authorized by WaMu Cayman's Board of Directors on February 23, 2006. The issuance of the Fixed Rate Company Preferred Securities was authorized by the Company's Board of Managers on February 23, 2006. The issuance of the Fixed Rate WMI Preferred Stock was authorized by WMI's Board of Directors on January t7, 2006 and February 2t, 2006.

## Independent Accountants

The independent registered public accountants of the Company will be Deloitte & Touche LLP. WaMu Cayman will engage a nationally recognized accounting firm to act as its independent registered public accountant. Deloitte & Touche LLP are also the independent registered public accountants for WMI and WMB.

## Documents

Copies of the LLC Agreement and WaMu Cayman's Articles of Association will, so long as any Series A-2 WaMu Cayman Preferred Securities are outstanding, be available free of charge for inspection during usual business hours at the specified office of the Paying Agent in Luxembourg.

For so long as the Series A-2 WaMu Cayman Preferred Securities are listed on the Euro MTF Market of the Luxembourg Stock Exchange, a copy of WMI's Restated Articles of Incorporation, as amended, and Restated Bylaws, as amended, will be available for inspection at the specified office of the Paying Agent in Luxembourg.

For so long as the Series A-2 WaMu Cayman Preferred Securities are listed on the Euro MTF Market of the Luxembourg Stock Exchange, copies of the audited annual consolidated financial statements and the unaudited consolidated interim financial statements for the quarters ending March 3t, June 30 and September 30 of WMI, of WaMu Cayman and the Company will be available, free of charge, at the specified office of the Paying Agent in Luxembourg.

## No Material Adverse Change

Except as disclosed in this offering circular, there has been no adverse change in the financial position of the Company, WaMu Cayman, WMB or WMI since December 3t, 2005, or their respective dates of establishment (which was February 3, 2006 in the case of the Company

and February 23, 2006 in the case of WaMu Cayman), that would be deemed material in the context of the issue and sale of the WaMu Cayman Preferred Securities in this Offering.

Legal Proceedings

Neither the Company nor WaMu Cayman are involved in any litigation, arbitration or administrative proceeding relating to claims or amounts that are material in the context of the issue and sale of the WaMu Cayman Preferred Securities or the Fixed Rate Company Preferred Securities to which the Company or WaMu Cayman are a party, nor to the best of the Company's or WaMu Cayman's knowledge, is there any threatened litigation, arbitration or administrative proceedings relating to claims or amounts that are material in the context of the issue and sale of the WaMu Cayman Preferred Securities or the Fixed Rate Company Preferred Securities that would in either case jeopardize the Company's or WaMu Cayman's ability to discharge the Company's or WaMu Cayman's respective obligations in respect of the issue and sale of the WaMu Cayman Preferred Securities or the Fixed Rate Company Preferred Securities.

Neither the Company nor the Asset Trust is the subject of any litigation. None of the Company, WMI or WMB is currently involved in or, to WMB's knowledge, currently threatened with, any material litigation with respect to the assets included in the Asset Trust's portfolio, other than routine litigation arising in the ordinary course of business. Based on information currently available, advice of counsel, available insurance coverage and established reserves, WMB believes that the eventual outcome of the actions with respect to the assets included in the Asset Trust's portfolio will not, in the aggregate, have a material adverse effect on the Company's consolidated financial position or results of operations. However, in the event of unexpected future developments, it is possible that the ultimate resolution of those matters, if unfavorable, may be material to the Company's results of operations for any particular period.

WMB, the Company, the Asset Trust, WaMu Cayman and WaMu Delaware have not been named as defendants in any of the following lawsuits and, on that basis they do not expect such lawsuits to materially affect their respective operations or financial results.

*South Ferry L.P. #2 v. Killinger et al., No. CV04-1599C (W.D. Wa., Filed Jul. 19, 2004) (the "Securities Action").* This class action lawsuit is currently pending against WMI and certain of its senior executives in the U.S. District Court, Western Division of Washington. On behalf of a putative class of purchasers of WMI securities from April 15, 2003 through June 28, 2004, lead plaintiffs allege that in various public statements the defendants purportedly made misrepresentations and failed to disclose material facts concerning, among other things, alleged internal systems problems and hedging issues.

The defendants moved to dismiss the Securities Action on May 17, 2005. After briefing, but without oral argument, the Court on November 17, 2005 denied the motion in principal part; however, the Court dismissed the claims against certain of the individual defendants, dismissed claims pleaded on behalf of sellers of put options on WMI stock, and concluded that the plaintiffs could not rely on supposed violations of generally accepted accounting principles to support their claims. The remaining defendants subsequently moved for reconsideration or, in the alternative, certification of the opinion for interlocutory appeal to the United States Court of Appeals for the Ninth Circuit. The District Court denied the motion for reconsideration, but the motion for certification remains pending.

