# EXHIBIT B

CONFIDENTIAL



# Washington Mutual

$1,250,000,000

# Washington Mutual Preferred Funding Trust I

Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities
Automatically Exchangeable in Specified Circumstances into
Depositary Shares representing Preferred Stock of Washington Mutual, Inc.

The Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities, liquidation preference $100,000 per security (the "*Trust Securities*"), of Washington Mutual Preferred Funding Trust I, a Delaware statutory trust ("*WaMu Delaware*"), offered hereby represent undivided beneficial ownership interests in a like amount of Fixed-to-Floating Rate Perpetual Non-cumulative Preferred Securities, liquidation preference $1,000 per security (the "*Fixed-to-Floating Rate Company Preferred Securities*"), of Washington Mutual Preferred Funding LLC, a Delaware limited liability company (the "*Company*"). WaMu Delaware will have no assets other than the Fixed-to-Floating Rate Company Preferred Securities. WaMu Delaware will pass through dividends paid and redemption and liquidation payments made by the Company on the Fixed-to-Floating Rate Company Preferred Securities as distributions and redemption and liquidation payments on the Trust Securities. The Company's initial material assets will consist of indirect interests in mortgages and mortgage-related assets originated by Washington Mutual Bank as described herein.

Dividends on the Fixed-to-Floating Rate Company Preferred Securities will be payable if, when and as declared by the Company's Board of Managers out of legally available funds, on a non-cumulative basis at an annual rate of 6.534% until March 15, 2011 and 3-month USD LIBOR plus 1.4825% thereafter on the liquidation preference per security, quarterly in arrears on March 15, June 15, September 15 and December 15 of each year, commencing on June 15, 2006, or the next Business Day if any such day is not a Business Day (each, a "*Dividend Payment Date*").

If the Office of Thrift Supervision (together with any successor regulator, the "*OTS*") so directs following the occurrence of an Exchange Event as described herein, each Trust Security will be automatically exchanged for depositary shares representing a like amount of Washington Mutual, Inc.'s ("*WMI*") Series I Perpetual Non-cumulative Fixed-to-Floating Rate Preferred Stock.

The Fixed-to-Floating Rate Company Preferred Securities will not be redeemable at the option of the Company prior to the Dividend Payment Date in March 2011, except upon the occurrence of a Tax Event, an Investment Company Act Event or a Regulatory Capital Event (each as described herein). Upon the occurrence of a Tax Event, an Investment Company Act Event or a Regulatory Capital Event, the Company may redeem the Fixed-to-Floating Rate Company Preferred Securities in whole but not in part. On or after the Dividend Payment Date in March 2011, the Company may redeem the Fixed-to-Floating Rate Company Preferred Securities in whole or in part. Any redemption will be subject to the prior approval of the OTS and will be at a redemption price equal to the liquidation preference per Fixed-to-Floating Rate Company Preferred Security, *plus* declared but unpaid dividends, if any, *plus* a U.S. Treasury-based "make whole" amount if the redemption occurs prior to the Dividend Payment Date in March 2011.

The Trust Securities will be issued only in book-entry form. Each individual purchaser or group of affiliated purchasers that acquires Trust Securities in the initial offering must acquire at least three Trust Securities having an aggregate liquidation preference of $300,000.

The Trust Securities will not be listed on any securities exchange or automated dealer quotation system.

**The securities offered hereby are not insured or guaranteed by the U.S. Federal Deposit Insurance Corporation.**

*See "Risk Factors" beginning on page 17 for a description of the risk factors you should consider before you invest in the securities offered hereby.*

### Offering price: $100,000.00 per Trust Security

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*") AND ARE BEING OFFERED AND SOLD ONLY TO PERSONS THAT ARE BOTH "QUALIFIED INSTITUTIONAL BUYERS" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) AND "QUALIFIED PURCHASERS" (WITHIN THE MEANING OF SECTION 2(a)(51) OF THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "*INVESTMENT COMPANY ACT*")) IN RELIANCE ON AN EXEMPTION FROM REGISTRATION PURSUANT TO RULE 144A. PROSPECTIVE PURCHASERS OF TRUST SECURITIES ARE HEREBY NOTIFIED THAT THE SELLER OF THE TRUST SECURITIES MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A. THE SECURITIES ARE NOT TRANSFERABLE EXCEPT IN ACCORDANCE WITH THE RESTRICTIONS DESCRIBED UNDER "NOTICE TO INVESTORS."

The Initial Purchasers expect to deliver the Trust Securities through the facilities of The Depository Trust Company and Euroclear Bank S.A./N.V., as operator of the Euroclear System, and Clearstream Banking, société anonyme, as participants in The Depository Trust Company, in each case, against payment in New York, New York on or about March 7, 2006.

| Goldman, Sachs & Co. | Credit Suisse | Morgan Stanley |
|---|---|---|
| *Sole Global Coordinator,*<br>*Sole Structuring Coordinator and*<br>*Joint Bookrunner* | *Joint Bookrunner* | *Joint Bookrunner* |

Offering Circular dated February 24, 2006.

*This offering circular is confidential. You are authorized to use this offering circular solely for the purpose of considering the purchase of the securities described in the offering circular. WMI, Washington Mutual Bank ("WMB"), University Street, Inc. ("University Street"), the Company, WaMu Delaware, Washington Mutual Home Equity Trust I (the "Asset Trust"), Washington Mutual Preferred Funding (Cayman) I Ltd. ("WaMu Cayman") and other sources identified herein have provided the information contained in this offering circular. The Initial Purchasers named herein make no representation or warranty, express or implied, as to the accuracy or completeness of such information, and nothing contained in this offering circular is, or shall be relied upon as, a promise or representation by the Initial Purchasers. You may not reproduce or distribute this offering circular, in whole or in part, and you may not disclose any of the contents of this offering circular or use any information herein for any purpose other than considering the purchase of the notes. You agree to the foregoing by accepting delivery of this offering circular.*

---

**THE SECURITIES OFFERED HEREBY HAVE NOT BEEN RECOMMENDED BY ANY UNITED STATES FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

The distribution of this offering circular and the offering and sale of the securities offered hereby in certain jurisdictions may be restricted by law. WMI, WMB, University Street, the Company, WaMu Delaware, the Asset Trust, WaMu Cayman and the Initial Purchasers require persons in whose possession this offering circular comes to inform themselves about and to observe any such restrictions. This offering circular does not constitute an offer of, or an invitation to purchase, any of the securities offered hereby in any jurisdiction in which such offer or invitation would be unlawful.

---

Notwithstanding anything herein to the contrary, each investor (and each employee, representative, or agent of any investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated herein and all materials of any kind (including opinions or other tax analyses) that are provided to the investors relating to such tax treatment and tax structure. However, any information relating to the United States Federal income tax treatment or tax structure will remain confidential (and the foregoing sentence will not apply) to the extent reasonably necessary to enable any person to comply with applicable securities laws. For this purpose, "tax treatment" means United States Federal or state income tax treatment, and "tax structure" means any facts relevant to the United States Federal or state income tax treatment of the transactions contemplated herein but does not include information relating to the identity of the issuer of the securities, the issuer of any assets underlying the securities, or any of their respective affiliates that are offering the securities.

No person has been authorized to give any information or to make any representations other than those contained in this offering circular, and, if given or made, such information or representations must not be relied upon as having been authorized by any of WMI, WMB, University Street, the Company, WaMu Delaware, WaMu Cayman or the Asset Trust. Neither the delivery of this offering circular nor any sale hereunder will create, under any circumstances, any implication that there has been no change in the affairs of WMI, WMB, the Company, WaMu Delaware, University Street, or the Asset Trust since the date hereof or that the information contained herein is correct as of any time subsequent to its date.

i

## NOTICE TO NEW HAMPSHIRE RESIDENTS ONLY

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE OF NEW HAMPSHIRE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

---

IN CONNECTION WITH THIS OFFERING, GOLDMAN, SACHS & CO. AND ITS AFFILIATES, ON BEHALF OF THE INITIAL PURCHASERS, MAY OVER-ALLOT OR EFFECT TRANSACTIONS WITH A VIEW TO SUPPORTING THE MARKET PRICE OF THE SECURITIES OFFERED HEREBY AT A LEVEL HIGHER THAN THAT WHICH MIGHT OTHERWISE PREVAIL FOR A LIMITED PERIOD OF TIME AFTER THE ISSUE DATE. HOWEVER, THERE MAY BE NO OBLIGATION ON GOLDMAN, SACHS & CO. TO DO THIS. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME, AND MUST BE BROUGHT TO AN END AFTER A LIMITED PERIOD.

## NOTICE TO INVESTORS

*Because of the following restrictions, purchasers are advised to consult legal counsel prior to making any offer, purchase, resale, pledge or other transfer of the securities offered hereby.*

### Representations of Purchasers

Each purchaser of Trust Securities (including the registered holders and beneficial owners of the Trust Securities as they exist from time to time, including as a result of transfers, in each case as of the time of purchase) will be deemed to have represented and agreed as follows:

(A) the purchaser (i) is a *"qualified institutional buyer"* within the meaning of Rule 144A of the Securities Act, (ii) is aware that the sale of the Trust Securities to it is being made in reliance on Rule 144A or another exemption from the registration requirements of the Securities Act and (iii) is acquiring such Trust Securities for its own account or the account of one or more qualified institutional buyers;

(B) the purchaser (i) is a *"qualified purchaser"* within the meaning of Section 2(a)(51) of the Investment Company Act and the rules and regulations thereunder, (ii) is aware that WaMu Delaware will not be registered under the Investment Company Act in reliance on the exemption set forth in Section 3(c)(7) thereof and that the Trust Securities have not been and will not be registered under the Securities Act and (iii) is acquiring such Trust Securities for its own account or the account of one or more qualified purchasers as to which the purchaser exercises sole investment discretion, as the case may be;

(C) either (i) the purchaser is not (A) an *"employee benefit plan"* as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended *("ERISA")*, whether or not subject to ERISA and including, without limitation, foreign or governmental plans (B) a *"plan"* within the meaning of Section 4975 of the Internal Revenue Code of 1986, as amended (the *"Code"*), or (c) any entity whose underlying assets include *"plan assets"* of any of the foregoing by reason of investment by an employee benefit plan or other plan in such entity (each of the foregoing, a *"Benefit Plan Investor"*), or (ii) the purchaser is an insurance company general account that represents, warrants and covenants that, at the time of acquisition and throughout the period it holds the securities, (A) it is eligible for and meets the requirements of the Department of Labor Prohibited Transaction Class Exemption 95-60, (B) less than 25% of the assets of such general account are (or represent) assets of a Benefit Plan Investor and (C) it is not a person who has discretionary authority or control with respect to the assets of WaMu Delaware or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person and would not otherwise be excluded under 29 C.F.R. 2510.3-101(f)(1);

(D) the purchaser is not purchasing the Trust Securities with a view to the resale, distribution or other disposition thereof in violation of the Securities Act;

(E) neither the purchaser nor any account for which the purchaser is acquiring the Trust Securities will hold such Trust Securities for the benefit of any other person and the purchaser and each such account will be the sole beneficial owners thereof for all purposes and will not sell participation interests in the Trust Securities or enter into any other arrangement pursuant to which any other person will be entitled to an interest in the distributions on the Trust Securities;

(F) the certificates evidencing the Trust Securities will bear a legend to the following effect:

THIS SECURITY IS ONE OF THE FIXED-TO-FLOATING RATE PERPETUAL NON-CUMULATIVE TRUST SECURITIES ("TRUST SECURITIES") ISSUED BY WASHINGTON MUTUAL PREFERRED FUNDING TRUST I ("WAMU DELAWARE"). THE ISSUER OF THIS SECURITY HAS NOT BEEN REGISTERED AS AN INVESTMENT COMPANY UNDER THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"), AND THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND NEITHER THIS SECURITY NOR ANY BENEFICIAL INTERESTS HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT TO A PERSON WHO IS BOTH A "QUALIFIED INSTITUTIONAL BUYER" WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT ("QUALIFIED INSTITUTIONAL BUYER") AND A "QUALIFIED PURCHASER" WITHIN THE MEANING OF SECTION 2(a)(51) OF THE INVESTMENT COMPANY ACT AND THE RULES AND REGULATIONS THEREUNDER ("QUALIFIED PURCHASER") ACQUIRING FOR ITS OWN ACCOUNT OR THE ACCOUNT OF A PERSON WHO IS BOTH A QUALIFIED INSTITUTIONAL BUYER AND A QUALIFIED PURCHASER (AN "ELIGIBLE PURCHASER") AND EACH SUCH PERSON AND ACCOUNT FOR WHICH SUCH PERSON IS PURCHASING (A) IS NOT A BROKER-DEALER THAT OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN US$25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT ITS AFFILIATED PERSONS, (B) IS NOT A PLAN REFERRED TO IN PARAGRAPH (a)(1)(i)(D) OR (a)(1)(i)(E) OF RULE 144A, OR A TRUST FUND REFERRED TO IN PARAGRAPH (a)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF SUCH PLAN, (C) WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN WAMU DELAWARE, (D) WILL HOLD AT LEAST $300,000 LIQUIDATION PREFERENCE OF TRUST SECURITIES (i.e., AT LEAST THREE TRUST SECURITIES) AND TRANSFER AT LEAST $100,000 LIQUIDATION PREFERENCE OF TRUST SECURITIES (i.e., AT LEAST ONE TRUST SECURITY) IN THE CASE OF EACH INITIAL INVESTOR, AND WILL HOLD AND TRANSFER AT LEAST $100,000 LIQUIDATION PREFERENCE OF TRUST SECURITIES (i.e., AT LEAST ONE TRUST SECURITY) IN THE CASE OF EACH SUBSEQUENT INVESTOR AND (E) UNDERSTANDS THAT WAMU DELAWARE MAY RECEIVE A LIST OF PARTICIPANTS HOLDING POSITIONS IN THIS SECURITY FROM ONE OR MORE BOOK-ENTRY DEPOSITARIES. EACH PURCHASER OF THIS SECURITY OR ANY BENEFICIAL INTERESTS HEREIN WILL BE DEEMED TO REPRESENT THAT IT AGREES TO COMPLY WITH THE TRANSFER RESTRICTIONS SET FORTH HEREIN AND IN THE AMENDED AND RESTATED TRUST AGREEMENT OF WAMU DELAWARE (THE "TRUST AGREEMENT"), AND WILL NOT TRANSFER THIS SECURITY OR ANY BENEFICIAL INTERESTS HEREIN EXCEPT TO AN ELIGIBLE PURCHASER WHO CAN MAKE THE SAME REPRESENTATIONS AND AGREEMENTS ON BEHALF OF ITSELF AND EACH ACCOUNT FOR WHICH IT IS PURCHASING. ANY PURPORTED TRANSFER OF THIS SECURITY OR ANY BENEFICIAL INTERESTS HEREIN THAT IS IN BREACH, AT THE TIME MADE, OF ANY TRANSFER RESTRICTIONS SET FORTH HEREIN OR IN THE TRUST AGREEMENT WILL BE VOID AB INITIO. IF AT ANY TIME WAMU DELAWARE DETERMINES IN GOOD FAITH THAT A HOLDER OR BENEFICIAL OWNER OF THIS SECURITY OR BENEFICIAL INTERESTS HEREIN IS IN BREACH, AT THE TIME GIVEN, OF ANY OF THE TRANSFER RESTRICTIONS SET FORTH HEREIN, WAMU DELAWARE SHALL CONSIDER THE ACQUISITION OF THIS SECURITY OR SUCH BENEFICIAL INTERESTS VOID, OF NO FORCE AND EFFECT AND WILL NOT, AT THE DISCRETION OF WAMU DELAWARE, OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO WAMU DELAWARE, ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT (THE

"TRANSFER AGENT"), OR ANY OTHER INTERMEDIARY. IN ADDITION, WAMU DELA-WARE OR THE TRANSFER AGENT MAY REQUIRE SUCH ACQUIRER OR BENEFICIAL OWNER TO SELL THIS SECURITY OR SUCH BENEFICIAL INTERESTS TO AN ELIGIBLE PURCHASER.

NO SECURITY MAY BE PURCHASED OR TRANSFERRED TO: (I) AN "EMPLOYEE BENEFIT PLAN" AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), WHETHER OR NOT SUBJECT TO ERISA AND INCLUDING, WITHOUT LIMITATION, FOREIGN OR GOVERN-MENTAL PLANS, (II) A "PLAN" WITHIN THE MEANING OF SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), OR (III) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" OF ANY OF THE FOREGOING BY REASON OF INVESTMENT BY AN EMPLOYEE BENEFIT PLAN OR OTHER PLAN IN SUCH ENTITY (EACH OF THE FOREGOING, A "BENEFIT PLAN INVESTOR"), EXCEPT FOR AN INSURANCE COMPANY GENERAL ACCOUNT THAT REPRESENTS, WARRANTS AND COVENANTS THAT, AT THE TIME OF ACQUISITION AND THROUGHOUT THE PERIOD IT HOLDS THE SECURITIES, (I) IT IS ELIGIBLE FOR AND MEETS THE REQUIREMENTS OF THE DEPARTMENT OF LABOR PROHIBITED TRANSACTION CLASS EXEMPTION 95-60, (II) LESS THAN 25% OF THE ASSETS OF SUCH GENERAL ACCOUNT ARE (OR REPRESENT) ASSETS OF A BENEFIT PLAN INVESTOR AND (III) IT IS NOT A PERSON WHO HAS DISCRETIONARY AUTHORITY OR CONTROL WITH RESPECT TO THE ASSETS OF WAMU DELAWARE OR ANY PERSON WHO PROVIDES INVESTMENT ADVICE FOR A FEE (DIRECT OR INDIRECT) WITH RESPECT TO SUCH ASSETS, OR ANY AFFILIATE OF SUCH A PERSON AND WOULD NOT OTHERWISE BE EXCLUDED UNDER 29 C.F.R. 2510.3-101(F)(1).

UNLESS THIS SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO WAMU DELAWARE OR THE TRANSFER AGENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

    (G) the purchaser and each account for which it is purchasing:

        (i) is not a broker-dealer that owns and invests on a discretionary basis less than $25 million in securities of unaffiliated issuers;

        (ii) is not a participant-directed employee plan, such as a 401(k) plan, as referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan;

        (iii) was not formed for the purpose of investing in WaMu Delaware;

        (iv) will hold at least $300,000 liquidation preference of Trust Securities (*i.e.*, at least three Trust Securities) and transfer at least $100,000 liquidation preference of Trust Securities (*i.e.*, at least one Trust Security) in the case of each initial investor, and will hold and transfer at least $100,000 liquidation preference of Trust Securities (*i.e.*, at least one Trust Security) in the case of each subsequent investor;

        (v) will provide notice of the transfer restrictions described in this "Notice to Investors" to any subsequent transferees;

(vi) acknowledges that WaMu Delaware may receive a list of participants holding positions in the Trust Securities from one or more book-entry depositaries; and

(vii) may not transfer the Trust Securities or beneficial interests therein except to a transferee who can make the same representations and agreements as set forth in this "Notice to Investors" and Amended and Restated Trust Agreement of WaMu Delaware (the "Trust Agreement") on behalf of itself and each account for which it is purchasing.

The purchaser acknowledges that the Trust Securities are being offered only in a transaction not involving any public offering within the meaning of the Securities Act. The Trust Securities have not been and will not be registered under the Securities Act and WaMu Delaware has not been and will not be registered under the Investment Company Act, and, if in the future the purchaser decides to offer, resell, pledge or otherwise transfer the Trust Securities, such Trust Securities may be offered, resold, pledged or otherwise transferred only in accordance with the legend on such Trust Securities described above. The purchaser acknowledges that no representation is made by WaMu Delaware, the Company or the Initial Purchasers as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Trust Securities.

## Forced Sale of Securities

Any transfer of Trust Securities in breach of the transfer restrictions set forth in this "Notice to Investors" and the Trust Agreement will be of no force and effect, will be void *ab initio*, and will not operate to transfer any rights to the transferee, notwithstanding any instructions to the contrary to WaMu Delaware, its Transfer Agent or any other intermediary.

The purchaser agrees that in the event that WaMu Delaware or its Transfer Agent determines in good faith that a holder or beneficial owner of the Trust Securities is in breach, at the time given, of any of the representations or agreements set forth above, WaMu Delaware shall consider the acquisition of the Trust Securities or beneficial interests therein void, of no force and effect and will not, at the discretion of WaMu Delaware, operate to transfer any rights to the transferee notwithstanding any instructions to the contrary to WaMu Delaware, the Transfer Agent or any other intermediary. In addition, WaMu Delaware or the Transfer Agent may require such acquirer or beneficial owner to transfer such Trust Securities or beneficial interests therein to a transferee acceptable to WaMu Delaware who is able to and who does make all of the representations and agreements set forth in this "Notice to Investors". Pending such transfer, such holder will be deemed not to be the holder of such Trust Securities for any purpose, including but not limited to receipt of dividend and redemption payments on such Trust Securities or distributions upon the liquidation of WaMu Delaware, and such holder will be deemed to have no interest whatsoever in such Trust Securities except as otherwise required to redeem or sell its interest therein as described in this paragraph.

## Investment Company Act

In reliance on Section 3(c)(7) under the Investment Company Act ("Section 3(c)(7)"), WaMu Delaware has not registered as an investment company pursuant to the Investment Company Act. To rely on Section 3(c)(7), WaMu Delaware must have a "reasonable belief" that all purchasers of the Trust Securities (including the Initial Purchasers and subsequent transferees) are qualified purchasers at the time of their purchase of such securities. WaMu Delaware will establish a reasonable belief for purposes of Section 3(c)(7) based upon the representations deemed made by the purchasers of the securities as set forth under "— Representations of Purchasers", the covenants and undertakings of WaMu Delaware referred to below and the agreements of the Initial Purchasers relating to the private placement of the securities pursuant to Rule 144A referred to under "Plan of Distribution."

**Reminder Notices**

Whenever WaMu Delaware sends an annual report or other periodic report to holders of the Trust Securities, it will also send a reminder notice (each, a "*Reminder Notice*") to the holders of the Trust Securities. Each Reminder Notice will state that (i) each holder of a Trust Security (or an interest in a Trust Security) must be able to make the representations set forth above in paragraphs (B) and (G)(iv) under "— Representations of Purchasers" (the "*3(c)(7) Representations*"), (ii) the Trust Securities (or interests in the Trust Securities) are transferable only to purchasers deemed to have made the 3(c)(7) Representations and to have satisfied the other transfer restrictions applicable to the securities, (iii) if any prospective transferee of the Trust Securities (or an interest in the Trust Securities) is determined not to be a qualified purchaser, then WaMu Delaware will have the right (exercisable in its sole discretion) to refuse to honor such transaction, and (iv) if any security holder (or any holder of an interest in a security) is determined not to be a qualified purchaser, then WaMu Delaware will have the right (exercisable in its sole discretion) to treat the transfer to such purchaser as null and void and require such purchaser to sell all of its securities (and all interests therein) to a transferee designated by WaMu Delaware at the then current market price therefor. WaMu Delaware will send a copy of each annual or other periodic reports (and each Reminder Notice) to DTC with a request that participating organizations in DTC ("*DTC Participants*") forward them to the security holders or holders of an interest in Trust Securities.

**DTC Actions with respect to the Trust Securities**

WaMu Delaware will direct DTC to take the following steps in connection with the Trust Securities:

- to include the "3c7" marker and, in lieu of the "GABS" marker or otherwise, the "GRLS" marker in the DTC 20-character security descriptor, and the 48-character additional descriptor for the Trust Securities in order to indicate that sales are limited to Qualified Purchasers;

- to cause (i) each physical DTC delivery order ticket delivered by DTC to purchasers to contain the 20-character security descriptors and (ii) each DTC delivery order ticket delivered by DTC to purchasers in electronic form to contain the "3c7" and "GRLS" indicators and the related user manual for participants, which will contain a description of relevant restrictions;

- to send, on or prior to the closing date of this Offering, an "Important Notice" to all DTC Participants in connection with the Offering of the securities. WaMu Delaware may instruct DTC from time to time (but not more frequently than every six months) to reissue the "Important Notice";

- to include WaMu Delaware in DTC's "Reference Directory" of Section 3(c)(7) offerings;

- to include in all "confirms" of trades of the Trust Securities in DTC, CUSIP numbers with a "fixed field" attached to the CUSIP number that has the "3c7" and "GRLS" markers; and

- to deliver to WaMu Delaware from time to time a list of all DTC Participants holding an interest in the securities.

