**The Asset Trust II Servicer**

*The Asset Trust II Servicer's Servicing Experience*

WMB has been servicing loans secured by real estate or other property for over 100 years. The Option ARMs in WMB's portfolio were originated by WMB.

The following table shows the number and aggregate principal balance of prime single-family residential mortgage loans, including conforming and nonconforming mortgage loans and fixed rate and adjustable rate mortgage loans, serviced by the Asset Trust II Servicer as of the specified date.

### Single-Family Residential Prime Mortgage Loans Serviced by the Asset Trust II Servicer

|  | September 30, 2006 | December 31, 2005 | December 31, 2004 |
|---|---|---|---|
| Number of Mortgage Loans Serviced for WMB or Its Affiliates (or Their Securitization Trusts) . . . . . . . . . . . . . . | 710,431 | 766,384 | 798,269 |
| Aggregate Principal Balance . . . . . . . . . . | $230,132,378,921 | 266,334,033,007 | 213,524,775,375 |
| Number of Mortgage Loans Serviced for Unaffiliated Third Parties . . . . . . . . . . . | 3,403,002 | 3,527,670 | 3,820,696 |
| Aggregate Principal Balance . . . . . . . . . . | $427,577,622,402 | 429,944,491,267 | 444,594,562,503 |

**Servicing Procedures**

*Servicing Functions.* The functions to be performed by the Asset Trust II Servicer under the Asset Trust II Pooling and Servicing Agreement will include, among other servicing functions, payment collection, payment application, investor reporting and other investor services, default management and escrow administration. The Asset Trust II Servicer will perform its servicing functions at loan servicing centers located in Florence, South Carolina; Milwaukee, Wisconsin; and Jacksonville, Florida.

*Servicing Standard; Waivers and Modifications.* Pursuant to the Asset Trust II Pooling and Servicing Agreement, the Asset Trust II Servicer will be required to service the Option ARMs owned by Asset Trust II consistent with prudent mortgage loan servicing practices and (unless inconsistent with those servicing practices) in the same manner in which, and with the same care, skill, prudence and diligence with which, it services and administers similar mortgage loans for other portfolios. The Asset Trust II Servicer will be required to make reasonable efforts to collect or cause to be collected all payments under the mortgage loans and, to the extent consistent with the Asset Trust II Pooling and Servicing Agreement and applicable insurance policies, follow such collection procedures as are followed with respect to comparable mortgage loans that are held in portfolios of responsible mortgage lenders in the local areas where each mortgaged property is located. Under the terms of the Asset Trust II Pooling and Servicing Agreement, the servicing standard applicable to the Asset Trust II Servicer may only be modified with the consent of the Company.

Under the terms of the Asset Trust II Pooling and Servicing Agreement, the Asset Trust II Servicer (subject to certain conditions) may waive, modify or vary any term of any mortgage loan or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to the applicable obligor if it has determined, exercising its good faith business judgment in the same manner as it would if it were the owner of the related Option ARM, that the security for, and the timely and full collectability of, such Option ARM would not be adversely affected by such waiver, modification, postponement or indulgence, and may make certain other modifications with respect to the Option ARMs and the related property in accordance with the terms of the Asset Trust II Pooling and Servicing Agreement.

***Mortgage Loan Servicing System.*** In performing its servicing functions, the Asset Trust II Servicer will use computerized mortgage loan servicing systems that it leases from Fidelity Information Services, a division of Fidelity National Financial *("Fidelity")*, a third party vendor (collectively, the *"Fidelity System"*). The Fidelity System produces detailed information about the financial status of each mortgage loan, including outstanding principal balance, current interest rate and the amount of any advances, unapplied payments, outstanding fees, escrow deposits or escrow account overdrafts, and about transactions that affect the mortgage loan, including the amount and due date of each payment, the date of receipt of each payment (including scheduled payments and prepayments), and how the payment was applied. The Fidelity System also produces additional information about mortgage loans that are in default, including the amount of any insurance and liquidation proceeds received. The Asset Trust II Servicer began using the Fidelity System in 1996. Prior to July 2004, the Asset Trust II Servicer serviced some mortgage loans using a proprietary mortgage loan servicing system; in July 2004, the Asset Trust II Servicer consolidated servicing into a single servicing platform by converting approximately 1.2 million loan records from the proprietary mortgage loan servicing system to the Fidelity System.

***Collections and Distributions.*** Under the terms of the Asset Trust II Pooling and Servicing Agreement, collections with respect to the Option ARMs will be collected by the Asset Trust II Servicer and will be aggregated into a Payment Clearing Account controlled by the Asset Trust II Servicer; such collections will then be deposited into accounts controlled by the Asset Trust II Servicer and may be commingled with funds with respect to other Option ARMs or mortgage loans serviced or owned by the Asset Trust II Servicer. The Asset Trust II Servicer will be required to deposit collections received with respect to the Option ARMs owned by Asset Trust II into a certificate account controlled by the Asset Trust II Trustee under the Asset Trust II Pooling and Servicing Agreement on a monthly basis. The amount of collections required to be remitted to the Asset Trust II Trustee in any given monthly deposit is determined by the timing of the Asset Trust II Servicer's receipt of collections and the type of collections they represent. In accordance with the terms of the Asset Trust II Pooling and Servicing Agreement, the Asset Trust II Servicer will be allowed to retain certain amounts with respect to expenses and advances from collections or apply them towards the costs of certain costs and permitted expenses connected with the servicing of the Option ARMs. The Asset Trust II Servicer will neither be permitted nor required to make servicer advances to cover any gap between scheduled payments on the Option ARMs and the actual collections thereon in any given period.

Subject to the terms and conditions set forth in the Asset Trust II Pooling and Servicing Agreement, on a monthly basis the Asset Trust II Trustee will distribute collections deposited in the certificate account to the Company, as holder of the Asset Trust II Class A Trust Certificate, less (a) fees, expenses and indemnities payable to the Asset Trust II Trustee and the Asset Trust II Delaware Trustee and (b) fees and certain other amounts payable to the Asset Trust II Servicer. No amounts will be payable from collections with respect to the Asset Trust II Class R Trust Certificate.

Under the terms of the Asset Trust II Pooling and Servicing Agreement, collections with respect to the Option ARMs may be invested in certain permitted investments prior to their distribution to the Company, as holder of the Asset Trust II Class A Trust Certificate. The Asset Trust II Servicer shall be entitled to retain any investment income produced by such investment as additional servicing compensation.

***Servicing of Delinquent Option ARMs; Foreclosure.*** The Asset Trust II Servicer will make reasonable efforts to collect or cause to be collected all payments on the Option ARMs owned by Asset Trust II that are 30 or more days delinquent. Such efforts may include payment reminder telephone calls to the mortgagor, letter campaigns, drive-by property inspections and other collection activities permissible under the Asset Trust II Loan Documents and applicable law.

The Asset Trust II Servicer will be required under the Asset Trust II Pooling and Servicing Agreement to foreclose upon the mortgaged property related to each defaulted Option ARM as to which no satisfactory arrangements can be made for collection of delinquent payments. Under the

Asset Trust II Pooling and Servicing Agreement, the Asset Trust II Servicer will be permitted, in lieu of foreclosure, if prudent to do so and taking into account the desirability of maximizing net liquidation proceeds, to accept a payment of less than the outstanding principal balance of the defaulted Option ARM. The Asset Trust II Servicer will not be permitted to foreclose upon a mortgaged property if it is aware of evidence of toxic waste or other environmental contamination on the mortgaged property and it determines that it would be imprudent to foreclose.

*Insurance.* For each Option ARM with an original loan-to-value ratio greater than 80%, the Asset Trust II Pooling and Servicing Agreement generally will require the Asset Trust II Servicer to keep in full force and effect a primary mortgage insurance policy. The Asset Trust II Servicer generally will not be required to maintain such policy if the outstanding principal balance of the Option ARM is 80% or less of the original appraised value of the related mortgaged property, unless required by applicable law.

### Limitations on the Asset Trust II Servicer's Liability

The Asset Trust II Pooling and Servicing Agreement will provide that neither the Asset Trust II Servicer nor any director, officer, employee or agent of the Asset Trust II Servicer (the *"Asset Trust II Servicer Indemnified Parties"*) will be under any liability to Asset Trust II, the Company or the holders of the Asset Trust II Class A Trust Certificate and the Asset Trust II Class R Trust Certificate or others for any action taken (or not taken) by any Asset Trust II Servicer Indemnified Party in good faith pursuant to the Asset Trust II Pooling and Servicing Agreement, or for errors in judgment; *provided, however,* that the Asset Trust II Servicer will not be protected against any liability that would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties thereunder. The Asset Trust II Pooling and Servicing Agreement will further provide that any Asset Trust II Servicer Indemnified Party is entitled to indemnification by Asset Trust II and will be held harmless against any loss, liability or expense incurred in connection with any legal action relating to the Asset Trust II Pooling and Servicing Agreement or the certificates issued thereunder (except any such loss, liability, or expense otherwise reimbursable pursuant to the Asset Trust II Pooling and Servicing Agreement) and any loss, liability or expense incurred by reason of willful misfeasance, bad faith or gross negligence in the performance of duties thereunder or by reason of reckless disregard of obligations and duties thereunder. In addition, the Asset Trust II Pooling and Servicing Agreement will provide that the Asset Trust II Servicer is not under any obligation to appear in, prosecute or defend any legal action that is not incidental to its responsibilities under the Asset Trust II Pooling and Servicing Agreement and that in its opinion may involve it in any expense or liability. The Asset Trust II Servicer may, however, in its discretion undertake any such action that it may deem necessary or desirable with respect to the Asset Trust II Pooling and Servicing Agreement and the rights and duties of the parties thereto and the interests of the holders of the Asset Trust II Class A Trust Certificate and the Asset Trust II Class R Trust Certificate. In such event, the legal expenses and costs of such action and any liability resulting therefrom will be expenses, costs and liabilities of Asset Trust II, and the Asset Trust II Servicer will be entitled to be reimbursed therefor and to charge the certificate account.

*Asset Trust II Servicer Termination and Replacement.* Under the terms of the Asset Trust II Pooling and Servicing Agreement, after the occurrence of any one of several typical servicer termination events, including but not limited to a receivership with respect to the Asset Trust II Servicer or (subject to the expiration of typical grace periods and materiality requirements) the failure by the Asset Trust II Servicer to make required deposits to the certificate account, the Company may remove the Asset Trust II Servicer. If the Asset Trust II Servicer is removed by the Company, the Company shall have the sole power to appoint a replacement Asset Trust II Servicer.

*The Asset Trust II Servicer's Third Party Vendors and Service Providers.* Under the Asset Trust II Pooling and Servicing Agreement, the Asset Trust II Servicer may perform its servicing responsibilities through agents or independent contractors, but will not thereby be released from any of its responsibilities thereunder. The Asset Trust II Servicer expects that it will outsource some of its

responsibilities pursuant to these provisions, which services may include some or all of the following: (i) processing and monitoring of foreclosure actions, (ii) processing and monitoring of mortgagor bankruptcy proceedings, (iii) preservation of properties related to delinquent loans, (iv) maintenance, marketing and sale of real-estate-owned properties, (v) assuring that hazard insurance coverage is maintained, (vi) determining whether flood insurance coverage is required and assuring that any required coverage is maintained, (vii) tax bill procurement and tracking of delinquent tax payments, (viii) printing and mailing billing statements, Option ARM notices and default notices and (ix) depositing mortgagor payments into a lockbox account. From time to time, the Asset Trust II Servicer may cease to outsource one or more of the foregoing servicing functions or may choose to outsource additional servicing functions. Some vendors may perform more than one function, and some functions may be performed by more than one vendor.

The Asset Trust II Servicer has entered into service level agreements with some of its vendors, which set forth detailed performance criteria, including in some cases minimum time requirements for completing specified tasks and maximum error rates, and which in some cases impose penalties for non-compliance with such criteria. The Asset Trust II Servicer will monitor vendor compliance with applicable servicing criteria through procedures that may include reviews of statistical samplings of Option ARMs and reviews of reports on vendor performance prepared by the vendor or the Asset Trust II Servicer.

### The Asset Trust II Servicer's Quality Control Procedures

The Asset Trust II Servicer uses a combination of management controls and technology controls to ensure the accuracy and integrity of servicing records. Management controls include the use of approval levels, the segregation of duties, and reconciliations of servicing data and accounts, among others. Technology controls include the use of data security controls and interface controls to ensure that only authorized persons have the ability to access and change system data or to submit data to or receive data from vendors and investors. Specific security profiles for each job function include a predetermined set of data security controls that are appropriate for that job function. The regional data center for the Fidelity System, which is located in Jacksonville, Florida, is kept in a fire resistant environment, and commercial electrical power is backed up by generators.

In addition, the Asset Trust II Servicer conducts periodic internal audits of critical servicing and technology functions. External audits by entities such as the Fannie Mae, Freddie Mac and Ginnie Mae and the annual examination by WMI's independent accountants in connection with their audit of WMI and its subsidiaries may provide independent verification of the adequacy of such functions. Periodic examination by the Asset Trust II Servicer's regulatory authorities may provide additional independent review of the Asset Trust II Servicer's management controls.

Both the Asset Trust II Servicer and Fidelity maintain detailed business continuity plans so that each entity can resume critical business functions in the event of a disaster or other serious system outage, which plans are reviewed and updated periodically. Fidelity is contractually obligated to return the Asset Trust II Servicer to full functionality within 48 hours of a reported system outage. The Asset Trust II Servicer and Fidelity perform annual disaster recovery tests in which they reroute data and servicing system operations to Fidelity's back-up site, and then process sample transactions from all servicing locations to ensure the functionality of such back-up site.

It is the Asset Trust II Servicer's policy to require its other third party vendors to implement measures similar to those described above to ensure the accuracy and integrity of servicing records.

### The Asset Trust II Custodian

Washington Mutual Bank will act as custodian (the *"Asset Trust II Custodian"*) for Asset Trust II pursuant to a Custody Agreement, to be entered into on or before the closing date (the *"Asset Trust II Custody Agreement"*), among the Asset Trust II Trustee, the Asset Trust II Servicer and the Asset Trust II Custodian. The Asset Trust II Custodian will hold the notes, mortgages and other legal

documents related to the Option ARMs (collectively, the *"Asset Trust II Loan Documents"*) for the benefit of the Asset Trust II Trustee. The Asset Trust II Custodian will maintain the Asset Trust II Loan Documents in secure and fire resistant facilities. The mortgage files held by the Asset Trust II Servicer will not be physically segregated from Asset Trust II Loan Documents in the Asset Trust II Custodian's custody but will be kept in shared facilities. The Asset Trust II Custodian will review the Asset Trust II Loan Documents related to each Option ARM and deliver to the Asset Trust II Trustee a certification to the effect that, except as noted in the certification, all required documents have been executed and received.

In the event of the termination of the Asset Trust II Custody Agreement, the Asset Trust II Custodian will be required to deliver the Asset Trust II Loan Documents in the Asset Trust II Custodian's custody to the Asset Trust II Trustee or any successor Asset Trust II Custodian appointed by the Company.

The Asset Trust II Servicer may, but does not currently, pay the Asset Trust II Custodian a fee for its services under the Asset Trust II Custody Agreement from time to time. Payment of this fee will not affect dividends to the Company.

## General

WMI is a Washington corporation. It owns two federal savings associations as well as numerous nonbank subsidiaries. WMI is a multiple savings and loan holding company. As a savings and loan holding company, WMI is subject to regulation by the OTS.

WMI's federal savings associations are subject to extensive regulation and examination by the OTS, their primary federal regulator, as well as the Federal Deposit Insurance Corporation *("FDIC")*. WMI's nonbank financial subsidiaries are also subject to various federal and state laws and regulations.

All of WMI's banking subsidiaries are under the common control of WMI and are insured by the FDIC. If an insured institution fails, claims for administrative expenses of the receiver and for deposits in U.S. branches (including claims of the FDIC as subrogee of the failed institution) have priority over the claims of general unsecured creditors. In addition, the FDIC has authority to require any of WMI's banking subsidiaries to reimburse it for losses it incurs in connection either with the failure of another of WMI's banking subsidiaries or with the FDIC's provision of assistance to one of WMI's banking subsidiaries that is in danger of failure.

## Holding Company Status and Acquisitions

WMI is a multiple savings and loan holding company, as defined by federal law, because it owns more than one savings association. WMI is regulated as a unitary savings and loan holding company, however, because the OTS deems WMI's federal savings associations to have been acquired in supervisory transactions. Therefore, WMI is exempt from certain restrictions that would otherwise apply under federal law to the activities and investments of a multiple savings and loan holding company. These restrictions will apply to WMI if any of WMI's banking institutions fails to meet a qualified thrift lender test established by federal law. As of September 30, 2006, WMI's banking subsidiaries were in compliance with qualified thrift lender standards.

WMI may not acquire control of another savings association without the prior approval of the OTS. WMI may not be acquired by a company, other than a bank holding company, unless the OTS approves such an acquisition, or by an individual unless the OTS does not object after receiving notice. WMI may not be acquired by a bank holding company unless the Board of Governors of the Federal Reserve System (the *"Federal Reserve"*) approves. In any case, the public must have an opportunity to comment on the proposed acquisition, and the OTS or Federal Reserve must complete an application review. Without prior approval from the OTS, WMI may not acquire more than 5% of the voting stock of any savings institution that is not one of WMI's subsidiaries.

The Gramm-Leach-Bliley Act generally restricts any non-financial entity from acquiring WMI unless such non-financial entity was, or had submitted an application to become, a savings and loan holding company as of May 4, 1999. Because WMI was treated as a unitary savings and loan holding company prior to that date, WMI may engage in non-financial activities and acquire non-financial subsidiaries.

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

WMB is the Asset Trust I Servicer, the Asset Trust II Servicer and the originator of the HELs held by the Company through Asset Trust I and the Option ARMs held by the Company through Asset Trust II. WMB is expected to be the servicer and may be the originator with respect to any Additional Assets. University Street is an indirect subsidiary of WMB. The Company is a subsidiary of University Street.

There is not currently, and there was not during the past two years, any material business relationship, agreement, arrangement, transaction or understanding that is or was entered into outside the ordinary course of business or is or was on terms other than would be obtained in an arm's-length transaction with an unrelated third party, between (i) any of WMB or University Street on the one hand and (ii) any of the Company, Asset Trust I, Asset Trust II or the Trust on the other hand.

Employees of WMB administer the day-to-day activities of the Company under the terms of the Administrative Services Agreement, which obligates the Company to pay an annual service fee as provided under such agreement. Additionally, the Company periodically reimburses WMB for general overhead expenses. The Company expects that the amount of such service fees and reimbursements will be *de minimis.*

## DESCRIPTION OF THE TRUST SECURITIES

*The following summary describes the material terms and provisions of the Trust Securities, which will represent undivided beneficial ownership interests in a like amount of Series 2006-C Company Preferred Securities held by the Trust. This description is qualified in its entirety by reference to the terms and provisions of the Trust Agreement. A copy of the Trust Agreement may be obtained upon request to WMI.*

### General

The Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities, liquidation preference $100,000 per security (the "*Trust Securities*"), of the Trust are beneficial ownership interests in the Trust, the terms of which are set forth in the Trust Agreement. The aggregate liquidation preference of the Trust Securities is $500,000,000.

The funds of the Trust available for distribution to the holders of the Trust Securities will be limited solely to payments received by the Trust from the Company as dividends on, or upon redemption of, the Series 2006-C Company Preferred Securities, which payments will be passed through upon receipt by the Trust to the holders of the Trust Securities. Consequently, if the Company does not pay any dividend or make any redemption payment on the Series 2006-C Company Preferred Securities, the Trust will not have funds to make the related distribution or redemption payment on the Trust Securities. Distributions on and the redemption price of each Trust Security will be passed through to the holders of the Trust Securities on the same dates and in the same amounts as the corresponding dividends and redemption price, as applicable, that are paid by the Company to the Trust on a like amount of Series 2006-C Company Preferred Securities; *provided* that if any such payment of dividends or redemption price is received by the Trust after 2:00 P.M. New York time, such payment will instead be passed through to the holders of the Trust Securities on the next day that is a Business Day. The Dividend Payment Dates and related Dividend Periods are the same for the Trust Securities and the Series 2006-C Company Preferred Securities, and, accordingly, the terms *"Dividend Payment Date"*, *"Dividend Period"* and *"Business Day"* have the same meanings as applied to each of those securities.

The Trust Securities are automatically exchangeable under certain circumstances into a like amount of Depositary Shares. See "— Conditional Exchange".

Under the Trust Agreement, the Trust is prohibited from issuing any securities other than the Trust Securities.

The Trust Securities are not obligations of, or guaranteed by, WMI, WMB, Marion, the Company, University Street, or any of their respective affiliates or any other entity. The Trust Securities represent equity interests solely in the Trust and do not represent an interest in any of the foregoing entities.

### Distributions

Distributions on the Trust Securities will be passed through on each date on which the Company pays to the Trust dividends on the Series 2006-C Company Preferred Securities owned by the Trust, in an amount per Trust Security equal to the amount of dividends received by the Trust on such date on a like amount of Series 2006-C Company Preferred Securities (including Additional Amounts, if any); *provided* that if any such payment of dividends is received by the Trust after 2:00 P.M. New York time, such payment will instead be passed through to the holders of the Trust Securities on the next day that is a Business Day. Accordingly:

- if the Company pays full dividends on a Dividend Payment Date for the Series 2006-C Company Preferred Securities, the Trust will pass through corresponding full distributions on the Trust Securities on such Dividend Payment Date;

- if the Company pays partial dividends on a Dividend Payment Date for the Series 2006-C Company Preferred Securities, the Trust will pass through partial distributions in the same proportionate amount on the Trust Securities on such Dividend Payment Date; and

- if the Company pays no dividends on a Dividend Payment Date for the Series 2006-C Company Preferred Securities, the Trust will not pass through any distributions on the Trust Securities on such Dividend Payment Date.

See "Description of the Series 2006-C Company Preferred Securities — Dividends".

The record date for distributions on the Trust Securities will be the first day of the month in which the relevant Dividend Payment Date occurs or, if any such day is not a Business Day, the next day that is a Business Day.

Dividends on the Series 2006-C Company Preferred Securities are non-cumulative. Accordingly, distributions on the Trust Securities are non-cumulative. If the Trust passes through no distributions or less than full distributions on the Trust Securities on a Dividend Payment Date because it received no dividend or less than full dividends on the Series 2006-C Company Preferred Securities, holders of Trust Securities will have no right to receive, and the Trust will have no obligation to pass through, such unpaid distributions at a future date, whether or not dividends or distributions are paid on a future Dividend Payment Date on the Company Common Securities or the Trust Securities.

## Restrictions on Dividends

Under certain circumstances, if the OTS determines that WMB is operating with an insufficient level of capital or is engaged in, or its relationship with the Company results in, an unsafe and unsound banking practice, the OTS could restrict payment of dividends by the Company on the Series 2006-C Company Preferred Securities, resulting in a corresponding restriction in the distributions passed through by the Trust to the holders of the Trust Securities.

## Restrictions on Dividends by WMI

WMI will covenant in the Exchange Agreement for the benefit of the holders of the Trust Securities that if for any Dividend Period full dividends on (i) the Series 2006-C Company Preferred Securities or (ii) the Trust Securities have not been declared and paid, then, as described under "Description of the Series 2006-C Company Preferred Securities — Restrictions on Dividends by WMI", WMI will not declare or pay dividends with respect to, or redeem, purchase or acquire, any of its equity capital securities during the next succeeding Dividend Period, except dividends in connection with a shareholders' rights plan, if any, or dividends in connection with benefits plans.

## Redemption

The Trust Securities will not be redeemable at the option of the holders thereof. On each day on which the Company redeems Series 2006-C Company Preferred Securities, the Trust will redeem a like amount of Trust Securities for a redemption price in the same amount as the corresponding redemption price paid to the Trust on a like amount of Series 2006-C Company Preferred Securities; *provided* that if any such payment of the redemption price is received by the Trust after 2:00 P.M. New York Time, the Trust will redeem the like amount of Trust Securities on the next day that is a Business Day. See "Description of the Series 2006-C Company Preferred Securities — Redemption".

If the redemption of the Series 2006-C Company Preferred Securities is in part instead of in whole on any redemption date, then the particular Trust Securities to be redeemed will be selected not more than 60 days prior to the redemption date by the Property Trustee from the outstanding Trust Securities not previously called for redemption, by such method as the Property Trustee deems fair and appropriate.

