# THE TRUST

Washington Mutual Preferred Funding Trust III (the "*Trust*") is a statutory trust created under the Delaware Statutory Trust Act, as amended (the "*Trust Act*"), pursuant to a certificate of trust filed with the Secretary of State of the State of Delaware and the execution of a trust agreement of the Trust on May 10, 2007. The Trust will continue its existence from and after the closing of this Offering pursuant to an amended and restated trust agreement (as so amended and restated, the "*Trust Agreement*"), to be entered into by and among the Company, as grantor, Wilmington Trust Company, as property trustee (the "*Property Trustee*"), and Wilmington Trust Company, as Delaware trustee (the "*Delaware Trustee*"), as of the date the Trust Securities are issued. The rights of the holders of the Trust Securities, including economic rights, rights to information and voting rights, are as set forth in the Trust Agreement and the Trust Act.

The Trust Agreement generally limits the Trust's activities to (i) holding the Series 2007-A Company Preferred Securities, (ii) issuing the Trust Securities, (iii) passing through dividends and redemption and liquidation payments paid by the Company to the Trust on the Series 2007-A Company Preferred Securities and (iv) performing functions necessary or incidental thereto. The Trust is prohibited from issuing other equity securities or any debt securities or engaging in any other activities. Subject to the limitations and assumptions described under "Certain U.S. Federal Income Tax Considerations", the Trust intends to be treated as a grantor trust for United States federal income tax purposes, with the result that holders of Trust Securities are expected to be treated as beneficial owners of the Series 2007-A Company Preferred Securities for United States federal income tax purposes. The Series 2007-A Company Preferred Securities will be the only assets of the Trust. The principal executive offices of the Trust will be located at 1301 Second Avenue, Seattle, Washington 98101. The office of the Delaware Trustee is Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890. Copies of the Trust Agreement will be available upon request to WMI.

As set forth in, and subject to, the Trust Agreement, the Property Trustee and the Delaware Trustee will have exclusive and complete authority to carry out the purposes of the Trust.

The Property Trustee will hold title to the Series 2007-A Company Preferred Securities for the benefit of the holders of the Trust Securities, and, as such holder, the Property Trustee will have the power to exercise all rights, powers and privileges with respect to the Series 2007-A Company Preferred Securities under the LLC Agreement. In addition, the Property Trustee will maintain exclusive control of a segregated non-interest bearing bank account to hold all payments made in respect of the Series 2007-A Company Preferred Securities for the benefit of the holders of the Trust Securities.

Pursuant to the Trust Agreement, all charges or expenses of the Trust other than payments required under the terms of the Trust Securities, including the fees, charges and expenses of the Property Trustee, the Delaware Trustee, the Registrar, the Transfer Agent or any Paying Agent, will be paid or caused to be paid by the Company; *provided, however,* that if the Company does not pay or cause to be paid such fees, charges and expenses or can pay such fees, charges and expenses only in a manner that would allocate such fees, charges and expenses against the interests of the holders of the Series M Company Preferred Stock, WMB will pay such fees, charges and expenses; *provided further, however,* that if the Property Trustee or the Delaware Trustee incurs fees, charges or expenses for which it is not otherwise liable under the Trust Agreement, or if the Paying Agent, the Registrar or the Transfer Agent incurs fees, charges or expenses for which it is not otherwise liable under the Agency Agreement, in each case at the request of a holder of Trust Securities or other person, such holder or other person will be liable for such fees, charges and expenses.

The information with respect to the Trust that is required by paragraph (d)(4)(i) of Rule 144A under the Securities Act, will be available upon request to the Property Trustee until the earlier of (i) the redemption in full of the Trust Securities or (ii) the Conditional Exchange.

## THE COMPANY

Washington Mutual Preferred Funding LLC (the "*Company*") is a Delaware limited liability company formed on February 3, 2006 under the Delaware Limited Liability Company Act, as amended (the "*LLC Act*"), pursuant to an initial limited liability company agreement and a certificate of formation filed with the Secretary of State of the State of Delaware. The limited liability company agreement was amended and restated in its entirety in connection with the issuance of the Series 2006-A Company Preferred Securities on March 7, 2006, and further amended and restated in connection with the issuance of the Series 2006-C Company Preferred Securities in December 2006. The limited liability company agreement of the Company will be further amended and restated to include the terms of the Series 2007-A Company Preferred Securities upon the closing of this Offering (as so amended, the "*LLC Agreement*").

The LLC Agreement generally limits the Company's activities to (i) issuing the Series 2007-A Company Preferred Securities, the Outstanding Company Preferred Securities and the common securities of the Company (the "*Company Common Securities*") and additional Parity Equity Securities and Junior Equity Securities of the Company, (ii) acquiring and holding Eligible Investments, including the Asset Trust I Class A Trust Certificate and Asset Trust II Class A Trust Certificate (which, other than Permitted Investments, will be the sole Eligible Investments of the Company immediately after the completion of this Offering) in accordance with the investment policy as described in "— Business of the Company — Assets of the Company" and (iii) performing functions necessary or incidental thereto. Subject to the limitations and assumptions described under "Certain U.S. Federal Income Tax Considerations", the Company intends to be treated as a partnership (other than a publicly traded partnership taxable as a corporation) for United States federal income tax purposes. The Company may not take any action, or permit any action to be taken, that would cause the Company to fail to be treated as a partnership for United States federal income tax purposes for so long as any Company Preferred Securities of any series are outstanding, except with the consent or affirmative vote of the holders of at least two-thirds of all the series of Company Preferred Securities, voting together as a single class. The principal executive office of the Company is c/o Washington Mutual, Inc., 1301 Second Avenue, Seattle, Washington 98101. Copies of the LLC Agreement will be available upon request to WMI.

The Company will receive the opinion of Mayer, Brown, Rowe & Maw LLP to the effect that, for United States federal income tax purposes, the Company will not be treated as an association taxable as a corporation or as a publicly traded partnership taxable as a corporation.

### Capitalization

Upon completion of this Offering, University Street, Inc., an indirect subsidiary of WMB ("*University Street*"), will continue to hold all of the Company Common Securities, representing 100% of the voting rights in the Company (subject to the limited voting rights of holders of the Series 2007-A Company Preferred Securities and the other Company Preferred Securities described under "Description of the Series 2007-A Company Preferred Securities — Voting Rights and Covenants"). Upon completion of this Offering, the Trust will hold all of the Series 2007-A Company Preferred Securities. Trust I will continue to hold all the Series 2006-A Company Preferred Securities, WaMu Cayman will continue to hold all the Series 2006-B Company Preferred Securities and Trust II will continue to hold all the Series 2006-C Company Preferred Securities.

The following table illustrates the expected capitalization of the Company as of the closing of this Offering, after giving effect to the issuance of the Series 2007-A Company Preferred Securities on the closing date:

| | As of the Closing Date[1] |
|---|---|
| | (Unaudited) |
| Series 2006-A Company Preferred Securities. . . . . . . . . . . . . | $1,250,000,000 |
| Series 2006-B Company Preferred Securities. . . . . . . . . . . . . | 750,000,000 |
| Series 2006-C Company Preferred Securities. . . . . . . . . . . . . | 500,000,000 |
| Series 2007-A Company Preferred Securities. . . . . . . . . . . . . | 500,000,000 |
| Company Common Securities . . . . . . . . . . . . . . . . . . . . . . . . | 4,279,380,658 |
| Total Capitalization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $7,279,380,658 |

(1) These figures exclude certain capitalized costs associated with the issuance of the Company Preferred Securities.

## Business of the Company

### Assets of the Company

In connection with the offering of the Trust I Securities and WaMu Cayman Securities in March 2006, WMB conveyed a portfolio of HELs to the Company in exchange for 100% of the Outstanding Company Preferred Securities. Concurrently, University Street conveyed a portfolio of HELs to the Company in exchange for the Company Common Securities. The portfolios conveyed by WMB and University Street to the Company consisted of HELs having an aggregate principal balance of approximately $5,389,459,150 as of January 31, 2006. Immediately upon the issuance of the Series 2006-A Company Preferred Securities and Series 2006-B Company Preferred Securities, the Company conveyed the assets received by it from WMB and University Street to Asset Trust I in exchange for interests in Asset Trust I represented by the Asset Trust I Class A Trust Certificate and a residual certificate (the "*Asset Trust I Class R Trust Certificate*"). The Asset Trust II Class R Trust Certificate was subsequently transferred to WMB as described under "Asset Trust I". WMB then sold the Series 2006-A Company Preferred Securities and Series 2006-B Company Preferred Securities for cash to Trust I and WaMu Cayman, respectively.

In connection with the offering of the Trust II Securities in December 2006, WMB conveyed a portfolio of Option ARMs to the Company in exchange for 100% of the Series 2006-C Company Preferred Securities. Concurrently, University Street conveyed a portfolio of Option ARMs to the Company as a capital contribution. The portfolios conveyed by WMB and University Street to the Company consisted of Option ARMs having an aggregate principal balance of approximately $2,899,877,211 as of November 14, 2006. Immediately upon the issuance of the Series 2006-C Company Preferred Securities, the Company conveyed 100% of the Option ARMs received by it from WMB and University Street to Asset Trust II in exchange for interests in Asset Trust II represented by the Asset Trust II Class A Asset Trust Certificate and a residual certificate (the "*Asset Trust II Class R Trust Certificate*"). The Asset Trust II Class R Trust Certificate was subsequently transferred to WMB as described under "Asset Trust II". WMB then sold the Series 2006-C Company Preferred Securities for cash to Trust II.

As of April 1, 2007, the Company's assets consisted of approximately $4,425,472,561 principal balance of HELs in the aggregate, held through Asset Trust I, $2,204,305,471 principal balance of Option ARMs and other mortgage assets in the aggregate, held through Asset Trust II, and $37,624,771 of permitted investments held directly or through the Asset Trusts, as the case may be. Since the issuance of the Series 2006-A Company Preferred Securities and Series 2006-B Company Preferred Securities in March 2006, the Company has paid to University Street approximately $160 million of cash distributions and approximately $1.42 billion of cash redemption payments, in each case on the Company Common Securities. The Company's source of funds for those dividends has been payments of interest and principal received by the Company through the Asset Trusts on

their Mortgage Loans. The Company expects that these assets alone would permit it to satisfy the coverage and FFO tests described under "Description of the Series 2007-A Company Preferred Securities — Ranking" for issuance of the Series 2007-A Company Preferred Securities as Parity Equity Securities.

The Eligible Investments (which will, immediately after the completion of this Offering and the transactions contemplated in connection therewith, consist of the Asset Trust I Class A Trust Certificate, the Asset Trust II Class A Trust Certificate and Permitted Investments (including Permitted Investments purchased with the proceeds of the sale of 2007-A Company Preferred Securities)) from time to time will generate net income for payment of dividends by the Company to the Trust as holder of the Series 2007-A Company Preferred Securities (and consequently for pass through by the Trust to holders of the Trust Securities), to Trust I, Trust II and WaMu Cayman, as holders of the Outstanding Company Preferred Securities, and to University Street as holder of the Company Common Securities.

The Company intends to manage its assets so as (i) to ensure that the Company will at all times maintain its exemption under the Investment Company Act, (ii) to result in the Company at all times maintaining sufficient FFO to allow payments to be made with respect to its Junior Equity Securities (including payments to University Street as holder of the Company Common Securities) and (iii) to maintain the desired treatment under the Code for the Company's assets and obligations.

Current requirements under the Investment Company Act mandate that in order to maintain its exemption from registration as an investment company, the Company must limit its assets that are not Qualifying Interests or other real estate related assets to no more than 20% of its total assets at any time. The Company expects that initially the distributions it receives from Asset Trust I and Asset Trust II as holder of the Asset Trust I Class A Trust Certificate and Asset Trust II Class A Trust Certificate, respectively, and its income on its Permitted Investments, will significantly exceed the amount required to pay dividends on all the series of Company Preferred Securities. Cash received from the Asset Trusts and any Permitted Investments purchased with such funds or with the proceeds of the sale of 2007-A Company Preferred Securities are not Qualifying Interests or other real estate related assets, and therefore funds received from the Asset Trusts or from the sale of 2007-A Company Preferred Securities and retained by the Company will be limited (together with any other assets that are not Qualifying Interests or other real estate related assets) to 20% of the Company's total assets at any time. Current cash and the expected proceeds of the sale of 2007-A Company Preferred Securities will not exceed 20% of the Company's total assets. For this and other reasons, (a) the Company may seek to invest a substantial portion of its Permitted Investments (after giving effect to the sale of 2007-A Company Preferred Securities) to purchase Additional Assets as described below and (b) the Company expects it will, in the ordinary course, distribute all or substantially all of the funds it receives from the Asset Trusts to University Street, as holder of the Company Common Securities, to the extent it is permitted to do so in accordance with the restrictions on dividends with respect to the Company Common Securities and such funds are not otherwise required to pay dividends on any series of the Company Preferred Securities. The Company intends to invest funds it receives from the Asset Trusts or from the sale of 2007-A Company Preferred Securities in Permitted Investments prior to such funds being distributed to the holders of the Company Common Securities or other Junior Equity Securities or of any series of the Company Preferred Securities.

The Company also expects that over time the principal balance of the Mortgage Loans held by the Asset Trusts will decrease as a result of principal payments and payoffs. Since (i) in accordance with the terms of the Asset Trust I Pooling and Servicing Agreement and Asset Trust II Pooling and Servicing Agreement, additional assets may be added to either Asset Trust only in very limited circumstances and (ii) funds distributed to the Company by an Asset Trust may be distributed to University Street as discussed above and to the extent held by the Company will generally (when invested in Permitted Investments) generate a lower rate of return than the Mortgage Loans held in the Asset Trusts, over time the Company expects that its FFO will decline. Accordingly, prior to the point at which the Company's FFO level is reduced to a level that would prevent payments with

respect to its Junior Equity Securities (including payments to University Street as holder of the Company Common Securities) the Company intends to acquire additional income producing investments that constitute Eligible Assets. Any additional assets that are acquired by the Company will not be transferred to either Asset Trust or serviced in accordance with the related Asset Documentation. Any additional Eligible Assets that are acquired by the Company (such assets, "*Additional Assets*") may (but are not in all cases required to) consist of obligations of Asset Subsidiaries. The terms of the Asset Documentation with respect to any Additional Assets will provide for the servicing of such Additional Assets.

"*Eligible Assets*" means assets:

(a) which (i) are securities, interests or other obligations of an Asset Subsidiary which are backed or collateralized by first or second lien closed end home equity loans, first or second lien home equity lines of credit, mortgage loans on single family or multi-family residences, commercial mortgage loans or other real estate assets, in each case, with respect to real estate located in the United States; *provided, however,* that the Company may acquire and hold first or second lien closed end home equity loans, first or second lien home equity lines of credit, mortgage loans on single family or multi-family residences, commercial mortgage loans or other real estate assets directly if the Company receives an Asset Tax Opinion in connection with such assets or (ii) otherwise satisfy the Rating Agency Condition and are approved by all of the Managers, including the Independent Manager;

(b) which will be serviced and maintained in accordance with Asset Documentation;

(c) the collateral for which is not permitted to include under the related Asset Documentation any first or second lien closed end home equity loans, first or second lien home equity lines of credit, mortgage loans on single family or multi-family residences, commercial mortgage loans or other real estate assets as to which the applicable obligor was more than 30 days delinquent as of the applicable cut-off date or transfer date;

(d) the collateral for which does not create or carry any obligation of the Company or any Asset Subsidiary to make future advances or loans to any obligor with respect to such collateral under lines of credit, revolving loan facilities or other similar features; and

(e) the acquisition, maintenance and servicing of which will not (in itself or in connection with any of the Company's other assets):

(i) cause the Company to be an "investment company" that is required to register under the Investment Company Act;

(ii) cause the imposition of United States federal income withholding tax (including under Section 1445 of the Code) in respect of payments made by the Company on any series of the Company Preferred Securities;

(iii) cause the Company to be treated under the Code as a publicly traded partnership taxable as a corporation;

(iv) cause the Company to be treated as engaged in a U.S. trade or business, as determined for United States federal income tax purposes; or

(v) cause income with respect to the Trust Securities to constitute unrelated business taxable income for U.S. federal income tax purposes or gain subject to U.S. net income taxation under Section 897 of the Code.

"*Asset Documentation*" means (a) with respect to Asset Trust I and the Asset Trust I Class A Trust Certificate, the Asset Trust I Pooling and Servicing Agreement and the related Asset Trust I Custody Agreement, (b) with respect to Asset Trust II and the Asset Trust II Class A Trust Certificate, the Asset Trust II Pooling and Servicing Agreement and the related Asset Trust II Custody Agreement, and (c) with respect to any Additional Assets, the documentation (i) governing the maintenance and

servicing of such Additional Assets and custodial arrangements related thereto and (to the extent applicable) any underlying collateral related to such Additional Assets and (ii) establishing (if applicable) any Asset Subsidiary created in connection with such Additional Assets; *provided* that the execution of any such documentation, to the extent such documentation is not substantially similar in all material respects to the Asset Trust I Pooling and Servicing Agreement (with such changes as may be necessary or desirable to reflect the collateral for such Additional Assets), must satisfy the Rating Agency Condition and be approved by all of the Managers, including the Independent Manager.

"*Asset Subsidiary*" means Asset Trust I, Asset Trust II and, with respect to any Additional Assets, an entity formed for the purpose of holding the collateral related to such Additional Assets and making payments with respect thereto to the Company:

(a) in which the Company holds all or substantially all of the economic interests;

(b) which is established and governed pursuant to Asset Documentation;

(c) which is not an "investment company" which is required to register under the Investment Company Act;

(d) the establishment and operation of which will not cause the Company to be an "investment company" that is required to register under the Investment Company Act;

(e) the establishment and operation of which will not cause the imposition of United States federal withholding tax (including under Section 1445 of the Code) in respect of payments by the Company on any series of the Company Preferred Securities;

(f) the establishment and operation of which will not cause the Company to be treated under the Code as a publicly traded partnership taxable as a corporation; and

(g) the establishment and operation of which will not cause the Company to be treated as engaged in a U.S. trade or business, as determined for United States federal income tax purposes.

"*Asset Tax Opinion*" means, with respect to any assets, an opinion of counsel from nationally recognized tax counsel to the effect that the acquisition and ownership of such assets by the Company will not (in itself or in connection with any of the Company's other assets):

(a) cause the imposition of United States federal withholding tax in respect of payments made by the Company on any series of the Company Preferred Securities;

(b) cause the Company to be treated under the Code as a publicly traded partnership taxable as a corporation; or

(c) cause the Company to be treated as engaged in a U.S. trade or business, as determined for United States federal income tax purposes.

