# DESCRIPTION OF OTHER COMPANY SECURITIES

*The following summary of the terms of the other Company securities does not purport to be complete and is subject in all respects to the applicable provisions of the LLC Act and the LLC Agreement. A copy of the LLC Agreement may be obtained upon request to WMI.*

## Common Securities

### General

The Company has outstanding, and will continue to have outstanding upon consummation of this offering, 1,000 Company Common Securities, all of which will be held by University Street.

The Company Common Securities may be sold, assigned or otherwise transferred by University Street to another entity, subject to WMI maintaining direct or indirect ownership of 100% of the outstanding Company Common Securities and receipt by University Street of an opinion of counsel to the effect that as a result of any such sale, transfer or assignment the Company will not be taxable as a corporation for United States federal income tax purposes.

Pursuant to the LLC Agreement, except with the consent or the affirmative vote of the holders of at least two-thirds of all series of the Company Preferred Securities, voting together as a single class, the Company will not issue any additional Company Common Securities or other Junior Equity Securities to any person, other than University Street or another affiliate of WMI.

No additional payments will be required pursuant to the LLC Act for Company Common Securities to represent limited liability company interests in the Company upon issuance against full payment of the purchase price therefor.

### Voting

Subject to the limited rights of the holders of the Series 2007-A Company Preferred Securities, as described under "Description of the Series 2007-A Company Preferred Securities — Voting Rights and Covenants", and any voting rights granted to holders of the Outstanding Company Preferred Securities and any other Parity Equity Securities, all voting rights of the Company's security holders are vested in the Company Common Securities.

### Dividends

The Company Common Securities rank junior to all the Company Preferred Securities as to payment of dividends. No dividends will be declared or paid in any Dividend Period on the Company Common Securities, other than dividends payable in Company Common Securities, and no Company Common Securities will be purchased, redeemed or otherwise acquired for consideration, directly or indirectly (other than as a result of reclassification of Company Common Securities for or into Company Common Securities, or the exchange or conversion of Company Common Securities for or into Company Common Securities), unless dividends in such Dividend Period on all series of the Company Preferred Securities have been declared and paid in full, or set aside for payment, as the case may be. Pursuant to the LLC Agreement, except with the consent or the affirmative vote of the holders of at least two-thirds of all series of the Company Preferred Securities, voting together as a single class, the Company will not pay any dividends on the Company Common Securities or other Junior Equity Securities unless the Company's FFO for the four prior fiscal quarters equals or exceeds 150% of the amount that would be required to pay full annual dividends on all series of the Company Preferred Securities; *provided* that for the purpose of such approval, a like amount of the applicable series of Company Preferred Securities as any Trust Securities, Trust I Securities, Trust II Securities or WaMu Cayman Securities that are directly or indirectly held or beneficially owned by any member of WMI Group will be treated as if they were not outstanding.

### Liquidation Rights

The Company Common Securities will rank junior to all series of the Company Preferred Securities upon liquidation. In the event of any voluntary or involuntary dissolution of the Company, after all of the Company's debts and liabilities have been satisfied and there have been paid or set aside for the holders of all series of the Company Preferred Securities the full preferential amounts to which such holders are entitled, the holders of Company Common Securities will be entitled to share equally and ratably in any assets remaining.

### Outstanding Company Preferred Securities

The Outstanding Company Preferred Securities will rank *pari passu* with the Series 2007-A Company Preferred Securities as to dividends and upon liquidation of the Company. The terms of the Series 2007-A Company Preferred Securities will be substantially identical to the Outstanding Company Preferred Securities except for the dividend rates and redemption dates and prices. The Series 2006-A Company Preferred Securities will, if, when and as declared by the Company's Board of Managers, pay dividends at an annual rate of 6.534% until March 15, 2011, and 3-month USD LIBOR plus 1.4825% thereafter. The Series 2006-A Company Preferred Securities are held by Trust I, which issued a like amount of Trust I Securities to investors on March 7, 2006. The Series 2006-B Company Preferred Securities will, if, when and as declared by the Company's Board of Managers, pay dividends at an annual rate of 7.25%. The Series 2006-B Company Preferred Securities are held by WaMu Cayman, which issued a like amount of WaMu Cayman Securities to investors on March 7, 2006. The Series 2006-C Company Preferred Securities will, if, when and as declared by the Company's Board of Managers, pay dividends at an annual rate of 6.665% until December 15, 2016, and 3-month USD LIBOR plus 1.7925% thereafter. The Series 2006-A Company Preferred Securities are held by Trust II, which issued a like amount of Trust II Securities to investors on December 13, 2006. The Outstanding Company Preferred Securities are not listed on any securities exchange or automated dealer quotation system.

### Ability to Issue Additional Preferred Securities

Pursuant to the LLC Agreement, the Company may not issue any Senior Equity Securities or incur any indebtedness except with the consent or affirmative vote of holders of at least two-thirds of all series of the Company Preferred Securities, voting together as a single class, as described under "Description of the Series 2007-A Company Preferred Securities — Voting Rights and Covenants". The Company may issue additional Parity Equity Securities without the consent of the holders of Company Preferred Securities only if the tests described under "Description of the Series 2007-A Company Preferred Securities — Ranking" are satisfied.

# DESCRIPTION OF THE SERIES M WMI PREFERRED STOCK

*The following summary describes the material terms and provisions of the Series M WMI Preferred Stock. The description is qualified in its entirety by reference to the terms and provisions of WMI's articles of incorporation and the articles of amendment establishing the Series M WMI Preferred Stock. A copy of WMI's articles of incorporation and such articles of amendment can be obtained upon request to WMI.*

## General

WMI has authorized and reserved for issuance upon a Conditional Exchange, as described under "Description of the Trust Securities — Conditional Exchange", 500 shares of its Series M Perpetual Non-cumulative Fixed-to-Floating Rate Preferred Stock, no par value and liquidation preference $1,000,000 per share (the "*Series M WMI Preferred Stock*"). The shares of Series M WMI Preferred Stock, if and when issued upon a Conditional Exchange, will be represented by depositary shares (the "*Depositary Shares*"), each representing 1/1000th of a share of Series M WMI Preferred Stock. The holders of the Series M WMI Preferred Stock will have no pre-emptive rights with respect to any shares of WMI's capital stock or any of its other securities convertible into or carrying rights or options to purchase any such capital stock. The Series M WMI Preferred Stock is perpetual and will not be convertible into shares of WMI common stock or any other class or series of its capital stock, and will not be subject to any sinking fund or other obligation for its purchase or retirement.

The Series M WMI Preferred Stock, upon issuance, will have substantially equivalent terms as to dividends, redemption, liquidation preference and redemption preference as the Series 2007-A Company Preferred Securities and Trust Securities for which they may be exchanged, except that the Series M WMI Preferred Stock: (i) will not have the benefit of the covenants described under "Description of Series 2007-A Company Preferred Securities — Voting Rights and Covenants" or "— Additional Amounts" and (ii) will be redeemable prior to the Dividend Payment Date occurring in June 2012 and on any Dividend Payment Date thereafter that is not a Five-Year Date only upon the occurrence of a Regulatory Capital Event or a Rating Agency Event or payment of the applicable "make-whole" amount as described under "— Redemption" below.

In addition, if WMI fails to pay, or declare and set aside for payment, full dividends on the Series M WMI Preferred Stock after its issuance or any other class or series of WMI Parity Stock (as defined below) having similar voting rights ("*Voting Parity Securities*") for six Dividend Periods or their equivalent, the authorized number of directors on WMI's board will be increased by two. Subject to compliance with any requirement for regulatory approval of, or non-objection to, persons serving as directors, the holders of Series M WMI Preferred Stock, voting together as a single and separate class with the holders of any outstanding Voting Parity Securities, will have the right to elect two directors in addition to the directors then in office at WMI's next annual meeting of shareholders.

The Dividend Payment Dates and related Dividend Periods for the Series M WMI Preferred Stock, once issued, will be the same as the Dividend Payment Dates and related Dividend Periods for the Trust Securities and Company Preferred Stock, and the terms "*Dividend Payment Date*" and "*Dividend Period*" will have the same meanings as applied to the Series M WMI Preferred Stock as applied to those securities, it being understood that if the Series M WMI Preferred Stock is not issued prior to the Dividend Payment Date occurring in June 2012, a Dividend Payment Date will be deemed to occur on such date with respect to the Series M WMI Preferred Stock for the purposes of determining the interest rate and the terms of redemption thereof. The term "*Business Day*", when used with reference to the Series M WMI Preferred Stock, means any day other than a Saturday, Sunday or any other day on which banks in New York, New York or Seattle, Washington are generally required or authorized by law to be closed.

The Series M WMI Preferred Stock will be subject to the Replacement Capital Covenant described under "Description of the Trust Securities — Restriction on Redemption or Purchases".

## Ranking

WMI will covenant in the Exchange Agreement in favor of the holders of the Trust Securities that, prior to the issuance of the Series M WMI Preferred Stock upon a Conditional Exchange, WMI will not issue any preferred stock that would rank senior to the Series M WMI Preferred Stock upon its issuance.

The Series M WMI Preferred Stock will, upon issuance, rank at least *pari passu* with the most senior preferred stock of WMI, if any, then outstanding, and to any other preferred stock that WMI may issue in the future. The Series M WMI Preferred Stock will, with respect to dividend rights and rights on liquidation, winding-up and dissolution, rank (i) on a parity with WMI's Series I WMI Preferred Stock, Series J WMI Preferred Stock, Series K WMI Preferred Stock, Series L WMI Preferred Stock (each as defined below) and each other class or series of preferred stock WMI may issue in the future, the terms of which expressly provide that such class or series will rank on a parity with the Series M WMI Preferred Stock as to dividend rights and rights on WMI's liquidation, winding-up and dissolution (collectively referred to as "*WMI Parity Stock*") and (ii) senior to WMI's common stock, its Series RP Preferred Stock and each other class of capital stock WMI may issue in the future, the terms of which do not expressly provide that it ranks on a parity with or senior to the Series M WMI Preferred Stock as to dividend rights and rights on WMI's liquidation, winding-up and dissolution (collectively referred to as "*Junior Securities*"). WMI may authorize and issue additional shares of preferred stock that may rank junior to or *pari passu* with the Series M WMI Preferred Stock as to dividends and upon liquidation, winding up or dissolution without the consent of the holders of the Series M WMI Preferred Stock. See "Description of the Other WMI Capital Stock" below.

## Dividends

Dividends on the Series M WMI Preferred Stock will be payable if, when and as declared by WMI's Board of Directors out of its legally available funds, on a non-cumulative basis at an annual rate of 6.895% to, but not including, June 15, 2012 (whether or not a Business Day) and 3-Month USD LIBOR plus 1.755% thereafter on the liquidation preference thereof, which is $1,000,000 per share, from and including the Dividend Payment Date on or prior to their date of issuance. Dividends on the Series M WMI Preferred Stock, if, when and as declared by WMI's Board of Directors, will be payable quarterly in arrears on each Dividend Payment Date, commencing on the first such day after issuance of the Series M WMI Preferred Stock. The record date for the payment of dividends, if declared, will be the first day of the month in which the relevant Dividend Payment Date occurs or, if any such day is not a Business Day, the next day that is a Business Day. Dividends payable on the Series M WMI Preferred Stock for any period greater or less than a full Dividend Period will be computed on the basis of (i) for any Dividend Periods ending prior to or in June 2012, twelve 30-day months, a 360-day year, and the actual number of days elapsed in the period and (ii) for any Dividend Periods thereafter, the actual number of days elapsed in the relevant dividend period divided by 360. No interest will be paid on any dividend payment made on the Series M WMI Preferred Stock or Depositary Shares. Holders of Depositary Shares will receive for each Depositary Share 1/1000th of any such dividend payment made on a single share of the Series M WMI Preferred Stock.

Dividends on the Series M WMI Preferred Stock will be non-cumulative. If WMI's Board of Directors does not declare a dividend on the Series M WMI Preferred Stock or declares less than a full dividend in respect of any Dividend Period, the holders of the Series M WMI Preferred Stock will have no right to receive any dividend or a full dividend, as the case may be, for the Dividend Period, and WMI will have no obligation to pay a dividend or to pay full dividends for that Dividend Period, whether or not dividends are declared and paid for any future Dividend Period with respect to the Series M WMI Preferred Stock, WMI's common stock or any other class or series of WMI's preferred stock.

**Redemption**

The Series M WMI Preferred Stock will not be redeemable at the option of the holders thereof. Subject to a covenant in favor of certain of WMI's debtholders limiting WMI's and its subsidiaries' right to purchase or redeem the Series M WMI Preferred Stock (among others) as described under "Description of the Trust Securities — Restriction on Redemption or Purchases", WMI may, at its option redeem the Series M WMI Preferred Stock:

- in whole but not in part, prior to the Dividend Payment Date in June 2012, upon the occurrence of a Regulatory Capital Event or a Rating Agency Event, at a cash redemption price equal to the sum of:

  - the greater of:

    - (i) $1,000,000 per share of Series M WMI Preferred Stock, and

    - (ii) the sum of the present value of $1,000,000 per share of Series M WMI Preferred Stock, discounted from the Dividend Payment Date in June 2012 to the redemption date, and the present values of all undeclared dividends for each Dividend Period from the redemption date to and including the Dividend Payment Date in June 2012, discounted from their applicable Dividend Payment Dates to the redemption date, in each case on a quarterly basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate, as calculated by an Independent Investment Banker, *plus* 0.50%,

  - *plus* any declared but unpaid dividends to the redemption date;

- in whole but not in part, on any Dividend Payment Date prior to the Dividend Payment Date in June 2012 for any reason other than the occurrence of a Rating Agency Event or a Regulatory Capital Event, at a cash redemption price equal to:

  - the greater of:

    - (i) $1,000,000 per share of Series M WMI Preferred Stock, or

    - (ii) the sum of the present value of $1,000,000 per share of Series M WMI Preferred Stock, discounted from the Dividend Payment Date in June 2012 to the redemption date, and the present values of all undeclared dividends for the Dividend Periods from the redemption date to and including the Dividend Payment Date in June 2012, discounted from their applicable Dividend Payment Dates to the redemption date, in each case on a quarterly basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate, as calculated by an Independent Investment Banker, plus 0.35%; *plus*

  - any declared but unpaid dividends to the redemption date;

- in whole but not in part, on any Dividend Payment Date after the Dividend Payment Date in June 2012 that is not a Five-Year Date, upon the occurrence of a Regulatory Capital Event or a Rating Agency Event, at a cash redemption price equal to $1,000,000 per share of Series M WMI Preferred Stock, *plus* any declared and unpaid dividends to the redemption date;

- in whole or in part, on each Dividend Payment Date that is a Five-Year Date, at a cash redemption price of $1,000,000 per share of Series M WMI Preferred Stock, *plus* any declared and unpaid dividends to the redemption date; and

- in whole but not in part, on any Dividend Payment Date after the Dividend Payment Date in June 2012 that is not a Five-Year Date for any reason other than the occurrence of a Rating Agency Event or a Regulatory Capital Event, at a cash redemption price equal to:

  - the greater of:

    - (i) $1,000,000 per share of Series M WMI Preferred Stock, or

(ii) the sum of the present value of $1,000,000 per share of Series M WMI Preferred Stock, discounted from the next succeeding Five-Year Date to the redemption date, and the present values of all undeclared dividends for each Dividend Period from the redemption date to and including the next succeeding Five-Year Date, discounted from their applicable Dividend Payment Dates to the redemption date, in each case on a quarterly basis (assuming a 360-day year consisting of twelve 30-day months) at the 3-month USD LIBOR Rate applicable to the Dividend Period immediately preceding such redemption date (which 3-month USD LIBOR Rate will also, for purposes of calculating such redemption price, be the rate used in calculating the amount for each undeclared dividend), as calculated by an Independent Investment Banker; *plus*

- any declared but unpaid dividends to the redemption date;

in each case, without accumulation of any undeclared dividends with respect to Dividend Payment Dates prior to the redemption date.

Dividends will cease to accrue on the Series M WMI Preferred Stock called for redemption on and as of the date fixed for redemption and such Series M WMI Preferred Stock will be deemed to cease to be outstanding, *provided* that the redemption price, including any authorized and declared but unpaid dividends for the current Dividend Period, if any, to the date fixed for redemption, has been duly paid or provision has been made for such payment.

Notice of any redemption will be mailed at least 30 days, but not more than 60 days, prior to any redemption date to each holder of the Series M WMI Preferred Stock to be redeemed, at such holder's registered address.

### Replacement

At or prior to issuance of the Series 2007-A Company Preferred Securities and the Trust Securities, WMI will enter into the Replacement Capital Covenant described under "Description of the Trust Securities — Restriction on Redemption or Purchases", limiting WMI's ability to redeem or purchase prior to May 24, 2017 certain securities, including the Series M WMI Preferred Stock, among others.

### Rights upon Liquidation

If WMI voluntarily or involuntarily liquidates, dissolves or winds up, the holders of Series M WMI Preferred Stock at the time outstanding will be entitled to receive liquidating distributions in the amount of $1,000,000 per share, or $1,000 per Depositary Share representing a 1/1000th interest in the Series M WMI Preferred Stock, plus an amount equal to declared but unpaid dividends for the current Dividend Period to the date of liquidation, out of WMI's assets legally available for distribution to its shareholders, before any distribution of assets is made to holders of WMI's common stock or any securities ranking junior to the Series M WMI Preferred Stock, subject to the rights of the holders of any class or series of securities ranking on a parity upon liquidation with the Series M WMI Preferred Stock upon liquidation and the rights of its depositors and creditors.

After payment of the full amount of the liquidating distributions to which they are entitled, the holders of the Series M WMI Preferred Stock will have no right or claim to any of WMI's remaining assets. In the event that, upon any such voluntary or involuntary liquidation, dissolution, or winding up, WMI's available assets are insufficient to pay the amount of the liquidation distributions on all outstanding Series M WMI Preferred Stock and the corresponding amounts payable on any other securities of equal ranking, then the holders of the Series M WMI Preferred Stock and any other securities of equal ranking will share ratably in any such distribution of assets in proportion to the full liquidating distributions to which they would otherwise be respectively entitled.

For such purposes, WMI's consolidation or merger with or into any other entity, the consolidation or merger of any other entity with or into it, or the sale of all or substantially all of WMI's property or business, will not be deemed to constitute its liquidation, dissolution, or winding up.

