# EXHIBIT E

 **WaMu**°

$1,000,000,000

# Washington Mutual Preferred Funding Trust IV

### Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities Automatically Exchangeable in Specified Circumstances into Depositary Shares representing Preferred Stock of Washington Mutual, Inc.

The Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities, liquidation preference $100,000 per security (each, a *"Trust Security"*, and collectively, the *"Trust Securities"*), of Washington Mutual Preferred Funding Trust IV, a Delaware statutory trust (the *"Trust"*), offered hereby represent undivided beneficial interests in a like amount of Fixed-to-Floating Rate Perpetual Non-cumulative Preferred Securities, Series 2007-B, liquidation preference $1,000 per security (the *"Series 2007-B Company Preferred Securities"*), of Washington Mutual Preferred Funding LLC, a Delaware limited liability company (the *"Company"*). The Trust will have no assets other than the Series 2007-B Company Preferred Securities. The Trust will pass through dividends paid and redemption and liquidation payments made by the Company on the Series 2007-B Company Preferred Securities as distributions and redemption and liquidation payments on the Trust Securities. The Company's material assets consist of indirect interests in mortgages, mortgage-related assets originated or acquired by Washington Mutual Bank (*"WMB"*), cash and other permitted investments as described herein.

Dividends on the Series 2007-B Company Preferred Securities will be payable if, when, and as declared by the Company's Board of Managers out of legally available funds, at an annual rate of 9.75% to, but not including December 15, 2017, and 3-Month USD LIBOR *plus* 4.723% thereafter, on the liquidation preference per security, quarterly in *arrears* on March 15, June 15, September 15 and December 15 of each year, commencing on December 15, 2007, or, in each case, the next Business Day if any such day is not a Business Day (each, a *"Dividend Payment Date"*). Dividends are non-cumulative, which means that holders will not receive dividends if they are not declared in the applicable quarter.

If the Office of Thrift Supervision (together with any successor regulator, the *"OTS"*) so directs following the occurrence of an Exchange Event as described herein, each Trust Security will be automatically exchanged for depositary shares representing a like amount of Washington Mutual, Inc.'s (*"WMI"*) Series N Perpetual Non-cumulative Fixed-to-Floating Rate Preferred Stock.

The Series 2007-B Company Preferred Securities will be redeemable, in whole or in part, at the option of the Company on the Dividend Payment Date occurring in December 2017 and each tenth anniversary thereafter (each a *"Ten-Year Date"*) at a redemption price equal to the sum of (i) $1,000 per Series 2007-B Company Preferred Security *plus* (ii) any declared and unpaid dividends to the redemption date. The Series 2007-B Company Preferred Securities will be redeemable, in whole but not in part, at the option of the Company on any Dividend Payment Date that is not a Ten-Year Date upon the occurrence of a Tax Event, an Investment Company Act Event, a Rating Agency Event or a Regulatory Capital Event (each as described herein) at a redemption price equal to the sum of (x) $1,000 per Series 2007-B Company Preferred Security *plus* (y) any declared and unpaid dividends to the redemption date *plus* (z) if such event and related redemption occur prior to the Dividend Payment Date in December 2017, a U.S. Treasury-based "make-whole" amount. The Company may also redeem the Series 2007-B Company Preferred Securities on any Dividend Payment Date that is not a Ten-Year Date, whether before or after December 2017, at a redemption price equal to the sum of (i) $1,000 per 2007-B Company Preferred Security *plus* (ii) any declared and unpaid dividends to the redemption date *plus* (iii) a "make-whole" amount, which will be a U.S. Treasury-based "make-whole" amount for any redemption prior to December 2017 or a 3-Month USD LIBOR-based "make-whole" amount for any redemption after December 2017. In each case, the redemption price will be calculated without accumulation of any undeclared dividends with respect to Dividend Payment Dates prior to the redemption date. In addition, the Company's right to redeem the Series 2007-B Company Preferred Securities prior to December 15, 2017 is also limited by its obligations set forth in the Replacement Capital Covenant described in this offering circular. The proceeds of any such redemption will be used to redeem a like amount of Trust Securities. Any redemption of the Series 2007-B Company Preferred Securities will be subject to the prior approval of the OTS.

The Trust Securities will be issued only in book-entry form. Each individual purchaser or group of affiliated purchasers that acquires Trust Securities in the initial offering must acquire at least three Trust Securities having an aggregate liquidation preference of $300,000.

The Trust Securities will not be listed on any securities exchange or automated dealer quotation system.

**The securities offered hereby are not insured or guaranteed by the U.S. Federal Deposit Insurance Corporation or any other insurer or government agency or instrumentality.**

See *"Risk Factors"* beginning on page 20 for a description of the risk factors you should consider before you invest in the securities offered hereby.

---

### Offering Price: $100,000.00 per Trust Security

---

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE *"SECURITIES ACT"*), AND ARE BEING OFFERED AND SOLD ONLY TO PERSONS THAT ARE BOTH "QUALIFIED INSTITUTIONAL BUYERS" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) AND "QUALIFIED PURCHASERS" (WITHIN THE MEANING OF SECTION 2(A)(51) OF THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE *"INVESTMENT COMPANY ACT"*)), IN RELIANCE ON AN EXEMPTION FROM REGISTRATION PURSUANT TO RULE 144A. PROSPECTIVE PURCHASERS OF TRUST SECURITIES ARE HEREBY NOTIFIED THAT THE SELLER OF THE TRUST SECURITIES MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A. THE SECURITIES ARE NOT TRANSFERABLE EXCEPT IN ACCORDANCE WITH THE RESTRICTIONS DESCRIBED UNDER "NOTICE TO INVESTORS".

The Initial Purchasers expect to deliver the Trust Securities through the facilities of The Depository Trust Company and Euroclear Bank S.A./N.V., as operator of the Euroclear System, and Clearstream Banking, *société anonyme*, as participants in The Depository Trust Company, in each case against payment in New York, New York, on or about October 25, 2007.

*Sole Structuring Coordinator and Bookrunner*

**Goldman, Sachs & Co.**

*Co-Managers*

| | | |
|---|---|---|
| **Credit Suisse** | **Lehman Brothers** | **Morgan Stanley** |

Offering Circular dated October 18, 2007.

*This offering circular is confidential. You are authorized to use this offering circular solely for the purpose of considering the purchase of the securities described in this offering circular. WMI, WMB, University Street, Inc. ("University Street"), the Company, the Trust, Washington Mutual Home Equity Trust I ("Asset Trust I"); WAMU 2006-OA1 ("Asset Trust II"), WAMU 2007-Flex1 ("Asset Trust III" and, together with Asset Trust I and Asset Trust II, collectively, the "Asset Trusts"), and other sources identified herein have provided the information contained in this offering circular. The Initial Purchasers make no representation or warranty, express or implied, as to the accuracy or completeness of such information, and nothing contained in this offering circular is, or shall be relied upon as, a promise or representation by the Initial Purchasers. You may not reproduce or distribute this offering circular, in whole or in part, and you may not disclose any of the contents of this offering circular or use any information herein for any purpose other than considering the purchase of the Trust Securities. You agree to the foregoing by accepting delivery of this offering circular.*

---

**THE SECURITIES OFFERED HEREBY HAVE NOT BEEN RECOMMENDED BY ANY UNITED STATES FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

The distribution of this offering circular and the offering and sale of the securities in certain jurisdictions may be restricted by law. WMI, WMB, University Street, the Company, the Trust, the Asset Trusts and the Initial Purchasers require persons into whose possession this offering circular comes to inform themselves about and to observe any such restrictions. This offering circular does not constitute an offer of, or an invitation to purchase, any of the securities in any jurisdiction in which such offer or invitation would be unlawful.

---

Notwithstanding anything herein to the contrary, investors may disclose to any and all persons, without limitation of any kind, the United States federal or state income tax treatment and tax structure of the offering and all materials of any kind (including opinions or other tax analyses) that are provided to the investors relating to such tax treatment and tax structure. However, any information relating to the United States federal income tax treatment or tax structure shall remain confidential (and the foregoing sentence shall not apply) to the extent reasonably necessary to enable any person to comply with applicable securities laws. For this purpose, "tax structure" means any facts relevant to the United States federal or state income tax treatment of the offering but does not include information relating to the identity of the issuer of the securities, the issuer of any assets underlying the securities, or any of their respective affiliates that are offering the securities.

No person has been authorized to give any information or to make any representations other than those contained in this offering circular, and, if given or made, such information or representations must not be relied upon as having been authorized by any of WMI, WMB, University Street, the Company, the Trust or any Asset Trust. Neither the delivery of this offering circular nor any sale hereunder will create, under any circumstances, any implication that there has been no change in the affairs of WMI, WMB, University Street, the Company, the Trust or any Asset Trust since the date hereof or that the information contained herein is correct as of any time subsequent to its date.

i

## NOTICE TO NEW HAMPSHIRE RESIDENTS ONLY

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLI-CATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES WITH THE STATE OF NEW HAMP-SHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE OF NEW HAMPSHIRE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MIS-LEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

---

IN CONNECTION WITH THIS OFFERING, GOLDMAN, SACHS & CO., MAY OVER-ALLOT OR EFFECT TRANSACTIONS WITH A VIEW TO SUPPORTING THE MARKET PRICE OF THE SECURITIES OFFERED HEREBY AT A LEVEL HIGHER THAN THAT WHICH MIGHT OTHERWISE PREVAIL FOR A LIMITED PERIOD OF TIME AFTER THE ISSUE DATE. HOWEVER, THERE MAY BE NO OBLIGATION ON GOLDMAN, SACHS & CO., TO DO THIS. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME, AND MUST BE BROUGHT TO AN END AFTER A LIMITED PERIOD.

---

### INDEX OF TERMS

*An index of terms used in this offering circular with specific meanings appears on the inside back cover of this offering circular.*

## NOTICE TO INVESTORS

*Because of the following restrictions, purchasers are advised to consult legal counsel prior to making any offer, purchase, resale, pledge or other transfer of the securities offered hereby.*

### Representations of Purchasers

Each purchaser of Trust Securities (including the registered holders and beneficial owners of the Trust Securities as they exist from time to time, including as a result of transfers) will be deemed to have represented and agreed as follows, in each case as of the time of purchase:

(A) the purchaser (i) is a *"qualified institutional buyer"* within the meaning of Rule 144A promulgated under the Securities Act (a *"Qualified Institutional Buyer"*), (ii) is aware that the Trust Securities have not been and will not be registered under the Securities Act and that the sale of the Trust Securities to it is being made in reliance on Rule 144A or another exemption from the registration requirements of the Securities Act and (iii) is acquiring such Trust Securities for its own account or the account of one or more qualified institutional buyers;

(B) the purchaser (i) is a *"qualified purchaser"* within the meaning of Section 2(a)(51) of the Investment Company Act and the rules and regulations thereunder (a *"Qualified Purchaser"*), (ii) is aware that the Trust will not be registered under the Investment Company Act in reliance on the exemption set forth in Section 3(c)(7) thereof and (iii) is acquiring such Trust Securities for its own account or the account of one or more qualified purchasers as to which the purchaser exercises sole investment discretion, as the case may be;

(C) (i) either (a) the purchaser is not (x) an *"employee benefit plan"* as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended (*"ERISA"*) that is subject to Title I of ERISA, (y) a plan, account or other arrangement that is subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the *"Code"*), or (z) any entity whose underlying assets include *"plan assets"* of any of the foregoing by reason of investment by an employee benefit plan or other plan in such entity (each of the foregoing, a *"Benefit Plan Investor"*), or (b) the purchaser is an insurance company general account that represents, warrants and covenants that, at the time of acquisition and throughout the period it holds the securities, (x) it is eligible for and meets the requirements of Department of Labor Prohibited Transaction Class Exemption 95-60, (y) less than 25% of the assets of such general account are (or represent) assets of a Benefit Plan Investor and (z) it is not a person who has discretionary authority or control with respect to the assets of the Trust or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person and would not otherwise be excluded under 29 C.F.R. § 2510.3-101(f)(1) and (ii) either (a) the purchaser is not a governmental plan, foreign plan, church plan or other plan subject to law that is substantially similar to the Section 406 of ERISA or Section 4975 of the Code (*"Similar Law"*) or (b) its purchase and holding of the Trust Securities will not constitute or result in a non-exempt violation of Similar Law;

(D) the purchaser is not purchasing the Trust Securities with a view to the resale, distribution or other disposition thereof in violation of the Securities Act;

(E) neither the purchaser nor any account for which the purchaser is acquiring the Trust Securities will hold such Trust Securities for the benefit of any other person and the purchaser and each such account will be the sole beneficial owners thereof for all purposes and will not sell participation interests in the Trust Securities or enter into any other arrangement pursuant to which any other person will be entitled to an interest in the distributions on the Trust Securities;

(F) the certificates evidencing the Trust Securities will bear a legend to the following effect:

THIS SECURITY IS ONE OF THE FIXED-TO-FLOATING RATE PERPETUAL NON-CUMULATIVE TRUST SECURITIES ("*TRUST SECURITIES*") ISSUED BY WASHINGTON MUTUAL PREFERRED FUNDING TRUST IV (THE "*TRUST*"). THE ISSUER OF THIS SECURITY HAS NOT BEEN REGISTERED AS AN INVESTMENT COMPANY UNDER THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "*INVESTMENT COMPANY ACT*"), AND THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"), AND NEITHER THIS SECURITY NOR ANY BENEFICIAL INTERESTS HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT TO A PERSON WHO IS BOTH A "*QUALIFIED INSTITUTIONAL BUYER*" WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT ("*QUALIFIED INSTITUTIONAL BUYER*") AND A "*QUALIFIED PURCHASER*" WITHIN THE MEANING OF SECTION 2(a)(51) OF THE INVESTMENT COMPANY ACT AND THE RULES AND REGULATIONS THEREUNDER ("*QUALIFIED PURCHASER*") ACQUIRING FOR ITS OWN ACCOUNT OR THE ACCOUNT OF A PERSON WHO IS BOTH A QUALIFIED INSTITUTIONAL BUYER AND A QUALIFIED PURCHASER (AN "*ELIGIBLE PURCHASER*") AND EACH SUCH PERSON AND ACCOUNT FOR WHICH SUCH PERSON IS PURCHASING (A) IS NOT A BROKER-DEALER THAT OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN $25 MILLION IN SECURITIES OF ISSUERS THAT ARE NOT ITS AFFILIATED PERSONS, (B) IS NOT A PLAN REFERRED TO IN PARAGRAPH (a)(1)(i)(D) OR (a)(1)(i)(E) OF RULE 144A, OR A TRUST FUND REFERRED TO IN PARAGRAPH (a)(1)(i)(F) OF RULE 144A THAT HOLDS THE ASSETS OF SUCH A PLAN, IF INVESTMENT DECISIONS WITH RESPECT TO THE PLAN ARE MADE BY THE BENEFICIARIES OF SUCH PLAN, (C) WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE TRUST, (D) WILL HOLD AT LEAST $300,000 LIQUIDATION PREFERENCE OF TRUST SECURITIES (*i.e.*, AT LEAST THREE TRUST SECURITIES) AND, IF IT TRANSFERS ANY INTEREST IN ANY TRUST SECURITY, WILL TRANSFER AT LEAST $100,000 LIQUIDATION PREFERENCE OF TRUST SECURITIES (*i.e.*, AT LEAST ONE TRUST SECURITY) IN THE CASE OF EACH INITIAL INVESTOR, AND WILL HOLD AND TRANSFER AT LEAST $100,000 LIQUIDATION PREFERENCE OF TRUST SECURITIES (*i.e.*, AT LEAST ONE TRUST SECURITY) IN THE CASE OF EACH SUBSEQUENT INVESTOR AND (E) UNDERSTANDS THAT THE TRUST MAY RECEIVE A LIST OF PARTICIPANTS HOLDING POSITIONS IN THIS SECURITY FROM ONE OR MORE BOOK-ENTRY DEPOSITARIES. EACH PURCHASER OF THIS SECURITY OR ANY BENEFICIAL INTERESTS HEREIN WILL BE DEEMED TO REPRESENT THAT IT AGREES TO COMPLY WITH THE TRANSFER RESTRICTIONS SET FORTH HEREIN AND IN THE AMENDED AND RESTATED TRUST AGREEMENT OF THE TRUST (THE "*TRUST AGREEMENT*"), AND WILL NOT TRANSFER THIS SECURITY OR ANY BENEFICIAL INTERESTS HEREIN EXCEPT TO AN ELIGIBLE PURCHASER WHO CAN MAKE THE SAME REPRESENTATIONS AND AGREEMENTS ON BEHALF OF ITSELF AND EACH ACCOUNT FOR WHICH IT IS PURCHASING. ANY PURPORTED TRANSFER OF THIS SECURITY OR ANY BENEFICIAL INTERESTS HEREIN THAT IS IN BREACH, AT THE TIME MADE, OF ANY TRANSFER RESTRICTIONS SET FORTH HEREIN OR IN THE TRUST AGREEMENT WILL BE VOID *AB INITIO*. IF AT ANY TIME THE TRUST DETERMINES IN GOOD FAITH THAT A HOLDER OR BENEFICIAL OWNER OF THIS SECURITY OR BENEFICIAL INTERESTS HEREIN IS IN BREACH, AT THE TIME GIVEN, OF ANY OF THE TRANSFER RESTRICTIONS SET FORTH HEREIN, THE TRUST SHALL CONSIDER THE ACQUISITION OF THIS SECURITY OR SUCH BENEFICIAL INTERESTS VOID, OF NO FORCE AND EFFECT AND WILL NOT, AT THE DISCRETION OF THE TRUST, OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE TRUST, ITS AGENT FOR REGISTRATION

OF TRANSFER, EXCHANGE OR PAYMENT (THE *"TRANSFER AGENT"*), OR ANY OTHER INTERMEDIARY. IN ADDITION, THE TRUST OR THE TRANSFER AGENT MAY REQUIRE SUCH ACQUIRER OR BENEFICIAL OWNER TO SELL THIS SECURITY OR SUCH BENEFICIAL INTERESTS TO AN ELIGIBLE PURCHASER.

