also by the regulator's interpretations and judgment on other matters. For example, the OTS's views on asset credit quality potentially could affect a thrift or savings association's capital status. Among other things, the OTS typically evaluates asset quality, loan loss reserves and procedures during periodic regulatory examinations of each federal savings association. If, following such an examination or otherwise, the OTS in its discretion were to require WMB to significantly increase its reserves against credit losses (i.e., the allowance for loan and lease losses), this could potentially reduce WMB's retained earnings and regulatory capital. As noted above, a savings association's allowance for loan and lease losses is includable within supplementary capital only up to a limit, and is not included at all in core capital.

The OTS has proposed to require savings associations that have certain aggregated "covered positions" (including on- and off-balance sheet positions in the savings association's trading account and all foreign exchange and commodity positions whether or not in the trading account) equal to 10 percent or more of total assets or $1 billion or more, to maintain regulatory capital against the market risk of their trading positions. The other federal banking agencies already impose a market risk capital requirement for their regulated entities (bank holding companies and banks). WMB and WMI are assessing the potential impacts of the proposed market risk capital rule.

A savings association's regulatory capital status, and the risk of being deemed "undercapitalized", could also be affected by other developments or by future changes in regulatory capital and other standards. WMB and WMI continue to actively follow the progress of the U.S. banking agencies and the Basel Committee on Banking Supervision in developing a new set of regulatory risk-based capital requirements. The Basel Committee on Banking Supervision is a committee of bank supervisory authorities established by the central bank governors of certain industrialized nations, including the United States. The new requirements are commonly referred to as Basel II or The New Basel Capital Accord; however, final requirements have not been adopted. WMB and WMI are also assessing the potential impacts of Basel II. Based on public U.S. regulatory guidance to date, WMB believes that it will be a required early adopter of Basel II requirements when final guidance regarding compliance with Basel II is released.

The regulatory capital ratios calculated for WMB, along with the capital amounts and ratios for the minimum regulatory requirement and the minimum amounts and ratios required to be categorized as well-capitalized under the regulatory framework for prompt corrective action were as follows:

| WMB | June 30, 2007 | | | | | |
|---|---|---|---|---|---|---|
| | Actual | | Minimum Regulatory Requirement | | Minimum to be Categorized as Well-Capitalized Under the OTS's Prompt Corrective Action Regulations | |
| | Amount | Ratio | Amount | Ratio | Amount | Ratio |
| | | | (Dollars in millions) | | | |
| Total capital to total risk-weighted assets. . . . . . . . . . . . . . . . . . . . . . | $28,966 | 12.17% | $19,048 | 8.00% | $23,810 | 10.00% |
| Core capital to total risk-weighted assets. . . . . . . . . . . . . . . . . . . . . . | 19,379 | 8.14 | 9,524 | 4.00 | 14,286 | 6.00 |
| Core capital to adjusted total assets (leverage) . . . . . . . . . . . . . . . . . . | 21,159 | 7.02 | 12,056 | 4.00 | 15,070 | 5.00 |
| Tangible capital to tangible assets (tangible equity) . . . . . . . . . . . . . | 20,830 | 6.92 | 6,021 | >2.00 | n/a | n/a |

| WMB | December 31, 2006 | | | | | |
|---|---|---|---|---|---|---|
| | Actual | | Minimum Regulatory Requirement | | Minimum to be Categorized as Well-Capitalized Under the OTS's Prompt Corrective Action Regulations | |
| | Amount | Ratio | Amount | Ratio | Amount | Ratio |
| | | | (Dollars in millions) | | | |
| Total capital to total risk-weighted assets................ | $30,950 | 12.16% | $20,364 | 8.00% | $25,455 | 10.00% |
| Core capital to total risk-weighted assets................ | 21,081 | 8.28 | 10,182 | 4.00 | 15,273 | 6.00 |
| Core capital to adjusted total assets (leverage)............... | 22,790 | 6.79 | 13,422 | 4.00[1] | 16,777 | 5.00 |
| Tangible capital to tangible assets (tangible equity) ........... | 22,397 | 6.68 | 6,703 | >2.00 | n/a | n/a |

| WMB | December 31, 2005[2] | | | | | |
|---|---|---|---|---|---|---|
| | Actual | | Minimum Regulatory Requirement | | Minimum to be Categorized as Well-Capitalized Under the OTS's Prompt Corrective Action Regulations | |
| | Amount | Ratio | Amount | Ratio | Amount | Ratio |
| | | | (Dollars in millions) | | | |
| Total capital to total risk-weighted assets................ | $26,219 | 11.50% | $18,240 | 8.00% | $22,800 | 10.00% |
| Core capital to total risk-weighted assets................ | 19,350 | 8.49 | 9,120 | 4.00 | 13,680 | 6.00 |
| Core capital to adjusted total assets (leverage)............... | 20,787 | 6.47 | 12,850 | 4.00 | 16,062 | 5.00 |
| Tangible capital to tangible assets (tangible equity) ........... | 20,331 | 6.34 | 6,416 | >2.00 | n/a | n/a |

(1) The minimum leverage ratio guideline is 3% for financial institutions that do not anticipate significant growth and that have well-diversified risk, excellent asset quality, high liquidity, good earnings, effective management and monitoring of market risk and, in general, are considered top-rate, strong banking organizations.

(2) Represents regulatory capital ratios as filed for the year ended December 31, 2005, prior to the merger of Long Beach Mortgage Company with and into WMB. Amounts have not been restated to reflect the merger.

## Benefits to WMB

The OTS has confirmed to WMB that the Series 2007-B Company Preferred Securities and Outstanding Company Preferred Securities will constitute core capital of WMB under the OTS's applicable regulatory capital regulations.

## USE OF PROCEEDS

The Trust will use the proceeds of the sale of the Trust Securities in this Offering, expected to be approximately $975,000,000 net of underwriting commissions, to purchase from WMB a like amount of Series 2007-B Company Preferred Securities, which the Company will issue to WMB in exchange for the conveyance of the Flex-5 ARMs to the Company. The WMI Group will use the proceeds from the sale of the Series 2007-B Company Preferred Securities to the Trust for general corporate purposes.

# THE TRUST

Washington Mutual Preferred Funding Trust IV (the *"Trust"*) is a statutory trust created under the Delaware Statutory Trust Act, as amended (the *"Trust Act"*), pursuant to a certificate of trust filed with the Secretary of State of the State of Delaware and the execution of a trust agreement of the Trust on August 9, 2007. The Trust will continue its existence from and after the closing of this Offering pursuant to an amended and restated trust agreement (as so amended and restated, the *"Trust Agreement"*), to be entered into by and among the Company, as grantor, Wilmington Trust Company, as property trustee (the *"Property Trustee"*), and Wilmington Trust Company, as Delaware trustee (the *"Delaware Trustee"*), as of the date the Trust Securities are issued. The rights of the holders of the Trust Securities, including economic rights, rights to information and voting rights, are as set forth in the Trust Agreement and the Trust Act.

The Trust Agreement generally limits the Trust's activities to (i) holding the Series 2007-B Company Preferred Securities, (ii) issuing the Trust Securities, (iii) passing through dividends and redemption and liquidation payments paid by the Company to the Trust on the Series 2007-B Company Preferred Securities and (iv) performing functions necessary or incidental thereto. The Trust is prohibited from issuing other equity securities or any debt securities or engaging in any other activities. Subject to the limitations and assumptions described under "Certain U.S. Federal Income Tax Considerations", the Trust intends to be treated as a grantor trust for United States federal income tax purposes, with the result that holders of Trust Securities are expected to be treated as beneficial owners of the Series 2007-B Company Preferred Securities for United States federal income tax purposes. The Series 2007-B Company Preferred Securities will be the only assets of the Trust. The principal executive offices of the Trust will be located at 1301 Second Avenue, Seattle, Washington 98101. The office of the Delaware Trustee is Rodney Square North, 1100 North Market Street, Wilmington, Delaware 19890. Copies of the Trust Agreement will be available upon request to WMI.

As set forth in, and subject to, the Trust Agreement, the Property Trustee and the Delaware Trustee will have exclusive and complete authority to carry out the purposes of the Trust.

The Property Trustee will hold title to the Series 2007-B Company Preferred Securities for the benefit of the holders of the Trust Securities, and, as such holder, the Property Trustee will have the power to exercise all rights, powers and privileges with respect to the Series 2007-B Company Preferred Securities under the LLC Agreement. In addition, the Property Trustee will maintain exclusive control of a segregated non-interest bearing bank account to hold all payments made in respect of the Series 2007-B Company Preferred Securities for the benefit of the holders of the Trust Securities.

Pursuant to the Trust Agreement, all charges or expenses of the Trust other than payments required under the terms of the Trust Securities, including the fees, charges and expenses of the Property Trustee, the Delaware Trustee, the Registrar, the Transfer Agent or any Paying Agent, will be paid or caused to be paid by the Company; *provided, however,* that if the Company does not pay or cause to be paid such fees, charges and expenses or can pay such fees, charges and expenses only in a manner that would allocate such fees, charges and expenses against the interests of the holders of the Series N Company Preferred Stock, WMB will pay such fees, charges and expenses; *provided further,* that if the Property Trustee or the Delaware Trustee incurs fees, charges or expenses for which it is not otherwise liable under the Trust Agreement, or if the Paying Agent, the Registrar or the Transfer Agent incurs fees, charges or expenses for which it is not otherwise liable under the Agency Agreement, in each case at the request of a holder of Trust Securities or other person, such holder or other person will be liable for such fees, charges and expenses.

The information with respect to the Trust that is required by paragraph (d)(4)(i) of Rule 144A under the Securities Act, will be available upon request to the Property Trustee until the earlier of (i) the redemption in full of the Trust Securities or (ii) the Conditional Exchange.

# THE COMPANY

Washington Mutual Preferred Funding LLC (the *"Company"*) is a Delaware limited liability company formed on February 3, 2006 under the Delaware Limited Liability Company Act, as amended (the *"LLC Act"*), pursuant to an initial limited liability company agreement and a certificate of formation filed with the Secretary of State of the State of Delaware. The limited liability company agreement was amended and restated in its entirety in connection with each of the issuance of the Series 2006-A Company Preferred Securities in March 2006, the Series 2006-C Company Preferred Securities in December 2006 and the Series 2007-A Company Preferred Securities in May 2007. The limited liability company agreement of the Company will be further amended and restated to include the terms of the Series 2007-B Company Preferred Securities upon the closing of this Offering (as so amended, the *"LLC Agreement"*).

The LLC Agreement generally limits the Company's activities to (i) issuing (a) the Series 2006-A Company Preferred Securities, which were sold to Trust I, (b) the Series 2006-B Company Preferred Securities, which were sold to WaMu Cayman, (c) the Series 2006-C Company Preferred Securities, which were sold to Trust II, (d) the Series 2007-A Company Preferred Securities, which were sold to Trust III, (e) other Parity Equity Securities, such as the Series 2007-B Company Preferred Securities, subject to the limitations described in this offering circular, (f) the common securities of the Company (the *"Company Common Securities"*) to University Street, Inc., an indirect subsidiary of WMB (*"University Street"*), and (g) additional Junior Equity Securities, subject to certain limitations described in this offering circular, (ii) acquiring and holding Eligible Investments, including the Asset Trust I Class A Trust Certificate, the Asset Trust II Class A Trust Certificate and the Asset Trust III Class A Trust Certificate (which, other than Permitted Investments, will be the sole Eligible Investments of the Company immediately after the completion of this Offering) in accordance with the investment policy as described in "— Business of the Company — Assets of the Company" and (iii) performing functions necessary or incidental thereto. Subject to the limitations and assumptions described under "Certain U.S. Federal Income Tax Considerations", the Company intends to be treated as a partnership (other than a publicly traded partnership taxable as a corporation) for United States federal income tax purposes. The Company may not take any action, or permit any action to be taken, that would cause the Company to fail to be treated as a partnership for United States federal income tax purposes for so long as any Company Preferred Securities of any series are outstanding, except with the consent or affirmative vote of the holders of at least two-thirds of all the series of Company Preferred Securities, voting together as a single class. The principal executive office of the Company is c/o Washington Mutual, Inc., 1301 Second Avenue, Seattle, Washington 98101. Copies of the LLC Agreement will be available upon request to WMI.

The Company will receive the opinion of Mayer Brown LLP to the effect that, for United States federal income tax purposes, the Company will not be treated as an association taxable as a corporation or as a publicly traded partnership taxable as a corporation.

## Capitalization

Upon completion of this Offering, University Street will continue to hold all of the Company Common Securities, representing 100% of the voting rights in the Company (subject to the limited voting rights of holders of the Series 2007-B Company Preferred Securities and the other Company Preferred Securities described under "Description of the Series 2007-B Company Preferred Securities — Voting Rights and Covenants"). Upon completion of this Offering, the Trust will hold all of the Series 2007-B Company Preferred Securities. Trust I will continue to hold all the Series 2006-A Company Preferred Securities, WaMu Cayman will continue to hold all the Series 2006-B Company Preferred Securities, Trust II will continue to hold all the Series 2006-C Company Preferred Securities and Trust III will continue to hold all the Series 2007-A Company Preferred Securities.

The following table illustrates the capitalization of the Company as of June 30, 2007 and the expected capitalization of the Company as of the closing of this Offering (the *"Closing Date"*), after giving effect to the issuance of the Series 2007-B Company Preferred Securities:

| | As of June 30, 2007[1] | As of the Closing Date[1] |
|---|---|---|
| | (Unaudited) | (Unaudited) |
| Series 2006-A Company Preferred Securities . . . . . . . . . . . . . . . | $1,250,000,000 | $ 1,250,000,000 |
| Series 2006-B Company Preferred Securities . . . . . . . . . . . . . . . | 750,000,000 | 750,000,000 |
| Series 2006-C Company Preferred Securities . . . . . . . . . . . . . . . | 500,000,000 | 500,000,000 |
| Series 2007-A Company Preferred Securities . . . . . . . . . . . . . . . | 500,000,000 | 500,000,000 |
| Series 2007-B Company Preferred Securities . . . . . . . . . . . . . . | — | 1,000,000,000 |
| Company Common Securities . . . . . . . . . . . . . . . . . . . . . . . . . | 3,896,229,848 | 7,644,035,493 |
| Total Capitalization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $6,596,229,848 | $11,644,035,493 |

[1] These figures exclude certain capitalized costs associated with the issuance of the Company Preferred Securities and exclude retained earnings.

## Business of the Company

### *Assets of the Company*

In connection with the February 2006 offering of the Series 2006-A Company Preferred Securities and Series 2006-B Company Preferred Securities, WMB conveyed a portfolio of first lien, closed-end, fixed rate home equity loans (*"HELs"*) to the Company in exchange for 100% of the Series 2006-A Company Preferred Securities and Series 2006-B Company Preferred Securities. Concurrently with this transfer by WMB, University Street conveyed a portfolio of HELs to the Company in exchange for 100% of the Company Common Securities. The portfolio conveyed by WMB and University Street to the Company and subsequently transferred to Asset Trust I consisted of approximately $5,389,459,150 of HELs in the aggregate, calculated as of January 31, 2006. The Company conveyed 100% of the HELs that it received to Asset Trust I in exchange for the interests in Asset Trust I represented by the Class A Asset Trust Certificate of Asset Trust I (the *"Asset Trust I Class A Trust Certificate"*) and a residual certificate (the *"Asset Trust I Class R Trust Certificate"*), which the Company transferred to WMB. WMB then sold the Series 2006-A Company Preferred Securities and Series 2006-B Company Preferred Securities for cash to Trust I and WaMu Cayman, respectively.

In connection with the December 2006 offering of the Series 2006-C Company Preferred Securities, WMB conveyed a portfolio of payment option adjustable rate mortgages ("Option ARMs") to the Company in exchange for 100% of the Series 2006-C Company Preferred Securities, and University Street contributed a pool of Option ARMs to the Company as a capital contribution. The aggregate outstanding principal balance of all Option ARMs contributed to the Company by WMB and University Street and subsequently transferred to Asset Trust II was approximately $2,899,877,211 in the aggregate, calculated as of November 14, 2006. The Company conveyed 100% of the Option ARMs that it received to Asset Trust II in exchange for interests in Asset Trust II represented by the Class A Asset Trust Certificate of Asset Trust II (the *"Asset Trust II Class A Trust Certificate"*) and a residual certificate (the *"Asset Trust II Class R Trust Certificate"*), which the Company transferred to WMB. WMB then sold the Series 2006-C Company Preferred Securities for cash to Trust II.

As of September 30, 2007, the Company's assets consisted of approximately $4,083,661,672 of HELs in the aggregate, held through Asset Trust I; $1,664,792,954 of Option ARMs in the aggregate, held through Asset Trust II; and $525 million of permitted investments held directly or held through Asset Trust I or Asset Trust II, as the case may be. Since the March 2006 issuance of Company Preferred Securities, the Company has paid to University Street approximately $272.4 million of cash distributions and $2.217 billion of cash redemption payments, in each case on the Company Common Securities.

The Company's source of funds for those dividends has been payments of interest and principal received by the Company through Asset Trust I on its HELs and Asset Trust II on its Option ARMs.

Contemporaneously with this Offering, WMB will convey a portfolio of Flex-5 ARMs to the Company in exchange for 100% of the Series 2007-B Company Preferred Securities and University Street will contribute a pool of Flex-5 ARMs to the Company as a capital contribution. The portfolio of Flex-5 ARMs to be conveyed by WMB to the Company will consist of approximately $1,000,000,000 outstanding principal amount of Flex-5 ARMs in the aggregate, and the portfolio of Flex-5 ARMs contributed by University Street to the Company will consist of approximately $4,199,147,686 outstanding principal amount of Flex-5 ARMs in the aggregate. The aggregate outstanding principal balance of Flex-5 ARMs contributed to Asset Trust III by WMB and University Street will be approximately $5,199,147,686, calculated as of September 30, 2007. The Company will, in turn, convey 100% of the Flex-5 ARMs that it owns to Asset Trust III in exchange for interests in Asset Trust III represented by the Class A-1 2007-Flex1 Asset Trust Certificate of Asset Trust III (the *"Asset Trust III Class A Trust Certificate"*) and a second certificate (the *"Asset Trust III Class R Trust Certificate"*), which the Company expects to transfer to WMB. WMB will then sell the Series 2007-B Company Preferred Securities for cash to the Trust.

After giving effect to the contribution of the Flex-5 ARMs to the Company and Asset Trust III, on a *pro forma* basis, the Company's assets will consist of approximately $4,083,661,672 of HELs in the aggregate, as of September 30, 2007, held through Asset Trust I; $1,664,792,954 of Option ARMs in the aggregate, as of September 30, 2007, held through Asset Trust II; and $5,199,147,686 of Flex-5 ARMs in the aggregate, as of September 30, 2007, to be held through Asset Trust III.

