# EXHIBIT M

$1,000,000,000

**Washington Mutual Preferred Funding Trust IV**

Fixed-to-Floating Rate Perpetual Non-Cumulative Trust Securities

Automatically Exchangeable in Specified Circumstances into Depositary
Shares representing Preferred Stock of Washington Mutual, Inc.

<u>Purchase Agreement</u>

October 18, 2007

Goldman, Sachs & Co.
    c/o Goldman, Sachs & Co.,
    As representatives of the several
    Purchasers named in Schedule I,
85 Broad Street,
New York, New York 10004.

Ladies and Gentlemen:

Washington Mutual Bank, a Federal savings association ("*WMB*") and an indirect
subsidiary of Washington Mutual, Inc., a Washington corporation ("*WMI*"), has previously
caused to be established Washington Mutual Preferred Funding LLC, a Delaware limited
liability company (the "*Company*") as its indirect subsidiary. The Company, as grantor,
has established Washington Mutual Preferred Funding Trust IV, a Delaware statutory
trust ("*Trust IV*"), for purposes of the offering of securities by Trust IV provided for in this
Agreement. At or before the Time of Delivery (as defined in Section 4(b)), (i) University
Street, Inc., an indirect subsidiary of WMB ("*University Street*") and the holder of all the
common member interests in the Company (the "*Company Common Securities*"),
proposes to contribute a portfolio of fixed/floating rate mortgages ("*Flex-5 ARMs*") to the
Company and (ii) WMB proposes to convey a portfolio of Flex-5 ARMs to the Company
in exchange for 1,000,000 of the Company's Fixed-to-Floating Rate Perpetual Non-
cumulative Preferred Securities, Series 2007-B, liquidation preference $1,000 per
security and $1,000,000,000 in the aggregate (the "*Company Preferred Securities*"). At
the time of Delivery, subject to the terms and conditions stated herein:

(a)      Trust IV proposes to (i) issue and sell to the Purchasers named in Schedule I
        $1,000,000,000 stated amount of its Fixed-to-Floating Perpetual Non-cumulative
        Offered Securities (the "*Offered Securities*") and (ii) apply the proceeds of the
        Offered Securities to purchase from WMB a like amount of the Company
        Preferred Securities; and

(b)      WMI, WMB and the Company propose to cause the issuances and sales of
        securities referred to in clause (a) to occur.

Under the circumstances described in the Preliminary Offering Circular (as defined in Section 1(A)(a)) and Offering Circular (as defined in Section 1(A)(a)), the Offered Securities will be exchanged automatically for a like amount of newly-issued depositary shares ("*Depositary Shares*"), each representing a 1/1000th interest in one share of WMI's Series N Perpetual Non-cumulative Fixed-to-Floating Rate Preferred Stock (the "*WMI Preferred Stock*"). "*Depositary Receipts*" issued pursuant to the Deposit Agreement (defined in Section 1(A)(f)) will evidence the Depositary Shares.

The Offered Securities, together with the Company Preferred Securities, the Depositary Receipts, the Depositary Shares and WMI Preferred Stock, are together referred to herein as the "*Securities*". WMI, WMB, the Company and Trust IV are together referred to herein as the "*Issuer/Sellers*", and individually as an "*Issuer/Seller*".

Terms used herein and not otherwise defined but that are defined in the Pricing Circular (as defined in Section 1(A)(a)) have the meanings specified in the Pricing Circular.

1.    Representations and Warranties

(A)    WMI and WMB, jointly and severally, represent and warrant to, and agree with, each of the Purchasers as follows (except that WMB's representations and warranties apply only to matters relating to it, Trust IV and the Company):

(a)    A preliminary offering circular, dated October 18, 2007 (the "*Preliminary Offering Circular*"), and an offering circular, dated October 18, 2007 (the "*Offering Circular*"), have been prepared in connection with the offering of the Offered Securities and the Depositary Shares issuable upon a Conditional Exchange. The Preliminary Offering Circular, as amended and supplemented immediately prior to the Applicable Time (as defined in Section 1(A)(b)), is hereinafter referred to as the "*Pricing Circular*". Any reference to the Preliminary Offering Circular, Pricing Circular or Offering Circular shall be deemed to refer to and include (i) WMI's Annual Report on Form 10-K filed on March 1, 2007 relating to the year ended December 31, 2006; (ii) Quarterly Reports on Form 10-Q filed May 10, 2007 and August 9, 2007 relating to the quarters ended March 31, 2007 and June 30, 2007, respectively, and (iii) Current Reports on Form 8-K filed or furnished, as the case may be, on January 22, 2007, February 7, 2007, March 14, 2007, April 23, 2007, May 30, 2007, July 18, 2007(other than information furnished under Item 2.02 including Exhibits 99.1, 99.2 and 99.3), September 13, 2007, October 17, 2007 and October 18, 2007, in each case filed by WMI with the United States Securities and Exchange Commission (the "*Commission*") pursuant to Section 13(a), 13(c) or 15(d) of the United States Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), on or prior to the date of such circular, and (ii) WMB's Annual Report on Form 10-K filed on April 2, 2007 relating to the year ended December 31, 2006; and Quarterly Reports on Form 10-Q filed May 15, 2007 and August 14, 2007 relating to the quarters ended March 31, 2007 and June 30, 2007, respectively; and Current Reports on Form 8-K filed or furnished, as the case may be, on April 23, 2007 and September 17, 2007, in each case filed by WMB with the United States Office of Thrift Supervision (the "*OTS*") pursuant to Section 13(a), 13(c) or 15(d) of the Exchange Act or regulations of the OTS substantially similar thereto on or prior to

the date of such circular; and any reference to the Preliminary Offering Circular, Pricing Circular or Offering Circular, as the case may be, as amended or supplemented, as of any specified date, shall also be deemed to include (i) any documents filed with the Commission (in the case of WMI) or the OTS (in the case of WMB) pursuant to Section 13(a), 13(c) or 15(d) of the Exchange Act or regulations of the OTS substantially similar thereto after the date of such Preliminary Offering Circular or the Offering Circular, as the case may be, and prior to such specified date and (ii) any Additional Issuer/Seller Information (as defined in Section 5(f)) furnished by WMI prior to the completion of the distribution of the Offered Securities; and all documents filed under the Exchange Act and so deemed to be included in the Preliminary Offering Circular, Pricing Circular or Offering Circular, as the case may be, or any amendment or supplement thereto are hereinafter called the "*Exchange Act Reports*". The Exchange Act Reports, when they were or are filed with the Commission or the OTS, as applicable, conformed or will conform in all material respects to the applicable requirements of the Exchange Act and the applicable rules and regulations of the Commission and the OTS thereunder in effect as of their respective dates of filing; and no such documents were filed with the Commission or the OTS since the Commission's or OTS's (as applicable) close of business on the business day immediately prior to the date of this Agreement and prior to the execution of this Agreement, except as set forth on Schedule II(A). Additionally, any reference to the Preliminary Offering Circular, Pricing Circular or Offering Circular shall be deemed to refer to and include WMB's Thrift Financial Reports incorporated therein by reference and referred to in the Preliminary Offering Circular and Offering Circular under the caption "Where You Can Find More Information". The Thrift Financial Reports, when filed with the OTS, conformed or will conform in all material respects to the applicable requirements of the OTS with respect thereto. The Preliminary Offering Circular, Pricing Circular or Offering Circular and any amendments or supplements thereto and the Exchange Act Reports did not and will not, as of their respective dates, contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided, however,* that this representation and warranty shall not apply to any statements or omissions made in reliance upon and in conformity with information furnished in writing to WMI by a Purchaser through Goldman, Sachs & Co. expressly for use therein.

(b)     For the purposes of this Agreement, the "*Applicable Time*" is 3:00 p.m., Eastern time, on the date of this Agreement; the Pricing Circular as supplemented by the information set forth in Schedule III, taken together (collectively, the "*Pricing Disclosure Package*") as of the Applicable Time did not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; and each Issuer/Seller Supplemental Disclosure Document (as defined in Section 6(a)(i)) listed on Schedule II(B) does not conflict with the information contained in the Pricing Circular or the Offering Circular and each such Issuer/Seller Supplemental Disclosure Document, as supplemented by and taken together with the Pricing Disclosure Package as of the Applicable

Time, did not include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; *provided, however*, that this representation and warranty shall not apply to statements or omissions made in an Issuer/Seller Supplemental Disclosure Document in reliance upon and in conformity with information furnished in writing to WMI by a Purchaser through Goldman, Sachs & Co. expressly for use therein.

(c)    WMI has been duly incorporated and is an existing corporation under the laws of the State of Washington, with power and authority (corporate and other) to own its properties and conduct its business as described in the Pricing Circular; and WMI is duly qualified to do business as a foreign corporation in good standing in all other jurisdictions in which its ownership or lease of property or the conduct of its business requires such qualification, except for such failures to qualify that would not, individually or in the aggregate, have a material adverse effect on the condition (financial or other), business, properties or results of operations of WMI and its subsidiaries taken as a whole or the consummation of any of the transactions contemplated by the Pricing Circular, this Agreement or any of the other Transaction Agreements (as defined in Section 1(A)(f)) (a "*Material Adverse Effect*").

(d)    New American Capital, Inc. has been duly incorporated and is a validly existing corporation in good standing under the laws of the State of Delaware, Washington Mutual Bank fsb has been duly organized as a federal savings association and is in good standing under the laws of the United States, and WMB (together with New American Capital, Inc. and Washington Mutual Bank fsb, each a "*Significant Subsidiary*", and, together, the "*Significant Subsidiaries*") has been duly organized as a federal savings association and is in good standing under the laws of the United States. Each Significant Subsidiary has the power and authority (corporate and other) to own its properties and conduct its business as described in the Pricing Circular; and each Significant Subsidiary is duly qualified to do business as a foreign corporation in good standing in all other jurisdictions in which its ownership or lease of property or the conduct of its business requires such qualification, except for such failures to qualify that would not, individually or in the aggregate, have a Material Adverse Effect; WMI has an authorized capitalization as set forth in the Pricing Circular; all of the issued and outstanding capital stock of each Significant Subsidiary has been duly authorized and validly issued and is fully paid and nonassessable; and the capital stock of each Significant Subsidiary is owned by WMI, directly or through subsidiaries, free from liens, encumbrances and defects. WMI has no "significant subsidiaries" as defined in Rule 1-02(w) of the Commission's Regulation S-X other than the Significant Subsidiaries.

(e)    WMI has been duly registered as a savings and loan holding company under the applicable provisions of the Home Owners' Loan Act; WMI and each of its subsidiaries are in compliance in all material respects with all applicable laws administered by and regulations of the Federal Deposit Insurance Corporation ("*FDIC*"), the OTS and any other federal or state bank regulatory authority (the "*Bank Regulatory Authorities*") with jurisdiction over WMB or any of its

NY12532:406459.6

subsidiaries, other than where such failures to comply would not, individually or in the aggregate, have a Material Adverse Effect; and neither WMI nor any of its subsidiaries is a party to any written agreement or memorandum of understanding with, or a party to any commitment letter or similar undertaking to, or is subject to any order or directive by, or is a recipient of an extraordinary supervisory letter from, or has adopted any board resolutions at the request of, any Bank Regulatory Authority which restricts materially the conduct of its business, or in any manner relates to its capital adequacy, its credit policies or its management, nor have any of them been advised by any Bank Regulatory Authority that it is contemplating issuing or requesting (or is considering the appropriateness of issuing or requesting) any such order, decree, agreement, memorandum of understanding, extraordinary supervisory letter, commitment letter or similar submission, or any such board resolutions.

