October [__], 2007

Washington Mutual Inc.
1301 Second Avenue
Seattle, Washington 98101

Ladies and Gentlemen:

We have acted as counsel to you, Washington Mutual, Inc., a Washington corporation (the "Company"), in connection with the Replacement Capital Covenant entered into by the Company on October [__], 2007, a copy of which is attached as Annex 1 (the "Replacement Capital Covenant"). Capitalized terms used herein and not otherwise defined are used with the meanings assigned to them in the Replacement Capital Covenant.

You have asked for our opinion as to whether the Replacement Capital Covenant will be enforceable by Covered Debtholders in the event the Company were to breach its promise and covenant in Section 2 of the Replacement Capital Covenant.

Because the class or series of the Company's long-term indebtedness for money borrowed that is the Covered Debt may change from time-to-time and the governing law of the indenture, agreement or other instrument under which the Covered Debt exists may or may not be the law of the State of New York, the Company has chosen to implement its promise and covenant set forth in Section 2 of the Replacement Capital Covenant as a promise and covenant intended to be enforceable against the Company as a promise reasonably inducing action or forbearance, commonly referred to as "promissory estoppel" (see Restatement (Second) of Contracts § 90 (1981) (the "Second Restatement")), instead of as a term of the indenture, agreement or other instrument of the applicable Covered Debt, which would require an amendment to each related indenture, agreement or other instrument. The three essential elements of a promissory estoppel claim that can be derived from the Second Restatement are that (i) there must be a clear and unambiguous promise, (ii) there must be reasonable and forseeable reliance by the promisee on the promise, and (iii) the promisee must have sustained an injury as a result of a breach of the promise on which the promisee relied. Promissory estoppel is a generally applicable doctrine and, although we are not aware of any judicial decision applying promissory estoppel specifically to undertakings for the benefit of holders of investment securities, we are aware of no decision holding that the promissory estoppel doctrine would not be applicable in such a context if the elements of a promissory estoppel claim are satisfied.

Applying these elements to the Replacement Capital Covenant:

(a)    the Replacement Capital Covenant is straightforward and satisfies the requirement that there be a clear and unambiguous promise;

NY12532:406459.6

(b)     assuming that the Company complies with its covenant regarding public disclosure and notices set forth in Section 4 of the Replacement Capital Covenant, we believe that such disclosure and notices, together with Recitals D and E in the Replacement Capital Covenant, should enable a Covered Debtholder to demonstrate that its reliance on the Company's promise and covenant in Section 2 of the Replacement Capital Covenant was reasonable and forseeable; and

(c)     the Company has entered into the Replacement Capital Covenant with the expectation that its compliance with its promise and covenant in Section 2 will be a relevant factor in any Covered Debtholder's evaluation of whether to buy or sell the related Covered Debt and that Covered Debtholders would be damaged if the Company disregarded or breached such promise and covenant, as reflected in Recitals D and E of the Replacement Capital Covenant.

We, as your counsel, have examined such corporate records, certificates and other documents and such questions of law (including the elements of promissory estoppel, as discussed above), as we have considered it necessary or appropriate for the purposes of this opinion.

With your approval, in our examination we have further assumed, without independent investigation:

1.     that the Company is duly organized and validly existing in the State of Washington;

2.     that the Company is duly qualified to transact business as a foreign corporation or other entity and is in good standing in the jurisdictions in which it transacts business or is otherwise required to be so qualified;

3.     the due authorization of the Replacement Capital Covenant by the Company;

4.     the due execution and delivery of the Replacement Capital Covenant by the Company;

5.     the full legal power and authority of the Company to execute, deliver and perform its obligations under the Replacement Capital Covenant;

6.     the legal competence and capacity of all natural persons executing the Replacement Capital Covenant;

7.     that there has not been any fraud, duress, undue influence or material mistake of fact in connection with the execution and performance of the Replacement Capital Covenant;

8.     that there are no agreements of the Company that would alter, and no material agreements of the Company that would conflict with, the agreements set forth in the Replacement Capital Covenant.

Upon the basis of such examination and based upon the foregoing assumptions, we advise you that, in our opinion, assuming that the Company complies with its covenant in Section 4 as to public disclosure and notices, if the Company were to disregard or breach its promise and covenant set forth in Section 2 of the Replacement Capital Covenant, the Replacement Capital Covenant would be enforceable against the Company by any Covered Debtholder that bought or sold Covered Debt in reliance on the Replacement Capital Covenant and established damages from such breach, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

The foregoing opinion is limited to the Federal laws of the United States and the laws of the State of New York. Moody's Investors Service Inc. may rely on this opinion as if the opinion were addressed to it.

Very truly yours,

Mayer Brown LLP

NY12532:406459.6

**Opinion of Heller Ehrman LLP**

[To be updated by Heller Ehrman]

Goldman, Sachs & Co., ● and ●,
     as Representatives of the several
     Purchasers named in Schedule I
     to the Purchase Agreement as defined below
85 Broad Street
New York, New York 10004

     Re:    Washington Mutual, Inc. and Certain Subsidiaries

Ladies and Gentlemen:

We have acted as counsel for Washington Mutual, Inc , a Washington corporation ("*WMI*"), Washington Mutual Bank, a federal savings bank ("*WMB*") and University Street, Inc., a Washington corporation ("*University Street*") in connection with the issuance by Washington Mutual Preferred Funding LLC, a Delaware limited liability company (the "*Company*") of its Fixed-to-Floating Rate Perpetual Non-cumulative Preferred Securities, Series 2007-B, liquidation preference $1,000 per security (the "Company Preferred Securities").

Washington Mutual Preferred Funding Trust IV, a Delaware statutory trust ("*WaMu Delaware*"), will issue its Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities (the "*Trust Securities*") and apply the proceeds to purchase the Company Preferred Securities. Under specified circumstances, the Trust Securities are automatically exchangeable into depositary shares representing interests in shares of Series N Perpetual Non-cumulative Fixed-to-Floating Rate Preferred Stock of WMI (the "*Series N Preferred Stock*"). Such an exchange is herein referred to as a "Conditional Exchange."

This opinion letter is being delivered pursuant to Section 8(c) of that certain Purchase Agreement dated October ●, 2007 (the "Purchase Agreement") by and among WMI, WMB, the Company, WaMu Delaware and Goldman, Sachs & Co., as representatives of the Purchasers named on Schedule I to the Purchase Agreement. Capitalized terms used and not otherwise defined in this letter have the meanings given them in the Purchase Agreement.

**I.**

We have assumed the authenticity of all records, documents and instruments submitted to us as originals, the genuineness of all signatures, the legal capacity of natural persons and the conformity to the originals of all records, documents and instruments submitted to us as copies. We have based our opinion upon a review of the following records, documents, instruments and certificates and such additional certificates relating to factual matters as we have deemed appropriate:

     A.    The Purchase Agreement;

B.     The Final Offering Circular dated October ●, 2007 relating to the Trust Securities (the "*Offering Circular*");

C.     The Deposit Agreement dated as of October ●, 2007 among WMI, Mellon Investor Services LLC ("*Mellon*"), as depositary and as registrar, and the holders from time to time of the Depositary Receipts;

D.     The Exchange Agreement dated as of October ●, 2007 among WMI, WaMu Delaware and Mellon;

E.     The Master Loan Contribution and Purchase Agreement dated as of March 7, 2006 and the related Loan Transfer Confirmations, dated as of March 7, 2006, December 13, 2006 and October ●, 2007, respectively (together, the "*University Street Asset Transfer Agreement*") between University Street and the Company;

F.     The Master Loan Contribution and Purchase Agreement dated as of March 7, 2006 and the related Loan Transfer Confirmations, dated as of March 7, 2006, December 13, 2006 and October ●, 2007, respectively (together, the "*WMB Asset Transfer Agreement*") between WMB and the Company;

G.     The Pooling and Servicing Agreement dated as of March 7, 2006, the Pooling and Servicing Agreement dated as of December 13, 2006 and the Pooling and Servicing Agreement dated as of October ●, 2007, each among the Company, WMB, Deutsche Bank Trust Company Delaware and Deutsche Bank National Trust Company;

H.     The Administrative Services Agreement dated as of March 6, 2006 among the Company, WMB and WMI;

I.     The Agency Agreement dated as of October ●, 2007 among the Company, WaMu Delaware and Wilmington Trust Company;

J.     Articles of Amendment filed by WMI on October ●, 2007 with the Secretary of State of the State of Washington relating to the Series N Preferred Stock (the "*WMI Articles of Amendment*");

K.     A Certificate of Existence/Authorization relating to WMI issued by the Washington Secretary of State, dated October ●, 2007;

L.     A Certificate of Existence/Authorization relating to University Street issued by the Washington Secretary of State, dated October ●, 2007;

M.     A certified copy of the articles of incorporation of WMI issued by the Washington Secretary of State, dated October ●, 2007;

N.     A certified copy of the articles of incorporation of University Street issued by the Washington Secretary of State, dated October ●, 2007;

O.     A letter relating to the status of WMI as a savings and loan holding company from the Office of Thrift Supervision (the "*OTS*"), dated October ●, 2007;

A-3-2

P.     The officer's certificates delivered by WMI and University Street pursuant to the Purchase Agreement;

Q.     A Secretary's Certificate of WMI;

R.     A Secretary's Certificate of University Street;

S.     Records certified to us by an officer of WMI of proceedings and actions of the board of directors and certain authorized officers relating to the issuance of the Series N Preferred Stock; and

T.     Records certified to us by an officer of University Street of proceedings and actions of the board of directors relating to the University Street Asset Transfer Agreement.

The agreements described in Paragraphs C, D and H above are sometimes referred to herein as the "WMI Transaction Agreements." The agreements described in Paragraphs C through I above are sometimes referred to herein as the "Transaction Agreements." The agreements described in Paragraphs E and F above are sometimes referred to herein as the "Asset Transfer Agreements."

Our opinion expressed in Paragraph 1 of Part IV is based solely on the certificate enumerated in Paragraph K above.  We have made no additional investigation after the date of such certificate in rendering the opinion expressed in Paragraph 1 of Part IV.

Our opinion expressed in Paragraph 3 of Part IV as to WMI's status as a unitary savings and loan holding company is based solely on the letter enumerated in Paragraph O above.  We have made no additional investigation after the date of such letter in rendering the opinion expressed in Paragraph 3 of Part IV.

## II.

We have also assumed the following, without making any inquiry into the reasonableness or validity thereof:

(a)     Each of the parties (other than WMB and University Street) to the Asset Transfer Agreements (each a "*Third Party*" and collectively the "*Third Parties*") has all necessary power and authority to execute and deliver, and to perform its obligations under, the Agreements to which it is a party;

(b)     Each of the Asset Transfer Agreements is a valid and binding obligation of each Third Party that is a party thereto, enforceable against each such Third Party in accordance with its terms;

(c)     There are no facts or circumstances relating to any Third Party (for example, regulatory prohibitions or the failure to qualify to do business) that might prevent any such Third Party from enforcing any of the rights to which our opinion relates;

A-3-3

(d)     With respect to our opinion in Paragraph 4 of Part IV, we have assumed that WMI will be a duly incorporated and existing corporation under the laws of the State of Washington at the time of the occurrence of a Conditional Exchange and that the WMI Preferred Stock will be represented by a duly issued certificate or WMI will comply with § 23B.06.260 of the Revised Code of Washington relating to shares without certificates; and

(e)     With respect to our opinion in Paragraph 7 of Part IV, we have assumed that WMB (1) is a federal savings bank duly chartered under the laws of the United States with its charter in full force and effect, (2) has corporate power and authority to execute and deliver, and to perform its obligations under, the WMB Asset Transfer Agreement and (3) has duly authorized, executed and delivered the WMB Asset Transfer Agreement, and we understand that you are relying on the opinion of Charles E. Smith, Esq. dated the date hereof with respect to such matters.

