# EXHIBIT GG

THE WAY FORWARD >>>

# JPMORGAN CHASE & CO.

# DEAR FELLOW SHAREHOLDERS,



Jamie Dimon,
Chairman and
Chief Executive Officer

In last year's shareholder letter, I referred to the "turbulence" and "unprecedented" nature of events that had taken place during the preceding months. We did not know when the cycle would end or the extent of the damage it would cause. But we did know that we had to "prepare for a severe economic downturn." Collectively, we resolved to navigate through the tough conditions, to help our clients in every way we could and to show leadership in the industry, as has been our legacy during times of crisis.

It is now a year later. What transpired was largely unprecedented and virtually inconceivable. Our firm tried to meet every challenge, and, in the process, we distinguished ourselves in our service to clients and communities. Although our financial results were weak in absolute terms (but fairly good in relative terms), reflecting terrible market conditions, I believe — and I hope you agree — that this year may have been one of our finest.

The way forward will not be easy. We do not know what the future will bring, but we do know that it will require everyone – the banks, the regulators and the government -- to work together and get it right. As we prepare for a very tough 2009, with most signs pointing to continued deterioration of the economy, we still remain long-term optimists about our future and that of our country. Whatever may come, we will meet the challenge.

In this letter, I will describe our 2008 performance by line of business and review the many critical events of the previous year. I also will focus on where the industry went wrong and what the implications for the future may be. I hope, after reading this letter, you will share my confidence in our ability to build a stronger, more vibrant company for the future.

www.global-reports.com

JPMorgan Chase earned nearly $6 billion in 2008, down 64% from the $15 billion we earned in the prior year. During a "normal" credit cycle and environment, we should earn more than $15 billion. So clearly, this was not a great year financially. Essentially, the year's financial results were marred by two issues, both of which were highlighted as major risks in last year's letter. The first related to increasing credit costs, mostly for consumer and mortgage loans. The second resulted from Investment Bank write-downs of more than $10 billion, primarily from leveraged lending and mortgage exposures.

Throughout this financial crisis, we have benefited from a fortress balance sheet. We started this year with Tier 1 capital of 8.4% and ended it with 10.9%. We increased credit loss reserves to $24 billion (up almost $14 billion, including $4 billion related to Washington Mutual (WaMu)). Even without the infusion of government capital in the year's final quarter, our Tier 1 capital at year-end would have been 8.9%. Across all other measures of capital, we have remained relatively conservative. Although we did not anticipate all of the extraordinary events of the year, our strong balance sheet, general conservatism and constant focus on risk management served us well and enabled us to weather this terrible environment.

While we are disappointed with our 2008 financial results, we have not lost sight of our important achievements. We are extremely gratified that we were able to grow and gain healthy market share in virtually *all* of our businesses. And we never stopped investing in our systems and infrastructure and adding bankers, branches and products.

Regardless of what 2009 will bring, this emphasis on serving clients and growing our businesses will drive our results for years to come.

## A. Results by Line of Business

### *The Investment Bank reported a loss of $1.2 billion*

Our Investment Bank (IB) had disappointing financial results on an absolute basis but performed relatively well compared with most of our competitors. The results reflect a tough operating environment and suffered from the aforementioned $10 billion in write-downs on leveraged lending and mortgage-related assets, partially related to the acquisition of Bear Stearns. While those write-downs were painful, they were among the lowest in our industry. Moreover, our underlying business performed solidly, and in some notable areas, it outperformed. Several core businesses – Rates and Currencies, Commodities, Emerging Markets and Credit Trading – reported record results.

We also were able to make significant progress across our IB business. At the end of May, we closed our acquisition of Bear Stearns, which I will discuss in more detail later in this letter. Throughout the year, we stayed completely focused on servicing our corporate and investor clients, and in spite of the credit crisis, we continued to be there for our clients when they needed our advice and responsible capital support. J.P. Morgan was engaged in nearly all of the largest and most complex deals of the year, and we solidly established ourselves as the first call for clients on their most important challenges.

We try not to overemphasize market share tables or awards, but years of focus and discipline did lead to some extraordinary industry recognition that is worth noting. We earned our best rankings ever across the league tables, finishing first in global investment banking fees; mergers and acquisitions; global syndicated loans; debt; equity; and debt and equity-related transactions – the only firm ever to finish No. 1 in all of these categories in a given year. In our Markets businesses, client revenue increased 40% year-over-year, as clients shifted more of their business to us in uncertain times. In addition, J.P. Morgan received top awards from *International Financing Review, Risk* and *Financial News* and received a leading number of distinctions in the Greenwich Associates' 2008 Quality Leader survey – a record number of industry honors for us.

As we move into 2009, we are not resting on our laurels. We know we operate in a risky business with many tough competitors who inevitably will come back strong – even if some currently are distracted. We also know that the investment banking business, in many ways, will never be the same. Leverage will be lower, and certain structured financial products will likely cease to exist. But the fundamental business will remain the same: advising corporations and investors, raising capital, executing trades, providing research, making markets, and giving our clients the best ideas and the financing to make those plans a reality.

*Retail Financial Services reported net income of $880 million with an ROE of 5%*

With $880 million in earnings, Retail Financial Services (RFS) had a poor year overall. For its two primary businesses – Retail Banking and Consumer Lending – it was a tale of two cities.

On the plus side, Retail Banking, which includes Consumer Banking and Business Banking, earned $3 billion and, more important, grew its franchise – both organically and through the acquisition of Washington Mutual. We expect the WaMu acquisition to contribute more than $2 billion in annual earnings, and it has extended our branch network to more than 5,000 branches in 23 states, adding 7,200 bankers and increasing our ATMs to 14,500, the second-largest ATM network nationally. In Retail Banking, since the Bank One merger and the addition of The Bank of New York and WaMu branch networks, we have exponentially grown our footprint, adding 4,400 branches through acquisition and 500 organically. This five-year expansion is reflected in more checking accounts (from 2.3 million to 24 million), more deposits (from $89 billion to $342 billion) and more states in which we operate (from four to 23).

On the negative side, Consumer Lending, which includes the Mortgage, Home Equity, Student Loan and Auto Finance businesses, reported a loss of $2.1 billion, driven by a 274% increase, to $9.5 billion, in the provision for credit losses, primarily in the home lending businesses. Despite these losses, Consumer

Lending remains core to what we do. It enables us to serve customers across many products and extend $352 billion in loans. However, continued pressure on home prices, the effects of past poor underwriting standards and the deepening recession have pushed up, and, unfortunately, will continue to push up, credit costs. Our current expectation is that quarterly charge-offs for the Mortgage and Home Equity portfolios could range from $1.8 billion to $2.4 billion (an extremely high annualized loss rate of 3.5% to 5%). By the end of 2008, we had reserves of more than $8 billion across all of RFS, and, with the expectation of higher charge-offs, we also expect to build additional reserves in 2009. However, there is one area that has shown an improving trend: third-party mortgage servicing. This business relies on scale and efficiency and, including the addition of the WaMu portfolio, it grew 91% to $1.17 trillion of loans.

We believe we have corrected for the underwriting mistakes of the past. Essentially, by the end of 2008, we saw a return to old-fashioned home lending standards (a maximum of 80% loan-to-value, with fully documented income). In addition, we closed down all business originated by mortgage brokers. My worst mistake of the past several years was not doing this sooner. In general, the credit losses in the broker-originated business are two to three times worse than that of our own directly originated business. Unfortunately, approximately 30% of our home loans were originated through the broker channel. Although we will be paying for this bad underwriting for years to come, we will continue to build the Consumer Lending business with new standards in place.

We have always loved the Retail Banking business and believe that the exceptional economics of the branch-based businesses will fuel growth and earn a return on equity (ROE) of more than 30% over time. As for the Consumer Lending business, it should produce returns of 15%-20%, especially as we capitalize on the benefits of cross-selling and cross-underwriting.

www.global-reports.com

**Earnings by Line of Business** (in millions)

|  | 2004 [a] | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| Investment Bank | $ 3,654 | $ 3,673 | $ 3,674 | $ 3,139 | $ (1,175) |
| Retail Financial Services | 3,279 | 3,427 | 3,213 | 2,925 | 880 |
| Card Services | 1,681 | 1,907 | 3,206 | 2,919 | 780 |
| Commercial Banking | 992 | 951 | 1,010 | 1,134 | 1,439 |
| Treasury & Securities Services | 231 | 863 | 1,090 | 1,397 | 1,767 |
| Asset Management | 879 | 1,216 | 1,409 | 1,966 | 1,357 |
| Corporate | (4,172) | (3,554) | 842 | 1,885 | 557 |
| JPMorgan Chase | $ 6,544 | $ 8,483 | $ 14,444 | $ 15,365 | $ 5,605 |

(a) 2004 data are unaudited pro forma combined, reflecting the merger of JPMorgan Chase and Bank One

*Card Services reported net income of $780 million with an ROE of 5%*

Card Services' full-year net income was $780 million, down 73% year-over-year as charge-offs increased from $5.5 billion in 2007 to $8.2 billion in 2008 (up 48%). The net charge-off rate was approximately 5% of loans. In 2008, Card Services increased net revenue by 8% and grew managed loans by 3% (excluding WaMu).

In 2008, we added 14.9 million new credit card accounts. By investing in activities to further engage current cardmembers and attract new customers, we continued growing the business. These activities included renewing contracts with important partners (AARP, Continental, Disney, Marriott and United) and enhancing our customer service. Equally important, Chase kept credit open and available to customers and businesses in a safe and sound manner and extended more than $84 billion in new credit.

With the WaMu acquisition, Chase became the largest credit card issuer in the nation, with more than 168 million cards in circulation and more than $190 billion in managed loans. Yet, being the biggest does not mean we are the best. We will continue to invest in areas that will make us the best in the business. Specifically, our focus will be on responsive customer service, valued loyalty and rewards programs, and upgraded systems and infrastructure. In addition, our ability to do a better job underwriting and to give our customers added value through cross-selling is a huge competitive advantage in both the card and retail banking businesses.

