# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------ x
*In re*                                                            : Chapter 11
                                                                   :
WASHINGTON MUTUAL, INC., *et al.*,                                 : Case No. 08-12229 (MFW)
                                                                   :
    Debtors.                                   : Jointly Administered
------------------------------------------------------------------ :
Black Horse Capital LP, Black Horse Capital Master Fund Ltd.,    x
Black Horse Capital (QP) LP, Greywolf Capital Partners II,         :
Greywolf Overseas Fund, Guggenheim Portfolio Company VII,          :
LLC, HFR RVA Combined Master Trust, IAM Mini-Fund 14               :
Limited, LMA SPC for and on behalf of the MAP 89 Segregated        :
Portfolio, Lonestar Partners LP, Mariner LDC, Nisswa               :
Convertibles Master Fund Ltd., Nisswa Fixed Income Master          :
Fund Ltd., Nisswa Master Fund Ltd., Paige Opportunity Partners     :
LP, Paige Opportunity Partners Master Fund, Pandora Select         : Adv. No. 10-51387 (MFW)
Partners, LP, Pines Edge Value Investors Ltd., Riva Ridge          :
Capital Management LP, Riva Ridge Master Fund, Ltd., Scoggin       :
Capital Management II LLC, Scoggin International Fund Ltd.,        :
Scoggin Worldwide Fund Ltd., Visium Global Fund, Ltd., VR          :
Global Partners, L.P., Whitebox Asymmetric Partners LP,            :
Whitebox Combined Partners, LP, Whitebox Convertible               :
Arbitrage Partners, LP, Whitebox Hedged High Yield Partners,       :
LP and Whitebox Special Opportunities LP, Series B,                :
                                                                   :
    Plaintiffs,                                :
                                                                   :
    v.                                         :
                                                                   :
JPMorgan Chase Bank, N.A., JPMorgan Chase & Co.,                   :
Washington Mutual, Inc., Washington Mutual Preferred               :
Funding, LLC, Washington Mutual Preferred Funding (Cayman)         :
I Ltd., Washington Mutual Preferred Funding Trust I,               :
Washington Mutual Preferred Funding Trust II, Washington           :
Mutual Preferred Funding Trust III and Washington Mutual           :
Preferred Funding Trust IV,                                        :
                                                                   :
    Defendants.                                :
------------------------------------------------------------------ x

# DEFENDANTS WASHINGTON MUTUAL, INC. AND JPMORGAN CHASE BANK, N.A.'S JOINT MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND ANSWERS TO INTERROGATORIES

Pursuant to Rules 26(b), 34 and 37(a) of the Federal Rules of Civil Procedure, as incorporated into this adversary proceeding by Rules 7026, 7034 and 7037 of the Federal Rules of Bankruptcy Procedure, defendants Washington Mutual, Inc. ("WMI") and JPMorgan Chase Bank, National Association ("JPMC," and collectively with WMI, "Defendants") hereby move to compel the Plaintiffs to produce documents responsive to, and answer interrogatories included in, *Defendants' Combined First Sets of Requests for the Production of Documents and Interrogatories* (the "Discovery Request"), a copy of which is attached as Exhibit A to the accompanying Certification of Counsel, and respectfully represent:

## PRELIMINARY STATEMENT

1. Plaintiffs in this adversary proceeding (the "Adversary Proceeding") are holders of WMI preferred equity. By this action, Plaintiffs are asking this Court to convert them into Trust Preferred Securities holders by erasing a transaction that took place two years ago, as part of their ongoing effort to seek a preference over other shareholders and creditors. Although this is a lawsuit brought by them, seeking a special benefit to them, in discovery Plaintiffs have refused to divulge meaningful information, ranging from evidence as mundane (but important) as the identities of their corporate affiliates, to evidence that would establish that they have no good reason to bring this action at all. At base, Plaintiffs ask this Court to award them a $1.1 billion windfall in Trust Preferred Securities, despite the fully disclosed September 2008 automatic exchange of these Trust Preferred Securities for interests in WMI preferred stock (the "Automatic Exchange")—because, according to Plaintiffs, WMI and its chief federal regulator colluded to defraud the holders of Trust Preferred Securities by concealing the nature and

likelihood of an Automatic Exchange, as well as WMI's intended use of the Trust Preferred Securities following the Automatic Exchange.

