# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| WASHINGTON MUTUAL, INC., et al., | : | Case No. 08-12229 (MFW) |
| | : | |
| Debtors | : | Jointly Administered |

| | | |
|---|---|---|
| Black Horse Capital LP, Black Horse Capital Master Fund Ltd., Black Horse Capital (QP) LP, Greywolf Capital Partners II, Greywolf Overseas Fund, Guggenheim Portfolio Company VII, LLC, HFR RVA Combined Master Trust, IAM Mini-Fund 14 Limited, LMA SPC for and on behalf of the MAP 89 Segregated Portfolio, Lonestar Partners LP, Mariner LDC, Nisswa Convertibles Master Fund Ltd., Nisswa Fixed Income Master Fund Ltd., Nisswa Master Fund Ltd., Paige Opportunity Partners LP, Paige Opportunity Partners Master Fund, Pandora Select Partners, LP, Pines Edge Value Investors Ltd, Riva Ridge Capital Management LP, Riva Ridge Master Fund, Ltd., Scoggin Capital Management II LLC, Scoggin International Fund Ltd., Scoggin Worldwide Fund Ltd., Visium Global Fund, Ltd., VR Global Partners, L.P. Whitebox Asymmetric Partners LP, Whitebox Combined Partners, LP, Whitebox Convertible Arbitrage Partners, LP, Whitebox Hedged High Yield Partners, LP and Whitebox Special Opportunities LP, Series B, | : | Adversary Proceeding No. 10-51387 (MFW) |
| Plaintiffs | : | |
| v. | : | |
| JPMorgan Chase Bank, N.A., Washington Mutual, Inc., Washington Mutual Preferred Funding, LLC, Washington Mutual Preferred Funding (Cayman) I Ltd., Washington Mutual Preferred Funding Trust I, Washington Mutual Preferred Funding Trust II, Washington Mutual Preferred Funding Trust III, Washington Mutual Preferred Funding Trust IV | : | |
| Defendants. | : | |

# NOTICE OF DEPOSITION OF WASHINGTON MUTUAL INC. BY RULE 30(b)(6) REPRESENTATIVE

TO: Washington Mutual Inc.
c/o Brian Rosen
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Federal Rules of Civil Procedure and Rules 7030 and 9014 of the Federal Rules of Bankruptcy Procedure, the Plaintiffs in the above-captioned adversary proceeding, by and through their undersigned attorneys, will take the deposition of a designated representative of Washington Mutual, Inc pursuant to Fed. R. Civ. P. 30(b)(6). Fed. R. Civ. P. 30(b)(6) requires the deponent to designate one or more officers, directors, managing agents or other persons with the most particularized knowledge as to the matters listed on Schedule A, Topics Of Inquiry. The deposition will take place on **November 10, 2010, at 10 a.m.** at the offices of **Campbell & Levine LLC, 800 North King Street, Suite 300, Wilmington, DE 19801** and will continue from day to day thereafter until complete. The deposition will be taken before an authorized court reporter or other officer authorized by law to administer oaths and will be recorded by stenographic means. The deposition will be taken according to the Federal Rules of Bankruptcy Procedure for the purpose of discovery, use as evidence at any hearing or trial, or any other purpose allowed by law.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Dated: Wilmington, Delaware
October 12, 2010

**CAMPBELL & LEVINE LLC**

*/s/ Kathleen Campbell Davis*
Marla Rosoff Eskin, Esq. (DE 2989)
Bernard G. Conaway, Esq. (DE 2856)
Kathleen Campbell Davis, Esq. (DE 4229)
800 North King Street, Suite 300
Wilmington, DE 19809
(302) 426-1900
(302) 426-9947 (fax)

– and –

**BROWN RUDNICK LLP**
Robert J. Stark, Esq.
Sigmund Wissner-Gross, Esq.
Seven Times Square
New York, NY 10036
(212) 209-4800
(212) 209-4801 (fax)

– and –

Jeremy B. Coffey, Esq.
James W. Stoll, Esq.
Daniel J. Brown, Esq.
One Financial Center
Boston, MA 02111
(617) 856-8200
(617) 856-8201 (fax)

*Counsel to Plaintiffs*

# SCHEDULE A – TOPICS OF INQUIRY

## I. DEFINITIONS

1. The words "and" and "or" are to be construed both conjunctively and disjunctively. The singular form of a noun or pronoun includes the plural form and vice versa. The word "all" shall also include "each of," and vice versa.

