**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| WASHINGTON MUTUAL, INC., et al., ) | Case No. 08-12229 (MFW) |
| ) | |
| Debtors. ) | Jointly Administered |
| _____) | |
| ) | |
| BLACK HORSE CAPITAL LP et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Adv. No. 10-51387 (MFW) |
| v. ) | |
| ) | |
| JPMORGAN CHASE BANK, N.A. et al. ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## OPINION[1]

Before the Court are cross motions for partial summary judgment filed by the parties in the above-captioned adversary. For the reasons stated below, the Court will grant the motions of the Defendants and deny the motion of the Plaintiffs for summary judgment.

I.  BACKGROUND

Washington Mutual, Inc. ("WMI") was a savings and loan holding company, which held inter alia, all of the stock of Washington Mutual Bank ("WMB"). In February 2006, a subsidiary of WMB, University Street, Inc. ("University") created a new

---

[1] This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

subsidiary called Washington Mutual Preferred Funding LLC ("WMPF"). University and WMB then transferred to WMPF portfolios of home equity and other mortgage loans in exchange for all the WMPF common stock and WMPF preferred securities, respectively. WMPF then transferred the loan assets to statutory trusts in exchange for certificates entitling it to payments of principal and interest on the loans. The WMPF preferred securities paid dividends based on distributions from the trusts. In five similarly-structured issuances between March 2006 and October 2007, the trusts issued approximately $4 billion in Trust Preferred Securities (the "TPS") which were sold to qualified institutional buyers pursuant to private placements. Each series of TPS was evidenced by a global certificate registered in the name of and held by a custodian of the Depository Trust Company.

Each series of TPS had a feature that provided that if the Office of Thrift Supervision (the "OTS") determined that WMB had become undercapitalized or would become undercapitalized in the near term or that WMB had been placed in a receivership or conservatorship (defined as an "Exchange Event"), then the OTS could direct that the TPS be transferred to WMI in exchange for new Depositary Shares (the "Conditional Exchange"). (McIntosh Decl. at Exs. 3A & 4A.) The Depositary Shares were to be issued to WMI in exchange for WMI Preferred Shares. (Id.) In order to obtain the agreement of the OTS to the issuance of the TPS and

their treatment as core capital for WMB, WMI agreed that if it acquired the TPS as a result of a Conditional Exchange, then WMI would contribute the TPS to WMB. (Id. at Exs. 5C, 5E, 5G, 5H.)

On September 7, 2008, as its financial condition worsened, WMB entered into a memorandum of understanding with the OTS (the "MOU") pursuant to which the OTS explicitly limited WMB's ability to declare a dividend. (Id. at 7A, §2(B).) On September 25, 2008, the OTS concluded that based on the MOU's limitations on WMB's ability to pay dividends, an Exchange Event had occurred and directed the Conditional Exchange of the TPS. (Id. at Ex. 6A.) WMI responded to that directive on September 25, 2008, advising that it would issue a press release on September 26, 2008, announcing that the Conditional Exchange would occur as of 8:00 a.m. Eastern time on that date. (Id. at Ex. 6B.) WMI also executed an assignment to WMB of all of WMI's entitlements to the TPS. (Id. at Ex. 7B.)

On that same day, September 25, 2008, the OTS seized WMB and appointed the Federal Deposit Insurance Corporation (the "FDIC") as receiver. Immediately after its appointment as receiver, the FDIC sold substantially all of the assets of WMB to JPMorgan Chase Bank, N.A. ("JPMC") for approximately $1.9 billion and assumption of certain of WMB's liabilities. (Id. at Exs. 7C & 7D.)

At 7:45 a.m. Eastern time on September 26, 2008, WMI issued

3

a press release announcing, inter alia, that an Exchange Event had occurred and that consequently the Conditional Exchange would occur at 8:00 a.m. Eastern time on that date resulting in the automatic exchange of the TPS for Depositary Shares tied to WMI Preferred Shares. (Id. at Ex. 6C.)

Later that same day, September 26, 2008, WMI filed a petition for relief under chapter 11 of the Bankruptcy Code. During the course of the bankruptcy case, disputes arose between WMI and JPMC regarding the ownership of certain assets, including the TPS. Ultimately a Global Settlement was reached between them (and the FDIC and other parties) which has been incorporated into the Debtors' Sixth Amended Joint Plan of Reorganization (the "Plan").