*Lee Family Investments, by and through its Trustee W.B. Lee, Derivatively and on behalf of Nominal Defendant Washington Mutual, Inc. v. Killinger et al, No. CV05-2121C (W.D. Wa., Filed Nov. 29, 2005) (the "Derivative Action").* On November 29, 2005, 12 days after the Court denied the motion to dismiss the Securities Action, a separate plaintiff filed in Washington State Superior Court a derivative shareholder lawsuit purportedly asserting claims for the benefit of WMI. The defendants include those individuals remaining as defendants in the Securities Action, as well as those of WMI's current independent directors who were directors at any time from April 15, 2003

through June 2004. The allegations in the Derivative Action mirror those in the Securities Action, but seek relief based on claims that the independent director defendants failed to take action to respond to the misrepresentations alleged in the Securities Action and that the filing of that action has caused WMI to expend sums to defend itself and the individual defendants and to conduct internal investigations related to the underlying claims. The defendants have not yet responded to the complaint in the Derivative Action.

## Governing Law

The LLC Agreement and the Fixed Rate Company Preferred Securities will be governed by, and construed in accordance with, the laws of the State of Delaware. WaMu Cayman's Articles of Association and the WaMu Cayman Preferred Securities will be governed by, and construed in accordance with, the laws of the Cayman Islands. The Fixed Rate WMI Preferred Stock will be governed by and construed in accordance with the laws of the State of Washington. The Fixed Rate Depositary Shares will be governed by, and construed in accordance with, the laws of the State of New York.

**WMI**
Washington Mutual, Inc.
1201 Third Avenue
Seattle, WA 98101

**WMB**
Washington Mutual Bank
1201 Third Avenue
Seattle, WA 98101

**WAMU CAYMAN**
Washington Mutual Preferred
Funding (Cayman) I Ltd.
c/o M&C Corporate Services
Limited
P.O. Box 309GT
Ugland House, South Church Street
George Town, Grand Cayman,
Cayman Islands

**THE COMPANY**
Washington Mutual Preferred
Funding LLC
1201 Third Avenue
Seattle, WA 98101

**SOLE GLOBAL COORDINATOR AND SOLE STRUCTURING COORDINATOR**
Goldman, Sachs & Co.
85 Broad Street
New York, NY 10004

**LEGAL ADVISORS TO INITIAL PURCHASERS**
*As to U.S. Federal and New York law:*
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004-2498

**LEGAL ADVISORS TO WMI, WMB AND THE COMPANY**
*As to U.S. Federal and New York law:*
Mayer, Brown, Rowe & Maw LLP
1675 Broadway
New York, NY 10019

*As to Washington law:*
Heller Ehrman LLP
701 Fifth Avenue, Suite 6100
Seattle, WA 98104-7098

**SPECIAL LEGAL ADVISORS TO WASHINGTON MUTUAL PREFERRED FUNDING (CAYMAN) I LTD**

*As to Delaware law:*
Richards, Layton & Finger, P.A
One Rodney Square
Wilmington, DE 19801

*As to Cayman Islands law:*
Maples and Calder
P.O. Box 309GT
Ugland House, South Church Street
George Town, Grand Cayman
Cayman Islands

**REGISTRAR, TRANSFER AGENT AND PAYING AGENT**
Wilmington Trust (Cayman), Ltd.
4th Floor, Century Yard
Cricket Square, Elgin Avenue
George Town, Grand Cayman
Cayman Islands