**Euroclear Actions with respect to the Trust Securities**

WaMu Delaware will instruct Euroclear Bank S.A./N.V., as operator of the Euroclear System ("*Euroclear*"), to take the following steps in connection with the Trust Securities:

- to reference "144A/3(c)(7)" as part of the security name in the Euroclear securities database;

- in each daily securities balances report and daily transactions report to Euroclear participants holding positions in the Trust Securities, to include "144A/3(c)(7)" in the securities name for the Trust Securities;

- periodically (and at least annually) to send to the Euroclear participants holding positions in the Trust Securities an electronic "Important Notice" outlining the restrictions applicable to 3(c)(7) securities;

- to deliver to WaMu Delaware from time to time, upon its request, a list of all Euroclear participants holding an interest in the Trust Securities; and

- to include the 3(c)(7) marker in the name of the Trust Securities in lists distributed by Euroclear monthly to its participants showing all securities accepted within the Euroclear securities' database.

**Clearstream Actions with respect to the Trust Securities**

WaMu Delaware will instruct Clearstream Banking, société anonyme ("*Clearstream*") to take the following steps in connection with the Trust Securities:

- to reference "144A/3(c)(7)" as part of the security name in the Clearstream securities database;

- in each daily portfolio report and daily settlement report to Clearstream participants holding positions in the Trust Securities, to include "144A/3(c)(7)" in the securities name for the Trust Securities;

- periodically (and at least annually) to send to the Clearstream participants holding positions in the Trust Securities an electronic "Important Notice" outlining the restrictions applicable to 3(c)(7) securities;

- to deliver to WaMu Delaware from time to time, upon its request, a list of all Clearstream participants holding an interest in the Trust Securities; and

- to include the 3(c)(7) marker in the name of the Trust Securities in the continuously updated list made available by Clearstream to its participants showing all securities accepted within the Clearstream securities' database and to include the 3(c)(7) marker in the name of the Trust Securities.

**Bloomberg Screens, etc.**

WaMu Delaware will from time to time request all third-party vendors to include on screens maintained by such vendors appropriate legends regarding Rule 144A and Section 3(c)(7) restrictions on the Trust Securities. Without limiting the foregoing, the Initial Purchasers will request that Bloomberg, L.P. include the following on each Bloomberg screen containing information about the securities as applicable:

- the bottom of the "Security Display" page describing the Trust Securities should state: "Iss'd under 144A/3c7" and "GRLS";

- the "Security Display" page should have a flashing red indicator stating "Additional Note Pg";

- such indicator for the Trust Securities should link to an "Additional Security Information" page, which should state that the Trust Securities "are being offered in reliance on the exception from registration under Rule 144A of the Securities Act of 1933, as amended (the "*Securities Act*") to persons that are (i) "qualified institutional buyers" as defined in Rule 144A under the Securities Act, and (ii) "qualified purchasers" as defined under Section 2(a)(51) of the Investment Company Act of 1940, as amended";

- the "Disclaimer" pages for the Trust Securities should state that the securities "have not been and will not be registered under the Securities Act of 1933, as amended, and Washington Mutual Preferred Funding Trust I has not been registered under the Investment Company Act of 1940, as amended (the "*Investment Company Act*"), and the Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities may not be offered or sold absent an applicable exemption from registration requirements and any such offer and sale of these securities must be in accordance with Section 3(c)(7) of the Investment Company Act".

## CUSIP

WaMu Delaware will cause each "CUSIP" obtained for a Global Security to have an attached "fixed field" that contains "3c7", "GRLS" and "144A" indicators.

## Legends

WaMu Delaware will not remove the legend set forth in "— Representations of Purchasers" at any time.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This offering circular and the documents incorporated herein by reference contain certain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995 with respect to financial condition, results of operations, and other matters. Statements in this offering circular, including those incorporated herein by reference, that are not historical facts are "forward-looking statements" for the purpose of the safe harbor provided by Section 21E of the Exchange Act and Section 27A of the Securities Act. Forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts. They often include words, such as "expects", "anticipates", "intends", "plans", "believes", "seeks", "estimates" or words of similar meaning, or future or conditional verbs, such as "will", "should", "could" or "may".

Forward-looking statements provide WMI's or WMB's (as applicable) expectations or predictions of future conditions, events or results. They are not guarantees of future performance. By their nature forward-looking statements are subject to risks and uncertainties. These statements speak only as of the date they are made. WMI and WMB do not undertake to update forward-looking statements to reflect the impact of circumstances or events that arise after the date the forward-looking statements were made. There are a number of factors, many of which are beyond WMI's or WMB's (as applicable) control, that could cause actual conditions, events or results to differ significantly from those described in the forward-looking statements. The factors are generally described in WMI's or WMB's (as applicable) most recent Form 10-K and Form 10-Q under the caption "Risk Factors."

## WHERE YOU CAN FIND MORE INFORMATION

WMI files annual, quarterly and current reports, proxy statements and other information with the Securities and Exchange Commission (the "SEC"). You may read and copy any document that WMI files with the SEC at the SEC's public reference room in Washington, D.C. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. In addition, WMI's SEC filings are available to the public at the SEC's web site at http://www.sec.gov. You can also inspect reports, proxy statements and other information about WMI at the offices of the New York Stock Exchange, 20 Broad Street, New York, New York.

This offering circular incorporates by reference certain information that WMI files with the SEC. The information incorporated by reference is considered to be a part of this offering circular and should be read with the same care. When WMI updates the information contained in documents that have been incorporated by reference by making future filings with the SEC, the information incorporated by reference in this offering circular is considered to be automatically updated and superseded. In other words, in the case of a conflict or inconsistency between information with respect to WMI contained in this offering circular and information incorporated by reference into this offering circular, you should rely on the information contained in the document that was filed later. WMI incorporates by reference the documents listed below and any documents it files with the SEC in the future under Sections 13(a), 13(c), 14, or 15(d) of the Exchange Act until the Offering is completed:

- Annual Report on Form 10-K for the year ended December 31, 2004;

- Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2005, June 30, 2005 and September 30, 2005; and

- Current Reports on Form 8-K dated January 6, 2005, January 14, 2005, January 20, 2005, January 24, 2005, February 18, 2005, February 22, 2005, March 2, 2005, March 22, 2005, March 23, 2005, April 19, 2005, June 7, 2005, June 9, 2005, June 24, 2005, July 6, 2005, July 20, 2005, July 25, 2005, September 8, 2005, September 23, 2005, September 26, 2005, October 4, 2005, October 19, 2005, October 27, 2005, November 2, 2005, December 23, 2005, January 18, 2006, January 23, 2006, February 7, 2006 and February 21, 2006. The press release text of WMI dated January 18, 2006 and the financial supplement of WMI, included as Exhibits 99.1 and 99.2 to WMI's Current Report on Form 8-K, dated January 18, 2006, are incorporated by reference in this offering circular notwithstanding that such Current Report provides that the press release and financial statements were "furnished" but not "filed" under the Exchange Act. Please note that the information included in the January 18, 2006 Current Report on Form 8-K has not been audited by Deloitte & Touche LLP, WMI's independent registered public accountants.

WMB files annual and quarterly reports and other information with the OTS. You may read and copy these reports and other non-confidential information that WMB files with the OTS at the OTS's offices at 1700 G Street, N.W., Washington, D.C. 20552. In addition, WMB's most recent periodic filings with the OTS are available to the investors at WMI's website at http://www.wamu.com/ir and then clicking the "Fixed Income" button.

This offering circular incorporates by reference certain information that WMB files with the OTS. The information incorporated by reference is considered to be a part of this offering circular and should be read with the same care. When WMB updates the information contained in documents that have been incorporated by reference by making future filings with the OTS, the information incorporated by reference in this offering circular is considered to be automatically updated and superseded. In other words, in the case of a conflict or inconsistency between information with respect to WMB contained in this offering circular and information incorporated by reference into this offering circular, you should rely on the information contained in the

document that was filed later. WMB incorporates by reference the documents listed below and any documents it files with the OTS in the future under Sections 13(a), 13(c), 14, or 15(d) of the Exchange Act or regulations of the OTS to substantially similar effect until the Offering is completed:

- Annual Report on Form 10-K for the year ended December 31, 2004; and
- Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2005, June 30, 2005 and September 30, 2005.

This offering circular also incorporates herein by reference certain other information that WMB submits to the OTS. WMB submits to the OTS quarterly reports regarding WMB's financial condition and operations on OTS Form 1313 entitled "Thrift Financial Report" (each, a "Thrift Financial Report" and collectively, the "Thrift Financial Reports"). Each Thrift Financial Report consists of a Consolidated Statement of Condition, Consolidated Statement of Operations, Consolidated Cash Flow Information, Consolidated Capital Requirements and other supporting schedules as of the end of the period to which the report relates. The Thrift Financial Reports are prepared in accordance with regulatory instructions issued by the OTS. These regulatory instructions in most, but not all, cases follow generally accepted accounting principles in the United States ("GAAP") or the opinions and statements of the Accounting Principles Board or the Financial Accounting Standards Board. While the Thrift Financial Reports are supervisory and regulatory documents, not previously accounting documents, and do not provide a complete range of financial disclosure about WMB, the reports nevertheless provide important information concerning WMB's financial condition and operating results. In addition, WMB's Thrift Financial Reports are not audited. The non-confidential portions of Thrift Financial Reports filed by WMB are on file with, and are publicly available upon written request to the Office of Thrift Supervision, FOIA, 1700 G Street, N.W., Washington, D.C. 20552, Attention: Dissemination Branch and are also available at the U.S. Federal Deposit Insurance Corporation's (the "FDIC") web site at http://www.fdic.gov.

You may request a copy of these filings, other than an exhibit to a filing unless that exhibit is specifically incorporated by reference into that filing, at no cost, by writing to or telephoning WMI at:

1201 Third Avenue
Seattle, Washington 98101
(206) 461-3187

## INDEX OF TERMS

*An index of terms used in this offering circular with specific meanings appears on the inside back cover of this offering circular.*

## OFFERING CIRCULAR SUMMARY

*The following summary is qualified in its entirety by the detailed information appearing elsewhere in this offering circular, in particular, the information under the headings "Description of the Trust Securities" and "Description of the Fixed-to-Floating Rate Company Preferred Securities," which describe the terms and conditions of the securities offered hereby.*

### Introduction

The Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities, liquidation preference $100,000 per security (the *"Trust Securities"*), are being issued by Washington Mutual Preferred Funding Trust I (*"WaMu Delaware"*) in a financing transaction that raises capital for Washington Mutual Bank (*"WMB"*). WMB is a subsidiary of Washington Mutual, Inc. (*"WMI"*). WMI and its affiliates are referred to herein as the *"WMI Group"*.

WaMu Delaware will invest the proceeds of the Trust Securities in a like amount of Fixed-to-Floating Rate Perpetual Non-cumulative Preferred Securities, liquidation preference $1,000 per security (the *"Fixed-to-Floating Rate Company Preferred Securities"*), of Washington Mutual Preferred Funding LLC, a Delaware limited liability company (the *"Company"*). WaMu Delaware will have no assets other than the Fixed-to-Floating Rate Company Preferred Securities. Dividends paid and redemption and liquidation payments made by the Company on the Fixed-to-Floating Rate Company Preferred Securities will pass through WaMu Delaware as distributions and redemption and liquidation payments on the Trust Securities. The Company's initial material assets will consist of direct or indirect interests in mortgages or mortgage-related assets originated by WMB as described under "The Company — Business of the Company — Assets of the Company" and "The Asset Trust."

The Trust Securities are being offered in reliance upon Rule 144A under the U.S. Securities Act of 1933, as amended (the *"Securities Act"*) only to persons who are *"qualified institutional buyers"* within the meaning of 144A and *"qualified purchasers"* within the meaning of Section 2(a)(51) of the U.S. Investment Company Act of 1940, as amended (the *"Investment Company Act"*). Resales of the Trust Securities are subject to restrictions as described under "Notice to Investors".

By a separate offering circular dated the date of this offering circular, Washington Mutual Preferred Funding (Cayman) I Ltd., a Cayman Islands exempted company limited by shares (*"WaMu Cayman"*), is offering 3,023 of its 7.25% Perpetual Non-cumulative Preferred Securities, Series A-1, liquidation preference $100,000 per security and $302,300,000 in the aggregate (the *"Series A-1 WaMu Cayman Preferred Securities"*), and 44,770 of its 7.25% Perpetual Non-cumulative Preferred Securities, Series A-2, liquidation preference $10,000 per security and $447,700,000 in the aggregate (the *"Series A-2 WaMu Cayman Preferred Securities"* and, together with the Series A-1 WaMu Cayman Preferred Securities, the *"WaMu Cayman Preferred Securities"*). WaMu Cayman will invest the proceeds of the WaMu Cayman Preferred Securities in a like amount of 7.25% Perpetual Non-cumulative Preferred Securities, liquidation preference $1,000 per security and $750,000,000 in the aggregate (*"Fixed Rate Company Preferred Securities"* and, together with the Fixed-to-Floating Rate Company Preferred Securities, the *"Company Preferred Securities"*). The terms of the Fixed Rate Company Preferred Securities are substantially identical to the Fixed-to-Floating Rate Company Preferred Securities except for the dividend rate. The Series A-1 WaMu Cayman Preferred Securities are being offered and sold only in the United States and only to U.S. persons and the Series A-2 WaMu Cayman Preferred Securities are being offered and sold only to non-U.S. persons in transactions outside the United States. They are not being offered by this offering circular. The Trust Securities are not exchangeable for the WaMu Cayman Preferred Securities, or *vice versa*.

WMB has asked for confirmation from the Office of Thrift Supervision (together with any successor regulator, the "*OTS*") that the Company Preferred Securities constitute core capital of WMB under the OTS' applicable regulatory capital regulations and, upon receipt of such confirmation, intends to treat the Company Preferred Securities accordingly.

If the OTS so directs following the occurrence of an Exchange Event, each Trust Security will be automatically exchanged for a like amount of Fixed-to-Floating Rate Depositary Shares each representing 1/1000th of a share of WMI's Series I Perpetual Non-cumulative Fixed-to-Floating Rate Preferred Stock, no par value and liquidation preference $1,000,000 per share (the "*Fixed-to-Floating Rate WMI Preferred Stock*"), as described below in this summary under "— The Offering — Conditional Exchange." Upon a Conditional Exchange, the WaMu Cayman Preferred Securities will also be automatically exchanged, but for depositary shares representing a different series of WMI's preferred stock, having substantially equivalent terms (with certain exceptions) as to dividends, liquidation preference and redemption preference as the Fixed Rate Company Preferred Securities.

This offering circular uses the term "*like amount*" in describing the number of Fixed-to-Floating Rate Company Preferred Securities in which a holder of Trust Securities has a beneficial interest and in describing the number of Fixed-to-Floating Rate Depositary Shares, each representing a 1/1000th of interest in one share of Fixed-to-Floating Rate WMI Preferred Stock for which the Trust Securities will be exchanged upon a Conditional Exchange. The term "*like amount*" means:

- when describing the number of Fixed-to-Floating Rate Company Preferred Securities in which a holder of Trust Securities has a beneficial interest, the number of Fixed-to-Floating Rate Company Preferred Securities that has the same aggregate liquidation preference as the Trust Securities to which the reference is being made (*e.g.*, 1,000 Fixed-to-Floating Rate Company Preferred Securities with an aggregate liquidation preference of $1,000,000 are a "like amount" for 10 Trust Securities having an aggregate liquidation preference of $1,000,000); and

- when describing the number of Fixed-to-Floating Rate Depositary Shares for Fixed-to-Floating Rate WMI Preferred Stock with which Trust Securities will be exchanged upon a Conditional Exchange, a number of Fixed-to-Floating Rate Depositary Shares each representing 1/1000th of an interest in one share of Fixed-to-Floating Rate WMI Preferred Stock having a liquidation preference equal to the liquidation preference of the Trust Securities that are being exchanged (*e.g.*, 1,000 Fixed-to-Floating Rate Depositary Shares representing Fixed-to-Floating Rate WMI Preferred Stock with an aggregate liquidation preference of $1,000,000 are a "like amount" for 10 Trust Securities having an aggregate liquidation preference of $1,000,000).

The offering of the Trust Securities and the related issuance of the Fixed-to-Floating Rate Company Preferred Securities are referred to herein as the "*Offering*".

The following diagram outlines the relationship among WMI, WMB, University Street, the Company, the Asset Trust, WaMu Delaware, WaMu Cayman, purchasers of the Trust Securities and purchasers of the WaMu Cayman Preferred Securities:



---

[1] New American Capital, Inc., not shown here, is WMB's direct parent.

[2] Marion Holdings, Inc., not shown here, is University Street's direct parent.

[3] Transferred by WMB to WaMu Cayman.

[4] Transferred by WMB to WaMu Delaware.

**WaMu Delaware**

Washington Mutual Preferred Funding Trust I is a statutory trust created under the Delaware Statutory Trust Act on February 23, 2006 for the purposes set forth below in "WaMu Delaware." The Fixed-to-Floating Rate Company Preferred Securities will be the only assets of WaMu Delaware. Under the Trust Agreement, WaMu Delaware is prohibited from issuing any securities other than the Trust Securities.

Subject to the limitations and assumptions described under "Certain U.S. Federal Income Tax Considerations," WaMu Delaware will be treated as a grantor trust for United States Federal income tax purposes, with the result that holders of Trust Securities will be treated as beneficial owners of Fixed-to-Floating Rate Company Preferred Securities for United States Federal income tax purposes.

**The Company**

Washington Mutual Preferred Funding LLC is a Delaware limited liability company formed on February 3, 2006 for the purpose of (i) issuing the Fixed-to-Floating Rate Company Preferred Securities to WaMu Delaware, the Fixed Rate Company Preferred Securities to WaMu Cayman, the common securities of the Company (the "Company Common Securities") to University Street, Inc., an indirect subsidiary of WMB ("University Street"), and additional Parity Equity Securities or Junior Equity Securities subject to certain limitations described in this offering circular, (ii) acquiring and holding Eligible Investments and (iii) performing functions necessary or incidental thereto.

The Fixed Rate Company Preferred Securities rank pari passu with the Fixed-to-Floating Rate Company Preferred Securities as to dividends and upon liquidation of the Company. The terms of the Fixed Rate Company Preferred Securities are substantially identical to the terms of the Fixed-to-Floating Rate Company Preferred Securities other than with respect to the rate applicable to dividends or distributions thereon. The Fixed Rate Company Preferred Securities will, if, when and as declared by the Company's Board of Managers, pay dividends at an annual rate of 7.25%.

University Street will own all of the Company Common Securities. The Eligible Investments owned by the Company from time to time will generate net income for payment by the Company to WaMu Delaware as dividends on the Fixed-to-Floating Rate Company Preferred Securities (and consequently for pass through by WaMu Delaware as distributions to the holders of the Trust Securities), to WaMu Cayman as dividends on the Fixed Rate Company Preferred Securities (and consequently for payment by WaMu Cayman as dividends to holders of the WaMu Cayman Preferred Securities) and to University Street as dividends on the Company Common Securities.

Subject to the limitations and assumptions described under "Certain U.S. Federal Income Tax Considerations," the Company intends to be treated as a partnership (other than a publicly traded partnership taxable as a corporation) for United States Federal income tax purposes and will receive the opinion of Mayer, Brown, Rowe & Maw LLP to the effect that, for United States Federal income tax purposes, the Company will not be treated as an association taxable as a corporation or as a publicly traded partnership taxable as a corporation.

The Company will be managed by a Board of Managers. The Company's Board of Managers will have three members, one of whom is not, and has not been during the preceding five years, an officer or employee of WMI or any affiliate of WMI, other than a financing subsidiary (the "Independent Manager").

## Initial Conveyances

In connection with the Offering, WMB will convey a portfolio of first lien, closed-end, fixed rate home equity loans ("HELs") to the Company in exchange for 100% of the Company Preferred Securities. Concurrently with such transfer by WMB, University Street will convey a portfolio of HELs to the Company in exchange for 100% of the Company Common Securities. The portfolio conveyed by WMB and University Street to the Company will consist of approximately $5,389,459,150 of HELs in the aggregate. The Company will convey 100% of the HELs that it owns to the Asset Trust in exchange for the Class A Asset Trust Certificate of the Asset Trust. WMB will then sell the Fixed-to-Floating Rate Company Preferred Securities and the Fixed Rate Company Preferred Securities for cash to WaMu Delaware and WaMu Cayman, respectively.

## University Street

University Street, Inc. is a Washington corporation. It has elected to be treated as a real estate investment trust for United States Federal income tax purposes. University Street will hold 100% of the Company Common Securities which represent 100% of the voting rights in the Company (subject to the limited rights of holders of the Company Preferred Securities described herein).

## The Asset Trust

Washington Mutual Home Equity Trust I is a Delaware statutory trust formed pursuant to a trust agreement, to be entered into on or before the closing date, between the Company, as depositor, and Deutsche Bank Trust Company Delaware, as Delaware trustee (the "PSA Delaware Trustee"). The Pooling and Servicing Agreement among the Company, WMB, as servicer, Deutsche Bank Trust Company Delaware, as Delaware trustee, and Deutsche Bank National Trust Company, as Trustee (the "Pooling and Servicing Agreement"), will restate the trust agreement and will be the governing instrument of the Asset Trust. The Asset Trust will make an election to be treated as a real estate mortgage investment conduit ("REMIC") for United States Federal income tax purposes.

The initial assets of the Asset Trust will consist of the portfolio of HELs to be conveyed by the Company to the Asset Trust in connection with the Offering. The HELs were originated by WMB primarily through its retail branches between September 2001 and September 2005. As of January 31, 2006, the HELs to be transferred into the Asset Trust had an aggregate unpaid principal balance of approximately $5,389,459,150.

## WMI

With a history dating back to 1889, Washington Mutual, Inc., a Washington corporation, is a retailer of financial services to consumers and small businesses. Based on its consolidated assets on September 30, 2005, WMI was the largest thrift holding company in the United States and the seventh largest among all U.S.-based bank and thrift holding companies. As of September 30, 2005, WMI, together with its subsidiaries, had total assets of approximately $333.6 billion, total liabilities of approximately $311.0 billion and total stockholders' equity of approximately $22.6 billion. As of September 30, 2005, WMI and its subsidiaries also had total deposits of approximately $190.4 billion. WMI's common stock is listed on the New York Stock Exchange under the symbol "WM". The principal business offices of WMI are located at 1201 Third Avenue, Seattle, Washington 98101 and its telephone number is 206-461-2000.

## WMB

Washington Mutual Bank (formerly known as Washington Mutual Bank, FA) is a federally chartered savings association, chartered and operating under the United States Home Owners'

Loan Act of 1933, as amended. WMB engages in mortgage banking, consumer banking and small business banking. WMB, as a federally chartered association, has the authority to make various types of loans, including loans secured by homes and commercial real estate, secured and unsecured consumer loans, and secured and unsecured commercial loans. As a federal savings association, WMB is subject to regulation and examination by the OTS, its primary regulator. WMB is an indirect wholly-owned subsidiary of WMI.

Prior to 2004, WMB had two sister depositary institutions which were both owned directly by WMI. WMB has since acquired both of these sister institutions. One of these institutions, Washington Mutual Bank fsb, a federal savings bank, became a wholly-owned subsidiary of WMB on February 1, 2004. The other institution, Washington Mutual Bank, a savings bank chartered under the laws of the state of Washington, converted into a federally chartered savings bank and then was merged into WMB on January 1, 2005.

**The Offering**

Issuer . . . . . . . . . . . . . . . . . . . . . . . . . . . As to the Trust Securities, Washington Mutual Preferred Funding Trust I, a Delaware statutory trust.

As to the Fixed-to-Floating Rate Company Preferred Securities, Washington Mutual Preferred Funding LLC, a Delaware limited liability company.

As to the Fixed-to-Floating Rate WMI Preferred Stock (which will be represented by the Fixed-to-Floating Rate Depositary Shares) for which the Trust Securities will be exchanged upon the occurrence of a Conditional Exchange, Washington Mutual, Inc., a Washington corporation.

Offered Securities . . . . . . . . . . . . . . . . Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities, liquidation preference $100,000 per security and $1,250,000,000 in the aggregate, issued by WaMu Delaware.

Dividends . . . . . . . . . . . . . . . . . . . . . . . Dividends on the Fixed-to-Floating Rate Company Preferred Securities will be passed through by WaMu Delaware as distributions on the Trust Securities on each date on which the Company pays to WaMu Delaware dividends on the Fixed-to-Floating Rate Company Preferred Securities, in an amount per Trust Security equal to the amount of dividends received by WaMu Delaware on a like amount of Fixed-to-Floating Rate Company Preferred Securities (including Additional Amounts, if any).