A notice of redemption of the Trust Securities will be mailed by first class mail, postage prepaid, addressed to the holders of record of the securities to be redeemed at their respective last addresses appearing on the books and records of the Trust. Such mailing will be at least 30 days but not more than 60 days before the date fixed for redemption.

## Restriction on Redemption or Purchases

At or prior to the initial issuance of the Trust Securities, WMI will enter into a *"Replacement Capital Covenant"* relating to the Trust Securities, the Series 2006-C Company Preferred Securities, the Depository Shares and the Series L WMI Preferred Stock that may be issued upon a Conditional Exchange (collectively the *"Replacement Covenant Covered Securities"*). The Replacement Capital Covenant will only benefit holders of Covered Debt (as defined below) and will not be enforceable by holders of Trust Securities of any other Replacement Covenant Covered Securities. However, the Replacement Capital Covenant could preclude WMI from redeeming or purchasing Replacement Covenant Covered Securities at a time WMI might otherwise wish to do so.

In the Replacement Capital Covenant, WMI will covenant to redeem or purchase Replacement Covenant Covered Securities only if and to the extent that the total redemption or purchase price is equal to or less than designated percentages of the net cash proceeds that WMI or its subsidiaries have received during the 180 days prior to the redemption or purchase from the issuance of WMI common stock, non-cumulative perpetual preferred stock or certain other securities or combinations of securities satisfying the requirements of the Replacement Capital Covenant.

WMI's ability to raise proceeds from qualifying securities during the 180 days prior to a proposed redemption or purchase will depend on, among other things, market conditions at such times as well as the acceptability to prospective investors of the terms of such qualifying securities.

WMI's covenants in the Replacement Capital Covenant will run in favor of persons that buy, hold or sell WMI's indebtedness during the period that such indebtedness is *"Covered Debt"*, which is currently comprised of WMI's 4.625% Subordinated Notes due 2014, bearing CUSIP No. 939322AN3. Other debt will replace WMI's Covered Debt under the Replacement Capital Covenant on the earlier to occur of (i) the date two years prior to the maturity of the existing Covered Debt, (ii) the date of a redemption or purchase of the existing Covered Debt in an amount such that the outstanding principal amount of the existing Covered Debt is or will become less than $100 million.

The Replacement Capital Covenant will be subject to various additional terms and conditions and this description is qualified in its entirety by reference to the Replacement Capital Covenant, a copy of the form of which is available upon request from WMI. The Replacement Capital Covenant may be terminated if the holders of at least 51% of the principal amount of the Covered Debt so agree, or if WMI no longer has outstanding any long-term indebtedness that qualifies as Covered Debt, without regard to whether such indebtedness is rated by a nationally recognized statistical rating organization.

Subject to the limitations described above and the terms of any preferred stock ranking senior to the Trust Securities or of any outstanding debt instruments, WMI or its affiliates may from time to time purchase any outstanding shares of Series L WMI Preferred Stock by tender, in the open market or by private agreement.

## Voting Rights

Except as set forth below, the holders of Trust Securities will have no voting rights.

In the event that the Trust is entitled to exercise its voting rights with respect to the Series 2006-C Company Preferred Securities, each holder of Trust Securities will have the right to direct the manner in which the Property Trustee on behalf of the Trust exercises such voting rights with respect to a like amount of Series 2006-C Company Preferred Securities on a proportionate basis. If the Property Trustee receives notice from the Company that the Trust as holder of Series 2006-C Company Preferred Securities is entitled to vote on any matter, promptly after learning of such entitlement, the Property Trustee shall cause to be mailed to each holder of Trust Securities, notice of such vote

(including a description of the subject matter of the vote and related circumstances to the extent known to the Property Trustee), along with a copy of any notice or other written communication received by the Property Trustee from the Company with respect to such vote and related matters. In each such notice, the Property Trustee shall request direction from each holder of Trust Securities as to how the Trust as a holder of Series 2006-C Company Preferred Securities shall vote on the matter at issue. Each holder of Trust Securities shall have the right to direct the manner in which the Property Trustee on behalf of the Trust exercises such voting rights with respect to a like amount of Series 2006-C Company Preferred Securities.

Notwithstanding the description above of the voting rights available to holders of the Trust Securities under the Trust Agreement, such voting rights may be exercised only by a beneficial owner of a Trust Security that is a U.S. Person or by a U.S. Person acting as irrevocable agent with discretionary powers for the beneficial owner of a Trust Security that is not a U.S. Person. Beneficial owners of Trust Securities that are not U.S. Persons must irrevocably appoint a U.S. Person with discretionary powers to act as their agent with respect to such voting rights. As used in this paragraph, the term *"U.S. Person"* means, for United States federal income tax purposes, a citizen or resident of the United States, a corporation created or organized in or under the laws of the United States or any state, an estate the income of which is includible in gross income for United States federal income tax purposes regardless of its source, or a trust if a court within the United States is able to exercise primary supervision over its administration and one or more United States persons have authority to control all substantial decisions of the trust.

In the case where the Company, the Property Trustee and the Delaware Trustee wish to enter into one or more agreements supplemental to the Trust Agreement, they may do so without the consent of the holders of the Trust Securities for the following purposes: (i) to evidence the succession of another entity to the Company and the assumption by any such successor of the covenants of the Company contained in the Trust Agreement; (ii) to add to the covenants of the Company for the benefit of the holders of the Trust Securities, or to surrender any right or power conferred upon the Company; (iii)(A) to correct or supplement any provision of the Trust Agreement which may be defective or inconsistent with any other provision therein or (B) to make any other provisions with respect to matters or questions arising under the Trust Agreement, *provided* that any such action taken under this clause (iii) shall not materially adversely affect the interests of the holders of the Trust Securities; or (iv) to cure any ambiguity or correct any manifest error. Any other amendment or agreement supplemental to the Trust Agreement must be in writing and approved by a majority of the holders (by aggregate liquidation preference) of the Trust Securities then outstanding, *provided* that, for the purpose of such approval, any Series 2006-C Company Preferred Securities that are directly or indirectly held or beneficially owned by any member of the WMI Group will be treated as if they were not outstanding.

**Conditional Exchange**

Each Trust Security will be exchanged automatically for a like amount of newly issued Fixed-to-Floating Rate Depositary Shares, each representing a 1/1000th interest in one share of Series L WMI Preferred Stock, if the OTS so directs in writing upon or after the occurrence of an Exchange Event. An *"Exchange Event"* will occur when:

- WMB becomes "undercapitalized" under the OTS's "prompt corrective action" regulations;

- WMB is placed into conservatorship or receivership; or

- the OTS, in its sole discretion, anticipates WMB becoming "undercapitalized" in the near term or takes a supervisory action that limits the payment of dividends by WMB and in connection therewith, directs an exchange.

For purposes of this offering circular, this exchange is referred to as the *"Conditional Exchange"*.

73

If the OTS so directs following the occurrence of an Exchange Event, each holder of Trust Securities will be unconditionally obligated to surrender to WMI or its agent any certificates representing the Trust Securities owned by such holder, and WMI will be unconditionally obligated to issue to such holder, in exchange for each such Trust Security, a depositary receipt representing a like amount of Depositary Shares. Any Trust Securities purchased or redeemed by WMI or any of its affiliates prior to the time of exchange will not be deemed outstanding and will not be subject to the Conditional Exchange.

The Conditional Exchange will occur as of 8:00 A.M. New York time, on the date for such exchange set forth in the applicable OTS directive, or if such date is not set forth in the directive, as of 8:00 A.M., New York time, on the earliest possible date such exchange could occur consistent with the directive, as evidenced by the issuance by WMI of a press release prior to such time. As of the time of exchange, all of the Trust Securities will be transferred to WMI without any further action by the Trust, all rights of the holders of Trust Securities as holders of beneficial interests in the Trust will cease, and such persons will be, for all purposes, the holders of Depositary Shares.

WMI will mail notice of the issuance of an OTS directive after the occurrence of an Exchange Event to each holder of Trust Securities within 30 days, and WMI will deliver (or cause to be delivered) to each such holder depositary receipts for Depositary Shares upon surrender of the Trust Securities. Until such depositary receipts are delivered or in the event such depositary receipts are not delivered, any certificates previously representing Trust Securities will be deemed for all purposes to represent Depositary Shares. All corporate authorization necessary for WMI to issue the Depositary Shares and the Series L WMI Preferred Stock as of the time of exchange will be completed prior to or upon completion of this Offering. Accordingly, once the OTS directs a Conditional Exchange after the occurrence of an Exchange Event, no action will be required to be taken by holders of Trust Securities, by WMI, by WMB (other than to inform the OTS), by the Company or by the Trust in order to effect the automatic exchange as of the time of exchange. After the occurrence of the Conditional Exchange, the Trust Securities will be owned by WMI.

Holders of Trust Securities, by purchasing such securities, whether in this Offering or in the secondary market after this Offering, will be deemed to have agreed to be bound by the unconditional obligation to exchange such Trust Securities for Depositary Shares if the OTS so directs following the occurrence of an Exchange Event. The Trust Agreement provides that the holders of Trust Securities will be unconditionally obligated to surrender such Trust Securities. Prior to issuance of the Trust Securities, WMI will enter into an Exchange Agreement (the *"Exchange Agreement"*) among WMI, the Trust and Mellon Investor Services LLC, as depositary (the *"Depositary"*), to implement the Conditional Exchange.

Holders of Trust Securities cannot exchange their Trust Securities for Depositary Shares voluntarily. Absent an OTS directive after the occurrence of an Exchange Event, no exchange of the Trust Securities for Depositary Shares will occur. Upon the issuance of an OTS directive on or following the occurrence of an Exchange Event, the Series L WMI Preferred Stock and the related Depositary Shares to be issued in the Conditional Exchange will constitute a newly issued series of preferred stock of WMI and will have substantially similar terms and provisions with respect to dividends, liquidation, and redemption as the Series 2006-C Company Preferred Securities, except that the Depositary Shares:

- will not have the benefit of the covenants, including with respect to any additional taxes, described under "Description of Series 2006-C Company Preferred Securities — Voting Rights and Covenants";

- will be redeemable prior to the Dividend Payment Date occurring in December 2016 only upon the occurrence of a Regulatory Capital Event or a Rating Agency Event or payment of a U.S. Treasury-based "make-whole" amount; and

- Additional Amounts will not be payable with respect to the Series L WMI Preferred Stock as described under "Description of Series 2006-C Company Preferred Securities — Additional Amounts".

In addition, if WMI fails to pay, or declare and set aside for payment, full dividends on the Series L WMI Preferred Stock or other Voting Parity Stock for six Dividend Periods, the authorized number of WMI's directors will increase by two, and the holders of Series L WMI Preferred Stock, voting together with the holders of any other Voting Parity Stock, will have the right to elect two directors in addition to the directors then in office at the next annual meeting of shareholders.

WMI will covenant in the Exchange Agreement in favor of the holders of the Trust Securities that, prior to the issuance of the Series L WMI Preferred Stock upon a Conditional Exchange, WMI will not issue any preferred stock that would rank senior to the Series L WMI Preferred Stock upon its issuance. Each share of Series L WMI Preferred Stock will upon issuance rank at least *pari passu* with the most senior preferred stock of WMI, if any, then outstanding. The Initial Purchasers are under no obligation to and do not intend to make a market in the Depositary Shares. Absent the occurrence of a Conditional Exchange, holders of Trust Securities will have no dividend, liquidation preference, redemption or other rights with respect to any security of WMI, WMB or University Street.

## Form, Transfer and Book-Entry Procedures

The Trust Securities will be issued only in book-entry form. See "Book-Entry Issuance".

## Payments and Paying Agent

Payments in respect of the Trust Securities in the form of Global Securities will be made to the address of the holder entitled thereto as such address will appear on the register. The DTC nominee (the *"Nominee"*) will be the registered holder of the Trust Securities in the form of Global Securities. Payments made to the order of the Nominee will be made by wire transfer to DTC and DTC will credit the relevant accounts of the DTC Participants. In the event that the circumstances described under "Book-Entry Issuance — Form, Denomination, Transfer and Book-Entry Procedures — Special Situations When the Global Security Will Be Terminated" apply and the Trust Securities are not in the form of Global Securities, payments in respect of the Trust Securities will be made by wire transfer, direct deposit or check mailed to the address of the holder entitled thereto as such address will appear on the securities register. The paying agent (the *"Paying Agent"*) for the Trust Securities initially will be Wilmington Trust Company (in its individual capacity, *"WTC"*) and any co-paying agent will be appointed by the Trust. The Paying Agent and any co-paying agent (collectively, the *"Paying Agents"*) will be permitted to resign as Paying Agents upon 30 days' written notice to the Company. In the event that WTC will no longer be the Paying Agent, the Company will appoint a successor to act as Paying Agent.

## Registrar and Transfer Agent

WTC will act as Registrar (the *"Registrar"*) and Transfer Agent (the *"Transfer Agent"*) for the Trust Securities.

Registration of transfers of Trust Securities will be effected without charge by or on behalf of the Trust, but the Property Trustee or the Registrar and Transfer Agent will require, prior to registration, payment (or the giving of such indemnity as the Registrar and Transfer Agent may require) of a sum sufficient to cover any tax or other governmental charges that may be imposed in connection with any transfer of definitive Trust Securities. The Trust will not be required to register or cause to be registered the transfer of definitive Trust Securities during the period of 15 days before the day of selection for redemption of such Trust Securities and ending at the close of business on the day of mailing of the notice of redemption for the Trust Securities that have been called for redemption.

## Expenses of the Paying Agent, Transfer Agent and Registrar

If the Paying Agent, Transfer Agent or Registrar incurs fees, charges or expenses, for which it is not otherwise liable under the Agency Agreement, to be entered into on or before the closing date, among WTC, as Registrar, Transfer Agent and Paying Agent, and the Trust acting through the Property Trustee at the request of a holder of Trust Securities or other person, such holder or other person will be liable for such fees, charges or expenses.

## Notices

Notices to the holders of the Trust Securities will be given by delivery of the relevant notice to DTC and any other relevant securities clearing system identified in writing by the Trust for communication by each of them to entitled participants.

## Listing

The Trust Securities will not be listed on any securities exchange or automated dealer quotation system.

## Governing Law

The Trust Agreement and the Trust Securities will be governed by and construed in accordance with the laws of the State of Delaware.

## Restrictions on Transfer

For information regarding restrictions on ownership and transfer of the Trust Securities, see "Notice to Investors".

## DESCRIPTION OF THE SERIES 2006-C COMPANY PREFERRED SECURITIES

*The following summary describes the material terms and provisions of the Series 2006-C Company Preferred Securities. This description is qualified in its entirety by reference to the terms and provisions of the LLC Agreement. A copy of the LLC Agreement may be obtained upon request to WMI.*

### General

The Fixed-to-Floating Rate Perpetual Non-cumulative Preferred Securities, Series 2006-C, liquidation preference $1,000 per security and $500,000,000 in the aggregate (the *"Series 2006-C Company Preferred Securities"*), are limited liability company interests in the Company, the terms of which are set forth in the LLC Agreement. When issued, the Series 2006-C Company Preferred Securities will be validly issued, and no additional payments will be required pursuant to the LLC Act for such securities to represent limited liability company interests in the Company. The holders of the Series 2006-C Company Preferred Securities will have no pre-emptive rights with respect to any limited liability company interests in the Company or any other securities of the Company convertible into or carrying rights or options to purchase any such securities. The Series 2006-C Company Preferred Securities are perpetual and will not be convertible into Company Common Securities or any other class or series of limited liability company interests in the Company and will not be subject to any sinking fund or other obligation of the Company for their repurchase or retirement.

The Series 2006-C Company Preferred Securities will be issued in certificated form only.

The Series 2006-C Company Preferred Securities are not obligations of, or guaranteed by, WMI, WMB, Marion, University Street or any of their respective affiliates or any other entity. The Series 2006-C Company Preferred Securities solely represent an interest in the Company and do not represent an interest in any of the foregoing entities.

The Series 2006-C Company Preferred Securities are not insured or guaranteed by the FDIC or any other insurer or governmental agency or instrumentality.

### Ranking

The Series 2006-C Company Preferred Securities will rank senior to the Company Common Securities and will rank *pari passu* with any other series of Company Preferred Securities, including the Outstanding Company Preferred Securities, in terms of payment of dividends and on liquidation.

The Company's Board of Managers has the power to create and issue Junior Equity Securities and additional equity securities ranking *pari passu* with the Series 2006-C Company Preferred Securities in terms of payment of dividends or on liquidation or redemption (any such securities, the *"Parity Equity Securities"*) without the consent of the holders of the Series 2006-C Company Preferred Securities, *provided* that (i) after giving effect to the issuance of any Parity Equity Securities, the *pro forma* net book value of the Company's assets (after giving effect to any assets acquired by the Company in connection with the issuance of such Parity Equity Securities *("New Assets")*) will equal or exceed 1.5 times the sum of the aggregate liquidation preference of the preferred securities of the Company then outstanding and any such Parity Equity Securities that the Company proposes to issue, (ii) after giving effect to such issuance, the Company's *pro forma* FFO for the four fiscal quarters beginning with the fiscal quarter in which such Parity Equity Securities are proposed to be issued (calculated (A) assuming that such proposed Parity Equity Securities are issued and that, if outstanding or proposed new Parity Equity Securities bear dividends based on a floating rate, the applicable dividend rate will not change during such four fiscal quarters from the rate in effect on the applicable date of determination, (B) assuming for each Option ARM directly or indirectly owned by the Company that the interest rate in the applicable mortgage note and the then effective minimum monthly payment determined in accordance with such mortgage note will not change during such four quarters from the rate and minimum monthly payment in effect on the applicable date of determination, and (C) as

adjusted to reflect any New Assets) equals or exceeds 150% of the amount that would be required to pay full annual dividends on all preferred securities of the Company then outstanding and any such Parity Equity Securities that the Company proposes to issue and (iii) the Company is not otherwise in breach of any of its covenants set forth in the LLC Agreement. Funds from operations, or *"FFO"*, means net income (excluding gains (or losses) from sales of property and taking into account with respect to each Option ARM directly or indirectly owned by the Company only the cash payment of interest on the related mortgage note, but otherwise computed in accordance with GAAP), *plus* depreciation and amortization, and after adjustments for unconsolidated partnerships and joint ventures. Adjustments for unconsolidated partnerships and joint ventures will be calculated to reflect funds from operations on the same basis.

The Series 2006-C Company Preferred Securities are Parity Equity Securities with respect to the Outstanding Company Preferred Securities, and are being offered without the consent of the holders of the Outstanding Company Preferred Securities because the Company will comply with the tests outlined above. After giving effect to the issuance of the Series 2006-C Company Preferred Securities:

- the *pro forma* net book value of the Company's assets will be $7,708,022,354, less dividends declared, but unpaid, if any, the aggregate liquidation preference of the Series 2006-C Company Preferred Securities and the Outstanding Company Preferred Securities, taken together, will be $2,500,000,000, and the ratio of the *pro forma* net book value of the Company's assets to such aggregate liquidation preference will be 3.08; and

- (i) the Company's *pro forma* FFO for the four fiscal quarters beginning on October 1, 2006, calculated in the manner above, is $327,002,962 ("X"), (ii) the amount required to pay full dividends for one year on the Series 2006-C Company Preferred Securities and the Outstanding Company Preferred Securities calculated in the manner set forth above is $162,710,000 and 150% of that amount is $244,065,000 ("Y"), and (iii) "X" exceeds "Y" by $82,937,962.

The LLC Agreement provides that, so long as any Company Preferred Securities of any series remain outstanding, the Company may not, except with the consent of at least two-thirds of all series of Company Preferred Securities, voting together as a single class, issue Senior Equity Securities.

## Dividends

For purposes of this offering circular, we refer to distributions payable by the Company on its securities as "dividends". Dividends on the Series 2006-C Company Preferred Securities will be payable if, when and as declared by the Company's Board of Managers out of its legally available funds, on a non-cumulative basis at an annual rate of 6.665% until December 15, 2016 and 3-month USD LIBOR plus 1.7925% for the period starting on December 15, 2016 and each Dividend Period thereafter, in each case, on the liquidation preference thereof, which is $1,000 per security.

Dividends on the Series 2006-C Company Preferred Securities, if, when and if declared by the Company's Board of Managers, will be payable quarterly in arrears on March 15, June 16, September 15, and December 15 of each year, commencing on March 15, 2007, or, if any such day is not a Business Day, the next Business Day (each such date, a *"Dividend Payment Date"*). Each period from and including a Dividend Payment Date (or the date of issuance of the Series 2006-C Company Preferred Securities) to but excluding the following Dividend Payment Date is referred to herein as a *"Dividend Period"*. Dividends on the Series 2006-C Company Preferred Securities will accrue from December 13, 2006. The record date for the payment of dividends, if declared, will be the first day of the month in which the relevant dividend payment occurs or, if any such day is not a Business Day, the next day that is a Business Day. Dividends payable on the Series 2006-C Company Preferred Securities for any period greater or less than a full Dividend Period will be computed on the basis of (x) for any Dividend Period ending prior to the Dividend Payment Date in December 2016, twelve 30-day months, a 360-day year, and the actual number of days elapsed in the period, and (y) for any Dividend Period thereafter, the actual number of days in the relevant period divided by 360. No

interest will be paid on any dividend payment made on the Series 2006-C Company Preferred Securities, Trust Securities or Depositary Shares.

"*Business Day*" means any day other than a Saturday, Sunday or any other day on which banks in New York, New York, London, England, Seattle, Washington or Wilmington, Delaware are generally required or authorized by law to be closed.

"*3-Month USD LIBOR*" means, with respect to any Dividend Period, a rate determined on the basis of the offered rates for three-month U.S. dollar deposits of not less than a principal amount equal to that which is representative for a single transaction in such market at such time, commencing on the first day of such Dividend Period, which appears on U.S. LIBOR Telerate Page 3750 as of approximately 11:00 A.M., London time, on the LIBOR Determination Date for such Dividend Period. If on any LIBOR Determination Date no rate appears on U.S. LIBOR Telerate Page 3750 as of approximately 11:00 A.M., London time, the Company or another affiliate of WMI on behalf of the Company will on such LIBOR Determination Date request four major reference banks in the London interbank market selected by the Company to provide the Company with a quotation of the rate at which three-month deposits in U.S. dollars, commencing on the first day of such Dividend Period, are offered by them to prime banks in the London interbank market as of approximately 11:00 A.M., London time, on such LIBOR Determination Date and in a principal amount equal to that which is representative for a single transaction in such market at such time. If at least two such quotations are provided, 3-Month USD LIBOR for such Dividend Period will be the arithmetic mean (rounded upward if necessary to the nearest .00001 of 1%) of such quotations as calculated by the Company. If fewer than two quotations are provided, 3-Month USD LIBOR for such Dividend Period will be the arithmetic mean (rounded upward if necessary to the nearest .00001 of 1%) of the rates quoted as of approximately 11:00 A.M., New York time, on the first day of such Dividend Period by three major banks in New York, New York selected by the Company for loans in U.S. dollars to leading European banks, for a three-month period commencing on the first day of such Dividend Period and in a principal amount of not less than $1,000,000.

"*LIBOR Business Day*" means any day on which commercial banks are open for general business (including dealings in deposits in U.S. dollars) in London.

"*LIBOR Determination Date*" means, as to each Dividend Period, the date that is two LIBOR Business Days prior to the first day of such Dividend Period.

"*U.S. LIBOR Telerate Page 3750*" means the display page of Moneyline's Telerate Service designated as 3750 (or such other page as may replace that page on that service, or such other service as may be nominated as the information vendor, for the purpose of displaying rates comparable to 3-month USD LIBOR).

Dividends on the Series 2006-C Company Preferred Securities are non-cumulative. If the Company's Board of Managers does not declare a dividend on the Series 2006-C Company Preferred Securities or declares less than a full dividend in respect of any Dividend Period, holders of the Series 2006-C Company Preferred Securities will have no right to receive any dividend or a full dividend, as the case may be, for that Dividend Period, and the Company will have no obligation to pay any dividends or full dividends on the Series 2006-C Company Preferred Securities for that Dividend Period, whether or not dividends are declared and paid for any future Dividend Period with respect to any series of the Company Preferred Securities, the Company Common Securities or any other Junior Equity Securities.