"*Eligible Investments*" means the Asset Trust I Class A Trust Certificate, the Asset Trust II Class A Trust Certificate, the Asset Trust I Class R Trust Certificate, the Asset Trust II Class R Trust Certificate, any other Eligible Assets and any Permitted Investments.

"*Permitted Investments*" means one or more of the obligations or securities listed below:

(a) obligations of, or guaranteed as to principal and interest by, the United States of America or any agency or instrumentality thereof when such obligations are backed by the full faith and credit of the United States of America;

(b) repurchase agreements on obligations described in clause (a) of this definition of "*Permitted Investments*"; *provided* that the unsecured obligations of the party agreeing to repurchase such obligations have, at the time at which the repurchase agreement is entered into, one of the two highest short-term debt ratings of each of the Rating Agencies; and *provided further* that such repurchaser's unsecured long-term debt has, at the time at which the

repurchase agreement is entered into, one of the two highest unsecured long-term debt ratings of each of the Rating Agencies;

(c) federal funds, certificates of deposit, time deposits and bankers' acceptances of any bank or trust company incorporated under the laws of the United States of America or any state; *provided* that the debt obligations of such bank or trust company (or, in the case of the principal bank in a bank holding company system, debt obligations of the bank holding company) at the date of acquisition thereof have one of the two highest short-term debt ratings of each of the Rating Agencies and unsecured long-term debt has one of the two highest unsecured long-term debt ratings of each of the Rating Agencies;

(d) federal funds, certificates of deposit, time deposits, demand deposits and bankers' acceptances of WMB;

(e) obligations of, or obligations guaranteed by, any state of the United States of America or the District of Columbia; *provided* that such obligations at the date of acquisition thereof shall have one of the two highest long-term debt ratings available for such securities from each of the Rating Agencies;

(f) commercial paper of any corporation incorporated under the laws of the United States of America or any state thereof, which on the date of acquisition has the highest commercial paper rating of each of the Rating Agencies; *provided* that the corporation has unsecured long-term debt that has one of the two highest unsecured long-term debt ratings of each of the Rating Agencies;

(g) securities (other than stripped bonds or stripped coupons) bearing interest or sold at a discount that are issued by any corporation incorporated under the laws of the United States of America or any state thereof and have one of the two highest long-term unsecured ratings available for such securities from each of the Rating Agencies; and

(h) any other category of investments that satisfy the Rating Agency Condition and is approved by all of the Managers, including the Independent Manager, subject to the receipt by the Company of an Asset Tax Opinion with respect to such category of investments;

*provided, however,* that (i) any of the investments listed above will not be Permitted Investments to the extent that investment therein would cause the outstanding principal amount of Permitted Investments that are then held by the Company to exceed 20% of the aggregate principal amount of all Eligible Investments and (ii) (A) any payments received with respect to any of the investments listed above must not be subject to withholding tax of any jurisdiction assuming compliance with standard tax documentation requirements, unless the Company is entitled to a full gross-up (on an after-tax basis) with respect to any such withholding tax, (B) the gain from the disposition of such investment would not be subject to U.S. federal income or withholding tax under section 897 or section 1445, respectively, of the Code and (C) such investments will not cause the imposition of U.S. federal withholding tax in respect of payments made by the Company on any series of the Company Preferred Securities. In no event shall an instrument be a Permitted Investment if the instrument evidences a right to receive only interest payments with respect to the obligations underlying such instrument or has been purchased at a price greater than the outstanding principal balance of such instrument.

"*Rating Agencies*" means, at any time, S&P, Moody's and Fitch, but only in the case of each such agency if it is rating the relevant security, including the Trust Securities at the relevant time or, if none of them is providing a rating for the relevant security, including the Trust Securities at such time, then any "*nationally recognized statistical rating organization*" as that phrase is defined for purposes of Rule 436(g)(2) under the Securities Act, which is rating such relevant security.

"*Rating Agency Condition*" means written notice from each Rating Agency confirming that the proposed action, change or modification will not result in a reduction of the rating then currently assigned by such Rating Agency to the Trust Securities.

### Employees and Administration Agreement

The Company and WMB have entered into an Administrative Services Agreement (the "*Administrative Services Agreement*") pursuant to which WMB provides (or causes to be provided) certain accounting, legal, tax and other support services to the Company, assists the Company in maintaining compliance with all pertinent U.S. local, state and federal laws and provides necessary administrative, recordkeeping and secretarial services to the Company. Under this agreement, the Company has agreed to reimburse the provider of such services from time to time for the value of services provided by such provider to the Company. The Company expects that any such reimbursement will be in a *de minimis* amount. The Company may in the future amend or terminate the Administrative Services Agreement.

The Company will maintain limited liability company records and audited financial statements that are separate from those of WMI and any of its other affiliates. None of the officers, employees or Managers of the Company will have any direct or indirect pecuniary interest in any security to be acquired or disposed of by the Company or in any transaction in which the Company has an interest.

## Management of the Company

### Managers and Officers

The Company will be managed by a Board of Managers. The LLC Agreement provides that the Company's Board of Managers will at all times be composed of three members (each, a "*Manager*"), one of whom is not and has not been during the preceding five years an officer or employee of WMI or any affiliate of WMI, other than a financing subsidiary (the "*Independent Manager*"). The Managers will serve until their successors are duly elected and qualified. Except in certain circumstances described under "— Independent Manager" below, action by the Company's Board of Managers will be by majority vote. The Company has nine officers.

The persons who currently serve as the Managers and officers of the Company are:

| Name | Position and Offices Held |
|---|---|
| Robert Williams | Manager and Senior Vice-President |
| Peter Freilinger | Manager and Senior Vice-President |
| Kenneth J. Uva | Independent Manager |
| Bret W. Scott | Vice-President and Chief Financial Officer |
| Tim Cleary | First Vice-President |
| Jim Douthitt | Senior Vice-President |
| Doreen Logan | First Vice-President and Assistant Secretary |
| Jack Read | First Vice-President |
| Chad Smith | First Vice-President and Secretary |

Each of the current Managers (other than the Independent Manager) and officers of the Company are individuals who are officers or employees of WMI or one of its affiliates. The initial Independent Manager is Kenneth J. Uva, who is an employee of CT Corporation.

### Independent Manager

Under the LLC Agreement, in order to be considered "*independent*", a Manager must not, during the preceding five years, have been a director or employee of WMI or any affiliate of WMI, other than a direct or indirect financing subsidiary of WMI.

The LLC Agreement requires that, in assessing the benefits to the Company of any proposed action requiring his or her consent, the Company's Independent Manager take into account the interests of holders of both the Junior Equity Securities, including Company Common Securities, and any series of the Company Preferred Securities. The LLC Agreement provides that in considering the interests of the holders of the Company Preferred Securities, any Junior Equity Securities and any

series of Company Preferred Securities, the Company's Independent Manager owes all such holders the same duties.

The LLC Agreement provides that, for so long as any Company Preferred Securities are outstanding, certain actions by the Company will be subject to prior approval of all Managers, including the Independent Manager. The Company will not be able, without the approval of the Independent Manager, to (i) terminate, amend or otherwise change any of the Company's Asset Documentation or (ii) effect a consolidation, merger or share exchange that is not tax-free to the holders of any series of the Company Preferred Securities unless such consolidation, merger or share exchange was approved by the consent or affirmative vote of the holders of at least two-thirds of all series of the Company Preferred Securities, voting together as a single class. In addition, if either Asset Trust fails to make a payment to the Company or any payments are not received with regard to any Additional Asset in violation of the terms of the related Asset Documentation on any scheduled payment date, the Independent Manager will have the authority to cause the Company, as the holder of the Asset Trust I Class A Trust Certificate, the Asset Trust II Class A Trust Certificate or any Additional Asset, as applicable, to enforce its rights in such capacity until payments have been resumed and a year has passed since the date of the latest scheduled payment date with respect to which the Asset Trust or the Additional Asset failed to make a payment.

The holders of all the series of Company Preferred Securities, voting together as a single class, by majority vote of the votes cast on such matter at a meeting properly called and held or by written instructions signed by the holders of Company Preferred Securities representing a majority of the voting rights of all series of the Company Preferred Securities then outstanding, voting together as a single class, are entitled to remove the initial or any succeeding Independent Manager and to fill the vacancy created by such removal or any other vacancy existing in the office of the Independent Manager if (i) the Company fails to pay full dividends on any series of Company Preferred Securities on any Dividend Payment Date, (ii) any Trust Holder fails to pass through full dividends paid by the Company on the Company Preferred Securities held by the Trust Holder to the holders of the Trust Holder's Securities on any Dividend Payment Date or (iii) a Bankruptcy Event occurs. The person so elected will be deemed to be an Independent Manager irrespective of whether he or she meets the independence test described above. This right will continue for as long as any Company Preferred Securities of any series are outstanding.

"*Bankruptcy Event*" means the Company, the Trust or any other Trust Holder (i) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due, (ii) makes a general assignment, arrangement or composition with or for the benefit of its creditors or (iii) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding up or liquidation.

### Compensation of the Independent Manager

The Company pays the Independent Manager a reasonable fee for his or her services as a Manager of the Company, plus reimbursement of expenses for attendance at each meeting of the Company's Board of Managers.

### Indemnification of Managers and Officers

The LLC Agreement provides that the Company will, to the fullest extent permitted by law, indemnify any Manager or officer of the Company for any liability and related expenses (including reasonable counsel's fees) arising out of such Manager's or officer's status as a Manager or officer of the Company; *provided, however,* that a court of competent jurisdiction has not determined that such Manager or officer did not act in good faith and in a manner that he or she reasonably believed to be in, or not opposed to, the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe that his or her conduct was unlawful. The LLC

Agreement provides that the right to indemnification is a contract right and set forth certain procedural and evidentiary standards applicable to enforcement of a claim. The LLC Agreement provides that the Company may purchase and maintain insurance to protect any Manager or officer against any liability asserted against him or her, or incurred by him or her, arising out of his or her status as such.

## Additional Covenants of the Company in the LLC Agreement

The LLC Agreement provides that, so long as any Company Preferred Securities of any series are outstanding, the Company will not authorize, create or increase the authorized amount of or issue any class or series of any equity shares of the Company, or any warrants, options or other rights convertible or exchangeable into any class or series of any equity shares of the Company, ranking senior to the Company Preferred Securities, either as to dividend rights, redemption rights or rights on dissolution, liquidation or winding up of the Company without the consent or an affirmative vote of the holders of at least two-thirds of all series of the Company Preferred Securities, voting together as a single class. The LLC Agreement also provides that, except with the consent or affirmative vote of the holders of at least two-thirds of all the series of Company Preferred Securities, voting together as a single class, the Company will not take certain other actions.

These actions are described under "Description of the Series 2007-A Company Preferred Securities — Voting Rights and Covenants".

## Additional Information

The information with respect to the Company that is required by paragraph (d)(4)(i) of Rule 144A under the Securities Act, including quarterly unaudited and annual audited financial statements, in each case prepared in accordance with GAAP, will be available upon request to WMI until the earlier of (i) the redemption in full of the Series 2007-A Company Preferred Securities or (ii) the Conditional Exchange.

## ASSET TRUST I

### General

Washington Mutual Home Equity Trust I ("*Asset Trust I*") is a statutory trust formed under the laws of the State of Delaware pursuant to a trust agreement between the Company, as depositor, and Deutsche Bank Trust Company Delaware, as Delaware trustee. The Asset Trust I Pooling and Servicing Agreement, dated as of March 7, 2006 (the "*Asset Trust I Pooling and Servicing Agreement*"), among the Company, as depositor, WMB, as servicer (the "*Asset Trust I Servicer*"), Deutsche Bank Trust Company Delaware, as Delaware trustee (the "*Asset Trust I Delaware Trustee*") and Deutsche Bank National Trust Company, as trustee (the "*Asset Trust I Trustee*"), restated the initial trust agreement and is the governing instrument of Asset Trust I.

Asset Trust I does not and will not own any assets other than the HELs and the other assets described below. Asset Trust I does not and will not have any liabilities other than those incurred in connection with the Asset Trust I Pooling and Servicing Agreement and any related agreement. Asset Trust I does not and will not have any directors, officers or other employees. No equity contribution has or will be made to Asset Trust I by WMB, the Company or any other party, except for a *de minimis* contribution made by the Company, as depositor, pursuant to the initial trust agreement, and Asset Trust I does not and will not have any other capital. The fiscal year end of Asset Trust I is December 31. Asset Trust I acts through the Asset Trust I Trustee and the Asset Trust I Delaware Trustee, whose fees and reasonable expenses are paid or reimbursed by the Asset Trust I Servicer.

For purposes of this offering circular with respect to the underwriting, origination and servicing of the HELs in Asset Trust I, references to WMB include WMB, originators acquired by WMB and WMB's subsidiaries.

### General Description of Assets

The assets of Asset Trust I consist of HELs that had, as of January 31, 2006, a value and aggregate unpaid principal balance of approximately $5,389,459,150, payments received thereon and certain other investments. The HELs were originated or acquired by WMB between September 1, 2001 and September 30, 2005. As of April 1, 2007, the HELs transferred into Asset Trust I had an aggregate unpaid principal balance of approximately $4,425,472,561.

As of April 1, 2007, the HELs had a weighted average gross interest rate of 6.07% and ranged from a gross interest rate of approximately 4.000% to 11.315% per annum. As of April 1, 2007, the average current, unpaid principal balance of the HELs was approximately $90,456 with a minimum current, unpaid principal balance of approximately $18.00 and a maximum current, unpaid principal balance of approximately $932,128. As of April 1, 2007, assets in Asset Trust I had various original maturities ranging from 5 years to 30 years and were, on average, originated within the last 41 months. As of April 1, 2007, the current weighted average loan-to-value ratio of the HELs was approximately 51.35% and the weighted average loan-to-value ratio at origination was approximately 58.66%. As of April 1, 2007, the HELs had a weighted average Credit Score (as defined below) of approximately 758. Most of the properties underlying the HELs are owner occupied with approximately 3.81% of the properties non-owner occupied. The HELs are geographically concentrated in Texas (approximately 50.41%), California (approximately 29.35%), Florida (approximately 7.06%), and New York (approximately 5.10%). HELs are typically made for reasons such as home purchases, home improvements, furniture and fixtures purchases, purchases of automobiles and debt consolidation. The HELs are generally repaid on a fully amortizing basis.

### Acquisition of the Portfolio and Related Transactions

In connection with the issuance of the Outstanding Company Preferred Securities, WMB contributed a pool of HELs to the Company in exchange for a corresponding amount of the Outstanding Company Preferred Securities. In addition, University Street contributed a pool of HELs

to the Company in exchange for all of the Company Common Securities as of January 31, 2006. The aggregate value of these contributions totaled approximately $5,389,459,150.

The Company contributed to Asset Trust I all of the HELs it received from WMB and University Street. This contribution was made in exchange for the Class A-1 Washington Mutual Home Equity Trust I Certificate (the "*Asset Trust I Class A Trust Certificate*") and the Class R Washington Mutual Home Equity Trust I Certificate (the "*Asset Trust I Class R Trust Certificate*"). For United States federal income tax purposes, the Asset Trust I Class A Trust Certificate represents the sole class of regular interests in Asset Trust I, and the Asset Trust I Class R Trust Certificate represents the sole class of residual interests in Asset Trust I. The Company retained the Asset Trust I Class A Trust Certificate and sold the Asset Trust I Class R Trust Certificate to WMB on March 7, 2006.

Asset Trust I owns the right to receive all payments of principal and interest on the HELs. A schedule to the Asset Trust I Pooling and Servicing Agreement includes information about each HEL, including:

- the outstanding principal balance as of the close of business on January 31, 2006;

- the term of the HEL; and

- the applicable interest rate as of the close of business on January 31, 2006.

The notes relating to the HELs were not endorsed to Asset Trust I and no assignments to Asset Trust I of the mortgages securing the HELs were prepared. WMB, in its capacity as initial Asset Trust I Custodian, has possession of and reviews such notes and the HELs as custodian for Asset Trust I and financing statements were filed evidencing Asset Trust I's interest in the HELs.

**Description of the Portfolio**

*General*

All of the HELs in the portfolio of Asset Trust I consist of closed-end, first lien home equity loans secured by a first lien that primarily is on the borrower's residence. Such residences are largely single family properties. These loans typically are made for reasons such as home purchases, home improvements, acquisition of furniture and fixtures, purchases of automobiles, and debt consolidation. The HELs are generally paid on a fully-amortizing basis. As of April 1, 2007, fewer than 135 HELs were delinquent in payments for a period of 30 days or more; however, there can be no assurance that HELs held in the portfolio of Asset Trust I will not become delinquent in the future.

The tables in Appendix B to this offering circular represent information as of April 1, 2007 with respect to the HELs included in the portfolio of Asset Trust I.

**Underwriting**

*General*

The HELs owned by Asset Trust I were, in all material respects, originated in accordance with the underwriting guidelines of WMB as described herein. The HELs were underwritten by WMB using automated underwriting systems.

WMB's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Some HELs are manually underwritten, in which case an underwriter reviews information submitted by the borrower and supporting documentation, if required, and a credit report of the borrower, and based on that review determines whether to originate a loan in the amount and with the terms requested by the borrower. Some HELs are underwritten through WMB's automated underwriting system, described below.

Prospective borrowers are required to provide details about their financial factors such as their assets, liabilities and related monthly expenses, as well as income and employment information. Borrowers may provide this information by electronic transmission to a bank representative who inputs the information directly into the lending system. Each borrower also provides an authorization to access a credit report that summarizes the borrower's credit history.

### Evaluation of the Borrower's Credit Standing

To evaluate a prospective borrower's credit history, the loan underwriter obtains a credit report relating to the borrower from one or more credit reporting agencies. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments. In most cases, the credit report provides a credit score (each, a "*Credit Score*") for the borrower. Credit Scores are designed to assess a borrower's creditworthiness and likelihood to default on an obligation over a defined period (usually two to three years) based on a borrower's credit history. Credit Scores do not necessarily correspond to the probability of default over the life of a HEL because they reflect past credit history, rather than an assessment of future payment performance. Credit Scores range from approximately 430 to approximately 850, with higher scores indicating more favorable credit history. In the case of co-borrowers, the Credit Score for the primary borrower is typically used, unless the co-borrower has a Credit Score that is 40 points lower than that of the primary borrower, in which case the lower score is then used. The primary borrower is determined by the applicant at the time the borrowing request is made. Minimum Credit Scores are required for some loan products and loan programs. Credit Scores may not be available for some borrowers.