## Voting Rights

Holders of Series M WMI Preferred Stock will not have any voting rights, including the right to elect any directors, except upon issuance as required by law, or as set forth below.

Washington law attaches mandatory voting rights to classes or series of shares that are affected by certain amendments to the articles of incorporation. The holders of the outstanding shares of a class or series are entitled to vote as a separate voting group if shareholder voting is otherwise required by Washington law and if the amendment would:

- increase the aggregate number of authorized shares of the class or series;

- effect an exchange or reclassification of all or part of the issued and outstanding shares of the class or series into shares of another class or series, thereby adversely affecting the holders of the shares so exchanged or reclassified;

- change the rights, preferences, or limitations of all or part of the issued and outstanding shares of the class or series, thereby adversely affecting the holders of shares of the class or series;

- change all or part of the issued and outstanding shares of the class or series into a different number of shares of the same class or series, thereby adversely affecting the holders of shares of the class or series;

- create a new class or series of shares having rights or preferences with respect to dividends or other distributions or to dissolution that are, or upon designation by the board of directors may be, prior, superior, or substantially equal to the shares of the class or series;

- increase the rights or preferences with respect to distributions, or on liquidations or dissolution, or the number of authorized shares of any class or series that, after giving effect to the amendment, has rights or preferences with respect to distributions, or on liquidations or dissolution that are, or upon designation by the board of directors may be, prior, superior, or substantially equal to the shares of the class or series;

- limit or deny an existing pre-emptive right of all or part of the shares of the class or series;

- cancel or otherwise adversely affect rights to distributions that have accumulated but not yet been declared on all or part of the shares of the class or series; or

- effect a redemption or cancellation of all or part of the shares of the class or series in exchange for cash or any other form of consideration other than shares of the corporation.

Holders of the outstanding shares of a class or series of stock are entitled under Washington law to vote as a separate voting group with respect to a merger or share exchange if shareholder voting is otherwise required by Washington law and if, as a result of the merger or share exchange, holders of a part or all of the class or series would hold or receive:

- shares of any class or series of the surviving or acquiring corporation, or of any parent corporation of the surviving corporation, and either (i) that class or series has a greater number of authorized shares than the class or series held by the holders, or (ii) there is a change in the number of shares held by the holders or in the rights, preferences or limitations of the shares or the class or series and the change adversely affects the holders;

- shares of any class or series of the surviving or acquiring corporation, or of any parent corporation of the surviving corporation, and such holders would be, as compared to their circumstances prior to the merger or exchange, adversely affected by the creation, existence,

number of authorized shares or rights or preferences of another series that may be prior, superior or substantially equal to the shares to be received by such holders; or

- cash or any other property other than shares of the surviving or acquiring corporation or of any parent corporation of the surviving corporation.

Under Washington law, if any class or series of shares is entitled to vote as a group in connection with an amendment of the articles, a merger or a share exchange, such class or series and any other classes or series affected in a substantially similar way will vote together as a single voting group unless otherwise provided by the articles or by the board of directors.

Washington law permits these statutory voting rights to be expanded or, in certain circumstances, limited in the designation of the terms of a class or series. The statutory voting rights of the holders of Series M WMI Preferred Stock will be expanded and, in certain circumstances, limited as described below.

If after issuance of the Series M WMI Preferred Stock WMI fails to pay, or declare and set aside for payment, full dividends on the Series M WMI Preferred Stock or any other class or series of Voting Parity Securities for six Dividend Periods or their equivalent, the authorized number of WMI's directors will be increased by two. Subject to compliance with any requirement for regulatory approval of, or non-objection to, persons serving as directors, the holders of Series M WMI Preferred Stock, voting together as a single and separate class with the holders of any outstanding Voting Parity Securities, will have the right to elect two directors in addition to the directors then in office at WMI's next annual meeting of shareholders. This right will continue at each subsequent annual meeting until WMI pays dividends in full on the Series M WMI Preferred Stock and any Voting Parity Securities for three consecutive Dividend Periods or their equivalent and pays or declares and sets aside for payment dividends in full for the fourth consecutive Dividend Period or its equivalent.

The term of such additional directors will terminate, and the total number of directors will be decreased by two after WMI pays dividends in full for three consecutive Dividend Periods or their equivalent and declares and pays or sets aside for payment dividends in full on the Series M WMI Preferred Stock and any Voting Parity Securities for the fourth consecutive Dividend Period or its equivalent or, if earlier, upon the redemption of all Series M WMI Preferred Stock. After the term of such additional directors terminates, the holders of the Series M WMI Preferred Stock will not be entitled to elect additional directors unless full dividends on the Series M WMI Preferred Stock have again not been paid or declared and set aside for payment for six future Dividend Periods.

Any additional director elected by the holders of the Series M WMI Preferred Stock and the Voting Parity Securities may be removed only by the vote of the holders of record of the outstanding Series M WMI Preferred Stock and Voting Parity Securities, voting together as a single and separate class, at a meeting of WMI's shareholders called for that purpose. Any vacancy created by the removal of any such director may be filled only by the vote of the holders of the outstanding Series M WMI Preferred Stock and Voting Parity Securities, voting together as a single and separate class.

So long as any shares of Series M WMI Preferred Stock are outstanding, the vote or consent of the holders of at least $66^{2/3}$% of the shares of Series M WMI Preferred Stock at the time outstanding, voting as a class with all other series of preferred stock ranking equal with the Series M WMI Preferred Stock and entitled to vote thereon, given in person or by proxy, either in writing without a meeting or by vote at any meeting called for the purpose, will be necessary for effecting or validating any of the following actions, whether or not such approval is required by Washington law:

- any amendment, alteration or repeal of any provision of WMI's amended and restated Articles of Incorporation (including the Articles of Amendment creating the Series M WMI Preferred Stock) or WMI's bylaws that would alter or change the voting powers, preferences or special rights of the Series M WMI Preferred Stock so as to affect them adversely;

- any amendment or alteration of WMI's amended and restated Articles of Incorporation to authorize or create, or increase the authorized amount of, any shares of, or any securities convertible into shares of, any class or series of WMI's capital stock ranking prior to the Series M WMI Preferred Stock in the payment of dividends or in the distribution of assets on any liquidation, dissolution or WMI's winding-up; or

- the consummation of a binding share exchange or reclassification involving the Series M WMI Preferred Stock or a merger or consolidation of WMI with another entity, except holders of Series M WMI Preferred Stock will have no right to vote under this provision or otherwise under Washington law if in each case (i) the Series M WMI Preferred Stock remains outstanding or, in the case of any such merger or consolidation with respect to which WMI is not the surviving or resulting entity, is converted into or exchanged for preference securities of the surviving or resulting entity or its ultimate parent, and (ii) such Series M WMI Preferred Stock remaining outstanding or such preference securities, as the case may be, have such rights, preferences, privileges and voting powers, taken as a whole, as are not materially less favorable to the holders thereof than the rights, preferences, privileges and voting powers of the Series M WMI Preferred Stock, taken as a whole;

*provided, however,* that any increase in the amount of the authorized or issued Series M WMI Preferred Stock or authorized preferred stock or any securities convertible into preferred stock or the creation and issuance, or an increase in the authorized or issued amount, of other series of preferred stock or any securities convertible into preferred stock ranking equally with and/or junior to the Series M WMI Preferred Stock with respect to the payment of dividends (whether such dividends are cumulative or non-cumulative) and/or the distribution of assets upon WMI's liquidation, dissolution or winding-up will not be deemed to adversely affect the voting powers, preferences or special rights of the Series M WMI Preferred Stock and, notwithstanding any provision of Washington law, holders of Series M WMI Preferred Stock will have no right to vote on such an increase.

If an amendment, alteration, repeal, share exchange, reclassification, merger or consolidation described above would adversely affect one or more but not all series of Voting Parity Securities (including the Series M WMI Preferred Stock for this purpose), then only those series affected and entitled to vote shall vote as a class in lieu of all such series of preferred stock.

The foregoing voting provisions will not apply if, at or prior to the time when the act with respect to which such vote would otherwise be required is effected, all outstanding shares of Series M WMI Preferred Stock have been redeemed or called for redemption upon proper notice and sufficient funds have been set aside by WMI for the benefit of the holders of the Series M WMI Preferred Stock to effect such redemption.

WMI will covenant in the Exchange Agreement that in the event WMI, prior to the Conditional Exchange, effects, or is, the subject of a merger, consolidation, statutory share exchange, sale of all or substantially all of its assets or other form of business combination, (i) in which WMI is not the surviving, resulting or receiving corporation thereof or (ii) if WMI is the surviving or resulting corporation, shares representing a majority of WMI's total voting power are either converted or exchanged into securities of another person or into cash or other property (any such transaction in either (i) or (ii) being a "*Business Combination*"), then WMI (i) will not enter into such Business Combination unless the Successor Entity agrees, effective upon the consummation of such Business Combination, to abide by all of WMI's obligations under the provisions of the Exchange Agreement restricting the payment of dividends by WMI in the event dividends are not paid with respect to the Company Preferred Securities and (ii) may, at the election of the Board of Directors of WMI prior to the effectiveness of such Business Combination, assign, effective upon the consummation of such Business Combination, all of its other obligations under the Exchange Agreement to a Successor Entity that has Fixed-to-Floating Rate Substitute Preferred Stock and, as a result of such assignment, all references to WMI, Series M WMI Preferred Stock and Depositary Shares shall become and be

deemed to be references to such Successor Entity, to such Fixed-to-Floating Rate Substitute Preferred Stock and to a Fixed-to-Floating Rate Successor Depositary Share, respectively.

"*Successor Entity*" means a corporation designated by the Board of Directors of WMI (i) that is the surviving, resulting or receiving corporation, as applicable, in any Business Combination, (ii) the securities of which are received in a Business Combination by some or all holders of WMI voting shares or (iii) that the Board of Directors of WMI determines to be an acquirer of WMI in a Business Combination.

"*Fixed-to-Floating Rate Substitute Preferred Stock*" means a class or series of equity securities of a Successor Entity having the preferences, limitations and relative rights in its articles or certificate of incorporation or other constituent documents that are substantially similar to those set forth in the articles of amendment establishing the Series M WMI Preferred Stock.

"*Fixed-to-Floating Rate Successor Depositary Share*" means a depositary share substantially similar to a Depositary Share representing an interest in the Fixed-to-Floating Rate Substitute Preferred Stock.

**Conditional Exchange**

For a description of how an exchange of the Trust Securities into Depositary Shares may occur upon an Exchange Event, purchasers should read "Description of the Trust Securities — Conditional Exchange".

## DESCRIPTION OF THE DEPOSITARY SHARES

*The following summary describes the material terms and provisions of the Depositary Shares. This description is qualified in its entirety by reference to the terms and provisions of the Deposit Agreement, the form of depositary receipts, which contain the terms and provisions of the Depositary Shares, and WMI's articles of incorporation and articles of amendment. Copies of each of the foregoing documents may be obtained upon request to WMI.*

### General

Each depositary share will represent a 1/1000th interest in one share of Series M WMI Preferred Stock (the "*Depositary Shares*"). The Depositary Shares will be evidenced by depositary receipts issued in definitive registered form. The shares of Series M WMI Preferred Stock underlying the Depositary Shares will, upon an exchange as a result of an Exchange Event, be deposited with Mellon Investor Series LLC, as depositary (the "*Depositary*"), under a Deposit Agreement, to be entered into on or before the closing date (the "*Deposit Agreement*"), among WMI, the Depositary, the registrar appointed thereunder and all holders from time to time of depositary receipts issued by the Depositary thereunder. WMI does not intend to list or quote the Depositary Shares or the Series M WMI Preferred Stock on any securities exchange or automated dealer quotation system. Accordingly, there will be no public trading market for the Depositary Shares or the Series M WMI Preferred Stock. The Initial Purchasers are under no obligation to and do not intend to make a market in the Depositary Shares.

Subject to the terms of the Deposit Agreement, each owner of a Depositary Share will be entitled, through the Depositary, to all the rights, preferences and privileges of 1/1000th of a share of Series M WMI Preferred Stock. Owners of a single Depositary Share, representing a 1/1000th interest in one share of Series M WMI Preferred Stock, will be subject to all of the limitations of the fractional share represented thereby, which are summarized above under "Description of the Series M WMI Preferred Stock".

The Depositary will act as transfer agent, registrar and paying agent with respect to the Depositary Shares.

The Depositary's office at which the depositary receipts will be administered is located at 480 Washington Boulevard, Jersey City, New Jersey 07310.

Purchasers may hold Depositary Shares either directly or indirectly through their broker or other financial institution. If purchasers hold Depositary Shares directly, by having Depositary Shares registered in their name on the books of the Depositary, the purchaser is a depositary receipt holder. If purchasers hold the Depositary Shares through their broker or financial institution nominee, the purchasers must rely on the procedures of such broker or financial institution to assert the rights of a depositary receipt holder described in this section. Purchasers should consult with their broker or financial institution to find out what those procedures are.

### Issuance of Depositary Receipts

Automatically upon a Conditional Exchange, WMI will issue the shares of Series M WMI Preferred Stock, and deposit those shares with the Depositary, which will then issue and deliver the depositary receipts to WMI. WMI will, in turn, deliver the depositary receipts to the holders of Trust Securities as of the date of the Conditional Exchange. Depositary receipts will be issued evidencing only whole Depositary Shares. Each Trust Security will then be exchanged for a like amount of depositary receipts as described under "Description of the Trust Securities — Conditional Exchange".

### Dividends and Other Distributions

The Depositary will distribute all cash dividends, dividends paid in Depositary Shares representing paid-up and nonassessable shares of Series M WMI Preferred Stock or other cash distributions

received in respect of the Series M WMI Preferred Stock to the record holders of Depositary Shares in proportion to the numbers of such Depositary Shares owned by such holders on the relevant record date. In the event of a distribution other than in cash, the Depositary will distribute property received by it to the record holders of Depositary Shares entitled thereto, unless the Depositary determines that it is not feasible to make such a distribution, in which case the Depositary may, after consultation with WMI, sell such property and distribute the net proceeds from such sale to such holders.

**Redemption of Depositary Shares**

If the shares of Series M WMI Preferred Stock underlying the Depositary Shares are redeemed, in whole or in part, Depositary Shares will be redeemed with the proceeds received by the Depositary resulting from the redemption of the Series M WMI Preferred Stock held by the Depositary. The redemption price per Depositary Share will be equal to 1/1000th of the redemption price per share payable with respect to such Series M WMI Preferred Stock. If less than all the shares of Series M WMI Preferred Stock are to be redeemed, a corresponding proportion of the Depositary Shares will be redeemed and the Depositary Shares to be redeemed will be selected by lot or *pro rata,* in WMI's sole discretion.

After the date fixed for redemption (which will be the same date as the redemption date for the Series M WMI Preferred Stock), the Depositary Shares so called for redemption will no longer be deemed to be outstanding and all rights of the holders of the Depositary Shares will cease, except the right to receive the moneys payable upon such redemption and any money or other property to which the holders of such Depositary Shares were entitled upon such redemption upon surrender to the Depositary of the depositary receipts evidencing such Depositary Shares.

**Amendment of Deposit Agreement**

The form of depositary receipt evidencing the Depositary Shares and any provision of the Deposit Agreement may at any time be amended by agreement between WMI and the Depositary. However, any amendment that materially and adversely alters the rights of the holders of depositary receipts will not be effective unless such amendment has been approved by the holders of at least a majority of the Depositary Shares then outstanding. Every holder of an outstanding depositary receipt at the time any amendment becomes effective will be deemed, by continuing to hold such depositary receipt, to consent and agree to such amendment and to be bound by the Deposit Agreement as amended thereby.

**Charges of Depositary**

WMI will pay the charges of the Depositary in connection with the initial deposit of the Series M WMI Preferred Stock and the initial issuance of the Depositary Shares upon a Conditional Exchange, and any redemption of the Series M WMI Preferred Stock. Holders of Depositary Shares will pay all other transfer and other taxes and governmental charges and, in addition, such other charges as are expressly provided in the Deposit Agreement to be for their accounts. All other charges and expenses of the Depositary and of any registrar incident to the performance of their respective obligations arising from the depositary arrangements will be paid by WMI only after prior consultation and agreement between the Depositary and WMI and consent by WMI to the incurrence of such expenses, which consent will not be unreasonably withheld.

**Miscellaneous**

The Depositary will forward to the holders of the Depositary Shares all reports and communications from WMI that WMI would be required to furnish to the holders of the Series M WMI Preferred Stock.

Neither the Depositary nor WMI will be liable if it is prevented or delayed by law or any circumstances beyond its control in performing its obligations under the Deposit Agreement. The

obligations of WMI and the Depositary under the Deposit Agreement will be limited to performance in good faith of their duties thereunder, and they will not be obligated to prosecute or defend any legal proceedings in respect of any Depositary Shares or the Series M WMI Preferred Stock unless satisfactory indemnity is furnished. They may rely upon written advice of counsel or independent accountants, or information provided by persons presenting Series M WMI Preferred Stock for deposit, holders of Depositary Shares or other persons believed to be competent and on documents believed to be genuine.

**Resignation and Removal of Depositary; Termination of Deposit Agreement**

The Depositary may resign at any time by delivering to WMI notice of its election to do so, and WMI may at any time remove the Depositary, with any such resignation or removal taking effect upon the appointment of a successor depositary and its acceptance of such appointment. Such successor depositary will be appointed by WMI within 60 days after delivery of the notice of resignation or removal. Upon termination of the Deposit Agreement, the Depositary will discontinue the transfer of depositary receipts, will suspend the distribution of dividends to the holders thereof and will not give any further notices (other than notice of such termination) or perform any further acts under the Deposit Agreement, except that the Depositary will continue to collect dividends and other distributions pertaining to Series M WMI Preferred Stock and will continue to deliver Series M WMI Preferred Stock certificates together with such dividends and distributions and the net proceeds of any sales of rights, preferences, privileges, or other property in exchange for depositary receipts surrendered. At any time after the expiration of three years from the date of termination, the Depositary may sell the Series M WMI Preferred Stock and hold the proceeds of such sale, without interest, for the benefit of the holders of depositary receipts who have not then surrendered their depositary receipts. After making such sale, the Depositary will be discharged from all obligations under the Deposit Agreement except to account for such proceeds.