NO SECURITY MAY BE PURCHASED OR TRANSFERRED TO: (I) AN *"EMPLOYEE BENEFIT PLAN"* AS DEFINED IN SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED (*"ERISA"*), THAT IS SUBJECT TO TITLE I OF ERISA II) A PLAN, ACCOUNT OR OTHER ARRANGEMENT THAT IS SUBJECT TO SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE *"CODE"*), OR (III) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE *"PLAN ASSETS"* OF ANY OF THE FOREGOING BY REASON OF INVEST- MENT BY AN EMPLOYEE BENEFIT PLAN OR OTHER PLAN IN SUCH ENTITY (EACH OF THE FOREGOING, A *"BENEFIT PLAN INVESTOR"*), EXCEPT FOR AN INSURANCE COMPANY GENERAL ACCOUNT THAT REPRESENTS, WARRANTS AND COVENANTS THAT, AT THE TIME OF ACQUISITION AND THROUGHOUT THE PERIOD IT HOLDS THE SECURITIES, (I) IT IS ELIGIBLE FOR AND MEETS THE REQUIREMENTS OF DEPARTMENT OF LABOR PROHIBITED TRANSACTION CLASS EXEMPTION 95-60, (II) LESS THAN 25% OF THE ASSETS OF SUCH GENERAL ACCOUNT ARE (OR REPRESENT) ASSETS OF A BENEFIT PLAN INVESTOR AND (III) IT IS NOT A PERSON WHO HAS DISCRETIONARY AUTHORITY OR CONTROL WITH RESPECT TO THE ASSETS OF THE TRUST OR ANY PERSON WHO PROVIDES INVESTMENT ADVICE FOR A FEE (DIRECT OR INDIRECT) WITH RESPECT TO SUCH ASSETS, OR ANY AFFILIATE OF SUCH A PERSON AND WOULD NOT OTHERWISE BE EXCLUDED UNDER 29 C.F.R. § 2510.3-101(F)(1). IN ADDITION, EACH PURCHASER OR TRANS- FEREE OF THIS SECURITY WILL BE REQUIRED TO REPRESENT AND WARRANT (OR, IN CERTAIN CIRCUMSTANCES, WILL BE DEEMED TO REPRESENT AND WAR- RANT) THAT, FROM THE DATE OF ACQUISITION AND THROUGHOUT THE PERIOD OF HOLDING THIS SECURITY, EITHER (A) IT IS NOT A GOVERNMENTAL PLAN, FOREIGN PLAN, CHURCH PLAN OR OTHER PLAN SUBJECT TO LAW THAT IS SUBSTANTIALLY SIMILAR TO THE SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE (*"SIMILAR LAW"*) OR (B) ITS PURCHASE AND HOLDING OF THIS SECU- RITY WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT VIOLATION OF SIMILAR LAW.

UNLESS THIS SECURITY IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION (*"DTC"*), TO THE TRUST OR THE TRANSFER AGENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRE- SENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

(G) the purchaser and each account for which it Is purchasing:

(i) is not a broker-dealer that owns and invests on a discretionary basis less than $25 million in securities of unaffiliated issuers;

(ii) is not a participant-directed employee plan, such as a 401(k) plan, as referred to in paragraph (a)(1)(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan;

(iii) was not formed for the purpose of investing in the Trust;

(iv) will hold at least $300,000 liquidation preference of Trust Securities (*i.e.*, at least three Trust Securities) and, if it transfers any interest in any Trust Security, will transfer at least $100,000 liquidation preference of Trust Securities (*i.e.*, at least one Trust Security) in the case of each initial investor, and will hold and transfer at least $100,000 liquidation preference of Trust Securities (*i.e.*, at least one Trust Security) in the case of each subsequent investor;

(v) will provide notice of the transfer restrictions described in this "Notice to Investors" to any subsequent transferees;

(vi) acknowledges that the Trust may receive a list of participants holding positions in the Trust Securities from one or more book-entry depositaries; and

(vii) may not transfer the Trust Securities or beneficial interests therein except to a transferee who can make the same representations and agreements as set forth in this "Notice to Investors" and the Amended and Restated Trust Agreement of the Trust (the *"Trust Agreement"*) on behalf of itself and each account for which it is purchasing.

The purchaser acknowledges that the Trust Securities are being offered only in a transaction not involving any public offering within the meaning of the Securities Act. The Trust Securities have not been and will not be registered under the Securities Act and the Trust has not been and will not be registered under the Investment Company Act, and, if in the future the purchaser decides to offer, resell, pledge or otherwise transfer the Trust Securities or any interest therein, such Trust Securities or interest may be offered, resold, pledged or otherwise transferred only in accordance with the legend on such Trust Securities described above. The purchaser acknowledges that no representation is made by the Trust, the Company or the Initial Purchasers as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Trust Securities.

## Forced Sale of Securities

Any transfer of Trust Securities in breach of the transfer restrictions set forth in this "Notice to Investors" and the Trust Agreement will be of no force and effect, will be void *ab initio*, and will not operate to transfer any rights to the transferee, notwithstanding any instructions to the contrary to the Trust, its Transfer Agent or any other intermediary.

The purchaser agrees that in the event that the Trust or its Transfer Agent determines in good faith that a holder or beneficial owner of the Trust Securities is in breach, at the time given, of any of the representations or agreements set forth above, the Trust shall consider the acquisition of the Trust Securities or beneficial interests therein void, of no force and effect and will not, at the discretion of the Trust, operate to transfer any rights to the transferee notwithstanding any instructions to the contrary to the Trust, the Transfer Agent or any other intermediary. In addition, the Trust or the Transfer Agent may require such acquirer or beneficial owner to transfer such Trust Securities or beneficial interests therein to a transferee acceptable to the Trust who is able to and who does make all of the representations and agreements set forth in this "Notice to Investors". Pending such transfer, such holder will be deemed not to be the holder of such Trust Securities for any purpose, including but not limited to receipt of dividend and redemption payments on such Trust Securities or distributions upon the liquidation of the Trust, and such holder will be deemed to have no interest whatsoever in such Trust Securities except as otherwise required to redeem or sell its interest therein as described in this paragraph.

## Investment Company Act

In reliance on Section 3(c)(7) under the Investment Company Act (*"Section 3(c)(7)"*), the Trust has not registered as an investment company pursuant to the Investment Company Act. To rely on Section 3(c)(7), the Trust must have a "reasonable belief" that all purchasers of the Trust Securities (including the Initial Purchasers and subsequent transferees) are qualified purchasers at the time of

their purchase of such securities. The Trust will establish a reasonable belief for purposes of Section 3(c)(7) based upon the representations deemed made by the purchasers of the securities as set forth under "— Representations of Purchasers" above, the covenants and undertakings of the Trust referred to below and the agreements of the Initial Purchasers relating to the private placement of the securities pursuant to Rule 144A referred to under "Plan of Distribution".

## Reminder Notices

Whenever the Trust sends an annual report or other periodic report to holders of the Trust Securities, it will also send a reminder notice (each, a *"Reminder Notice"*) to the holders of the Trust Securities. Each Reminder Notice will state that (i) each holder of a Trust Security (or an interest in a Trust Security) must be able to make the representations set forth above in paragraphs (B) and (G) under "— Representations of Purchasers" (the *"3(c)(7) Representations"*), (ii) the Trust Securities (or interests in the Trust Securities) are transferable only to purchasers deemed to have made the 3(c)(7) Representations and to have satisfied the other transfer restrictions applicable to the Trust Securities, (iii) if any prospective transferee of the Trust Securities (or an interest in the Trust Securities) is determined not to be a qualified purchaser, then the Trust will have the right (exercisable in its sole discretion) to refuse to honor such transaction and (iv) if any security holder (or any holder of an interest in a security) is determined not to be a qualified purchaser, then the Trust will have the right (exercisable in its sole discretion) to treat the transfer to such purchaser as null and void *ab initio* and require such purchaser to sell all of its securities (and all interests therein) to a transferee designated by the Trust at the then current market price therefor. The Trust will send a copy of each annual or other periodic report (and each Reminder Notice) to DTC with a request that participating organizations in DTC (*"DTC Participants"*) forward them to the security holders or holders of an interest in Trust Securities.

## DTC Actions with respect to the Trust Securities

The Trust will direct DTC to take the following steps in connection with the Trust Securities:

- to include the "3c7" marker and, in lieu of the "GABS" marker or otherwise, the "GRLS" marker in the DTC 20-character security descriptor, and the 48-character additional descriptor for the Trust Securities in order to indicate that sales are limited to Qualified Purchasers;

- to cause (i) each physical DTC delivery order ticket delivered by DTC to purchasers to contain the 20-character security descriptors and (ii) each DTC delivery order ticket delivered by DTC to purchasers in electronic form to contain the "3c7" and "GRLS" indicators and the related user manual for participants, which will contain a description of relevant restrictions;

- to send, on or prior to the closing date of this Offering, an "Important Notice" to all DTC Participants in connection with this Offering of the Trust Securities. The Trust may instruct DTC from time to time (but not more frequently than every six months) to reissue the "Important Notice";

- to include the Trust in DTC's "Reference Directory" of Section 3(c)(7) offerings;

- to include in all "confirms" of trades of the Trust Securities in DTC, CUSIP numbers with a "fixed field" attached to the CUSIP number that has the "3c7" and "GRLS" markers; and

- to deliver to the Trust from time to time a list of all DTC Participants holding an interest in the securities.

## Euroclear Actions with respect to the Trust Securities

The Trust will instruct Euroclear Bank S.A./N.V., as operator of the Euroclear System (*"Euroclear"*), to take the following steps in connection with the Trust Securities:

- to reference "144A/3(c)(7)" as part of the security name in the Euroclear securities database;

- in each daily securities balances report and daily transactions report to Euroclear Participants holding positions in the Trust Securities, to include "144A/3(c)(7)" in the securities name for the Trust Securities;

- periodically (and at least annually) to send to the Euroclear Participants holding positions in the Trust Securities an electronic "Important Notice" outlining the restrictions applicable to 3(c)(7) securities;

- to deliver to the Trust from time to time, upon its request, a list of all Euroclear Participants holding an interest in the Trust Securities; and

- to include the 3(c)(7) marker in the name of the Trust Securities in lists distributed by Euroclear monthly to its participants showing all securities accepted within the Euroclear securities database.

## Clearstream Actions with respect to the Trust Securities

The Trust will instruct Clearstream Banking, société anonyme ("Clearstream"), to take the following steps in connection with the Trust Securities:

- to reference "144A/3(c)(7)" as part of the security name in the Clearstream securities database;

- in each daily portfolio report and daily settlement report to Clearstream Participants holding positions in the Trust Securities, to include "144A/3(c)(7)" in the securities name for the Trust Securities;

- periodically (and at least annually) to send to the Clearstream Participants holding positions in the Trust Securities an electronic "Important Notice" outlining the restrictions applicable to 3(c)(7) securities;

- to deliver to the Trust from time to time, upon its request, a list of all Clearstream Participants holding an interest in the Trust Securities; and

- to include the 3(c)(7) marker in the name of the Trust Securities in the continuously updated list made available by Clearstream to its participants showing all securities accepted within the Clearstream securities database and to include the 3(c)(7) marker in the name of the Trust Securities.

## Bloomberg Screens, etc.

The Trust will request, from time to time, all third-party vendors to include appropriate legends regarding Rule 144A and Section 3(c)(7) restrictions on the Trust Securities on screens maintained by such vendors. Without limiting the foregoing, the Initial Purchasers will request that Bloomberg, L.P. include the following on each Bloomberg screen containing information about the securities as applicable:

- the bottom of the "Security Display" page describing the Trust Securities should state: "Iss'd under 144A/3c7" and "GRLS";

- the "Security Display" page for the Trust Securities should have a flashing red indicator stating "Additional Note Pg";

- such indicator should link to an "Additional Security Information" page, which should state that the Trust Securities "are being offered in reliance on the exception from registration under Rule 144A of the Securities Act of 1933, as amended (the "Securities Act"), to persons that are (i) "qualified institutional buyers" as defined in Rule 144A under the Securities Act, and (ii) "qualified purchasers" as defined under Section 2(a)(51) of the Investment Company Act of 1940, as amended"; and

- the "Disclaimer" pages for the Trust Securities should state that the securities "have not been and will not be registered under the Securities Act of 1933, as amended, and Washington Mutual Preferred Funding Trust IV has not been registered under the Investment Company Act of 1940, as amended (the *"Investment Company Act"*), and the Trust Securities may not be offered or sold absent an applicable exemption from registration requirements and any such offer and sale of these securities must be in accordance with Section 3(c)(7) of the Investment Company Act".

## CUSIP

The Trust will cause each "CUSIP" obtained for a Global Security to have an attached "fixed field" that contains "3c7", "GRLS" and "144A" indicators.

## Legends

The Trust will not remove the legend set forth in "— Representations of Purchasers" at any time.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This offering circular and the documents incorporated herein by reference contain certain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995 with respect to financial condition, results of operations and other matters. Statements in this offering circular, including those incorporated herein by reference, that are not historical facts are "forward-looking statements" for the purpose of the safe harbor provided by Section 21E of the Securities Exchange Act of 1934, as amended (the *"Exchange Act"*) and Section 27A of the Securities Act. Forward-looking statements can be identified by the fact that they do not relate strictly to historical or current facts. They often include words, such as "expects", "anticipates", "intends", "plans", "believes", "seeks", "estimates" or words of similar meaning, or future or conditional verbs, such as "will", "should", "would", "could" or "may".

Forward-looking statements provide WMI's or WMB's (as applicable) expectations or predictions of future conditions, events or results. They may include projections of the Company's revenues, income, earnings per share, capital expenditures, dividends, capital structure or other financial items, descriptions of management's plans or objectives for future operations, products or services, or descriptions of assumptions underlying or relating to the foregoing. They are not guarantees of future performance. By their nature, forward-looking statements are subject to risks and uncertainties. These statements speak only as of the date made and WMI and WMB do not undertake to update them to reflect changes or events that occur after that date. There are a number of significant factors that could cause actual conditions, events or results to differ materially from those described in the forward-looking statements many of which are beyond WMI's or WMB's (as applicable) control or ability to accurately forecast or predict. The factors are generally described in WMI's or WMB's (as applicable) most recent Form 10-K under the Table of Contents entry "Risk Factors" and the heading "Factors That May Affect Future Results and Form 10-Q under the caption "Cautionary Statements".

## WHERE YOU CAN FIND MORE INFORMATION

WMI files annual, quarterly and current reports, proxy statements and other information with the Securities and Exchange Commission (the "SEC"). You may read and copy any document that WMI files with the SEC at the SEC's public reference room in Washington, D.C. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. In addition, WMI's SEC filings are available to the public at the SEC's web site at http://www.sec.gov. You can also inspect reports, proxy statements and other information about WMI at the offices of the New York Stock Exchange, 20 Broad Street, New York, New York.

This offering circular incorporates by reference certain information that WMI files with the SEC. The information incorporated by reference is considered to be a part of this offering circular and should be read with the same care. When WMI updates the information contained in documents that have been incorporated by reference by making future filings with the SEC, the information incorporated by reference in this offering circular is considered to be automatically updated and superseded. In other words, in the case of a conflict or inconsistency between information with respect to WMI contained in this offering circular and information incorporated by reference into this offering circular, you should rely on the information contained in the document that was filed later. WMI incorporates by reference the documents listed below and any documents it files with the SEC in the future under Sections 13(a), 13(c), 14, or 15(d) of the Exchange Act until this Offering is completed:

- Annual Report on Form 10-K filed on March 1, 2007 relating to the year ended December 31, 2006;

- Quarterly report on Form 10-Q filed May 10, 2007 relating to the quarter ended March 31, 2007;

- Quarterly report on Form 10-Q filed on August 9, 2007 relating to the quarter ended June 30, 2007; and

- Current Reports on Form 8-K filed or furnished, as the case may be, on January 22, 2007, February 7, 2007, March 14, 2007, April 23, 2007, May 30, 2007, July 18, 2007 (other than information furnished under Item 2.02 including Exhibits 99.1, 99.2 and 99.3), September 13, 2007 and October 17, 2007, and Current Report on Form 8-K/A furnished on October 18, 2007.

WMB files annual, quarterly and current reports and other information with the OTS. You may read and copy these reports and other non-confidential information that WMB files with the OTS at the OTS's offices at 1700 G Street, N.W., Washington, D.C. 20552. In addition, WMB's most recent periodic filings with the OTS are available to the Investors at WMI's website at http://www.wamu.com/ir and then clicking the "Fixed Income" button.

This offering circular incorporates by reference certain information that WMB files with the OTS. The information incorporated by reference is considered to be a part of this offering circular and should be read with the same care. When WMB updates the information contained in documents that have been incorporated by reference by making future filings with the OTS, the information incorporated by reference in this offering circular is considered to be automatically updated and superseded. In other words, in the case of a conflict or inconsistency between information with respect to WMB contained in this offering circular and information incorporated by reference into this offering circular, you should rely on the information contained in the document that was filed later. WMB incorporates by reference the documents listed below and any documents it files with the OTS in the future under Sections 13(a), 13(c), 14, or 15(d) of the Exchange Act or regulations of the OTS to substantially similar effect until this Offering is completed:

- Annual Report on Form 10-K filed on April 2, 2007 relating to the year ended December 31, 2006;

- Quarterly Report on Form 10-Q filed May 15, 2007 relating to the quarter ended March 31, 2007;

- Quarterly report on Form 10-Q filed on August 14, 2007 relating to the quarter ended June 30, 2007; and

- Current Reports on Form 8-K filed or furnished, as the case may be, with the OTS on April 23, 2007 and September 17, 2007.