The HELs currently held in Asset Trust I, the Option ARMs held in Asset Trust II and the Flex-5 ARMs to be held in Asset Trust III will together satisfy the coverage and FFO tests described under "Description of the Series 2007-B Company Preferred Securities — Ranking" for issuance of the Series 2007-B Company Preferred Securities as Parity Equity Securities with respect to the Outstanding Company Preferred Securities.

The Eligible Investments (which will, immediately after the completion of this Offering and the transactions contemplated in connection therewith, consist of the Asset Trust I Class A Trust Certificate, the Asset Trust II Class A Trust Certificate, the Asset Trust III Class A Trust Certificate and Permitted Investments from time to time will generate net income for payment of dividends by the Company to the Trust as holder of the Series 2007-B Company Preferred Securities (and consequently for pass through by the Trust to holders of the Trust Securities), to Trust I, Trust II, Trust III and WaMu Cayman, as holders of the Outstanding Company Preferred Securities, and to University Street as holder of the Company Common Securities.

The Company intends to manage its assets so as (i) to ensure that the Company will at all times maintain its exemption under the Investment Company Act, (ii) to result in the Company at all times maintaining sufficient FFO to allow payments to be made with respect to its Junior Equity Securities (including payments to University Street as holder of the Company Common Securities) and (iii) to maintain the desired treatment under the Code for the Company's assets and obligations.

Current requirements under the Investment Company Act mandate that in order to maintain its exemption from registration as an investment company, the Company must limit its assets that are not Qualifying Interests or other real estate related assets to no more than 20% of its total assets at any time. The Company expects that initially the distributions it receives from Asset Trust I, Asset Trust II and Asset Trust III as holder of the Asset Trust I Class A Trust Certificate, the Asset Trust II Class A Trust Certificate and the Asset Trust III Class A Trust Certificate, respectively, and its income on its Permitted Investments, will significantly exceed the amount required to pay dividends on all the series of Company Preferred Securities. Cash received from the Asset Trusts and any Permitted Investments purchased with such funds or with the proceeds of the sale of the Series 2007-A Company Preferred Securities are not Qualifying Interests or other real estate related assets, and therefore funds received from the Asset Trusts or from the sale of the Series 2007-A Company Preferred Securities and

retained by the Company will be limited (together with any other assets that are not Qualifying Interests or other real estate related assets) to 20% of the Company's total assets at any time. Current cash and the expected proceeds of the sale of 2007-B Company Preferred Securities will not exceed 20% of the Company's total assets. For this and other reasons, (i) the Company may seek to invest a substantial portion of its Permitted Investments (after giving effect to the sale of 2007-B Company Preferred Securities) to purchase Additional Assets as described below and (ii) the Company expects it will, in the ordinary course, distribute all or substantially all of the funds it receives from the Asset Trusts to University Street, as holder of the Company Common Securities, to the extent it is permitted to do so in accordance with the restrictions on dividends with respect to the Company Common Securities and such funds are not otherwise required to pay dividends on any series of the Company Preferred Securities. The Company intends to invest funds it receives from the Asset Trusts in Permitted Investments prior to such funds being distributed to the holders of the Company Common Securities or other Junior Equity Securities or of any series of the Company Preferred Securities.

The Company also expects that over time the principal balance of the Mortgage Loans held by the Asset Trusts will decrease as a result of principal payments and payoffs. Since (i) in accordance with the terms of the Pooling and Servicing Agreements, additional assets may be added to any Asset Trust only in very limited circumstances and (ii) funds distributed to the Company by an Asset Trust may be distributed to University Street as discussed above and to the extent held by the Company will generally (when invested in Permitted Investments) generate a lower rate of return than the Mortgage Loans held in the Asset Trusts, over time the Company expects that its FFO will decline. Accordingly, prior to the point at which the Company's FFO level is reduced to a level that would prevent payments with respect to its Junior Equity Securities (including payments to University Street as holder of the Company Common Securities), the Company intends to acquire additional income producing investments that constitute Eligible Assets. Any additional assets that are acquired by the Company will not be transferred to any Asset Trust or serviced in accordance with the related Asset Documentation. Any additional Eligible Assets that are acquired by the Company (such assets, *"Additional Assets"*) may (but are not in all cases required to) consist of obligations of Asset Subsidiaries. The terms of the Asset Documentation with respect to any Additional Assets will provide for the servicing of such Additional Assets.

*"Eligible Assets"* means assets:

(i) which (a) are securities, interests or other obligations of an Asset Subsidiary which are backed or collateralized by first or second lien closed end home equity loans, first or second lien home equity lines of credit, mortgage loans on single family or multi-family residences, commercial mortgage loans or other real estate assets, in each case, with respect to real estate located in the United States; *provided, however,* that the Company may acquire and hold first or second lien closed end home equity loans, first or second lien home equity lines of credit, mortgage loans on single family or multi-family residences, commercial mortgage loans or other real estate assets directly if the Company receives an Asset Tax Opinion in connection with such assets or (b) otherwise satisfy the Rating Agency Condition and are approved by all of the Managers, including the Independent Manager;

(ii) which will be serviced and maintained in accordance with Asset Documentation, as applicable;

(iii) the collateral for which is not permitted to include under the related Asset Documentation any first or second lien closed end home equity loans, first or second lien home equity lines of credit, mortgage loans on single family or multi-family residences, commercial mortgage loans or other real estate assets as to which the applicable obligor was more than 30 days delinquent as of the applicable cut-off date or transfer date;

(iv) the collateral for which does not create or carry any obligation of the Company or any Asset Subsidiary to make future advances or loans to any obligor with respect to such collateral under lines of credit, revolving loan facilities or other similar features; and

(v) the acquisition, maintenance and servicing of which will not (in itself or in connection with any of the Company's other assets):

(a) cause the Company to be an "investment company" that is required to register under the Investment Company Act;

(b) cause the imposition of United States federal income withholding tax (including under Section 1445 of the Code) in respect of payments made by the Company on any series of the Company Preferred Securities;

(c) cause the Company to be treated under the Code as a publicly traded partnership taxable as a corporation;

(d) cause the Company to be treated as engaged in a U.S. trade or business, as determined for United States federal income tax purposes; or

(e) cause income with respect to the Trust Securities to constitute unrelated business taxable income for U.S. federal income tax purposes or gain subject to U.S. net income taxation under Section 897 of the Code.

"*Asset Documentation*" means (i) with respect to Asset Trust I and the Asset Trust I Class A Trust Certificate, the Asset Trust I Pooling and Servicing Agreement and the related Asset Trust I Custody Agreement, (ii) with respect to Asset Trust II and the Asset Trust II Class A Trust Certificate, the Asset Trust II Pooling and Servicing Agreement and the related Asset Trust II Custody Agreement, (iii) with respect to Asset Trust III and the Asset Trust III Class A Trust Certificate, the Asset Trust III Pooling and Servicing Agreement and the related Asset Trust III Custody Agreement, (iv) the Master Loan Contribution and Purchase Agreement, dated as of March 6, 2007, between the Company and WMB and the Master Loan Contribution and Purchase Agreement, dated as of March 6, 2007, between the Company and University Street (together with any Loan Transfer Confirmations thereunder, collectively, the "*Asset Contribution Agreements*"), and (v) with respect to any Additional Assets, the documentation (a) governing the maintenance and servicing of such Additional Assets and custodial arrangements related thereto and (to the extent applicable) any underlying collateral related to such Additional Assets, (b) establishing (if applicable) any Asset Subsidiary created in connection with such Additional Assets, and (c) governing (if applicable) the acquisition by the Company of any Eligible Assets or first or second lien closed end home equity loans, first or second lien home equity lines of credit, mortgage loans on single family or multi-family residences, commercial mortgage loans or other real estate assets; *provided*, that the execution of any such documentation, to the extent such documentation is not substantially similar in all material respects to the Asset Trust I Pooling and Servicing Agreement and the Asset Contribution Agreements (with such changes as may be necessary or desirable to reflect the collateral for such Additional Assets and the acquisition thereof), must satisfy the Rating Agency Condition and be approved by all of the Managers, including the Independent Manager.

"*Asset Subsidiary*" means Asset Trust I, Asset Trust II, Asset Trust III and, with respect to any Additional Assets, an entity formed for the purpose of holding the collateral related to such Additional Assets and making payments with respect thereto to the Company and:

(i) in which the Company holds all or substantially all of the economic interests;

(ii) which is established and governed pursuant to Asset Documentation;

(iii) which is not an "investment company" which is required to register under the Investment Company Act;

(iv) the establishment and operation of which will not cause the Company to be an "investment company" that is required to register under the Investment Company Act;

(v) the establishment and operation of which will not cause the imposition of United States federal withholding tax (including under Section 1445 of the Code) in respect of payments by the Company on any series of the Company Preferred Securities;

(vi) the establishment and operation of which will not cause the Company to be treated under the Code as a publicly traded partnership taxable as a corporation; and

(vii) the establishment and operation of which will not cause the Company to be treated as engaged in a U.S. trade or business, as determined for United States federal income tax purposes.

*"Asset Tax Opinion"* means, with respect to any assets, an opinion of counsel from nationally recognized tax counsel to the effect that the acquisition and ownership of such assets by the Company will not (in itself or in connection with any of the Company's other assets):

(i) cause the imposition of United States federal withholding tax in respect of payments made by the Company on any series of the Company Preferred Securities;

(ii) cause the Company to be treated under the Code as a publicly traded partnership taxable as a corporation; or

(iii) cause the Company to be treated as engaged in a U.S. trade or business, as determined for United States federal income tax purposes.

*"Eligible Investments"* means the Asset Trust I Class A Trust Certificate, the Asset Trust II Class A Trust Certificate, the Asset Trust III Class A Trust Certificate, the Asset Trust I Class R Trust Certificate, the Asset Trust II Class R Trust Certificate, the Asset Trust III Class R Trust Certificate any other Eligible Assets and any Permitted Investments.

*"Permitted Investments"* means one or more of the obligations or securities listed below:

(i) obligations of, or guaranteed as to principal and interest by, the United States of America or any agency or instrumentality thereof when such obligations are backed by the full faith and credit of the United States of America;

(ii) repurchase agreements on obligations described in clause (i) of this definition of *"Permitted Investments"*; *provided*, that the unsecured obligations of the party agreeing to repurchase such obligations have, at the time at which the repurchase agreement is entered into, one of the two highest short-term debt ratings of each of the Rating Agencies; and *provided further*, that such repurchaser's unsecured long-term debt has, at the time at which the repurchase agreement is entered into, one of the two highest unsecured long-term debt ratings of each of the Rating Agencies;

(iii) federal funds, certificates of deposit, time deposits and bankers' acceptances of any bank or trust company incorporated under the laws of the United States of America or any state; *provided*, that the debt obligations of such bank or trust company (or, in the case of the principal bank in a bank holding company system, debt obligations of the bank holding company) at the date of acquisition thereof have one of the two highest short-term debt ratings of each of the Rating Agencies and unsecured long-term debt has one of the two highest unsecured long-term debt ratings of each of the Rating Agencies;

(iv) federal funds, certificates of deposit, time deposits, demand deposits and bankers' acceptances of WMB;

(v) obligations of, or obligations guaranteed by, any state of the United States of America or the District of Columbia; *provided*, that such obligations at the date of acquisition thereof shall have one of the two highest long-term debt ratings available for such securities from each of the Rating Agencies;

(vi) commercial paper of any corporation incorporated under the laws of the United States of America or any state thereof, which on the date of acquisition has the highest commercial paper rating of each of the Rating Agencies; *provided*, that the corporation has unsecured long-term debt that has one of the two highest unsecured long-term debt ratings of each of the Rating Agencies;

(vii) securities (other than stripped bonds or stripped coupons) bearing interest or sold at a discount that are issued by any corporation incorporated under the laws of the United States of America or any state thereof and have one of the two highest long-term unsecured ratings available for such securities from each of the Rating Agencies; and

(viii) any other category of investments that satisfy the Rating Agency Condition and is approved by all of the Managers, including the Independent Manager, subject to the receipt by the Company of an Asset Tax Opinion with respect to such category of investments;

*provided, however*, that (x) any of the investments listed above will not be Permitted Investments to the extent that investment therein would cause the outstanding principal amount of Permitted Investments that are then held by the Company to exceed 20% of the aggregate principal amount of all Eligible Investments and (y) (a) any payments received with respect to any of the investments listed above must not be subject to withholding tax of any jurisdiction assuming compliance with standard tax documentation requirements, unless the Company is entitled to a full gross-up (on an after-tax basis) with respect to any such withholding tax, (b) the gain from the disposition of such investment would not be subject to U.S. federal income or withholding tax under section 897 or section 1445, respectively, of the Code and (c) such investments will not cause the imposition of U.S. federal withholding tax in respect of payments made by the Company on any series of the Company Preferred Securities. In no event shall an instrument be a Permitted Investment if the instrument evidences a right to receive only interest payments with respect to the obligations underlying such instrument or has been purchased at a price greater than the outstanding principal balance of such instrument.

*"Rating Agencies"* means, at any time, S&P, Moody's and Fitch, but only in the case of each such agency if it is rating the relevant security, including the Trust Securities at the relevant time or, if none of them is providing a rating for the relevant security, including the Trust Securities at such time, then any *"nationally recognized statistical rating organization"* as that phrase is defined for purposes of Rule 436(g)(2) under the Securities Act, which is rating such relevant security.

*"Rating Agency Condition"* means written notice from each Rating Agency confirming that the proposed action, change or modification will not result in a reduction of the rating then currently assigned by such Rating Agency to the Trust Securities.

## Employees and Administration Agreement

The Company and WMB have entered into an Administrative Services Agreement (the *"Administrative Services Agreement"*) pursuant to which WMB provides (or causes to be provided) certain accounting, legal, tax and other support services to the Company, assists the Company in maintaining compliance with all pertinent U.S. local, state and federal laws and provides necessary administrative, recordkeeping and secretarial services to the Company. Under this agreement, the Company has agreed to reimburse the provider of such services from time to time for the value of services provided by such provider to the Company. The Company expects that any such reimbursement will be in a *de minimis* amount. The Company may in the future amend or terminate the Administrative Services Agreement.

The Company will maintain limited liability company records and audited financial statements that are separate from those of WMI and any of its other affiliates. None of the officers, employees or Managers of the Company will have any direct or indirect pecuniary interest in any security to be acquired or disposed of by the Company or in any transaction in which the Company has an interest.

## Management of the Company

### Managers and Officers

The Company will be managed by a Board of Managers (the "Company's Board of Managers"). The LLC Agreement provides that the Company's Board of Managers will at all times be composed of three members (each, a "Manager"), one of whom is not and has not been during the preceding five years an officer or employee of WMI or any affiliate of WMI, other than a financing subsidiary (the "Independent Manager"). The Managers will serve until their successors are duly elected and qualified. Except in certain circumstances described under "— Independent Manager" below, action by the Company's Board of Managers will be by majority vote. The Company has nine officers.

The persons who currently serve as the Managers and officers of the Company are:

| Name: | Position and Offices Held: |
| --- | --- |
| Robert Williams | Manager and Senior Vice-President |
| Peter Freilinger | Manager and Senior Vice-President |
| Kenneth J. Uva | Independent Manager |
| Tim Cleary | Senior Vice-President |
| Jim Douthitt | Senior Vice-President and Chief Financial Officer |
| Doreen Logan | First Vice-President and Assistant Secretary |
| Jack Read | Senior Vice-President |
| Charles E. Smith | First Vice-President and Secretary |
| Jessica Jaeger | Vice-President |
| Susan Chan | First Vice-President |

Each of the current Managers (other than the Independent Manager) and officers of the Company are individuals who are officers or employees of WMI or one of its affiliates. The Independent Manager is currently Kenneth J. Uva, who is an employee of CT Corporation.

### Independent Manager

Under the LLC Agreement, in order to be considered "independent", a Manager must not, during the preceding five years, have been a director or employee of WMI or any affiliate of WMI, other than a direct or indirect financing subsidiary of WMI.

The LLC Agreement requires that, in assessing the benefits to the Company of any proposed action requiring his or her consent, the Company's Independent Manager take into account the interests of holders of both the Junior Equity Securities, including Company Common Securities, and any series of the Company Preferred Securities. The LLC Agreement provides that in considering the interests of the holders of the Company Preferred Securities, any Junior Equity Securities and any series of Company Preferred Securities, the Company's Independent Manager owes all such holders the same duties.

The LLC Agreement provides that, for so long as any Company Preferred Securities are outstanding, certain actions by the Company will be subject to prior approval of all Managers, including the Independent Manager. The Company will not be able, without the approval of the Independent Manager, to (i) terminate, amend or otherwise change any of the Company's Asset Documentation or (ii) effect a consolidation, merger or share exchange (excluding the Conditional Exchange) that is not tax-free to the holders of any series of the Company Preferred Securities, and the related Trust Securities, unless such consolidation, merger or share exchange was approved by the consent or affirmative vote of the holders of at least two-thirds of all series of the Company Preferred Securities, voting together as a single class. In addition, if any Asset Trust fails to make a payment to the Company or any payments are not received with regard to any Additional Asset in violation of the terms of the related Asset Documentation on any scheduled payment date, the Independent Manager will have the authority to cause the Company, as the holder of the Asset Trust I

Class A Trust Certificate, the Asset Trust II Class A Trust Certificate, the Asset Trust III Class A Trust Certificate or any Additional Asset, as applicable, to enforce its rights in such capacity until payments have been resumed and a year has passed since the date of the latest scheduled payment date with respect to which the applicable Asset Trust or the Additional Asset failed to make a payment. Furthermore, the Independent Manager shall also have authority to enforce the Company's rights pursuant to any Asset Contribution Agreements.

The holders of all the series of Company Preferred Securities, voting together as a single class, by majority vote of the votes cast on such matter at a meeting properly called and held or by written instructions signed by the holders of Company Preferred Securities representing a majority of the voting rights of all series of the Company Preferred Securities then outstanding, voting together as a single class, are entitled to remove the initial or any succeeding Independent Manager and to fill the vacancy created by such removal or any other vacancy existing in the office of the Independent Manager if (i) the Company fails to pay full dividends on any series of Company Preferred Securities on any Dividend Payment Date, (ii) any Trust Holder fails to pass through full dividends paid by the Company on the Company Preferred Securities held by the Trust Holder to the holders of the Trust Holder's securities on any Dividend Payment Date or (iii) a Bankruptcy Event occurs. The person so elected will be deemed to be an Independent Manager irrespective of whether he or she meets the independence test described above. This right will continue for as long as any Company Preferred Securities of any series are outstanding.

"*Bankruptcy Event*" means the Company, the Trust or any other Trust Holder (i) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due, (ii) makes a general assignment, arrangement or composition with or for the benefit of its creditors or (iii) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding up or liquidation.

### Compensation of the Independent Manager

The Company pays the Independent Manager a reasonable fee for his or her services as a Manager of the Company, plus reimbursement of expenses for attendance at each meeting of the Company's Board of Managers.