(f)     Each of (i) the Deposit Agreement to be entered into at or before the Time of Delivery among WMI, Mellon Investor Services, LLC, as depositary (the "*Depositary*"), the registrar appointed thereunder and the holders from time-to-time of the applicable Depositary Receipts (together, the "*Deposit Agreement*"), and (ii) the Exchange Agreement to be entered into at or before the Time of Delivery among WMI, Trust IV and Mellon Investor Services, LLC, as Depositary (the "*Exchange Agreement*"), and, together with the Deposit Agreement, the "*WMI Transaction Agreements*"; the WMI Transaction Agreements, together with the Company Transaction Agreements (as defined in Section 1(B)(a)) and the Trust IV Transaction Agreements (as defined in Section 1(C)(a)), the "*Transaction Agreements*"), each in substantially the form previously provided to the representatives, has been duly authorized by WMI and has been or, at the Time of Delivery, will have been duly executed and delivered, will conform in all material respects to the description thereof in the Pricing Disclosure Package and the Offering Circular, and constitutes or, at the Time of Delivery, will constitute valid and legally binding obligations of WMI enforceable in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(g)     Each of (i) the Master Loan Contribution and Purchase Agreements, dated as of March 7, 2006 and December 13, 2006 (the "*University Street Asset Transfer Agreement*"), between University Street and the Company, (ii) and the "Fourth Amended and Restated Limited Liability Company Agreement of Washington Mutual Preferred Funding LLC" to be entered into at or before the Time of Delivery among University Street, Trust IV, WMB and the Securityholders thereunder from time to time (the "*Company LLC Agreement*"), (iii) the Loan Transfer Confirmation to be entered into at or before the Time of Delivery between University Street and WMB (the "*First Loan Transfer Confirmation*") and (iv) the Loan Transfer Confirmation to be entered into at or before the Time of Delivery between University Street and the Company (the "*Second Loan Transfer Confirmation*") has been duly authorized by University Street and has been duly executed and delivered by University Street and constitutes or, at the Time of Delivery, will constitute valid and legally binding obligations of University Street enforceable in accordance with its terms, subject to bankruptcy, insolvency,

-5-

receivership, conservatorship, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles. Each of (i) the Master Loan Contribution and Purchase Agreement, dated as of March 6, 2007 and December 13, 2006 (the "*WMB Asset Transfer Agreement*" and, together with the University Street Asset Transfer Agreement, the "*Asset Transfer Agreements*"), between WMB and the Company, (ii) the Asset Trust I PSA, Asset Trust II PSA and Asset Trust III PSA (each as defined in Section 1(B)(a)), (iii) the Administrative Services Agreement (as defined in Section 1(B)(a)), (iv) the First Loan Transfer Confirmation, (v) the Loan Transfer Confirmation to be entered into at or before the Time of Delivery between WMB and the Company (the "*Third Loan Transfer Confirmation*"), (vi) the Custody Agreement to be entered into at or before the Time of Delivery between WMB and Deutsche Bank National Trust Company (the "*Custody Agreement*") and (vii) the Company LLC Agreement has been duly authorized by WMB and has been duly executed and delivered, conforms in all material respects to the description thereof in the Pricing Disclosure Package and the Offering Circular, and constitute valid and legally binding obligations of WMB enforceable in accordance with its terms, subject to bankruptcy, insolvency, receivership, conservatorship, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(h)     The WMI Preferred Stock has been duly authorized and, effective upon filing of the articles of amendment to the articles of incorporation of WMI relating to the Series N Preferred Stock with the Secretary of State of the State of Washington, reserved for issuance and when issued and delivered upon the occurrence of an Exchange Event will be validly issued, fully paid and non-assessable and will not be issued in violation of the pre-emptive or other similar rights of any securityholder of WMI; the capital stock of WMI conforms in all material respects to the description thereof in the Pricing Disclosure Package and the Offering Circular; upon issuance by the Depositary of Depositary Receipts evidencing Depositary Shares against the deposit of WMI Preferred Stock in respect thereof in accordance with the provisions of the Depositary Agreement, such Depositary Receipts will be duly and validly issued and the persons in whose names the Depositary Receipts are registered will be entitled to the rights specified therein and in the Deposit Agreement.

(i)     No consent, approval, authorization, or order of, or filing with, any governmental agency or body or any court is required for the consummation of the transactions contemplated by this Agreement or the other Transaction Agreements or in connection with the issuance and sale of any of the Securities, except (i) such as will have been obtained or made prior to the Time of Delivery and (ii) as may be required under state securities or "blue sky" laws.

(j)     The execution, delivery and performance of this Agreement and the other Transaction Agreements, and the issuance and sale of the Securities and compliance with the terms and provisions thereof will not result in a breach or violation of any of the terms and provisions of, or constitute a default under, (i) any statute, or any rule, regulation or order of any governmental agency or

-6-

body or any court, domestic or foreign, having jurisdiction over WMI or any Significant Subsidiary or any of their properties, (ii) any agreement or instrument to which WMI or any Significant Subsidiary is a party or by which WMI or any Significant Subsidiary is bound or to which any of the properties of WMI or any Significant Subsidiary is subject, except for such breaches, violations or defaults that would not individually or in the aggregate have a Material Adverse Effect, or (iii) the charter or by-laws of WMI or any Significant Subsidiary; and WMI has full power and authority (corporate and other) to authorize, issue and sell the Depositary Shares and the WMI Preferred Stock as contemplated by this Agreement.

(k)     This Agreement has been duly authorized, executed and delivered by WMI and WMB.

(l)     Except as disclosed in the Pricing Circular and except for such failures that would not individually or in the aggregate have a Material Adverse Effect, WMI and its subsidiaries have good and marketable title to all real properties and all other properties and assets owned by them, in each case free from liens, encumbrances and defects that would affect the value thereof or interfere with the use made or to be made thereof by them; and except as disclosed in the Pricing Circular and except for such failures that would not individually or in the aggregate have a Material Adverse Effect, WMI and its subsidiaries hold all leased real or personal property under valid and enforceable leases with no exceptions that would interfere with the use made or to be made thereof by them.

(m)    WMI and its subsidiaries possess adequate certificates, authorities or permits issued by appropriate governmental agencies or bodies necessary to conduct the business now operated by them, except where the failure to so possess would not individually or in the aggregate have a Material Adverse Effect, and have not received any notice of proceedings relating to the revocation or modification of any such certificate, authority or permit that, if determined adversely to WMI or any of its subsidiaries, would individually or in the aggregate have a Material Adverse Effect.

(n)    Except as disclosed in the Pricing Circular, there are no pending actions, suits or proceedings against or affecting WMI, any of its subsidiaries, the Company, Washington Mutual Preferred Funding Trust I ("*Trust I*"), Washington Mutual Preferred Funding Trust II ("*Trust II*"), Washington Mutual Preferred Funding Trust III ("*Trust III*"), Trust IV, Washington Mutual Preferred Funding (Cayman) I Ltd. ("*WaMu Cayman*"), Washington Mutual Home Equity Trust I ("*Asset Trust I*") or WAMU 2006-OA1 ("*Asset Trust II*"), or any of their respective properties that, if determined adversely to WMI or any of its subsidiaries, the Company, Trust I, Trust II, Trust III, Trust IV, WaMu Cayman, Asset Trust I or Asset Trust II, would individually or in the aggregate have a Material Adverse Effect, or would materially and adversely affect the ability of any Issuer/Seller to perform its obligations under any Transaction Agreement or this Agreement, or that are otherwise material in the context of the sale of the Offered Securities; and no such actions, suits or proceedings are, to WMI's knowledge, threatened (in writing in the case of any entity other than the Company, Trust I, Trust II, Trust III,

-7-

Trust IV, WaMu Cayman, Asset Trust I or Asset Trust II) or, to WMI's knowledge, contemplated.

(o) The financial statements of WMI and WMB (including the related notes and supporting schedules) included or incorporated by reference in the Pricing Circular present fairly the financial position of WMI or WMB, as applicable, and their respective consolidated subsidiaries as of the dates shown and their results of operations and cash flows for the periods shown, and, except as otherwise disclosed in the Pricing Circular, such financial statements have been prepared in conformity with the generally accepted accounting principles in the United States applied on a consistent basis.

(p) Except as disclosed in the Pricing Circular, since the date of the latest financial statements included or incorporated by reference in the Pricing Circular, there has been no material adverse change, nor any development or event involving a prospective material adverse change, in the condition (financial or other), business, properties or results of operations of WMI and its subsidiaries taken as a whole, and, except as disclosed in or contemplated by Pricing Circular, there has been no dividend or distribution of any kind declared, paid or made by WMI on any class of its capital stock.

(q) WMI is not and, after giving effect to the offering and sale of the Securities and the application of the proceeds thereof as described in the Pricing Circular, will not be an "investment company" as defined in the United States Investment Company Act of 1940, as amended (the "*Investment Company Act*").

(r) WMI, on a consolidated basis, has insurance covering its properties, operations, personnel and businesses, which insurance is in such amounts and insures against such losses and risks as are prudent and customary in the business in which WMI is engaged. WMI has not received notice from any insurer or agent of such insurer that capital improvements or other expenditures are required or necessary to be made in order to continue such insurance.

(s) None of the proceeds of the sale of the Securities will be used, directly or indirectly, for any purpose which would violate Regulation U of the Federal Reserve Board.

(t) Prior to the date hereof, neither WMI nor any of its affiliates has taken any action which is designed to or which has constituted or which could reasonably be expected to cause or result in stabilization or manipulation of the price of any security of WMI in connection with the offering of the Offered Securities.

(u) The statements set forth in the Pricing Circular and the Offering Circular (i) under the captions "Description of the Trust Securities", "Description of the 2007-B Company Preferred Securities", "Description of Other Company Securities", "Description of the Series N WMI Preferred Stock", "Description of the Depositary Shares" and "Description of the Other WMI Capital Stock", insofar as they purport to constitute a summary of the terms of Securities, and (ii) under the captions "Certain U.S. Federal Income Tax Considerations", "ERISA Considerations" and

-8-

"Plan of Distribution", insofar as they purport to describe the provisions of the laws and documents referred to therein, are accurate, complete and fair in all material respects.

(v)     When the Offered Securities are issued and delivered pursuant to this Agreement, none of the Securities will be of the same class (within the meaning of Rule 144A under the United States Securities Act of 1933, as amended (the "*Act*")) as securities which are listed on a national securities exchange registered under Section 6 of the Exchange Act or quoted in a U.S. automated inter-dealer quotation system.

(w)    WMI is subject to Section 13 or 15(d) of the Exchange Act and WMB files reports with the OTS pursuant to regulations of the OTS substantially similar thereto.

(x)     Neither WMI, WMB, the Company or Trust IV, nor any person acting on its or their behalf, has offered or sold the Offered Securities by means of any general solicitation or general advertising within the meaning of Rule 502(c) under the Act.

(y)     Within the preceding six months, neither WMI nor any other person acting on behalf of WMI has offered or sold to any person any Securities, or any securities of the same or a similar class as any of the Securities, other than the Series 2007-A Company Preferred Securities and corresponding Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities of Trust III which are automatically exchangeable in certain circumstances for depositary shares representing a like amount of WMI's Series M Perpetual Non-cumulative Fixed-to-Floating Rate Preferred Stock (the "*Series M WMI Preferred Stock*") issued (other than in the case of the Series M WMI Preferred Stock) on May 24, 2007 and Securities offered or sold to the Purchasers hereunder. WMI will take reasonable precautions designed to insure that any offer or sale, direct or indirect, in the United States or to any U.S. person (as defined in Rule 902 under the Act) of any Securities or any substantially similar security issued by WMI or any affiliate, within six months subsequent to the date on which the distribution of the Offered Securities has been completed (as notified to WMI by Goldman, Sachs & Co.), is made under restrictions and other circumstances reasonably designed not to affect the status of the offer and sale of the Securities in the United States and to U.S. persons contemplated by this Agreement as transactions exempt from the registration provisions of the Securities Act.

(z)     The representations and warranties of the Company in Section 1(B) and Trust IV in Section 1(C) are true and correct.

(aa)   At the Time of Delivery, the representations and warranties of University Street in the University Street Asset Transfer Agreement and of WMB in the WMB Asset Transfer Agreement, the Asset Trust I PSA, the Asset Trust II PSA and the Asset Trust III PSA will be true and correct in all material respects.