## III.

We express no opinion as to any securities laws, rules or regulations (other than as set forth in Paragraph 11 of Part IV of this letter), tax laws or any laws, rules or regulations applicable to any Third Party by virtue of its status as a financial securities institution, pension fund, insurance company or similarly regulated entity. In addition, we express no opinion as to whether any party (other than WMI and University Street) is required to qualify to do business in the State of Washington.

Our opinions in Paragraphs 1 through 10 of Part IV are limited to the internal laws of the State of Washington and our opinion in Paragraph 11 is limited to the laws of the United States. We disclaim any opinion as to the laws of any other jurisdiction. We further disclaim any opinion as to any statute, rule, regulation, ordinance, order or other promulgation of any regional or local governmental body or as to any related judicial or administrative opinion.

## IV.

Based upon the foregoing and our examination of such questions of law as we have deemed necessary or appropriate for our opinion, and subject to the limitations and qualifications expressed herein, it is our opinion that:

1.     WMI has been duly incorporated and is an existing corporation under the laws of the State of Washington.

2.     WMI has the corporate power and authority to own its properties and conduct its business as described in the Offering Circular.

3.     WMI has been duly registered as a savings and loans holding company under the applicable provisions of the Home Owners' Loan Act.

4.     The shares of the Series N Preferred Stock initially issuable upon a Conditional Exchange of the Trust Securities have been duly authorized and reserved

A-3-4

for issuance upon such Conditional Exchange and, when issued upon the occurrence of such Conditional Exchange, will be validly issued, fully paid and nonassessable.

5.      The descriptions (i) in the Offering Circular of the Series N Preferred Stock under the caption "Description of the Series N WMI Preferred Stock," and (ii) in the Offering Circular of other securities of WMI under the caption "Description of the Other WMI Capital Stock," insofar as they purport to describe the provisions of laws, securities and other documents referred to therein, are accurate in all material respects and provide a fair summary of such provisions in all material respects.

6.      The University Street Asset Transfer Agreement (i) has been duly authorized, executed and delivered by University Street and, assuming it has been duly authorized, executed and delivered by the Company, constitutes the valid and legally binding obligation of University Street, enforceable in accordance with its terms, subject to bankruptcy, insolvency, receivership, conservatorship, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles, and (ii) assuming the transaction is a sale and not a security interest that secures an obligation and assuming the proper completion of a loan transfer confirmation in the case of any transfer other than the transfers pursuant to the Loan Transfer Confirmations referred to in Paragraph E of Part I above, is sufficient to transfer to the Company the entire right, title and interest of University Street in the loans identified as being transferred in the University Street Asset Transfer Agreement, subject to bankruptcy, insolvency, receivership, conservatorship, fraudulent transfer, reorganization, moratorium and similar laws.

7.      The WMB Asset Transfer Agreement (i) assuming it has been duly authorized, executed and delivered by the Company, constitutes the valid and legally binding obligation of WMB, enforceable in accordance with its terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' right and to general equity principles, and (ii) assuming the transaction is a sale and not a security interest that secures an obligation and assuming the proper completion of a loan transfer confirmation in the case of any transfer other than the transfer pursuant to the Loan Transfer Confirmations referred to in Paragraph F of Part I above, is sufficient to transfer to the Company the entire right, title and interest of WMB in the loans identified as being transferred in the WMB Asset Transfer Agreement, subject to bankruptcy, insolvency, receivership, conservatorship, fraudulent transfer, reorganization, moratorium and similar laws.

8.      Each of the Purchase Agreement and the WMI Transaction Agreements has been duly authorized, executed and delivered by WMI.

9.      No consent, approval, authorization or order of, or filing with, any governmental agency or body of the State of Washington or any court located in the State of Washington is required for the consummation of the transactions contemplated by the Purchase Agreement or the Transaction Agreements or in connection with the issuance and sale of any of the Securities, except as may be required under the securities or "blue sky" laws of the State of Washington and except for the filing of the

WMI Articles of Amendment with the Washington Secretary of State (which has been made) and any UCC filings with the Washington Department of Licensing.

10.     The execution, delivery and performance of the Purchase Agreement by WMI, WMB, the Company and WaMu Delaware, and the execution, delivery and performance of any Transaction Agreement by WMI or any of its subsidiaries that is a party thereto, and the issuance and sale of the Trust Securities in compliance with the terms and provisions thereof, will not result in a breach or violation of any of the terms and provisions of any statute, any rule or any regulation of any governmental agency or body of the State of Washington.

11.     The Exchange Act Reports (other than the financial statements, the related schedules therein and other financial data contained therein, as to which we express no opinion), when they were filed with the Commission or the OTS (as applicable), complied as to form in all material respects with the applicable requirements of the Exchange Act, and the rules and regulations of the Commission or the OTS (as applicable) thereunder.

## V.

Although we have not undertaken to determine independently the accuracy, completeness or fairness of any of the statements made in the Exchange Act Reports, we have reviewed the Exchange Act Reports and participated in conferences with representatives of WMI and WMB and their accountants at which the contents of the Exchange Act Reports and related matters were discussed and reviewed. On the basis of the information that was developed in the course of the performance of the services referred to above, we advise you that nothing has come to our attention that has led us to believe that any of such documents, at the date they were so filed, contained an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made when such documents were so filed, not misleading. The limitations inherent in the independent verification of factual matters and the character of determinations involved in the preparation of the Exchange Act Reports are such, however, that we do not assume any responsibility for the accuracy, completeness or fairness of the statements contained in the Exchange Act Reports. We also do not express any opinion or belief as to the financial statements or other financial data contained in the Exchange Act Reports.

## VI.

We further advise you that:

(a)     As noted, the enforceability of the Asset Transfer Agreements is subject to the effect of general principles of equity. These principles include, without limitation, concepts of commercial reasonableness, materiality and good faith and fair dealing. As applied to the Agreements, these principles will require the parties to the Asset Transfer Agreements other than WMB and University Street (the "*Other Parties*") to act reasonably, in good faith and in a manner that is not arbitrary or capricious in the administration and enforcement of the Asset

A-3-6

Transfer Agreements and will preclude the Other Parties from invoking penalties for defaults that bear no reasonable relation to the damage suffered or that would otherwise work a forfeiture.

(b)     The enforceability of the Asset Transfer Agreements is subject to the effects of (i) provisions of the Uniform Commercial Code (a) stating that obligations of good faith, diligence, reasonableness and care prescribed may not be disclaimed by agreement, although the parties may by agreement determine the standards by which the performance of such obligations is to be measured if those standards are not manifestly unreasonable, or (b) imposing an obligations of good faith in the performance or enforcement of a contract and (ii) legal principles under which a court may refuse to enforce, or may limit the enforcement of, a contract or any clause of a contract that a court finds as a matter of law to have been unconscionable at the time it was made.  We express no opinion as to the attachment, validity, perfection or priority of any security interest that secures an obligation.

(c)     The effectiveness of indemnities, rights of contribution, exculpatory provisions, choice of venue provisions, waivers of jury trials and waivers of the benefits of statutory provisions may be limited on public policy grounds.

(d)     Provisions of any agreement requiring that waivers must be in writing may not be binding or enforceable if a non-executory oral agreement has been created modifying any such provision or an implied agreement by trade practice or course of conduct has given rise to a waiver.

## VII.

The foregoing opinion is being delivered solely to you in connection with the issuance of the Trust Securities and may not be relied on by you for any other purpose or by any other person for any purpose without our written consent, except that Sullivan & Cromwell LLP and Mayer Brown LLP may each rely on this opinion to the extent each is delivering legal opinions pursuant to the Purchase Agreement that opine as to matters covered by our opinion.  We disclaim any obligation to advise you of any change of law that occurs, or any facts of which we become aware, after the date of this opinion.

Very truly yours,


HELLER EHRMAN LLP

NY12532:406459.6

**Opinion of Richards, Layton & Finger, P.A.**

[To be updated by Richards, Layton & Finger, P.A.]

To Each of the Persons Listed
    on Schedule A Attached Hereto

    Re:    <u>Washington Mutual Preferred Funding LLC</u>

Ladies and Gentlemen:

    We have acted as special Delaware counsel for Washington Mutual Preferred Funding LLC, a Delaware limited liability company (the "*Company*"), in connection with the matters set forth herein. At your request, this opinion is being furnished to you.

    For purposes of giving the opinions hereinafter set forth, our examination of documents has been limited to the examination of originals or copies of the following:

    ☐    The Certificate of Formation of the Company, dated February 3, 2006, as filed in the office of the Secretary of State of the State of Delaware (the "*Secretary of State*") on February 3, 2006 (under the name "Washington Mutual Preferred Funding, LLC"), as amended by the Certificate of Amendment thereto, dated February 6, 2006, as filed in the office of the Secretary of State on February 6, 2006 (reflecting a change in the name of the Company to "Washington Mutual Preferred Funding LLC"), as corrected by the Certificate of Correction thereto, dated as of February 23, 2006, as filed in the office of the Secretary of State on February 23, 2006 (as so amended and corrected, the "*LLC Certificate*"),

    ☐    The Limited Liability Company Agreement of the Company, dated as of February 23, 2006 (the "*Initial Company Agreement*"), entered into by University Street, Inc. ("*University*"), as the sole member of the Company;

    ☐    The Amended and Restated Limited Liability Company Agreement of the Company, dated as of March 7, 2006 (the "*Amended LLC Agreement*"), including the By-Laws of the Company attached thereto as Annex A;

    ☐    The Fourth Amended and Restated Limited Liability Company Agreement of the Company, dated as of October ●, 2007 including the By-Laws of the Company attached thereto as Annex A (the "*Company Agreement*"), among University, as initial securityholder and holder of the common securities of the Company (the "*Company Common Securities*"), Washington Mutual Preferred Funding (Cayman) I Ltd. ("*WaMu Cayman*"), as holder of the Series 2006-B Company Preferred Securities (as defined therein), Washington Mutual Preferred Funding Trust I ("*Trust I*"), as holder of the Series 2006-A Company Preferred Securities (as defined therein), Washington Mutual Preferred Funding Trust II (Trust II), as holder of the 2006-C Company Preferred Securities, Washington Mutual Preferred Funding Trust III ("*Trust III*"), as holder of the 2007-A Company Preferred Securities and Washington Mutual Bank ("*WMB*"), as initial

holder of the ● 2007-B Company Preferred Securities (as defined therein) (the "*2007-B Company Preferred Securities*");

☐  The documents listed on Schedule B attached hereto (each, a "*Transaction Document*" and collectively, the "*Transaction Documents*"); and

☐  A Certificate of Good Standing for the Company, dated October ●, 2007, obtained from the Secretary of State.