Our focus on sound risk management extends to the card business. Early in this crisis, we responded quickly to leading indicators of change and made considerable risk management improvements. This included: raising the credit-score threshold for direct-mail marketing and increasing the number of applications that are subject to our thorough review process. We regularly manage our customers' credit lines, based on their willingness and ability to pay. While we are lowering credit lines for customers who show signs of increased risk or inactivity, we also are raising lines for our most creditworthy customers. In addition, we are closing accounts that have been inactive for long periods of time because we know from experience that these accounts are extremely risky.

Looking ahead, we expect losses will continue to increase from 5% to 9%, essentially tracking the rate of unemployment. To prepare for higher losses, we increased our reserves from $3 billion to $8 billion and are intensifying our collections efforts. At the same time, we have expanded our use of flexible payment programs to help those customers experiencing financial distress: In 2008, we saw 600,000 new enrollments in payment programs, and we anticipate, and are prepared for, that number to increase.

We do not expect 2009 to be a good year for the credit card business. In fact, we do not expect to make any money in Card Services this year. However, once this crisis is over, we believe that our ongoing investments in service quality, rewards programs and enhanced infrastructure will ultimately make us one of the best credit card companies in America.

**Net Income**
(in billions)



**Net Revenue**
(in billions)



Pretax preprovision profit

(a) 2004 data are unaudited pro forma combined, reflecting the merger of JPMorgan Chase and Bank One

*Commercial Banking reported net income of $1.4 billion with an ROE of 20%*

Commercial Banking delivered strong results, outperforming its peer group and even exceeding our 2008 plan in a tough year. Strong credit quality, risk management, client service, operational efficiency, expense control and effective pricing all contributed to the strong result: a 27% increase to a record $1.4 billion of net income, on a record $4.8 billion in revenue. And instead of relying on lending to be the key driver of revenue, Commercial Banking achieved record results in gross investment banking revenue of $966 million (up 9%), treasury services revenue of $2.6 billion (up 13%), average liability balances of $103.1 billion (up 18%) and average loan balances of $82.3 billion (up 35%). It also is notable that only 36% of Commercial Banking's revenue relates to loans.

In addition to ranking among the top three commercial banks nationally in market penetration and lead share and being the No. 2 large middle-market lender in the United States, Commercial Banking maintained a favorable market position relative to peers in risk management and deposit growth. We also are encouraged by the prospects for the Commercial Term Lending business we acquired from WaMu and the expansion of our middle-market model across the West and Southeast footprints. As ever, client selection is critical to our success, and Commercial Banking has not only created more than 1,800 new relationships but also has expanded nearly 10,000 existing relationships – a sign of the continued vitality of our business.

That said, due to our clients' waning loan demand and higher credit losses, 2009 will be a tough year for the Commercial Banking business. While we expect problems in commercial construction and real estate to worsen for the rest of this year, we are fortunate to have limited exposure and strong reserves. The turbulence in the economy and its anticipated impact on the broader Commercial Banking portfolio has led us to shift into a recession-management mode and dedicate many of our best resources into critically important workout units, where expert senior managers are involved on a daily basis.

Commercial Banking is a business with excellent long-term value for us. We play a critical role in serving so many great companies across this nation. And as this important and vibrant sector of the economy grows, so will we.

*Treasury & Securities Services reported record net income of $1.8 billion*

Treasury & Securities Services (TSS) delivered exceptional financial results in 2008. Its net income has more than doubled since 2005. For 2008, it stands at $1.8 billion (up 26%), with a 47% return on equity, on record revenue (up 17%). We value this business tremendously and appreciate how it has grown consistently over time, produced good margins, and maintained great global scale and long-standing client relationships.

The business maintains a leading position in holding, valuing, clearing and servicing securities and providing cash management, corporate card and liquidity prod-

www.global-reports.com

nets, and trade finance services to the world's leading companies and institutional investors. We now serve more than 2,800 clients around the world. In 2008, TSS brought in more than 250 significant new client relationships, representing more than $80 million in annualized revenue. In a business with global scale, 50% of TSS' revenue is from business outside the United States, and in 2008, this revenue grew by 15%. TSS further strengthened its international presence, expanding services in more than 20 countries throughout Europe, the Middle East, Africa, Asia and Latin America – we now do business in more than 45 countries.

Notably, TSS also broke its single-day U.S. dollar-clearing volume record – by clearing a staggering $5 trillion in a single day, 59% over its average. Due to market conditions, TSS assets under custody decreased by 17% to $13.2 trillion. Yet, at the same time, average liability balances were up 22% to $280 billion, reflecting a flight to quality as clients were drawn to the stability of J.P. Morgan.

TSS is preparing for continued stress in the equity markets in 2009, declining securities lending balances and the negative impact of 0% interest rates. Nevertheless, it remains an excellent business, serving clients from all five of our other businesses, and we expect it to produce strong results for years to come.

### *Asset Management reported net income of $1.4 billion with an ROE of 24%*

Asset Management, with assets under supervision of $1.5 trillion, experienced a turbulent year in 2008. As anticipated in this letter last year, earnings dropped (by 31%). But overall, the year's results were the result of three trends: continued strong growth in Private Banking, a small reduction in assets under management (but a large change in the mix of asset types) and a rigorous management of risk.

Private Banking had an exceptional year, bringing in a record number of new clients and a record level of net new assets (approximately $80 billion, for a total of $538 billion). Earnings grew 12%. Over the past two years, more than 235 new bankers have joined the Private Bank and promise to contribute significantly to its future growth.

Assets under management were $1.13 trillion at the end of 2008 versus $1.19 trillion in 2007. Net new inflows were a healthy $151 billion, up 31% from the prior year. Unfortunately, this was more than offset by the declines in market values. In addition, there was a large change in the mix of assets. The cash we manage for all our clients increased dramatically, with liquidity balances growing by $210 billion to reach $613 billion by year-end, as clients globally sought safety away from higher-risk investments. Equities and alternatives went in the opposite direction, with a 49% decline to $240 billion from $472 billion, largely due to a 41% drop in the value of equity markets. Finally, alternative assets dropped 17% to $100 billion from $121 billion.

The current turmoil has reinforced the importance of managing risk. Our culture of strong risk management (proper due diligence, documentation, auditing, among other measures) is consistent with our philosophy of putting clients' interests first and has enabled us to avoid many of the negative developments that surfaced last year.

We anticipate another difficult year in 2009, with earnings continuing to be affected by market conditions. But this is a great business, and we intend to keep it that way by focusing on helping our clients through the current environment.

### *The Corporate sector reported net income of $557 million*

In 2008, we reported a net loss of $700 million in Private Equity – a different story from 2007, when we reported pre-tax private equity gains of more than $4 billion. We love the private equity business, but as we indicated in prior years, private equity returns are by their nature lumpy, and we did not expect the stellar 2007 results to be repeated in 2008. We will remain patient and still expect this business to deliver in excess of 20% return on equity for us over time.

Aside from Private Equity, our Corporate sector, excluding merger-related items, produced $1.5 billion in net income. This includes unallocated corporate expense of approximately $500 million, which we expect to continue at approximately the same level in 2009, as well as a myriad of other items that are disclosed in detail in our financial statements.

## B. Strong strategic positions of all our businesses

One important and critical point to highlight is that each of our businesses now ranks as one of the top three players in its respective industry. As ever, our goal is to be the best, not necessarily the biggest. That said, we know that size matters in businesses where economies of scale – in areas such as systems, operations, innovation, branding and risk diversification – can be critical to success. The only reason to get bigger and gain economies of scale is when doing so enables you to do a better job for your clients; i.e., by giving them more, better and faster at a lower cost. Ultimately, this is also the only real reason to do a merger – the client gets something better. If this isn't the case, big can be bad. If bureaucracy, hubris, lack of attention to detail – or other ailments of large corporations – overwhelm the benefits of size, then failure will ultimately result.

We are also keenly aware of the value added at more detailed levels in our businesses. For example, in Retail Financial Services, we gained share with small businesses as we expanded our brand footprint. Our Investment Bank has become a top player in both Prime Brokerage and Energy, previously two of our weak spots. Commercial Banking added WaMu's Commercial and Community Lending businesses to its portfolio, representing $44.5 billion in loans. And Private Banking's record in net new asset flows showed the strength of the J.P. Morgan franchise, as high-net-worth individuals worldwide chose us to manage their investments. We also continue to upgrade our infrastructure by improving systems, data centers, products and services.

Suffice it to say, we like our market position and believe that each business is strong and getting stronger. Even in tough years like 2008 and 2009, we did not – and will not – stop doing all the things that make our businesses better.

**Managed Net Revenue**[a] **by Line of Business**
(in millions)



Card Services $16,474 — 23%

Commercial Banking $4,777 — 7%

Treasury & Securities Services $8,134 — 11%

Asset Management $7,584 — 10%

Corporate $69

Investment Bank $12,214 — 17%

Retail Financial Services $23,520 — 32%

(a) For a discussion of managed basis presentation and a reconciliation to reported net revenue, see pages 50-51 of this Annual Report.

www.global-reports.com

## II. REVIEW OF CRITICAL EVENTS OF THE YEAR

In this section, I want to review some of the critical events for us this past year:

• The purchase of Bear Stearns

• The purchase of Washington Mutual

• The gathering storm that arrived with a vengeance

• The acceptance of government TARP

### A. The purchase of Bear Stearns

On May 30, 2008, we closed our acquisition of Bear Stearns – a deal completed in record time under truly extraordinary circumstances.

Over the weekend of March 15, we were asked by the U.S. government to assist in preventing Bear Stearns from going bankrupt before the opening of the Asian markets on Monday morning. The possibility was real that if Bear Stearns had been allowed to go bankrupt, it could have had a cataclysmic effect on the financial markets. (Many believe that later experiences with Lehman Brothers essentially proved this to be true.) To a person, our Board of Directors felt JPMorgan Chase had a special obligation to do all we could to help, especially knowing that we were among the few companies – if not the only one – in a position to do so. However, this deal posed more risks and threatened to be more backbreaking than any other acquisition we had done in the past. And it had to make sense for our shareholders.