2. Defendants will establish that Plaintiffs' claims have no merit. In support of this, Defendants need access to discovery, including discovery of critical information that goes to the heart of Plaintiffs' fraud allegations and claim to title. Defendants submitted narrowly tailored requests for the production of documents and interrogatories to achieve this. Most crucially here, Defendants seek production of documents that relate directly to:

- *Plaintiffs' reliance on the information they claim was fraudulent.* Plaintiffs' awareness of the Automatic Exchange, the placement of Washington Mutual Bank ("WMB") into receivership, and the nature and value of the interests they purchased—as shown through their own analyses, the investment advice on which they relied, and their due diligence—goes to the heart of their actual and reasonable reliance on any alleged fraud and to their awareness of facts they claim were hidden. (*See* Certification of Counsel ("Certification") Ex. A, Requests Nos. 3, 4, 5, 6, 15, 16, 17(a), 17(c), and 18, Interrogatories Nos. 3 and 4.)

- *The equity of awarding Plaintiffs a $1.1 billion windfall.* Plaintiffs' awareness of the Automatic Exchange, their motives in purchasing their interests, their sophistication as investors, and the timing, pricing, and accounting treatment for those purchases are all critical pieces of information that relate directly to the equity of granting Plaintiffs a $1.1 billion preference over creditors and other equity holders—in some cases awarding them *100 times* their purchase price—and indeed to whether Plaintiffs commenced this action in good faith. (*See id.* Requests Nos. 3, 4, 5, 6, 15, 16, 17(a), 17(c), and 18, Interrogatories Nos. 3 and 4.)

3. Plaintiffs have refused to respond to these document requests and interrogatories, asserting that only the conduct of WMI and the Office of Thrift Supervision (the "OTS") is relevant. But that is not the law—Plaintiffs cannot conceal the state of their knowledge of the events of which they complain. These Plaintiffs are hedge funds and arbitrageurs that bought their purported interests in the securities at issue here for pennies on the dollar—or in some instances, a *single* penny on the dollar—many with full knowledge of the purportedly undisclosed events that, they assert, give rise to the special remedy they seek. Many of the Plaintiffs purchased their interests *after* the Automatic Exchange occurred, even *after* filing this

action. Yet Plaintiffs now assert that their own conduct and their own understanding of the Automatic Exchange and of other events at issue are irrelevant and undiscoverable.

4. As Defendants will prove, the Automatic Exchange was fully disclosed; if Plaintiffs hope to unwind the effect of that Exchange to the tune of a $1.1 billion preference because they did not know or understand something, Defendants have a right to know what they knew or understood. Defendants therefore respectfully request the Court to compel Plaintiffs' production of documents responsive to their Requests 3, 4, 5, 6, 15, 16, 17(a), 17(c), and 18, and complete answers to Interrogatories 3 and 4.[1]

## BACKGROUND

5. The Trust Preferred Securities were issued by Washington Mutual affiliates in a campaign to raise core capital for WMB over the course of 2006 and 2007, and each included a feature called the "Conditional Exchange" or "Automatic Exchange," whereby the Trust Preferred Securities were to be automatically exchanged for interests in WMI preferred stock if the OTS so directed upon certain events related to WMB's financial health, including its being placed into receivership. (Ex. E to JPMC Answer (D.I. 61), WMPF IV Offering Circular, p. 15.)

6. The controlling documents allowed, but did not require, the issuing entities to redeem the securities at a stated liquidation value. (*See* Ex. E to JPMC Answer, WMPF IV Offering Circular, pp. 20-21.) These documents extensively disclosed the risk that, if WMB were placed into a receivership, the resulting Automatic Exchange would leave the Trust Preferred Securities holders with Depositary Shares in WMI preferred stock—which in such a situation would be *worth little to nothing*. (*Id.* at 30 (following a Conditional Exchange,

---

[1] The Defendants reserve their rights to pursue responses on other requests at a later date but have limited their Motion to these enumerated requests. The Defendants desire to obtain these most critical documents and information sufficiently before depositions commence.

investors "would likely receive, *if anything*, substantially less than they would have received had the Conditional Exchange not occurred") (emphasis added).) On September 25, 2008, the OTS directed the Automatic Exchange, and the next morning, WMI announced its occurrence in a press release. (JPMC Answer, ¶ 72; WMI Answer, ¶ 72 (D.I. 60).)