2. "Communication" means any oral or written utterance, notation, or statement of any nature whatsoever between or among two or more persons, by or to whomsoever made, and including, without limitation, correspondence, documents, conversations, dialogues, discussions, e-mails, interviews, consultations, agreements, and other understandings.

3. As used herein, the term "Disclosure Statement" shall mean the Disclosure Statement for the Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, filed on or about July 1, 2010 in the Debtors' Chapter 11 cases, including any prior or subsequent versions of the Disclosure Statement.

4. "Document" means any printed, written, typed, recorded, transcribed, taped, photographic, or graphic matter, however produced or reproduced, including but not limited to: any letter, correspondence, or communication of any sort; film, print or negative of photograph; sound recording, video recording; note, notebook, diary, calendar, minutes, memorandum, contract, agreement, or any amendment thereto; telex, telegram, cable; summary, report or record of telephone conversation, voice mail or voice mail back-up, personal conversation, discussion, interview, meeting, conference, investigation, negotiation, act or activity; projection, work paper, or draft; computer or computer network output or input, hard or floppy disc, electronic mail, magnetic and/or optical medias, archived or back up data on any of these medias, and documents that have been deleted but are recoverable from any of these medias; opinion or report of consultant; request, order, invoice or bill of lading; analysis, diagram, map, index, sketch, drawing, plan, chart, manual, brochure, pamphlet, advertisement, circular, newspaper or magazine clipping, press release; receipt, journal, ledger, schedule, bill, or voucher; financial statement, statement of account, bank statement, checkbook, stubs, or register, canceled check, deposit slip, charge slip, tax return (income or other), requisition; file, study, graph, tabulation, and any and all other writings and recordings of whatever nature, whether signed or unsigned or transcribed, and any other data compilation from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonably usable form.

5. As used herein, the term "Global Settlement Agreement" shall mean the Proposed Global Settlement Agreement or the Global Settlement Agreement, each as defined in any version of the Disclosure Statement and/or Plan.

6. As used herein, the term "Person" means any natural person or any business, legal, or governmental entity or association.

7. As used herein, the term "Plan" means the Fifth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, filed on or about July 1, 2010 in the Debtors' Chapter 11 cases, including any prior or subsequent versions of the Plan.

8. "Referring to," "relating to," "evidencing" or "constituting" mean containing, comprising, embodying, mentioning, indicating, supporting, proving, showing, relating, or referring in any way, in whole or in part, including, but not limited to documents underlying, supporting, currently or previously attached or appended to, or used in the preparation of any document called for by the request.

9. As used herein, the term "Settlement Parties" means those signatories to the Global Settlement Agreement.

10. As used herein, the term "Trust Preferred Securities" shall mean and refer to the following securities:

   a. Washington Mutual Preferred Funding (Cayman) I Ltd. 7.25% Perpetual Non-Cumulative Preferred Securities, Series A-1 and Series A-2, as described in an offering circular dated February 24, 2006 (the "WaMu Cayman TPS");

   b. Washington Mutual Preferred Funding Trust I Fixed-to-Floating Rate Perpetual Non-Cumulative Trust Securities, as described in an offering circular dated February 24, 2006 (the "WaMu Delaware I TPS");

   c. Washington Mutual Preferred Funding Trust II Fixed-to-Floating Rate Perpetual Non-Cumulative Trust Securities, as described in an offering circular dated December 6, 2006 (the "WaMu Delaware II TPS");

   d. Washington Mutual Preferred Funding Trust III Fixed-to-Floating Rate Perpetual Non-Cumulative Trust Securities, as described in an offering circular dated May 21, 2007 (the "WaMu Delaware III TPS"); and

   e. Washington Mutual Preferred Funding Trust IV Fixed-to-Floating Rate Perpetual Non-Cumulative Trust Securities, as described in an offering circular dated October 18, 2007 (the "WaMu Delaware IV TPS").

11. "You", "Your", or "WMI" mean and refer to Washington Mutual Inc., any current or former parent, affiliates or subsidiaries, or any of their members, officers, directors, representatives, employees, agents, consultants, accountants, attorneys, financial advisors, predecessors, successors, assigns and any other person currently or formerly acting or purporting to act on WMI's behalf for any purpose whatsoever.

12. Unless otherwise defined herein, capitalized terms shall bear the meanings ascribed thereto in the Disclosure Statement and/or Plan, as applicable.

## II. TOPICS OF INQUIRY

1. The current ownership of the Trust Preferred Securities.

2. Any purported "Conditional Exchange" of the Trust Preferred Securities.

3. The Downstream Undertaking.

4. Any and all communications between WMI and/or WMB, the OTS and/or the FDIC regarding the Trust Preferred Securities and/or any assets associated with the Trust Preferred Securities.