After the announcement of the Global Settlement, the Plaintiffs[2] filed a complaint against WMI and JPMC seeking, inter alia, a declaration that the TPS were still owned by the investors and did not belong to WMI or JPMC. On September 7, 2010, the Court stayed litigation of certain of the counts of the Complaint and permitted the parties to conduct discovery and file dispositive motions with respect to Counts I through VI.[3] The

---

[2] The Plaintiffs are approximately 30 institutional investors who acquired the TPS. Most of the acquisitions were made after September 26, 2008.

[3] The Plaintiffs have subsequently withdrawn Count III of the Complaint.

4

parties agreed that those counts had to be determined (by dispositive motions or trial) before the Debtors could proceed with confirmation of the Plan. The parties filed cross motions for summary judgment which were fully briefed by November 24, 2010. The matter is ripe for decision.

II. JURISDICTION

This Court has jurisdiction over the adversary, which is a core proceeding pursuant to 28 U.S.C. §§ 1334 & 157(b)(2)(A), (B), (K), (M) & (O).

III. DISCUSSION

A. Standards for Summary Judgment

Rule 7056 of the Federal Rules of Bankruptcy Procedure incorporates Rule 56 of the Federal Rules of Civil Procedure in adversary proceedings.

In considering a motion for summary judgment under Rule 56, the court must view the inferences from the record in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Hollinger v. Wagner Mining Equip. Co., 667 F.2d 402, 405 (3d Cir. 1981). If there does not appear to be a genuine issue as to any material fact and on such facts the movant is entitled to judgment as a matter of law, then the court shall enter judgment in the movant's favor. See, e.g.,

5

Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986); Carlson v. Arnot-Ogden Mem'l Hosp., 918 F.2d 411, 413 (3d Cir. 1990).

The movant bears the burden of establishing that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585 n.10 (1986); Integrated Water Res., Inc. v. Shaw Envtl., Inc. (In re IT Group, Inc.), 377 B.R. 471, 475 (Bankr. D. Del. 2007). A fact is material when it could "affect the outcome of the suit." Anderson, 477 U.S. at 248.

Once the moving party has established a prima facie case in its favor, the non-moving party must go beyond the pleadings and point to specific facts showing more than a scintilla of evidence that there is a genuine issue of fact for trial. See, e.g., Anderson, 477 U.S. at 252; Matsushita, 475 U.S. at 585-86; Michaels v. New Jersey, 222 F.3d 118, 121 (3d Cir. 2000); Robeson Indus. Corp. v. Hartford Accident & Indem. Co., 178 F.3d 160, 164 (3d Cir. 1999). If the moving party offers only speculation and conclusory allegations in support of its motion, the burden is not met. See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999). Therefore, when the court determines that the non-moving party has presented no genuine issue of fact, summary judgment may be granted. See Matsushita, 475 U.S. at 587.

In this case, all parties agree that summary judgment is

appropriate with respect to Counts I and II of the Complaint because they require only the consideration of contract language and legal principles. See, e.g., Amadeus Global Travel Distrib., S.A. v. Orbitz, LLC, 302 F. Supp. 2d 329, 334 (D. Del. 2004) (concluding that under Delaware law, the interpretation of contracts is "a matter of law for the court to determine."); Quintus Corp. v. Avaya, Inc. (In re Quintus Corp.), 353 B.R. 77, 82 (Bankr. D. Del. 2006) ("Summary judgment is proper where contract language is unambiguous and favors the interpretation advanced by the movant.").

    B.    Counts I & II: Conditions Precedent

The Plaintiffs contend that the Conditional Exchange never occurred because of the failure of certain conditions precedent, which were required under the applicable agreements or under Delaware law. The Defendants respond that there were no conditions precedent to the occurrence of the Conditional Exchange that had not, in fact, occurred. The parties agree that there are no material issues of fact in dispute and that the determination of this issue depends on an interpretation of the operative agreements and applicable law.