**LUXEMBOURG LISTING AGENT AND PAYING AGENT**
JPMorgan Bank Luxembourg S.A.
6, route de Treves
L-2633 Senningerberg

**DEPOSITORY**
Mellon Investor Services LLC
480 Washington Blvd.
Jersey City, NJ 07310

**TRUSTEE**
Deutsche Bank National Trust Company
1761 East Saint Andrew Place
Santa Ana, CA 92705

**DELAWARE TRUSTEE**
Deutsche Bank Trust Company Delaware
1011 Centre Road, Suite 200
Wilmington, DE 19805

# INDEX OF TERMS

3(c)(7) Representations . . . .   vi
Additional Amounts . . . . . . . . .   82
Additional Assets . . . . . . . . . . .   43
Additional Tax Event . . . . . . . .   82
Additional Taxes . . . . . . . . . . . .   82
Administration Agreement . . .   38
Administrative Services
   Agreement . . . . . . . . . . . . . . .   46
Administrator . . . . . . . . . . . . . . .   38
Advanced Consumer Lending
   System or ACLS . . . . . . . . . .   59
alternative services . . . . . . . . . .   56
Asset Documentation . . . . . . . .   44
Asset Portfolio . . . . . . . . . . . . . .   45
Asset Subsidiary . . . . . . . . . . . .   44
Asset Tax Opinion . . . . . . . . . .   45
Asset Trust . . . . . . . . . . . . . . . . .   i, 50
AVM . . . . . . . . . . . . . . . . . . . . . .   56
back-end ratio . . . . . . . . . . . . . .   55
Bankruptcy Event . . . . . . . . . . .   48
Benefit Plan Investor . . . . . . . .   iii, 110
Business Combination . . . . . . .   90
Business Day . . . . . . . . . . . . . . .   65, 76, 86
CACS . . . . . . . . . . . . . . . . . . . . .   59
Cayman Trust . . . . . . . . . . . . . .   37
Class A Asset Trust
   Certificate . . . . . . . . . . . . . . .   51
Class R Asset Trust
   Certificate . . . . . . . . . . . . . . .   51
Clearstream . . . . . . . . . . . . . . . .   100
Clearstream International . . . .   100
Clearstream Participants . . . . .   100
Code . . . . . . . . . . . . . . . . . . . . . .   iii, 110
Code of Ethics . . . . . . . . . . . . . .   57
Companies Law . . . . . . . . . . . .   37
Company . . . . . . . . . . . . . . . . . .   cover, 1, 41
Company Common
   Securities . . . . . . . . . . . . . . .   4, 41
Company Designated
   Directors . . . . . . . . . . . . . . . .   39
Company Preferred
   Securities . . . . . . . . . . . . . . .   2, 41
Company's Portfolio . . . . . . . . .   27
Comparable Treasury Issue . .   78
Comparable Treasury Price . .   78
Conditional Exchange . . . . . . .   71
core capital . . . . . . . . . . . . . . . .   33
Covered Debt . . . . . . . . . . . . . . .   68
Credit Score . . . . . . . . . . . . . . . .   53
Custodian . . . . . . . . . . . . . . . . . .   62
Custody Agreement . . . . . . . . .   62
Cut-Off Date . . . . . . . . . . . . . . . .   51
debt-to-income ratio . . . . . . . . .   55

Declaration of Trust . . . . . . . . .   37
Delaware Trustee . . . . . . . . . . .   5, 50
Deposit Agreement . . . . . . . . . .   92
Depositary . . . . . . . . . . . . . . . . .   71
Derivative Action . . . . . . . . . . . .   118
Dividend Payment Date . . . . . .   cover, 65, 76, 86
Dividend Period . . . . . . . . . . . . .   65, 76, 86
DTC . . . . . . . . . . . . . . . . . . . . . . .   97
DTC Participants . . . . . . . . . . . .   vi, 98
DWAC . . . . . . . . . . . . . . . . . . . . .   102
Eligible Assets . . . . . . . . . . . . . .   43
Eligible Investments . . . . . . . . .   45
employee benefit plan . . . . . . .   iii
ERISA . . . . . . . . . . . . . . . . . . . . .   iii, 110
Euroclear . . . . . . . . . . . . . . . . . . .   100
Euroclear Operator . . . . . . . . . .   100
Euroclear Participants . . . . . . .   100
Euroclear Terms and
   Conditions . . . . . . . . . . . . . . .   100
Exchange Agreement . . . . . . . .   71
Exchange Event . . . . . . . . . . . .   11, 70
Expenses Agreement . . . . . . . .   38
FDIC . . . . . . . . . . . . . . . . . . . . . .   xiv, 63
Federal Reserve . . . . . . . . . . . .   63
FFO . . . . . . . . . . . . . . . . . . . . . . .   11, 76
Fitch . . . . . . . . . . . . . . . . . . . . . . .   111
Fixed Rate Company
   Preferred Securities . . . . . . .   cover, 1, 37, 75
Fixed Rate Depositary
   Shares . . . . . . . . . . . . . . . . . .   11, 86, 92
Fixed Rate Substitute
   Preferred Stock . . . . . . . . . . .   91
Fixed Rate Successor
   Depositary Share . . . . . . . . .   91
Fixed Rate WMI Preferred
   Stock . . . . . . . . . . . . . . . . . . . .   2, 86
Fixed-to-Floating Rate
   Company Preferred
   Securities . . . . . . . . . . . . . . .   1, 41
Fixed-to-Floating Rate
   Depositary Shares . . . . . . . .   95
Fixed-to-Floating Rate
   Substitute Preferred
   Stock . . . . . . . . . . . . . . . . . . . .   91
Fixed-to-Floating Rate
   Successor Depositary
   Share . . . . . . . . . . . . . . . . . . . .   91
Fixed-to-Floating Rate WMI
   Preferred Stock . . . . . . . . . . .   95
Foreign Holder . . . . . . . . . . . . . .   104
FSA . . . . . . . . . . . . . . . . . . . . . . .   113
FSMA . . . . . . . . . . . . . . . . . . . . .   113
GAAP . . . . . . . . . . . . . . . . . . . . .   xiv, 40