For purposes of this offering circular, we refer to distributions payable by the Company on its securities as "dividends". Dividends on the Fixed-to-Floating Rate Company Preferred Securities are payable as follows:

*Dividend Rate.* Dividends on the Fixed-to-Floating Rate Company Preferred Securities will accrue at a rate *per annum* equal to 6.534% until March 15, 2011 and 3-month USD LIBOR plus 1.4825% for the Dividend Period starting in March, 2011 and each Dividend Period thereafter applied to the liquidation preference of $1,000 per Fixed-to-Floating Rate Company Preferred Security.

*Dividend Payment Dates.* If declared by the Company's Board of Managers, the Dividend Payment Dates for the Fixed-to-Floating Rate Company Preferred Securities will be (i) March 15, June 15, September 15 and December 15 of each year commencing on June 15, 2006 and through and including March 15, 2011, and (ii) each March 15, June 15, September 15 and December 15 thereafter, or in each case the next Business Day if any such day is not a Business Day.

*Declaration of Dividends, etc.* Dividends on the Fixed-to-Floating Rate Company Preferred Securities when, as and if declared by the Company's Board of Managers out of

7

legally available funds, will be payable at the applicable dividend rate applied to the liquidation preference per Fixed-to-Floating Rate Company Preferred Security accruing on a non-cumulative basis on each such security as follows: (i) from March 7, 2006 in the case of the Fixed-to-Floating Rate Company Preferred Securities offered hereby and (ii) if additional Fixed-to-Floating Rate Company Preferred Securities are issued at a future date, from (A) March 7, 2006 if such date is before the Dividend Payment Date in June 2006, (B) the date of issue if such date is a Dividend Payment Date and (C) either the immediately preceding Dividend Payment Date or the date of issuance as determined by the Company if the date of issuance is other than a Dividend Payment Date and is after the Dividend Payment Date in June 2006. Any such dividends will be distributed to holders of Fixed-to-Floating Rate Company Preferred Securities in the manner described under "Description of the Fixed-to-Floating Rate Company Preferred Securities — Dividends."

***Non-cumulative Dividends.*** Dividends on the Fixed-to-Floating Rate Company Preferred Securities are not cumulative. Accordingly, in the event dividends are not declared on the Fixed-to-Floating Rate Company Preferred Securities for payment on any Dividend Payment Date, then any accrued dividends will cease to accrue and be payable. If the Company's Board of Managers has not declared a dividend before the Dividend Payment Date for any Dividend Period, the Company will have no obligation to pay dividends accrued for such Dividend Period after the Dividend Payment Date for that Dividend Period, whether or not dividends on the Fixed-to-Floating Rate Company Preferred Securities or the Company Common Securities are declared for any future Dividend Period.

Redemption/Replacement Capital Covenant . . . . . . . . . . . . . . . . . . . . . . .

***General.*** On each day on which the Company redeems Fixed-to-Floating Rate Company Preferred Securities, WaMu Delaware will apply the redemption proceeds it receives on the Fixed-to-Floating Rate Company Preferred Securities to redeem a like amount of Trust Securities. The redemption provisions of the Fixed-to-Floating Rate Company Preferred Securities are described below.

Subject to a covenant in favor of certain of WMI's debtholders limiting WMI's and its subsidiaries' right to repurchase or redeem the Fixed-to-Floating Rate Company Preferred Securities or the Trust Securities (among others) as described in the next paragraph, and subject to the Company having received the prior approval of the OTS for any proposed redemption of Fixed-to-Floating Rate Company Preferred Securities, the Company may, at

its option, redeem the Fixed-to-Floating Rate Company Preferred Securities:

- in whole but not in part, prior to the Dividend Payment Date in March 2011, if a Tax Event, an Investment Company Act Event or a Regulatory Capital Event occurs. The cash redemption price will be the greater of (i) $1,000 per Fixed-to-Floating Rate Company Preferred Security or (ii) the sum of present values of $1,000 per Fixed-to-Floating Rate Company Preferred Security and all undeclared dividends for the Dividend Period from the redemption date to and including the Dividend Payment Date in March 2011, discounted to the redemption date on a quarterly basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate, as calculated by an Independent Investment Banker, plus 0.30%,

  plus any declared and unpaid dividends to the redemption date; or

- in whole or in part, on or after the Dividend Payment Date in March 2011, at a cash redemption price of $1,000 per Fixed-to-Floating Rate Company Preferred Security, plus any declared and unpaid dividends to the redemption date, without accumulation of any undeclared dividends.

See "Description of Fixed-to-Floating Rate Company Preferred Securities — Redemption."

**Restriction on Redemption or Repurchases.** At or prior to initial issuance of the Trust Securities, WMI will enter into a "*Replacement Capital Covenant*" as described under "Description of the Trust Securities — Restriction on Redemption or Repurchases." In the Replacement Capital Covenant, WMI will covenant in favor of certain of its debtholders that, if WMI or a subsidiary repurchases or redeems any Trust Securities, WaMu Cayman Preferred Securities or Company Preferred Securities or, after a Conditional Exchange, Fixed-to-Floating Rate Depositary Shares (or related Fixed-to-Floating Rate WMI Preferred Stock), WMI or its subsidiaries will do so only if and to the extent that the total redemption or purchase price is equal to or less than designated percentages of the net cash proceeds that WMI or its subsidiaries have received during the 180 days prior to such redemption or repurchase from the issuance of other securities or combinations of securities having the characteristics described under "Description of the Trust Securities — Restriction on Redemption or Repurchases."

Ranking . . . . . . . . . . . . . . . . . . . . . . . . **Trust Securities.** The Trust Securities will be the only securities issued by WaMu Delaware. The Amended and Restated Trust Agreement of WaMu Delaware (the "*Trust*

Agreement") will provide that WaMu Delaware will not issue any other securities.

**Fixed-to-Floating Rate Company Preferred Securities.** The Fixed-to-Floating Rate Company Preferred Securities will rank *pari passu* with the Fixed Rate Company Preferred Securities and senior to the Company Common Securities in terms of dividends and liquidation payments.

During a Dividend Period, the Company may not declare or pay any dividends on any of its Junior Equity Securities other than dividends payable in Junior Equity Securities, or repurchase, redeem or otherwise acquire for consideration, directly or indirectly, any Junior Equity Securities (other than as a result of reclassification of Junior Equity Securities for or into other Junior Equity Securities, or the exchange or conversion of Junior Equity Securities for or into other Junior Equity Securities), unless dividends for such Dividend Period on all outstanding Company Preferred Securities have been declared and paid in full, or declared and set aside for payment, as the case may be.

The Company may from time to time issue additional Parity Equity Securities without the consent of the holders of the Company Preferred Securities, *provided* that (i) after giving effect to such issuance, the *pro forma* net book value of the Company's assets (after giving effect to the acquisition of any New Assets in connection with the issuance of such Parity Equity Securities) will equal or exceed 1.5 times the sum of the aggregate liquidation preference of the preferred securities of the Company then outstanding and any such Parity Equity Securities that the Company proposes to issue, (ii) after giving effect to such issuance, the Company's *pro forma* funds from continuing operations, or "*FFO*", for the four fiscal quarters beginning with the fiscal quarter in which such Parity Equity Securities are proposed to be issued (calculated (A) assuming that such proposed Parity Equity Securities are issued and that, if any Parity Equity Securities (including the Parity Equity Securities that the Company proposes to issue) bear dividends based on a floating rate, the applicable dividend rate will not change during such four fiscal quarters from the rate in effect on the applicable date of determination and (B) as adjusted to reflect any New Assets) equals or exceeds 150% of the amount that would be required to pay full annual dividends on all preferred securities of the Company then outstanding and any such Parity Equity Securities that the Company proposes to issue and (iii) the Company is not otherwise in breach of any of its covenants set forth in the LLC Agreement. See "Description of the Fixed-to-Floating Rate Company Preferred Securities — Ranking."

In the Exchange Agreement, WMI will covenant in favor of the holders of the Trust Securities and the WaMu Cayman

Preferred Securities that, if full dividends on (i) the Company Preferred Securities, (ii) the Trust Securities or (iii) the WaMu Cayman Preferred Securities for any Dividend Period are not paid, then WMI will not declare or pay dividends with respect to, or redeem, purchase or acquire, any of its equity capital securities during the next succeeding Dividend Period, except dividends in connection with a shareholders' rights plan, if any, or dividends in connection with benefits plans.

Conditional Exchange . . . . . . . . . . . . . If the OTS so directs following the occurrence of an Exchange Event, each Trust Security will be automatically exchanged for a like amount of Fixed-to-Floating Rate Depositary Shares representing 1/1000th of a share of WMI's Series I Perpetual Non-cumulative Fixed-to-Floating Rate Preferred Stock (the *"Fixed-to-Floating Rate Depositary Shares"*).

*"Exchange Event"* means (i) WMB becoming "undercapitalized" under the OTS' "prompt corrective action" regulations, (ii) WMB being placed into conservatorship or receivership or (iii) the OTS, in its sole discretion, directing such exchange in anticipation of WMB becoming "undercapitalized" in the near term or taking supervisory action that limits the payment of dividends, as applicable, by WMB, and in connection therewith, directs such exchange.

The Fixed-to-Floating Rate WMI Preferred Stock will have substantially equivalent terms as to dividends, redemption and liquidation preference as the Fixed-to-Floating Rate Company Preferred Securities, except that: (i) the Fixed-to-Floating Rate WMI Preferred Stock will not have the benefit of the covenants described under "Description of Fixed-to-Floating Rate Company Preferred Securities — Voting Rights and Covenants;" (ii) the Fixed-to-Floating Rate WMI Preferred Stock will be redeemable prior to the Dividend Payment Date occurring in March 2011 only upon the occurrence of a Regulatory Capital Event (as described herein); (iii) Additional Amounts will not be payable with respect to the Fixed-to-Floating Rate WMI Preferred Stock; and (iv) if WMI fails to pay, or declare and set aside for payment, full dividends on the Fixed-to-Floating Rate WMI Preferred Stock for six Dividend Periods, the authorized number of WMI's directors will increase by two, and the holders of Fixed-to-Floating Rate WMI Preferred Stock, voting together with the holders of any other equity capital securities of WMI having similar voting rights, including the Fixed Rate WMI Preferred Stock, will have the right to elect two directors in addition to the directors then in office at the next annual meeting of shareholders. The Fixed-to-Floating Rate WMI Preferred Stock will be subject to the Replacement Capital Covenant provisions described under "— Redemption/Replacement Capital Covenant" above.

11

WMI will covenant in the Exchange Agreement in favor of the holders of the Trust Securities that it will not issue any preferred stock that would rank senior to the Fixed-to-Floating Rate WMI Preferred Stock upon its issuance. Each share of Fixed-to-Floating Rate WMI Preferred Stock will, upon issuance, rank at least *pari passu* with the most senior preferred stock of WMI, if any, then outstanding.

**Voting Rights and Certain Covenants** ....................... Except as set forth below, the holders of the Fixed-to-Floating Rate Company Preferred Securities will not have voting rights.

The LLC Agreement will provide that, except with the consent or affirmative vote of the holders of at least two-thirds of the Fixed-to-Floating Rate Company Preferred Securities and the Fixed Rate Company Preferred Securities, voting together as a single class, the Company will not:

- effect a consolidation, merger or share exchange with or into another entity other than an entity controlled by, or under common control with, WMI;

- issue any securities of the Company ranking senior to the Company Preferred Securities in respect of payments of dividends or on liquidation to the Company Preferred Securities (*"Senior Equity Securities"*);

- incur any indebtedness for borrowed money;

- pay dividends on the Company's Junior Equity Securities unless the Company's FFO for the four prior fiscal quarters equals or exceeds 150% of the amount that would be required to pay full annual dividends on all outstanding Company Preferred Securities, as well as any other Parity Equity Securities;

- amend or otherwise change the requirement that the Company make investments and distributions with the proceeds of the Company's assets such that the Company's FFO over any period of four fiscal quarters will equal or exceed 150% of the amount that would be required to pay full annual dividends on all outstanding Company Preferred Securities, as well as any other Parity Equity Securities;

- issue any additional Company Common Securities to any person, other than University Street or another affiliate of WMI;

- amend or otherwise change the terms of any Asset Documentation in a manner which is materially adverse to WaMu Delaware or the holders of the Trust Securities;

- remove or cause to be removed, as applicable, "Washington Mutual" from the Company's, WaMu Delaware's or WaMu Cayman's name unless the name of WMI

changes and the Company makes a change to the Company's, WaMu Delaware's and WaMu Cayman's name to be consistent with the new group name;

- take any action or fail to take any action that would cause the Company to fail to be treated as a partnership (other than a publicly traded partnership taxable as a corporation) for United States Federal income tax purposes;

- amend or otherwise change the requirement that the Company not engage in a U.S. trade or business for United States Federal income tax purposes;

- amend or otherwise change the requirement that the Company hold only assets that qualify for the portfolio interest exemption under the Code and are exempt from gross basis United States withholding taxes;

- amend or otherwise change the requirement that the Company manage its affairs such that income with respect to the Trust Securities does not constitute "unrelated business taxable income" for United States Federal income tax purposes; or

- amend its Certificate of Formation or LLC Agreement in a manner that materially and adversely affects the terms of the Company Preferred Securities; *provided, however*, that, if such amendment affects only one class of Company Preferred Securities, such amendment will require only the class vote of the holders of at least two-thirds of the applicable Company Preferred Securities of such class (voting separately and not as a single class with the other class) and, if such amendment affects both classes but affects them differently, then such amendment will require a class vote of each class of Company Preferred Securities, each voting separately.

In addition, the LLC Agreement will provide that, without the consent of all of the Managers, including the Independent Manager, the Company will not:

- terminate, amend or otherwise change any Asset Documentation; or

- effect a consolidation, merger or share exchange (excluding the Conditional Exchange) that is not tax-free to the holders of the Fixed-to-Floating Rate Company Preferred Securities, and the related Trust Securities, unless such transaction was approved by the consent or affirmative vote of the holders of at least two-thirds of the Fixed-to-Floating Rate Company Preferred Securities and the Fixed Rate Preferred Securities, voting together as a single class.

In addition, the LLC Agreement will provide that if (i) the Company fails to pay full dividends on the Company

Preferred Securities on any Dividend Payment Date,
(ii) WaMu Delaware fails to pass through full dividends
paid by the Company on the Fixed-to-Floating Rate
Company Preferred Securities to the holders of the Trust
Securities on any Dividend Payment Date or (iii) a
Bankruptcy Event occurs, the holders of the Fixed-to-
Floating Rate Company Preferred Securities and the Fixed
Rate Company Preferred Securities, voting together as a
single class, by majority vote, are entitled to remove the
initial or any succeeding Independent Manager and to fill
the vacancy created by such removal or any other vacancy
existing in the office of the Independent Manager.

Each holder of Trust Securities will have the right to direct
the Property Trustee acting for WaMu Delaware, as holder
of the Fixed-to-Floating Rate Company Preferred Securi-
ties, as to the exercise of the voting rights described above
pertaining to a like amount of Fixed-to-Floating Rate
Company Preferred Securities representing its respective
Trust Securities. The voting rights described above with
respect to the Fixed Rate Company Preferred Securities
will be passed on to the holders of the related WaMu
Cayman Preferred Securities. See "Description of the Trust
Securities — Voting Rights."

Additional Amounts ..............    If the Company or WaMu Delaware is required to pay any
Additional Taxes as a result of an Additional Tax Event, the
Company will pay as additional amounts on the Fixed-to-
Floating Rate Company Preferred Securities such amounts
as will be required so that dividends on the Fixed-to-
Floating Rate Company Preferred Securities, and accord-
ingly the amounts passed through by WaMu Delaware on
the Trust Securities, will not be reduced as a result of any
such Additional Taxes. See "Description of the Fixed-to-
Floating Rate Company Preferred Securities — Additional
Amounts." If investors exchange their Fixed-to-Floating
Rate Company Preferred Securities for Fixed-to-Floating
Rate WMI Preferred Stock upon a Conditional Exchange,
WMI will not be obligated to pay Additional Amounts on the
Fixed-to-Floating Rate WMI Preferred Stock.

Assets and the Asset Trust ........    The initial assets of the Company will consist of the
Class A Asset Trust Certificate representing its interest in
the Asset Trust. The Asset Trust is a Delaware statutory
trust formed under the laws of the State of Delaware
pursuant to a trust agreement between the Company, as
depositor, and Deutsche Bank Trust Company Delaware,
as Delaware trustee. The Pooling and Servicing Agreement
among the Company, as depositor, WMB, as Servicer,
Deutsche Bank Trust Company Delaware, as PSA Dela-
ware Trustee, and Deutsche Bank National Trust Company,
as Trustee, will restate the trust agreement and will
thereafter be the governing instrument of the Asset Trust.

The Asset Trust will make a REMIC election for United States Federal income tax purposes.

The initial assets of the Asset Trust will consist of a portfolio (including payments thereon received from and after February 1, 2006) of HELs and certain related assets originated by WMB primarily through its retail branches between September 1, 2001 and September 30, 2005. As of January 31, 2006, the 56,090 HELs had an aggregate unpaid principal balance of approximately $5,389,459,150. These loans typically are made for reasons such as home purchases, home improvements, furniture and fixtures purchases, purchases of automobiles and debt consolidation. These HELs are first lien, closed-end fixed rate home equity loans and are generally repaid on a self-amortizing basis.

From time to time, the Company may acquire Additional Assets. All Additional Assets acquired by the Company will be Eligible Assets.

Listing ........................... The Trust Securities will not be listed on any securities exchange or automated dealer quotation system.

Use of Proceeds.................. WaMu Delaware will use the proceeds of the sale of the Trust Securities to purchase a like amount of Fixed-to-Floating Rate Company Preferred Securities from WMB, which the Company will issue to WMB in exchange for the conveyance of a portfolio of HELs to the Company. The WMI Group will use the proceeds from the sale of the Fixed-to-Floating Rate Company Preferred Securities to WaMu Delaware and the Fixed Rate Preferred Securities to WaMu Cayman for general corporate purposes, which may include the repurchase of WMI's common stock.

Ratings ........................... The Trust Securities are expected to be assigned upon issuance ratings of "BBB" by Standard & Poor's Rating Services, a division of The McGraw Hill Companies, Inc., "Baa2" by Moody's Investors Services, Inc. and "A−" by Fitch, Inc. A rating is not a recommendation to buy, sell or hold securities and may be subject to revision, suspension or withdrawal at any time by the assigning rating organization.

Tax Consequences .............. It is anticipated that WaMu Delaware will be treated as a grantor trust for United States Federal income tax purposes. Accordingly, each holder of a Trust Security will be treated as if it owned directly the Fixed-to-Floating Rate Company Preferred Securities allocable to such Trust Security.

The Company intends to qualify as a partnership (other than a publicly traded partnership taxable as a corporation) for United States Federal income tax purposes, and thus, the Fixed-to-Floating Rate Company Preferred Securities held by WaMu Delaware are intended to constitute

equity interests in such partnership. As a partnership, the Company intends that it will not be subject to United States Federal income tax. Instead, each holder of a Trust Security will be required to report on its United States Federal income tax return its share of the income, gains, losses, deductions and credits of the Company that are allocable to WaMu Delaware, even if such holder has not received any cash distributions.

See "Certain U.S. Federal Income Tax Considerations — United States Federal Income Tax Consequences."

ERISA Considerations............. No Trust Security may be purchased by or transferred to any Benefit Plan Investor, except for an insurance company general account that represents, warrants and covenants that, at the time of acquisition and throughout the period it holds the securities, (A) it is eligible for and meets the requirements of the Department of Labor Prohibited Transaction Class Exemption 95-60, (B) less than 25% of the assets of such general account are (or represent) assets of a Benefit Plan Investor and (C) it is not a person who has discretionary authority or control with respect to the assets of WaMu Delaware or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person and would not otherwise be excluded under 29 C.F.R. 2510.3-101(f)(1).

Governing Law ................... The Trust Agreement, the Trust Securities, the LLC Agreement and the Fixed-to-Floating Rate Company Preferred Securities will be governed by, and construed in accordance with, the laws of the State of Delaware. The Fixed-to-Floating Rate WMI Preferred Stock will be governed by and construed in accordance with the laws of the State of Washington. The Fixed-to-Floating Rate Depositary Shares will be governed by, and construed in accordance with, the laws of the State of New York.

CUSIP .......................... 93934W AA 3

ISIN ............................ US93934WAA36

# RISK FACTORS

Purchasers should carefully consider the following risk factors in conjunction with the other information contained in this offering circular, as well as information that is incorporated by reference in this offering circular, before purchasing any Trust Securities, the financial entitlements of which will be substantially similar to those of a like amount of Fixed-to-Floating Rate Company Preferred Securities and which are conditionally exchangeable into Fixed-to-Floating Rate Depositary Shares representing interests in Fixed-to-Floating WMI Preferred Stock.

## Risks Relating to the Terms of the Trust Securities and the Fixed-to-Floating Rate Company Preferred Securities

### Holders of Trust Securities will only receive distributions if the Company pays dividends on the Fixed-to-Floating Rate Company Preferred Securities.

Amounts available to WaMu Delaware for payment on the Trust Securities will be limited to dividends received by WaMu Delaware as the holder of the Fixed-to-Floating Rate Company Preferred Securities. If the Company does not declare and pay dividends on the Fixed-to-Floating Rate Company Preferred Securities, WaMu Delaware will not pass through such dividends to holders of the Trust Securities.

### Dividends on the Fixed-to-Floating Rate Company Preferred Securities are not cumulative and purchasers will not receive dividends on the Trust Securities for any quarter unless dividends are authorized and declared by the Company's Board of Managers for that quarter on the like amount of Fixed-to-Floating Rate Company Preferred Securities held by WaMu Delaware.

Dividends on the Fixed-to-Floating Rate Company Preferred Securities are not cumulative. Consequently, if the Board of Managers does not declare a dividend on the Fixed-to-Floating Rate Company Preferred Securities for any quarter, WaMu Delaware, as holder of the Fixed-to-Floating Rate Company Preferred Securities, and consequently the holders of Trust Securities, will not receive dividends for that quarter. In addition, the Company's Board of Managers may determine that it would be in the Company's best interests to pay less than the full amount of the stated dividends on the Fixed-to-Floating Rate Company Preferred Securities or no dividends for any quarter even though funds are available. Factors that would generally be considered by the Company's Board of Managers in making this determination are the amount of available funds, the Company's financial condition and capital needs, the impact of current and pending legislation and regulations, economic conditions, and tax considerations.

### The level of the Company's assets relative to the aggregate liquidation preference of the Company Preferred Securities could shrink over time because of, among other things, dividends paid by the Company on the Company Common Securities or other Junior Equity Securities if any are issued at a future date.

The LLC Agreement includes provisions that limit the Company's ability to pay dividends on the Company's Junior Equity Securities but, subject to satisfaction of those limitations, does not prohibit dividends that could cause the level of the Company's assets relative to the aggregate liquidation preference of the Company Preferred Securities to shrink. These limitations are described under "Description of the Fixed-to-Floating Rate Company Preferred Securities — Ranking," "— Restrictions on Dividends" and "Voting Rights and Covenants." They include the following:

- during a Dividend Period, the Company may not pay dividends on Junior Equity Securities, or repurchase, redeem or otherwise acquire for consideration directly or indirectly (with limited exceptions) Junior Equity Securities, unless dividends for such Dividend Period on all outstanding Company Preferred Securities have been declared and paid in full, or set aside for payment, as the case may be; and

- without the consent or affirmative vote of the holders of at least two-thirds of the Fixed-to-Floating Rate Company Preferred Securities and the Fixed Rate Company Securities, voting together as a single class, the Company may not:

- pay dividends on Junior Equity Securities unless the Company's FFO for the four prior fiscal quarters equals or exceeds 150% of the amount that would be required to pay full dividends on the outstanding Company Preferred Securities, as well as any other Parity Equity Securities; or

- amend or otherwise change the requirement that the Company make investments and distributions with the proceeds of the Company's assets such that the Company's FFO for any period of four fiscal quarters will equal or exceed 150% of the amount that would be required to pay full annual dividends on all outstanding Company Preferred Securities, as well as any other Parity Equity Securities.