**Restrictions on Dividends**

During a Dividend Period, no dividends will be declared or paid on any securities of the Company ranking junior to the Company Preferred Securities in respect of payments of dividends or on liquidation ("*Junior Equity Securities*"), other than dividends payable in Junior Equity Securities of the same class or series, or Junior Equity Securities ranking junior to that class or series, and no Junior

Equity Securities will be purchased, redeemed or otherwise acquired for consideration, directly or indirectly (other than as a result of reclassification of Junior Equity Securities for or into other Junior Equity Securities, or the exchange or conversion of Junior Equity Securities for or into other Junior Equity Securities), unless dividends for such Dividend Period on all series of Company Preferred Securities have been declared and paid in full, or declared and set aside for payment, as the case may be.

When dividends are not paid in full on, or a sum sufficient for such full payment is not set apart for, all series of the Company Preferred Securities, all dividends declared upon all series of the Company Preferred Securities will be declared *pro rata.* Thus, the amount of dividends declared per Company Preferred Security of each series will in all cases bear to each other the same ratio that (i) full dividends per Company Preferred Security of such series for the then-current Dividend Period, which will not include any accumulation in respect of unpaid dividends for prior Dividend Periods, and (ii) full dividends, which will not include any accumulation in respect of unpaid dividends for prior Dividend Periods, on all other series of Company Preferred Securities, bear to each other.

Under certain circumstances, if the OTS determines that WMB is operating with an insufficient level of capital or is engaged in, or its relationship with the Company results in, an unsafe and unsound banking practice, the OTS could restrict the Company's ability to pay dividends, including dividends to the holders of the Series 2006-C Company Preferred Securities. See "The Company — Business of the Company".

## Restrictions on Dividends by WMI

WMI will covenant in the Exchange Agreement for the benefit of the holders of the Trust Securities that if full dividends on (i) any series of Company Preferred Securities, or (ii) the Trust Securities, Trust I Securities or WaMu Cayman Securities for any Dividend Period have not been declared and paid, WMI will not declare or pay dividends with respect to, or redeem, purchase or acquire any of its equity capital securities during the next succeeding Dividend Period, except dividends in connection with a shareholders' rights plan, if any, or dividends in connection with benefits plans.

## Redemption

The Series 2006-C Company Preferred Securities will not be redeemable at the option of the holders thereof. Subject to the Replacement Capital Covenant in favor of certain of WMI's debtholders limiting WMI's and its subsidiaries' right to purchase or redeem the Series 2006-C Company Preferred Securities or the Trust Securities (among others) as described under "Description of the Trust Securities — Restriction on Redemption or Purchases", and subject to the Company having received the prior approval of the OTS for any proposed redemption of Series 2006-C Company Preferred Securities, the Company may, at its option, redeem the Series 2006-C Company Preferred Securities:

- in whole but not in part, on any Dividend Payment Date prior to the Dividend Payment Date in December 2016 upon the occurrence of a Tax Event, an Investment Company Act Event, a Rating Agency Event or a Regulatory Capital Event, at a cash redemption price equal to:
  - the greater of:
    - (i) $1,000 per Series 2006-C Company Preferred Security, or
    - (ii) the sum of the present value of $1,000 per Series 2006-C Company Preferred Security, discounted from the Dividend Payment Date in December 2016 to the redemption date, and the present values of all undeclared dividends for each Dividend Period from the redemption date to and including the Dividend Payment Date in December 2016, discounted from their applicable Dividend Payment Dates to the redemption date, in each case on a quarterly basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate, as calculated by an Independent Investment Banker, *plus* 0.50%, *plus*

- any declared but unpaid dividends to the redemption date;

- in whole but not in part, on any Dividend Payment Date prior to the Dividend Payment Date in December 2016 for any reason other than the occurrence of a Tax Event, an Investment Company Act Event, a Rating Agency Event or a Regulatory Capital Event, at a cash redemption price equal to:

  - the greater of:

    (i) $1,000 per Series 2006-C Company Preferred Security, or

    (ii) the sum of the present value of $1,000 per Series 2006-C Company Preferred Security, discounted from the Dividend Payment Date in December 2016 to the redemption date, and the present values of all undeclared dividends for the Dividend Periods from the redemption date to and including the Dividend Payment Date in December 2016, discounted from their applicable Dividend Payment Dates to the redemption date, in each case on a quarterly basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate, as calculated by an Independent Investment Banker, plus 0.35%; *plus*

  - any declared but unpaid dividends to the redemption date;

- in whole but not in part, on any Dividend Payment Date after the Dividend Payment Date in December 2016 that is not a Ten-Year Date, upon the occurrence of a Tax Event, an Investment Company Act Event, a Rating Agency Event or a Regulatory Capital Event, at a cash redemption price equal to $1,000 per Series 2006-C Company Preferred Securities, *plus* any declared and unpaid dividends to the redemption date;

- in whole or in part, on each Dividend Payment Date that is a Ten-Year Date at a cash redemption price of $1,000 per Series 2006-C Company Preferred Security, *plus* any declared and unpaid dividends to the redemption date; and

- in whole but not in part, on any Dividend Payment Date after the Dividend Payment Date in December 2016 that is not a Ten-Year Date for any reason other than the occurrence of a Tax Event, an Investment Company Act Event, a Rating Agency Event or a Regulatory Capital Event, at a cash redemption price equal to:

  - the greater of:

    (i) $1,000 per Series 2006-C Company Preferred Security, or

    (ii) the sum of the present value of $1,000 per Series 2006-C Company Preferred Security, discounted from the next succeeding Ten-Year Date to the redemption date, and the present values of all undeclared dividends for the Dividend Periods from the redemption date to and including the next succeeding Ten-Year Date, discounted from their applicable Dividend Payment Dates to the redemption date, in each case on a quarterly basis (assuming a 360-day year consisting of twelve 30-day months) at the 3-month USD LIBOR Rate applicable to the Dividend Period immediately preceding such redemption date (which 3-month USD LIBOR Rate will also, for purposes of calculating such redemption price, be the rate used in calculating the amount for each such undeclared dividend), as calculated by an Independent Investment Banker; *plus*

  - any declared but unpaid dividends to the redemption date;

in each case, without accumulation of any undeclared dividends with respect to Dividend Payment Dates prior to the redemption date.

*"Comparable Treasury Issue"* means the United States Treasury security selected by the Independent Investment Banker as having a maturity comparable to the term remaining to the

Dividend Payment Date in December 2016 that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of perpetual preferred securities having terms similar to those of the Series 2006-C Company Preferred Securities with respect to the payment of dividends and distributions of assets upon liquidation, dissolution or winding up of the issuer of such preferred stock.

*"Comparable Treasury Price"* means, with respect to any redemption date for the Series 2006-C Company Preferred Securities, the average of the Reference Treasury Dealer Quotations for such redemption date, after excluding the highest and lowest of such Reference Treasury Dealer Quotations, or if the Independent Investment Banker obtains fewer than five such Reference Treasury Dealer Quotations, the average of all such quotations.

*"Independent Investment Banker"* means an independent investment banking institution of national standing appointed by the Company.

An *"Investment Company Act Event"* occurs with respect to the Series 2006-C Company Preferred Securities when the Company determines, based upon receipt of an opinion of counsel, that there is a significant risk that the Company, the Trust, Asset Trust I, Asset Trust II or any other Asset Subsidiary will be considered an "investment company" that is required to be registered under the Investment Company Act, as a result of a change in applicable laws, regulations or related interpretations.

A *"Rating Agency Event"* occurs when the Company reasonably determines that an amendment, clarification or change has occurred in the equity criteria for securities such as the Series 2006-C Company Preferred Securities of any Rating Agency that then publishes a rating for WMI which amendment, clarification or change results in a lower equity credit for WMI than the respective equity credit assigned by such Rating Agency to the Company Preferred Securities on the closing date of this Offering.

*"Reference Treasury Dealer"* means each of three primary U.S. government securities dealers (each a "Primary Treasury Dealer"), as specified by the Company; *provided* that if any Primary Treasury Dealer specified by the Company ceases to be a Primary Treasury Dealer, the Company will substitute for such Primary Treasury Dealer another Primary Treasury Dealer and if the Company fails to select a substitute within a reasonable period of time, then the substitute will be a Primary Treasury Dealer selected by the Independent Investment Banker after consultation with the Company.

*"Reference Treasury Dealer Quotations"* means, with respect to each Reference Treasury Dealer and any redemption date, the average, as determined by the Independent Investment Banker, of the bid and asked prices for the Comparable Treasury Issue (expressed, in each case, as a percentage of its principal amount) quoted in writing to the Independent Investment Banker by such Reference Treasury Dealer at 5:00 P.M., New York City time, on the third Business Day preceding such redemption date.

A *"Regulatory Capital Event"* occurs with respect to the Series 2006-C Company Preferred Securities when the Company determines, based upon receipt of an opinion of counsel, that there is a significant risk that the Series 2006-C Company Preferred Securities will no longer constitute core capital of WMB for purposes of the capital adequacy regulations issued by the OTS as a result of a change in applicable laws, regulations or related interpretations after issuance of the Series 2006-C Company Preferred Securities.

A *"Tax Event"* occurs with respect to the Series 2006-C Company Preferred Securities when the Company determines, based upon receipt of an opinion of counsel, that there is a significant risk that (i) the Company will be required by a relevant jurisdiction to withhold amounts from payments to the holders of any Series 2006-C Company Preferred Securities for taxes or any other governmental charges, (ii) the Trust will be required by a relevant jurisdiction to withhold amounts from payments to the holders of the Trust Securities for taxes or any other governmental charges or (iii) the Company is or will be treated as a publicly traded partnership taxable as a corporation or as an association taxable

as a corporation for United States federal income tax purposes, as a result of any change in law or regulation, or any judicial or regulatory action, that is effective or announced after the issuance of the Series 2006-C Company Preferred Securities.

*"Treasury Rate"* means the rate per year equal to the quarterly equivalent yield to maturity of the Comparable Treasury Issue, calculated using a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such redemption date. The Treasury Rate will be calculated on the third Business Day preceding the redemption date.

A notice of redemption of the Series 2006-C Company Preferred Securities will be mailed by first-class mail, postage prepaid, addressed to the holders of record of the securities to be redeemed at their respective last addresses appearing on the books and records of the Company. Such mailing will be at least 35 days but not more than 65 days before the date fixed for redemption.

The Company's ability to redeem any Company Preferred Security is subject to compliance with applicable regulatory requirements, including the prior approval of the OTS, relating to the redemption of capital instruments. Under current policies of the OTS, such approval would be granted only if the redemption were to be made out of the proceeds of the issuance of another capital instrument or if the OTS were to determine that the conditions and circumstances of WMB warrant the reduction of a source of permanent capital.

## Restrictions on Redemption or Purchases

At or prior to issuance of the Series 2006-C Company Preferred Securities and the Trust Securities, WMI will enter into the Replacement Capital Covenant described under "Description of the Trust Securities — Restriction on Redemption or Purchases", limiting WMI's and its subsidiaries, including the Company's, ability to redeem or purchase certain securities, including any series of the Company Preferred Securities.

## Rights upon Liquidation

In the event the Company voluntarily or involuntarily dissolves and winds up, the holders of Series 2006-C Company Preferred Securities at the time outstanding will be entitled to receive liquidating dividends in the amount of $1,000 per security, *plus* any authorized, declared, but unpaid dividends to the date of liquidation, out of the Company's assets legally available for distribution, before any distribution of assets is made to holders of Junior Equity Securities and subject to the rights of general creditors.

After payment of the full amount of the liquidating distributions to which they are entitled, the holders of Series 2006-C Company Preferred Securities will have no right or claim to any of the Company's remaining assets. In the event that, upon any such voluntary or involuntary dissolution and winding up, the available assets are insufficient to pay the amount of the liquidation distributions on all series of Company Preferred Securities, then the holders of all the series of Company Preferred Securities will share ratably in any such distribution of assets in proportion to the full liquidating distributions to which they would otherwise be respectively entitled.

For such purposes, the Company's consolidation or merger with or into any other entity, the consolidation or merger of any other entity with or into the Company, or the sale of all or substantially all of the Company's property or business, will not be deemed to constitute the Company's dissolution and winding up.

## Voting Rights and Covenants

Except as set forth below, holders of Series 2006-C Company Preferred Securities will not have voting rights. The LLC Agreement provides that, so long as any Company Preferred Securities of any series are outstanding, the Company will not, except with the consent or affirmative vote of the holders of at least two-thirds of all series of the Company Preferred Securities, voting together as a single

class (*provided* that for the purpose of such approval, a like amount of Company Preferred Securities as any Trust Securities, Trust I Securities or WaMu Cayman Securities that are directly or indirectly held or beneficially owned by any member of WMI Group will be treated as if they were not outstanding):

- effect a consolidation, merger or share exchange with or into another entity *provided* that the Company may consolidate or merge with or into, or enter into a share exchange with, another entity without the consent of the holders of the Company Preferred Securities if (A) the other entity is controlled by, or under common control with, WMI, (B) the other entity elects to be treated as a partnership for U.S. federal income tax purposes and is not required to register as an "investment company" under the 1940 Act, (C) the other entity expressly assumes all of the Company's obligations and commitments pursuant to the consolidation, merger, or share exchange, (D) the outstanding Company Preferred Securities are exchanged for or converted into shares of the surviving entity having preferences, limitations, and relative voting and other rights substantially identical to those of the Company Preferred Securities, including limitations on personal liability of the Company Preferred Securityholders, (E) after giving effect to the merger, consolidation, or share exchange, no breach, or event which, with the giving of notice or passage of time or both, could become a breach, by the Company of obligations under the LLC Agreement shall have occurred and be continuing, and (F) the Company has received written confirmation that the Rating Agency Condition has been satisfied;

- issue any Senior Equity Securities;

- incur any indebtedness for borrowed money;

- pay dividends on the Company's Junior Equity Securities unless the Company's FFO for the four prior fiscal quarters, equals or exceeds 150% of the amount that would be required to pay full annual dividends on all series of Company Preferred Securities;

- fail to invest the proceeds of the Company's assets such that the Company's FFO over any period of four fiscal quarters will equal or exceed 150% of the amount that would be required to pay full annual dividends on all series of Company Preferred Securities;

- issue any additional Company Common Securities to any person, other than University Street or another affiliate of WMI;

- amend or otherwise change the terms of any Asset Documentation in a manner which is materially adverse of the Trust, or to any other Trust Holder or to the holders of that Trust Holder's securities; *provided, however*, that, if any amendment or change affects only one Trust Holder or the holders of one Trust Holder's securities, the amendment or change will require only the class vote of the holders of at least two-thirds of the series of Company Preferred Securities held by that Trust Holder (voting separately and not as a single class with any other class) and, if the amendment or change affects more than one class but affects them differently, then the amendment will require a class vote of each affected class of Company Preferred Securities, each voting separately;

- remove or cause to be removed, as applicable, "Washington Mutual" from the Company's or the Trust's name unless the name of WMI changes and the Company makes a change to the Company's or the name of any other Trust Holder, the Trust's or such other Trust Holder's name to be consistent with the new group name; *provided, however*, that, if any change affects only one Trust Holder, the change will require only the class vote of the holders of at least two-thirds of the series of Company Preferred Securities held by that Trust Holder (voting separately and not as a single class with any other class);

- take or fail to take any action that would cause the Company to fail to be treated as a partnership (other than a publicly traded partnership taxable as a corporation) for United States federal income tax purposes;

- engage in a U.S. trade or business for United States federal income tax purposes;

- fail to hold only assets that qualify for the portfolio interest exemption under the Code or are otherwise exempt from United States federal withholding taxes;

- fail to manage its affairs such that its income does not constitute "unrelated business taxable income" for United States federal income tax purposes;

- take any action that could reasonably be expected to cause a Tax Event, an Investment Company Act Event, a Rating Agency Event or a Regulatory Capital Event; or

- amend its Certificate of Formation or LLC Agreement in a manner that materially and adversely affects the terms of any series of Company Preferred Securities; *provided, however,* that, if such amendment affects only one class of preferred securities issued by the Company, such amendment will require only the class vote of such class (voting separately and not as a single class with the other class) and, if such amendment affects both classes but affects them differently, then such amendment will require a class vote of each class of preferred securities issued by the Company, each voting separately.

In addition, the LLC Agreement provides that, except with the consent of all of the Company's Managers, including its Independent Manager, the Company will not:

- terminate, amend or otherwise change any Asset Documentation; or

- effect a consolidation, merger or share exchange (excluding the Conditional Exchange) that is not tax-free to the holders of any series of the Company Preferred Securities and the related Trust Securities, Trust I Securities or WaMu Cayman Securities, as applicable, unless such transaction was approved by the consent or affirmative vote of the holders of at least two-thirds of all series of the Company Preferred Securities, voting together as a single class.

In addition, the LLC Agreement will provide that if (i) the Company fails to pay full dividends on any series of the Company Preferred Securities on any Dividend Payment Date, (ii) the Trust fails to pass through full dividends paid by the Company on the Series 2006-C Company Preferred Securities to the holders of the Trust Securities, or any other Trust Holder fails to pass through full dividends paid by the Company on the series of Company Preferred Securities held by that Trust Holder, on any Dividend Payment Date or (iii) a Bankruptcy Event occurs, the holders of all the series of Company Preferred Securities, voting together as a single class, by majority vote, are entitled to remove the initial or any succeeding Independent Manager and to fill the vacancy created by such removal or any other vacancy existing in the office of the Independent Manager.

The LLC Agreement requires that, in assessing the benefits to the Company of any proposed action requiring his or her consent, the Company's Independent Manager take into account the interests of holders of both Company Common Securities and all series of the Company Preferred Securities. The LLC Agreement provides that in considering the interests of the holders of the Company Preferred Securities, the Company's Independent Manager owes the same duties to such holders which the Independent Manager owes to the holders of Company Common Securities.

As a condition to effecting any consolidation, merger or share exchange described above, the Company will mail to the holders of record of the Company Preferred Securities a notice of such consolidation, merger or share exchange. The notice will be mailed at least 15 days prior to such transaction becoming effective and will contain a description of such transaction together with a certificate of one of the Company's officers stating that such transaction complies with the requirements set forth in the LLC Agreement and that all conditions precedent provided therein relating to such transaction have been fulfilled.

As described under "Description of the Trust Securities — Voting Rights", each holder of Trust Securities will have the right to direct the manner in which Property Trustee on behalf of the Trust exercises its voting rights as to a like amount of Series 2006-C Company Preferred Securities

held by the Trust with respect to any of the matters on which a holder of Series 2006-C Company Preferred Securities is entitled to vote.

WMI's articles of incorporation do not contain similar covenants regarding the Series L WMI Preferred Stock following an exchange of the Trust Securities. Therefore, following a Conditional Exchange, holders of the Depositary Shares would no longer have any voting rights, except as provided by Washington law or in connection with the right to elect directors if dividends are skipped or not paid in full. See below under "Description of the Series L WMI Preferred Stock — Voting Rights".

## Additional Amounts

If the Company or the Trust is required to pay any Additional Taxes as a result of an Additional Tax Event, the Company will pay as additional amounts on the Series 2006-C Company Preferred Securities such amounts as will be required so that dividends on the Series 2006-C Company Preferred Securities or the Trust Securities, as applicable, will not be reduced as a result of any such Additional Taxes *("Additional Amounts")*.

*"Additional Taxes"* means the sum of any additional taxes, duties and other governmental charges to which the Company or the Trust has become subject from time to time as a result of an Additional Tax Event.

An *"Additional Tax Event"* means the determination by the Company, based upon receipt of an opinion of counsel, rendered by a law firm experienced in such matters, in form and substance reasonably satisfactory to the Company and WMI, to the effect that, as a result of any amendment to, or change (including any announced proposed change) in, the laws (or any regulations thereunder) of the United States or of any political subdivision or taxing authority thereof or therein, or as a result of any official administrative pronouncement or judicial decision interpreting or applying such laws or regulations, which amendment or change is effective or which proposed change, pronouncement or decision is announced on or after the date of issuance of the Trust Securities, there is a significant risk that (i) the Company or the Trust is, or will be within 90 days of the date of such opinion of counsel, required by a relevant jurisdiction to withhold amounts from payments to the holders of the Series 2006-C Company Preferred Securities or Trust Securities, respectively, for any taxes, duties and other governmental charges, (ii) the Trust is, or will be within 90 days of the date of such opinion of counsel, subject to United States federal income tax with respect to income received or accrued on the like amount of Series 2006-C Company Preferred Securities held by it or (iii) the Trust is, or will be within 90 days of the date of such opinion of counsel, subject to more than a *de minimis* amount of other taxes, duties or other governmental charges.

## Amendments and Termination of the LLC Agreement

University Street may, at any time and from time to time, without the consent of the holders of the Company Preferred Securities of any series, amend the LLC Agreement: (i) to correct or supplement any provision in the LLC Agreement that may be defective or inconsistent with any other provision therein, or to make any other provisions with respect to matters or questions arising under the LLC Agreement, *provided* that any such action taken under this clause will not materially adversely affect the interests of the holders of any series of the Company Preferred Securities and *provided further* that any such amendment shall not cause the Company, the Trust or any other Trust Holder to be required to be registered under the 1940 Act, be taxable as a corporation for United States Federal income tax purposes, or be treated as engaged in a trade or business within the United States, as determined for United States Federal income tax purposes; (ii) to cure any ambiguity or inconsistency or correct any manifest error, or (iii) to give effect to the future issuance of Parity Equity Securities or Junior Equity Securities and to set the designations, preferences, and rights of any such Parity Equity Security or Junior Equity Security. Any other amendment of the LLC Agreement must be approved by vote of holders of two-thirds (by aggregate liquidation preference) of any series of the Company

Preferred Securities, voting together as a single class (see "— Voting Rights and Covenants"); *provided* that for the purpose of such approval, if any member of WMI Group directly or indirectly holds or beneficially owns any Trust Securities or securities of any other Trust Holder, then a like amount of the applicable series of Company Preferred Securities will be treated as if they were not outstanding. The Company will notify the Paying Agents and the holders of the Trust Securities of any such amendment of the LLC Agreement within a reasonable period of time.

The LLC Agreement will terminate upon the termination of the Company under the LLC Act.

## Governing Law

The LLC Agreement and the Series 2006-C Company Preferred Securities will be governed by, and construed in accordance with, the laws of the State of Delaware.

# DESCRIPTION OF OTHER COMPANY SECURITIES

*The following summary of the terms of the other Company securities does not purport to be complete and is subject in all respects to the applicable provisions of the LLC Act and the LLC Agreement. A copy of the LLC Agreement may be obtained upon request to WMI.*

## Common Securities

### General

The Company has outstanding, and will continue to have outstanding upon consummation of this offering, 1,000 Company Common Securities, all of which will be held by University Street.

The Company Common Securities may be sold, assigned or otherwise transferred by University Street to another entity, subject to WMI maintaining direct or indirect ownership of 100% of the outstanding Company Common Securities and receipt by University Street of an opinion of counsel to the effect that as a result of any such sale, transfer or assignment the Company will not be taxable as a corporation for United States federal income tax purposes.

Pursuant to the LLC Agreement, except with the consent or the affirmative vote of the holders of at least two-thirds of all series of the Company Preferred Securities, voting together as a single class, the Company will not issue any additional Company Common Securities or other Junior Equity Securities to any person, other than University Street or another affiliate of WMI.

No additional payments will be required pursuant to the LLC Act for Company Common Securities to represent limited liability company interests in the Company upon issuance against full payment of the purchase price therefor.

### Voting

Subject to the limited rights of the holders of the Series 2006-C Company Preferred Securities, as described under "Description of the Series 2006-C Company Preferred Securities — Voting Rights and Covenants", and any voting rights granted to holders of the Outstanding Company Preferred Securities and any other Parity Equity Securities, all voting rights of the Company's security holders are vested in the Company Common Securities.

### Dividends

The Company Common Securities rank junior to all the Company Preferred Securities as to payment of dividends. No dividends will be declared or paid in any Dividend Period on the Company Common Securities, other than dividends payable in Company Common Securities, and no Company Common Securities will be purchased, redeemed or otherwise acquired for consideration, directly or indirectly (other than as a result of reclassification of Company Common Securities for or into Company Common Securities, or the exchange or conversion of Company Common Securities for or into Company Common Securities), unless dividends in such Dividend Period on all series of the Company Preferred Securities have been declared and paid in full, or set aside for payment, as the case may be. Pursuant to the LLC Agreement, except with the consent or the affirmative vote of the holders of at least two-thirds of all series of the Company Preferred Securities, voting together as a single class, the Company will not pay any dividends on the Company Common Securities or other Junior Equity Securities unless the Company's FFO for the four prior fiscal quarters equals or exceeds 150% of the amount that would be required to pay full annual dividends on all series of the Company Preferred Securities; *provided* that for the purpose of such approval, a like amount of the applicable series of Company Preferred Securities as any Trust Securities, Trust I Securities or WaMu Cayman Securities that are directly or indirectly held or beneficially owned by any member of WMI Group will be treated as if they were not outstanding.