### Evaluation of the Borrower's Repayment Ability

In evaluating a prospective borrower's ability to repay a HEL, the loan underwriter considers the ratio of the borrower's total monthly debt (including non-housing expenses) to the borrower's gross income (referred to as the "*debt-to-income ratio*" or "*back-end ratio*"). The maximum acceptable ratios may vary depending on other loan factors, such as loan amount and loan purpose, loan-to-value ratio, credit score and the availability of other liquid assets. Exceptions to the ratio guidelines may be made when compensating factors are present.

### Evaluation of the Adequacy of the Collateral

The adequacy of the property being pledged as collateral generally is determined by an appraisal made in accordance with pre-established appraisal guidelines. At origination, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation, and are made on forms acceptable to the Federal National Mortgage Association and/or the Federal Home Loan Mortgage Corporation. Appraisers may be staff appraisers employed by WMB or independent appraisers selected in accordance with the pre-established appraisal guidelines. Such guidelines generally require that the appraiser, or an agent on its behalf, personally inspect the property and verify whether the property is in adequate condition and, if the property is new construction, whether it is substantially completed. However, in the case of HELs underwritten through WMB's automated underwriting system, an automated valuation method ("*AVM*") may be used in lieu of a traditional appraisal. The AVM relies on public records regarding the encumbered property and/or neighboring properties and statistically derives a value using that information. If AVMs are used, they comply with the requirements of the Financial Institutions Reform and Recovery Act of 1989, as amended, and are independently verified periodically. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property.

Title insurance or alternative services (*e.g.*, lien insurance) are required for all HELs. Certain of the HELs owned by Asset Trust I involve the use of "*alternative services*". These services consist of

three services (including property reports and recording services) and are used in lieu of title insurance, endorsements and title company services. Alternative services may be used in certain circumstances including in connection with first liens that are being granted to a lender other than in connection with the purchase of a home; or in connection with loans made to borrowers who already own, on a free and clear basis, the property being used as collateral to secure the loan in question. Alternative services provide a low-cost alternative to standard title insurance and provide acceptable risk coverage in the event of default.

### Documentation Programs

Each HEL owned by Asset Trust I was underwritten using either WMB's full income documentation program or its stated income program. Under WMB's full documentation program, the prospective borrower's stated income is verified through receipt of the borrower's most recent pay stub and most recent W-2 form or, in the case of self-employed borrowers or borrowers with more than 25% of their income from commissions, two years of personal (and, if applicable, business) tax returns. For self-employed borrowers, profit and loss statements may also be required.

Under WMB's stated income program, the prospective borrower's income and assets either are not required to be obtained or are obtained but not verified. Eligibility criteria and the amount of the loan are determined by an automated underwriting system. Purchase loans as well as refinance loans may be eligible for participation in WMB's stated income program.

A credit report for the borrower generally is required for all HELs underwritten under either program.

### Exceptions to Program Parameters

Exceptions to WMB's loan program parameters may be made on a case-by-case basis if compensating factors are present. In those cases, the basis for the exception is documented, and in some cases the approval of a senior underwriter is required. Compensating factors may include, but are not limited to, low loan-to-value ratio, good credit standing, the availability of other liquid assets and stable employment.

### Automated Underwriting System

Currently, all HELs originated by WMB utilize a proprietary automated underwriting system known as "SUCCESS". Based on the borrower's credit report and the information provided by the borrower, the system either (i) approves the loan subject to the satisfaction of specified conditions, which may include the receipt of additional documentation, (ii) refers the loan application to an underwriter for manual underwriting, or (iii) declines the file based on predetermined eligibility criteria. In making the underwriting decision, SUCCESS distinguishes among different levels of credit standing, based on a proprietary custom score model, the borrower's Credit Score, and specific policies, application and loan characteristics. WMB has developed these credit standing levels based on a statistical analysis of the past performance of its portfolio of home equity loans. WMB has used analysis of the past performance of its portfolio of home equity loans. WMB has used SUCCESS to underwrite HELs since May 2001. WMB regularly evaluates and validates SUCCESS and to date has completed all required compliance and fair lending evaluations in a satisfactory manner. WMB periodically upgrades its proprietary automated underwriting system. SUCCESS was last upgraded in November 2004.

### Quality Control Review

WMB's credit risk oversight department conducts quality control reviews of statistical samplings of previously originated HELs on a regular basis.

## Credit Risk Management Policies

Credit risk within the WMI Group is managed by means of a broad set of policies and principles contained in its credit policy. The Chief Credit Officer is responsible for overseeing the work of a credit policy committee, monitoring the quality of the WMI Group's credit portfolio, determining the reasonableness of the WMI Group's allowance for loan losses, reviewing and approving large credit exposures and setting underwriting criteria for credit-related products and programs. Credit risk management is based on analyzing the creditworthiness of the borrower, the adequacy of the underlying collateral given current events and conditions and the existence and strength of any guarantor support.

Credit risk assessment is a process that requires the evaluation of numerous factors, many of which are qualitative. Process integrity relies on the ability of the WMI Group's lending personnel to analyze all risk elements. It also depends on maintaining risk rating accuracy by recognizing changing elements of credit risk and promptly initiating risk rating changes.

## Conflicts of Interest Policies

Pursuant to WMB's code of ethics (the "*Code of Ethics*"), WMB extends credit to borrowers only when the extension of credit is financially reasonable for both WMB and the borrower in question. Pursuant to the Code of Ethics, lending personnel cannot permit personal relationships or other considerations to influence lending decisions, and cannot approve extensions of credit to, or be involved in the funding or auditing of any loans made to family or friends.

## Servicing and the Asset Trust I Servicer

### General

All of the HELs owned by Asset Trust I are serviced by WMB, as the Asset Trust I Servicer, pursuant to the Asset Trust I Pooling and Servicing Agreement. WMB has possession of the mortgage files (*i.e.,* the credit reports, servicing documents, etc.) in its capacity as Asset Trust I Servicer and the Asset Trust I Loan Documents (as defined below) in its capacity as Asset Trust I Custodian.

The Asset Trust I Pooling and Servicing Agreement provides that WMB may not resign from its obligations and duties thereunder as Asset Trust I Servicer except upon a determination that its duties thereunder are no longer permissible under applicable law. No such resignation will become effective until a successor Asset Trust I Servicer has assumed WMB's servicing obligations and duties under the Asset Trust I Pooling and Servicing Agreement. If the Asset Trust I Servicer resigns, the Company, subject to the terms of the Asset Trust I Pooling and Servicing Agreement, will appoint a successor Asset Trust I Servicer.

The Asset Trust I Servicer receives a fee for its services as Asset Trust I Servicer under the Asset Trust I Pooling and Servicing Agreement. The servicing fee is calculated as a per annum percentage for each HEL based on the principal balance for such HEL. The servicing fee with respect to each such HEL equals 0.125% *per annum* and is paid monthly. The Asset Trust I Servicer is entitled to retain certain ancillary fees and charges, including, but not limited to, any prepayment fees, insufficient funds fees, modification fees, payoff statement fees and late charges with respect to the HELs as additional servicing compensation and is also entitled to certain income generated by permitted investments made with collections on the HELs. The Asset Trust I Servicer generally pays all expenses incurred in connection with its responsibilities as Asset Trust I Servicer under the Asset Trust I Pooling and Servicing Agreement (subject to reimbursement for certain expenses and advances, including those incurred by it in connection with the liquidation of defaulted HELs, the restoration of damaged mortgaged properties, and payments by the Asset Trust I Servicer for taxes and insurance premiums with respect to mortgaged properties).

Any person into which the Asset Trust I Servicer may be merged, converted or consolidated, or any person resulting from any merger, conversion or consolidation to which the Asset Trust I Servicer

is a party will be the successor Asset Trust I Servicer under the Asset Trust I Pooling and Servicing Agreement.

The Asset Trust I Servicer may outsource to third party vendors some servicing functions, as described under "— The Asset Trust I Servicer — Servicing Procedures — The Asset Trust I Servicer's Third Party Vendors and Service Providers" below.

### The Asset Trust I Servicer

#### The Asset Trust I Servicer's Servicing Experience

WMB, including its predecessors in interest, has been servicing loans secured by real estate or other property for over 100 years. The home equity loans serviced by WMB include closed-end fixed and adjustable rate home equity loans and open-end home equity lines of credit. The HELs in WMB's portfolio have been originated or acquired by WMB.

The following table shows the number and aggregate unpaid principal balance of HELs serviced by the Asset Trust I Servicer as of December 31 for each of the most recent four years:

#### Closed-end Home Equity Loans Serviced by the Asset Trust I Servicer

|  | December 31 | | |
| --- | --- | --- | --- |
|  | **2006** | **2005** | **2004** |
|  | (Dollars in thousands) | | |
| Number of Closed-End Home Equity Loans Serviced by WMB . . . . . . . . . . . . . . . . . . . . . | 329,158 | 213,872 | 150,450 |
| Aggregate Unpaid Principal Balance . . . . . . . . | $20,683,549 | $13,762,872 | $9,851,722 |

#### Servicing Procedures

**Servicing Functions.** The functions performed by the Asset Trust I Servicer under the Asset Trust I Pooling and Servicing Agreement include, among other servicing functions, payment collection, payment application, and default management. The Asset Trust I Servicer performs its servicing functions at loan servicing centers located in Melbourne, Florida; Houston, Texas; San Antonio, Texas; Stockton, California; Chatsworth, California; Seattle, Washington; and Canyon Park, Washington.

**Servicing Standard; Waivers and Modifications.** Pursuant to the Asset Trust I Pooling and Servicing Agreement, the Asset Trust I Servicer is required to service the HELs owned by Asset Trust I, consistent with prudent first lien, closed-end home equity loan servicing practices and (unless inconsistent with those servicing practices) in the same manner in which, and with the same care, skill, prudence and diligence with which, it services and administers similar HELs for its own portfolio. The Asset Trust I Servicer is required to make reasonable efforts to collect or cause to be collected all payments under the HELs and, to the extent consistent with the Asset Trust I Pooling and Servicing Agreement and applicable insurance policies, follow such collection procedures as are followed with respect to comparable HELs that are held in portfolios of responsible mortgage lenders in the local areas where each mortgaged property is located. Under the terms of the Asset Trust I Pooling and Servicing Agreement, the servicing standard applicable to the Asset Trust I Servicer may only be modified with the consent of the Company.

Under the terms of the Asset Trust I Pooling and Servicing Agreement, the Asset Trust I Servicer (subject to certain conditions) may waive, modify or vary any term of any HEL or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to the applicable obligor if it has determined, exercising its good faith business judgment in the same manner as it would if it were the owner of the related HEL, that the security for, and the timely and full collectability of, such HEL would not be adversely affected by such waiver, modification, postponement

or indulgence, and may make certain other modifications with respect to the HELs and the related property in accordance with the terms of the Asset Trust I Pooling and Servicing Agreement.

**Loan Servicing System.** In performing its servicing functions, the Asset Trust I Servicer generally uses computerized loan servicing systems. The Asset Trust I Servicer leases its primary servicing system from AMS-CGI (known as "*Advanced Consumer Lending System*" or "*ACLS*"). ACLS produces detailed information about the financial status of each HEL, including outstanding principal balance, current interest rate, outstanding fees and information about transactions that affect the HEL, including the amount and due date of each payment, the date of receipt of each payment, and how the payment was applied. ACLS works in conjunction with AMS-CGI's Computer Automated Collection System ("*CACS*") to monitor payment collections and to provide default collection activity information regarding delinquent consumer loans. The Asset Trust I Servicer began using ACLS in 2003. Prior to November 2003, the Asset Trust I Servicer serviced equity HELs using an ALLTEL loan servicing system; in November 2003, the Asset Trust I Servicer transferred servicing onto the ACLS servicing platform by converting approximately 948,000 loan records from the ALLTEL loan servicing system to ACLS.

**Collections and Distributions.** Under the terms of the Asset Trust I Pooling and Servicing Agreement, collections with respect to the HELs are collected by the Asset Trust I Servicer and initially deposited into accounts controlled by the Asset Trust I Servicer and may be commingled with funds with respect to other HELs or mortgage loans serviced or owned by the Asset Trust I Servicer. The Asset Trust I Servicer is required to deposit collections received with respect to the HELs owned by Asset Trust I into a certificate account controlled by the Asset Trust I Trustee under the Asset Trust I Pooling and Servicing Agreement on a monthly basis. The amount of collections required to be remitted to the Asset Trust I Trustee in any given monthly deposit is determined by the timing of the Asset Trust I Servicer's receipt of collections and the type of collections they represent. In accordance with the terms of the Asset Trust I Pooling and Servicing Agreement, the Asset Trust I Servicer may retain certain amounts with respect to expenses and advances from collections or apply them towards the costs of certain costs and permitted expenses connected with the servicing of the HELs. The Asset Trust I Servicer is neither permitted nor required to make servicer advances to cover any gap between scheduled payments on the HELs and the actual collections thereon in any given period.

Subject to the terms and conditions set forth in the Asset Trust I Pooling and Servicing Agreement, on a monthly basis the Asset Trust I Trustee distributes collections deposited in the certificate account to the Company, as holder of the Asset Trust I Class A Trust Certificate, less (a) fees, expenses and indemnities payable to the Asset Trust I Trustee and the Asset Trust I Delaware Trustee and (b) fees and certain other amounts payable to the Asset Trust I Servicer. No amounts will be payable from collections with respect to the Asset Trust I Class R Trust Certificate.

Under the terms of the Asset Trust I Pooling and Servicing Agreement, collections with respect to the HELs may be invested in certain permitted investments prior to their distribution to the Company, as holder of the Asset Trust I Class A Trust Certificate. The Asset Trust I Servicer is entitled to retain any investment income produced by such investment as additional servicing compensation.

**Servicing of Delinquent HELs; Foreclosure.** The Asset Trust I Servicer is required under the terms of the Asset Trust I Pooling and Servicing Agreement to make reasonable efforts to collect or cause to be collected all payments on the HELs owned by Asset Trust I that are 16 or more days delinquent. Strategic decisions regarding early stage collection efforts are guided by Experian's Strategic Account Management System, Probe©. Early stage collections, in other words, collections beginning on the 16th day of delinquency and continuing through the 89th day of delinquency, are conducted primarily through the use of automated outbound collection telephone calls and debt collection letters. Late stage collections, or collection efforts taking place from the 90th day and through the 180th day of delinquency, are segregated in CACS by risk and a combination of manual and automated collection efforts are used. CACS also segregates delinquent accounts by status, including bankruptcy, probate, foreclosure, real-estate-owned and "special activities" (*e.g.,* consumer

credit counseling and recovery). These collection efforts are carried out by personnel who specialize in debt collection and recovery. Such efforts may include payment reminder telephone calls to the borrower, letter campaigns, drive-by property inspections and other collection activities permissible under the Asset Trust I Loan Documents and applicable law.

The Asset Trust I Servicer is required under the Asset Trust I Pooling and Servicing Agreement to foreclose upon the mortgaged property related to each defaulted HEL as to which no satisfactory arrangements can be made for collection of delinquent payments. Under the Asset Trust I Pooling and Servicing Agreement, the Asset Trust I Servicer is permitted, in lieu of foreclosure, if prudent to do so and taking into account the desirability of maximizing net liquidation proceeds, to accept a payment of less than the outstanding principal balance of the defaulted HELs. The Asset Trust I Servicer is not permitted to foreclose upon a mortgaged property if it is aware of evidence of toxic waste or other environmental contamination on the mortgaged property and it determines that it would be imprudent to foreclose.

*Insurance.* The Asset Trust I Servicer maintains a blanket hazard policy for all HELs. In addition, the Asset Trust I Servicer tracks all HELs for compliance with applicable law regarding flood insurance coverage. When necessary, the Asset Trust I Servicer "force places" flood insurance policies.

### Limitations on the Asset Trust I Servicer's Liability

The Asset Trust I Pooling and Servicing Agreement provides that neither the Asset Trust I Servicer nor any director, officer, employee or agent of the Asset Trust I Servicer (the "*Asset Trust I Servicer Indemnified Parties*") is under any liability to Asset Trust I, the Company or the holders of the Asset Trust I Class A Trust Certificate and the Asset Trust I Class R Trust Certificate or others for any action taken (or not taken) by any Asset Trust I Servicer Indemnified Party in good faith pursuant to the Asset Trust I Pooling and Servicing Agreement, or for errors in judgment; *provided, however,* that the Asset Trust I Servicer is not protected against any liability that would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties thereunder. The Asset Trust I Pooling and Servicing Agreement further provides that any Asset Trust I Servicer Indemnified Party is entitled to indemnification by Asset Trust I and will be held harmless against any loss, liability or expense incurred in connection with any legal action relating to the Asset Trust I Pooling and Servicing Agreement or the certificates issued thereunder (except any such loss, liability, or expense otherwise reimbursable pursuant to the Asset Trust I Pooling and Servicing Agreement) and any loss, liability or expense incurred by reason of willful misfeasance, bad faith or gross negligence in the performance of duties thereunder or by reason of reckless disregard of obligations and duties thereunder. In addition, the Asset Trust I Pooling and Servicing Agreement provides that the Asset Trust I Servicer is not under any obligation to appear in, prosecute or defend any legal action that is not incidental to its responsibilities under the Asset Trust I Pooling and Servicing Agreement and that in its opinion may involve it in any expense or liability. The Asset Trust I Servicer may, however, in its discretion, undertake any such action that it may deem necessary or desirable with respect to the Asset Trust I Pooling and Servicing Agreement and the rights and duties of the parties thereto and the interests of the holders of the Asset Trust I Class A Trust Certificate and the Asset Trust I Class R Trust Certificate. In such event, the legal expenses and costs of such action and any liability resulting therefrom will be expenses, costs and liabilities of Asset Trust I, and the Asset Trust I Servicer will be entitled to be reimbursed therefor and to charge the certificate account.

*Asset Trust I Servicer Termination and Replacement.* Under the terms of the Asset Trust I Pooling and Servicing Agreement, after the occurrence of any one of several typical Asset Trust I Servicer termination events, including but not limited to a receivership with respect to the Asset Trust I Servicer or (subject to the expiration of typical grace periods and materiality requirements) the failure by the Asset Trust I Servicer to make required deposits to the certificate account, the Company may

remove the Asset Trust I Servicer. If the Asset Trust I Servicer is removed by the Company, the Company shall have the sole power to appoint a replacement Asset Trust I Servicer.