# DESCRIPTION OF THE OTHER WMI CAPITAL STOCK

As of the date hereof, the authorized capital stock of WMI consists of 1,600,000,000 shares of WMI common stock and 10,000,000 shares of preferred stock, no par value. As of the close of business on May 18, 2007, there were 888,383,743 shares of WMI common stock outstanding and 500 shares of WMI's Series K Perpetual Non-Cumulative Floating Rate Preferred Stock outstanding. As of the close of business on May 18, 2007, 700,000 shares of preferred stock of WMI were authorized, but unissued, as contemplated by WMI's Rights Agreement, dated as of December 20, 2000, entered into by and between WMI and Mellon Investor Services LLC. In addition, 2,500 shares of WMI preferred stock were authorized for issuance in connection with the issuance of the Trust I Securities, WaMu Cayman Securities and Trust II Securities as described below. The shares of WMI preferred stock to be issued upon the occurrence of a Conditional Exchange have been duly authorized and when and if issued will be validly issued, fully paid, nonassessable and free of preemptive rights, with no personal liability attaching to the ownership thereof.

WMI authorized and reserved for issuance in connection with the offering of the Trust I Securities and the related issuance by the Company of the Series 2006-A Company Preferred Securities up to 1,250 shares of its Series I Perpetual Non-cumulative Fixed-to-Floating Rate Preferred Stock, no par value, and liquidation preference of $1,000,000 per share (the "*Series I WMI Preferred Stock*"). WMI also authorized for issuance in connection with the offering of the WaMu Cayman Securities and the related issuance by the Company of the Series 2006-B Company Preferred Securities up to 750 shares of its Series J Perpetual Non-cumulative Fixed Rate Preferred Stock, no par value, and liquidation preference of $1,000,000 per share (the "*Series J WMI Preferred Stock*"). WMI authorized and reserved for issuance in connection with the offering of the Trust II Securities and the related issuance by the Company of the Series 2007-A Company Preferred Securities up to 500 shares of its Series L Perpetual Non-cumulative Fixed-to-Floating Rate Preferred Stock, no par value, and liquidation preference of $1,000,000 per share (the "*Series L WMI Preferred Stock*"). The shares of Series I WMI Preferred Stock, Series J WMI Preferred Stock and the Series L WMI Preferred Stock will be issued by WMI solely upon the occurrence of a Conditional Exchange with respect to the Trust I Securities and WaMu Cayman Securities, respectively. If and when the shares of Series I WMI Preferred Stock, Series J WMI Preferred Stock and the Series L WMI Preferred Stock are issued upon the occurrence of a Conditional Exchange, they will be represented by depositary shares of WMI, each of which will represent 1/1000th of a share of such preferred stock. The Series I WMI Preferred Stock, Series J WMI Preferred Stock, Series L WMI Preferred Stock rank, and the Series M WMI Preferred Stock when issued will rank, *pari passu* with one another as to dividends and upon liquidation of WMI. None of these series of WMI preferred stock will be listed on any securities exchange or automated dealer quotation system.

In September 2006, WMI issued 20,000,000 depositary shares, each of which represented a 1/40,000th interest in a share of WMI's Series K Perpetual Non-Cumulative Floating Rate Preferred Stock (the "*Series K WMI Preferred Stock*"). 500 shares of Series K WMI Preferred Stock were issued. The Series K WMI Preferred Stock has a liquidation preference of $1,000,000 per share. Dividends on the Series K WMI Preferred Stock are non-cumulative and, if declared by the board of directors, are paid quarterly at a per annum rate equal to the greater of (i) 3-month USD LIBOR for the related dividend period, plus 0.70%, or (ii) 4.00%. The Series K WMI Preferred Stock has no stated maturity. Beginning in September 2011, WMI may at its option redeem the Series K WMI Preferred Stock in whole or in part at any time or from time to time at a price equal to $1,000,000 per share plus any declared and unpaid dividends. The Series K WMI Preferred Stock has no voting rights except in certain specific circumstances. The Series I WMI Preferred Stock, the Series J WMI Preferred Stock and the Series L WMI Preferred Stock rank, and the Series M WMI Preferred Stock will rank, on a parity with Series K WMI Preferred Stock as to dividends rights and rights on liquidation, winding up and dissolution of WMI.

# BOOK-ENTRY ISSUANCE

## Form, Denomination, Transfer and Book-Entry Procedures

### General

The Trust Securities will be issued only in fully registered form. Each purchaser in this Offering and each account for which it is purchasing will hold at least $300,000 liquidation preference of Trust Securities (*i.e.*, at least three Trust Securities) and, if it transfers any interest in any Trust Security, will transfer at least $100,000 liquidation preference of Trust Securities (*i.e.*, at least one Trust Security) and each subsequent purchaser and each account for which it is purchasing will hold and transfer at least $100,000 liquidation preference of Trust Securities (*i.e.*, at least one Trust Security). Any transfer, sale or other disposition of Trust Securities having a liquidation preference of less than $100,000 or that results in a beneficial owner holding Trust Securities having an aggregate liquidation preference of less than $100,000, will be deemed to be null and void *ab initio* and of no legal effect whatsoever. Any such transferee will be deemed not to be the beneficial owner of such Trust Securities for any purpose, including, but not limited to, the receipt of dividends on such Trust Securities, and such transferee will be deemed to have no interest whatsoever in such Trust Securities.

### Global Security

The Trust Securities initially will be represented by one or more securities in registered, global form (collectively, the "*Global Security*"). The Global Security will be deposited upon issuance with the Registrar as custodian for The Depository Trust Company ("*DTC*") in New York, New York, and registered in the name of DTC or its nominee (the "*Nominee*"), in each case for credit to an account of a DTC Participant, as described below.

### Special Considerations for Global Securities

As an indirect holder, a purchaser's rights relating to a Global Security will be governed by the account rules of the purchaser's financial institution and of DTC, as well as the general laws relating to securities transfers. The Trust will not recognize the purchaser as a holder of Trust Securities and instead will deal only with DTC or its nominee. See "— The DTC System".

Purchasers should be aware that because Trust Securities are issued only in the form of a Global Security:

- they cannot get Trust Securities registered in their name;
- they cannot receive physical certificates for their interest in the Trust Securities;
- they will be "Street Name" holders and must look to their own bank or broker for payments on the Trust Securities and the protection of their legal rights relating to the Trust Securities;
- they may not be able to sell interests in the Trust Securities to some insurance companies and other institutions that are required by law to own securities in the form of physical certificates; and
- DTC's policies will govern payments, transfers, exchanges and other matters relating to the purchaser's interest in the Global Security. See "— The DTC System". The Trust, the Company and the Registrar have no responsibility for any aspect of DTC's actions or for its records of ownership interests in the Global Security. The Trust, the Company and the Registrar also do not supervise DTC in any way.

### Special Situations When the Global Security Will Be Terminated

In a few special situations, interests in the Global Security will be exchanged for definitive physical certificates representing Trust Securities. After that exchange, the choice of whether to hold

Trust Securities directly or in "Street Name" will be up to the beneficial owner. Purchasers must consult their own bank or broker to find out how to have their interests in Trust Securities transferred to their own name, so that they will be direct holders.

The special situations for exchange of the Global Security for definitive physical certificates are:

- DTC notifies the Trust that it is unwilling, unable or no longer qualified to continue as the depositary for the Trust Securities; or

- the Trust in its sole discretion determines that the Global Security will be exchangeable for certificated Trust Securities.

When the Global Security is exchanged, DTC (and not the Trust, the Company or the Registrar) will be responsible for deciding the names of the institutions that will be the initial direct holders.

If Trust Securities are issued in certificated form, dividends, if any, will be payable, and Trust Securities may be transferred or exchanged, at the corporate trust office of the Registrar in New York, New York, *provided* that payment of interest on certificated Trust Securities may be made at the option of the Trust by check mailed to the address of the persons entitled thereto.

## The DTC System

DTC is a limited-purpose trust company created to hold securities for its participating organizations (the "*DTC Participants*"). DTC also facilitates the clearance and settlement between DTC Participants of transactions in securities deposited with DTC through changes in the account records of DTC Participants. DTC Participants include securities brokers and dealers (including the Initial Purchasers), banks, trust companies, clearing corporations and certain other organizations. Access to DTC's system is also available to other entities such as securities brokers and dealers, banks and trust companies that work through a DTC Participant (the "*Indirect DTC Participants*").

When the Trust Securities are purchased through the DTC system, the purchase must be made by or through a DTC Participant, who will receive credit for the Trust Securities on DTC's records. The purchaser's ownership interest will only be recorded on the DTC Participants' (or Indirect DTC Participants') records. DTC has no knowledge of a purchaser's individual ownership of the Trust Securities. DTC's records show only the identity of the DTC Participants and the amount of the Trust Securities held by or through them. A purchaser will not receive a written confirmation of its purchase or sale or any periodic statement directly from DTC; it will receive these from the DTC Participant or Indirect DTC Participant at which it maintains its account. Thus, the DTC Participants (or Indirect DTC Participants) are responsible for keeping an accurate account of the holdings of their customers.

Any redemption notices with respect to the Trust Securities will be sent by the Company and the Trust directly to DTC, who will in turn inform the DTC Participants, who will then contact the beneficial owners. If less than all of the Trust Securities are being redeemed, DTC's current practice is to choose by lot the amount of the interest of each DTC Participant to be redeemed. Each DTC Participant will then use an appropriate method to allocate the redemption among its beneficial holders.

It is DTC's current practice, upon receipt of any payment in respect of the Global Security to credit DTC Participants' accounts on the payment date based on their holdings of beneficial interests in the Global Security as shown on DTC's records. In addition, it is DTC's current practice to assign any consenting or voting rights to DTC Participants whose accounts are credited beneficial interests in the Global Security on a record date, by using an omnibus proxy. Payments by DTC Participants to owners of beneficial interests in the Global Security, and voting by DTC Participants, will be based on the customary practices between the DTC Participants and owners of beneficial interests, as is the case with securities held for the account of customers registered in "Street Name". However, payments will be the responsibility of the DTC Participants and not of DTC, the Registrar, the Trust or the Company.

Interests in the Trust Securities will trade in DTC's same-day funds settlement system, and secondary market trading activity in such interests will therefore settle in immediately available funds, subject in all cases to the rules and procedures of DTC and its participants.

DTC has advised the Trust that it will take any action permitted to be taken by a holder of the Trust Securities only at the direction of one or more DTC Participants to whose account with DTC interests in the Global Security are credited and only in respect of such portion of the aggregate principal amount of the Trust Securities as to which such participant or participants has or have given such direction.

Although DTC has agreed to the foregoing procedures in order to facilitate transfers of beneficial ownership interests in the Global Security among participants of DTC it is under no obligation to perform or continue to perform such procedures, and such procedures may be discontinued at any time. Neither the Company, the Trust, the Registrar or any of their representative agents will have any responsibility for the performance by DTC, the DTC Participants or the Indirect DTC Participants of its obligations under the rules and procedures governing their operations, including maintaining, supervising or reviewing the records relating to, or payments made on account of, beneficial ownership interests in the Global Security.

### Euroclear and Clearstream

Clearstream Banking, société anonyme, 42 Avenue JF Kennedy, L-1855, Luxembourg (*"Clearstream"*), is a subsidiary of Clearstream International (*"Clearstream International"*), a Luxembourg limited liability company formed in January 2000 through the merger of Cedel International and Deutsche Boerse Clearing, a subsidiary of Deutsche Boerse AG. In July 2002, Deutsche Boerse AG acquired Cedel International and its 50% ownership of Clearstream International.

Clearstream is registered as a bank in Luxembourg, and as such is subject to supervision by the Luxembourg Financial Sector Supervisory Commission, which supervises Luxembourg banks.

Clearstream holds securities for its customers (*"Clearstream Participants"*) and facilitates the clearance and settlement of securities transactions by electronic book-entry transfers between their accounts. Clearstream provides various services, including safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Clearstream also deals with domestic securities markets in several countries through established depository and custodial relationships. Clearstream has established an electronic bridge with Euroclear Bank S.A./N.V. as the Euroclear Operator in Brussels to facilitate settlement of trades between systems. Clearstream currently accepts over 200,000 securities for clearance.

Clearstream International's customers are worldwide financial institutions including underwriters, securities brokers and dealers, banks, trust companies and clearing corporations. Clearstream International's United States customers are limited to securities brokers and dealers and banks. Currently, Clearstream International has over 2,500 customers located in over 94 countries, including all major European countries, Canada and the United States. Indirect access to Clearstream is available to other institutions which clear through or maintain a custodial relationship with an account holder of Clearstream.

The Euroclear System (*"Euroclear"*) was created in 1968 to hold securities for its participants (*"Euroclear Participants"*) and to clear and settle transactions between Euroclear Participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for physical movement of certificates and any risk from lack of simultaneous transfers of securities and cash. Transactions may be settled in a variety of currencies, including United States dollars. Euroclear includes various other securities, including securities lending and borrowing and interfaces with domestic markets in several countries generally similar to the arrangements for cross-market transfers with DTC described above. Euroclear is operated by Euroclear Bank S.A./N.V. (the *"Euroclear Operator"*). All operations are conducted by the Euroclear Operator, and all Euroclear securities

clearance accounts and Euroclear cash accounts are accounts with the Euroclear Operator. Euroclear plc establishes policy for Euroclear on behalf of Euroclear Participants. Euroclear Participants include banks (including central banks), securities brokers and dealers and other professional financial intermediaries. Indirect access to Euroclear is also available to other firms that clear through or maintain a custodial relationship with a Euroclear Participant, either directly or indirectly.

Securities clearance accounts and cash accounts with the Euroclear Operator are governed by the Terms and Conditions Governing Use of Euroclear and the related Operating Procedures of the Euroclear System and applicable Belgian law (collectively, the "*Euroclear Terms and Conditions*"). The Euroclear Terms and Conditions govern transfers of securities and cash within Euroclear, withdrawals of securities and cash from Euroclear, and receipts of payments with respect to securities in Euroclear. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear Operator acts under the Euroclear Terms and Conditions only on behalf of Euroclear Participants, and has no record of, or relationship with, persons holding through Euroclear Participants.

# CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS

*United States Internal Revenue Service Circular 230 Notice: To ensure compliance with Internal Revenue Service Circular 230, prospective investors are hereby notified that: (i) any discussion of U.S. federal tax issues contained or referred to in this offering circular or any document referred to herein is not intended or written to be used, and cannot be used, by prospective investors for the purpose of avoiding penalties that may be imposed on them under the U.S. Internal Revenue Code; (ii) such discussion is written for use in connection with the promotion or marketing of the transactions or matters addressed herein; and (iii) prospective investors should seek advice based on their particular circumstances from an independent tax advisor.*

## General

The following discussion summarizes the principal United States federal income tax treatment of the Trust and the Company, and the principal United States federal income tax consequences to holders of the Trust Securities. This discussion is of a general nature and is not intended to be, nor should it be construed as, tax advice to any holder. Purchasers should consult their own tax advisors regarding the tax consequences of acquiring, owning and disposing of Trust Securities.

The discussion is addressed only to holders that beneficially own Trust Securities as capital assets and does not purport to be a comprehensive description of all the tax considerations that may be relevant to particular holders in light of their personal circumstances. The discussion also does not describe all aspects of taxation that may be relevant to certain types of holders to which special provisions of United States federal income tax law may apply, including:

- dealers in securities and currencies;
- regulated investment companies;
- traders in securities;
- tax-exempt organizations;
- banks and insurance companies;
- persons that hold Trust Securities as part of a hedge, straddle or conversion transaction;
- persons whose functional currency is not the United States dollar; and
- U.S. expatriates.

The summary is based on United States federal income tax law, including the Code, existing and proposed U.S. Treasury regulations, administrative rulings and judicial decisions all as currently in effect. These legal sources are subject to change or differing interpretations at any time, which change or interpretation could apply retroactively and could affect the validity of the discussion below. There can be no assurance that the Internal Revenue Service ("*IRS*") will take the same view of the United States federal income tax consequences of an investment in the Trust Securities as described herein.

**Each purchaser is urged to consult its own tax advisor as to the tax consequences of acquiring, owning and disposing of Trust Securities, including the United States federal, state, local and any other tax consequences of acquiring, owning and disposing of Depositary Shares.**

As used in this discussion, the term "*U.S. Holder*" means a beneficial owner of a Trust Security that is, for United States federal income tax purposes, a citizen or resident of the United States, a corporation or partnership created or organized in or under the laws of the United States or any state, an estate the income of which is includible in gross income for United States federal income tax purposes regardless of its source, or a trust if a court within the United States is able to exercise primary supervision over its administration and one or more United States persons have authority to

control all substantial decisions of the trust. The term "*Foreign Holder*" means a beneficial owner of Trust Securities that is not a U.S. Holder.

## United States Federal Income Tax Consequences

### Tax Treatment of the Trust and its Investment in Series 2007-A Company Preferred Securities

*Classification of the Trust and the Company.* The Trust intends to take the position that it will be treated for United States federal income tax purposes as a grantor trust. Informal guidance recently issued by the IRS has created some uncertainty as to whether certain arrangements such as those involving the Trust and its investment in Company Preferred Securities will be treated as a grantor trust for United States federal income tax purposes. In the absence of further guidance, however, the Trust intends to take the position that it will be treated as a grantor trust. If the Trust were not treated as a grantor trust for United States federal income tax purposes, it would most likely be treated as a partnership which, among other things, would change the nature of and the manner in which the Trust would be required to comply with its United States federal tax reporting obligations, including its tax reporting obligations to holders of Trust Securities. By purchasing a Trust Security, a holder agrees that it will treat the Trust as a grantor trust for U.S. Federal income tax purposes and will treat the Trust Securities as an undivided beneficial ownership interest in the Company Preferred Securities, and that it will report income from its investment in the Trust Securities in a manner consistent with the information provided to or on behalf of or with respect to the Trust.

Provided that the Trust is treated as a grantor trust, each holder of a Trust Security will be treated as if it owns directly the Series 2007-A Company Preferred Securities allocable to such Trust Security. All of the Trust's assets are expected to consist of Series 2007-A Company Preferred Securities. The Company intends to be classified as a U.S. domestic partnership for United States federal income tax purposes, and the Series 2007-A Company Preferred Securities acquired by the Trust are intended to constitute equity interests in such partnership.

An entity that is classified as a partnership for United States federal income tax purposes generally is not a taxable entity and incurs no United States federal income tax liability. Instead, each partner is required to take into account its allocable share of income, gains, losses, deductions and credits of the partnership in computing its United States federal income tax liability, if any, even if no cash distributions are made by the partnership to the partner. An entity that is classified as a partnership for United States federal income tax purposes nevertheless will be taxable as a corporation if it is a "publicly traded partnership" and fails to satisfy a "90% qualifying income" test, within the meaning of Code Section 7704.