This offering circular also incorporates herein by reference the publicly available portions of quarterly reports regarding WMB's financial condition and operations that WMB submits to the OTS on OTS Form 1313 entitled *"Thrift Financial Report"* (each, a *"Thrift Financial Report"*) as of and for the annual period ended December 31, 2004 and all periods thereafter. Each Thrift Financial Report consists of a Consolidated Statement of Condition, Consolidated Statement of Operations, Consolidated Cash Flow Information, Consolidated Capital Requirements and other supporting schedules as of the end of the period to which the report relates. The Thrift Financial Reports are prepared in accordance with regulatory instructions issued by the OTS. These regulatory instructions in most, but not all, cases follow generally accepted accounting principles in the United States (*"GAAP"*) or the opinions and statements of the Accounting Principles Board or the Financial Accounting Standards Board. While the Thrift Financial Reports are supervisory and regulatory documents, not primarily accounting documents, and do not provide a complete range of financial disclosure about WMB, the reports nevertheless provide important information concerning WMB's financial condition and operating results. In addition, WMB's Thrift Financial Reports are not audited. The non-confidential portions of Thrift Financial Reports filed by WMB are on file with, and are publicly available upon written request, to the Office of Thrift Supervision, FOIA, 1700 G Street, N.W., Washington, D.C. 20552, Attention: Dissemination Branch and are also available at the U.S. Federal Deposit Insurance Corporation's (the *"FDIC"*) web site at http://www.fdic.gov.

You may request a copy of these filings, other than an exhibit to a filing unless that exhibit is specifically incorporated by reference into that filing, at no cost, by writing to or telephoning WMI at:

1301 Second Avenue
Seattle, Washington 98101
(206) 461-2000

The Company was formed on February 3, 2006 and has elected a calendar year fiscal year. The Independent Auditor's Report with regard to the audited financial statements (and related notes) of the Company for the fiscal year ended December 31, 2006 and the unaudited financial statements (and related notes) of the Company for the six months ended June 30, 2007 are included as Appendix A to this offering circular. The Company has agreed in its LLC Agreement to produce audited annual financial statements and unaudited interim financial statements and to make such financial statements available to investors or prospective investors upon request. The financial statements as of and for the year ended December 31, 2006 are the Company's first annual audited financial statements.

# OFFERING CIRCULAR SUMMARY

*The following summary is qualified in its entirety by the detailed information appearing elsewhere in this offering circular, in particular, the information under the headings "Description of the Trust Securities", "Description of the Series 2007-B Company Preferred Securities", "Description of the Series N WMI Preferred Stock" and "Description of the Depositary Shares", which describe the terms and conditions of the securities offered hereby.*

## Introduction

The Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities, liquidation preference $100,000 per security (each, a *"Trust Security"*, and collectively *"Trust Securities"*), are being issued by Washington Mutual Preferred Funding Trust IV (the *"Trust"*) in a financing transaction that raises capital for Washington Mutual Bank (*"WMB"*). WMB is an indirect subsidiary of Washington Mutual, Inc. (*"WMI"*). WMI and its affiliates are referred to herein as the *"WMI Group"*.

The Trust will invest the proceeds of the Trust Securities in a like amount of Fixed-to-Floating Rate Perpetual Non-cumulative Preferred Securities, Series 2007-B, liquidation preference $1,000 per security (the *"Series 2007-B Company Preferred Securities"*), of Washington Mutual Preferred Funding LLC, a Delaware limited liability company (the *"Company"*). The Trust will have no assets other than the Series 2007-B Company Preferred Securities. Dividends paid and redemption and liquidation payments made by the Company on the Series 2007-B Company Preferred Securities will pass through the Trust as distributions on and redemption and liquidation payments on the Trust Securities. The Company's material assets consist of direct or indirect interests in mortgages or mortgage-related assets originated or acquired by WMB, cash and other permitted investments as described more specifically under "The Company — Business of the Company — Assets of the Company", "Asset Trust I", "Asset Trust II" and "Asset Trust III."

The Trust Securities are being offered in reliance upon Rule 144A under the U.S. Securities Act of 1933, as amended (the *"Securities Act"*), only to persons who are *"qualified institutional buyers"* within the meaning of 144A under the Securities Act (each, a *"Qualified Institutional Buyer"*) and *"qualified purchasers"* (each, a *"Qualified Purchaser"*) within the meaning of Section 2(a)(51) of the U.S. Investment Company Act of 1940, as amended (the *"Investment Company Act"*). Resales of the Trust Securities are subject to restrictions as described under "Notice to Investors".

WMB established the Company as its indirect subsidiary to facilitate financing transactions that raise core capital for WMB. The Series 2007-B Company Preferred Securities are the fifth series of preferred securities to be issued by the Company. The Company has previously issued:

- In March 2006, $1,250,000,000 aggregate liquidation preference of its Fixed-to-Floating Rate Perpetual Non-cumulative Preferred Securities having an initial annual dividend rate of 6.534% (the *"Series 2006-A Company Preferred Securities"*), which were sold to Washington Mutual Preferred Funding Trust I, a Delaware statutory trust (*"Trust I"*), which in turn issued $1,250,000,000 liquidation preference of its Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities (the *"Trust I Securities"*) to investors;

- Also in March 2006, $750,000,000 aggregate liquidation preference of its 7.25% Perpetual Non-Cumulative Preferred Securities (the *"Series 2006-B Company Preferred Securities"*), which were sold to Washington Mutual Preferred Funding (Cayman) I Ltd., a Cayman Islands exempted company limited by shares (*"WaMu Cayman"*), which in turn issued $750,000,000 liquidation preference of its 7.25% Perpetual Non-cumulative Preferred Securities, in two series (the *"WaMu Cayman Securities"*), to investors; and

- In December 2006, $500,000,000 aggregate liquidation preference of its Fixed-to-Floating Rate Perpetual Non-cumulative Preferred Securities, Series 2006-C, having an initial annual dividend rate of 6.665% (the *"Series 2006-C Company Preferred Securities"*), which were sold to

Washington Mutual Preferred Funding Trust II, a Delaware statutory trust (*"Trust II"*), which in turn issued $500,000,000 liquidation preference of its Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities (the *"Trust II Securities"*) to investors.

- In May 2007, $500,000,000 aggregate liquidation preference of its Fixed-to-Floating Rate Perpetual Non-cumulative Preferred Securities, Series 2007-A, having an initial annual dividend rate of 6.895% (the *"Series 2007-A Company Preferred Securities"* and, together with the Series 2006-A Company Preferred Securities, the Series 2006-B Company Preferred Securities and the Series 2006-C Company Preferred Securities, the *"Outstanding Company Preferred Securities"*, and the Outstanding Company Preferred Securities together with the Series 2007-B Company Preferred Securities and any other Parity Equity Securities that may be issued on a future date, the *"Company Preferred Securities"*), which were sold to Washington Mutual Preferred Funding Trust III, a Delaware statutory trust (*"Trust III"*), which in turn issued $500,000,000 liquidation preference of its Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities (the *"Trust III Securities"*) to investors.

Under the Company's LLC Agreement, the Company's Board of Managers has the power to create and issue additional equity securities ranking *pari passu* with the Outstanding Company Preferred Securities in terms of payment of dividends or on liquidation of the Company (called *"Parity Equity Securities"* in the LLC Agreement) without the consent of the holders of the Outstanding Company Preferred Securities; *provided*, that after giving effect to the issuance of any Parity Equity Securities the Company satisfies an asset test and a funds from operations test (the *"FFO Test"*) and the Company is not otherwise in breach of any of its covenants set forth in the LLC Agreement. The Series 2007-B Company Preferred Securities will be Parity Equity Securities with respect to the Outstanding Company Preferred Securities. Therefore, on the closing date for this Offering, the Company will be required to satisfy the tests for issuance of the Series 2007-B Company Preferred Securities as Parity Equity Securities with respect to the Outstanding Company Preferred Securities. See "Description of the Series 2007-B Company Preferred Securities — Ranking" for a description of those tests and the calculation of the Company's compliance with those tests. In addition to the Parity Equity Securities, the Company may from time to time issue Junior Equity Securities subject to certain limitations described herein.

The Office of Thrift Supervision (together with any successor regulator, the *"OTS"*) has confirmed to WMB that the Series 2007-B Company Preferred Securities and the Outstanding Company Preferred Securities will constitute core capital of WMB under the OTS's applicable regulatory capital regulations.

If the OTS so directs following the occurrence of an Exchange Event, each Trust Security will be automatically exchanged (a *"Conditional Exchange"*) for a like amount of Fixed-to-Floating Rate Depositary Shares (the *"Depositary Shares"*) each representing 1/1000th of a share of WMI's Series N Perpetual Non-cumulative Fixed-to-Floating Rate Preferred Stock, no par value and liquidation preference $1,000,000 per share (the *"Series N WMI Preferred Stock"*), as described below in this summary under "— The Offering — Conditional Exchange". Upon a Conditional Exchange, the Trust I Securities, the Trust II Securities, the Trust III Securities and the WaMu Cayman Securities will also be automatically exchanged, but for depositary shares representing different series of WMI's preferred stock, having substantially equivalent terms (with certain exceptions) as to dividends, liquidation preference and redemption preference as the Outstanding Company Preferred Securities owned by Trust I, Trust II, Trust III or WaMu Cayman, as applicable.

This offering circular uses the term *"like amount"* in describing the number of Series 2007-B Company Preferred Securities in which a holder of Trust Securities has a beneficial interest and in describing the number of Depositary Shares for which the Trust Securities will be exchanged upon a Conditional Exchange. The term *"like amount"* means:

- when describing the number of Series 2007-B Company Preferred Securities in which a holder of Trust Securities has a beneficial interest, the number of Series 2007-B Company Preferred

Securities that has the same aggregate liquidation preference as the Trust Securities to which the reference is being made (*e.g.*, 1,000 Series 2007-B Company Preferred Securities with an aggregate liquidation preference of $1,000,000 are a *"like amount"* for 10 Trust Securities having an aggregate liquidation preference of $1,000,000); and

- when describing the number of Depositary Shares for which Trust Securities will be exchanged upon a Conditional Exchange, a number of Depositary Shares each representing 1/1000th of an interest in one share of Series N WMI Preferred Stock having a liquidation preference equal to the liquidation preference of the Trust Securities that are being exchanged (*e.g.*, 1,000 Depositary Shares representing Series N WMI Preferred Stock with an aggregate liquidation preference of $1,000,000 are a *"like amount"* for 10 Trust Securities having an aggregate liquidation preference of $1,000,000).

The offering of the Trust Securities and the related issuance of the Series 2007-B Company Preferred Securities are referred to herein as the *"Offering"*.

The following diagram outlines the relationship among WMI, WMB, University Street, the Company, the Trust, Asset Trust I, Asset Trust II, Asset Trust III, the Outstanding Company Preferred Securities and the holders of the Trust Securities:



---

(1) New American Capital, Inc., not shown here, is WMB's direct parent.

(2) Intermediate subsidiaries of WMB not shown.

(3) The Series 2006-A, 2006-B, 2006-C and 2007-A Company Preferred Securities are held by Trust I, WaMu Cayman, Trust II, and Trust III, respectively.

(4) Transfer of Flex-5 ARMs by WMB to the Company. In addition, a portion of the Flex-5 ARMs will be contributed by University Street to the Company.

(5) The Series 2007-B Company Preferred Securities will be transferred to WMB in exchange for a contribution of a portfolio of Flex-5 ARMs. WMB will then sell the Series 2007-B Company Preferred Securities to the Trust.

**The Trust**

Washington Mutual Preferred Funding Trust IV is a statutory trust created under the Delaware Statutory Trust Act on August 9, 2007 for the purposes set forth below under "The Trust". The Series 2007-B Company Preferred Securities will be the only assets of the Trust. Under the Trust Agreement, the Trust is prohibited from issuing any securities other than the Trust Securities.

Subject to the limitations and assumptions described under "Certain U.S. Federal Income Tax Considerations", the Trust intends to be treated as a grantor trust for United States federal income tax purposes, with the result that holders of Trust Securities are expected to be treated as beneficial owners of Series 2007-B Company Preferred Securities for United States federal income tax purposes.

**The Company**

Washington Mutual Preferred Funding LLC is a Delaware limited liability company formed on February 3, 2006. The LLC Agreement generally limits the Company's activities to (i) issuing (a) the Series 2006-A Company Preferred Securities, which were sold to Trust I, (b) the Series 2006-B Company Preferred Securities, which were sold to WaMu Cayman, (c) the Series 2006-C Company Preferred Securities, which were sold to Trust II, (d) the Series 2007-A Company Preferred Securities, which were sold to Trust III, (e) other Parity Equity Securities such as the Series 2007-B Company Preferred Securities, subject to the limitations described in this offering circular, (f) the common securities of the Company (the *"Company Common Securities"*) to University Street, Inc., an indirect subsidiary of WMB (*"University Street"*) and (g) additional Junior Equity Securities, subject to certain limitations described in this offering circular, (ii) acquiring and holding Eligible Investments, including the Asset Trust I Class A Trust Certificate, the Asset Trust II Class A Trust Certificate, the Asset Trust III Class A Trust Certificate and the Asset Trust III Class R Trust Certificate (which, other than Permitted Investments, will be the sole Eligible Investments of the Company immediately after the completion of this Offering) in accordance with the investment policy as described in "— Business of the Company — Assets of the Company" and (iii) performing functions necessary or incidental thereto.

The Series 2007-B Company Preferred Securities will rank *pari passu* with the Outstanding Company Preferred Securities as to dividends and upon liquidation of the Company. The terms of the Series 2007-B Company Preferred Securities will be substantially identical to the terms of the Outstanding Company Preferred Securities, other than with respect to the rate applicable to dividends, redemption dates and redemption prices.

University Street owns all of the Company Common Securities. The Eligible Investments owned by the Company from time to time will generate net income for payment by the Company to the Trust as dividends on the Series 2007-B Company Preferred Securities (and consequently for pass through by the Trust as distributions to the holders of the Trust Securities), to holders of other series of preferred securities of the Company as distributions on such series (including to Trust I, Trust II, Trust III and WaMu Cayman as holders of the Outstanding Company Preferred Securities), and to University Street to make distributions on, or to partially redeem, the Company Common Securities. When used in this offering circular with respect to the Company Common Securities or other Junior Equity Securities, the term *"dividend"* refers to payments by the Company as a distribution on, or to redeem a like amount of, the Company Common Securities or other Junior Equity Securities.

Subject to the limitations and assumptions described under "Certain U.S. Federal Income Tax Considerations", the Company intends to be treated as a partnership (other than a publicly traded partnership taxable as a corporation) for United States federal income tax purposes and will receive the opinion of Mayer Brown LLP to the effect that, for United States federal income tax purposes, the Company will not be treated as an association taxable as a corporation or as a publicly traded partnership taxable as a corporation.

The Company is managed by a Board of Managers. The Company's Board of Managers has three members, one of whom is not, and has not been during the preceding five years, an officer or employee of WMI or any affiliate of WMI, other than a financing subsidiary thereof (the *"Independent Manager"*).

## Conveyances of the Mortgage Loans

In connection with the February 2006 offering of the Series 2006-A Company Preferred Securities and Series 2006-B Company Preferred Securities, WMB conveyed a portfolio of first lien, closed-end, fixed rate home equity loans (*"HELs"*) to the Company in exchange for 100% of the Series 2006-A Company Preferred Securities and Series 2006-B Company Preferred Securities. Concurrently with this transfer by WMB, University Street conveyed a portfolio of HELs to the Company in exchange for 100% of the Company Common Securities. The portfolio conveyed by WMB and University Street to the Company and subsequently transferred to Asset Trust I consisted of approximately $5,389,459,150 of HELs in the aggregate, calculated as of January 31, 2006. The Company conveyed 100% of the HELs that it received to Asset Trust I in exchange for the interests in Asset Trust I represented by the Class A Asset Trust Certificate of Asset Trust I (the *"Asset Trust I Class A Trust Certificate"*) and a residual certificate (the *"Asset Trust I Class R Trust Certificate"*), which the Company transferred to WMB. WMB then sold the Series 2006-A Company Preferred Securities and Series 2006-B Company Preferred Securities for cash to Trust I and WaMu Cayman, respectively.

In connection with the December 2006 offering of the Series 2006-C Company Preferred Securities, WMB conveyed a portfolio of payment option adjustable rate mortgages (*"Option ARMs"*) to the Company in exchange for 100% of the Series 2006-C Company Preferred Securities, and University Street contributed a pool of Option ARMs to the Company as a capital contribution. The aggregate outstanding principal balance of all Option ARMs contributed to the Company by WMB and University Street and subsequently transferred to Asset Trust II was approximately $2,899,877,211 in the aggregate, calculated as of November 14, 2006. The Company conveyed 100% of the Option ARMs that it received to Asset Trust II in exchange for interests in Asset Trust II represented by the Class A Asset Trust Certificate of Asset Trust II (the *"Asset Trust II Class A Trust Certificate"*) and a residual certificate (the *"Asset Trust II Class R Trust Certificate"*), which the Company transferred to WMB. WMB then sold the Series 2006-C Company Preferred Securities for cash to Trust II.

As of September 30, 2007, the Company's assets consisted of approximately $4,083,661,672 of HELs in the aggregate, held through Asset Trust I; $1,664,792,954 of Option ARMs in the aggregate, held through Asset Trust II; and $525 million of permitted investments held directly or held through Asset Trust I or Asset Trust II, as the case may be. Since the March 2006 issuance of Company Preferred Securities, the Company has paid to University Street approximately $272.4 million of cash distributions and $2.217 billion of cash redemption payments, in each case on the Company Common Securities. The Company's source of funds for those dividends has been payments of interest and principal received by the Company through Asset Trust I on its HELs and Asset Trust II on its Option ARMs.