### Indemnification of Managers and Officers

The LLC Agreement provides that the Company will, to the fullest extent permitted by law, indemnify any Manager or officer of the Company for any liability and related expenses (including reasonable counsel's fees) arising out of such Manager's or officer's status as a Manager or officer of the Company; *provided, however,* that a court of competent jurisdiction has not determined that such Manager or officer did not act in good faith and in a manner that he or she reasonably believed to be in, or not opposed to, the best interests of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe that his or her conduct was unlawful. The LLC Agreement provides that the right to indemnification is a contract right and set forth certain procedural and evidentiary standards applicable to enforcement of a claim. The LLC Agreement provides that the Company may purchase and maintain insurance to protect any Manager or officer against any liability asserted against him or her, or incurred by him or her, arising out of his or her status as such.

### Additional Covenants of the Company in the LLC Agreement

The LLC Agreement provides that, so long as any Company Preferred Securities of any series are outstanding, the Company will not authorize, create or increase the authorized amount of or issue any class or series of any equity shares of the Company, or any warrants, options or other rights convertible or exchangeable into any class or series of any equity shares of the Company, ranking senior to the Company Preferred Securities, either as to dividend rights, or rights on dissolution,

liquidation and winding up of the Company, without the consent or an affirmative vote of the holders of at least two-thirds of all series of the Company Preferred Securities, voting together as a single class. The LLC Agreement also provides that, except with the consent or affirmative vote of the holders of at least two-thirds of all the series of Company Preferred Securities, voting together as a single class, the Company will not take certain other actions. These actions are described under "Description of the Series 2007-B Company Preferred Securities — Voting Rights and Covenants".

**Additional Information**

The information with respect to the Company that is required by paragraph (d)(4)(i) of Rule 144A under the Securities Act, including quarterly unaudited and annual audited financial statements, in each case prepared in accordance with GAAP, will be available upon request to WMI until the earlier of (i) the redemption in full of the Series 2007-B Company Preferred Securities or (ii) the Conditional Exchange.

# ASSET TRUST I

## General

Washington Mutual Home Equity Trust I (*"Asset Trust I"*) is a statutory trust formed under the laws of the State of Delaware pursuant to a trust agreement between the Company, as depositor, and Deutsche Bank Trust Company Delaware, as Delaware trustee. The Asset Trust I Pooling and Servicing Agreement, dated as of March 7, 2006 (the *"Asset Trust I Pooling and Servicing Agreement"*), among the Company, as depositor, WMB, as servicer (the *"Asset Trust I Servicer"*), Deutsche Bank Trust Company Delaware, as Delaware trustee (the *"Asset Trust I Delaware Trustee"*) and Deutsche Bank National Trust Company, as trustee (the *"Asset Trust I Trustee"*), restated the initial trust agreement and is the governing instrument of Asset Trust I.

Asset Trust I does not and will not own any assets other than the HELs and the other assets described below. Asset Trust I does not and will not have any liabilities other than those incurred in connection with the Asset Trust I Pooling and Servicing Agreement and any related agreement. Asset Trust I does not and will not have any directors, officers or other employees. No equity contribution has or will be made to Asset Trust I by WMB, the Company or any other party, except for a *de minimis* contribution made by the Company, as depositor, pursuant to the initial trust agreement, and Asset Trust I does not and will not have any other capital. The fiscal year end of Asset Trust I is December 31. Asset Trust I acts through the Asset Trust I Trustee and the Asset Trust I Delaware Trustee, whose fees and reasonable expenses are paid or reimbursed by the Asset Trust I Servicer.

For purposes of this offering circular with respect to the underwriting, origination and servicing of the HELs in Asset Trust I, references to WMB include WMB, originators acquired by WMB and WMB's subsidiaries.

## General Description of Assets

The assets of Asset Trust I consist of HELs that had, as of January 31, 2006, an aggregate unpaid principal balance of approximately $5,389,459,150, together with payments received thereon and certain other investments. The HELs were originated or acquired by WMB between September 1, 2001 and September 30, 2005. As of September 30, 2007, the HELs held by Asset Trust I had an aggregate unpaid principal balance of approximately $4,083,661,672.

As of September 30, 2007, the HELs had a weighted average gross interest rate of approximately 6.07% and ranged from a gross interest rate of approximately 4.00% to 11.32% per annum. As of September 30, 2007, the average current, unpaid principal balance of the HELs was approximately $88,299 with a minimum current, unpaid principal balance of approximately $8 and a maximum current, unpaid principal balance of approximately $917,267. As of September 30, 2007, assets in Asset Trust I had various original maturities ranging from 5 years to 30 years and were, on average, originated within the last 47 months. As of September 30, 2007, the current weighted average loan-to-value ratio of the HELs was approximately 50.39% and the weighted average loan-to-value ratio at origination was approximately 58.69%. As of September 30, 2007, the HELs had a weighted average Credit Score of approximately 758. Most of the properties underlying the HELs are owner occupied with approximately 3.82% of the properties non-owner occupied. The HELs are geographically concentrated in Texas (approximately 50.55%), California (approximately 29.29%), Florida (approximately 7.06%), and New York (approximately 5.11%). HELs are typically made for reasons such as home purchases, home improvements, furniture and fixtures purchases, purchases of automobiles and debt consolidation. The HELs are generally repaid on a fully amortizing basis.

## Acquisition of the Portfolio and Related Transactions

In connection with the issuance of the Series 2006-A Company Preferred Securities and Series 2006-B Company Preferred Securities, WMB contributed a pool of HELs to the Company in exchange for a corresponding amount of the Series 2006-A Company Preferred Securities and

Series 2006-B Company Preferred Securities. In addition, University Street contributed a pool of HELs to the Company in exchange for all of the Company Common Securities. The aggregate value of these contributions totaled approximately $5,389,459,150, calculated as of January 31, 2006.

The Company contributed to Asset Trust I all of the HELs it received from WMB and University Street. This contribution was made in exchange for the Class A-1 Washington Mutual Home Equity Trust I Certificate (the *"Asset Trust I Class A Trust Certificate"*) and the Class R Washington Mutual Home Equity Trust I Certificate (the *"Asset Trust I Class R Trust Certificate"*). For United States federal income tax purposes, the Asset Trust I Class A Trust Certificate represents the sole class of regular interests in Asset Trust I, and the Asset Trust I Class R Trust Certificate represents the sole class of residual interests in Asset Trust I. The Company retained the Asset Trust I Class A Trust Certificate and sold the Asset Trust I Class R Trust Certificate to WMB on March 7, 2006.

Asset Trust I owns the right to receive all payments of principal and interest on the HELs. A schedule to the Asset Trust I Pooling and Servicing Agreement includes information about each HEL, including:

- the outstanding principal balance as of the close of business on January 31, 2006;

- the term of the HEL; and

- the applicable interest rate as of the close of business on January 31, 2006.

The notes relating to the HELs were not endorsed to Asset Trust I and no assignments to Asset Trust I of the mortgages securing the HELs were prepared. WMB, in its capacity as initial Asset Trust I Custodian, has possession of and reviews such notes and the HELs as custodian for Asset Trust I and financing statements were filed evidencing Asset Trust I's interest in the HELs.

## Description of the Portfolio

### General

All of the HELs in the portfolio of Asset Trust I consist of closed-end, first lien home equity loans secured by a first lien that primarily is on the borrower's residence. Such residences are largely single family properties. These loans typically are made for reasons such as home purchases, home improvements, acquisition of furniture and fixtures, purchases of automobiles, and debt consolidation. The HELs are generally paid on a fully-amortizing basis. As of September 30, 2007, 0.40% of the HELs in Asset Trust I were 30 days or more delinquent, 0.18% were 60 days or more delinquent and 0.11% were 90 days or more delinquent. Because no delinquent HELs were initially included in the Company's Portfolio, the foregoing delinquency data is therefore limited in its scope. There can be no assurance that delinquencies with respect to the HELs will not increase in the future. See "Risk Factors — Risks Relating to the Mortgage Loans — General economic conditions in the United States could change and possible resulting changes in delinquency rates of the Mortgage Loans could negatively impact the Company's financial condition, results of operations and ability to pay dividends".

The tables in Appendix B to this offering circular represent information as of September 30, 2007 with respect to the HELs included in the portfolio of Asset Trust I.

## Underwriting

### General

The HELs owned by Asset Trust I were, in all material respects, originated in accordance with the underwriting guidelines of WMB as described herein. The HELs were underwritten by WMB using automated underwriting systems.

WMB's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as

collateral. Some HELs are manually underwritten, in which case an underwriter reviews information submitted by the borrower and supporting documentation, if required, and a credit report of the borrower, and based on that review determines whether to originate a loan in the amount and with the terms requested by the borrower. Some HELs are underwritten through WMB's automated underwriting system, described below.

Prospective borrowers are required to provide details about their financial factors such as their assets, liabilities and related monthly expenses, as well as income and employment information. Borrowers may provide this information by electronic transmission to a bank representative who inputs the information directly into the lending system. Each borrower also provides an authorization to access a credit report that summarizes the borrower's credit history.

### Evaluation of the Borrower's Credit Standing

To evaluate a prospective borrower's credit history, the loan underwriter obtains a credit report relating to the borrower from one or more credit reporting agencies. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments. In most cases, the credit report provides a credit score (each, a *"Credit Score"*) for the borrower. Credit Scores are designed to assess a borrower's creditworthiness and likelihood to default on an obligation over a defined period (usually two to three years) based on a borrower's credit history. Credit Scores do not necessarily correspond to the probability of default over the life of a HEL because they reflect past credit history, rather than an assessment of future payment performance. Credit Scores range from approximately 350 to approximately 850, with higher scores indicating more favorable credit history. In the case of co-borrowers, the Credit Score for the primary borrower is typically used, unless the co-borrower has a Credit Score that is 40 points lower than that of the primary borrower, in which case the lower score is then used. The primary borrower is determined by the applicant at the time the borrowing request is made. Minimum Credit Scores are required for some loan products and loan programs. Credit Scores may not be available for some borrowers.

### Evaluation of the Borrower's Repayment Ability

In evaluating a prospective borrower's ability to repay a HEL, the loan underwriter considers the ratio of the borrower's total monthly debt (including non-housing expenses) to the borrower's gross income (referred to as the *"debt-to-income ratio"* or *"back-end ratio"*). The maximum acceptable ratios may vary depending on other loan factors, such as loan amount and loan purpose, loan-to-value ratio, credit score and the availability of other liquid assets. Exceptions to the ratio guidelines may be made when compensating factors are present.

### Evaluation of the Adequacy of the Collateral

The adequacy of the property being pledged as collateral generally is determined by an appraisal made in accordance with pre-established appraisal guidelines. At origination, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation, and are made on forms acceptable to the Federal National Mortgage Association and/or the Federal Home Loan Mortgage Corporation. Appraisers may be staff appraisers employed by WMB or independent appraisers selected in accordance with the pre-established appraisal guidelines. Such guidelines generally require that the appraiser, or an agent on its behalf, personally inspect the property and verify whether the property is in adequate condition and, if the property is new construction, whether it is substantially completed. However, in the case of HELs underwritten through WMB's automated underwriting system, an automated valuation method (*"AVM"*) may be used in lieu of a traditional appraisal. The AVM relies on public records regarding the encumbered property and/or neighboring properties and statistically derives a value using that information. If AVMs are used, they comply with the requirements of the Financial Institutions Reform and Recovery Act of 1989, as amended, and are independently verified

periodically. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property.

Title insurance or alternative services (*e.g.,* lien insurance) are required for all HELs. Certain of the HELs owned by Asset Trust I involve the use of *"alternative services".* These services consist of three services (including property reports and recording services) and are used in lieu of title insurance, endorsements and title company services. Alternative services may be used in certain circumstances including in connection with first liens that are being granted to a lender other than in connection with the purchase of a home; or in connection with loans made to borrowers who already own, on a free and clear basis, the property being used as collateral to secure the loan in question. Alternative services provide a low-cost alternative to standard title insurance and provide acceptable risk coverage in the event of default.

### Documentation Programs

Each HEL owned by Asset Trust I was underwritten using either WMB's full income documentation program or its stated income program. Under WMB's full documentation program, the prospective borrower's stated income is verified through receipt of the borrower's most recent pay stub and most recent W-2 form, or by using a written Verification of Employment form completed by the borrower's employer. In the case of self-employed borrowers or borrowers with more than 25% of their income from commissions, two years of personal (and, if applicable, business) tax returns. For self-employed borrowers, profit and loss statements may also be required.

Under WMB's stated income program, the prospective borrower's income and assets either are not required to be obtained or are obtained but not verified. Eligibility criteria and the amount of the loan are determined by an automated underwriting system. Purchase loans as well as refinance loans may be eligible for participation in WMB's stated income program.

A credit report for the borrower generally is required for all HELs underwritten under either program.

### Exceptions to Program Parameters

Exceptions to WMB's loan program parameters may be made on a case-by-case basis if compensating factors are present. In those cases, the basis for the exception is documented, and in some cases the approval of a senior underwriter is required. Compensating factors may include, but are not limited to, low loan-to-value ratio, good credit standing, the availability of other liquid assets and stable employment.

### Automated Underwriting System

Currently, all HELs originated by WMB utilize a proprietary automated underwriting system known as *"SUCCESS".* Based on the borrower's credit report and the information provided by the borrower, the system either (i) approves the loan, which approval may involve relief from certain documentation otherwise required for manual underwriting or be subject to the satisfaction of specified conditions, which may include the receipt of additional documentation, (ii) refers the loan application to an underwriter for manual underwriting, or (iii) declines the file based on predetermined eligibility criteria. In making the underwriting decision, SUCCESS distinguishes among different levels of credit standing, based on a proprietary custom score model, the borrower's Credit Score, and specific policies, application and loan characteristics. WMB has developed these credit standing levels based on a statistical analysis of the past performance of its portfolio of home equity loans. WMB has used analysis of the past performance of its portfolio of home equity loans. WMB has used SUCCESS to underwrite HELs since May 2001. WMB regularly evaluates and validates SUCCESS and to date has completed all required compliance and fair lending evaluations in a satisfactory manner. WMB

periodically upgrades its proprietary automated underwriting system. SUCCESS was last upgraded in November 2004.

### Quality Control Review

WMB's credit risk oversight department conducts quality control reviews of statistical samplings of previously originated HELs on a regular basis.

### Credit Risk Management Policies

Credit risk within the WMI Group is managed by means of a broad set of policies and principles contained in its credit policy. The Chief Credit Officer is responsible for overseeing the work of a credit policy committee, monitoring the quality of the WMI Group's credit portfolio, determining the reasonableness of the WMI Group's allowance for loan losses, reviewing and approving large credit exposures and setting underwriting criteria for credit-related products and programs. Credit risk management is based on analyzing the creditworthiness of the borrower, the adequacy of the underlying collateral given current events and conditions and the existence and strength of any guarantor support.

Credit risk assessment is a process that requires the evaluation of numerous factors, many of which are qualitative. Process integrity relies on the ability of the WMI Group's lending personnel to analyze all risk elements. It also depends on maintaining risk rating accuracy by recognizing changing elements of credit risk and promptly initiating risk rating changes.

### Conflicts of Interest Policies

Pursuant to WMB's code of ethics (the *"Code of Ethics"*), WMB extends credit to borrowers only when the extension of credit is financially reasonable for both WMB and the borrower in question. Pursuant to the Code of Ethics, lending personnel cannot permit personal relationships or other considerations to influence lending decisions, and cannot approve extensions of credit to, or be involved in the funding or auditing of any loans made to family or friends.

## Servicing and the Asset Trust I Servicer

### General

All of the HELs owned by Asset Trust I are serviced by WMB, as the Asset Trust I Servicer, pursuant to the Asset Trust I Pooling and Servicing Agreement. WMB has possession of the mortgage files (*i.e.,* the credit reports, servicing documents, etc.) in its capacity as Asset Trust I Servicer and the Asset Trust I Loan Documents in its capacity as Asset Trust I Custodian.

The Asset Trust I Pooling and Servicing Agreement provides that WMB may not resign from its obligations and duties thereunder as Asset Trust I Servicer except upon a determination that its duties thereunder are no longer permissible under applicable law. No such resignation will become effective until a successor Asset Trust I Servicer has assumed WMB's servicing obligations and duties under the Asset Trust I Pooling and Servicing Agreement. If the Asset Trust I Servicer resigns, the Company, subject to the terms of the Asset Trust I Pooling and Servicing Agreement, will appoint a successor Asset Trust I Servicer.

The Asset Trust I Servicer receives a fee for its services as Asset Trust I Servicer under the Asset Trust I Pooling and Servicing Agreement. The servicing fee is calculated as a per annum percentage for each HEL based on the principal balance for such HEL. The servicing fee with respect to each such HEL equals 0.125% *per annum* and is paid monthly. The Asset Trust I Servicer is entitled to retain certain ancillary fees and charges, including, but not limited to, any prepayment fees, insufficient funds fees, modification fees, payoff statement fees and late charges with respect to the HELs as additional servicing compensation and is also entitled to certain income generated by permitted investments made with collections on the HELs. The Asset Trust I Servicer generally pays

all expenses incurred in connection with its responsibilities as Asset Trust I Servicer under the Asset Trust I Pooling and Servicing Agreement (subject to reimbursement for certain expenses and advances, including those incurred by it in connection with the liquidation of defaulted HELs, the restoration of damaged mortgaged properties, and payments by the Asset Trust I Servicer for taxes and insurance premiums with respect to mortgaged properties).

Any person into which the Asset Trust I Servicer may be merged, converted or consolidated, or any person resulting from any merger, conversion or consolidation to which the Asset Trust I Servicer is a party will be the successor Asset Trust I Servicer under the Asset Trust I Pooling and Servicing Agreement.

The Asset Trust I Servicer may outsource to third party vendors some servicing functions, as described under "— The Asset Trust I Servicer — Servicing Procedures — The Asset Trust I Servicer's Third Party Vendors and Service Providers" below.

### The Asset Trust I Servicer

#### The Asset Trust I Servicer's Servicing Experience

WMB, including its predecessors in interest, has been servicing loans secured by real estate or other property for over 100 years. The home equity loans serviced by WMB include closed-end fixed and adjustable rate home equity loans and open-end home equity lines of credit. The HELs in WMB's portfolio have been originated or acquired by WMB.

The following table shows the number and aggregate unpaid principal balance of HELs serviced by the Asset Trust I Servicer as of December 31 for each of the most recent three years:

#### Closed-end Home Equity Loans Serviced by the Asset Trust I Servicer[1]

| | September 30 | December 31 | | |
|---|---|---|---|---|
| | 2007 | 2006 | 2005 | 2004 |
| | | *(Dollars in thousands)* | | |
| Number of Closed-End Home Equity Loans Serviced by WMB . . . . . . . . . . . | 133,811 | 133,146 | 134,181 | 143,033 |
| Aggregate Unpaid Principal Balance . . . . | $8,144,446 | $8,197,747 | $8,617,244 | $9,502,897 |

[1] In April of 2007, WMB reclassified home equity loans it had purchased from third parties as subprime home equity loans rather than closed-end home equity loans on its balance sheet. In July 2007, WMB reclassified fixed-rate loan option loans as home equity lines of credit rather than as closed-end home equity loans on its balance sheet. This table reflects the closed-end home equity loans, as currently defined by WMB for purposes of its balance sheet, serviced by the Asset Trust I Servicer. None of the HELs held by Asset Trust I were or are subject to reclassification as subprime home equity loans or home equity lines of credit.