(bb)   WMI maintains (i) effective internal control over financial reporting as defined in Rule 13a-15 under the Exchange Act, and (ii) a system of internal accounting

controls sufficient to provide reasonable assurance that (A) transactions are executed in accordance with the management's general or specific authorizations; (B) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset accountability; (C) access to assets is permitted only in accordance with management's general or specific authorization; and (D) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

(cc)     Based on its evaluation of its internal controls over financial reporting, WMI is not aware of (i) any significant deficiency or material weakness in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect WMI's ability to record, process, summarize and report financial information; or (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in WMI's internal control over financial reporting.

(B)     The Company represents and warrants to, and agrees with, each of the Purchasers that:

(a)     The Company has been duly created and is validly existing as a limited liability company in good standing under the laws of the State of Delaware and at the Time of Delivery will have the power and authority (limited liability company and other) to own its property and conduct its business as described in the Pricing Circular and to execute and deliver and perform its obligations under (i) this Agreement, (ii) the Company LLC Agreement, (iii) the Pooling and Servicing Agreement, dated as of March 7, 2006 (the "*Asset Trust I PSA*"), among the Company, WMB, as servicer, Deutsche Bank National Trust Company Delaware, as Delaware trustee (the "*Asset Trust I Delaware Trustee*"), and Deutsche Bank National Trust Company, as trustee (the "*Asset Trust I PSA Trustee*" and, together with the Asset Trust I Delaware Trustee, the "*Asset Trust I PSA Trustees*"), (iv) the Pooling and Servicing Agreement dated as of December 13, 2006 (the "*Asset Trust II PSA*"), among the Company, WMB, as servicer, Deutsche Bank Trust Company Delaware, as Delaware trustee (the "*Asset Trust II Delaware Trustee*"), and Deutsche Bank National Trust Company, as trustee (the "*Asset Trust II PSA Trustee*" and, together with the Delaware Trustee, the "*Asset Trust II PSA Trustees*"), (v) the Pooling and Servicing Agreement to be entered into, at or prior to the Time of Delivery (the "*Asset Trust III PSA*"), among the Company, WMB, as servicer, Deutsche Bank Trust Company Delaware, as Delaware trustee (the "*Asset Trust III Delaware Trustee*"), and Deutsche Bank National Trust Company, as trustee (the "*Asset Trust III PSA Trustee*" and, together with the Asset Trust III Delaware Trustee, the "*Asset Trust III PSA Trustees*"), in substantially the form previously provided to you, which will establish Asset Trust III described in the Offering Circular, (vi) the Administrative Services Agreement, dated as of March 7, 2006 (the "*Administrative Services Agreement*"), between the Company and WMB, (vii) the Asset Transfer Agreements (viii) the Agency Agreement (as defined in Section 1(C)(a)), (ix) the Second Loan Transfer Confirmation and (x) the Third Loan

-10-

Transfer Confirmation (the documents referred to in clauses (iii), (iv), (v), (vi), (viii), (ix) and (x), together, the "*Other Company Transaction Agreements*" and, together with this Agreement and the Company LLC Agreement, the "*Company Transaction Agreements*").

(b)     The Company has conducted and will conduct no business other than the transactions contemplated or permitted by this Agreement, the Company LLC Agreement and the Other Company Transaction Agreements and described in the Pricing Circular; the Company is not, and at the Time of Delivery will not be, a party to or bound by any agreement or instrument other than the Company Transaction Agreements; the Company has no liabilities or obligations other than those arising out of the transactions contemplated by the Company Transaction Agreements and described in the Pricing Circular; and the Company is not a party to or subject to any action, suit or proceeding of any nature and, to the best of its knowledge, no such action, suit or proceeding is threatened against the Company or its property.

(c)     At the Time of Delivery, the Company Preferred Securities will have been duly authorized and, when issued, delivered and paid for pursuant to this Agreement, will have been duly and validly issued and will be fully paid and non-assessable member interests in the Company entitled to the benefits of the Company LLC Agreement, and the Company Preferred Securities will conform in all material respects to the description thereof in the Pricing Circular.

(d)     At the Time of Delivery, the Company Common Securities will have been duly authorized, will have been duly and validly issued and will be fully paid and non-assessable member interests in the Company entitled to the benefits of the Company LLC Agreement, and will continue to be owned of record and beneficially by University Street; and the Company Common Securities will conform in all material respects to the description thereof in the Pricing Circular.

(e)     The Company has good and marketable title to the Asset Trust I Class A Trust Certificate, the Asset Trust II Class A Trust Certificate and the other property described in the Pricing Circular as owned by the Company, Asset Trust I has good and marketable title to the HELs and the other property described in the Pricing Circular as owned by Asset Trust I; Asset Trust II has good and marketable title to the Option ARMs and the other property described in the Pricing Circular as owned by Asset Trust II; subject in each case only to the limitations of the Company Transaction Documents and such other limitations on transfer or defects in title that would not have a Material Adverse Effect. At the Time of Delivery, the Company will have good and marketable title to the Asset Trust I Class A Trust Certificate, the Asset Trust II Class A Trust Certificate, the Asset Trust III Class A Trust Certificate, the Asset Trust III Class R Trust Certificate and the other property described in the Pricing Circular as owned by the Company, Asset Trust I will have good and marketable title to the HELs and the other property described in the Pricing Circular as owned by Asset Trust I; Asset Trust II will have good and marketable title to the Option ARMs and the other property described in the Pricing Circular as owned by Asset Trust II; and Asset Trust III will have good and marketable title to the Flex-5 ARMs and the

-11-

other property described in the Pricing Circular as owned by Asset Trust III, subject in each case only to the limitations of the Company Transaction Documents and such other limitations on transfer or defects in title that would not have a Material Adverse Effect.

(f)     At the Time of Delivery, each Other Company Transaction Agreement will have been duly authorized, executed and delivered by the Company and will constitute a valid and legally binding instrument of the Company enforceable in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles; and the Company Transaction Agreements will conform in all material respects to the descriptions thereof in the Pricing Circular.

(g)     This Agreement has been duly authorized, executed and delivered by the Company.

(h)     The issuance by the Company of the Company Preferred Securities and of the Series 2006-A Company Preferred Securities, Series 2006-B Company Preferred Securities, Series 2006-C Company Preferred Securities and Series 2007-A Company Preferred Securities (each as defined in the Pricing Circular) and the Company Common Securities, the ownership by the Company of interests in Asset Trust I, Asset Trust II and Asset Trust III as described in the Pricing Circular and subsequent Asset Subsidiaries pursuant to the Asset Trust I PSA, the Asset Trust II PSA, the Asset Trust III PSA or similar pooling and servicing agreements entered into at future dates, and the execution and delivery by the Company of the Company Transaction Agreements and the performance by it of its obligations thereunder have not and will not, as applicable, result in any violation of or conflict with any law, order, rule, regulation or decree of any court, governmental agency or authority having jurisdiction over the Company or any of its properties; and no consent, authorization or order of, or filing or registration with, any court or governmental agency is or was required for the issue and sale of the Company Preferred Securities by the Company, or the execution, delivery or performance by the Company of this Agreement or any of the Other Company Transaction Agreements or the consummation by the Company of the transactions contemplated hereby and thereby, except such as have been made or obtained or will be made or obtained prior to the Time of Delivery and except such as may be required under applicable state securities or "blue sky" laws.

(i)     Neither the Company nor Asset Trust I, Asset Trust II or Asset Trust III is and, after giving effect to the offering and sale of the Company Preferred Securities and the application of the proceeds thereof as described in the Pricing Circular, neither the Company nor Asset Trust I, Asset Trust II or Asset Trust III will be, an "investment company" or an entity "controlled" by an "investment company", as such terms are defined in the Investment Company Act.

(C)     Trust IV represents and warrants to, and agrees with, each of the Purchasers that:

(a)     Trust IV has been duly created and is validly existing as a statutory trust in good standing under the laws of the State of Delaware and at the Time of Delivery will have the power and authority (trust and other) to own its property and conduct its business as described in the Pricing Circular and to execute and deliver and perform its obligations under (i) this Agreement, (ii) the Trust Agreement (as defined in Section 1(C)(b)), (iii) the Company LLC Agreement, (iv) the Exchange Agreement, and (v) the Agency Agreement to be entered into at or before the Time of Delivery between Trust IV, Wilmington Trust Company, as paying agent, transfer agent and registrar and the Company (the "*Agency Agreement*") (the documents referred to in clauses (iii), (iv) and (v), together, the "*Other Trust IV Transaction Agreements*" and, together with this Agreement, the "*Trust IV Transaction Agreements*").

(b)     Trust IV has conducted and will conduct no business other than the transactions contemplated by this Agreement and the Amended and Restated Trust Agreement (the "*Trust Agreement*") in substantially the form previously provided to the representatives and to be entered into at or before the Time of Delivery among the Company, as depositor, and Wilmington Trust Company, as property trustee and as Delaware trustee (the "*Trust IV Trustee*") and described in the Pricing Circular; Trust IV is not, and, at the Time of Delivery will not be, a party to or bound by any agreement or instrument other than the Trust IV Transaction Agreements; Trust IV has, and at the Time of Delivery, will have no material liabilities or obligations other than those arising out of the transactions contemplated by the Trust IV Transaction Agreements and described in the Pricing Circular; and Trust IV is not, and, at the Time of Delivery, will not be a party to or subject to any action, suit or proceeding of any nature and, to the best of its knowledge, no such action, suit or proceeding is threatened against Trust IV or its property.

(c)     At the Time of Delivery, the Offered Securities will have been duly authorized and, when issued, delivered and paid for pursuant to this Agreement, will have been duly and validly issued and will be fully paid and non-assessable beneficial interests in Trust IV entitled to the benefits of the Trust Agreement, and the Offered Securities will conform in all material respects to the description thereof in the Pricing Circular.

(d)     At the Time of Delivery, each Other Trust IV Transaction Agreement will have been duly authorized, executed and delivered by Trust IV and will constitute a valid and legally binding instrument of Trust IV enforceable in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles; and the Trust IV Transaction Agreements will conform in all material respects to the descriptions thereof in the Pricing Circular.

(e)     This Agreement has been duly authorized, executed and delivered by Trust IV.

-13-

(f)     The issuance by Trust IV of the Offered Securities, the purchase by Trust IV of the Company Preferred Securities, and the execution and delivery by Trust IV of the Trust IV Transaction Agreements and the performance by it of its obligations thereunder will not result in any violation of or conflict with any law, order, rule, regulation or decree of any court, governmental agency or authority having jurisdiction over Trust IV or any of its properties; and no consent, authorization or order of, or filing or registration with, any court or governmental agency is required for the issue and sale of the Offered Securities by Trust IV, the purchase by Trust IV of the Company Preferred Securities, or the execution, delivery or performance by Trust IV of this Agreement or any of the Other Trust IV Transaction Agreements or the consummation by Trust IV of the transactions contemplated hereby and thereby, except such as have been made or obtained or will be made or obtained prior to the Time of Delivery and except such as may be required under applicable state securities or "blue sky" laws.

(g)     Trust IV is not and, after giving effect to the offering and sale of the Offered Securities and the application of the proceeds thereof as described in the Pricing Circular, will not be, an "investment company" or an entity "controlled" by an "investment company", as such terms are defined in the Investment Company Act.

2.     Purchase and Sale

Subject to the terms and conditions herein set forth:

(a)     Trust IV agrees to issue and sell to each of the Purchasers, and each of the Purchasers agrees, severally and not jointly, to purchase from Trust IV, at a purchase price of $97,500 per Trust Security, plus accrued distributions, if any, from October 25, 2007 to the Time of Delivery, the stated amount of Offered Securities set forth opposite the name of such Purchaser in Schedule I; and

(b)     WMB agrees to sell to Trust IV, and Trust IV agrees to purchase from WMB, 1,000,000 Company Preferred Securities for an aggregate purchase price equal to the purchase price received by Trust IV from the Purchasers pursuant to Section 2(a).