Initially capitalized terms used herein and not otherwise defined are used as defined in the Company Agreement. The Series 2006-A Company Preferred Securities, Series 2006-B Company Preferred Securities, Series 2006-C Company Preferred Securities, Series 2007-A Company Preferred Securities and the 2007-B Company Preferred Securities are hereinafter collectively referred to as the "Company Preferred Securities." The Series 2006-A Company Preferred Securities, the Series 2006-B Company Preferred Securities, the Series 2006-C Company Preferred Securities and the Series 2007-A Company Preferred Securities are hereinafter collectively referred to as the "Issued Company Preferred Securities."

For purposes of this opinion, we have not reviewed any documents other than the documents listed in paragraphs (a) through (f) above. In particular, we have not reviewed any document (other than the documents listed in paragraphs (a) through (f) above) that is referred to in or incorporated by reference into the documents reviewed by us. We have assumed that there exists no provision in any document that we have not reviewed that is inconsistent with the opinions stated herein. We have conducted no independent factual investigation of our own, but rather have relied solely upon the foregoing documents, the statements and information set forth therein and the additional matters recited or assumed herein, all of which we have assumed to be true, complete and accurate in all material respects.

With respect to all documents examined by us, we have assumed (i) the authenticity of all documents submitted to us as authentic originals, (ii) the conformity with the originals of all documents submitted to us as copies or forms, and (iii) the genuineness of all signatures.

For purposes of this opinion, we have assumed (i) except to the extent provided in paragraph 1 below, that each party to the documents examined by us has been duly created, organized or formed, as the case may be, and is validly existing in good standing under the laws of the jurisdiction governing its creation, organization or formation, (ii) the legal capacity of natural persons who are signatories to the documents examined by us, (iii) except to the extent set forth in paragraphs 2 and 4 below, that each of the parties to the documents examined by us has the power and authority to execute and deliver, and to perform its obligations under, such documents, (iv) except to the extent set forth in paragraph 5 below, that all documents examined by us have been duly authorized, executed and delivered by all parties thereto, (v) that the books and records of the Company set forth all information required by the Company Agreement and the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.) (the "*LLC Act*"), including all information with respect to all *Persons* to be admitted as Securityholders and their contributions to the Company, (vi) that the Issued Company

A-4-2

Preferred Securities have been issued and sold to WMB, and WMB has paid the full consideration due from it for the Issued Company Preferred Securities acquired by it, in accordance with the Company Agreement, (vii) that, on the date hereof, the Series 2007-B Company Preferred Securities are issued and sold to Trust IV, and Trust IV has paid the full consideration due from it for the Series 2007-B Company Preferred Securities acquired by it, in accordance with the Company Agreement, (viii) that the Company Common Securities have been issued and sold to University, and University has paid the full consideration due from it for the Company Common Securities acquired by it, in accordance with the Company Agreement, (ix) that the transactions contemplated by the WMB Contribution Agreement and the University Street Contribution Agreement (each as defined on Schedule B attached hereto) have been consummated, (x) that the Series 2006-B Company Preferred Certificates, the Series 2006-A Company Preferred Certificates, the Series 2006-C Company Preferred Certificates and the Series 2007-A Company Preferred Certificates have been duly executed and issued to WaMu Cayman, Trust I, Trust II and Trust III respectively, in accordance with the Company Agreement, (xi) that, on the date hereof, the Series 2007-B Company Preferred Securities have been duly executed and issued to Trust IV, in accordance with the Company Agreement, (xii) that each of the Company, WMB and WaMu Cayman has no assets, activities (other than, in the case of the Company, the maintenance of a registered office and registered agent in the State of Delaware and the filing of documents with the Secretary of State) or employees in the State of Delaware, (xiii) that each of the Company, WMB, Trust I, Trust II, Trust III, Trust IV and WaMu Cayman has obtained such authorizations, consents, approvals and orders, and has made such registrations, filings and qualifications, as are customarily required in the conduct of its business, (xiv) that any amendment or restatement of any document reviewed by us (other than the Initial Company Agreement and Amended LLC Agreement) has been accomplished in accordance with, and was permitted by, the relevant provisions of said document prior to its amendment or restatement from time to time, (xv) that the Company Agreement and the LLC Certificate are in full force and effect, have not been amended and no amendment of the Company Agreement or the LLC Certificate is pending or has been proposed, (xvi) that the Initial Company Preferred Securities were transferred by WMB to Trust I, Trust II, Trust III and WaMu Cayman in accordance with the Company Agreement, (xvii) that, on the date hereof, the Series 2007-B Company Preferred Securities are transferred by WMB to Trust IV in accordance with the Company Agreement, (xiii) that Trust II, Trust III and WaMu Cayman have paid the purchase price set forth in the Initial Purchase Agreement (as defined on Schedule B attached hereto) to WMB for the Company Preferred Securities acquired by it, (xix) that on the date hereof Trust IV paid the purchase price set forth in the Purchase Agreement (as defined on Schedule B attached hereto) to WMB for the Series 2007-B Company Preferred Securities being acquired by it, (xx) that the Series 2007-B Company Preferred Securities constitute Parity Equity Securities (as defined in the Amended LLC Agreement), (xxi) that all conditions and restrictions relating to the issuance of Parity Equity Securities set forth in Section 7.10 of the Amended LLC Agreement and Section 7.13 of the Company Agreement have been satisfied, and (xxii) that all notices are promptly sent as required by Section 15.2 of the Amended LLC Agreement. We have not participated in the preparation of any offering material relating to the Company, Trust I, Trust II, Trust III, Trust IV or WaMu Cayman and assume no responsibility for the contents of any such material.

A-4-3

This opinion is limited to the laws of the State of Delaware (excluding the securities laws and blue sky laws of the State of Delaware), and we have not considered and express no opinion on the laws of any other jurisdiction, including United States federal laws and rules and regulations relating thereto. Our opinions are rendered only with respect to Delaware laws and rules, regulations and orders thereunder that are currently in effect. In rendering the opinions set forth herein, we express no opinion concerning (i) the creation, attachment, perfection or priority of any security interest, lien or other encumbrance, or (ii) the nature or validity of title to any property.

Based upon the foregoing, and upon our examination of such questions of law and statutes of the State of Delaware as we have considered necessary or appropriate, and subject to the assumptions, qualifications, limitations and exceptions set forth herein, we are of the opinion that:

☐    The Company has been duly formed and is validly existing in good standing as a limited liability company under the LLC Act, and all filings required under the LLC Act with respect to the formation and valid existence of the Company as a limited liability company in the State of Delaware have been made.

☐    Under the Company Agreement and the LLC Act, the Company has all necessary limited liability company power and authority to own its property and conduct its business, all as described in the Company Agreement.

☐    The Company Agreement constitutes a legal, valid and binding agreement of University, Trust I, Trust II, Trust III, Trust IV and WaMu Cayman, and is enforceable against University, Trust I, Trust II, Trust III, Trust IV and WaMu Cayman, in accordance with its terms. Prior to WMB ceasing to be a Company Preferred Securityholder pursuant to Section 2.2(f) of the Company Agreement, the Company Agreement constituted a legal, valid and binding agreement of WMB, and was enforceable against WMB, in accordance with its terms.

☐    Under the Company Agreement and the LLC Act, the Company has all necessary limited liability company power and authority (i) to execute and deliver each of the Transaction Documents, and to perform its obligations thereunder, and (ii) to accept a capital contribution from University in respect of the Company Common Securities held by University, (iii) to issue the Series 2007-B Company Preferred Securities to Trust IV, and to perform its obligations under the Company Common Securities and the Company Preferred Securities.

☐    Under the Company Agreement and the LLC Act, the execution and delivery by the Company of each of the Transaction Documents, and the performance by the Company of its obligations thereunder, have been duly authorized by all necessary limited liability company action on the part of the Company.

☐    The Series 2007-B Company Preferred Securities have been duly authorized and validly issued by the Company to WMB and, subject to the qualifications set forth in paragraph 7 below, are fully paid and nonassessable limited liability company interests in the Company. The Company Common Securities have been duly authorized and validly issued by the Company to University and, subject to the qualifications set

A-4-4

forth in paragraph 7 below, are fully paid and nonassessable limited liability company interests in the Company.

☐ Each of University, Trust I, Trust II, Trust III, Trust IV and WaMu Cayman, as a member of the Company (each, a "*Member*"), shall not be obligated personally for any of the debts, obligations or liabilities of the Company, whether arising in contract, tort or otherwise solely by reason of being a member of the Company, except that a Member may be obligated to make payments provided for in the Company Agreement and to repay any funds wrongfully distributed to it. A Member may be liable for its tortious or wrongful conduct and for its obligations as set forth in the Company Agreement. We note that, under Section 12.1(a) of the Company Agreement, University has certain unqualified payment obligations.

☐ The provisions of the Company Agreement, including the terms of the Series 2007-B Company Preferred Securities, are permitted under the LLC Act.

☐ The issuance and sale by the Company of the Company Common Securities to University and the Series 2007-B Company Preferred Securities to WMB pursuant to the Company Agreement, and the sale by WMB of the Series 2007-B Company Preferred Securities to Trust IV pursuant to the Purchase Agreement and the Company Agreement, and the performance by the Company of its obligations under each of the Transaction Documents, do not violate (i) any Delaware statute, rule or regulation, or (ii) the LLC Certificate or the Company Agreement.

☐ No consent, approval, authorization, order, registration, filing or qualification of or with any Delaware court or Delaware governmental agency or body is required to be obtained or made by the Company solely in connection with (i) the acceptance by the Company of a capital contribution from University in respect of the Company Common Securities held by University as contemplated by the Company Agreement, (ii) the issuance and sale by the Company of the Series 2007-B Company Preferred Securities to Trust IV as contemplated by the Company Agreement, or (iii) the execution, delivery and performance by the Company of any of the Transaction Documents.

☐ Under the Company Agreement and the LLC Act, the issuance by the Company of the Company Common Securities to University and the Series 2007-B Company Preferred Securities to Trust IV is not subject to the preemptive purchase rights of any Person.

☐ Trust IV has been duly admitted to the Company as a Company Preferred Securityholder.

The opinions expressed in paragraph 3 above are subject to the effect upon the Company Agreement of (i) bankruptcy, insolvency, moratorium, receivership, reorganization, liquidation, fraudulent transfer and conveyance and other similar laws relating to or affecting the rights and remedies of creditors generally, (ii) principles of equity, including applicable law relating to fiduciary duties (regardless of whether considered and applied in a proceeding in equity or at law), and (iii) the effect of

A-4-5

applicable public policy on the enforceability of provisions relating to indemnification or contribution.

In rendering the opinions expressed above, we express no opinion with respect to (i) provisions of a document reviewed by us to the extent that such provisions purport to bind a Person that is not a party to such document, (ii) transfer restrictions in a document reviewed by us to the extent that a transfer occurs by operation of law, and (iii) the right or power of a member of the Company to apply to or petition a court to decree dissolution of the Company pursuant to Section 18-802 of the LLC Act.

We understand that you will rely as to matters of Delaware law upon this opinion in connection with the transactions contemplated by the Purchase Agreement. In connection with the foregoing, we hereby consent to your relying as to matters of Delaware law upon this opinion. We also consent to Mayer Brown LLP and Sullivan and Cromwell LLP's relying as to matters of Delaware law upon this opinion in connection with opinions to be rendered by them on the date hereof pursuant to the Purchase Agreement. Except as stated above, without our prior written consent, this opinion may not be furnished or quoted to, or relied upon by, any other Person for any purpose.