Going into this deal, we had two things in our favor: the strength of our balance sheet and capital base and the skill of our people.

Our first priority was to quickly reduce our downside risk. This required us to massively de-risk Bear Stearns quickly and in potentially dangerous markets. Bear Stearns had approximately $400 billion in assets that we needed to consolidate into our financial and risk systems and reduce quickly to approximately $200 billion of assets. We had to manage this reduction so that the remaining risk was manageable and well-controlled. The potential downside – given the treacherous markets – was enormous. We asked the government to finance and assume the risk on approximately $30 billion of

mortgage assets (compared with our $370 billion of total assets acquired from Bear Stearns). The portion that the government agreed to take comprised the less risky mortgage assets (we kept the most risky mortgage assets). We simply could not and would not take on any more mortgage risk – it would have been extremely irresponsible. And remember, the government could finance the assets much more cheaply than we could and could hold them as it saw fit, whereas we would have been forced to sell them immediately.

Under normal conditions, the price we ultimately paid for Bear Stearns would have been considered low by most standards. But these were not normal conditions, and because of the risk we were taking, we needed a huge margin for error. We were not buying a house – we were buying a house on fire.

We paid $1.5 billion for Bear Stearns, a company that had reported a little more than $11 billion in common equity. We knew that most – but we hoped not all – of the common equity we were buying would be used for close-down costs, litigation expenses, severance costs and, most important, quickly eliminating the risk on the balance sheet. We have largely completed this task, but, unfortunately, all of the equity was used up in this process, and several billions more in losses ran through our income statement in the second half of 2008.

Despite these additional costs, we still believe that Bear Stearns has added significantly to our franchise. In particular, it completed our franchise in two areas where we were weak, Prime Brokerage and Commodities, and it enhanced our broader equity and fixed income businesses. Ultimately, we expect the businesses we acquired to add approximately $1 billion of annual earnings to the company.

The truly impressive part of the Bear Stearns deal was the human side – seeing our people rise to the challenge under a great deal of strain. On Thursday night, March 13, I called our investment banking heads, Steve Black and Bill Winters, who then called our finance, audit, tax, trading and banking professionals as well as legal, real estate and systems teams around the world – many of whom got out of bed and went back to work.

Soon, hundreds returned to work that night. By the weekend, thousands of people from around the world were working around the clock. These professionals ably managed the due diligence work and gave us the confidence we needed to complete the deal. Their Herculean effort over that weekend and the next several months made it possible for us to sign and close the deal in about 75 days. If you could have seen what I saw during that intensely stressful time, you would have been very proud of the team at JPMorgan Chase.

## B. The purchase of WaMu

On September 25, the Federal Deposit Insurance Corporation (FDIC) seized the banking assets of Washington Mutual in the largest bank failure in history. Moments later, we acquired the deposits, assets and certain liabilities of Washington Mutual for approximately $1.9 billion. We now know that JPMorgan Chase was the only bank prepared to act immediately. We acquired WaMu's 2,200 branches, 5,000 ATMs and 12.6 million checking accounts, as well as savings, mortgage and credit card accounts. Importantly, we did not acquire the assets or liabilities of the bank's holding company or assume the $14 billion of senior unsecured debt and subordinated debt of Washington Mutual's banks.

The deal was financially compelling – it was immediately accretive to earnings, and it will add an estimated $2 billion or 50 cents per share to our 2009 results and increasingly more thereafter. To achieve these anticipated earnings, we did not rely on heroic revenue assumptions. Instead, we mostly relied on expected cost savings (net of the large investments in the technology and refurbishment of the branches) of $1.5 billion. We now expect to achieve cost savings of more than $2 billion. We also plan to complete all rebranding and system conversions by the end of this year.

With the acquisition of WaMu, we purchased approximately $240 billion of mortgage and mortgage-related assets, with $160 billion in deposits and $38 billion in equity. We immediately wrote down most of the bad or impaired assets (approximately $31 billion), proper-

ly reserved for the remaining assets, and established reserves for severance and close-down costs. After recognizing all of these costs, we believe that we now have a relatively "clean" company that came with approximately $4 billion in "good" common equity.

Our due diligence on WaMu's assets was extensive, and our assumptions were conservative. We assumed that home prices would go down another 10% (from the day we closed), providing a healthy margin for error. However, if home prices go down more than expected, say 20%, all other things being equal, this could cost us $5 billion-$10 billion more. Even under these circumstances, we think the transaction will remain a great deal, at a great price for our shareholders. We are confident that it will add enormous value to JPMorgan Chase in the future.

Given our conservative nature, we sold $11.5 billion in common stock the morning after the deal announcement to maintain our strong capital base. The capital raise – upsized due to strong response from investors – was the largest U.S. common stock follow-on offering ever executed. In addition, WaMu's retail deposits contributed to our stable funding base and liquidity position.

In prior years, we consistently expressed our desire to broaden our retail footprint to attractive regions such as the West Coast and Florida – as long as the plan made good sense financially and we could execute the transaction effectively. The WaMu transaction aligned perfectly with this criteria. Specifically, it expands our retail franchise into fast-growing new markets with established branches; bolsters our presence in our significant footprint states; and, over time, will allow us to extend the reach of our commercial banking, business banking, credit card and wealth management efforts. These additional businesses were not heritage strengths of WaMu but, in effect, can be built on top of the WaMu branches and we hope eventually will add another $500 million to our earnings (this will take many years and was not built into our assumptions). An expanded product line, together with enhanced systems, will benefit former WaMu customers tremendously.

www.global-reports.com

Our people across the business – together with our experts in systems, marketing, legal, finance, audit and human resources - did an outstanding job executing this transaction, making it possible for us to take this important strategic step.

## C. The gathering storm arrived with a vengeance — and how JPMorgan Chase fared

In 2008, Bear Stearns collapsed; Lehman Brothers declared bankruptcy; Fannie Mae and Freddie Mac were placed into government conservatorship; the government assumed majority ownership of AIG; Merrill Lynch sold itself to Bank of America; Wells Fargo took over a struggling Wachovia; IndyMac and WaMu went into receivership by the Federal Deposit Insurance Corporation; Countrywide and the U.S. mortgage business virtually collapsed; the two remaining major investment banks, Goldman Sachs and Morgan Stanley, became bank holding companies; around the globe, French, British, Swiss and German banks were rescued by their governments; and the world entered the sharpest, most globalized downturn since the Great Depression.

As for JPMorgan Chase, we had large credit and operational exposures in virtually every situation mentioned above, affecting nearly every line of business. Our firm's management teams, credit officers, risk officers, and legal, finance, audit and compliance teams worked tirelessly to protect the company. We believe it is a considerable sign of strength that we could manage through such extraordinary problems with minimal losses to the company.

### *We avoided many critical problems that would have made things far worse*

In last year's letter, we focused on our problems – including mortgage issues in Retail Financial Services and write-downs in the Investment Bank of leveraged loans and mortgage securities. Those issues cost us a considerable amount of money in 2008 and will continue to cost us money in 2009. But it also is instructive to focus on how we were able to avoid certain problems, control the damage and minimize the cost.

In 2008:

- We essentially stayed away from sponsoring structured investment vehicles (SIV) because we viewed them as arbitrage vehicles with plenty of risk and a limited business purpose. We also minimized our financing to SIVs for the same reasons, and back in 2005, we sold the only small SIV we had sponsored.

- We didn't write option ARMs (adjustable rate mortgages) because we did not think they were a consumer-friendly product. Although we made plenty of mistakes in the mortgage business, this was not one of them.

- We substantially cut back on subprime early in the crisis. While subprime mortgages cost us nearly $1 billion in 2008, we avoided far worse results because we had significantly reduced our exposures in 2006. This was true both in the mortgage business and in the Investment Bank.

- We never built up the structured finance business. While we are a large player in the asset-backed securities market, we deliberately avoided the structured collateralized debt obligation (CDO) business because we believed the associated risks were too high. Structured finance in its most complicated forms, such as "CDO-squared," has largely disappeared after unleashing a myriad of problems on the financial system. They will not be missed.

- We did not unduly leverage our capital, nor did we rely on low-quality forms of capital. We always had high targets of 8% to 8.5% Tier 1 capital. We always believed in "high-quality" capital, which, among other things, means conservative accounting, strong loan loss reserves and a high component of tangible common equity. The higher the quality of capital, the more prepared one is for tough times.

- We maintained a high level of liquidity – and were always prepared for unexpected draws (i.e., collateral calls). Strong liquidity is a constant for us. The fact that we have total deposits of $1 trillion across our retail and wholesale businesses positions the firm advantageously overall and has helped us weather

## Peer Comparison of Tier 1 Capital Ratios



Tier 1 Capital Ratio – JPMorgan Chase

Average Tier 1 Capital Ratio – Peers (Bank of America, Citi, Wells Fargo and Wachovia; 2008 peer capital ratio excludes Wachovia)

(a) 2004 data are unaudited pro forma combined, reflecting the merger of JPMorgan Chase and Bank One

the worst of the crisis. We will do whatever it takes to ensure that our liquidity remains a strong part of our fortress balance sheet so that we can maintain flexibility during challenging times to be in a position to support our clients.

· We avoided short-term funding of illiquid assets, and we essentially do not rely on wholesale funding. (Of our $1 trillion of deposits, approximately $300 billion is referred to as "wholesale," but it essentially is comprised of deposits that corporate clients leave with us in the normal course of business – i.e., they are "sticky" and not like brokered certificates of deposit or "hot money" that move on a whim for one basis point.) Simply put, we still follow the financial commandment: Do not borrow short to invest long.