7. Plaintiffs are thirty investment funds that claim to have purchased interests in Trust Preferred Securities. (Complaint, ¶¶ 8-37 (D.I. 1).) But those that purchased their interests before September 25, 2008 are simply WMI Preferred Stockholders seeking special treatment following the Automatic Exchange of all the Trust Preferred Securities for WMI preferred equity. And those that purchased after September 25, 2008 are likewise only purchasers of WMI preferred equity, since, at that time, no Trust Preferred Securities were available for purchase due to the Automatic Exchange. (JPMC Answer, ¶ 1; WMI Answer, pp. 1-4.)

8. Plaintiffs commenced this Adversary Proceeding on July 7, 2010—almost two years after the Automatic Exchange took place, and after WMI and JPMC had litigated the ultimate result of the Automatic Exchange for nearly as long—claiming that the Automatic Exchange never occurred in the first place and requesting a declaration that Plaintiffs own certain of the Trust Preferred Securities. In their joint verified statement of July 26, 2010, filed pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure, Plaintiffs claim to hold approximately $1.1 billion of Trust Preferred Securities. (Certification Ex. C, ¶ 4.) Plaintiffs admit that they paid as little as 1¢ on the dollar for their interests (*i.e.*, with a maximum price of 67.5¢ specified in the 2019 statement, they bought at a discount of between 32.5% and 99%) over a period from November 26, 2007, to July 22, 2010—notably, *after* the filing of their Complaint. (*Id.* ¶ 5.)

9. On August 27, 2010, the Defendants served the instant Discovery Request on Plaintiffs, consisting of 22 requests for the production of documents and 7 interrogatories. On September 29, 2010, Plaintiffs responded, offering to produce subsets of documents responsive to four requests and giving *de minimis* answers to three interrogatories. (*See* Certification Ex. B, Black Horse Responses and Objections.[2]) Plaintiffs objected to nearly all the requests as "overly broad" and "unduly burdensome," or claimed that the requests were only made to "harass," "annoy," or "oppress" Plaintiffs. For example, Plaintiffs refused even to give their date of incorporation or identify their subsidiaries and affiliates, "on the grounds that [the request] is overly broad and not reasonably calculated to lead to the discovery of admissible evidence." (Certification Ex. B, p. 23, Answer No. 1.)

10. Critically, Plaintiffs categorically refuse to produce documents in response to Requests 4, 5, 6, 15, 16, 17(a), 17(c), and 18, refuse to respond fully to Request 3, and refuse to answer fully Interrogatories 3 and 4—which as explained below relate directly to Plaintiffs' knowledge and understanding of the allegedly fraudulent events and of the interests they purchased—"on the grounds that [these requests] [are] overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence." (*E.g.*, Certification Ex. B, p. 11, Answer No. 4.) During a meet-and-confer teleconference on September 29, 2010, Plaintiffs reiterated their refusal, asserting that "reliance isn't even a key issue" (Certification ¶ 2)—this despite the repeated allegations of fraud, misrepresentation, and aiding and abetting fraud throughout their Complaint, including in counts that have not been stayed.

---

[2] The ten different sets of Responses and Objections Plaintiffs submitted are substantially identical in the scope and extent of their responses; Exhibit B is representative of the other responses.

## ARGUMENT

11. Plaintiffs' knowledge and understanding of the alleged fraud *is* a key issue. Counts IV-VI of the Complaint, which have not been stayed, turn on Plaintiffs' allegations that WMI committed a fraud in selling the Trust Preferred Securities, that the OTS—WMI's primary federal regulator—aided and abetted that fraud, and that JPMC knew of the fraud when it purchased WMB's assets. (Complaint ¶¶ 229-258.) It is hornbook law that reliance is an essential element of fraud and that actual knowledge of the alleged fraud *defeats* any claim of fraud, and so it is immediately clear that Plaintiffs face serious challenges in establishing this element.