5. Communications between WMI and/or WMB and any other party regarding the purported occurrence of a "Conditional Exchange."

6. Any purported transfer of the Trust Preferred Securities from Washington Mutual, Inc. to Washington Mutual Bank.

7. Any purported transfer of the Trust Preferred Securities to JPMorgan Chase Bank.

8. The underwriting, offering and/or issuance of the Trust Preferred Securities.

9. Preparation of the offering circulars prepared in connection with the offering of each of the Trust Preferred Securities.

10. The current administration and/or servicing of the collateral pool underlying the Trust Preferred Securities.

11. Communications between WMI and investors in the Trust Preferred Securities.

12. The strategic decisions of WMI and/or WMB with regard to mortgage lending between 2003 and 2008.

13. Subprime lending operations of WMI and/or WMB, including but not limited to the lending operations of Long Beach Mortgage Company ("Long Beach").

14. Mortgage underwriting practices and procedures of WMI and/or WMB.

15. Compensation systems of Long Beach and/or WMB loan processing personnel and/or sales associates.

16. The due diligence performed by JPMC regarding any attempt to acquire, merge with, or invest in WMI or WMB during 2008, or thereafter.

17. The assets of WMB purportedly acquired by JPMC on or after September 25, 2008.

18. The determination of the amount of the bid submitted by JPMC to the FDIC for the purchase of WMB assets.

19. Negotiation of the terms of the Global Settlement Agreement and/or the Plan.

20. The purported "Settlement with the REIT Series Holders" referenced in Section I.C.8 of the Debtors' Disclosure Statement, including but not limited to the negotiation of that "settlement" and the identity(ies) of the party(ies) claimed to have negotiated that "settlement."

21. The treatment of the Trust Preferred Securities under the Global Settlement Agreement and/or the Plan.

22. Any investigation and/or analysis performed by WMI relating to the Global Settlement Agreement and/or the Plan.

23. Any analysis or investigation of claims performed by WMI related to the Global Settlement Agreement and/or the Plan.

24. Any valuation performed by WMI related to the Global Settlement Agreement and/or the Plan.

25. The releases, exculpations and/or injunctions proposed to be granted or issued under the Global Settlement Agreement and/or the Plan, including but not limited to the negotiation of such releases, exculpations and/or injunctions and the identity(ies) of the party(ies) claimed to have negotiated those releases, exculpations and/or injunctions.

26. The allocation of the Tax Refunds under the Global Settlement Agreement.

27. The Debtors' conclusions as to the "substantial expense of litigating the issues" as that phrase is used in Section I.C. of the Disclosure Statement.

28. The Debtors' conclusions as to the "complexity and uncertainty involved" as that phrase is used in Section I.C. of the Disclosure Statement.

29. The Debtors' conclusions as to the "length of time necessary to resolve each of the issues presented in the pending litigation" as that phrase is used in Section I.C. of the Disclosure Statement.

30. The Debtors' conclusions as to "the existence of potential additional claims and causes of action of the Debtors and the Debtors' chapter 11 estates against JPMC" as that phrase was used in Section I.C. of the Disclosure Statement.

31. Any analysis and/or "business judgment" and/or determination "that the benefits of settling with the JPMC entities, the FDIC Receiver, FDIC Corporate, and the other parties to the Global Settlement Agreement far outweigh any gains likely to be achieved by continuing litigation with such parties" as stated in Section I.C of the Disclosure Statement.

32. The Debtors' understanding or knowledge of "claims against the Debtors and JPMC arising out of, related to, or resulting from, among other things, the issuance or assignment of the Trust Preferred Securities or any commitment, disclosure or non-disclosure with respect thereto, the declaration of any Exchange Event, the assignment of the Trust

Preferred Securities subsequent thereto, and any and all claims in any way related to the Trust Preferred Securities or the REIT Series . . ." as that phrase is used in Section I.C.8. of the Disclosure Statement.

33. Any conflicts of interest of professionals for the Debtors, including without limitation, information related to: (a) conflicts of interest of Weil Gotshal & Manges LLP in these chapter 11 cases; (b) the participation of Weil Gotshal & Manges LLP in negotiating the Global Settlement Agreement and/or the Plan; and (c) the participation of Quinn Emanuel Urquhart & Sullivan, LLP (or any other party claimed to have acted on behalf of the Debtors) in such negotiations.