"Conditions precedent 'are not favored in contract interpretation because of their tendency to work a forfeiture.'" AES Puerto Rico, L.P. v. Alstom Power, Inc., 429 F. Supp. 2d 713, 717 (D. Del. 2006) (citing Stoltz v. Realty Co. v. Paul, No. Civ.

7

S. 94C-02-208, 1995 WL 654152, at *9 (Del. Super. Sept. 20, 1995)). Therefore, conditions precedent must be expressly stated in a contract to be given force. Castle v. Cohen, 840 F.2d 173, 177 (3d Cir. 1988).

    1.   Terms of the Agreements

The Plaintiffs contend in Count I of the Complaint that, under the express terms of the Exchange Agreements, the Conditional Exchange could not occur until (i) WMI issued new Preferred Shares and deposited them with the Depositary, (ii) the Depositary issued new Depositary Shares and transferred the Depositary Shares to WMI and (iii) WMI then exchanged those Depositary Shares for the TPS. The Defendants contend that those steps were not conditions precedent to the occurrence of the Conditional Exchange but were merely ministerial steps that would a fortiori occur after the Conditional Exchange. Instead, the Defendants argue that the only actual conditions precedent to the occurrence of the Conditional Exchange were (i) the determination by the OTS that an Exchange Event had occurred and (ii) the direction by the OTS that the Conditional Exchange occur.

There is no dispute that an Exchange Event[4] occurred on

---

[4] An Exchange Event was defined in both the Exchange Agreements and the Trust Agreements to include:
    when . . . WMB becomes undercapitalized under the OTS' "prompt corrective action" regulations . . . , WMB is placed into conservatorship or receivership, or . . . the OTS, in its sole discretion, anticipates WMB becoming undercapitalized in the near term or takes a

8

September 7, 2008, as a result of the MOU whereby WMB's ability to declare a dividend was restricted. Nor is it disputed that the OTS directed on September 25, 2008, that the Conditional Exchange occur. The Court concludes that under the express terms of the agreements those were the only conditions that needed to occur for the Conditional Exchange to be effective.

The Trust Agreements with respect to each TPS series provided:

> If the OTS so directs upon the occurrence of an Exchange Event, <u>each [TPS] then outstanding shall be exchanged automatically</u> for a Like Amount of newly issued [Depositary Shares tied to WMI Preferred Shares] (the "Conditional Exchange").

(McIntosh Decl., Exs. 3A-3E, §4.08(a) (emphasis added).)

The Trust Agreements expressly state the effect of the Conditional Exchange and make it clear that it automatically divests the TPS holders of any more rights in the TPS and converts them to interests only in Depositary Shares that reflect WMI Preferred Shares:

> As of the time of the Conditional Exchange, . . . all rights of the exchanging Holders of [TPS] as beneficiaries of the Trust shall cease, and such Persons shall be, for all purposes, solely holders of [Depositary Shares tied to WMI Preferred Shares], and WMI shall be the holder of all outstanding TPS.

(<u>Id.</u> at Ex. 3A-3E, §4.08(b).)

---

> supervisory action that limits the payment of dividends by WMB, and in connection therewith, directs a Conditional Exchange.

(<u>Id.</u> at Exs. 3A-3E, §1.01; Exs. 4A-4E at 3.)

9

The Plaintiffs argue, however, that the language of the Trust Agreements is not relevant, because they are not the operative agreements. The Plaintiffs argue instead that the Exchange Agreements executed by WMI and the Trusts are the operative agreements. The Plaintiffs cite to section 3 of the Exchange Agreements which they argue provide additional conditions to the occurrence of the Conditional Exchange:

> If at any time after the issuance and sale of the [TPS], the OTS directs in writing that the [TPS] be exchanged into a like amount of [Depositary Shares tied to WMI Preferred Shares] following the occurrence of an Exchange Event, then:
> (a) each holder of [TPS] shall be unconditionally obligated to surrender to WMI any certificate representing the [TPS] . . . ;
> (b) WMI shall immediately and unconditionally issue [WMI Preferred Shares] and deposit such shares with the Depositary;
> (c) effective on the date and time of the Conditional Exchange, [the registrar] shall record, or cause to be recorded, in the Register WMI as the owner of all of the [TPS] . . . ; and
> (d) upon receipt of the [WMI Preferred Shares], the Depositary shall issue a like kind of . . . Depositary Shares and, in turn, WMI shall deliver such receipts to the holders of record of the [TPS] upon surrender of the certificates representing the [TPS].