| | | | |
|---|---|---|---|
| Global Securities . . . . . . . . . . . | 97 | REMIC . . . . . . . . . . . . . . . . . . . . | 5, 105 |
| HELs . . . . . . . . . . . . . . . . . . . . . | 5 | Reminder Notice . . . . . . . . . . . . | vi |
| Independent Director . . . . . . . . | 39 | Replacement Capital | |
| Independent Investment | | Covenant . . . . . . . . . . . . . . . . . | 9, 68 |
| Banker . . . . . . . . . . . . . . . . . . | 78 | Replacement Covenant | |
| Independent Manager . . . . . . . | 5, 46 | Covered Securities . . . . . . . . | 68 |
| Indirect Participants . . . . . . . . . | 98 | Restricted Period . . . . . . . . . . | 97 |
| Investment Company Act . . . . | cover, xi, 1 | Rule 144A Global Security . . . | 97 |
| Investment Company Act | | Rule 144A Offering . . . . . . . . . | 96 |
| Event . . . . . . . . . . . . . . . . . . . | 78 | S&P . . . . . . . . . . . . . . . . . . . . . | 111 |
| IRS . . . . . . . . . . . . . . . . . . . . . . | 103 | SEC . . . . . . . . . . . . . . . . . . . . . | xiii |
| Japan Securities and | | Section 3(c)(7) . . . . . . . . . . . | x |
| Exchange Law . . . . . . . . . . . . | 114 | Securities Act . . . . . . . . . . . . . . | cover, xi, 1 |
| Junior Equity Securities . . . . . | 77 | Securities Action . . . . . . . . . . . | 118 |
| like amount . . . . . . . . . . . . . . . . | 2 | Senior Equity Securities . . . . . | 13 |
| LLC Act . . . . . . . . . . . . . . . . . . . | 41 | Series A-1 WaMu Cayman | |
| LLC Agreement . . . . . . . . . . . . . | 41 | Preferred Securities . . . . . . . | cover, 1, 37, 65 |
| Loan Documents . . . . . . . . . . . . | 62 | Series A-2 WaMu Cayman | |
| Marion . . . . . . . . . . . . . . . . . . . . | 23 | Preferred Securities . . . . . . . | cover, 1, 37, 65 |
| Moody's . . . . . . . . . . . . . . . . . . . | 111 | Servicer . . . . . . . . . . . . . . . . . . . | 50 |
| New Assets . . . . . . . . . . . . . . . . | 75 | Servicer Indemnified Parties | 60 |
| Nominee . . . . . . . . . . . . . . . . . . . | 72, 97 | SFA . . . . . . . . . . . . . . . . . . . . . . | 114 |
| Offering . . . . . . . . . . . . . . . . . . . | 2 | Share Trustee . . . . . . . . . . . . . . | 37 |
| OTS . . . . . . . . . . . . . . . . . . . . . . | cover, 2, 32 | SUCCESS . . . . . . . . . . . . . . . . . | 56 |
| Parity Equity Securities . . . . . . | 75 | Successor Entity . . . . . . . . . . . . | 91 |
| Paying Agent in Luxembourg . . | 37, 73 | supplementary capital . . . . . . . | 33 |
| Paying Agent(s) . . . . . . . . . . . . | 73 | Tax Event . . . . . . . . . . . . . . . . . | 79 |
| Permitted Investments . . . . . . . | 45 | Tax-Exempt U.S. Holder . . . . . | 107 |
| PFIC . . . . . . . . . . . . . . . . . . . . . . | 16, 106 | Thrift Financial Report(s) . . . | xiv |
| plan . . . . . . . . . . . . . . . . . . . . . . | iii | total capital . . . . . . . . . . . . . . . . | 33 |
| Plan . . . . . . . . . . . . . . . . . . . . . . | 110 | Transfer Agent . . . . . . . . . . . . . | 73 |
| plan assets . . . . . . . . . . . . . . . . | iii | Treasury Rate . . . . . . . . . . . . . . | 79 |
| Pooling and Servicing | | Trust Securities . . . . . . . . . . . . . | 1 |
| Agreement . . . . . . . . . . . . . . . | 5 | Trustee . . . . . . . . . . . . . . . . . . . . | 50 |
| Primary Treasury Dealer . . . . . | 78 | UBTI . . . . . . . . . . . . . . . . . . . . . . | 107 |
| Principal Paying Agent . . . . . . | 72 | University Street . . . . . . . . . . . . | i, 4, 41 |
| QEF . . . . . . . . . . . . . . . . . . . . . . | 106 | U.S. Holder . . . . . . . . . . . . . . . . | 104 |
| qualified institutional | | Voting Parity Stock . . . . . . . . . . | 89 |
| buyer(s) . . . . . . . . . . . . . . . . . | iii, 1 | WaMu Cayman . . . . . . . . . . . . . | cover, 1, 37 |
| qualified purchaser(s) . . . . . . | iii, 1 | WaMu Cayman Ordinary | |
| Qualifying Interests . . . . . . . . . . | 25 | Shares . . . . . . . . . . . . . . . . . . | 4, 37 |
| Rating Agencies . . . . . . . . . . . . | 46 | WaMu Cayman Preferred | |
| Rating Agency Condition . . . . | 46 | Securities . . . . . . . . . . . . . . . | cover, 1, 37 |
| Reference Treasury Dealer . . | 78 | WaMu Cayman's Articles of | |
| Reference Treasury Dealer | | Association . . . . . . . . . . . . . . . | vi, 10, 37 |
| Quotations . . . . . . . . . . . . . . . | 78 | WaMu Delaware . . . . . . . . . . . . | i, 1 |
| Registrar . . . . . . . . . . . . . . . . . . . | 73 | WMB . . . . . . . . . . . . . . . . . . . . . | i, 1, 32 |
| Regulation . . . . . . . . . . . . . . . . . | 110 | WMI . . . . . . . . . . . . . . . . . . . . . . | cover, 1 |
| Regulation S Global Security . . | 97 | WMI Group . . . . . . . . . . . . . . . . . | 1 |
| Regulation S Offering . . . . . . . | 96 | WMI's Board of Directors . . . . | 31 |
| Regulatory Capital Event . . . . | 79 | WMI Parity Stock . . . . . . . . . . . | 86 |
| Relevant Implementation Date | 113 | WTC Cayman . . . . . . . . . . . . . . . | 73 |
| Relevant Member State . . . . . . | 113 | | |