As HELs in the Asset Trust prepay or repay principal and distributions with respect to such principal payments are made by the Asset Trust to the Company on the Class A Asset Trust Certificate, subject to the limitations referenced above, the Company may choose to apply such amounts to pay dividends on the Company Common Securities or reinvest such amounts in additional Eligible Assets. Additionally, subject to the limitations referenced above, the Company could distribute a portion of the Class A Asset Trust Certificate as a dividend on the Company Common Securities. The Company has no current intention to pay an extraordinary dividend, and WMI has no current intention to cause or permit the Company to pay an extraordinary dividend. Nevertheless, dividends paid by the Company on the Company Common Securities could result in a reduction in the Company's assets that could have the consequence, notwithstanding its compliance with the limitations referred to above, of the Company not having funds available to pay full dividends on the Company Preferred Securities in future periods or loss by investors of some or all of the amount of their investment were the Company to be liquidated.

***The Trust Securities and the Fixed-to-Floating Rate Company Preferred Securities are perpetual and not redeemable at the option of the holder, and holders of the Trust Securities can have no assurance of receiving their initial investment back.***

The Trust Securities may not be redeemed at the option of the holder thereof under any circumstances, are perpetual and have no maturity date. If and when the Company redeems Fixed-to-Floating Rate Company Preferred Securities, WaMu Delaware will redeem a like amount of Trust Securities. While the Fixed-to-Floating Rate Company Preferred Securities may be redeemed at the option of the Company under certain circumstances described herein, any such redemption is subject to the approval of the OTS and may be constrained by operation of the Replacement Capital Covenant. Investors in the Trust Securities will have no right to reclaim their initial investment from WaMu Delaware and there can be no guarantee that the Trust Securities will ever be redeemed. If investors in the Trust Securities choose to sell their Trust Securities in order to reclaim all or part of their initial investment in the absence of any redemption, there can be no guarantee that such investors would be able to sell their securities in the secondary market, or that if such sale occurred the sale price would be at or above the initial price.

***A decline in WMB's capital levels may result in a Conditional Exchange. If a Conditional Exchange occurs, it is likely to occur at a time when WMB's and WMI's financial condition has deteriorated and may have other adverse consequences.***

The returns from an investment in the Trust Securities will be dependent to a significant extent on the performance and capital of WMB due to the potential for a Conditional Exchange. A decline in the performance and capital levels of WMB or the placement by the OTS of WMB into conservatorship or receivership could result in a Conditional Exchange of the Trust Securities for Fixed-to-Floating Rate Depositary Shares representing Fixed-to-Floating Rate WMI

Preferred Stock. The Fixed-to-Floating Rate WMI Preferred Stock would represent an investment in WMI and not in the Company or WaMu Delaware. Under these circumstances:

- the Trust Securities would be exchanged for a preferred equity interest in WMI at a time when WMB's and, ultimately, WMI's financial condition has deteriorated or when WMB may have been placed into conservatorship or receivership and, accordingly, it is unlikely that WMI would be in a financial position to make any dividend payment on the amount of Fixed-to-Floating Rate WMI Preferred Stock;

- in the event of a liquidation of WMI, the claims of creditors of WMI would be entitled to priority in payment over the claims of holders of equity interests such as the Fixed-to-Floating Rate Depositary Shares, and, therefore, the former holders of the Trust Securities who would then hold the Fixed-to-Floating Rate Depositary Shares representing the Fixed-to-Floating Rate WMI Preferred Stock because of the occurrence of the Conditional Exchange may receive substantially less than such holders would receive had the Trust Securities not been exchanged for the Fixed-to-Floating Rate Depositary Shares. See "— Risk Factors Applicable to Fixed-to-Floating Rate Depositary Shares Issued in a Conditional Exchange — The Fixed-to-Floating Rate WMI Preferred Stock will rank subordinate to the direct indebtedness of WMI;"

- for United States Federal income tax purposes, a Conditional Exchange would most likely be a taxable event to holders of the Trust Securities, and in that event such holders generally would incur a gain or loss, as the case may be, measured by the difference between their adjusted tax basis in the Trust Securities and the fair market value of the Fixed-to-Floating Rate Depositary Shares; and

- although the terms of Fixed-to-Floating Rate Depositary Shares are substantially similar to the terms of the Fixed-to-Floating Rate Company Preferred Securities, there are differences that holders of Trust Securities might deem to be important, such as the fact that holders of Fixed-to-Floating Rate Depositary Shares will not generally have voting rights, except as required by law or in connection with the right to elect directors if dividends are missed (see "Description of the Fixed-to-Floating Rate WMI Preferred Stock — Voting Rights"), or benefit from any protective covenants.

***The terms of the Trust Securities and the Fixed-to-Floating Rate Company Preferred Securities provide for limited voting rights.***

Except as specified in the Trust Agreement or in relation to the right to direct the manner in which the Property Trustee acting on behalf of WaMu Delaware exercises its voting rights with respect to the Fixed-to-Floating Rate Company Preferred Securities, holders of Trust Securities are not entitled to voting rights. Except as specified in the LLC Agreement, WaMu Delaware, as holder of Fixed-to-Floating Rate Company Preferred Securities, is not entitled to voting rights. However, the Company is prohibited by the LLC Agreement from taking certain actions without the consent or vote of at least two-thirds of either the Fixed-to-Floating Rate Company Preferred Securities voting separately or the Fixed-to-Floating Rate Company Preferred Securities and the Fixed Rate Company Preferred Securities, voting together as a single class, as applicable. For a description of the matters on which the holders of Fixed-to-Floating Rate Company Preferred Securities have a right to vote, see "Description of the Fixed-to-Floating Rate Company Preferred Securities — Voting Rights and Covenants."

*Holders of the Trust Securities and Fixed-to-Floating Rate Company Preferred Securities have no redemption rights; however, the Company may (but is not required to) redeem the Fixed-to-Floating Rate Company Preferred Securities upon the occurrence of a Tax Event, an Investment Company Act Event or a Regulatory Capital Event prior to March 15, 2011, and at any time thereafter and such redemption will cause an automatic redemption of the Trust Securities.*

Subject to the Replacement Capital Covenant and the prior approval of the OTS, the Company may redeem the Fixed-to-Floating Rate Company Preferred Securities (i) in whole but not in part upon the occurrence of a Tax Event, an Investment Company Act Event or a Regulatory Capital Event prior to March 15, 2011, and (ii) in whole or in part, at any time on or after March 15, 2011, at a redemption price equal to the liquidation preference per Fixed-to-Floating Rate Company Preferred Security, plus declared but unpaid dividends, if any, plus a U.S. Treasury-based "make-whole" amount if the redemption occurs prior to March 15, 2011. The redemption by the Company of the Fixed-to-Floating Rate Company Preferred Securities will automatically cause a redemption of the Trust Securities for which the redemption price will be paid from the proceeds WaMu Delaware receives from the Company as a consequence of the redemption of the Fixed-to-Floating Rate Company Preferred Securities. The occurrence of a Tax Event, an Investment Company Act Event or a Regulatory Capital Event will not, however, give a holder of the Trust Securities any right to request that the Fixed-to-Floating Rate Company Preferred Securities or the Trust Securities be redeemed.

If the Company redeems the Fixed-to-Floating Rate Company Preferred Securities, the Trust Securities will be automatically redeemed, and the former holders of the Trust Securities may not be able to invest their redemption proceeds in securities with a dividend yield and other terms comparable to that of the Trust Securities. A Treasury based "make whole" amount will be payable only in connection with a redemption prior to the Dividend Payment Date in March 2011.

*The Fixed-to-Floating Rate Company Preferred Securities will rank subordinate to claims of the Company's creditors and on a parity with other series of preferred securities issued by the Company.*

The Fixed-to-Floating Rate Company Preferred Securities will rank subordinate to all claims of the Company's creditors. The Fixed-to-Floating Rate Company Preferred Securities will rank *pari passu* as to dividends and upon liquidation with the Fixed Rate Company Preferred Securities and other Parity Equity Securities that the Company may issue. The Company will issue the Fixed Rate Company Preferred Securities to WaMu Cayman at a time substantially contemporaneous with this Offering, and may issue additional Parity Equity Securities at any time in the future, subject to certain conditions at the time of issuance, without the consent or approval of the holders of the Trust Securities. Accordingly, if

- the Company does not have funds legally available to pay full dividends on the Fixed-to-Floating Rate Company Preferred Securities and any Parity Equity Securities; or

- in the event of the Company's liquidation, dissolution or winding up, the Company does not have funds legally available to pay the full liquidation value of the Fixed-to-Floating Rate Company Preferred Securities and any Parity Equity Securities,

any funds that are legally available to pay such amounts will be paid *pro rata* to the Fixed-to-Floating Rate Company Preferred Securities and any other Parity Equity Securities then outstanding. See "Description of Other Company Securities — Fixed Rate Company Preferred Securities."

*There has never been a market for the Trust Securities.*

Prior to this Offering, there was no market for the Trust Securities. Although the Initial Purchasers intend to make a market in the Trust Securities, they are under no obligation to do so

and, to the extent that such market making is commenced, it may be discontinued at any time. The Trust Securities will not be listed on any securities exchange or automated dealer quotation system. There can be no assurance that an active and liquid trading market for the Trust Securities will develop or be sustained. If such a market were to develop, the prices at which the Trust Securities trade would depend on many factors, including prevailing interest rates, the operating results of the Company, WMB and WMI, and the market for similar securities. Holders of Trust Securities may not be able to resell their Trust Securities at or above the initial price. Furthermore, the Trust Securities are not and will not be registered under the Securities Act, will be deemed to be restricted securities within the meaning of Rule 144 under the Securities Act and are subject to significant transfer restrictions as described in "Notice to Investors." These restrictions on transfer may inhibit the development of an active and liquid trading market for the Trust Securities and may adversely impact the market price of the Trust Securities.

### The Trust Securities are not obligations of, or guaranteed by, any other entity.

The Trust Securities do not constitute obligations or equity securities of WMI, WMB, the Company, Marion Holdings Inc., an intermediate holding company between WMB and University Street ("Marion"), University Street, the Asset Trust, WaMu Cayman or any other entity, nor are WaMu Delaware's obligations with respect to the Trust Securities guaranteed by any other entity. In particular, neither WMI, WMB, the Company, University Street, Marion, the Asset Trust, WaMu Cayman nor any other entity guarantees that WaMu Delaware will pass through any dividends paid by the Company to WaMu Delaware as the holder of the Trust Securities, nor are they obligated to provide additional capital or other support to WaMu Delaware to enable WaMu Delaware to make distributions in the event the Company fails to pay dividends on the Fixed-to-Floating Rate Company Preferred Securities and WaMu Delaware is thus unable to pass through such dividends on the Trust Securities to holders of the Trust Securities. The Trust Securities are not exchangeable for Fixed-to-Floating Rate Depositary Shares or Fixed-to-Floating Rate WMI Preferred Stock except upon a Conditional Exchange. No holder of Trust Securities will have the right to require WaMu Delaware to exchange the Trust Securities for Fixed-to-Floating Rate Depositary Shares.

### The Fixed-to-Floating Rate Company Preferred Securities represent solely an interest in the Company and are not obligations of, or guaranteed by, any other entity.

The Fixed-to-Floating Rate Company Preferred Securities do not constitute obligations or equity securities of any entity other than the Company, including WMI, WMB, Marion, University Street, WaMu Cayman, the Asset Trust and WaMu Delaware, nor are the Company's obligations with respect to the Fixed-to-Floating Rate Company Preferred Securities guaranteed by any other entity. In particular, neither WMI, WMB, Marion, University Street, WaMu Delaware, the Asset Trust, WaMu Cayman nor any other entity, guarantees that the Company will declare or pay any dividends to WaMu Delaware, nor are they obligated to provide additional capital or other support to the Company to enable the Company to pay dividends on the Fixed-to-Floating Rate Company Preferred Securities to WaMu Delaware in the event the Company's assets and results from operations are insufficient for such purpose.

### Risks Associated with the Company's Business

### The Company is effectively controlled by WMI and the Company's relationship with WMI, and/or WMB may create potential conflicts of interest.

All of the Company's officers and certain of the Company's managers are also officers of WMI or WMB or their affiliates. After this Offering, WMI, WMB and University Street will continue to control all of the Company's outstanding voting securities. WMI, WMB, and University Street will have the right to elect all of the Company's managers, including the Independent Manager.

WMB and University Street may have interests that are not identical to the Company's interests. WMI, through its subsidiary, New American Capital, Inc., is the ultimate owner of WMB's and University Street's common stock, and may have investment goals and strategies that differ from those of the holders of the Trust Securities. Consequently, conflicts of interest between the Company, on one hand, and WMB, University Street and/or WMI, on the other hand, may arise.

**The Company is dependent on the officers and employees of WMI and WMB for the selection, structuring and monitoring of the loans in the Asset Trust and the Company's relationship with WMI and/or WMB may create potential conflicts of interest.**

WMI and WMB are involved in virtually every aspect of the Company's existence. WMB administers the Company's day-to-day activities under the terms of certain agreements between WMB and the Company. The Company is dependent on the diligence and skill of the officers and employees of WMB for the selection, structuring and monitoring of the HELs in the Asset Trust and the Company's other Eligible Investments.

This dependency and the Company's close relationship with WMI and WMB may create potential conflicts of interest. Specifically, such conflicts of interest may arise because the employees of WMI and WMB (i) were directly involved in the decisions regarding the amount, type and price of HELs and other assets acquired indirectly from University Street and WMB prior to the Offering and (ii) will make decisions on the amount, type and (if applicable) price of any future acquisitions by the Company of Additional Assets from University Street, WMI or other parties.

**The Company is dependent on the officers and employees of WMB for the servicing of the loans in the Asset Trust and the Company's relationship with WMB may create potential conflicts of interest.**

The Company is dependent on WMB and others for the servicing of the HELs in the Asset Trust and is expected to be dependent on WMB and others for the servicing of any underlying collateral with respect to Additional Assets. WMB administers the Company's day-to-day activities under the terms of the Asset Documentation relating to the Company's assets. These agreements contain and will contain terms which the Company believes are consistent with those resulting from arm's-length negotiations. With respect to the Pooling and Servicing Agreement and the Asset Trust, WMB's servicing fee will be a *per annum* fee, paid monthly, for each HEL based on the unpaid principal balance of such HEL and will equal 0.125% *per annum*. WMB, as Servicer, will be entitled to retain certain fees and ancillary charges, including any prepayment fees, insufficient funds fees, modification fees, payoff statement fees and late charges with respect to the HELs as additional servicing compensation and will also be entitled to certain income generated by permitted investments made with collections on the HELs.

Despite the Company's belief that the terms of the Asset Documentation between WMB and the Company reflect and will reflect terms consistent with those negotiated on an arm's-length basis, the Company's dependency on WMB's officers and employees and the Company's close relationship with WMB may create potential conflicts of interest. Specifically, such conflicts of interest may arise because the employees of WMB have the power to modify the terms of HELs and other assets in the Asset Trust and other Eligible Assets and make business decisions with respect to the servicing of such underlying assets, particularly to the extent such underlying collateral is defaulted or otherwise non-performing.

***Regulators may limit the Company's ability to implement the Company's business plan and may restrict the Company's ability to pay dividends.***

Because the Company is an indirect subsidiary of WMB, regulatory authorities will have the right to examine the Company and its activities and, under certain circumstances, to impose restrictions on WMB or the Company that could impact its ability to conduct business pursuant to the Company's business plan and that could adversely affect the Company's financial condition and results of operations.

If the OTS, which is WMB's primary regulator, determines that WMB's relationship with the Company results in an unsafe or unsound practice, or if, in certain instances, WMB is no longer well-capitalized, then the OTS has the authority to:

- restrict the Company's ability to transfer assets;

- restrict the Company's ability to pay dividends to its security holders;

- restrict the Company's ability to redeem its preferred securities; or

- require WMB to sever its relationship with the Company or divest its ownership of the Company.

If the OTS determines that WMB is operating with an insufficient level of capital, or that the payment of dividends by either WMB or its subsidiaries, under the then-present circumstances, is an unsafe and unsound practice, the OTS could restrict the Company's ability to pay dividends.

***If any of the Company, the Asset Trust or WaMu Delaware loses its exemption under the Investment Company Act it could have a material adverse effect on the Company and would likely result in a redemption of the Fixed-to-Floating Rate Company Preferred Securities and the Trust Securities.***

Each of the Company, the Asset Trust and WaMu Delaware believes that it is not, and intends to conduct its operations so as not to be, required to register as an investment company under the Investment Company Act. Under the Investment Company Act, a non-exempt entity that is an investment company is required to register with the SEC and is subject to extensive, restrictive and potentially adverse regulation relating to, among other things, operating methods, management, capital structure, dividends and transactions with affiliates. The Investment Company Act exempts entities that, directly or through majority-owned subsidiaries, are "primarily engaged in the business of purchasing or otherwise acquiring mortgages and other liens on and interests in real estate" (which the Company refers to as *"Qualifying Interests"*). Under current interpretations of the staff of the SEC, in order to qualify for this exemption, each of the Company and the Asset Trust, among other things, must maintain at least 55% of the Company's assets in Qualifying Interests and also may be required to maintain an additional 25% in Qualifying Interests or other real estate related assets. The assets that the Company or the Asset Trust may acquire therefore may be limited by the provisions of the Investment Company Act. The Company and the Asset Trust have each established a policy of limiting authorized investments which are not Qualifying Interests to no more than 20% of the value of their respective total assets. The Investment Company Act does not treat cash and cash equivalents as either Qualifying Interests or other real estate related assets.

Based on the criteria outlined above, the Company and the Asset Trust each believe that, as of the time of the Offering, the Company's and the Asset Trust's Qualifying Interests will comprise at least 90% of the estimated fair market value of their respective total assets. As a result, the Company and the Asset Trust each believe that they are not required to register as an investment company under the Investment Company Act. Neither the Company nor the Asset Trust intends, however, to seek an exemptive order, no-action letter or other form of interpretive guidance from the SEC or its staff on this position. If the SEC or its staff were to take a different

position with respect to whether the Company's or the Asset Trust's assets constitute Qualifying Interests, the Company or the Asset Trust could be required either (i) to change the manner in which it conducts its operations to avoid being required to register as an investment company, or (ii) to register as an investment company, either of which could have a material adverse effect on the Company or the Asset Trust, as the case may be, the Company's ability to make payments in respect of the Fixed-to-Floating Rate Company Preferred Securities and, accordingly, the trading price of the Trust Securities. Further, in order to ensure that the Company and the Asset Trust at all times continues to qualify for the above exemption from the Investment Company Act, the Company and the Asset Trust may be required at times to adopt less efficient methods of financing certain of the Company's and the Asset Trust's assets than would otherwise be the case and may be precluded from acquiring certain types of assets whose yield is higher than the yield on assets that could be purchased in a manner consistent with the exemption. The net effect of these factors may be to lower at times the Company's net interest income. Finally, if the Company or the Asset Trust were an unregistered investment company, there would be a risk that the Company or the Asset Trust, as the case may be, would be subject to monetary penalties and injunctive relief in an action brought by the SEC, that the Company or the Asset Trust, as the case may be, would be unable to enforce contracts with third parties and that third parties could seek to obtain rescission of transactions undertaken during the period the Company or the Asset Trust was determined to be an unregistered investment company. In the event the Company, the Asset Trust or WaMu Delaware is ever considered an investment company under the Investment Company Act as a result of an Investment Company Act Event, the Company would likely redeem the Fixed-to-Floating Rate Company Preferred Securities. See "Description of the Fixed-to-Floating Rate Company Preferred Securities — Redemption."

Additionally, the Company may from time to time have Asset Subsidiaries other than the Asset Trust. The Company may not establish an Asset Subsidiary unless the establishment and operation of such Asset Subsidiary will not cause the Company to be an investment company which is required to register under the Investment Company Act and such Asset Subsidiary is not itself an investment company which is required to register under the Investment Company Act. If any such Asset Subsidiary were to be required to register as an investment company, the results would be similar to those described above in respect to the Asset Trust being required to register as an investment company.

## Adverse Effect of Determination of Company's Partnership Status

Prior to the issuance of the Company Preferred Securities, the Company will receive an opinion from Mayer, Brown, Rowe & Maw LLP to the effect that, for United States Federal income tax purposes, (i) the Company will not be treated as an association taxable as a corporation and (ii) although no activities closely comparable to that contemplated by the Company have been the subject of any U.S. Treasury regulation, revenue ruling or judicial decision, the Company will not be treated as a publicly traded partnership taxable as a corporation. The opinions are based on certain assumptions and on certain representations and agreements regarding restrictions on the future conduct of the activities of the Company. Although the Company intends to conduct its activities in accordance with such assumptions, representations and agreements, if it were nonetheless determined that the Company was taxable as a corporation for United States Federal income tax purposes, then the Company would be subject under the Code to the regular corporate income tax. Such taxes would reduce the amounts available to make payments on the Company Preferred Securities.

*The Company has no control over changes in interest rates and such changes could negatively impact the Company's financial condition, results of operations, and ability to pay dividends.*

Initially, the Company's income consists primarily of payments received on the HELs which are the underlying assets supporting the Class A Asset Trust Certificate (such underlying assets, together with any collateral with respect to any Additional Assets, the *"Company's Portfolio"*). At January 31, 2006, 100% of the HELs to be included in the Company's Portfolio bore interest at fixed rates; *however,* in the future, the Company could acquire Additional Assets which include or are secured by adjustable rate loans. Adjustable rate loans decrease the risks to a lender associated with changes in interest rates but involve other risks. As interest rates rise, the payment by the borrower rises to the extent permitted by the terms of the loan, and the increased payment increases the potential for default. At the same time, the marketability of the underlying property may be adversely affected by higher interest rates. In a declining interest rate environment, there may be an increase in prepayments on the HELs or other assets in the Company's Portfolio as the borrowers refinance their mortgages at lower interest rates. Under these circumstances, the Company may find it more difficult to acquire Additional Assets with rates sufficient to support the payment of the dividends on the Fixed-to-Floating Rate Company Preferred Securities. A declining interest rate environment would adversely affect the Company's ability to pay full, or even partial, dividends on the Fixed-to-Floating Rate Company Preferred Securities.

*The loans in the Company's Portfolio are subject to economic conditions that could negatively affect the value of the collateral securing such loans and/or the results of the Company's operations.*

The value of the collateral underlying the Company's Portfolio and/or the results of the Company's operations could be affected by various conditions in the economy, such as:

- local and other economic conditions affecting real estate and other collateral values;

- sudden or unexpected changes in economic conditions, including changes that might result from terrorist attacks and the United States' response to such attacks;

- the continued financial stability of a borrower and the borrower's ability to make loan principal and interest payments, which may be adversely affected by job loss, recession, divorce, illness or personal bankruptcy; and

- interest rate levels and the availability of credit to refinance loans at or prior to maturity.

*The loans in the Company's Portfolio that are held through the Asset Trust are concentrated in two states, and adverse conditions in those states, in particular, could negatively impact the Company's operations.*

At January 31, 2006, more than 79% (as a percentage of loan principal balances) of the assets in the Company's Portfolio were located in Texas and California. Because of the concentration of the Company's interest in those states, in the event of adverse economic conditions in those states, the Company would likely experience higher rates of loss and delinquency on the Company's Portfolio than if the underlying HELs were more geographically diversified. Additionally, the HELs in the Company's Portfolio may be subject to a greater risk of default than other comparable loans in the event of adverse economic, political, or business developments or natural hazards that may affect Texas and California, and the ability of property owners or commercial borrowers in those states to make payments of principal and interest on the underlying loans. In the event of any adverse development or natural disaster in those states, the Company's ability to pay dividends on the Fixed-to-Floating Rate Company Preferred Securities could be adversely affected.

*The Company cannot assure purchasers that it paid WMB and University Street fair market value for all of the Company's assets because the Company has not obtained any third party valuations of all such assets. Nor can the Company assure purchasers that the Company will acquire or dispose of its assets in the future at their fair market value.*

The Company has adopted policies with a view to ensuring that all financial dealings between WMB, University Street and the Company will be fair to each party and consistent with market terms. However, there has been no third party valuation of all of the Company's assets. In addition, it is not anticipated that third party valuations will be obtained in connection with future acquisitions or dispositions of assets even in circumstances where an affiliate of the Company is selling the assets to the Company, or purchasing the assets from the Company. Accordingly, the Company cannot assure purchasers that the purchase price the Company paid for all of the Company's assets was equal to the fair market value of those assets. Nor can the Company assure purchasers that the consideration to be paid by the Company to, or received by the Company from, WMB, University Street or any of the Company's affiliates in connection with future acquisitions or dispositions of assets will be equal to the fair market value of such assets.