### Liquidation Rights

The Company Common Securities will rank junior to all series of the Company Preferred Securities upon liquidation. In the event of any voluntary or involuntary dissolution of the Company, after all of the Company's debts and liabilities have been satisfied and there have been paid or set aside for the holders of all series of the Company Preferred Securities the full preferential amounts to which such holders are entitled, the holders of Company Common Securities will be entitled to share equally and ratably in any assets remaining.

### Outstanding Company Preferred Securities

The Outstanding Company Preferred Securities rank *pari passu* with the Series 2006-C Company Preferred Securities as to dividends and upon liquidation of the Company. The terms of the Outstanding Company Preferred Securities will be substantially identical to the Series 2006-C Company Preferred Securities other than with respect to the rate applicable to dividends thereon. The Series 2006-A Company Preferred Securities will, if, when and as declared by the Company's Board of Managers, pay dividends at an annual rate of 6.534% until March 15, 2011, and 3-month USD LIBOR plus 1.4825% thereafter. The Series 2006-A Company Preferred Securities are held by Trust I, which issued a like amount of Trust I Securities to investors on March 7, 2006. The Series 2006-B Company Preferred Securities will, if, when and as declared by the Company's Board of Managers, pay dividends at an annual rate of 7.25%. The Series 2006-B Company Preferred Securities are held by WaMu Cayman, which issued a like amount of WaMu Cayman Securities to investors on March 7, 2006. The Series 2006-A Company Preferred Securities and Series 2006-B Company Preferred Securities are not listed on any securities exchange or automated dealer quotation system.

### Ability to Issue Additional Preferred Securities

Pursuant to the LLC Agreement, the Company may not issue any Senior Equity Securities or incur any indebtedness except with the consent or affirmative vote of holders of at least two-thirds of all series of the Company Preferred Securities, voting together as a single class, as described under "Description of the Series 2006-C Company Preferred Securities — Voting Rights and Covenants". The Company may issue additional Parity Equity Securities without the consent of the holders of Company Preferred Securities only if the tests described under "Description of the Series 2006-C Company Preferred Securities — Ranking" are satisfied.

## DESCRIPTION OF THE SERIES L WMI PREFERRED STOCK

*The following summary describes the material terms and provisions of the Series L WMI Preferred Stock. The description is qualified in its entirety by reference to the terms and provisions of WMI's articles of incorporation and the articles of amendment establishing the Series L WMI Preferred Stock. A copy of WMI's articles of incorporation and such articles of amendment can be obtained upon request to WMI.*

### General

WMI has authorized and reserved for issuance upon a Conditional Exchange, as described under "Description of the Trust Securities — Conditional Exchange", 500 shares of its Series L Perpetual Non-cumulative Fixed-to-Floating Rate Preferred Stock, no par value and liquidation preference $1,000,000 per share (the *"Series L WMI Preferred Stock"*). The shares of Series L WMI Preferred Stock, if and when issued upon a Conditional Exchange, will be represented by depositary shares (the *"Depositary Shares"*), each representing 1/1000th of a share of Series L WMI Preferred Stock. The holders of the Series L WMI Preferred Stock will have no pre-emptive rights with respect to any shares of WMI's capital stock or any of its other securities convertible into or carrying rights or options to purchase any such capital stock. The Series L WMI Preferred Stock is perpetual and will not be convertible into shares of WMI common stock or any other class or series of its capital stock, and will not be subject to any sinking fund or other obligation for its purchase or retirement.

The Series L WMI Preferred Stock, upon issuance, will have substantially equivalent terms as to dividends, redemption, liquidation preference and redemption preference as the Series 2006-C Company Preferred Securities and Trust Securities for which they may be exchanged, except that the Series L WMI Preferred Stock: (i) will not have the benefit of the covenants described under "Description of Series 2006-C Company Preferred Securities — Voting Rights and Covenants" or "— Additional Amounts" and (ii) will be redeemable prior to the Dividend Payment Date occurring in December 2016 and on any Dividend Payment Date thereafter that is not a Ten-Year Date only upon the occurrence of a Regulatory Capital Event or a Rating Agency Event or payment of the applicable "make-whole" amount as described under "— Redemption" below.

In addition, if WMI fails to pay, or declare and set aside for payment, full dividends on the Series L WMI Preferred Stock after its issuance or any other class or series of WMI Parity Stock (as defined below) having similar voting rights *("Voting Parity Securities")* for six Dividend Periods or their equivalent, the authorized number of directors on WMI's board will be increased by two. Subject to compliance with any requirement for regulatory approval of, or non-objection to, persons serving as directors, the holders of Series L WMI Preferred Stock, voting together as a single and separate class with the holders of any outstanding Voting Parity Securities, will have the right to elect two directors in addition to the directors then in office at WMI's next annual meeting of shareholders.

The Dividend Payment Dates and related Dividend Periods for the Series L WMI Preferred Stock, once issued, will be the same as the Dividend Payment Dates and related Dividend Periods for the Trust Securities and Company Preferred Stock, and the terms *"Dividend Payment Date"* and *"Dividend Period"* will have the same meanings as applied to the Series L WMI Preferred Stock as applied to those securities, it being understood that if the Series L WMI Preferred Stock is not issued prior to the Dividend Payment Date occurring in December 2016, a Dividend Payment Date will be deemed to occur on such date with respect to the Series L WMI Preferred Stock for the purposes of determining the interest rate and the terms of redemption thereof. The term *"Business Day"*, when used with reference to the Series L WMI Preferred Stock, means any day other than a Saturday, Sunday or any other day on which banks in New York, New York or Seattle, Washington are generally required or authorized by law to be closed.

The Series L WMI Preferred Stock will be subject to the Replacement Capital Covenant described under "Description of the Trust Securities — Restriction on Redemption or Purchases".

## Ranking

WMI will covenant in the Exchange Agreement in favor of the holders of the Trust Securities that, prior to the issuance of the Series L WMI Preferred Stock upon a Conditional Exchange, WMI will not issue any preferred stock that would rank senior to the Series L WMI Preferred Stock upon its issuance.

The Series L WMI Preferred Stock will, upon issuance, rank at least *pari passu* with the most senior preferred stock of WMI, if any, then outstanding, and to any other preferred stock that WMI may issue in the future. The Series L WMI Preferred Stock will, with respect to dividend rights and rights on liquidation, winding-up and dissolution, rank (i) on a parity with WMI's Series I WMI Preferred Stock, Series J WMI Preferred Stock, Series K WMI Preferred Stock (each as defined below) and each other class or series of preferred stock WMI may issue in the future, the terms of which expressly provide that such class or series will rank on a parity with the Series L WMI Preferred Stock as to dividend rights and rights on WMI's liquidation, winding-up and dissolution (collectively referred to as *"WMI Parity Stock"*) and (ii) senior to WMI's common stock, its Series RP Preferred Stock and each other class of capital stock WMI may issue in the future, the terms of which do not expressly provide that it ranks on a parity with or senior to the Series L WMI Preferred Stock as to dividend rights and rights on WMI's liquidation, winding-up and dissolution (collectively referred to as *"Junior Securities"*). WMI may authorize and issue additional shares of preferred stock that may rank junior to or *pari passu* with the Series L WMI Preferred Stock as to dividends and upon liquidation, winding up or dissolution without the consent of the holders of the Series L WMI Preferred Stock. See "Description of the Other WMI Capital Stock" below.

## Dividends

Dividends on the Series L WMI Preferred Stock will be payable if, when and as declared by WMI's Board of Directors out of its legally available funds, on a non-cumulative basis at an annual rate of 6.665% to, but not including, December 15, 2016 (whether or not a Business Day) and 3-Month USD LIBOR plus 1.7925% thereafter on the liquidation preference thereof, which is $1,000,000 per share, from and including the Dividend Payment Date on or prior to their date of issuance. Dividends on the Series L WMI Preferred Stock, if, when and as declared by WMI's Board of Directors, will be payable quarterly in arrears on each Dividend Payment Date, commencing on the first such day after issuance of the Series L WMI Preferred Stock. The record date for the payment of dividends, if declared, will be the first day of the month in which the relevant Dividend Payment Date occurs or, if any such day is not a Business Day, the next day that is a Business Day. Dividends payable on the Series L WMI Preferred Stock for any period greater or less than a full Dividend Period will be computed on the basis of (i) for any Dividend Periods ending prior to or in December 2016, twelve 30-day months, a 360-day year, and the actual number of days elapsed in the period and (ii) for any Dividend Periods thereafter, the actual number of days elapsed in the relevant dividend period divided by 360. No interest will be paid on any dividend payment made on the Series L WMI Preferred Stock or Depositary Shares. Holders of Depositary Shares will receive for each Depositary Share 1/1000th of any such dividend payment made on a single share of the Series L WMI Preferred Stock.

Dividends on the Series L WMI Preferred Stock will be non-cumulative. If WMI's Board of Directors does not declare a dividend on the Series L WMI Preferred Stock or declares less than a full dividend in respect of any Dividend Period, the holders of the Series L WMI Preferred Stock will have no right to receive any dividend or a full dividend, as the case may be, for the Dividend Period, and WMI will have no obligation to pay a dividend or to pay full dividends for that Dividend Period, whether or not dividends are declared and paid for any future Dividend Period with respect to the Series L WMI Preferred Stock, WMI's common stock or any other class or series of WMI's preferred stock.

**Redemption**

The Series L WMI Preferred Stock will not be redeemable at the option of the holders thereof. Subject to a covenant in favor of certain of WMI's debtholders limiting WMI's and its subsidiaries' right to purchase or redeem the Series L WMI Preferred Stock (among others) as described under "Description of the Trust Securities — Restriction on Redemption or Purchases", WMI may, at its option redeem the Series L WMI Preferred Stock:

- in whole but not in part, prior to the Dividend Payment Date in December 2016, upon the occurrence of a Regulatory Capital Event or a Rating Agency Event, at a cash redemption price equal to the sum of:

    - the greater of:

        (i) $1,000,000 per share of Series L WMI Preferred Stock and

        (ii) the sum of the present value of $1,000,000 per share of Series L WMI Preferred Stock, discounted from the Dividend Payment Date in December 2016 to the redemption date, and the present values of all undeclared dividends for each Dividend Period from the redemption date to and including the Dividend Payment Date in December 2016, discounted from their applicable Dividend Payment Dates to the redemption date, in each case on a quarterly basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate, as calculated by an Independent Investment Banker, *plus* 0.50%,

    - *plus* any declared but unpaid dividends to the redemption date;

- in whole but not in part, on any Dividend Payment Date prior to the Dividend Payment Date in December 2016 for any reason other than the occurrence of a Rating Agency Event or a Regulatory Capital Event, at a cash redemption price equal to:

    - the greater of:

        (i) $1,000,000 per share of Series L WMI Preferred Stock, or

        (ii) the sum of the present value of $1,000,000 per share of Series L WMI Preferred Stock, discounted from the Dividend Payment Date in December 2016 to the redemption date, and the present values of all undeclared dividends for the Dividend Periods from the redemption date to and including the Dividend Payment Date in December 2016, discounted from their applicable Dividend Payment Dates to the redemption date, in each case on a quarterly basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate, as calculated by an Independent Investment Banker, plus 0.35%; *plus*

    - any declared but unpaid dividends to the redemption date;

- in whole but not in part, on any Dividend Payment Date after the Dividend Payment Date in December 2016 that is not a Ten-Year Date, upon the occurrence of a Regulatory Capital Event or a Rating Agency Event, at a cash redemption price equal to $1,000,000 per share of Series L WMI Preferred Stock, *plus* any declared and unpaid dividends to the redemption date;

- in whole or in part, on each Dividend Payment Date that is a Ten-Year Date, at a cash redemption price of $1,000,000 per share of Series L WMI Preferred Stock, *plus* any declared and unpaid dividends to the redemption date; and

- in whole but not in part, on any Dividend Payment Date after the Dividend Payment Date in December 2016 that is not a Ten-Year Date for any reason other than the occurrence of a Rating Agency Event or a Regulatory Capital Event, at a cash redemption price equal to:

    - the greater of:

(i) $1,000,000 per share of Series L WMI Preferred Stock, or

(ii) the sum of the present value of $1,000,000 per share of Series L WMI Preferred Stock, discounted from the next succeeding Ten-Year Date to the redemption date, and the present values of all undeclared dividends for the Dividend Periods from the redemption date to and including the next succeeding Ten-Year Date, discounted from their applicable Dividend Payment Dates to the redemption date, in each case on a quarterly basis (assuming a 360-day year consisting of twelve 30-day months) at the 3-month USD LIBOR Rate applicable to the Dividend Period immediately preceding such redemption date (which 3-month USD LIBOR Rate will also, for purposes of calculating such redemption price, be the rate used in calculating the amount for each undeclared dividend), as calculated by an Independent Investment Banker; *plus*

- any declared but unpaid dividends to the redemption date;

in each case, without accumulation of any undeclared dividends with respect to Dividend Payment Dates prior to the redemption date.

Dividends will cease to accrue on the Series L WMI Preferred Stock called for redemption on and as of the date fixed for redemption and such Series L WMI Preferred Stock will be deemed to cease to be outstanding, *provided* that the redemption price, including any authorized and declared but unpaid dividends for the current Dividend Period, if any, to the date fixed for redemption, has been duly paid or provision has been made for such payment.

Notice of any redemption will be mailed at least 30 days, but not more than 60 days, prior to any redemption date to each holder of the Series L WMI Preferred Stock to be redeemed, at such holder's registered address.

**Replacement**

At or prior to issuance of the Series 2006-C Company Preferred Securities and the Trust Securities, WMI will enter into the Replacement Capital Covenant described under "Description of the Trust Securities — Restriction on Redemption or Purchases", limiting WMI's ability to redeem or purchase certain securities, including the Series L WMI Preferred Stock.

**Rights upon Liquidation**

If WMI voluntarily or involuntarily liquidates, dissolves or winds up, the holders of Series L WMI Preferred Stock at the time outstanding will be entitled to receive liquidating distributions in the amount of $1,000,000 per share, or $1,000 per Depositary Share representing a 1/1000th interest in the Series L WMI Preferred Stock, plus an amount equal to declared but unpaid dividends for the current Dividend Period to the date of liquidation, out of WMI's assets legally available for distribution to its shareholders, before any distribution of assets is made to holders of WMI's common stock or any securities ranking junior to the Series L WMI Preferred Stock, subject to the rights of the holders of any class or series of securities ranking on a parity upon liquidation with the Series L WMI Preferred Stock upon liquidation and the rights of its depositors and creditors.

After payment of the full amount of the liquidating distributions to which they are entitled, the holders of the Series L WMI Preferred Stock will have no right or claim to any of WMI's remaining assets. In the event that, upon any such voluntary or involuntary liquidation, dissolution, or winding up, WMI's available assets are insufficient to pay the amount of the liquidation distributions on all outstanding Series L WMI Preferred Stock and the corresponding amounts payable on any other securities of equal ranking, then the holders of the Series L WMI Preferred Stock and any other securities of equal ranking will share ratably in any such distribution of assets in proportion to the full liquidating distributions to which they would otherwise be respectively entitled.

For such purposes, WMI's consolidation or merger with or into any other entity, the consolidation or merger of any other entity with or into it, or the sale of all or substantially all of WMI's property or business, will not be deemed to constitute its liquidation, dissolution, or winding up.

## Voting Rights

Holders of Series L WMI Preferred Stock will not have any voting rights, including the right to elect any directors, except upon issuance as required by law, or as set forth below.

Washington law attaches mandatory voting rights to classes or series of shares that are affected by certain amendments to the articles of incorporation. The holders of the outstanding shares of a class or series are entitled to vote as a separate voting group if shareholder voting is otherwise required by Washington law and if the amendment would:

- increase the aggregate number of authorized shares of the class or series;

- effect an exchange or reclassification of all or part of the issued and outstanding shares of the class or series into shares of another class or series, thereby adversely affecting the holders of the shares so exchanged or reclassified;

- change the rights, preferences, or limitations of all or part of the issued and outstanding shares of the class or series, thereby adversely affecting the holders of shares of the class or series;

- change all or part of the issued and outstanding shares of the class or series into a different number of shares of the same class or series, thereby adversely affecting the holders of shares of the class or series;

- create a new class or series of shares having rights or preferences with respect to dividends or other distributions or to dissolution that are, or upon designation by the board of directors may be, prior, superior, or substantially equal to the shares of the class or series;

- increase the rights or preferences with respect to distributions, or on liquidations or dissolution, or the number of authorized shares of any class or series that, after giving effect to the amendment, has rights or preferences with respect to distributions, or on liquidations or dissolution that are, or upon designation by the board of directors may be, prior, superior, or substantially equal to the shares of the class or series;

- limit or deny an existing pre-emptive right of all or part of the shares of the class or series;

- cancel or otherwise adversely affect rights to distributions that have accumulated but not yet been declared on all or part of the shares of the class or series; or

- effect a redemption or cancellation of all or part of the shares of the class or series in exchange for cash or any other form of consideration other than shares of the corporation.

Holders of the outstanding shares of a class or series of stock are entitled under Washington law to vote as a separate voting group with respect to a merger or share exchange if shareholder voting is otherwise required by Washington law and if, as a result of the merger or share exchange, holders of a part or all of the class or series would hold or receive:

- shares of any class or series of the surviving or acquiring corporation, or of any parent corporation of the surviving corporation, and either (i) that class or series has a greater number of authorized shares than the class or series held by the holders, or (ii) there is a change in the number of shares held by the holders or in the rights, preferences or limitations of the shares or the class or series and the change adversely affects the holders;

- shares of any class or series of the surviving or acquiring corporation, or of any parent corporation of the surviving corporation, and such holders would be, as compared to their circumstances prior to the merger or exchange, adversely affected by the creation, existence,

number of authorized shares or rights or preferences of another series that may be prior, superior or substantially equal to the shares to be received by such holders; or

- cash or any other property other than shares of the surviving or acquiring corporation or of any parent corporation of the surviving corporation.

Under Washington law, if any class or series of shares is entitled to vote as a group in connection with an amendment of the articles, a merger or a share exchange, such class or series and any other classes or series affected in a substantially similar way will vote together as a single voting group unless otherwise provided by the articles or by the board of directors.

Washington law permits these statutory voting rights to be expanded or, in certain circumstances, limited in the designation of the terms of a class or series. The statutory voting rights of the holders of Series L WMI Preferred Stock will be expanded and, in certain circumstances, limited as described below.

If after issuance of the Series L WMI Preferred Stock WMI fails to pay, or declare and set aside for payment, full dividends on the Series L WMI Preferred Stock or any other class or series of Voting Parity Securities for six Dividend Periods or their equivalent, the authorized number of WMI's directors will be increased by two. Subject to compliance with any requirement for regulatory approval of, or non-objection to, persons serving as directors, the holders of Series L WMI Preferred Stock, voting together as a single and separate class with the holders of any outstanding Voting Parity Securities, will have the right to elect two directors in addition to the directors then in office at WMI's next annual meeting of shareholders. This right will continue at each subsequent annual meeting until WMI pays dividends in full on the Series L WMI Preferred Stock and any Voting Parity Securities for three consecutive Dividend Periods or their equivalent and pays or declares and sets aside for payment dividends in full for the fourth consecutive Dividend Period or its equivalent.

The term of such additional directors will terminate, and the total number of directors will be decreased by two after WMI pays dividends in full for three consecutive Dividend Periods or their equivalent and declares and pays or sets aside for payment dividends in full on the Series L WMI Preferred Stock and any Voting Parity Securities for the fourth consecutive Dividend Period or its equivalent or, if earlier, upon the redemption of all Series L WMI Preferred Stock. After the term of such additional directors terminates, the holders of the Series L WMI Preferred Stock will not be entitled to elect additional directors unless full dividends on the Series L WMI Preferred Stock have again not been paid or declared and set aside for payment for six future Dividend Periods.

Any additional director elected by the holders of the Series L WMI Preferred Stock and the Voting Parity Securities may be removed only by the vote of the holders of record of the outstanding Series L WMI Preferred Stock and Voting Parity Securities, voting together as a single and separate class, at a meeting of WMI's shareholders called for that purpose. Any vacancy created by the removal of any such director may be filled only by the vote of the holders of the outstanding Series L WMI Preferred Stock and Voting Parity Securities, voting together as a single and separate class.

So long as any shares of Series L WMI Preferred Stock are outstanding, the vote or consent of the holders of at least 66⅔% of the shares of Series L WMI Preferred Stock at the time outstanding, voting as a class with all other series of preferred stock ranking equal with the Series L WMI Preferred Stock and entitled to vote thereon, given in person or by proxy, either in writing without a meeting or by vote at any meeting called for the purpose, will be necessary for effecting or validating any of the following actions, whether or not such approval is required by Washington law:

- any amendment, alteration or repeal of any provision of WMI's amended and restated Articles of Incorporation (including the Articles of Amendment creating the Series L WMI Preferred Stock) or WMI's bylaws that would alter or change the voting powers, preferences or special rights of the Series L WMI Preferred Stock so as to affect them adversely;

- any amendment or alteration of WMI's amended and restated Articles of Incorporation to authorize or create, or increase the authorized amount of, any shares of, or any securities convertible into shares of, any class or series of WMI's capital stock ranking prior to the Series L WMI Preferred Stock in the payment of dividends or in the distribution of assets on any liquidation, dissolution or WMI's winding-up; or

- the consummation of a binding share exchange or reclassification involving the Series L WMI Preferred Stock or a merger or consolidation of WMI with another entity, except holders of Series L WMI Preferred Stock will have no right to vote under this provision or otherwise under Washington law if in each case (i) the Series L WMI Preferred Stock remains outstanding or, in the case of any such merger or consolidation with respect to which WMI is not the surviving or resulting entity, is converted into or exchanged for preference securities of the surviving or resulting entity or its ultimate parent; and (ii) such Series L WMI Preferred Stock remaining outstanding or such preference securities, as the case may be, have such rights, preferences, privileges and voting powers, taken as a whole, as are not materially less favorable to the holders thereof than the rights, preferences, privileges and voting powers of the Series L WMI Preferred Stock, taken as a whole;

*provided, however,* that any increase in the amount of the authorized or issued Series L WMI Preferred Stock or authorized preferred stock or any securities convertible into preferred stock or the creation and issuance, or an increase in the authorized or issued amount, of other series of preferred stock or any securities convertible into preferred stock ranking equally with and/or junior to the Series L WMI Preferred Stock with respect to the payment of dividends (whether such dividends are cumulative or non-cumulative) and/or the distribution of assets upon WMI's liquidation, dissolution or winding-up will not be deemed to adversely affect the voting powers, preferences or special rights of the Series L WMI Preferred Stock and, notwithstanding any provision of Washington law, holders of Series L WMI Preferred Stock will have no right to vote on such an increase.

If an amendment, alteration, repeal, share exchange, reclassification, merger or consolidation described above would adversely affect one or more but not all series of Voting Parity Securities (including the Series L WMI Preferred Stock for this purpose), then only those series affected and entitled to vote shall vote as a class in lieu of all such series of preferred stock.

The foregoing voting provisions will not apply if, at or prior to the time when the act with respect to which such vote would otherwise be required is effected, all outstanding shares of Series L WMI Preferred Stock have been redeemed or called for redemption upon proper notice and sufficient funds have been set aside by WMI for the benefit of the holders of the Series L WMI Preferred Stock to effect such redemption.

WMI will covenant in the Exchange Agreement that in the event WMI, prior to the Conditional Exchange, effects, or is, the subject of a merger, consolidation, statutory share exchange, sale of all or substantially all of its assets or other form of business combination, (i) in which WMI is not the surviving, resulting or receiving corporation thereof or (ii) if WMI is the surviving or resulting corporation, shares representing a majority of WMI's total voting power are either converted or exchanged into securities of another person or into cash or other property (any such transaction in either (i) or (ii) being a "*Business Combination*"), then WMI (i) will not enter into such Business Combination unless the Successor Entity agrees, effective upon the consummation of such Business Combination, to abide by all of WMI's obligations under the provisions of the Exchange Agreement restricting the payment of dividends by WMI in the event dividends are not paid with respect to the Company Preferred Securities and (ii) may, at the election of the Board of Directors of WMI prior to the effectiveness of such Business Combination, assign, effective upon the consummation of such Business Combination, all of its other obligations under the Exchange Agreement to a Successor Entity that has Fixed-to-Floating Rate Substitute Preferred Stock and, as a result of such assignment, all references to WMI, Series L WMI Preferred Stock and Depositary Shares shall become and be

deemed to be references to such Successor Entity, to such Fixed-to-Floating Rate Substitute Preferred Stock and to a Fixed-to-Floating Rate Successor Depositary Share, respectively.