**The Asset Trust I Servicer's Third Party Vendors and Service Providers.** Under the Asset Trust I Pooling and Servicing Agreement, the Asset Trust I Servicer may perform its servicing responsibilities through agents or independent contractors, but will not thereby be released from any of its responsibilities thereunder. The Asset Trust I Servicer outsources some of its responsibilities pursuant to these provisions, that may include some or all of the following: (i) management of foreclosure actions, (ii) monitoring of borrower bankruptcy proceedings, (iii) preservation of properties related to delinquent loans, (iv) processing of primary mortgage insurance claims, (v) maintenance, marketing and sale of real-estate-owned properties, (vi) assuring that hazard insurance coverage is maintained, (vii) determining whether flood insurance coverage is required and assuring that any required coverage is maintained, (viii) tax bill procurement and tracking of delinquent tax payments, (ix) printing and mailing billing statements, (x) depositing borrower payments into lockbox accounts, (xi) performing certain calculations with respect to scheduled and actual collections, (xii) performing certain tax related calculations, (xiii) performing calculations with respect to monthly distributions from Asset Trust I and (xiv) performing reporting functions required under the Asset Trust I Pooling and Servicing Agreement. From time to time, the Asset Trust I Servicer may cease to outsource one or more of the foregoing servicing functions or may choose to outsource additional servicing functions. Some vendors may perform more than one function, and some functions may be performed by more than one vendor.

## The Asset Trust I Servicer's Quality Control Procedures

The Asset Trust I Servicer uses a combination of management controls and technology controls to ensure the accuracy and integrity of servicing records. Management controls include the use of approval levels, the segregation of duties, and reconciliations of servicing data and accounts, among others. Technology controls include the use of data security controls and interface controls to ensure that only authorized persons have the ability to access and change system data or to submit data to or receive data from vendors and investors. Specific security profiles for each job function include a predetermined set of data security controls that are appropriate for that job function. The regional data center for the ACLS Server, which is located in Seattle, Washington, is kept in a fire resistant environment, and commercial electrical power is backed up by generators.

In addition, the Asset Trust I Servicer conducts periodic internal audits of critical servicing and technology functions. External audits by entities such as the OTS and certain third party mortgage guarantors and the annual examination by WMI's independent accountants in connection with their audit of WMI and its subsidiaries may provide independent verification of the adequacy of such functions.

The Asset Trust I Servicer maintains detailed business continuity plans so that it can resume critical business functions in the event of a disaster or other serious system outage, which plans are reviewed and updated periodically. The Asset Trust I Servicer is obligated to return to full system functionality within 48 hours of a reported system outage. The Asset Trust I Servicer performs annual disaster recovery tests in which it reroutes data and servicing system operations to the designated back-up site, and then processes sample transactions from all servicing locations to ensure the functionality of such back-up site.

It is the Asset Trust I Servicer's policy to require its other third party vendors to implement measures similar to those described above to ensure the accuracy and integrity of servicing records.

## The Asset Trust I Custodian

Washington Mutual Bank acts as custodian (the "*Asset Trust I Custodian*") for Asset Trust I pursuant to a Custody Agreement dated as of March 7, 2006 (the "*Asset Trust I Custody Agreement*"), among the Asset Trust I Trustee, the Asset Trust I Servicer and the Asset Trust I Custodian. The

Asset Trust I Custodian holds the notes, mortgages and other legal documents related to the HELs (collectively, the "*Asset Trust I Loan Documents*") for the benefit of the Asset Trust I Trustee. The Asset Trust I Custodian maintains the Asset Trust I Loan Documents in secure and fire resistant facilities. The mortgage files held by the Asset Trust I Servicer have not been physically segregated from Asset Trust I Loan Documents in the Asset Trust I Custodian's custody but are kept in shared facilities. The Asset Trust I Custodian has reviewed the Asset Trust I Loan Documents related to each HEL and delivered to the Asset Trust I Trustee a certification to the effect that, except as noted in such certification, all required documents have been executed and received.

In the event of the termination of the Asset Trust I Custody Agreement, the Asset Trust I Custodian will be required to deliver the Asset Trust I Loan Documents in the Asset Trust I Custodian's custody to the Asset Trust I Trustee or any successor Asset Trust I Custodian appointed by the Company.

The Asset Trust I Servicer may, but does not currently, pay the Asset Trust I Custodian a fee for its services under the Asset Trust I Custody Agreement from time to time. Payment of this fee will not affect dividends to the Company.

## ASSET TRUST II

**General**

WAMU 2006-OA1 ("*Asset Trust II*") is a statutory trust formed under the laws of the State of Delaware pursuant to a trust agreement between the Company, as depositor, and Deutsche Bank Trust Company Delaware, as Delaware trustee. The Asset Trust II Pooling and Servicing Agreement, dated as of December 13, 2006 (the "*Asset Trust II Pooling and Servicing Agreement*"), among the Company, as depositor, WMB, as servicer (the "*Asset Trust II Servicer*"), Deutsche Bank Trust Company Delaware, as Delaware trustee (the "*Asset Trust II Delaware Trustee*") and Deutsche Bank National Trust Company, as trustee (the "*Asset Trust II Trustee*"), restates the initial trust agreement and is the governing instrument of Asset Trust II.

Asset Trust II does not own any assets other than the Option ARMs and a de minimis number of other mortgage assets. Asset Trust II does not have any liabilities other than those incurred in connection with the Asset Trust II Pooling and Servicing Agreement and any related agreement. Asset Trust II does not have any directors, officers or other employees. No equity contribution has been made to Asset Trust II by WMB, the Company or any other party, except for a *de minimis* contribution made by the Company, as depositor, pursuant to the initial trust agreement, and Asset Trust II does not have any other capital. The fiscal year end of Asset Trust II is December 31. Asset Trust II acts through the Asset Trust II Trustee and the Asset Trust II Delaware Trustee, whose fees and reasonable expenses are paid or reimbursed by the Asset Trust II Servicer.

For purposes of this offering circular with respect to the underwriting, origination and servicing of the Option ARMs in Asset Trust II, references to WMB include WMB, originators acquired by WMB and WMB's subsidiaries.

**General Description of Assets**

The assets of Asset Trust II are substantially all Option ARMs that had, as of November 14, 2006, a value and aggregate unpaid principal balance of approximately $2,899,877,211, together with payments received thereon and certain other investments. The Option ARMs were originated by WMB. A portion of the Option ARMs were contributed to the Company by University Street, the owner of all the Company's common interests. As of April 1, 2007, the Option ARMs transferred into Asset Trust II had an aggregate unpaid principal balance of approximately $2,204,305,471.

The interest rate for each Option ARM is fixed for a specified initial period, and is then adjusted on a monthly basis based on its index. The index for the Option ARMs is a per annum rate equal to the twelve-month moving average monthly yield on United States Treasury Securities adjusted to a constant maturity of one year ("*One-Year MTA*" or the "*Index*"), as published by the Board of Governors of the Federal Reserve System in the Federal Reserve Statistical Release "*Selected Interest Rates (H.15)*", determined by averaging the monthly yields for the most recently available twelve months. The One-Year MTA figure used for each interest rate adjustment date is the most recent One-Year MTA figure available as of fifteen days before that date.

If One-Year MTA is no longer available, the Asset Trust II Servicer will choose a new index that is based on comparable information. When the Asset Trust II Servicer chooses a new index, it will increase or decrease the margin on each Option ARM by the difference between the average of One-Year MTA for the final three years it was in effect and the average of the replacement index for the most recent three years. The margin will be increased by that difference if the average of One-Year MTA is greater than the average of the replacement index, and the margin will be decreased by that difference if the average of the replacement index is greater than the average of One-Year MTA. The new margin will be rounded up as provided in the related mortgage note.

After an initial fixed-rate period of one, three or twelve months, the mortgage interest rate on each Option ARM is adjusted monthly to equal the sum of the applicable index and the per annum

rate (the "*Margin*") specified in the applicable mortgage note. As of April 1, 2007, the Margin rates applicable to the mortgage loans in the Asset Trust II had a weighted average of approximately 2.67% and range from 1.80% to 4.50% per annum. The mortgage loans in the Asset Trust II are subject to Lifetime Rate Caps, with a weighted average of approximately 10.02% and ranging from 8.95% to 14.35% per annum. During the initial fixed rate period of an Option ARM, mortgagors are required to pay a minimum monthly payment that, in some cases, will not fully amortize the mortgage loan. Each month thereafter, mortgagors are given one or more payment options, which may include a payment amount less than, equal to or greater than a fully amortizing monthly payment. Whether an Option ARM is repaid on a fully-amortizing basis depends on the payment option selected by the mortgagor on each monthly payment date. If the minimum monthly payment in a given month is less than the amount of accrued and unpaid interest on the mortgage loan, the excess interest will be added to the outstanding principal balance of the mortgage loan in the form of negative amortization ("*Negative Amortization*"). The maximum Negative Amortization (the "*Negative Amortization Cap*") of the Option ARMs in Asset Trust II ranges from 110% to 125% of the original principal balance. On the earlier of the sixty-first month or the month in which the Negative Amortization Cap is reached, mortgagors are required to make fully amortizing payments.

As of April 1, 2007, the average current, unpaid principal balance of the Option ARMs was approximately $448,485, with a minimum current, unpaid principal balance of approximately $4,582 and a maximum current, unpaid principal balance of approximately $9,195,089. The Option ARMs have various original maturities ranging from 15 years to 40 years and were, on average, originated within the last 29 months. The majority of the Option ARMs were underwritten under WMB's reduced documentation program (described below); as of April 1, 2007, approximately 28.34% of the Option ARMs were underwritten under WMB's full documentation program (described below). As of April 1, 2007, the current weighted average loan-to-value ratio was approximately 68.65% and the weighted average loan-to-value ratio at origination was approximately 68.79%. The mortgage loans in the Asset Trust II have a weighted average Credit Score of approximately 746. The majority of the properties underlying the Option ARMs are owner occupied with approximately 27.98% of the properties non-owner occupied. Of the Option ARMs in Asset Trust II, approximately 45.63% are cash-out refinances, approximately 40.37% are purchase loans and approximately 14.00% are rate/term refinances. The Option ARMs are geographically concentrated in California (approximately 74.94%).

**Acquisition of the Option ARMs and Related Transactions**

Contemporaneously with the issuance of the Series 2006-C Company Preferred Securities, WMB contributed a pool of Option ARMs to the Company in exchange for the Series 2006-C Company Preferred Securities. In addition, University Street contributed a pool of Option ARMs to the Company as a capital contribution. The aggregate value of these contributions was $2,899,877,211, calculated as of November 14, 2006.

The Company contributed to Asset Trust II all of the Option ARMs it received from WMB and University Street. This contribution was made in exchange for the Class A-1 2006-OA1 Certificate (the "*Asset Trust II Class A Trust Certificate*") and the Class R 2006-OA1 Certificate (the "*Asset Trust II Class R Trust Certificate*"). For United States federal income tax purposes, the Asset Trust II Class A Trust Certificate represented the sole class of regular interests in Asset Trust II, and the Asset Trust II Class R Trust Certificate represented the sole class of residual interests in Asset Trust II. The Company retained the Asset Trust II Class A Trust Certificate and transferred the Asset Trust II Class R Trust Certificate to WMB.

Asset Trust II owns the right to receive all payments of principal and interest on the Option ARMs due after November 30, 2006. A schedule to the Asset Trust II Pooling and Servicing Agreement included information about each of the Option ARMs, including:

- the outstanding principal balance as of the close of business on November 30, 2006;

- the term of the Option ARM; and

- the applicable interest rate as of the close of business on November 30, 2006.

The notes relating to the Option ARMs have not been endorsed to Asset Trust II and no assignments to Asset Trust II of the mortgages securing the Option ARMs were prepared. WMB, in its capacity as initial Asset Trust II Custodian, has possession of and reviews such notes and the Option ARMs as custodian for Asset Trust II and financing statements were filed evidencing Asset Trust II's interest in the Option ARMs.

In exchange for the Option ARMs and the other assets described above, the Asset Trust II Trustee authenticated and delivered the Asset Trust II Class A Trust Certificate and the Asset Trust II Class R Trust Certificate pursuant to the Company's order.

## Description of the Portfolio

### General

The Option ARMs in the portfolio of Asset Trust II consist of payment-option adjustable rate mortgage loans with a negative amortization feature secured by a first lien, fee simple or leasehold interest in a one-to-four-family residential property or shares of stock relating to cooperative apartments. Such residences include detached homes, duplexes, triplexes, fourplexes, townhomes, individual condominium units, individual units in planned unit developments and other attached dwelling units that are part of buildings consisting of no more than four units. As of April 1, 2007, 53 of the Option ARMs were delinquent in payments for a period of 30 days or more; however, there can be no assurance that Option ARMs held in the portfolio of Asset Trust II will not become delinquent in the future.

The tables in Appendix C to this offering circular represent information as of April 1, 2007 with respect to the Option ARMs included in the portfolio of Asset Trust II.

## Underwriting

### General

The Option ARMs owned by Asset Trust II were, in all material respects, originated in accordance with the underwriting guidelines of WMB as described herein. The Option ARMs were underwritten by WMB.

WMB's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Some Option ARMs are manually underwritten, in which case an underwriter reviews information submitted by the borrower and supporting documentation, if required, and a credit report of the borrower, and based on that review determines whether to originate a loan in the amount and with the terms requested by the borrower. Some Option ARMs are underwritten through WMB's automated underwriting system, described below.

### Evaluation of the Borrower's Credit Standing

To evaluate a prospective borrower's credit history, the loan underwriter obtains a credit report relating to the borrower from one or more credit reporting agencies. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments. In most cases the credit report provides a Credit Score for the borrower. Credit Scores are designed to assess a borrower's creditworthiness and likelihood to default on an obligation over a defined period (usually two to three years) based on a borrower's credit history. Credit Scores do not necessarily correspond to the probability of default over the life of an Option ARM because they reflect past credit history, rather than an assessment of future payment performance. Credit Scores range from

approximately 350 to approximately 850, with higher scores indicating more favorable credit history. If the loan underwriter obtains credit scores from three credit reporting companies, the middle score generally is used, and if two credit scores are obtained, the lower score generally is used. In the case of co-borrowers, the credit score for the borrower with the lowest credit score generally is used (determined for each borrower as described in the immediately preceding sentence). Minimum credit scores are required for some loan products and loan programs. For borrowers for which credit scores are not available, the loan underwriter will require alternative documentation indicating the borrower's creditworthiness, such as rental or utility payment history or payment history on other debt.

### Evaluation of the Borrower's Repayment Ability

In evaluating a prospective borrower's ability to repay an Option ARM, the loan underwriter considers the ratio of the borrower's total monthly debt (including non-housing expenses) to the borrower's gross income (referred to as the "*debt-to-income ratio*" or "*back-end ratio*"). The maximum acceptable ratios may vary depending on other loan factors, such as loan amount and loan purpose, loan-to-value ratio, credit score and the availability of other liquid assets. Exceptions to the ratio guidelines may be made when compensating factors are present.

For purposes of calculating the "front end" and "back end" ratios for certain Option ARMs, the borrower's monthly mortgage debt is determined based on the fully indexed rate and a predetermined factor as set by WMB's credit department from time to time (which rate may be greater than the rate in effect for the Option ARM during the initial fixed-rate period). In addition, for purposes of calculating these ratios for an Option ARM with a 40-year term, the borrower's monthly mortgage debt is determined based on 30-year term.

### Evaluation of the Adequacy of the Collateral

The adequacy of the Option ARM as collateral generally was determined by an appraisal made in accordance with pre-established appraisal guidelines. At origination, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation, and are made on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by WMB or independent appraisers selected in accordance with the pre-established appraisal guidelines. Such guidelines generally require that the appraiser, or an agent on its behalf, personally inspect the property and verify whether the property is in adequate condition and, if the property is new construction, whether it is substantially completed. However, in the case of Option ARMs underwritten through WMB's auto-mated underwriting system, an automated valuation method may be used, under which the appraiser does not personally inspect the property but instead relies on public records regarding the mortgaged property and/or neighboring properties. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property. For Option ARMs underwritten under WMB's streamline documentation programs, the appraisal guidelines in some cases permit the appraisal obtained for an existing Option ARM to be used. Title insurance is required for all Option ARMs, except that for Option ARMs secured by shares of cooperative apartments, title insurance is not required for the cooperative apartment building (but a lien search is provided by the title company). Specific additional title insurance coverage is required for some types of Option ARMs.

### Documentation Programs

Each Option ARM owned by Asset Trust II was underwritten under one of WMB's documentation guidelines for verification of the borrowers' stated income and assets. Under WMB's full/alternative documentation program, the prospective borrower's stated income is verified through receipt of the borrower's most recent pay stub and most recent W-2 form, or, in the case of self-employed borrowers or borrowers with more than 25% of their income from commissions, two years of personal (and, if

applicable, business) tax returns. For self-employed borrowers, profit and loss statements may also be required. Under the full/alternative documentation program, the borrower's stated assets are verified through receipt of the borrower's two most recent bank or brokerage statements. In addition, the borrower's employment may be verified with the employer by telephone or by other independent means.

The WMB low documentation program places increased reliance on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and (in some cases) the borrower's assets. It is available to borrowers with certain loan-to-value ratios, loan amounts and credit scores. Under this program, the income as stated in the borrower's loan application is not verified, although the borrower's employment may be verified by telephone. The borrower's stated income must be reasonable for the borrower's occupation and assets (as determined in the underwriter's discretion). Assets may be verified for higher risk transactions and when exceptions are approved, such as when specific loan-to-value ratios or loan amount limits are exceeded.

A credit report for the borrower generally is required for all mortgage loans underwritten under WMB's full/alternative and low documentation programs.

### Exceptions to Program Parameters

Exceptions to WMB's loan program parameters may be made on a case-by-case basis if compensating factors are present. In those cases, the basis for the exception is documented, and in some cases the approval of a senior underwriter (who is an employee of WMB) is required. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit standing, the availability of other liquid assets, stable employment and time in residence at the prospective borrower's current address.

### Automated Underwriting System

Some mortgage loans originated through WMB have been underwritten in whole or in part through WMB's proprietary automated underwriting system, known as Enterprise Decision Engine or "EDE". Based on the borrower's credit report and the information in the borrower's loan application, the system either (a) approves the loan subject to the satisfaction of specified conditions, which may include the receipt of additional documentation, or (b) refers the loan application to an underwriter for manual underwriting. In making the underwriting decision, EDE distinguishes between ten different levels of credit standing, based on both the credit score and characteristics of the loan. WMB has developed these ten levels of credit standing based on a statistical analysis of the past performance of approximately 193,000 mortgage loans originated by the sponsor for its own portfolio between 1998 and 2001. WMB has been using EDE for underwriting of mortgage loans since January 2005. WMB has also used in the past, and currently uses, other automated underwriting systems. All or some of the mortgage loans owed by Asset Trust II may have been underwritten through EDE or other automated underwriting systems.