On the date of the initial issuance of the Trust Securities, the Company will receive an opinion from Mayer, Brown, Rowe & Maw LLP to the effect that, for United States federal income tax purposes, although no activities closely comparable to those contemplated by the Company have been the subject of any U.S. Treasury regulation, revenue ruling or judicial decision, the Company will not be treated as an association or publicly traded partnership taxable as a corporation. The opinions are based on certain assumptions and on certain representations and agreements regarding restrictions on the future conduct of the activities of the Company. Although the Company intends to conduct its activities in accordance with such assumptions, representations and agreements, if it were nonetheless determined that the Company was taxable as a corporation for United States federal income tax purposes, then cash available for distribution in respect of the Series 2007-A Company Preferred Securities would be reduced on account of taxes payable by the Company. A determination by the Company, based on receipt of an opinion of counsel, that there is a significant risk that the Company is or will be treated as an association or publicly traded partnership taxable as a corporation as a result of a change in law would constitute a Tax Event. See "Description of the Series 2007-A Company Preferred Securities — Redemption". The remainder of this discussion assumes that the Company is treated as a partnership, and not as an association or publicly traded partnership taxable

as a corporation, for U.S. federal income tax purposes, and that the Series 2007-A Company Preferred Securities will constitute equity interests in such partnership.

## Tax Consequences to U.S. Holders of Trust Securities

*Income and Deductions in General.* Each U.S. Holder of Trust Securities will be required to report on its United States federal income tax return its share of income, gains, losses, deductions and credits of the Company that are allocable to the Trust, even if such holder has not received any cash distributions from the Trust.

*Distributions on Trust Securities.* Distributions of money by the Trust to a U.S. Holder of Trust Securities generally will not result in taxable gain to the U.S. Holder. A U.S. Holder of Trust Securities will recognize taxable gain upon a distribution of money by the Company to the Trust with respect to the Series 2007-A Company Preferred Securities if and to the extent that the U.S. Holder's share of such distribution exceeds the U.S. Holder's adjusted tax basis in the Series 2007-A Company Preferred Securities allocable to such U.S. Holder's Trust Securities immediately before the distribution. In general, each U.S. Holder of Trust Securities will have an initial tax basis in the Series 2007-A Company Preferred Securities allocable to such U.S. Holder's Trust Securities equal to the amount paid by the Trust to purchase such Series 2007-A Company Preferred Securities. A U.S. Holder's tax basis in such Series 2007-A Company Preferred Securities generally will be increased by the U.S. Holder's proportionate share of the Company's income and gain allocated to the holder and decreased, but not below zero, by the holder's proportionate share of any cash and the tax basis of any property distributed by the Company and Company losses, deductions and nondeductible expenditures that are not chargeable to capital.

*Allocations of Company Income, Gain, Loss and Deductions.* Each holder of Trust Securities must report its proportionate share of the Company's income, gain, loss and deduction allocated to the Trust for each year. Under Section 704(b) of the Code, a partnership's allocation of any item of income, gain, loss or deduction to a partner will be given effect for United States federal income tax purposes so long as it has "substantial economic effect", or is otherwise in accordance with the "partner's interest in the partnership". If an allocation of an item does not satisfy this standard, it will be reallocated among the partners on the basis of their respective interests in the partnership, taking into account all facts and circumstances. The Company believes that the allocations of items of income, gain, loss and deduction under the LLC Agreement will be considered to have substantial economic effect under the applicable Treasury regulations. U.S. Holders are not expected to be allocated any losses for United States federal income tax purposes with respect to their indirect interests in the Company. The deductibility of expenses and other losses arising from a partnership such as the Company is subject to certain limitations under the Code. In the event expenses or losses are allocated to U.S. Holders of the Trust Securities, such U.S. Holders should consult their tax advisors to determine the deductibility of such losses.

*Sale, Exchange or Other Disposition of Trust Securities.* In general, a U.S. Holder will recognize gain or loss upon the sale or exchange of such U.S. Holder's Trust Securities equal to the difference between the amount realized and such U.S. Holder's adjusted tax basis in the Series 2007-A Company Preferred Securities allocable to such U.S. Holder's Trust Securities. Initially, the tax basis of a U.S. Holder should equal the amount paid for its Trust Securities. Such basis will be increased or decreased as described above and, as a general matter, at all times is expected to equal the face value of the U.S. Holder's Trust Securities. If a holder's Trust Securities are exchanged for Depositary Shares for Series M WMI Preferred Stock, the transaction would most likely be a taxable event to the holder. The holder would recognize gain or loss measured by the difference between the fair market value of the Depositary Shares received and the holder's adjusted tax basis in its relinquished Trust Securities.

*Company Audits.* The tax treatment of Company-related items is determined at the Company level. University Street will be appointed as "tax matters partner" with the authority to determine the

Company's response to an audit. The limitations period for assessment of deficiencies and claims for refunds with respect to items related to the Company is three years after the Company's return for the taxable year in question is filed, and the tax matters partner has the authority to, and may, extend such period with respect to all members of the Company. If an audit results in an adjustment, the holders of the Trust Securities, as the deemed owners of the Series 2007-A Company Preferred Securities, may be required to restate their taxable income, which could cause holders of Trust Securities to pay additional taxes, interest and possibly penalties and such holders may themselves also be subject to audits. There can be no assurance that the Company's or a U.S. Holder's tax return will not be audited by the IRS or that no adjustments to their returns will be made as a result of such an audit.

*Series M WMI Preferred Stock Received in a Conditional Exchange.* If, as a result of a Conditional Exchange, a U.S. Holder receives Depositary Shares for Series M WMI Preferred Stock, any distributions made on the Depositary Shares generally will be included in the holder's income as ordinary dividend income to the extent of WMI's current and accumulated earnings and profits. Distributions in excess of WMI's current and accumulated earnings and profits will be treated as a return of capital to the extent of the U.S. Holder's adjusted tax basis in the Depositary Shares and thereafter as capital gain from the sale or exchange of the Depositary Shares. Dividends received by a corporate U.S. Holder may be eligible for a dividends received deduction, subject to applicable limitations. The sale, exchange or redemption of any Depositary Shares for Series M WMI Preferred Stock will be subject to tax under the rules described above under "— Sale, Exchange or Other Disposition of Trust Securities".

### Tax Treatment of Tax-Exempt U.S. Holders of Trust Securities

For purposes of this discussion, a "*Tax-Exempt U.S. Holder*" means any United States domestic organization qualified under Code Section 501(c)(3), any trust or governmental plan qualified under Code Section 401(a), any individual retirement account and any other non-governmental U.S. Holder generally exempt from United States federal income taxation. A Tax-Exempt U.S. Holder is not expected to be subject to the tax on unrelated business taxable income ("*UBTI*") with respect to its share of Company income and gain allocable to the Trust or any capital gains derived from an investment in the Trust Securities. However, notwithstanding the foregoing, a Tax-Exempt U.S. Holder that incurs "acquisition indebtedness" (as defined in Code Section 514(c)) with respect to its Trust Securities may be subject to the tax on UBTI in respect of any income or gains derived in respect of the Trust Securities to the extent that such Trust Securities constitute "debt-financed property" of the Tax-Exempt U.S. Holder within the meaning of Code Section 514(b).

Tax-Exempt U.S. Holders should consult their own tax advisors regarding the tax consequences to them of an investment in the Trust Securities.

### Tax Treatment of Foreign Holders of Trust Securities

*U.S. Trade or Business Status.* The Company intends to conduct its affairs so as to not be engaged in a trade or business in the United States. On the date of the initial issuance of the Trust Securities, the Company will receive an opinion from Mayer, Brown, Rowe & Maw LLP to the effect that, for United States federal income tax purposes, although no activities closely comparable to those contemplated by the Company have been the subject of any U.S. Treasury regulation, revenue ruling or judicial decision, it will not be treated as engaged in the conduct of a trade or business within the United States. Mayer, Brown, Rowe & Maw LLP's opinion is not binding on the IRS or the courts, and no ruling will be sought from the IRS regarding this, or any other, aspect of the Company's United States federal income tax treatment. Accordingly, no assurance can be given that the IRS will not assert positions contrary to those stated in Mayer, Brown, Rowe & Maw LLP's opinion or that a court would not entertain any such assertions.

Mayer, Brown, Rowe & Maw LLP's opinion is based on certain assumptions and on certain representations and agreements regarding restrictions on the future conduct of the Company's activities. Although the Company intends to conduct its activities in accordance with such assumptions, representations and agreements, if it were nonetheless determined to be engaged in a trade or business in the United States and had taxable income that was effectively connected with such United States trade or business, then each Foreign Holder would be subject to United States federal income tax on such Foreign Holder's share of the Company's effectively connected taxable income allocable to the Trust at regular United States corporate income tax rates and possibly to a 30% United States branch profits tax as well. Moreover, in the event a Foreign Holder were to derive effectively connected income in respect of its ownership of Trust Securities the United States, corporate income tax imposed thereon would be required to be collected in the first instance through a withholding by the Company of such tax at a rate of 35% on such Foreign Holder's distributive share of the income. A determination by the Company, based on receipt of an opinion of counsel, that there is a significant risk that it is or will be treated as engaged in a trade or business within the United States would constitute a Tax Event. See "Description of the Series 2007-A Company Preferred Securities — Redemption". The remainder of this discussion assumes that the Company will not be considered to be engaged in a trade or business in the United States.

**United States Withholding Tax.** Interest that constitutes "portfolio interest" within the meaning of the Code is generally exempt from United States withholding tax. A Foreign Holder will be treated as earning directly its share of the income earned by the Company. Immediately following the completion of this Offering, the Company's material assets will consist of the "regular interests" issued in registered form by the Asset Trusts (*i.e.*, the Asset Trust I Class A Trust Certificate and the Asset Trust II Class A Trust Certificate), each of which will be treated as a "real estate mortgage investment conduit" under the Code (a "*REMIC*") as well as cash and permitted investments. REMIC regular interests are generally treated as indebtedness for United States federal income tax purposes that qualifies for the portfolio interest exemption. In addition, during the term of the transaction, the Company expects, pursuant to its investment guidelines, to invest cash proceeds from the offering of the Series 2007-A Company Preferred Securities in short term debt instruments and other debt securities that qualify for the portfolio interest exemption.

Accordingly, it is expected that a Foreign Holder's share of the Trust's distributive share of the Company's interest income will constitute "portfolio interest", and thus, will not be subject to U.S. withholding tax, so long as the Foreign Holder has certified its status as a Foreign Holder under penalties of perjury on an appropriate IRS Form W-8. In addition, gain realized on the sale, exchange or redemption of the Trust Securities held by a Foreign Holder generally will not be subject to United States federal income or withholding tax, as the case may be, unless such Foreign Holder is a nonresident alien individual who holds the Trust Securities as a capital asset and who is present in the United States more than 182 days in the taxable year of the sale and certain other conditions are met.

**Series M WMI Preferred Stock Received in a Conditional Exchange.** If a Conditional Exchange of the Trust Securities were to occur, any dividends paid to a Foreign Holder of the Depositary Shares for Series M WMI Preferred Stock received upon such Conditional Exchange generally would be subject to a 30% U.S. withholding tax unless the holder qualifies for an exemption or a reduced rate under the U.S. Internal Revenue Code or applicable U.S. tax treaty.

### Information Reporting and Backup Withholding

Under regulations applicable starting with calendar year 2007, a "widely held fixed investment trust" such as the Trust must report to the IRS on IRS Form 1099 for each calendar year any interest allocable to an investor in the trust that is a partnership or that otherwise generally receives Form 1099s. In addition, the regulations provide that such investors in a trust will receive a written statement that includes the information provided on the Form 1099, as well as information relating to any expenses or deductions allocable to the investor and any other information necessary for the investor to accurately prepare its tax return. This written statement must be provided to an investor not later than the March 15

following the end of the year. These rules do not specifically address how to report income derived by a trust from an investment in a partnership such as the Company, and it is possible that the IRS would take a different view as to how the Trust and the Company should provide tax reporting than that described herein. Unless it is advised to use a different method of tax reporting, the Trust intends to report such information under the trust reporting rules. Accordingly, the Trust will comply with its obligations under these regulations, including by timely providing any broker through which a holder holds its Trust Securities with the information necessary for the holder to receive the written statement described above. The Trust will prepare its reports using the accrual method of tax accounting. A Holder may obtain a copy of such information directly from the Trust at Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890 upon reasonable request.

Payments to non-corporate holders of Trust Securities may be subject in certain circumstances to backup withholding if such holders do not furnish their correct taxpayer identification number and certain certifications, or are otherwise subject to backup withholding. Backup withholding is not an additional tax. Any amounts withheld from payments made to investors may be refunded or credited against your U.S. Federal income tax liability, if any, provided, that the required information is timely furnished to the IRS.

The payment of the proceeds from the disposition of a Trust Security by a Foreign Holder generally will not be subject to information reporting and backup withholding if the Foreign Holder certifies its status as a Foreign Holder (and, if applicable, its beneficial owners also certify their status as non-United States persons) under penalties of perjury on the appropriate IRS Form W-8, satisfies certain documentary evidence requirements for establishing that it is a Foreign Holder or otherwise establishes an exemption.

### Tax Return Disclosure Requirements

Recently issued Treasury Regulations and other administrative guidance promulgated by the IRS prescribe certain circumstances under which holders of the Trust Securities could be required to file information returns with the IRS (the "*New Reporting Rules*").

The New Reporting Rules could apply to a U.S. Holder (and to certain Foreign Holders who hold their Trust Securities in connection with a United States trade or business) if the Trust or the Company were to enter into one or more "reportable transactions". The definition of "reportable transaction" is highly technical. It is not expected that the Trust or the Company will engage in activities that would give rise to any reportable transactions. If the Trust or the Company were to engage in any "reportable transaction", then, subject to certain exceptions and threshold limitations, a U.S. Holder or Foreign Holder may be required to file IRS Form 8886 with such holder's United States federal income tax return for each taxable year in which such "reportable transaction" affects such holder's taxable income, and to file a copy of such form with the IRS's Office of Tax Shelter Analysis. The Trust intends to provide to the holders of Trust Securities any information necessary to complete such form.

In addition, subject to certain significant exceptions, any holder of Trust Securities that recognizes a loss on a sale or exchange of such holder's Trust Securities may be required to file IRS Form 8886 in the manner described above if the loss exceeds certain thresholds and no exception applies.

**Prospective purchasers of Trust Securities are urged to consult their own tax advisors regarding the application to them of the New Reporting Rules with respect to an investment in the Trust Securities.**

### Foreign, State, and Local Taxes

Holders may be liable for foreign, state, and local taxes in the country, state, or locality in which they are resident or doing business or in a state or locality in which the Trust or the Company conducts or is deemed to conduct business. Because the tax laws of each country, state, and locality may differ, each prospective purchaser should consult its own tax advisors with respect to any taxes that may be payable as a result of an investment in the Trust Securities.

# ERISA CONSIDERATIONS

Section 406 of the Employee Retirement Income Security Act of 1974, as amended ("*ERISA*") and Section 4975 of the Code prohibit pension, profit-sharing or other retirement plans and accounts subject to ERISA or Section 4975 of the Code and entities that are deemed to hold "plan assets" of any of the foregoing (each, a "*Plan*") from engaging in certain transactions with persons that are "parties in interest" under ERISA or "disqualified persons" under the Code with respect to such Plan. A violation of these "prohibited transaction" rules may result in an excise tax or other penalties and liabilities under ERISA and the Code for such persons or the fiduciaries of the Plan. In addition, Title I of ERISA also requires fiduciaries of a Plan subject to ERISA to make investments that are prudent, diversified and in accordance with the governing plan documents.

Certain transactions involving the Trust might be deemed to constitute prohibited transactions under ERISA and the Code with respect to a Plan that purchased Trust Securities or Series 2007-A Company Preferred Securities if assets of the Trust were deemed to be assets of the Plan. Under a regulation issued by the United States Department of Labor (the "*Regulation*"), the assets of the Trust would be treated as plan assets of a Plan for the purposes of ERISA and the Code only if the Plan acquired an "equity interest" in the Trust and none of the exceptions to plan assets contained in the Regulation was applicable. An equity interest is defined under the Regulation as an interest other than an instrument that is treated as indebtedness under applicable local law and that has no substantial equity features. The Series 2007-A Company Preferred Securities are not likely to be treated as indebtedness for purposes of the Regulation. As such, the Trust intends to prohibit the acquisition and holding of any Trust Security or Company Preferred Security or any interest in a Trust Security or Company Preferred Security by or on behalf of a Benefit Plan Investor (as defined below).

The term "*Benefit Plan Investor*" is defined in Section 3(42) of ERISA to include all employee benefit plans that are subject to Title I of ERISA, individual retirement accounts, Keogh Plans and other plans subject to Section 4975 of the Code, and entities whose underlying assets are deemed to include plan assets by reason of the investment in that entity by Benefit Plan Investors, such as group trusts, bank collective investment trusts, insurance company separate accounts, and certain insurance company general accounts.

By acquiring a Trust Security or Company Preferred Security (or any interest therein), each purchaser and transferee will be deemed to represent, warrant and covenant that, from the date of acquisition throughout the period of holding such Trust Security or Company Preferred Security (or interest therein), it is not, and it is not acquiring such Trust Security or Company Preferred Security (or interest therein) with the assets of a Benefit Plan Investor, except for an insurance company general account that represents, warrants and covenants that, at the time of acquisition and throughout the period it holds the securities, (i) it is eligible for and meets the requirements of Department of Labor Prohibited Transaction Class Exemption 95-60, (ii) less than 25% of the assets of such general account are (or represent) assets of a Benefit Plan Investor and (iii) it is not a person who has discretionary authority or control with respect to the assets of the Trust or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person and would not otherwise be excluded under 29 C.F.R. § 2510.3-101(f)(1).

Government sponsored plans are not subject to the fiduciary provisions of ERISA, and are also not subject to the prohibited transaction provisions under Section 4975 of the Code. However, federal, state or local laws or regulations governing the investment and management of the assets of such plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code discussed above and may include other limitations on permissible investments. Accordingly, fiduciaries of governmental plans, in consultation with their advisors, should consider the requirements of their respective pension codes with respect to purchase of a Trust Security or Company Preferred Security, as well as general fiduciary considerations.