Contemporaneously with this Offering, WMB will convey a portfolio of fixed/floating rate mortgages (*"Flex-5 ARMs"*) to the Company in exchange for 100% of the Series 2007-B Company Preferred Securities and University Street will contribute a pool of Flex-5 ARMs to the Company as a capital contribution. The portfolio of Flex-5 ARMs to be conveyed by WMB to the Company will consist of approximately $1,000,000,000 outstanding principal amount of Flex-5 ARMs in the aggregate, as of September 30, 2007, and the portfolio of Flex-5 ARMs contributed by University Street to the Company will consist of approximately $4,199,147,686 outstanding principal amount of Flex-5 ARMs in the aggregate, as of September 30, 2007. The aggregate outstanding principal balance of Flex-5 ARMs contributed to Asset Trust III by WMB and University Street will be approximately $5,199,147,686, calculated as of September 30, 2007. The Company will, in turn, convey 100% of the Flex-5 ARMs that it owns to a newly formed Delaware Trust, WAMU 2007-Flex1 (*"Asset Trust III"* and, together with Asset Trust I and Asset Trust II, the *"Asset Trusts"*) in exchange for interests in Asset

6

Trust III represented by the Class A-1 2007-Flex1 Asset Trust Certificate of Asset Trust III (the *"Asset Trust III Class A Trust Certificate"*) and a second certificate (the *"Asset Trust III Class R Trust Certificate"*), which the Company expects to transfer to WMB. WMB will then sell the Series 2007-B Company Preferred Securities for cash to the Trust.

After giving effect to the contribution of the Flex-5 ARMs to the Company and Asset Trust III, on a pro forma basis, the Company's assets will consist of approximately $4,083,661,672 of HELs in the aggregate, as of September 30, 2007, held through Asset Trust I; $1,664,792,954 of Option ARMs in the aggregate, as of September 30, 2007, held through Asset Trust II; and $5,199,147,686 of Flex-5 ARMs in the aggregate, as of September 30, 2007, to be held through Asset Trust III.

The HELs currently held in Asset Trust I, the Option ARMs currently held in Asset Trust II and the Flex-5 ARMs to be held in Asset Trust III will together satisfy the coverage and FFO tests described under "Descriptions of the Series 2007-B Company Preferred Securities — Ranking" for issuance of the Series 2007-B Company Preferred Securities as Parity Equity Securities with respect to the Outstanding Company Preferred Securities.

### University Street

University Street, Inc. is a Washington corporation. It has elected to be treated as a real estate investment trust for United States federal income tax purposes. University Street holds 100% of the Company Common Securities, which represent 100% of the voting rights in the Company (subject to the limited rights of holders of the Company Preferred Securities described below).

### The Asset Trusts

Washington Mutual Home Equity Trust I *("Asset Trust I")* is a Delaware statutory trust existing under the Pooling and Servicing Agreement, dated as of March 7, 2006 (the *"Asset Trust I Pooling and Servicing Agreement"*), among WMB, as servicer, the Company, Deutsche Bank National Trust Company, as Trustee, and Deutsche Bank Trust Company Delaware, as Delaware trustee (the *"Asset Trust I Delaware Trustee"*). The Asset Trust I Pooling and Servicing Agreement is the governing instrument of Asset Trust I. Asset Trust I has made an election to be treated as a real estate mortgage investment conduit (*"REMIC"*) for United States federal income tax purposes.

The assets of Asset Trust I consist of the portfolio of HELs conveyed by the Company to Asset Trust I in connection with the issuance by the Company of the Series 2006-A Company Preferred Securities and 2006-B Company Preferred Securities and the related offerings by Trust I of the Trust I Securities and by WaMu Cayman of the WaMu Cayman Securities. The HELs were originated or acquired by WMB primarily through its branch network. As of September 30, 2007, the HELs held by the Company through Asset Trust I had an aggregate unpaid principal balance of approximately $4,083,661,672.

WAMU 2006-OA1 (*"Asset Trust II"*) is a Delaware statutory trust existing under the Pooling and Servicing Agreement, dated as of December 13, 2006 (the *"Asset Trust II Pooling and Servicing Agreement"*) among the Company, WMB, as servicer, Deutsche Bank Trust Company Delaware, as Delaware trustee (the *"Asset Trust II Delaware Trustee"*), and Deutsche Bank National Trust Company, as Trustee. The Asset Trust II Pooling and Servicing Agreement is the governing instrument of Asset Trust II. Asset Trust II has made an election to be treated as a REMIC for United States Federal income tax purposes.

The assets of Asset Trust II consist substantially of the portfolio of Option ARMs conveyed by the Company to Asset Trust II in connection with the issuance by the Company of the Series 2006-C Company Preferred Securities and the related offering by Trust II of the Trust II Securities. The Option ARMs were originated by WMB between July 31, 1997 and April 21, 2006. As of September 30, 2007, the Option ARMs held by the Company through Asset Trust II had an aggregate unpaid principal balance of approximately $1,664,792,954.

WAMU 2007-Flex1 ("*Asset Trust III*") is a Delaware statutory trust formed pursuant to a trust agreement, entered into on August 9, 2007, between the Company, as depositor, and Deutsche Bank Trust Company Delaware, as Delaware trustee (the "*Asset Trust III Delaware Trustee*"). The Pooling and Servicing Agreement, to be entered into on or before the closing date of this Offering, relating to Asset Trust III among the Company, WMB, as servicer, Deutsche Bank Trust Company Delaware, as Delaware trustee, and Deutsche Bank National Trust Company, as Trustee (the "*Asset Trust III Pooling and Servicing Agreement*", and together with the Asset Trust I Pooling and Servicing Agreement and the Asset Trust II Pooling and Servicing Agreement, collectively, the "*Pooling and Servicing Agreements*"), will amend and restate the trust agreement of Asset Trust III and will be the governing instrument of Asset Trust III. Asset Trust III will also make an election to be treated as a REMIC for United States Federal Income tax purposes.

The initial assets of Asset Trust III will consist of the portfolio of Flex-5 ARMs to be conveyed by the Company to Asset Trust III in connection with this Offering. The Flex-5 ARMs were originated by WMB between 2000 and 2006. As of September 30, 2007, the Flex-5 ARMs to be transferred into Asset Trust III had an aggregate unpaid principal balance of approximately $5,199,147,686.

Unless the context requires otherwise, the HELs owned by Asset Trust I, the Option ARMs owned by Asset Trust II and the Flex-5 ARMs to be held by Asset Trust III are referred to in this offering circular collectively as the "*Mortgage Loans*".

## WMt

With a history dating back to 1889, Washington Mutual, Inc., a Washington corporation, is a consumer and small business banking company with operations in major U.S. markets. Based on its consolidated assets on June 30, 2007, WMI was the largest thrift holding company in the United States and the seventh largest among all U.S.-based bank and thrift holding companies. As of September 30, 2007, WMI, together with its subsidiaries, had total assets of approximately $330.1 billion, total liabilities of approximately $306.1 billion and total stockholders' equity of approximately $24.0 billion. As of September 30, 2007, WMI and its subsidiaries also had total deposits of approximately $194.3 billion. WMI's common stock is listed on the New York Stock Exchange under the symbol "WM". The principal business offices of WMI are located at 1301 Second Avenue, Seattle, Washington 98101 and its telephone number is 206-461-2000.

See "WMI — Recent Developments" for a discussion of recent developments concerning WMI and the WMI Group.

## WMB

Washington Mutual Bank is a federally chartered savings association, chartered and operating under the United States Home Owners' Loan Act of 1933, as amended. WMB accepts deposits from the general public; originates, purchases, services and sells home loans; makes credit card, home equity and commercial real estate loans (the latter being loans secured primarily by multi-family properties); and offers cash management and deposit services. WMB purchases, sells and services loans to subprime borrowers through its subprime mortgage channel. WMB also markets annuities and other insurance products and offers securities brokerage services through its insurance and broker-dealer subsidiaries. As a federal savings association, WMB is subject to regulation and examination by the OTS, its primary regulator. WMB is an indirect, wholly-owned subsidiary of WMI.

## The Offering

Issuer . . . . . . . . . . . . . . . . . . . . . . .
As to the Trust Securities, Washington Mutual Preferred Funding Trust IV, a Delaware statutory trust.

As to the Series 2007-B Company Preferred Securities, Washington Mutual Preferred Funding LLC, a Delaware limited liability company.

As to the Series N WMI Preferred Stock (which will be represented by Depositary Shares) for which the Trust Securities will be exchanged upon the occurrence of a Conditional Exchange, Washington Mutual, Inc., a Washington corporation.

Offered Securities . . . . . . . . . . . . . .
Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities, liquidation preference $100,000 per security and $1,000,000,000 in the aggregate, issued by the Trust.

Dividends . . . . . . . . . . . . . . . . . . . .
Dividends on the Series 2007-B Company Preferred Securities will be passed through by the Trust as distributions on the Trust Securities on each date on which the Company pays to the Trust dividends on the Series 2007-B Company Preferred Securities, in an amount per Trust Security equal to the amount of dividends received by the Trust on a like amount of Series 2007-B Company Preferred Securities (including Additional Amounts, if any).

For purposes of this offering circular, we refer to distributions (with respect to Company Preferred Securities) and distributions and redemption payments (with respect to the Company Common Securities or other Junior Equity Securities) payable by the Company on its securities as *"dividends"*. Dividends on the Series 2007-B Company Preferred Securities are payable as follows:

*Dividend Rate.* Dividends on the Series 2007-B Company Preferred Securities will accrue at an annual rate equal to 9.75% to, but not including December 15, 2017, and 3-Month USD LIBOR *plus* 4.723% commencing December 15, 2017 and for each Dividend Period thereafter, applied to the liquidation preference of $1,000 per Company Preferred Security.

*Dividend Payment Dates.* If, when and as declared by the Company's Board of Managers, the Dividend Payment Dates for the Series 2007-B Company Preferred Securities will be March 15, June 15, September 15 and December 15 of each year commencing on December 15, 2007, or, in each case, the next Business Day if any such day is not a Business Day.

*Declaration of Dividends, etc.* Dividends on the Series 2007-B Company Preferred Securities if, when and as declared by the Company's Board of Managers out of legally available funds, will be payable at the dividend rate described above applied to the liquidation preference per Company Preferred Security accruing on a non-cumulative basis from October 25, 2007. Any such dividends will be distributed to holders

9

of Series 2007-B Company Preferred Securities in the manner described under "Description of the Series 2007-B Company Preferred Securities — Dividends".

*Non-cumulative Dividends.* Dividends on the Series 2007-B Company Preferred Securities are non-cumulative. If the Company's Board of Managers does not declare a dividend on the Series 2007-B Company Preferred Securities or declares less than a full dividend in respect of any Dividend Period, holders of the Series 2007-B Company Preferred Securities will have no right to receive any dividend or a full dividend, as the case may be, for that Dividend Period, and the Company will have no obligation to pay any dividends or full dividends on the Series 2007-B Company Preferred Securities for that Dividend Period, whether or not dividends are declared and paid for any future Dividend Period with respect to any series of the Company Preferred Securities, the Company Common Securities or any other Junior Equity Securities.

Redemption/Replacement Capital Covenant/Intentions of WMI and the Company . . . . . . . . . . . . . . . . . . . . . .    *General.* On each day on which the Company redeems Series 2007-B Company Preferred Securities, the Trust will apply the redemption proceeds it receives on the Series 2007-B Company Preferred Securities to redeem a like amount of Trust Securities. The redemption provisions of the Series 2007-B Company Preferred Securities are described below. Subject to a covenant in effect until October 25, 2017, in favor of certain of WMI's debtholders limiting WMI's and its subsidiaries' right to purchase or redeem the Series 2007-B Company Preferred Securities or the Trust Securities (among others), as described in the next paragraph, and subject to the Company having received the prior approval of the OTS for any proposed redemption of Series 2007-B Company Preferred Securities, the Company may, at its option, redeem the Series 2007-B Company Preferred Securities:

- in whole but not in part, on any Dividend Payment Date prior to the Dividend Payment Date in December 2017 upon the occurrence of a Tax Event, an Investment Company Act Event, a Rating Agency Event or a Regulatory Capital Event, at a cash redemption price equal to the sum of: (i) the greater of: (A) $1,000 per Series 2007-B Company Preferred Security, or (B) the sum of the present values of $1,000 per Series 2007-B Company Preferred Security, discounted from the Dividend Payment Date in December 2017 to the redemption date, and the present values of all undeclared dividends for each Dividend Period from the redemption date to and including the Dividend Payment Date in December 2017, discounted from their applicable Dividend Payment Dates to the redemption date on a quarterly basis, in each case (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate, as calculated by an

Independent Investment Banker, *plus* 1.00%; *plus* (ii) any declared and unpaid dividends to the redemption date;

- in whole but not in part, on any Dividend Payment Date prior to the Dividend Payment Date in December 2017 for any reason other than the occurrence of a Tax Event, an Investment Company Act Event, a Rating Agency Event or a Regulatory Capital Event, at a cash redemption price equal to the sum of (i) the greater of: (A) $1,000 per Series 2007-B Company Preferred Security, or (B) the *sum* of the present value of $1,000 per Series 2007-B Company Preferred Security, discounted from the Dividend Payment Date in December 2017 to the redemption date, and the present values of all undeclared dividends for each Dividend Period from the redemption date to and including the Dividend Payment Date in December 2017, discounted from their applicable Dividend Payment Dates to the redemption date, in each case on a quarterly basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate, as calculated by an Independent Investment Banker, *plus* 0.75%; *plus* (ii) any declared but unpaid dividends to the redemption date;

- in whole but not in part, on any Dividend Payment Date after the Dividend Payment Date in December 2017 that is not a Ten-Year Date, upon the occurrence of a Tax Event, an Investment Company Act Event, a Rating Agency Event or a Regulatory Capital Event, at a cash redemption price equal to $1,000 per Series 2007-B Company Preferred Security, *plus* any declared and unpaid dividends to the redemption date;

- in whole or in part, on each Dividend Payment Date that is a Ten-Year Date at a cash redemption price of $1,000 per Company Preferred Security, *plus* any declared and unpaid dividends to the redemption date; and

- in whole but not in part, on any Dividend Payment Date after the Dividend Payment Date in December 2017 that is not a Ten-Year Date for any reason other than the occurrence of a Tax Event, an Investment Company Act Event, a Rating Agency Event or a Regulatory Capital Event, at a cash redemption price equal to the sum of (i) the greater of (A) $1,000 per Series 2007-B Company Preferred Security, and (B) the sum of the present value of $1,000 per Series 2007-B Company Preferred Security, discounted from the next succeeding Ten-Year Date to the redemption date, and the present values of all undeclared dividends for each Dividend Period from the redemption date to and including the next succeeding Ten-Year Date, discounted from their applicable Dividend Payment Dates to the redemption date, in each case on a quarterly basis (assuming a 360-day year consisting of twelve 30-day months) at the 3-Month USD LIBOR Rate applicable to the Dividend Period immediately preceding such redemption date (which 3-Month USD

LIBOR Rate will also, for purposes of calculating such redemption price, be the rate used in calculating the amount for each such undeclared dividend), as calculated by an Independent Investment Banker; *plus* (ii) any declared but unpaid dividends to the redemption date, in each case, without accumulation of any undeclared dividends with respect to Dividend Payment Dates prior to the redemption date.

"*Ten-Year Date*" means the Dividend Payment Date in December 2017 and the Dividend Payment Date in December of each tenth succeeding year (*i.e.*, December 2027, December 2037, etc.)

**Restriction on Redemption or Purchases.** At or prior to initial issuance of the Trust Securities, WMI will enter into a "*Replacement Capital Covenant*" as described under "Description of the Trust Securities — Restriction on Redemption or Purchases". In the Replacement Capital Covenant, WMI will covenant in favor of certain of its debtholders that, if WMI or a subsidiary purchases or redeems any Trust Securities or Series 2007-B Company Preferred Securities or, after a Conditional Exchange, Depositary Shares (or related Series N WMI Preferred Stock), WMI or its subsidiaries will do so only if and to the extent that the total redemption or purchase price is equal to or less than designated percentages of the net cash proceeds that WMI or its subsidiaries have received during the 180 days prior to such redemption or purchase from the issuance of other securities or combinations of securities having the characteristics described under "Description of the Trust Securities — Restriction on Redemption or Purchases". The Replacement Capital Covenant will terminate on October 25, 2017 without any action by WMI or any other person. WMI entered into similar replacement capital covenants in connection with the issuance of the Outstanding Company Preferred Securities in May 2007, March 2006 and December 2006.

In addition, upon the expiration of the Replacement Capital Covenant on October 25, 2017, WMI and the Company intend that, to the extent the Series 2007-B Company Preferred Securities and the related Trust Securities provide WMI with equity credit from a nationally recognized rating agency at the time of redemption or repurchase of such securities, WMI will purchase and/or the Company will redeem or purchase (but, in the case of the Company, only to the extent such redemption or purchase is funded, directly or indirectly, by WMI and its subsidiaries, other than WMB and its subsidiaries) the Series 2007-B Company Preferred Securities and the related Trust Securities, as applicable, only to the extent that the amount paid by WMI and its subsidiaries (other than WMB and its subsidiaries), net of fees and expenses, in connection with such redemption or repurchase does not exceed the net proceeds received by WMI (and, in the case of the Company, made available to the Company in connection with a

redemption or purchase by it) from the sale or issuance, during the 180-day period prior to the notice date for such redemption or purchase, by WMI or its subsidiaries, other than WMB and its subsidiaries, to third-party purchasers, other than a subsidiary of WMI, of securities for which WMI will receive equity credit, at the time of sale or issuance, that is, in the aggregate, equal to or greater than the equity credit attributed to WMI from the 2007-B Company Preferred Securities at the time of such redemption or repurchase. The determination of the equity credit attributable to the 2007-B Company Preferred Securities and the related Trust Securities that may be redeemed or purchased, as applicable, may result in the issuance of an amount of new securities that may be less than the liquidation preference of the 2007-B Company Preferred Securities and related Trust Securities redeemed or purchased, depending upon, *inter alia*, the nature of the new securities issued and the equity credit attributed by a nationally recognized rating agency to the Series 2007-B Company Preferred Securities redeemed or purchased and the new securities. Upon the occurrence of an Exchange Event, the foregoing shall apply to the Series N WMI Preferred Stock *mutatis mutandis*. Unlike the specific agreements set forth in the Replacement Capital Covenant, the foregoing represents WMI's and the Company's intentions with respect to the Series 2007-B Company Preferred Securities.