#### Servicing Procedures

**Servicing Functions.** The functions performed by the Asset Trust I Servicer under the Asset Trust I Pooling and Servicing Agreement include, among other servicing functions, payment collection, payment application, and default management. The Asset Trust I Servicer performs its servicing functions at loan servicing centers located in Melbourne, Florida; San Antonio, Texas; Stockton, California; Chatsworth, California; and Seattle, Washington.

**Servicing Standard; Waivers and Modifications.** Pursuant to the Asset Trust I Pooling and Servicing Agreement, the Asset Trust I Servicer is required to service the HELs owned by Asset Trust I, consistent with prudent first lien, closed-end home equity loan servicing practices and (unless inconsistent with those servicing practices) in the same manner in which, and with the same care, skill, prudence and diligence with which, it services and administers similar HELs for its own portfolio.

The Asset Trust I Servicer is required to make reasonable efforts to collect or cause to be collected all payments under the HELs and, to the extent consistent with the Asset Trust I Pooling and Servicing Agreement and applicable insurance policies, follow such collection procedures as are followed with respect to comparable HELs that are held in portfolios of responsible mortgage lenders in the local areas where each mortgaged property is located. Under the terms of the Asset Trust I Pooling and Servicing Agreement, the servicing standard applicable to the Asset Trust I Servicer may only be modified with the consent of the Company.

Under the terms of the Asset Trust I Pooling and Servicing Agreement, the Asset Trust I Servicer (subject to certain conditions) may waive, modify or vary any term of any HEL or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to the applicable obligor if it has determined, exercising its good faith business judgment in the same manner as it would if it were the owner of the related HEL, that the security for, and the timely and full collectability of, such HEL would not be adversely affected by such waiver, modification, postponement or indulgence, and may make certain other modifications with respect to the HELs and the related property in accordance with the terms of the Asset Trust I Pooling and Servicing Agreement.

***Loan Servicing System.*** In performing its servicing functions, the Asset Trust I Servicer generally uses computerized loan servicing systems. The Asset Trust I Servicer leases its primary servicing system from AMS-CGI (known as *"Advanced Consumer Lending System"* or *"ACLS"*). ACLS produces detailed information about the financial status of each HEL, including outstanding principal balance, current interest rate, outstanding fees and information about transactions that affect the HEL, including the amount and due date of each payment, the date of receipt of each payment, and how the payment was applied. ACLS works in conjunction with AMS-CGI's Computer Automated Collection System (*"CACS"*) to monitor payment collections and to provide default collection activity information regarding delinquent consumer loans. The Asset Trust I Servicer began using ACLS in 2003. Prior to November 2003, the Asset Trust I Servicer serviced equity HELs using an ALLTEL loan servicing system; in November 2003, the Asset Trust I Servicer transferred servicing onto the ACLS servicing platform by converting approximately 948,000 loan records from the ALLTEL loan servicing system to ACLS.

***Collections and Distributions.*** Under the terms of the Asset Trust I Pooling and Servicing Agreement, collections with respect to the HELs are collected by the Asset Trust I Servicer and initially deposited into accounts controlled by the Asset Trust I Servicer and may be commingled with funds with respect to other HELs or mortgage loans serviced or owned by the Asset Trust I Servicer. The Asset Trust I Servicer is required to deposit collections received with respect to the HELs owned by Asset Trust I into a certificate account controlled by the Asset Trust I Trustee under the Asset Trust I Pooling and Servicing Agreement on a monthly basis. The amount of collections required to be remitted to the Asset Trust I Trustee in any given monthly deposit is determined by the timing of the Asset Trust I Servicer's receipt of collections and the type of collections they represent. In accordance with the terms of the Asset Trust I Pooling and Servicing Agreement, the Asset Trust I Servicer may retain certain amounts with respect to expenses and advances from collections or apply them towards the costs of certain costs and permitted expenses connected with the servicing of the HELs. The Asset Trust I Servicer is neither permitted nor required to make servicer advances to cover any gap between scheduled payments on the HELs and the actual collections thereon in any given period.

Subject to the terms and conditions set forth in the Asset Trust I Pooling and Servicing Agreement, on a monthly basis the Asset Trust I Trustee distributes collections deposited in the certificate account to the Company, as holder of the Asset Trust I Class A Trust Certificate, less (a) fees, expenses and indemnities payable to the Asset Trust I Trustee and the Asset Trust I Delaware Trustee and (b) fees and certain other amounts payable to the Asset Trust I Servicer. No amounts will be payable from collections with respect to the Asset Trust I Class R Trust Certificate.

Under the terms of the Asset Trust I Pooling and Servicing Agreement, collections with respect to the HELs may be invested in certain permitted investments prior to their distribution to the

Company, as holder of the Asset Trust I Class A Trust Certificate. The Asset Trust I Servicer is entitled to retain any investment income produced by such investment as additional servicing compensation.

*Servicing of Delinquent HELs; Foreclosure.* The Asset Trust I Servicer is required under the terms of the Asset Trust I Pooling and Servicing Agreement to make reasonable efforts to collect or cause to be collected all payments on the HELs owned by Asset Trust I that are 16 or more days delinquent. Strategic decisions regarding early stage collection efforts are guided by Experian's Strategic Account Management System, Probe©. Early stage collections, in other words, collections beginning on the 16th day of delinquency and continuing through the 89th day of delinquency, are conducted primarily through the use of automated outbound collection telephone calls and debt collection letters. Late stage collections, or collection efforts taking place from the 90th day and through the 180th day of delinquency, are segregated in CACS by risk and a combination of manual and automated collection efforts are used. CACS also segregates delinquent accounts by status, including bankruptcy, probate, foreclosure, real-estate-owned and "special activities" (*e.g.,* consumer credit counseling and recovery). These collection efforts are carried out by personnel who specialize in debt collection and recovery. Such efforts may include payment reminder telephone calls to the borrower, letter campaigns, drive-by property inspections and other collection activities permissible under the Asset Trust I Loan Documents and applicable law.

The Asset Trust I Servicer is required under the Asset Trust I Pooling and Servicing Agreement to foreclose upon the mortgaged property related to each defaulted HEL as to which no satisfactory arrangements can be made for collection of delinquent payments. Under the Asset Trust I Pooling and Servicing Agreement, the Asset Trust I Servicer is permitted, in lieu of foreclosure, if prudent to do so and taking into account the desirability of maximizing net liquidation proceeds, to accept a payment of less than the outstanding principal balance of the defaulted HELs. The Asset Trust I Servicer is not permitted to foreclose upon a mortgaged property if it is aware of evidence of toxic waste or other environmental contamination on the mortgaged property and it determines that it would be imprudent to foreclose.

*Insurance.* The Asset Trust I Servicer maintains a blanket hazard policy for all HELs. In addition, the Asset Trust I Servicer tracks all HELs for compliance with applicable law regarding flood insurance coverage. When necessary, the Asset Trust I Servicer "force places" flood insurance policies.

### Limitations on the Asset Trust I Servicer's Liability

The Asset Trust I Pooling and Servicing Agreement provides that neither the Asset Trust I Servicer nor any director, officer, employee or agent of the Asset Trust I Servicer (the *"Asset Trust I Servicer Indemnified Parties"*) is under any liability to Asset Trust I, the Company or the holders of the Asset Trust I Class A Trust Certificate and the Asset Trust I Class R Trust Certificate or others for any action taken (or not taken) by any Asset Trust I Servicer Indemnified Party in good faith pursuant to the Asset Trust I Pooling and Servicing Agreement, or for errors in judgment; *provided, however,* that the Asset Trust I Servicer is not protected against any liability that would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties thereunder. The Asset Trust I Pooling and Servicing Agreement further provides that any Asset Trust I Servicer Indemnified Party is entitled to indemnification by Asset Trust I and will be held harmless against any loss, liability or expense incurred in connection with any legal action relating to the Asset Trust I Pooling and Servicing Agreement or the certificates issued thereunder (except any such loss, liability, or expense otherwise reimbursable pursuant to the Asset Trust I Pooling and Servicing Agreement) and any loss, liability or expense incurred by reason of willful misfeasance, bad faith or gross negligence in the performance of duties thereunder or by reason of reckless disregard of obligations and duties thereunder. In addition, the Asset Trust I Pooling and Servicing Agreement provides that the Asset Trust I Servicer is not under any obligation to appear in, prosecute or defend any legal action that is not incidental to its responsibilities under the Asset Trust I Pooling and Servicing Agreement and that in its opinion may

involve it in any expense or liability. The Asset Trust I Servicer may, however, in its discretion, undertake any such action that it may deem necessary or desirable with respect to the Asset Trust I Pooling and Servicing Agreement and the rights and duties of the parties thereto and the interests of the holders of the Asset Trust I Class A Trust Certificate and the Asset Trust I Class R Trust Certificate. In such event, the legal expenses and costs of such action and any liability resulting therefrom will be expenses, costs and liabilities of Asset Trust I, and the Asset Trust I Servicer will be entitled to be reimbursed therefor and to charge the certificate account.

*Asset Trust I Servicer Termination and Replacement.* Under the terms of the Asset Trust I Pooling and Servicing Agreement, after the occurrence of any one of several typical Asset Trust I Servicer termination events, including but not limited to a receivership with respect to the Asset Trust I Servicer or (subject to the expiration of typical grace periods and materiality requirements) the failure by the Asset Trust I Servicer to make required deposits to the certificate account, the Company may remove the Asset Trust I Servicer. If the Asset Trust I Servicer is removed by the Company, the Company shall have the sole power to appoint a replacement Asset Trust I Servicer.

*The Asset Trust I Servicer's Third Party Vendors and Service Providers.* Under the Asset Trust I Pooling and Servicing Agreement, the Asset Trust I Servicer may perform its servicing responsibilities through agents or independent contractors, but will not thereby be released from any of its responsibilities thereunder. The Asset Trust I Servicer outsources some of its responsibilities pursuant to these provisions, that may include some or all of the following: (i) management of foreclosure actions, (ii) monitoring of borrower bankruptcy proceedings, (iii) preservation of properties related to delinquent loans, (iv) processing of primary mortgage insurance claims, (v) maintenance, marketing and sale of real-estate-owned properties, (vi) assuring that hazard insurance coverage is maintained, (vii) determining whether flood insurance coverage is required and assuring that any required coverage is maintained, (viii) tax bill procurement and tracking of delinquent tax payments, (ix) printing and mailing billing statements, (x) depositing borrower payments into lockbox accounts, (xi) performing certain calculations with respect to scheduled and actual collections, (xii) performing certain tax related calculations, (xiii) performing calculations with respect to monthly distributions from Asset Trust I and (xiv) performing reporting functions required under the Asset Trust I Pooling and Servicing Agreement. From time to time, the Asset Trust I Servicer may cease to outsource one or more of the foregoing servicing functions or may choose to outsource additional servicing functions. Some vendors may perform more than one function, and some functions may be performed by more than one vendor.

### The Asset Trust I Servicer's Quality Control Procedures

The Asset Trust I Servicer uses a combination of management controls and technology controls to ensure the accuracy and integrity of servicing records. Management controls include the use of approval levels, the segregation of duties, and reconciliations of servicing data and accounts, among others. Technology controls include the use of data security controls and interface controls to ensure that only authorized persons have the ability to access and change system data or to submit data to or receive data from vendors and investors. Specific security profiles for each job function include a predetermined set of data security controls that are appropriate for that job function. The regional data center for the ACLS Server, which is located in Seattle, Washington, is kept in a fire resistant environment, and commercial electrical power is backed up by generators.

In addition, the Asset Trust I Servicer conducts periodic internal audits of critical servicing and technology functions. External audits by entities such as the OTS and certain third party mortgage guarantors and the annual examination by WMI's independent accountants in connection with their audit of WMI and its subsidiaries may provide independent verification of the adequacy of such functions.

The Asset Trust I Servicer maintains detailed business continuity plans so that it can resume critical business functions in the event of a disaster or other serious system outage, which plans are

reviewed and updated periodically. The Asset Trust I Servicer is obligated to return to full system functionality within 48 hours of a reported system outage. The Asset Trust I Servicer performs annual disaster recovery tests in which it reroutes data and servicing system operations to the designated back-up site, and then processes sample transactions from all servicing locations to ensure the functionality of such back-up site.

It is the Asset Trust I Servicer's policy to require its other third party vendors to implement measures similar to those described above to ensure the accuracy and integrity of servicing records.

**The Asset Trust I Custodian**

Washington Mutual Bank acts as custodian (the *"Asset Trust I Custodian"*) for Asset Trust I pursuant to a Custody Agreement dated as of March 7, 2006 (the *"Asset Trust I Custody Agreement"*), among the Asset Trust I Trustee, the Asset Trust I Servicer and the Asset Trust I Custodian. The Asset Trust I Custodian holds the notes, mortgages and other legal documents related to the HELs (collectively, the *"Asset Trust I Loan Documents"*) for the benefit of the Asset Trust I Trustee. The Asset Trust I Custodian maintains the Asset Trust I Loan Documents in secure and fire resistant facilities. The mortgage files held by the Asset Trust I Servicer have not been physically segregated from Asset Trust I Loan Documents in the Asset Trust I Custodian's custody but are kept in shared facilities. The Asset Trust I Custodian has reviewed the Asset Trust I Loan Documents related to each HEL and delivered to the Asset Trust I Trustee a certification to the effect that, except as noted in such certification, all required documents have been executed and received.

In the event of the termination of the Asset Trust I Custody Agreement, the Asset Trust I Custodian will be required to deliver the Asset Trust I Loan Documents in the Asset Trust I Custodian's custody to the Asset Trust I Trustee or any successor Asset Trust I Custodian appointed by the Company.

The Asset Trust I Servicer may, but does not currently, pay the Asset Trust I Custodian a fee for its services under the Asset Trust I Custody Agreement from time to time. Payment of this fee will not affect dividends to the Company.

## ASSET TRUST II

### General

WAMU 2006-OA1 ("*Asset Trust II*") is a statutory trust formed under the laws of the State of Delaware pursuant to a trust agreement between the Company, as depositor, and Deutsche Bank Trust Company Delaware, as Delaware trustee. The Asset Trust II Pooling and Servicing Agreement, dated as of December 13, 2006 (the "*Asset Trust II Pooling and Servicing Agreement*"), among the Company, as depositor, WMB, as servicer (the "*Asset Trust II Servicer*"), Deutsche Bank Trust Company Delaware, as Delaware trustee (the "*Asset Trust II Delaware Trustee*") and Deutsche Bank National Trust Company, as trustee (the "*Asset Trust II Trustee*"), restates the initial trust agreement and is the governing instrument of Asset Trust II.

Asset Trust II does not own any assets other than the Option ARMs and the other assets described below. Asset Trust II does not have any liabilities other than those incurred in connection with the Asset Trust II Pooling and Servicing Agreement and any related agreement. Asset Trust II does not have any directors, officers or other employees. No equity contribution has been made to Asset Trust II by WMB, the Company or any other party, except for a *de minimis* contribution made by the Company, as depositor, pursuant to the initial trust agreement, and Asset Trust II does not have any other capital. The fiscal year end of Asset Trust II is December 31. Asset Trust II acts through the Asset Trust II Trustee and the Asset Trust II Delaware Trustee, whose fees and reasonable expenses are paid or reimbursed by the Asset Trust II Servicer.

For purposes of this offering circular with respect to the underwriting, origination and servicing of the Option ARMs in Asset Trust II, references to WMB include WMB, originators acquired by WMB and WMB's subsidiaries.

### General Description of Assets

The assets of Asset Trust II are Option ARMs that had, as of November 14, 2006, an aggregate unpaid principal balance of approximately $2,899,877,211, together with payments received thereon and certain other investments. The Option ARMs were originated by WMB. A portion of the Option ARMs were contributed to the Company by University Street, the owner of all the Company's common interests. As of September 30, 2007, the Option ARMs held by Asset Trust II had an aggregate unpaid principal balance of approximately $1,664,792,954.

The interest rate for substantially all Option ARMs is fixed for a specified initial period, and is then adjusted on a monthly basis based on its index. The index for substantially all Option ARMs is a per annum rate equal to the twelve-month moving average monthly yield on United States Treasury Securities adjusted to a constant maturity of one year ("*One-Year MTA*" or the "*Index*"), as published by the Board of Governors of the Federal Reserve System in the Federal Reserve Statistical Release "Selected Interest Rates (H.15)", determined by averaging the monthly yields for the most recently available twelve months. The One-Year MTA figure used for each interest rate adjustment date is the most recent One-Year MTA figure available as of fifteen days before that date.

If One-Year MTA is no longer available, the Asset Trust II Servicer will choose a new index that is based on comparable information. When the Asset Trust II Servicer chooses a new index, it will increase or decrease the margin on substantially all Option ARMs by the difference between the average of One-Year MTA for the final three years it was in effect and the average of the replacement index for the most recent three years. The margin will be increased by that difference if the average of One-Year MTA is greater than the average of the replacement index, and the margin will be decreased by that difference if the average of the replacement index is greater than the average of One-Year MTA. The new margin will be rounded up as provided in the related mortgage note.

After an initial fixed-rate period of one or three months, the mortgage interest rate on substantially all Option ARMs is adjusted monthly to equal the sum of the applicable index and the per annum

rate (the *"Margin"*) specified in the applicable mortgage note. As of September 30, 2007, the Margin rates applicable to the mortgage loans in the Asset Trust II had a weighted average of approximately 2.68% and range from 1.80% to 4.50% per annum. The mortgage loans in the Asset Trust II are subject to Lifetime Rate Caps, with a weighted average of approximately 10.04% and ranging from 8.95% to 14.35% per annum. Generally, during the initial fixed rate period of an Option ARM, mortgagors are required to pay a minimum monthly payment that, in some cases, will not fully amortize the mortgage loan. Each month thereafter, mortgagors are given one or more payment options, which may include a payment amount less than, equal to or greater than a fully amortizing monthly payment. Whether an Option ARM with a negative amortization feature is repaid on a fully-amortizing basis depends on the payment option selected by the mortgagor on each monthly payment date. If the minimum monthly payment in a given month is less than the amount of accrued and unpaid interest on the mortgage loan, the excess interest will be added to the outstanding principal balance of the mortgage loan in the form of negative amortization (*"Negative Amortization"*). The maximum Negative Amortization (the *"Negative Amortization Cap"*) of substantially all the Option ARMs in Asset Trust II ranges from 110% to 125% of the original principal balance. On the earlier of the sixty-first month or the month in which the Negative Amortization Cap is reached, mortgagors are required to make fully amortizing payments.