3.     Offer of Offered Securities

Upon the authorization by WMI of the release of the Offered Securities, the Purchasers propose to offer such Offered Securities for sale upon the terms and conditions set forth in this Agreement and the Offering Circular and each such Purchaser hereby represents and warrants to, and agrees with WMI, Trust IV and the Company that:

(a)     it will offer and sell such Offered Securities only to persons who it reasonably believes are both (i) "qualified institutional buyers" ("*QIBs*") within the meaning of Rule 144A under the Act in transactions meeting the requirements of Rule 144A and (ii) "qualified purchasers" ("*QPs*") within the meaning of Section 2(a)(51) of the Investment Company Act (but not a broker-dealer that owns and invests on a discretionary basis less than $25 million in securities of unaffiliated issuers and

-14-

not a participant-directed employee plan, such as a 401(k) plan, as referred to in paragraph (a)1(i)(D) or (a)(1)(i)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such a plan), in each case;

(b)     it is an institutional "accredited investor" within the meaning of Rule 501 under the Act; and

(c)     it will not offer or sell such Offered Securities by any form of general solicitation or general advertising, including, but not limited to, the methods described in Rule 502(c) under the Act.

4.     Delivery of Offered Securities

(a)     The Offered Securities to be purchased by each Purchaser hereunder will be represented by one or more definitive global Offered Securities in book-entry form which will be deposited by or on behalf of Trust IV with The Depository Trust Company ("*DTC*") or its designated custodian. Trust IV will (and WMI will cause Trust IV to) deliver the Offered Securities to Goldman, Sachs & Co. for the account of each Purchaser, against payment by or on behalf of such Purchaser of the purchase price therefor by wire transfer in Federal (same day) funds, by causing DTC to credit the Offered Securities to the account of Goldman, Sachs & Co. at DTC.

(b)     Trust IV will (and WMI will cause Trust IV to) cause the certificates representing the Offered Securities to be made available to Goldman, Sachs & Co. for checking at least twenty-four hours prior to the Time of Delivery at the office of Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004 (the "*Closing Location*"). The time and date of such delivery and payment shall be 9:30 a.m., New York City time, on October 25, 2007 or such other time and date as Goldman, Sachs & Co. and the Company may agree upon in writing. Such time and date are herein called the "*Time of Delivery*".

(c)     The documents to be delivered at the Time of Delivery by or on behalf of the parties hereto pursuant to Section 8, including the cross-receipts for the Offered Securities and any additional documents requested by the Purchasers pursuant to Section 8(k), will be delivered at such time and date at the Closing Location, and the Offered Securities will be delivered at DTC or its designated custodian, all at the Time of Delivery. A meeting will be held at the Closing Location at 2:00 p.m., New York City time, on the New York Business Day next preceding the Time of Delivery, at which meeting the final drafts of the documents to be delivered pursuant to the preceding sentence will be available for review by the parties hereto. For the purposes of this Section 4, "*New York Business Day*" shall mean each Monday, Tuesday, Wednesday, Thursday and Friday which is not a day on which banking institutions in New York are generally authorized or obligated by law or executive order to close.

-15-

5.    Issuer/Seller Covenants.

WMI, WMB, the Company and Trust IV each agrees with each of the Purchasers:

(a)    To prepare the Offering Circular in a form approved by the representatives; to make no amendment or any supplement to the Offering Circular which shall be disapproved by the representatives promptly after reasonable notice thereof; and to furnish the representatives with copies thereof;

(b)    Promptly from time to time to take such action as the representatives may reasonably request to qualify the Securities for offering and sale under the securities laws of such jurisdictions as the representatives may reasonably request and to comply with such laws so as to permit the continuance of sales and dealings therein in such jurisdictions for as long as may be necessary to complete the distribution of the Offered Securities, *provided* that in connection therewith no Issuer/Seller shall be required to qualify as a foreign corporation or to file a general consent to service of process in any jurisdiction;

(c)    To furnish the Purchasers with written and electronic copies of the Offering Circular in such quantities as the representatives may from time to time reasonably request, and if, at any time prior to the expiration of nine months after the date of the Offering Circular, any event shall have occurred as a result of which the Offering Circular as then amended or supplemented would include an untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made when the Offering Circular is delivered, not misleading, or, if for any other reason it shall be necessary or desirable during such same period to amend or supplement the Offering Circular, to notify the representatives and upon the representatives' request to prepare and furnish without charge to each Purchaser and to any dealer in securities as many written and electronic copies as the representatives may from time to time reasonably request of such amended Offering Circular or a supplement to the Offering Circular which will correct such statement or omission or effect such compliance;

(d)    During the period beginning from the date hereof and continuing until the date six months after the Time of Delivery, not to offer, sell, contract to sell or otherwise dispose of, except as provided hereunder any securities of WMI, the Company or Trust IV that are substantially similar to any of the Securities without the prior written consent of Goldman Sachs & Co. acting in its capacity as a representative of the Purchasers (such consent not to be unreasonably withheld);

(e)    In the case of WMI, the Company and Trust IV, not to be or become, at any time prior to the expiration of two years after the Time of Delivery, an open-end investment company, unit investment trust, closed-end investment company or face-amount certificate company that is or is required to be registered under Section 8 of the Investment Company Act;

(f)    In the case of WMI, the Company and Trust IV, at any time when it is not subject to Section 13 or 15(d) of the Exchange Act, for the benefit of holders from time to

-16-

time of Offered Securities, to furnish at its expense, upon request, to holders of Securities and prospective purchasers of securities information (the "*Additional Issuer/Seller Information*") satisfying the requirements of subsection (d)(4)(i) of Rule 144A under the Act;

(g) If requested by the representatives, to use its best efforts to cause the Offered Securities to be eligible for the PORTAL trading system of the National Association of Securities Dealers, Inc.;

(h) Except for such documents that are publicly available on EDGAR, in the case of WMI, furnish to the holders of the Offered Securities as soon as practicable, but in no event shall it be required prior to 90 days, after the end of each fiscal year an annual report (including a balance sheet and statements of income, stockholders' equity and cash flows of WMI and its consolidated subsidiaries certified by independent public accountants) and, as soon as practicable, but in no event shall it be required prior to 45 days, after the end of each of the first three quarters of each fiscal year (beginning with the fiscal quarter ending after the date of the Offering Circular), to make available to its stockholders consolidated summary financial information of the Company and its subsidiaries for such quarter in reasonable detail;

(i) During the period of two years after the Time of Delivery, it will not, and will not permit any of its "affiliates" (as defined in Rule 144 under the Securities Act) to, resell any of the Offered Securities which constitute "restricted securities" under Rule 144 that have been reacquired by any of them;

(j) To use the net proceeds received by it from the sale of the Securities pursuant to this Agreement in the manner specified in the Pricing Circular; and

(k) In the case of WMI, to reserve and keep available at all times, free of preemptive rights, shares of WMI Preferred Stock for the purpose of enabling WMI to satisfy any obligations to issue shares of its WMI Preferred Stock upon a Conditional Exchange.

6. <u>Issuer Free Writing Prospectuses</u>

(a) (i) Each Issuer/Seller represents and agrees that, without the prior consent of Goldman, Sachs & Co., it has not made and will not make any offer relating to the Offered Securities that, if the offering of the Offered Securities contemplated by this Agreement were conducted as a public offering pursuant to a registration statement filed under the Act with the Commission, would constitute an "issuer free writing prospectus", as defined in Rule 433 under the Act (any such offer is hereinafter referred to as an "*Issuer/Seller Supplemental Disclosure Document*");

(ii) each Purchaser represents and agrees that, without the prior consent of WMI and Goldman, Sachs & Co., other than one or more term sheets relating to the Offered Securities containing customary information and conveyed to purchasers of securities, it has not made and will not make

-17-

any offer relating to the Offered Securities that, if the offering of the Offered Securities contemplated by this Agreement were conducted as a public offering pursuant to a registration statement filed under the Act with the Commission, would constitute a "free writing prospectus", as defined in Rule 433 under the Act (any such offer (other than any such term sheets), is hereinafter referred to as a *"Purchaser Supplemental Disclosure Document"*); and

(iii) any Issuer/Seller Supplemental Disclosure Document or Purchaser Supplemental Disclosure Document the use of which has been consented to by WMI and Goldman, Sachs & Co. is listed on Schedule II(B).

7.   Expenses.  WMI covenants and agrees with the several Purchasers that WMI will pay or cause to be paid the following: (i) the reasonable fees, disbursements and expenses of each Issuer/Seller's counsel and accountants in connection with the issue of the Securities and all other expenses in connection with the preparation, printing, reproduction and filing of the Preliminary Offering Circular, the Pricing Circular and the Offering Circular and any amendments and supplements thereto and the mailing and delivery of copies thereof to the Purchasers and dealers; (ii) the cost of printing or producing any Agreement among Purchasers, this Agreement, any Transaction Agreement, closing documents (including any compilations thereof) and any other documents in connection with the offering, purchase, sale and delivery of the Securities; (iii) all expenses in connection with the qualification of the Securities for offering and sale under state securities laws as provided in Section 5(b), including the reasonable fees and disbursements of counsel for the Purchasers in connection with such qualification and in connection with the Blue Sky and legal investment surveys; (iv) any fees charged by securities rating services for rating the Offered Securities; (v) the cost of preparing the Securities; (vi) the fees and expenses of the Trust IV Trustee and any agent of the Trust IV Trustee and the fees and disbursements of counsel for the Trust IV Trustee in connection with the Trust IV Trust Agreement and the Offered Securities; (vii) any cost incurred in connection with the designation of the Securities for trading in PORTAL and the listing of the shares of WMI Preferred Stock issuable upon a Conditional Exchange; (viii) the fees and expenses of the Asset Trust I PSA Trustees, Asset Trust II PSA Trustees, Asset Trust III PSA Trustees and WMB as servicer of assets held in Asset Trust I, Asset Trust II and Asset Trust III; and (ix) all other costs and expenses incident to the performance of its obligations hereunder which are not otherwise specifically provided for in this Section.  It is understood, however, that, except as provided in this Section, and Sections 9 and 12, the Purchasers will pay all of their own costs and expenses, including the fees of their counsel, transfer taxes on resale of any of the Securities by them, and any advertising expenses connected with any offers they may make.

8.   Conditions Precedent.  The obligations of the Purchasers hereunder shall be subject, in their discretion, to the condition that all representations and warranties and other statements of the Issuer/Sellers herein are, at and as of the Time of Delivery, true and correct, the condition that the Issuer/Sellers shall have

-18-

performed all of their obligations hereunder theretofore to be performed, and the following additional conditions:

(a) Sullivan & Cromwell LLP, counsel for the Purchasers, shall have furnished to the representatives such opinion or opinions, dated the Time of Delivery, as the representatives may reasonably request, and such counsel shall have received such papers and information as they may reasonably request to enable them to pass upon such matters.

(b) Mayer Brown LLP, counsel for the Issuer/Sellers, shall have furnished to the representatives their written opinion, dated the Time of Delivery, in form and substance satisfactory to the representatives, substantially to the effect set forth in Annex 2.

(c) Heller Ehrman LLP, counsel for the Issuer/Sellers, shall have furnished to the representatives their written opinion, dated the Time of Delivery, in form and substance satisfactory to the representatives, substantially to the effect set forth in Annex 3.

(d) Richards, Layton & Finger, P.A., special Delaware counsel to WMI, the Company and Trust IV, shall have furnished to the representatives their written opinion, dated the Time of Delivery, in form and substance satisfactory to the representatives, substantially to the effect set forth in Annex 4.

(e) Charles E. Smith, Esq., First Vice President & Assistant General Counsel, Legal Department, of WMI, shall have furnished to the representatives his written opinion, dated the Time of Delivery, in form and substance satisfactory to the representatives, substantially to the effect set forth in Annex 5.

(f) On the date of the Offering Circular, prior to the execution of this Agreement and also at the Time of Delivery, Deloitte & Touche LLP shall have furnished to the representatives a letter or letters, dated the respective dates of delivery thereof, in form and substance satisfactory to the representatives, substantially to the effect set forth in Annex 6.