Very truly yours,

RICHARDS, LAYTON & FINGER, P.A.

NYI12532:406459.6

## SCHEDULE A

Washington Mutual Preferred Funding LLC

Washington Mutual Preferred Funding (Cayman) I Ltd.

Washington Mutual Preferred Funding Trust I

Washington Mutual Preferred Funding Trust II

Washington Mutual Preferred Funding Trust III

Washington Mutual Preferred Funding Trust IV

Washington Mutual Home Equity Trust I

WAMU 2006-OA1

WAMU 2007-Flex1

Washington Mutual, Inc.

Washington Mutual Bank

Goldman, Sachs & Co., ● and ●, as representatives of the several purchasers

Deutsche Bank National Trust Company

Deutsche Bank Trust Company Delaware

Wilmington Trust (Cayman) Ltd.

Wilmington Trust Company

NY12532:406459.6

## SCHEDULE B

1. The Purchase Agreement, dated as of February 24, 2006 (the "*Initial Purchase Agreement*"), among Trust I, the Company, Washington Mutual, Inc., WMB, and Goldman, Sachs & Co., on behalf of each of the Purchasers (as defined therein).

2. The Purchase Agreement, dated as of December 6, 2006 (the "*Purchase Agreement*"), among Trust II, the Company, Washington Mutual, Inc., WMB and Goldman, Sachs & Co., on behalf of each of the Purchasers (as defined therein).

3. The Purchase Agreement, dated as of May 21, 2007 among Trust III, the Company, Washington Mutual Inc., WMB and Goldman, Sachs & Co., on behalf of each of the Purchasers (as defined therein).

4. The Purchase Agreement, dated as of October ●, 2007 among Trust IV, the Company, Washington Mutual Inc., WMB and Goldman, Sachs & Co., on behalf of each of the Purchasers (as defined therein).

5. The Pooling and Servicing Agreement, dated as of December 13, 2006, among WMB, as servicer, the Company, as depositor, Deutsche Bank Trust Company Delaware ("*Deutsche Delaware*"), as Delaware trustee, and Deutsche Bank National Trust Company ("*Deutsche*"), as trustee.

6. The Master Loan Contribution and Purchase Agreement, dated as of March 7, 2006, between the Company, as contributee and purchaser, and WMB, as contributor and seller, as supplemented by the Loan Transfer Confirmations, dated as of December 13, 2006, March 7, 2006 and October ●, 2007 between the Company and WMB (as supplemented, the "*WMB Contribution Agreement*").

7. The Master Loan Contribution and Purchase Agreement, dated as of March 7, 2006, between the Company, as contributee and purchaser, and University, as contributor and seller, as supplemented by the Loan Transfer Confirmations, dated as of December 13, 2006, March 7, 2006 and October ●, 2007, between the Company and University (as supplemented, the "*University Contribution Agreement*").

8. The Agency Agreement, dated as of October ●, 2007, among Trust IV, the Company and Wilmington Trust Company.

9. The Amended and Restated Trust Agreement of Trust IV, dated as of October ●, 2007, among the Company, as grantor, and Wilmington Trust Company, as Delaware trustee and property trustee.

10. The Pooling and Servicing Agreement, dated as of March 7, 2006, among WMB, as servicer, the Company, as depositor, Deutsche Bank Trust Company Delaware, as Delaware trustee, and Deutsche Bank National Trust Company, as trustee.

NY12532:406459.6

11.    The Pooling and Servicing Agreement, dated as of October ●, 2007, among WMB, as servicer, the Company, as depositor, Deutsche Bank Trust Company Delaware, as Delaware trustee, and Deutsche Bank National Trust Company, as trustee.

To The Persons Listed On
Schedule A Attached Hereto

> Re:  Washington Mutual Home Equity Trust I
> WAMU 2006-OA1
> WAMU 2007-Flex1
> <u>Washington Mutual Preferred Funding Trust IV</u>

Ladies and Gentlemen:

We have acted as special Delaware counsel to (i) Washington Mutual Preferred Funding Trust IV, a Delaware statutory trust ("*Funding Trust IV*"), in connection with the transactions contemplated by the Amended and Restated Trust Agreement, dated as of October ●, 2007 (the "*Trust Agreement*"), between Wilmington Trust Company, a Delaware banking corporation, as property trustee (in such capacity, the "*Property Trustee*") and as Delaware trustee (in such capacity, the "*Delaware Trustee*"), and Washington Mutual Preferred Funding LLC, a Delaware limited liability company (the "*Company*"), as grantor, (ii) Washington Mutual Home Equity Trust I, a Delaware statutory trust ("*Asset Trust I*"), in connection with the transactions contemplated by the Pooling and Servicing Agreement, dated as of March 7, 2006 (the "*Asset Trust I Pooling Agreement*"), between Deutsche Bank National Trust Company, a national banking association ("*Deutsche Bank*"), as trustee (the "*Asset Trust I Trustee*"), Deutsche Bank Trust Company Delaware, a Delaware banking corporation ("*DB Delaware*"), as Delaware trustee (the "*Asset Trust I Delaware Trustee*"), Washington Mutual Bank ("*WMB*"), as servicer, and the Company, as depositor, (iii) WAMU 2006-OA1, a Delaware statutory trust ("*Asset Trust II*"), in connection with the transactions contemplated by the Pooling and Servicing Agreement, dated as of December 13, 2006 (the "*Asset Trust II Pooling Agreement*"), between Deutsche Bank, as trustee (the "*Asset Trust II Trustee*"), DB Delaware, as Delaware trustee (the "*Asset Trust II Delaware Trustee*"), WMB, as servicer, and the Company, as depositor, and (iv) WAMU 2007-Flex1, a Delaware statutory trust ("*Asset Trust III*"), in connection with the transactions contemplated by the Pooling and Servicing Agreement, dated as of October ●, 2007 (the "*Asset Trust III Pooling Agreement*," and together with the Asset Trust I Pooling Agreement and the Asset Trust II Pooling Agreement, the "*Pooling Agreements*"), between Deutsche Bank, as trustee (the "*Asset Trust III Trustee*" and together with the Asset Trust I Trustee and the Asset Trust II Trustee, the "*Asset Trust Trustees*"), DB Delaware, as Delaware trustee (the "*Asset Trust III Delaware Trustee*" and together with the Asset Trust I Delaware Trustee and the Asset Trust II Delaware Trustee, the "*Asset Trust Delaware Trustees*"), WMB, as servicer, and the Company, as depositor.

This opinion is being delivered pursuant to your request. Capitalized terms used herein and not otherwise defined shall have the respective meanings set forth in the Trust Agreement, except that reference herein to any document shall mean such document as in effect on the date hereof.

We have examined originals or copies of the following documents:

> (a)  The Trust Agreement;

NY12532:406459.6

(b)     The Original Trust Agreement;

(c)     The Grantor LLC Agreement;

(d)     The Exchange Agreement;

(e)     The Trust Agency Agreement;

(f)     The Purchase Agreement (together with the agreements listed in (c) through (e) above, the "*Funding Trust IV Transaction Agreements*");

(g)     Forms of the Trust Securities;

(h)     The Asset Trust I Pooling Agreement;

(i)     The Trust Agreement, dated as of March 1, 2006, between the Company and the Asset Trust Delaware Trustee, providing for the creation of the Asset Trust I;

(j)     The Asset Trust II Pooling Agreement;

(k)     The Trust Agreement, dated as of December 5, 2006, between the Company and the Asset Trust II Delaware Trustee, providing for the creation of Asset Trust II;

(l)     The Asset Trust III Pooling Agreement;

(m)     The Trust Agreement, dated as of August 9, 2007, between the Company and the Asset Trust III Delaware Trustee, providing for the creation of Asset Trust III;

(n)     A form of the Class A Certificate (as defined in the Asset I Pooling Agreement) (the "*Asset Trust I Certificate*")

(o)     A form of the Class A Certificate (as defined in the Asset II Pooling Agreement) (the "*Asset Trust II Class A Certificate*");

(p)     A form of the Class A Certificate (as defined in the Asset III Pooling Agreement) (the "*Asset Trust III Class A Certificate*");

(q)     A form of the Class R Certificate (as defined in the Asset III Pooling Agreement) (the "*Asset Trust III Class R Certificate*," and together with the Asset Trust III Class A Certificate, the "*Asset Trust III Certificates*");

(r)     A certified copy of the certificate of trust (the "*Funding Trust IV Certificate of Trust*") of Funding Trust IV which was filed with the Secretary of State of the State of Delaware (the "*Secretary of State*") on August 9, 2007;

(s)     A certified copy of the certificate of trust (the *"Asset Trust I Certificate of Trust"*) of the Asset Trust which was filed with the Secretary of State on March 1, 2006;

(t)     A certified copy of the certificate of trust (the *"Asset Trust II Certificate of Trust"*) of the Asset Trust II which was filed with the Secretary of State on December 5, 2006;

(u)     A certified copy of the certificate of trust (the *"Asset Trust III Certificate of Trust"*) of the Asset Trust III which was filed with the Secretary of State on August 9, 2007;

(v)     A Certificate of Good Standing for Funding Trust IV, dated October ●, 2007, obtained from the Secretary of State;

(w)     A Certificate of Good Standing for Asset Trust I, dated October ●, 2007, obtained from the Secretary of State;

(x)     A Certificate of Good Standing for Asset Trust II, dated October ●, 2007, obtained from the Secretary of State; and

(y)     A Certificate of Good Standing for Asset Trust III, dated October ●, 2007, obtained from the Secretary of State.

We have not reviewed any documents other than the foregoing documents for purposes of rendering our opinions as expressed herein, and we have assumed that there exists no provision of any such other document that bears upon or is inconsistent with our opinions as expressed herein. We have conducted no independent factual investigation of our own but have relied solely upon the foregoing documents, the statements and information set forth therein and the additional matters recited or assumed herein, all of which we have assumed to be true, complete and accurate in all material respects.

Based upon the foregoing and upon an examination of such questions of law as we have deemed necessary or appropriate, and subject to the assumptions, exceptions and qualifications set forth herein, we advise you that, in our opinion:

1.     Funding Trust IV has been duly created and is validly existing in good standing as a statutory trust under the Delaware Statutory Trust Act, 12 Del. C. § 3801, et seq. (the *"Act"*), and all filings required under the laws of Delaware with respect to the creation and valid existence of Funding Trust IV as a statutory trust have been made.

2.     Under the Act and the Trust Agreement, Funding Trust IV has the trust power and authority to own its property and conduct its business, all as described in the Trust Agreement.

3.     The provisions of the Trust Agreement, including the terms of the Trust Securities, are permitted under the Act and the Trust Agreement constitutes a

A-4-12

legal, valid and binding obligation of the Company, the Property Trustee and the Delaware Trustee, enforceable against each of them in accordance with its terms.

4.     Under the Act and the Trust Agreement, Funding Trust IV has the power and authority to (a) execute and deliver the Funding Trust IV Transaction Agreements and to perform its obligations under the Funding Trust IV Transaction Agreements and (b) issue and perform its obligations under the Trust Securities.

5.     Under the Act and the Trust Agreement, the execution and delivery by Funding Trust IV of the Funding Trust IV Transaction Agreements and the performance by Funding Trust IV of its obligations thereunder have been duly authorized by all necessary trust action on the part of Funding Trust IV.  The Funding Trust IV Transaction Agreements have been duly executed and delivered by Funding Trust IV.