## D. The acceptance of government TARP

On October 13, 2008, I went to Washington, D.C., with eight chief executives of other financial firms. There, we were asked by the Secretary of the Treasury, the Chairman of the Federal Reserve, the Office of the Comptroller of the Currency (OCC), the FDIC and the New York Federal Reserve Bank to agree to accept a package of capital from the government. As part of its Troubled Asset Relief Program (TARP), the U.S. government was proposing some powerful measures to help fix the collapse in the credit and lending markets.

They prevailed upon the nine of us to set an example for others by accepting this capital infusion as a sign of our unanimous support of these measures. The logic was that a massive infusion of capital into the U.S. banking system would pave the way for the industry as a whole to extend more credit than they otherwise would have provided. The government's view was also that if any of the banks declined the TARP funds, then many of the additional banks might not want to be tainted by their acceptance of the TARP money because it might be viewed as a sign of weakness.

*We felt then that accepting the TARP funds was the right thing to do for the U.S. financial system – even though it may not have been as beneficial for JPMorgan Chase as it was for some of the others.*

In short, we did not ask for the TARP capital infusion, and we did not feel we needed it (our Tier 1 capital at year-end would have been 8.9% without it). In fact, the TARP program had asymmetric benefits to those accepting it; i.e., it was least beneficial to strong companies like ours and vice versa. That said, we believe that accepting the TARP funds was the right thing to do for the U.S. financial system – and that JPMorgan Chase should not be parochial or selfish and stand in the way of actions that the government wanted to take to help the whole financial system.

12

*We think the government acted boldly in a very tough
situation, the outcome of which could have possibly been
far worse had it not taken such steps*

The government acted quickly and boldly – taking
unorthodox steps to try to right the ship. It had to act
with urgency while dealing with complex and rapidly
changing problems that did not lend themselves to
simplistic solutions. While we will never actually
know, we believe, as many economists and analysts do,
that without these and other actions the government
has taken to date, things could have been much worse.

So while it is easy to criticize the timing, marketing or
consistency of the effort – we also recognize how hard
it is to act boldly in difficult and dangerous times. We
should remind ourselves of what President Theodore
Roosevelt expressed nearly a century ago:

*"It is not the critic who counts; not the man who points
out how the strong man stumbles, or where the doer of
deeds could have done them better. The credit belongs
to the man who is actually in the arena, whose face is
marred by dust and sweat and blood; who strives
valiantly; who errs, who comes short again and again,
because there is no effort without error and shortcom-
ing; but who does actually strive to do the deeds; who
knows great enthusiasms, the great devotions; who
spends himself in a worthy cause; who at the best
knows in the end the triumph of high achievement, and
who at the worst, if he fails, at least fails while daring
greatly, so that his place shall never be with those cold
and timid souls who neither know victory nor defeat."*

We hope that our leaders will continue to be bold
and brave in seeking solutions to these once-in-a-
generation problems.

It is important to recognize that TARP capital is only
14% of our total capital. It is also important to recog-
nize that to the extent we use the money and lose it,
the risk is 100% ours because we still owe the money
back to the government. Despite that, we, and other
banks, are trying to use TARP capital to benefit share-
holders, clients and communities. In the fourth quarter
of 2008 alone, we extended more than $150 billion in
new credit to consumers, businesses, municipalities
and not-for-profit organizations, including nearly $30
billion in home lending and $2.8 billion in auto lend-
ing. We increased loans and commitments to govern-
ment units, health care companies and not-for-profits
by 33% in 2008 and plan to increase lending to these
groups by $5 billion in 2009. We also completed sever-
al major syndicated leveraged finance loans, and, in
one critical instance, we bought the entire $1.4 billion
bond issue from the state of Illinois when no one
else would bid for it, giving Illinois the financing for
payroll and other important needs. Finally, we remain
very active in the interbank market (where banks lend
to each other) and have had on average $40 billion to
$50 billion out in the interbank market each night.

While total lending by banks fluctuates according to
the markets and changing credit conditions, we do
believe that TARP has enabled many banks to increase
their lending in certain key areas – more than they
otherwise would have done.

While we clearly understood that there might be
potential (mostly political) unintended consequences
of TARP, we believed that it would help the U.S.
financial system at that critical moment.

# III. FUNDAMENTAL CAUSES AND CONTRIBUTIONS TO THE FINANCIAL CRISIS

After Lehman's collapse, the global financial system went into cardiac arrest. There is much debate over whether Lehman's crash caused it - but looking back, I believe the cumulative trauma of all the aforementioned events and some large flaws in the financial system are what caused the meltdown. If it hadn't been Lehman, something else would have been the straw that broke the camel's back.

The causes of the financial crisis will be written about, analyzed and subject to historical revisions for decades. Any view that I express at this moment will likely be proved incomplete or possibly incorrect over time. However, I still feel compelled to attempt to do so because regulation will be written soon, in the next year or so, that will have an enormous impact on our country and our company. If we are to deal properly with this crisis moving forward, we must be brutally honest and have a full understanding of what caused it in the first place. The strength of the United States lies not in its ability to avoid problems but in our ability to face problems, to reform and to change. So it is in that spirit that I share my views.

Albert Einstein once said, "Make everything as simple as possible, but not simpler." Simplistic answers or blanket accusations will lead us astray. Any plan for the future must be based on a clear and comprehensive understanding of the key underlying causes of – and multiple contributors to – the crisis, which include the following:

- The burst of a major housing bubble

- Excessive leverage pervaded the system

- The dramatic growth of structural risks and the unanticipated damage they caused

- Regulatory lapses and mistakes

- The pro-cyclical nature of virtually all policies, actions and events

- The impact of huge trade and financing imbalances on interest rates, consumption and speculation

Each main cause had multiple contributing factors. As I wrote about these causes, it became clear to me that each main cause and the related contributors could easily be rearranged and still be fairly accurate.

It was also surprising to realize that many of the main causes, in fact, were known and discussed abundantly before the crisis. However, no one predicted that all of these issues would come together in the way that they did and create the largest financial and economic crisis of our lifetime.

Even the more conservative of us, and I consider myself to be among them, looked at the past major crises (the 1974, 1982 and 1990 recessions; the 1987 and 2001 market crashes) or some mix of them as the worst-case events for which we needed to be prepared. We even knew that the next one would be different - but we missed the ferocity and magnitude that was lurking beneath. It also is possible that had this crisis played out differently, the massive and multiple vicious cycles of asset price reductions, a declining economy and a housing price collapse all might have played out differently – either more benignly or more violently.

It is critical to understand that the capital markets today are *fundamentally* different than they were after World War II. This is not your grandfather's economy. The role of banks in the capital markets has changed considerably. And this change is not well-understood – in fact, it is fraught with misconceptions. Traditional banks now provide only 20% of total lending in the economy (approximately $14 trillion of the total credit provided by all financial intermediaries). Right after World War II, that number was almost 60%. The other lending has been provided by what many call the "shadow banking" system. "Shadow" implies nefarious and in the dark, but only part of this shadow banking system was in the dark (i.e., SIVs and conduits) – the rest was right in front of us. Money market funds, which had grown to $4 trillion of assets, directly lend to corporations by buying commercial paper (they owned $700 billion of commercial paper). Bond funds, which had grown to approximately $2 trillion, also were direct buyers of corporate credit and securitizations. Securitizations, which came in many forms (including CDOs, collateralized loan obligations and

commercial mortgage-backed securities), either directly or indirectly bought consumer and commercial loans. Asset securitizations simply were a conduit by which investment and commercial banks passed the loans onto the ultimate buyers.

In the two weeks after the Lehman bankruptcy, money market and bond funds *withdrew approximately $700 billion from the credit markets*. They did this because investors (i.e., individuals and institutions) withdrew money from these funds. At the same time, bank lending actually went up as corporations needed to increasingly rely on their banks for lending. With this as a backdrop, let's revisit the main causes of this crisis in more detail.

## A. The burst of a major housing bubble

U.S. home prices have been appreciating for almost 10 years -- essentially doubling over that time. While some appreciation is normal, the large appreciation, in this case, and the ultimate damage it caused were compounded by the factors discussed below.

*New and poorly underwritten mortgage products (i.e., option ARMs, subprime mortgages) helped fuel asset appreciation, excessive speculation and far higher credit losses*

As the housing bubble grew, increasingly aggressive underwriting standards helped drive housing price appreciation and market speculation to unprecedented levels. Poor underwriting standards (including little or no verification of income and loan-to-value ratios as high as 100%) and poorly designed new products (like option ARMs) contributed directly to the bubble and its disastrous aftermath.

*Mortgage securitization had two major flaws*

In many securitizations, no one along the chain, from originator to distributor, had ultimate responsibility for the *results* of the underwriting. In addition, the poorly constructed tranches of securitizations that comprised these transactions effectively converted a large portion of poorly underwritten loans into Triple A-rated securi-

ties. Clearly, the rating agencies also played a key role in this flawed process. These securitizations ended up in many forms; the one most discussed is CDOs. Essentially, these just added a lot more fuel to the fire.

*While most people are honorable, excess speculation and dishonesty were far greater than ever seen before, on the part of both brokers and consumers*

The combination of no-money-down mortgages, speculation on home prices, and some dishonest brokers and consumers who out-and-out lied will cause damage for years to come. This, in no way, absolves the poor underwriting judgments made by us and other institutions, and it certainly doesn't absolve anyone who mis-sold loans to consumers.

## B. Excessive leverage pervaded the system

Over many years, consumers were adding to their leverage (mostly as a function of the housing bubble), some commercial banks increased theirs, most of the U.S. investment banks dramatically increased theirs and many foreign banks had the most leverage of all. In addition, increasing leverage appeared in:

- Hedge funds, many using high leverage, grew dramatically over time. Some of that leverage was the result of global banks and investment banks lending them too much money.

- Private equity firms were increasingly leveraging up their buyouts. Again, some banks and the capital markets lent them too much money.

- Some banks (and other entities) added to their leverage by using off-balance sheet arbitrage vehicles, like SIVs and leveraged puts.