12. Likewise, where, as here, Plaintiffs are seeking an equitable remedy—to be awarded title they do not hold and to unwind a transaction that already took place—Plaintiffs' knowledge will be key evidence regarding whether they have "clean hands," including whether the hedge funds that bought at bankruptcy-distress prices got exactly the benefit of their bargain. For example, if the Plaintiffs purchased interests that they knew to be WMI preferred equity, fully aware of the Automatic Exchange and the other events described in their Complaint, but planning at the time to claim that a fraud had been perpetrated on them and other investors, that knowledge would be relevant to, if not dispositive of, their title claims and their eligibility for a $1.1 billion windfall at the expense of the bankruptcy estate.

13. Rule 26 of the Federal Rules of Civil Procedure, incorporated into this Adversary Proceeding by Fed. Bankr. R. Pro. 7026, allows discovery of relevant information if it "appears reasonably calculated to lead to the discovery of admissible information." *See* Fed. R. Civ. Pro. 26(b)(1). "It is well recognized that the federal rules allow broad and liberal discovery." *Pacitti v. Macy's*, 193 F.3d 766, 777 (3d Cir. 1999). "For purposes of discovery, relevancy is broadly

construed," *Inventio AG v. Thyssenkrupp Elevator Americas Corp.*, 662 F. Supp. 2d 375, 380 (D. Del. 2009), and is even more expansive than the definition in the Federal Rules of Evidence, *United States v. Dentsply, Inc.*, No. Civ.A. 99-5 MMS, 2000 WL 654286, at *5 n.9 (D. Del. May 10, 2000). For these reasons, "discovery should ordinarily be allowed under the concept of relevancy unless it is clear that the information sought *can have no possible bearing* upon the subject matter of the action." *Id.* at *4 (emphasis added).

14. Defendants' requested discovery more than satisfies this standard—indeed, it is potentially dispositive of the proceeding. Actual and justifiable reliance is an essential element of any fraud claim. *See CFJ Assocs. of N.Y., Inc. v. Hanson Indus.*, 274 A.D.2d 892, 894 (N.Y. App. Div. 2000). "Plaintiff must show not only that he actually relied on the misrepresentations, but also that such reliance was reasonable." *Stuart Silver Assocs. v. Baco Dev. Corp.*, 245 A.D.2d 96, 99 (N.Y. App. Div.1997).[3] It is impossible to believe that Plaintiffs relied on "fraudulently concealed" information about the nature and likelihood of an Automatic Exchange years *after* that Exchange happened. It is equally impossible to establish reasonable reliance if Plaintiffs understood, or should have understood, the facts and circumstances allegedly concealed, whether from their own analyses, outside investment advice, or diligence, or from the massive quantities of public information available regarding the collapse of the housing market, the receivership of WMB, and the sale of certain WMB assets and liabilities to JPMC.

15. Even setting fraud aside, the timing and price of Plaintiffs' purchases and their knowledge and belief regarding the allegedly fraudulent events at the time of those purchases go straight to the heart of their eligibility for equitable relief. Apparently, the earliest any Plaintiff

---

[3] Whether New York, Delaware, or Washington law governs Plaintiffs' fraud claims, reasonable reliance is, of course, an essential element of any fraud claim. *See, e.g., DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 958 (Del. 2005); *Guarino v. Interactive Objects, Inc.*, 122 Wash. App. 95, 126 (2004).

bought its interest was November 26, 2007—weeks after WMI reported major third-quarter write-downs and the New York Attorney General announced its investigation into mortgage practices[4]—and the highest price that any Plaintiff paid was a 32.5% discount from the securities' liquidation value. (Certification Ex. C, ¶¶ 4, 5.) Some of the Plaintiffs—though they have so far refused to disclose which—paid just *one penny* on the dollar. (*Id.* at ¶ 5.)

16.  In other words, *all* Plaintiffs bought their interests during or after the subprime mortgage crisis and at distressed prices. And some Plaintiffs purchased *after* the Automatic Exchange, *after* the press reports and Congressional hearings about lending practices, and even *after* the filing of the Complaint that detailed at length how Plaintiffs had been deceived.