(See id. at Ex. 4A, § 3.)

Specifically, the Plaintiffs contend that the obligations of WMI to issue new Preferred Shares and exchange them for Depositary Shares were conditions precedent to the occurrence of the Conditional Exchange. Because WMI never issued new Preferred Shares or exchanged them for Depositary Shares, the Plaintiffs contend that the Conditional Exchange never occurred.

The Court disagrees. Under the express terms of the applicable Agreements, the Conditional Exchange occurred <u>automatically</u> once the OTS declared that an Exchange Event had occurred and directed that the Conditional Exchange occur. Further, the Depositary Shares are defined in the Trust Agreements as "depositary shares <u>issuable</u> upon a Conditional Exchange. . . ." (Id. at Ex. 3A, §1.01 (emphasis added).) This suggests that they would not be issued until after the Conditional Exchange occurred.[5]

In addition, even the Exchange Agreements on which the Plaintiffs rely specifically contemplate that the Conditional Exchange will be effective without the issuance of the WMI Preferred Shares or the Depositary Shares. The Exchange Agreements provide that: "Until receipts evidencing the . . . Depositary Shares are delivered or in the event such replacement receipts <u>are not delivered</u>, any certificates previously representing the [TPS] <u>shall be deemed</u> for all purposes to represent . . . Depositary Shares." (Id. Ex. 4A, § 3 (emphasis added).) This is consistent with the Trust Agreements which provide that:

> Until replacement certificates representative of [Depositary Shares tied to WMI Preferred Shares] are delivered or in the event such replacement certificates

---

[5] While the WMI Preferred shares were not issued, WMI did designate authorized shares to be issued "if and only if a Conditional Exchange occurs." (McCombs Decl., Exs. 2A-2E, § 1.)

11

> are not delivered, any certificates previously
> representing [TPS] <u>shall be deemed</u> for all purposes to
> represent [Depositary Shares tied to WMI Preferred
> Shares].

(<u>Id.</u> at Ex. 3A, §4.08(c) (emphasis added).)

This interpretation of the Agreements is consistent with the language of the offering Circulars for the TPS, which expressly disclosed the automatic and unconditional nature of the exchange on the front cover: "If the [OTS] so directs following the occurrence of an Exchange Event as described herein, each [TPS] will be <u>automatically exchanged</u> for [WMI Preferred Shares]." (<u>Id.</u> at Ex. 1A at cover page (emphasis added).) Further, inside the Circulars, it was disclosed that:

> once the OTS directs a Conditional Exchange after the
> occurrence of an Exchange Event, no action will be
> required to be taken by holders of [TPS], by WMI, by
> WMB (other than to inform the OTS), by [WMPF] or by
> WaMu Delaware in order to effect <u>the automatic exchange
> as of the time of exchange</u>. After the occurrence of
> the Conditional Exchange, the [TPS] will be owned by
> WMI.

(<u>Id.</u> at Ex. 1A at 64 (emphasis added).)

Therefore the Court concludes that there were no conditions precedent to the Conditional Exchange that did not occur. The Court finds that all of the operative documents expressly evidence that the Conditional Exchange would occur automatically once the OTS directed that the Conditional Exchange occur, even without the delivery of new WMI Preferred Shares or Depositary Shares tied to the new WMI Preferred Shares. Neither the Trust

12

Agreements nor the Exchange Agreements expressly state that the acts identified by the Plaintiffs were conditions precedent to the effectiveness of the Conditional Exchange. In fact, the acts could only occur after the Conditional Exchange became effective. Under the plain language of the Trust Agreements, the Conditional Exchange automatically occurred on September 26, 2008. (Id. at Ex. 3A-3E, § 4.08(b); Ex. 6(C).) Therefore, under the express language of the Trust Agreements and the Exchange Agreements, the Court concludes that the certificates held by the TPS holders are no longer TPS but are deemed to be Depositary Shares tied to WMI Preferred Shares. (Id. at Exs. 3A-3E, § 4.08(b) & (c); Exs. 4A-4E, § 3.)