No dealer, salesperson or other person is authorized to give any information or to represent anything not contained in this offering circular. You must not rely on any unauthorized information or representations. This offering circular is an offer to sell only the notes offered hereby, but only under circumstances and in jurisdictions where it is lawful to do so. The information contained in this offering circular is current only as of its date.

TABLE OF CONTENTS

| | Page |
|---|---|
| Notice to Investors | iii |
| Special Note Regarding Forward-Looking Statements | xii |
| Where You Can Find More Information | xiii |
| Enforcement of Civil Liabilities | xiv |
| Index of Terms | xiv |
| Offering Circular Summary | 1 |
| Risk Factors | 18 |
| Certain Information Concerning WMB | 32 |
| Use of Proceeds | 36 |
| WaMu Cayman | 37 |
| The Company | 41 |
| The Asset Trust | 50 |
| WMI | 63 |
| Certain Relationships and Related Party Transactions | 64 |
| Description of the WaMu Cayman Preferred Securities | 65 |
| Description of the Fixed Rate Company Preferred Securities | 75 |
| Description of Other Company Securities | 84 |
| Description of the Fixed Rate WMI Preferred Stock | 86 |
| Description of the Fixed Rate Depositary Shares | 92 |
| Description of the Other WMI Capital Stock | 95 |
| Book-Entry Issuance | 96 |
| Certain Tax Considerations | 103 |
| ERISA Considerations | 110 |
| Ratings | 111 |
| Plan of Distribution | 112 |
| Validity of Securities | 116 |
| General Information | 117 |
| Index of Terms | 123 |

$750,000,000

# Washington Mutual Preferred Funding (Cayman) I Ltd.

7.25% Perpetual Non-cumulative Preferred Securities Automatically Exchangeable in Specified Circumstances into Depositary Shares representing Preferred Stock of Washington Mutual, Inc.



## Washington Mutual

## Goldman, Sachs & Co.
*Sole Global Coordinator and Sole Structuring Coordinator*

### Citigroup

### Credit Suisse

### HSBC

### Morgan Stanley
*Senior Co-Manager*

### UBS Investment Bank