*The Asset Trust or any other Asset Subsidiary, and therefore, the Company, could incur losses as a result of environmental liabilities of properties underlying the Company's assets in the Company's Portfolio through foreclosure action.*

The Asset Trust or any other Asset Subsidiary may be forced to foreclose on an underlying HEL or other assets where the borrower has defaulted on its obligation to repay the applicable loans. It is possible that the Asset Trust or any other Asset Subsidiary, and therefore, the Company, may be subject to environmental liabilities with respect to foreclosed property. The discovery of these liabilities and any associated costs for removal of hazardous substances, wastes, contaminants or pollutants, could have a material adverse effect on the fair value of such assets.

*Delays in liquidating defaulted loans could occur and could cause the Company's business to suffer.*

Substantial delays could be encountered in connection with the liquidation of the collateral securing defaulted loans in the Company's Portfolio, with corresponding delays in the Company's receipt of related proceeds. An action to foreclose on a mortgaged property or repossess and sell other collateral securing a loan is regulated by state statutes and rules. Any such action is subject to many of the delays and expenses of lawsuits, which may impede the Company's ability to foreclose on or sell the collateral or to obtain proceeds sufficient to repay all amounts due on the related loan in the Company's Portfolio.

*The Company may invest in assets that involve new risks and need not maintain the current asset coverage.*

Although the Company's Portfolio currently consists primarily of HELs held through the Asset Trust, to the extent it acquires Additional Assets in the future, the Company is not required to limit its investments to assets of the types currently in the Company's Portfolio. See "The Company — Business of the Company — Assets of the Company." Assets such as second lien closed end home equity loans, first or second lien home equity lines of credit, mortgage loans on single family or multi-family residences, commercial mortgage loans or other real estate assets may involve different risks not described in this offering circular. Moreover, while the LLC Agreement will call for maintaining specified levels of FFO coverage as to expected dividends, the Company is not required to maintain the levels of asset coverage that currently exist.

***The Company is dependent on WMI, WMB and University Street with respect to its acquisition of Additional Assets and may be subject to conflicts of interest with respect to its acquisition of new assets.***

The dependency of the Company on WMI, University Street and WMB and the Company's close relationship with WMI, University Street and WMB may create potential conflicts of interest in connection with the Company's acquisition of Additional Assets. The Company will be dependent on WMI, University Street and WMB to identify Additional Assets which it may acquire, but WMI, University Street and WMB are not required to contribute or sell Additional Assets to the Company. If WMI, University Street and WMB are unable to identify, or are unwilling to contribute or sell, suitable Additional Assets, then over time the Company's level of FFO coverage as to expected dividends will decline. Moreover, conflicts of interest may arise because the employees of WMI, University Street and WMB will, subject to certain restrictions, make decisions on the amount, type and (to the extent the Company purchases Additional Assets) price of future acquisitions by the Company of Additional Assets from University Street, WMB or other members of the WMI Group as well as future dispositions of assets to WMB, University Street or third parties.

### Risk Factors Applicable to Fixed-to-Floating Rate Depositary Shares Issued in a Conditional Exchange.

***Holders of Trust Securities may have adverse tax consequences as a result of a Conditional Exchange.***

For United States Federal income tax purposes, a Conditional Exchange would most likely be a taxable event to holders of Trust Securities under the Code, and they would incur a gain or loss, as the case may be, measured by the difference between their adjusted tax basis in the Trust Securities and the fair market value of the Fixed-to-Floating Rate Depositary Shares. In addition, dividends, if any, paid to Foreign Holders of Fixed-to-Floating Rate Depositary Shares received upon a Conditional Exchange generally will be subject to a 30% U.S. withholding tax unless the holder qualifies for a reduction from withholding tax under an applicable United States income tax treaty.

***A decline in WMI's financial condition may restrict its ability to pay dividends and could result in a loss on the investment of the former holders of Trust Securities.***

If WMI's financial condition were to deteriorate, the holders of the Fixed-to-Floating Rate Depositary Shares could suffer direct and materially adverse consequences, including suspension of the payment of non-cumulative dividends on the Fixed-to-Floating Rate WMI Preferred Stock and, if a liquidation, dissolution or winding up of WMI were to occur, loss by holders of Fixed-to-Floating Rate Depositary Shares of all or part of their investment. See "Description of the Fixed-to-Floating Rate WMI Preferred Stock."

***A Conditional Exchange may be based on WMB's receivership, which could lead to WMI's bankruptcy and would mean that others are likely to have liquidation claims senior to that of the holders of the Fixed-to-Floating Rate Depositary Shares.***

An Exchange Event triggering a Conditional Exchange will occur if WMB is placed into conservatorship or receivership. WMB's conservatorship or receivership could lead to WMI becoming subject to a voluntary or involuntary proceeding under the U.S. Bankruptcy Code. In the event of WMI's bankruptcy, the claims of WMI's secured, senior, general and subordinated creditors would be entitled to a priority of payment over the claims of holders of equity interests such as the Fixed-to-Floating Rate WMI Preferred Stock. As a result of such subordination, if WMI became subject to a bankruptcy proceeding after a Conditional Exchange the holders of the

Fixed-to-Floating Rate Depositary Shares would likely receive, if anything, substantially less than they would have received had the Conditional Exchange not occurred.

### The Fixed-to-Floating Rate WMI Preferred Stock will rank subordinate to the direct indebtedness of WMI.

The Fixed-to-Floating Rate WMI Preferred Stock will be subordinate and rank junior in right of payment to all of WMI's indebtedness for borrowed money and indebtedness evidenced by notes or other securities. Because the sole source of funds for payment in respect of the Fixed-to-Floating Rate Depositary Shares is the Fixed-to-Floating Rate WMI Preferred Stock, the Fixed-to-Floating Rate Depositary Shares are effectively subordinated on the same basis as the Fixed-to-Floating Rate WMI Preferred Stock. The terms of the Fixed-to-Floating Rate Depositary Shares and the Fixed-to-Floating Rate WMI Preferred Stock will not limit in any way WMI's ability to incur additional indebtedness.

### The Fixed-to-Floating Rate WMI Preferred Stock will be structurally subordinated to all obligations of WMI's subsidiaries, and as a holding company, WMI may require cash from its subsidiaries to make payments with respect to the Fixed-to-Floating Rate Depositary Shares.

WMI is a holding company that conducts its operations through its operating subsidiaries and relies primarily on interest payments, dividends, proceeds from inter-company transactions and loans from those subsidiaries to meet its obligations for payment with respect to its outstanding equity securities, any and all of which may be subject to contractual restrictions and regulatory restrictions. Accordingly, the Fixed-to-Floating Rate WMI Preferred Stock (and thus the Fixed-to-Floating Rate Depositary Shares) is structurally subordinated to all existing and future liabilities of WMI's subsidiaries. Holders of Fixed-to-Floating Rate Depositary Shares should look only to the assets of WMI, and not any of its subsidiaries, for payments with respect to the Fixed-to-Floating Rate Depositary Shares. If WMI is unable to obtain cash from its subsidiaries it may be unable to fund dividend payments in respect of the Fixed-to-Floating Rate Depositary Shares.

### Upon the occurrence of a Conditional Exchange, the holders of the Fixed-to-Floating Rate Depositary Shares will not have the benefit of the same favorable covenants as the Fixed-to-Floating Rate Company Preferred Securities.

Upon the occurrence of a Conditional Exchange, the holders of the Fixed-to-Floating Rate Depositary Shares will not benefit from the same favorable covenants as the Fixed-to-Floating Rate Company Preferred Securities.

### WMI is not obligated to pay dividends on the Fixed-to-Floating Rate WMI Preferred Stock and dividends on these securities are not cumulative.

Dividends on the Fixed-to-Floating Rate WMI Preferred Stock are not cumulative. Consequently, if the board of directors of WMI ("WMI's Board of Directors") does not declare dividends on the Fixed-to-Floating Rate WMI Preferred Stock for any quarterly period, the holders of the Fixed-to-Floating Rate Depositary Shares would not be entitled to any such dividend whether or not funds are or subsequently become available.

WMI's Board of Directors may determine that it would be in WMI's best interest to pay less than the full amount of the stated dividends on the Fixed-to-Floating Rate WMI Preferred Stock or no dividends for any quarter even if funds are available. Factors that would be considered by WMI's Board of Directors in making this determination are WMI's financial condition and capital needs, the impact of current and pending legislation and regulations, economic conditions, tax considerations, and such other factors as WMI's Board of Directors may deem relevant.

*There is no active trading market for Fixed-to-Floating Rate WMI Preferred Stock or the Fixed-to-Floating Rate Depositary Shares and such trading market may never develop.*

The Fixed-to-Floating Rate WMI Preferred Stock and the Fixed-to-Floating Rate Depositary Shares will be new issues of securities. WMI does not intend to cause the listing or quotation of the Fixed-to-Floating Rate WMI Preferred Stock or the Fixed-to-Floating Rate Depositary Shares on any securities exchange or automated dealer quotation system. The Initial Purchasers are under no obligation to and do not intend to make a market in the Fixed-to-Floating Rate Depositary Shares. Consequently, it is unlikely that an active and liquid trading public market for the Fixed-to-Floating Rate Depositary Shares or the underlying Fixed-to-Floating Rate WMI Preferred Stock will develop or be maintained. The lack of liquidity and an active trading market could adversely affect ability of the holders of Fixed-to-Floating Rate Depositary Shares to dispose of such shares.

In addition, neither the Fixed-to-Floating Rate Depositary Shares nor the Fixed-to-Floating Rate WMI Preferred Stock represented by such shares have or will be registered under the Securities Act and will be deemed to be restricted securities within the meaning of Rule 144 of the Securities Act. Holders of Fixed-to-Floating Rate Depositary Shares will not be able to offer, sell, pledge or otherwise transfer the Fixed-to-Floating Rate Depositary Shares other than:

- to a qualified institutional buyer within the meaning of Rule 144A of the Securities Act in a transaction complying with Rule 144A;
- otherwise in accordance with an applicable exemption from the registration requirements of the Securities Act; or
- to WMI or one of WMI's affiliates, and in any case, in accordance with exemptions from any applicable state securities or blue sky laws.

These restrictions on transfer may inhibit the development of an active and liquid trading market for the Fixed-to-Floating Rate Depositary Shares and may adversely impact the market price of such shares.

## CERTAIN INFORMATION CONCERNING WMB

### General

Washington Mutual Bank (formerly known as Washington Mutual Bank, FA and referred to herein as "WMB") is a federally chartered savings association, chartered and operating under the United States Home Owners' Loan Act of 1933, as amended. WMB engages in mortgage banking, consumer banking and small business banking. WMB, as a federally chartered association, has the authority to make various types of loans, including loans secured by homes and commercial real estate, secured and unsecured consumer loans, and secured and unsecured commercial loans. As a federal savings association, WMB is subject to regulation and examination by the U.S. Office of Thrift Supervision (together with any successor regulator, the "OTS"), its primary regulator. WMB is an indirect wholly-owned subsidiary of WMI.

Prior to 2004, WMB had two sister depository institutions which were both owned directly by WMI. WMB has since acquired both of these sister institutions. One of these institutions, Washington Mutual Bank fsb, a federal savings bank, became a wholly-owned subsidiary of WMB on February 1, 2004. The other institution, Washington Mutual Bank, a savings bank chartered under the laws of the state of Washington, converted into a federally chartered savings bank and then was merged into WMB on January 1, 2005.

WMB has applied to the OTS for approval to acquire Long Beach Mortgage Company. Long Beach Mortgage Company's primary business is to originate, purchase, securitize and sell subprime loans. Long Beach Mortgage Company is a wholly-owned subsidiary of WMI and is a non-bank affiliate of WMB. Assets originated by Long Beach Mortgage Company will not be owned by the Asset Trust.

The Trust Securities will be exchangeable, without the approval or any action on the part of the holders of such securities, for Fixed-to-Floating Rate Depositary Shares under any of the following circumstances, each of which is referred to as an Exchange Event:

- WMB becomes "undercapitalized" under the OTS' "prompt corrective action" regulations;

- WMB is placed into conservatorship or receivership; or

- the OTS, in its sole discretion, anticipates that WMB may become "undercapitalized" in the near term or takes supervisory action that limits the payment of dividends by WMB, and in connection therewith, directs such exchange.

### Capital Adequacy

WMB is subject to OTS capital requirements. The capital adequacy requirements are quantitative measures established by OTS regulations that require WMB to maintain minimum amounts and ratios of capital. The OTS requires WMB to maintain minimum ratios of core and total capital to risk-weighted assets, as well as core capital to adjusted total assets and tangible capital to adjusted total assets. Under applicable OTS regulations "Tier 1 capital" and "core capital" have the same meaning.

Federal law and regulations establish minimum capital standards, and under the OTS regulations, WMB is required to have a (i) leverage ratio of core capital to adjusted total assets of at least 4.00%, (ii) a ratio of core capital to total risk-weighted assets ratio of at least 4.00%, (iii) a ratio of total capital to risk-weighted assets of at least 8.00% and (iv) a ratio of tangible capital to total adjusted assets of at least 1.50%. A savings association's adjusted total assets represent the savings association's total assets on its Thrift Financial Report Consolidated Statement of Condition filed with the OTS less assets of non-includable subsidiaries, goodwill and other intangibles assets (exclusive of mortgage servicing rights and purchased credit card relationships), disallowed servicing assets and purchased credit card relationships and accumu-

lated gains (losses) on certain available-for-sale securities and cash flow hedges. For purposes of determining risk-weighted assets for the risk-based capital ratios, the book value of each of the savings association's on-balance sheet assets, and a portion of certain off-balance sheet items and exposures, are weighted from 0% to 100% based on broad categories. For instance, U.S. government debt obligations are generally risk-weighted at 0%; certain qualifying residential mortgage loans on one-to-four family dwellings are generally risk weighted at 50%; and commercial loans and most other assets are generally risk-weighted at 100%. Off-balance sheet items (including letters of credit, loan commitments, swaps and other derivatives) are converted into on-balance sheet "equivalent" amounts for risk-based capital purposes, then assigned a risk weight like other assets. The capital risk weighting assigned to certain asset-backed securities may vary from 20% to 200% depending on credit rating. Subordinated residual interests retained in asset securitizations, credit enhancement and forms of "recourse" can result in higher capital charges or deductions from capital.

For purposes of the OTS regulations, "*total capital*" is defined as the sum of core capital and supplementary capital. "Core *capital*" generally includes: common shareholders' equity (which includes related surplus); non-cumulative perpetual preferred stock (which includes related surplus); and qualifying minority interests in the equity accounts of consolidated subsidiaries (which may include such instruments as qualifying REIT preferred stock and the Company Preferred Securities). "*Supplementary capital*" generally includes (subject to certain limits and sub-limits): cumulative perpetual preferred stock; maturing capital instruments; Dutch auction and money market preferred stock; hybrid capital instruments (including certain mandatory convertible notes); term subordinated debt; the savings association's allowance for loan and lease losses (up to a maximum of 1.25% of total risk-weighted assets); and up to 45% of the pretax net unrealized gains of available-for-sale equity securities investments. Supplementary capital is permitted to count towards only one-half of total capital. Both core capital and tangible capital are subject to various deductions. Some of these deductions are more stringent for tangible capital than core capital, including goodwill, certain other intangible assets, and certain servicing assets in excess of certain limits.

Federal law and regulations also establish five capital categories for savings associations: well-capitalized, adequately capitalized, undercapitalized, significantly undercapitalized and critically undercapitalized. A savings association is treated as well-capitalized if its ratio of total capital to risk-weighted assets is 10.00% or more, its ratio of core capital to risk-weighted assets is 6.00% or more, its leverage ratio is 5.00% or more, and it is not subject to any federal supervisory agreement order or directive to meet a specific capital level. In order to be adequately capitalized, any savings association must have a ratio of total capital to risk-weighted assets of not less than 8.00%, a ratio of core capital to risk-weighted assets of not less than 4.00%, and (unless it is in the most highly-rated category) a leverage ratio of not less than 4.00%. Any savings association that is neither well-capitalized nor adequately capitalized will be considered undercapitalized. Any savings association with a tangible equity ratio of 2.00% or less will be considered critically undercapitalized.

Undercapitalized savings associations are subject to certain prompt corrective action requirements, regulatory controls and restrictions, which become more extensive as an association becomes more severely undercapitalized. Failure by WMB to comply with applicable capital requirements, if unremedied, would result in restrictions on its activities and lead to regulatory enforcement actions against WMB including, but not limited to, the issuance of a capital directive to ensure the maintenance of required capital levels. The Federal Deposit Insurance Corporation Improvement Act of 1991 requires the federal banking regulators to take prompt corrective action with respect to depository institutions that do not meet minimum capital requirements. Additionally, FDIC or OTS approval of any regulatory application filed for its review may be dependent on compliance with capital requirements.

31

In addition, the OTS from time to time may impose higher specific capital requirements on any savings association that is perceived to have risks, exposures, credit concentration, rapid growth or other circumstances warranting special attention. Failure to satisfy such a capital directive could subject an association to civil money penalties, judicial enforcement and administrative remedies available to the OTS, as well as a finding that a savings association is "undercapitalized".

Whether WMB would ever be determined by the OTS to be "undercapitalized" or at risk of becoming "undercapitalized" in the near term — thereby triggering the exchange of the Trust Securities for Fixed-to-Floating Rate Depositary Shares — could be influenced not only by the OTS' capital adequacy regulations, but also by the regulator's interpretations and judgment on other matters. For example, the OTS' views on asset credit quality potentially could affect a thrift or savings association's capital status. Among other things, the OTS typically evaluates asset quality, loan loss reserves and procedures during periodic regulatory examinations of each federal savings association. If, following such an examination or otherwise, the OTS in its discretion were to require WMB to significantly increase its reserves against credit losses (i.e., the allowance for loan and lease losses), this could potentially reduce WMB's retained earnings and regulatory capital. As noted above, a savings association's allowance for loan and lease losses is includable within supplementary capital only up to a limit, and is not includable at all in core capital.

A savings association's regulatory capital status, and the risk of being deemed "undercapitalized" could also be affected by other developments or by future changes in regulatory capital and other standards. WMB and WMI continue to actively follow the progress of the U.S. banking agencies and the Basel Committee on Banking Supervision in developing a new set of regulatory risk-based capital requirements. The Basel Committee on Banking Supervision is a committee established by the central bank governors of certain industrialized nations, including the United States. The new requirements are commonly referred to as Basel II or The New Basel Capital Accord; however, final requirements have not been adopted. WMB and WMI are also assessing the potential impacts of Basel II.

The regulatory capital ratios calculated for WMB, along with the capital amounts and ratios for the minimum regulatory requirement and the minimum amounts and ratios required to be categorized as well-capitalized under the regulatory framework for prompt corrective action were as follows:

| WMB | December 31, 2005 | | | | | |
|---|---|---|---|---|---|---|
| | Actual | | Minimum Regulatory Requirement | | Minimum to be Categorized as Well-Capitalized Under the OTS' Prompt Corrective Action Regulations | |
| | Amount | Ratio | Amount | Ratio | Amount | Ratio |
| | | | (Dollars in millions) | | | |
| Total capital to total risk-weighted assets | $26,530 | 11.62% | $18,260 | 8.00% | $22,825 | 10.00% |
| Core capital to total risk-weighted assets | 19,661 | 8.61 | 9,130 | 4.00 | 13,695 | 6.00 |
| Core capital to adjusted total assets (leverage) | 21,098 | 6.56 | 12,860 | 4.00[1] | 16,075 | 5.00 |
| Tangible capital to tangible assets (tangible equity) | 20,642 | 6.43 | 4,816 | 1.50 | n/a | n/a |

| WMB | December 31, 2004 | | | | | |
|---|---|---|---|---|---|---|
| | Actual | | Minimum Regulatory Requirement | | Minimum to be Categorized as Well-Capitalized Under the OTS' Prompt Corrective Action Provisions | |
| | Amount | Ratio | Amount | Ratio | Amount | Ratio |
| | | | (Dollars in millions) | | | |
| Total capital to total risk-weighted assets | $20,698 | 11.68% | $14,174 | 8.00% | $17,718 | 10.00% |
| Core capital to total risk-weighted assets | 14,392 | 8.12 | 7,087 | 4.00 | 10,631 | 6.00 |
| Core capital to adjusted total assets (leverage) | 14,530 | 5.46 | 10,635 | 4.00[1] | 13,294 | 5.00 |
| Tangible capital to tangible assets (tangible equity) | 14,530 | 5.46 | 3,988 | 1.50 | n/a | n/a |

| WMB | December 31, 2003 | | | | | |
|---|---|---|---|---|---|---|
| | Actual | | Minimum Regulatory Requirement | | Minimum to be Categorized as Well-Capitalized Under the OTS' Prompt Corrective Action Regulations | |
| | Amount | Ratio | Amount | Ratio | Amount | Ratio |
| | | | (Dollars in millions) | | | |
| Total capital to total risk-weighted assets | $15,444 | 10.80% | $11,441 | 8.00% | $14,302 | 10.00% |
| Core capital to total risk-weighted assets | 12,472 | 8.72 | 5,721 | 4.00 | 8,581 | 6.00 |
| Core capital to adjusted total assets (leverage) | 12,531 | 5.50 | 9,116 | 4.00[1] | 11,395 | 5.00 |
| Tangible capital to tangible assets (tangible equity) | 12,531 | 5.50 | 3,419 | 1.50 | n/a | n/a |

[1] The minimum leverage ratio guideline is 3% for financial institutions that do not anticipate significant growth and that have well-diversified risk, excellent asset quality, high liquidity, good earnings, effective management and monitoring of market risk and, in general, are considered top-rate, strong banking organizations.

**Benefits to WMB**

WMB has requested confirmation from the OTS that the Company Preferred Securities constitute core capital of WMB under the OTS's applicable regulatory capital regulations and, upon receipt of such confirmation, intends to treat the Company Preferred Securities accordingly.

## USE OF PROCEEDS

WaMu Delaware will use the proceeds of the sale of the Trust Securities in this Offering, expected to be approximately $1,225,000,000, net of underwriting commissions, to purchase from WMB a like amount of Fixed-to-Floating Rate Company Preferred Securities, which the Company will issue to WMB in exchange for the conveyance from WMB of a portfolio of HELs. The WMI Group will use the proceeds from the sale of the Fixed-to-Floating Rate Company Preferred Securities to WaMu Delaware and the Fixed Rate Company Preferred Securities to WaMu Cayman for general corporate purposes, which may include the repurchase of WMI's common stock.

## WAMU DELAWARE

Washington Mutual Preferred Funding Trust I ("*WaMu Delaware*") is a statutory trust created under the Delaware Statutory Trust Act, as amended (the "*Trust Act*"), pursuant to a certificate of trust filed with the Secretary of State of the State of Delaware and the execution of a trust agreement of WaMu Delaware on February 23, 2006. WaMu Delaware will continue its existence from and after the closing of the Offering pursuant to an amended and restated trust agreement (as so amended and restated, the "*Trust Agreement*"), to be entered into by and among the Company, as grantor, Wilmington Trust Company, as property trustee (the "*Property Trustee*"), and Wilmington Trust Company, as Delaware trustee (the "*Delaware Trustee*"), as of the date the Trust Securities are issued. The rights of the holders of the Trust Securities, including economic rights, rights to information and voting rights, are as set forth in the Trust Agreement and the Trust Act.

The Trust Agreement generally limits WaMu Delaware's activities to (i) holding the Fixed-to-Floating Rate Company Preferred Securities, (ii) issuing the Trust Securities, (iii) passing through dividends paid by the Company to WaMu Delaware on the Fixed-to-Floating Rate Company Preferred Securities and (iv) performing functions necessary or incidental thereto. WaMu Delaware is prohibited from issuing other equity securities or any debt securities or engaging in any other activities. Subject to the limitations and assumptions described under "Certain U.S. Federal Income Tax Considerations," WaMu Delaware will be treated as a grantor trust for United States Federal income tax purposes, with the result that holders of Trust Securities will be treated as beneficial owners of Fixed-to Floating Rate Company Preferred Securities for United States Federal income tax purposes. The Fixed-to-Floating Rate Company Preferred Securities will be the only assets of WaMu Delaware. The principal executive offices of WaMu Delaware will be located at 1201 Third Avenue, Seattle, WA 98101. The office of the Delaware Trustee is Rodney Square North, 1100 North Market Street, Wilmington, DE 19890. Copies of the Trust Agreement will be available upon request to WMI.

As set forth in, and subject to, the Trust Agreement, the Property Trustee and the Delaware Trustee will have exclusive and complete authority to carry out the purposes of WaMu Delaware.

The Property Trustee will hold title to the Fixed-to-Floating Rate Company Preferred Securities for the benefit of the holders of the Trust Securities, and, as such holder, the Property Trustee will have the power to exercise all rights, powers and privileges with respect to the Fixed-to-Floating Rate Company Preferred Securities under the LLC Agreement. In addition, the Property Trustee will maintain exclusive control of a segregated non-interest bearing bank account to hold all payments made in respect of the Fixed-to-Floating Rate Company Preferred Securities for the benefit of the holders of the Trust Securities.