*"Successor Entity"* means a corporation designated by the Board of Directors of WMI (i) that is the surviving, resulting or receiving corporation, as applicable, in any Business Combination, (ii) the securities of which are received in a Business Combination by some or all holders of WMI voting shares or (iii) that the Board of Directors of WMI determines to be an acquirer of WMI in a Business Combination.

*"Fixed-to-Floating Rate Substitute Preferred Stock"* means a class or series of equity securities of a Successor Entity having the preferences, limitations and relative rights in its articles or certificate of incorporation or other constituent documents that are substantially similar to those set forth in the articles of amendment establishing the Series L WMI Preferred Stock.

*"Fixed-to-Floating Rate Successor Depositary Share"* means a depositary share substantially similar to a Depositary Share representing an interest in the Fixed-to-Floating Rate Substitute Preferred Stock.

## Conditional Exchange

For a description of how an exchange of the Trust Securities into Depositary Shares may occur upon an Exchange Event, purchasers should read "Description of the Trust Securities — Conditional Exchange".

## DESCRIPTION OF THE DEPOSITARY SHARES

*The following summary describes the material terms and provisions of the Depositary Shares. This description is qualified in its entirety by reference to the terms and provisions of the Deposit Agreement, the form of depositary receipts, which contain the terms and provisions of the Depositary Shares, and WMI's articles of incorporation and articles of amendment. Copies of each of the foregoing documents may be obtained upon request to WMI.*

### General

Each depositary share will represent a 1/1000th interest in one share of Series L WMI Preferred Stock (the *"Depositary Shares"*). The Depositary Shares will be evidenced by depositary receipts issued in definitive registered form. The shares of Series L WMI Preferred Stock underlying the Depositary Shares will, upon an exchange as a result of an Exchange Event, be deposited with Mellon Investor Series LLC, as depositary (the *"Depositary"*), under a Deposit Agreement, to be entered into on or before the closing date (the *"Deposit Agreement"*), among WMI, the Depositary, the registrar appointed thereunder and all holders from time to time of depositary receipts issued by the Depositary thereunder. WMI does not intend to list or quote the Depositary Shares or the Series L WMI Preferred Stock on any securities exchange or automated dealer quotation system. Accordingly, there will be no public trading market for the Depositary Shares or the Series L WMI Preferred Stock. The Initial Purchasers are under no obligation to and do not intend to make a market in the Depositary Shares.

Subject to the terms of the Deposit Agreement, each owner of a Depositary Share will be entitled, through the Depositary, to all the rights, preferences and privileges of 1/1000th of a share of Series L WMI Preferred Stock. Owners of a single Depositary Share, representing a 1/1000th interest in one share of Series L WMI Preferred Stock, will be subject to all of the limitations of the fractional share represented thereby, which are summarized above under "Description of the Series L WMI Preferred Stock".

The Depositary will act as transfer agent, registrar and paying agent with respect to the Depositary Shares.

The Depositary's office at which the depositary receipts will be administered is located at 480 Washington Boulevard, Jersey City, New Jersey 07310.

Purchasers may hold Depositary Shares either directly or indirectly through their broker or other financial institution. If purchasers hold Depositary Shares directly, by having Depositary Shares registered in their name on the books of the Depositary, the purchaser is a depositary receipt holder. If purchasers hold the Depositary Shares through their broker or financial institution nominee, the purchasers must rely on the procedures of such broker or financial institution to assert the rights of a depositary receipt holder described in this section. Purchasers should consult with their broker or financial institution to find out what those procedures are.

### Issuance of Depositary Receipts

Automatically upon a Conditional Exchange, WMI will issue the shares of Series L WMI Preferred Stock, and deposit those shares with the Depositary, which will then issue and deliver the depositary receipts to WMI. WMI will, in turn, deliver the depositary receipts to the holders of Trust Securities as of the date of the Conditional Exchange. Depositary receipts will be issued evidencing only whole Depositary Shares. Each Trust Security will then be exchanged for a like amount of depositary receipts as described under "Description of the Trust Securities — Conditional Exchange".

### Dividends and Other Distributions

The Depositary will distribute all cash dividends, dividends paid in Depositary Shares representing paid-up and nonassessable shares of Series L WMI Preferred Stock or other cash distributions received in respect of the Series L WMI Preferred Stock to the record holders of Depositary Shares in

proportion to the numbers of such Depositary Shares owned by such holders on the relevant record date. In the event of a distribution other than in cash, the Depositary will distribute property received by it to the record holders of Depositary Shares entitled thereto, unless the Depositary determines that it is not feasible to make such a distribution, in which case the Depositary may, after consultation with WMI, sell such property and distribute the net proceeds from such sale to such holders.

## Redemption of Depositary Shares

If the shares of Series L WMI Preferred Stock underlying the Depositary Shares are redeemed, in whole or in part, Depositary Shares will be redeemed with the proceeds received by the Depositary resulting from the redemption of the Series L WMI Preferred Stock held by the Depositary. The redemption price per Depositary Share will be equal to 1/1000th of the redemption price per share payable with respect to such Series L WMI Preferred Stock. If less than all the shares of Series L WMI Preferred Stock are to be redeemed, a corresponding proportion of the Depositary Shares will be redeemed and the Depositary Shares to be redeemed will be selected by lot or *pro rata,* in WMI's sole discretion.

After the date fixed for redemption (which will be the same date as the redemption date for the Series L WMI Preferred Stock), the Depositary Shares so called for redemption will no longer be deemed to be outstanding and all rights of the holders of the Depositary Shares will cease, except the right to receive the moneys payable upon such redemption and any money or other property to which the holders of such Depositary Shares were entitled upon such redemption upon surrender to the Depositary of the depositary receipts evidencing such Depositary Shares.

## Amendment of Deposit Agreement

The form of depositary receipt evidencing the Depositary Shares and any provision of the Deposit Agreement may at any time be amended by agreement between WMI and the Depositary. However, any amendment that materially and adversely alters the rights of the holders of depositary receipts will not be effective unless such amendment has been approved by the holders of at least a majority of the Depositary Shares then outstanding. Every holder of an outstanding depositary receipt at the time any amendment becomes effective will be deemed, by continuing to hold such depositary receipt, to consent and agree to such amendment and to be bound by the Deposit Agreement as amended thereby.

## Charges of Depositary

WMI will pay the charges of the Depositary in connection with the initial deposit of the Series L WMI Preferred Stock and the initial issuance of the Depositary Shares upon a Conditional Exchange, and any redemption of the Series L WMI Preferred Stock. Holders of Depositary Shares will pay all other transfer and other taxes and governmental charges and, in addition, such other charges as are expressly provided in the Deposit Agreement to be for their accounts. All other charges and expenses of the Depositary and of any registrar incident to the performance of their respective obligations arising from the depositary arrangements will be paid by WMI only after prior consultation and agreement between the Depositary and WMI and consent by WMI to the incurrence of such expenses, which consent will not be unreasonably withheld.

## Miscellaneous

The Depositary will forward to the holders of the Depositary Shares all reports and communications from WMI that WMI would be required to furnish to the holders of the Series L WMI Preferred Stock.

Neither the Depositary nor WMI will be liable if it is prevented or delayed by law or any circumstances beyond its control in performing its obligations under the Deposit Agreement. The obligations of WMI and the Depositary under the Deposit Agreement will be limited to performance in

good faith of their duties thereunder, and they will not be obligated to prosecute or defend any legal proceedings in respect of any Depositary Shares or the Series L WMI Preferred Stock unless satisfactory indemnity is furnished. They may rely upon written advice of counsel or independent accountants, or information provided by persons presenting Series L WMI Preferred Stock for deposit, holders of Depositary Shares or other persons believed to be competent and on documents believed to be genuine.

## Resignation and Removal of Depositary; Termination of Deposit Agreement

The Depositary may resign at any time by delivering to WMI notice of its election to do so, and WMI may at any time remove the Depositary, with any such resignation or removal taking effect upon the appointment of a successor depositary and its acceptance of such appointment. Such successor depositary will be appointed by WMI within 60 days after delivery of the notice of resignation or removal. Upon termination of the Deposit Agreement, the Depositary will discontinue the transfer of depositary receipts, will suspend the distribution of dividends to the holders thereof and will not give any further notices (other than notice of such termination) or perform any further acts under the Deposit Agreement, except that the Depositary will continue to collect dividends and other distributions pertaining to Series L WMI Preferred Stock and will continue to deliver Series L WMI Preferred Stock certificates together with such dividends and distributions and the net proceeds of any sales of rights, preferences, privileges, or other property in exchange for depositary receipts surrendered. At any time after the expiration of three years from the date of termination, the Depositary may sell the Series L WMI Preferred Stock and hold the proceeds of such sale, without interest, for the benefit of the holders of depositary receipts who have not then surrendered their depositary receipts. After making such sale, the Depositary will be discharged from all obligations under the Deposit Agreement except to account for such proceeds.

## DESCRIPTION OF THE OTHER WMI CAPITAL STOCK

As of the date hereof, the authorized capital stock of WMI consists of 1,600,000,000 shares of WMI common stock and 10,000,000 shares of preferred stock, no par value. As of the close of business on November 30, 2006, there were 945,303,839 shares of WMI common stock outstanding and 500 shares of WMI's Series K Perpetual Non-Cumulative Floating Rate Preferred Stock outstanding. As of the close of business on October 31, 2006, 700,000 shares of preferred stock of WMI were authorized, but unissued, as contemplated by WMI's Rights Agreement, dated as of December 20, 2000, entered into by and between WMI and Mellon Investor Services LLC. In addition, 2,000 shares of WMI preferred stock were authorized for issuance in connection with the issuance of the Trust I Securities and WaMu Cayman Securities, as described below. The shares of WMI preferred stock to be issued upon the occurrence of a Conditional Exchange have been duly authorized and when and if issued will be validly issued, fully paid, nonassessable and free of preemptive rights, with no personal liability attaching to the ownership thereof.

WMI authorized and reserved for issuance in connection with the offering of the Trust I Securities and the related issuance by the Company of the Series 2006-A Company Preferred Securities up to 1,250 shares of its Series I Perpetual Non-cumulative Fixed-to-Floating Rate Preferred Stock, no par value, and liquidation preference of $1,000,000 per share (the *"Series I WMI Preferred Stock"*). WMI also authorized for issuance in connection with the offering of the WaMu Cayman Securities and the related issuance by the Company of the Series 2006-B Company Preferred Securities up to 750 shares of its Series J Perpetual Non-cumulative Fixed Rate Preferred Stock, no par value, and liquidation preference of $1,000,000 per share (the *"Series J WMI Preferred Stock"*). The shares of Series I WMI Preferred Stock and Series J WMI Preferred Stock will be issued by WMI solely upon the occurrence of a Conditional Exchange with respect to the Trust I Securities and WaMu Cayman Securities, respectively. If and when the shares of Series I WMI Preferred Stock and Series J WMI Preferred Stock are issued upon the occurrence of a Conditional Exchange, they will be represented by depositary shares of WMI, each of which will represent 1/1000th of a share of such preferred stock. The Series I WMI Preferred Stock, Series J WMI Preferred Stock and Series L WMI Preferred Stock when issued will rank *pari passu* with one another as to dividends and upon liquidation of WMI. None of these series of WMI preferred stock will be listed on any securities exchange or automated dealer quotation system.

In September 2006, WMI issued 20,000,000 depositary shares, each of which represented a 1/40,000th interest in a share of WMI's Series K Perpetual Non-Cumulative Floating Rate Preferred Stock (the *"Series K WMI Preferred Stock"*). 500 shares of Series K WMI Preferred Stock were issued. The Series K WMI Preferred Stock has a liquidation preference of $1,000,000 per share. Dividends on the Series K WMI Preferred Stock are non-cumulative and, if declared by the board of directors, are paid quarterly at a per annum rate equal to the greater of (i) 3-month USD LIBOR for the related dividend period, plus 0.70%, or (ii) 4.00%. The Series K WMI Preferred Stock has no stated maturity. Beginning in September 2011, WMI may at its option redeem the Series K WMI Preferred Stock in whole or in part at any time or from time to time at a price equal to $1,000,000 per share plus any declared and unpaid dividends. The Series K WMI Preferred Stock has no voting rights except in certain specific circumstances. The Series I WMI Preferred Stock and the Series J WMI Preferred Stock rank, and the Series L WMI Preferred Stock will rank, on a parity with Series K WMI Preferred Stock as to dividends rights and rights on liquidation, winding up and dissolution of WMI.

## BOOK-ENTRY ISSUANCE

### Form, Denomination, Transfer and Book-Entry Procedures

#### General

The Trust Securities will be issued only in fully registered form. Each purchaser in this Offering and each account for which it is purchasing will hold at least $300,000 liquidation preference of Trust Securities (*i.e.*, at least three Trust Securities) and, if it transfers any interest in any Trust Security, will transfer at least $100,000 liquidation preference of Trust Securities (*i.e.*, at least one Trust Security) and each subsequent purchaser and each account for which it is purchasing will hold and transfer at least $100,000 liquidation preference of Trust Securities (*i.e.*, at least one Trust Security). Any transfer, sale or other disposition of Trust Securities having a liquidation preference of less than $100,000 or that results in a beneficial owner holding Trust Securities having an aggregate liquidation preference of less than $100,000, will be deemed to be null and void *ab initio* and of no legal effect whatsoever. Any such transferee will be deemed not to be the beneficial owner of such Trust Securities for any purpose, including, but not limited to, the receipt of dividends on such Trust Securities, and such transferee will be deemed to have no interest whatsoever in such Trust Securities.

#### Global Security

The Trust Securities initially will be represented by one or more securities in registered, global form (collectively, the *"Global Security"*). The Global Security will be deposited upon issuance with the Registrar as custodian for The Depository Trust Company *("DTC")* in New York, New York, and registered in the name of DTC or its nominee (the *"Nominee"*), in each case for credit to an account of a DTC Participant, as described below.

#### Special Considerations for Global Securities

As an indirect holder, a purchaser's rights relating to a Global Security will be governed by the account rules of the purchaser's financial institution and of DTC, as well as the general laws relating to securities transfers. The Trust will not recognize the purchaser as a holder of Trust Securities and instead will deal only with DTC or its nominee. See "— The DTC System".

Purchasers should be aware that because Trust Securities are issued only in the form of a Global Security:

- they cannot get Trust Securities registered in their name;

- they cannot receive physical certificates for their interest in the Trust Securities;

- they will be "Street Name" holders and must look to their own bank or broker for payments on the Trust Securities and the protection of their legal rights relating to the Trust Securities;

- they may not be able to sell interests in the Trust Securities to some insurance companies and other institutions that are required by law to own securities in the form of physical certificates; and

- DTC's policies will govern payments, transfers, exchanges and other matters relating to the purchaser's interest in the Global Security. See "— The DTC System". The Trust, the Company and the Registrar have no responsibility for any aspect of DTC's actions or for its records of ownership interests in the Global Security. The Trust, the Company and the Registrar also do not supervise DTC in any way.

#### Special Situations When the Global Security Will Be Terminated

In a few special situations, interests in the Global Security will be exchanged for definitive physical certificates representing Trust Securities. After that exchange, the choice of whether to hold

Trust Securities directly or in "Street Name" will be up to the beneficial owner. Purchasers must consult their own bank or broker to find out how to have their interests in Trust Securities transferred to their own name, so that they will be direct holders.

The special situations for exchange of the Global Security for definitive physical certificates are:

- DTC notifies the Trust that it is unwilling, unable or no longer qualified to continue as the depositary for the Trust Securities; or

- the Trust in its sole discretion determines that the Global Security will be exchangeable for certificated Trust Securities.

When the Global Security is exchanged, DTC (and not the Trust, the Company or the Registrar) will be responsible for deciding the names of the institutions that will be the initial direct holders.

If Trust Securities are issued in certificated form, dividends, if any, will be payable, and Trust Securities may be transferred or exchanged, at the corporate trust office of the Registrar in New York, New York, *provided* that payment of interest on certificated Trust Securities may be made at the option of the Trust by check mailed to the address of the persons entitled thereto.

## The DTC System

DTC is a limited-purpose trust company created to hold securities for its participating organizations (the *"DTC Participants"*). DTC also facilitates the clearance and settlement between DTC Participants of transactions in securities deposited with DTC through changes in the account records of DTC Participants. DTC Participants include securities brokers and dealers (including the Initial Purchasers), banks, trust companies, clearing corporations and certain other organizations. Access to DTC's system is also available to other entities such as securities brokers and dealers, banks and trust companies that work through a DTC Participant (the *"Indirect DTC Participants"*).

When the Trust Securities are purchased through the DTC system, the purchase must be made by or through a DTC Participant, who will receive credit for the Trust Securities on DTC's records. The purchaser's ownership interest will only be recorded on the DTC Participants' (or Indirect DTC Participants') records. DTC has no knowledge of a purchaser's individual ownership of the Trust Securities. DTC's records show only the identity of the DTC Participants and the amount of the Trust Securities held by or through them. A purchaser will not receive a written confirmation of its purchase or sale or any periodic statement directly from DTC; it will receive these from the DTC Participant or Indirect DTC Participant at which it maintains its account. Thus, the DTC Participants (or Indirect DTC Participants) are responsible for keeping an accurate account of the holdings of their customers.

Any redemption notices with respect to the Trust Securities will be sent by the Company and the Trust directly to DTC, who will in turn inform the DTC Participants, who will then contact the beneficial owners. If less than all of the Trust Securities are being redeemed, DTC's current practice is to choose by lot the amount of the interest of each DTC Participant to be redeemed. Each DTC Participant will then use an appropriate method to allocate the redemption among its beneficial holders.

It is DTC's current practice, upon receipt of any payment in respect of the Global Security to credit DTC Participants' accounts on the payment date based on their holdings of beneficial interests in the Global Security as shown on DTC's records. In addition, it is DTC's current practice to assign any consenting or voting rights to DTC Participants whose accounts are credited beneficial interests in the Global Security on a record date, by using an omnibus proxy. Payments by DTC Participants to owners of beneficial interests in the Global Security, and voting by DTC Participants, will be based on the customary practices between the DTC Participants and owners of beneficial interests, as is the case with securities held for the account of customers registered in "Street Name". However, payments will be the responsibility of the DTC Participants and not of DTC, the Registrar, the Trust or the Company.

Interests in the Trust Securities will trade in DTC's same-day funds settlement system, and secondary market trading activity in such interests will therefore settle in immediately available funds, subject in all cases to the rules and procedures of DTC and its participants.

DTC has advised the Trust that it will take any action permitted to be taken by a holder of the Trust Securities only at the direction of one or more DTC Participants to whose account with DTC interests in the Global Security are credited and only in respect of such portion of the aggregate principal amount of the Trust Securities as to which such participant or participants has or have given such direction.

Although DTC has agreed to the foregoing procedures in order to facilitate transfers of beneficial ownership interests in the Global Security among participants of DTC it is under no obligation to perform or continue to perform such procedures, and such procedures may be discontinued at any time. Neither the Company, the Trust, the Registrar or any of their representative agents will have any responsibility for the performance by DTC, the DTC Participants or the Indirect DTC Participants of its obligations under the rules and procedures governing their operations, including maintaining, supervising or reviewing the records relating to, or payments made on account of, beneficial ownership interests in the Global Security.

### Euroclear and Clearstream

Clearstream Banking, société anonyme, 42 Avenue JF Kennedy, L-1855, Luxembourg ("Clearstream"), is a subsidiary of Clearstream International ("Clearstream International"), a Luxembourg limited liability company formed in January 2000 through the merger of Cedel International and Deutsche Boerse Clearing, a subsidiary of Deutsche Boerse AG. In July 2002, Deutsche Boerse AG acquired Cedel International and its 50% ownership of Clearstream International.

Clearstream is registered as a bank in Luxembourg, and as such is subject to supervision by the Luxembourg Financial Sector Supervisory Commission, which supervises Luxembourg banks.

Clearstream holds securities for its customers ("Clearstream Participants") and facilitates the clearance and settlement of securities transactions by electronic book-entry transfers between their accounts. Clearstream provides various services, including safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Clearstream also deals with domestic securities markets in several countries through established depository and custodial relationships. Clearstream has established an electronic bridge with Euroclear Bank S.A./N.V. as the Euroclear Operator in Brussels to facilitate settlement of trades between systems. Clearstream currently accepts over 200,000 securities for clearance.

Clearstream International's customers are worldwide financial institutions including underwriters, securities brokers and dealers, banks, trust companies and clearing corporations. Clearstream International's United States customers are limited to securities brokers and dealers and banks. Currently, Clearstream International has over 2,500 customers located in over 94 countries, including all major European countries, Canada and the United States. Indirect access to Clearstream is available to other institutions which clear through or maintain a custodial relationship with an account holder of Clearstream.

The Euroclear System ("Euroclear") was created in 1968 to hold securities for its participants ("Euroclear Participants") and to clear and settle transactions between Euroclear Participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for physical movement of certificates and any risk from lack of simultaneous transfers of securities and cash. Transactions may be settled in a variety of currencies, including United States dollars. Euroclear includes various other securities, including securities lending and borrowing and interfaces with domestic markets in several countries generally similar to the arrangements for cross-market transfers with DTC described above. Euroclear is operated by Euroclear Bank S.A./N.V. (the "Euroclear Operator"). All operations are conducted by the Euroclear Operator, and all Euroclear securities

clearance accounts and Euroclear cash accounts are accounts with the Euroclear Operator. Euroclear plc establishes policy for Euroclear on behalf of Euroclear Participants. Euroclear Participants include banks (including central banks), securities brokers and dealers and other professional financial intermediaries. Indirect access to Euroclear is also available to other firms that clear through or maintain a custodial relationship with a Euroclear Participant, either directly or indirectly.

Securities clearance accounts and cash accounts with the Euroclear Operator are governed by the Terms and Conditions Governing Use of Euroclear and the related Operating Procedures of the Euroclear System and applicable Belgian law (collectively, the *"Euroclear Terms and Conditions"*). The Euroclear Terms and Conditions govern transfers of securities and cash within Euroclear, withdrawals of securities and cash from Euroclear, and receipts of payments with respect to securities in Euroclear. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear Operator acts under the Euroclear Terms and Conditions only on behalf of Euroclear Participants, and has no record of, or relationship with, persons holding through Euroclear Participants.

# CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

*United States Internal Revenue Service Circular 230 Notice: To ensure compliance with Internal Revenue Service Circular 230, prospective investors are hereby notified that: (i) any discussion of U.S. federal tax issues contained or referred to in this offering circular or any document referred to herein is not intended or written to be used, and cannot be used, by prospective investors for the purpose of avoiding penalties that may be imposed on them under the U.S. Internal Revenue Code; (ii) such discussion is written for use in connection with the promotion or marketing of the transactions or matters addressed herein; and (iii) prospective investors should seek advice based on their particular circumstances from an independent tax advisor.*

## General

The following discussion summarizes the principal United States federal income tax treatment of the Trust and the Company, and the principal United States federal income tax consequences to holders of the Trust Securities. This discussion is of a general nature and is not intended to be, nor should it be construed as, tax advice to any holder. Purchasers should consult their own tax advisor regarding the tax consequences of acquiring, owning and disposing of Trust Securities.

The discussion is addressed only to holders that beneficially own Trust Securities as capital assets and does not purport to be a comprehensive description of all the tax considerations that may be relevant to particular holders in light of their personal circumstances. The discussion also does not describe all aspects of taxation that may be relevant to certain types of holders to which special provisions of United States federal income tax law may apply, including:

- dealers in securities and currencies;
- regulated investment companies;
- traders in securities;
- tax-exempt organizations;
- banks and insurance companies;
- persons that hold Trust Securities as part of a hedge, straddle or conversion transaction;
- persons whose functional currency is not the United States dollar; and
- U.S. expatriates.

The summary is based on United States federal income tax law, including the Code, existing and proposed U.S. Treasury regulations, administrative rulings and judicial decisions all as currently in effect. These legal sources are subject to change or differing interpretations at any time, which change or interpretation could apply retroactively and could affect the validity of the discussion below. There can be no assurance that the Internal Revenue Service *("IRS")* will take the same view of the United States federal income tax consequences of an investment in the Trust Securities as described herein.