### Quality Control Review

WMB's credit risk oversight department conducts quality control reviews of statistical samplings of previously originated Option ARMs on a regular basis.

### Credit Risk Management Policies

Credit risk within the WMI Group is managed by means of a broad set of policies and principles contained in its credit policy. The Chief Credit Officer is responsible for overseeing the work of a credit policy committee, monitoring the quality of the WMI Group's credit portfolio, determining the reasonableness of the WMI Group's allowance for loan losses, reviewing and approving large credit exposures and setting underwriting criteria for credit-related products and programs. Credit risk management is based on analyzing the creditworthiness of the borrower, the adequacy of the

underlying collateral given current events and conditions and the existence and strength of any guarantor support.

Credit risk assessment is a process that requires the evaluation of numerous factors, many of which are qualitative. Process integrity relies on the ability of the WMI Group's lending personnel to analyze all risk elements. It also depends on maintaining risk rating accuracy by recognizing changing elements of credit risk and promptly initiating risk rating changes.

## Conflicts of Interest Policies

Pursuant to WMB's code of ethics (the "*Code of Ethics*"), WMB extends credit to borrowers only when the extension of credit is financially reasonable for both WMB and the borrower in question. Pursuant to the Code of Ethics, lending personnel cannot permit personal relationships or other considerations to influence lending decisions, and cannot approve extensions of credit to, or be involved in the funding or auditing of any loans made to family or friends.

## Servicing and the Asset Trust II Servicer

### General

All of the Option ARMs owned by Asset Trust II are serviced by WMB, as the Asset Trust II Servicer, pursuant to the Asset Trust II Pooling and Servicing Agreement. WMB has possession of the mortgage files (*i.e.*, the credit reports, servicing documents, etc.) in its capacity as Asset Trust II Servicer and the Asset Trust II Loan Documents (as defined below) in its capacity as Asset Trust II Custodian.

The Asset Trust II Pooling and Servicing Agreement provides that WMB may not resign from its obligations and duties thereunder as Asset Trust II Servicer except upon a determination that its duties thereunder are no longer permissible under applicable law. No such resignation will become effective until a successor Asset Trust II Servicer has assumed WMB's servicing obligations and duties under the Asset Trust II Pooling and Servicing Agreement. If the Asset Trust II Servicer resigns, the Company, subject to the terms of the Asset Trust II Pooling and Servicing Agreement, will appoint a successor Asset Trust II Servicer.

The Asset Trust II Servicer receives a fee for its services as Asset Trust II Servicer under the Asset Trust II Pooling and Servicing Agreement. The servicing fee is calculated as a per annum percentage for each Option ARM based on the principal balance for such Option ARM. The servicing fee with respect to each Option ARM equals 0.375% *per annum* and is paid monthly. The Asset Trust II Servicer is entitled to retain certain ancillary fees and charges, including, but not limited to, any prepayment fees, insufficient funds fees, modification fees, payoff statement fees and late charges with respect to the Option ARMs as additional servicing compensation and is also entitled to certain income generated by permitted investments made with collections on the Option ARMs. The Asset Trust II Servicer generally pays all expenses incurred in connection with its responsibilities as Asset Trust II Servicer under the Asset Trust II Pooling and Servicing Agreement (subject to reimbursement for certain expenses and advances, including those incurred by it in connection with the liquidation of defaulted Option ARMs, the restoration of damaged mortgaged properties, and payments by the Asset Trust II Servicer for taxes and insurance premiums with respect to mortgaged properties).

Any person into which the Asset Trust II Servicer may be merged, converted or consolidated, or any person resulting from any merger, conversion or consolidation to which the Asset Trust II Servicer is a party will be the successor Asset Trust II Servicer under the Asset Trust II Pooling and Servicing Agreement.

The Asset Trust II Servicer may outsource to third party vendors some servicing functions, as described under "— The Asset Trust II Servicer — Servicing Procedures — The Asset Trust II Servicer's Third Party Vendors and Service Providers" below.

### The Asset Trust II Servicer

*The Asset Trust II Servicer's Servicing Experience*

WMB has been servicing loans secured by real estate or other property for over 100 years. The Option ARMs in WMB's portfolio were originated by WMB.

The following table shows the number and aggregate principal balance of prime single-family residential mortgage loans, including conforming and nonconforming mortgage loans and fixed rate and adjustable rate mortgage loans, serviced by the Asset Trust II Servicer as of the specified date.

**Single-Family Residential Prime Mortgage Loans Serviced by the Asset Trust II Servicer**

|  | December 31, 2006 | December 31, 2005 | December 31, 2004 |
|---|---|---|---|
|  | (Dollar Amounts in Millions) | | |
| Number of Mortgage Loans Serviced for WMB or Its Affiliates (or Their Securitization Trusts) | 707,497 | 766,384 | 798,269 |
| Aggregate Principal Balance | $ 232,607 | 266,334 | 213,525 |
| Number of Mortgage Loans Serviced for Unaffiliated Third Parties | 2,800,162 | 3,527,670 | 3,820,696 |
| Aggregate Principal Balance | $ 373,679 | 429,944 | 444,595 |

*Servicing Procedures*

**Servicing Functions.** The functions performed by the Asset Trust II Servicer under the Asset Trust II Pooling and Servicing Agreement include, among other servicing functions, payment collection, payment application, investor reporting and other investor services, default management and escrow administration. The Asset Trust II Servicer performs its servicing functions at loan servicing centers located in Florence, South Carolina; Milwaukee, Wisconsin; Northridge/Chatsworth, California; and Jacksonville, Florida.

**Servicing Standard; Waivers and Modifications.** Pursuant to the Asset Trust II Pooling and Servicing Agreement, the Asset Trust II Servicer is required to service the Option ARMs owned by Asset Trust II consistent with prudent mortgage loan servicing practices and (unless inconsistent with those servicing practices) in the same manner in which, and with the same care, skill, prudence and diligence with which, it services and administers similar mortgage loans for other portfolios. The Asset Trust II Servicer is required to make reasonable efforts to collect or cause to be collected all payments under the mortgage loans and, to the extent consistent with the Asset Trust II Pooling and Servicing Agreement and applicable insurance policies, follow such collection procedures as are followed with respect to comparable mortgage loans that are held in portfolios of responsible mortgage lenders in the local areas where each mortgaged property is located. Under the terms of the Asset Trust II Pooling and Servicing Agreement, the servicing standard applicable to the Asset Trust II Servicer may only be modified with the consent of the Company.

Under the terms of the Asset Trust II Pooling and Servicing Agreement, the Asset Trust II Servicer (subject to certain conditions) may waive, modify or vary any term of any mortgage loan or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to the applicable obligor if it has determined, exercising its good faith business judgment in the same manner as it would if it were the owner of the related Option ARM, that the security for, and the timely and full collectability of, such Option ARM would not be adversely affected by such waiver, modification, postponement or indulgence, and may make certain other modifications with respect to the Option ARMs and the related property in accordance with the terms of the Asset Trust II Pooling and Servicing Agreement.

**Mortgage Loan Servicing System.** In performing its servicing functions, the Asset Trust II Servicer generally uses computerized mortgage loan servicing systems that it leases from Fidelity Information Services, a division of Fidelity National Financial ("*Fidelity*"), a third party vendor (collectively, the "*Fidelity System*"). The Fidelity System produces detailed information about the financial status of each mortgage loan, including outstanding principal balance, current interest rate and the amount of any advances, unapplied payments, outstanding fees, escrow deposits or escrow account overdrafts, and about transactions that affect the mortgage loan, including the amount and due date of each payment, the date of receipt of each payment (including scheduled payments and prepayments), and how the payment was applied. The Fidelity System also produces additional information about mortgage loans that are in default, including the amount of any insurance and liquidation proceeds received. The Asset Trust II Servicer began using the Fidelity System in 1996. Prior to July 2004, the Asset Trust II Servicer serviced some mortgage loans using a proprietary mortgage loan servicing system; in July 2004, the Asset Trust II Servicer consolidated servicing into a single servicing platform by converting approximately 1.2 million loan records from the proprietary mortgage loan servicing system to the Fidelity System.

**Collections and Distributions.** Under the terms of the Asset Trust II Pooling and Servicing Agreement, collections with respect to the Option ARMs are collected by the Asset Trust II Servicer and aggregated into a Payment Clearing Account controlled by the Asset Trust II Servicer; such collections are deposited into accounts controlled by the Asset Trust II Servicer and may be commingled with funds with respect to other Option ARMs or mortgage loans serviced or owned by the Asset Trust II Servicer. The Asset Trust II Servicer is required to deposit collections received with respect to the Option ARMs owned by Asset Trust II into a certificate account controlled by the Asset Trust II Trustee under the Asset Trust II Pooling and Servicing Agreement on a monthly basis. The amount of collections required to be remitted to the Asset Trust II Trustee in any given monthly deposit is determined by the timing of the Asset Trust II Servicer's receipt of collections and the type of collections they represent. In accordance with the terms of the Asset Trust II Pooling and Servicing Agreement, the Asset Trust II Servicer is allowed to retain certain amounts with respect to expenses and advances from collections or apply them towards the costs of certain costs and permitted expenses connected with the servicing of the Option ARMs. The Asset Trust II Servicer is neither be permitted nor required to make servicer advances to cover any gap between scheduled payments on the Option ARMs and the actual collections thereon in any given period.

Subject to the terms and conditions set forth in the Asset Trust II Pooling and Servicing Agreement, on a monthly basis the Asset Trust II Trustee distributes collections deposited in the certificate account to the Company, as holder of the Asset Trust II Class A Trust Certificate, less (a) fees, expenses and indemnities payable to the Asset Trust II Trustee and the Asset Trust II Delaware Trustee and (b) fees and certain other amounts payable to the Asset Trust II Servicer. No amounts are payable from collections with respect to the Asset Trust II Class R Trust Certificate.

Under the terms of the Asset Trust II Pooling and Servicing Agreement, collections with respect to the Option ARMs may be invested in certain permitted investments prior to their distribution to the Company, as holder of the Asset Trust II Class A Trust Certificate. The Asset Trust II Servicer shall be entitled to retain any investment income produced by such investment as additional servicing compensation.

**Servicing of Delinquent Option ARMs; Foreclosure.** The Asset Trust II Servicer is required under the terms of the Asset Trust II Pooling and Servicing Agreement to make reasonable efforts to collect or cause to be collected all payments on the Option ARMs owned by Asset Trust II that are 30 or more days delinquent. Such efforts may include payment reminder telephone calls to the mortgagor, letter campaigns, drive-by property inspections and other collection activities permissible under the Asset Trust II Loan Documents and applicable law.

The Asset Trust II Servicer is required under the Asset Trust II Pooling and Servicing Agreement to foreclose upon the mortgaged property related to each defaulted Option ARM as to which no

satisfactory arrangements can be made for collection of delinquent payments. Under the Asset Trust II Pooling and Servicing Agreement, the Asset Trust II Servicer is permitted, in lieu of foreclosure, if prudent to do so and taking into account the desirability of maximizing net liquidation proceeds, to accept a payment of less than the outstanding principal balance of the defaulted Option ARM. The Asset Trust II Servicer is not permitted to foreclose upon a mortgaged property if it is aware of evidence of toxic waste or other environmental contamination on the mortgaged property and it determines that it would be imprudent to foreclose.

*Insurance.* For each Option ARM with an original loan-to-value ratio greater than 80%, the Asset Trust II Pooling and Servicing Agreement generally requires the Asset Trust II Servicer to keep in full force and effect a primary mortgage insurance policy. The Asset Trust II Servicer generally is not required to maintain such policy if the outstanding principal balance of the Option ARM is 80% or less of the original appraised value of the related mortgaged property, unless required by applicable law.

### Limitations on the Asset Trust II Servicer's Liability

The Asset Trust II Pooling and Servicing Agreement provides that neither the Asset Trust II Servicer nor any director, officer, employee or agent of the Asset Trust II Servicer (the "*Asset Trust II Servicer Indemnified Parties*") is under any liability to Asset Trust II, the Company or the holders of the Asset Trust II Class A Trust Certificate and the Asset Trust II Class R Trust Certificate or others for any action taken (or not taken) by any Asset Trust II Servicer Indemnified Party in good faith pursuant to the Asset Trust II Pooling and Servicing Agreement, or for errors in judgment; *provided, however,* that the Asset Trust II Servicer is not protected against any liability that would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties thereunder. The Asset Trust II Pooling and Servicing Agreement further provides that any Asset Trust II Servicer Indemnified Party is entitled to indemnification by Asset Trust II and will be held harmless against any loss, liability or expense incurred in connection with any legal action relating to the Asset Trust II Pooling and Servicing Agreement or the certificates issued thereunder (except any such loss, liability, or expense otherwise reimbursable pursuant to the Asset Trust II Pooling and Servicing Agreement) and any loss, liability or expense incurred by reason of willful misfeasance, bad faith or gross negligence in the performance of duties thereunder or by reason of reckless disregard of obligations and duties thereunder. In addition, the Asset Trust II Pooling and Servicing Agreement provides that the Asset Trust II Servicer is not under any obligation to appear in, prosecute or defend any legal action that is not incidental to its responsibilities under the Asset Trust II Pooling and Servicing Agreement and that in its opinion may involve it in any expense or liability. The Asset Trust II Servicer may, however, in its discretion undertake any such action that it may deem necessary or desirable with respect to the Asset Trust II Pooling and Servicing Agreement and the rights and duties of the parties thereto and the interests of the holders of the Asset Trust II Class A Trust Certificate and the Asset Trust II Class R Trust Certificate. In such event, the legal expenses and costs of such action and any liability resulting therefrom will be expenses, costs and liabilities of Asset Trust II, and the Asset Trust II Servicer will be entitled to be reimbursed therefor and to charge the certificate account.

*Asset Trust II Servicer Termination and Replacement.* Under the terms of the Asset Trust II Pooling and Servicing Agreement, after the occurrence of any one of several typical Asset Trust II Servicer termination events, including but not limited to a receivership with respect to the Asset Trust II Servicer or (subject to the expiration of typical grace periods and materiality requirements) the failure by the Asset Trust II Servicer to make required deposits to the certificate account, the Company may remove the Asset Trust II Servicer. If the Asset Trust II Servicer is removed by the Company, the Company shall have the sole power to appoint a replacement Asset Trust II Servicer.

*The Asset Trust II Servicer's Third Party Vendors and Service Providers.* Under the Asset Trust II Pooling and Servicing Agreement, the Asset Trust II Servicer may perform its servicing responsibilities through agents or independent contractors, but will not thereby be released from any

of its responsibilities thereunder. The Asset Trust II Servicer currently outsources certain of its responsibilities and may in the future outsource other of its responsibilities pursuant to these provisions, which services may include some or all of the following: (i) collections on early stage delinquent loans, (ii) processing and monitoring of foreclosure actions, (iii) processing and monitoring of mortgagors bankruptcy proceedings, (iv) preservation of properties related to delinquent loans, (v) maintenance, marketing and sale of real-estate-owned properties, (vi) assuring that hazard insurance coverage is maintained, (vii) determining whether flood insurance coverage is required and assuring that any required coverage is maintained, (viii) tax bill procurement and tracking of delinquent tax payments, (ix) printing and mailing billing statements, Option ARM notices and default notices and (x) depositing mortgagor payments into a lockbox account. From time to time, the Asset Trust II Servicer may cease to outsource one or more of the foregoing servicing functions or may choose to outsource additional servicing functions. Some vendors may perform more than one function, and some functions may be performed by more than one vendor.

The Asset Trust II Servicer has entered into service level agreements with some of its vendors, which set forth detailed performance criteria, including in some cases minimum time requirements for completing specified tasks and maximum error rates, and which in some cases impose penalties for non-compliance with such criteria. The Asset Trust II Servicer monitors vendor compliance with applicable servicing criteria through procedures that may include reviews of statistical samplings of Option ARMs and reviews of reports on vendor performance prepared by the vendor or the Asset Trust II Servicer.

### The Asset Trust II Servicer's Quality Control Procedures

The Asset Trust II Servicer uses a combination of management controls and technology controls to ensure the accuracy and integrity of servicing records. Management controls include the use of approval levels, the segregation of duties, and reconciliations of servicing data and accounts, among others. Technology controls include the use of data security controls and interface controls to ensure that only authorized persons have the ability to access and change system data or to submit data to or receive data from vendors and investors. Specific security profiles for each job function include a predetermined set of data security controls that are appropriate for that job function. The regional data center for the Fidelity System, which is located in Jacksonville, Florida, is kept in a fire resistant environment, and commercial electrical power is backed up by generators.

In addition, the Asset Trust II Servicer conducts periodic internal audits of critical servicing and technology functions. External audits by entities such as the Fannie Mae, Freddie Mac and Ginnie Mae and the annual examination by WMI's independent accountants in connection with their audit of WMI and its subsidiaries may provide independent verification of the adequacy of such functions. Periodic examination by the Asset Trust II Servicer's regulatory authorities may provide additional independent review of the Asset Trust II Servicer's management controls.

Both the Asset Trust II Servicer and Fidelity maintain detailed business continuity plans so that each entity can resume critical business functions in the event of a disaster or other serious system outage, which plans are reviewed and updated periodically. Fidelity is contractually obligated to return the Asset Trust II Servicer to full functionality within 48 hours of a reported system outage. The Asset Trust II Servicer and Fidelity perform annual disaster recovery tests in which they reroute data and servicing system operations to Fidelity's back-up site, and then process sample transactions from all servicing locations to ensure the functionality of such back-up site.

It is the Asset Trust II Servicer's policy to require its other third party vendors to implement measures similar to those described above to ensure the accuracy and integrity of servicing records.

### The Asset Trust II Custodian

Washington Mutual Bank acts as custodian (the "*Asset Trust II Custodian*") for Asset Trust II pursuant to a Custody Agreement, dated as of December 13, 2006 (the "*Asset Trust II Custody*

*Agreement*"), among the Asset Trust II Trustee, the Asset Trust II Servicer and the Asset Trust II Custodian. The Asset Trust II Custodian holds the notes, mortgages and other legal documents related to the Option ARMs (collectively, the "*Asset Trust II Loan Documents*") for the benefit of the Asset Trust II Trustee. The Asset Trust II Custodian is required to maintain the Asset Trust II Loan Documents in secure and fire resistant facilities. The mortgage files held by the Asset Trust II Servicer are not required to be physically segregated from Asset Trust II Loan Documents in the Asset Trust II Custodian's custody but are kept in shared facilities. The Asset Trust II Custodian is required to review the Asset Trust II Loan Documents related to each Option ARM and deliver to the Asset Trust II Trustee a certification to the effect that, except as noted in the certification, all required documents have been executed and received.