Each purchaser and transferee of a Trust Security or Company Preferred Security will be required to represent and warrant (or, in certain circumstances, will be deemed to represent and

warrant) that, from the date of acquisition throughout the period of holding such Trust Security or Company Preferred Security (or interest therein), either (a) it is not a governmental plan, foreign plan, church plan or other plan subject to law that is substantially similar to the Section 406 of ERISA or Section 4975 of the Code ("*Similar Law*") or (b) its purchase and holding of the Trust Security or Company Preferred Security will not constitute or result in a non-exempt violation of Similar Law.

## RATINGS

It is expected that the Trust Securities will be rated "Baa1" by Moody's Investors Service, Inc. ("*Moody's*"), "BBB" by Standard & Poor's Rating Services, a Division of The McGraw-Hill Companies, Inc. ("*S&P*") and "A−" by Fitch, Inc. ("*Fitch*"). The ratings of the Trust Securities are not recommendations to purchase, hold or sell the Trust Securities, inasmuch as the ratings do not comment as to the market price or suitability for a particular purchaser. Nor do the ratings described above address the likelihood that a holder of Trust Securities will be able to sell such securities. The ratings are based on current information furnished to Moody's, S&P and Fitch by WMI, WMB, the Company and the Trust and information obtained from other sources. The ratings may be changed, suspended or withdrawn at any time as a result of changes in, or the unavailability of, such information. See "Risk Factors — Risks Relating to the Terms of the Trust Securities and the Series 2007-A Company Preferred Securities — Rating agencies may change rating methodologies".

## PLAN OF DISTRIBUTION

The Company, the Trust, WMI and the initial purchasers listed in the table below (the "*Initial Purchasers*") have entered into a purchase agreement with respect to the Trust Securities. Subject to certain conditions, each Initial Purchaser has severally agreed to purchase the amount (by liquidation preference) of Trust Securities indicated in the following table.

| Initial Purchasers | Liquidation Preference of Trust Securities |
|---|---|
| Goldman, Sachs & Co. | $200,000,000 |
| Lehman Brothers Inc. | 125,000,000 |
| UBS Securities LLC | 125,000,000 |
| Credit Suisse Securities (USA) LLC | 10,000,000 |
| Keefe, Bruyette & Woods Inc. | 10,000,000 |
| J.P. Morgan Securities Inc. | 10,000,000 |
| Morgan Stanley & Co. Incorporated | 10,000,000 |
| Wachovia Capital Markets, LLC | 10,000,000 |
| Total | $500,000,000 |

The Initial Purchasers are committed to take and pay for all of the securities being offered hereby, if any are taken. The initial offering price is set forth on the cover page of this offering circular. After the securities are released for sale, the Initial Purchasers may change the offering price and other selling terms.

The securities offered hereby have not been and will not be registered under the Securities Act. The Initial Purchasers have agreed that they will offer or sell the Trust Securities only to persons who are both "qualified institutional buyers" within the meaning of Rule 144A under the Securities Act and "qualified purchasers" within the meaning of Section 2(a)(51) under the Investment Company Act in transactions meeting the requirements of Rule 144A.

In connection with this Offering, the Initial Purchasers may purchase and sell securities in the open market. These transactions may include short sales, stabilizing transactions and purchases to cover positions created by short sales. Short sales involve the sale by the Initial Purchasers of a greater number of securities than they are required to purchase in this Offering. Stabilizing transactions consist of certain bids or purchases made for the purpose of preventing or retarding a decline in the market price of the securities while this Offering is in progress.

These activities by the Initial Purchasers may stabilize, maintain or otherwise affect the market price of the securities. As a result, the price of the securities may be higher than the price that otherwise might exist in the open market. If these activities are commenced, they may be discontinued by the Initial Purchasers at any time. These transactions may be effected in the over-the-counter market or otherwise.

Each of the Initial Purchasers has represented and agreed that:

- It has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of section 21 of the Financial Services and Markets Act 2000 (as amended) (the "*FSMA*") to persons who have professional experience in matters relating to investments falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 or in circumstances in which section 21 of FSMA does not apply to the Trust; and

- It has complied, and will comply, with all applicable provisions of FSMA with respect to anything done by it in relation to the Trust Securities in, from or otherwise involving the United Kingdom.

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "*Relevant Member State*"), each Initial Purchaser has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "*Relevant Implementation Date*") it has not made and will not make an offer of the securities being offered hereby to the public in that Relevant Member State prior to the publication of a prospectus in relation to the Trust Securities which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of securities to the public in that Relevant Member State at any time:

- to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

- to any legal entity which has two or more of (i) an average of at least 250 employees during the last financial year; (ii) a total balance sheet of more than € 43,000,000; and (iii) an annual net turnover of more than € 50,000,000, as shown in its last annual or consolidated accounts; or

- in any other circumstances which do not require the publication by the Trust of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of securities to the public" in relation to any securities in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the securities to be offered so as to enable an investor to decide to purchase or subscribe the securities, as the same may be varied in that Relevant Member State by any measure implementing the Prospectus Directive in that Relevant Member State and the expression Prospectus Directive means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

The Trust Securities offered hereby may not be offered or sold by means of any document other than (i) in circumstances which do not constitute an offer to the public within the meaning of the Companies Ordinance (Cap 32, Laws of Hong Kong), or (ii) to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder, or (iii) in other circumstances which do not result in the document being a "prospectus" within the meaning of the Companies Ordinance (Cap 32, Laws of Hong Kong), and no advertisement, invitation or document relating to the Trust Securities may be issued or may be in the possession of any person for the purpose of issue (in each case whether in Hong Kong or elsewhere), which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the laws of Hong Kong) other than with respect to securities which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder.

This offering circular has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this offering circular and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the Trust Securities may not be circulated or distributed, nor may the Trust Securities be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "*SFA*"), (ii) to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the Trust Securities are subscribed or purchased under Section 275 by a relevant person which is: (a) a corporation (which is not an accredited investor) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or (b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor, shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest in that trust shall not be transferable for 6 months after that corporation or that trust has acquired the shares under Section 275 except: (1) to an institutional investor under Section 274 of the SFA or to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA; (2) where no consideration is given for the transfer; or (3) by operation of law.

The Trust Securities offered hereby have not been and will not be registered under the Securities and Exchange Law of Japan (the "*Japan Securities and Exchange Law*") and each Initial Purchaser has agreed that it will not offer or sell any Trust Securities, directly or indirectly, in Japan or to, or for the benefit of, any resident of Japan (which term as used herein means any person resident in Japan, including any corporation or other entity organized under the laws of Japan), or to others for re-offering or resale, directly or indirectly, in Japan or to a resident of Japan, except pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the Japan Securities and Exchange Law and any other applicable laws, regulations and ministerial guidelines of Japan.

WMI, the Company and the Trust have agreed in the purchase agreement, subject to certain exceptions, that for a period of 180 days after the date of this offering circular, neither they, nor any of their subsidiaries or other affiliates over which they exercise management or voting control, nor any person acting on their behalf will, without the prior written consent of Goldman, Sachs & Co., offer, sell, contract to sell or otherwise dispose of any securities that are substantially similar to the Trust Securities.

WMI and the Company have agreed to indemnify the Initial Purchasers against certain liabilities, including liabilities under the Securities Act.

Certain of the Initial Purchasers and their respective affiliates have, from time to time, performed, and may in the future perform, various financial advisory and investment banking services for the Company, for which they received or will receive customary fees and expenses.

## NOTICE TO CANADIAN RESIDENTS

### Resale Restrictions

The distribution of the Trust Securities in Canada is being made only on a private placement basis exempt from the requirement that we prepare and file a prospectus with the securities regulatory authorities in each province where trades of Trust Securities are made. Any resale of the Trust Securities in Canada must be made under applicable securities laws which will vary depending on the relevant jurisdiction, and which may require resales to be made under available statutory exemptions or under a discretionary exemption granted by the applicable Canadian securities regulatory authority. Purchasers are advised to seek legal advice prior to any resale of the Trust Securities.

### Representations of Purchasers

By purchasing Trust Securities in Canada and accepting a purchase confirmation a purchaser is representing to us and the dealer from whom the purchase confirmation is received that:

- the purchaser is entitled under applicable provincial securities laws to purchase the Trust Securities without the benefit of a prospectus qualified under those securities laws,

- where required by law, that the purchaser is purchasing as principal and not as agent,

- the purchaser has reviewed the text above under Resale Restrictions, and

- the purchaser acknowledges and consents to the provision of specified information concerning its purchase of the Trust Securities to the regulatory authority that by law is entitled to collect the information.

Further details concerning the legal authority for this information is available on request.

### Rights of Action — Ontario Purchasers Only

Under Ontario securities legislation, certain purchasers who purchase a security offered by this Offering Circular during the period of distribution will have a statutory right of action for damages, or while still the owner of the Trust Securities, for rescission against us in the event that this Offering Circular contains a misrepresentation without regard to whether the purchaser relied on the misrepresentation. The right of action for damages is exercisable not later than the earlier of 180 days from the date the purchaser first had knowledge of the facts giving rise to the cause of action and three years from the date on which payment is made for the Trust Securities. The right of action for rescission is exercisable not later than 180 days from the date on which payment is made for the Trust Securities. If a purchaser elects to exercise the right of action for rescission, the purchaser will have no right of action for damages against us. In no case will the amount recoverable in any action exceed the price at which the Trust Securities were offered to the purchaser and if the purchaser is shown to have purchased the securities with knowledge of the misrepresentation, we will have no liability. In the case of an action for damages, we will not be liable for all or any portion of the damages that are proven to not represent the depreciation in value of the Trust Securities as a result of the misrepresentation relied upon. These rights are in addition to, and without derogation from, any other rights or remedies available at law to an Ontario purchaser. The foregoing is a summary of the rights available to an Ontario purchaser. Ontario purchasers should refer to the complete text of the relevant statutory provisions.

### Enforcement of Legal Rights

All of our directors and officers as well as the experts named herein may be located outside of Canada and, as a result, it may not be possible for Canadian purchasers to effect service of process within Canada upon us or those persons. All or a substantial portion of our assets and the assets of those persons may be located outside of Canada and, as a result, it may not be possible to satisfy a

judgment against us or those persons in Canada or to enforce a judgment obtained in Canadian courts against us or those persons outside of Canada.

**Taxation and Eligibility for Investment**

Canadian purchasers of Trust Securities should consult their own legal and tax advisors with respect to the tax consequences of an investment in the Trust Securities in their particular circumstances and about the eligibility of the Trust Securities for investment by the purchaser under relevant Canadian legislation.

## VALIDITY OF SECURITIES

The validity of the Trust Securities will be passed upon for WMI and the Initial Purchasers by Richards, Layton & Finger, P.A., Wilmington, Delaware. The validity of the Series 2007-A Company Preferred Securities will be passed upon for the Company by Richards, Layton & Finger, P.A., special Delaware counsel for the Company, for WMI by Mayer, Brown, Rowe & Maw LLP, New York, New York, and for the Initial Purchasers by Sullivan & Cromwell LLP, New York, New York. The validity of the Depositary Shares and of the Series M WMI Preferred Stock will be passed upon for WMI by Mayer, Brown, Rowe & Maw LLP and by Heller Ehrman LLP, Seattle, Washington, and for the Initial Purchasers by Sullivan & Cromwell LLP. Mayer, Brown, Rowe & Maw LLP and Sullivan & Cromwell LLP will rely upon the opinion of Richards, Layton & Finger, P.A., as to matters of Delaware law, and upon the opinion of Heller Ehrman LLP as to matters of Washington law.

## ADDITIONAL INFORMATION

### INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The financial statements of WMI and WMB as of and for the years ended December 31, 2006 and 2005, and management's reports on the effectiveness of internal control over financial reporting as of December 31, 2006 for both WMI and WMB, incorporated by reference in this offering circular have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their reports appearing therein.

### INDEPENDENT AUDITORS

The financial statements of the Company as of and for the year ended December 31, 2006, included in this offering circular have been audited by Deloitte &Touche LLP, independent auditors, as stated in their reports appearing herein.

### No Material Adverse Change

Except as disclosed in this offering circular, there has been no adverse change in the financial position of the Company, the Trust, WMB or WMI since December 31, 2006 or their respective dates of establishment (which was December 4, 2006 in the case of the Trust), that would be deemed material in the context of the issue and sale of the Trust Securities in this Offering.

### Legal Proceedings

The following litigation is in relation to WMI. WMB, the Company, Asset Trust I, Asset Trust II and the Trust have not been named as defendants in any of the following lawsuits and, on that basis, they do not expect such lawsuits materially affect their respective operations or financial results.

In the ordinary course of business, WMI and its subsidiaries are routinely defendants in or parties to a number of pending and threatened legal actions and proceedings, including actions brought on behalf of various classes of claimants. In certain of these actions and proceedings, claims for substantial monetary damages are asserted against WMI and its subsidiaries. Certain of these actions and proceedings are based on alleged violations of consumer protection, banking and other laws.

In July 2004, WMI and a number of its officers were named as defendants in a series of cases alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), Rule 10b-5 thereunder and Section 20(a) of the Exchange Act. By stipulation, those cases were consolidated into a single case currently pending in the U.S. District Court for the Western Division of Washington *South Ferry L.P. #2 v. Killinger et al.*, No. CV04-1599C (W.D. Wa., Filed Jul. 19, 2004) (the "Securities Action"). In brief, the plaintiffs in the Securities Action allege, on behalf of a putative class of purchasers of Washington Mutual, Inc., securities from April 15, 2003, through June 28, 2004, that, in various public statements, the defendants purportedly made misrepresentations and failed to disclose material facts concerning, among other things, alleged internal systems problems and hedging issues.

The defendants moved to dismiss the Securities Action on May 17, 2005. After briefing, but without oral argument, the Court on November 17, 2005, denied the motion in principal part; however, the Court dismissed the claims against certain of the individual defendants, dismissed claims pleaded on behalf of sellers of put options on Washington Mutual stock, and concluded that the plaintiffs could not rely on supposed violations of accounting standards to support their claims. The remaining defendants subsequently moved for reconsideration or, in the alternative, certification of the opinion for interlocutory appeal to the United States Court of Appeals for the Ninth Circuit. The District Court denied the motion for reconsideration, but on March 6, 2006, granted the motion for certification.

The defendants thereafter moved to have the Ninth Circuit Court of Appeals accept the case for interlocutory review of the District Court's original order denying the motion to dismiss. On June 9, 2006, the Ninth Circuit granted the defendants' motion, indicating that it will hear the merits of the defendants' appeal. The defendants filed their initial brief on September 25, 2006. Pursuant to an updated, stipulated briefing schedule, the plaintiffs filed their responsive brief on January 10, 2007, and the defendants' reply is set to be filed on March 12, 2007.

On November 29, 2005, 12 days after the Court denied the motion to dismiss the Securities Action, a separate plaintiff filed in Washington State Superior Court a derivative shareholder lawsuit purportedly asserting claims for the benefit of WMI. The case was removed to federal court, where it is now pending. *Lee Family Investments, by and through its Trustee W.B. Lee, Derivatively and on behalf of Nominal Defendant Washington Mutual, Inc. v. Killinger et al.*, No. CV05-2121C (W.D. Wa., Filed Nov. 29, 2005) (the "Derivative Action"). The defendants in the Derivative Action include those individuals remaining as defendants in the Securities Action, as well as those of WMI's current independent directors who were directors at any time from April 15, 2003, through June 2004. The allegations in the Derivative Action mirror those in the Securities Action, but seek relief based on claims that the independent director defendants failed properly to respond to the misrepresentations alleged in the Securities Action and that the filing of that action has caused WMI to expend sums to defend itself and the individual defendants and to conduct internal investigations related to the underlying claims. At the end of February 2006, the parties submitted a stipulation to the Court that the matter be stayed pending the outcome of the Securities Action. On March 2, 2006, the Court entered an Order pursuant to that stipulation, staying the Derivative Action in its entirety.

**Governing Law**

The LLC Agreement, the Trust Agreement, the Trust Securities and the Series 2007-A Company Preferred Securities will be governed by, and construed in accordance with, the laws of the State of Delaware. The Series M WMI Preferred Stock will be governed by, and construed in accordance with, the laws of the State of Washington. The Depositary Shares will be governed by, and construed in accordance with, the laws of the State of New York.

# Deloitte.

Deloitte & Touche LLP
Suite 3300
925 Fourth Avenue
Seattle, WA 98104-1126
USA

Tel: +1 206 716 7000
Fax: +1 206 965 7000
www.deloitte.com

## INDEPENDENT AUDITORS' REPORT

To the Board of Managers of
Washington Mutual Preferred Funding
LLC Seattle, Washington

We have audited the accompanying statement of financial condition of Washington Mutual Preferred Funding LLC (the "Company") as of December 31, 2006, and the related statements of income, member interests, and cash flows for the period February 3, 2006 (date of inception) to December 31, 2006. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with generally accepted auditing standards as established by the Auditing Standards Board (United States) and in accordance with the auditing standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, such financial statements present fairly, in all material respects, the financial position of Washington Mutual Preferred Funding LLC at December 31, 2006, and the results of its operations and its cash flows for the above-stated period, in conformity with accounting principles generally accepted in the United States of America.