See "Description of the Series 2007-B Company Preferred Securities — Redemption".

Ranking. . . . . . . . . . . . . . . . . . . . . . . **Trust Securities.** The Trust Securities will be the only securities issued by the Trust. The Amended and Restated Trust Agreement of the Trust (the *"Trust Agreement"*) will provide that the Trust will not issue any other securities.

**Series 2007-B Company Preferred Securities.** The Series 2007-B Company Preferred Securities will rank *pari passu* with the Outstanding Company Preferred Securities and senior to the Company Common Securities and any other Junior Equity Securities in terms of dividends and liquidation payments.

During a Dividend Period, the Company may not declare or pay any dividends on any of its Junior Equity Securities other than dividends payable in Junior Equity Securities of the same class or series or Junior Equity Securities ranking junior to that class or series, or purchase, redeem or otherwise acquire for consideration, directly or indirectly, any Junior Equity Securities (other than as a result of reclassification of Junior Equity Securities for or into other Junior Equity Securities, or the exchange or conversion of Junior Equity Securities for or into other Junior Equity Securities), unless dividends for such Dividend Period on all Company Preferred Securities then outstanding have been declared and paid in full, or declared and set aside for payment, as the case may be.

The Company may issue additional Parity Equity Securities from time to time without the consent of the holders of the Series 2007-B Company Preferred Securities; *provided*, that (i) after giving effect to such issuance, the *pro forma* net book value of the Company's assets (after giving effect to the acquisition of any New Assets in connection with the issuance of such Parity Equity Securities) will equal or exceed 1.5 times the sum of the aggregate liquidation preference of the Company Preferred Securities then outstanding and any such Parity Equity Securities that the Company proposes to issue, (ii) after giving effect to such issuance, the Company's *pro forma* funds from operations, or *"FFO"*, for the four fiscal quarters beginning with the fiscal quarter in which such Parity Equity Securities are proposed to be issued (calculated (a) assuming that such proposed Parity Equity Securities are issued and that, if any Parity Equity Securities (including the Parity Equity Securities that the Company proposes to issue) bear dividends based on a floating rate, the applicable dividend rate will not change during such four fiscal quarters from the rate in effect on the applicable date of determination, (b) assuming, to the extent necessary, for each mortgage loan, which bears an adjustable or floating interest rate and/or having adjustable periodic payments, that is directly or indirectly owned by the Company that the interest rate and the minimum monthly payment in the applicable mortgage note will not change during such four quarters from the interest rate and minimum monthly payment in effect on the applicable date of determination, and (c) as adjusted to reflect any New Assets) equals or exceeds 150% of the amount that would be required to pay full annual dividends on all preferred securities of the Company then outstanding and any such Parity Equity Securities that the Company proposes to issue and (iii) the Company is not otherwise in breach of any of its covenants set forth in the LLC Agreement. The Series 2007-B Company Preferred Securities are Parity Equity Securities with respect to the Outstanding Company Preferred Securities, and the Company satisfies the tests for the issuance of the Series 2007-B Company Preferred Securities as Parity Equity Securities. See "Description of the Series 2007-B Company Preferred Securities — Ranking".

WMI will covenant in the Exchange Agreement for the benefit of the holders of the Trust Securities that if for any Dividend Period full dividends on (i) the Series 2007-B Company Preferred Securities or (ii) the Trust Securities have not been declared and paid, then WMI will not declare or pay dividends with respect to, or redeem, purchase or acquire, any of its equity capital securities during the next succeeding Dividend Period, except dividends in connection with a shareholders' rights plan, if any, or dividends in connection with benefits plans. WMI entered into similar exchange agreements that included equivalent covenants in connection with the issuance of the Outstanding Company Preferred Securities.

| | |
|---|---|
| Conditional Exchange . . . . . . . . . . . | If the OTS so directs following the occurrence of an Exchange Event, each Trust Security will be automatically exchanged for a like amount of Depositary Shares, with each Depositary Share representing 1/1000th of a share of Series N WMI Preferred Stock (the *"Depositary Shares"*). |

An *"Exchange Event"* will occur when (i) WMB becomes "undercapitalized" under the OTS's "prompt corrective action" regulations, (ii) WMB is placed into conservatorship or receivership or (iii) the OTS, in its sole discretion, anticipates WMB becoming "undercapitalized" in the near term or takes a supervisory action that limits the payment of dividends by WMB, and in connection therewith, directs such exchange.

The Series N WMI Preferred Stock, upon issuance, will have substantially equivalent terms as to dividends, redemption and liquidation preferences as the Series 2007-B Company Preferred Securities and the Trust Securities for which they may be exchanged, except that: (i) the Series N WMI Preferred Stock will not have the benefit of the favorable covenants described under "Description of the Series 2007-B Company Preferred Securities — Voting Rights and Covenants"; (ii) the occurrence of an Investment Company Act Event or Tax Event will not affect the ability of WMI to redeem the Series N WMI Preferred Stock; (iii) Additional Amounts will not be payable with respect to the Series N WMI Preferred Stock; and (iv) if WMI fails to pay, or declare and set aside for payment, whether or not consecutive, full dividends on the Series N WMI Preferred Stock after its issuance or any then outstanding Voting Parity Securities for six Dividend Periods, the authorized number of WMI's directors will increase by two, and the holders of Series N WMI Preferred Stock, voting together with the holders of any other Voting Parity Securities, such as the Series I WMI Preferred Stock, Series J WMI Preferred Stock, Series L WMI Preferred Stock and Series M WMI Preferred Stock issuable upon an Exchange Event in exchange for the Trust I Securities, the WaMu Cayman Securities, the Trust II Securities or the Trust III Securities, as applicable, will have the right to elect two directors in addition to the directors then in office at the next annual meeting of shareholders.

WMI will covenant in the Exchange Agreement in favor of the holders of the Trust Securities that, prior to the issuance of the Series N WMI Preferred Stock upon a Conditional Exchange, WMI will not issue any preferred stock that would rank senior to the Series N WMI Preferred Stock upon its issuance in terms of dividends or liquidation payments. Each share of Series N WMI Preferred Stock will, upon issuance, rank at least *pari passu* with the most senior preferred stock of WMI, if any, then outstanding, and to any other preferred stock that WMI may have issued prior to the date of such issuance of such Series N WMI Preferred Stock.

| Voting Rights and Certain Covenants | Except as set forth below, the holders of the Series 2007-B Company Preferred Securities will not have voting rights. |

The LLC Agreement will provide that, so long as any Company Preferred Securities of any series are outstanding the Company will not, except with the consent or affirmative vote of the holders of at least two-thirds of all the series of Company Preferred Securities, voting together as a single class:

- effect a consolidation, conversion, merger or share exchange with or into another entity other than an entity controlled by, or under common control with, WMI;

- issue any equity securities of the Company ranking senior to the Company Preferred Securities in respect of payments of dividends or on liquidation to the Company Preferred Securities ("Senior Equity Securities");

- incur any indebtedness for borrowed money;

- pay dividends on the Company's Junior Equity Securities unless the Company's FFO for the four prior fiscal quarters equals or exceeds 150% of the amount that would be required to pay full annual dividends on all series of Company Preferred Securities then outstanding;

- fail to invest the proceeds of the Company's assets such that the Company's FFO over any period of four fiscal quarters will equal or exceed 150% of the amount that would be required to pay full annual dividends on all series of Company Preferred Securities then outstanding;

- issue any additional Company Common Securities to any person, other than University Street or another affiliate of WMI;

- amend or otherwise change the terms of any Asset Documentation in a manner that is materially adverse to the Trust or the holders of the Trust Securities or to any other entity holding a series of Company Preferred Securities (including Trust I, WaMu Cayman, Trust II and Trust III, a "Trust Holder") or to the holders of that Trust Holder's securities;

- remove or cause to be removed, as applicable, "Washington Mutual" from the Company's or the Trust's name or the name of any other Trust Holder unless the name of WMI changes and the Company makes a change to the Company's, the Trust's, or such other Trust Holder's name to be consistent with the new group name;

- take any action or fail to take any action that would cause the Company to fail to be treated as a partnership (other than a publicly traded partnership taxable as a corporation) for United States federal income tax purposes;

- engage in a U.S. trade or business for United States federal income tax purposes;

- fail to hold only assets that qualify for the portfolio interest exemption under the Code or are otherwise exempt from gross basis United States withholding taxes;

- fail to manage its affairs such that income with respect to the Trust Securities does not constitute "unrelated business taxable income" for United States federal income tax purposes;

- take any action that could reasonably be expected to cause a Tax Event, an Investment Company Act Event, a Rating Agency Event or a Regulatory Capital Event to occur; or

- amend its certificate of formation or LLC Agreement in a manner that materially and adversely affects the terms of any series of Company Preferred Securities; *provided, however,* that, if any amendment affects fewer than all classes of Company Preferred Securities, the amendment will require only a vote of the holders of such affected class or classes of Company Preferred Securities, voting together as a separate class.

In addition, the LLC Agreement will provide that, for so long as any Company Preferred Securities are outstanding, certain actions by the Company will be subject to the prior approval of all Managers, including the Independent Manager. The Company will not be able, without the approval of the Independent Manager, to:

- terminate, amend or otherwise change any Asset Documentation; or

- effect a consolidation, merger or share exchange (excluding the Conditional Exchange) that is not tax-free to the holders of any series of Company Preferred Securities, and the related trust securities, unless the transaction was approved by the consent or affirmative vote of the holders of at least two-thirds of all the series of Company Preferred Securities, voting together as a single class.

In addition, the LLC Agreement will provide that if (i) the Company fails to pay full dividends on any series of Company Preferred Securities on any Dividend Payment Date, (ii) any Trust Holder fails to pass through full dividends paid by the Company on the Company Preferred Securities held by that Trust Holder to the holders of the Trust Holder's securities on any Dividend Payment Date, or (iii) a Bankruptcy Event occurs, the holders of all the series of Company Preferred Securities, voting together as a single class, by majority vote of the votes cast on such matter, are entitled to remove the initial or any succeeding Independent Manager and to fill the vacancy created by such removal or any other vacancy existing in the office of the Independent Manager.

Each holder of Trust Securities will have the right to direct the Property Trustee acting for the Trust, as holder of the Series 2007-B Company Preferred Securities, as to the

| | |
|---|---|
| | exercise of the voting rights described above pertaining to a like amount of Series 2007-B Company Preferred Securities represented by its respective Trust Securities. See "Description of the Trust Securities — Voting Rights". |
| Additional Amounts . . . . . . . . . . . . . | If the Company or the Trust is required to withhold or pay any Additional Taxes as a result of an Additional Tax Event, the Company will pay as additional amounts on the Series 2007-B Company Preferred Securities such amounts as will be required so that dividends on the Series 2007-B Company Preferred Securities and/or the amounts passed through by the Trust on the Trust Securities, as applicable, will not be reduced as a result of any such Additional Taxes. See "Description of the Series 2007-B Company Preferred Securities — Additional Amounts". If the Trust Securities are exchanged for Series N WMI Preferred Stock upon a Conditional Exchange, WMI will not be obligated to pay Additional Amounts on the Series N WMI Preferred Stock. |
| Listing . . . . . . . . . . . . . . . . . . . . . . | The Trust Securities will not be listed on any securities exchange or automated dealer quotation system. |
| Use of Proceeds . . . . . . . . . . . . . . . | The Trust will use the proceeds of the sale of the Trust Securities in this Offering to purchase from WMB a like amount of Series 2007-B Company Preferred Securities, which the Company will issue to WMB in exchange for the conveyance of the Flex-5 ARMs to the Company. The WMI Group will use the proceeds from the sale of the Series 2007-B Company Preferred Securities to the Trust for general corporate purposes. |
| Ratings . . . . . . . . . . . . . . . . . . . . . . | The Trust Securities are expected to be assigned upon issuance ratings of "BBB" by Standard & Poor's Rating Services, a Division of The McGraw-Hill Companies, Inc. ("S&P"), "Baa1" by Moody's Investors Service, Inc. ("Moody's") and "A−" by Fitch, Inc. ("Fitch"). A rating is not a recommendation to buy, sell or hold securities and may be subject to revision, suspension or withdrawal at any time by the assigning rating organization. See "Risk Factors — Risks Relating to the Terms of the Trust Securities and the Series 2007-B Company Preferred Securities — Rating agencies may change rating methodologies". |
| Tax Consequences . . . . . . . . . . . . . | It is anticipated that the Trust will be treated as a grantor trust for United States federal income tax purposes. Accordingly, each holder of a Trust Security is expected to be treated as if it owned directly the Series 2007-B Company Preferred Securities allocable to such Trust Security. |
| | The Company intends to qualify as a partnership (other than a publicly traded partnership taxable as a corporation) for United States federal income tax purposes, and thus, the Series 2007-B Company Preferred Securities held by the Trust are intended to constitute equity interests in a partnership. As a partnership, the Company intends that it will not be subject to United States federal income tax. Instead, each holder of a Trust Security will be required to report on its United States |

| | |
|---|---|
| | federal income tax return its share of the income, gains, losses, deductions and credits of the Company that are allocable to the Trust, even if such holder has not received any cash distributions. |
| | See "Certain U.S. Federal Income Tax Considerations — United States Federal Income Tax Consequences". |
| ERISA Considerations . . . . . . . . . . . | No Trust Security may be purchased by or transferred to any Benefit Plan Investor, except for an insurance company general account that represents, warrants and covenants that, at the time of acquisition and throughout the period it holds the securities, (i) it is eligible for and meets the requirements of Department of Labor Prohibited Transaction Class Exemption 95-60, (ii) less than 25% of the assets of such general account are (or represent) assets of a Benefit Plan Investor and (iii) it is not a person who has discretionary authority or control with respect to the assets of the Trust or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person and would not otherwise be excluded under 29 C.F.R. § 2510.3-101(f)(1). |
| Governing Law . . . . . . . . . . . . . . . . | The Trust Agreement, the Trust Securities, the LLC Agreement and the Series 2007-B Company Preferred Securities will be governed by, and construed in accordance with, the laws of the State of Delaware. The Series N WMI Preferred Stock will be governed by and construed in accordance with the laws of the State of Washington. The Depositary Shares will be governed by, and construed in accordance with, the laws of the State of New York. |
| CUSIP . . . . . . . . . . . . . . . . . . . . . . . | 93936TAA8 |
| ISIN . . . . . . . . . . . . . . . . . . . . . . . . | US93936TAA88 |

# RISK FACTORS

*Purchasers should carefully consider the following risk factors in conjunction with the other information contained in this offering circular, as well as information that is incorporated by reference in this offering circular, before purchasing any Trust Securities, the financial entitlements of which will be substantially similar to those of a like amount of Series 2007-B Company Preferred Securities and which are conditionally exchangeable into Depositary Shares representing interests in Series N WMI Preferred Stock. In addition, purchasers should also carefully consider the risk factors included in WMI's and WMB's Annual Reports on Form 10-K for the year ended December 31, 2006, and their respective Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2007 and June 30, 2007.*

## Risks Relating to the Terms of the Trust Securities and the Series 2007-B Company Preferred Securities

### Holders of Trust Securities will receive distributions only if the Company pays dividends on the Series 2007-B Company Preferred Securities.

Amounts available to the Trust for payment on the Trust Securities will be limited to dividends received by the Trust as the holder of the Series 2007-B Company Preferred Securities. If the Company does not declare and pay dividends on the Series 2007-B Company Preferred Securities, the Trust will not pass through any dividends to holders of the Trust Securities.

### Dividends on the Series 2007-B Company Preferred Securities are not cumulative and purchasers will not receive dividends on the Trust Securities for any Dividend Period unless dividends are authorized and declared by the Company's Board of Managers for that Dividend Period on the like amount of Series 2007-B Company Preferred Securities held by the Trust.

Dividends on the Series 2007-B Company Preferred Securities are not cumulative. Consequently, if the Board of Managers does not declare a dividend on the Series 2007-B Company Preferred Securities for any Dividend Period, the Trust, as holder of the Series 2007-B Company Preferred Securities, and consequently the holders of Trust Securities, will not receive dividends for that Dividend Period. In addition, the Company's Board of Managers may determine that it would be in the Company's best interests to pay less than the full amount of the stated dividends on the Series 2007-B Company Preferred Securities or no dividends for any Dividend Period even if funds are available. Factors that would generally be considered by the Company's Board of Managers in making this determination are the amount of available funds, the Company's financial condition and capital needs, the impact of current and pending legislation and regulations, economic conditions and tax considerations.

### The level of the Company's assets relative to the aggregate liquidation preference of the Company's preferred securities could shrink over time because of, among other things, dividends paid by the Company on the Company Common Securities or other Junior Equity Securities if any are issued at a future date.