As of September 30, 2007, the average current, unpaid principal balance of the Option ARMs was approximately $440,888, with a minimum current, unpaid principal balance of approximately $979 and a maximum current, unpaid principal balance of approximately $9,195,090. The Option ARMs have various original maturities ranging from 15 years to 40 years and were, on average, originated within the last 34 months. The majority of the Option ARMs were underwritten under WMB's reduced documentation program (described below); as of September 30, 2007, approximately 29.07% of the Option ARMs were underwritten under WMB's full documentation program (described below). As of September 30, 2007, the current weighted average loan-to-value ratio was approximately 70.05% and the weighted average loan-to-value ratio at origination was approximately 68.86%. The mortgage loans in the Asset Trust II have a weighted average Credit Score of approximately 738. The majority of the properties underlying the Option ARMs are owner occupied with approximately 28.93% of the properties non-owner occupied. Of the Option ARMs in Asset Trust II, approximately 46.68% are cash-out refinances, approximately 40.03% are purchase loans and approximately 13.29% are rate/term refinances. The Option ARMs are geographically concentrated in California (approximately 73.19%).

## Acquisition of the Option ARMs and Related Transactions

Contemporaneously with the issuance of the Series 2006-C Company Preferred Securities, WMB contributed a pool of Option ARMs to the Company in exchange for the Series 2006-C Company Preferred Securities. In addition, University Street contributed a pool of Option ARMs to the Company as a capital contribution. The aggregate value of these contributions was approximately $2,899,877,211, calculated as of November 14, 2006.

The Company contributed to Asset Trust II all of the Option ARMs it received from WMB and University Street. This contribution was made in exchange for the Class A-1 2006-OA1 Certificate (the *"Asset Trust II Class A Trust Certificate"*) and the Class R 2006-OA1 Certificate (the *"Asset Trust II Class R Trust Certificate"*). For United States federal income tax purposes, the Asset Trust II Class A Trust Certificate represented the sole class of regular interests in Asset Trust II, and the Asset Trust II Class R Trust Certificate represented the sole class of residual interests in Asset Trust II. The Company retained the Asset Trust II Class A Trust Certificate and transferred the Asset Trust II Class R Trust Certificate to WMB.

Asset Trust II owns the right to receive all payments of principal and interest on the Option ARMs due after November 30, 2006. A schedule to the Asset Trust II Pooling and Servicing Agreement included information about each of the Option ARMs, including:

- the outstanding principal balance as of the close of business on November 30, 2006;

- the term of the Option ARM; and

- the applicable interest rate as of the close of business on November 30, 2006.

The notes relating to the Option ARMs have not been endorsed to Asset Trust II and no assignments to Asset Trust II of the mortgages securing the Option ARMs were prepared. WMB, in its capacity as initial Asset Trust II Custodian, has possession of and reviews such notes and the Option ARMs as custodian for Asset Trust II and financing statements were filed evidencing Asset Trust II's interest in the Option ARMs.

In exchange for the Option ARMs and the other assets described above, the Asset Trust II Trustee authenticated and delivered the Asset Trust II Class A Trust Certificate and the Asset Trust II Class R Trust Certificate pursuant to the Company's order.

## Description of the Portfolio

### General

The majority of Option ARMs in the portfolio of Asset Trust II consist of payment-option adjustable rate mortgage loans with a negative amortization feature secured by a first lien, fee simple or leasehold interest in a one-to-four-family residential property or shares of stock relating to cooperative apartments. Such residences include detached homes, duplexes, triplexes, fourplexes, townhomes, individual condominium units, individual units in planned unit developments and other attached dwelling units that are part of buildings consisting of no more than four units. As of September 30, 2007, 2.59% of the Option ARMs in Asset Trust II were 30 days or more delinquent, 1.33% were 60 days or more delinquent and 0.72% were 90 days or more delinquent. Because no delinquent Option ARMs were initially included in the Company's Portfolio, the foregoing delinquency data is therefore limited in its scope. There can be no assurance that delinquencies with respect to the Option ARMs will not increase in the future. See "Risk Factors — Risks Relating to the Mortgage Loans — General economic conditions in the United States could change and possible resulting changes in delinquency rates of the Mortgage Loans could negatively impact the Company's financial condition, results of operations and ability to pay dividends".

The tables in Appendix C to this offering circular represent information as of September 30, 2007 with respect to the Option ARMs included in the portfolio of Asset Trust II.

## Underwriting

### General

The Option ARMs owned by Asset Trust II were, in all material respects, originated in accordance with the underwriting guidelines of WMB as described herein. The Option ARMs were underwritten by WMB.

WMB's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Some Option ARMs are manually underwritten, in which case an underwriter reviews information submitted by the borrower and supporting documentation, if required, and a credit report of the borrower, and based on that review determines whether to originate a loan in the amount and with the terms requested by the borrower. Some Option ARMs are underwritten through WMB's automated underwriting system, described below.

### Evaluation of the Borrower's Credit Standing

To evaluate a prospective borrower's credit history, the loan underwriter obtains a credit report relating to the borrower from one or more credit reporting agencies. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments. In most cases the credit report provides a Credit Score for the borrower. Credit Scores are designed to assess a borrower's creditworthiness and likelihood to default on an obligation over a defined period (usually two to three years) based on a borrower's credit history. Credit Scores do not necessarily correspond to the probability of default over the life of an Option ARM because they reflect past credit history, rather than an assessment of future payment performance. Credit Scores range from approximately 350 to approximately 850, with higher scores indicating more favorable credit history. If the loan underwriter obtains credit scores from three credit reporting companies, the middle score generally is used, and if two credit scores are obtained, the lower score generally is used. In the case of co-borrowers, the credit score for the borrower with the lowest credit score generally is used (determined for each borrower as described in the immediately preceding sentence). Minimum credit scores are required for some loan products and loan programs. For borrowers for which credit scores are not available, the loan underwriter will require alternative documentation indicating the borrower's creditworthiness, such as rental or utility payment history or payment history on other debt.

### Evaluation of the Borrower's Repayment Ability

In evaluating a prospective borrower's ability to repay an Option ARM, the loan underwriter considers the ratio of the borrower's total monthly debt (including non-housing expenses) to the borrower's gross income (referred to as the *"debt-to-income ratio"* or *"back-end ratio"*). The maximum acceptable ratios may vary depending on other loan factors, such as loan amount and loan purpose, loan-to-value ratio, credit score and the availability of other liquid assets. Exceptions to the ratio guidelines may be made when compensating factors are present.

For purposes of calculating the "front end" and "back end" ratios for certain Option ARMs, the borrower's monthly mortgage debt is determined based on the fully indexed rate and a predetermined factor as set by WMB's credit department from time to time (which rate may be greater than the rate in effect for the Option ARM during the initial fixed-rate period). In addition, for purposes of calculating these ratios for an Option ARM with a 40-year term, the borrower's monthly mortgage debt is determined based on 30-year term.

### Evaluation of the Adequacy of the Collateral

The adequacy of the Option ARM as collateral generally was determined by an appraisal made in accordance with pre-established appraisal guidelines. At origination, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation, and are made on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by WMB or independent appraisers selected in accordance with the pre-established appraisal guidelines. Such guidelines generally require that the appraiser, or an agent on its behalf, personally inspect the property and verify whether the property is in adequate condition and, if the property is new construction, whether it is substantially completed. However, in the case of Option ARMs underwritten through WMB's auto-mated underwriting system, an automated valuation method may be used, under which the appraiser does not personally inspect the property but instead relies on public records regarding the mortgaged property and/or neighboring properties. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property. For Option ARMs underwritten under WMB's streamline documentation programs, the appraisal guidelines in some cases permit the appraisal obtained for an existing Option ARM to be used. Title insurance is required for all Option ARMs, except that for Option ARMs secured by shares of cooperative

apartments, title insurance is not required for the cooperative apartment building (but a lien search is provided by the title company). Specific additional title insurance coverage is required for some types of Option ARMs.

## Documentation Programs

Each Option ARM owned by Asset Trust II was underwritten under one of WMB's documentation guidelines for verification of the borrowers' stated income and assets. Under WMB's full/alternative documentation program, the prospective borrower's stated income is verified through receipt of the borrower's most recent pay stub and most recent W-2 form, or by using a written Verification of Employment form completed by the borrower's employer. In the case of self-employed borrowers or borrowers with more than 25% of their income from commissions, two years of personal (and, if applicable, business) tax returns. For self-employed borrowers, profit and loss statements may also be required. Under the full/alternative documentation program, the borrower's stated assets are verified through receipt of the borrower's two most recent bank or brokerage statements. In addition, the borrower's employment may be verified with the employer by telephone or by other independent means.

The WMB low documentation program places increased reliance on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and (in some cases) the borrower's assets. It is available to borrowers with certain loan-to-value ratios, loan amounts and credit scores. Under this program, the income as stated in the borrower's loan application is not verified, although the borrower's employment may be verified by telephone. The borrower's stated income must be reasonable for the borrower's occupation and assets (as determined in the underwriter's discretion). Assets may be verified for higher risk transactions and when exceptions are approved, such as when specific loan-to-value ratios or loan amount limits are exceeded.

A credit report for the borrower generally is required for all mortgage loans underwritten under WMB's full/alternative and low documentation programs.

## Exceptions to Program Parameters

Exceptions to WMB's loan program parameters may be made on a case-by-case basis if compensating factors are present. In those cases, the basis for the exception is documented, and in some cases the approval of a senior underwriter (who is an employee of WMB) is required. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit standing, the availability of other liquid assets, stable employment and time in residence at the prospective borrower's current address.

## Automated Underwriting System

Some mortgage loans originated through the sponsor's retail and wholesale lending divisions have been underwritten in whole or in part through the sponsor's proprietary automated underwriting system, known as Enterprise Decision Engine or "EDE". Based on the borrower's credit report and the information in the borrower's loan application, the system either (a) approves the loan, which approval may involve relief from certain documentation otherwise required for manual underwriting or be subject to the satisfaction of specified conditions, which may include the receipt of additional documentation, or (b) refers the loan application to an underwriter for manual underwriting. In making the underwriting decision, EDE evaluates the borrower's default risk based on both the credit score and characteristics of the loan. The sponsor has been using EDE for underwriting of mortgage loans since January 2005. The version of EDE used by the sponsor through October 2006 was developed based on a statistical analysis of the past performance of approximately 193,000 mortgage loans originated by the sponsor for its own portfolio between 1998 and 2001. The version of EDE used by the sponsor since October 2006 was developed based on a statistical analysis of the past performance of approximately one million mortgage loans originated by the sponsor between 1998 and 2002. The sponsor has also used in the past, and currently uses, other automated underwriting systems. All or some of the mortgage loans owned by Asset Trust II may have been underwritten through EDE or other automated underwriting systems.

### Quality Control Review

WMB's credit risk oversight department conducts quality control reviews of statistical samplings of previously originated Option ARMs on a regular basis.

### Credit Risk Management Policies

Credit risk within the WMI Group is managed by means of a broad set of policies and principles contained in its credit policy. The Chief Credit Officer is responsible for overseeing the work of a credit policy committee, monitoring the quality of the WMI Group's credit portfolio, determining the reasonableness of the WMI Group's allowance for loan losses, reviewing and approving large credit exposures and setting underwriting criteria for credit-related products and programs. Credit risk management is based on analyzing the creditworthiness of the borrower, the adequacy of the underlying collateral given current events and·conditions and the existence and strength of any guarantor support.

Credit risk assessment is a process that requires the evaluation of numerous factors, many of which are qualitative. Process integrity relies on the ability of the WMI Group's lending personnel to analyze all risk elements. It also depends on maintaining risk rating accuracy by recognizing changing elements of credit risk and promptly initiating risk rating changes.

### Conflicts of Interest Policies

Pursuant to WMB's code of ethics (the *"Code of Ethics"*), WMB extends credit to borrowers only when the extension of credit is financially reasonable for both WMB and the borrower in question. Pursuant to the Code of Ethics, lending personnel cannot permit personal relationships or other considerations to influence lending decisions, and cannot approve extensions of credit to, or be involved in the funding or auditing of any loans made to family or friends.

## Servicing and the Asset Trust II Servicer

### General

All of the Option ARMs owned by Asset Trust II are serviced by WMB, as the Asset Trust II Servicer, pursuant to the Asset Trust II Pooling and Servicing Agreement. WMB has possession of the mortgage files (*i.e.,* the credit reports, servicing documents, etc.) in its capacity as Asset Trust II Servicer and the Asset Trust II Loan Documents in its capacity as Asset Trust II Custodian.

The Asset Trust II Pooling and Servicing Agreement provides that WMB may not resign from its obligations and duties thereunder as Asset Trust II Servicer except upon a determination that its duties thereunder are no longer permissible under applicable law. No such resignation will become effective until a successor Asset Trust II Servicer has assumed WMB's servicing obligations and duties under the Asset Trust II Pooling and Servicing Agreement. If the Asset Trust II Servicer resigns, the Company, subject to the terms of the Asset Trust II Pooling and Servicing Agreement, will appoint a successor Asset Trust II Servicer.

The Asset Trust II Servicer receives a fee for its services as Asset Trust II Servicer under the Asset Trust II Pooling and Servicing Agreement. The servicing fee is calculated as a per annum percentage for each Option ARM based on the principal balance for such Option ARM. The servicing fee with respect to each Option ARM equals 0.375% *per annum* and is paid monthly. The Asset Trust II Servicer is entitled to retain certain ancillary fees and charges, including, but not limited to, any prepayment fees, insufficient funds fees, modification fees, payoff statement fees and late charges with respect to the Option ARMs as additional servicing compensation and is also entitled to certain income generated by permitted investments made with collections on the Option ARMs. The Asset Trust II Servicer generally pays all expenses incurred in connection with its responsibilities as Asset Trust II Servicer under the Asset Trust II Pooling and Servicing Agreement (subject to reimbursement for certain expenses and advances, including those incurred by it in connection with the liquidation of

defaulted Option ARMs, the restoration of damaged mortgaged properties, and payments by the Asset Trust II Servicer for taxes and insurance premiums with respect to mortgaged properties).

Any person into which the Asset Trust II Servicer may be merged, converted or consolidated, or any person resulting from any merger, conversion or consolidation to which the Asset Trust II Servicer is a party will be the successor Asset Trust II Servicer under the Asset Trust II Pooling and Servicing Agreement.

The Asset Trust II Servicer may outsource to third party vendors some servicing functions, as described under "— The Asset Trust II Servicer — Servicing Procedures — The Asset Trust II Servicer's Third Party Vendors and Service Providers" below.

## The Asset Trust II Servicer

### The Asset Trust II Servicer's Servicing Experience

WMB has been servicing loans secured by real estate or other property for over 100 years. The Option ARMs in WMB's portfolio were originated by WMB.

The following table shows the number and aggregate principal balance of prime single-family residential mortgage loans, including conforming and nonconforming mortgage loans and fixed rate and adjustable rate mortgage loans, serviced by the Asset Trust II Servicer as of the specified date.

**Single-Family Residential Prime Mortgage Loans Serviced by the Asset Trust II Servicer[1]**

| | September 30 | December 31 | | |
|---|---|---|---|---|
| | 2007 | 2006 | 2005 | 2004 |
| | | (Dollars in millions) | | |
| Number of Mortgage Loans Serviced for WMB or Its Affiliates (or Their Securitization Trusts). . . . . . . . . . . . . . . . | 675,819 | 707,497 | 766,384 | 798,269 |
| Aggregate Principal Balance. . . . . . . . . . . . | $ 231,116 | $ 232,607 | $266,334 | $ 213,525 |
| Number of Mortgage Loans Serviced for Unaffiliated Third Parties. . . . . . . . . . . . . | 2,034,562 | 2,800,162 | 0 | 3,820,696 |
| Aggregate Principal Balance. . . . . . . . . . . . | $ 292,273 | $ 373,679 | $429,944 | $ 444,595 |

[1] Both the Option ARMs held by Asset Trust II and the Flex-5 ARMs held by Asset Trust III are considered as single-family residential prime mortgage loans for the purposes of this chart.

### Servicing Procedures

**Servicing Functions.** The functions performed by the Asset Trust II Servicer under the Asset Trust II Pooling and Servicing Agreement include, among other servicing functions, payment collection, payment application, investor reporting and other investor services, default management and escrow administration. The Asset Trust II Servicer performs its servicing functions at loan servicing centers located in Florence, South Carolina; and Jacksonville, Florida.

**Servicing Standard; Waivers and Modifications.** Pursuant to the Asset Trust II Pooling and Servicing Agreement, the Asset Trust II Servicer is required to service the Option ARMs owned by Asset Trust II consistent with prudent mortgage loan servicing practices and (unless inconsistent with those servicing practices) in the same manner in which, and with the same care, skill, prudence and diligence with which, it services and administers similar mortgage loans for other portfolios. The Asset Trust II Servicer is required to make reasonable efforts to collect or cause to be collected all payments under the mortgage loans and, to the extent consistent with the Asset Trust II Pooling and Servicing Agreement and applicable insurance policies, follow such collection procedures as are followed with respect to comparable mortgage loans that are held in portfolios of responsible mortgage lenders in

the local areas where each mortgaged property is located. Under the terms of the Asset Trust II Pooling and Servicing Agreement, the servicing standard applicable to the Asset Trust II Servicer may only be modified with the consent of the Company.

Under the terms of the Asset Trust II Pooling and Servicing Agreement, the Asset Trust II Servicer (subject to certain conditions) may waive, modify or vary any term of any mortgage loan or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to the applicable obligor if it has determined, exercising its good faith business judgment in the same manner as it would if it were the owner of the related Option ARM, that the security for, and the timely and full collectability of, such Option ARM would not be adversely affected by such waiver, modification, postponement or indulgence, and may make certain other modifications with respect to the Option ARMs and the related property in accordance with the terms of the Asset Trust II Pooling and Servicing Agreement.

***Mortgage Loan Servicing System.***   In performing its servicing functions, the Asset Trust II Servicer generally uses computerized mortgage loan servicing systems that it leases from Fidelity Information Services, a division of Fidelity National Financial (*"Fidelity"*), a third party vendor (collectively, the *"Fidelity System"*). The Fidelity System produces detailed information about the financial status of each mortgage loan, including outstanding principal balance, current interest rate and the amount of any advances, unapplied payments, outstanding fees, escrow deposits or escrow account overdrafts, and about transactions that affect the mortgage loan, including the amount and due date of each payment, the date of receipt of each payment (including scheduled payments and prepayments), and how the payment was applied. The Fidelity System also produces additional information about mortgage loans that are in default, including the amount of any insurance and liquidation proceeds received. The Asset Trust II Servicer began using the Fidelity System in 1996. Prior to July 2004, the Asset Trust II Servicer serviced some mortgage loans using a proprietary mortgage loan servicing system; in July 2004, the Asset Trust II Servicer consolidated servicing into a single servicing platform by converting approximately 1.2 million loan records from the proprietary mortgage loan servicing system to the Fidelity System.