(g) On the date of the Offering Circular, prior to the execution of this Agreement and also at the Time of Delivery, Deloitte & Touche LLP shall have furnished to the representatives a letter or letters, dated the respective dates of delivery thereof, in form and substance reasonably satisfactory to the representatives, as to certain matters agreed upon between the representatives and WMI with respect to the descriptions in the Offering Circular of the assets of Asset Trust I, Asset Trust II and Asset Trust III.

(h) (i) Neither WMI nor any of its Significant Subsidiaries shall have sustained since the date of the latest audited financial statements included in the Pricing Circular any loss or interference with its business from fire, explosion, flood or other calamity, whether or not covered by insurance, or from any labor dispute or court or governmental action, order or decree, otherwise than as set forth or contemplated in the Pricing Circular, and (ii) since the respective dates as of

-19-

which information is given in the Pricing Circular there shall not have been any change in the capital stock or long-term debt of WMI or any of its Significant Subsidiaries or any change, or any development involving a prospective change, in or affecting the general affairs, management, financial position, stockholders' equity or results of operations of WMI and its Significant Subsidiaries, otherwise than as set forth or contemplated in the Pricing Circular, the effect of which, in any such case described in clause (i) or (ii), is, in the representatives' judgment, so material and adverse as to make it impracticable or inadvisable to proceed with the offering or the delivery of the Securities on the terms and in the manner contemplated in this Agreement and in the Offering Circular.

(i)     On or after the Applicable Time (i) no downgrading shall have occurred in the rating accorded WMI's debt securities by any "nationally recognized statistical rating organization", as that term is defined by the Commission for purposes of Rule 436(g)(2) under the Act, and (ii) no such organization shall have publicly announced that it has under surveillance or review, with possible negative implications, its rating of any of WMI's debt securities.

(j)     On or after the Applicable Time there shall not have occurred any of the following: (i) a suspension or material limitation in trading in securities generally on the New York Stock Exchange; (ii) a suspension or material limitation in trading in WMI's securities on The New York Stock Exchange; (iii) a general moratorium on commercial banking activities declared by either Federal or New York State authorities or a material disruption in commercial banking or securities settlement or clearance services in the United States; (iv) the outbreak or escalation of hostilities involving the United States or the declaration by the United States of a national emergency or war; or (v) the occurrence of any other calamity or crisis or any change in financial, political or economic conditions in the United States or elsewhere, if the effect of any such event specified in clause (iv) or (v) in the representatives' judgment makes it impracticable or inadvisable to proceed with the offering or the delivery of the Securities on the terms and in the manner contemplated in the Offering Circular.

(k)     Each Issuer/Seller shall have furnished or caused to be furnished to the representatives at the Time of Delivery certificates of its officers or trustee, as applicable, satisfactory to the representatives as to the accuracy of the representations and warranties of such Issuer/Seller herein at and as of the Time of Delivery, as to the performance by such Issuer/Seller of all of its obligations hereunder to be performed at or prior to the Time of Delivery, as to the matters set forth in subsection (h) of this Section and as to such other matters as the representatives may reasonably request.

9.      Indemnity

(a)     WMI and the Company (together, the "*Issuer/Seller Indemnifying Parties*") will indemnify and hold harmless each Purchaser against any losses, claims, damages or liabilities, joint or several, to which such Purchaser may become subject, under the Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon an untrue

-20-

statement or alleged untrue statement of a material fact contained in the Preliminary Offering Circular, the Pricing Circular, the Offering Circular, or any amendment or supplement thereto, any Issuer/Seller Supplemental Disclosure Document, or arise out of or are based upon the omission or alleged omission to state therein a material fact necessary to make the statements therein not misleading, and will reimburse each Purchaser for any legal or other expenses reasonably incurred by such Purchaser in connection with investigating or defending any such action or claim as such expenses are incurred; *provided*, *however*, that the Issuer/Seller Indemnifying Parties shall not be liable in any such case to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement or omission or alleged omission made in the Preliminary Offering Circular, the Pricing Circular, the Offering Circular or any such amendment or supplement, or any Issuer/Seller Supplemental Disclosure Document, in reliance upon and in conformity with written information furnished to WMI by any Purchaser through Goldman, Sachs & Co. expressly for use therein.

(b)    Each Purchaser will indemnify and hold harmless WMI, the Company and Trust IV (together, the "*Issuer/Seller Indemnified Parties*") against any losses, claims, damages or liabilities to which any Issuer/Seller Indemnified Party may become subject, under the Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon an untrue statement or alleged untrue statement of a material fact contained in the Preliminary Offering Circular, the Pricing Circular, the Offering Circular, or any amendment or supplement thereto, or any Issuer/Seller Supplemental Disclosure Document, or arise out of or are based upon the omission or alleged omission to state therein a material fact or necessary to make the statements therein not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in the Preliminary Offering Circular, the Pricing Circular, the Offering Circular or any such amendment or supplement, or any Issuer/Seller Supplemental Disclosure Document in reliance upon and in conformity with written information furnished to WMI by such Purchaser through Goldman, Sachs & Co. expressly for use therein; and will reimburse each Issuer/Seller Indemnified Party for any legal or other expenses reasonably incurred by such Issuer/Seller Indemnified Party in connection with investigating or defending any such action or claim as such expenses are incurred.

(c)    Promptly after receipt by an indemnified party under subsection (a) or (b) above of notice of the commencement of any action, such indemnified party shall, if a claim in respect thereof is to be made against the indemnifying party under such subsection, notify the indemnifying party in writing of the commencement thereof; but the omission so to notify the indemnifying party shall not relieve it from any liability which it may have to any indemnified party otherwise than under such subsection. In case any such action shall be brought against any indemnified party and it shall notify the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to participate therein and, to the extent that it shall wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel satisfactory to such indemnified party (who

-21-

shall not, except with the consent of the indemnified party, be counsel to the indemnifying party), and, after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party shall not be liable to such indemnified party under such subsection for any legal expenses of other counsel or any other expenses, in each case subsequently incurred by such indemnified party, in connection with the defense thereof other than reasonable costs of investigation. No indemnifying party shall, without the written consent of the indemnified party, effect the settlement or compromise of, or consent to the entry of any judgment with respect to, any pending or threatened action or claim in respect of which indemnification or contribution may be sought hereunder (whether or not the indemnified party is an actual or potential party to such action or claim) unless such settlement, compromise or judgment (i) includes an unconditional release of the indemnified party from all liability arising out of such action or claim and (ii) does not include a statement as to, or an admission of, fault, culpability or a failure to act, by or on behalf of any indemnified party.

(d)     If the indemnification provided for in this Section 9 is unavailable to or insufficient to hold harmless an indemnified party under subsection (a) or (b) above in respect of any losses, claims, damages or liabilities (or actions in respect thereof) referred to therein, then each indemnifying party shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities (or actions in respect thereof) in such proportion as is appropriate to reflect the relative benefits received by the Issuer/Seller Indemnified Parties, considered together as a single entity, on the one hand and the Purchasers on the other from the offering of the Offered Securities. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law or if the indemnified party failed to give the notice required under subsection (c) above, then each indemnifying party shall contribute to such amount paid or payable by such indemnified party in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of the Issuer/Seller Indemnified Parties, considered together as a single entity, on the one hand and the Purchasers on the other in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities (or actions in respect thereof), as well as any other relevant equitable considerations. The relative benefits received by the Issuer/Seller Indemnified Parties, considered together as a single entity, on the one hand and the Purchasers on the other shall be deemed to be in the same proportion as the total net proceeds from the offering (before deducting expenses) received by Trust IV bear to the total underwriting discounts and commissions received by the Purchasers, in each case as set forth in the Offering Circular. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Issuer/Seller Indemnified Parties, considered together as a single entity, on the one hand or the Purchasers on the other and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission. The Issuer/Sellers and the Purchasers agree that it would not be just and equitable if contribution pursuant to this subsection (d) were determined by *pro*

-22-.

*rata* allocation (even if the Purchasers were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to above in this subsection (d). The amount paid or payable by an indemnified party as a result of the losses, claims, damages or liabilities (or actions in respect thereof) referred to above in this subsection (d) shall be deemed to include any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. Notwithstanding the provisions of this subsection (d), no Purchaser shall be required to contribute any amount in excess of the amount by which the total price at which the Offered Securities underwritten by it and distributed to investors were offered to investors exceeds the amount of any damages which such Purchaser has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. The Purchasers' obligations in this subsection (d) to contribute are several in proportion to their respective underwriting obligations and not joint.

(e)     The obligations of the Issuer/Seller Indemnifying Parties under this Section 9 shall be in addition to any liability which the Issuer/Seller Indemnifying Parties may otherwise have and shall extend, upon the same terms and conditions, to any affiliate of each Purchaser and each person, if any, who controls any Purchaser within the meaning of the Act; and the obligations of the Purchasers under this Section 9 shall be in addition to any liability which the respective Purchasers may otherwise have and shall extend, upon the same terms and conditions, to each officer and director of the Issuer/Seller Indemnifying Parties and to each person, if any, who controls an Issuer/Seller Indemnifying Party within the meaning of the Act.

10.     Purchaser Default

(a)     If any Purchaser shall default in its obligation to purchase the Offered Securities which it has agreed to purchase hereunder, the representatives may in the representatives' discretion arrange for the representatives or another party or other parties to purchase such Offered Securities on the terms contained herein. If within thirty-six hours after such default by any Purchaser the representatives do not arrange for the purchase of such Offered Securities, then WMI shall be entitled to a further period of thirty-six hours within which to procure another party or other parties satisfactory to the representatives to purchase such Offered Securities on such terms. In the event that, within the respective prescribed periods, the representatives notify WMI that the representatives have so arranged for the purchase of such Offered Securities, or WMI notifies the representatives that it has so arranged for the purchase of such Offered Securities, the representatives or WMI shall have the right to postpone the Time of Delivery for a period of not more than seven days, in order to effect whatever changes may thereby be made necessary in the Offering Circular, or in any other documents or arrangements, and WMI agrees to prepare promptly any amendments to the Offering Circular which in the representatives' opinion may thereby be made necessary. The term *"Purchaser"* as used in this Agreement shall include any person substituted under this Section with like effect as if such

-23-

person had originally been a party to this Agreement with respect to such Offered Securities.

(b)    If, after giving effect to any arrangements for the purchase of the Offered Securities of a defaulting Purchaser or Purchasers by the representatives and WMI as provided in subsection (a) above, the aggregate number of such Offered Securities which remains unpurchased does not exceed one-eleventh of the aggregate number of all the Offered Securities, then WMI shall have the right to require each non-defaulting Purchaser to purchase the number of Offered Securities which such Purchaser agreed to purchase hereunder and, in addition, to require each non-defaulting Purchaser to purchase its *pro rata* share (based on the number of Offered Securities which such Purchaser agreed to purchase hereunder) of the Offered Securities of such defaulting Purchaser or Purchasers for which such arrangements have not been made; but nothing herein shall relieve a defaulting Purchaser from liability for its default.

(c)    If, after giving effect to any arrangements for the purchase of the Offered Securities of a defaulting Purchaser or Purchasers by the representatives and WMI as provided in subsection (a) above, the aggregate number of Offered Securities which remains unpurchased exceeds one-eleventh of the aggregate number of all the Offered Securities, or if WMI shall not exercise the right described in subsection (b) above to require non-defaulting Purchasers to purchase Securities of a defaulting Purchaser or Purchasers, then this Agreement shall thereupon terminate, without liability on the part of any non-defaulting Purchaser or the Company, except for the expenses to be borne by the Company and the Purchasers as provided in Section 6 hereof and the indemnity and contribution agreements in Section 9 hereof; but nothing herein shall relieve a defaulting Purchaser from liability for its default.

11.    Survival. The respective indemnities, agreements, representations, warranties and other statements of the Issuer/Sellers and the several Purchasers, as set forth in this Agreement or made by or on behalf of them, respectively, pursuant to this Agreement, shall remain in full force and effect, regardless of any investigation (or any statement as to the results thereof) made by or on behalf of any Purchaser or any controlling person of any Purchaser, or any Issuer/Seller, or any officer or director or controlling person of any Issuer/Seller, and shall survive delivery of and payment for the Securities.