6.     Under the Act, the form of certificate attached to the Trust Agreement to evidence ownership of the Trust Securities is in an appropriate form. The Trust Securities have been duly authorized by the Trust Agreement and, when executed and delivered to and paid for by the purchasers thereof, in accordance with the Trust Agreement and the Purchase Agreement, will be validly issued and (subject to the qualifications set forth in this paragraph) fully paid and nonassessable beneficial interests in Funding Trust IV entitled to the benefits provided by the Trust Agreement (subject to the terms of the Trust Agreement); and the holders of Trust Securities, as beneficial owners of Funding Trust IV, will be entitled to the same limitation of personal liability extended to stockholders of private corporations for profit organized under the General Corporation Law of the State of Delaware.  The holders of Trust Securities may be obligated, pursuant to the Trust Agreement, to (a) provide indemnity and/or security in connection with and pay taxes or governmental charges arising from transfers or exchanges of Trust Securities certificates and the issuance of replacement of Trust Securities certificates, and (b) provide security and indemnity in connection with requests of or directions to the Property Trustee to exercise its rights and remedies under the Trust Agreement.

7.     Under the Act and the Trust Agreement, the issuance of the Trust Securities is not subject to preemptive rights.

8.     The issuance and sale by Funding Trust IV of the Trust Securities, the execution, delivery and performance by Funding Trust IV of the Funding Trust IV Transaction Agreements, the consummation by Funding Trust IV of the transactions contemplated thereby and compliance by Funding Trust IV with its obligations thereunder do not violate (a) any of the provisions of the Funding Trust IV Certificate of Trust or the Trust Agreement, or (b) any applicable Delaware law, rule or regulation.

9.     No authorization, approval, consent or order of any Delaware court or Delaware governmental authority or Delaware agency is required to be obtained by Funding Trust IV solely in connection with the issuance and sale of the Trust Securities or the execution, delivery and performance by Funding Trust IV of the Funding Trust IV Transaction Agreements.

10.    Each Asset Trust has been duly created and is validly existing in good standing under the Act, and all filings required under the laws of the State of Delaware with respect to the creation and valid existence of each Asset Trust as a statutory trust has been made.

11.    Under the Act and the applicable Pooling Agreement, each Asset Trust has the trust power and authority to own its property and conduct its business, all as described in the Asset Trust I Pooling Agreement, the Asset Trust II Pooling Agreement or the Asset Trust III Pooling Agreement, as applicable.

12.    The provisions of the Asset Trust I Pooling Agreement, including the terms of the Asset Trust I Certificate, the provisions of the Asset Trust II Pooling Agreement, including the terms of the Asset Trust II Certificates and the provisions of the Asset Trust III Pooling Agreement, including the terms of the Asset Trust III Certificates are permitted under the Act, and the Pooling Agreements constitute legal, valid and binding obligations of the Company, WMB, the Asset Trust Trustees and the Asset Trust Delaware Trustees, enforceable against each of them in accordance with their respective terms.

13.    Under the Act and the Asset Trust I Pooling Agreement, the Asset Trust II Pooling Agreement or the Asset Trust III Pooling Agreement, as applicable, each Asset Trust has the trust power and authority to (a) perform its obligations under the applicable Pooling Agreement, and (b) issue and perform its obligations under the Asset Trust I Certificate, the Asset Trust II Certificate or the Asset Trust III Certificates, as applicable.

14.    Under the Act, the form of each of the Asset Trust I Certificate attached to the Asset Trust I Pooling Agreement, the Asset Trust II Class A Certificate and the Asset Trust II Class R Certificate attached to the Asset Trust II Pooling Agreement, and the Asset Trust III Class A Certificate and the Asset Trust III Class R Certificate attached to the Asset Trust III Pooling Agreement are in an appropriate form. Each of the Asset Trust I Certificate, the Asset Trust II Certificate and the Asset Trust III Certificates have been duly authorized by the applicable Pooling Agreement, and, when delivered to the Company in exchange for the assets as contemplated by the Asset Trust I Pooling Agreement, the Asset Trust II Pooling Agreement and the Asset Trust III Pooling Agreement, respectively, will be validly issued and (subject to the qualifications set forth in this paragraph) fully paid and nonassessable beneficial interests in the applicable Asset Trust entitled to the benefits provided by the applicable Pooling Agreement (subject to the terms of such Pooling Agreement); and the Company as holder of the Asset Trust I Certificate, the Asset Trust II Certificate and the Asset Trust III Certificates will be entitled to the same limitation of personal liability extended to stockholders of private corporations for profit organized under the General Corporation Law of the State of Delaware. The Company may be obligated, pursuant to each Pooling Agreement, to (a) provide indemnity and/or security in connection with and pay taxes or governmental charges arising from transfers or exchanges of such certificates and the issuance of replacement of such certificates, and (b) provide security and indemnity in connection with requests of or directions to the applicable Asset Trustee to exercise its rights and remedies under such Pooling Agreement.

15. The issuance and sale by Asset Trust I of the Asset Trust I Certificate, by Asset Trust II of the Asset Trust II Certificate and by Asset Trust III of the Asset Trust III Certificates and the consummation by each Asset Trust of the transactions contemplated by the applicable Pooling Agreement did not and do not violate (a) any of the provisions of the Asset Trust I Certificate of Trust, the Asset Trust II Certificate of Trust, the Asset Trust III Certificate of Trust, the Asset Trust I Pooling Agreement, the Asset Trust II Pooling Agreement or the Asset Trust III Pooling Agreement, as applicable, or (b) any applicable Delaware law, rule or regulation.

16. No authorization, approval, consent or order of any Delaware court or Delaware governmental authority or Delaware agency is required to be obtained by Asset Trust I, Asset Trust II or Asset Trust III solely in connection with the issuance of the Asset Trust I Certificate, the Asset Trust II Certificates or the Asset Trust III Certificates, as applicable.

17. Assuming that neither Funding Trust IV nor any Asset Trust derives income from or is connected with services provided within the State of Delaware and has no assets, activities (other than maintaining the Delaware Trustee (in the case of Funding Trust IV) and the applicable Asset Trust Delaware Trustee (in the case of the Asset Trusts) and the filing of documents with the Secretary of State of the State of Delaware) or employees in the State of Delaware and assuming that Funding Trust IV is treated as a grantor trust or as an association not taxable as a corporation for U.S. federal income tax purposes and the Asset Trusts are treated as "real estate mortgage investment conduits" for federal income tax purposes, the holders of Trust Securities (other than those holders who reside or are domiciled in the State of Delaware) will have no liability for income taxes imposed by the State of Delaware solely as a result of their participation in Funding Trust IV, and neither Funding Trust IV nor any Asset Trust will be liable for any income tax imposed by the State of Delaware.

The foregoing opinions are subject to the following exceptions, qualifications and assumptions:

A. We are admitted to practice law in the State of Delaware (excluding the securities laws of the State of Delaware) and we do not hold ourselves out as being experts on the law of any other jurisdiction. The foregoing opinions are limited to the laws of the State of Delaware currently in effect. We express no opinion with respect to (i) federal laws, including without limitation, tax laws, the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, the Trust Indenture Act of 1939, as amended, and the Investment Company Act of 1940, as amended, (ii) state securities or blue sky laws or (iii) laws relating to the particular nature of the Trust assets.

B. We have assumed (i) except to the extent provided in paragraphs 1 and 10 above, the valid existence of each party to the documents examined by us under the laws of the jurisdiction governing its organization, (ii) except to the extent provided in paragraphs 4 and 13 above, that each party has the power and authority to execute and deliver, and to perform its obligations under, the documents examined by us, (iii) the legal capacity of natural persons who are signatories to the documents examined by us, (iv) except to the extent provided in paragraph 5 above, that each party has duly

A-4-15

authorized, executed and delivered the documents examined by us, (v) that each party has complied with all of the obligations and satisfied all of the conditions on its part to be performed or satisfied pursuant to the documents examined by us, (vi) that the Trust Agreement constitutes the entire agreement among the parties thereto with respect to the subject matter thereof, including, without limitation, the creation, operation and termination of Funding Trust IV, and that the Trust Agreement and the Funding Trust IV Certificate of Trust are in full force and effect and have not been amended, (vii) that the Asset Trust I Pooling Agreement constitutes the entire agreement among the parties thereto with respect to the subject matter thereof, including, without limitation, the creation, operation and termination of Asset Trust I, and that the Asset Trust I Pooling Agreement and the Asset Trust I Certificate of Trust are in full force and effect and have not been amended, (viii) that the Asset Trust II Pooling Agreement constitutes the entire agreement among the parties thereto with respect to the subject matter thereof, including, without limitation, the creation, operation and termination of Asset Trust II, and that the Asset Trust II Pooling Agreement and the Asset Trust II Certificate of Trust are in full force and effect and have not been amended, (ix) that the Asset Trust III Pooling Agreement constitutes the entire agreement among the parties thereto with respect to the subject matter thereof, including, without limitation, the creation, operation and termination of Asset Trust III, and that the Asset Trust III Pooling Agreement and the Asset Trust III Certificate of Trust are in full force and effect and have not been amended, and (x) except to the extent provided in paragraphs 9 and 16 above, that the execution, delivery and performance of the documents examined by us by each of the parties thereto does not and will not violate or require any consent or approval of, the withholding of objection on the part of, the giving of notice to, the filing, registration or qualification with, or the taking of any other action under, any agreement, indenture or instrument to which it is a party or by which it is bound or any provision of any law, rule, regulation, judgment, order, writ, injunction or decree of any court or governmental authority applicable to it or any of its property.

C.     The foregoing opinions regarding enforceability are subject to (i) applicable bankruptcy, insolvency, moratorium, receivership, reorganization, fraudulent transfer and similar laws relating to and affecting the rights and remedies of creditors generally, (ii) principles of equity, including applicable law relating to fiduciary duties (regardless of whether considered and applied in a proceeding in equity or at law), and (iii) applicable public policy with respect to the enforceability of provisions relating to indemnification or contribution.

D.     We have assumed that all signatures on documents examined by us are genuine, that all documents submitted to us as originals are authentic, and that all documents submitted to us as copies conform with the originals, which facts we have not independently verified.

E.     We express no opinion as to the creation, attachment, perfection or priority of any mortgage or security interest or the nature or validity of title to any property.

F.     We have not participated in the preparation of any offering materials with respect to the Trust Securities or the Asset Trust I Certificate or the Asset Trust II Certificates and assume no responsibility for their contents.

A-4-16

**Circular 230 Notice**. Any advice contained in this communication with respect to any federal tax matter was not intended or written to be used, and it cannot be used by any taxpayer, for the purpose of avoiding penalties that the Internal Revenue Service may impose on the taxpayer. If any such advice is made to any person other than to our client for whom the advice was prepared, the advice expressed above is being delivered to support the promotion or marketing (by a person other than Richards, Layton & Finger) of the transaction or matter discussed or referenced, and such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

This opinion may be relied upon by you in connection with the matters set forth herein. We consent to Mayer Brown LLP and Sullivan and Cromwell LLP's relying as to matters of Delaware law upon this opinion in connection with opinions to be rendered by them on the date hereof pursuant to the Purchase Agreement. Except as stated in the previous sentence, without our prior written consent, this opinion may not be relied upon by or furnished to any other person or entity for any purpose.