- Nonbank entities, including mortgage banks, CDO managers, consumer and commercial finance companies, and even some bond funds, all increased their leverage over time.

- Even pension plans and universities added to their leverage, often in effect, by making large "forward-commitments."

Basically, the whole world was at the party, high on leverage – and enjoying it while it lasted.

## C. The dramatic growth of structural risks and the unanticipated damage they caused

I believe there are four structural risks or imbalances that grew and coalesced to cause a "run on the bank." But this was not a traditional bank run – it was a run on our capital markets, the likes of which we had never experienced. After Lehman's bankruptcy, many parts of our capital markets system stopped providing any capital to the market at all. If the crisis had unfolded differently, then perhaps the events that followed would not have occurred. Surely no one deliberately built a system with these fundamental flaws and imbalances. Clearer heads will understand that much of this was not malfeasance – our world had changed a lot and in ways that we didn't understand the full potential risk. But when the panic started, it was too much for the system to bear.

### Many structures increasingly allowed short-term financing to support illiquid assets

In essence, too much longer-term, non-investment grade product was converted into shorter-term Triple A-rated product. Some banks, hedge funds, SIVs and CDOs were using short-term financing to support illiquid, long-term assets. When the markets froze, these entities were unable to get short-term financing. As a result, they were forced to sell these illiquid assets. One of the functions of banking and the capital markets is to intermediate between the needs of investors and issuers. This triggers a normal conversion, either directly or indirectly (through securitizations) of longer-term, illiquid assets held by the issuers, who need to finance the business into the shorter-term, higher-grade product that most investors want. Clearly, over time, this imbalance had grown too large and unsupportable.

### Money market funds had a small structural risk, which became a critical point of failure

Money market funds promise to pay back 100% to the investor *on demand*. Many money market funds invested in 30- to 180-day commercial paper or asset-backed securities that under *typical* circumstances could be

sold back at par. In normal times, investors demanded their money in fairly predictable ways, and funds were able to meet their demands. Over time, money market funds grew dramatically to exceed $4 trillion. After Lehman collapsed, one money fund in particular, which held a lot of Lehman paper, was unable to meet the withdrawal demands. As word of that situation spread, investors in many funds responded by demanding their money. In a two-week period, investors pulled $500 billion from many money funds, which were forced to sell assets aggressively. To raise liquidity, these money funds essentially were forced to sell assets. As investors moved away from credit funds and into government funds, the banks simply were unable to make up the difference. This became one more huge rupture in the dike.

### Repo financing terms got too loose, and too many illiquid assets were repo'ed

Over time, in those markets where financial companies financed their liquid assets, financial terms had become too lax. For example, to buy non-agency mortgage securities, financial institutions only had to put up 2%-5% versus a more traditional 15%-25%. The repo markets also had begun to finance fairly esoteric securities, and when things got scary, they simply stopped doing so. In the two weeks after Lehman's bankruptcy, more than $200 billion was removed from this type of financing, by both investors and banks. Once again, financial institutions had to liquidate securities to pay back short-term borrowing – thus, another rupture in the dike.

### Investors acted wisely to protect themselves, but the system couldn't handle them all doing it at the same time

Individual investors, corporations, pension plans, bond and loan funds, money market funds and others – all acted in their own self-interest, and all individually acted wisely. But collectively, they caused enormous flows out of the banking and credit system. Regardless of whether the funds came out of a bank, a money fund, or a bond or loan fund, the fact remains that the cumulative result was a severe shortage of necessary credit that was removed from the system.

Clearly, things had changed. In the past, regulators had focused on preventing a systemic collapse of the main intermediaries in the financial system; i.e., the banks. In this new world, however, we need to discuss how to protect ourselves not only from runs on banks but also from runs on other critical vehicles in the capital and financial markets.

## D. Regulatory lapses and mistakes

With great hesitation, I would like to point out that mistakes also were made by the regulatory system. That said, I do not blame the regulators for what happened. In each and every circumstance, the responsibility for a company's actions rests with us, the CEO and the company's management. Just because regulators let you do something, it does not mean you should do it. But regulators have a responsibility, too. And if we are ever to get this right, it is important to examine what the regulators could have done better. In many instances, good regulation could have prevented some of the problems. And had some of these problems not happened, perhaps things would not have gotten this bad.

*Unregulated or lightly regulated parts of the market contributed to the crisis*

I've already discussed some of the flaws with money market funds and hedge funds – the latter were not regulated, and the former were lightly regulated. In addition, there are two large segments, among others, that – had they been regulated – could have helped the system avoid some problems.

- Much of the mortgage business was largely unregulated. While the banks in this business were regulated, most mortgage brokers essentially were not. In fact, no major commercial bank that was regulated by the OCC wrote option ARMs (possibly the worst mortgage product). A very good argument could be made that the lower standards of the unregulated parts of the business put a lot of pressure on those players in the regulated part of the business to reduce their standards so they could compete. In this case, bad regulation trumped good regulation.

- Insurance regulators essentially missed the large and growing one-sided credit insurance and credit derivative bets being made by AIG and the monoline insurers. This allowed these companies to take huge one-sided bets, in some cases, by insuring various complex mortgage securities.

*Basel II, which was adopted by global banks and U.S. investment banks, allowed too much leverage*

It is quite clear now that the second of the Accords by the Basel Committee on Banking Supervision (known as Basel II), published in 2004, was highly flawed. It was applied differently in different jurisdictions, allowed too much leverage, had an over-reliance on published credit ratings and failed to account for how a company was being funded (i.e., it allowed too much short-term wholesale funding). In 2004, the five independent U.S. investment banks adopted Basel II under the jurisdiction of the Securities and Exchange Commission (this was not allowed by the banks regulated by the Federal Reserve or the OCC, which remained under Basel I). The investment banks jettisoned prior conservative net capital requirements and greatly increased their leverage under Basel II. And the rest is history.

*Perhaps the largest regulatory failure of all time was the inadequate regulation of Fannie Mae and Freddie Mac*

The extraordinary growth and high leverage of Fannie Mae and Freddie Mac were well-known. Many talked about these issues, including their use of derivatives. Surprisingly, they had their own regulator, which clearly was not up to the task. These government-sponsored entities had grown to become larger than the Federal Reserve. Both had dramatically increased their leverage over the last 20 years. And, amazingly, a situation was allowed to exist where the very fundamental premise of their credit was implicit, not explicit. This should never happen again. Their collapse caused damage to the mortgage markets and the financial system. And, had the Treasury not stepped in, it would have caused damage to the credit of the United States itself.

*Too many regulators — with overlapping responsibilities and inadequate authorities — were ill equipped to handle the crisis*

Our current regulatory system is poorly organized and archaic. Overlapping responsibilities have led to a diffusion of responsibility and an unproductive competition among regulators, which probably accelerated a race to the bottom. Many regulators also did not have the appropriate statutory authority (through no fault of their own) to deal with some of the problems they were about to face. One large, glaring example revealed by the collapse of Bear Stearns and Lehman was the lack of a resolution process in place to deal with failure of investment banks. If commercial banks fail, the FDIC can take them over. This was not the case with investment banks. In addition, a resolution process needs to be in place for large, global financial companies that operate in many jurisdictions and use many different regulatory licenses.

### E. The pro-cyclical nature of virtually all policies, actions and events

In a crisis, pro-cyclical policies make things worse. I cannot think of one single policy that acted as a counterbalance to all of the pro-cyclical forces. Although regulation can go only so far in minimizing the impact of pro-cyclical forces in times of crisis, we still must be aware of the impact they have. For example:

- Loan loss reserving causes reserves to be at their lowest level right when things take a turn for the worse. Therefore, as a crisis unfolds, a bank not only faces higher charge-offs but also has to add to its level of reserves, depleting precious capital.

- Although we are proponents of fair value accounting in trading books (a lot of the mark-to-market losses that people complained about will end up being real losses), we also recognize that market levels resulting from large levels of forced liquidations may not reflect underlying values. Certain applications of fair value accounting can contribute to a downward spiral where losses deplete capital, and lower capital causes people to respond by selling more, at increasingly lower values.

- The rating agencies made mistakes (like the rest of us) that clearly helped fuel a CDO and mortgage debacle. They also, in the midst of a crisis, continually downgraded credits. Lower ratings, in turn, required many financial institutions to raise more capital, thus adding to the vicious cycle.

- In bad times, the market itself demands both an increase in capital and more conservative lending. We may not be able to change this phenomenon, but there are steps we can take to ensure that the system is better prepared for it.

- Financing arrangements allow the most leverage in good times, but they force a dramatic reduction in leverage in bad times.

- As capital markets volatility increases, Basel II capital calculations and many risk management tools, like Value-at-Risk, demand that more capital be held to own securities or loans.

### F. The impact of huge trade and financing imbalances on interest rates, consumption and speculation

I suspect when analysts and economists study the fundamental causes of this crisis, they will point to the enormous U.S. trade deficit as one of the main underlying culprits. Over an eight-year period, the United States ran a trade deficit of $3 trillion. This means that Americans bought $3 trillion more than they sold overseas. Dollars were used to pay for the goods. Foreign countries took these dollars and purchased, for the most part, U.S. Treasuries and mortgage-backed securi-

ties. It also is likely that this process kept U.S. interest rates very low, even beyond Federal Reserve policy, for an extended period of time. It is likely that this excess demand also kept risk premiums (i.e., credit spreads) at an all-time low for an extended period of time. Low interest rates and risk premiums probably fueled excessive leverage and speculation. Excess consumption could be financed cheaply. And adding fuel to the fire, in the summer of 2008, the United States had its third energy crisis – further imbalancing capital flows.

There have been times when large imbalances – such as those in trade – sort themselves out without causing massive global disruption. However, it is bad planning and wishful thinking to assume that this will always be the case. These imbalances shouldn't be allowed to get that large – they create too much potential risk.