17.  Defendants' Document Requests 3, 4, 5, 6, 15, 16, 17(a), 17(c), and 18 and Interrogatories 3 and 4 all are reasonably calculated to lead to the discovery of evidence as to Plaintiffs' knowledge of the allegedly fraudulent events described in the Plaintiffs' Complaint and as to their eligibility for the equitable relief they seek from this Court. These requests and interrogatories seek, *inter alia*:

- Documents concerning any purchase, sale, acquisition or other transfer of Trust Preferred Securities by any Plaintiff (Certification Ex. A, Request No. 3.);

- Documents concerning Plaintiffs' "due diligence, investigation, assessment or evaluation" of the securities (*id.* Request No. 4.);

- Documents Plaintiffs considered or reviewed in analyzing the value of the Trust Preferred Securities (*id.* Request No. 5);

- Plaintiffs' investment advisory agreements relating to or affecting their purported purchases of the Trust Preferred Securities (*id.* Request No. 6);

---

[4]  *See* Bill Virgin, "Washington Mutual Stock Falls below $20 a Share: Analysts Cut WaMu Earnings Estimates: Reaction Follows Warning of Weaker Housing Market," *The Seattle Post-Intelligencer*, at E1 (Nov. 9, 2007); Matthias Rieker, "Banks Pummeled on Credit Concerns," *American Banker*, Vol. 172, No. 216, at 19 (Nov. 8, 2007).

- Documents concerning the policies and criteria governing Plaintiffs' investment decisions in the Trust Preferred Securities or in other securities featuring an Automatic Exchange provision (*id.* Request Nos. 15-16);

- Plaintiffs' quarter-end portfolio holdings in, and their hedging activities regarding, the Trust Preferred Securities (*id.* Request No. 17(a), (c));

- Agreements or understandings into which Plaintiffs have entered regarding the Trust Preferred Securities (*id.* Request No. 18);

- Plaintiffs' reasons for buying their purported interests in Trust Preferred Securities (*id.* Interrogatory No. 3); and

- The identity of persons and entities, including investment advisors, who were involved in Plaintiffs' purported purchase of Trust Preferred Securities (*id.* Interrogatory No. 4).

18. Defendants expect to learn from these requests when and for what price each Plaintiff purchased these interests, who advised Plaintiffs on their purchases, what information Plaintiffs considered in determining to purchase these interests, and what knowledge or understanding each Plaintiff had regarding the value of these interests and the events described in Plaintiffs' Complaint at the time each Plaintiff decided to purchase these interests.

# CONCLUSION

19. For the foregoing reasons, the Defendants respectfully request the Court to enter an order similar to the Proposed Order attached herein, to compel Plaintiffs' production of documents in response to Requests 3, 4, 5, 6, 15, 16, 17(a), 17(c), and 18, and to answer fully Interrogatories 3 and 4.

Dated: Wilmington, Delaware
October 1, 2010

| | |
|---|---|
| _/s/ Chun I. Jang_ | _/s/ Matthew B. McGuire_ |
| Mark D. Collins (No. 2981) | Adam G. Landis (I.D. 3407) |
| Chun I. Jang (No. 4790) | Matthew B. McGuire (I.D. 4366) |
| RICHARDS, LAYTON & FINGER, P.A. | LANDIS RATH & COBB LLP |
| One Rodney Square | 919 Market Street Suite 1800 |
| 920 North King Street | Wilmington, Delaware 19801 |
| Wilmington, Delaware 19801 | Telephone: (302) 467-4400 |
| Telephone: (302) 651-7700 | Facsimile: (302) 467-4450 |
| Facsimile: (302) 651-7701 | |
| | – and – |
| – and – | |
| | Robert A. Sacks |
| Marcia L. Goldstein | Stacey R. Friedman |
| Brian S. Rosen | Brent J. McIntosh |
| WEIL, GOTSHAL & MANGES LLP | SULLIVAN & CROMWELL LLP |
| 767 Fifth Avenue | 125 Broad Street |
| New York, New York 10153 | New York, New York 10004 |
| Telephone: (212) 310-8000 | Telephone: (212) 558-4000 |
| Facsimile: (212) 310-8007 | Facsimile: (212) 558-3588 |
| | |
| _Attorneys for Washington Mutual, Inc._ | _Attorneys for JPMorgan Chase Bank, N.A._ |