       2. <u>Delaware Law</u>

The Plaintiffs contend in Count II of the Complaint that the physical delivery of new certificates of ownership was nonetheless required to effectuate a transfer of the TPS under Delaware law. 6 Del. C. § 8-301. Because the TPS certificates have never been delivered to WMI, the Plaintiffs contend that WMI does not have title to the TPS.

The Court disagrees. First, Article 8 does not provide the exclusive means by which ownership of securities can arise. 6 Del. C. §8-302 cmt. 2 (2010) ("Article 8 is also not a comprehensive codification of all of the law governing the creation or transfer of interest in securities."); 17 Williston

13

on Contracts § 51:40 (4th ed.) ("[W]hile the [UCC] provides that 'upon delivery,' the purchaser acquires the transferor's rights, this does not mean that a person can acquire an interest in a security only by delivery. Revised Article 8 is not a comprehensive codification of all of the law governing the creation or transfer of interests in securities."). See also Kallop v. McAllister, 678 A.2d 526, 529 (Del. 1996) (noting that "Article 8 of the UCC . . . did not preclude the validity of a stock transfer accomplished by methods that are not listed" in that article and acknowledging that other methods recognized by law may be used to transfer ownership in securities.).

Further, the UCC expressly allows parties to vary its provisions by contract. 6 Del. C. § 1-302(a) cmt. 1 (2010)("an agreement can change the legal consequences that would otherwise flow from the provisions of the Uniform Commercial Code."). In this case, the Exchange Agreements do exactly that: they provide that the ownership of the TPS will occur automatically, even before delivery of new certificates, upon the direction of the OTS after the occurrence of an Exchange Event. (McIntosh Decl. at Ex. 4A , §§ 2 & 3.) Therefore, the Court concludes that the transfer was effective notwithstanding the lack of physical delivery of new certificates of ownership.

In addition, section 8-301 on which the Plaintiffs rely does not even apply to the transfer at issue because the transfer was

not a sale of a security to a purchaser but instead was an involuntary automatic transfer. 6 Del. C. § 8-302 cmt. 2 (2010) (Article 8 does not apply to transfers by operation of law because they are not voluntary). See also, United States v. Seattle-First Nat. Bank, 321 U.S. 583, 587-88 (1944) (finding that the transfer of securities by operation of law must be evaluated by the "immediate mechanism by which the transfer is effective," not its general background). Therefore, while the initial issuance and purchase of the TPS might have been a voluntary transaction, it does not result in the Conditional Exchange being voluntary.

    C. <u>Misrepresentation and Fraud Allegations</u>

The Plaintiffs contend that the Debtors committed a fraud by failing to disclose to the TPS investors that WMI had agreed to transfer the TPS to WMB in the event that they were transferred to WMI as the result of a Conditional Exchange. The Defendants respond that (1) the Plaintiffs suffered no damages as a result of the alleged failure of disclosure, (2) many of the current TPS holders have no standing to assert this claim because they were not original buyers of the TPS (and in fact bought them after the Conditional Exchange had already occurred), and (3) at most the Plaintiffs would have a subordinated claim equivalent to an equity interest pursuant to section 510(b).

The Court agrees with the Defendants that the Plaintiffs can

prove no damages resulting from the alleged misrepresentations. It is significant that nowhere in the agreements or offering circulars was there any restriction on what WMI could do with the TPS once it received them on a Conditional Exchange. Specifically absent is any restriction on WMI contributing the TPS to its subsidiary WMB. In fact, the Defendants argue that it could have been anticipated that if the OTS took the extreme step of directing a Conditional Exchange because WMB was in financial trouble, the OTS would have required that WMI provide financial support to WMB including contribution of the TPS to WMB. Therefore, the Plaintiffs cannot establish that there was any misrepresentation that WMI would retain the TPS if it got them in the Conditional Exchange.