Pursuant to the Trust Agreement, all charges or expenses of WaMu Delaware other than payments required under the terms of the Trust Securities, including the fees, charges and expenses of the Property Trustee, the Delaware Trustee, the Registrar, and Transfer Agent or any Paying Agent, will be paid or caused to be paid by the Company; *provided, however*, that if the Company does not pay or cause to be paid such fees, charges and expenses or can only pay such fees, charges and expenses in a manner that would allocate such fees, charges and expenses against the interests of the holders of the Fixed-to Floating Rate Company Preferred Securities, WMB will pay such fees, charges and expenses; *provided further*, that if the Property Trustee or the Delaware Trustee incurs fees, charges or expenses, for which they are not otherwise liable under the Trust Agreement, or if the Paying Agent or Registrar and Transfer Agent incurs fees, charges or expenses for which they are not otherwise liable under the Agency Agreement, in each case at the request of a holder of Trust Securities or other person, such holder or other person will be liable for such fees, charges and expenses.

The information with respect to WaMu Delaware that is required by paragraph (d)(4)(i) of Rule 144A under the Securities Act, will be available upon request to the Property Trustee until the earlier of (i) the redemption in full of the Trust Securities or (ii) the Conditional Exchange.

## THE COMPANY

Washington Mutual Preferred Funding LLC (the "*Company*") is a Delaware limited liability company formed on February 3, 2006 under the Delaware Limited Liability Company Act, as amended (the "*LLC Act*"), pursuant to an initial limited liability company agreement and a certificate of formation filed with the Secretary of State of the State of Delaware. The limited liability company agreement will be amended and restated in its entirety on or about March 7, 2006 (as so amended and restated, the "*LLC Agreement*").

The LLC Agreement generally limits the Company's activities to (i) issuing the Fixed-to-Floating Rate Company Preferred Securities, the Fixed Rate Company Preferred Securities and the common securities of the Company (the "*Company Common Securities*") and additional Parity Equity Securities of the Company, (ii) acquiring and holding Eligible Investments, including the Class A Asset Trust Certificate (which will be the sole initial Eligible Investments of the Company) in accordance with the investment policy as described in "— Business of the Company — Assets of the Company" and (iii) performing functions necessary or incidental thereto. Subject to the limitations and assumptions described under "Certain U.S. Federal Income Tax Considerations," the Company intends to be treated as a partnership (other than a publicly traded partnership taxable as a corporation) for United States Federal income tax purposes. Further, the Company may not take any action, or permit any action to be taken, that would cause the Company to fail to be treated as a partnership for United States Federal income tax purposes for so long as any Company Preferred Securities are outstanding, except with the consent or affirmative vote of the holders of at least two-thirds of the Fixed-to-Floating Rate Company Preferred Securities and the Fixed Rate Company Preferred Securities, voting together as a single class. The principal executive office of the Company is 1201 Third Avenue, Seattle, Washington 98101. Copies of the LLC Agreement will be available upon request to WMI.

The Company will receive the opinion of Mayer, Brown, Rowe & Maw LLP to the effect that, for United States Federal income tax purposes, the Company will not be treated as an association taxable as a corporation or as a publicly traded partnership taxable as a corporation.

### Capitalization

Upon completion of this Offering, University Street, Inc., an indirect subsidiary of WMB ("*University Street*"), will hold all of the Company Common Securities, representing 100% of the voting rights in the Company (subject to the limited voting rights of holders of the Company Preferred Securities described under "Description of Fixed-to-Floating Rate Company Preferred Securities — Voting Rights and Covenants"). Upon completion of this Offering, WaMu Delaware will hold all of the Fixed-to-Floating Rate Company Preferred Securities and WaMu Cayman will hold all of the Fixed Rate Company Preferred Securities.

The following table illustrates the expected capitalization of the Company as of the closing of this Offering, after giving effect to the issuance of the Company Common Securities, the Fixed-to-Floating Rate Company Preferred Securities and the Fixed Rate Company Preferred Securities on the closing date:

|  | As of the Closing Date (Unaudited) |
|---|---|
| Fixed-to-Floating Rate Company Preferred Securities . . . . . . . . | $1,250,000,000 |
| Fixed Rate Company Preferred Securities . . . . . . . . . . . . . . . . . . | $750,000,000 |
| Company Common Securities . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,389,459,150 |
| Total Capitalization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $5,389,459,150 |

## Business of the Company

### Assets of the Company

In connection with the Offering, WMB will convey a portfolio of HELs to the Company in exchange for 100% of the Company Preferred Securities. Concurrently, University Street will convey a portfolio of HELs to the Company in exchange for the Company Common Securities. The portfolios conveyed by WMB and University Street to the Company will consist of HELs having an aggregate principal balance of approximately $5,389,459,150 as of January 31, 2006 and includes payments received on such portfolio from and after February 1, 2006. The Company will then convey the assets received by it from WMB and University Street to the Asset Trust in exchange for interests in the Asset Trust represented by the Class A Asset Trust Certificate and the Class R Asset Trust Certificate.

The Eligible Investments (which will initially consist of the Class A Asset Trust Certificate owned by the Company) from time to time will generate net income for payment of dividends by the Company to WaMu Delaware as holder of the Fixed-to-Floating Rate Company Preferred Securities (and consequently for pass through by WaMu Delaware to holders of the Trust Securities), to WaMu Cayman as holder of the Fixed Rate Company Preferred Securities (and, consequently for payment as dividends by WaMu Cayman to the holders of the WaMu Cayman Preferred Securities), and to University Street as holder of the Company Common Securities.

The Company intends to manage its assets so as (i) to ensure that the Company will at all times maintain its exemption under the Investment Company Act, (ii) to result in the Company at all times maintaining sufficient FFO to allow payments to be made with respect to its Junior Equity Securities (including payments to University Street as holder of the Company Common Securities) and (iii) to maintain the desired treatment under the Code for the Company's assets and obligations.

Current requirements under the Investment Company Act mandate that in order to maintain its exemption from registration as an investment company the Company must limit its assets which are not Qualifying Interests to no more than 20% of its total assets at any time. The Company expects that initially the distributions it receives from the Asset Trust as holder of the Class A Asset Trust Certificate will significantly exceed the amount required to pay dividends on the Company Preferred Securities and any Parity Equity Securities. Cash received from the Asset Trust and any Permitted Investments purchased with such funds are not Qualifying Interests, and therefore funds received from the Asset Trust and retained by the Company will be limited (together with any other assets which are not Qualifying Interests) to 20% of the Company's total assets at any time. For this and other reasons, in the ordinary course, the Company expects that it will distribute all or substantially all of the funds it receives from the Asset Trust to University Street, as holder of the Company Common Securities, to the extent it is permitted to do so in accordance with the restrictions on dividends with respect to the Company Common Securities and such funds are not otherwise required to pay dividends on the Company Preferred Securities and any other Parity Equity Securities. The Company intends to invest funds it receives from the Asset Trust in Permitted Investments prior to such funds being distributed to the holders of the Company Common Securities, the Company Preferred Securities and any other Parity Equity Securities.

The Company also expects that over time the principal balance of the HELs held by the Asset Trust will decrease as a result of principal payments and payoffs. Since (i) in accordance with the terms of the Pooling and Servicing Agreement, additional assets may only be added to the Asset Trust in very limited circumstances and (ii) funds distributed to the Company by the Asset Trust may be distributed to University Street as discussed above and to the extent held by the Company will generally (when invested in Permitted Investments) generate a lower rate of return than the HELs held in the Asset Trust, over time the Company expects that its FFO will decline. Accordingly, prior to the point that the Company's FFO level is reduced to a level that

would prevent payments with respect to its Junior Equity Securities (Including payments to University Street as holder of the Company Common Securities) the Company intends to acquire additional income producing investments which constitute Eligible Assets. Any additional assets which are acquired by the Company will not be transferred to the Asset Trust or serviced in accordance with the Pooling and Servicing Agreement. Additional assets which are acquired by the Company and are not Permitted Investments (such assets, "*Additional Assets*") may (but are not in all cases required to) consist of obligations of Asset Subsidiaries. The terms of the Asset Documentation with respect to any Additional Assets will provide for the servicing of such Additional Assets.

"*Eligible Assets*" means assets:

(a) which (i) are securities, interests or other obligations of an Asset Subsidiary which are backed or collateralized by first or second lien closed end home equity loans, first or second lien home equity lines of credit, mortgage loans on single family or multi-family residences, commercial mortgage loans or other real estate assets, in each case, with respect to real estate located in the United States; *provided, however*, that the Company may acquire and hold first or second lien closed end home equity loans, first or second lien home equity lines of credit, mortgage loans on single family or multi-family residences, commercial mortgage loans or other real estate assets directly if the Company receives an Asset Tax Opinion in connection with such assets or (ii) otherwise satisfy the Rating Agency Condition and are approved by all of the managers, including the Independent Manager;

(b) which will be serviced and maintained in accordance with Asset Documentation;

(c) the collateral for which is not permitted to include under the related Asset Documentation any first or second lien closed end home equity loans, first or second lien home equity lines of credit, mortgage loans on single family or multi-family residences, commercial mortgage loans or other real estate assets as to which the applicable obligor was more than 30 days delinquent as of the applicable cut-off date or transfer date;

(d) the collateral for which does not create or carry any obligation of the Company or any Asset Subsidiary to make future advances or loans to any obligor with respect to such collateral under lines of credit, revolving loan facilities or other similar features; and

(e) the acquisition, maintenance and servicing of which will not (in itself or in connection with any of the Company's other assets):

(i) cause the Company to be an "investment company" which is required to register under the Investment Company Act;

(ii) cause the imposition of United States Federal income withholding tax in respect of payments made by the Company on the Company Preferred Securities or any Parity Equity Securities;

(iii) cause the Company to be treated under the Code as a publicly traded partnership taxable as a corporation; or

(iv) cause the Company to be treated as engaged in a U.S. trade or business, as determined for United States Federal income tax purposes.

"*Asset Documentation*" means (a) with respect to the Asset Trust and the Class A Asset Trust Certificate, the Pooling and Servicing Agreement and any related Custody Agreement and (b) with respect to any Additional Assets, the documentation (i) governing the maintenance and

servicing of such Additional Assets and custodial arrangements related thereto and (to the extent applicable) any underlying collateral related to such Additional Assets and (ii) establishing (if applicable) any Asset Subsidiary created in connection with such Additional Assets; *provided* that the execution of any such documentation, to the extent such documentation is not substantially similar in all material respects to the Pooling and Servicing Agreement (with such changes as may be necessary or desirable to reflect the collateral for such Additional Assets), must satisfy the Rating Agency Condition and be approved by all of the managers, including the Independent Manager.

*"Asset Subsidiary"* means the Asset Trust and, with respect to any Additional Assets, an entity formed for the purpose holding the collateral related to such Additional Assets and making payments with respect thereto to the Company and:

(a) in which the Company holds all or substantially all of the economic interests;

(b) which is established and governed pursuant to Asset Documentation;

(c) which is not an "investment company" which is required to register under the Investment Company Act;

(d) the establishment and operation of which will not cause the Company to be an "investment company" which is required to register under the Investment Company Act;

(e) the establishment and operation of which will not cause the imposition of United States Federal withholding tax in respect of payments by the Company on the Company Preferred Securities or any Parity Equity Securities;

(f) the establishment and operation of which will not cause the Company to be treated under the Code as a publicly traded partnership taxable as a corporation; and

(g) the establishment and operation of which will not cause the Company to be treated as engaged in a US trade or business, as determined for United States Federal income tax purposes.

*"Asset Tax Opinion"* means, with respect to any assets, an opinion of counsel from a nationally recognized tax counsel to the effect that the acquisition and ownership of such assets by the Company will not (in itself or in connection with any of the Company's other assets):

(a) cause the imposition of United States Federal withholding tax in respect of payments made by the Company on the Company Preferred Securities or any Parity Equity Securities;

(b) cause the Company to be treated under the Code as a publicly traded partnership taxable as a corporation; or

(c) cause the Company to be treated as engaged in a U.S. trade or business, as determined for United States Federal income tax purposes.

*"Asset Portfolio"* means the Class A Asset Trust Certificate and any Permitted Investments and Additional Assets held by the Company from time to time.

*"Eligible Investments"* means Permitted Investments, the Class A Trust Certificate, the Class R Asset Trust Certificate and Eligible Assets.

*"Permitted Investments"* means one or more of the obligations or securities listed below:

(a) obligations of, or guaranteed as to principal and interest by, the United States of America or any agency or instrumentality thereof when such obligations are backed by the full faith and credit of the United States of America;

(b) repurchase agreements on obligations described in clause (a) of this definition of "Permitted Investments"; *provided further,* that the unsecured obligations of the party agreeing lo repurchase such obligations have at the time one of the two highest short term debt ratings of each of the Rating Agencies; and *provided* that such repurchaser's unsecured long term debt has one of the two highest unsecured long term debt ratings of each of the Rating Agencies;

(c) federal funds, certificates of deposit, time deposits and bankers' acceptances of any bank or trust company incorporated under the laws of the United States of America or any state; *provided* that the debt obligations of such bank or trust company (or, in the case of the principal bank in a bank holding company system, debt obligations of the bank holding company) at the date of acquisition thereof have one of the two highest short term debt ratings of each of the Rating Agencies and unsecured long term debt has one of the two highest unsecured long term debt ratings of each of the Rating Agencies;

(d) federal funds, certificates of deposit, time deposits, demand deposits and bankers' acceptances of WMB;

(e) obligations of, or obligations guaranteed by, any state of the United States of America or the District of Columbia, *provided* that such obligations at the date of acquisition thereof shall have one of the two highest long-term debt ratings available for such securities from each of the Rating Agencies;

(f) commercial paper of any corporation incorporated under the laws of the United States of America or any state thereof, which on the date of acquisition has the highest commercial paper rating of each of the Rating Agencies; *provided* that the corporation has unsecured long term debt that has one of the two highest unsecured long term debt ratings of each of the Rating Agencies;

(g) securities (other than stripped bonds or stripped coupons) bearing interest or sold at a discount that are issued by any corporation incorporated under the laws of the United States of America or any state thereof and have one of the two highest long-term unsecured ratings available for such securities from each of the Rating Agencies; and

(h) any other category of investments that satisfy the Rating Agency Condition and is approved by all of the managers, including the Independent Manager; subject to the receipt by the Company of an Asset Tax Opinion with respect to such category of investments;

*provided, however,* that any of the investments listed above will not be Permitted Investments to the extent that investment therein would cause the outstanding principal amount of Permitted Investments that are then held by the Company to exceed 20% of the aggregate principal amount of all Eligible Investments. In no event shall an instrument be a Permitted Investment if such instrument (x) evidences a right to receive only interest payments with respect to the obligations underlying such instrument or (y) has been purchased at a price greater than the outstanding principal balance of such instrument.

"*Rating Agencies*" means, at any time, S&P, Moody's and Fitch, but only in the case of each such agency if it is rating the relevant security, including the Trust Securities or the WaMu Cayman Preferred Securities, at the time or, if none of them is providing a rating for the relevant security, including the Trust Securities or the WaMu Cayman Preferred Securities at such time, then any "nationally recognized statistical rating organization" as that phrase is defined for purposes of Rule 436(g)(2) under the Securities Act, which is rating such relevant security.

"*Rating Agency Condition*" means written notice from each Rating Agency confirming that the proposed change or modification will not result in a reduction of the rating then currently assigned by such Rating Agency to the Trust Securities or the WaMu Cayman Preferred Securities.

### Employees and Administration Agreement

Prior to issuing the Fixed-to-Floating Rate Company Preferred Securities, the Company and WMB will enter into an Administrative Services Agreement (the "*Administrative Services Agreement*") pursuant to which WMB will provide (or cause to be provided) certain accounting, legal, tax and other support services to the Company, assist the Company in maintaining compliance with all pertinent U.S. local, state and federal laws and provide necessary administrative, record keeping and secretarial services to the Company. Under such agreement, the Company will agree to reimburse the provider of such services from time to time for the value of services provided by such provider to the Company. The Company expects that any such reimbursement will be in a *de minimis* amount.

The Company will maintain limited liability company records and audited financial statements that are separate from those of WMI and any of its other affiliates. None of the officers, employees or managers of the Company will have any direct or indirect pecuniary interest in any security to be acquired or disposed of by the Company or in any transaction in which the Company has an interest.

### Management of the Company

### Managers and Officers

The Company will be managed by a Board of Managers. The LLC Agreement will provide that the Company's Board of Managers will at all times be composed of three members, one of whom is not and has not been during the preceding five years an officer or employee of WMI or any affiliate of WMI, other than a financing subsidiary (the "*Independent Manager*"). The Company's managers will serve until their successors are duly elected and qualified. Except in certain circumstances described under "— Independent Manager" below, action by the Company's Board of Managers will be by majority vote. The Company will have five officers upon issuance of the Fixed-to-Floating Rate Company Preferred Securities.

The persons who will be the managers and executive officers of the Company upon completion of the Offering will include:

| Name | Position and Offices Held |
|---|---|
| Robert Williams | Manager and Senior Vice-President |
| Peter Freilinger | Manager and Senior Vice-President |
| Kenneth J. Uva | Independent Manager |
| Doreen Logan | First Vice President and Assistant Secretary |
| Paul Phillips | Vice President |
| Chad Smith | First Vice President and Secretary |

Each of the initial managers (other than the Independent Manager) and officers of the Company are individuals who are officers or employees of WMI or one of its affiliates. The initial Independent Manager is Kenneth J. Uva, who is an employee of CT Corporation.

### Independent Manager

Under the LLC Agreement, in order to be considered "independent", a manager must not, during the preceding five years, have been a director or employee of WMI or any affiliate of WMI, other than a direct or indirect financing subsidiary of WMI.

The LLC Agreement will require that, in assessing the benefits to the Company of any proposed action requiring his or her consent, the Company's Independent Manager take into account the interests of holders of both Company Common Securities and the Company Preferred Securities. The LLC Agreement provides that in considering the interests of the holders of the Company Preferred Securities, the Company's Independent Manager owes such holders the same duties which the Independent Manager owes to the holders of Company Common Securities.

The LLC Agreement will provide that, for so long as any Company Preferred Securities are outstanding, certain actions by the Company are subject to prior approval of all Managers including the Independent Manager. The Company will not be able, without the approval of the Independent Manager, to (i) terminate, amend or otherwise change any of the Company's Asset Documentation or (ii) effect a consolidation, merger or share exchange that is not tax-free to the holders of the Company Preferred Securities unless such consolidation, merger or share exchange was approved by the consent or affirmative vote of the holders of at least two-thirds of the Fixed-to-Floating Rate Company Preferred Securities and the Fixed Rate Company Preferred Securities, voting together as a single class. In addition, in the event that the Asset Trust fails to make a payment to the Company or any payments are not received with regard to any Additional Asset in violation of the terms of the related Asset Documentation on any scheduled payment date, the Independent Manager will have the authority to cause the Company, as the holder of the Series A Asset Trust Certificate or any Additional Asset, as applicable to enforce its rights in such capacity until payments have been resumed and a year has passed since the date of the latest scheduled payment date with respect to which the Asset Trust or the Additional Asset failed to make a payment.

The holders of the Company Preferred Securities, voting together as a single class, by majority vote of the votes cast on such matter at a meeting properly called and held or by written instructions signed by the holders of Company Preferred Securities representing a majority of the voting rights of all outstanding Company Preferred Securities, voting together as a single class, are entitled to remove the initial or any succeeding Independent Manager and to fill the vacancy created by such removal or any other vacancy existing in the office of the Independent Manager if (i) the Company fails to pay full dividends on the Company Preferred Securities on any Dividend Payment Date, (ii) WaMu Delaware fails to pass through dividends paid by the Company on the Fixed-to-Floating Rate Company Preferred Securities to the holders of the Trust Securities on any Dividend Payment Date or (iii) a Bankruptcy Event occurs. The person so elected will be deemed to be an Independent Manager irrespective of whether he or she meets the independence test described above. Such right will continue for as long as any Fixed-to-Floating Rate Company Preferred Securities are outstanding.

"*Bankruptcy Event*" means the Company, WaMu Delaware or WaMu Cayman (i) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due, (ii) makes a general assignment, arrangement or composition with or for the benefit of its creditors or (iii) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding up or liquidation.

## Compensation of Managers and Officers

The Company intends to pay the initial Independent Manager a reasonable fee for his or her services as a manager of the Company, plus reimbursement of expenses for attendance at each meeting of the Company's Board of Managers. As to managers and officers of the Company who are also officers or employees of WMI or one of its affiliates, the Company will pay, or reimburse the related affiliate for, a portion of the salary and benefits of any such persons in proportion to the estimated amount of time spent by such person on the Company's business as compared to

time spent on the business of WMI or one of its other affiliates. However, the Company expects such amount to be *de minimis.*

## Indemnification of Managers and Officers

The LLC Agreement will provide that the Company will, to the fullest extent permitted by law, indemnify any manager or officer of the Company for any liability and related expenses (including reasonable counsel's fees) arising out of such manager's or officer's status as a manager or officer of the Company; *provided, however,* that a court of competent jurisdiction has not determined that such manager or officer did not act in good faith and in a manner that he or she reasonably believed to be in, or not opposed to, the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe that his or her conduct was unlawful. The LLC Agreement will provide that the right to indemnification is a contract right and set forth certain procedural and evidentiary standards applicable to enforcement of a claim. The LLC Agreement will provide that the Company may purchase and maintain insurance to protect any manager or officer against any liability asserted against him or her, or incurred by him or her, arising out of his or her status as such.

## Additional Covenants of the Company in the LLC Agreement

The LLC Agreement provides that, so long as any Company Preferred Securities are outstanding, the Company will not authorize, create or increase the authorized amount of or issue any class or series of any equity shares of the Company, or any warrants, options or other rights convertible or exchangeable into any class or series of any equity shares of the Company, ranking senior to the Company Preferred Securities, either as to dividend rights, redemption rights or rights on dissolution, liquidation or winding up of the Company without the consent or an affirmative vote of the holders of at least two-thirds of the Fixed-to-Floating Rate Company Preferred Securities and the Fixed Rate Company Preferred Securities, voting together as a single class. The LLC Agreement also provides that, except with the consent or affirmative vote of the holders of at least two-thirds of the Fixed-to-Floating Rate Company Preferred Securities and the Fixed Rate Company Preferred Securities, voting together as a single class, the Company will not take certain other actions.

These actions are described under "Description of the Fixed-to-Floating Rate Company Preferred Securities — Voting Rights and Covenants."

## Additional Information

The information with respect to the Company that is required by paragraph (d)(4)(i) of Rule 144A under the Securities Act, including quarterly unaudited and annual audited financial statements, in each case prepared in accordance with U.S. GAAP, will be available upon request to WMI until the earlier of (i) the redemption in full of the Fixed-to-Floating Rate Company Preferred Securities or (ii) the Conditional Exchange.

# THE ASSET TRUST

## General

Washington Mutual Home Equity Trust I (the *"Asset Trust"*) is a statutory trust formed under the laws of the State of Delaware pursuant to a trust agreement between the Company, as depositor, and Deutsche Bank Trust Company Delaware, as Delaware trustee. The Pooling and Servicing Agreement among the Company, as depositor, WMB, as servicer (the *"Servicer"*), Deutsche Bank Trust Company Delaware, as Delaware trustee (the *"PSA Delaware Trustee"*) and Deutsche Bank National Trust Company, as trustee (the *"Trustee"*), will restate the trust agreement and will be the governing instrument of the Asset Trust.

The Asset Trust will not own any assets other than the HELs and the other assets described below. The Asset Trust will not have any liabilities other than those incurred in connection with the Pooling and Servicing Agreement and any related agreement. The Asset Trust will not have any directors, officers or other employees. No equity contribution will be made to the Asset Trust by WMB, the depositor or any other party, except for a *de minimis* contribution made by the depositor pursuant to the initial trust agreement, and the Asset Trust will not have any other capital. The fiscal year end of the Asset Trust will be December 31. The Asset Trust will act through the Trustee and the PSA Delaware Trustee, whose fees and reasonable expenses will be paid or reimbursed by the Servicer.

For purposes of this offering circular with respect to the underwriting, origination and servicing of the HELs in the Asset Trust, references to WMB include WMB, originators acquired by WMB and WMB's subsidiaries.

## General Description of Assets

The assets of the Asset Trust will consist of HELs having, as of the Cut-Off Date, a value of approximately $5,389,459,150, payments received thereon and certain other investments. The HELs were originated by WMB primarily through its retail branches between September 1, 2001 and September 30, 2005. As of January 31, 2006, the HELs transferred into the Asset Trust had an aggregate unpaid principal balance of approximately $5,389,459,150.

The assets of the Asset Trust will consist of 56,090 HELs that had an aggregate unpaid principal balance as of the Cut-Off Date of approximately $5,389,459,150. The HELs have a weighted average gross interest rate of 6.076% and range from a gross interest rate of 4.00% to 11.315%. The weighted average current, unpaid principal balance of the HELs is $96,086 with a minimum current, unpaid principal balance of $25,002 and a maximum current, unpaid principal balance of $965,000. Assets in the Asset Trust have various original maturities ranging from 5 years to 40 years and were, on average, originated within the last 25.46 months. The current average loan-to-value ratio is 53.48% and the average loan-to-value ratio at origination was 57.51%. The HELs have a weighted average Credit Score (as defined below) of 757. Most of the properties underlying the HELs are owner occupied with 3.86% of the properties non-owner occupied. The HELs are geographically concentrated in Texas (49.01%), California (30.59%), Florida (7.17%), and New York (5.08%). HELs are typically made for reasons such as home purchases, home improvements, furniture and fixtures purchases, purchases of automobiles and debt consolidation. The HELs are generally repaid on a fully-amortizing basis.

## Acquisition of the Portfolio and Related Transactions

In anticipation of the transactions described in this offering circular, WMB contributed a pool of HELs to the Company in exchange for a corresponding amount of the Company's Fixed-to-Floating Rate Company Preferred Securities and Fixed Rate Company Preferred Securities. In addition, University Street contributed a pool of HELs to the Company in exchange for all of the

Company Common Securities. The aggregate value of these contributions totaled approximately $5,389,459,150.

Concurrently with the issuance of the Trust Securities, the Company will contribute to the Asset Trust all of the HELs it received from WMB and University Street. Such contribution will be made in exchange for the Class A-1 Washington Mutual Home Equity Trust I Certificate (the "Class A Asset Trust Certificate") and the Class R Washington Mutual Home Equity Trust I Certificate (the "Class R Asset Trust Certificate"). For United States Federal income tax purposes, the Class A Asset Trust Certificate will represent the sole class of regular interests in the Asset Trust, and the Class R Asset Trust Certificate will represent the sole class of residual interests in the Asset Trust. The Company will retain the Class A Asset Trust Certificate and expects to sell the Class R Asset Trust Certificate to WMB.

The Asset Trust will own the right to receive all payments of principal and interest on the HELs due after January 31, 2006 (the "Cut-Off Date"). A schedule to the Pooling and Servicing Agreement will include information about each HEL, including:

- the outstanding principal balance as of the close of business on the Cut-Off Date;

- the term of the HEL; and

- the applicable interest rate as of the close of business on the Cut-Off Date.

The notes relating to the HELs will not be endorsed to the Asset Trust and no assignments to the Asset Trust of the mortgages securing the HELs will be prepared. WMB, in its capacity as initial Custodian, will have possession of and will review such notes and the HELs as Custodian for the Asset Trust and financing statements will be filed evidencing the Asset Trust's interest in the HELs.

In exchange for the HELs and the other assets described above, the Trustee will authenticate and deliver the Class A Asset Trust Certificate and the Class R Asset Trust Certificate pursuant to the order of the depositor.

## Description of the Portfolio

### General

All of the HELs in the portfolio of the Asset Trust will consist of closed-end, first lien home equity loans secured by a first lien that primarily is on the borrower's residence. Such residences are largely single family properties. These loans typically are made for reasons such as home purchases, home improvements, acquisition of furniture and fixtures, purchases of automobiles, and debt consolidation. The HELs are generally paid on a fully-amortizing basis. As of January 31, 2006, none of the HELs were delinquent in payments for a period of more than 30 days; however, the process of selection for the HELs conveyed to the Asset Trust excluded any such loans. Nevertheless, there can be no assurance that HELs held in the portfolio of the Asset Trust will not become delinquent in the future. WMB's delinquency experience with respect to first lien, closed-end home equity loans owned by WMB and its subsidiaries has consistently been less than one percent of the total outstanding unpaid principal balance of such loans. As of December 31, 2005, total delinquencies of the first lien, closed-end home equity loans owned by WMB and its subsidiaries, including charge-offs during 2005, were 0.60% of the total unpaid principal balances of such loans.

The following tables represent information as of January 31, 2006 with respect to the HELs included in the portfolio of the Asset Trust:

### Distribution by Current Principal Balance

| Current Principal Balance | Number of Loans | Current Principal Balance | Percent of Overall Portfolio Balance |
|---|---|---|---|
| $0–$49,999 | 11,198 | $ 432,387,414 | 8.02% |
| $50,000–$74,999 | 13,561 | 853,233,512 | 15.83 |
| $75,000–$99,999 | 11,231 | 976,769,683 | 18.12 |
| $100,000–$199,999 | 17,073 | 2,313,001,283 | 42.92 |
| $200,000–$299,999 | 2,322 | 539,701,841 | 10.01 |
| $300,000–$499,999 | 644 | 236,692,050 | 4.39 |
| Greater than $500,000 | 61 | 37,673,368 | 0.70 |
| Total | 56,090 | $5,389,459,150 | 100.00% |

### Distribution by Current Gross Interest Rate

| Current Gross Interest Rate | Number of Loans | Current Principal Balance | Percent of Overall Portfolio Balance |
|---|---|---|---|
| 4.00–4.99% | 15 | $ 1,977,067 | 0.04% |
| 5.00–5.99 | 26,026 | 2,624,484,236 | 48.70 |
| 6.00–6.99 | 27,509 | 2,571,843,320 | 47.72 |
| 7.00–7.99 | 2,277 | 173,421,367 | 3.22 |
| 8.00–8.99 | 209 | 14,243,687 | 0.26 |
| 9.00–9.99 | 26 | 1,654,510 | 0.03 |
| 10.00–10.99 | 25 | 1,658,731 | 0.03 |
| 11.00–11.99 | 3 | 176,232 | 0.00 |
| Total | 56,090 | $5,389,459,150 | 100.00% |

### Distribution by Property Type

| Property Type | Number of Loans | Current Principal Balance | Percent of Overall Portfolio Balance |
|---|---|---|---|
| Single Family | 51,667 | $4,958,055,897 | 92.00% |
| Townhouse | 2,071 | 253,335,974 | 4.70 |
| Condominium | 2,269 | 171,618,855 | 3.18 |
| Manufactured Housing | 83 | 6,448,424 | 0.12 |
| Total | 56,090 | $5,389,459,150 | 100.00% |

## Distribution by State

| State | Number of Loans | Current Principal Balance | Percent of Overall Portfolio Balance |
|---|---|---|---|
| Texas | 28,652 | $2,641,385,492 | 49.01% |
| California | 15,288 | 1,648,481,206 | 30.59 |
| Florida | 4,943 | 386,598,404 | 7.17 |
| New York | 2,486 | 273,920,738 | 5.08 |
| Washington | 1,181 | 110,746,674 | 2.05 |
| New Jersey | 694 | 76,275,944 | 1.42 |
| Oregon | 788 | 74,128,630 | 1.38 |
| Georgia | 446 | 38,773,740 | 0.72 |
| Idaho | 334 | 27,517,454 | 0.51 |
| Arizona | 305 | 26,256,800 | 0.49 |
| Other | 973 | 85,374,067 | 1.58 |
| Total | 56,090 | $5,389,459,150 | 100.00% |

## Distribution by Credit Score

| Credit Score[1] | Number of Loans | Current Principal Balance | Percent of Overall Portfolio Balance |
|---|---|---|---|
| Less than 600 | 900 | $ 80,943,626 | 1.50% |
| 600–649 | 1,786 | 169,408,159 | 3.14 |
| 650–699 | 5,866 | 566,608,998 | 10.51 |
| 700–749 | 11,759 | 1,160,863,350 | 21.54 |
| 750–799 | 21,633 | 2,144,571,619 | 39.79 |
| 800–849 | 14,146 | 1,267,063,398 | 23.51 |
| Total | 56,090 | $5,389,459,150 | 100.00% |

[1] "Credit Score" means a statistical credit score obtained by WMB and many other mortgage lenders in connection with a loan application to help assess a borrower's creditworthiness. A Credit Score is generated by models developed by a third party, Fair, Isaac & Co., and made available to WMB through three national consumer reporting agencies. The Credit Score is based on a borrower's historical credit data, including, among other things, payment history, delinquencies on accounts, levels of outstanding indebtedness, length of credit history, types of credit and bankruptcy experience. A higher Credit Score indicates a more favorable credit rating.

### Distribution by Current Loan-to-Value Ratio

| Current Loan-to-Value Ratio[1] | Number of Loans | Current Principal Balance | Percent of Overall Portfolio Balance |
|---|---|---|---|
| Less than 10.001% | 887 | $ 35,940,629 | 0.67% |
| 10.001–20.000 | 4,030 | 218,673,171 | 4.06 |
| 20.001–30.000 | 5,876 | 416,715,161 | 7.73 |
| 30.001–40.000 | 7,745 | 645,895,191 | 11.98 |
| 40.001–50.000 | 8,680 | 815,139,892 | 15.12 |
| 50.001–60.000 | 9,517 | 997,096,237 | 18.50 |
| 60.001–70.000 | 9,082 | 1,018,570,234 | 18.90 |
| 70.001–80.000 | 9,703 | 1,173,314,741 | 21.77 |
| 80.001–90.000 | 567 | 67,808,505 | 1.26 |
| 90.001–100.000 | 3 | 305,389 | 0.01 |
| **Total** | 56,090 | $5,389,459,150 | 100.00% |

[1] The current loan-to-value ratio of a mortgage loan is a fraction, the numerator of which is the outstanding principal balance of the mortgage loan and the denominator of which is the collateral value, generally at time of origination of the related mortgage property, expressed as a percentage.

### Distribution by Remaining Months to Maturity

| Remaining Months to Maturity | Number of Loans | Current Principal Balance | Percent of Overall Portfolio Balance |
|---|---|---|---|
| Less than 61 | 939 | $ 39,046,979 | 0.72% |
| 61–120 | 5,522 | 318,110,997 | 5.90 |
| 121–180 | 12,882 | 1,011,975,772 | 18.78 |
| 181–240 | 28,716 | 3,034,564,574 | 56.31 |
| 241–300 | 342 | 37,686,873 | 0.70 |
| 301–360 | 7,688 | 948,039,671 | 17.59 |
| Greater than 360 | 1 | 34,284 | 0.00 |
| **Total** | 56,090 | $5,389,459,150 | 100.00% |

### Distribution by Year of Origination

| Year of Origination | Number of Loans | Current Principal Balance | Percent of Overall Portfolio Balance |
|---|---|---|---|
| 2001 | 266 | $ 21,414,942 | 0.40% |
| 2002 | 5,685 | 548,951,912 | 10.19 |
| 2003 | 27,005 | 2,649,489,615 | 49.16 |
| 2004 | 16,285 | 1,593,766,430 | 29.57 |
| 2005 | 6,849 | 575,836,251 | 10.68 |
| **Total** | 56,090 | $5,389,459,150 | 100.00% |

## Underwriting

### General

The HELs owned by the Asset Trust were, in all material respects, originated in accordance with the underwriting guidelines of WMB as described herein. The HELs have been underwritten by WMB using automated underwriting systems.

WMB's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Some HELs are manually underwritten, in which case an underwriter reviews information submitted by the borrower and supporting documentation, if required, and a credit report of the borrower, and based on that review determines whether to originate a loan in the amount and with the terms requested by the borrower. Some HELs are underwritten through WMB's automated underwriting system, described below.

Prospective borrowers are required to provide details about their financial factors such as their assets, liabilities and related monthly expenses, as well as income and employment information. Borrowers may provide this information by electronic transmission to a bank representative who inputs the information directly into the lending system. Each borrower also provides an authorization to access a credit report that summarizes the borrower's credit history.

### Evaluation of the Borrower's Credit Standing

To evaluate a prospective borrower's credit history, the loan underwriter obtains a credit report relating to the borrower from one or more credit reporting agencies. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments. In most cases the credit report provides a Credit Score for the borrower. Credit Scores are designed to assess a borrower's creditworthiness and likelihood to default on an obligation over a defined period (usually two to three years) based on a borrower's credit history. Credit Scores do not necessarily correspond to the probability of default over the life of a HEL because they reflect past credit history, rather than an assessment of future payment performance. Credit Scores range from approximately 430 to approximately 850, with higher scores indicating more favorable credit history. In the case of co-borrowers, the Credit Score for the primary borrower is typically used, unless the co-borrower has a Credit Score that is 40 points lower than that of the primary borrower, in which case the lower score is then used. The primary borrower is determined by the applicant at the time the borrowing request is made. Minimum Credit Scores are required for some loan products and loan programs. Credit Scores may not be available for some borrowers.

### Evaluation of the Borrower's Repayment Ability

In evaluating a prospective borrower's ability to repay a HEL, the loan underwriter considers the ratio of the borrower's total monthly debt (including non-housing expenses) to the borrower's gross income (referred to as the "*debt-to-income ratio*" or "*back-end ratio*"). The maximum acceptable ratios may vary depending on other loan factors, such as loan amount and loan purpose, loan-to-value ratio, credit score and the availability of other liquid assets. Exceptions to the ratio guidelines may be made when compensating factors are present.

### Evaluation of the Adequacy of the Collateral

The adequacy of the property being pledged as collateral generally is determined by an appraisal made in accordance with pre-established appraisal guidelines. At origination, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation, and are made on forms

acceptable to the Federal National Mortgage Association and/or the Federal Home Loan Mortgage Corporation. Appraisers may be staff appraisers employed by WMB or independent appraisers selected in accordance with the pre-established appraisal guidelines. Such guidelines generally require that the appraiser, or an agent on its behalf, personally inspect the property and verify whether the property is in adequate condition and, if the property is new construction, whether it is substantially completed. However, in the case of HELs underwritten through WMB's automated underwriting system, an automated valuation method ("AVM") may be used in lieu of a traditional appraisal. The AVM relies on public records regarding the encumbered property and/or neighboring properties and statistically derives a value using that information. If AVMs are used, they comply with the requirements of the Financial Institutions Reform and Recovery Act of 1989, as amended, and are independently verified periodically. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property.

Title insurance or alternative services (e.g., lien insurance) are required for all HELs. Certain of the HELs owned by the Asset Trust involve the use of "alternative services". These services consist of three services (including property reports and recording services) and are used in lieu of title insurance, endorsements and title company services. Alternative services may be used in certain circumstances including in connection with first liens that are being granted to a lender other than in connection with the purchase of a home; or in connection with loans made to borrowers who already own, on a free and clear basis, the property being used as collateral to secure the loan in question. Alternative services provide a low cost alternative to standard title insurance and provide acceptable risk coverage in the event of default.

### Documentation Programs

Each HEL owned by the Asset Trust has been underwritten using either WMB's full income documentation program or its stated income program. Under WMB's full documentation program, the prospective borrower's stated income is verified through receipt of the borrower's most recent pay stub and most recent W-2 form or, in the case of self-employed borrowers or borrowers with more than 25% of their income from commissions, two years of personal (and, if applicable, business) tax returns. For self-employed borrowers, profit and loss statements may also be required.

Under WMB's stated income program, the prospective borrower's income and assets either are not required to be obtained or are obtained but not verified. Eligibility criteria and the amount of the loan are determined by an automated underwriting system. Purchase loans as well as refinance loans may be eligible for participation in WMB's stated income program.

A credit report for the borrower generally is required for all HELs underwritten under either program.

### Exceptions to Program Parameters

Exceptions to WMB's loan program parameters may be made on a case-by-case basis if compensating factors are present. In those cases, the basis for the exception is documented, and in some cases the approval of a senior underwriter is required. Compensating factors may include, but are not limited to, low loan-to-value ratio, good credit standing, the availability of other liquid assets and stable employment.

### Automated Underwriting System

Currently, all HELs originated by WMB utilize a proprietary automated underwriting system known as "SUCCESS". Based on the borrower's credit report and the information provided by the borrower, the system either (i) approves the loan subject to the satisfaction of specified

conditions, which may include the receipt of additional documentation, (ii) refers the loan application to an underwriter for manual underwriting, or (iii) declines the file based on predetermined eligibility criteria. In making the underwriting decision, SUCCESS distinguishes among different levels of credit standing, based on a proprietary custom score model, the borrower's Credit Score, and specific policies, application and loan characteristics. WMB has developed these credit standing levels based on a statistical analysis of the past performance of its portfolio of home equity loans. WMB has used analysis of the past performance of its portfolio of home equity loans. WMB has used SUCCESS to underwrite HELs since May 2001. WMB regularly evaluates and validates SUCCESS and to date has completed all required compliance and fair lending evaluations in a satisfactory manner. WMB periodically upgrades its proprietary automated underwriting system. SUCCESS was last upgraded in November 2004.

### Quality Control Review

WMB's credit risk oversight department conducts quality control reviews of statistical samplings of previously originated HELs on a regular basis.

### Credit Risk Management Policies

Credit risk within the WMI Group is managed by means of a broad set of policies and principles contained in its credit policy. The Chief Credit Officer is responsible for overseeing the work of a credit policy committee, monitoring the quality of the WMI Group's credit portfolio, determining the reasonableness of the WMI Group's allowance for loan losses, reviewing and approving large credit exposures and setting underwriting criteria for credit-related products and programs. Credit risk management is based on analyzing the creditworthiness of the borrower, the adequacy of the underlying collateral given current events and conditions and the existence and strength of any guarantor support.

Credit risk assessment is a process that requires the evaluation of numerous factors, many of which are qualitative. Process integrity relies on the ability of the WMI Group's lending personnel to analyze all risk elements. It also depends on maintaining risk rating accuracy by recognizing changing elements of credit risk and promptly initiating risk rating changes.

### Conflicts of Interest Policies

Pursuant to WMB's code of ethics (the "Code of Ethics"), WMB extends credit to borrowers only when such extension of credit is financially reasonable for both WMB and the borrower in question. Pursuant to the Code of Ethics, lending personnel cannot permit personal relationships or other considerations to influence lending decisions, and cannot approve extensions of credit to, or be involved in the funding or auditing of any loans made to family or friends.

### Servicing and the Servicers

### General

All of the HELs owned by the Asset Trust will be serviced by WMB, as the Servicer, pursuant to the Pooling and Servicing Agreement. WMB will have possession of the mortgage files (i.e., the credit reports, servicing documents, etc.) in its capacity as Servicer and the Loan Documents (as defined below) in its capacity as Custodian for the Asset Trust.

The Pooling and Servicing Agreement will provide that WMB may not resign from its obligations and duties thereunder as Servicer except upon a determination that its duties thereunder are no longer permissible under applicable law. No such resignation will become effective until a successor Servicer has assumed WMB's servicing obligations and duties under

the Pooling and Servicing Agreement. In the event of a Servicer resignation, the Company, subject to the terms of the Pooling and Servicing Agreement, shall appoint a successor Servicer.

The Servicer will receive a fee for its services as Servicer under the Pooling and Servicing Agreement. The servicing fee will be calculated as a per annum percentage for each HEL based on the principal balance for such HEL. The servicing fee with respect to each such HEL will equal 0.125% *per annum* and will be paid monthly. This Servicer will be entitled to retain certain ancillary fees and charges, including, but not limited to, any prepayment fees, insufficient funds fees, modification fees, payoff statement fees and late charges with respect to the HELs as additional servicing compensation and will also be entitled to certain income generated by permitted investments made with collections on the HELs. The Servicer generally will pay all expenses incurred in connection with its responsibilities as Servicer under the Pooling and Servicing Agreement (subject to reimbursement for certain expenses and advances, including those incurred by it in connection with the liquidation of defaulted HELs, the restoration of damaged mortgaged properties, and payments by the Servicer for taxes and insurance premiums with respect to mortgaged properties).

Any person into which the Servicer may be merged, converted or consolidated, or any person resulting from any merger, conversion or consolidation to which the Servicer is a party will be the successor Servicer under the Pooling and Servicing Agreement.

The Servicer will outsource to third party vendors some servicing functions, as described under " — The Servicer — Servicing Procedures — The Servicer's Third Party Vendors and Service Providers" below.

### The Servicer

#### The Servicer's Servicing Experience

WMB, including its predecessors in interest, has been servicing loans secured by real estate or other property for over 115 years. The home equity loans serviced by WMB include closed-end fixed and adjustable rate home equity loans and open-end home equity lines of credit. The HELs in WMB's portfolio have been originated by WMB.

The following table shows the number and aggregate unpaid principal balance of HELs serviced by the Servicer as of December 31 for each of the most recent three years:

#### Closed-end Home Equity Loans Serviced by the Servicer

|  | December 31 | | |
|---|---|---|---|
|  | 2004 | 2003 | 2002 |
|  | (Dollars in Thousands) | | |
| Number of Closed-End Home Equity Loans Serviced by WMB .................................................... | 150,450 | 131,105 | 126,547 |
| Aggregate Unpaid Principal Balance ................... | $9,851,722 | $7,918,281 | $6,364,840 |

#### Servicing Procedures

*Servicing Functions.* The functions to be performed by the Servicer under the Pooling and Servicing Agreement will include, among other servicing functions, payment collection, payment application, and default management. The Servicer will perform its servicing functions at loan servicing centers located in Melbourne, Florida; Houston, Texas; San Antonio, Texas; Stockton, California; Chatsworth, California; Seattle, Washington; and Canyon Park, Washington.

*Servicing Standard; Waivers and Modifications.* Pursuant to the Pooling and Servicing Agreement, the Servicer will be required to service the HELs owned by the Asset Trust,

consistent with prudent first lien, closed-end home equity loan servicing practices and (unless inconsistent with those servicing practices) in the same manner in which, and with the same care, skill, prudence and diligence with which, it services and administers similar HELs for its own portfolio. The Servicer will be required to make reasonable efforts to collect or cause to be collected all payments under the HELs and, to the extent consistent with the Pooling and Servicing Agreement and applicable insurance policies, follow such collection procedures as are followed with respect to comparable HELs that are held in portfolios of responsible mortgage lenders in the local areas where each mortgaged property is located. Under the terms of the Pooling and Servicing Agreement, the servicing standard applicable to the Servicer may only be modified with the consent of the Company.

Under the terms of the Pooling and Servicing Agreement, the Servicer (subject to certain conditions) may waive, modify or vary any term of any HEL or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to the applicable obligor if it has determined, exercising its good faith business judgment in the same manner as it would if it were the owner of the related HEL, that the security for, and the timely and full collectability of, such HEL would not be adversely affected by such waiver, modification, postponement or indulgence, and may make certain other modifications with respect to the HELs and the related property in accordance with the terms of the Pooling and Servicing Agreement.

***Loan Servicing System.*** In performing its servicing functions, the Servicer generally will use computerized loan servicing systems. The Servicer leases its primary servicing system from AMS-CGI (known as *"Advanced Consumer Lending System"* or *"ACLS"*). ACLS produces detailed information about the financial status of each HEL, including outstanding principal balance, current interest rate, outstanding fees and information about transactions that affect the HEL, including the amount and due date of each payment, the date of receipt of each payment, and how the payment was applied. ACLS works in conjunction with AMS-CGI's Computer Automated Collection System (*"CACS"*) to monitor payment collections and to provide default collection activity information regarding delinquent consumer loans. The Servicer began using ACLS in 2003. Prior to November 2003, the Servicer serviced equity HELs using an ALLTEL loan servicing system; in November 2003, the Servicer transferred servicing onto the ACLS servicing platform by converting approximately 948,000 loan records from the ALLTEL loan servicing system to ACLS.

***Collections and Distributions.*** Under the terms of the Pooling and Servicing Agreement, collections with respect to the HELs will be collected by the Servicer and initially deposited into accounts controlled by the Servicer and may be commingled with funds with respect to other HELs or mortgage loans serviced or owned by the Servicer. The Servicer is required to deposit collections received with respect to the HELs owned by the Asset Trust into a certificate account controlled by the Trustee under the Pooling and Servicing Agreement on a monthly basis. The amount of collections required to be remitted to the Trustee in any given monthly deposit is determined by the timing of the Servicer's receipt of collections and the type of collections they represent. In accordance with the terms of the Pooling and Servicing Agreement, the Servicer may retain certain amounts with respect to expenses and advances from collections or apply them towards the costs of certain costs and permitted expenses connected with the servicing of the HELs. The Servicer will neither be permitted nor required to make servicer advances to cover any gap between scheduled payments on the HELs and the actual collections thereon in any given period.

Subject to the terms and conditions set forth in the Pooling and Servicing Agreement, on a monthly basis the Trustee will distribute collections deposited in the certificate account to the Company, as holder of the Class A Asset Trust Certificate, less (a) fees, expenses and indemnities payable to the Trustee and the PSA Delaware Trustee and (b) fees and certain other amounts payable to the Servicer. No amounts will be payable from collections with respect to the Class R Asset Trust Certificate.

Under the terms of the Pooling and Servicing Agreement, collections with respect to the HELs may be invested in certain permitted investments prior to their distribution to the Company, as holder of the Class A Asset Trust Certificate. The Servicer shall be entitled to retain any investment income produced by such investment as additional servicing compensation.

*Servicing of Delinquent HELs; Foreclosure.* The Servicer will make reasonable efforts to collect or cause to be collected all payments on the HELs owned by the Asset Trust that are 16 or more days delinquent. Strategic decisions regarding early stage collection efforts are guided by Experian's Strategic Account Management System, Probe®. Early stage collections, in other words, collections beginning on the 16th day of delinquency and continuing through the 89th day of delinquency, are conducted primarily through the use of automated outbound collection telephone calls and debt collection letters. Late stage collections, or collection efforts taking place from the 90th day and through the 180th day of delinquency, are segregated in CACS by risk and a combination of manual and automated collection efforts are used. CACS also segregates delinquent accounts by status, including bankruptcy, probate, foreclosure, real-estate-owned and "special activities" (*e.g.*, consumer credit counselling and recovery). These collection efforts are carried out by personnel who specialize in debt collection and recovery. Such efforts may include payment reminder telephone calls to the borrower, letter campaigns, drive-by property inspections and other collection activities permissible under the Loan Documents and applicable law.

The Servicer will be required under the Pooling and Servicing Agreement to foreclose upon the mortgaged property related to each defaulted HEL as to which no satisfactory arrangements can be made for collection of delinquent payments. Under the Pooling and Servicing Agreement, the Servicer will be permitted, in lieu of foreclosure, if prudent to do so and taking into account the desirability of maximizing net liquidation proceeds, to accept a payment of less than the outstanding principal balance of the defaulted HELs. The Servicer will not be permitted to foreclose upon a mortgaged property if it is aware of evidence of toxic waste or other environmental contamination on the mortgaged property and it determines that it would be imprudent to foreclose.

*Insurance.* The Servicer maintains a blanket hazard policy for all HELs. In addition, the Servicer tracks all HELs for compliance with applicable law regarding flood insurance coverage. When necessary, the Servicer "force places" flood insurance policies.

### Limitations on the Servicer's Liability

The Pooling and Servicing Agreement will provide that neither the Servicer nor any director, officer, employee or agent of the Servicer (the *"Servicer Indemnified Parties"*) will be under any liability to the Asset Trust, the Company or the holder of the Class A Asset Trust Certificate and the Class R Asset Trust Certificate or others for any action taken (or not taken) by any Servicer Indemnified Party in good faith pursuant to the Pooling and Servicing Agreement, or for errors in judgment; *provided, however,* that the Servicer shall not be protected against any liability that would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties thereunder. The Pooling and Servicing Agreement will further provide that any Servicer Indemnified Party is entitled to indemnification by the Asset Trust and will be held harmless against any loss, liability or expense incurred in connection with any legal action relating to the Pooling and Servicing Agreement or the certificates issued thereunder (except any such loss, liability, or expense otherwise reimbursable pursuant to the Pooling and Servicing Agreement) and any loss, liability or expense incurred by reason of willful misfeasance, bad faith or gross negligence in the performance of duties thereunder or by reason of reckless disregard of obligations and duties thereunder. In addition, the Pooling and Servicing Agreement will provide that the Servicer is not under any obligation to appear in, prosecute or defend any legal action that is not incidental to its responsibilities under the Pooling and Servicing Agreement and that in

its opinion may involve it in any expense or liability. The Servicer may however, in its discretion, undertake any such action that it may deem necessary or desirable with respect to the Pooling and Servicing Agreement and the rights and duties of the parties thereto and the interests of the holders of the Class A Asset Trust Certificate and the Class R Asset Trust Certificate. In such event, the legal expenses and costs of such action and any liability resulting therefrom will be expenses, costs and liabilities of the Asset Trust, and the Servicer will be entitled to be reimbursed therefor and to charge the certificate account.

**Servicer Termination, Servicer Replacement.** Under the terms of the Pooling and Servicing Agreement, after the occurrence of any one of several typical Servicer termination events, including but not limited to a receivership with respect to the Servicer or (subject to the expiration of typical grace periods and materiality requirements) the failure by the Servicer to make required deposits to the certificate account, the Company may remove the Servicer. If the Servicer is removed by the Company, the Company shall have the sole power to appoint a replacement Servicer.

**The Servicer's Third Party Vendors and Service Providers.** Under the Pooling and Servicing Agreement, the Servicer may perform its servicing responsibilities through agents or independent contractors, but shall not thereby be released from any of its responsibilities thereunder. The Servicer expects that it will outsource some of its responsibilities pursuant to these provisions, which services may include some or all of the following: (i) management of foreclosure actions, (ii) monitoring of borrower bankruptcy proceedings, (iii) preservation of properties related to delinquent loans, (iv) processing of primary mortgage insurance claims, (v) maintenance, marketing and sale of real-estate-owned properties, (vi) assuring that hazard insurance coverage is maintained, (vii) determining whether flood insurance coverage is required and assuring that any required coverage is maintained, (viii) tax bill procurement and tracking of delinquent tax payments, (ix) printing and mailing billing statements, (x) depositing borrower payments into lockbox accounts, (xi) performing certain calculations with respect to scheduled and actual collections, (xii) performing certain tax related calculations, (xiii) performing calculations with respect to monthly distributions from the Asset Trust and (xiv) performing reporting functions required under the Pooling and Servicing Agreement. From time to time, the Servicer may cease to outsource one or more of the foregoing servicing functions or may choose to outsource additional servicing functions. Some vendors may perform more than one function, and some functions may be performed by more than one vendor.

### The Servicer's Quality Control Procedures

The Servicer uses a combination of management controls and technology controls to ensure the accuracy and integrity of servicing records. Management controls include the use of approval levels, the segregation of duties, and reconciliations of servicing data and accounts, among others. Technology controls include the use of data security controls and interface controls to ensure that only authorized persons have the ability to access and change system data or to submit data to or receive data from vendors and investors. Specific security profiles for each job function include a predetermined set of data security controls that are appropriate for that job function. The regional data center for the ACLS Server, which is located in Seattle, Washington, is kept in a fire resistant environment, and commercial electrical power is backed up by generators.

In addition, the Servicer conducts periodic internal audits of critical servicing and technology functions. External audits by entities such as the OTS and United Guaranty and the annual examination by WMI's independent accountants in connection with their audit of WMI and its subsidiaries may provide independent verification of the adequacy of such functions.

The Servicer maintains detailed business continuity plans so that it can resume critical business functions in the event of a disaster or other serious system outage, which plans are

reviewed and updated periodically. The Servicer is obligated to return to full system functionality within 48 hours of a reported system outage. The Servicer performs annual disaster recovery tests in which it reroutes data and servicing system operations to the designated back-up site, and then processes sample transactions from all servicing locations to ensure the functionality of such back-up site.

It is the Servicer's policy to require its other third party vendors to implement measures similar to those described above to ensure the accuracy and integrity of servicing records.

### The Custodian

Washington Mutual Bank will act as custodian (the *"Custodian"*) for the Asset Trust pursuant to a Custody Agreement, to be entered into on or before the closing date (the *"Custody Agreement"*), among the Trustee, the Servicer and the Custodian. The Custodian will hold the notes, mortgages and other legal documents related to the HELs (collectively, the *"Loan Documents"*) for the benefit of the Trustee. The Custodian will maintain the Loan Documents in secure and fire resistant facilities. The mortgage files held by the Servicer will not be physically segregated from Loan Documents in the Custodian's custody but will be kept in shared facilities. The Custodian will review the Loan Documents related to each HEL and deliver to the Trustee a certification to the effect that, except as noted in the certification, all required documents have been executed and received.

In the event of the termination of the Custody Agreement, the Custodian will be required to deliver the Loan Documents in the Custodian's custody to the Trustee or any successor Custodian appointed by the Company.

The Servicer may pay the Custodian a fee for its services under the Custody Agreement from time to time. Payment of this fee will not affect dividends to the Company.

## General

WMI is a Washington corporation. It owns two federal savings associations as well as numerous nonbank subsidiaries. WMI is a multiple savings and loan holding company. As a savings and loan holding company, WMI is subject to regulation by the OTS.

WMI's federal savings associations are subject to extensive regulation and examination by the OTS, their primary federal regulator, as well as the U.S. Federal Deposit Insurance Corporation ("FDIC"). Prior to 2004, WMB had two sister depository institutions which were both owned directly by WMI. WMB has since acquired both of these sister institutions. One of these institutions, Washington Mutual Bank fsb, a federal savings bank, became a wholly-owned subsidiary of WMB on February 1, 2004. The other institution, Washington Mutual Bank, a savings bank chartered under the laws of the state of Washington, converted into a federally chartered savings bank and then was merged into WMB on January 1, 2005. Consequently, WMI no longer owns a state savings bank that is subject to regulation and supervision by the Director of Financial Institutions of the State of Washington or by the FDIC. WMI's nonbank financial subsidiaries are also subject to various federal and state laws and regulations.

All of WMI's banking subsidiaries are under the common control of WMI and are insured by the FDIC. If an insured institution fails, claims for administrative expenses of the receiver and for deposits in U.S. branches (including claims of the FDIC as subrogee of the failed institution) have priority over the claims of general unsecured creditors. In addition, the FDIC has authority to require any of WMI's banking subsidiaries to reimburse it for losses it incurs in connection either with the failure of another of WMI's banking subsidiaries or with the FDIC's provision of assistance to one of WMI's banking subsidiaries that is in danger of failure.

## Holding Company Status and Acquisitions

WMI is a multiple savings and loan holding company, as defined by federal law, because it owns more than one savings association. WMI is regulated as a unitary savings and loan holding company, however, because the OTS deems WMI's federal savings associations to have been acquired in supervisory transactions. Therefore, WMI is exempt from certain restrictions that would otherwise apply under federal law to the activities and investments of a multiple savings and loan holding company. These restrictions will apply to WMI if any of WMI's banking institutions fails to meet a qualified thrift lender test established by federal law. As of December 31, 2004, WMI's banking subsidiaries were in compliance with qualified thrift lender standards.

WMI may not acquire control of another savings association without the prior approval of the OTS. WMI may not be acquired by a company, other than a bank holding company, unless the OTS approves such an acquisition, or by an individual unless the OTS does not object after receiving notice. WMI may not be acquired by a bank holding company unless the Board of Governors of the Federal Reserve System (the "Federal Reserve") approves. In any case, the public must have an opportunity to comment on the proposed acquisition, and the OTS or Federal Reserve must complete an application review. Without prior approval from the OTS, WMI may not acquire more than 5% of the voting stock of any savings institution that is not one of WMI's subsidiaries.

The Gramm-Leach-Bliley Act generally restricts any non-financial entity from acquiring WMI unless such non-financial entity was, or had submitted an application to become, a savings and loan holding company as of May 4, 1999. Because WMI was treated as a unitary savings and loan holding company prior to that date, WMI may engage in non-financial activities and acquire non-financial subsidiaries.

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

WMB is the Servicer and the originator of the HELs. WMB is expected to be the Servicer and may be the originator with respect to any Additional Assets. University Street is an indirect subsidiary of WMB. The Company is a subsidiary of University Street.

There is not currently, and there was not during the past two years, any material business relationship, agreement, arrangement, transaction or understanding that is or was entered into outside the ordinary course of business or is or was on terms other than would be obtained in an arm's-length transaction with an unrelated third party, between (i) any of WMB or University Street on the one hand and (ii) any of the Company, the Asset Trust, WaMu Delaware or WaMu Cayman on the other hand.

Employees of WMB administer the day-to-day activities of the Company under the terms of Administrative Services Agreement, which obligates the Company to pay an annual service fee as provided under such agreement. Additionally, the Company periodically reimburses WMB for general overhead expenses. The Company expects that the amount of such service fees and reimbursements will be *de minimis*.

# DESCRIPTION OF THE TRUST SECURITIES

*The following summary describes the material terms and provisions of the Trust Securities, which will represent undivided beneficial ownership interests in a like amount of Fixed-to-Floating Rate Company Preferred Securities held by WaMu Delaware. This description is qualified in its entirety by reference to the terms and provisions of the Trust Agreement. A copy of the Trust Agreement may be obtained upon request to WMI.*

## General

The Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities, liquidation preference $100,000 per security (the "*Trust Securities*"), of WaMu Delaware are beneficial ownership interests in WaMu Delaware, the terms of which are set forth in the Trust Agreement. The aggregate liquidation preference of the Trust Securities is $1,250,000,000.

The funds of WaMu Delaware available for distribution to the holders of the Trust Securities will be limited solely to payments received by WaMu Delaware from the Company as dividends on, or upon redemption of, the Fixed-to-Floating Rate Company Preferred Securities, which payments will be passed through upon receipt by WaMu Delaware to the holders of the Trust Securities. Consequently, if the Company does not pay any dividend or make any redemption payment on the Fixed-to-Floating Rate Company Preferred Securities, WaMu Delaware will not have funds to make the related distribution or redemption payment on the Trust Securities. Distributions on and the redemption price of each Trust Security will be passed through to the holders of the Trust Securities on the same dates and in the same amounts as the corresponding dividends and redemption price, as applicable, that are paid by the Company to WaMu Delaware on a like amount of Fixed-to-Floating Rate Company Preferred Securities; *provided* that if any such payment of dividends or redemption price is received by WaMu Delaware after 2:00 P.M. New York time, such payment will instead be passed through to the holders of the Trust Securities on the next day that is a Business Day. The Dividend Payment Dates and related Dividend Periods are the same for the Trust Securities and the Fixed-to-Floating Rate Company Preferred Securities, and, accordingly, the terms "*Dividend Payment Date*", "*Dividend Period*" and "*Business Day*" have the same meanings as applied to each of those securities.

The Trust Securities are automatically exchangeable under certain circumstances into a like amount of Fixed-to-Floating Rate Depositary Shares. See "— Conditional Exchange."

Under the Trust Agreement, WaMu Delaware is prohibited from issuing any securities other than the Trust Securities.

The Trust Securities are not obligations of, or guaranteed by, WMI, WMB, Marion, the Company, University Street, WaMu Cayman or any of their respective affiliates or any other entity. The Trust Securities represent equity interests solely in WaMu Delaware and do not represent an interest in any of the foregoing entities.

## Distributions

Distributions on the Trust Securities will be passed through on each date on which the Company pays to WaMu Delaware dividends on the Fixed-to-Floating Rate Company Preferred Securities owned by WaMu Delaware, in an amount per Trust Security equal to the amount of dividends received by WaMu Delaware on such date on a like amount of Fixed-to-Floating Rate Company Preferred Securities (including Additional Amounts, if any); *provided* that if any such payment of dividends is received by WaMu Delaware after 2:00 P.M. New York time, such

payment will instead be passed through to the holders of the Trust Securities on the next day that Is a Business Day. Accordingly:

- if the Company pays full dividends on a Dividend Payment Date for the Fixed-to-Floating Rate Company Preferred Securities, WaMu Delaware will pass through corresponding full distributions on the Trust Securities on such Dividend Payment Date;

- if the Company pays partial dividends on a Dividend Payment Date for the Fixed-to-Floating Rate Company Preferred Securities, WaMu Delaware will pass through partial distributions in the same proportionate amount on the Trust Securities on such Dividend Payment Date; and

- if the Company pays no dividends on a Dividend Payment Date for the Fixed-to-Floating Rate Company Preferred Securities, WaMu Delaware will not pass through any distributions on the Trust Securities on such Dividend Payment Date.

See "Description of the Fixed-to-Floating Rate Company Preferred Securities — Dividends."

The record date for distributions on the Trust Securities will be the first day of the month in which the relevant Dividend Payment Date occurs or, if any such day is not a Business Day, the next day that is a Business Day.

Dividends on the Fixed-to-Floating Rate Company Preferred Securities are non-cumulative. Accordingly, distributions on the Trust Securities are non-cumulative. If WaMu Delaware passes through no distributions or less than full distributions on the Trust Securities on a Dividend Payment Date because it received no dividend or less than full dividends on the Fixed-to-Floating Rate Company Preferred Securities, holders of Trust Securities will have no right to receive, and WaMu Delaware will have no obligation to pass through, such unpaid distributions at a future date, whether or not dividends or distributions are paid on a future Dividend Payment Date on the Company Common Securities or the Trust Securities.

## Restrictions on Dividends

Under certain circumstances, if the OTS determines that WMB is operating with an insufficient level of capital or is engaged in, or its relationship with the Company results in, an unsafe and unsound banking practice, the OTS could restrict payment of dividends by the Company on the Fixed-to-Floating Rate Company Preferred Securities, resulting in a corresponding restriction in the distributions passed through by WaMu Delaware to the holders of the Trust Securities.

## Restrictions on Dividends by WMI

WMI will covenant in the Exchange Agreement for the benefit of the holders of the Trust Securities and the WaMu Cayman Preferred Securities that if for any Dividend Period full dividends on (i) the Company Preferred Securities, (ii) the Trust Securities or (iii) the WaMu Cayman Preferred Securities have not been declared and paid, then, as described under "Description of the Fixed-to-Floating Rate Company Preferred Securities — Restrictions on Dividends by WMI", WMI will not declare or pay dividends with respect to, or redeem, purchase or acquire, any of its equity capital securities during the next succeeding Dividend Period, except dividends in connection with a shareholders' rights plan, if any, or dividends in connection with benefits plans.

## Redemption

The Trust Securities will not be redeemable at the option of the holders thereof. On each day on which the Company redeems Fixed-to-Floating Rate Company Preferred Securities, WaMu Delaware will redeem a like amount of Trust Securities for a redemption price in the same

amount as the corresponding redemption price paid to WaMu Delaware on a like amount of Fixed-to-Floating Rate Company Preferred Securities; *provided* that if any such payment of the redemption price is received by WaMu Delaware after 2:00 P.M. New York Time, WaMu Delaware will redeem the like amount of Trust Securities on the next day that is a Business Day. See "Description of the Fixed-to-Floating Rate Company Preferred Securities — Redemption."

If the redemption of the Fixed-to-Floating Rate Company Preferred Securities is in part instead of in whole on any redemption date, then the particular Trust Securities to be redeemed will be selected not more than 60 days prior to the redemption date by the Property Trustee from the outstanding Trust Securities not previously called for redemption, by such method as the Property Trustee deems fair and appropriate.

A notice of redemption of the Trust Securities will be mailed by first class mail, postage prepaid, addressed to the holders of record of the securities to be redeemed at their respective last addresses appearing on the books and records of WaMu Delaware. Such mailing will be at least 30 days but not more than 60 days before the date fixed for redemption.

### Restriction on Redemption or Repurchases

At or prior to the initial issuance of the Trust Securities, WMI will enter into a "*Replacement Capital Covenant*" relating to the Trust Securities, the WaMu Cayman Preferred Securities, the Fixed-to-Floating Rate Company Preferred Securities, the Fixed-to-Floating Rate Depositary Shares (and related Fixed-to-Floating Rate WMI Preferred Stock), the Fixed Rate Company Preferred Securities, and the Fixed Rate Depositary Shares (and related Fixed Rate WMI Preferred Stock) that may be issued upon a Conditional Exchange (collectively, the "*Replacement Covenant Covered Securities*"). WMI's covenants in the Replacement Capital Covenant run only to the benefit of holders of Covered Debt (as defined below), and are not enforceable by holders of Trust Securities or of any other Replacement Covenant Covered Securities. However, those covenants could preclude WMI from redeeming or repurchasing Replacement Covenant Covered Securities at a time WMI might otherwise wish to do so.

In the Replacement Capital Covenant, WMI covenants to redeem or repurchase Replacement Covenant Covered Securities only if and to the extent that the total redemption or repurchase price is equal to or less than the sum, as of the date of redemption or repurchase, of (i) 133.33% of the aggregate net cash proceeds WMI or its subsidiaries have received during the 180 days prior to such date from the issuance and sale of common stock of WMI plus (ii) 100% of the aggregate net cash proceeds WMI or its subsidiaries have received during the 180 days prior to such date from the issuance of securities that, among other things:

- are, with limited exceptions (including for certain hybrid securities that are in the form of debt), *pari passu* with or junior to the Fixed-to-Floating Rate WMI Preferred Stock upon WMI's liquidation, dissolution or winding up;

- are perpetual, or have a mandatory redemption or maturity date that is not less than forty years after the date of initial issuance of such securities; and

- provide for dividends or other distributions that are either non-cumulative or, if cumulative, are subject to certain optional or mandatory deferral provisions and certain explicit replacement provisions.

WMI's ability to raise proceeds from qualifying securities during the 180 days prior to a proposed redemption or repurchase sufficient to allow such redemption or repurchase to proceed without violating the Replacement Capital Covenant will depend on, among other things, market conditions at such times as well as the acceptability to prospective purchasers of the terms of such qualifying securities.

WMI's covenants in the Replacement Capital Covenant will run in favor of persons that buy, hold or sell WMI's indebtedness during the period that such indebtedness is *"Covered Debt"*, which is currently comprised of WMI's 4.625% Subordinated Notes due 2014, which have CUSIP No. 939322AN3. Other debt will replace WMI Covered Debt under the Replacement Capital Covenant on the earlier to occur of (i) the date two years prior to the maturity of such existing Covered Debt or (ii) the date WMI gives notice of a redemption of such existing Covered Debt such that the date such existing Covered Debt is repurchased in such an amount that, the outstanding principal amount of such existing Covered Debt is or will become less than $100 million.

The Replacement Capital Covenant is subject to various additional terms and conditions and this description is qualified in its entirety by reference to the Replacement Capital Covenant, a copy of which is available upon request from WMI. The Replacement Capital Covenant may be terminated if the holders of at least 51% by principal amount of each of the Covered Debt so agree, or if WMI no longer has outstanding any long-term indebtedness that qualifies as Covered Debt, without regard to whether such indebtedness is rated by a nationally recognized statistical rating organization.

Subject to the Replacement Capital Covenant and the terms of any outstanding debt instruments, WMI or its affiliates may from time to time purchase any outstanding Trust Securities by tender, in the open market or by private agreement.

## Voting Rights

Except as set forth below, the holders of Trust Securities will have no voting rights.

In the event that WaMu Delaware is entitled to exercise its voting rights with respect to the Fixed-to-Floating Rate Company Preferred Securities, each holder of Trust Securities will have the right to direct the manner in which the Property Trustee on behalf of WaMu Delaware exercises such voting rights with respect to a like amount of Fixed-to-Floating Rate Company Preferred Securities on a proportionate basis. If the Property Trustee receives notice from the Company that WaMu Delaware as holder of Fixed-to-Floating Rate Company Preferred Securities is entitled to vote on any matter, promptly after learning of such entitlement, the Property Trustee shall cause to be mailed to each holder of Trust Securities, notice of such vote (including a description of the subject matter of the vote and related circumstances to the extent known to the Property Trustee), along with a copy of any notice or other written communication received by the Property Trustee from the Company with respect to such vote and related matters. In each such notice the Property Trustee shall request direction from each holder of Trust Securities as to how WaMu Delaware as a holder of Fixed-to-Floating Rate Company Preferred Securities shall vote on the matter at issue. Each holder of Trust Securities shall have the right to direct the manner in which the Property Trustee on behalf of WaMu Delaware exercises such voting rights with respect to a like amount of Fixed-to-Floating Rate Company Preferred Securities.

Notwithstanding the description above of the voting rights available to holders of the Trust Securities under the Trust Agreement, such voting rights may be exercised only by a beneficial owner of a Trust Security that is a U.S. Person or by a U.S. Person acting as irrevocable agent with discretionary powers for the beneficial owner of a Trust Security that is not a U.S. Person. Beneficial owners of Trust Securities that are not U.S. Persons must irrevocably appoint a U.S. Person with discretionary powers to act as their agent with respect to such voting rights. As used in this paragraph, the term *"U.S. Person"* means, for United States Federal income tax purposes, a citizen or resident of the United States, a corporation created or organized in or under the laws of the United States or any state, an estate the income of which is includible in gross income for United States Federal income tax purposes regardless of its source, or a trust if a court within the United States is able to exercise primary supervision over its administration