Each purchaser is urged to consult its own tax advisor as to the tax consequences of acquiring, owning and disposing of Trust Securities, including the United States federal, state, local and any other tax consequences of acquiring, owning and disposing of Depositary Shares.

As used in this discussion, the term *"U.S. Holder"* means a beneficial owner of a Trust Security that is, for United States federal income tax purposes, a citizen or resident of the United States, a corporation or partnership created or organized in or under the laws of the United States or any state, an estate the income of which is includible in gross income for United States federal income tax purposes regardless of its source, or a trust if a court within the United States is able to exercise primary supervision over its administration and one or more United States persons have authority to control all substantial decisions of the trust. The term *"Foreign Holder"* means a beneficial owner of Trust Securities that is not a U.S. Holder.

106

**United States Federal Income Tax Consequences**

*Tax Treatment of the Trust and its Investment in Series 2006-C Company Preferred Securities*

*Classification of the Trust and the Company.* The Trust intends to be treated as a grantor trust for United States federal income tax purposes. Accordingly, each holder of a Trust Security will be treated as if it owned directly the Series 2006-C Company Preferred Securities allocable to such Trust Security. All of the Trust's assets are expected to consist of Series 2006-C Company Preferred Securities. The Company intends to be classified as a U.S. domestic partnership for United States federal income tax purposes, and the Series 2006-C Company Preferred Securities acquired by the Trust are intended to constitute equity interests in such partnership.

An entity that is classified as a partnership for United States federal income tax purposes generally is not a taxable entity and incurs no United States federal income tax liability. Instead, each partner is required to take into account its allocable share of income, gains, losses, deductions and credits of the partnership in computing its United States federal income tax liability, if any, even if no cash distributions are made by the partnership to the partner. An entity that is classified as a partnership for United States federal income tax purposes nevertheless will be taxable as a corporation if it is a "publicly traded partnership" and fails to satisfy a "90% qualifying income" test, within the meaning of Code Section 7704.

On the date of the initial issuance of the Trust Securities, the Company will receive an opinion from Mayer, Brown, Rowe & Maw LLP to the effect that, for United States federal income tax purposes, although no activities closely comparable to those contemplated by the Company have been the subject of any U.S. Treasury regulation, revenue ruling or judicial decision, the Company will not be treated as an association or publicly traded partnership taxable as a corporation. The opinions are based on certain assumptions and on certain representations and agreements regarding restrictions on the future conduct of the activities of the Company. Although the Company intends to conduct its activities in accordance with such assumptions, representations and agreements, if it were nonetheless determined that the Company was taxable as a corporation for United States federal income tax purposes, then cash available for distribution in respect of the Series 2006-C Company Preferred Securities would be reduced on account of taxes payable by the Company. A determination by the Company, based on receipt of an opinion of counsel, that there is a significant risk that the Company is or will be treated as an association or publicly traded partnership taxable as a corporation as a result of a change in law would constitute a Tax Event. See "Description of the Series 2006-C Company Preferred Securities — Redemption". The remainder of this discussion assumes that the Company is treated as a partnership, and not as an association or publicly traded partnership taxable as a corporation, for U.S. federal income tax purposes, and that the Series 2006-C Company Preferred Securities will constitute equity interests in such partnership.

*Tax Consequences to U.S. Holders of Trust Securities*

*Income and Deductions in General.* Each U.S. Holder of Trust Securities will be required to report on its United States federal income tax return its share of income, gains, losses, deductions and credits of the Company that are allocable to the Trust, even if such holder has not received any cash distributions from the Trust.

*Distributions on Trust Securities.* Distributions of money by the Trust to a U.S. Holder of Trust Securities generally will not result in taxable gain to the U.S. Holder. A U.S. Holder of Trust Securities will recognize taxable gain as a result of a distribution of money by the Company to the Trust with respect to the Series 2006-C Company Preferred Securities only if and to the extent that the U.S. Holder's share of such distribution exceeds the U.S. Holder's adjusted tax basis in the Series 2006-C Company Preferred Securities allocable to such U.S. Holder's Trust Securities immediately before the distribution. In general, each U.S. Holder of Trust Securities will have an initial basis in the Series 2006-C Company Preferred Securities allocable to such U.S. Holder's Trust Securities equal to the amount paid by the Trust to purchase such Series 2006-C Company Preferred Securities.

Such U.S. Holder's basis in such Series 2006-C Company Preferred Securities generally will be increased by such U.S. Holder's share of the Company's taxable income and decreased, but not below zero, by such holder's share of amounts distributed with respect to the Series 2006-C Company Preferred Securities and Company losses, deductions and nondeductible expenditures that are not chargeable to capital allocable to the Trust.

*Allocations of Company Income, Gain, Loss and Deductions.* Each holder of Trust Securities must report its proportionate share of the Company's income, gain, loss and deduction allocated to the Trust for each year. Under Section 704(b) of the Code, a partnership's allocation of any item of income, gain, loss or deduction to a partner will be given effect for United States federal income tax purposes so long as it has "substantial economic effect", or is otherwise in accordance with the "partner's interest in the partnership". If an allocation of an item does not satisfy this standard, it will be reallocated among the partners on the basis of their respective interests in the partnership, taking into account all facts and circumstances. The Company believes that the allocations of items of income, gain, loss and deduction under the LLC Agreement will be considered to have substantial economic effect under the applicable Treasury regulations. U.S. Holders are not expected to be allocated any losses for United States federal income tax purposes with respect to their indirect interests in the Company. The deductibility of expenses and other losses arising from a partnership such as the Company is subject to certain limitations under the Code. In the event expenses or losses are allocated to U.S. Holders of the Trust Securities, such U.S. Holders should consult their tax advisors to determine the deductibility of such losses.

*Sale, Exchange or Other Disposition of Trust Securities.* In general, a U.S. Holder will recognize gain or loss upon the sale or exchange of such U.S. Holder's Trust Securities equal to the difference between the amount realized and such U.S. Holder's adjusted tax basis in the Series 2006-C Company Preferred Securities allocable to such U.S. Holder's Trust Securities. Initially, the tax basis of a U.S. Holder should equal the amount paid for its Trust Securities. Such basis will be increased or decreased as described above and, as a general matter, at all times is expected to equal the face value of the U.S. Holder's Trust Securities. If a holder's Trust Securities are exchanged for Depositary Shares for Series L WMI Preferred Stock, the transaction will be a fully taxable sale to the holder. The amount realized by a holder on this kind of disposition of a Trust Security will equal the fair market value of the Depositary Shares received.

*Company Audits.* The tax treatment of Company-related items is determined at the Company level. University Street will be appointed as "tax matters partner" with the authority to determine the Company's response to an audit. The limitations period for assessment of deficiencies and claims for refunds with respect to items related to the Company is three years after the Company's return for the taxable year in question is filed, and the tax matters partner has the authority to, and may, extend such period with respect to all members of the Company. If an audit results in an adjustment, the holders of the Trust Securities, as the deemed owners of the Series 2006-C Company Preferred Securities, may be required to restate their taxable income, which could cause holders of Trust Securities to pay additional taxes, interest and possibly penalties and such holders may themselves also be subject to audits. There can be no assurance that the Company's or a U.S. Holder's tax return will not be audited by the IRS or that no adjustments to their returns will be made as a result of such an audit.

*Series L WMI Preferred Stock Received in a Conditional Exchange.* If, as a result of a Conditional Exchange, a U.S. Holder receives Depositary Shares for Series L WMI Preferred Stock, any distributions made on the Depositary Shares generally will be included in the holder's income as ordinary dividend income to the extent of WMI's current and accumulated earnings and profits. Distributions in excess of WMI's current and accumulated earnings and profits will be treated as a return of capital to the extent of the U.S. Holder's adjusted tax basis in the Depositary Shares and thereafter as capital gain from the sale or exchange of the Depositary Shares. Dividends received by a corporate U.S. Holder may be eligible for a dividends received deduction, subject to applicable limitations. The sale, exchange or redemption of any Depositary Shares for Series L WMI Preferred

Stock will be subject to tax under the rules described above under "— Sale, Exchange or Other Disposition of Trust Securities".

## Tax Treatment of Tax-Exempt U.S. Holders of Trust Securities

For purposes of this discussion, a *"Tax-Exempt U.S. Holder"* means any United States domestic organization qualified under Code Section 501(c)(3), any trust or governmental plan qualified under Code Section 401(a), any individual retirement account and any other non-governmental U.S. Holder generally exempt from United States federal income taxation. A Tax-Exempt U.S. Holder is not expected to be subject to the tax on unrelated business taxable income *("UBTI")* with respect to its share of Company income and gain allocable to the Trust or any capital gains derived from an investment in the Trust Securities. However, notwithstanding the foregoing, a Tax-Exempt U.S. Holder that incurs "acquisition indebtedness" (as defined in Code Section 514(c)) with respect to its Trust Securities may be subject to the tax on UBTI in respect of any income or gains derived in respect of the Trust Securities to the extent that such Trust Securities constitute "debt-financed property" of the Tax-Exempt U.S. Holder within the meaning of Code Section 514(b).

Tax-Exempt U.S. Holders should consult their own tax advisors regarding the tax consequences to them of an investment in the Trust Securities.

## Tax Treatment of Foreign Holders of Trust Securities

*U.S. Trade or Business Status.* The Company intends to conduct its affairs so as to not be engaged in a trade or business in the United States. On the date of the initial issuance of the Trust Securities, the Company will receive an opinion from Mayer, Brown, Rowe & Maw LLP to the effect that, for United States federal income tax purposes, although no activities closely comparable to those contemplated by the Company have been the subject of any U.S. Treasury regulation, revenue ruling or judicial decision, it will not be treated as engaged in the conduct of a trade or business within the United States. Mayer, Brown, Rowe & Maw LLP's opinion is not binding on the IRS or the courts, and no ruling will be sought from the IRS regarding this, or any other, aspect of the Company's United States federal income tax treatment. Accordingly, no assurance can be given that the IRS will not assert positions contrary to those stated in Mayer, Brown, Rowe & Maw LLP's opinion or that a court would not entertain any such assertions.

Mayer, Brown, Rowe & Maw LLP's opinion is based on certain assumptions and on certain representations and agreements regarding restrictions on the future conduct of the Company's activities. Although the Company intends to conduct its activities in accordance with such assumptions, representations and agreements, if it were nonetheless determined to be engaged in a trade or business in the United States and had taxable income that was effectively connected with such United States trade or business, then each Foreign Holder would be subject to United States federal income tax on such Foreign Holder's share of the Company's effectively connected taxable income allocable to the Trust at regular United States corporate income tax rates and possibly to a 30% United States branch profits tax as well. Moreover, in the event a Foreign Holder were to derive effectively connected income in respect of its ownership of Trust Securities the United States, corporate income tax imposed thereon would be required to be collected in the first instance through a withholding by the Company of such tax at a rate of 35% on such Foreign Holder's distributive share of the income. A determination by the Company, based on receipt of an opinion of counsel, that there is a significant risk that it is or will be treated as engaged in a trade or business within the United States would constitute a Tax Event. See "Description of Series 2006-C Company Preferred Securities — Redemption". The remainder of this discussion assumes that the Company will not be considered to be engaged in a trade or business in the United States.

*United States Withholding Tax.* Interest that constitutes "portfolio interest" within the meaning of the Code is generally exempt from United States withholding tax. A Foreign Holder will be treated as earning directly its share of the income earned by the Company. Immediately following the

completion of this Offering, the Company's material assets will consist of the "regular interests" issued in registered form by the Asset Trusts (*i.e.*, the Asset Trust I Class A Trust Certificate and the Asset Trust II Class A Trust Certificate), each of which will be treated as a "real estate mortgage investment conduit" under the Code (a *"REMIC"*). REMIC regular interests are generally treated as indebtedness for United States federal income tax purposes that qualifies for the portfolio interest exemption. In addition, during the term of the transaction, the Company expects, pursuant to its investment guidelines, to invest cash on hand from time to time in short term debt instruments and other debt securities that qualify for the portfolio interest exemption.

Accordingly, it is expected that a Foreign Holder's share of the Trust's distributive share of the Company's interest income will constitute "portfolio interest", and thus, will not be subject to U.S. withholding tax, so long as the Foreign Holder has certified its status as a Foreign Holder under penalties of perjury on an appropriate IRS Form W-8. In addition, gain realized on the sale, exchange or redemption of the Trust Securities held by a Foreign Holder generally will not be subject to United States federal income or withholding tax, as the case may be, unless such Foreign Holder is a nonresident alien individual who holds the Trust Securities as a capital asset and who is present in the United States more than 182 days in the taxable year of the sale and certain other conditions are met.

**Series L WMI Preferred Stock Received in a Conditional Exchange.** If a Conditional Exchange of the Trust Securities were to occur, any dividends paid to a Foreign Holder of the Depositary Shares for Series L WMI Preferred Stock received upon such Conditional Exchange generally would be subject to a 30% U.S. withholding tax unless the holder qualifies for an exemption or a reduced rate under the U.S. Internal Revenue Code or applicable U.S. tax treaty.

## Information Reporting and Backup Withholding

Under certain circumstances, the Code requires "information reporting", and may require "backup withholding", with respect to certain payments made on the Trust Securities and the payment of the proceeds from the disposition of such instruments. Backup withholding generally will not apply to corporations, tax-exempt organizations, qualified pension and profit sharing trusts, and individual retirement accounts. Backup withholding will apply to a U.S. Holder if the U.S. Holder fails to provide certain identifying information (such as the U.S. Holder's taxpayer identification number) or otherwise comply with the applicable requirements of the backup withholding rules. The application for exemption from backup withholding for a U.S. Holder is available by providing a properly completed IRS Form W-9.

The payment of the proceeds from the disposition of a Trust Security by a Foreign Holder generally will not be subject to information reporting and backup withholding if the Foreign Holder certifies its status as a Foreign Holder (and, if applicable, its beneficial owners also certify their status as non-United States persons) under penalties of perjury on the appropriate IRS Form W-8, satisfies certain documentary evidence requirements for establishing that it is a Foreign Holder or otherwise establishes an exemption.

Backup withholding is not an additional tax and may be refunded (or credited against the U.S. Holder's or Foreign Holder's United States federal income tax liability, if any), provided that certain required information is furnished. The information reporting requirements may apply regardless of whether withholding is required.

## Tax Return Disclosure Requirements

Recently issued Treasury Regulations and other administrative guidance promulgated by the IRS prescribe certain circumstances under which holders of the Trust Securities could be required to file information returns with the IRS (the *"New Reporting Rules"*).

The New Reporting Rules could apply to a U.S. Holder (and to certain Foreign Holders who hold their Trust Securities in connection with a United States trade or business) if the Trust or the Company

were to enter into one or more "reportable transactions". The definition of "reportable transaction" is highly technical. It is not expected that the Trust or the Company will engage in activities that would give rise to any reportable transactions. If the Trust or the Company were to engage in any "reportable transaction", then, subject to certain exceptions and threshold limitations, a U.S. Holder or Foreign Holder may be required to file IRS Form 8886 with such holder's United States federal income tax return for each taxable year in which such "reportable transaction" affects such holder's taxable income, and to file a copy of such form with the IRS's Office of Tax Shelter Analysis. The Trust intends to provide to the holders of Trust Securities any information necessary to complete such form.

In addition, subject to certain significant exceptions, any holder of Trust Securities that recognizes a loss on a sale or exchange of such holder's Trust Securities may be required to file IRS Form 8886 in the manner described above if the loss exceeds certain thresholds and no exception applies.

**Prospective purchasers of Trust Securities are urged to consult their own tax advisors regarding the application to them of the New Reporting Rules with respect to an investment in the Trust Securities.**

### Foreign, State, and Local Taxes

Holders may be liable for foreign, state, and local taxes in the country, state, or locality in which they are resident or doing business or in a state or locality in which the Trust or the Company conducts or is deemed to conduct business. Because the tax laws of each country, state, and locality may differ, each prospective purchaser should consult its own tax advisors with respect to any taxes that may be payable as a result of an investment in the Trust Securities.

## ERISA CONSIDERATIONS

Section 406 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and Section 4975 of the Code prohibit pension, profit-sharing or other retirement plans and accounts subject to ERISA or Section 4975 of the Code and entities that are deemed to hold "plan assets" of any of the foregoing (each, a "Plan") from engaging in certain transactions with persons that are "parties in interest" under ERISA or "disqualified persons" under the Code with respect to such Plan. A violation of these "prohibited transaction" rules may result in an excise tax or other penalties and liabilities under ERISA and the Code for such persons or the fiduciaries of the Plan. In addition, Title I of ERISA also requires fiduciaries of a Plan subject to ERISA to make investments that are prudent, diversified and in accordance with the governing plan documents.

Certain transactions involving the Trust might be deemed to constitute prohibited transactions under ERISA and the Code with respect to a Plan that purchased Trust Securities or Series 2006-C Company Preferred Securities if assets of the Trust were deemed to be assets of the Plan. Under a regulation issued by the United States Department of Labor (the "Regulation"), the assets of the Trust would be treated as plan assets of a Plan for the purposes of ERISA and the Code only if the Plan acquired an "equity interest" in the Trust and none of the exceptions to plan assets contained in the Regulation was applicable. An equity interest is defined under the Regulation as an interest other than an instrument that is treated as indebtedness under applicable local law and that has no substantial equity features. The Series 2006-C Company Preferred Securities are not likely to be treated as indebtedness for purposes of the Regulation. As such, the Trust intends to prohibit the acquisition and holding of any Trust Security or Company Preferred Security or any interest in a Trust Security or Company Preferred Security by or on behalf of a Benefit Plan Investor (as defined below).

The term "Benefit Plan Investor" is defined in Section 3(42) of ERISA to include all employee benefit plans that are subject to Title I of ERISA, individual retirement accounts, Keogh Plans and other plans subject to Section 4975 of the Code, and entities whose underlying assets are deemed to include plan assets by reason of the investment in that entity by Benefit Plan Investors, such as group trusts, bank collective investment trusts, insurance company separate accounts, and certain insurance company general accounts.

By acquiring a Trust Security or Company Preferred Security (or any interest therein), each purchaser and transferee will be deemed to represent, warrant and covenant that, from the date of acquisition throughout the period of holding such Trust Security or Company Preferred Security (or interest therein), it is not, and it is not acquiring such Trust Security or Company Preferred Security (or interest therein) with the assets of a Benefit Plan Investor, except for an insurance company general account that represents, warrants and covenants that, at the time of acquisition and throughout the period it holds the securities, (i) it is eligible for and meets the requirements of Department of Labor Prohibited Transaction Class Exemption 95-60, (ii) less than 25% of the assets of such general account are (or represent) assets of a Benefit Plan Investor and (iii) it is not a person who has discretionary authority or control with respect to the assets of the Trust or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person and would not otherwise be excluded under 29 C.F.R. § 2510.3-101(f)(1).

Government sponsored plans are not subject to the fiduciary provisions of ERISA, and are also not subject to the prohibited transaction provisions under Section 4975 of the Code. However, federal, state or local laws or regulations governing the investment and management of the assets of such plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code discussed above and may include other limitations on permissible investments. Accordingly, fiduciaries of governmental plans, in consultation with their advisors, should consider the requirements of their respective pension codes with respect to purchase of a Trust Security or Company Preferred Security, as well as general fiduciary considerations.

Each purchaser and transferee of a Trust Security or Company Preferred Security will be required to represent and warrant (or, in certain circumstances, will be deemed to represent and

warrant) that, from the date of acquisition throughout the period of holding such Trust Security or Company Preferred Security (or interest therein), either (a) it is not a governmental plan, foreign plan, church plan or other plan subject to law that is substantially similar to the Section 406 of ERISA or Section 4975 of the Code ("Similar Law") or (b) its purchase and holding of the Trust Security or Company Preferred Security will not constitute or result in a non-exempt violation of Similar Law.

## RATINGS

It is expected that the Trust Securities will be rated "Baa2" by Moody's Investors Service, Inc. ("Moody's"), "BBB" by Standard & Poor's Rating Services, a Division of The McGraw-Hill Companies, Inc. ("S&P") and "A−" by Fitch, Inc. ("Fitch"). The ratings of the Trust Securities are not recommendations to purchase, hold or sell the Trust Securities, inasmuch as the ratings do not comment as to the market price or suitability for a particular purchaser. Nor do the ratings described above address the likelihood that a holder of Trust Securities will be able to sell such securities. The ratings are based on current information furnished to Moody's, S&P and Fitch by WMI, WMB, the Company and the Trust and information obtained from other sources. The ratings may be changed, suspended or withdrawn at any time as a result of changes in, or the unavailability of, such information. See "Risk Factors — Rating agencies may change rating methodologies, including their view on 'notching' practices".

## PLAN OF DISTRIBUTION

The Company, the Trust, WMI and the initial purchasers listed in the table below (the "Initial Purchasers") have entered into a purchase agreement with respect to the Trust Securities. Subject to certain conditions, each Initial Purchaser has severally agreed to purchase the amount (by liquidation preference) of Trust Securities indicated in the following table.

| Initial Purchasers | Liquidation Preference of Trust Securities |
| --- | --- |
| Credit Suisse Securities (USA) LLC | $112,500,000 |
| Goldman, Sachs & Co. | 112,500,000 |
| Lehman Brothers Inc. | 112,500,000 |
| Morgan Stanley & Co. Incorporated | 112,500,000 |
| Keefe, Bruyette & Woods Inc. | 25,000,000 |
| UBS Securities LLC | 25,000,000 |
| Total | $500,000,000 |

The Initial Purchasers are committed to take and pay for all of the securities being offered hereby, if any are taken. The initial offering price is set forth on the cover page of this offering circular. After the securities are released for sale, the Initial Purchasers may change the offering price and other selling terms.

The securities offered hereby have not been and will not be registered under the Securities Act. The Initial Purchasers have agreed that they will offer or sell the Trust Securities only to persons who are both "qualified institutional buyers" within the meaning of Rule 144A under the Securities Act and "qualified purchasers" within the meaning of Section 2(a)(51) under the Investment Company Act in transactions meeting the requirements of Rule 144A.

In connection with this Offering, the Initial Purchasers may purchase and sell securities in the open market. These transactions may include short sales, stabilizing transactions and purchases to cover positions created by short sales. Short sales involve the sale by the Initial Purchasers of a greater number of securities than they are required to purchase in this Offering. Stabilizing transactions consist of certain bids or purchases made for the purpose of preventing or retarding a decline in the market price of the securities while this Offering is in progress.

These activities by the Initial Purchasers may stabilize, maintain or otherwise affect the market price of the securities. As a result, the price of the securities may be higher than the price that otherwise might exist in the open market. If these activities are commenced, they may be discontinued by the Initial Purchasers at any time. These transactions may be effected in the over-the-counter market or otherwise.

Each of the Initial Purchasers has represented and agreed that:

- It has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of section 21 of the Financial Services and Markets Act 2000 (as amended) (the *"FSMA"*) to persons who have professional experience in matters relating to investments falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 or in circumstances in which section 21 of FSMA does not apply to the Trust; and

- It has complied, and will comply, with all applicable provisions of FSMA with respect to anything done by it in relation to the Trust Securities in, from or otherwise involving the United Kingdom.

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a *"Relevant Member State"*), each Initial Purchaser has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the *"Relevant Implementation Date"*) it has not made and will not make an offer of the securities being offered hereby to the public in that Relevant Member State prior to the publication of a prospectus in relation to the Trust Securities which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of securities to the public in that Relevant Member State at any time:

- to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

- to any legal entity which has two or more of (i) an average of at least 250 employees during the last financial year; (ii) a total balance sheet of more than € 43,000,000; and (iii) an annual net turnover of more than € 50,000,000, as shown in its last annual or consolidated accounts; or

- in any other circumstances which do not require the publication by the Trust of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of securities to the public" in relation to any securities in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the securities to be offered so as to enable an investor to decide to purchase or subscribe the securities, as the same may be varied in that Relevant Member State by any measure implementing the Prospectus Directive in that Relevant Member State and the expression Prospectus Directive means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

The Trust Securities offered hereby may not be offered or sold by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong), or (ii) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap. 32, Laws of Hong Kong), and no advertisement, invitation or document relating to the Trust Securities may be issued or may be in the

possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to securities which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder.

This offering circular has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this offering circular and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the Trust Securities may not be circulated or distributed, nor may the Trust Securities be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the *"SFA"*), (ii) to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the Trust Securities are subscribed or purchased under Section 275 by a relevant person which is: (a) a corporation (which is not an accredited investor) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or (b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor, shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest in that trust shall not be transferable for 6 months after that corporation or that trust has acquired the shares under Section 275 except: (1) to an institutional investor under Section 274 of the SFA or to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA; (2) where no consideration is given for the transfer; or (3) by operation of law.

The Trust Securities offered hereby have not been and will not be registered under the Securities and Exchange Law of Japan (the *"Japan Securities and Exchange Law"*) and each Initial Purchaser has agreed that it will not offer or sell any Trust Securities, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organized under the laws of Japan), or to others for re-offering or resale, directly or indirectly, in Japan or to a resident of Japan, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the Japan Securities and Exchange Law and any other applicable laws, regulations and ministerial guidelines of Japan.

WMI, the Company and the Trust have agreed in the purchase agreement, subject to certain exceptions, that for a period of 180 days after the date of this offering circular, neither they, nor any of their subsidiaries or other affiliates over which they exercise management or voting control, nor any person acting on their behalf will, without the prior written consent of Goldman, Sachs & Co., offer, sell, contract to sell or otherwise dispose of any securities that are substantially similar to the Trust Securities.

WMI and the Company have agreed to indemnify the Initial Purchasers against certain liabilities, including liabilities under the Securities Act.

Certain of the Initial Purchasers and their respective affiliates have, from time to time, performed, and may in the future perform, various financial advisory and investment banking services for the Company, for which they received or will receive customary fees and expenses.

## NOTICE TO CANADIAN RESIDENTS

### Resale Restrictions

The distribution of the Trust Securities in Canada is being made only on a private placement basis exempt from the requirement that we prepare and file a prospectus with the securities regulatory authorities in each province where trades of Trust Securities are made. Any resale of the Trust Securities in Canada must be made under applicable securities laws which will vary depending on the relevant jurisdiction, and which may require resales to be made under available statutory exemptions or under a discretionary exemption granted by the applicable Canadian securities regulatory authority. Purchasers are advised to seek legal advice prior to any resale of the Trust Securities.

### Representations of Purchasers

By purchasing Trust Securities in Canada and accepting a purchase confirmation a purchaser is representing to us and the dealer from whom the purchase confirmation is received that:

- the purchaser is entitled under applicable provincial securities laws to purchase the Trust Securities without the benefit of a prospectus qualified under those securities laws,

- where required by law, that the purchaser is purchasing as principal and not as agent,

- the purchaser has reviewed the text above under Resale Restrictions, and

- the purchaser acknowledges and consents to the provision of specified information concerning its purchase of the Trust Securities to the regulatory authority that by law is entitled to collect the information.

Further details concerning the legal authority for this information is available on request.

### Rights of Action — Ontario Purchasers Only

Under Ontario securities legislation, certain purchasers who purchase a security offered by this Offering Circular during the period of distribution will have a statutory right of action for damages, or while still the owner of the Trust Securities, for rescission against us in the event that this Offering Circular contains a misrepresentation without regard to whether the purchaser relied on the misrepresentation. The right of action for damages is exercisable not later than the earlier of 180 days from the date the purchaser first had knowledge of the facts giving rise to the cause of action and three years from the date on which payment is made for the Trust Securities. The right of action for rescission is exercisable not later than 180 days from the date on which payment is made for the Trust Securities. If a purchaser elects to exercise the right of action for rescission, the purchaser will have no right of action for damages against us. In no case will the amount recoverable in any action exceed the price at which the Trust Securities were offered to the purchaser and if the purchaser is shown to have purchased the securities with knowledge of the misrepresentation, we will have no liability. In the case of an action for damages, we will not be liable for all or any portion of the damages that are proven to not represent the depreciation in value of the Trust Securities as a result of the misrepresentation relied upon. These rights are in addition to, and without derogation from, any other rights or remedies available at law to an Ontario purchaser. The foregoing is a summary of the rights available to an Ontario purchaser. Ontario purchasers should refer to the complete text of the relevant statutory provisions.

### Enforcement of Legal Rights

All of our directors and officers as well as the experts named herein may be located outside of Canada and, as a result, it may not be possible for Canadian purchasers to effect service of process within Canada upon us or those persons. All or a substantial portion of our assets and the assets of those persons may be located outside of Canada and, as a result, it may not be possible to satisfy a

judgment against us or those persons in Canada or to enforce a judgment obtained in Canadian courts against us or those persons outside of Canada.

## Taxation and Eligibility for Investment

Canadian purchasers of Trust Securities should consult their own legal and tax advisors with respect to the tax consequences of an investment in the Trust Securities in their particular circumstances and about the eligibility of the Trust Securities for investment by the purchaser under relevant Canadian legislation.

# VALIDITY OF SECURITIES

The validity of the Trust Securities will be passed upon for WMI and the Initial Purchasers by Richards, Layton & Finger, P.A., Wilmington, Delaware. The validity of the Series 2006-C Company Preferred Securities will be passed upon for the Company by Richards, Layton & Finger, P.A., special Delaware counsel for the Company, for WMI by Mayer, Brown, Rowe & Maw LLP, New York, New York, and for the Initial Purchasers by Sullivan & Cromwell LLP, New York, New York. The validity of the Depositary Shares and of the Series L WMI Preferred Stock will be passed upon for WMI by Mayer, Brown, Rowe & Maw LLP and by Heller Ehrman LLP, Seattle, Washington, and for the Initial Purchasers by Sullivan & Cromwell LLP. Mayer, Brown, Rowe & Maw LLP and Sullivan & Cromwell LLP will rely upon the opinion of Richards, Layton & Finger, P.A., as to matters of Delaware law, and upon the opinion of Heller Ehrman LLP as to matters of Washington law.

# ADDITIONAL INFORMATION

## Independent Accountants

The independent registered public accountants of the Company will be Deloitte & Touche LLP. Deloitte & Touche LLP are also the independent registered public accountants for WMI and WMB.

## No Material Adverse Change

Except as disclosed in this offering circular, there has been no adverse change in the financial position of the Company, the Trust, WMB or WMI since September 30, 2006 or their respective dates of establishment (which was December 4, 2006 in the case of the Trust), that would be deemed material in the context of the issue and sale of the Trust Securities in this Offering.

## *Recent Developments*

## *Other Events*

On October 1, 2006, WMI completed its acquisition of Commercial Capital Bancorp, Inc. ("Commercial Capital") in a cash transaction with an aggregate purchase price of approximately $1 billion. Commercial Capital was a multifamily and small commercial real estate lending institution located in Southern California with $5.5 billion of total assets at December 31, 2005. In connection with the acquisition, Commercial Capital Bank, FSB, the federal savings bank subsidiary of Commercial Capital, merged with and into WMB.

## *Litigation*

The following litigation is in relation to WMI. WMB, the Company, Asset Trust I, Asset Trust II and the Trust have not been named as defendants in any of the following lawsuits and, on that basis, they do not expect such lawsuits materially affect their respective operations or financial results.

*South Ferry L.P. #2 v. Killinger et al., No. CV04-1599C (W.D. Wa., Filed Jul. 19, 2004)* (the "Securities Action"). In July 2004, WMI and a number of its officers were named as defendants in a

series of cases alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "*Exchange Act*"), Rule 10b-5 thereunder and Section 20(a) of the Exchange Act. In brief, the plaintiffs in the Securities Action allege, on behalf of a putative class of purchasers of WMI securities from April 15, 2003 through June 28, 2004, that in various public statements the defendants purportedly made misrepresentations and failed to disclose material facts concerning, among other things, alleged internal systems problems and hedging issues.

The defendants moved to dismiss the Securities Action on May 17, 2005. After briefing, but without oral argument, the court on November 17, 2005 denied the motion in principal part; however, the court dismissed the claims against certain of the individual defendants, dismissed claims pleaded on behalf of sellers of put options on WMI stock, and concluded that the plaintiffs could not rely on supposed violations of accounting standards to support their claims. The remaining defendants subsequently moved for reconsideration or, in the alternative, certification of the opinion for interlocutory appeal to the United States Court of Appeals for the Ninth Circuit. The District Court denied the motion for reconsideration, but on March 6, 2006, granted the motion for certification. At the same time, the District Court stayed further proceedings before it pending the outcome of any proceedings before the Ninth Circuit.

The defendants thereafter moved the Ninth Circuit to have the Appellate Court accept the case for interlocutory review of the District Court's original order denying the motion to dismiss. On June 9, 2006, the Ninth Circuit granted the defendants' motion, indicating that the Court will hear the merits of the defendants' appeal. The defendants filed their initial brief on September 25, 2006. Pursuant to an updated, stipulated briefing schedule, the plaintiffs' responsive brief is due in December 2006, and the defendants' reply will be filed in early February 2007.

*Lee Family Investments, by and through its Trustee W. B. Lee, Derivatively and on behalf of Nominal Defendant Washington Mutual, Inc. v. Killinger et al, No. CV05-2121C (W.D. Wa., Filed Nov. 29, 2005)* (the *"Derivative Action"*). On November 29, 2005, 12 days after the District Court denied the motion to dismiss the Securities Action, a separate plaintiff filed in Washington State Superior Court a derivative shareholder lawsuit purportedly asserting claims for the benefit of WMI. The case was removed to federal court, where it is now pending. The defendants in the Derivative Action include those individuals remaining as defendants in the Securities Action, as well as those of WMI's current independent directors who were directors at any time from April 15, 2003 through June 2004. The allegations in the Derivative Action mirror those in the Securities Action, but seek relief based on claims that the independent director defendants failed properly to respond to the misrepresentations alleged in the Securities Action and that the filing of that action has caused WMI to expend sums to defend itself and the individual defendants and to conduct internal investigations related to the underlying claims. At the end of February 2006, the parties submitted a stipulation to the court that the matter be stayed pending the outcome of the Securities Action. On March 2, 2006, the court entered an order pursuant to that stipulation, staying the Derivative Action in its entirety.

**Governing Law**

The LLC Agreement, the Trust Agreement, the Trust Securities and the Series 2006-C Company Preferred Securities will be governed by, and construed in accordance with, the laws of the State of Delaware. The Series L WMI Preferred Stock will be governed by, and construed in accordance with, the laws of the State of Washington. The Depositary Shares will be governed by, and construed in accordance with, the laws of the State of New York.

# APPENDIX A

## Washington Mutual Preferred Funding LLC Financials

### Statements of Income
### (Unaudited)

| | Three Months Ended | | From Inception (February 3 2006) through |
| | September 30, 2006 | June 30, 2006 | September 30, 2006 |
|---|---|---|---|
| **Interest Income** | | | |
| Interest income . . . . . . . . . . . . . . . . . . . . . . | $73,239,961 | $76,264,847 | $170,678,827 |
| Provision for loan losses (reversal) . . . . . . . . | 1,221,556 | (9,009,543) | (7,901,862) |
| Net interest income after reversal of provision for loan losses . . . . . . . . . . . . | 72,018,405 | 85,274,390 | 178,580,689 |
| **Noninterest Expense** | | | |
| Servicing fee . . . . . . . . . . . . . . . . . . . . . . . . | 1,543,224 | 1,624,887 | 4,284,915 |
| Other expenses . . . . . . . . . . . . . . . . . . . . . . | 16,138 | 12,491 | 57,219 |
| Total noninterest expense . . . . . . . . . . . . | 1,559,362 | 1,637,378 | 4,342,134 |
| **Net Income** . . . . . . . . . . . . . . . . . . . . . . . . | $70,459,043 | $83,637,012 | $174,238,555 |

## Statements of Financial Condition
## (Unaudited)

|  | As of September 30, 2006 | As of June 30, 2006 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents............................ | $ 48,987,534 | $ 51,448,950 |
| Loans held in portfolio................................ | 4,841,677,556 | 5,055,251,106 |
| Allowance for loan losses ............................. | (19,111,099) | (17,975,647) |
| Total loans held in portfolio, net of allowance for loan losses ......................................... | 4,822,566,457 | 5,037,275,459 |
| Receivable from affiliates ............................. | 67,775,618 | 81,191,697 |
| Other assets....................................... | 13,864,469 | 14,307,015 |
| **Total assets** ........................................ | $4,953,194,078 | $5,184,223,121 |
| **Liabilities** | | |
| Payable to affiliates................................. | $ 357,217 | $ 65,762,472 |
| Other liabilities .................................... | 24,518 | 556,192 |
| Total liabilities ................................. | 381,735 | 66,318,664 |
| **Member Interests** | | |
| Common securities.................................. | 2,976,605,193 | 3,134,721,402 |
| Preferred securities................................. | 1,956,851,791 | 1,956,838,150 |
| Retained earnings.................................. | 19,355,359 | 26,344,905 |
| Total member interests ........................... | 4,952,812,343 | 5,117,904,457 |
| **Total Liabilities and Member Interests** ................... | $4,953,194,078 | $5,184,223,121 |

## Statements of Member Interests
## (Unaudited)

|  | Common Securities | Preferred Securities | Retained Earnings | Total |
|---|---|---|---|---|
| **BALANCE, February 3, 2006**................ | $ — | $ — | $ — | $ — |
| Net income............. |  |  | 20,142,500 | 20,142,500 |
| Common securities issued.............. | 3,423,697,341 |  |  | 3,423,697,341 |
| Preferred securities issued.............. |  | 1,957,371,824 |  | 1,957,371,824 |
| **BALANCE, March 31, 2006**................. | $3,423,697,341 | $1,957,371,824 | $ 20,142,500 | $5,401,211,665 |
| Net income............. |  |  | 83,637,012 | 83,637,012 |
| Cash dividends paid on common and preferred securities ........... |  |  | (77,434,607) | (77,434,607) |
| Common securities redeemed ........... | (288,975,939) |  |  | (288,975,939) |
| Preferred securities costs capitalized........... |  | (533,674) |  | (533,674) |
| **BALANCE, June 30, 2006** .. | $3,134,721,402 | $1,956,838,150 | $ 26,344,905 | $5,117,904,457 |
| Net income............. |  |  | 70,459,043 | 70,459,043 |
| Cash dividends paid on common and preferred securities ........... |  |  | (77,448,589) | (77,448,589) |
| Common securities redeemed ........... | (158,116,209) |  |  | (158,116,209) |
| Preferred securities costs capitalized........... |  | 13,640 |  | 13,640 |
| **BALANCE, September 30, 2006**................. | $2,976,605,193 | $1,956,851,790 | $ 19,355,359 | $4,952,812,342 |

(This page intentionally left blank)

## Portfolio Data for Asset Trust I*

### Distribution by Principal Balance

| Distribution by Current Principal Balance | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the HELs Information Cut-Off Date |
|---|---|---|---|
| $0.00 - $49,999 . . . . . . . . . . . | 11,473 | $ 426,882,496 | 9.00% |
| 50,000 - 74,999 . . . . . . . . . . | 12,569 | 789,258,994 | 16.63 |
| 75,000 - 99,999 . . . . . . . . . | 9,982 | 866,844,454 | 18.27 |
| 100,000 - 199,999 . . . . . . . . . | 14,775 | 1,993,466,033 | 42.01 |
| 200,000 - 299,999 . . . . . . . . . | 1,866 | 434,076,088 | 9.15 |
| 300,000 - 499,999 . . . . . . . . . | 556 | 203,013,466 | 4.28 |
| Greater than $500,000 . . . . . . | 53 | 32,050,538 | 0.68 |
| **Total:** . . . . . . . . . . . . . . . . . . | 51,274 | $4,745,592,069 | 100.00% |

### Distribution by Gross Rate

| Distribution by Current Gross Rate | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the HELs Information Cut-Off Date |
|---|---|---|---|
| 4.00% - 4.99% . . . . . . . . . . . . | 15 | $ 1,893,887 | 0.04% |
| 5.00 - 5.99 . . . . . . . . . . . . . . . | 23,915 | 2,326,352,440 | 49.02 |
| 6.00 - 6.99 . . . . . . . . . . . . . . . | 24,887 | 2,239,513,168 | 47.19 |
| 7.00 - 7.99 . . . . . . . . . . . . . . . | 2,181 | 159,631,709 | 3.36 |
| Greater than 7.99% . . . . . . . . | 276 | 18,200,865.00 | 0.38 |
| **Total:** . . . . . . . . . . . . . . . . . . | 51,274 | $4,745,592,069 | 100.00% |

### Distribution by Remaining Months to Maturity

| Distribution by Remaining Months to Maturity | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the HELs Information Cut-Off Date |
|---|---|---|---|
| Less than 61 . . . . . . . . . . . . . . | 978 | $ 33,769,835 | 0.71% |
| 61 - 120 . . . . . . . . . . . . . . . . | 5,079 | 271,469,316 | 5.72 |
| 121 - 180 . . . . . . . . . . . . . . . | 11,809 | 885,273,437 | 18.65 |
| 181 - 240 . . . . . . . . . . . . . . . | 26,131 | 2,676,314,529 | 56.40 |
| 241 - 300 . . . . . . . . . . . . . . . | 304 | 33,245,146 | 0.70 |
| 301 - 360 . . . . . . . . . . . . . . . | 6,973 | 845,519,806 | 17.82 |
| **Total:** . . . . . . . . . . . . . . . . . . | 51,274 | $4,745,592,069 | 100.00% |

---

* All information in this Appendix B is as of November 1, 2006 *(the "HELs Information Cut-off Date")*.   Due to rounding, the percentages shown may not precisely total 100.00%.

**Distribution by Year of Origination**

| Year of Origination | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the HELs Information Cut-Off Date |
|---|---|---|---|
| 1998 - 2001.............. | 262 | $ 19,273,503 | 0.41% |
| 2002................... | 5,049 | 471,398,364 | 9.93 |
| 2003................... | 24,478 | 2,320,903,194 | 48.91 |
| 2004................... | 14,757 | 1,388,482,518 | 29.26 |
| 2005................... | 6,659 | 540,453,960 | 11.39 |
| 2006................... | 69 | 5,080,529 | 0.11 |
| **Total:** .................. | 51,274 | $4,745,592,069 | 100.00% |

**Distribution by FICO Score**[1]

| Distribution by Credit Score | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the HELs Information Cut-Off Date |
|---|---|---|---|
| Not Available.............. | 127 | $ 10,378,701 | 0.22% |
| Less Than 600 ............ | 1,006 | 86,527,506 | 1.82 |
| 600 - 649 ................ | 1,655 | 149,812,400 | 3.16 |
| 650 - 699 ................ | 5,221 | 485,446,788 | 10.23 |
| 700 - 749 ................ | 10,138 | 982,182,600 | 20.70 |
| 750 - 799 ................ | 19,594 | 1,863,840,000 | 39.28 |
| 800 - 849 ................ | 13,533 | 1,167,404,073 | 24.60 |
| **Total:** .................. | 51,274 | $4,745,592,069 | 100.00% |

[1] "FICO Score" means a statistical credit score obtained by WMB and many other mortgage lenders in connection with a loan application to help assess a borrower's creditworthiness. A FICO Score is generated by models developed by a third party, Fair, Isaac & Co., and made available to WMB through three national consumer reporting agencies. The FICO Score is based on a borrower's historical credit data, including, among other things, payment history, delinquencies on accounts, levels of outstanding indebtedness, length of credit history, types of credit and bankruptcy experience. A higher FICO Score indicates a more favorable credit rating.

**Distribution by Property Type**

| Distribution by Property Type | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the HELs Information Cut-Off Date |
|---|---|---|---|
| Single Family.............. | 47,255 | $4,366,203,016 | 92.01% |
| Townhouse ............... | 1,899 | 224,846,136 | 4.74 |
| Condominium ............. | 2,040 | 148,383,641 | 3.13 |
| Manufactured Housing....... | 80 | 6,159,275 | 0.13 |
| **Total:** .................. | 51,274 | $4,745,592,069 | 100.00% |

**Distribution by State**

| Distribution by State | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the HELs Information Cut-Off Date |
|---|---|---|---|
| Texas .................... | 26,568 | $2,363,770,040 | 49.81% |
| California................ | 13,657 | 1,414,957,367 | 29.82 |
| Florida................... | 4,462 | 337,660,925 | 7.12 |
| New York................. | 2,291 | 241,843,351 | 5.10 |
| Washington............... | 1,077 | 97,841,552 | 2.06 |
| New Jersey............... | 643 | 68,206,336 | 1.44 |
| Oregon .................. | 709 | 64,647,690 | 1.36 |
| Georgia.................. | 413 | 34,919,096 | 0.74 |
| Indiana.................. | 309 | 24,733,681 | 0.52 |
| Arizona.................. | 268 | 22,404,151 | 0.47 |
| Illinois................... | 222 | 21,002,437 | 0.44 |
| Other.................... | 655 | 53,605,443 | 1.13 |
| **Total:** .................... | 51,274 | $4,745,592,069 | 100.00% |

**Distribution by Current Loan-to-Value Ratio[1]**

| Distribution by Current LTV | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the HELs Information Cut-Off Date |
|---|---|---|---|
| Not available .............. | 1 | $ 52,174 | 0.00% |
| Less than 10.01% .......... | 1,014 | 34,739,587 | 0.73 |
| 10.01 - 20.00.............. | 3,847 | 194,963,617 | 4.11 |
| 20.01 - 30.00.............. | 5,445 | 364,644,064 | 7.68 |
| 30.01 - 40.00.............. | 7,166 | 574,136,418 | 12.10 |
| 40.01 - 50.00.............. | 8,012 | 726,331,695 | 15.31 |
| 50.01 - 60.00.............. | 8,819 | 909,022,834 | 19.16 |
| 60.01 - 70.00.............. | 8,628 | 940,732,136 | 19.82 |
| 70.01 - 80.00.............. | 7,812 | 937,707,065 | 19.76 |
| 80.01 - 90.00.............. | 527 | 62,930,884 | 1.33 |
| Greater than 90% .......... | 3 | 331,595 | 0.01 |
| **Total:** .................... | 51,274 | $4,745,592,069 | 100.00% |

(1) The current loan-to-value ratio of a mortgage loan is a fraction, the numerator of which is the outstanding principal balance of the mortgage loan and the denominator of which is the collateral value, generally at a time of origination of the related mortgage property, expressed as a percentage.

(This page intentionally left blank)

## APPENDIX C

### Portfolio Data for Asset Trust II*

**Distribution by Principal Balance**

| Balance | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the Option ARMs Information Cut-Off Date |
|---|---|---|---|
| $0 - $49,999 . . . . . . . . | 3 | $ 123,192 | 0.00% |
| 50,000 - 74,999 . . . . . | 3 | 157,789 | 0.01 |
| 75,000 - 99,999 . . . . . | 4 | 361,405 | 0.01 |
| 100,000 - 199,999 . . . . . | 1,488 | 223,284,977 | 7.70 |
| 200,000 - 299,999 . . . . . | 1,174 | 290,599,488 | 10.02 |
| 300,000 - 499,999 . . . . . | 1,753 | 702,358,119 | 24.22 |
| 500,000 - 999,999 . . . . . | 1,424 | 948,539,605 | 32.71 |
| Greater than $1,000,000 . . . . . . . . | 450 | 734,452,636 | 25.33 |
| **Total:** . . . . . . . . . . . . . . | 6,299 | $2,899,877,211 | 100.00% |

**Distribution by Current Rate**

| Current Rate | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the Option ARMs Information Cut-Off Date |
|---|---|---|---|
| 6.00% - 6.99% . . . . . . . | 550 | $ 309,256,833 | 10.66% |
| 7.00 - 7.99 . . . . . . . . | 5,204 | 2,346,978,333 | 80.93 |
| 8.00 - 8.99 . . . . . . . . | 539 | 240,955,264 | 8.31 |
| 9.00 - 9.99 . . . . . . . . | 6 | 2,686,781 | 0.09 |
| **Total:** . . . . . . . . . . . . . . | 6,299 | $2,899,877,211 | 100.00% |

**Distribution by Remaining Months to Maturity**

| (Months) Remaining Term | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the Option ARMs Information Cut-Off Date |
|---|---|---|---|
| 121 - 180 . . . . . . . . . . . | 2 | $ 404,525 | 0.01% |
| 241 - 300 . . . . . . . . . . . | 306 | 92,784,312 | 3.20 |
| 301 - 360 . . . . . . . . . . . | 5,235 | 2,393,652,659 | 82.54 |
| Greater than 360. . . . . . | 756 | 413,035,715 | 14.24 |
| **Total:** . . . . . . . . . . . . . . | 6,299 | $2,899,877,211 | 100.00% |

* All information in this Appendix C is as of November 14, 2006 *(the "Option ARMs Information Cut-off Date")*. Due to rounding, the percentages shown may not precisely total 100.00%.

**Distribution by Year of Origination**

| Year of Origination | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the Option ARMs Information Cut-Off Date |
|---|---|---|---|
| 1997 - 2001 ......... | 319 | $ 95,801,148 | 3.30% |
| 2002 .............. | 119 | 51,542,000 | 1.78 |
| 2003 .............. | 1,691 | 586,143,229 | 20.21 |
| 2004 .............. | 1,140 | 524,452,411 | 18.09 |
| 2005 .............. | 2,666 | 1,417,106,417 | 48.87 |
| 2006 .............. | 364 | 224,832,005 | 7.75 |
| **Total:** .............. | 6,299 | $2,899,877,211 | 100.00% |

**Distribution by FICO Score[1]**

| FICO Score | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the Option ARMs Information Cut-Off Date |
|---|---|---|---|
| Not Available......... | 34 | $ 16,821,913 | 0.58% |
| Less than 600 ........ | 49 | 31,692,537 | 1.09 |
| 600 - 649 .......... | 159 | 77,036,788 | 2.66 |
| 650 - 699 .......... | 677 | 338,386,488 | 11.67 |
| 700 - 749 .......... | 1,744 | 847,714,103 | 29.23 |
| 750 - 799 .......... | 2,665 | 1,208,966,733 | 41.69 |
| 800 - 849 .......... | 971 | 379,258,649 | 13.08 |
| **Total:** .............. | 6,299 | $2,899,877,211 | 100.00% |

(1) "FICO Score" means a statistical credit score obtained by WMB and many other mortgage lenders in connection with a loan application to help assess a borrower's creditworthiness. A FICO Score is generated by models developed by a third party, Fair, Isaac & Co., and made available to WMB through three national consumer reporting agencies. The FICO Score is based on a borrower's historical credit data, including, among other things, payment history, delinquencies on accounts, levels of outstanding indebtedness, length of credit history, types of credit and bankruptcy experience. A higher FICO Score indicates a more favorable credit rating.

**Distribution by Property Type**

| Property Type | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the Option ARMs Information Cut-Off Date |
|---|---|---|---|
| Single Family......... | 3,680 | $1,806,277,215 | 62.29% |
| Planned Unit Development ....... | 999 | 514,763,074 | 17.75 |
| Condo.............. | 820 | 285,741,163 | 9.85 |
| 2-Unit Multifamily...... | 452 | 148,946,132 | 5.14 |
| 3-4 Unit Multifamily .... | 308 | 129,237,006 | 4.46 |
| Co-Op.............. | 26 | 9,584,673 | 0.33 |
| Townhouse .......... | 14 | 5,327,949 | 0.18 |
| **Total:** .............. | 6,299 | $2,899,877,211 | 100.00% |

**Distribution by State**

| State | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the Option ARMs Information Cut-Off Date |
|---|---|---|---|
| California. . . . . . . . . . . . | 4,078 | $2,217,392,437 | 76.47% |
| Florida. . . . . . . . . . . . . | 340 | 100,939,760 | 3.48 |
| New York . . . . . . . . . . | 176 | 92,417,088 | 3.19 |
| Colorado . . . . . . . . . . . | 278 | 62,673,994 | 2.16 |
| Massachusetts . . . . . . . | 140 | 47,107,708 | 1.62 |
| New Jersey . . . . . . . . . | 109 | 38,462,342 | 1.33 |
| Virginia . . . . . . . . . . . . | 90 | 36,188,063 | 1.25 |
| Michigan . . . . . . . . . . . | 139 | 31,082,627 | 1.07 |
| Illinois . . . . . . . . . . . . . | 119 | 30,797,409 | 1.06 |
| Connecticut . . . . . . . . . | 53 | 25,891,739 | 0.89 |
| Other. . . . . . . . . . . . . . | 777 | 216,924,043 | 7.48 |
| **Total:** . . . . . . . . . . . . . | 6,299 | $2,899,877,211 | 100.00% |

**Distribution by Current Loan-to-Value Ratio[1]**

| Current Loan-to-Value Ratio | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the Option ARMs Information Cut-Off Date |
|---|---|---|---|
| 0.001% - 10.000% . . . | 4 | $ 397,701 | 0.01% |
| 10.001 - 20.000 . . . . | 31 | 10,488,177 | 0.36 |
| 20.001 - 30.000 . . . . | 79 | 23,859,784 | 0.82 |
| 30.001 - 40.000 . . . . | 163 | 61,548,579 | 2.12 |
| 40.001 - 50.000 . . . . | 354 | 140,142,608 | 4.83 |
| 50.001 - 60.000 . . . . | 592 | 295,423,876 | 10.19 |
| 60.001 - 70.000 . . . . | 1,372 | 682,081,633 | 23.52 |
| 70.001 - 80.000 . . . . | 3,370 | 1,565,064,304 | 53.97 |
| 80.001 - 90.000 . . . . | 330 | 120,131,629 | 4.14 |
| 90.001 - 100.000 . . . . | 4 | 738,919 | 0.03 |
| **Total:** . . . . . . . . . . . . . | 6,299 | $2,899,877,211 | 100.00% |

(1) The current loan-to-value ratio of a mortgage loan is a fraction, the numerator of which is the outstanding principal balance of the mortgage loan and the denominator of which is the collateral value, generally at a time of origination of the related mortgage property, expressed as a percentage.

(This page intentionally left blank)

# APPENDIX D

## Portfolio Data for Asset Trust I And Asset Trust II, Combined*

### *Distribution by Principal Balance*

| Balance | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the Combined Information Cut-Off Date |
|---|---|---|---|
| $0 -$49,999 . . . . . . . . . . . | 11,476 | $ 427,005,687 | 5.59% |
| 50,000 - 74,999 . . . . . . . | 12,572 | 789,416,784 | 10.33 |
| 75,000 - 99,999 . . . . . . . | 9,986 | 867,205,859 | 11.34 |
| 100,000 - 199,999 . . . . . . . | 16,263 | 2,216,751,010 | 28.99 |
| 200,000 - 299,999 . . . . . . . | 3,040 | 724,675,576 | 9.48 |
| 300,000 - 499,999 . . . . . . . | 2,309 | 905,371,584 | 11.84 |
| 500,000 - 999,999 . . . . . . . | 1,477 | 980,590,143 | 12.83 |
| Greater than $1,000,000 . . | 450 | 734,452,636 | 9.61 |
| **Total:** . . . . . . . . . . . . . . . . . | 57,573 | $7,645,469,280 | 100.00% |

### *Distribution by Current Rate*

| Current Rate | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the Combined Information Cut-Off Date |
|---|---|---|---|
| 4.00% - 4.99% . . . . . . . . | 15 | $ 1,893,887 | 0.02% |
| 5.00 - 5.99 . . . . . . . . . . | 23,915 | 2,326,352,440 | 30.43 |
| 6.00 - 6.99 . . . . . . . . . . | 25,437 | 2,548,770,001 | 33.34 |
| 7.00 - 7.99 . . . . . . . . . . | 7,385 | 2,506,610,041 | 32.79 |
| 8.00 - 8.99 . . . . . . . . . . | 761 | 255,536,642 | 3.34 |
| 9.00 - 9.99 . . . . . . . . . . | 35 | 4,781,275 | 0.06 |
| 10.00 - 10.99 . . . . . . . . . | 21 | 1,321,303 | 0.02 |
| 11.00 - 11.99 . . . . . . . . . | 4 | 203,689 | 0.00 |
| **Total:** . . . . . . . . . . . . . . . . . | 57,573 | $7,645,469,280 | 100.00% |

### *Distribution by Remaining Months to Maturity*

| Distribution by Remaining Months to Maturity | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the Combined Information Cut-Off Date |
|---|---|---|---|
| Less than 61. . . . . . . . . . | 978 | $ 33,769,835 | 0.44% |
| 61 - 120 . . . . . . . . . . . . . | 5,079 | 271,469,316 | 3.55 |
| 121 - 180 . . . . . . . . . . . . . | 11,811 | 885,677,962 | 11.58 |
| 181 - 240 . . . . . . . . . . . . . | 26,131 | 2,676,314,529 | 35.01 |
| 241 - 300 . . . . . . . . . . . . . | 610 | 126,029,457 | 1.65 |
| 301 - 360 . . . . . . . . . . . . . | 12,208 | 3,239,172,465 | 42.37 |
| Greater than 360 . . . . . . . . | 756 | 413,035,715 | 5.40 |
| **Total:** . . . . . . . . . . . . . . . . . | 57,573 | $7,645,469,280 | 100.00% |

---

\* All information in this Appendix D is as of November 1, 2006 for the HELs and November 14, 2006 for the Option ARMs (*the "Combined Information Cut-off Date"*). Due to rounding, the percentages shown may not precisely total 100.00%.

## Distribution by Year of Origination

| Year of Origination | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the Combined Information Cut-Off Date |
|---|---|---|---|
| 1997 - 2002 . . . . . . . . . . . | 5,749 | $ 638,015,016 | 8.35% |
| 2003. . . . . . . . . . . . . . . | 26,169 | 2,907,046,423 | 38.02 |
| 2004. . . . . . . . . . . . . . . | 15,897 | 1,912,934,930 | 25.02 |
| 2005. . . . . . . . . . . . . . . | 9,325 | 1,957,560,378 | 25.60 |
| 2006. . . . . . . . . . . . . . . | 433 | 229,912,534 | 3.01 |
| **Total:** . . . . . . . . . . . . . . . | 57,573 | $7,645,469,280 | 100.00% |

## Distribution by FICO Score[1]

| FICO Score | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the Combined Information Cut-Off Date |
|---|---|---|---|
| Not Available . . . . . . . . . | 161 | $ 27,200,615 | 0.36% |
| Less than 600 . . . . . . . . . | 1,055 | 118,220,043 | 1.55 |
| 600-649 . . . . . . . . . . . . . | 1,814 | 226,849,188 | 2.97 |
| 650-699 . . . . . . . . . . . . . | 5,898 | 823,833,276 | 10.78 |
| 700-749 . . . . . . . . . . . . . | 11,882 | 1,829,896,703 | 23.93 |
| 750-799 . . . . . . . . . . . . . | 22,259 | 3,072,806,733 | 40.19 |
| 800-849 . . . . . . . . . . . . . | 14,504 | 1,546,662,722 | 20.23 |
| **Total:** . . . . . . . . . . . . . . . | 57,573 | $7,645,469,280 | 100.00% |

(1) "FICO Score" means a statistical credit score obtained by WMB and many other mortgage lenders in connection with a loan application to help assess a borrower's creditworthiness. A FICO Score is generated by models developed by a third party, Fair, Isaac & Co., and made available to WMB through three national consumer reporting agencies. The FICO Score is based on a borrower's historical credit data, including, among other things, payment history, delinquencies on accounts, levels of outstanding indebtedness, length of credit history, types of credit and bankruptcy experience. A higher FICO Score indicates a more favorable credit rating.

## Distribution by Property Type

| Property Type | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the Combined Information Cut-Off Date |
|---|---|---|---|
| Single Family . . . . . . . . . . . . . | 50,935 | $6,172,480,231 | 80.73% |
| Condominium . . . . . . . . . . . . | 2,860 | 434,124,804 | 5.68 |
| Townhouse . . . . . . . . . . . . . . | 1,913 | 230,174,085 | 3.01 |
| Planned Unit Development. . . | 999 | 514,763,074 | 6.73 |
| 2-Unit Multifamily . . . . . . . . . . | 452 | 148,946,132 | 1.95 |
| 3-4 Unit Multifamily. . . . . . . . . | 308 | 129,237,006 | 1.69 |
| Manufactured Housing . . . . . . | 80 | 6,159,275 | 0.08 |
| Co-op . . . . . . . . . . . . . . . . . | 26 | 9,584,673 | 0.13 |
| **Total:** . . . . . . . . . . . . . . . . . | 57,573 | $7,645,469,280 | 100.00% |

### Distribution by State

| State | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the Combined Information Cut-Off Date |
|---|---|---|---|
| California . . . . . . . . . . . . . . | 17,735 | $3,632,349,804 | 47.51% |
| Texas . . . . . . . . . . . . . . . . | 26,625 | 2,380,500,687 | 31.14 |
| Florida . . . . . . . . . . . . . . . | 4,802 | 438,600,685 | 5.74 |
| New York . . . . . . . . . . . . . | 2,467 | 334,260,439 | 4.37 |
| Washington . . . . . . . . . . . | 1,167 | 123,265,229 | 1.61 |
| New Jersey . . . . . . . . . . . | 752 | 106,668,678 | 1.40 |
| Oregon . . . . . . . . . . . . . . . | 745 | 70,698,840 | 0.92 |
| Colorado . . . . . . . . . . . . . | 357 | 69,932,816 | 0.91 |
| Illinois . . . . . . . . . . . . . . . | 341 | 51,799,845 | 0.68 |
| Georgia . . . . . . . . . . . . . . | 448 | 48,826,824 | 0.64 |
| Other . . . . . . . . . . . . . . . . | 2,134 | 388,565,433 | 5.08 |
| **Total:** . . . . . . . . . . . . . . . | 57,573 | $7,645,469,280 | 100.00% |

### Distribution by Current Loan-to-Value Ratio[1]

| Current Loan-to-Value Ratio | Number of Initial Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Aggregate Unpaid Principal Balance as of the Combined Information Cut-Off Date |
|---|---|---|---|
| Not Available . . . . . . . . . . . | 1 | $ 52,174 | 0.00% |
| Less than 10.001% . . . . . . | 1,018 | 35,137,288 | 0.46 |
| 10.001 - 20.000 . . . . . . . | 3,878 | 205,451,793 | 2.69 |
| 20.001 - 30.000 . . . . . . . | 5,524 | 388,503,848 | 5.08 |
| 30.001 - 40.000 . . . . . . . | 7,329 | 635,684,998 | 8.31 |
| 40.001 - 50.000 . . . . . . . | 8,366 | 866,474,303 | 11.33 |
| 50.001 - 60.000 . . . . . . . | 9,411 | 1,204,446,710 | 15.75 |
| 60.001 - 70.000 . . . . . . . | 10,000 | 1,622,813,770 | 21.23 |
| 70.001 - 80.000 . . . . . . . | 11,182 | 2,502,771,369 | 32.74 |
| 80.001 - 90.000 . . . . . . . | 857 | 183,062,513 | 2.39 |
| Above 90% . . . . . . . . . . . . | 7 | 1,070,514 | 0.01 |
| **Total:** . . . . . . . . . . . . . . . | 57,573 | $7,645,469,280 | 100.00% |

[1] The current loan-to-value ratio of a mortgage loan is a fraction, the numerator of which is the outstanding principal balance of the mortgage loan and the denominator of which is the collateral value, generally at a time of origination of the related mortgage property, expressed as a percentage.

(This page intentionally left blank)

# APPENDIX E

## Index of Terms

| | | | |
|---|---|---|---|
| 3(c)(7) Representations | vii | Company | i |
| 3-Month USD LIBOR | 79 | Company Common Securities | 4 |
| ACLS | 53 | Company Preferred Securities | 1 |
| Additional Amounts | 86 | Company's Portfolio | 25 |
| Additional Assets | 40 | Comparable Treasury Issue | 81 |
| Additional Tax Event | 86 | Comparable Treasury Price | 82 |
| Additional Taxes | 86 | Conditional Exchange | 2 |
| Administrative Services Agreement | 43 | core capital | 33 |
| Advanced Consumer Lending System | 53 | Covered Debt | 72 |
| Alternative Services | 49 | Credit Score | 49 |
| Asset Documentation | 41 | debt-to-income ratio | 49 |
| Asset Subsidiary | 41 | Delaware Trustee | 37 |
| Asset Tax Opinion | 42 | Deposit Agreement | 98 |
| Asset Trust I | i | Depositary | 74 |
| Asset Trust I Class A Trust Certificate | 48 | Depositary Shares | 2 |
| Asset Trust I Class R Trust Certificate | 39 | Derivative Action | 118 |
| Asset Trust I Custodian | 55 | Dividend Payment Date | 78 |
| Asset Trust I Custody Agreement | 55 | Dividend Period | 70 |
| Asset Trust I Cut-Off Date | 47 | dividends | 7 |
| Asset Trust I Delaware Trustee | 5 | DTC | v |
| Asset Trust I Loan Documents | 56 | DTC Participants | vii |
| Asset Trust I Pooling and Servicing | | Eligible Assets | 40 |
| Agreement | 5 | Eligible Investments | 42 |
| Asset Trust I Servicer | 47 | ERISA | iii |
| Asset Trust I Servicer Indemnified Parties | 54 | Euroclear | vii |
| Asset Trust I Trustee | 47 | Euroclear Operator | 104 |
| Asset Trust II | i | Euroclear Participants | 104 |
| Asset Trust II Class A Trust Certificate | 5 | Euroclear Terms and Conditions | 105 |
| Asset Trust II Class R Trust Certificate | 5 | Exchange Act | ix |
| Asset Trust II Custodian | 66 | Exchange Agreement | 74 |
| Asset Trust II Custody Agreement | 66 | Exchange Event | 12 |
| Asset Trust II Cut-Off Date | 57 | FDIC | xi |
| Asset Trust II Delaware Trustee | 6 | Federal Reserve | 68 |
| Asset Trust II Loan Documents | 67 | FFO | 11 |
| Asset Trust II Pooling and Servicing | | FFO Test | 2 |
| Agreement | 6 | F.I.C.O. Score | B-2 |
| Asset Trust II Servicer | 57 | Fidelity | 64 |
| Asset Trust II Servicer Indemnified Parties | 65 | Fidelity System | 64 |
| Asset Trust II Trustee | 57 | Fitch | 16 |
| Asset Trusts | i | Fixed-to-Floating Rate Substitute Preferred | |
| AVM | 49 | Stock | 97 |
| back-end ratio | 49 | Fixed-to-Floating Rate Successor Depositary | |
| Bankruptcy Event | 45 | Share | 97 |
| Benefit Plan Investor | iii | Foreign Holder | 106 |
| Business Combination | 96 | FSMA | 114 |
| Business Day | 70 | GAAP | xi |
| CACS | 53 | Global Security | 102 |
| Clearstream | viii | HELs Information Cut-Off Date | B-1 |
| Clearstream International | 104 | HELs | 4 |
| Clearstream Participants | 104 | independent | 44 |
| Code | iii | Independent Investment Banker | 82 |
| Code of Ethics | 51 | Independent Manager | 4, 44 |
| Combined Information Cut-Off Date | D-1 | Index | 57 |
| Commercial Capital | 117 | Indirect DTC Participants | 103 |

| | |
|---|---|
| Initial Purchasers | 113 |
| Investment Company Act | iv |
| Investment Company Act Event | 82 |
| IRS | 106 |
| Japan Securities and Exchange Law | 115 |
| Junior Equity Securities | 79 |
| Junior Securities | 91 |
| LIBOR Business Day | 79 |
| LIBOR Determination Date | 79 |
| like amount | 2 |
| LLC Act | 38 |
| LLC Agreement | 38 |
| Manager | 44 |
| Margin | 57 |
| Marion | 22 |
| Moody's | 16 |
| Mortgage Loans | 16 |
| Negative Amortization | 58 |
| Negative Amortization Cap | 58 |
| New Assets | 77 |
| New Reporting Rules | 110 |
| Nominee | 75 |
| Offering | 2 |
| One-Year MTA | 57 |
| Option ARMs | 5 |
| Option ARMs Information Cut-Off Date | C-1 |
| OTS | 2 |
| Outstanding Company Preferred Securities | 1 |
| Parity Equity Securities | 2 |
| Paying Agent | 75 |
| Paying Agents | 75 |
| Permitted Investments | 42 |
| Plan | 112 |
| Primary Treasury Dealer | 82 |
| Property Trustee | 37 |
| Qualified Institutional Buyer | iii |
| Qualified Purchaser | iii |
| Qualifying Interests | 24 |
| Rating Agencies | 43 |
| Rating Agency Condition | 43 |
| Rating Agency Event | 82 |
| Reference Treasury Dealer | 82 |
| Reference Treasury Dealer Quotations | 82 |
| Registrar | 75 |
| Regulation | 112 |
| Regulatory Capital Event | 82 |
| Relevant Implementation Date | 114 |
| Relevant Member State | 114 |
| REMIC | 5 |
| Reminder Notice | vii |
| Replacement Capital Covenant | 10 |
| Replacement Covenant Covered Securities | 72 |
| S&P | 16 |
| SEC | ix |
| Section 3(c)(7) | vi |
| Securities Act | iv |
| Securities Action | 117 |
| Selected Interest Rates (H.15) | 57 |
| Senior Equity Securities | 13 |
| Series 2006-A Company Preferred Securities | 1 |
| Series 2006-B Company Preferred Securities | 1 |
| Series 2006-C Company Preferred Securities | 1 |
| Series I WMI Preferred Stock | 101 |
| Series J WMI Preferred Stock | 101 |
| Series K WMI Preferred Stock | 101 |
| Series L WMI Preferred Stock | 2 |
| SFA | 115 |
| Successor Entity | 96 |
| Supplementary Capital | 33 |
| Tangible Capital | 33 |
| Tax Event | 82 |
| Tax-Exempt U.S. Holder | 109 |
| Ten-Year Date | 10 |
| Thrift Financial Report | x |
| Total Capital | 33 |
| Transfer Agent | 75 |
| Treasury Rate | 83 |
| Trust | iv |
| Trust Act | 37 |
| Trust Agreement | iv |
| Trust Holder | 13 |
| Trust I | 1 |
| Trust I Securities | 1 |
| Trust Securities | iv |
| U.S. Holder | 106 |
| U.S. Person | 73 |
| UBTI | 109 |
| University Street | i |
| U.S. LIBOR Telerate Page 3750 | 79 |
| Voting Parity Securities | 90 |
| WaMu Cayman | 1 |
| WaMu Cayman Securities | 1 |
| WMB | 1 |
| WMI | 1 |
| WMI Group | 1 |
| WMI Parity Stock | 91 |
| WMI's Board of Directors | 28 |
| WTC | 75 |

No dealer, salesperson or other person is authorized to give any information or to represent anything not contained in this offering circular. You must not rely on any unauthorized information or representations. This offering circular is an offer to sell only the Trust Securities offered hereby, but only under circumstances and in jurisdictions where it is lawful to do so. The information contained in this offering circular is current only as of its date.

## TABLE OF CONTENTS

| | Page |
|---|---|
| Notice to Investors | iii |
| Special Note Regarding Forward-Looking Statements | ix |
| Where You Can Find More Information | ix |
| Index of Terms | xi |
| Offering Circular Summary | 1 |
| Risk Factors | 18 |
| Certain Information Concerning WMB | 32 |
| Use of Proceeds | 36 |
| The Trust | 37 |
| The Company | 38 |
| Asset Trust I | 47 |
| Asset Trust II | 57 |
| WMI | 68 |
| Certain Relationships and Related Party Transactions | 68 |
| Description of the Trust Securities | 70 |
| Description of the Series 2006-C Company Preferred Securities | 77 |
| Description of Other Company Securities | 88 |
| Description of the Series L WMI Preferred Stock | 90 |
| Description of the Depositary Shares | 98 |
| Description of the Other WMI Capital Stock | 101 |
| Book-Entry Issuance | 102 |
| Certain U.S. Federal Income Tax Considerations | 106 |
| ERISA Considerations | 112 |
| Ratings | 113 |
| Plan of Distribution | 113 |
| Validity of Securities | 117 |
| Additional Information | 117 |
| Appendix A: Washington Mutual Preferred Funding LLC Financials | A-1 |
| Appendix B: Portfolio Data for Asset Trust I | B-1 |
| Appendix C: Portfolio Data for Asset Trust II | C-1 |
| Appendix D: Portfolio Data for Asset Trust I and Asset Trust II, Combined | D-1 |
| Appendix E: Index of Terms | E-1 |

$500,000,000

# Washington Mutual Preferred Funding Trust II

Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities Automatically Exchangeable in Specified Circumstances into Depositary Shares representing Preferred Stock of Washington Mutual, Inc.



## Washington Mutual

*Joint Bookrunners*

# Credit Suisse

# Goldman, Sachs & Co.

# Lehman Brothers Inc.

# Morgan Stanley

*Co-Lead Managers*

# Keefe, Bruyette & Woods

# UBS Investment Bank



Perfect Information

# End of Document

Perfect Information Limited
Michael House
35 Chiswell Street
London
EC1Y 4SE
Tel: +44 (0) 20 7892 4200
www.perfectinfo.com

London o New York o Hong Kong