In the event of the termination of the Asset Trust II Custody Agreement, the Asset Trust II Custodian will be required to deliver the Asset Trust II Loan Documents in the Asset Trust II Custodian's custody to the Asset Trust II Trustee or any successor Asset Trust II Custodian appointed by the Company.

The Asset Trust II Servicer may, but does not currently, pay the Asset Trust II Custodian a fee for its services under the Asset Trust II Custody Agreement from time to time. Payment of this fee will not affect dividends to the Company.

## General

WMI is a Washington corporation. It owns two federal savings associations as well as numerous nonbank subsidiaries. WMI is a multiple savings and loan holding company. As a savings and loan holding company, WMI is subject to regulation by the OTS.

WMI's federal savings associations are subject to extensive regulation and examination by the OTS, their primary federal regulator, as well as the Federal Deposit Insurance Corporation ("*FDIC*"). WMI's nonbank financial subsidiaries are also subject to various federal and state laws and regulations.

All of WMI's banking subsidiaries are under the common control of WMI and are insured by the FDIC. If an insured institution fails, claims for administrative expenses of the receiver and for deposits in U.S. branches (including claims of the FDIC as subrogee of the failed institution) have priority over the claims of general unsecured creditors. In addition, the FDIC has authority to require any of WMI's banking subsidiaries to reimburse it for losses it incurs in connection either with the failure of another of WMI's banking subsidiaries or with the FDIC's provision of assistance to one of WMI's banking subsidiaries that is in danger of failure.

## Holding Company Status and Acquisitions

WMI is a multiple savings and loan holding company, as defined by federal law, because it owns more than one savings association. WMI is regulated as a unitary savings and loan holding company, however, because the OTS deems WMI's federal savings associations to have been acquired in supervisory transactions. Therefore, WMI is exempt from certain restrictions that would otherwise apply under federal law to the activities and investments of a multiple savings and loan holding company. These restrictions will apply to WMI if any of WMI's banking institutions fails to meet a qualified thrift lender test established by federal law. As of December 31, 2006, WMI's banking subsidiaries were in compliance with qualified thrift lender standards.

WMI may not acquire control of another savings association without the prior approval of the OTS. WMI may not be acquired by a company, other than a bank holding company, unless the OTS approves such an acquisition, or by an individual unless the OTS does not object after receiving notice. WMI may not be acquired by a bank holding company unless the Board of Governors of the Federal Reserve System (the "*Federal Reserve*") approves. In any case, the public must have an opportunity to comment on the proposed acquisition, and the OTS or Federal Reserve must complete an application review. Without prior approval from the OTS, WMI may not acquire more than 5% of the voting stock of any savings institution that is not one of WMI's subsidiaries.

The Gramm-Leach-Bliley Act generally restricts any non-financial entity from acquiring WMI unless such non-financial entity was, or had submitted an application to become, a savings and loan holding company as of May 4, 1999. Because WMI was treated as a unitary savings and loan holding company prior to that date, WMI may engage in non-financial activities and acquire non-financial subsidiaries.

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

WMB is the Asset Trust I Servicer, the Asset Trust II Servicer and the originator of the HELs held by the Company through Asset Trust I and the Option ARMs held by the Company through Asset Trust II. WMB is expected to be the servicer and may be the originator with respect to any Additional Assets. University Street is an indirect subsidiary of WMB. The Company is a subsidiary of University Street.

There is not currently, and there was not during the past two years, any material business relationship, agreement, arrangement, transaction or understanding that is or was entered into outside the ordinary course of business or is or was on terms other than would be obtained in an arm's-length transaction with an unrelated third party, between (i) any of WMB or University Street on the one hand and (ii) any of the Company, Asset Trust I, Asset Trust II or the Trust on the other hand.

The Company will periodically reimburse WMB for general overhead expenses incurred by WMB on behalf of the Company. The Company expects that the amount of such reimbursements will be *de minimis*.

## DESCRIPTION OF THE TRUST SECURITIES

*The following summary describes the material terms and provisions of the Trust Securities, which will represent undivided beneficial ownership interests in a like amount of Series 2007-A Company Preferred Securities held by the Trust. This description is qualified in its entirety by reference to the terms and provisions of the Trust Agreement. A copy of the Trust Agreement may be obtained upon request to WMI.*

### General

The Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities, liquidation preference $100,000 per security (the "*Trust Securities*"), of the Trust are beneficial ownership interests in the Trust, the terms of which are set forth in the Trust Agreement. The aggregate liquidation preference of the Trust Securities is $500,000,000.

The funds of the Trust available for distribution to the holders of the Trust Securities will be limited solely to payments received by the Trust from the Company as dividends on, or upon redemption of, the Series 2007-A Company Preferred Securities, which payments will be passed through upon receipt by the Trust to the holders of the Trust Securities. Consequently, if the Company does not pay any dividend or make any redemption payment on the Series 2007-A Company Preferred Securities, the Trust will not have funds to make the related distribution or redemption payment on the Trust Securities. Distributions on and the redemption price of each Trust Security will be passed through to the holders of the Trust Securities on the same dates and in the same amounts as the corresponding dividends and redemption price, as applicable, that are paid by the Company to the Trust on a like amount of Series 2007-A Company Preferred Securities; *provided* that if any such payment of dividends or redemption price is received by the Trust after 2:00 P.M. New York time, such payment will instead be passed through to the holders of the Trust Securities on the next day that is a Business Day. The Dividend Payment Dates and related Dividend Periods are the same for the Trust Securities and the Series 2007-A Company Preferred Securities, and, accordingly, the terms "*Dividend Payment Date*", "*Dividend Period*" and "*Business Day*" have the same meanings as applied to each of those securities.

The Trust Securities are automatically exchangeable under certain circumstances into a like amount of Depositary Shares. See "— Conditional Exchange".

Under the Trust Agreement, the Trust is prohibited from issuing any securities other than the Trust Securities.

The Trust Securities are not obligations of, or guaranteed by, WMI, WMB, Marion, the Company, University Street, or any of their respective affiliates or any other entity. The Trust Securities represent equity interests solely in the Trust and do not represent an interest in any of the foregoing entities.

### Distributions

Distributions on the Trust Securities will be passed through on each date on which the Company pays to the Trust dividends on the Series 2007-A Company Preferred Securities owned by the Trust, in an amount per Trust Security equal to the amount of dividends received by the Trust on such date on a like amount of Series 2007-A Company Preferred Securities (including Additional Amounts, if any); *provided* that if any such payment of dividends is received by the Trust after 2:00 P.M. New York time, such payment will instead be passed through to the holders of the Trust Securities on the next day that is a Business Day. Accordingly:

- if the Company pays full dividends on a Dividend Payment Date for the Series 2007-A Company Preferred Securities, the Trust will pass through corresponding full distributions on the Trust Securities on such Dividend Payment Date;

- if the Company pays partial dividends on a Dividend Payment Date for the Series 2007-A Company Preferred Securities, the Trust will pass through partial distributions in the same proportionate amount on the Trust Securities on such Dividend Payment Date; and

- if the Company pays no dividends on a Dividend Payment Date for the Series 2007-A Company Preferred Securities, the Trust will not pass through any distributions on the Trust Securities on such Dividend Payment Date.

See "Description of the Series 2007-A Company Preferred Securities — Dividends".

The record date for distributions on the Trust Securities will be the first day of the month in which the relevant Dividend Payment Date occurs or, if any such day is not a Business Day, the next day that is a Business Day.

Dividends on the Series 2007-A Company Preferred Securities are non-cumulative. Accordingly, distributions on the Trust Securities are non-cumulative. If the Trust passes through no distributions or less than full distributions on the Trust Securities on a Dividend Payment Date because it received no dividend or less than full dividends on the Series 2007-A Company Preferred Securities, holders of Trust Securities will have no right to receive, and the Trust will have no obligation to pass through, such unpaid distributions at a future date, whether or not dividends or distributions are paid on a future Dividend Payment Date on the Company Common Securities or the Trust Securities.

**Restrictions on Dividends**

Under certain circumstances, if the OTS determines that WMB is operating with an insufficient level of capital or is engaged in, or its relationship with the Company results in, an unsafe and unsound banking practice, the OTS could restrict payment of dividends by the Company on the Series 2007-A Company Preferred Securities, resulting in a corresponding restriction in the distributions passed through by the Trust to the holders of the Trust Securities.

**Restrictions on Dividends by WMI**

WMI will covenant in the Exchange Agreement for the benefit of the holders of the Trust Securities that if for any Dividend Period full dividends on (i) the Series 2007-A Company Preferred Securities or (ii) the Trust Securities have not been declared and paid, then, as described under "Description of the Series 2007-A Company Preferred Securities — Restrictions on Dividends by WMI", WMI will not declare or pay dividends with respect to, or redeem, purchase or acquire, any of its equity capital securities during the next succeeding Dividend Period, except dividends in connection with a shareholders' rights plan, if any, or dividends in connection with benefits plans.

**Redemption**

The Trust Securities will not be redeemable at the option of the holders thereof. On each day on which the Company redeems Series 2007-A Company Preferred Securities, the Trust will redeem a like amount of Trust Securities for a redemption price in the same amount as the corresponding redemption price paid to the Trust on a like amount of Series 2007-A Company Preferred Securities; *provided* that if any such payment of the redemption price is received by the Trust after 2:00 P.M. New York time, the Trust will redeem the like amount of Trust Securities on the next day that is a Business Day. See "Description of the Series 2007-A Company Preferred Securities — Redemption".

If the redemption of the Series 2007-A Company Preferred Securities is in part instead of in whole on any redemption date, then the particular Trust Securities to be redeemed will be selected not more than 60 days prior to the redemption date by the Property Trustee from the outstanding Trust Securities not previously called for redemption, by such method as the Property Trustee deems fair and appropriate.

A notice of redemption of the Trust Securities will be mailed by first class mail, postage prepaid, addressed to the holders of record of the securities to be redeemed at their respective last addresses appearing on the books and records of the Trust. Such mailing will be at least 30 days but not more than 60 days before the date fixed for redemption.

## Restriction on Redemption or Purchases

At or prior to the initial issuance of the Trust Securities, WMI will enter into a "*Replacement Capital Covenant*" relating to the Trust Securities, the Series 2007-A Company Preferred Securities, the Depository Shares and the Series M WMI Preferred Stock that may be issued upon a Conditional Exchange (collectively the "*Replacement Covenant Covered Securities*"). The Replacement Capital Covenant will only benefit holders of Covered Debt (as defined below) and will not be enforceable by holders of Trust Securities or any other Replacement Covenant Covered Securities. However, the Replacement Capital Covenant could preclude WMI from redeeming or purchasing Replacement Covenant Covered Securities at a time WMI might otherwise wish to do so.

In the Replacement Capital Covenant, WMI will covenant to redeem or purchase Replacement Covenant Covered Securities only if and to the extent that the total redemption or purchase price is equal to or less than designated percentages of the net cash proceeds that WMI or its subsidiaries have received during the 180 days prior to the redemption or purchase from the issuance of WMI common stock, non-cumulative perpetual preferred stock or certain other securities or combinations of securities satisfying the requirements of the Replacement Capital Covenant.

WMI's ability to raise proceeds from qualifying securities during the 180 days prior to a proposed redemption or purchase will depend on, among other things, market conditions at such times as well as the acceptability to prospective investors of the terms of such qualifying securities.

WMI's covenants in the Replacement Capital Covenant will run in favor of persons that buy, hold or sell WMI's indebtedness during the period that such indebtedness is "*Covered Debt*", which is currently comprised of WMI's 4.625% Subordinated Notes due 2014, bearing CUSIP No. 939322AN3. Other debt will replace WMI's Covered Debt under the Replacement Capital Covenant on the earlier to occur of (i) the date two years prior to the maturity of the existing Covered Debt, (ii) the date of a redemption or purchase of the existing Covered Debt in an amount such that the outstanding principal amount of the existing Covered Debt is or will become less than $100 million.

The Replacement Capital Covenant will be subject to various additional terms and conditions and this description is qualified in its entirety by reference to the Replacement Capital Covenant, a copy of the form of which is available upon request from WMI. The Replacement Capital Covenant may be terminated if the holders of at least 51% of the principal amount of the Covered Debt so agree, or if WMI no longer has outstanding any long-term indebtedness that qualifies as Covered Debt, without regard to whether such indebtedness is rated by a nationally recognized statistical rating organization. The Replacement Capital Covenant will terminate on May 24, 2017 without any action by WMI or any other person.

Subject to the limitations described above and the terms of any preferred stock ranking senior to the Trust Securities or of any outstanding debt instruments, WMI or its affiliates may from time to time purchase any outstanding shares of Series M WMI Preferred Stock by tender, in the open market or by private agreement.

## Voting Rights

Except as set forth below, the holders of Trust Securities will have no voting rights.

In the event that the Trust is entitled to exercise its voting rights with respect to the Series 2007-A Company Preferred Securities, each holder of Trust Securities will have the right to direct the manner in which the Property Trustee on behalf of the Trust exercises such voting rights with respect to a like amount of Series 2007-A Company Preferred Securities on a proportionate basis. If the Property

Trustee receives notice from the Company that the Trust as holder of Series 2007-A Company Preferred Securities is entitled to vote on any matter, promptly after learning of such entitlement, the Property Trustee shall cause to be mailed to each holder of Trust Securities, notice of such vote (including a description of the subject matter of the vote and related circumstances to the extent known to the Property Trustee), along with a copy of any notice or other written communication received by the Property Trustee from the Company with respect to such vote and related matters. In each such notice, the Property Trustee shall request direction from each holder of Trust Securities as to how the Trust as a holder of Series 2007-A Company Preferred Securities shall vote on the matter at issue. Each holder of Trust Securities shall have the right to direct the manner in which the Property Trustee on behalf of the Trust exercises such voting rights with respect to a like amount of Series 2007-A Company Preferred Securities.

Notwithstanding the description above of the voting rights available to holders of the Trust Securities under the Trust Agreement, such voting rights may be exercised only by a beneficial owner of a Trust Security that is a U.S. Person or by a U.S. Person acting as irrevocable agent with discretionary powers for the beneficial owner of a Trust Security that is not a U.S. Person. Beneficial owners of Trust Securities that are not U.S. Persons must irrevocably appoint a U.S. Person with discretionary powers to act as their agent with respect to such voting rights. As used in this paragraph, the term "*U.S. Person*" means, for United States federal income tax purposes, a citizen or resident of the United States, a corporation created or organized in or under the laws of the United States or any state, an estate the income of which is includible in gross income for United States federal income tax purposes regardless of its source, or a trust if a court within the United States is able to exercise primary supervision over its administration and one or more United States persons have authority to control all substantial decisions of the trust.

In the case where the Company, the Property Trustee and the Delaware Trustee wish to enter into one or more agreements supplemental to the Trust Agreement, they may do so without the consent of the holders of the Trust Securities for the following purposes: (i) to evidence the succession of another entity to the Company and the assumption by any such successor of the covenants of the Company contained in the Trust Agreement; (ii) to add to the covenants of the Company for the benefit of the holders of the Trust Securities, or to surrender any right or power conferred upon the Company; (iii)(A) to correct or supplement any provision of the Trust Agreement which may be defective or inconsistent with any other provision therein or (B) to make any other provisions with respect to matters or questions arising under the Trust Agreement, *provided* that any such action taken under this clause (iii) shall not materially adversely affect the interests of the holders of the Trust Securities; or (iv) to cure any ambiguity or correct any manifest error. Any other amendment or agreement supplemental to the Trust Agreement must be in writing and approved by a majority of the holders (by aggregate liquidation preference) of the Trust Securities then outstanding, *provided* that, for the purpose of such approval, any Series 2007-A Company Preferred Securities that are directly or indirectly held or beneficially owned by any member of the WMI Group will be treated as if they were not outstanding.

**Conditional Exchange**

Each Trust Security will be exchanged automatically for a like amount of newly issued Fixed-to-Floating Rate Depositary Shares, each representing a 1/1000th interest in one share of Series M WMI Preferred Stock, if the OTS so directs in writing upon or after the occurrence of an Exchange Event. An "*Exchange Event*" will occur when:

- WMB becomes "undercapitalized" under the OTS's "prompt corrective action" regulations;

- WMB is placed into conservatorship or receivership; or

- the OTS, in its sole discretion, anticipates WMB becoming "undercapitalized" in the near term or takes a supervisory action that limits the payment of dividends by WMB and in connection therewith, directs an exchange.

For purposes of this offering circular, this exchange is referred to as the "*Conditional Exchange*".

If the OTS so directs following the occurrence of an Exchange Event, each holder of Trust Securities will be unconditionally obligated to surrender to WMI or its agent any certificates representing the Trust Securities owned by such holder, and WMI will be unconditionally obligated to issue to such holder, in exchange for each such Trust Security, a depositary receipt representing a like amount of Depositary Shares. Any Trust Securities purchased or redeemed by WMI or any of its affiliates prior to the time of exchange will not be deemed outstanding and will not be subject to the Conditional Exchange.

The Conditional Exchange will occur as of 8:00 A.M. New York time, on the date for such exchange set forth in the applicable OTS directive, or if such date is not set forth in the directive, as of 8:00 A.M., New York time, on the earliest possible date such exchange could occur consistent with the directive, as evidenced by the issuance by WMI of a press release prior to such time. As of the time of exchange, all of the Trust Securities will be transferred to WMI without any further action by the Trust, all rights of the holders of Trust Securities as holders of beneficial interests in the Trust will cease, and such persons will be, for all purposes, the holders of Depositary Shares.

WMI will mail notice of the issuance of an OTS directive after the occurrence of an Exchange Event to each holder of Trust Securities within 30 days, and WMI will deliver (or cause to be delivered) to each such holder depositary receipts for Depositary Shares upon surrender of the Trust Securities. Until such depositary receipts are delivered or in the event such depositary receipts are not delivered, any certificates previously representing Trust Securities will be deemed for all purposes to represent Depositary Shares. All corporate authorization necessary for WMI to issue the Depositary Shares and the Series M WMI Preferred Stock as of the time of exchange will be completed prior to or upon completion of this Offering. Accordingly, once the OTS directs a Conditional Exchange after the occurrence of an Exchange Event, no action will be required to be taken by holders of Trust Securities, by WMI, by WMB (other than to inform the OTS), by the Company or by the Trust in order to effect the automatic exchange as of the time of exchange. After the occurrence of the Conditional Exchange, the Trust Securities will be owned by WMI.

Holders of Trust Securities, by purchasing such securities, whether in this Offering or in the secondary market after this Offering, will be deemed to have agreed to be bound by the unconditional obligation to exchange such Trust Securities for Depositary Shares if the OTS so directs following the occurrence of an Exchange Event. The Trust Agreement provides that the holders of Trust Securities will be unconditionally obligated to surrender such Trust Securities. Prior to issuance of the Trust Securities, WMI will enter into an Exchange Agreement (the "*Exchange Agreement*") among WMI, the Trust and Mellon Investor Services LLC, as depositary (the "*Depositary*"), to implement the Conditional Exchange.

Holders of Trust Securities cannot exchange their Trust Securities for Depositary Shares voluntarily. Absent an OTS directive after the occurrence of an Exchange Event, no exchange of the Trust Securities for Depositary Shares will occur. Upon the issuance of an OTS directive on or following the occurrence of an Exchange Event, the Series M WMI Preferred Stock and the related Depositary Shares to be issued in the Conditional Exchange will constitute a newly issued series of preferred stock of WMI and will have substantially similar terms and provisions with respect to dividends, liquidation, and redemption as the Series 2007-A Company Preferred Securities, except that the Depositary Shares:

- will not have the benefit of the covenants, including with respect to any additional taxes, described under "Description of the Series 2007-A Company Preferred Securities — Voting Rights and Covenants";

- will be redeemable prior to the Dividend Payment Date occurring in June 2012 only upon the occurrence of a Regulatory Capital Event or a Rating Agency Event or payment of a U.S. Treasury-based "make-whole" amount; and

- Additional Amounts will not be payable with respect to the Series M WMI Preferred Stock as described under "Description of the Series 2007-A Company Preferred Securities — Additional Amounts".

In addition, if WMI fails to pay, or declare and set aside for payment, full dividends on the Series M WMI Preferred Stock or other Voting Parity Stock for six Dividend Periods, the authorized number of WMI's directors will increase by two, and the holders of Series M WMI Preferred Stock, voting together with the holders of any other Voting Parity Stock, will have the right to elect two directors in addition to the directors then in office at the next annual meeting of shareholders.

WMI will covenant in the Exchange Agreement in favor of the holders of the Trust Securities that, prior to the issuance of the Series M WMI Preferred Stock upon a Conditional Exchange, WMI will not issue any preferred stock that would rank senior to the Series M WMI Preferred Stock upon its issuance. Each share of Series M WMI Preferred Stock will upon issuance rank at least *pari passu* with the most senior preferred stock of WMI, if any, then outstanding. The Initial Purchasers are under no obligation to and do not intend to make a market in the Depositary Shares. Absent the occurrence of a Conditional Exchange, holders of Trust Securities will have no dividend, liquidation preference, redemption or other rights with respect to any security of WMI, WMB or University Street.

## Form, Transfer and Book-Entry Procedures

The Trust Securities will be issued only in book-entry form. See "Book-Entry Issuance".

## Payments and Paying Agent

Payments in respect of the Trust Securities in the form of Global Securities will be made to the address of the holder entitled thereto as such address will appear on the register. The DTC nominee (the "*Nominee*") will be the registered holder of the Trust Securities in the form of Global Securities. Payments made to the order of the Nominee will be made by wire transfer to DTC and DTC will credit the relevant accounts of the DTC Participants. In the event that the circumstances described under "Book-Entry Issuance — Form, Denomination, Transfer and Book-Entry Procedures — Special Situations When the Global Security Will Be Terminated" apply and the Trust Securities are not in the form of Global Securities, payments in respect of the Trust Securities will be made by wire transfer, direct deposit or check mailed to the address of the holder entitled thereto as such address will appear on the securities register. The paying agent (the "*Paying Agent*") for the Trust Securities initially will be Wilmington Trust Company (in its individual capacity, "*WTC*") and any co-paying agent will be appointed by the Trust. The Paying Agent and any co-paying agent (collectively, the "*Paying Agents*") will be permitted to resign as Paying Agents upon 30 days' written notice to the Company. In the event that WTC will no longer be the Paying Agent, the Company will appoint a successor to act as Paying Agent.

## Registrar and Transfer Agent

WTC will act as Registrar (the "*Registrar*") and Transfer Agent (the "*Transfer Agent*") for the Trust Securities.

Registration of transfers of Trust Securities will be effected without charge by or on behalf of the Trust, but the Property Trustee or the Registrar and Transfer Agent will require, prior to registration, payment (or the giving of such indemnity as the Registrar and Transfer Agent may require) of a sum sufficient to cover any tax or other governmental charges that may be imposed in connection with any transfer of definitive Trust Securities. The Trust will not be required to register or cause to be registered the transfer of definitive Trust Securities during the period of 15 days before the day of selection for redemption of such Trust Securities and ending at the close of business on the day of mailing of the notice of redemption for the Trust Securities that have been called for redemption.

**Expenses of the Paying Agent, Transfer Agent and Registrar**

If the Paying Agent, Transfer Agent or Registrar incurs fees, charges or expenses, for which it is not otherwise liable under the Agency Agreement, to be entered into on or before the closing date, among WTC, as Registrar, Transfer Agent and Paying Agent, and the Trust acting through the Property Trustee at the request of a holder of Trust Securities or other person, such holder or other person will be liable for such fees, charges or expenses.

**Notices**

Notices to the holders of the Trust Securities will be given by delivery of the relevant notice to DTC and any other relevant securities clearing system identified in writing by the Trust for communication by each of them to entitled participants.

**Listing**

The Trust Securities will not be listed on any securities exchange or automated dealer quotation system.

**Governing Law**

The Trust Agreement and the Trust Securities will be governed by and construed in accordance with the laws of the State of Delaware.

**Restrictions on Transfer**

For information regarding restrictions on ownership and transfer of the Trust Securities, see "Notice to Investors".

## DESCRIPTION OF THE SERIES 2007-A COMPANY PREFERRED SECURITIES

*The following summary describes the material terms and provisions of the Series 2007-A Company Preferred Securities. This description is qualified in its entirety by reference to the terms and provisions of the LLC Agreement. A copy of the LLC Agreement may be obtained upon request to WMI.*

### General

The Fixed-to-Floating Rate Perpetual Non-cumulative Preferred Securities, Series 2007-A, liquidation preference $1,000 per security and $500,000,000 in the aggregate (the "*Series 2007-A Company Preferred Securities*"), are limited liability company interests in the Company, the terms of which are set forth in the LLC Agreement. When issued, the Series 2007-A Company Preferred Securities will be validly issued, and no additional payments will be required pursuant to the LLC Act for such securities to represent limited liability company interests in the Company. The holders of the Series 2007-A Company Preferred Securities will have no pre-emptive rights with respect to any limited liability company interests in the Company or any other securities of the Company convertible into or carrying rights or options to purchase any such securities. The Series 2007-A Company Preferred Securities are perpetual and will not be convertible into Company Common Securities or any other class or series of limited liability company interests in the Company and will not be subject to any sinking fund or other obligation of the Company for their repurchase or retirement.

The Series 2007-A Company Preferred Securities will be issued in certificated form only.

The Series 2007-A Company Preferred Securities are not obligations of, or guaranteed by, WMI, WMB, Marion, University Street or any of their respective affiliates or any other entity. The Series 2007-A Company Preferred Securities solely represent an interest in the Company and do not represent an interest in any of the foregoing entities.

The Series 2007-A Company Preferred Securities are not insured or guaranteed by the FDIC or any other insurer or governmental agency or instrumentality.

### Ranking

The Series 2007-A Company Preferred Securities will rank senior to the Company Common Securities and will rank *pari passu* with any other series of Company Preferred Securities, including the Outstanding Company Preferred Securities, in terms of payment of dividends and on liquidation.

The Company's Board of Managers has the power to create and issue Junior Equity Securities and additional equity securities ranking *pari passu* with the Series 2007-A Company Preferred Securities in terms of payment of dividends or on liquidation or redemption (any such securities, the "*Parity Equity Securities*") without the consent of the holders of the Series 2007-A Company Preferred Securities, *provided* that (i) after giving effect to the issuance of any Parity Equity Securities, the *pro forma* net book value of the Company's assets (after giving effect to any assets acquired by the Company in connection with the issuance of such Parity Equity Securities ("*New Assets*")) will equal or exceed 1.5 times the sum of the aggregate liquidation preference of the preferred securities of the Company then outstanding and any such Parity Equity Securities that the Company proposes to issue, (ii) after giving effect to such issuance, the Company's *pro forma* FFO for the four fiscal quarters beginning with the fiscal quarter in which such Parity Equity Securities are proposed to be issued (calculated (A) assuming that such proposed Parity Equity Securities are issued and that, if outstanding or proposed new Parity Equity Securities bear dividends based on a floating rate, the applicable dividend rate will not change during such four fiscal quarters from the rate in effect on the applicable date of determination, (B) assuming for each Option ARM directly or indirectly owned by the Company that the interest rate in the applicable mortgage note and the then effective minimum monthly payment determined in accordance with such mortgage note will not change during such four quarters from the rate and minimum monthly payment in effect on the applicable date of determination, and (C) as

adjusted to reflect any New Assets) equals or exceeds 150% of the amount that would be required to pay full annual dividends on all preferred securities of the Company then outstanding and any such Parity Equity Securities that the Company proposes to issue and (iii) the Company is not otherwise in breach of any of its covenants set forth in the LLC Agreement. Funds from operations, or "*FFO*", means net income (excluding gains (or losses) from sales of property and taking into account with respect to each Option ARM directly or indirectly owned by the Company only the cash payment of interest on the related mortgage note, but otherwise computed in accordance with GAAP), *plus* depreciation and amortization, and after adjustments for unconsolidated partnerships and joint ventures. Adjustments for unconsolidated partnerships and joint ventures will be calculated to reflect funds from operations on the same basis.

The Series 2007-A Company Preferred Securities are Parity Equity Securities with respect to the Outstanding Company Preferred Securities, and are being offered without the consent of the holders of the Outstanding Company Preferred Securities because the Company will comply with the tests outlined above. After giving effect to the issuance of the Series 2007-A Company Preferred Securities:

- the *pro forma* net book value of the Company's assets will be $7,279,380,658, less dividends declared, but unpaid, if any, the aggregate liquidation preference of the Series 2007-A Company Preferred Securities and the Outstanding Company Preferred Securities, taken together, will be $3,000,000,000, and the ratio of the *pro forma* net book value of the Company's assets to such aggregate liquidation preference will be 2.43; and

- (i) the Company's pro forma FFO for the four fiscal quarters beginning on April 1, 2007, calculated in the manner above, is $361,534,073.29 ("X"), (ii) the amount required to pay full dividends for one year on the Series 2007-A Company Preferred Securities and the Outstanding Company Preferred Securities calculated in the manner set forth above is $203,830,000 and 150% of that amount is $305,775,000 ("Y"), and (iii) "X" exceeds "Y" by $55,759,073.29.

The LLC Agreement provides that, so long as any Company Preferred Securities of any series remain outstanding, the Company may not, except with the consent of at least two-thirds of all series of Company Preferred Securities, voting together as a single class, issue Senior Equity Securities.

## Dividends

For purposes of this offering circular, we refer to distributions payable by the Company on its securities as "dividends". Dividends on the Series 2007-A Company Preferred Securities will be payable if, when and as declared by the Company's Board of Managers out of its legally available funds, on a non-cumulative basis at an annual rate of 6.895% to, but not including, June 15, 2012, and 3-month USD LIBOR plus 1.755% for the period starting on June 15, 2012 and each Dividend Period thereafter, in each case, on the liquidation preference thereof, which is $1,000 per security.

Dividends on the Series 2007-A Company Preferred Securities, if, when and as declared by the Company's Board of Managers, will be payable quarterly in arrears on March 15, June 15, September 15, and December 15 of each year, commencing on September 15, 2007, or, if any such day is not a Business Day, the next Business Day (each such date, a "*Dividend Payment Date*"). Each period from and including a Dividend Payment Date (or the date of issuance of the Series 2007-A Company Preferred Securities) to but excluding the following Dividend Payment Date is referred to herein as a "*Dividend Period*". Dividends on the Series 2007-A Company Preferred Securities will accrue from May 24, 2007. The record date for the payment of dividends, if declared, will be the first day of the month in which the relevant dividend payment occurs or, if any such day is not a Business Day, the next day that is a Business Day. Dividends payable on the Series 2007-A Company Preferred Securities for any period greater or less than a full Dividend Period will be computed on the basis of (x) for any Dividend Period ending prior to the Dividend Payment Date in June 2012, twelve 30-day months, a 360-day year, and the actual number of days elapsed in the period, and (y) for any Dividend Period thereafter, the actual number of days in the relevant period divided by 360. No interest will be

paid on any dividend payment made on the Series 2007-A Company Preferred Securities, Trust Securities or Depositary Shares.

"*Business Day*" means any day other than a Saturday, Sunday or any other day on which banks in New York, New York, London, England, Seattle, Washington or Wilmington, Delaware are generally required or authorized by law to be closed.

"*3-Month USD LIBOR*" means, with respect to any Dividend Period, a rate determined on the basis of the offered rates for three-month U.S. dollar deposits of not less than a principal amount equal to that which is representative for a single transaction in such market at such time, commencing on the first day of such Dividend Period, which appears on Reuters Screen LIBOR01 Page as of approximately 11:00 A.M., London time, on the LIBOR Determination Date for such Dividend Period. If on any LIBOR Determination Date no rate appears on Reuters Screen LIBOR01 Page as of approximately 11:00 A.M., London time, the Company or another affiliate of WMI on behalf of the Company will on such LIBOR Determination Date request four major reference banks in the London interbank market selected by the Company to provide the Company with a quotation of the rate at which three-month deposits in U.S. dollars, commencing on the first day of such Dividend Period, are offered by them to prime banks in the London interbank market as of approximately 11:00 A.M., London time, on such LIBOR Determination Date and in a principal amount equal to that which is representative for a single transaction in such market at such time. If at least two such quotations are provided, 3-Month USD LIBOR for such Dividend Period will be the arithmetic mean (rounded upward if necessary to the nearest .00001 of 1%) of such quotations as calculated by the Company. If fewer than two quotations are provided, 3-Month USD LIBOR for such Dividend Period will be the arithmetic mean (rounded upward if necessary to the nearest .00001 of 1%) of the rates quoted as of approximately 11:00 A.M., New York time, on the first day of such Dividend Period by three major banks in New York, New York selected by the Company for loans in U.S. dollars to leading European banks, for a three-month period commencing on the first day of such Dividend Period and in a principal amount of not less than $1,000,000.

"*LIBOR Business Day*" means any day on which commercial banks are open for general business (including dealings in deposits in U.S. dollars) in London.

"*LIBOR Determination Date*" means, as to each Dividend Period, the date that is two LIBOR Business Days prior to the first day of such Dividend Period.

"*Reuters Screen LIBOR01 Page*" means the display so designated on the Reuters 3000 Xtra (or such other page as may replace that page on that service, or such other service as may be nominated as the information vendor, for the purpose of displaying rates or prices comparable to the London Interbank Offered rate for U.S. dollar deposits).

Dividends on the Series 2007-A Company Preferred Securities are non-cumulative. If the Company's Board of Managers does not declare a dividend on the Series 2007-A Company Preferred Securities or declares less than a full dividend in respect of any Dividend Period, holders of the Series 2007-A Company Preferred Securities will have no right to receive any dividend or a full dividend, as the case may be, for that Dividend Period, and the Company will have no obligation to pay any dividends or full dividends on the Series 2007-A Company Preferred Securities for that Dividend Period, whether or not dividends are declared and paid for any future Dividend Period with respect to any series of the Company Preferred Securities, the Company Common Securities or any other Junior Equity Securities.

**Restrictions on Dividends**

During a Dividend Period, no dividends will be declared or paid on any securities of the Company ranking junior to the Company Preferred Securities in respect of payments of dividends or on liquidation ("*Junior Equity Securities*"), other than dividends payable in Junior Equity Securities of the same class or series, or Junior Equity Securities ranking junior to that class or series, and no Junior

Equity Securities will be purchased, redeemed or otherwise acquired for consideration, directly or indirectly (other than as a result of reclassification of Junior Equity Securities for or into other Junior Equity Securities, or the exchange or conversion of Junior Equity Securities for or into other Junior Equity Securities), unless dividends for such Dividend Period on all series of Company Preferred Securities have been declared and paid in full, or declared and set aside for payment, as the case may be.

When dividends are not paid in full on, or a sum sufficient for such full payment is not set apart for, all series of the Company Preferred Securities, all dividends declared upon all series of the Company Preferred Securities will be declared *pro rata*. Thus, the amount of dividends declared per Company Preferred Security of each series will in all cases bear to each other the same ratio that (i) full dividends per Company Preferred Security of such series for the then-current Dividend Period, which will not include any accumulation in respect of unpaid dividends for prior Dividend Periods, and (ii) full dividends, which will not include any accumulation in respect of unpaid dividends for prior Dividend Periods, on all other series of Company Preferred Securities, bear to each other.

Under certain circumstances, if the OTS determines that WMB is operating with an insufficient level of capital or is engaged in, or its relationship with the Company results in, an unsafe and unsound banking practice, the OTS could restrict the Company's ability to pay dividends, including dividends to the holders of the Series 2007-A Company Preferred Securities. See "The Company — Business of the Company".

**Restrictions on Dividends by WMI**

WMI will covenant in the Exchange Agreement for the benefit of the holders of the Trust Securities that if full dividends on (i) any series of Company Preferred Securities, or (ii) the Trust Securities, Trust I Securities or WaMu Cayman Securities for any Dividend Period have not been declared and paid, WMI will not declare or pay dividends with respect to, or redeem, purchase or acquire any of its equity capital securities during the next succeeding Dividend Period, except dividends in connection with a shareholders' rights plan, if any, or dividends in connection with benefits plans.

**Redemption**

The Series 2007-A Company Preferred Securities will not be redeemable at the option of the holders, prior to May 24, 2017, thereof. Subject to the Replacement Capital Covenant in favor of certain of WMI's debtholders limiting WMI's and its subsidiaries' right to purchase or redeem the Series 2007-A Company Preferred Securities or the Trust Securities (among others) as described under "Description of the Trust Securities — Restriction on Redemption or Purchases", and subject to the Company having received the prior approval of the OTS for any proposed redemption of Series 2007-A Company Preferred Securities, the Company may, at its option, redeem the Series 2007-A Company Preferred Securities:

- in whole but not in part, on any Dividend Payment Date prior to the Dividend Payment Date in June 2012 upon the occurrence of a Tax Event, an Investment Company Act Event, a Rating Agency Event or a Regulatory Capital Event, at a cash redemption price equal to:

  - the greater of:

    (i) $1,000 per Series 2007-A Company Preferred Security, or

    (ii) the sum of the present value of $1,000 per Series 2007-A Company Preferred Security, discounted from the Dividend Payment Date in June 2012 to the redemption date, and the present values of all undeclared dividends for each Dividend Period from the redemption date to and including the Dividend Payment Date in June 2012, discounted from their applicable Dividend Payment Dates to the redemption date, in each case on a quarterly basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate, as calculated by an Independent Investment Banker, *plus* 0.50%, *plus*

- any declared but unpaid dividends to the redemption date;

- in whole but not in part, on any Dividend Payment Date prior to the Dividend Payment Date in June 2012 for any reason other than the occurrence of a Tax Event, an Investment Company Act Event, a Rating Agency Event or a Regulatory Capital Event, at a cash redemption price equal to:

  - the greater of:

    (i) $1,000 per Series 2007-A Company Preferred Security, or

    (ii) the sum of the present value of $1,000 per Series 2007-A Company Preferred Security, discounted from the Dividend Payment Date in June 2012 to the redemption date, and the present values of all undeclared dividends for each Dividend Period from the redemption date to and including the Dividend Payment Date in June 2012, discounted from their applicable Dividend Payment Dates to the redemption date, in each case on a quarterly basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate, as calculated by an Independent Investment Banker, plus 0.35%; *plus*

  - any declared but unpaid dividends to the redemption date;

- in whole but not in part, on any Dividend Payment Date after the Dividend Payment Date in June 2012 that is not a Five-Year Date, upon the occurrence of a Tax Event, an Investment Company Act Event, a Rating Agency Event or a Regulatory Capital Event, at a cash redemption price equal to $1,000 per Series 2007-A Company Preferred Securities, *plus* any declared and unpaid dividends to the redemption date;

- in whole or in part, on each Dividend Payment Date that is a Five-Year Date at a cash redemption price of $1,000 per Series 2007-A Company Preferred Security, *plus* any declared and unpaid dividends to the redemption date; and

- in whole but not in part, on any Dividend Payment Date after the Dividend Payment Date in June 2012 that is not a Five-Year Date for any reason other than the occurrence of a Tax Event, an Investment Company Act Event, a Rating Agency Event or a Regulatory Capital Event, at a cash redemption price equal to:

  - the greater of:

    (i) $1,000 per Series 2007-A Company Preferred Security, or

    (ii) the sum of the present value of $1,000 per Series 2007-A Company Preferred Security, discounted from the next succeeding Five-Year Date to the redemption date, and the present values of all undeclared dividends for each Dividend Period from the redemption date to and including the next succeeding Five-Year Date, discounted from their applicable Dividend Payment Dates to the redemption date, in each case on a quarterly basis (assuming a 360-day year consisting of twelve 30-day months) at the 3-month USD LIBOR Rate applicable to the Dividend Period immediately preceding such redemption date (which 3-month USD LIBOR Rate will also, for purposes of calculating such redemption price, be the rate used in calculating the amount for each such undeclared dividend), as calculated by an Independent Investment Banker; *plus*

  - any declared but unpaid dividends to the redemption date;

in each case, without accumulation of any undeclared dividends with respect to Dividend Payment Dates prior to the redemption date.

"*Comparable Treasury Issue*" means the United States Treasury security selected by the Independent Investment Banker as having a maturity comparable to the term remaining to the Dividend Payment Date in June 2012 that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of perpetual preferred securities having terms

similar to those of the Series 2007-A Company Preferred Securities with respect to the payment of dividends and distributions of assets upon liquidation, dissolution or winding up of the issuer of such preferred stock.

"*Comparable Treasury Price*" means, with respect to any redemption date for the Series 2007-A Company Preferred Securities, the average of the Reference Treasury Dealer Quotations for such redemption date, after excluding the highest and lowest of such Reference Treasury Dealer Quotations, or if the Independent Investment Banker obtains fewer than five such Reference Treasury Dealer Quotations, the average of all such quotations.

"*Independent Investment Banker*" means an independent investment banking institution of national standing appointed by the Company.

An "*Investment Company Act Event*" occurs with respect to the Series 2007-A Company Preferred Securities when the Company determines, based upon receipt of an opinion of counsel, that there is a significant risk that the Company, the Trust, Asset Trust I, Asset Trust II or any other Asset Subsidiary will be considered an "investment company" that is required to be registered under the Investment Company Act, as a result of a change in applicable laws, regulations or related interpretations.

A "*Rating Agency Event*" occurs when the Company reasonably determines that an amendment, clarification or change has occurred in the equity criteria for securities such as the Series 2007-A Company Preferred Securities of any Rating Agency that then publishes a rating for WMI which amendment, clarification or change results in a lower equity credit for WMI than the respective equity credit assigned by such Rating Agency to the Company Preferred Securities on the closing date of this Offering.

"*Reference Treasury Dealer*" means each of three primary U.S. government securities dealers (each a "*Primary Treasury Dealer*"), as specified by the Company; *provided* that if any Primary Treasury Dealer specified by the Company ceases to be a Primary Treasury Dealer, the Company will substitute for such Primary Treasury Dealer another Primary Treasury Dealer and if the Company fails to select a substitute within a reasonable period of time, then the substitute will be a Primary Treasury Dealer selected by the Independent Investment Banker after consultation with the Company.

"*Reference Treasury Dealer Quotations*" means, with respect to each Reference Treasury Dealer and any redemption date, the average, as determined by the Independent Investment Banker, of the bid and asked prices for the Comparable Treasury Issue (expressed, in each case, as a percentage of its principal amount) quoted in writing to the Independent Investment Banker by such Reference Treasury Dealer at 5:00 P.M., New York City time, on the third Business Day preceding such redemption date.

A "*Regulatory Capital Event*" occurs with respect to the Series 2007-A Company Preferred Securities when the Company determines, based upon receipt of an opinion of counsel, that there is a significant risk that the Series 2007-A Company Preferred Securities will no longer constitute core capital of WMB for purposes of the capital adequacy regulations issued by the OTS as a result of a change in applicable laws, regulations or related interpretations after issuance of the Series 2007-A Company Preferred Securities.

A "*Tax Event*" occurs with respect to the Series 2007-A Company Preferred Securities when the Company determines, based upon receipt of an opinion of counsel, that there is a significant risk that (i) the Company will be required by a relevant jurisdiction to withhold amounts from payments to the holders of any Series 2007-A Company Preferred Securities for taxes or any other governmental charges, (ii) the Trust will be required by a relevant jurisdiction to withhold amounts from payments to the holders of the Trust Securities for taxes or any other governmental charges or (iii) the Company is or will be treated as a publicly traded partnership taxable as a corporation or as an association taxable as a corporation for United States federal income tax purposes, as a result of any change in law or

regulation, or any judicial or regulatory action, that is effective or announced after the issuance of the Series 2007-A Company Preferred Securities.

"*Treasury Rate*" means the rate per year equal to the quarterly equivalent yield to maturity of the Comparable Treasury Issue, calculated using a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such redemption date. The Treasury Rate will be calculated on the third Business Day preceding the redemption date.

A notice of redemption of the Series 2007-A Company Preferred Securities will be mailed by first-class mail, postage prepaid, addressed to the holders of record of the securities to be redeemed at their respective last addresses appearing on the books and records of the Company. Such mailing will be at least 35 days but not more than 65 days before the date fixed for redemption.

The Company's ability to redeem any Company Preferred Security is subject to compliance with applicable regulatory requirements, including the prior approval of the OTS, relating to the redemption of capital instruments. Under current policies of the OTS, such approval would be granted only if the redemption were to be made out of the proceeds of the issuance of another capital instrument or if the OTS were to determine that the conditions and circumstances of WMB warrant the reduction of a source of permanent capital.

## Restrictions on Redemption or Purchases

At or prior to issuance of the Series 2007-A Company Preferred Securities and the Trust Securities, WMI will enter into the Replacement Capital Covenant described under "Description of the Trust Securities — Restriction on Redemption or Purchases", limiting WMI's and its subsidiaries, including the Company's, ability to redeem or purchase prior to May 24, 2017 certain securities, including the Series 2007-A Company Preferred Securities or the Trust Preferred Securities, among others.

## Rights upon Liquidation

In the event the Company voluntarily or involuntarily dissolves and winds up, the holders of Series 2007-A Company Preferred Securities at the time outstanding will be entitled to receive liquidating dividends in the amount of $1,000 per security, *plus* any authorized, declared, but unpaid dividends to the date of liquidation, out of the Company's assets legally available for distribution, before any distribution of assets is made to holders of Junior Equity Securities and subject to the rights of general creditors.

After payment of the full amount of the liquidating distributions to which they are entitled, the holders of Series 2007-A Company Preferred Securities will have no right or claim to any of the Company's remaining assets. In the event that, upon any such voluntary or involuntary dissolution and winding up, the available assets are insufficient to pay the amount of the liquidation distributions on all series of Company Preferred Securities, then the holders of all the series of Company Preferred Securities will share ratably in any such distribution of assets in proportion to the full liquidating distributions to which they would otherwise be respectively entitled.

For such purposes, the Company's consolidation or merger with or into any other entity, the consolidation or merger of any other entity with or into the Company, or the sale of all or substantially all of the Company's property or business, will not be deemed to constitute the Company's dissolution and winding up.

## Voting Rights and Covenants

Except as set forth below, holders of Series 2007-A Company Preferred Securities will not have voting rights. The LLC Agreement provides that, so long as any Company Preferred Securities of any series are outstanding, the Company will not, except with the consent or affirmative vote of the holders of at least two-thirds of all series of the Company Preferred Securities, voting together as a single

class (*provided* that for the purpose of such approval, a like amount of Company Preferred Securities as any Trust Securities, Trust I Securities or WaMu Cayman Securities that are directly or indirectly held or beneficially owned by any member of WMI Group will be treated as if they were not outstanding):

- effect a consolidation, merger or share exchange with or into another entity *provided* that the Company may consolidate or merge with or into, or enter into a share exchange with, another entity without the consent of the holders of the Company Preferred Securities if (A) the other entity is controlled by, or under common control with, WMI, (B) the other entity elects to be treated as a partnership for U.S. federal income tax purposes and is not required to register as an "investment company" under the 1940 Act, (C) the other entity expressly assumes all of the Company's obligations and commitments pursuant to the consolidation, merger, or share exchange, (D) the outstanding Company Preferred Securities are exchanged for or converted into shares of the surviving entity having preferences, limitations, and relative voting and other rights substantially identical to those of the Company Preferred Securities, including limitations on personal liability of the Company Preferred Securityholders, (E) after giving effect to the merger, consolidation, or share exchange, no breach, or event which, with the giving of notice or passage of time or both, could become a breach, by the Company of obligations under the LLC Agreement shall have occurred and be continuing, and (F) the Company has received written confirmation that the Rating Agency Condition has been satisfied;

- issue any Senior Equity Securities;

- incur any indebtedness for borrowed money;

- pay dividends on the Company's Junior Equity Securities unless the Company's FFO for the four prior fiscal quarters, equals or exceeds 150% of the amount that would be required to pay full annual dividends on all series of Company Preferred Securities;

- fail to invest the proceeds of the Company's assets such that the Company's FFO over any period of four fiscal quarters will equal or exceed 150% of the amount that would be required to pay full annual dividends on all series of Company Preferred Securities;

- issue any additional Company Common Securities to any person, other than University Street or another affiliate of WMI;

- amend or otherwise change the terms of any Asset Documentation in a manner which is materially adverse of the Trust, or to any other Trust Holder or to the holders of that Trust Holder's securities;

- remove or cause to be removed, as applicable, "Washington Mutual" from the Company's or the Trust's name unless the name of WMI changes and the Company makes a change to the Company's or the name of any other Trust Holder, the Trust's or such other Trust Holder's name to be consistent with the new group name;

- take or fail to take any action that would cause the Company to fail to be treated as a partnership (other than a publicly traded partnership taxable as a corporation) for United States federal income tax purposes;

- engage in a U.S. trade or business for United States federal income tax purposes;

- fail to hold only assets that qualify for the portfolio interest exemption under the Code or are otherwise exempt from United States federal withholding taxes;

- fail to manage its affairs such that its income does not constitute "unrelated business taxable income" for United States federal income tax purposes;

- take any action that could reasonably be expected to cause a Tax Event, an Investment Company Act Event, a Rating Agency Event or a Regulatory Capital Event; or

- amend its Certificate of Formation or LLC Agreement in a manner that materially and adversely affects the terms of any series of Company Preferred Securities; *provided, however,* that, if such amendment affects fewer than all classes of preferred securities issued by the

Company, such amendment will require only a vote of the holders of such affected class or classes of Company Preferred Securities, voting together as a separate class.

In addition, the LLC Agreement provides that, except with the consent of all of the Company's Managers, including its Independent Manager, the Company will not:

- terminate, amend or otherwise change any Asset Documentation; or
- effect a consolidation, merger or share exchange (excluding the Conditional Exchange) that is not tax-free to the holders of any series of the Company Preferred Securities and the related Trust Securities, Trust I Securities or WaMu Cayman Securities, as applicable, unless such transaction was approved by the consent or affirmative vote of the holders of at least two-thirds of all series of the Company Preferred Securities, voting together as a single class.

In addition, the LLC Agreement will provide that if (i) the Company fails to pay full dividends on any series of the Company Preferred Securities on any Dividend Payment Date, (ii) the Trust fails to pass through full dividends paid by the Company on the Series 2007-A Company Preferred Securities to the holders of the Trust Securities, or any other Trust Holder fails to pass through full dividends paid by the Company on the series of Company Preferred Securities held by that Trust Holder, on any Dividend Payment Date or (iii) a Bankruptcy Event occurs, the holders of all the series of Company Preferred Securities, voting together as a single class, by majority vote, are entitled to remove the initial or any succeeding Independent Manager and to fill the vacancy created by such removal or any other vacancy existing in the office of the Independent Manager.

The LLC Agreement requires that, in assessing the benefits to the Company of any proposed action requiring his or her consent, the Company's Independent Manager take into account the interests of holders of both Company Common Securities and all series of the Company Preferred Securities. The LLC Agreement provides that in considering the interests of the holders of the Company Preferred Securities, the Company's Independent Manager owes the same duties to such holders which the Independent Manager owes to the holders of Company Common Securities.

As a condition to effecting any consolidation, merger or share exchange described above, the Company will mail to the holders of record of the Company Preferred Securities a notice of such consolidation, merger or share exchange. The notice will be mailed at least 15 days prior to such transaction becoming effective and will contain a description of such transaction together with a certificate of one of the Company's officers stating that such transaction complies with the requirements set forth in the LLC Agreement and that all conditions precedent provided therein relating to such transaction have been fulfilled.

As described under "Description of the Trust Securities — Voting Rights", each holder of Trust Securities will have the right to direct the manner in which Property Trustee on behalf of the Trust exercises its voting rights as to a like amount of Series 2007-A Company Preferred Securities held by the Trust with respect to any of the matters on which a holder of Series 2007-A Company Preferred Securities is entitled to vote.

WMI's articles of incorporation do not contain similar covenants regarding the Series M WMI Preferred Stock following an exchange of the Trust Securities. Therefore, following a Conditional Exchange, holders of the Depositary Shares would no longer have any voting rights, except as provided by Washington law or in connection with the right to elect directors if dividends are skipped or not paid in full. See below under "Description of the Series M WMI Preferred Stock — Voting Rights".

## Additional Amounts

If the Company or the Trust is required to pay any Additional Taxes as a result of an Additional Tax Event, the Company will pay as additional amounts on the Series 2007-A Company Preferred Securities such amounts as will be required so that dividends on the Series 2007-A Company Preferred Securities or the Trust Securities, as applicable, will not be reduced as a result of any such Additional Taxes ("*Additional Amounts*").

"*Additional Taxes*" means the sum of any additional taxes, duties and other governmental charges to which the Company or the Trust has become subject from time to time as a result of an Additional Tax Event.

An "*Additional Tax Event*" means the determination by the Company, based upon receipt of an opinion of counsel, rendered by a law firm experienced in such matters, in form and substance reasonably satisfactory to the Company and WMI, to the effect that, as a result of any amendment to, or change (including any announced proposed change) in, the laws (or any regulations thereunder) of the United States or of any political subdivision or taxing authority thereof or therein, or as a result of any official administrative pronouncement or judicial decision interpreting or applying such laws or regulations, which amendment or change is effective or which proposed change, pronouncement or decision is announced on or after the date of issuance of the Trust Securities, there is a significant risk that (i) the Company or the Trust is, or will be within 90 days of the date of such opinion of counsel, required by a relevant jurisdiction to withhold amounts from payments to the holders of the Series 2007-A Company Preferred Securities or Trust Securities, respectively, for any taxes, duties and other governmental charges, (ii) the Trust is, or will be within 90 days of the date of such opinion of counsel, subject to United States federal income tax with respect to income received or accrued on the like amount of Series 2007-A Company Preferred Securities held by it or (iii) the Trust is, or will be within 90 days of the date of such opinion of counsel, subject to more than a *de minimis* amount of other taxes, duties or other governmental charges.

## Amendments and Termination of the LLC Agreement

University Street may, at any time and from time to time, without the consent of the holders of the Company Preferred Securities of any series, amend the LLC Agreement: (i) to correct or supplement any provision in the LLC Agreement that may be defective or inconsistent with any other provision therein, or to make any other provisions with respect to matters or questions arising under the LLC Agreement, *provided* that any such action taken under this clause will not materially adversely affect the interests of the holders of any series of the Company Preferred Securities and *provided further* that any such amendment shall not cause the Company, the Trust or any other Trust Holder to be required to be registered under the 1940 Act, be taxable as a corporation for United States Federal income tax purposes, or be treated as engaged in a trade or business within the United States, as determined for United States Federal income tax purposes; (ii) to cure any ambiguity or inconsistency or correct any manifest error; or (iii) to give effect to the future issuance of Parity Equity Securities or Junior Equity Securities and to set the designations, preferences, and rights of any such Parity Equity Security or Junior Equity Security. Any other amendment of the LLC Agreement must be approved by vote of holders of two-thirds (by aggregate liquidation preference) of any series of the Company Preferred Securities, voting together as a single class (see "— Voting Rights and Covenants"); *provided* that for the purpose of such approval, if any member of WMI Group directly or indirectly holds or beneficially owns any Trust Securities or securities of any other Trust Holder, then a like amount of the applicable series of Company Preferred Securities will be treated as if they were not outstanding. The Company will notify the Paying Agents and the holders of the Trust Securities of any such amendment of the LLC Agreement within a reasonable period of time.

The LLC Agreement will terminate upon the termination of the Company under the LLC Act.

## Governing Law

The LLC Agreement and the Series 2007-A Company Preferred Securities will be governed by, and construed in accordance with, the laws of the State of Delaware.