*Deloitte & Touche LLP*

Seattle, Washington
March 21, 2007

Member of
Deloitte Touche Tohmatsu

**Washington Mutual Preferred Funding LLC**

**Statement of Income**

| | From Inception (February 3, 2006) through December 31, 2006 |
|---|---|
| **Interest Income** | |
| Interest income | $250,796,200 |
| Recovery of reserve for loan losses | (9,460,790) |
| Interest income after recovery of reserve for loan losses | 260,256,990 |
| **Expense** | |
| Loan servicing fees | 6,625,659 |
| Other expenses | 114,889 |
| Total expense | 6,740,548 |
| **Net Income** | $253,516,442 |

See Notes to Financial Statements

**Washington Mutual Preferred Funding LLC**

**Statement of Financial Condition**

| | December 31, 2006 |
|---|---|
| **ASSETS** | |
| Cash | $ 43,165,776 |
| Loans held in portfolio | 7,281,604,640 |
| Allowance for loan losses | (24,994,354) |
| Total loans held in portfolio, net of of reserve for loan losses | 7,256,610,286 |
| Receivable from affiliates for collections related to the servicing of loans | 218,575,543 |
| Other assets | 27,217,293 |
| **Total assets** | $7,545,568,898 |
| **LIABILITIES** | |
| Payable to affiliates | $ 23,545,756 |
| Other liabilities | 205,242 |
| Total liabilities | 23,750,998 |
| **Member Interests** | |
| Common securities | 5,049,306,234 |
| Preferred securities no par value: 2,500,000 securities authorized, issued and outstanding ($1,000 per security liquidation preference) | 2,446,240,411 |
| Retained earnings | 26,271,255 |
| Total member interests | 7,521,817,900 |
| **Total Liabilities and Member Interests** | $7,545,568,898 |

See Notes to Financial Statements

A-3

## Washington Mutual Preferred Funding LLC

### Statement of Member Interests

| | Common Securities | Preferred Securities | Retained Earnings | Total |
|---|---|---|---|---|
| **BALANCE, February 3, 2006** . . . | $ — | $ — | $ — | $ — |
| Net income . . . . . . . . . . . . . . . | | | 253,516,442 | 253,516,442 |
| Common securities issued . . . . | 5,695,621,428 | | | 5,695,621,428 |
| Preferred securities issued net of capitalized costs . . . . . . . . | | 2,446,240,411 | | 2,446,240,411 |
| Cash dividends paid on common securities . . . . . . . . . | | | (122,184,355) | (122,184,355) |
| Cash dividends paid on preferred securities . . . . . . . | | | (105,060,832) | (105,060,832) |
| Common securities redeemed . . | (646,315,194) | | | (646,315,194) |
| **BALANCE, December 31, 2006** . . | $5,049,306,234 | $2,446,240,411 | $ 26,271,255 | $7,521,817,900 |

See Notes to Financial Statements

A-4

**Washington Mutual Preferred Funding LLC**

**Statement of Cash Flows**

|  | From Inception (February 3, 2006) through December 31, 2006 |
| --- | --- |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | |
| Net income | $ 253,516,442 |
| Adjustments to reconcile net income to net cash provided by operating activities: | |
| Recovery of reserve for loan losses | (9,460,790) |
| Increase in receivable from affiliates | (218,575,543) |
| Increase in other assets | (4,224,332) |
| Increase in payable to affiliates | 23,545,756 |
| Increase in other liabilities | 205,242 |
| Net cash provided by operating activities | 45,006,775 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | |
| Purchase of loans | (33,021,548) |
| Principal payments on loans held in portfolio | 798,467,624 |
| Net cash provided by investing activities | 765,446,076 |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | |
| Proceeds from the issuance of common securities | 113,283,332 |
| Proceeds from the issuance of preferred securities | 46,749,564 |
| Payment of capitalized costs | (53,759,590) |
| Redemption of common securities | (646,315,194) |
| Dividends paid | (227,245,187) |
| Net cash used in financing activities | (767,287,075) |
| Increase in cash | 43,165,776 |
| **CASH,** beginning of period | — |
| **CASH,** end of period | $ 43,165,776 |
| **SUPPLEMENTAL SCHEDULE OF NONCASH FINANCING ACTIVITIES:** | |
| The Company issued common and preferred securities in exchange for cash, loans and other assets as follows: | |
| Loans received in exchange for common and preferred securities | $8,012,774,740 |
| Other assets received in exchange for common and preferred securities | 22,813,792 |

## NOTE 1: DESCRIPTION OF THE COMPANY

Washington Mutual Preferred Funding LLC (the "Company") is a Delaware limited liability company formed on February 3, 2006 for the purpose of (i) issuing preferred and common securities, (ii) acquiring and holding eligible assets, and (iii) performing functions necessary or incidental to the foregoing. The Company is classified as a partnership for U.S. federal income tax purposes. No provision for income taxes is recognized in the accompanying financial statements.

The assets owned by the Company provide cash flows for payment by the Company to holders of the securities.

On March 6, 2006, a pool of closed end, first lien home equity loans ("HELs") was contributed by Washington Mutual Bank ("WMB") and University Street Inc. ("University Street"), an indirect subsidiary of WMB, to the Company in exchange for the Company's common securities and the Series 2006-A and Series 2006-B Preferred Securities. Subsequently, and on the same day, the Company transferred the HELs to Washington Mutual Home Equity Trust I (the "Asset Trust I"), a statutory trust formed under the laws of the State of Delaware, in exchange for Class A-1 Washington Mutual Home Equity Trust I Certificates.

On December 12, 2006, a pool of payment option adjustable rate mortgages ("Option ARMs") was contributed by WMB and University Street to the Company in exchange for the additional common securities and the Series 2006-C Preferred Securities. Subsequently, and on the same day, the Company transferred the Option ARMs to WAMU 2006 OA-1 (the "Asset Trust II"), a statutory trust formed under the laws of the State of Delaware, in exchange for Class A-1 WAMU 2006 OA-1 Certificates.

Asset Trust I and Asset Trust II hold only HEL and Option ARM assets, respectively. The trusts do not have any liabilities other than those incurred in connection with the Pooling and Servicing Agreements (PSAs) and any related agreements. The trusts do not have any directors, officers or other employees. At December 31, 2006, Asset Trust I and Asset Trust II had total assets of $4.7 billion and $2.8 billion, respectively.

As the transfers of assets from the Company to the Asset Trust I and Asset Trust II did not meet the definition of a sale within the scope of Statement of Financial Accounting Standards 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities,* the assets continue to be recorded as loans on the Statement of Financial Condition.

## NOTE 2: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Cash

Cash includes amounts due from banks.

### Use of Estimates

The Company's reporting and accounting policies conform to accounting principles generally accepted in the United States of America ("GAAP"). The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Management has made significant estimates in certain areas, including the allowance for loan losses. Actual results could differ from those estimates.

### Loans Held in Portfolio

Loans held in portfolio are recorded at the principal amount outstanding, net of deferred loan costs or fees and any discounts received or premiums paid on purchased loans. Deferred costs or fees, discounts and premiums are amortized over the contractual term of the loan, adjusted for actual prepayments, using the interest method. The Company uses contractual payment terms to determine the constant yield needed to apply the interest method.

### Allowance for Loan Losses

The allowance for loan losses represents management's estimate of incurred credit losses inherent in its loan portfolio as of the reporting date. The Company's estimate of the allowance is based on a variety of factors, including past loan loss experience, the current credit profile of its borrowers, adverse situations that have occurred that may affect the borrowers' ability to repay, the estimated value of underlying collateral, the impact that changes in interest rates has on a borrower's ability to repay adjustable-rate loans and general economic conditions.

The Company accounts for the allowance for loan losses on portfolios of loans that are evaluated for collective impairment in accordance with Financial Accounting Standards Board ("FASB") Statement No. 5, *Accounting for Contingencies* ("Statement No. 5") when available information indicates that it is probable that a loss has been incurred and the amount of the loss can be reasonably estimated. The allowance comprises both an allocated and an unallocated component.

The Company determines the allocated portion of the allowance based on analyses of pools of loans with similar attributes. The allocated allowance is determined using statistical forecasting models that estimate default and loss outcomes based on an evaluation of past performance of similar pools of loans in our portfolio, and other factors affecting default and loss factors, as well as industry historical loan loss data.

The unallocated portion of the allowance reflects management's assessment of various risk factors that are not fully reflected in the models used to determine the allocated component of the allowance. These factors include general economic and business conditions specific to the Company's key lending products and markets, credit quality and collateral value trends, loan concentrations, specific industry conditions within portfolio segments, recent loss experience in particular segments of the portfolio, duration of the current business cycle and the impact of other such variables for which recent historical data do not provide a high level of precision for risk evaluation.

### Nonaccrual Loans

When a loan is placed on Nonaccrual status, all interest accrued, but not collected, is reversed against interest income. Loans are placed in nonaccrual status when they are 90 days past due. The Company accounts for these loans on the cash or cost recovery method, until they qualify for return to accrual status. Loans are returned to accrual status when the borrower brings the loans to less than 30 days past due. Loans are generally written down to the fair value of the underlying collateral (less estimated costs to sell) when those loans are 180 days past due.

### Other Assets

Other assets include foreclosed assets and interest receivable on loans. Foreclosed assets are accounted for at the lower of cost or fair value (less estimated costs to sell). The amount the Company ultimately recovers from foreclosed assets may differ substantially from the net carrying value of these assets because of future market factors beyond its control or because of changes in its

strategy for sale of the property. At December 31, 2006, the Company had foreclosed assets of $179,168.

### Recently Issued Accounting Standards Not Yet Adopted

In September 2006, the FASB issued Statement No. 157, *Fair Value Measurements* ("Statement No. 157). Statement No. 157 prescribes a definition of the term "fair value", establishes a framework for measuring fair value and expands disclosure about fair value measurements. Statement No. 157 is effective for fiscal years beginning after November 15, 2007, with early adoption permitted as of January 1, 2007. The Company does not expect the application of Statement No. 157 to have a material effect on the Statement of Income and the Statement of Financial Condition.

In February 2007, the FASB issued Statement No. 159, *The Fair Value Option for Financial Assets and Financial Liabilities* ("Statement No. 159"). Statement No. 159 permits an instrument by instrument election to account for selected financial assets and liabilities at fair value. Statement No. 159 is effective for fiscal years beginning after November 15, 2007, with early adoption permitted as of January 1, 2007. The Company is currently evaluating the impact Statement No. 159 will have on its Statement of Income and Statement of Financial Condition.

## NOTE 3: LOANS AND ALLOWANCE FOR LOAN LOSSES

Loans held in portfolio consisted of the following:

|  | December 31, 2006 |
| --- | --- |
| Loans held in portfolio: | |
| Option ARMs home loans(1) | $2,638,560,716 |
| Home equity loans | 4,643,043,924 |
| Total loans held in portfolio(2) | $7,281,604,640 |

(1) The total amount by which the unpaid principal balance of Option ARM loans exceeded their original principal amount was $6.2 million at December 31, 2006.

(2) Includes net unamortized deferred loan origination costs of $67.7 million at December 31, 2006.

### Features of residential loans

Certain residential loans have features that may result in increased credit risk when compared with residential loans without those features. Categories of loans within the Company's portfolio that have such features include loans with an option to defer the payment of interest (i.e., Option ARM home loans). The portfolio of Option ARM loans largely consisted of loans with properties residing in the state of California.

At December 31, 2006 all loans held in portfolio were pledged as collateral for issued securities.

### Fair value of loans held in portfolio

The following estimated fair value amount has been determined by the Company using quoted market prices, internal estimates and the pricing of similar instruments. These estimates do not reflect any premium or discount that could result from offering for sale at one time the Company's entire holdings of loans held in portfolio. Fair value estimates were based on management's judgment concerning current economic conditions, risk characteristic of the loans held in portfolio and other

factors. In addition, considerable judgment was required to interpret market data to develop the estimates of fair value. Accordingly, the estimates presented herein are not necessarily indicative of the amounts the Company could realize in a current market exchange. The use of different market assumptions and/or estimation methodologies may have a material effect on the estimated fair value amount.

The net carrying amount and the fair value of the loans held in portfolio at December 31, 2006 was $7,256,610,286 and $6,962,489,000, respectively.

Changes in the allowance for loan losses were as follows:

|  | From Inception through December 31, 2006 |
| --- | --- |
| Balance, February 3, 2006 | $ — |
| Allowance acquired from loans transferred | 34,573,575 |
| Recovery of reserve for loan losses | (9,460,790) |
|  | 25,112,785 |
| Loans charged off: |  |
| Home equity loans | (118,450) |
| Total loans charged off | (118,450) |
| Recoveries of loans previously charged off: |  |
| Home equity loans | 19 |
| Total recoveries of loans previously charged off | 19 |
| Net charge — offs | (118,431) |
| Balance, end of year | $24,994,354 |

The amount of Nonaccrual loans held in portfolio at December 31, 2006 was $3,996,795.

## Note 4: Common Securities

At December 31, 2006, the Company had $5,049,306,234 of common securities issued and outstanding. The Company, at its discretion, may pay distributions on the Company's common securities out of legally available funds.

During the year, the Company declared and paid dividends in the amount of $122,184,355 to University Street after paying dividends on the Company's preferred securities. The Company also redeemed common securities in the amount of $646,315,194 from University Street during the year.

## Note 5: Preferred Securities

At December 31, 2006, the Company had (i) 1,250,000 of Series 2006-A Company Preferred Securities, (ii) 750,000 of Series 2006-B Company Preferred Securities, and (iii) 500,000 of Series 2006-C Company Preferred Securities issued and outstanding. The preferred securities do not have any voting rights.

When and if declared, dividends on the Series 2006-A Company Preferred Securities will be payable on a non-cumulative basis at a fixed rate per annum equal to 6.534% (calculated on a 30/360 Basis), and on and after March 15, 2011 at a variable rate per annum equal to three-month LIBOR for the related dividends period plus 1.485% (calculated on an Actual/360 Basis), in each case, on the

liquidation preference of $1,000 per security. If declared, dividends on the Series 2006-A Company Preferred Securities will be payable quarterly in arrears on March 15, June 15, September 15 and December 15 of each year commencing June 15, 2006. At its discretion, the Company may redeem the Series 2006-A Company Preferred Securities on March 15, 2011 or thereafter.

When and if declared, dividends on the Series 2006-B Company Preferred Securities will be payable on a non-cumulative basis at a fixed rate per annum equal to 7.25% (calculated on a 30/360 basis) on the liquidation preference of $1,000 per security. If declared, dividends on the Series 2006-B Company Preferred Securities will be payable quarterly in arrears on March 15, June 15, September 15 and December 15 of each year commencing June 15, 2006. At its discretion, the Company may redeem the Series 2006-B Company Preferred Securities on March 15, 2011 or thereafter.

When and if declared, dividends on the Series 2006-C Company Preferred Securities will be payable on a non-cumulative basis at a fixed rate per annum equal to 6.665% (calculated on a 30/360 Basis), and on and after December 15, 2016 at a variable rate per annum equal to three-month LIBOR for the related dividends period plus 1.7925% (calculated on an Actual/360 Basis), in each case, on the liquidation preference of $1,000 per security. If declared, dividends on the Series 2006-C Company Preferred Securities will be payable quarterly in arrears on March 15, June 15, September 15 and December 15 of each year commencing March 15, 2007. At its discretion, the Company may redeem the Series 2006-C Company Preferred Securities on December 15, 2016 or thereafter.

During the year, the Company declared and paid dividends in the amounts of $63,071,250 and $41,989,582 to holders of the Series 2006-A Company Preferred Securities and Series 2006-B Company Preferred Securities, respectively.

During the year, the Company incurred and capitalized costs associated with the issuance of preferred securities. These costs, totaling $53,759,590, related to legal, underwriting and other professional fees.

### Note 6: Certain Relationships And Related Party Transactions

WMB is the servicer of the HELs and Option ARMs that were conveyed to the Company in exchange for Company's common securities and the Company's preferred securities. WMB is entitled to a servicing fee from the Company equal to the beginning balance of the HELs loan portfolio and Option ARMs loan portfolio for any given period multiplied by an annualized rate equal to 0.125% and 0.375%, respectively. Since its inception, the Company has paid $6,625,659 to WMB as part of the servicing agreement.

At December 31, 2006, the Company had a payable to WMB in the amount of $23,545,756, which represented costs paid by WMB on behalf of the Company as well as excess asset contributions made by WMB to the Company.

At December 31, 2006, the Company had a receivable from WMB in the amount of $218,575,543, which represented principal and interest collections by WMB as the servicer of the HELs and Option ARMs.

The Second Amended and Restated Limited Liability Company Agreement of Washington Mutual Preferred Funding LLC (the LLC Agreement) provides that the Company be managed by a Board of Managers consisting of three members (Managers), one of whom is not and has not been during the preceding five years an officer or employee of Washington Mutual Inc. ("WMI") or any affiliate of WMI, other than a financing subsidiary (the Independent Manager). The Independent Manager is paid a nominal fee for his services which is recorded in other expenses. The remaining two managers are employees of Washington Mutual Inc. and are not directly paid compensation by the Company for services rendered.

WMI and its affiliates do not allocate overhead expenses to the Company. Such expenses are considered *de minimis* to the Company's financial statements taken as a whole. The Company reimburses WMB for costs paid on the Company's behalf.

There is no material business relationship, agreement, arrangement, transaction or understanding that is or was entered into outside the ordinary course of business or is or was on terms other than would be obtained in an arm's-length transaction with an unrelated third party, between WMB or University Street and the Company.

## Portfolio Data for Asset Trust I*

### Distribution by Principal Balance

| Distribution by Current Principal Balance | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the HELs Information Cut-Off Date |
|---|---|---|---|
| $   0.00 — $ 49,999 . . . . . . | 11,619 | $   422,905,803 | 9.56% |
| 50,000 —   74,999. . . . . . . | 12,116 | 759,717,752 | 17.17 |
| 75,000 —   99,999. . . . . . . | 9,377 | 813,828,432 | 18.39 |
| 100,000 — 199,999 . . . . . . | 13,574 | 1,824,672,354 | 41.23 |
| 200,000 — 299,999 . . . . . . | 1,686 | 391,662,661 | 8.85 |
| 300,000 — 499,999 . . . . . . | 505 | 184,040,974 | 4.16 |
| Greater than $500,000 . . . . . . | 47 | 28,644,586 | 0.65 |
| **Total:** . . . . . . . . . . . . . . . . . . | **48,924** | **$4,425,472,561** | **100.00%** |

### Distribution by Gross Rate

| Distribution by Current Gross Rate | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the HELs Information Cut-Off Date |
|---|---|---|---|
| 4.00% — 4.99%. . . . . . . . . . | 15 | $   1,846,604 | 0.04% |
| 5.00   — 5.99 . . . . . . . . . . . | 22,975 | 2,187,243,685 | 49.42 |
| 6.00   — 6.99 . . . . . . . . . . . | 23,638 | 2,075,075,362 | 46.89 |
| 7.00   — 7.99 . . . . . . . . | 2,050 | 145,577,247 | 3.29 |
| Greater than 7.99% . . . . . . . . | 246 | 15,729,662 | 0.36 |
| **Total:** . . . . . . . . . . . . . . . . . . | **48,924** | **$4,425,472,561** | **100.00%** |

### Distribution by Remaining Months to Maturity

| Distribution by Remaining Months to Maturity | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the HELs Information Cut-Off Date |
|---|---|---|---|
| Less than 61 . . . . . . . . . . . . . | 1,084 | $   34,255,585 | 0.77% |
| 61 — 120 . . . . . . . . . . . . . . | 5,082 | 266,347,879 | 6.02 |
| 121 — 180 . . . . . . . . . . . . . | 11,737 | 872,517,367 | 19.72 |
| 181 — 240 . . . . . . . . . . . . . | 24,003 | 2,413,098,915 | 54.53 |
| 241 — 300 . . . . . . . . . . . . . | 302 | 32,158,062 | 0.73 |
| 301 — 360 . . . . . . . . . . . . . | 6,716 | 807,094,753 | 18.24 |
| **Total:** . . . . . . . . . . . . . . . . . . | **48,924** | **$4,425,472,561** | **100.00%** |

* All information in this Appendix B is as of April 1, 2007 *(the "HELs Information Cut-off Date")*. Due to rounding, the percentages shown may not precisely total 100.00%.

## Distribution by Year of Origination

| Distribution by Year of Origination | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the HELs Information Cut-Off Date |
|---|---|---|---|
| 1998 — 2001 | 248 | $ 17,982,467 | 0.41% |
| 2002 | 4,776 | 434,468,182 | 9.82 |
| 2003 | 23,444 | 2,177,283,818 | 49.20 |
| 2004 | 14,024 | 1,287,121,767 | 29.08 |
| 2005 | 6,369 | 504,341,235 | 11.40 |
| 2006 | 63 | 4,275,092 | 0.10 |
| **Total:** | **48,924** | **$4,425,472,561** | **100.00%** |

## Distribution by FICO Score[1]

| Distribution by Credit Score | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the HELs Information Cut-Off Date |
|---|---|---|---|
| Not Available | 1 | $ 100,564 | 0.00% |
| Less Than 600 | 1,006 | 85,580,043 | 1.93 |
| 600 — 649 | 1,498 | 128,319,808 | 2.90 |
| 650 — 699 | 4,959 | 452,931,024 | 10.23 |
| 700 — 749 | 9,617 | 906,229,686 | 20.48 |
| 750 — 799 | 18,517 | 1,727,747,836 | 39.04 |
| 800 — 849 | 13,326 | 1,124,563,600 | 25.41 |
| **Total:** | **48,924** | **$4,425,472,561** | **100.00%** |

(1) "*FICO Score*" means a statistical credit score obtained by WMB and many other mortgage lenders in connection with a loan application to help assess a borrower's creditworthiness. A FICO Score is generated by models developed by a third party, Fair, Isaac & Co., and made available to WMB through three national consumer reporting agencies. The FICO Score is based on a borrower's historical credit data, including, among other things, payment history, delinquencies on accounts, levels of outstanding indebtedness, length of credit history, types of credit and bankruptcy experience. A higher FICO Score indicates a more favorable credit rating.

## Distribution by Property Type

| Distribution by Property Type | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the HELs Information Cut-Off Date |
|---|---|---|---|
| Single Family | 45,101 | $4,073,677,770 | 92.05% |
| Townhouse | 1,789 | 206,797,731 | 4.67 |
| Manufactured Housing | 76 | 5,796,671 | 0.13 |
| Condominium | 1,958 | 139,200,389 | 3.15 |
| **Total:** | **48,924** | **$4,425,472,561** | **100.00%** |

## Distribution by State

| Distribution by State | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the HELs Information Cut-Off Date |
|---|---|---|---|
| Texas................... | 25,585 | $2,230,840,507 | 50.41% |
| California............... | 12,850 | 1,298,771,347 | 29.35 |
| Florida................. | 4,215 | 312,331,366 | 7.06 |
| New York............... | 2,198 | 225,744,016 | 5.10 |
| Washington............. | 1,008 | 89,111,028 | 2.01 |
| New Jersey............. | 617 | 63,549,753 | 1.44 |
| Oregon................. | 669 | 59,538,552 | 1.35 |
| Georgia................ | 396 | 32,545,771 | 0.74 |
| Idaho.................. | 292 | 22,475,693 | 0.51 |
| Arizona................ | 263 | 21,426,810 | 0.48 |
| Other.................. | 831 | 69,137,717 | 1.56 |
| **Total:** ................. | **48,924** | **$4,425,472,561** | **100.00%** |

## Distribution by Current Loan-to-Value Ratio[1]

| Distribution by Current LTV | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the HELs Information Cut-Off Date |
|---|---|---|---|
| Not available ............ | 3 | $ 575,567 | 0.01% |
| Less than 10.01% ......... | 1,268 | 40,570,713 | 0.92 |
| 10.01 — 20.00 ........... | 4,060 | 204,363,511 | 4.62 |
| 20.01 — 30.00 ........... | 5,640 | 381,260,693 | 8.62 |
| 30.01 — 40.00 ........... | 7,323 | 589,124,742 | 13.31 |
| 40.01 — 50.00 ........... | 7,824 | 710,580,491 | 16.06 |
| 50.01 — 60.00 ........... | 8,313 | 853,811,248 | 19.29 |
| 60.01 — 70.00 ........... | 8,008 | 868,179,385 | 19.62 |
| 70.01 — 80.00 ........... | 6,122 | 735,390,113 | 16.62 |
| 80.01 — 90.00 ........... | 361 | 41,396,606 | 0.94 |
| 90.01 — 100.00% ......... | 2 | 219,492 | 0.00 |
| **Total:** ................. | **48,924** | **$4,425,472,561** | **100.00%** |

(1) The Current Loan-To-Value Ratio of a mortgage loan is a fraction, the numerator of which is the outstanding principal balance of the mortgage loan and the denominator of which is the collateral value, generally at a time of origination of the related mortgage property, expressed as a percentage.

## APPENDIX C

### Portfolio Data for Asset Trust II*

**Distribution by Principal Balance**

| Distribution by Current Principal Balance | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the Option ARMs Information Cut-Off Date |
|---|---|---|---|
| $ 0 — $ 49,999 . . . . . . . . . . . | 8 | $ 233,006 | 0.01% |
| 50,000 — 74,999 . . . . . . . . . . . | 3 | 174,840 | 0.01 |
| 75,000 — 99,999 . . . . . . . . . . . | 18 | 1,658,085 | 0.08 |
| 100,000 — 199,999 . . . . . . . . . . . | 1,194 | 178,812,994 | 8.11 |
| 200,000 — 299,999 . . . . . . . . . . . | 890 | 220,618,730 | 10.01 |
| 300,000 — 499,999 . . . . . . . . . . . | 1,352 | 541,090,459 | 24.55 |
| 500,000 — 999,999 . . . . . . . . . . . | 1,122 | 743,502,016 | 33.73 |
| Greater than $1,000,000 . . . . . . . . . | 328 | 518,215,341 | 23.51 |
| **Total:** . . . . . . . . . . . . . . . . . . . . | **4,915** | **$2,204,305,471** | **100.00%** |

**Distribution by Gross Rate**

| Distribution by Current Gross Rate | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the Option ARMs Information Cut-Off Date |
|---|---|---|---|
| 6.00% — 6.99% . . . . . . . . . . . . . . . | 190 | $ 102,203,509 | 4.64% |
| 7.00 — 7.99 . . . . . . . . . . . . . . . . . | 3,723 | 1,682,391,316 | 76.32 |
| 8.00 — 8.99 . . . . . . . . . . . . . . . . | 997 | 417,272,077 | 18.93 |
| Greater than 8.99 . . . . . . . . . . . . . . | 5 | 2,438,570 | 0.11 |
| **Total:** . . . . . . . . . . . . . . . . . . . . | **4,915** | **$2,204,305,471** | **100.00%** |

**Distribution by Remaining Months to Maturity**

| Distribution by Remaining Months to Maturity | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the Option ARMs Information Cut-Off Date |
|---|---|---|---|
| 121 — 180 . . . . . . . . . . . . . . . . . . . | 2 | $ 397,906 | 0.02% |
| 241 — 300 . . . . . . . . . . . . . . . . . . . | 275 | 83,246,572 | 3.78 |
| 301 — 360 . . . . . . . . . . . . . . . . . . . | 4,009 | 1,776,586,067 | 80.60 |
| Greater than 360 . . . . . . . . . . . . . . | 629 | 344,074,927 | 15.61 |
| **Total:** . . . . . . . . . . . . . . . . . . . . | **4,915** | **$2,204,305,471** | **100.00%** |

* All information in this Appendix C is as April 1, 2007 *(the "Option ARMs Information Cut-off Date")*.  Due to rounding, the percentages shown may not precisely total 100.00%.

## Distribution by Year of Origination

| Distribution by Year of Origination | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the Option ARMs Information Cut-Off Date |
|---|---|---|---|
| 1997 — 2001 | 273 | $ 81,511,904 | 3.70% |
| 2002 | 73 | 31,676,242 | 1.44 |
| 2003 | 1,219 | 409,380,197 | 18.57 |
| 2004 | 880 | 398,123,959 | 18.06 |
| 2005 | 2,167 | 1,101,876,155 | 49.99 |
| 2006 | 303 | 181,737,014 | 8.24 |
| **Total:** | **4,915** | **$2,204,305,471** | **100.00%** |

## Distribution by FICO Score[1]

| Distribution by Credit Score | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the Option ARMs Information Cut-Off Date |
|---|---|---|---|
| Not Available | 18 | $ 10,591,210 | 0.48% |
| Less than 600 | 68 | 28,876,767 | 1.31 |
| 600 — 649 | 157 | 88,063,026 | 4.00 |
| 650 — 699 | 558 | 266,926,776 | 12.11 |
| 700 — 749 | 1,303 | 612,740,517 | 27.80 |
| 750 — 799 | 2,014 | 891,993,198 | 40.47 |
| 800 — 849 | 797 | 305,113,978 | 13.84 |
| **Total:** | **4,915** | **$2,204,305,471** | **100.00%** |

(1) "FICO Score" means a statistical credit score obtained by WMB and many other mortgage lenders in connection with a loan application to help assess a borrower's creditworthiness. A FICO Score is generated by models developed by a third party, Fair, Isaac & Co., and made available to WMB through three national consumer reporting agencies. The FICO Score is based on a borrower's historical credit data, including, among other things, payment history, delinquencies on accounts, levels of outstanding indebtedness, length of credit history, types of credit and bankruptcy experience. A higher FICO Score indicates a more favorable credit rating.

## Distribution by Property Type

| Distribution by Property Type | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the Option ARMs Information Cut-Off Date |
|---|---|---|---|
| Single Family | 2,834 | $1,359,629,795 | 61.68% |
| Planned Unit Development | 746 | 366,854,212 | 16.64 |
| Condo | 670 | 235,665,032 | 10.69 |
| 2-Unit Multifamily | 379 | 124,056,534 | 5.63 |
| 3-4 Unit Multifamily | 254 | 105,767,249 | 4.80 |
| Co-Op | 23 | 8,688,458 | 0.39 |
| Townhouse | 9 | 3,644,191 | 0.17 |
| **Total:** | **4,915** | **$2,204,305,471** | **100.00%** |

**Distribution by State**

| Distribution by State | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the Option ARMs Information Cut-Off Date |
|---|---|---|---|
| California | 3,119 | $1,652,001,347 | 74.94% |
| Florida | 284 | 87,663,069 | 3.98 |
| New York | 153 | 82,037,824 | 3.72 |
| Colorado | 222 | 49,209,967 | 2.23 |
| Massachusetts | 114 | 37,940,437 | 1.72 |
| New Jersey | 86 | 31,936,711 | 1.45 |
| Virginia | 74 | 28,996,807 | 1.32 |
| Michigan | 109 | 24,534,416 | 1.11 |
| Illinois | 95 | 22,263,295 | 1.01 |
| Washington | 72 | 20,514,600 | 0.93 |
| Other | 587 | 167,206,999 | 7.59 |
| **Total:** | **4,915** | **$2,204,305,471** | **100.00%** |

**Distribution by Current Loan-to-Value Ratio[1]**

| Distribution by Current LTV | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the Option ARMs Information Cut-Off Date |
|---|---|---|---|
| 0.01% — 10.00% | 10 | $ 516,158 | 0.02% |
| 10.01 — 20.00 | 26 | 8,970,957 | 0.41 |
| 20.01 — 30.00 | 55 | 13,863,869 | 0.63 |
| 30.01 — 40.00 | 131 | 49,434,987 | 2.24 |
| 40.01 — 50.00 | 269 | 97,064,554 | 4.40 |
| 50.01 — 60.00 | 467 | 223,801,637 | 10.15 |
| 60.01 — 70.00 | 1,083 | 523,452,763 | 23.75 |
| 70.01 — 80.00 | 2,677 | 1,211,577,510 | 54.96 |
| 80.01 — 90.00 | 197 | 75,623,037 | 3.43 |
| **Total:** | **4,915** | **$2,204,305,471** | **100.00%** |

(1) The Current Loan-To-Value Ratio of a mortgage loan is a fraction, the numerator of which is the outstanding principal balance of the mortgage loan and the denominator of which is the collateral value, generally at a time of origination of the related mortgage property, expressed as a percentage.

## APPENDIX D

### Portfolio Data for Asset Trust I And Asset Trust II, Combined*

**Distribution by Principal Balance**

| Distribution by Current Principal Balance | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the Combined Information Cut-Off Date |
|---|---|---|---|
| $ 0 — $ 49,999 . . . . . | 11,627 | $ 423,138,809 | 6.38% |
| 50,000 — 74,999 . . . . . | 12,119 | 759,892,591 | 11.46 |
| 75,000 — 99,999 . . . . . | 9,395 | 815,486,517 | 12.30 |
| 100,000 — 199,999 . . . . . | 14,768 | 2,003,485,348 | 30.22 |
| 200,000 — 299,999 . . . . . | 2,576 | 612,281,391 | 9.24 |
| 300,000 — 499,999 . . . . . | 1,857 | 725,131,433 | 10.94 |
| 500,000 — 999,999 . . . . . | 1,169 | 772,146,602 | 11.65 |
| Greater than $1,000,000 . . . | 328 | 518,215,341 | 7.82 |
| **Total:** . . . . . . . . . . . . . . . . | **53,839** | **$6,629,778,032** | **100.00%** |

**Distribution by Gross Rate**

| Distribution by Current Gross Rate | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the Combined Information Cut-Off Date |
|---|---|---|---|
| 4.00% — 4.99% . . . . . . | 15 | $ 1,846,604 | 0.03% |
| 5.00 — 5.99 . . . . . . . | 22,975 | 2,187,243,685 | 32.99 |
| 6.00 — 6.99 . . . . . . . | 23,828 | 2,177,278,871 | 32.84 |
| 7.00 — 7.99 . . . . . . . | 5,773 | 1,827,968,563 | 27.57 |
| 8.00 — 8.99 . . . . . . . | 1,197 | 429,971,629 | 6.49 |
| 9.00 — 9.99 . . . . . . . | 31 | 4,379,733 | 0.07 |
| 10.00 — 10.99 . . . . . . . | 16 | 886,751 | 0.01 |
| 11.00 — 11.99 . . . . . . . | 4 | 202,197 | 0.00 |
| **Total:** . . . . . . . . . . . . . . . | **53,839** | **$6,629,778,032** | **100.00%** |

**Distribution by Remaining Months to Maturity**

| Distribution by Remaining Months to Maturity | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the Combined Information Cut-Off Date |
|---|---|---|---|
| Less than 61 . . . . . . . . . | 1,084 | $ 34,255,585 | 0.52% |
| 61 — 120 . . . . . . . . . . . | 5,082 | 266,347,879 | 4.02 |
| 121 — 180 . . . . . . . . . . . | 11,739 | 872,915,273 | 13.17 |
| 181 — 240 . . . . . . . . . . . | 24,003 | 2,413,098,915 | 36.40 |
| 241 — 300 . . . . . . . . . . . | 577 | 115,404,634 | 1.74 |
| 301 — 360 . . . . . . . . . . . | 10,725 | 2,583,680,820 | 38.97 |
| Greater than 360 . . . . . . . | 629 | 344,074,927 | 5.19 |
| **Total:** . . . . . . . . . . . . . . . | **53,839** | **$6,629,778,032** | **100.00%** |

---

\* All information in this Appendix D is as of April 1, 2007 *(the "Combined Information Cut-off Date")*. Due to rounding, the percentages shown may not precisely total 100.00%.

## Distribution by Year of Origination

| Distribution by Year of Origination | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the Combined Information Cut-Off Date |
|---|---|---|---|
| 1997 — 2001 . . . . . . . . . | 521 | $ 99,494,371 | 1.50% |
| 2002 . . . . . . . . . . . . . | 4,849 | 466,144,424 | 7.03 |
| 2003 . . . . . . . . . . . . . . | 24,663 | 2,586,664,014 | 39.02 |
| 2004 . . . . . . . . . . . . . . | 14,904 | 1,685,245,726 | 25.42 |
| 2005 . . . . . . . . . . . . . . | 8,536 | 1,606,217,391 | 24.23 |
| 2006 . . . . . . . . . . . . . . | 366 | 186,012,106 | 2.81 |
| **Total:** . . . . . . . . . . . . . . | **53,839** | **$6,629,778,032** | **100.00%** |

## Distribution by FICO Score[1]

| Distribution by Credit Score | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the Combined Information Cut-Off Date |
|---|---|---|---|
| Not Available . . . . . . . . . . | 19 | $ 10,691,774 | 0.16% |
| Less than 600 . . . . . . . . . | 1,074 | 114,456,810 | 1.73 |
| 600 — 649 . . . . . . . . . . . | 1,655 | 216,382,834 | 3.26 |
| 650 — 699 . . . . . . . . . . . | 5,517 | 719,857,800 | 10.86 |
| 700 — 749 . . . . . . . . . . . | 10,920 | 1,518,970,202 | 22.91 |
| 750 — 799 . . . . . . . . . . . | 20,531 | 2,619,741,034 | 39.51 |
| 800 — 849 . . . . . . . . . . . | 14,123 | 1,429,677,578 | 21.56 |
| **Total:** . . . . . . . . . . . . . . | **53,839** | **$6,629,778,032** | **100.00%** |

(1) "FICO Score" means a statistical credit score obtained by WMB and many other mortgage lenders in connection with a loan application to help assess a borrower's creditworthiness. A FICO Score is generated by models developed by a third party, Fair, Isaac & Co., and made available to WMB through three national consumer reporting agencies. The FICO Score is based on a borrower's historical credit data, including, among other things, payment history, delinquencies on accounts, levels of outstanding indebtedness, length of credit history, types of credit and bankruptcy experience. A higher FICO Score indicates a more favorable credit rating.

## Distribution by Property Type

| Distribution by Property Type | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the Combined Information Cut-Off Date |
|---|---|---|---|
| Single Family . . . . . . . . . . | 47,935 | $5,433,307,565 | 81.95% |
| Condominium . . . . . . . . . | 2,628 | 374,865,421 | 5.65 |
| Planned Unit Development . . . . . . . . | 746 | 366,854,212 | 5.53 |
| Townhouse . . . . . . . . . . | 1,798 | 210,441,922 | 3.17 |
| 2-Unit Multifamily . . . . . . . | 379 | 124,056,534 | 1.87 |
| 3-4-Unit Multifamily . . . . . | 254 | 105,767,249 | 1.60 |
| Co-op . . . . . . . . . . . . . | 23 | 8,688,458 | 0.13 |
| Manufactured Housing . . . | 76 | 5,796,671 | 0.09 |
| **Total:** . . . . . . . . . . . . . . | **53,839** | **$6,629,778,032** | **100.00%** |

## Distribution by State

| Distribution by State | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the Combined Information Cut-Off Date |
|---|---|---|---|
| California............. | 15,969 | $2,950,772,694 | 44.51% |
| Texas ............... | 25,626 | 2,242,172,559 | 33.82 |
| Florida.............. | 4,499 | 399,994,436 | 6.03 |
| New York............ | 2,351 | 307,781,840 | 4.64 |
| Washington .......... | 1,080 | 109,625,628 | 1.65 |
| New Jersey .......... | 703 | 95,486,464 | 1.44 |
| Oregon ............. | 698 | 64,633,143 | 0.97 |
| Colorado ............ | 298 | 56,086,481 | 0.85 |
| Illinois .............. | 306 | 42,054,560 | 0.63 |
| Georgia............. | 420 | 41,534,978 | 0.63 |
| Other............... | 1,889 | 319,635,251 | 4.82 |
| **Total:** ............... | **53,839** | **$6,629,778,032** | **100.00%** |

## Distribution by Current Loan-to-Value Ratio[1]

| Distribution by Current LTV | Number of Mortgage Loans | Aggregate Unpaid Principal Balance | Percentage of Principal Balance as of the Combined Information Cut-Off Date |
|---|---|---|---|
| Not Available ......... | 3 | $ 575,567 | 0.01% |
| Less than 10.01% ...... | 1,278 | 41,086,870 | 0.62 |
| 10.01 — 20.00......... | 4,086 | 213,334,469 | 3.22 |
| 20.01 — 30.00......... | 5,695 | 395,124,562 | 5.96 |
| 30.01 — 40.00......... | 7,454 | 638,559,729 | 9.63 |
| 40.01 — 50.00......... | 8,093 | 807,645,045 | 12.18 |
| 50.01 — 60.00......... | 8,780 | 1,077,612,885 | 16.25 |
| 60.01 — 70.00......... | 9,091 | 1,391,632,148 | 20.99 |
| 70.01 — 80.00......... | 8,799 | 1,946,967,623 | 29.37 |
| 80.01 — 90.00......... | 558 | 117,019,643 | 1.77 |
| 90.01 — 100.00% ...... | 2 | 219,492 | 0.00 |
| **Total:** ............... | **53,839** | **$6,629,778,032** | **100.00%** |

(1) The Current Loan-To-Value Ratio of a mortgage loan is a fraction, the numerator of which is the outstanding principal balance of the mortgage loan and the denominator of which is the collateral value, generally at a time of origination of the related mortgage property, expressed as a percentage.

## APPENDIX E

### Index of Terms

3(c)(7) Representations . . . . . . . . . . . . vii
3-Month USD LIBOR . . . . . . . . . . . . . . 79
ACLS . . . . . . . . . . . . . . . . . . . . . . . . . 53
Additional Amounts . . . . . . . . . . . . . . . 85
Additional Assets . . . . . . . . . . . . . . . . . 41
Additional Tax Event . . . . . . . . . . . . . . 86
Additional Taxes . . . . . . . . . . . . . . . . . 86
Administrative Services Agreement . . . 44
Advanced Consumer Lending
  System . . . . . . . . . . . . . . . . . . . . . . 53
alternative services . . . . . . . . . . . . . . . 49
Asset Documentation . . . . . . . . . . . . . . 41
Asset Subsidiary . . . . . . . . . . . . . . . . . 42
Asset Tax Opinion . . . . . . . . . . . . . . . . 42
Asset Trust I . . . . . . . . . . . . . . . . . . . . 5
Asset Trust I Class A Trust Certificate . . 48
Asset Trust I Class R Trust Certificate . . 39
Asset Trust I Custodian . . . . . . . . . . . . 55
Asset Trust I Custody Agreement . . . . 55
Asset Trust I Delaware Trustee . . . . . . 47
Asset Trust I Loan Documents . . . . . . . 56
Asset Trust I Pooling and Servicing
  Agreement . . . . . . . . . . . . . . . . . . . . 5
Asset Trust I Servicer . . . . . . . . . . . . . 47
Asset Trust I Servicer Indemnified
  Parties . . . . . . . . . . . . . . . . . . . . . . . 54
Asset Trust I Trustee . . . . . . . . . . . . . . 47
Asset Trust II . . . . . . . . . . . . . . . . . . . . A-6
Asset Trust II Class A
  Trust Certificate . . . . . . . . . . . . . . . . 5
Asset Trust II Class R
  Trust Certificate . . . . . . . . . . . . . . . 58
Asset Trust II Custodian . . . . . . . . . . . . 66
Asset Trust II Custody Agreement . . . . 66
Asset Trust II Delaware Trustee . . . . . . 6
Asset Trust II Loan Documents . . . . . . 67
Asset Trust II Pooling and Servicing
  Agreement . . . . . . . . . . . . . . . . . . . . 6
Asset Trust II Servicer . . . . . . . . . . . . . 57
Asset Trust II Servicer Indemnified
  Parties . . . . . . . . . . . . . . . . . . . . . . . 65
Asset Trust II Trustee . . . . . . . . . . . . . . 57
Asset Trusts . . . . . . . . . . . . . . . . . . . . i
AVM . . . . . . . . . . . . . . . . . . . . . . . . . . 49

back-end ratio . . . . . . . . . . . . . . . . . . . 49
Bankruptcy Event . . . . . . . . . . . . . . . . 45
Benefit Plan Investor . . . . . . . . . . . . . . 111
Business Combination . . . . . . . . . . . . . 95
Business Day . . . . . . . . . . . . . . . . . . . . 70
CACS . . . . . . . . . . . . . . . . . . . . . . . . . 53
Clearstream . . . . . . . . . . . . . . . . . . . . . viii
Clearstream International . . . . . . . . . . . 103
Clearstream Participants . . . . . . . . . . . 103
Code . . . . . . . . . . . . . . . . . . . . . . . . . . iii
Code of Ethics . . . . . . . . . . . . . . . . . . . 51
Combined Information Cut-off Date . . . D-1
Company . . . . . . . . . . . . . . . . . . . . . . . 1
Company Common Securities . . . . . . . 4
Company Preferred Securities . . . . . . . 2
Company's Portfolio . . . . . . . . . . . . . . . 26
Comparable Treasury Issue . . . . . . . . . 81
Comparable Treasury Price . . . . . . . . . 82
Conditional Exchange . . . . . . . . . . . . . 2
core capital . . . . . . . . . . . . . . . . . . . . . 33
Covered Debt . . . . . . . . . . . . . . . . . . . 72
Credit Score . . . . . . . . . . . . . . . . . . . . 49
debt-to-income ratio . . . . . . . . . . . . . . 49
Delaware Trustee . . . . . . . . . . . . . . . . 37
Deposit Agreement . . . . . . . . . . . . . . . 97
Depositary . . . . . . . . . . . . . . . . . . . . . . 74
Depositary Shares . . . . . . . . . . . . . . . . 2
Dividend Payment Date . . . . . . . . . . . . 70
Dividend Period . . . . . . . . . . . . . . . . . . 70
dividends . . . . . . . . . . . . . . . . . . . . . . . 7
DTC . . . . . . . . . . . . . . . . . . . . . . . . . . 101
DTC Participants . . . . . . . . . . . . . . . . . vii, 102
Eligible Assets . . . . . . . . . . . . . . . . . . . 41
Eligible Investments . . . . . . . . . . . . . . . 42
ERISA . . . . . . . . . . . . . . . . . . . . . . . . . iii
Euroclear . . . . . . . . . . . . . . . . . . . . . . . vii, 103
Euroclear Operator . . . . . . . . . . . . . . . 103
Euroclear Participants . . . . . . . . . . . . . 103
Euroclear Terms and Conditions . . . . . 104
Exchange Act . . . . . . . . . . . . . . . . . . . x
Exchange Agreement . . . . . . . . . . . . . 74
Exchange Event . . . . . . . . . . . . . . . . . 12
FDIC . . . . . . . . . . . . . . . . . . . . . . . . . . xii

Federal Reserve . . . . . . . . . . . . . . . . . . 68
FFO . . . . . . . . . . . . . . . . . . . . . . . . . 11
FFO Test . . . . . . . . . . . . . . . . . . . . . . . 2
FICO Score . . . . . . . . . . . . . . . . . . . . . B-2
Fidelity . . . . . . . . . . . . . . . . . . . . . . . . 64
Fidelity System . . . . . . . . . . . . . . . . . . 64
Fitch . . . . . . . . . . . . . . . . . . . . . . . . . 16
Five-Year Date . . . . . . . . . . . . . . . . . . . 10
Fixed-to-Floating Rate Substitute
    Preferred Stock . . . . . . . . . . . . . . . . 96
Fixed-to-Floating Rate Successor
    Depositary Share . . . . . . . . . . . . . . . 96
Foreign Holder . . . . . . . . . . . . . . . . . . . 106
FSMA . . . . . . . . . . . . . . . . . . . . . . . . 113
GAAP . . . . . . . . . . . . . . . . . . . . . . . . xii
Global Security . . . . . . . . . . . . . . . . . . 101
HELs . . . . . . . . . . . . . . . . . . . . . . . . . 5
HELs Information Cut-off Date . . . . . . . B-1
independent . . . . . . . . . . . . . . . . . . . . 44
Independent Investment Banker . . . . . . 82
Independent Manager . . . . . . . . . . . . . . 4
Index . . . . . . . . . . . . . . . . . . . . . . . . . 57
Indirect DTC Participants . . . . . . . . . . . 102
Initial Purchasers . . . . . . . . . . . . . . . . . 113
Investment Company Act . . . . . . . . . . . ix
Investment Company Act Event . . . . . . 82
IRS . . . . . . . . . . . . . . . . . . . . . . . . . . 105
Japan Securities and Exchange Law . . 115
Junior Equity Securities . . . . . . . . . . . . 79
Junior Securities . . . . . . . . . . . . . . . . . 90
LIBOR Business Day . . . . . . . . . . . . . . 79
LIBOR Determination Date . . . . . . . . . 79
like amount . . . . . . . . . . . . . . . . . . . . . 2
LLC Act . . . . . . . . . . . . . . . . . . . . . . . 38
LLC Agreement . . . . . . . . . . . . . . . . . . 38
Manager . . . . . . . . . . . . . . . . . . . . . . . 44
Margin . . . . . . . . . . . . . . . . . . . . . . . . 58
Marion . . . . . . . . . . . . . . . . . . . . . . . . 22
Moody's . . . . . . . . . . . . . . . . . . . . . . . 16
Mortgage Loans . . . . . . . . . . . . . . . . . 16
negative amortization . . . . . . . . . . . . . 29
Negative Amortization . . . . . . . . . . . . . 58
Negative Amortization Cap . . . . . . . . . 58
New Assets . . . . . . . . . . . . . . . . . . . . . 77
New Reporting Rules . . . . . . . . . . . . . . 1
Nominee . . . . . . . . . . . . . . . . . . . . . . . 75

Offering . . . . . . . . . . . . . . . . . . . . . . . . 3
One-Year MTA . . . . . . . . . . . . . . . . . . . 57
Option ARMs . . . . . . . . . . . . . . . . . . . . 5
Option ARMs Information Cut-off
    Date . . . . . . . . . . . . . . . . . . . . . . . . C-1
OTS . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Outstanding Company Preferred
    Securities . . . . . . . . . . . . . . . . . . . . 2
Parity Equity Securities . . . . . . . . . . . . 2
Paying Agent . . . . . . . . . . . . . . . . . . . . 75
Paying Agents . . . . . . . . . . . . . . . . . . . 75
Permitted Investments . . . . . . . . . . . . . 42
Plan . . . . . . . . . . . . . . . . . . . . . . . . . . 111
Pooling and Servicing Agreements . . . 6
Primary Treasury Dealer . . . . . . . . . . . 82
Property Trustee . . . . . . . . . . . . . . . . . 37
Qualified Institutional Buyer . . . . . . . . . iii
Qualified Purchaser . . . . . . . . . . . . . . . iii
Qualifying Interests . . . . . . . . . . . . . . . 24
Rating Agencies . . . . . . . . . . . . . . . . . 43
Rating Agency Condition . . . . . . . . . . . 43
Rating Agency Event . . . . . . . . . . . . . . 82
Reference Treasury Dealer . . . . . . . . . 82
Reference Treasury Dealer
    Quotations . . . . . . . . . . . . . . . . . . . . 82
Registrar . . . . . . . . . . . . . . . . . . . . . . . 75
Regulation . . . . . . . . . . . . . . . . . . . . . . 111
Regulatory Capital Event . . . . . . . . . . . 82
Relevant Implementation Date . . . . . . . 113
Relevant Member State . . . . . . . . . . . . 114
REMIC . . . . . . . . . . . . . . . . . . . . . . . . 6
Reminder Notice . . . . . . . . . . . . . . . . . vii
Replacement Capital Covenant . . . . . . 10
Replacement Covenant Covered
    Securities . . . . . . . . . . . . . . . . . . . . 72
Reuters Screen LIBOR01 Page . . . . . . 79
S&P . . . . . . . . . . . . . . . . . . . . . . . . . . 16
SEC . . . . . . . . . . . . . . . . . . . . . . . . . . xi
Section 3(c)(7) . . . . . . . . . . . . . . . . . . . vi
Securities Act . . . . . . . . . . . . . . . . . . . viii
Senior Equity Securities . . . . . . . . . . . . 12
Series 2006-A Company Preferred
    Securities . . . . . . . . . . . . . . . . . . . . 1
Series 2006-B Company Preferred
    Securities . . . . . . . . . . . . . . . . . . . . 1
Series 2006-C Company Preferred
    Securities . . . . . . . . . . . . . . . . . . . . 1

| | |
|---|---|
| Series 2007-A Company Preferred Securities.................... | 1 |
| Series I WMI Preferred Stock ....... | 100 |
| Series J WMI Preferred Stock ....... | 100 |
| Series K WMI Preferred Stock ....... | 100 |
| Series L WMI Preferred Stock ....... | 100 |
| Series M WMI Preferred Stock ...... | 2 |
| SFA.......................... | 114 |
| Similar Law .................... | iii |
| Successor Entity ................. | 96 |
| supplementary capital ............. | 33 |
| tangible capital ................. | 33 |
| Tax Event ..................... | 82 |
| Tax-Exempt U.S. Holder ........... | 108 |
| Thrift Financial Report ............. | xii |
| total capital .................... | 33 |
| Transfer Agent .................. | 75 |
| Treasury Rate ................... | 83 |
| Trust ........................ | 1 |
| Trust Act ...................... | 37 |
| Trust Agreement ................. | vi |
| Trust Holder.................... | 13 |
| Trust I ........................ | 1 |
| Trust I Securities ................ | 1 |
| Trust II........................ | 2 |
| Trust II Securities................. | 2 |
| Trust Securities ................. | 1 |
| U.S. Holder .................... | 105 |
| U.S. Person.................... | 73 |
| UBTI ......................... | 108 |
| University Street ................ | 4 |
| Voting Parity Securities ........... | 89 |
| WaMu Cayman .................. | 1 |
| WaMu Cayman Securities .......... | 1 |
| WMB......................... | 1 |
| WMI ......................... | 1 |
| WMI Group .................... | 1 |
| WMI Parity Stock................. | 90 |
| WMI's Board of Directors........... | 29 |
| WTC ......................... | 75 |

No dealer, salesperson or other person is authorized to give any information or to represent anything not contained in this offering circular. You must not rely on any unauthorized information or representations. This offering circular is an offer to sell only the Trust Securities offered hereby, but only under circumstances and in jurisdictions where it is lawful to do so. The information contained in this offering circular is current only as of its date.

### TABLE OF CONTENTS

| | Page |
|---|---|
| Index of Terms | ii |
| Notice to Investors | iii |
| Special Note Regarding Forward-Looking Statements | x |
| Where You Can Find More Information | xi |
| Offering Circular Summary | 1 |
| Risk Factors | 18 |
| Certain Information Concerning WMB | 32 |
| Use of Proceeds | 36 |
| The Trust | 37 |
| The Company | 38 |
| Asset Trust I | 47 |
| Asset Trust II | 57 |
| WMI | 68 |
| Certain Relationships and Related Party Transactions | 69 |
| Description of the Trust Securities | 70 |
| Description of the Series 2007-A Company Preferred Securities | 77 |
| Description of Other Company Securities | 87 |
| Description of the Series M WMI Preferred Stock | 89 |
| Description of the Depositary Shares | 97 |
| Description of the Other WMI Capital Stock | 100 |
| Book-Entry Issuance | 101 |
| Certain U.S. Federal Income Tax Considerations | 105 |
| ERISA Considerations | 111 |
| Ratings | 112 |
| Plan of Distribution | 113 |
| Notice to Canadian Residents | 116 |
| Validity of Securities | 118 |
| Additional Information | 119 |
| APPENDIX A Washington Mutual Preferred Funding LLC, Financials | A-1 |
| APPENDIX B Portfolio Data for Asset Trust I | B-1 |
| APPENDIX C Portfolio Data for Asset Trust II | C-1 |
| APPENDIX D Portfolio Data for Asset Trust I And Asset Trust II, Combined | D-1 |
| APPENDIX E Index of Terms | E-1 |

$500,000,000

# Washington Mutual

Preferred Funding Trust III
Fixed-to-Floating Rate
Perpetual Non-cumulative
Trust Securities
Automatically Exchangeable in
Specified Circumstances into
Depositary Shares Representing
Preferred Stock of
Washington Mutual, Inc.



**WaMu**®

*Sole Structuring Coordinator and Joint Bookrunner*

## Goldman, Sachs & Co.

*Joint Bookrunners*

## Lehman Brothers

## UBS Investment Bank

*Co-Managers*

## Credit Suisse

## Keefe, Bruyette & Woods

## JPMorgan

## Morgan Stanley

## Wachovia Securities