The LLC Agreement includes provisions that limit the Company's ability to pay dividends on the Company's Junior Equity Securities but, subject to satisfaction of those limitations, does not prohibit dividends that could cause the level of the Company's assets relative to the aggregate liquidation preference of the Company Preferred Securities to shrink. These limitations are described under "Description of the Series 2007-B Company Preferred Securities — Ranking", "— Restrictions on Dividends" and "— Voting Rights and Covenants". They include the following:

- during a Dividend Period, the Company may not pay dividends on Junior Equity Securities, or purchase, redeem or otherwise acquire for consideration directly or indirectly (with limited exceptions) Junior Equity Securities, unless dividends for such Dividend Period on all series of

20

Company Preferred Securities then outstanding have been declared and paid in full, or set aside for payment, as the case may be; and

- without the consent or affirmative vote of the holders of at least two-thirds of all series of Company Preferred Securities, voting together as a single class, the Company may not:

  - pay dividends on Junior Equity Securities unless the Company's FFO for the four prior fiscal quarters equals or exceeds 150% of the amount that would be required to pay full dividends on all series of the Company Preferred Securities; or

  - amend or otherwise change the requirement that the Company make investments and distributions with the proceeds of the Company's assets such that the Company's FFO for any period of four fiscal quarters will equal or exceed 150% of the amount that would be required to pay full annual dividends on all series of Company Preferred Securities;

Additionally, the Company's Board of Directors has the power to create and issue Parity Equity Securities without the consent of the holders of the Company Preferred Securities so long as the Company satisfies the FFO Test on a pro forma basis and the pro forma net book value of the Company's assets equals or exceeds 1.5 times the sum of the aggregate liquidation preference of the Company Preferred Securities then outstanding and the Parity Equity Securities proposed to be issued.

As the Mortgage Loans held by the Asset Trusts prepay or repay principal and distributions with respect to such principal payments are made by each Asset Trust to the Company subject to the limitations referenced above, the Company may choose to apply such amounts and any retained proceeds of this offering to pay dividends on the Company Common Securities or other Junior Equity Securities or reinvest such amounts in Permitted Investments or additional Eligible Assets. Since March 6, 2006, the date on which Company Preferred Securities were first issued, the Company has paid dividends totaling approximately $2.489 billion on the Company Common Securities from principal and interest collections on the Mortgage Loans. Additionally, subject to the limitations referenced above, the Company could distribute a portion of the Asset Trust I Class A Trust Certificate, Asset Trust II Class A Trust Certificate or the Asset Trust III Class A Trust Certificate as a dividend on the Company Common Securities. The Company has no current intention to pay an extraordinary dividend, and WMI has no current intention to cause or permit the Company to pay an extraordinary dividend. Nevertheless, dividends paid by the Company on the Company Common Securities could result in a reduction in the Company's assets that could have the consequence, notwithstanding its compliance with the limitations referred to above, of the Company not having funds available to pay full dividends on the Series 2007-B Company Preferred Securities in future periods or loss by investors of some or all of the amount of their investment were the Company to be liquidated.

***The Trust Securities and the Series 2007-B Company Preferred Securities are perpetual and not redeemable at the option of the holder, and holders of the Trust Securities can have no assurance of receiving their initial investment back.***

The Trust Securities may not be redeemed at the option of their holder under any circumstances, are perpetual and have no maturity date. If and when the Company redeems Series 2007-B Company Preferred Securities, the Trust will redeem a like amount of Trust Securities. While the Series 2007-B Company Preferred Securities may be redeemed at the option of the Company under certain circumstances described herein, any such redemption is subject to the approval of the OTS and may be constrained by operation of the Replacement Capital Covenant. Investors in the Trust Securities will have no right to reclaim their initial investment from the Trust and there can be no guarantee that the Trust Securities will ever be redeemed. If investors in the Trust Securities choose to sell their Trust Securities in order to reclaim all or part of their initial investment in the absence of any redemption, there can be no guarantee that such investors would be able to sell their securities in the secondary market, or that if such a sale occurred the sale price would be at or above the initial price.

*A decline in WMB's capital levels or its placement into conservatorship or receivership may result in a Conditional Exchange. If a Conditional Exchange occurs, it is likely to occur at a time when WMB's and WMI's financial condition has deteriorated and may have other adverse consequences.*

The returns from an investment in the Trust Securities will be dependent to a significant extent on the performance and capital of WMB due to the potential for a Conditional Exchange. A decline in the performance and capital levels of WMB or the placement by the OTS of WMB into conservatorship or receivership could result in the occurrence of an Exchange Event and a Conditional Exchange of the Trust Securities for Depositary Shares representing Series N WMI Preferred Stock. The Series N WMI Preferred Stock would represent an investment in WMI and not in the Company or the Trust. Under these circumstances:

- the Trust Securities would be exchanged for a preferred equity interest in WMI at a time when WMB's and, ultimately, WMI's financial condition has significantly deteriorated or when WMB may have been placed into conservatorship or receivership and, accordingly, it is quite unlikely that WMI would be in a financial position to make any dividend payment on the Series N WMI Preferred Stock;

- in the event of a liquidation of WMI, the claims of creditors of WMI and of all its subsidiaries, including WMB, would be entitled to priority in payment over the claims of holders of equity interests such as the Series N WMI Preferred Stock, and, therefore, the former holders of the Trust Securities who would then hold the Depositary Shares representing Series N WMI Preferred Stock may receive substantially less than such holders would receive had the Trust Securities not been exchanged for the Depositary Shares. See "— Risk Factors Applicable to Depositary Shares Issued in a Conditional Exchange — The Series N WMI Preferred Stock will rank subordinate to the direct indebtedness of WMI";

- for United States federal income tax purposes, a Conditional Exchange would most likely be a taxable event to holders of the Trust Securities, and in that event the holders generally would incur a gain or loss, as the case may be, measured by the difference between their adjusted tax basis in the Trust Securities and the fair market value of the Depositary Shares; and

- although the terms of Depositary Shares are substantially similar to the terms of the Series 2007-B Company Preferred Securities, there are differences that holders of Trust Securities might deem to be important, such as the fact that holders of Depositary Shares will not generally have voting rights, except as required by law or in connection with the right to elect directors if dividends are missed or as otherwise described in this Offering Circular (see "Description of the Series N WMI Preferred Stock — Voting Rights"), and will not benefit from the same favorable covenants as the Series 2007-B Company Preferred Securities.

**The terms of the Trust Securities and the Series 2007-B Company Preferred Securities provide for limited voting rights.**

Except as specified in the Trust Agreement or in relation to the right to direct the manner in which the Property Trustee acting on behalf of the Trust exercises its voting rights with respect to the Series 2007-B Company Preferred Securities, holders of Trust Securities are not entitled to voting rights. Except as specified in the LLC Agreement, the Trust, as holder of Series 2007-B Company Preferred Securities, is not entitled to voting rights. Nevertheless, the LLC Agreement prohibits the Company from taking certain actions without the consent or vote of at least two-thirds of either the Series 2007-B Company Preferred Securities, voting separately, or of all the series of Company Preferred Securities, voting together as a single class, as applicable. For a description of the matters on which the holders of Series 2007-B Company Preferred Securities have a right to vote, see "Description of the Series 2007-B Company Preferred Securities — Voting Rights and Covenants".

***Holders of the Trust Securities and Series 2007-B Company Preferred Securities have no redemption rights; however, the Company may (but is not required to) redeem the Series 2007-B Company Preferred Securities on any Dividend Payment Date, and such redemption will cause an automatic redemption of the Trust Securities.***

Subject to the Replacement Capital Covenant and to the Company having received the prior approval of the OTS for any proposed redemption of Series 2007-B Company Preferred Securities, the Company may redeem the Series 2007-B Company Preferred Securities: (I) in whole but not In part on any Dividend Payment Date upon the occurrence of a Tax Event, an Investment Company Act Event, a Rating Agency Event or a Regulatory Capital Event and (ii) in whole or in part, on any other Dividend Payment Date, at a redemption price equal to the liquidation preference per Series 2007-B Company Preferred Security, *plus* declared but unpaid dividends, if any, *plus* a U.S. Treasury-based "make-whole" amount if the redemption occurs prior the Dividend Payment Date occurring in December 2017 or a LIBOR-based "make-whole" amount if the redemption occurs after December 2017 on a Dividend Payment Date that is not a Ten-Year Date. The redemption by the Company of the of the Series 2007-B Company Preferred Securities will automatically cause the redemption of the Trust Securities for which the redemption price will be paid from the proceeds the Trust receives from the Company as a consequence of the redemption of the Series 2007-B Company Preferred Securities. The occurrence of a Tax Event, an Investment Company Act Event, a Rating Agency Event or a Regulatory Capital Event will not, however, give a holder of the Trust Securities any right to require that the Series 2007-B Company Preferred Securities or the Trust Securities be redeemed.

If the Company redeems the 2007-B Company Preferred Securities, the Trust Securities will be automatically redeemed, and the former holders of the Trust Securities may not be able to invest their redemption proceeds in securities with a dividend yield and other terms comparable to that of the Trust Securities. A Treasury based "make whole" amount will be payable only in connection with a redemption prior to the Dividend Payment Date in December 2017; after the Dividend Payment Date occurring in December 2017, a LIBOR-based "make-whole" amount will be payable only if the Series 2007-B Company Preferred Securities are redeemed on a Dividend Payment Date that is not a Ten-Year Date and no Tax Event, Investment Company Act Event, Rating Agency Event or Regulatory Capital Event shall have occurred.

***The Series 2007-B Company Preferred Securities will rank subordinate to claims of the Company's creditors and on a parity with other series of preferred securities issued by the Company, whether presently or in the future.***

The Series 2007-B Company Preferred Securities will rank subordinate to all claims of the Company's creditors. The Series 2007-B Company Preferred Securities will rank *pari passu* as to dividends and upon liquidation with the Outstanding Company Preferred Securities and any other Parity Equity Securities that the Company may issue. The Company may issue additional Parity Equity Securities at any time in the future, subject to satisfying certain conditions at the time of issuance, without the consent or approval of the holders of the Trust Securities. Accordingly, if

- the Company does not have funds legally available to pay full dividends on all series of the Company Preferred Securities; or

- in the event of the Company's liquidation, dissolution or winding up, the Company does not have funds legally available to pay the full liquidation value of all the series of Company Preferred Securities,

any funds that are legally available to pay such amounts will be paid *pro rata* to the holders of the Series 2007-B Company Preferred Securities, the Outstanding Company Preferred Securities and any other Parity Equity Securities. See "Description of Other Company Securities".

### There has never been a market for the Trust Securities.

Prior to this Offering, there was no market for the Trust Securities. Although the initial Purchasers intend to make a market in the Trust Securities, they are under no obligation to do so and, to the extent that such market making is commenced, it may be discontinued at any time. The Trust Securities will not be listed on any securities exchange or automated dealer quotation system. There can be no assurance that an active and liquid trading market for the Trust Securities will develop or be sustained. If such a market were to develop, the prices at which the Trust Securities trade would depend on many factors, including prevailing interest rates, the operating results of the Company, WMB and WMI, and the market for similar securities. Holders of Trust Securities may not be able to resell their Trust Securities at or above the initial price. Furthermore, the Trust Securities that are not and will not be registered under the Securities Act and will be deemed to be restricted securities within the meaning of Rule 144 under the Securities Act and are subject to significant transfer restrictions as described in "Notice to Investors". These restrictions on transfer may inhibit the development of an active and liquid trading market for the Trust Securities and may adversely impact the market price of the Trust Securities.

### The Trust Securities are not obligations of, or guaranteed by, any other entity.

The Trust Securities do not constitute obligations or equity securities of WMI, WMB, the Company, WM Marion Holdings, LLC ("Marion"), Seneca Holdings, Inc. ("Seneca") (Seneca and Marion being intermediate holding companies between WMB and University Street), University Street, Trust I, Trust II, WaMu Cayman, any of the Asset Trusts or any entity other than the Trust, nor are the Trust's obligations with respect to the Trust Securities guaranteed by any entity. In particular, none of WMI, WMB, the Company, Marion, Seneca, University Street, any of the Asset Trusts or any other entity guarantees that the Trust will pass through any dividends paid by the Company to the Trust as the holder of the Trust Securities, nor are they obligated to provide additional capital or other support to the Trust to enable the Trust to make distributions in the event the Company fails to pay dividends on the Series 2007-B Company Preferred Securities and the Trust has no dividends to pass through to holders of the Trust Securities. The Trust Securities are not exchangeable for Depositary Shares or Series N WMI Preferred Stock except upon a Conditional Exchange. No holder of Trust Securities will have the right to require the Trust to exchange the Trust Securities for Depositary Shares.

### The Series 2007-B Company Preferred Securities represent solely an interest in the Company and are not obligations of, or guaranteed by, any other entity.

The Series 2007-B Company Preferred Securities do not constitute obligations or equity securities of any entity other than the Company, including WMI, WMB, Marion, Seneca, University Street, the Trust, Trust I, Trust II, WaMu Cayman or any of the Asset Trusts, nor are the Company's obligations with respect to the Series 2007-B Company Preferred Securities guaranteed by any other entity. In particular, none of WMI, WMB, Marion, Seneca, University Street, the Trust, Trust I, Trust II, WaMu Cayman, any of the Asset Trusts or any other entity guarantees that the Company will declare or pay any dividends to the Trust, nor are they obligated to provide additional capital or other support to the Company to enable the Company to pay dividends on the Series 2007-B Company Preferred Securities to the Trust in the event the Company's assets and results from operations are insufficient for this purpose or the Company otherwise fails to do so. Holders of Series 2007-B Company Preferred Securities do not have the right to require an exchange of their securities for any securities of WMI or WMB.

### Rating agencies may change rating methodologies.

The rating methodologies for securities with features similar to the Trust Securities are still developing and the rating agencies may change their methodologies in the future. This may include, for example, the relationship between ratings assigned to WMI's senior securities and ratings assigned to securities with features similar to the Trust Securities, sometimes called "notching". If the rating

agencies were to change their practices for rating such securities in the future and the ratings of the Trust Securities were to be subsequently lowered, this may have a negative impact on the trading price of the Trust Securities.

## Risks Associated with the Company's Business

### *The Company is effectively controlled by WMI and the Company's relationship with WMI and WMB may create potential conflicts of interest.*

All of the Company's officers and all but one of the Company's Managers may also be officers of WMI, WMB or their respective affiliates, as the case may be. After this Offering, WMI, WMB and University Street will continue to control all of the Company's outstanding voting securities. WMI, WMB, and University Street will have the right to elect all of the Company's Managers, including the Independent Manager.

WMB and University Street may have interests that are not identical to the Company's interests. WMI, through its subsidiary, New American Capital, Inc., is the ultimate owner of WMB's and University Street's common stock, and may have investment goals and strategies that differ from those of the holders of the Trust Securities. Consequently, conflicts of interest between the Company, on one hand, and WMB, University Street and/or WMI, on the other hand, may arise.

### *The Company is dependent on the officers and employees of WMI and WMB for the selection, structuring and monitoring of the Mortgage Loans and the Company's relationship with WMI and WMB may create potential conflicts of interest.*

WMI and WMB are involved in virtually every aspect of the Company's existence. WMB administers the Company's day-to-day activities under the terms of certain agreements between WMB and the Company. The Company is dependent on the diligence and skill of the officers and employees of WMB for the selection, structuring and monitoring of the Mortgage Loans and the Company's other Eligible Investments.

This dependency and the Company's close relationship with WMI and WMB may create potential conflicts of interest. Specifically, such conflicts of interest may arise because the employees of WMI and WMB (i) were directly involved in the decisions regarding the amount, type and price of the Mortgage Loans and other assets acquired indirectly from University Street and WMB prior to this Offering and (ii) will make decisions on the amount, type and (if applicable) price of any future acquisitions by the Company of Additional Assets from University Street, WMI or other parties.

### *The Company is dependent on the officers and employees of WMB for the servicing of the Mortgage Loans in the Asset Trusts and the Company's relationship with WMB may create potential conflicts of interest.*

The Company is dependent on WMB and others for the servicing of the Mortgage Loans and is expected to be dependent on WMB and others for the servicing of any underlying collateral with respect to Additional Assets. WMB administers the Company's day-to-day activities under the terms of the Asset Documentation relating to the Company's assets. These agreements contain and will contain terms that the Company believes are consistent with those resulting from arm's-length negotiations. With respect to the Asset Trust I Pooling and Servicing Agreement and Asset Trust I, WMB's servicing fee is an annual fee of 0.125%, paid monthly, for each HEL based on the unpaid principal balance of such HEL. With respect to the Asset Trust II Pooling and Servicing Agreement and Asset Trust II, WMB's servicing fee is an annual fee of 0.375%, paid monthly, for each Option ARM based on the unpaid principal balance of such Option ARM. With respect to the Asset Trust III Pooling and Servicing Agreement and Asset Trust III, WMB's servicing fee is an annual fee of 0.125%, paid monthly, for each Flex-5 ARM based on the unpaid principal balance of such Flex-5 ARM. WMB, as the servicer of the Mortgage Loans, will be entitled to retain certain fees and ancillary charges, including any prepayment fees, insufficient funds fees, modification fees, payoff statement fees and

late charges with respect to the Mortgage Loans as additional servicing compensation and will also be entitled to certain income generated by permitted investments made with collections on the Mortgage Loans.

Despite the Company's belief that the terms of the Asset Documentation between WMB and the Company reflect and will reflect terms consistent with those negotiated on an arm's-length basis, the Company's dependency on WMB's officers and employees and the Company's close relationship with WMB may create potential conflicts of interest. Specifically, such conflicts of interest may arise because the employees of WMB have the power to modify the terms of or sell the Mortgage Loans and other assets in the Asset Trusts and any Additional Assets and make business decisions with respect to the servicing of those underlying assets, particularly to the extent such underlying collateral is defaulted or otherwise non-performing.

**Regulators may limit the Company's ability to implement the Company's business plan and may restrict the Company's ability to pay dividends.**

Because the Company is an indirect subsidiary of WMB, regulatory authorities will have the right to examine the Company and its activities and, under certain circumstances, to impose restrictions on WMB or the Company that could affect its ability to conduct business pursuant to the Company's business plan and that could adversely affect the Company's financial condition and results of operations.

If the OTS, which is WMB's primary regulator, determines that WMB's relationship with the Company results in an unsafe or unsound practice, or if, in certain instances, WMB is no longer well-capitalized, then the OTS has the authority to:

- restrict the Company's ability to transfer assets;
- restrict the Company's ability to pay dividends to its security holders;
- restrict the Company's ability to redeem its preferred securities; or
- require WMB to sever its relationship with the Company or divest its ownership of the Company.

If the OTS determines that WMB is operating with an insufficient level of capital, or that the payment of dividends by either WMB or its subsidiaries, under the then-present circumstances, is an unsafe and unsound practice, the OTS could restrict the Company's ability to pay dividends.

**If any of the Company, the Asset Trusts or the Trust loses its exemption under the Investment Company Act, it could have a material adverse effect on the Company and would likely result in a redemption of the Series 2007-B Company Preferred Securities and the Trust Securities.**

Each of the Company, Asset Trust I, Asset Trust II, Asset Trust III and the Trust believes that it is not, and intends to conduct its operations so as not to be, required to register as an investment company under the Investment Company Act. Under the Investment Company Act, a non-exempt entity that is an investment company is required to register with the SEC and is subject to extensive, restrictive and potentially adverse regulation relating to, among other things, operating methods, management, capital structure, dividends and transactions with affiliates. The Investment Company Act exempts entities that, directly or through majority-owned subsidiaries, are "primarily engaged in the business of purchasing or otherwise acquiring mortgages and other liens on and interests in real estate" (which the Company refers to as *"Qualifying Interests"*). Under current interpretations of the staff of the SEC, in order to qualify for this exemption, each of the Company and each Asset Trust, among other things, must maintain at least 55% of the Company's assets in Qualifying Interests and also may be required to maintain an additional 25% in Qualifying Interests or other real estate related assets. The assets that the Company or the Asset Trusts may acquire therefore may be limited by the provisions of the Investment Company Act. The Company and the Asset Trusts have each established

a policy of limiting authorized investments which are not Qualifying Interests to not more than 20% of the value of their respective total assets. The Investment Company Act does not treat cash and cash equivalents as either Qualifying Interests or other real estate related assets.

Based on the criteria outlined above, the Company and the Asset Trusts each believe that, as of the time of this Offering, the Company's and the Asset Trusts' Qualifying Interests (excluding cash received in connection with this offering) will comprise at least 90% of the estimated fair market value of their respective total assets. As a result, the Company and the Asset Trusts each believe that they are not required to register as investment companies under the Investment Company Act. Neither the Company nor the Asset Trusts intend, however, to seek an exemptive order, no-action letter or other form of interpretive guidance from the SEC or its staff on this position. If the SEC or its staff were to take a different position with respect to whether the Company's or an Asset Trust's assets constitute Qualifying Interests, the Company or the relevant Asset Trust could be required either (i) to change the manner in which it conducts its operations to avoid being required to register as an investment company, or (ii) to register as an investment company, either of which could have a material adverse effect on the Company or the Asset Trust, as the case may be, the Company's ability to make payments in respect of the Series 2007-B Company Preferred Securities and, accordingly, the trading price of the Trust Securities. Further, in order to ensure that the Company and Asset Trusts at all times continue to qualify for the above exemption from the Investment Company Act, the Company and the Asset Trusts may be required at times to adopt less efficient methods of financing certain of the Company's and the Asset Trusts' assets than would otherwise be the case and may be precluded from acquiring certain types of assets whose yield is higher than the yield on assets that could be purchased in a manner consistent with the exemption. The net effect of these factors may be to lower at times the Company's net interest income. Finally, if the Company or an Asset Trust were an unregistered investment company, there would be a risk that the Company or the Asset Trust, as the case may be, would be subject to monetary penalties and injunctive relief in an action brought by the SEC, that the Company or the Asset Trust, as the case may be, would be unable to enforce contracts with third parties and that third parties could seek to obtain rescission of transactions undertaken during the period the Company or the Asset Trust was determined to be an unregistered investment company. If the Company, any of the Asset Trusts or the Trust is ever considered an investment company under the Investment Company Act as a result of an Investment Company Act Event, the Company would likely redeem the Series 2007-B Company Preferred Securities. See "Description of the Series 2007-B Company Preferred Securities — Redemption".

Additionally, the Company may from time to time have Asset Subsidiaries other than the Asset Trusts. The Company may not establish an Asset Subsidiary unless the establishment and operation of such Asset Subsidiary will not cause the Company to be an investment company that is required to register under the Investment Company Act and such Asset Subsidiary is not itself an investment company that is required to register under the Investment Company Act. If any such Asset Subsidiary were to be required to register as an investment company, the results would be similar to those described above in respect to any Asset Trust being required to register as an investment company.

### *An adverse determination of the Company's partnership status could subject the Company to taxation.*

Contemporaneously with the issuance of the Series 2007-B Company Preferred Securities, the Company will receive an opinion from Mayer Brown LLP to the effect that, for United States federal income tax purposes, (i) the Company will not be treated as an association taxable as a corporation and (ii) although no activities closely comparable to that contemplated by the Company have been the subject of any U.S. Treasury regulation, revenue ruling or judicial decision, the Company will not be treated as a publicly traded partnership taxable as a corporation. The opinions are based on certain assumptions and on certain representations and agreements regarding restrictions on the future conduct of the activities of the Company. Although the Company intends to conduct its activities in accordance with such assumptions, representations and agreements, if it were nonetheless

determined that the Company was taxable as a corporation for United States federal income tax purposes, then the Company would be subject under the Code to the regular corporate income tax. Such taxes would reduce the amounts available to make payments on the Series 2007-B Company Preferred Securities.

***The Company cannot assure purchasers that it paid WMB and University Street fair market value for all of the Company's assets because the Company has not obtained any third party valuations of all such assets. Nor can the Company assure purchasers that the Company will acquire or dispose of its assets in the future at their fair market value.***

The Company has adopted policies with a view to ensuring that all financial dealings between WMB, University Street and the Company will be fair to each party and consistent with market terms. However, there has been no third-party valuation of all of the Company's assets. In addition, it is not anticipated that third-party valuations will be obtained in connection with the acquisition of the Flex-5 ARMs or with other future acquisitions or dispositions of assets even in circumstances where an affiliate of the Company is selling the assets to the Company or purchasing the assets from the Company. Accordingly, the Company cannot assure purchasers that the purchase price the Company paid for all of the Company's assets was equal to the fair market value of those assets. Nor can the Company assure purchasers that the consideration to be paid by the Company to, or received by the Company from, WMB, University Street or any of the Company's other affiliates in connection with future acquisitions or dispositions of assets will be equal to the fair market value of such assets.

***The Asset Trusts or any other Asset Subsidiary, and therefore the Company, could incur losses as a result of environmental liabilities relating to properties underlying the Company's assets in the Company's Portfolio through foreclosure action.***

Any Asset Trust or any other Asset Subsidiary may be forced to foreclose on an underlying Mortgage Loan or other assets where the borrower has defaulted on its obligation to repay the applicable Mortgage Loans. It is possible that an Asset Trust or any other Asset Subsidiary, and therefore, the Company, may be subject to environmental liabilities with respect to foreclosed property. The discovery of these liabilities and any associated costs for removal of hazardous substances, wastes, contaminants or pollutants, could have a material adverse effect on the fair value of such assets.

***Delays in liquidating defaulted loans could occur and could cause the Company's business to suffer.***

Substantial delays could be encountered in connection with the liquidation of the collateral securing defaulted loans in the Company's Portfolio, with corresponding delays in the Company's receipt of related proceeds. An action to foreclose on a mortgaged property or repossess and sell other collateral securing a loan is regulated by state statutes and rules. Any such action is subject to many of the delays and expenses of lawsuits, which may impede the Company's ability to foreclose on or sell the collateral or to obtain proceeds sufficient to repay all amounts due on the related loan in the Company's Portfolio.

***The Company may invest in assets that involve new risks and need not maintain the current asset coverage.***

Although the Company's Portfolio, immediately after the completion of this Offering, will consist primarily of Mortgage Loans, to the extent it acquires Additional Assets in the future, the Company is not required to limit its investments to assets of the types currently in the Company's Portfolio. See "The Company — Business of the Company — Assets of the Company". Assets such as second lien closed end home equity loans, first or second lien home equity lines of credit, mortgage loans on single family or multi-family residences, commercial mortgage loans or other real estate assets may involve different risks not described in this offering circular. Moreover, while the LLC Agreement will

28

call for maintaining specified levels of FFO coverage as to expected dividends, the Company is not required to maintain the levels of asset coverage that currently exist.

***The Company is dependent on WMI, WMB and University Street with respect to its acquisition of Additional Assets and may be subject to conflicts of interest with respect to its acquisition of new assets.***

The dependency of the Company on WMI, University Street and WMB and the Company's close relationship with WMI, University Street and WMB may create potential conflicts of interest in connection with the Company's acquisition of Additional Assets. The Company will be dependent on WMI, University Street and WMB to identify Additional Assets that it may acquire, but WMI, University Street and WMB are not required to contribute or sell Additional Assets to the Company. If WMI, University Street and WMB are unable to identify, or are unwilling to contribute or sell, suitable Additional Assets, then over time the Company's level of FFO coverage as to expected dividends will decline. Moreover, conflicts of interest may arise because the employees of WMI, University Street and WMB will, subject to certain restrictions, make decisions on the amount, type and (to the extent the Company purchases Additional Assets) price of future acquisitions by the Company of Additional Assets from University Street, WMB or other members of the WMI Group as well as future dispositions of assets to WMB, University Street or third parties.

### Risk Factors Applicable to Depositary Shares Issued in a Conditional Exchange.

***Adverse developments in the mortgage lending business have recently affected WMI's business.***

WMI's results for the third quarter of 2007 reflect adverse developments in the mortgage lending business (and in the housing market more generally) and related volatility and liquidity constraints in the capital markets since June 30, 2007, including with respect to net income, net interest income, non-performing assets, and provisions for loan and lease losses. It appears that such developments will be significantly worse and longer lasting than originally expected. See "WMI — Recent Developments".

***Holders of Trust Securities may have adverse tax consequences as a result of a Conditional Exchange.***

For United States federal income tax purposes, a Conditional Exchange would most likely be a taxable event to holders of Trust Securities; and holders would recognize gain or loss, as the case may be, measured by the difference between their adjusted tax basis in the Trust Securities and the fair market value of the Depositary Shares received in the exchange. In addition, dividends, if any, paid to Foreign Holders of Depositary Shares received upon a Conditional Exchange generally will be subject to a 30% U.S. withholding tax unless the holder qualifies for a reduction from withholding tax under an applicable United States income tax treaty.

***A decline in WMI's financial condition may restrict its ability to pay dividends and could result in a loss on the investment of the former holders of Trust Securities.***

If WMI's financial condition were to deteriorate (which would be quite likely to have occurred or occur thereafter in the event of a Conditional Exchange), the holders of the Depositary Shares could suffer direct and significantly adverse consequences, including suspension of the payment of non-cumulative dividends on the Series N WMI Preferred Stock and, if a dissolution, liquidation or winding up of WMI were to occur, loss by holders of Depositary Shares of all or part of their investment.

***A Conditional Exchange may be based on WMB's receivership, which could likely lead to WMI's bankruptcy and would mean that others are likely to have liquidation claims senior to that of the holders of the Depositary Shares.***

An Exchange Event triggering a Conditional Exchange will occur if WMB is placed into conservatorship or receivership. WMB's conservatorship or receivership could likely lead to WMI becoming subject to a voluntary or involuntary proceeding under the U.S. Bankruptcy Code. In the event of WMI's bankruptcy, the claims of WMI's secured, senior, general and subordinated creditors would be entitled to a priority of payment over the claims of holders of equity interests such as the Series N WMI Preferred Stock. As a result of such subordination, if WMI became subject to a bankruptcy proceeding after a Conditional Exchange, the holders of the Depositary Shares would likely receive, if anything, substantially less than they would have received had the Conditional Exchange not occurred.

***Upon the occurrence of a Conditional Exchange, the holders of the Depositary Shares will not have the benefit of the same favorable covenants as the Series 2007-B Company Preferred Securities.***

Upon the occurrence of a Conditional Exchange, the holders of the Depositary Shares will not benefit from the same favorable covenants as the Series 2007-B Company Preferred Securities.

***WMI is not obligated to pay dividends on the Series N WMI Preferred Stock and dividends on these securities are not cumulative.***

Dividends on the Series N WMI Preferred Stock are not cumulative. Consequently, if the board of directors of WMI (*"WMI's Board of Directors"*) does not declare dividends on the Series N WMI Preferred Stock for any quarterly period, the holders of the Depositary Shares would not be entitled to any such dividend whether or not funds are or subsequently become available.

WMI's Board of Directors may determine that it would be in WMI's best interest to pay less than the full amount of the stated dividends on the Series N WMI Preferred Stock or no dividends for any quarter even if funds are available. Factors that would be considered by WMI's Board of Directors in making this determination are WMI's financial condition and capital needs, the impact of current and pending legislation and regulations, economic conditions, tax considerations, and such other factors as WMI's Board of Directors may deem relevant.

***The Series N WMI Preferred Stock will rank subordinate to the direct indebtedness of WMI.***

The Series N WMI Preferred Stock will be subordinate and rank junior in right of payment to all of WMI's indebtedness for borrowed money and indebtedness evidenced by notes or other securities. Because the sole source of funds for payment in respect of the Depositary Shares is the Series N WMI Preferred Stock, the Depositary Shares are effectively subordinated on the same basis as the Series N WMI Preferred Stock. The terms of the Depositary Shares and the Series N WMI Preferred Stock will not limit in any way WMI's ability to incur additional indebtedness.

***The Series N WMI Preferred Stock will be structurally subordinated to all obligations of WMI's subsidiaries, and as a holding company, WMI may require cash from its subsidiaries to make payments with respect to the Series N WMI Preferred Stock.***

WMI is a holding company that conducts its operations through its operating subsidiaries and relies primarily on dividends and proceeds from intercompany transactions and loans from those subsidiaries to meet its obligations for payment with respect to its outstanding equity securities, any and all of which may be subject to contractual restrictions and regulatory restrictions. Accordingly, the Series N WMI Preferred Stock (and thus the Depositary Shares) will be structurally subordinated to all existing and future liabilities of WMI's subsidiaries, including WMB. Holders of Depositary Shares should look only to the assets of WMI, and not any of its subsidiaries, for payments with respect to

the Depositary Shares. If WMI is unable to obtain cash from its subsidiaries it may be unable to fund dividend payments in respect of the Series N WMI Preferred Stock.

***Upon the occurrence of a Conditional Exchange, the holders of the Depositary Shares will not have the benefit of the same favorable covenants as the Series 2007-B Company Preferred Securities.***

Upon the occurrence of a Conditional Exchange, the holders of the Depositary Shares will not benefit from the same favorable covenants as the Series 2007-B Company Preferred Securities.

***There is no active trading market for Series N WMI Preferred Stock or the Depositary Shares and such a trading market may never develop.***

The Series N WMI Preferred Stock and the Depositary Shares will be new issues of securities. WMI does not intend to cause the listing or quotation of the Series N WMI Preferred Stock or the Depositary Shares on any securities exchange or automated dealer quotation system. The Initial Purchasers are under no obligation to and do not intend to make a market in the Depositary Shares. Consequently, it is unlikely that an active and liquid trading public market for the Depositary Shares or the underlying Series N WMI Preferred Stock will develop or be maintained. The lack of liquidity and an active trading market could adversely affect ability of the holders of Depositary Shares to dispose of such shares.

In addition, neither the Depositary Shares nor the Series N WMI Preferred Stock represented by such shares have been or will be registered under the Securities Act and will be deemed to be restricted securities within the meaning of Rule 144 of the Securities Act. Holders of Depositary Shares will not be able to offer, sell, pledge or otherwise transfer the Depositary Shares other than:

- to a qualified institutional buyer within the meaning of Rule 144A of the Securities Act in a transaction complying with Rule 144A;

- otherwise in accordance with an applicable exemption from the registration requirements of the Securities Act; or

- to WMI or one of WMI's affiliates,

and, in any case, in accordance with exemptions from any applicable state securities or blue sky laws.

These restrictions on transfer may inhibit the development of an active and liquid trading market for the Depositary Shares and may adversely impact the market price of such shares.

### Risks Relating to the Mortgage Loans

***General economic conditions in the United States could change and possible resulting changes in delinquency rates of the Mortgage Loans could negatively impact the Company's financial condition, results of operations and ability to pay dividends.***

At the time of the contribution of the HELs in March 2006 and the Option ARMs in December 2006, no loans that were delinquent 30 days or more were included in such Mortgage Loans that were contributed to Asset Trust I and Asset Trust II, as applicable. Similarly, the Flex-5 ARMs to be contributed to Asset Trust III will not include any loans that are 30 days or more delinquent.

Delinquency rates may be affected by many factors, including general economic conditions, applicable interest rates and the availability of refinancing opportunities. Recently, many mortgage lenders, including WMB, have experienced increasing delinquency rates due to such factors. Economic conditions may generally decline, interest rates may increase and refinancing opportunities may become constrained by tightening credit and underwriting standards or declining property prices. There can be no assurance that delinquencies with respect to the HELs, Option ARMs and/or the Flex-5 ARMs held in the applicable Asset Trusts will not be negatively affected in the future or that

such delinquencies will not be higher than those experienced by other lenders or by WMB with respect to loans owned or originated by it that are not part of the Company's Portfolio.

Since the Company's income consists primarily of payments received on the Mortgage Loans in the Company's Portfolio, an increase in delinquencies with respect to such Mortgage Loans may adversely affect the Company's ability to pay full, or even partial, dividends on the Series 2007-B Company Preferred Securities.

**The Company has no control over changes in interest rates and such changes could negatively affect the Company's financial condition, results of operations and ability to pay dividends.**

The Company's income will consist primarily of payments received on the HELs that are the underlying assets supporting the Asset Trust I Class A Trust Certificate, on the Option ARMs that are the underlying assets supporting the Asset Trust II Class A Trust Certificate and on the Flex-5 ARMs that will be the underlying assets supporting the Asset Trust III Class A Trust Certificate (such underlying assets, together with any collateral with respect to any Additional Assets, the *"Company's Portfolio"*). As of September 30, 2007, all of the HELs included in the Company's Portfolio bore interest at fixed rates, substantially all of the Option ARMs bore interest at floating rates, and as of September 30, 2007, substantially all of the Flex-5 ARMs bore interest at fixed rates (subject to change to adjustable rates after the expiration of the respective five year period from the date of origination of each Flex-5 ARM) and other related mortgage assets included in the Company's Portfolio bore interest at adjustable rates. In the future, the Company could acquire Additional Assets that include or are secured by loans with a fully or partially adjustable rate. Adjustable rate loans decrease the risks to a lender associated with changes in interest rates but involve other risks. As interest rates rise, the payment required from the borrower rises to the extent permitted by the terms of the loan, and the increased payment obligation increases the potential for default. In addition, if credit and underwriting standards become more restrictive in a period of increasing interest rates, as is currently the case in the United States, borrowers facing increased payments under the terms of their respective loans may become unable to refinance their loans, thus further heightening the potential for increased payment delinquencies and ultimately, defaults. At the same time, the marketability of the underlying property may be adversely affected by higher interest rates. Thus, an increasing interest rate environment may adversely affect the Company's ability to pay full, or even partial, dividends on the Series 2007-B Company Preferred Securities. In a declining interest rate environment, there may be an increase in prepayments on the HELs, Option ARMs or other assets in the Company's Portfolio as borrowers refinance their mortgages at lower interest rates. Under these circumstances, the Company may find it more difficult to acquire Additional Assets with rates sufficient to support the payment of the dividends on the Series 2007-B Company Preferred Securities. A declining interest rate environment would adversely affect the Company's ability to pay full, or even partial, dividends on the Series 2007-B Company Preferred Securities.

**More generally, the Mortgage Loans in the Company's Portfolio are subject to economic conditions that could negatively affect the value of the collateral securing such Mortgage Loans and/or the results of the Company's operations.**

The value of the Mortgage Loans underlying the Company's Portfolio and/or the results of the Company's operations could be affected by various conditions in the economy, such as:

- local and other economic conditions affecting real estate and other collateral values;

- sudden or unexpected changes in economic conditions, including changes that might result from terrorist attacks and the United States' response to such attacks; and

- the continued financial stability of a borrower and the borrower's ability to make loan principal and interest payments, which may be adversely affected by job loss, recession, divorce, illness or personal bankruptcy.

### A substantial portion of the Flex-5 ARMs, and particularly the Option ARMs, may experience Negative Amortization.

A substantial portion of the Option ARMs and Flex-5 ARMs may experience Negative Amortization. After giving effect to the contribution of the Flex-5 ARMs to Asset Trust III, approximately 62.70% of the Company's assets, on a pro forma basis as of September 30, 2007, will consist of a portfolio of Option ARMs and Flex-5 ARMs, which will be held through Asset Trust II and Asset Trust III, respectively. After an initial fixed-rate period (generally one or three months in the case of Option ARMs and five years in the case of the Flex-5 ARMs), the mortgage interest rate on substantially all Option ARMs and Flex-5 ARMs will be adjusted monthly to equal the sum of an index and the per annum rate specified in each mortgage note, which means that the interest payable with respect to substantially all of the Option ARMs and Flex-5 ARMs which are no longer in their initial fixed-rate period will change monthly, and may increase through time.

Substantially all the Option ARMs grant borrowers the option to pay a minimum monthly payment that is typically less than the amount of interest calculated at the fully indexed interest rate, in which case the difference between the amount of interest calculated at the fully indexed rate and the minimum monthly payment would be added to the principal balance of the loan. Substantially all of the Flex-5 ARMs provide for a minimum monthly payment during the initial fixed period sufficient to fully pay the interest on the loan. Thereafter during the adjustable rate period for each Flex-5 ARM the minimum monthly payment is reset on an annual basis to an amount sufficient to fully amortize the mortgage loan over the term based on an assumed interest rate. The borrower is given the option to pay this minimum monthly payment even if the applicable index rate which is used for the calculation of interest actually accruing on the loan is higher than the assumed interest rate, in which case the difference between the amount of interest calculated at the fully indexed rate and the minimum monthly payment would be added to the principal balance of the loan. In either case, the addition to the principal balance of the Option ARM or the Flex-5 ARM, as the case may be, is referred to generally as "negative amortization". Increases in the related index are a significant possibility for any Option ARM or Flex-5 ARM, particularly if it was originated at a time when the value of the index was low relative to historical values, and any such increase may create negative amortization. Many factors, including changes in economic conditions and monetary policy of the U.S. Federal Reserve System, may lead to increases in the index.

With respect to Option ARMs, in general, during the first five years the minimum monthly payment may not increase by more than specified amounts, and will not increase at all during the first year of the mortgage. Even after the first year, when the minimum monthly payment may increase, this adjustment may not be enough to raise the minimum monthly payment to the amount necessary to pay the interest due on the Option ARM based on the sum of the applicable index and the margin in effect. If the minimum monthly payment increases, but is still less than the amount of interest due, there will continue to be negative amortization if the mortgagor chooses to pay the minimum monthly payment.

With respect to Flex-5 ARMs, there should not be negative amortization during the initial fixed rate period. Thereafter, negative amortization may occur to the extent that the applicable index rate rises above the assumed interest rate used for the annual calculation of the applicable minimum monthly payment, and the borrower chooses to make only the minimum monthly payment rather than a payment equal to the full amount of interest actually accrued for such month.

33

Negative amortization can increase both the likelihood of default, and the severity of losses in the event of a loan default. As a result of negative amortization, Option ARMs and Flex-5 ARMs owned by Asset Trust II and Asset Trust III, respectively, may in the future have increased loan-to-value ratios. The result could be to increase the likelihood of default because the mortgagor's principal obligation is increased. In addition, when interest due on an Option ARM or Flex-5 ARM is added to the principal balance of such Option ARM or Flex-5 ARM through negative amortization, the mortgaged property provides proportionally less overcollateralization for the repayment of such Option ARM or Flex-5 ARM. Therefore, if the mortgagor defaults on such Option ARM or Flex-5 ARM there is a greater likelihood that a loss will be incurred upon the liquidation of the mortgaged property. Furthermore, the loss will be larger than would otherwise have been recognized in the absence of negative amortization. These losses could adversely affect the funds available to pay dividends to the holders of the Company Preferred Securities, including the Series 2007-B Company Preferred Securities, or to return to investors the liquidation amount of the Company Preferred Securities if the Company were liquidated.

The interest accrued and due on an Option ARM or Flex-5 ARM is considered interest income under US GAAP without respect to any negative amortization that may occur. As a result, the reported financials of the Company may include non-cash income related to negative amortization. As a result, funds available to pay dividends to the holders of the Company Preferred Securities, including the Series 2007-B Company Preferred Securities, could materially differ from income actually received from Asset Trust II and Asset Trust III as reported by the Company.

*The HELs, Option ARMs and Flex-5 ARMs in the Company's Portfolio that are or will be held through Asset Trust I, Asset Trust II and Asset Trust III, respectively are concentrated in specific states, and adverse conditions in those states, in particular, could have a negative impact on the Company's operations.*

As of September 30, 2007, approximately 79.84% (as a percentage of such loans' unpaid principal balances) of the HELs in the Company's Portfolio were located in Texas and California. As of September 30, 2007, approximately 73.19% (as a percentage of such loans' unpaid principal balances) of the Option ARMs in the Company's Portfolio and, as of September 30, 2007, approximately 45.30% (as a percentage of such loans' unpaid principal balances) of the Flex-5 ARMs in the Company's Portfolio were located in California. Because of the concentration of the Company's interest in those states, in the event of adverse economic conditions in those states, the Company would likely experience higher rates of loss and delinquency on the Company's Portfolio than if the underlying HELs, Option ARMs or Flex-5 ARMs were more geographically diversified. Additionally, the HELs, Option ARMs and Flex-5 ARMs in the Company's Portfolio may be subject to a greater risk of default than other comparable mortgage loans in the event of adverse economic, political, or business developments or natural hazards that may affect Texas and California, and the ability of property owners or commercial borrowers in those states to make payments of principal and interest on the underlying mortgage loans. In the event of any adverse development or natural disaster in those states, the Company's ability to pay dividends on the Company Preferred Securities, including the Series 2007-B Company Preferred Securities could be adversely affected.

*The origination of mortgage loans, including those currently owned by the Company through the Asset Trusts, is heavily regulated, and real or alleged violations of statutes or regulations applicable to the origination of the Company's mortgage loans could have an adverse effect on the Company's financial condition and results of operation and its ability to pay dividends on the Company Preferred Securities.*

The origination of the HELs, Option ARMs and Flex-5 ARMs currently owned by the Company through the Asset Trusts, and other mortgage loans that the Company may own in the future, is governed by a variety of laws and regulations, including, for example, the Truth in Lending Act ("*TILA*") and various anti-fraud and consumer protection statutes. The Company believes its mortgage loans

were originated in compliance with applicable laws and regulations in all material respects. From time to time, however, borrowers may allege that the origination of their mortgage loans did not comply with applicable laws or regulations in one or more respects. Borrowers may assert such violations as an affirmative defense to payment or to the exercise by the Company of its remedies, including foreclosure proceedings, or in an action seeking statutory and other damages in connection with such alleged violations. The Company could become involved in litigation in connection with any such dispute, including class action lawsuits. If the Company were not successful in demonstrating that the mortgage loans in dispute were originated in accordance with applicable statutes and regulations, the Company could become subject to monetary damages and other civil penalties, including possible rescission of the affected mortgage loans, and could incur substantial litigation costs over a period of time that could be protracted. The risk that borrowers will allege a defense to payment of their mortgage loans, including that the origination of the mortgage loan did not comply in some respect with laws or regulations, increases to the extent general economic conditions in the United States deteriorate and delinquencies and foreclosures accordingly increase.

In connection with the transfer of the HELs, the Option ARMs and the Flex-5 ARMs, WMB has represented and warranted to the Company that the HELs, the Option ARMs, the Flex-5 ARMs and their origination complied in all material respects with applicable federal and state laws and related regulations, including TILA. If WMB were determined to have breached those representations and warranties, the Company's recourse against WMB in connection with these breaches could be impaired if at that time WMB itself was in financial distress. This could in turn negatively affect the Company's financial condition, results from operations and ability to pay dividends.

# CERTAIN INFORMATION CONCERNING WMB

### General

Washington Mutual Bank ("WMB") is a federally chartered savings association, chartered and operating under the United States Home Owners' Loan Act of 1933, as amended. WMB accepts deposits from the general public; originates, purchases, services and sells home loans; makes credit card, home equity and commercial real estate loans (the latter being loans secured primarily by multi-family properties); and offers cash management and deposit services. WMB purchases, sells and services loans to subprime borrowers through its subprime mortgage channel. WMB also markets annuities and other insurance products and offers securities brokerage services. As a federal savings association, WMB is subject to regulation and examination by the U.S. Office of Thrift Supervision (together with any successor regulator, the "OTS"), its primary regulator. WMB is an indirect wholly-owned subsidiary of WMI.

The Trust Securities will be exchangeable, without the approval or any action on the part of the holders of such securities, for Depositary Shares under any of the following circumstances, each of which is referred to as an Exchange Event:

- WMB becomes "undercapitalized" under the OTS's "prompt corrective action" regulations;

- WMB is placed into conservatorship or receivership; or

- the OTS, in its sole discretion, anticipates that WMB may become "undercapitalized" in the near term or takes supervisory action that limits the payment of dividends by WMB, and in connection therewith, directs such exchange.

Upon occurrence of an Exchange Event, the OTS may direct that each Trust Security be automatically exchanged for a like amount of Depositary Shares.

### Capital Adequacy

WMB is subject to OTS capital requirements. The capital adequacy requirements are quantitative measures established by OTS regulations that require WMB to maintain minimum amounts and ratios of capital. The OTS requires WMB to maintain minimum ratios of core and total capital to risk-weighted assets, as well as core capital to adjusted total assets and tangible capital to adjusted total assets. Under applicable OTS regulations "Tier 1 capital" and "core capital" have the same meaning.

Federal law and regulations establish minimum capital standards, and under the OTS regulations, WMB is required to have a (i) leverage ratio of core capital to adjusted total assets of at least 4.00%, (ii) a ratio of core capital to total risk-weighted assets of at least 4.00%, (iii) a ratio of total capital to risk-weighted assets of at least 8.00% and (iv) a ratio of tangible capital to adjusted total assets of at least 1.50%. A savings association's adjusted total assets represent the savings association's total assets on its Thrift Financial Report filed with the OTS less assets of non-includable subsidiaries, goodwill and other intangibles assets (exclusive of mortgage servicing rights and purchased credit card relationships), disallowed servicing assets and purchased credit card relationships and accumulated gains (losses) on certain available-for-sale securities and cash flow hedges. For purposes of determining risk-weighted assets for the risk-based capital ratios, the book value of each of the savings association's on-balance sheet assets, and a portion of certain off-balance sheet items and exposures, are weighted from 0% to 100% based on broad categories. For instance, U.S. government debt obligations are generally risk-weighted at 0%; certain qualifying residential mortgage loans on one-to-four family dwellings are generally risk weighted at 50%; and commercial loans and most other assets are generally risk-weighted at 100%. Off-balance sheet items (including letters of credit, loan commitments, swaps and other derivatives) are converted into on-balance sheet "equivalent" amounts for risk-based capital purposes, then assigned a risk weight like other assets. The capital risk weighting assigned to certain asset-backed securities may vary from 20% to 200%

depending on credit rating. Subordinated residual interests retained in asset securitizations, credit enhancement and forms of "recourse" can result in higher capital charges or deductions from capital.

For purposes of the OTS regulations, *"total capital"* is defined as the sum of core capital and supplementary capital. *"Core capital"* generally includes: common shareholders' equity (which includes related surplus); non-cumulative perpetual preferred stock (which includes related surplus); and qualifying minority interests in the equity accounts of consolidated subsidiaries (which may include such instruments as qualifying REIT preferred stock and the Company Preferred Securities). "Supplementary capital" generally includes (subject to certain limits and sub-limits): cumulative perpetual preferred stock; maturing capital instruments; Dutch auction and money market preferred stock; hybrid capital instruments (including certain mandatory convertible notes); term subordinated debt; the savings association's allowance for loan and lease losses (up to a maximum of 1.25% of total risk-weighted assets); and up to 45% of the pretax net unrealized gains of available-for-sale equity securities investments. Supplementary capital is permitted to count towards only one-half of total capital. Both core capital and tangible capital are subject to various deductions. *"Tangible capital"* is defined, generally, as common stock and retained earnings, noncumulative perpetual preferred stock and retained earnings, certain nonwithdrawable accounts, and minority interests in fully consolidated subsidiaries (which includes, among other instruments, the Company Preferred Securities), less certain amounts of intangible assets, servicing assets, credit-enhancing interest-only strips and investments (both equity and debt) in certain subsidiaries. Some of these deductions are more stringent for tangible capital than core capital, including goodwill, certain other intangible assets, and certain servicing assets in excess of certain limits.

Federal law and regulations also establish five capital categories for savings associations: well-capitalized, adequately capitalized, undercapitalized, significantly undercapitalized and critically under-capitalized. A savings association is treated as well-capitalized if its ratio of total capital to risk-weighted assets is 10.00% or more, its ratio of core capital to risk-weighted assets is 6.00% or more, its leverage ratio is 5.00% or more, and it is not subject to any federal supervisory agreement order or directive to meet a specific capital level. In order to be adequately capitalized, any savings association must have a ratio of total capital to risk-weighted assets of not less than 8.00%, a ratio of core capital to risk-weighted assets of not less than 4.00%, and (unless it is in the most highly-rated category) a leverage ratio of not less than 4.00%. Any savings association that is neither well-capitalized nor adequately capitalized will be considered undercapitalized. Any savings association with a tangible equity ratio of 2.00% or less will be considered critically undercapitalized.

Undercapitalized savings associations are subject to certain prompt corrective action requirements, regulatory controls and restrictions, which become more extensive as an association becomes more severely undercapitalized. Failure by WMB to comply with applicable capital requirements, if unremedied, would result in restrictions on its activities and lead to regulatory enforcement actions against WMB including, but not limited to, the issuance of a capital directive to ensure the maintenance of required capital levels. The Federal Deposit Insurance Corporation Improvement Act of 1991 requires the federal banking regulators to take prompt corrective action with respect to depository institutions that do not meet minimum capital requirements. Additionally, FDIC or OTS approval of any regulatory application filed for its review may be dependent on compliance with capital requirements.

In addition, the OTS from time to time may impose higher specific capital requirements on any savings association that is perceived to have risks, exposures, credit concentration, rapid growth or other circumstances warranting special attention. Failure to satisfy such a capital directive could subject an association to civil money penalties, judicial enforcement and administrative remedies available to the OTS, as well as a finding that a savings association is "undercapitalized".

Whether WMB would ever be determined by the OTS to be "undercapitalized" or at risk of becoming "undercapitalized" in the near term — thereby triggering the exchange of the Trust Securities for Depositary Shares — could be influenced not only by the OTS's capital adequacy regulations, but