***Collections and Distributions.***   Under the terms of the Asset Trust II Pooling and Servicing Agreement, collections with respect to the Option ARMs are collected by the Asset Trust II Servicer and aggregated into a Payment Clearing Account controlled by the Asset Trust II Servicer; such collections are deposited into accounts controlled by the Asset Trust II Servicer and may be commingled with funds with respect to other Option ARMs or mortgage loans serviced or owned by the Asset Trust II Servicer. The Asset Trust II Servicer is required to deposit collections received with respect to the Option ARMs owned by Asset Trust II into a certificate account controlled by the Asset Trust II Trustee under the Asset Trust II Pooling and Servicing Agreement on a monthly basis. The amount of collections required to be remitted to the Asset Trust II Trustee in any given monthly deposit is determined by the timing of the Asset Trust II Servicer's receipt of collections and the type of collections they represent. In accordance with the terms of the Asset Trust II Pooling and Servicing Agreement, the Asset Trust II Servicer is allowed to retain certain amounts with respect to expenses and advances from collections or apply them towards the costs of certain costs and permitted expenses connected with the servicing of the Option ARMs. The Asset Trust II Servicer is neither be permitted nor required to make servicer advances to cover any gap between scheduled payments on the Option ARMs and the actual collections thereon in any given period.

Subject to the terms and conditions set forth in the Asset Trust II Pooling and Servicing Agreement, on a monthly basis the Asset Trust II Trustee distributes collections deposited in the certificate account to the Company, as holder of the Asset Trust II Class A Trust Certificate, less (a) fees, expenses and indemnities payable to the Asset Trust II Trustee and the Asset Trust II Delaware Trustee and (b) fees and certain other amounts payable to the Asset Trust II Servicer. No amounts are payable from collections with respect to the Asset Trust II Class R Trust Certificate.

Under the terms of the Asset Trust II Pooling and Servicing Agreement, collections with respect to the Option ARMs may be invested in certain permitted investments prior to their distribution to the Company, as holder of the Asset Trust II Class A Trust Certificate. The Asset Trust II Servicer shall be entitled to retain any investment income produced by such investment as additional servicing compensation.

***Servicing of Delinquent Option ARMs; Foreclosure.*** The Asset Trust II Servicer is required under the terms of the Asset Trust II Pooling and Servicing Agreement to make reasonable efforts to collect or cause to be collected all payments on the Option ARMs owned by Asset Trust II that are 30 or more days delinquent. Such efforts may include payment reminder telephone calls to the mortgagor, letter campaigns, drive-by property inspections and other collection activities permissible under the Asset Trust II Loan Documents and applicable law.

The Asset Trust II Servicer is required under the Asset Trust II Pooling and Servicing Agreement to foreclose upon the mortgaged property related to each defaulted Option ARM as to which no satisfactory arrangements can be made for collection of delinquent payments. Under the Asset Trust II Pooling and Servicing Agreement, the Asset Trust II Servicer is permitted, in lieu of foreclosure, if prudent to do so and taking into account the desirability of maximizing net liquidation proceeds, to accept a payment of less than the outstanding principal balance of the defaulted Option ARM. The Asset Trust II Servicer is not permitted to foreclose upon a mortgaged property if it is aware of evidence of toxic waste or other environmental contamination on the mortgaged property and it determines that it would be imprudent to foreclose.

***Insurance.*** For each Option ARM with an original loan-to-value ratio greater than 80%, the Asset Trust II Pooling and Servicing Agreement generally requires the Asset Trust II Servicer to keep in full force and effect a primary mortgage insurance policy. The Asset Trust II Servicer generally is not required to maintain such policy if the outstanding principal balance of the Option ARM is 80% or less of the original appraised value of the related mortgaged property, unless required by applicable law.

### Limitations on the Asset Trust II Servicer's Liability

The Asset Trust II Pooling and Servicing Agreement provides that neither the Asset Trust II Servicer nor any director, officer, employee or agent of the Asset Trust II Servicer (the *"Asset Trust II Servicer Indemnified Parties"*) is under any liability to Asset Trust II, the Company or the holders of the Asset Trust II Class A Trust Certificate and the Asset Trust II Class R Trust Certificate or others for any action taken (or not taken) by any Asset Trust II Servicer Indemnified Party in good faith pursuant to the Asset Trust II Pooling and Servicing Agreement, or for errors in judgment; *provided, however,* that the Asset Trust II Servicer is not protected against any liability that would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties thereunder. The Asset Trust II Pooling and Servicing Agreement further provides that any Asset Trust II Servicer Indemnified Party is entitled to indemnification by Asset Trust II and will be held harmless against any loss, liability or expense incurred in connection with any legal action relating to the Asset Trust II Pooling and Servicing Agreement or the certificates issued thereunder (except any such loss, liability, or expense otherwise reimbursable pursuant to the Asset Trust II Pooling and Servicing Agreement) and any loss, liability or expense incurred by reason of willful misfeasance, bad faith or gross negligence in the performance of duties thereunder or by reason of reckless disregard of obligations and duties thereunder. In addition, the Asset Trust II Pooling and Servicing Agreement provides that the Asset Trust II Servicer is not under any obligation to appear in, prosecute or defend any legal action that is not incidental to its responsibilities under the Asset Trust II Pooling and Servicing Agreement and that in its opinion may involve it in any expense or liability. The Asset Trust II Servicer may, however, in its discretion undertake any such action that it may deem necessary or desirable with respect to the Asset Trust II Pooling and Servicing Agreement and the rights and duties of the parties thereto and the interests of the holders of the Asset Trust II Class A Trust Certificate and the Asset Trust II Class R

Trust Certificate. In such event, the legal expenses and costs of such action and any liability resulting therefrom will be expenses, costs and liabilities of Asset Trust II, and the Asset Trust II Servicer will be entitled to be reimbursed therefor and to charge the certificate account.

**Asset Trust II Servicer Termination and Replacement.** Under the terms of the Asset Trust II Pooling and Servicing Agreement, after the occurrence of any one of several typical Asset Trust II Servicer termination events, including but not limited to a receivership with respect to the Asset Trust II Servicer or (subject to the expiration of typical grace periods and materiality requirements) the failure by the Asset Trust II Servicer to make required deposits to the certificate account, the Company may remove the Asset Trust II Servicer. If the Asset Trust II Servicer is removed by the Company, the Company shall have the sole power to appoint a replacement Asset Trust II Servicer.

**The Asset Trust II Servicer's Third Party Vendors and Service Providers.** Under the Asset Trust II Pooling and Servicing Agreement, the Asset Trust II Servicer may perform its servicing responsibilities through agents or independent contractors, but will not thereby be released from any of its responsibilities thereunder. The Asset Trust II Servicer currently outsources certain of its responsibilities and may in the future outsource other of its responsibilities pursuant to these provisions, which services may include some or all of the following: (i) collections on early stage delinquent loans, (ii) processing and monitoring of foreclosure actions, (iii) processing and monitoring of mortgagors bankruptcy proceedings, (iv) preservation of properties related to delinquent loans, (v) maintenance, marketing and sale of real-estate-owned properties, (vi) assuring that hazard insurance coverage is maintained, (vii) determining whether flood insurance coverage is required and assuring that any required coverage is maintained, (viii) tax bill procurement and tracking of delinquent tax payments, (ix) printing and mailing billing statements, Option ARM notices and default notices and (x) depositing mortgagor payments into a lockbox account. From time to time, the Asset Trust II Servicer may cease to outsource one or more of the foregoing servicing functions or may choose to outsource additional servicing functions. Some vendors may perform more than one function, and some functions may be performed by more than one vendor.

The Asset Trust II Servicer has entered into service level agreements with some of its vendors, which set forth detailed performance criteria, including in some cases minimum time requirements for completing specified tasks and maximum error rates, and which in some cases impose penalties for non-compliance with such criteria. The Asset Trust II Servicer monitors vendor compliance with applicable servicing criteria through procedures that may include reviews of statistical samplings of Option ARMs and reviews of reports on vendor performance prepared by the vendor or the Asset Trust II Servicer.

### The Asset Trust II Servicer's Quality Control Procedures

The Asset Trust II Servicer uses a combination of management controls and technology controls to ensure the accuracy and integrity of servicing records. Management controls include the use of approval levels, the segregation of duties, and reconciliations of servicing data and accounts, among others. Technology controls include the use of data security controls and interface controls to ensure that only authorized persons have the ability to access and change system data or to submit data to or receive data from vendors and investors. Specific security profiles for each job function include a predetermined set of data security controls that are appropriate for that job function. The regional data center for the Fidelity System, which is located in Jacksonville, Florida, is kept in a fire resistant environment, and commercial electrical power is backed up by generators.

In addition, the Asset Trust II Servicer conducts periodic internal audits of critical servicing and technology functions. External audits by entities such as the Fannie Mae, Freddie Mac and Ginnie Mae and the annual examination by WMI's independent accountants in connection with their audit of WMI and its subsidiaries may provide independent verification of the adequacy of such functions. Periodic examination by the Asset Trust II Servicer's regulatory authorities may provide additional independent review of the Asset Trust II Servicer's management controls.

Both the Asset Trust II Servicer and Fidelity maintain detailed business continuity plans so that each entity can resume critical business functions in the event of a disaster or other serious system outage, which plans are reviewed and updated periodically. Fidelity is contractually obligated to return the Asset Trust II Servicer to full functionality within 48 hours of a reported system outage. The Asset Trust II Servicer and Fidelity perform annual disaster recovery tests in which they reroute data and servicing system operations to Fidelity's back-up site, and then process sample transactions from all servicing locations to ensure the functionality of such back-up site.

It is the Asset Trust II Servicer's policy to require its other third party vendors to implement measures similar to those described above to ensure the accuracy and integrity of servicing records.

## The Asset Trust II Custodian

Washington Mutual Bank acts as custodian (the *"Asset Trust II Custodian"*) for Asset Trust II pursuant to a Custody Agreement, dated as of December 13, 2006 (the *"Asset Trust II Custody Agreement"*), among the Asset Trust II Trustee, the Asset Trust II Servicer and the Asset Trust II Custodian. The Asset Trust II Custodian holds the notes, mortgages and other legal documents related to the Option ARMs (collectively, the *"Asset Trust II Loan Documents"*) for the benefit of the Asset Trust II Trustee. The Asset Trust II Custodian is required to maintain the Asset Trust II Loan Documents in secure and fire resistant facilities. The mortgage files held by the Asset Trust II Servicer are not required to be physically segregated from Asset Trust II Loan Documents in the Asset Trust II Custodian's custody but are kept in shared facilities. The Asset Trust II Custodian is required to review the Asset Trust II Loan Documents related to each Option ARM and deliver to the Asset Trust II Trustee a certification to the effect that, except as noted in the certification, all required documents have been executed and received.

In the event of the termination of the Asset Trust II Custody Agreement, the Asset Trust II Custodian will be required to deliver the Asset Trust II Loan Documents in the Asset Trust II Custodian's custody to the Asset Trust II Trustee or any successor Asset Trust II Custodian appointed by the Company.

The Asset Trust II Servicer may, but does not currently, pay the Asset Trust II Custodian a fee for its services under the Asset Trust II Custody Agreement from time to time. Payment of this fee will not affect dividends to the Company.

## ASSET TRUST III

### General

WAMU 2007-Flex1 (*"Asset Trust III"*) is a statutory trust formed under the laws of the State of Delaware pursuant to a trust agreement between the Company, as depositor, and Deutsche Bank Trust Company Delaware, as Delaware trustee. The Asset Trust III Pooling and Servicing Agreement, to be dated as of October 25, 2007 (the *"Asset Trust III Pooling and Servicing Agreement"*), among the Company, as depositor, WMB, as servicer (the *"Asset Trust III Servicer"*), Deutsche Bank Trust Company Delaware, as Delaware trustee (the *"Asset Trust III Delaware Trustee"*) and Deutsche Bank National Trust Company, as trustee (the *"Asset Trust III Trustee"*), will amend and restate the initial trust agreement and will be the governing instrument of Asset Trust III.

Asset Trust III will not own any assets other than the Flex-5 ARMs and the other assets described below. Asset Trust III will not have any liabilities other than those incurred in connection with the Asset Trust III Pooling and Servicing Agreement and any related agreement. Asset Trust III will not have any directors, officers or other employees. No equity contribution will be made to Asset Trust III by WMB, the Company or any other party, except for a *de minimis* contribution made by the Company, as depositor, pursuant to the initial trust agreement, and Asset Trust III will not have any other assets. The fiscal year end of Asset Trust III is December 31. Asset Trust III will act through the Asset Trust III Trustee and the Asset Trust III Delaware Trustee, whose fees and reasonable expenses will be paid or reimbursed by the Asset Trust III Servicer.

For purposes of this offering circular with respect to the underwriting, origination and servicing of the Flex-5 ARMs in Asset Trust III, references to WMB include WMB, originators acquired by WMB and WMB's subsidiaries.

### General Description of Assets

The assets of Asset Trust III will consist of Flex-5 ARMs that had, as of September 30, 2007 (the *"Asset Trust III Cut-Off Date"*), an aggregate unpaid principal balance of approximately $5,199,147,686, together with payments received thereon and certain other investments. The Flex-5 ARMs were originated by WMB. A portion of the Flex-5 ARMs will be contributed to the Company by University Street, the owner of all the Company's common interests.

In general, the interest rate for each Flex-5 ARM is fixed for a specified initial five-year period, and thereafter will adjust on a monthly basis based on its index. The index for the Flex-5 ARMs is a per annum rate equal to the One-Year MTA, as published by the Board of Governors of the Federal Reserve System in the Federal Reserve Statistical Release *"Selected Interest Rates (H.15)"*, determined by averaging the monthly yields for the most recently available twelve months. The One-Year MTA figure used for each interest rate adjustment date will be the most recent One-Year MTA figure available as of fifteen days before that date.

If One-Year MTA is no longer available, the Asset Trust III Servicer will choose a new index that is based on comparable information. When the Asset Trust III Servicer chooses a new index, it will increase or decrease the margin on substantially all Flex-5 ARMs by the difference between the average of One-Year MTA for the final three years it was in effect and the average of the replacement index for the most recent three years. The margin will be increased by that difference if the average of One-Year MTA is greater than the average of the replacement index, and the margin will be decreased by that difference if the average of the replacement index is greater than the average of One-Year MTA. The new margin will be rounded up as provided in the related mortgage note.

After an initial fixed-rate period of five years, the mortgage interest rate on substantially all the Flex-5 ARMs adjusts monthly to equal the sum of the applicable index and the per annum rate (the *"Margin"*) specified in the applicable mortgage note. The Margin rates applicable to the mortgage loans in the Asset Trust III had a weighted average of approximately 2.66% and range from 1.23% to

5.25% per annum. The mortgage loans in the Asset Trust III are subject to a maximum interest rate that may be charged at any point over the life of the mortgage (a *"Lifetime Rate Cap"*), with a weighted average of approximately 12.01% and ranging from 8.75% to 16.95% per annum. During the initial fixed rate period of a Flex-5 ARM, mortgagors will be required to pay a minimum monthly payment in an amount sufficient to fully amortize the mortgage loan over the term. Each month thereafter, mortgagors are given one or more payment options, which may include a payment amount less than, equal to or greater than a fully amortizing monthly payment, but in no case less than the minimum monthly payment. The minimum monthly payment is recalculated during the adjustable rate period on an annual basis in an amount sufficient to fully amortize the mortgage loan over the term based on an assumed interest rate equal to the interest rate in effect forty-five days prior to the recalculation date. Whether a Flex-5 ARM is repaid on a fully-amortizing basis depends on whether the actual interest rate payable on a mortgage loan during any annual period exceeds the assumed interest rate used in calculating the minimum monthly payment for such annual period and the payment option selected by the mortgagor on each monthly payment date. If the payment made in a given month is insufficient to pay the amount of accrued and unpaid interest on the mortgage loan, the excess interest will be added to the outstanding principal balance of the mortgage loan in the form of Negative Amortization. The maximum Negative Amortization Cap of the Flex-5 ARMs that will be in Asset Trust III ranges from 110% to 125% of the original principal balance. On the month in which the Negative Amortization Cap is reached, mortgagors are required to make fully amortizing payments.

As of the Asset Trust III Cut-Off Date, the average current, unpaid principal balance of the Flex-5 ARMs is approximately $297,009, with a minimum current, unpaid principal balance of approximately $188 and a maximum current, unpaid principal balance of approximately $5,205,972. The Flex-5 ARMs that will be in Asset Trust III have various original maturities ranging from 15 years to 40 years and were, on average, originated within the last 43 months. The majority of the Flex-5 ARMs were underwritten under WMB's low documentation program (described below); approximately 22.88% of the Flex-5 ARMs were underwritten under WMB's full documentation program (described below). The current weighted average loan-to-value ratio is approximately 63.02% and the weighted average loan-to-value ratio at origination was approximately 67.72%. The mortgage loans that will be in Asset Trust III have a weighted average Credit Score of approximately 715. The majority of the properties underlying the Flex-5 ARMs are owner occupied with approximately 19.45% of the properties non-owner occupied. Of the Flex-5 ARMs that will be in Asset Trust III, approximately 43.70% are cash-out refinances, approximately 34.84% are purchase loans and approximately 21.46% are rate/term refinances. The Flex-5 ARMs are geographically concentrated in California (approximately 45.30%).

**Acquisition of the Flex-5 ARMs and Related Transactions**

Contemporaneously with the issuance of the Series 2007-B Company Preferred Securities, WMB will contribute a pool of Flex-5 ARMs to the Company in exchange for the Series 2007-B Company Preferred Securities. In addition, University Street will contribute a pool of Flex-5 ARMs to the Company as a capital contribution. The aggregate value of these contributions is expected to total approximately $5,199,147,686.

The Company will contribute to Asset Trust III all of the Flex-5 ARMs it will receive from WMB and University Street. This contribution will be made in exchange for the Class A-1 2007-Flex1 Certificate of Asset Trust III (the *"Asset Trust III Class A Trust Certificate"*) and the Class R 2007-Flex1 Certificate of Asset Trust III (the *"Asset Trust III Class R Trust Certificate"*). For United States federal income tax purposes, the Asset Trust III Class A Trust Certificate will represent the sole class of regular interests in Asset Trust III, and the Asset Trust III Class R Trust Certificate will represent the sole class of residual interests in Asset Trust III. The Company will retain the Asset Trust III Class A Trust Certificate and expects that it will transfer the Asset Trust III Class R Trust Certificate to WMB.

Asset Trust III will own the right to receive all payments of principal and interest on the Flex-5 ARMs due after the Asset Trust III Cut-Off Date. A schedule to the Asset Trust III Pooling and Servicing Agreement will include information about each of the Flex-5 ARMs, including:

- the outstanding principal balance as of the Asset Trust III Cut-Off Date;

- the term of the Flex-5 ARM; and

- the applicable interest rate as of the close of business on the Asset Trust III Cut-Off Date.

The notes relating to the Flex-5 ARMs will be endorsed in blank to Asset Trust III and no assignments to Asset Trust III of the mortgages securing the Flex-5 ARMs will be prepared. WMB, in its capacity as initial Asset Trust III Custodian, will have possession of and will review such notes and the Flex-5 ARMs as custodian for Asset Trust III and financing statements will be filed evidencing Asset Trust III's interest in the Flex-5 ARMs.

In exchange for the Flex-5 ARMs and the other assets described above, the Asset Trust III Trustee will authenticate and deliver the Asset Trust III Class A Trust Certificate and the Asset Trust III Class R Trust Certificate pursuant to the Company's order.

## Description of the Portfolio

### General

The Flex-5 ARMs in the portfolio of Asset Trust III will consist of flex-5 adjustable rate mortgage loans which may under certain circumstances experience negative amortization. See "Asset Trust III — General Description of Assets". These mortgage loans are secured by a first lien, fee simple or leasehold interest in a one-to-four-family residential property. Such residences may include detached homes, duplexes, triplexes, fourplexes, townhomes, individual condominium units, individual units in planned unit developments and other attached dwelling units that are part of buildings consisting of no more than four units. As of September 30, 2007, none of the Flex-5 ARMs were delinquent in payments for a period of 30 days or more, in large part because the process of selection for the Flex-5 ARMs that will be conveyed to Asset Trust III excluded any such loans; however, there can be no assurance that Flex-5 ARMs that will be held in the portfolio of Asset Trust III will not become delinquent in the future. WMB's delinquency experience with respect to mortgage loans owned by WMB and its subsidiaries substantially similar to the Flex-5 ARMs has been as follows: the percentage of the unpaid principal balance of such loans which were delinquent (for the purposes of this sentence, defined as having two or more payments overdue, or being classified as non-performing) as of the end of the calendar year in 2004 was 1.08%, in 2005 1.31%, in 2006 1.55% and as of September 30, 2007 2.16%.

The tables in Appendix D to this offering circular represent information as of September 30, 2007 with respect to the Flex-5 ARMs that will be included in the portfolio of Asset Trust III.

## Underwriting

### General

The Flex-5 ARMs that will be owned by Asset Trust III were, in all material respects, originated in accordance with the underwriting guidelines of WMB as described herein. The Flex-5 ARMs were underwritten by WMB.

WMB's underwriting guidelines generally are intended to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Some Flex-5 ARMs are manually underwritten, in which case an underwriter reviews information submitted by the borrower and supporting documentation, if required, and a credit report of the borrower, and based on that review determines whether to originate a loan in the amount and

with the terms requested by the borrower. Some Flex-5 ARMs are underwritten through WMB's automated underwriting system, described below.

### Evaluation of the Borrower's Credit Standing

To evaluate a prospective borrower's credit history, the loan underwriter obtains a credit report relating to the borrower from one or more credit reporting agencies. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, repossession, suits or judgments. In most cases the credit report provides a Credit Score for the borrower. Credit Scores are designed to assess a borrower's creditworthiness and likelihood to default on an obligation over a defined period (usually two to three years) based on a borrower's credit history. Credit Scores do not necessarily correspond to the probability of default over the life of a Flex-5 ARM because they reflect past credit history, rather than an assessment of future payment performance. Credit Scores are measured relative to a scale of 350 to 850, with higher scores indicating more favorable credit history. If the loan underwriter obtains Credit Scores from three credit reporting companies, the middle score generally is used, and if two Credit Scores are obtained, the lower score generally is used. In the case of co-borrowers, the Credit Score for the borrower with the lowest Credit Score generally is used (determined for each borrower as described in the immediately preceding sentence). Minimum Credit Scores are required for some loan products and loan programs. For borrowers for which Credit Scores are not available, the loan underwriter will require alternative documentation indicating the borrower's creditworthiness, such as rental or utility payment history or payment history on other debt.

### Evaluation of the Borrower's Repayment Ability

In evaluating a prospective borrower's ability to repay a Flex-5 ARM, the loan underwriter considers the ratio of the borrower's total monthly debt (including non-housing expenses) to the borrower's gross income (referred to as the "debt-to-income ratio" or "back-end ratio"). The maximum acceptable ratios may vary depending on other loan factors, such as loan amount and loan purpose, loan-to-value ratio, Credit Score and the availability of other liquid assets. Exceptions to the ratio guidelines may be made when compensating factors are present.

For purposes of calculating the ratios for certain Flex-5 ARMs, the borrower's monthly mortgage debt and other factors are determined based on the fixed rate and a predetermined factor as set by WMB's credit department from time to time (which rate may be greater than the rate in effect for the Flex-5 ARM during the initial fixed-rate period). In addition, for purposes of calculating these ratios for a Flex-5 ARM with a 40-year term, the borrower's monthly mortgage debt is determined based on 30-year term.

### Evaluation of the Adequacy of the Collateral

The adequacy of the Flex-5 ARM as collateral generally is determined by an appraisal made in accordance with pre-established appraisal guidelines. At origination, all appraisals are required to conform to the Uniform Standards of Professional Appraisal Practice adopted by the Appraisal Standards Board of the Appraisal Foundation, and are made on forms acceptable to Fannie Mae and/or Freddie Mac. Appraisers may be staff appraisers employed by WMB or independent appraisers selected in accordance with the pre-established appraisal guidelines. Such guidelines generally require that the appraiser, or an agent on its behalf, personally inspect the property and verify whether the property is in adequate condition and, if the property is new construction, whether it is substantially completed. However, in the case of Flex-5 ARMs underwritten through WMB's automated underwriting system, an automated valuation method may be used, under which the appraiser does not personally inspect the property but instead relies on public records regarding the mortgaged property and/or neighboring properties. In either case, the appraisal normally is based upon a market data analysis of recent sales of comparable properties and, when deemed applicable, a replacement cost analysis based on the current cost of constructing or purchasing a similar property. For Flex-5

ARMs underwritten under WMB's low documentation programs, the appraisal guidelines in some cases permit the appraisal obtained for an existing Flex-5 ARM to be used. Title insurance is required for all Flex-5 ARMs, except that for Flex-5 ARMs secured by shares of cooperative apartments, title insurance is not required for the cooperative apartment building (but a lien search is provided by the title company). Specific additional title insurance coverage is required for some types of Flex-5 ARMs.

## Documentation Programs

Each Flex-5 ARM that will be owned by Asset Trust III was underwritten under one of WMB's documentation guidelines for verification of the borrowers' stated income and assets. Under WMB's full/alternative documentation program, the prospective borrower's stated income is verified through receipt of the borrower's most recent pay stub and most recent W-2 form, or by using a written Verification of Employment form completed by the borrower's employee. In the case of self-employed borrowers or borrowers with more than 25% of their income from commissions, two years of personal (and, if applicable, business) tax returns. For self-employed borrowers, profit and loss statements may also be required. Under the full/alternative documentation program, the borrower's stated assets are verified through receipt of the borrower's two most recent bank or brokerage statements. In addition, the borrower's employment may be verified with the employer by telephone or by other independent means.

The WMB low documentation program places increased reliance on the value and adequacy of the mortgaged property as collateral, the borrower's credit standing and (in some cases) the borrower's assets. It is available to borrowers with certain loan-to-value ratios, loan amounts and Credit Scores. Under this program, the income as stated in the borrower's loan application is not verified, although the borrower's employment may be verified by telephone. The borrower's stated income must be reasonable for the borrower's occupation and assets (as determined in the underwriter's discretion). Assets may be verified for higher risk transactions and when exceptions are approved, such as when specific loan-to-value ratios or loan amount limits are exceeded.

A credit report for the borrower generally is required for all mortgage loans underwritten under WMB's full/alternative and low documentation programs.

## Exceptions to Program Parameters

Exceptions to WMB's loan program parameters may be made on a case-by-case basis if compensating factors are present. In those cases, the basis for the exception is documented, and in some cases the approval of a senior underwriter (who is an employee of WMB) is required. Compensating factors may include, but are not limited to, low loan-to-value ratio, low debt-to-income ratio, good credit standing, the availability of other liquid assets, stable employment and time in residence at the prospective borrower's current address.

## Automated Underwriting System

Some mortgage loans originated through the sponsor's retail and wholesale lending divisions have been underwritten in whole or in part through the sponsor's proprietary automated underwriting system, known as Enterprise Decision Engine or "EDE". Based on the borrower's credit report and the information in the borrower's loan application, the system either (a) approves the loan, which approval may involve relief from certain documentation otherwise required for manual underwriting or be subject to the satisfaction of specified conditions, which may include the receipt of additional documentation, or (b) refers the loan application to an underwriter for manual underwriting. In making the underwriting decision, EDE evaluates the borrower's default risk ten different levels of credit standing, based on both the Credit Score and characteristics of the loan. The sponsor has been using EDE for underwriting of mortgage loans since January 2005. The version of EDE used by the sponsor through October 2006 was developed based on a statistical analysis of the past performance of approximately 193,000 mortgage loans originated by the sponsor for its own portfolio between 1998 and 2001.

The version of EDE used by the sponsor since October 2006 was developed based on a statistical analysis of the past performance of approximately one million mortgage loans originated by the sponsor between 1998 and 2002. The sponsor has also used in the past, and currently uses, other automated underwriting systems. All or some of the mortgage loans owned by Asset Trust III may have been underwritten through EDE or other automated underwriting systems.

### Quality Control Review

WMB's credit risk oversight department conducts quality control reviews of statistical samplings of previously originated Flex-5 ARMs on a regular basis.

### Credit Risk Management Policies

Credit risk within the WMI Group is managed by means of a broad set of policies and principles contained in its credit policy. The Chief Credit Officer is responsible for overseeing the work of a credit policy committee, monitoring the quality of the WMI Group's credit portfolio, determining the reasonableness of the WMI Group's allowance for loan losses, reviewing and approving large credit exposures and setting underwriting criteria for credit-related products and programs. Credit risk management is based on analyzing the creditworthiness of the borrower, the adequacy of the underlying collateral given current events and conditions and the existence and strength of any guarantor support.

Credit risk assessment is a process that requires the evaluation of numerous factors, many of which are qualitative. Process integrity relies on the ability of the WMI Group's lending personnel to analyze all risk elements. It also depends on maintaining risk rating accuracy by recognizing changing elements of credit risk and promptly initiating risk rating changes.

### Conflicts of Interest Policies

Pursuant to WMB's Code of Ethics, WMB extends credit to borrowers only when the extension of credit is financially reasonable for both WMB and the borrower in question. Pursuant to the Code of Ethics, lending personnel cannot permit personal relationships or other considerations to influence lending decisions, and cannot approve extensions of credit to, or be involved in the funding or auditing of any loans made to family or friends.

## Servicing and the Asset Trust III Servicer

### General

All of the Flex-5 ARMs owned by Asset Trust III will be serviced by WMB, as the Asset Trust III Servicer, pursuant to the Asset Trust III Pooling and Servicing Agreement. WMB will have possession of the mortgage files (i.e., the credit reports, servicing documents, etc.) in its capacity as Asset Trust III Servicer and the Asset Trust III Loan Documents (as defined below) in its capacity as Asset Trust III Custodian.

The Asset Trust III Pooling and Servicing Agreement will provide that WMB may not resign from its obligations and duties thereunder as Asset Trust III Servicer except upon a determination that its duties thereunder are no longer permissible under applicable law. No such resignation will become effective until a successor Asset Trust III Servicer has assumed WMB's servicing obligations and duties under the Asset Trust III Pooling and Servicing Agreement. If the Asset Trust III Servicer resigns, the Company, subject to the terms of the Asset Trust III Pooling and Servicing Agreement, will appoint a successor Asset Trust III Servicer.

The Asset Trust III Servicer will receive a fee for its services as Asset Trust III Servicer under the Asset Trust III Pooling and Servicing Agreement. The servicing fee will be calculated as a per annum percentage for each Flex-5 ARM based on the principal balance for such Flex-5 ARM. The servicing fee with respect to each Flex-5 ARM will equal 0.125% per annum and will be paid monthly. The Asset Trust III Servicer will be entitled to retain certain ancillary fees and charges, including, but not limited to, any prepayment fees, insufficient funds fees, modification fees, payoff statement fees

and late charges with respect to the Flex-5 ARMs as additional servicing compensation and will also be entitled to certain income generated by permitted investments made with collections on the Flex-5 ARMs. The Asset Trust III Servicer generally will pay all expenses incurred in connection with its responsibilities as Asset Trust III Servicer under the Asset Trust III Pooling and Servicing Agreement (subject to reimbursement for certain expenses and advances, including those incurred by it in connection with the liquidation of defaulted Flex-5 ARMs, the restoration of damaged mortgaged properties, and payments by the Asset Trust III Servicer for taxes and insurance premiums with respect to mortgaged properties).

Any person into which the Asset Trust III Servicer may be merged, converted or consolidated, or any person resulting from any merger, conversion or consolidation to which the Asset Trust III Servicer is a party will be the successor Asset Trust III Servicer under the Asset Trust III Pooling and Servicing Agreement.

The Asset Trust III Servicer may outsource to third party vendors some servicing functions, as described under "— The Asset Trust III Servicer — Servicing Procedures — The Asset Trust III Servicer's Third Party Vendors and Service Providers" below.

### The Asset Trust III Servicer

#### The Asset Trust III Servicer's Servicing Experience

WMB has been servicing loans secured by real estate or other property for over 100 years. The Flex-5 ARMs in WMB's portfolio were originated by WMB.

The following table shows the number and aggregate principal balance of prime single-family residential mortgage loans, including conforming and nonconforming mortgage loans and fixed rate and adjustable rate mortgage loans, serviced by the Asset Trust III Servicer as of the specified date.

**Single-Family Residential Prime Mortgage Loans Serviced by the Asset Trust III Servicer[1]**

|  | September 30 | December 31 | | |
|---|---|---|---|---|
|  | 2007 | 2006 | 2005 | 2004 |
|  |  | (Dollars in millions) | | |
| Number of Mortgage Loans Serviced for WMB or Its Affiliates (or Their Securitization Trusts) | 675,819 | 707,497 | 766,384 | 798,269 |
| Aggregate Principal Balance | $ 231,116 | $ 232,607 | $266,334 | $ 213,525 |
| Number of Mortgage Loans Serviced for Unaffiliated Third Parties | 2,034,562 | 2,800,162 | 0 | 3,820,696 |
| Aggregate Principal Balance | $ 292,273 | $ 373,679 | $429,944 | $ 444,595 |

[1] Both the Option ARMs held by Asset Trust II and the Flex-5 ARMs held by Asset Trust III are considered as single-family residential prime mortgage loans for the purposes of this chart.

#### Servicing Procedures

**Servicing Functions.** The functions to be performed by the Asset Trust III Servicer under the Asset Trust III Pooling and Servicing Agreement will include, among other servicing functions, payment collection, payment application, investor reporting and other investor services, default management and escrow administration. The Asset Trust III Servicer will perform substantially all of its servicing functions at loan servicing centers located in Florence, South Carolina and Jacksonville, Florida.

**Servicing Standard; Waivers and Modifications.** Pursuant to the Asset Trust III Pooling and Servicing Agreement, the Asset Trust III Servicer will be required to service the Flex-5 ARMs owned by Asset Trust III consistent with prudent mortgage loan servicing practices and (unless inconsistent

with those servicing practices) in the same manner in which, and with the same care, skill, prudence and diligence with which, it services and administers similar mortgage loans for other portfolios. The Asset Trust III Servicer will be required to make reasonable efforts to collect or cause to be collected all payments under the mortgage loans and, to the extent consistent with the Asset Trust III Pooling and Servicing Agreement and applicable insurance policies, follow such collection procedures as are followed with respect to comparable mortgage loans that are held in portfolios of responsible mortgage lenders in the local areas where each mortgaged property is located. Under the terms of the Asset Trust III Pooling and Servicing Agreement, the servicing standard applicable to the Asset Trust III Servicer may only be modified with the consent of the Company.

Under the terms of the Asset Trust III Pooling and Servicing Agreement, the Asset Trust III Servicer (subject to certain conditions) may waive, modify or vary any term of any mortgage loan or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to the applicable obligor if it has determined, exercising its good faith business judgment in the same manner as it would if it were the owner of the related Flex-5 ARM, that the security for, and the timely and full collectability of, such Flex-5 ARM would not be adversely affected by such waiver, modification, postponement or indulgence, and may make certain other modifications with respect to the Flex-5 ARMs and the related property in accordance with the terms of the Asset Trust III Pooling and Servicing Agreement.

*Mortgage Loan Servicing System.* In performing its servicing functions, the Asset Trust III Servicer generally will use computerized mortgage loan servicing systems that it leases from Fidelity Information Services. The Fidelity System produces detailed information about the financial status of each mortgage loan, including outstanding principal balance, current interest rate and the amount of any advances, unapplied payments, outstanding fees, escrow deposits or escrow account overdrafts, and about transactions that affect the mortgage loan, including the amount and due date of each payment, the date of receipt of each payment (including scheduled payments and prepayments), and how the payment was applied. The Fidelity System also produces additional information about mortgage loans that are in default, including the amount of any insurance and liquidation proceeds received. The Asset Trust III Servicer began using the Fidelity System in 1996. Prior to July 2004, the Asset Trust III Servicer serviced some mortgage loans using a proprietary mortgage loan servicing system; in July 2004, the Asset Trust III Servicer consolidated servicing into a single servicing platform by converting approximately 1.2 million loan records from the proprietary mortgage loan servicing system to the Fidelity System.

*Collections and Distributions.* Under the terms of the Asset Trust III Pooling and Servicing Agreement, collections with respect to the Flex-5 ARMs will be collected by the Asset Trust III Servicer and will be aggregated into a Payment Clearing Account controlled by the Asset Trust III Servicer; such collections will then be deposited into accounts controlled by the Asset Trust III Servicer and may be commingled with funds with respect to other Flex-5 ARMs or mortgage loans serviced or owned by the Asset Trust III Servicer. The Asset Trust III Servicer will be required to deposit collections received with respect to the Flex-5 ARMs owned by Asset Trust III into a certificate account controlled by the Asset Trust III Trustee under the Asset Trust III Pooling and Servicing Agreement on a monthly basis. The amount of collections required to be remitted to the Asset Trust III Trustee in any given monthly deposit is determined by the timing of the Asset Trust III Servicer's receipt of collections and the type of collections they represent. In accordance with the terms of the Asset Trust III Pooling and Servicing Agreement, the Asset Trust III Servicer will be allowed to retain certain amounts with respect to expenses and advances from collections or apply them towards the costs of certain costs and permitted expenses connected with the servicing of the Flex-5 ARMs. The Asset Trust III Servicer will neither be permitted nor required to make servicer advances to cover any gap between scheduled payments on the Flex-5 ARMs and the actual collections thereon in any given period.

Subject to the terms and conditions set forth in the Asset Trust III Pooling and Servicing Agreement, on a monthly basis the Asset Trust III Trustee will distribute collections deposited in the certificate account to the Company, as holder of the Asset Trust III Class A Trust Certificate, less

(a) fees, expenses and indemnities payable to the Asset Trust III Trustee and the Asset Trust III Delaware Trustee and (b) fees and certain other amounts payable to the Asset Trust III Servicer. No amounts will be payable from collections with respect to the Asset Trust III Class R Trust Certificate.

Under the terms of the Asset Trust III Pooling and Servicing Agreement, collections with respect to the Flex-5 ARMs may be invested in certain permitted investments prior to their distribution to the Company, as holder of the Asset Trust III Class A Trust Certificate. The Asset Trust III Servicer shall be entitled to retain any investment income produced by such investment as additional servicing compensation.

*Servicing of Delinquent Flex-5 ARMs; Foreclosure.* The Asset Trust III Servicer will be required under the terms of the Asset Trust III Pooling and Servicing Agreement to make reasonable efforts to collect or cause to be collected all payments on the Flex-5 ARMs owned by Asset Trust III that are 30 or more days delinquent. Such efforts may include payment reminder telephone calls to the mortgagor, letter campaigns, drive-by property inspections and other collection activities permissible under the Asset Trust III Loan Documents and applicable law.

The Asset Trust III Servicer will be required under the Asset Trust III Pooling and Servicing Agreement to foreclose upon the mortgaged property related to each defaulted Flex-5 ARM as to which no satisfactory arrangements can be made for collection of delinquent payments. Under the Asset Trust III Pooling and Servicing Agreement, the Asset Trust III Servicer will be permitted, in lieu of foreclosure, if prudent to do so and taking into account the desirability of maximizing net liquidation proceeds, to accept a payment of less than the outstanding principal balance of the defaulted Flex-5 ARM, sell the Mortgage Loan for an amount less than its outstanding principal balance or enter into a modification of a Mortgage Loan that would constitute a troubled debt restructuring for purposes of GAAP. The Asset Trust III Servicer will not be permitted to foreclose upon a mortgaged property if it is aware of evidence of toxic waste or other environmental contamination on the mortgaged property and it determines that it would be imprudent to foreclose.

*Insurance.* For each Flex-5 ARM with an original loan-to-value ratio greater than 80%, the Asset Trust III Pooling and Servicing Agreement generally will require the Asset Trust III Servicer to keep in full force and effect a primary mortgage insurance policy. The Asset Trust III Servicer generally will not be required to maintain such policy if the outstanding principal balance of the Flex-5 ARM is 80% or less of the original appraised value of the related mortgaged property, unless required by applicable law.

### Limitations on the Asset Trust III Servicer's Liability

The Asset Trust III Pooling and Servicing Agreement will provide that neither the Asset Trust III Servicer nor any director, officer, employee or agent of the Asset Trust III Servicer (the *"Asset Trust III Servicer Indemnified Parties"*) will be under any liability to Asset Trust III, the Company or the holders of the Asset Trust III Class A Trust Certificate and the Asset Trust III Class R Trust Certificate or others for any action taken (or not taken) by any Asset Trust III Servicer Indemnified Party in good faith pursuant to the Asset Trust III Pooling and Servicing Agreement, or for errors in judgment; provided, however, that the Asset Trust III Servicer will not be protected against any liability that would otherwise be imposed by reason of willful misfeasance, bad faith or gross negligence in the performance of duties or by reason of reckless disregard of obligations and duties thereunder. The Asset Trust III Pooling and Servicing Agreement will further provide that any Asset Trust III Servicer Indemnified Party is entitled to indemnification by Asset Trust III and will be held harmless against any loss, liability or expense incurred in connection with any legal action relating to the Asset Trust III Pooling and Servicing Agreement or the certificates issued thereunder (except any such loss, liability, or expense otherwise reimbursable pursuant to the Asset Trust III Pooling and Servicing Agreement) and any loss, liability or expense incurred by reason of willful misfeasance, bad faith or gross negligence in the performance of duties thereunder or by reason of reckless disregard of obligations and duties thereunder. In addition, the Asset Trust III Pooling and Servicing Agreement will provide that the Asset

Trust III Servicer is not under any obligation to appear in, prosecute or defend any legal action that is not incidental to its responsibilities under the Asset Trust III Pooling and Servicing Agreement and that in its opinion may involve it in any expense or liability. The Asset Trust III Servicer may, however, in its discretion undertake any such action that it may deem necessary or desirable with respect to the Asset Trust III Pooling and Servicing Agreement and the rights and duties of the parties thereto and the interests of the holders of the Asset Trust III Class A Trust Certificate and the Asset Trust III Class R Trust Certificate. In such event, the legal expenses and costs of such action and any liability resulting therefrom will be expenses, costs and liabilities of Asset Trust III, and the Asset Trust III Servicer will be entitled to be reimbursed therefor and to charge the certificate account.

*Asset Trust III Servicer Termination and Replacement.* Under the terms of the Asset Trust III Pooling and Servicing Agreement, after the occurrence of any one of several typical Asset Trust III Servicer termination events, including but not limited to a receivership with respect to the Asset Trust III Servicer or (subject to the expiration of typical grace periods and materiality requirements) the failure by the Asset Trust III Servicer to make required deposits to the certificate account, the Company may remove the Asset Trust III Servicer. If the Asset Trust III Servicer is removed by the Company, the Company shall have the sole power to appoint a replacement Asset Trust III Servicer.

*The Asset Trust III Servicer's Third Party Vendors and Service Providers.* Under the Asset Trust III Pooling and Servicing Agreement, the Asset Trust III Servicer may perform its servicing responsibilities through agents or independent contractors, but will not thereby be released from any of its responsibilities thereunder. The Asset Trust III Servicer expects that it will outsource some other of its responsibilities pursuant to these provisions, which services may include some or all of the following: (i) certain collection-related activities on early stage delinquent loans, (ii) processing and monitoring of foreclosure actions, (iii) processing and monitoring of mortgagors bankruptcy proceedings, (iv) preservation of properties related to delinquent loans, (v) maintenance, marketing and sale of real-estate-owned properties, (vi) assuring that hazard insurance coverage is maintained, (vii) determining whether flood insurance coverage is required and assuring that any required coverage is maintained, (viii) tax bill procurement and tracking of delinquent tax payments, (ix) printing and mailing billing statements, Flex-5 ARM notices and default notices and (x) depositing mortgagor payments into a lockbox account. From time to time, the Asset Trust III Servicer may cease to outsource one or more of the foregoing servicing functions or may choose to outsource additional servicing functions. Some vendors may perform more than one function, and some functions may be performed by more than one vendor.

The Asset Trust III Servicer has entered into service level agreements with some of its vendors, which set forth detailed performance criteria, including in some cases minimum time requirements for completing specified tasks and maximum error rates, and which in some cases impose penalties for non-compliance with such criteria. The Asset Trust III Servicer will monitor vendor compliance with applicable servicing criteria through procedures that may include reviews of statistical samplings of Flex-5 ARMs and reviews of reports on vendor performance prepared by the vendor or the Asset Trust III Servicer.

### The Asset Trust III Servicer's Quality Control Procedures

The Asset Trust III Servicer uses a combination of management controls and technology controls to ensure the accuracy and integrity of servicing records. Management controls include the use of approval levels, the segregation of duties, and reconciliations of servicing data and accounts, among others. Technology controls include the use of data security controls and interface controls to ensure that only authorized persons have the ability to access and change system data or to submit data to or receive data from vendors and investors. Specific security profiles for each job function include a predetermined set of data security controls that are appropriate for that job function. The regional data center for the Fidelity System, which is located in Jacksonville, Florida, is kept in a fire resistant environment, and commercial electrical power is backed up by generators.

In addition, the Asset Trust III Servicer conducts periodic internal audits of critical servicing and technology functions. External audits by entities such as the Fannie Mae, Freddie Mac and Ginnie Mae and the annual examination by WMI's independent accountants in connection with their audit of WMI and its subsidiaries may provide independent verification of the adequacy of such functions. Periodic examination by the Asset Trust III Servicer's regulatory authorities may provide additional independent review of the Asset Trust III Servicer's management controls.

Both the Asset Trust III Servicer and Fidelity maintain detailed business continuity plans so that each entity can resume critical business functions in the event of a disaster or other serious system outage, which plans are reviewed and updated periodically. Fidelity is contractually obligated to return the Asset Trust III Servicer to full functionality within 48 hours of a reported system outage. The Asset Trust III Servicer and Fidelity perform annual disaster recovery tests in which they reroute data and servicing system operations to Fidelity's back-up site, and then process sample transactions from all servicing locations to ensure the functionality of such back-up site.

It is the Asset Trust III Servicer's policy to require its other third party vendors to implement measures similar to those described above to ensure the accuracy and integrity of servicing records.

**The Asset Trust III Custodian**

Washington Mutual Bank will act as custodian (the *"Asset Trust III Custodian"*) for Asset Trust III pursuant to a Custody Agreement, to be entered into on or before the closing date (the *"Asset Trust III Custody Agreement"*), among the Asset Trust III Trustee, the Asset Trust III Servicer and the Asset Trust III Custodian. The Asset Trust III Custodian will hold the notes, mortgages and other legal documents related to the Flex-5 ARMs (collectively, the *"Asset Trust III Loan Documents"*) for the benefit of the Asset Trust III Trustee. The Asset Trust III Custodian will be required to maintain the Asset Trust III Loan Documents in secure and fire resistant facilities. The mortgage files held by the Asset Trust III Servicer will not be required to be physically segregated from Asset Trust III Loan Documents in the Asset Trust III Custodian's custody but will be kept in shared facilities. The Asset Trust III Custodian will be required to review the Asset Trust III Loan Documents related to each Flex-5 ARM and deliver to the Asset Trust III Trustee a certification to the effect that, except as noted in the certification, all required documents have been executed and received.

In the event of the termination of the Asset Trust III Custody Agreement, the Asset Trust III Custodian will be required to deliver the Asset Trust III Loan Documents in the Asset Trust III Custodian's custody to the Asset Trust III Trustee or any successor Asset Trust III Custodian appointed by the Company.

The Asset Trust III Servicer may, but does not currently, pay the Asset Trust III Custodian a fee for its services under the Asset Trust III Custody Agreement from time to time. Payment of this fee will not affect distributions to the Company.

## General

WMI is a Washington corporation. It owns two federal savings associations as well as numerous non-bank subsidiaries. WMI is a multiple savings and loan holding company. As a savings and loan holding company, WMI is subject to regulation by the OTS.

WMI's federal savings associations are subject to extensive regulation and examination by the OTS, their primary federal regulator, as well as the Federal Deposit Insurance Corporation ("*FDIC*"). WMI's nonbank financial subsidiaries are also subject to various federal and state laws and regulations.

All of WMI's banking subsidiaries are under the common control of WMI and are insured by the FDIC. If an insured institution fails, claims for administrative expenses of the receiver and for deposits in U.S. branches (including claims of the FDIC as subrogee of the failed institution) have priority over the claims of general unsecured creditors. In addition, the FDIC has authority to require any of WMI's banking subsidiaries to reimburse it for losses it incurs in connection either with the failure of another of WMI's banking subsidiaries or with the FDIC's provision of assistance to one of WMI's banking subsidiaries that is in danger of failure.

## Holding Company Status and Acquisitions

WMI is a multiple savings and loan holding company, as defined by federal law, because it owns more than one savings association. WMI is regulated as a unitary savings and loan holding company, however, because the OTS deems WMI's federal savings associations to have been acquired in supervisory transactions. Therefore, WMI is exempt from certain restrictions that would otherwise apply under federal law to the activities and investments of a multiple savings and loan holding company. These restrictions will apply to WMI if any of WMI's banking institutions fails to meet a qualified thrift lender test established by federal law. As of June 30, 2007, WMI's banking subsidiaries were in compliance with qualified thrift lender standards.

WMI may not acquire control of another savings association without the prior approval of the OTS. WMI may not be acquired by a company, other than a bank holding company, unless the OTS approves such an acquisition, or by an individual unless the OTS does not object after receiving notice. WMI may not be acquired by a bank holding company unless the Board of Governors of the Federal Reserve System (the "*Federal Reserve*") approves. In any case, the public must have an opportunity to comment on the proposed acquisition, and the OTS or Federal Reserve must complete an application review. Without prior approval from the OTS, WMI may not acquire more than 5% of the voting stock of any savings institution that is not one of WMI's subsidiaries.

The Gramm-Leach-Bliley Act generally restricts any non-financial entity from acquiring WMI unless such non-financial entity was, or had submitted an application to become, a savings and loan holding company as of May 4, 1999. Because WMI was treated as a unitary savings and loan holding company prior to that date, WMI may engage in non-financial activities and acquire non-financial subsidiaries.

## Recent Developments

On October 17, 2007, the WMI Group announced its results of operations for the quarter ended September 30, 2007. The WMI Group's net income was $210 million in the third quarter of 2007, compared with net income of $748 million in the third quarter of 2006 and $830 million in the second quarter of 2007.

Net interest income was $2.014 billion in the third quarter of 2007, compared with $1.947 billion in the third quarter of 2006 and $2.034 billion in the second quarter of 2007.

Non-performing assets were approximately $5.5 billion, or 1.65% of total assets, at September 30, 2007, compared with approximately $2.40 billion or 0.69%, at September 30, 2006 and approximately $4.03 billion, or 1.29%, at June 30, 2007. The provision for loan and lease losses was $967 million in the third quarter of 2007, compared with $166 million in the third quarter of 2006 and $372 million in the second quarter of 2007. This resulted in the WMI Group's allowance for loan and lease losses increasing to $1.9 billion at September 30, 2007, up 21% from June 30, 2007.

Total assets at September 30, 2007 were $330.1 billion, compared to $348.9 billion at September 30, 2006 and $312.2 billion at June 30, 2007. Total net loans held in portfolio, net of allowance for loan and lease losses at September 30, 2007 were $235.2 billion, compared to $240.2 billion at September 30, 2006 and $213.4 billion at June 30, 2007.

WMI Group's results for the third quarter of 2007 reflect adverse developments in the mortgage lending business (and in the housing market more generally) and related volatility and liquidity constraints in the capital markets since June 30, 2007. It appears that those developments will be significantly worse and longer lasting than originally expected. The consequences for the WMI Group have included:

- For the foreseeable future, the WMI Group likely will have higher level of non-performing assets leading to higher levels of provisions and charge-offs compared to periods prior to the second quarter of 2007.

- Disruptions in the capital markets continue to affect the ability of mortgage originators, including WMB, to sell mortgage loans to the capital markets through whole loan sales or any securitization format. Loans held in portfolio by the WMI Group increased during the third quarter as a result of its retention of loans that in the past it would have sold through whole loan sales or securitization format. Such retained loans consist primarily of non-conforming loans.

For additional information regarding the WMI Group's results for operations for the quarter ended September 30, 2007, please see WMI's press release, dated October 17, 2007, which was furnished to the SEC on Form 8-K on October 17, 2007 and which is incorporated by reference in this Offering Circular. See "Where You Can Find More Information".

## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

WMB is the Asset Trust I Servicer, the Asset Trust II Servicer, the Asset Trust III Servicer and the originator of the HELs held by the Company through Asset Trust I, the Option ARMs held by the Company through Asset Trust II and the Flex-5 ARMs held by the Company through Asset Trust III. WMB is expected to be the servicer and may be the originator with respect to any Additional Assets. University Street is an indirect subsidiary of WMB. The Company is a subsidiary of University Street.

There is not currently, and there was not during the past two years, any material business relationship, agreement, arrangement, transaction or understanding that is or was entered into outside the ordinary course of business or is or was on terms other than would be obtained in an arm's-length transaction with an unrelated third party, between (i) any of WMB or University Street, on the one hand, and (ii) any of the Company, Asset Trust I, Asset Trust II, Asset Trust III or the Trust, on the other hand.

The Company will periodically reimburse WMB for general overhead expenses incurred by WMB on behalf of the Company. The Company expects that the amount of such reimbursements will be *de minimis*.

## DESCRIPTION OF THE TRUST SECURITIES

The following summary describes the material terms and provisions of the Trust Securities, which will represent undivided beneficial ownership interests in a like amount of Series 2007-B Company Preferred Securities held by the Trust. This description is qualified in its entirety by reference to the terms and provisions of the Trust Agreement. A copy of the Trust Agreement may be obtained upon request to WMI.

### General

The Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities, liquidation preference $100,000 per security (the *"Trust Securities"*), of the Trust are beneficial ownership interests in the Trust, the terms of which are set forth in the Trust Agreement. The aggregate liquidation preference of the Trust Securities is $1,000,000,000. The funds of the Trust available for distribution to the holders of the Trust Securities will be limited solely to payments received by the Trust from the Company as dividends on, or upon redemption of, the Series 2007-B Company Preferred Securities, which payments will be passed through upon receipt by the Trust to the holders of the Trust Securities. Consequently, if the Company does not pay any dividend or make any redemption payment on the Series 2007-B Company Preferred Securities, the Trust will not have funds to make the related distribution or redemption payment on the Trust Securities. Distributions on and the redemption price of each Trust Security will be passed through to the holders of the Trust Securities on the same dates and in the same amounts as the corresponding dividends and redemption price, as applicable, that are paid by the Company to the Trust on a like amount of Series 2007-B Company Preferred Securities; *provided,* that if any such payment of dividends or redemption price is received by the Trust after 2:00 P.M. New York time, such payment will instead be passed through to the holders of the Trust Securities on the next day that is a Business Day. The Dividend Payment Dates and related Dividend Periods are the same for the Trust Securities and the Series 2007-B Company Preferred Securities, and, accordingly, the terms *"Dividend Payment Date"*, *"Dividend Period"* and *"Business Day"* have the same meanings as applied to each of those securities.

The Trust Securities are automatically exchangeable under certain circumstances into a like amount of Depositary Shares. See "— Conditional Exchange".

Under the Trust Agreement, the Trust is prohibited from issuing any securities other than the Trust Securities.

The Trust Securities are not obligations of, or guaranteed by, WMI, WMB, Marion, Seneca, the Company, University Street, Trust I, Trust II, Trust III, WaMu Cayman or any of their respective affiliates or any other entity. The Trust Securities represent equity interests solely in the Trust and do not represent an interest in any of the foregoing entities.

### Distributions

Distributions on the Trust Securities will be passed through on each date on which the Company pays to the Trust dividends on the Series 2007-B Company Preferred Securities owned by the Trust, in an amount per Trust Security equal to the amount of dividends received by the Trust on such date on a like amount of Series 2007-B Company Preferred Securities (including Additional Amounts, if any); *provided,* that if any such payment of dividends is received by the Trust after 2:00 P.M. New York time, such payment will instead be passed through to the holders of the Trust Securities on the next day that is a Business Day. Accordingly:

- if the Company pays full dividends on a Dividend Payment Date for the Series 2007-B Company Preferred Securities, the Trust will pass through corresponding full distributions on the Trust Securities on such Dividend Payment Date;