12.    Expenses on Termination. If this Agreement shall be terminated pursuant to Section 10, the Issuer/Sellers shall not then be under any liability to any Purchaser except as provided in Sections 7 and 9; but, if for any other reason, the Offered Securities are not delivered by or on behalf of the Purchasers as provided herein, WMI and the Company, jointly and severally will reimburse the Purchasers through the representatives for all expenses approved in writing by the representatives, including fees and disbursements of counsel, reasonably incurred by the Purchasers in making preparations for the purchase, sale and delivery of the Offered Securities, but WMI and the Company shall then be under no further liability to any Purchaser except as provided in Sections 7 and 9.

-24-

13. <u>The Representative; Notices</u>.  In all dealings hereunder, the representatives shall act on behalf of each of the Purchasers, and the parties hereto shall be entitled to act and rely upon any statement, request, notice or agreement on behalf of any Purchaser made or given by the representatives.

All statements, requests, notices and agreements hereunder shall be in writing, and if to the Purchasers shall be delivered or sent by mail, telex or facsimile transmission to the representatives at One New York Plaza, 42nd Floor, New York, New York 10004, Attention: Registration Department; and if to any Issuer/Seller shall be delivered or sent by mail, telex or facsimile transmission to the address of WMI set forth in the Offering Circular, Attention: Secretary; *provided, however,* that any notice to a Purchaser pursuant to Section 10 shall be delivered or sent by mail, telex or facsimile transmission to such Purchaser at its address set forth in its Purchasers' Questionnaire, or telex constituting such Questionnaire, which address will be supplied to the Company by the representatives upon request.  Any such statements, requests, notices or agreements shall take effect upon receipt thereof.

14. <u>Binding Agreement</u>.  This Agreement shall be binding upon, and inure solely to the benefit of, the Purchasers, the Issuer/Sellers and, to the extent provided in Sections 9 and 11, the officers and directors of the Issuer/Seller Indemnified parties and each person who controls an Issuer/Seller Indemnified Party or any Purchaser, and their respective heirs, executors, administrators, successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.  No purchaser of any of the Offered Securities from any Purchaser shall be deemed a successor or assign by reason merely of such purchase.

15. <u>Time of the Essence</u>.  Time shall be of the essence of this Agreement.

16. <u>Arm's-Length Transactions</u>.  The Issuer/Sellers acknowledge and agree that (i) the purchase and sale of the Offered Securities pursuant to this Agreement is an arm's-length commercial transaction between the Issuer/Sellers, on the one hand, and the several Purchasers, on the other, (ii) in connection therewith and with the process leading to such transaction each Purchaser is acting solely as a principal and not the agent or fiduciary of the Issuer/Sellers, (iii) no Purchaser has assumed an advisory or fiduciary responsibility in favor of the Issuer/Sellers with respect to the offering contemplated hereby or the process leading thereto (irrespective of whether such Purchaser has advised or is currently advising any Issuer/Seller on other matters) or any other obligation to any Issuer/Seller except the obligations expressly set forth in this Agreement, and (iv) the Issuer/Sellers consulted their own legal and financial advisors to the extent it deemed appropriate.  Each Issuer/Seller agrees that it will not claim that the Purchasers, or any of them, has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Issuer/Seller, in connection with such transaction or the process leading thereto.

-25-

17.     Entire Agreement.  This Agreement supersedes all prior agreements and
        understandings (whether written or oral) between the Issuer/Sellers and the
        Purchasers, or any of them, with respect to the subject matter hereof.

18.     **Governing Law.  This Agreement shall be governed by and construed in
        accordance with the laws of the State of New York.**

19.     Waiver of Jury Trial.  Each Issuer/Seller and each Purchaser hereby irrevocably
        waives, to the fullest extent permitted by applicable law, any and all right to trial
        by jury in any legal proceeding arising out of or relating to this Agreement or the
        transactions contemplated hereby.

20.     Counterparts.  This Agreement may be executed by any one or more of the
        parties hereto in any number of counterparts, each of which shall be deemed to
        be an original, but all such respective counterparts shall together constitute one
        and the same instrument.

21.     Disclosure.  Notwithstanding anything herein to the contrary, the Issuer/Sellers
        (and the Issuer/Sellers' employees, representatives and other agents) are
        authorized to disclose to any and all persons, the tax treatment and tax structure
        of the potential transaction and all materials of any kind (including tax opinions
        and other tax analyses) provided to the Issuer/Seller relating to that treatment
        and structure, without the Purchasers' imposing any limitation of any kind.
        However, any information relating to the tax treatment and tax structure shall
        remain confidential (and the foregoing sentence shall not apply) to the extent
        necessary to enable any person to comply with securities laws.  For this purpose,
        "tax treatment" means U.S. federal and state income tax treatment, and "tax
        structure" is limited to any facts that may be relevant to that treatment.

22.     Wilmington Trust Company Signs as Trustee.  It is expressly understood and
        agreed by the parties that (a) this document is executed and delivered by
        Wilmington Trust Company, not individually or personally, but solely as Trust IV
        Trustee, in the exercise of the powers and authority conferred and vested in it,
        pursuant to the Trust Agreement, (b) each of the representations, undertakings
        and agreements herein made on the part of Trust IV is made and intended not as
        personal representations, undertakings and agreements by Wilmington
        Trust Company but is made and intended for the purpose for binding only Trust
        IV, (c) nothing herein contained shall be construed as creating any liability on
        Wilmington Trust Company, individually or personally, to perform any covenant
        either expressed or implied contained herein, all such liability, if any, being
        expressly waived by the parties hereto and by any person claiming by, through or
        under the parties hereto, and (d) under no circumstances shall Wilmington
        Trust Company be personally liable for the payment of any indebtedness or
        expenses of Trust IV or be liable for the breach or failure of any obligation,
        representation, warranty or covenant made or undertaken by Trust IV under this
        Agreement or any other related documents.  It is expressly understood and
        agreed by the parties that (a) this document is executed and delivered by
        Wilmington Trust Company, not individually or personally, but solely as Property
        Trustee, in the exercise of the powers and authority conferred and vested in it,

-26-

pursuant to the Trust Agreement, (b) each of the representations, undertakings and agreements herein made on the part of the Trust is made and intended not as personal representations, undertakings and agreements by Wilmington Trust Company but is made and intended for the purpose for binding only the Trust, (c) nothing herein contained shall be construed as creating any liability on Wilmington Trust Company, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any person claiming by, through or under the parties hereto, and (d) under no circumstances shall Wilmington Trust Company be personally liable for the payment of any indebtedness or expenses of Trust IV or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by Trust IV under this Agreement or any other related documents.

NY12532:406459.6

If the foregoing is in accordance with your understanding, please sign and return to us 11 counterparts hereof, and upon the acceptance hereof by you, on behalf of each of the Purchasers, this letter and such acceptance hereof shall constitute a binding agreement between each of the Purchasers and each of the Issuer/Sellers. It is understood that your acceptance of this letter on behalf of each of the Purchasers is pursuant to the authority set forth in a form of Agreement among Purchasers, the form of which shall be submitted to WMI for examination upon request, but without warranty on your part as to the authority of the signers thereof.

Very truly yours,

WASHINGTON MUTUAL, INC.

By: _____
Name: Peter Freilinger
Title: Senior Vice President

WASHINGTON MUTUAL BANK

By: _____
Name: Peter Freilinger
Title: Senior Vice President

WASHINGTON MUTUAL PREFERRED
FUNDING LLC

By: _____
Name: ROBERT J. WILLIAMS
Title: SENIOR VICE PRESIDENT AND TREASURER

WASHINGTON MUTUAL PREFERRED
FUNDING TRUST IV

By:    Wilmington Trust Company, not in
its individual capacity but solely as
Property Trustee

By: _____
Name: W. Thomas Morris, II
Title: Assistant Vice President


Accepted as of the date hereof:

Goldman, Sachs & Co., on behalf of each of the
Purchasers listed on Schedule I hereto

By:_____
(Goldman, Sachs & Co.)

WASHINGTON MUTUAL PREFERRED
FUNDING TRUST IV

By:    Wilmington Trust Company, not in
its individual capacity but solely as
Property Trustee

By:_____
Name:
Title:

Accepted as of the date hereof:

Goldman, Sachs & Co., on behalf of each of the
Purchasers listed on Schedule I hereto

By: _____
(Goldman, Sachs & Co.)

Purchase Agreement

## SCHEDULE I

| Offered Securities Purchaser | Number of Offered Securities to be Purchased |
|---|---|
| Goldman, Sachs & Co. | 7,000 |
| Credit Suisse Securities (USA) LLC. | 1,000 |
| Lehman Brothers Inc. | 1,000 |
| Morgan Stanley & Co. Incorporated | 1,000 |
| Total | 10,000 |

**SCHEDULE** II

(A)     Additional Documents Incorporated by Reference:

        None.

(B)     Approved Supplemental Disclosure Documents:

        None.

 **Washington Mutual**

## Summary of Terms

### $1 BILLION FIXED-TO-FLOATING RATE PERPETUAL NON-CUMULATIVE TRUST SECURITIES

| | |
|---|---|
| Issuer: | Washington Mutual Preferred Funding Trust IV |
| Ratings: | Baa1 / BBB / A- (Stable / Stable / Stable) |
| Security type: | Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities, Automatically Exchangeable in Specified Circumstances into Depository Shares representing Preferred Stock of Washington Mutual, Inc. |
| Size of offering: | 10,000 Trust Securities, liquidation preference $100,000 per security and $1,000,000,000 in the aggregate, corresponding to (i) 1,000,000 Series 2007-B Company Preferred Securities, liquidation preference $1,000 per security and $1,000,000,000 in the aggregate, of Washington Mutual Preferred Funding LLC, and (ii) 1,000,000 depository shares representing interests in WMI Preferred Stock, liquidation preference $1,000,000 per share and $1,000,000,000 in the aggregate |
| Trade date: | October 18, 2007 |
| Settlement date (T+5 days): | October 25, 2007 |
| Maturity date: | Perpetual |
| Initial Dividend: | 9.75% (Year 1 – 10) |
| Floating Rate Dividend: | 3-Month LIBOR + 472.3 bps (Year 10-Perpetuity) |
| Dividend Frequency: | Quarterly |
| Dividend Payment Dates: | March 15, June 15, September 15 and December 15 |
| First Pay Date: | December 15, 2007 |
| Day Count: | Fixed: 30/360 Floating Rate: Act/360 |
| Optional Ten Year Redemption: | Non-call 10 at Par (callable in whole or in part at Par every 10 years commencing December 15, 2017) |
| Special Event and Other Redemption: | Prior to the Dividend Payment Date in December 2017, redeemable in whole but not in part (A) at the greater of (i) par or (ii) treasury based make whole amount based on a discount rate of Treasuries plus 1.00% upon a Tax, Investment Company Act, Rating Agency, or Regulatory Capital Event on an Dividend Payment Date, or (B) on any Dividend Payment Date at the greater of (i) par or (ii) a treasury based make whole amount based on a discount rate of Treasuries plus .75%.<br><br>After the Dividend Payment Date in December 2017, redeemable in whole but not in part (A) at par upon a Tax, Investment Company Act, Rating Agency or Regulatory Capital Event on any Dividend Payment Date that is not a Ten-Year Date, or (B) on any Dividend Payment Date that is not a Ten-Year Date at the greater of (i) par or (ii) a LIBOR based make whole amount based on a discount rate of 3-Month USD LIBOR |
| Pricing Benchmark:: | UST 4 3/4% due 08/17 |
| Benchmark Yield: | 4.503% |
| Reoffer Spread: | 5.365% |
| Semi-Annual Reoffer Yield: | 9.868% (semi-annual) |
| Quarterly Adjusted Reoffer Yield: | 9.75% (quarterly until year 10) |
| Price to the Public: | $100,000 per security ($300,000 minimum initial sale) |
| Liquidation Preference: | $100,000 per security ($300,000 minimum initial sale) |
| Gross Spread: | 2.5% |
| Net Proceeds to Issuer: | $975,000,000 |
| Expected Capitalization of the Company after Closing: | Series 2006-A Company Preferred Securities: $1,250,000,000; Series 2006-B Company Preferred Securities: $750,000,000; Series 2006-C Company Preferred Securities: $500,000,000; Series 2007-A Company Preferred Securities: $500,000,000; Series 2007-B Company Preferred Securities: $1,000,000,000 (collectively, the "Outstanding Company Preferred Securities"); Company Common Securities: $7,644,035,493 (approximately); total capitalization: $11,654,035,493 (approximately) |
| Test for Issuance of Series 2007-B Company Preferred Securities: | After giving effect to the contribution of the Flex-5 ARMs by WMB to the Company, the contribution of the Flex-5 ARMs by the Company to Asset Trust III in exchange for the Asset Trust III Class A Certificate and the Asset Trust III Class R Certificate and the issuance of the Series 2007-B Company Preferred Securities:<br><br>• the *pro forma* net book value of the Company's assets will be $11,644,035,493, less dividends declared, but unpaid, if any, the aggregate liquidation preference of the Series 2007-B Company Preferred Securities and the Outstanding Company Preferred Securities, taken together, will be $4,000,000,000, and the ratio of the pro forma net book value of the Company's assets to such aggregate liquidation preference will be 2.91; and<br><br>• the Company's pro forma FFO for the four fiscal quarters beginning on July 1, 2007, calculated in the manner above, is $563,891,061 ("X"), (ii) the amount required to pay full dividends for one year on the |

| | Series 2007-B Company Preferred Securities and the Outstanding Company Preferred Securities calculated in the manner set forth above is $301,350,000 and 150% of that amount is $452,025,000 ("Y"), and (iii) "X" exceeds "Y" by $111,866,061. |
|---|---|
| Bookrunner: | Goldman, Sachs & Co. |
| Co-Managers | Credit Suisse Securities (USA) LLC, Lehman Brothers Inc., Morgan Stanley & Co. Incorporated |
| CUSIP Number: | 93936TAA8 |
| ISIN Number: | US93936TAA88 |

This material is confidential and is for your information only and is not intended to be used by anyone other than you. This information does not purport to be a complete description of these securities or the offering. Please refer to the offering circular for a complete description. This communication is being distributed solely to Qualified Institutional Buyers, as defined in Rule 144A under the Securities Act of 1933, who are also Qualified Purchasers as defined under the Investment Company Act of 1940.

This communication does not constitute an offer to sell or the solicitation of an offer to buy any securities in any jurisdiction to any person to whom it is unlawful to make such offer or solicitation in such jurisdiction. A copy of the offering circular for the offering can be obtained from Goldman, Sachs & Co., 85 Broad Street, New York, NY 10004 Attention: Prospectus Department (212-902-1171).

NY12532:406459.6

## I. Opinion of Mayer Brown LLP

October [__], 2007

To the Persons Listed on Schedule I Attached Hereto

Re:    Washington Mutual Preferred Funding – Corporate
       and Securities Law Opinion

Ladies and Gentlemen:

We have acted as special New York counsel to Washington Mutual Preferred Funding Trust IV, a statutory trust formed under the laws of the State of Delaware ("WaMu Delaware IV"), Washington Mutual Preferred Funding LLC, a limited liability company incorporated under the laws of the state of Delaware (the "LLC"), Washington Mutual Home Equity Trust I ("Asset Trust I"), WAMU 2006-OA1 ("Asset Trust II"), WAMU 2007-Flex1 ("Asset Trust III"), Washington Mutual, Inc. ("WMI"), and Washington Mutual Bank ("WMB") (each a "Represented Party" and collectively, the "Represented Parties"), in connection with (a) the issuance by WaMu Delaware IV of [●] of its Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities, liquidation preference $100,000 per security and $[●] in the aggregate (the "Trust Securities"), (b) the issuance and sale by LLC of [●] of its Fixed-to-Floating Rate Perpetual Non-cumulative Preferred Securities, Series 2007-B, liquidation preference $1,000 per security and $[●] in the aggregate (the "Series 2007-B Company Preferred Securities") and (c) the authorization and reservation for issuance upon a Conditional Exchange by WMI of the Series N Perpetual Non-cumulative Fixed-to-Floating Rate Preferred Stock of WMI (the "WMI Preferred Stock"; the Series 2007-B Company Preferred Securities, the Trust Securities, the Depositary Shares (as defined below) and the WMI Preferred Stock, together, the "Securities"). The shares of the WMI Preferred Stock will be represented by fixed-to-floating rate depositary shares of WMI (the "Depositary Shares").

Capitalized terms used and not defined herein have the meanings ascribed thereto in the Fourth Amended and Restated Limited Liability Company Agreement of the LLC dated as of October [__], 2007 (the "LLC Agreement").

### I.    Documents Reviewed

In arriving at the opinions expressed below, we have examined and relied on the following documents:

(a)    an executed copy of the Purchase Agreement, dated October [__], 2007 (the "Purchase Agreement"), among WMI, WMB, the LLC, WaMu Delaware IV and Goldman, Sachs & Co., [ ] and [ ] as representative of the initial purchasers;

(b)    an executed copy of the Exchange Agreement, dated as of the date hereof (the "Exchange Agreement"), among WaMu Delaware IV, WMI and Mellon Investor Services L.L.C., as depositary;

(c)     an executed copy of the Deposit Agreement, dated as of the date hereof (the "Deposit Agreement"), between WMI and Mellon Investor Services LLC, as depositary and registrar;

(d)     an executed copy of the Master Loan Contribution and Purchase Agreement, dated as of March 7, 2006, between the LLC and WMB and the related Loan Transfer Confirmations, dated as of March 7, 2006, December 13, 2006 and October [___], 2007;

(e)     an executed copy of the Master Loan Contribution and Purchase Agreement, dated as of March 7, 2006, between University Street, Inc. (the "REIT") and the LLC and the related Loan Transfer Confirmations, dated as of March 7, 2006, December 13, 2006 and October [___], 2007;

(f)     an executed copy of the Cross-Receipt dated as of the date hereof, between WMB and WaMu Delaware IV;

(g)     an executed copy of the Pooling and Servicing Agreement, dated as of March 7, 2006, by and among WMB, as servicer, the LLC, as depositor, Deutsche Bank National Trust Company, as trustee and Deutsche Bank Trust Company Delaware, as Delaware trustee;

(h)     an executed copy of the Pooling and Servicing Agreement, dated as of December 13, 2006, by and among WMB, as servicer, the LLC, as depositor, Deutsche Bank National Trust Company, as trustee and Deutsche Bank National Trust Company Delaware, as Delaware trustee;

(i)     an executed copy of the Pooling and Servicing Agreement, dated as of October [__], 2007, by and among WMB, as servicer, the LLC, as depositor, Deutsche Bank National Trust Company, as trustee and Deutsche Bank National Trust Company Delaware, as Delaware trustee;

(j)     an executed copy of the Fourth Amended and Restated LLC Agreement, dated as of the date hereof, by and among University Street, as initial Common Securityholder, WaMu Cayman, as a Company Preferred Securityholder, Washington Mutual Preferred Funding Trust I, as a Company Preferred Securityholder, WMB, as initial Company Preferred Securityholder. Washington Mutual Preferred Funding Trust II, as a Company Preferred Securityholder, Washington Mutual Preferred Funding Trust III, as a Company Preferred Securityholder and WaMu Delaware IV, as a Company Preferred Securityholder;

(k)     an executed copy of the Amended and Restated Trust Agreement of WaMu Delaware IV (the "Trust Agreement"), dated as of the date hereof, among the LLC, as grantor, Wilmington Trust Company, as Delaware Trustee, and Wilmington Trust Company, as Property Trustee;

(l)     an executed copy of the Administrative Services Agreement, dated as of March 6, 2006, between the LLC, WMI and WMB;

A-2-2

(m)     an executed copy of the Agency Agreement, dated as of the date hereof, between the LLC, Wamu Delaware IV and Wilmington Trust Company;

(n)     an executed copy of the Custody Agreement, dated as of the date hereof, between WMB and Deutsche Bank National Trust Company;

(o)     a final offering circular with respect to the Trust Securities, dated October [__], 2007 (the "Offering Circular");

The documents described in items (a) through (m) above are herein collectively called the "Transaction Documents."

In addition, we have reviewed the originals or copies certified or otherwise identified to our satisfaction of all such limited liability company, corporate or trust, as applicable, records of the Represented Parties and such other instruments and other certificates of public officials, officers and representatives of the Represented Parties and such other persons, and we have made such investigations of law, as we have deemed appropriate as a basis for the opinions expressed below.

In rendering the opinions expressed below, we have assumed the authenticity of all documents submitted to us as originals and the conformity to the originals of all documents submitted to us as copies. In addition, we have assumed and have not verified the accuracy as to factual matters of each document we have reviewed (including, without limitation, the accuracy of the representations and warranties as to factual matters of the Represented Parties, the Initial Purchasers and the other parties thereto in the Transaction Documents).

## II.     Opinions Rendered

Based on the foregoing, and subject to the further assumptions and qualifications set forth below, it is our opinion that:

1.     The execution and delivery by each Represented Party of the Transaction Documents to which it is a party, and the performance by each Represented Party of its obligations under the Transaction Documents to which it is a party, will not result in the violation of any federal or New York statute, rule or regulation.

2.     The execution and delivery by each Represented Party of the Transaction Documents to which it is a party, and the performance by each Represented Party of its obligations under the Transaction Documents to which it is a party, does not require any consent, approval, authorization, registration order, filing or qualification of or with any governmental agency, body or authority of the United States or the State of New York, other than such consents, approvals, authorizations, registrations or qualifications that have been obtained or made on or prior to the date hereof or as may be required under the securities or "blue sky" laws of the State of New York.

3.     Each of the Exchange Agreement and the Deposit Agreement constitutes a legal, valid and binding obligation of WMI, enforceable against WMI in accordance with its terms under the laws of the State of New York.

NY12532:406459.6

4.      No registration of the Trust Securities under the Securities Act is required in connection with the initial offer and sale and delivery of the Trust Securities by WaMu Delaware IV or the initial offers and sales of the Trust Securities by the Initial Purchasers, in each case assuming that such offers and sales are conducted in the manner contemplated by the Trust Agreement, the Purchase Agreement and the Offering Circular. We express no opinion, however, as to when and under what circumstances any Trust Securities sold by the Initial Purchasers may be reoffered or resold.

5.      As of the date hereof (and after giving effect to the offering and sale of the Trust Securities and the Series 2007-B Company Preferred Securities and the application of the proceeds thereof in accordance with the terms of the Transaction Documents, in each case assuming that such offers and sales are conducted in the manner contemplated by the Purchase Agreement, the Trust Agreement and the Offering Circular), none of WaMu Delaware IV, Asset Trust I, Asset Trust II, Asset Trust III or the LLC is required to be registered under the Investment Company Act of 1940, as amended.

6.      The Series 2007-B Company Preferred Securities have been duly authorized and validly issued by the Company and are fully paid and nonassessable limited liability company interests in the Company.

7.      The shares of WMI Preferred Stock initially issuable upon a Conditional Exchange of Trust Securities have been duly authorized and reserved for issuance upon such Conditional Exchange and, when issued upon such Conditional Exchange, will be validly issued, fully paid and nonassessable.

8.      The Depositary Shares initially issuable upon a Conditional Exchange of Trust Securities, when issued upon such Conditional Exchange, will be validly issued pursuant to the Deposit Agreement and the Exchange Agreement.

9.      The description in the Offering Circular of one or more of the Trust Securities or other securities under the captions "Description of the Trust Securities," "Description of the Series 2007-B Company Preferred Securities," "Description of Other Company Securities," "Description of the Series N WMI Preferred Stock," "Description of the Depositary Shares" and "Description of the Other WMI Capital Stock," insofar as they purport to describe the provisions of the securities and other documents referred to therein, are accurate in all material respects and provide a fair summary of such provisions in all material respects.

10.      The descriptions in the Offering Circular under the captions "Certain U.S. Federal Income Tax Considerations" and "ERISA Considerations," insofar as they purport to describe the provisions of the laws and regulations referred to therein are accurate in all material respects and provide a fair summary of such provisions in all material respects.

## III.      Assumptions

In rendering the opinions set forth herein, we have relied upon and assumed:

NY12532:406459.6

1.      The genuineness of all signatures, the authenticity of all writings submitted to us as originals, the conformity to original writings of all copies submitted to us as certified or photostatic copies, and the legal competence and capacity of all natural persons;

2.      The accuracy of all certificates and representations, writings and records reviewed by us, including the representations and warranties made in the Transaction Documents, in each case with respect to the factual matters set forth therein;

3.      All parties to the Transaction Documents are validly existing, and in good standing under the laws of their respective jurisdictions of organization and have the requisite organizational power to enter into such Transaction Documents;

4.      The execution and delivery of the Transaction Documents have been duly authorized by all necessary organizational proceedings on the part of all parties to each such document.

5.      The Transaction Documents have been duly executed and delivered by all parties to each such document.

6.      Except to the extent specifically addressed in our opinions in paragraphs II.3, II.6, II.7 and II.8, the Transaction Documents constitute the legal, valid and binding obligations of each party thereto, enforceable against each such parties in accordance with their respective terms.

7.      Except as specifically addressed in II.1 and II.2, the respective terms and provisions of each of the Transaction Documents do not, and the execution, delivery and performance of its obligations thereunder by each party to any Transaction Document will not violate the constitutive or organizational documents of any such party or any law, order or decree of any court, administrative agency or other governmental authority binding on any such party.

8.      There are no other agreements among any or all of the parties that would alter the agreements set forth in the Transaction Documents.

## IV.     Limitations and Qualifications

The opinions expressed herein are subject to the following qualifications, exceptions and limitations:

1.      Members of our firm are members of the State Bar of New York. We express no opinion as to the laws of any jurisdiction other than the State of New York (excluding municipal laws) and Federal laws of the United States of America to the extent expressly provided in this letter. To the extent that matters of Delaware law are relevant to any of the opinions expressed herein, we have relied entirely on the opinion of Richards, Layton & Finger, P.A. dated as of the date hereof and our opinions herein are subject to the qualifications, exceptions and limitations in such opinion. To the extent that matters of Washington law are relevant to the opinions expressed herein, we have relied entirely on the opinion of Heller Ehrman LLP dated as of the date hereof and

A-2-5

our opinions herein are subject to the qualifications, exceptions and limitations in such opinion. In each case we have relied on these opinions with your permission and our opinions herein are subject to the qualifications, exceptions and limitations in such opinions.

2. Our opinions in paragraphs II.1 and 2 as to violations of law and governmental consents, filings, registrations and the like apply only to laws that a New York lawyer exercising customary professional diligence would reasonably be expected to recognize as being applicable to the Represented Parties, the Transaction Documents and the transactions contemplated by the Offering Circular and that is not applicable solely because of the specific nature or source of the assets or business of any party to the Transaction Documents or any affiliate of any such party. Without limiting the generality of the foregoing, those opinions do not address any consumer protection laws, any employee benefit, pension or tax law or related rule or regulation or state or (except to the extent specifically set forth in paragraphs II.4 and 5) federal securities laws.

3. In rendering the opinions set forth in paragraphs II. 4 and 5, we have assumed the accuracy of the factual representations, warranties and certifications of, and compliance with the agreements by WaMu Delaware IV and the Initial Purchasers of the Securities contained in the Transaction Documents and the certificates and other documents delivered at the closing of the sale of the Trust Securities and the accuracy of the representations and warranties made or deemed to be made by the holders of the Trust Securities as described in the Offering Circular and the Purchase Agreement.

4. Our opinions as to the legal, valid and binding nature and enforceability of any agreement or instrument are subject to (i) the effect of any applicable bankruptcy, insolvency, fraudulent conveyance or similar law affecting creditors' rights generally, and (ii) to general principles of equity (regardless of whether considered in a proceeding in equity or at law), including concepts of commercial reasonableness, good faith and fair dealing and the possible unavailability of specific performance or injunctive relief.

5. We also express no opinion regarding: (i) any severability provision in the Transaction Documents; (ii) the enforceability of any waiver of rights or defenses set forth in the Transaction Documents to the extent such rights or defenses may not be waived under applicable law; or (iii) any provision of any Transaction Documents that purports to (a) appoint any person as the attorney-in-fact of any other person, (b) provide that all rights or remedies of any party are cumulative and may be enforced in addition to any other right or remedy and that the election of a particular remedy does not preclude recourse to one or more remedies, (c) permit set-off in the absence of mutuality between the parties, (d) confer subject matter jurisdiction on a Federal court to adjudicate any controversy in any situation in which such court would not have subject matter jurisdiction, (e) waive the right to jury trial or any right to object to the laying of venue or any claim that an action or proceeding has been brought in an inconvenient forum.

6. Our opinions with respect to any agreement of the Issuer to indemnify any person (including by way of contribution) are subject to the qualifications that any indemnity obligation may be limited by public policy considerations and may be subject to defenses available to sureties arising from actions of the indemnified party.

7.    We express no opinion in this letter as to the validity, perfection or priority of any security interest or on whether any purported sale of loans or other property is a true sale.

The opinions expressed herein shall be effective only as to the date of this opinion letter.  We do not assume responsibility for updating this opinion letter as of any date subsequent to the date of this opinion letter, and assume no responsibility for advising you of (i) any changes with respect to any matters described in this opinion letter or (ii) the discovery subsequent to the date of this opinion letter of factual information not previously known to us pertaining to the events occurring prior to the date of this opinion letter.

This opinion is being furnished only to you in connection with the transactions contemplated by the Transaction Documents, is solely for your benefit, and is not to be used, quoted, relied upon or otherwise referred to by any other person or for any other purposes without our prior written consent. This opinion is based on factual matters in existence as of the date hereof and laws and regulations in effect on the date hereof, and we assume no obligation to revise or supplement this opinion should such factual matters change or should such laws or regulations be changed by legislative or regulatory action, judicial decision or otherwise.

Very truly yours,

Mayer Brown LLP

NY12532:406459.6

Schedule I

Washington Mutual Preferred Funding LLC

Washington Mutual Preferred Funding Trust IV

Washington Mutual Home Equity Trust I

WAMU 2006-OA1

WAMU 2007-Flex1

Washington Mutual, Inc.

Washington Mutual Bank

Goldman, Sachs & Co., [_____], as representative[s] of the Initial Purchasers

Deutsche Bank National Trust Company

Deutsche Bank Trust Company Delaware

Wilmington Trust Company

Standard & Poor's Ratings Services

Moody's Investor Services, Inc.

Fitch, Inc.

October [____], 2007

To Goldman, Sachs & Co., [_____],
as representative[s] of the Initial Purchasers

Re:    Negative Assurance Letter
       Washington Mutual Preferred Funding Trust IV

Ladies and Gentlemen:

We have acted as special New York counsel to Washington Mutual Preferred Funding Trust IV, a statutory trust formed under the laws of the State of Delaware ("WaMu Delaware IV"), Washington Mutual Preferred Funding LLC, a limited liability company organized under the laws of the state of Delaware (the "LLC"), Washington Mutual, Inc. ("WMI"), and Washington Mutual Bank ("WMB") (each a "Represented Party" and collectively, the "Represented Parties"), in connection with the issuance and sale by WaMu Delaware IV of [●] of its Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities, liquidation preference $100,000 per security and $[●] in the aggregate (the "Trust Securities").

The Trust Securities are to be purchased by Goldman, Sachs & Co., [_____] and certain other initial purchasers (the "Initial Purchasers") pursuant to the Purchase Agreement, dated October [__], 2007, among the Represented Parties, Goldman Sachs & Co. as representative of the Initial Purchasers and certain other parties thereto, relating to the offer and sale of the Trust Securities (the "Purchase Agreement"). This opinion letter is furnished pursuant to the Purchase Agreement by request of the Initial Purchasers. Capitalized terms used herein and not otherwise defined have the meaning set forth in the Purchase Agreement.

A preliminary offering circular, dated October [__], 2007 (the "Preliminary Offering Circular" and, as supplemented by Schedule III to the Purchase Agreement, the "Pricing Disclosure Package"), and an offering circular, dated October [__], 2007 (the "Offering Circular"), have been prepared in connection with the offering of the Trust Securities.

References herein to the Preliminary Offering Circular and the Offering Circular shall include the information which WMI filed with the Securities and Exchange Commission and which WMB filed with the Office of Thrift Supervision, in each case to the extent incorporated by reference in the Preliminary Offering Circular and the Offering Circular under the heading "Where You Can Find More Information."

In the course of representing the Represented Parties in connection with the above, we have participated in telephone conferences with officers, managers, employees and representatives of the Represented Parties and the Initial Purchasers and their respective counsel, and the independent accountants of Washington Mutual, Inc. and Washington Mutual Bank, at which conferences the contents of certain sections

NYI2532:406459.6

of the Offering Circular and the Pricing Disclosure Package and related matters were discussed.

The purpose of our professional engagement was not to establish or confirm factual matters set forth in the Pricing Disclosure Package and the Offering Circular and we have not undertaken any obligation to verify independently any of the factual matters set forth in the Offering Circular. Moreover, many of the determinations required to be made in the preparation of the Pricing Disclosure Package and the Offering Circular involve matters of a non-legal nature.

We are not passing upon, and do not assume any responsibility for, the accuracy, completeness or fairness of the statements contained in the Offering Circular and the Pricing Disclosure Package (except to the extent that such matters are specifically addressed herein or in our separate opinion of even date herewith) and have made no independent check or verification thereof. Subject to the foregoing, we confirm that no facts have come to the attention of the attorneys who have worked on this transaction or otherwise have had principal responsibility for representing the Company, WMI or WMB on other significant matters that have led us to believe that: (a) the Pricing Disclosure Package, as of [_____] pm (Eastern Time) on October [__], 2007, contained any untrue statement of a material fact or omitted to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading or (b) the Offering Circular contained, as of October [__], 2007 or contains as of the date hereof, an untrue statement of a material fact or omitted or omits, as the case may be, to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, however that we express no opinion or belief with respect to the financial statements and other financial information included in or omitted from the Offering Circulars or the Pricing Disclosure Package.

Whenever in this letter, the existence or absence of facts is indicated to be based on our knowledge or awareness, we are referring to the actual knowledge of the Mayer Brown LLP attorneys who have represented the Represented Parties in connection with the transactions contemplated by the Offering Circular or who have participated in the preparation of the Pricing Disclosure Packages, the Offering Circular or the aforementioned conferences or otherwise have had principal responsibility for representing the Company, WMI or WMB on other significant matters. Except as expressly set forth herein, we have not undertaken any independent investigation to determine the existence or absence of such facts and no inference as to our knowledge concerning such facts should be drawn from the fact that such representation has been undertaken by us.

Pursuant to IRS Circular 230, we hereby inform you that this letter was not intended or written by us to be used, and cannot be used by you, for the purpose of avoiding penalties that may be imposed on you under U.S. tax law.

This letter is limited to the specific issues addressed herein and is limited in all respects to laws and facts existing on the date hereof. By delivering this letter, we do not undertake to advise you with respect to any other matter or of any change in such laws or facts or in the interpretations of such laws that may occur after the date hereof.

We are furnishing this letter to you solely for your benefit in connection with the Purchase Agreement and this letter may not be relied upon by any other person including, without limitation, the holders or beneficial owners of the Offered Securities from time to time. This letter is not to be assigned, used, circulated, quoted or otherwise referred to for any other purpose without prior written consent thereto.

Very truly yours,

Mayer Brown LLP

NY12532:406459.6