Very truly yours,

RICHARDS, LAYTON & FINGER, P.A.

NY12532:406459.6

# SCHEDULE A

Washington Mutual Preferred Funding LLC

Washington Mutual Preferred Funding (Cayman) I Ltd.

Washington Mutual Preferred Funding Trust I

Washington Mutual Preferred Funding Trust II

Washington Mutual Preferred Funding Trust III

Washington Mutual Preferred Funding Trust IV

Washington Mutual Home Equity Trust I

WAMU 2006-OA1

WAMU 2007-Flex1

Washington Mutual, Inc.

Washington Mutual Bank

Goldman, Sachs & Co., ● and ●, as representatives of the several purchasers

Deutsche Bank National Trust Company

Deutsche Bank Trust Company Delaware

Wilmington Trust (Cayman) Ltd.

Wilmington Trust Company

**Opinion of Charles E. Smith, Esq.**

October [__], 2007

Goldman Sachs & Co.
[_____],
    as representative[s] of the several Purchasers
    named in Schedule I attached to the Purchase Agreement
85 Broad Street
New York, New York 10004

    Re:    **Washington Mutual Preferred Funding Trust IV**
               **Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities**

Ladies and Gentlemen:

    I am a First Vice President and Assistant General Counsel of, and have acted as internal counsel for, Washington Mutual, Inc., a Washington corporation, ("WMI"); Washington Mutual Bank, a federal savings association ("WMB"); University Street, Inc., a Washington corporation ("University Street"); New American Capital, Inc., a Delaware corporation ("New American Capital, Inc."); Washington Mutual Bank fsb ("WMBfsb"); and Washington Mutual Preferred Funding LLC, a Delaware limited liability company (the "Company"). Unless otherwise indicated, WMI, WMB, University Street and the Company are referred to in this opinion as the "Opinion Parties". I am qualified to practice law in the State of Washington. Capitalized terms used and not otherwise defined herein shall have the meanings given to such terms in the Purchase Agreement (defined below).

I.

    I have based my opinion upon my review of the following agreements, documents and instruments:

    1)    an executed copy of the Purchase Agreement, dated October [__], 2007 (the "Purchase Agreement"), entered into by and among WMI, WMB, the Company, Washington Mutual Preferred Funding Trust IV, a Delaware statutory trust ("WaMu Delaware IV") and Goldman Sachs & Co. and [ ], as representatives of the Purchasers named on <u>Schedule I</u> attached to the Purchase Agreement;

    2)    an executed copy of the Exchange Agreement, dated as of the date hereof (the "Exchange Agreement"), among WaMu Delaware IV, WMI and Mellon Investor Services LLC, as depositary;

    3)    an executed copy of the Deposit Agreement, dated as of the date hereof (the "Deposit Agreement", and together with the Purchase Agreement and the Exchange Agreement, the "WMI Transaction Agreements"), among WMI, Mellon

A-5-2

Investor Services LLC, as depositary and registrar, and the holders from time to time of the receipts evidencing the Depositary Shares described therein;

4)      an executed copy of the Master Loan Contribution and Purchase Agreement, dated as of March 7, 2006, between the Company and WMB and the related Loan Transfer Confirmations, dated as of March 7, 2006, December 13, 2006 and October [___], 2007 (the "WMB Asset Transfer Agreement");

5)      an executed copy of the Master Loan Contribution and Purchase Agreement, dated as of March 7, 2006, between University Street and the Company and the related Loan Transfer Confirmations, dated as of March 7, 2006, December 13, 2006 and October [___], 2007 (the "University Street Asset Transfer Agreement");

6)      an executed copy of the Pooling and Servicing Agreement (the "Asset Trust I PSA"), dated as of March 7, 2006 by and among, WMB, as servicer (in such capacity, the "Asset Trust I Servicer"), the Company, as depositor, Deutsche Bank National Trust Company, as trustee (the "Trustee") and Deutsche Bank Trust Company Delaware, as Delaware trustee ("the "Delaware Trustee");

7)      an executed copy of the Pooling and Servicing Agreement (the "Asset Trust II PSA"), dated as of December 13, 2006 by and among, WMB, as servicer (in such capacity, the "Asset Trust II Servicer"), the Company, as depositor, the Trustee and the Delaware Trustee;

8)      an executed copy of the Pooling and Servicing Agreement (the "Asset Trust III PSA"), dated as of October [__], 2007 by and among, WMB, as servicer (in such capacity, the "Asset Trust III Servicer"), the Company, as depositor, the Trustee and the Delaware Trustee;

9)      an executed copy of the Custody Agreement, dated as of March 7, 2006 (the "Asset Trust I Custody Agreement"), by and among the Asset Trust I Servicer, the Trustee and WMB, as custodian (in such capacity, the "Custodian");

10)     an executed copy of the Custody Agreement, dated as of December 13, 2006 (the "Asset Trust II Custody Agreement"), by and among the Asset Trust II Servicer, the Trustee and WMB, as custodian;

11)     an executed copy of the Custody Agreement, dated as of October [__], 2007 (the "Asset Trust III Custody Agreement" and, together with the Asset Trust I and Asset Trust II Custody Agreements, the "Custody Agreements"), by and among the Asset Trust III Servicer, the Trustee and WMB, as custodian;

12)     ·an executed copy of the Administrative Services Agreement, dated as of March 6, 2006 (the "Administrative Services Agreement"), by and among the Company, WMI and WMB;

13)     an executed copy of the Fourth Amended and Restated LLC Agreement, dated as of the date hereof, by and among University Street, as initial Common

Securityholder, WaMu Cayman, as a Company Preferred Securityholder, Washington Mutual Preferred Funding Trust I, as a Company Preferred Securityholder, WMB, as initial Company Preferred Securityholder. Washington Mutual Preferred Funding Trust II, as a Company Preferred Securityholder, Washington Mutual Preferred Funding Trust III, as a Company Preferred Securityholder and WaMu Delaware IV, as a Company Preferred Securityholder;

14)     a final offering circular dated October [___], 2007 (the "WaMu Delaware Offering Circular"), with respect to the offering and sale by WaMu Delaware IV of $[●] Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities, liquidation preference $100,000 per security (the "Trust Securities");

15)     a certified copy of the amended and restated articles of incorporation of WMI issued by the Washington Secretary of State, dated October [___], 2007;

16)     a copy of the Amended and Restated Bylaws of WMI;

17)     a Certificate of Existence/Authorization relating to University Street issued by the Washington Secretary of State dated October [___], 2007;

18)     a certified copy of the articles of incorporation of University Street issued by the Washington Secretary of State, dated October [___], 2007;

19)     a copy of the Bylaws of University Street;

20)     a certified copy of the certificate of incorporation of New American Capital, Inc. issued by the Delaware Secretary of State dated October [___], 2007;

21)     a copy of the Bylaws of New American Capital, Inc.;

22)     a Certificate of Good Standing relating to New American Capital, Inc. issued by the Delaware Secretary of State dated October [___], 2007;

23)     a certified copy of the Charter of WMB issued by the U.S. Office of Thrift Supervision (the "OTS"), dated October [___], 2007;

24)     a copy of the Amended and Restated Bylaws of WMB;

25)     a Certificate of Corporate Existence relating to WMB issued by the OTS dated October [___], 2007;

26)     resolutions adopted by the Board of Directors of WMI on each of January 17, 2006, February 21, 2006, October 17, 2006, February 27, 2007, May 23, 2007 and August [21], 2007, relating to the WMI Transaction Agreements; [WAMU – PLEASE ADVISE OF ANY UPDATES]

27)     resolutions adopted by the Board of Directors of University Street relating to the University Street Asset Transfer Agreement; and

A-5-4

28) resolutions adopted by the Board of Directors of WMB relating to the Purchase Agreement, the WMB Asset Transfer Agreement, the Asset Trust I PSA, the Asset Trust II PSA, the Asset Trust III PSA and the Administrative Services Agreement.

The documents described in items (1) through (28) above are herein collectively called the "Opinion Documents". For purposes of my opinion set forth in paragraph 8 below, the Opinion Documents in items (1) through (13) above are referred to as "Transaction Agreements". Also for purposes of my opinion set forth in paragraphs 8 and 9 below, each of New American Capital, Inc. WMBfsb and WMB constitutes a "Significant Subsidiary".

As to factual matters, I have relied upon (a) representations made by the Opinion Parties in the Opinion Documents delivered at closing, (b) certificates of, and/or representations by, officers and employees of the Opinion Parties having knowledge of relevant facts, and (c) an examination of records of the Opinion Parties and upon certificates of public officials. This opinion also is based on personal knowledge acquired in the course of acting as internal counsel to the Opinion Parties.

Notwithstanding any provisions of the Opinion Documents or any other agreements or instruments examined for purposes of these opinions to the effect that such agreement or instrument reflects the entire understanding of the parties with respect to the matters described therein, the courts of the State of Washington may consider extrinsic evidence of the circumstances surrounding the entering, into of such agreement to ascertain the intent of the parties in using the language employed in such agreement, regardless of whether or not the meaning of the language used in such agreement is plain and unambiguous on its face, and may determine that additional or supplementary terms can be incorporated into such agreement. I have not considered parol evidence in connection with any of the opinions set forth below.

I have not examined any records of any court, administrative tribunal or other similar entity in connection with my opinion.

## II.

I also have assumed, without making any inquiry into the reasonableness or validity thereof, that the Company has all necessary power and authority to (i) execute and deliver the Administrative Services Agreement and (ii) perform its obligations thereunder. I also have assumed the authenticity of all writings submitted to me as originals, the conformity to original writings of all copies submitted to me as certified or photostatic copies and the legal competence and capacity of all natural persons.

I express no opinion as to any securities, tax, anti-trust, land use, safety, environmental, hazardous materials, insurance company or consumer protection laws, rules or regulations, or any laws, rules or regulations applicable to any party to a Transaction Agreement (other than the Opinion Parties) by virtue of its status as a regulated entity, or whether governmental consents, approvals, authorizations, registrations, declarations or filings are required to be obtained or made by any party to a Transaction Agreement (other than the Opinion Parties) in connection with the

A-5-5

performance of the Transaction Agreements, or, if required, whether they have been or will be applied for, received or made.

This opinion is limited to the Federal laws of the United States of America, the corporate and limited liability company laws of the State of Delaware, and the laws of the State of Washington, and I disclaim any opinion as to the laws of any other jurisdiction. I further disclaim any opinion as to any statute, rule, regulation, ordinance, order or other promulgation of any regional or local governmental body or as to any related judicial or administrative opinion.

## III.

Based upon the foregoing and my examination of such questions of law as I have deemed necessary or appropriate for my opinion, and subject to the limitations and qualifications expressed above and below, it is my opinion that:

1.    WMB was chartered under the laws of the United States to transact the business of a Federal savings bank and its charter is in full force and effect. WMB has all requisite corporate authority to own its properties and conduct its business as described in the WaMu Delaware Offering Circular.

2.    University Street has been duly incorporated and is a validly existing corporation under the laws of the State of Washington.

3.    New American Capital, Inc. has been duly incorporated and is a validly existing corporation in good standing under the laws of the State of Delaware.

4.    WMBfsb was chartered under the laws of the United States to transact the business of a Federal savings bank and its charter is in full force and effect.

5.    Each of the WMI Transaction Agreements and the Administrative Services Agreement has been duly authorized, executed and delivered by WMI.

6.    The University Street Asset Transfer Agreement were duly authorized, executed and delivered by University Street.

7.    The Purchase Agreement, the WMB Asset Transfer Agreement, the University Street Asset Transfer Agreement, the Asset Trust I PSA, the Asset Trust II PSA, the Asset Trust III PSA, the LLC Agreement, the Custody Agreements and the Administrative Services Agreement were duly authorized, executed and delivered by WMB.

8.    The Administrative Services Agreement constitutes the valid and legally binding obligation of WMB and WMI, respectively, enforceable against each of them in accordance with its terms, subject to bankruptcy, receivership, conservatorship, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

A-5-6

9.    The execution, delivery and performance of the Purchase Agreement by WMI, WMB, the Company and WaMu Delaware IV, and the execution, delivery and performance of any Transaction Agreement by WMI or any of its subsidiaries that is a party thereto, and the issuance of the sale of the Securities and compliance with the terms and provisions thereof, will not result in a breach or violation of any of the terms and provisions of, or constitute a default under, (i) any agreement or instrument to which WMI or any Significant Subsidiary is a party to or by which WMI or any Significant Subsidiary is bound or to which any of the properties of WMI or any Significant Subsidiary is subject, except for such breach, violation or default which would not individually or in the aggregate have a Material Adverse Effect, or (ii)(A) WMI's articles of incorporation, WMB's charter, or New American Capital, Inc.'s certificate of incorporation or (B) the bylaws of WMI or any Significant Subsidiary.

10.    Except as disclosed in the WaMu Delaware Offering Circular, there are no actions, suits or proceedings pending against or affecting WMI, any of its Significant Subsidiaries, WaMu Delaware IV or any of their respective properties that, if determined adversely to WMI or any of its Significant Subsidiaries, or WaMu Delaware IV, would individually or in the aggregate have a Material Adverse Effect, or would materially and adversely affect the ability of any issuer/seller to perform its obligations under any Transaction Agreement or the Purchase Agreement, or which are otherwise material in the context of the sale of the Offered Securities; and, to the best of my knowledge, no such actions, suits or proceedings are threatened in writing.

The foregoing opinion is being delivered solely to you in connection with the execution and delivery of the Opinion Documents and may not be relied on by you for any other purpose or by any other person for any purpose without my written consent. I disclaim any obligation to advise you of any change of law that occurs, or any facts of which I become aware, after the date of this opinion.

Very truly yours,

_____
Charles Edward Smith IIII

A-5-7

NY12532:406459.6

Goldman Sachs & Co.
[_____],
    as representatives of the several purchasers
    under the Purchase Agreement dated as of the date hereof
85 Broad Street
New York, New York 10004


Ladies and Gentlemen:

        I am a First Vice President and Assistant General Counsel of, and have acted as internal counsel for Washington Mutual, Inc., a Washington corporation (the "Company"), in connection with the Replacement Capital Covenant entered into by the Company on October [__], 2007, a copy of which is attached as Annex 1 (the "Replacement Capital Covenant"). The Replacement Capital Covenant has been entered into by the Company in favor of certain of its debtholders. I am qualified to practice law in the State of Washington. Capitalized terms used herein and not otherwise defined are used with the meanings assigned to them in the Replacement Capital Covenant.

        I have examined such corporate records, certificates and other documents and such questions of law, as I have considered it necessary or appropriate for the purposes of this opinion.

        Based upon the foregoing and my examination of such questions of law as I have deemed necessary or appropriate for my opinion, and subject to the limitation and qualifications expressed above and below, it is my opinion that:

1.      the Company has been duly organized and is a validly existing corporation in the State of Washington;

2.      the Company is duly qualified to transact business as a foreign corporation or other entity and is in good standing in the jurisdictions in which it transacts business or is otherwise required to be so qualified, unless and except to the extent that the Company's failure to be so qualified would not have a material adverse effect on its ability to transact business in any such jurisdiction;

3.      the Company has full legal power and authority to execute, deliver and perform its obligations under the Replacement Capital Covenant;

4.      the Replacement Capital Covenant has been duly authorized, executed and delivered by the Company;

5.      there has not been any fraud, duress, undue influence or material mistake of fact in connection with the execution and performance of the Replacement Capital Covenant;

NY12532:406459.6

6. there are no agreements of the Company that would alter, and no material agreements of the Company that would conflict with, the agreements set forth in the Replacement Capital Covenant.

NY12532:406459.6

The foregoing opinion is limited to the Federal laws of the United States and the laws of the State of Washington. Moody's Investors Service Inc. and Mayer Brown LLP may rely on this opinion as if the opinion were addressed to it.

Very truly yours,

_____
Charles Edward Smith III

Pursuant to Section 8(f) of the Purchase Agreement, Deloitte & Touche LLP shall furnish letters to the Purchasers to the effect that:

October [18], 2007

Washington Mutual, Inc.
Washington Mutual Bank

Goldman, Sachs & Co.
As representative of the initial purchasers of
*Washington Mutual Preferred Funding Trust IV*
*Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities*
c/o Goldman, Sachs & Co.

Dear Sirs/Madams:

We have audited the consolidated statements of financial condition of Washington Mutual, Inc. ("WMI") and of Washington Mutual Bank ("WMB"), as of December 31, 2006 and 2005, and the consolidated statements of income, of stockholders' equity and comprehensive income (stockholder's equity and comprehensive income (for WMB)), and of cash flows for each of the three years in the period ended December 31, 2006, and management's reports on the effectiveness of internal control over financial reporting as of December 31, 2006, all included in WMI's and WMB's Annual Reports on Form 10-K for the year ended December 31, 2006, filed by WMI and WMB with the Securities and Exchange Commission ("SEC") and the Office of Thrift Supervision ("OTS"), respectively, and incorporated by reference in the preliminary offering circular, dated October [18], 2007, relating to *Washington Mutual Preferred Funding Trust IV Fixed-to-Floating Rate Perpetual Non-cumulative Trust Securities* (including the documents incorporated by reference therein, the "Offering Circular") to be issued on or about October [25], 2007; our reports with respect thereto are also incorporated by reference in the Offering Circular.

This letter is being furnished in reliance upon your representation to us that:

1. You are knowledgeable with respect to the due diligence review process that would be performed if this offering of securities offered pursuant to the Offering Circular (the "Securities") were being registered pursuant to the Securities Act of 1933 (the "Act").

2. In connection with the offering of the Securities, the review process you have performed is substantially consistent with the due diligence review process that

A-6-1

you would have performed if this offering of the Securities were being registered pursuant to the Act.

In connection with the Offering Circular:

1. We are an independent registered public accounting firm with respect to WMI and WMB within the meaning of the Act and the applicable rules and regulations thereunder adopted by the SEC and the Public Company Accounting Oversight Board (United States) ("PCAOB").

2. We have not audited any financial statements of WMI or WMB as of any date or for any period subsequent to December 31, 2006; although we have conducted audits for the year ended December 31, 2006, the purpose (and therefore the scope) of the audits were to enable us to express our opinion on the respective consolidated financial statements of WMI and of WMB as of December 31, 2006, and for the year then ended, but not on the consolidated financial statements for any interim period within that year. Therefore, we are unable to and do not express any opinion on the unaudited interim consolidated statements of financial condition as of March 31, 2007 and June 30, 2007, and the unaudited interim consolidated statements of income, stockholders' equity and comprehensive income (stockholder's equity and comprehensive income for WMB), and of cash flows for the three-month periods ended March 31, 2007 and 2006, and the unaudited interim consolidated statements of income for the three- and six-month periods ended June 30, 2007 and 2006, and the unaudited interim consolidated statements of stockholders' equity and comprehensive income (stockholder's equity and comprehensive income for WMB), and of cash flows for the six-month periods ended June 30, 2007 and 2006, included in WMI's and WMB's quarterly reports on Form 10-Q for the quarters then ended and incorporated by reference in the Offering Circular or on the financial condition, results of operations, or cash flows as of any date or for any period subsequent to December 31, 2006.

3. For purposes of this letter, we have read the 2007 minutes of meetings of the Boards of Directors of WMI and of WMB and of the Audit Committees of the Boards of Directors of WMI and of WMB as set forth in the minute books at October [16], 2007, officials of WMI and of WMB having advised us that the minutes of all such meetings through that date were set forth therein, except the minutes of the October 16, 2007, Boards of Directors meetings, and the October 15, 2007, Audit Committees of the Boards of Directors meetings (which we attended), which have not been approved. We have carried out other procedures to October [16], 2007, as follows (our work did not extend to the period from October [17], 2007 to October [18], 2007, inclusive):

   a. With respect to the three-month periods ended March 31, 2007 and 2006, and the three- and six-month periods ended June 30, 2007 and 2006, we have:

      i. Performed the procedures specified by the PCAOB for a review of interim financial information as described in Statement on Auditing Standards

A-6-2

No. 100, Interim Financial Information, on WMI's and WMB's unaudited interim consolidated statements of financial condition as of March 31, 2007 and June 30, 2007, and the unaudited interim consolidated statements of income, stockholders' equity and comprehensive income (stockholder's equity and comprehensive income for WMB), and of cash flows for the three-month periods ended March 31, 2007 and 2006, and the unaudited interim consolidated statements of income for the three- and six-month periods ended June 30, 2007 and 2006, and the unaudited interim consolidated statements of stockholders' equity and comprehensive income (stockholder's equity and comprehensive income for WMB), and of cash flows for the six-month periods ended June 30, 2007 and 2006, included in WMI's and WMB's quarterly reports on Form 10-Q for the quarters then ended and incorporated by reference in the Offering Circular.

   ii.  Inquired of certain officials of WMI and of WMB who have responsibility for financial and accounting matters whether the unaudited interim consolidated financial statements referred to in item 3.a.i. comply as to form, in all material respects, with the applicable accounting requirements of the Securities Exchange Act of 1934 (the "Exchange Act") as it applies to form 10-Q, and the related rules and regulations adopted by the SEC.

  b.  With respect to the period from July 1, 2007 to September 30, 2007, we have:

   i.  Read the unaudited incomplete consolidated financial statements of WMI and of WMB for July, August, and September of both 2007 and 2006 furnished to us by WMI and WMB, officials of WMI and of WMB having advised us that the financial statements for July, August, and September of 2007 and 2006, are incomplete in that they omit the consolidated statements of stockholders' equity and comprehensive income (stockholder's equity and comprehensive income for WMB), and of cash flows, and other disclosures, and that no such financial statements as of any date or for any period subsequent to September 30, 2007, were available.

   ii.  Inquired of certain officials of WMI and of WMB who have responsibility for financial and accounting matters whether the unaudited incomplete consolidated financial statements referred to in item 3.b.i. are stated on a basis substantially consistent with the audited consolidated financial statements incorporated by reference in the Offering Circular, other than as disclosed in the Offering Circular, or in WMI's quarterly report on Form 10-Q, Note 4 of the Notes to Consolidated Financial Statements, for the quarter ended June 30, 2007, and WMB's quarterly report on Form 10-Q, Note 3 of the Notes to Consolidated Financial Statements, for the quarter ended June 30, 2007, each incorporated by reference in the Offering Circular.

4.  Nothing came to our attention as a result of the foregoing procedures, however, that caused us to believe that:

a. i. Any material modifications should be made to the unaudited interim consolidated financial statements described in item 3.a.i., incorporated by reference in the Offering Circular, for them to be in conformity with accounting principles generally accepted in the United States of America;

   ii. The unaudited interim consolidated financial statements described in item 3.a.i. do not comply as to form in all material respects with the applicable accounting requirements of the Exchange Act as it applies to Form 10-Q, and the related rules and regulations adopted by the SEC.

b. i. At September 30, 2007, there was any change in the number of common shares outstanding, increase in other borrowings, or any decrease in stockholders' equity or the combined balance of cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, trading assets, and available-for-sale securities of WMI, as compared with amounts shown in the June 30, 2007, unaudited interim consolidated financial statements of WMI incorporated by reference in the Offering Circular; or

   ii. For the period from July 1, 2007 to September 30, 2007, there were any decreases, as compared with the corresponding period in the preceding year, in net interest income, the combined balance of income from continuing operations before income taxes and total interest expense, income from continuing operations before income taxes, or net income of WMI, except in all instances for changes, increases, or decreases that the Offering Circular discloses have occurred or may occur and except as described in the following table:

   [to be inserted]

c. i. At September 30, 2007, there was any change in the number of common shares outstanding, increase in other borrowings, or any decrease in stockholder's equity or the combined balance of cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, trading assets, and available-for-sale securities of WMB, as compared with amounts shown in the June 30, 2007, unaudited interim consolidated financial statements of WMB incorporated by reference in the Offering Circular; or

   ii. For the period from July 1, 2007 to September 30, 2007, there were any decreases, as compared with the corresponding period in the preceding year, in net interest income, the combined balance of income before income taxes and total interest expense, income before income taxes, or net income of WMB, except in all instances for changes, increases, or decreases that the Offering Circular discloses have occurred or may occur and except as described in the following table:

   [to be inserted]

A-6-4

5. As mentioned in item 3.b.i., officials of WMI and of WMB have advised us that no consolidated financial statements as of any date or for any period subsequent to September 30, 2007, are available; accordingly, the procedures carried out by us with respect to changes in financial statement items for the period from October 1, 2007 to October [16], 2007 (our work did not extend to the period from October [17], 2007 to October [18], 2007, inclusive) have, of necessity, been even more limited than those with respect to the periods referred to in item 3.b.

   a. We have inquired of certain officials of WMI who have responsibility for financial and accounting matters whether:

      i. At October [16], 2007, there was any change in the number of common shares outstanding, increase in other borrowings, or any decrease in stockholders' equity or the combined balance of cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, trading assets, and available-for-sale securities of WMI, as compared with amounts shown in the June 30, 2007, unaudited interim consolidated financial statements of WMI, incorporated by reference in the Offering Circular; or

      ii. For the period from October 1, 2007 to October [16], 2007, there were any decreases, as compared with the corresponding period in the preceding year, in net interest income, the combined balance of income from continuing operations before income taxes and total interest expense, income from continuing operations before income taxes, or net income of WMI, except in all instances for changes, increases, or decreases that the Offering Circular discloses have occurred or may occur.

A-6-5

Officials of WMI have advised us that complete information is not available as to the number of common shares outstanding, other borrowings, stockholders' equity, or the combined balance of cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, trading assets, and available-for-sale securities of WMI as of October [16], 2007, and that complete information is not available as to net interest income, the combined balance of income from continuing operations before income taxes and total interest expense, income from continuing operations before income taxes, or net income of WMI for the period from October 1, 2007 to October [16], 2007, and the corresponding period in the preceding year.

Those officials referred to above stated that (i) at October [16], 2007, nothing came to their attention that caused them to believe that there was any change in the number of common shares outstanding, increase in other borrowings, or any decrease in stockholders' equity or in the combined balance of cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, trading assets, and available-for-sale securities of WMI as compared with amounts shown in the June 30, 2007, unaudited interim consolidated financial statements incorporated by reference in the Offering Circular, other than changes, increases, or decreases which may have occurred in the ordinary course of business and as noted above in paragraph 4.b., and (ii) for the period from October 1, 2007 to October [16], 2007, nothing came to their attention that caused them to believe there were any decreases, as compared with the corresponding period in the preceding year, in net interest income, the combined balance of income from continuing operations before income taxes and total interest expense, income from continuing operations before income taxes, or net income of WMI, other than which may have occurred in the ordinary course of business, except in all instances for changes, increases, or decreases that the Offering Circular discloses have occurred or may occur.

b.  We have inquired of certain officials of WMB who have responsibility for financial and accounting matters whether:

   i.  At October [16], 2007, there was any change in the number of common shares outstanding, increase in other borrowings, or any decrease in stockholder's equity or the combined balance of cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, trading assets, and available-for-sale securities of WMB, as compared with amounts shown in the June 30, 2007, unaudited interim consolidated financial statements of WMB, incorporated by reference in the Offering Circular; or

   ii.  For the period from October 1, 2007 to October [16], 2007, there were any decreases, as compared with the corresponding period in the preceding year, in net interest income, the combined balance of income before income taxes and total interest expense, income before income taxes, or net income of WMB, except in all instances for changes,

A-6-6

increases, or decreases that the Offering Circular discloses have occurred or may occur.

Officials of WMB have advised us that complete information is not available as to the number of common shares outstanding, other borrowings, stockholder's equity, or the combined balance of cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, trading assets, and available-for-sale securities of WMB as of October [16], 2007, and that complete information is not available as to net interest income, the combined balance of income before income taxes and total interest expense, income before income taxes, or net income of WMB for the period from October 1, 2007 to October [16], 2007, and the corresponding period in the preceding year.

Those officials referred to above stated that (i) at October [16], 2007, nothing came to their attention that caused them to believe that there was any change in the number of common shares outstanding, increase in other borrowings, or any decrease in stockholder's equity or in the combined balance of cash and cash equivalents, federal funds sold and securities purchased under agreements to resell, trading assets, and available-for-sale securities of WMB as compared with amounts shown in the June 30, 2007, unaudited interim consolidated financial statements incorporated by reference in the Offering Circular, other than changes, increases, or decreases which may have occurred in the ordinary course of business and as noted above in paragraph 4.c., and (ii) for the period from October 1, 2007 to October [16], 2007, nothing came to their attention that caused them to believe there were any decreases, as compared with the corresponding period in the preceding year, in net interest income, the combined balance of income before income taxes and total interest expense, income before income taxes, or net income of WMB, other than which may have occurred in the ordinary course of business, except in all instances for changes, increases, or decreases that the Offering Circular discloses have occurred or may occur.

6. For purposes of this letter, we have also read the items identified by you on the attached copy of the Offering Circular, WMI's and WMB's Annual Reports on Form 10-K for the year ended December 31, 2006, filed by WMI and WMB with the SEC and the OTS, respectively, and incorporated by reference in the Offering Circular, and WMI's and WMB's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2007 and June 30, 2007, filed by WMI and WMB with the SEC and the OTS, respectively, and incorporated by reference in the Offering Circular, and have performed the following procedures, which were applied as indicated with respect to the items explained below:

1) Compared the amount (as rounded, if applicable) to the audited consolidated financial statements of WMI or WMB (as applicable) and found them to be in agreement.

A-6-7

2) Proved the arithmetic accuracy of the amount (as rounded, if applicable) utilizing amounts appearing in the audited consolidated financial statements of WMI or WMB (as applicable).

3) Compared the amount (as rounded, if applicable) to the unaudited interim consolidated financial statements of WMI or WMB (as applicable) filed on Form 10-Q, and found them to be in agreement.

4) Proved the arithmetic accuracy of the amount (as rounded, if applicable) utilizing amounts appearing in the unaudited interim consolidated financial statements of WMI or WMB (as applicable), filed on Form 10-Q.

5) Compared the amount (as rounded, if applicable) to the general accounting records of WMI or WMB (as applicable) and found them to be in agreement.

6) Proved the arithmetic accuracy of the amount (as rounded, if applicable) utilizing amounts appearing in the general accounting records of WMI or WMB (as applicable).

7) Compared the amount (as rounded, if applicable) to a schedule prepared by accounting personnel of WMI or WMB (as applicable), and found them to be in agreement.

8) Proved the arithmetic accuracy of the amount (as rounded, if applicable) utilizing amounts appearing in a schedule prepared by accounting personnel of WMI or WMB (as applicable).

9) Proved the arithmetic accuracy of the amount (as rounded, if applicable) utilizing the financial information presented in the table.

10) Compared the amount (as rounded, if applicable) to the general accounting records of WMI and found them not to be in agreement. Officials of WMI have informed us that certain delinquent loans that were on accrual status have been included in the amount, and the balance of such loans is not determinable by individual loan category. However, officials of WMI have also informed us that the total amount of loans that were on accrual status and included in the table were $60 million at December 31, 2002.

11) Proved the arithmetic accuracy of the amount (as rounded, if applicable) utilizing the financial information presented in the Nonaccrual Loans, Foreclosed Assets and Restructured Loans table appearing on page 48 of WMI's Annual Report on Form 10-K for the year ended December 31, 2006, filed by WMI with the SEC and incorporated by reference in the Offering Circular. However, the amounts used in this calculation are impacted by the matter described in 10 above.

12) Proved the arithmetic accuracy of the amount (as rounded, if applicable) utilizing amounts appearing in the general accounting records of WMI, and found them to be in agreement. However, the amounts used in the calculation

NY12532:406459.6

of total nonperforming assets as a percentage of total assets at December 31, 2002, appearing on page 48 of WMI's Annual Report on Form 10-K for the year ended December 31, 2006, are impacted by the matter described in 10 above.

7. The procedures enumerated in the preceding paragraphs do not constitute an audit conducted in accordance with the standards of the PCAOB. Also, they would not necessarily reveal matters of significance with respect to the comments in the following paragraphs. Accordingly, we make no representations regarding the sufficiency of the foregoing procedures for your purposes.

8. Our audits of the consolidated financial statements for the periods referred to in the introductory paragraph of this letter comprised audit tests and procedures deemed necessary for the purpose of expressing an opinion on such financial statements taken as a whole. For none of the periods referred to therein, or any other period, did we perform audit tests for the purpose of expressing an opinion on individual balances of accounts or summaries of selected transactions, such as those enumerated above and, accordingly, we express no opinion thereon.

9. It should be understood that we make no representations regarding questions of legal interpretation or regarding the sufficiency for your purposes of the procedures enumerated in item 6; also, such procedures would not necessarily reveal any material misstatement of the amounts listed above. Further, we have addressed ourselves solely to the data as set forth or incorporated by reference in the Offering Circular and other attached documents, and make no representations regarding the adequacy of disclosure or regarding whether any material facts have been omitted.

10. This letter is solely for the information of the addressee and to assist the representative of the initial purchasers in conducting and documenting their investigation of the affairs of WMI and of WMB in connection with the offering of securities covered by the Offering Circular, and it is not to be used, circulated, quoted, or otherwise referred to for any purpose, including but not limited to the registration, purchase, or sale of securities, nor is it to be filed with or referred to in whole or in part in the Offering Circular or any other document, except that reference may be made to it in the purchase agreement or in any list of closing documents pertaining to the offering of the securities covered by the Offering Circular.

Yours truly,

NY12532:406459.6