Many other factors may have added to this storm – an expensive war in Iraq, short-selling, high energy prices, and irrational pressure on corporations, money managers and hedge funds to show increasingly better returns. It also is clear that excessive, poorly designed and short-term oriented compensation practices added to the problem by rewarding a lot of bad behavior.

The modern financial world has had its first major financial crisis. So far, many major actors are gone: many of the mortgage brokers, numerous hedge funds, Wachovia, WaMu, Bear Stearns, Lehman and many others. Some of the survivors are struggling, particularly as we face a truly global, massive recession – and it still is not over.

The extent of the damage and the magnitude of the systemic problems make it clear that our rules and regulations must be completely overhauled. Such changes to the regulatory system *could* have huge implications on the long-term health, and strategies, of our business.

While unprecedented actions have been taken by both the Federal Reserve and the Treasury, my hope is that new policies are grounded in a thorough analysis of what happened and what we need to do about it. Political agendas or simplistic views will not serve us well.

Often we hear the debate around the need for more or less regulation. What we need is better and more forward-looking regulation. Someone has famously said that a crisis should not go to waste. But what is also true is that it shouldn't take a crisis to solve our problems. During a crisis, people panic. This can make it harder, not easier, to do the right thing. From our perspective, certain improvements would make a big difference. We would like to share with you some of our suggestions.

## A. The need for a systemic regulator with much broader authority

We agree with our leaders in government that we should move ahead quickly to establish a systemic regulator. In the short term, this would allow us to focus attention on correcting some underlying weaknesses in our system and filling the gaps in regulation that contributed to the current situation. It also is clear that U.S. policy must be coordinated with the proper set of international regulators. When the crisis emerged, the actions of individual countries had a critical impact on numerous other countries. International coordination is essential in resolving this kind of crisis.

*There should be procedures in place to deal with systemically important institutions – failure is fine as long as it's orderly and controlled and **doesn't cause systemic failure***

Size is not the issue; rather, it is when institutions are too interconnected that an uncontrolled failure has the potential to bring the whole system down. What we need is a resolution process that *allows failure without causing damage to the whole system.* In the case of Bear

Stearns or Lehman—both investment banks – regulators did not have this protocol. They do have it, however, for commercial banks. Even more important, regulators are going to need a resolution process for large, global corporations that operate in many jurisdictions around the world.

The first goal should be to regulate financial institutions so they don't fail. If they do fail, a proper resolution process would ensure that action is swift, appropriate and consistent. The lack of consistency alone caused great confusion in the marketplace. For example, when some of the recent failures took place, there was inconsistent treatment among capital-holders (preferred stock and debt holders were treated very differently in different circumstances). It would have been better if the regulators had a resolution process that defined, a *priori*, what forms of aid companies would get and what the impact would be on capital-holders. The FDIC resolution process for banks provides a very good example of how a well-functioning process works.

Various liquidity and "lender of last resort" facilities, like some of those put into place during this crisis, also could be in place on an a *priori* basis. These controls would reduce risk and maximize confidence.

### *Regulation needs to be administered by product and economic substance - not by legal entity*

We have experienced the unintended consequences of redundant regulation; i.e., different agencies regulating the same product in the mortgage business, in the derivatives business and in lending overall. If, on the other hand, similar products were overseen by a single regulator, that regulator would have much deeper knowledge of the products and full information that extends across institutions. The "regulatory competition" that could have caused a race to the bottom would be eliminated.

### *Hedge funds, private equity funds and off-balance sheet vehicles must be included in our regulatory apparatus without compromising their freedom and positive assistance*

Certain vehicles like hedge funds and private equity funds need to be regulated but only to protect the system against risk. These vehicles do not need to be heav-

ily regulated like a deposit-gathering bank. We should consider requiring hedge funds over a certain size (say, $1 billion of equity) to register, provide quarterly audited reports, disclose total leverage and certain risk attributes – like volatility and investment categories – and outline operational procedures. They also could be required to show their regulators (not their competitors) any concentrated "trades" that could cause excessive systemic risk. This all could be done without compromising flexibility or disclosing confidential positions while allowing these vehicles to move capital – as freely and aggressively – as they see fit.

### *The systemic regulator needs the ability to anticipate risk and do something about it if necessary*

There, undoubtedly, are financial products in the market today that – if unchecked – could have a destabilizing effect. A systemic regulator, had it been closely watching the mortgage industry, might have identified the unregulated mortgage business as a critical point of failure. This regulator also might have been able to limit the leverage of Fannie and Freddie once they were deemed to pose major systemic risks. Such a regulator might have been in the position to recognize the one-sided credit derivative exposures of AIG and the monoline insurers and do something about it.

A systemic regulator also should be on the lookout for new or potential structural risks in our capital markets, such as the structural flaw that grew in money market funds.

### B. The need to simplify our regulatory system

Everyone agrees that the existing system is fragmented and overly complex. We have too many regulators and too many regulatory gaps. No one agency has access to all the relevant information. Responsibility often is highly diffused. This problem could be relatively easy to fix but only if we have the political will to fix it.

### C. The need to regulate the mortgage business – including commercial mortgages – in its entirety

Many of the same gaps in regulation that helped lead us into this mess still exist today – for example, in the

mortgage business. Mortgages are the largest financial product in the United States, and while we do not want to squelch innovation, the entire mortgage business clearly needs to be regulated. This is not the first time that mortgages and real estate have led this country and many of its financial institutions into deep trouble. Proper regulation would go a long way toward standardizing products, testing new ones, improving customer disclosure and clarifying responsibility.

### D. The need to fix securitization

We believe that securitization still is a highly effective way to finance assets. But some securitizations, particularly mortgage securitizations, had an enormous flaw built into them: No one was responsible for the actual quality of the underwriting. Even mortgage servicing contracts were not standardized such that if something went wrong, the customer would get consistent resolution. We cannot rely on market discipline (i.e., eliminating bad practices) alone to fix this problem.

We have heard several reasonable suggestions on how the originator, packager and seller of securitizations could be appropriately incentivized to ensure good underwriting. For example, requiring the relevant parties to keep part of the securitizations, much like we do with syndicated loans today, would help manage resolution if something were to go wrong and could go a long way to re-establish market confidence and proper accountability.

### E. The need to fix Basel II — leading to higher capital ratios but a more stable system

As discussed earlier, Basel II has many flaws – it has taken too long to implement, it responds slowly to market changes and it is applied unevenly across global borders. Perhaps its worst failing is that, in its current construct, Basel II does not include liquidity, which allowed commercial and investment banks to buy liquid or illiquid assets and fund them short. While this practice did not appear quite so dangerous in benign times, it created huge issues for many financial institutions during the market crisis. Basel II also has relied too heavily on rating agencies and, by its nature, has been highly pro-cyclical in its capital

requirements for assets. It would be easy to make these capital requirements less pro-cyclical and require Basel II to recognize the risk of short-term funding, particularly that of wholesale funding. Finally, Basel II should be applied consistently, reviewed continuously and updated regularly. The world changes quickly.

### F. The need to get accounting under control

We at JPMorgan Chase are strong believers in good, conservative accounting. Accounting should always reflect true underlying economics, which actually is how we run the company. However, accounting practices are not widely understood, are changed too frequently and are too susceptible to interpretation and manipulation. Sometimes, they even inadvertently determine U.S. government policy.

#### *We generally like fair value accounting*

For assets that are bought and sold, fair value accounting creates the best discipline. Fair value accounting (often referred to as mark-to-market accounting) already provides for some flexibility if recent prices are under highly distressed conditions. In such cases, good judgment and sound fundamental cash flow-type evaluations can be employed to value certain assets. However, in our opinion, the application of fair value accounting for certain categories needs to be reconsidered. For example:

• We now have to mark to market our private equity investments by using potentially artificial benchmarks. These investments, by their nature, are very illiquid and are intentionally held for several years. To mark them to market, proxies made up of comparable companies are used, and appropriate discounts and judgments are applied. Essentially, we write these investments up when markets are good and write them down when markets are bad. But I am fairly confident that this approach is not always right. In many instances, cost is the best proxy for fair value. We would rather describe our investments to our shareholders, tell them when we think these investments might be worth more and, certainly, write them down on our financial statements when they have become impaired.

- A new mark-to-market rule addresses "debit valuation adjustments." Essentially, we now have to mark to market credit spreads on certain JPMorgan Chase bonds that we issue. For example, when bond spreads widen on JPMorgan Chase debt, we actually can book a gain. Of course, when these spreads narrow, we book a loss. The theory is interesting, but, in practice, it is absurd. Taken to the extreme, if a company is on its way to bankruptcy, it will be booking huge profits on its own outstanding debt, right up until it actually declares bankruptcy – at which point it doesn't matter.

- It is becoming increasingly more difficult to compare mark-to-market values of certain instruments across different companies. While it's too involved to go into detail here, different companies may account for similar mark-to-market assets differently. This needs to be addressed by ensuring that companies adhere to consistent valuation principles while applying the rules.

- Fair value accounting does not and should not apply to all assets. Investments or certain illiquid assets that are intended to be held for the longer term (like real estate or plant and equipment) or loans and certain assets that are shorter term (like receivables or inventory) all could actually be marked to market. There are, in fact, markets for some of these assets, and others could be calculated based on reasonable assumptions; for example, a farm would be worth more when corn prices go up, and a semiconductor plant would be worth less when semiconductor prices go down. However, if we marked these assets in this way, they would have wildly different prices depending on the health of the economy or the swings in prices for their output. While accounting should recognize the real impairment in the value of assets, marking the aforementioned assets to market every day would be a waste of time. Under this scenario, it would be quite hard for companies to invest in anything illiquid or to make long-term investments.

*New accounting rules that have the potential to inadvertently affect how the capital markets function or change fundamental long-term U.S. government policies should be made thoughtfully, deliberately and with broad input.*

For example, we all believe that companies should have fully funded pension plans; i.e., the actual assets in the plan should be enough to meet a fair estimate of the liabilities. Years ago, if this wasn't the case, companies were allowed to maintain a "deficit" and fund it over several years. That deficit was not recorded on the financial statement of the company.

A change in accounting rules dictated that the deficit should not just be a footnote in the financial statements but that it should be reflected directly in the equity account of the corporation. Clearly, in very bad markets, these deficits grow dramatically, thus depleting the increasingly precious capital that companies have. (This is just another example of a pro-cyclical force.) When companies realized they were getting enormous volatility in their capital account, they began to curtail or eliminate their pension plans in favor of 401(k) plans (where the individual bears all the investment risk). This was a rational, precautionary step. But it, in effect, transferred the risk from the company to the individual. No longer did the large corporations assume the risk of providing a steady income stream to retired employees. Instead, the risk was passed to the individuals – many of whom could not afford it.

This is a perfect example of how accounting inadvertently sets policy. And, in my opinion, this was probably the wrong policy for the country. There would have been many ways to be true to the economic purpose of accounting without making a detrimental policy change. There are countless other examples, and we hope regulators and accountants will eventually find better ways to apply accounting principles.

6. The need for appropriate counter-cyclical policies

During this crisis, it became evident that our system created enormous pro-cyclical tendencies. In fact, I can't think of one counter-cyclical policy at all (other than emergency actions taken by the government).

Accounting policies such as mark-to-market and loan loss reserving are pro-cyclical. Basel II capital requirements are pro-cyclical. Regulatory and legal requirements are pro-cyclical. Repo and short-term financing are pro-cyclical. The one pro-cyclical tendency we probably can never correct is that of the market itself (i.e., the cost of capital goes way up in a downturn or investors refuse to finance less liquid assets). I have heard many good ideas about how to create some counter-cyclical policies and will focus on three here.

*Loan loss reserving can easily be made counter-cyclical*

I find it absurd that loan loss reserves tend to be at their lowest point precisely when things are about to get worse. As things get worse and charge-offs rise dramatically, one must dramatically increase loan loss reserves, thus depleting capital rapidly. This problem would be solved if banks were allowed to estimate credit losses over the life of their loan portfolios. Reserves should be maintained to absorb those losses. This would enable banks to increase reserves when losses are low and utilize reserves when losses are high. Transparency would be fully preserved because investors and regulators would still see actual charge-offs and nonperformers. This would require a rational explanation about the appropriateness of the lifetime loss estimates. It also would have the positive effect of constantly reminding CEOs, management teams and investors that bad times, in fact, do happen – and that they should be prepared for such events.

*Repo and short-term financing can easily be made counter-cyclical*

All banks now have access to the standard financing facilities for securities and loans via the Federal Reserve (i.e., the Fed will lend a specific amount of money against specific assets). A suggestion is this: If an institution provides financing to clients in excess of what the Fed would lend to the bank for the same securities, it would have to be disclosed to risk committees and the company's Board of Directors. The Fed then would have two major tools to reduce leverage and in a way that is counter-cyclical – it could charge

higher capital costs to a bank when the bank is lending more than the Fed would lend or the Fed could reduce the amount it would lend to the banks. Market players would still be free to provide credit and leverage as they see fit.

*Banks should have the ability to implement counter-cyclical capital raising with rapid rights offerings*

Banks and possibly other companies would be aided by having the ability to effect rights offerings at a moment's notice. Regulations should facilitate such offerings – with the proper disclosure – in a matter of days rather than weeks. This would allow a company to raise capital and repair a balance sheet that might have been stretched by unanticipated market events and to do so in a manner that is fair and does not dilute the company's existing shareholder base.

## H. The need for policies in health care, pensions, energy and the environment, infrastructure and education that will serve us well over time

Beyond the financial crisis, there are several important issues that will dictate whether or not the United States will continue to thrive over the next century. We believe our nation can and should be able to provide health care coverage for all. It is the right thing to do, it will help us build a stronger nation, and, if done properly and efficiently, we believe it ultimately will be cheaper than the current course we are on. On energy, we now have experienced our third major crisis, and we, as a nation, still have not executed a sensible long-term energy policy. Again, we believe that done right, an energy policy could be economically efficient, create great innovation, reduce geopolitical tensions and improve our environment. Similarly, we need to improve our nation's infrastructure and develop an education system that befits our heritage.

We can't fall into the trap of institutional sclerosis – now is the time to act. In the past, this nation has shown the fortitude to work together to accomplish great things, and we need to do that again. For our part, we at JPMorgan Chase are doing everything we can to be helpful to our leaders on all these issues.

Your management team is deeply engaged and is acting with extreme caution in navigating these uncharted waters. The U.S. Treasury and the Federal Reserve have continued to take bold and dramatic action, as have central banks and governments around the world. In this next section, we will discuss some of the important issues for JPMorgan Chase.

## A. Our leadership in mortgage modifications and support for the administration's mortgage programs

JPMorgan Chase is at the forefront of foreclosure prevention and mortgage modifications nationally. Our foreclosure prevention efforts are intended to reach both the $300 billion of loans that we own and the $1.2 trillion of investor-owned loans that we service. We already have helped keep 330,000 borrowers in their homes and expect to help avert 650,000 foreclosures by the end of 2010. We are committed to keeping borrowers in their homes by making sustainable, properly written loan modifications, in many cases before a default occurs.

We believe it is in the best interests of both the homeowner and the mortgage-holder to take corrective action as soon as possible. Our re-default rates are half the rates that the OCC has said are experienced by national servicers. Re-default rates in the industry generally will come down once modifications are done with proper underwriting and as the economy and home prices start to improve. If re-default rates were extremely low, we probably should be doing more modifications.

We strongly support the Obama administration's mortgage modification program. The plan's features are aligned with the program we already had implemented, extending them to more struggling homeowners and providing us and other servicers with more options to keep families in their homes. We also support the program because the guidelines establish a clear, fair and consistent set of standards for all servicers to follow. It is intended for borrowers with mortgages below $729,750; and all borrowers must fully document their income, clearly demonstrate financial hardship and live in the home.

We believe these mortgage modifications are economically and morally the right thing to do and that the program underscores the importance of mutual respect – by treating others in the way that we would like to be treated in the same situation – while upholding the essential principle that individuals, businesses and corporations should repay their loans if they can afford to do so. In our view, its completeness eliminates the need for judicial modification in bankruptcy proceedings. However, if legislated, judicial modifications should be consistent with this plan and focus only on borrowers who either don't qualify or have not been offered a modification. Beyond that, it is time to quickly implement the mortgage modification program – even if it is not perfect in everyone's view – and to move on.

## B. Comments on the derivatives business

Derivatives have become an essential and widely used risk management tool. The International Swaps and Derivatives Association estimates that 90% of the Fortune 500, 50% of mid-sized companies and thousands of other, smaller U.S. companies use derivatives to manage certain risks, including currency and interest rate risk. As such, derivatives are a large business for JPMorgan Chase and for firms around the world. It is important to note that derivatives in and of themselves did not cause this crisis. In fact, derivatives have performed fairly well in this crisis environment. However, it is clear that derivatives, at least in financial reporting, are hard to understand, lack transparency and did contribute somewhat to the crisis. At JPMorgan Chase, we believe derivatives, when used properly, play an important role in managing risk, and we are trying to address the concerns about derivatives.

- We have been standard setters in bringing more transparency to our financial reporting and will continue to be. In this report, you will find extensive details on our counterparty exposures and other risk considerations that are central to understanding our derivatives and other trading businesses.

- Some of the concerns about derivatives have to do with the large notional amounts. But those figures are reference measurements and do not reflect actual

www.global-reports.com

counterparty credit risk. Actual risk is the mark-to-market value of the contract after taking into account netting of risk across all transactions with a counterparty, collateral and hedging. Actual risk projections also take into account the potential future exposure coming from market moves.

- Our counterparty exposures net of collateral and hedges are $133 billion, and the company manages those exposures name by name – like a hawk. The figure is large, but we get paid to take the risks, we reserve and account for them conservatively, and we manage them in conjunction with all of our other credit exposures.

- As the overall amount of counterparty credit risk has grown, so has the concern that this growth has increased systemic risk. To address this issue, we support the development of clearinghouses, which we believe will reduce the counterparty risk and increase transparency for standardized contracts. We already clear a significant portion of our interest rate and commodities derivatives through clearinghouses, and we have been active in the development of a clearinghouse for credit default swaps. Those derivatives that are too customized to be cleared can easily be monitored by regulators to ensure they do not cause systemic risk.

- AIG's downfall wasn't due to its use of derivatives per se but to its poor risk management practices. The insurer took concentrated risks through credit default swaps insuring mortgage-related assets. On the other side of the equation, some dealers bought this insurance from AIG without requiring them to post collateral until such time as their credit rating deteriorated. This is a case where bad risk management on the part of AIG was compounded by bad counterparty risk management by AIG's counterparties. The potential systemic impact was substantial. JPMorgan Chase did business with AIG, but, in line with our general policies, we kept our credit exposure relatively small so that our firm would not be compromised if AIG had been allowed to fail. With hindsight, the problem itself could have been better

contained and dramatically mitigated had AIG been properly regulated and required to provide collateral (to a clearinghouse or its counterparties).

- There are regulatory gaps that need serious attention, as was evident with AIG. A way to prevent a future AIG is by empowering a systemic risk regulator (as described earlier). Such a regulator would have been in a position to see the risk piling up and address it before the company failed.

- Recognizing upfront profits for derivative transactions can be problematic. Even though it is not standard accounting, we believe the profits relating to the risk positions associated with derivatives should be booked over the life of the transaction, proportionate to the risk remaining.

With proper management, systemic risks created by derivatives can be dramatically reduced without compromising the ability of companies to use them in managing their exposures.

## C. The reasons for maintaining a fortress balance sheet and cutting the dividend

Maintaining a fortress balance sheet will always be essential to us. Our Tier 1 ratio is 10.9%, with tangible common equity of $81 billion, and we will continue to increase our loan loss reserves, as appropriate. With $24 billion in allowance for credit losses at the end of 2008, we believe our loan loss reserves across all our businesses are among the strongest in the industry.

Out of an abundance of caution to be prepared for the future during this uncertain environment, we believed it was prudent to reduce our quarterly dividend from $0.38 to $0.05 per share, effective with our next scheduled dividend payment.

We did not take this action lightly, and we recognize our tremendous obligation to shareholders to seek to maintain dividend levels. But extraordinary times require extraordinary measures. So while our performance and capital are solid, we have an even higher obligation to ensure that our fortress balance sheet remains intact. This will enable us to stay flexible to

## Earnings per Share
(fully diluted)



## Return on Equity



(a) 2004 data are unaudited pro forma combined, reflecting the merger of JPMorgan Chase and Bank One

seize opportunities and continue to build and invest in our market-leading businesses, even in a highly stressed environment.

We maintain a long-term commitment to the dividend and still view a 30%-40% payout ratio of normalized earnings as ultimately reasonable. We will continue to review all relevant criteria to ensure the ongoing strength of our capital base and will await a more stable economic environment before increasing the dividend.

### D. Comments on TARP

While the decision to reduce our dividend was not directly related to accepting TARP, it does provide us with additional capital – about $5 billion per year – which could position us to repay TARP funds sooner than otherwise would have been possible. We, of course, would do this in consultation with our regulators.

Many people would like us to repay the TARP funds as soon as we can; some are angry over the changing government conditions relating to the acceptance of TARP funds; and some would like to see swift repayment as a matter of principle.

The reason we accepted TARP still stands – we believed it was in the best interests of the United States and the banking system overall. We will not react capriciously or out of anger in determining when to repay the TARP funds. We will repay them only if doing so is consistent with the best interests of our country and our company.

### E. The impact of a deep recession, and the government's stress test

We have been forthright and consistent in letting our shareholders know that a recession will impact our financial results, a severe recession even more so. And that's if we do everything right. Last year, we noted that the recession would have a significant impact on credit and that in a difficult environment, "credit losses could rise significantly, by as much as $5 billion over time, which would require increases in loan loss reserves." Managed net charge-offs were $13 billion in 2008, up from $7 billion in 2007. Our current view is that 2009 charge-offs will be even higher.

The recession will ripple through and affect all of our consumer and commercial credit exposures – some worse than others. In addition to higher charge-offs, it will require substantial additions to reserves, which we have increased from $10 billion at the end of 2007 to $24 billion at the end of 2008. We already said last year how bad we thought mortgage and home equity losses might get, and, unfortunately, they have become even worse. The severity of this recession also could have a dramatic impact on credit card losses; we now expect a 9% unemployment rate to lead to charge-offs of higher than 9%. (In the past, we would expect unemployment of 9% to lead to charge-offs of 7% or more. Now, however, we believe that the combined effect of unemployment with the major housing down-turn will lead to a higher charge-off rate.)

The Treasury, in conjunction with the OCC, FDIC and Federal Reserve, has launched a stress test program to ensure that the 19 largest banks (those with more than

www.global-reports.com

$100 billion in assets) have the capacity to remain properly capitalized in a highly stressed environment. The government's adverse economic environment envisions a two-year recession, where unemployment reaches 10.4% and the housing price index declines 48% from peak to trough. While some banks may need additional capital or support, a successful completion of the stress test program should eliminate the need to guess which banks are properly capitalized and which are not. In the best case, it will affirm the banks' capital, accounting and reserve ratios, which will remove uncertainty in the marketplace and increase financial stability. (Unfortunately, the announcement of the stress test, which is expected to be presented in late April, is causing enormous consternation in the markets that would have been better to avoid.)

We regularly do stress tests for our company, always projecting forward our capital and liquidity. We think our capital ratios will maintain their extremely strong levels throughout the government's "adverse economic environment."

You also should know that your company will be prepared for an environment even worse than the one just described.

## F. Recent government actions and the potential power of concerted efforts

Governments around the world have taken dramatic actions during this crisis. The Federal Reserve and Treasury of the United States have provided $5 trillion of liquidity facilities to finance various types of assets and – to stabilize individual companies and the overall system – have guaranteed almost $1 trillion of assets on the balance sheets of certain institutions and injected $1 trillion of capital into the financial system. In addition, the government is trying to reduce the mortgage rate by buying mortgages, making it easier to refinance; reducing consumer payments; and aggressively pushing mortgage modification programs. We believe the recent Term Asset-Backed Securities Loan Facility, or TALF program, which allows private investors to get non-

recourse financing on asset-backed securities, will aid the securitization markets. This program eventually may lend up to $1 trillion to finance new securitized loans. It can also be modified and extended as appropriate. It should be noted that many of the government's programs are not only replacing bank lending but are also filling the gaps left by many of the nonbank lenders in the capital markets.

We know that these government actions will have unintended consequences and can lead to political interference and that we will need to remove these forms of support over time, intelligently. All these concerns add to our worries, particularly about potential future inflation, but we'll reserve such a discussion for another time.

There is no silver bullet: We believe that all of these actions, if implemented properly and executed – in a timely way and in conjunction with the U.S. fiscal stimulus program – could have an enormous positive impact. The sum of the parts can be a lot more powerful than each individual action.

We see that the largest global economic downturn is being met with massive global government actions – and while the specific outcome is uncertain, there is good reason to think that the governments will eventually win.

This country has had its defining moments: the Civil War; the Great Depression; World War II. This may also be one of them. President Abraham Lincoln said, "A house divided against itself cannot stand." Just as our military acts in concert – across the Army, Navy, Air Force and Marines, under one commander in-chief – now, so too, should we. This means coordination across the House and Senate, Democrats and Republicans. If we rise to the challenge now, *we will prevail.*

Looking back at last year, I continue to reflect on how proud I am of the people in this company. It often is in the toughest of times that one learns what people are really made of. Our employees worked harder than ever and performed admirably for the company, for our clients and even for our country under enormously challenging conditions. Throughout the unexpected events and incredible pressure of 2008, it was hard not to be impressed by the intellect, work ethic and strength of character of the individuals at this firm.

I know many Americans are concerned about compensation practices across the financial services industry, and many of the concerns are quite legitimate. At JPMorgan Chase, we believe we have been at the forefront of sensible compensation practices. Our process is disciplined and rigorous, and we have always sought to reward the long-term performance of our employees. Our practices reflect this:

- We pay our people for performing well over multiple years and for helping to build a company with long-term, sustainable performance.

- In looking at performance, we always try to properly account for risk being taken. We are also mindful that a rising tide lifts all boats, and we do not want to pay people on that basis.

- Performance to us has never been simply a financial measure. It has always included the broader contribution a person brings to a company, such as maintaining integrity and compliance; recruiting and training a diverse, outstanding workforce; and building better systems and innovation.

- We have had in place a bonus recoupment policy beyond that required by Sarbanes-Oxley.

- We don't have: change-of-control agreements, special executive retirement plans, golden parachutes, special severance packages for senior executives or merger bonuses.

- We have always paid a significant percentage of our incentive compensation in stock, approximately 50% for our senior management team. That stock vests over multiple years.

- Our senior management team generally must retain and hold approximately 75% of all stock ever received from the company.

There are a lot of legitimate complaints about compensation – not just at financial firms but at all types of companies. Good companies know that compensation can cause bad incentives. They know there is no magic to a calendar year and that they must be careful not to pay people too much in a current year – due to either exuberance or real market pressures. Compensation is one of the most complex issues we deal with because it is important to the individuals and the company. Improperly done, it can destroy a company. We strive mightily to hire, train and retain the best talent – smart, ethical, hard-working, entrepreneurial individuals – and getting compensation right is a critical part of this process.

www.global-reports.com

We believe we have a deep responsibility to you, our shareholders, and to our creditors, our clients and all our employees. We work incredibly hard to uphold all our obligations every day.

*Our commitment to corporate citizenship*

We have always been deeply committed to being good corporate citizens. It is an essential part of what we do – and who we are – as a firm. As such, we have intensified our corporate responsibility efforts, directing resources to make a meaningful difference to the people who live and work in the communities in which we operate.

While some may think of us as a Wall Street firm, we also are very much a part of Main Street: We employ 225,000 people worldwide in 48 U.S. states and more than 60 countries. Our 5,000 branches serve customers in 23 states. We provide health care coverage for 400,000 people. On average, we pay more than $10 billion a year in taxes to the U.S. government, as well as to state and local jurisdictions.

Last year alone, our firm and our Foundation made charitable contributions of approximately $100 million in our markets across the United States. And over the past five years, we have given more than $600 million to 13,500 organizations globally. These tremendously important investments help inner-city young adults get jobs, fund educational programs, build affordable housing and support rebuilding efforts after a tsunami, earthquake or hurricane hits one of our global communities. Our people are devoted to the communities they serve – and, in a mutually beneficial relationship, we thrive when those communities are healthy, secure and prosperous.

*The Way Forward: Stepping up our game*

We strive to help our clients and our customers in every way – and especially during these difficult times. This overall effort, part of an initiative called The Way Forward, represents our commitment to the actions we have taken and are willing to take to move America and the global economy forward.

Throughout our history, we have always believed that our obligation extends beyond simply serving shareholders, clients and employees. For us, public service means working with government officials, in a nonpartisan way, to fully identify, analyze and overcome our problems. We believe the right solutions come only when we participate in a constructive dialogue, get beyond the words, "It's not politically feasible," and take bold steps.

*Ensuring the health and vibrancy of this company for the next 200 years is paramount*

The real measure of strength for a country – or a company – is not whether we have problems but how we learn from them, overcome them and emerge better for it. For more than 200 years, the world has turned to JPMorgan Chase in times of difficulty and turmoil, counting on our people to support our country, our clients and our communities around the world. We feel that obligation more intensely than ever and are focused on doing everything in our power to make sure this company remains strong, healthy and vibrant so that it can continue to do what it does best for the next 200 years.

Jamie Dimon
Chairman and Chief Executive Officer

March 23, 2009