Further, the Defendants presented evidence that 26 of the 30 Plaintiffs bought their TPS after the Conditional Exchange occurred. (McIntosh Decl. at Ex. 13A, 3-16.) Therefore, those Plaintiffs cannot prove that they relied on any alleged representation that the TPS would not be transferred after WMI acquired them or were misled by the failure of WMI to disclose the agreement to contribute the TPS to WMB in the event a Conditional Exchange occurred.

The Court agrees further that, even if the Plaintiffs had a claim for fraud or misrepresentations relating to the issuance of the TPS, such claims would be subordinated to the claims of all

16

creditors under section 510(b).  Section 510(b) provides that

> a claim arising from rescission of a purchase or sale
> of a security of the debtor or of an affiliate of the
> debtor, for damages arising from the purchase or sale
> of such a security . . . shall be subordinated to all
> claims or interests that are senior to or equal the
> claim or interest represented by such security, except
> that if such security is common stock, such claim has
> the same priority as common stock.

11 U.S.C. § 510(b).

Because the claims asserted by the Plaintiffs relate to the purchase and sale of securities, they must be subordinated to the claims of creditors.  While the Plaintiffs contend that the claims relate to the purchase of the TPS, any potential claims that the Plaintiffs have against the Debtors actually relate to the preferred stock that WMI was to issue to them.  Therefore, the Court concludes that the claims, even if the Plaintiffs had any, would have to be subordinated to the level of preferred stock.

The Defendants also respond that this count must fail because the Plaintiffs are really asserting that the Conditional Exchange is not valid because the actions of the OTS were unlawful and fraudulent.  The Defendants argue that the Plaintiffs lack standing and cannot sue the OTS for any allegedly improper actions.

The Court agrees with the Defendants that the Plaintiffs do not have standing to sue the OTS for any alleged improper actions in declaring an Exchange Event and directing the Conditional

17

Exchange of the TPS. 12 U.S.C. § 1464(d)(1)(A) (providing that only federal savings associations or their officers and directors can sue the OTS to challenge its regulatory decisions). See, e.g., United Liberty Life Ins. Co. v. Ryan, 985 F.2d 1320, 1327 (6th Cir. 1993) (holding that investors in a bank's securities did not have standing to challenge an OTS regulatory decision affecting the bank).

The Plaintiffs cannot avoid this result by suing JPMC and WMI instead. See, e.g., Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 41-42 (1976) (holding that the Constitution "still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court."); Duquesne Light Co. v. U.S. EPA, 166 F.3d 609, 612-13 (3d Cir. 1999) (holding that plaintiffs could not sue federal agency to challenge the regulatory decision of a state agency).

Because the Court finds that the Plaintiffs have not proven any claim for misrepresentation or fraud, the Court will grant summary judgment for the Defendants on Count IV of the Complaint.

E. Equitable Relief

In Counts V and VI, the Plaintiffs argue that the Defendants have "unclean hands" and may not now invoke the Court's equitable powers to effectuate the Conditional Exchange. In

18

addition, the Plaintiffs assert that JPMC was not a bona fide purchaser of the TPS, because it had knowledge of WMI's alleged misrepresentations to the investors. These arguments are based on the premise that the Conditional Exchange did not occur and that the Defendants are asking the Court to provide equitable relief by permitting the Conditional Exchange to occur now.

As stated above, the Court finds that the Conditional Exchange occurred on September 26, 2008. This was a legal determination based on the interpretation of contract language and application of legal principles.[6] The Court is not granting any equitable relief. Therefore, the Plaintiffs' equitable defenses are inapplicable. See, e.g., Gen. Dev. Corp. v. Binstein, 743 F. Supp. 1115, 1133-34 (D.N.J. 1990) (finding that equitable defenses, such as unclean hands, are generally not applicable to bar claims seeking legal remedies). The Court concludes that judgment must be entered in favor of the Defendants on Counts V and VI of the Complaint.

IV. CONCLUSION

For the reasons set forth above, the Court will grant the Defendants' motions for summary judgment and deny the Plaintiffs' motion for summary judgment.

---

[6] At oral argument, Plaintiffs' counsel admitted that "equity has no place today," and that the issue being determined "is a matter of law, and should be resolved as a matter of law." (Hr'g Tr. 12/01/2010 at 55.)

An appropriate order is attached.

Dated: January 7, 2011    BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge